RON BENDER (SBN 143364)
BETH ANN R. YOUNG (SBN 143945)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: rb@lnbyb.com; bry@lnbyb.com; kjm@lnbyb.com

Attorneys for Dream Media Corporation

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>PENTHOUSE GLOBAL MEDIA, INC.,<br><br>Debtor.<br>―――――――――――――――――――<br>In re:<br>PENTHOUSE GLOBAL BROADCASTING, INC.<br>PENTHOUSE GLOBAL LICENSING, INC.<br>PENTHOUSE GLOBAL DIGITAL, INC.<br>PENTHOUSE GLOBAL PUBLISHING, INC.<br>GMI ONLINE VENTURES, LTD.<br>PENTHOUSE DIGITAL MEDIA PRODUCTIONS, INC.<br>TAN DOOR MEDIA, INC.<br>PENTHOUSE IMAGES ACQUISITIONS, LTD.<br>PURE ENTERTAINMENT TELECOMMUNICATIONS, INC., fka For Your Ears Only, Ltd.<br>XVHUB Group, Inc., fka Giant Swallowtail Inc.<br>GENERAL MEDIA COMMUNICATIONS, INC.<br>GENERAL MEDIA ENTERTAINMENT, INC., fka Penthouse Video, Inc.<br>DANNI ASHE, INC.<br>STREAMRAY STUDIOS, INC.,<br><br>Debtors.<br><br>_X_ Affects All Debtors. | Lead Case No.: 1:18-bk-10098-MB<br><br>Jointly administered with:<br>Case No.: 1:18-bk-10099-MB<br>Case No: 1:18-bk-10101-MB<br>Case No: 1:18-bk-10102-MB<br>Case No: 1:18-bk-10103-MB<br>Case No: 1:18-bk-10104-MB<br>Case No: 1:18-bk-10105-MB<br>Case No: 1:18-bk-10106-MB<br>Case No. 1:18-bk-10107-MB<br>Case No. 1:18-bk-10108-MB<br>Case No. 1:18-bk-10109-MB<br>Case No. 1:18-bk-10110-MB<br>Case No. 1:18-bk-10111-MB<br>Case No. 1:18-bk-10112-MB<br>Case No. 1:18-bk-10113-MB<br><br>Chapter 11 Cases<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DREAM MEDIA CORPORATION'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. §362 (PERSONAL PROPERTY)**<br><br>**[Filed concurrently with Motion for Relief; Declarations of Richardson and Abramowitz]**<br><br>Date:     February 14, 2018 |

Time:   10:00 am
Place:  Courtroom 303
        21041Burbank Blvd.
        Woodland Hills CA, 91367

Secured Creditor, Dream Media Corporation ("Dream Media"), hereby submits its Memorandum of Points and Authorities in Support of its Motion for Relief from the Automatic Stay ("Motion"), as follows:

1

# **TABLE OF CONTENTS**

2

3

I. UNDISPUTED FACTS WARRANTING RELIEF FROM THE AUTOMATIC STAY.........3

II. SUMMARY OF EVENTS LEADING UP TO   DEBTORS' COMMENCEMENT OF THESE BANKRUPTCY CASES ....................................................................................5

III. STATEMENT OF FACTS...............................................................................................6

IV. RELIEF FROM THE AUTOMATIC STAY UNDER § 362(d)(1) IS WARRANTED FOR CAUSE ...........................................................................................................................9

V. RELIEF FROM THE AUTOMATIC STAY UNDER § 362(d)(2) IS WARRANTED TO ALLOW DREAM MEDIA TO FORECLOSE ON ITS COLLATERAL..................................13

   A.    Dream Media has a Perfected Security Interest in the Collateral...................................14

   B.    The Debtors Have No Equity in the Collateral ............................................................14

   C.    The Collateral Is Not Necessary To An Effective Reorganization ...............................16

VI. CONCLUSION..............................................................................................................18

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Dynaco Corp.,*
  162 B.R. 389 (1993) ........................................................................ 12, 13

*In re Holly's Inc.,*
  140 B.R. 643 (Bankr W.D. Mich. 1992) ........................................... 16, 17

*Idaho v. Arnold (In re Arnold),*
  806 F.2d 937 (9th Cir. 1986) ................................................................. 10

*La Jolla Mortgage Fund v. Ranch El Cajon Associates,*
  18 B.R. 283 (Bankr. S.D. Ca. 1982) ...................................................... 14

*Laguna Associates Ltd. Partnership v. Aetna Casualty & Sur. Co. (In re Laguna
  Associates Ltd. Partnership),*
  30 F.3d 734 (6th Cir. 1994) .................................................................... 10

*Matter of Little Creek Dev. Co.,*
  779 F.2d at 1072–73 ............................................................................... 11

*Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (Matter of Little Creek
  Dev. Co.),*
  779 F.2d 1069, 1071-72 (5th Cir. 1986) ........................................... 10, 11

*In re Mack,*
  347 B.R. 911 (Bankr. M.D. Fla. 2006) ..................................................... 9

*In re Mense and Cottonsmith, LLC,*
  509 B.R. 269 (Bankr.C.D. Cal. 2014) ..................................................... 10

*Pistole v. Mellor (In re Mellor),*
  734 F.2d 1396 (9th Cir. 1984) ................................................................ 14

*In re Preuss,*
  15 B.R. 896 (B.A.P. 9th Cir. 1981) ......................................................... 14

*Stewart v. Gurley (In re Gurley),*
  745 F.2d 1194-96 (9th Cir. 1984) ........................................................... 14

*In re Sun Valley Newspapers, Inc.,*
  171 B.R. 71 (1994) ............................................................................ 16, 17

*Sutton v. Bank One, Texas National Association (In re Sutton),*
  904 F.2d 327 (5th Cir. 1990) .................................................................. 14

*Trident Assocs. v. Metropolitan Life Ins. Co. (In re Trident Assocs.)*,
 52 F.3d 127 (6th Cir. 1995) ................................................................................ 10

*In re Tucson Estates, Inc.*,
 912 F.2d 1162 (9th Cir. 1990) .............................................................................. 9

*United Savings Ass'n of Tex. V. Timbers of Inwood Forest Assocs., Ltd.*,
 484 U.S. 365 (1988) ............................................................................................ 16

*In re Wilson*,
 116 F.3d 87 (3d Cir. 1997) .................................................................................. 9

**Federal Statutes**

11 U.S.C.
 § 362(d) ............................................................................................................. 10
 § 362(d)(1) .............................................................................................. 4, 9, 10, 11
 § 362(d)(2) ................................................................................................. 4, 13, 17

# I.

## UNDISPUTED FACTS WARRANTING RELIEF FROM THE AUTOMATIC STAY

A few critical, undisputed facts cannot go unnoticed, all of which support entry of an order granting relief from the automatic stay to permit Dream Media to proceed under applicable non-bankruptcy law to enforce its remedies to repossess and sell the Collateral that secures Dream Media's loans to the Debtors:

1. Debtors filed their bankruptcy petitions on the eve of the hearing on Dream Media's *ex parte* application for the appointment of a Receiver over each of the Debtors in the pending State Court Action (defined below).

2. Debtors' Petitions at Item 13 expressly provide that "[a]fter administrative expenses[1] are paid, no funds will be available for distribution to unsecured creditors," making any attempt at reorganization unlikely, if not impossible, and certainly not feasible.

3. Debtors have failed to file any schedules or statements of financial affairs, and virtually no case commencement documents other than the Petitions.[2]

4. Debtors concede in their Motion for Joint Administration [Docket No. 15] that Debtors' secured creditor has a blanket lien on all of Debtors' assets. Thus, there are no assets of any of the Debtors that are unencumbered or available for use in the reorganization process.

---

[1] In the Cash Flow Statement filed by the Debtors with the Brand Declaration (Docket Nos. 42 and 44), Debtors indicate an intent to pay $300,000 during the next four months at the rate of $75,000 per month for "professional fees." Dream Media does not consent to use of its cash collateral for this purpose, and the Debtors do not have any other source of funds other than Dream Media's cash collateral. It appears that Debtors' rely upon unidentified and not-yet obtained DIP Financing to facilitate Debtors' operations for the next four months, but without this DIP Financing, Debtors have no ability to operate, even if they had consent of Dream Media for use of cash collateral (which they do not). Debtors have insufficient funds to operate and pay $75,000 per month in professional fees in a case where there will be no distribution to unsecured creditors. Indeed, the Cash Flow Statement raises more concerns about the Debtors' income and expenses than it purports to resolve.

[2] Debtors' schedules and statement of financial affairs were due by no later than January 25, 2018, but on January 23, 2018, Debtors filed a motion to extend this deadline to February 23, 2018. (See, Docket No. 41.) Accordingly, at the present time the Court and the estate have no meaningful information regarding the Debtors, their creditors, or the nature of the Debtors' financial condition, and presumably won't for at least another 30 days.

5.  Debtors have no commitment for any post-petition financing, and Dream Media has not consented to Debtors' use of cash collateral, except in very limited circumstances.[3]

6.  Less than two weeks prior to the Debtors' commencement of these bankruptcy cases, Debtors admitted that there was rampant internal and external accounting fraud dating back to at least early 2016, underscoring the lack of any credibility to Debtors' books and records, and the inability of Debtors; management to responsibly operate the Debtors' business.

7.  Debtors lack any equity in the Property which secures Dream Media's loans totaling $10,377,517.49, and with the continuing decline in Debtors' business,[4] Dream Media lacks adequate protection.

8.  This is the third bankruptcy case for Penthouse following the first bankruptcy in 2003 and the second bankruptcy in 2013.

These undisputed facts, either alone or in conjunction with one another, all support a finding of "cause" for relief from stay pursuant to 11 U.S.C. § 362(d)(1).  In addition to having established "cause," Dream Media has also submitted evidence of Debtors' lack of equity in the Property and the Property not being necessary to an effective reorganization, as further discussed below and as supported by the Declarations of Robert Richardson and Paul Abramowitz filed concurrently herewith, and the Declaration of Adam Levin annexed to the Motion, which supports a finding for relief from stay pursuant to 11 U.S.C. § 362(d)(2).

---

[3] Already two weeks into Debtors' bankruptcy cases, and still no motion for use of cash collateral has been filed, and no motion for approval of any alternative post-petition financing has been requested, although Debtors have (mis)represented on its Cash Flow Statement that it has "DIP Financing" which is not the case at the present time. (See, Docket Nos. 42 and 44) Thus, Debtors' ability to operate post-petition is questionable.

[4] Debtors have admitted losses at the EBITDA level in 2016 of $790,000 and losses continuing through at least July 2017 in the sum of $2,100,000.  (See, Abramowitz Declaration at ¶ 15.)

## II.

## SUMMARY OF EVENTS LEADING UP TO

## DEBTORS' COMMENCEMENT OF THESE BANKRUPTCY CASES

On December 28, 2017, a mere 15 days before commencement of these bankruptcy cases, Catherine Brandt, Chief Operating Officer of Penthouse Global Media, Inc. ("Penthouse"), the parent company of each of the other 14 entities who also filed on the same day their own chapter 11 bankruptcy cases (collectively, with Penthouse, the "Debtors"), had been falsifying all of their internal and external accounting records since at least 2016. (See, Abramowitz Declaration at ¶ 15 and Exhibit "D.")

Dream Media is the only secured creditor of these chapter 11 Debtors, and holds "blanket liens that encumber all of the Debtors in these cases."[5]   While there is a serious question whether Dream Media's predecessor was fraudulently induced to make the loans to Debtors based upon the falsified books and records (which will be an issue to resolve later), there is no question but that the value of Dream Media's collateral is not adequately protected and relief from stay is appropriate.  Indeed, Debtors acknowledge that they will continue to suffer losses during the next four months and have been seeking alternative financing in the sum of $1,000,000 to cover expenses during this time, but nothing has materialized yet.[6] And on each of the 15 petitions filed by the Debtors, Debtors readily admit that "[a]fter administrative expenses are paid, no funds will be available for distribution to unsecured creditors."  Thus, the Debtors' forecast is not encouraging and the purpose of these chapter 11

---

[5] See, Debtors' Motion for Joint Administration, filed January 15, 2018. [Docket No. 15.]

[6] See, Debtors' Cash Flow Statement filed as Exhibit "1" to the Brandt Declaration [Docket no. 42 and 44].  The Brandt Declaration references a "licensing agreement with Androcles Media, LLC," however no such licensing agreement has been entered into post-petition, and certainly not entered into with the approval of the Bankruptcy Court, and in any event, no portion of the $200,000 has been funded or is otherwise available to the Debtors to use.  Moreover, Dream Media has not approved this proposed licensing agreement, or use of its collateral to facilitate this licensing agreement.

1  cases is entirely unclear, but certainly reorganization is not on the immediate horizon and does

2  not seem plausible, probable, or assured, and in all likelihood is impossible.    Accordingly,

3  granting relief from the automatic stay is appropriate at this time.

4  **III.**

5  **STATEMENT OF FACTS**

6  In February, 2016, Penthouse Global Media Inc. ("Penthouse") borrowed the aggregate

7  sum of $9,000,000 (the "Loans") from ExWorks Capital Fund I, L.P. ("ExWorks").[7]    The

8  Loans are secured by Collateral (highly valuable patents, copyrights and trademarks, as well as

9  contract rights, inventory and accounts receivables, plus all additions to substitutions for, and

10  replacements, products and Proceeds of the foregoing property) as outlined in the Loan and

11  Security Agreement.[8]    The Loans were originally scheduled to mature one year later, in

12  February 2017.  However, through certain amendments to the terms of the Loans (as reflected

13  in written modifications), the maturity date was extended to April 30, 2018.  Due to multiple

14  monetary and non-monetary defaults, however, the Loans have been accelerated and are now

15  due and owing.

16  In June 2017, Penthouse failed to make the monthly payment then due and has failed

17  and refused to make any payments on the Loans thereafter.[9]    In September, 2017 ExWorks

[7] On November 21, 2017, pursuant to that certain Assignment and Assumption Agreement between Dream Media and ExWorks, Dream Media acquired all right, title and interest of ExWorks as the Lender, in and to the Loans which are the subject of this action (the "Loan Assignment").    In connection with the Loan Assignment, Dream Media and ExWorks also entered into that certain Assignment of Security Interest in Copyrights ("Security Assignment"), pursuant to which the security interests conveyed by Debtors to ExWorks in connection with the First Note, Second Note and Loan Agreement (as defined below) and as set forth in the Copyright Security Agreement recorded in the United States Copyright Office on March 23, 2016 at Volume 9915, Document Number 493 (the "Copyright Recording") was also assigned to Dream Media.  (See, Abramowitz Declaration at Exhibits "A," "B" and "C.")

[8] A true and correct copy of the pertinent loan agreements are annexed to both the Motion and the Declaration of Andrew Richardson, filed concurrently herewith.

[9] See, Richardson Declaration at ¶ 23 and ¶ 25.

delivered its written Notice of Default to Penthouse and the Loan Party Obligors (defined below), but still no payment was made or resolution reached.[10]  Then, on December 28, 2017, Penthouse made the startling admission that since at least 2016, when ExWorks was induced to make the Loans to Penthouse, Penthouse had been falsifying its internal and external accounting records. (See, Abramowitz Declaration at ¶ 15.)  Accordingly, on January 9, 2018, Dream Media filed its Complaint in the Los Angeles Superior Court[11] commencing a lawsuit to, *inter alia*, recover the unpaid Loans, take possession of the Collateral that secures the Loans, and obtain the appointment of a receiver over Penthouse and the other Loan Party Obligors:[12] GMCI Internet Operations, Inc. ("GMCI"), GMI On-Line Ventures, Ltd. ("GMI"), General Media Communications, Inc. ("General Communications"), General Media Entertainment, Inc. ("General Entertainment"), PMGI Holdings, Inc. ("PMGI"), Penthouse Digital Media Productions Inc. ("PDMP"), Penthouse Images Acquisitions, Ltd. ("PIAL"), Pure Entertainment Telecommunications Inc. ("Pure"), XVHub Group Inc. ("XVHub"), Danni Ashe, Inc. ("Danni Ashe"), Streamray Studios, Inc. ("Streamray"), Tan Door Media, Inc. ("Tan Door") and Penthouse Global Licensing, Inc. ("PGLI"), collectively referred to herein as the "Loan Party Obligors," and with Penthouse, collectively, the "Debtors."  However, on the eve of the hearing on the *ex parte* application for the appointment of a Receiver, the Debtors commenced their chapter 11 bankruptcy cases, thereby derailing Dream Media's request for the appointment of a receiver, and putting at risk the protection and preservation of the Collateral that a Receiver would have provided.

---

[10] See, Richardson Declaration at ¶ 24 and ¶ 25.

[11] The lawsuit filed on January 9, 2018 against the Debtors by Dream Media in the Los Angeles Superior Court bears Case No. BC 689593 (the "State Court Action").

[12] The Loan Party Obligors are all subsidiaries of Penthouse, and like Penthouse, have granted to Dream Media a continuing security interest in all of the property of each of the Loan Party Obligors, including the valuable copyrights, patents, trademarks, inventory, and accounts (as described in greater detail in the Loan Agreement).

Given not just the substantial monetary defaults that exist under the Loans, but the admission by the Chief Operating Officer of Penthouse that during at least the last two years, there have been "significant discrepancies within its accounting department," Dream Media has substantial concerns about not only the day to day operations of the Debtors, but also the protection of the Collateral.  The commencement of these chapter 11 bankruptcy cases does not allay these concerns or address the admitted rampant internal accounting fraud or provide any certainty that the accounting fraud has stopped.

Apparently, after uncovering the internal fraud months earlier, Catherine Brandt, Penthouse's newly appointed Chief Operating Officer, revealed in a December 28, 2017, email communication to Dream Media in an attached document entitled, "Penthouse Global Media Overview 2017 – 2020" the following alarming admissions regarding Penthouse's on-going fraud in both its internal and external accounting and financial reporting:

a. "PGMI [Penthouse] ownership uncovered significant discrepancies within its accounting department in the summer of 2017."

b. "The issues included inaccurate internal and external financial reporting."

c. "A restatement of the financial statements showed losses at the EBITDA level: 2016 ($790k); 2017 though July ($2.1 million)."

(See, Abramowitz Declaration at ¶ 15 and Exhibit "D".)

The actual scope of the accounting fraud which Ms. Brandt down-plays as "discrepancies" have not been explained in any manner, but the admission that Penthouse has suffered losses in 2017 at least $2,100,000 speaks volumes and requires a detailed accounting to not only explain the variances but also protect the assets which serve as Collateral for Plaintiff's Loans.[13]  While the admissions by Ms. Brandt on behalf of Penthouse are troubling,

---

[13] It may be that Penthouse's admission of the fraudulent accounting constitutes a crime, and of course there will be a further investigation in that regard. Indeed, it would be a further Event of

the admissions do not fully explain the magnitude of the fraud, or instill confidence that Penthouse is now properly operating with any degree of accuracy. Indeed, the converse is true.

Debtors, and each of them, are currently indebted to Dream Media under the Loan Agreement and certain amendments thereto, for an amount of at least $10,377,517.49 (the "Indebtedness") as of January 8, 2018,[14] and the value of the Collateral as of the Petition Date is only $6,000,000.[15]  Therefore, Dream Media is undersecured and the Debtors lack any equity in the Collateral.  Moreover, given the negative cash flow of the Debtors and the fact that Debtors do not have sufficient funds to make the monthly loan payments to Dream Media, Dream Media lacks adequate protection.  Thus, relief from stay is appropriate given these circumstances.

**IV.**

**RELIEF FROM THE AUTOMATIC STAY UNDER § 362(d)(1)**

**IS WARRANTED FOR CAUSE**

Section 362(d)(1) of the Bankruptcy Code mandates that a court "sRichardson grant relief from stay … for cause." 11 U.S.C. § 362(d)(1). Whether cause exists to grant stay relief is determined on a case-by-case basis based upon the totality of the circumstances in each particular case. *In re Tucson Estates, Inc.*, 912 F.2d 1162, 1166 (9th Cir. 1990); *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997). The totality of the circumstances of a case encompasses how the parties have conducted themselves – their good or bad faith, as well as their motives. *In re Mack*, 347 B.R. 911, 915 (Bankr. M.D. Fla. 2006) ("A debtor who does not act in good faith is

---

Default under the Loan Agreement where there is "any actual or threatened indictment of any Loan Party, any Loan Party's officers, any Other Obligor or any Other Obligor's officers, under any criminal statute or commencement or threatened commencement of criminal or civil proceedings against any such Person."  (See, Loan Agreement at ¶11.1(k).)

[14] See, Richardson Declaration at ¶ 22; Abramowitz Declaration at ¶ 12.

[15] See, Levin Declaration at ¶ 6.

not entitled to continue to enjoy the benefits, such as the automatic stay, afforded by the Bankruptcy Code."). Accordingly, bad faith can constitute cause for lifting the automatic stay under 11 U.S.C. § 362(d). *See In re Mense and Cottonsmith, LLC,* 509 B.R. 269, 276 (Bankr.C.D. Cal. 2014) (the lack of good faith constitutes cause for relief from the automatic stay under § 362(d)(1)); *Idaho v. Arnold (In re Arnold)*, 806 F.2d 937, 939 (9th Cir. 1986) ("The debtor's lack of good faith in filing a bankruptcy petition has often been used as cause for removing the automatic stay."); *Trident Assocs. v. Metropolitan Life Ins. Co. (In re Trident Assocs.)*, 52 F.3d 127, 131 (6th Cir. 1995); *Laguna Associates Ltd. Partnership v. Aetna Casualty & Sur. Co. (In re Laguna Associates Ltd. Partnership)*, 30 F.3d 734, 737-38 (6th Cir. 1994) ("a debtor's lack of good faith in filing a petition for bankruptcy may be the basis for lifting the automatic stay.") (citations omitted).

This Court, in quoting the Fifth Circuit in *Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (Matter of Little Creek Dev. Co.),* 779 F.2d 1069, 1071-72 (5th Cir. 1986), has itself expressly noted:

> "Bankruptcy is an equitable remedy whereby a debtor is clothed with the protection of an automatic stay, preventing his creditors from acting against him for a period of time, in order to facilitate rehabilitation or reorganization of his finances and to promote a 'fresh start' through the orderly disposition of assets to satisfy creditors. Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings. Such a standard furthers the balancing process between the interests of debtors and creditors which characterizes so many provisions of the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy. Requirement of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes. Moreover, a good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons (i.e., avoidance of liens, discharge of debts, marsRichardsoning and turnover of assets) available only to those debtors and creditors with 'clean hands.'"

*In re Mense,* 509 B.R. at 276-277.

The Court in *Little Creek Dev. Co.* identified a number of factors relevant to the analysis of whether a case was commenced in bad faith:

"Findings of lack of good faith in proceedings based on §§ 362(d) or 1112(b) have been predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate of factors rather than on any single datum. Several, but not all, of the following conditions usually exist. The debtor has one asset, such as a tract of undeveloped or developed real property. The secured creditors' liens encumber this tract. There are generally no employees except for the principals, little or no cash flow, and *no available sources of income to sustain a plan of reorganization or to make adequate protection payments pursuant to 11 U.S.C. §§ 361, 362(d)(1), 363(e), or 364(d)(1).* Typically, there are only a few, if any, unsecured creditors whose claims are relatively small. The property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court. *Alternatively, the debtor and one creditor may have proceeded to a stand-still in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford.* Bankruptcy offers the only possibility of forestalling loss of the property. *There are sometimes allegations of wrongdoing by the debtor or its principals.*"

*Matter of Little Creek Dev. Co.,* 779 F.2d at 1072–73. [emphasis added].

Here, in light of the paucity of financial information provided by Debtors along with their Petition, the failure to timely file the Debtors' Schedules and Statement of Financial Affairs, and the total lack of any "first day motions," it seems more likely than not that the Debtors' overriding motive is to delay creditors without benefitting them in any way,[16] which is grounds for "cause" under Section 362(d)(1). In addition to this, there are at least three other *Little* Creek factors met here:

(1)    Debtors have no available source of income to sustain a plan of reorganization or to make adequate protection payments on Dream Media's secured debt, which was accelerated due to numerous monetary and non-monetary defaults since at least June 2017; and which in any event matures on its terms in April 2018.

(2)    Debtors filed their chapter 11 bankruptcy cases on the eve of Dream Media's *ex parte* application for appointment of Receiver in the State Court Action.

---

[16] Debtors have not filed any of the typical first day motions that legitimate operating Debtors might file to keep the business up and running, such as a motion for use of cash collateral and approval of an operating budget, cash management motion, motion for employment of bankruptcy counsel; utilities motions; insider compensation request. Apparently, Debtors are operating without any safeguards in place.

(3)    Debtor has admitted to engaging in falsifying its internal and external books and records since at least 2016, which is not just an allegation of wrongdoing, but an outright admission of wrongdoing.

Because Debtors have not filed any schedules or statement of financial affairs, or even an operating budget, it is hard to get a clear picture of Debtors' creditors, their financial conditions or business operations, but that it is part of the underlying problem as well: a total lack of any meaningful information which would provide a basis to believe that Debtors can operate their business or which would provide any benefit to Debtors' creditors during this substantial period of delay. Certainly, the timing of the filing of the voluntary petitions indicates that they were intended to delay and interfere with Dream Media's *ex parte* application for appoint of a Receiver in the State Court Action. However, whereas the Receiver would have protected and preserved the Collateral for the benefit of Dream Media, the Debtors' bankruptcy is not set up to provide any assurance of adequate protection to the Collateral, particularly where the Debtors' have admitted to rampant internal and external accounting fraud.

In addition to the foregoing, Debtors lack equity in the collateral and Dream Media lacks adequate protection, as concluded in the Declaration of Dale Richards, annexed to the Motion. The pertinent inquiry to ascertain whether Dream Media's security interest is adequately protected requires a determination of the value of Dream Media's interest and whether the Debtors' proposed use of their cash collateral would impair that interest. (*In re Dynaco Corp.*, 162 B.R. 389, 394 (1993).) Adequate protection takes many forms, but "must be determined based upon equitable considerations arising from the particular facts of each proceeding." (*Id.*) In assessing the need for adequate protection:

> If the debtors make a solid showing that their continued operation of their business during the relevant period will pose no serious danger of such a decline,

there is no need for any additional adequate protection in terms of 'new money' to be infused into the enterprise by the equity holders or junior creditors to protect the secured creditor's present position in the collateral. *On the other hand, if the evidence before the Court establishes that a permanent decline in the soft collateral level is likely, the Court generally will require infusion of cash by the investors in the enterprise to assure adequate protection of the security interest involved, under the rubric that the Court not allow the debtors to 'risk other people's money' to salvage their own position.* (Emphasis added.)

(*In re Dynaco Corp.*, 162 B.R. 389, 394 - 395 (1993).)

Debtors admitted that their statements showed losses at the EBITDA level in 2016 of the sum of $790,000 and that in 2017, through only July 2017, the Debtors have sustained losses of $2,100,000.  (See, Abramowitz Declaration at ¶ 15.)  Certainly this is evidence of continued decline which poses a serious danger to Dream Media's present position.  There is no evidence of any stabilization of Debtors' business operations.  Additionally, Debtors have also admitted that after payment of administrative expenses there will be no payment to creditors holding unsecured claims in these cases.  Moreover, there is no indication of any infusion of cash by the equity holders or other interest in investing the Debtors, all while the collateral continues to decline in value.  (See, Levin Declaration at ¶ 7.)  Thus, to permit Debtors' continued operation at the risk of Dream Media's present position and at the risk of Dream Media's Collateral in order to try and salvage equity's position should not be permitted.

Based on a conglomerate of factors outlined above, the Court can easily find that in this case "cause" exists to grant Dream Media relief from stay to proceed with the enforcement of its non-bankruptcy remedies to possess and sell the Collateral.

**V.**

**RELIEF FROM THE AUTOMATIC STAY UNDER § 362(d)(2) IS WARRANTED**

**TO ALLOW DREAM MEDIA TO FORECLOSE ON ITS COLLATERAL**

Under Section 362(d)(2), stay relief <u>must</u> be granted if the debtor lacks equity in property and the property is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(2);

1    *In re Preuss*, 15 B.R. 896, 897 (B.A.P. 9th Cir. 1981). Here, both prongs are met and this Court

2    should grant relief from the automatic stay allowing Dream Media to foreclose on its Collateral

3    which includes all assets of the Debtors, wherever located, whether now owned or existing or

4    hereafter acquired or arising, together with all proceeds thereof, including but not limited to the

5    Patents, Trademarks and Copyrights all of which are outlined in the Exhibits C, D, E, F and G

6    annexed to the Motion (the "Collateral"), because the Debtors do not have equity in the

7    Collateral and it is not necessary for the Debtors' effective reorganization.

8

9    **A.  Dream Media has a Perfected Security Interest in the Collateral.**

10    Dream Media has a perfected first priority lien on all of the Debtors' Collateral. Dream

11    Media's secured interest in the Collateral was duly perfected when ExWorks filed the

12    Financing Statements in California and Delaware, and also when it recorded notices in the U.S.

13    Copyright Office and the U.S. Patent and Trademark Office. (See, Exhibits C, D, E, F and G

14    annexed to the Motion). All of these rights and interests were assigned to Dream Media. (See,

15    Abramowitz Declaration at Exhibits A, B and C.)

16

17    **B.  The Debtors Have No Equity in the Collateral.**

18    For the purpose of determining whether a debtor has equity in property, the court must

19    look to the difference between the value of the property and the total of all encumbrances upon

20    it. *Stewart v. Gurley (In re Gurley)*, 745 F.2d 1194-96 (9th Cir. 1984); *Pistole v. Mellor (In re*

21    *Mellor)*, 734 F.2d 1396, 1400, n.2 (9th Cir. 1984); *La Jolla Mortgage Fund v. Ranch El Cajon*

22    *Associates*, 18 B.R. 283, 290 (Bankr. S.D. Ca. 1982); *Sutton v. Bank One, Texas National*

23    *Association (In re Sutton)*, 904 F.2d 327, 329 (5th Cir. 1990). The movant has the burden of

24    proof with regards to equity and nothing else. *La Jolla Mortgage Fund v. Rancho El Cajon*

25    *Associates*, 18 B.R. 283, 290 (Bankr. S.D. Cal. 1982).

26

27

28

Here, there is no equity in the Collateral.  Indeed, Debtors acquired all of the assets in 2016 for the total price of $6,500,000. [Holland Declaration, ¶ 7 at Docket No. 42.]  In the Debtors' Status Report filed on January 24, 2018 [Docket No. 55], Debtors admit they have no idea what the value of the Collateral is at the present time stating that "[t]he value of those assets is not known with any specificity."  Apparently, in an effort to raise an issue of valuation, Debtors go on in the Status Report to provide that "[a]n appraisal done in late 2014 indicated that the value of the intellectual property was approximately $17,000,000."  Obviously, an appraisal dated in 2014 is outdated and unacceptable as evidence of value four years later.  So there is literally no foundation for such a valuation.  Certainly, the purchase price of $6,500,000 paid in 2016 confirms that the value is not anywhere close to $17,000,000, if it ever was.  Moreover, since Debtors' acquisition in 2016, Debtors sold a large portion of the assets in that certain Club License Transaction reflected in the Second Amendment to Loan Agreement (Exhibit "E" to the Richardson Declaration), thereby reducing the asset pool by the sum of at least $2,000,000, and reducing the cash flow of the company by the sum of $1,500,000 annually, and by extension, the value of the Collateral.  These assets are believed to have been the most valuable part of the Debtors' company, and are now gone.  (See, Levin Declaration at ¶ 5.)

As of January 10, 2018, Dream Media's secured claim against the Debtors' totals at least $10,377,517.49.   Based on Dream Media's valuation, the fair market value of the Collateral is the much lesser sum of $6,000,000.  (See, Levin Declaration at ¶ 6.)  Thus, Dream Media's claims are undersecured by more than $4,700,000.   As indicated by Mr. Levin, the value of the Collateral is declining because of Debtors' mismanagement as evidence by the Debtors' prior fraud and continuing losses, as well as the Debtors' inability to operate its

business effectively, and the Debtors' lack of financial resources to protect and preserve the Collateral.  Thus, Dream Media lacks adequate protection as well.

### C.  The Collateral Is Not Necessary To An Effective Reorganization.

Once the movant has established that the property lacks equity, the burden is on the debtor to establish that an effective reorganization is both feasible and based on more than speculative assumptions and projections to meet its burden under Section 362(d)(2)(B).  Further, a debtor must establish that the property under consideration is necessary to an effective reorganization and that there is a likelihood of a successful reorganization in prospect. *See, United Savings Ass'n of Tex. V. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988).

Where the debtor does not have equity in the property, the dispositive question is whether the property is necessary to an effective reorganization, which means that the debtor is required to establish that "[t]here must be a reasonable possibility of a successful reorganization within a reasonable time." *See, In re Sun Valley Newspapers, Inc.,* 171 B.R. 71, 75 (1994)(quoting *United Savings Ass'n of Tex. V. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 376 (1988).)  The requirement of an "effective reorganization" requires a showing that a proposed or contemplated plan is not patently unconfirmable and has a realistic chance of being confirmed. *Id.* "Courts usually require the debtor to do more than manifest unsubstantiated hopes for a successful reorganization." *Id.*  Although a Court will look at the debtor's burden of proof in four stages,[17] "if the evidence indicates that a successful

---

[17] The four stages, enunciated in the case of *In re Holly's Inc.*, 140 B.R. 643, 700 (Bankr W.D. Mich. 1992) provides that "the burden can be separated into four stages based upon when the creditor requests relief from the automatic stay.  In the early stages of the case, the burden of proof is satisfied if the debtor can offer sufficient evidence to indicate that a successful reorganization within a reasonable time is "plausible." Thereafter, near the end of the expiration of the exclusivity period the debtor must offer evidence to indicate that a successful reorganization within a reasonable time is "probable."  After the expiration of the exclusivity period the debtor must offer sufficient evidence to indicate that a successful reorganization is "assured."  And as indicated above, if the evidence indicates that a successful reorganization

reorganization within a reasonable time is 'impossible,' the court must grant relief from the stay." *Id.*

Here, although the Debtors' cases are in the very early stages, it is clear from not only the Debtors' admission of rampant internal and external accounting fraud but also the Debtors' poor operating history reported by the Debtors[18] after the accounting fraud was disclosed that it will be impossible for the Debtors to effectuate a successful reorganization within a reasonable time. This is underscored by Debtors' admission that after payment of the administrative expenses there will be no funds available for distribution to unsecured creditors. Although no plan has been proposed, it appears that any attempted reorganization here would be for the benefit of insiders, which was expressly rejected by the Court in *Sun Valley* in granting relief from the automatic stay. Indeed, in the Debtors' Status Report, it appears that Debtors "plan" is based upon "adding new capital and entering into long term prepaid licensing agreements." (See, Status Report at page 5, ¶C.) However, without more meaningful information, this looks to be nothing more than a disguised sale; cannot run afoul of Dream Media's security interest in the Collateral; and has little likelihood of success; particularly where the Debtors do not have the financial means or luxury of time to continue operate while these negotiations continue.

Based on the above, it is clear that the estate does not have any equity in the Collateral and it is not necessary for the Debtors' effective reorganization. Based on these reasons, the Court should lift the automatic stay to allow Dream Media to foreclose on the Collateral pursuant to Section 362(d)(2).

---

within a reasonable time is "impossible" the court must grant relief from stay. *In re Holly's Inc.*, 140 B.R. 643, 700 - 703 (Bankr W.D. Mich. 1992).

[18] Debtors reported losses at the EBITDA level in 2016 in the sum of $790,000; and additional lossed in 2017, through only July 2017, in the sum of $2,100,000.  (See, Abramowitz Declaration at ¶ 15.)

# VI.

## __CONCLUSION__

**WHEREFORE**, based on the foregoing, Dream Media respectfully requests that the Court enter an order (i) (a) granting the Motion in its entirety so Dream Media may proceed under applicable nonbankruptcy law to enforce its remedies to repossess and sell the Collateral, or in the alternative, (b) ordering adequate protection if relief from stay is not granted; (ii) granting waiver of any stay of the order prescribed by FRBP 4001(a)(3); and (iii) granting such other and further relief as just and proper under the circumstances.

Dated:  January 24, 2018                    Levene, Neale, Bender, Yoo & Brill L.L.P.


                                   By:___*Beth Ann R. Young*_____
                                        Ron Bender
                                        Beth Ann R. Young
                                        Krikor J. Meshefejian
                                   Attorneys for Dream Media Corporation

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DREAM MEDIA CORPORATION'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. §362 (PERSONAL PROPERTY)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **January 24, 2018**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Krikor J Meshefejian    kjm@lnbrb.com
- S Margaux Ross    margaux.ross@usdoj.gov
- Michael St James    ecf@stjames-law.com
- Howard Steinberg    steinbergh@gtlaw.com, pearsallt@gtlaw.com;laik@gtlaw.com
- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov
- Michael H Weiss    mw@weissandspees.com, lm@weissandspees.com
- Beth Ann R Young    bry@lnbyb.com

**2.  SERVED BY UNITED STATES MAIL**: On **January 24, 2018**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

S Margaux Ross
Office of the U.S. Trustee
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017

Debtor (Lead)
Penthouse Global Media, Inc., et al.
8944 Mason Ave.
Chatsworth, CA 91311

☒ *Service information continued on attached page*

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **January 24, 2018**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**SERVED BY PERSONAL DELIVERY**
Hon. Martin R. Barash
United States Bankruptcy Court
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA 91367

☒ *Service information continued on attached page* **SERVED BY EMAIL**

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                **F 9013-3.1.PROOF.SERVICE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| January 24, 2018 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**

## SERVICE BY U.S. MAIL AND/OR E-MAIL

# Mailing list top 20 creditors

## Penthouse Global Media, Inc.

EXWORKS Capital Funds I LP
333 W Wacker Drive Suite 1620
Chicago, IL 60606

DREAM MEDIA Corporation
10990 Wilshire Blvd Penthouse
Los Angeles, CA 90024

Greenberg Traurig, LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067

Bayard, P.A.
222 Delaware Ave., Suite 900
P. O. Box 25130
Wilmington, DE 19899

TGG Accounting
10188 Telesis Court, Suite 130
San Diego, CA 92121

Hogan Lovells US, LLP
1999 Avenue of The Stars, Suite 1400
Los Angeles, CA 90067

Squar Milner LLP
4100 Newport Place, Suite 600
Newport Beach, CA 92660

Miller Law Group
111 Sutter Street, Suite 700
San Francisco, CA 94104

Sedgwick, LLP
2301 McGee Street, Suite 500
Kansas City, MO 64108-2662

Allen, Dyer, Dopplet, Milbrath & Gilchris
255 South Orange Ave., Suite 1401
Orlando, FL 32801

Bressler Law PLLC IOLTA Account
3 West 35th Street, 9th Floor
New York, NY 10001

Premium Assignment Corporation/Marsh USA
P. O. Box 8000
Tallahassee, FL 32314-8000

California Choice Benefit Administrators
721 South Parker, Suite 200
Orange, CA 92868

Tom Fox
P. O. Box 2402
Santa Cruz, CA 95063

Total Records Information Management LLC
371 Starke Road
Carlstadt, NJ 07072

Iron Mountain
1000 Campus Drive
Collegeville, PA 19426

Akerman LLP
601 West Fifth Street, Suite 300
Los Angeles, CA 90071

GRM Information Management Services, Inc.
P. O. Box 35539
Newark, NJ 07193-5539

C.Hocquel Inc.
8310 Jayseel Street
Sunland, CA 91040

Allgemeines Treuunternehmen (ATU)
Aeulestrasse 5 P. O. Box 83
9490 Vaduz
Furstentum, Liechtenstein

DSS Consulting Corporation
638 Lindero Canyon Road, Suite 117
Oak Park, CA 91377

Nextgen Reporting
999 Old Eagle School, Suite 118
Wayne, PA 19087

# Penthouse Global Broadcasting, Inc.

M7 Group
L1246 2 rue Albert Borschette
Luxembourg

Basmedia B.V.
Pluggematen2
8331TV
Steenwijk, The Netherlands

Mile High
8148 Devonshire
Ville Mont-Royal
Quebec, Canada H4P2K3

Elle et Lui, LLC
761 S. Rainbow # 120
Las Vegas, NV 89145

Interactive Media AG
Einsiedlestrasse 23
CH-8834 Schindellegi SZ
Switzerland

PHE, Inc.
302 Meadowland Drive
Hillsborough, NC 27278

Art Attack Productions/ReVideo Inc.
10945 Old Santa Susana Pass
Chatsworth, CA 91311

Fluffy White Dog Media
8033 Sunset Blvd., Suite 308
Los Angeles, CA 90046

Priority Workforce
2170 S Towne Center Pl, # 350
Anaheim, CA 92806

FedEx
P. O. Box 7221
Pasadena, CA 91109-7321

SESAC, Inc.
35 Music Square E
Nashville, TN 37203

Digital Media Consultants, LLC
21781 Ventura Blvd., Suite 644
Woodland Hills, CA 91364

Jason Bekoski
168 E. Port Hueneme Road
Port Hueneme, CA 93041

Arkena SAS
15 Rue Cognacq-Jay
75007 Paris, France

Combat Zone
9909 Topanga Canyon Blvd., #20
Chatsworth, CA 91311

Szili Miklos
Adademia Korut 67
6000, Kecskemet, Hungary

Emily Palan
2412 Delancey Place
Philadelphia, PA 19103

Bizarre Video
21621 Nordhoff St., Suite B
Chatsworth, CA 91311

Nathanael Kalfa Consulting
Chaussee de Gand, 443
1080 Brussels, Belgium

Verizon – UpLynk
13031 W Jefferson Blvd., Bldg 900
Los Angeles, CA 90094

## Penthouse Global Licensing, Inc.

Pryor Cashman LLP
7 Times Square
New York, NY 10036

Max J. Sprecher, Law Office of
5850 Canoga Ave., 4th Floor
Woodland Hills, CA 91367

Corsearch
P. O. Box 4349
Carol Stream, IL 60197-4349

E.D. Publications Inc.
2431 Estancia Blvd., Bldg B
Clearwater, FL 33761-2608

Dennemeyer & Associates
55, rue des Bruyeres
L-1274 Howald, Luxembourg

## Penthouse Global Digital, Inc.

MojoHost
30300 Telegraph Road, Suite 300
Bingham Farms, MI 48025

Mannassi IT Solutions
22222 Sherman Way, Suite 206
Canoga Park, CA 91303

Ninja Partners, Inc.
1621 E. 6th Street, Suite 1130
Austin, TX 78702

NetNames USA Inc.
2711 Centerville Rd
Wilmington, DE 19808

Corporation Service Company
P. O. Box 13397
Philadelphia, PA 19101-3397

Cyber Pro Hosting
P. O. Box 26203
Milwaukee, WI 53226

WebDot Calm
237 Town Center West, # 267
Santa Maria, CA 93458

Hollywood Vaults Inc.
742 Seward Street
Hollywood, CA 90038

Philip Tranker
adenamediacorp@gmail.com
David Tanguay
537 Rue Helene-Baillargeon
Montreal, Quebec H2J4E8
Canada

Christine Pevarnik
2863 Brookside Drive
Mobile, AL 36693

Qisheng Wu
adenamediacorp@gmail.com

Vladyslav Plashchevatyi
xfive@setds.net

Sergio Freixas
deicox@gmail.com

SternDoor Inc.
affiliate@idealgasm.com

Arash Dadashzadeh
contact@pornixe.com

EX Situ Marketing
penthousepartners@thebestpartner.com
Marcella Monteleon
Marcym25@sweetspicy.com

Steven Moser
601 Stevens St., SW
Watertown, MN 55388

Kelly Publishing
255 S Rengstorff Ave., Apt 132
Mountain View, CA 94040

## Penthouse Global Publishing, Inc.

Creel Printing
6330 West Sunset Road
Las Vegas, NV 89118

Palm Coast Data LLC
11 Commerce Blvd.
Palm Coast, FL 32164

DVD Factory
7230 Coldwater Canyon
North Hollywood, CA 91605

Barbara F. Pizio
2342 82nd Street, Apt 3
Brooklyn, NY 11214

Zinio, LLC
75 Remittance Dr., Dept 6825
Chicago, IL 60675-6825

Edgewood Paper
115A Floral Vale Blvd.
Yardley, PA 19067-5529
Hudson News Distributors, LLC
701-705 Jefferson Road
Parsippany, NJ 07054

PR Newswire Association LLC
G.P.O. Box 5897
New York, NY 10087-5897

Getty Images
P. O. Box 953604
St. Louise, MO 63195-3604

V&M Design/Amanda Flores
13226 Azores Ave
Sylmar, CA 91342

Todd Francis
4328 Grand View Blvd.
Los Angeles, CA 90066

Philip J. Hanrahan Jr.
6031 N lake Drive
Whitefish Bay, WI 53217

Alan Dershowitz Consulting LLC
1675 N. Military Trail, 5th floor
Boca Raton, FL 33486

Pretty Things Press
P. O. Box 55
Point Reyes Station, CA 94956

Thomas Morton
288 Graham Ave., #1
Brooklyn, NY 11211

Drew Millard
115 W Woodridge Drive
Durham, NC 27707

Michael Hingston
11203-71 Avenue
Edmonton, AB
Canada, AB T6G 0A5

Apparel Brand Consultants LLC
97-05 24th Avenue
East Elmhurst, NY 11369

Disgraceful Inc.
24303 Woolsey Cyn Rd, Spc 31
West Hills, CA 91304

Matt Gallagher
112 Withers Street, Apt 2
Brooklyn, NY 11211