1  RON BENDER (SBN 143364)
   BETH ANN R. YOUNG (SBN 143945)
2  KRIKOR J. MESHEFEJIAN (SBN 255030)
   LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
4  Telephone: (310) 229-1234; Facsimile: (310) 229-1244
   Email:  rb@lnbyb.com; bry@lnbyb.com; kjm@lnbyb.com

5  Attorneys for Dream Media Corporation

6              UNITED STATES BANKRUPTCY COURT

7               CENTRAL DISTRICT OF CALIFORNIA

8               SAN FERNANDO VALLEY DIVISION

| 9  In re: | Lead Case No.: 1:18-bk-10098-MB |
|---|---|
| 10  PENTHOUSE GLOBAL MEDIA, INC., | Jointly administered with: |
| 11                          Debtor. | Case No.: 1:18-bk-10099-MB |
| | Case No: 1:18-bk-10101-MB |
| 12 | Case No: 1:18-bk-10102-MB |
| In re: | Case No: 1:18-bk-10103-MB |
| 13  PENTHOUSE GLOBAL BROADCASTING, INC. | Case No: 1:18-bk-10104-MB |
| | Case No: 1:18-bk-10105-MB |
| 14  PENTHOUSE GLOBAL LICENSING, INC. | Case No: 1:18-bk-10106-MB |
| PENTHOUSE GLOBAL DIGITAL, INC. | Case No. 1:18-bk-10107-MB |
| 15  PENTHOUSE GLOBAL PUBLISHING, INC. | Case No. 1:18-bk-10108-MB |
| GMI ONLINE VENTURES, LTD. | Case No. 1:18-bk-10109-MB |
| 16  PENTHOUSE DIGITAL MEDIA | Case No. 1:18-bk-10110-MB |
| PRODUCTIONS, INC. | Case No. 1:18-bk-10111-MB |
| 17  TAN DOOR MEDIA, INC. | Case No. 1:18-bk-10112-MB |
| 18  PENTHOUSE IMAGES ACQUISITIONS, LTD. | Case No. 1:18-bk-10113-MB |
| PURE ENTERTAINMENT | |
| 19  TELECOMMUNICATIONS, INC., fka For Your | Chapter 11 Cases |
| Ears Only, Ltd. | |
| 20  XVHUB Group, Inc., fka Giant Swallowtail Inc. | **DECLARATION OF ROBERT** |
| GENERAL MEDIA COMMUNICATIONS, INC. | **RICHARDSON IN SUPPORT OF** |
| 21  GENERAL MEDIA ENTERTAINMENT, INC., | **DREAM MEDIA CORPORATION'S** |
| fka Penthouse Video, Inc. | **MOTION FOR RELIEF FROM THE** |
| 22  DANNI ASHE, INC. | **AUTOMATIC STAY UNDER 11 U.S.C.** |
| 23  STREAMRAY STUDIOS, INC., | **§362 (PERSONAL PROPERTY)** |
| 24                          Debtors. | **[Filed concurrently with Motion for Relief and Declaration of Abramowitz]** |
| 25  X  Affects all Debtors. | Date:    February 14, 2018 |
| 26 | Time:    10:00 am |
| | Place:   Courtroom 303 |
| 27 | 21041 Burbank Boulevard |
| | Woodland Hills, CA 91367 |
| 28 | |

1

2      1.     I am the Senior Portfolio Manager of ExWorks Capital Fund I, L.P.

3 ("ExWorks"), the original lender on the loans to Penthouse Global Media, Inc. and its

4 subsidiaries and affiliates which are the subject of this Motion for Relief from the Automatic

5 Stay (the "Motion"). As described in greater detail below, on November 21, 2017, ExWorks

6 transferred and assigned all of ExWork's right, title and interest in the subject loans to Dream

7 Media Corporation ("Dream Media").

8

9      2.     Among my many duties as the Senior Portfolio Manager of ExWorks, I oversee

10 the accounting and collection of receivables owing by certain debtors to ExWorks, including

11 those sums that were due and owing to ExWorks by Penthouse Global Media Inc.

12 ("Penthouse") and which were guaranteed by GMCI Internet Operations, Inc. ("GMCI"), GMI

13 On-Line Ventures, Ltd. ("GMI"), General Media Communications, Inc. ("General

14 Communications"), General Media Entertainment, Inc. ("General Entertainment"), PMGI

15 Holdings, Inc. ("PMGI"), Penthouse Digital Media Productions Inc. ("PDMP"), Penthouse

16 Images Acquisitions, Ltd. ("PIAL"), Pure Entertainment Telecommunications Inc. ("Pure"),

17

18 XVHub Group Inc. ("XVHub"), Danni Ashe, Inc. ("Danni Ashe"), Streamray Studios, Inc.

19 ("Streamray"), Tan Door Media, Inc. ("Tan Door") and Penthouse Global Licensing, Inc.

20 ("PGLI"), and each of them, collectively referred to herein as "Debtors" or individually by

21 name.

22

23      3.     I have personal knowledge of the matters set forth in this Declaration, and, if

24 called upon to testify, I could and would testify competently thereto.

25 **CUSTODIAN OF RECORDS**

26      4.     As the Senior Portfolio Manager of ExWorks, I am required to know, and in

27 fact, am familiar with the jobs of various employees who are involved in the handling of

28

ExWorks's books, files, documents and records as to the amounts due and owing to ExWorks by the Debtors (the "Records") pursuant to the First Note, Second Note, Loan Agreement, Security Agreement, various amendments to the Loan Agreement and the Guaranty, as defined herein below.

5.    I am one of the custodians of ExWorks' Records as those Records pertain to the amounts owing to ExWorks when ExWorks was the lender to the Debtors. I have personally worked with and on ExWorks' Records and have personal knowledge that the Records were and are kept in the usual and ordinary course of ExWorks' business and the entries therein are made at or about the time of the events recorded by individuals employed by ExWorks who have had personal knowledge thereof and who have had a continuing business duty to make those entries and record those events at or about the time of the events recorded.

6.    The following sets forth the procedures used by ExWorks for the handling of Records and recording information regarding amounts owing to ExWorks by the Debtors:

    a.    **Original Contracts**

After the original loan documents evidencing the loan transaction between ExWorks and the Debtors were executed and delivered to ExWorks, they were placed into, and became a part of, ExWorks' Records. They were delivered directly to the officers whose duty it is to receive and safeguard them. The originals are safeguarded by making copies of them, placing the copies in ExWorks' contract file associated with the Debtors, and placing the originals in a separate documentation file in a secured area. If the documentation file is needed, after those records are reviewed, then they are replaced as soon as the work with the file is completed. Original documents are generally not removed from the secured location, but if it is necessary to remove an original document, it is replaced and returned to the secure location as soon as the task that led to the original being taken out is completed.

**b.      Records Other Than Original Documents**

ExWorks also keeps a file concerning its communications with the Debtors. This file typically will contain numerous documents other than copies of the original contracts, such as accounting schedules, correspondence, and other loan related documents. These Records are also put in the file by employees of ExWorks whose duty it is to file or generate such Records for the file at or about the time the Records are received or the information is generated and recorded and to maintain such Records in the file. These Records are available to employees of ExWorks working on the file, but only used by employees of ExWorks who have a business need to have the file or to look at the ExWorks Records or information therein. If a Record is ever removed from the file, it is replaced as soon as the task that led to the file being taken out is completed.

**c.      Accounting History**

ExWorks maintains detailed and comprehensive computerized records of all financial transactions between it and the Debtors. ExWorks uses the Stucky software program to record and track loan balances. This software is commonly used in the commercial lending industry. Employees input data into ExWorks' computer system reflecting loan advances and loan payments made. Only a limited number of employees are authorized by ExWorks to enter the data and make data changes. Information input into ExWorks' computer system is checked and reconciled for accuracy in the ordinary course of business. Whenever a payment is received, it is reflected in ExWorks' records by persons authorized to input the payment information into the computer system, who have a business duty to ExWorks to do so, and do so in their ordinary course of business. This includes reporting of the periodic cash sweeps made pursuant to the terms of the Loan Agreement.

d.   **Trustworthiness**

The foregoing methods have proven to be an accurate and trustworthy means for ExWorks maintaining Records and recording information about ExWorks' loan documents with the Debtors. These Records are utilized by employees of ExWorks, including me, on a regular basis, and such Records regularly are relied upon and are an accurate and proven means of reflecting the status of the loan balance and related matters with regard to the loans to the Debtors as of the date of the Assignment to Dream Media.

A.   **The Revolving Note, Term Note and Loan Agreement**

7.   Based on my review of ExWorks' Records and personal knowledge, the following is an accurate history of the lending transactions between ExWorks and the Debtors. On February 19, 2016, ExWorks and Penthouse entered into that certain Revolving Note pursuant to which Penthouse borrowed and promised to pay the sum of $6,000,000 (the "First Note"), and also that certain Term Note, pursuant to which Penthouse borrowed and promised to pay the sum of $3,000,000 (the "Second Note"). True and correct copies of the First Note and Second Note are attached hereto as Exhibits "A" and "B," respectively, and are incorporated herein by this reference and made a part hereof.

8.   The First Note and Second Note are each subject to those terms and conditions as set forth in the Loan and Security Agreement ("Loan Agreement"), also entered into on February 19, 2016, a true and correct copy of which is attached hereto as Exhibit "C" and is incorporated herein by this reference and made a part hereof.

9.   Pursuant to the terms of the Loan Agreement, the First Note and Second Note, and each of them accrued interest at the rate of the Cash Rate plus the PIK as defined in the Loan Agreement, with payments on the Second Note in equal consecutive monthly installments of $41,666.66 payable on the first day of each calendar month commencing March 1, 2016,

with the entire unpaid balance due and payable on the Maturity Date. (See, Exhibit "C.")

10. Pursuant to the terms of the Loan Agreement, the First Note and Second Note, and each of them, were scheduled to mature on February 19, 2017.

11. Pursuant to the terms of the Loan Agreement, the parties agreed that in the Event of a Default, interest would accrue on the First Note and Second Note at the increased rate of 2% in excess of the rate otherwise applicable. Debtors also agreed in the Loan Agreement to pay all costs of collection, including reasonable attorneys' fees and all costs of any workout, collection, bankruptcy, insolvency and other enforcement proceedings under any and all of the Loan Documents, including but not limited to the First Note, Second Note and Loan Agreement.

12. On February 17, 2017, Debtors and ExWorks entered into that certain Waiver, Joinder and First Amendment to Loan and Security Agreement ("First Amendment to Loan Agreement"), a true and correct copy of which is attached hereto as Exhibit "D" and is incorporated herein by this reference and made a part hereof.

13. Pursuant to the terms of the First Amendment to Loan Agreement, *inter alia*, Debtors and ExWorks, agreed to certain modifications of the Loan Agreement, including but not limited to the addition of PGLI as one of the Loan Party Obligors and the extension of the Maturity Date to April 30, 2017. Except as set forth in the First Amendment to Loan Agreement, all other terms and conditions of the Loan Agreement remained the same and unchanged.

14. On March 29, 2017, Debtors and ExWorks entered into that certain Consent and Second Amendment to Loan and Security Agreement ("Second Amendment to Loan Agreement"), a true and correct copy of which is attached hereto as Exhibit "E" and is incorporated herein by this reference and made a part hereof.

15.     Pursuant to the terms of the Second Amendment to Loan Agreement, *inter alia*, Debtors and ExWorks agreed to certain modifications of the Loan Agreement, including but not limited to providing consent for PGLI to enter into that certain Club License Agreement, requiring that certain proceeds of the Club License Transaction be paid to ExWorks and applied to the outstanding principal balance of the loan, and amending the loan in other respects as described in the Second Amendment to Loan Agreement.  Except as set forth in the Second Amendment to Loan Agreement, all other terms and conditions of the Loan Agreement remained the same and unchanged.

16.     On May 19, 2017, Debtors and ExWorks entered into that certain Waiver and Third Amendment to Loan and Security Agreement ("Third Amendment to Loan Agreement"), a true and correct copy of which is attached hereto as Exhibit "F" and is incorporated herein by this reference and made a part hereof.

17.     Pursuant to the terms of the Third Amendment to Loan Agreement, *inter alia*, Defendants, agreed to certain modifications of the Loan Agreement, including but not limited to (a) modification of the PIK Rate of interest; and (b) extension of the maturity date of the First Note and Second Note to April 30, 2018.  Except as set forth in the Third Amendment to Loan Agreement, all other terms and conditions of the Loan Agreement remained the same and unchanged.

**B.     The Security Agreement and Collateral**

18.     Included in the Loan Agreement is a security agreement (the "Security Agreement") in favor of ExWorks.  (See, Exhibit "C," Section 5.)  Pursuant to the Security Agreement, Debtors pledged collateral (the "Collateral") to ExWorks to secure Penthouse's performance of the payment obligations under the First Note and Second Note and each of the other Debtors' payment obligations under the Guaranty referred to below.  The Collateral is as

described in the Security Agreement consist of substantially all assets of the Debtors, including copyrights and trademarks, as well as contract rights, inventory and accounts receivables.

19.     In connection with the Security Agreement, ExWorks filed with the Secretary of State for the States of California, New York and Delaware UCC-1 Financing Statements ("UCC-1") as to each of the Debtors (in each case in the state in which such Debtor is organized). (See, Exhibit "D" annexed to the Motion filed concurrently herewith.)

20.     In connection with the Security Agreement, ExWorks filed (a) with the United States Patent and Trademark Office on February 22, 2016, that certain Trademark Security Agreement ("Trademark Assignment"), which was acknowledged by the United States Patent and Trademark Office pursuant to that certain Notice of Recordation of Assignment Document bearing Filing Number 900354921 and recorded at Reel 5736 / Frame 0493, a true and correct copy of which is annexed as Exhibit "F" to the Motion filed concurrently herewith; and (b) with in the United States Copyright Office on March 23, 2016, that certain Copyright Security Agreement, which was recorded by the United States Copyright Office at Volume 9915, Document Number 493 (the "Copyright Recording"), a true and correct copy of which is annexed as Exhibit "G" to the Motion filed concurrently herewith.

## C.     The Guaranty

21.     Included in the Loan Agreement at Section 12 is a Guaranty of the First Note and Second Note by each of the Loan Party Obligors other than Penthouse (the "Guaranty"), and each of them. (See, Exhibit "C.")  Pursuant to the Guaranty, the Loan Party Obligors (other than Penthouse), and each of them, guaranteed to ExWorks all of the obligations of Penthouse under the Loan Agreement, the First Note and the Second Note, all as described in the Loan Agreement.    The Guaranty explicitly states that it is a guaranty of payment and not of

8

### D.   The Indebtedness

22.   As of November 21, 2017, at the time of the Assignment of the Loan Agreement to Dream Media, the aggregate sums then due and owing by the Debtors pursuant to the First Note, Second Note and Loan Agreement was the aggregate sum of $10,148,802.07, which included the outstanding principal sum of $7,947,656.71, and unpaid interest and fees in the sum of $2,201,145.36.

### E.   Debtors' Defaults

23.   Prior to the Assignment of the Loan Agreement to Dream Media, the Debtors defaulted in their performance of the First Note, Second Note, Loan Agreement, Security Agreement and Guaranty when Debtors: (a) failed to make payments of interest as required to be paid on June 10, 2017, and each interest payment due thereafter; and (b) failed to make payments for those certain fees required by the terms of the Loan Agreement, starting on June 10, 2017, and continuing thereafter.

24.   Debtors were notified in writing of the defaults referred to above on September 27, 2017, when ExWorks delivered to Debtors, through Penthouse, that certain letter providing Debtors with Notice of Default and Reservation of Rights (the "Notice of Default"). A true and correct copy of the Notice of Default delivered to Penthouse by ExWorks is attached hereto as Exhibit "G" and is incorporated herein by this reference and made a part hereof.

25.   After delivery of the Notice of Default to Penthouse, Debtors failed to cure the defaults or pay the amounts required under the First Note, Second Note, Loan Agreement, Security Agreement and Guaranty.

### F.   Assignment of Loan Agreement to Dream Media

26.   On November 21, 2017, pursuant to that certain Assignment and Assumption

1  Agreement between ExWorks and Dream Media, Dream Media acquired all right, title and

2  interest of ExWorks as the Lender, in and to the loans which are the subject of this action (the

3  "Loan Assignment").

4      27.    In connection with the Loan Assignment, ExWorks and Dream Media also

5  entered into that certain Assignment of Security Interest in Copyrights and Assignment of

6  Security Interest in Trademarks, pursuant to which the security interests in copyrights and

7  trademarks conveyed by Debtors to ExWorks in connection with the First Note, Second Note

8

9  and Loan Agreement and as set forth in the Trademark Assignment and Copyright Recording

10  were assigned to Dream Media.

11      I declare under penalty of perjury under the laws of the United States of America that

12  the foregoing is true and correct. Executed this **24** day of January, 2018 in Chicago, Illinois.

13

14                                                ROBERT RICHARDSON

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "A"

## REVOLVING NOTE

$6,000,000                                                    February 19, 2016

The undersigned ("*Borrower*"), for value received, promises to pay to the order of ExWorks Capital Fund I, L.P. ("*Lender*") at its principal office, the aggregate unpaid amount of all Revolving Loans made to Borrower by Lender pursuant to the Loan Agreement referred to below, such principal amount to be payable on the dates set forth in the Loan Agreement.

Borrower further promises to pay interest on the unpaid principal amount of each Revolving Loan from the date of such Revolving Loan until such Revolving Loan is paid in full, payable at the rate(s) and at the time(s) set forth in the Loan and Security Agreement. Payments of both principal and interest are to be made in lawful money of the United States of America.

This Note evidences indebtedness incurred under, and is subject to the terms and provisions of, the Loan and Security Agreement, dated as of the date hereof (as amended, restated or otherwise modified from time to time, the *"Loan Agreement"*; terms not otherwise defined herein are used herein as defined in the Loan Agreement), among Borrower, Lender, and the other parties thereto from time to time, to which Loan Agreement reference is hereby made for a statement of the terms and provisions under which this Note may or must be paid prior to its due date or its due date accelerated.

This Note is made under and governed by the laws of the State of Illinois applicable to contracts made and to be performed entirely within such State.

PENTHOUSE GLOBAL MEDIA, INC.

By: _Kelly Holland_
Title: _CEO_

# EXHIBIT "B"

## TERM NOTE

$3,000,000                                                           February 19, 2016

The undersigned ("***Borrower***"), for value received, promises to pay to the order of ExWorks Capital Fund I, L.P. ("***Lender***") at its principal office, the aggregate unpaid amount of the Term Loan made to Borrower by Lender pursuant to the Loan Agreement referred to below, such principal amount to be payable on the dates set forth in the Loan Agreement.

Borrower further promises to pay interest on the unpaid principal amount of the Term Loan from the date of the Term Loan until the Term Loan is paid in full, payable at the rate(s) and at the time(s) set forth in the Loan and Security Agreement. Payments of both principal and interest are to be made in lawful money of the United States of America.

This Note evidences indebtedness incurred under, and is subject to the terms and provisions of, the Loan and Security Agreement, dated as of the date hereof (as amended, restated or otherwise modified from time to time, the "***Loan Agreement***"; terms not otherwise defined herein are used herein as defined in the Loan Agreement), among Borrower, Lender, and the other parties thereto from time to time, to which Loan Agreement reference is hereby made for a statement of the terms and provisions under which this Note may or must be paid prior to its due date or its due date accelerated.

This Note is made under and governed by the laws of the State of Illinois applicable to contracts made and to be performed entirely within such State.

[Signature page to follow]

PENTHOUSE GLOBAL MEDIA, INC.

By: _____
Title: _____

# EXHIBIT "C"

## LOAN AND SECURITY AGREEMENT

Dated as of February 19, 2016

between

### EXWORKS CAPITAL FUND I, L.P.,

as Lender,

### PENTHOUSE GLOBAL MEDIA, INC.,

as Borrower,

and the other parties hereto as Loan Party Obligors

## TABLE OF CONTENTS

Page

1. DEFINITIONS. ............................................................................................................. 1

    1.1.    Certain Defined Terms. ..................................................................... 1
    1.2.    Accounting Terms and Determinations. ...................................... 14
    1.3.    Other Definitional Provisions and References. ........................... 14

2. LOANS. .................................................................................................................... 15

    2.1.    Amount of Loans. .............................................................................. 15
    2.2.    Protective Advances. ........................................................................ 15
    2.3.    Notice of Borrowing; Manner of Revolving Loan Borrowing ...... 16
    2.4.    [Intentionally Omitted.] ................................................................... 16
    2.5.    Repayment ......................................................................................... 16
    2.6.    Prepayments / Voluntary Termination ......................................... 16
    2.7.    Obligations Unconditional .............................................................. 17
    2.8.    Reversal of Payments ....................................................................... 18

3. INTEREST AND FEES; LOAN ACCOUNT. .......................................................... 18

    3.1.    Interest ............................................................................................... 18
    3.2.    Fees ..................................................................................................... 18
    3.3.    Computation of Interest and Fees ................................................. 18
    3.4.    Loan Account; Monthly Accountings ............................................ 18
    3.5.    Further Obligations; Maximum Lawful Rate .............................. 19

4. CONDITIONS PRECEDENT. ................................................................................. 19

    4.1.    Conditions to Initial Loans ............................................................. 19
    4.2.    Conditions to all Loans ................................................................... 20

5. COLLATERAL. ........................................................................................................ 20

    5.1.    Grant of Security Interest .............................................................. 20
    5.2.    Possessory Collateral ...................................................................... 21
    5.3.    Further Assurances ......................................................................... 21
    5.4.    UCC Financing Statements ............................................................. 21

6. CERTAIN PROVISIONS REGARDING ACCOUNTS, INVENTORY, COLLECTIONS
    AND APPLICATIONS OF PAYMENTS. ................................................................ 22

    6.1.    Lock Boxes and Blocked Accounts ................................................ 22
    6.2.    Application of Payments ................................................................. 22
    6.3.    Notification; Verification ................................................................ 23
    6.4.    Power of Attorney. ........................................................................... 23
    6.5.    Disputes. ............................................................................................ 25
    6.6.    Invoices ............................................................................................. 25
    6.7.    Inventory. .......................................................................................... 25

7. REPRESENTATIONS, WARRANTIES AND AFFIRMATIVE COVENANTS. .............. 25

    7.1.    Existence and Authority ................................................................. 25
    7.2.    Names; Trade Names and Styles. .................................................. 26
    7.3.    Title to Collateral; Third Party Locations; Permitted Liens ...................... 26
    7.4.    Accounts and Chattel Paper .......................................................... 26

| | 7.5. | Electronic Chattel Paper | 27 |
|---|---|---|---|
| | 7.6. | Capitalization; Investment Property | 27 |
| | 7.7. | Commercial Tort Claims | 28 |
| | 7.8. | Jurisdiction of Organization; Location of Collateral | 28 |
| | 7.9. | Financial Statements and Reports; Solvency | 29 |
| | 7.10. | Tax Returns and Payments; Pension Contributions | 29 |
| | 7.11. | Compliance with Laws; Intellectual Property; Licenses. | 30 |
| | 7.12. | Litigation | 31 |
| | 7.13. | Use of Proceeds | 31 |
| | 7.14. | Insurance | 31 |
| | 7.15. | Financial, Collateral and Other Reporting / Notices | 32 |
| | 7.16. | Litigation Cooperation | 34 |
| | 7.17. | Maintenance of Collateral, Etc | 34 |
| | 7.18. | Material Contracts | 34 |
| | 7.19. | No Default | 34 |
| | 7.20. | No Material Adverse Change | 34 |
| | 7.21. | Full Disclosure | 34 |
| | 7.22. | Sensitive Payments | 35 |
| | 7.23. | Borrower as Holding Company | 35 |
| | 7.24. | Access to Collateral, Books and Records | 35 |
| | 7.25. | Appraisals | 35 |
| | 7.26. | Key-man Insurance | 35 |
| 8. | | NEGATIVE COVENANTS | 36 |
| 9. | | FINANCIAL COVENANTS | 37 |
| | 9.1. | Fixed Charge Coverage Ratio | 37 |
| | 9.2. | Minimum EBITDA | 38 |
| | 9.3. | Minimum Tangible Net Worth | 38 |
| 10. | | RELEASE, LIMITATION OF LIABILITY AND INDEMNITY. | 38 |
| | 10.1. | Release | 38 |
| | 10.2. | Limitation of Liability | 39 |
| | 10.3. | Indemnity | 39 |
| 11. | | EVENTS OF DEFAULT AND REMEDIES. | 39 |
| | 11.1. | Events of Default | 39 |
| | 11.2. | Remedies with Respect to Lending Commitments/Acceleration, Etc | 41 |
| | 11.3. | Remedies with Respect to Collateral | 41 |
| 12. | | LOAN GUARANTY. | 46 |
| | 12.1. | Guaranty | 46 |
| | 12.2. | Guaranty of Payment | 46 |
| | 12.3. | No Discharge or Diminishment of Loan Guaranty. | 46 |
| | 12.4. | Defenses Waived | 47 |
| | 12.5. | Rights of Subrogation | 47 |
| | 12.6. | Reinstatement; Stay of Acceleration | 47 |
| | 12.7. | Information | 48 |
| | 12.8. | Termination | 48 |
| | 12.9. | Maximum Liability | 48 |
| | 12.10. | Contribution | 48 |
| | 12.11. | Liability Cumulative | 49 |

13.     **PAYMENTS FREE OF TAXES; OBLIGATION TO WITHHOLD; PAYMENTS ON ACCOUNT OF TAXES.** ............................................................................................................ 49

14.     **GENERAL PROVISIONS.** ...................................................................................................... 51

    14.1.    **Notices.** ..................................................................................................................... 51
    14.2.    **Severability** .............................................................................................................. 52
    14.3.    **Integration** ................................................................................................................ 52
    14.4.    **Waivers** .................................................................................................................... 52
    14.5.    **Amendment** .............................................................................................................. 52
    14.6.    **Time of Essence** ....................................................................................................... 52
    14.7.    **Expenses, Fee and Costs Reimbursement** .............................................................. 52
    14.8.    **Benefit of Agreement; Assignability** ..................................................................... 53
    14.9.    **Recordation of Assignment** .................................................................................... 53
    14.10.   **Participations** .......................................................................................................... 54
    14.11.   **Headings; Construction** ........................................................................................... 54
    14.12.   **USA PATRIOT Act Notification** ........................................................................... 54
    14.13.   **Counterparts; Fax/Email Signatures** ...................................................................... 55
    14.14.   **GOVERNING LAW** ............................................................................................... 55
    14.15.   **CONSENT TO JURISDICTION; WAIVER OF JURY TRIAL; CONSENT TO SERVICE OF PROCESS.** ....................................................................................... 55
    14.16.   **Publication** .............................................................................................................. 55
    14.17.   **Confidentiality** ........................................................................................................ 56

Perfection Certificate
Annex I        Lender's Bank
Annex II       Reporting
Exhibit A      Form of Notice of Borrowing
Exhibit B      Closing Checklist
Exhibit C      Form of Compliance Certificate
Exhibit D      Form of Borrowing Base Certificate

## Loan and Security Agreement

This Loan and Security Agreement (as it may be amended, restated or otherwise modified from time to time, this *"Agreement"*) is entered into on February 19, 2016 among EXWORKS CAPITAL FUND I, L.P. (*"Lender"*), PENTHOUSE GLOBAL MEDIA, INC., a Delaware corporation (*"Borrower"*) and each of the parties signatory hereto as a Loan Party Obligor (as defined herein). The Schedules and Exhibits to this Agreement are an integral part of this Agreement and are incorporated herein by reference.

### 1.    DEFINITIONS.

#### 1.1.    Certain Defined Terms.

Unless otherwise defined herein, the following terms are used herein as defined in the UCC: Accounts, Account Debtor, Certificated Security, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Electronic Chattel Paper, Equipment, Farm Products, Fixtures, General Intangibles, Goods, Health-Care-Insurance Receivables, Instruments, Inventory, Letter-of-Credit Rights, Proceeds, Securities Accounts, Supporting Obligations and Tangible Chattel Paper.

As used in this Agreement, the following terms have the following meanings:

*"2016 Website CapEx"* means planned and budgeted Capital Expenditures of the Loan Parties during the 2016 Fiscal Year in connection with the rework of the Loan Parties' websites and related online presence, in an amount not to exceed $260,000.

*"Accounts Advance Rate"* means 85%; *provided*, that if Dilution exceeds 5%, Lender may, at its option, (A) reduce such advance rate by the number of full or partial percentage points comprising such excess or (B) establish a Reserve on account of such excess (the *"Dilution Reserve"*).

*"Advance Rates"* means, collectively, the Accounts Advance Rate and the Intellectual Property Advance Rate.

*"Affiliate"* means, with respect to any Person, any other Person in control of, controlled by, or under common control with the first Person, and any other Person who has a substantial interest, direct or indirect, in the first Person or any of its Affiliates, including, any officer or director of the first Person or any of its Affiliates; *provided*, that neither Lender nor any of its Affiliates shall be deemed an *"Affiliate"* of Borrower for any purposes of this Agreement. For the purpose of this definition, a *"substantial interest"* shall mean the direct or indirect legal or beneficial ownership of more than ten (10%) percent of any class of equity or similar interest.

*"Agreement"* has the meaning set forth in the preamble to this Agreement.

*"Bankruptcy Code"* means the United States Bankruptcy Code (11 U.S.C. § 101 et seq.).

*"Blocked Account"* has the meaning set forth in Section 5.1.

*"Borrower"* has the meaning set forth in the preamble to this Agreement.

*"Borrowing Base"* means, as of any date of determination, the Dollar Equivalent amount as of such date of determination of (a) the aggregate amount of Eligible Accounts multiplied by the Accounts Advance Rate, plus (b) the net orderly liquidation value of Eligible Intellectual

Property multiplied by the Intellectual Property Advance Rate (but in no event to exceed the Intellectual Property Sublimit) and minus (c) all Reserves which Lender has established pursuant to Section 2.1(b) (including those to be established in connection with any requested Revolving Loan).

*"Business Day"* means a day other than a Saturday or Sunday or any other day on which Lender or banks in Illinois are authorized to close.

*"Capital Expenditures"* means all expenditures which, in accordance with GAAP, would be required to be capitalized and shown on the consolidated balance sheet of Borrower, but excluding expenditures made in connection with the acquisition, replacement, substitution or restoration of assets to the extent financed (a) from insurance proceeds (or other similar recoveries) paid on account of the loss of or damage to the assets being replaced or restored or (b) with cash awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced and excluding capitalized film costs incurred in the ordinary course of business.

*"Capitalized Lease"* means any lease which is or should be capitalized on the balance sheet of the lessee thereunder in accordance with GAAP.

*"Cash Rate"* means 18% per annum.

*"Closing Date"* means February 19, 2016.

*"Closing Date Acquisition"* means the acquisition by Borrower of all of the outstanding equity interest of each of Danni Ashe, Inc., GMCI Internet Operations, Inc., GMI On-Line Ventures, Ltd., General Media Communications, Inc., General Media Entertainment, Inc., Great Ganilly Enterprise Limited, NAFT Media, S.L., Network Domain Services N.V., PMGI Holdings Inc., Penthouse Clubs International Establishment, Penthouse Digital Media Productions Inc., Penthouse Images Acquisitions, Ltd., Pure Entertainment Telecommunications, Inc., Streamray Studios Inc., Tan Door Media Inc., XVHUB Group Inc. on the Closing Date pursuant to the Closing Date Acquisition Agreement.

*"Closing Date Acquisition Agreement"* means that certain Stock Purchase Agreement dated as of February 19, 2016 by and among Borrower and Sellers.

*"Code"* means the Internal Revenue Code of 1986, as amended.

*"Collateral"* means all property and interests in property in or upon which a security interest, mortgage, pledge or other Lien is granted pursuant to this Agreement or the other Loan Documents, including all of the property of each Loan Party Obligor described in Section 5.1.

*"Collections"* has the meaning set forth in Section 6.1.

*"Compliance Certificate"* means a compliance certificate substantially in the form of Exhibit C hereto to be signed by the Chief Financial Officer or President of Borrower.

*"Confidential Information"* means confidential information that any Loan Party furnishes to the Lender pursuant to any Loan Document concerning any Loan Party's business, but does not include any such information once such information has become, or if such information is, generally available to the public (other than by a breach by Lender of its confidentiality obligations hereunder) or available to the Lender (or other applicable Person) from a source other than the Loan Parties which is not, to the Lender's knowledge, bound by any confidentiality agreement in respect thereof.

-2-

*"Control Agreement"* means a control agreement, in form and substance reasonably satisfactory to Lender, executed and delivered by a Loan Party Obligor, Lender, and the applicable securities intermediary (with respect to a Securities Account) or bank (with respect to a Deposit Account) or issuer (with respect to uncertificated securities) which grants Lender "control" (as defined in the UCC) over such Securities Account, Deposit Account or uncertificated securities, as the case may be, sufficient to perfect Lender's Lien over such Securities Account, Deposit Account or uncertificated securities.

*"Default"* means any event which with notice or passage of time, or both, would constitute an Event of Default.

*"Default Rate"* has the meaning set forth in Section 3.1.

*"Dilution"* means, as of any date of determination, a percentage, based upon the experience of the immediately prior six months, that is the result of dividing the Dollar Equivalent amount of (a) bad debt write-downs, discounts, advertising allowances, credits, or other dilutive items with respect to Borrower's Eligible Accounts during such period by (b) Borrower's billings with respect to Accounts during such period.

*"Dilution Reserve"* has the meaning set forth in the definition of Accounts Advance Rate.

*"Disqualified Equity Interests"* means any equity interests that, by their terms (or by the terms of any security or other equity interest into which they are convertible or for which they are exchangeable) or upon the happening of any event or condition, (a) mature or are mandatorily redeemable, pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Obligations the termination of all of Lender's commitments to extend Revolving Loans or any other credit accommodation under the Loan Documents), (b) are redeemable at the option of the holder thereof (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Obligations the termination of all of Lender's commitments to extend Revolving Loans or any other credit accommodation under the Loan Documents), in whole or in part, (c) provide for scheduled mandatory payments of dividends in cash or (d) are or become convertible into or exchangeable for Indebtedness or any other equity interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 181 days after the Scheduled Maturity Date at any time in effect.

*"Dollar Equivalent"* means, at any time, (a) as to any amount denominated in Dollars, the amount thereof at such time, and (b) as to any amount denominated in a currency other than Dollars, the equivalent amount in Dollars as determined by Lender at such time that such amount could be converted into Dollars by Lender according to prevailing exchange rates selected by Lender.

*"Dollars"* or *"$"* means United States Dollars.

*"Disregarded Domestic Subsidiary"* means a Subsidiary that (i) is treated as a disregarded entity for U.S. federal income tax purposes and (ii) holds no properties other than equity (and a de minimis amount of other assets related thereto) in one or more Foreign Subsidiaries.

*"EBITDA"* means, for the applicable period, for the Loan Parties on a consolidated basis, the sum of (a) Net Income, plus (b) Interest Expense deducted in the calculation of such Net Income, plus (c) taxes on income, whether paid, payable or accrued, deducted in the calculation of

such Net Income, plus (d) depreciation expense deducted in the calculation of such Net Income and plus (e) amortization expense deducted in the calculation of such Net Income, plus (f) to the extent deducted in the calculation of such Net Income, transaction costs incurred on or prior to the date that is 30 days after the Closing Date related to the documentation of the Loan Documents and the Closing Date Acquisition in an aggregate amount not to exceed $870,000.

*"Eligible Account"* means, at any time of determination, an Account owned by a Loan Party Obligor which satisfies the general criteria set forth below and which is otherwise acceptable to Lender in its sole discretion; *provided*, that Lender may, in its Permitted Discretion, change the general criteria for acceptability of Eligible Accounts and shall notify Borrower of such change promptly thereafter. An Account shall be deemed to meet the current general criteria if:

(i)     neither the Account Debtor nor any of its Affiliates is an Affiliate of any Loan Party;

(ii)     it does not remain unpaid more than the earlier to occur of (A) ninety (90) days after the original invoice date or (B) sixty (60) days after the original invoice due;

(iii)     the Account Debtor or its Affiliates are not past due (or past any of applicable dates referenced in clause (ii) above) on other Accounts owing to all Loan Party Obligors comprising more than 25% of all of the Accounts owing to the Loan Party Obligors by such Account Debtor or its Affiliates;

(iv)     all Accounts owing by the Account Debtor or its Affiliates do not represent more than 20% of all otherwise Eligible Accounts; *provided*, that Accounts which are deemed to be ineligible solely by reason of this clause (iv) shall be considered Eligible Accounts to the extent of the amount thereof which does not exceed 20% of all otherwise Eligible Accounts);

(v)     no covenant, representation or warranty contained in this Agreement or any other Loan Document with respect to such Account (including any of the representations set forth in Section 7.4) has been breached in any material respect;

(vi)     the Account is not subject to any contra relationship, counterclaim, dispute or contractual set-off; *provided*, that any reduction to the amount of Eligible Accounts made pursuant to this clause (vi) shall be the maximum amount of such contra, counterclaim, dispute or set-off, as asserted or claimed by the applicable counterparty, or, if such amount is not readily discernible, as determined by Lender in its Permitted Discretion;

(vii)     the Account Debtor's chief executive office or principal place of business is located (a) in the United States or Canada or (b) outside the United States or Canada if, in any case under this clause (b), (x)(A) the sale is fully backed by a letter of credit, guaranty or acceptance acceptable to Lender in its sole discretion and, if backed by a letter of credit, such letter of credit has been issued or confirmed by a bank satisfactory to Lender in its sole discretion, is sufficient to cover such Account and, if required by Lender, the original of such letter of credit has been delivered to Lender or Lender's agent and the issuer thereof notified of the assignment of the proceeds of such letter of credit to Lender or (B) such Account is subject to credit insurance payable to Lender issued by an insurer and on terms, conditions and in an amount acceptable to Lender in its sole discretion and (y) Lender has consented in writing to the inclusion of such Account as an Eligible Account in its sole discretion;

(viii)     it is payable solely in Dollars;

-4-

(ix)    it is absolutely owing to the applicable Loan Party Obligor and does not arise from a sale on a bill-and-hold, guarantied sale, sale-or-return, sale-on-approval, consignment, retainage or any other repurchase or return basis or consist of progress billings;

(x)    Lender shall have verified the Account in a manner reasonably satisfactory to Lender;

(xi)    the Account Debtor is not the United States of America or any state or political subdivision (or any department, agency or instrumentality thereof), unless the applicable Loan Party Obligor has complied with the Assignment of Claims Act of 1940 (31 U.S.C. §203 et seq.) or other applicable similar state or local law in a manner satisfactory to Lender;

(xii)    it is at all times subject to Lender's duly perfected, first-priority security interest and to no other Lien that is not a Permitted Lien, and the goods (to the extent such Account arises from the sale of goods) giving rise to such Account (A) were not, at the time of sale, subject to any Lien except Permitted Liens and (B) have been sold by the applicable Loan Party Obligor to the Account Debtor in the ordinary course of such Loan Party Obligor's business and delivered to and accepted by the Account Debtor, or the services giving rise to such Account have been performed by the applicable Loan Party Obligor and accepted by the Account Debtor in the ordinary course of such Loan Party Obligor's business;

(xiii)    the Account is not evidenced by Chattel Paper or an Instrument of any kind (unless such Chattel Paper or Instrument is delivered to Lender in accordance with Section 5.2) and has not been reduced to judgment;

(xiv)    the Account Debtor's total indebtedness to such Loan Party Obligor does not exceed the amount of any credit limit established by such Loan Party Obligor or Lender and the Account Debtor is otherwise deemed to be creditworthy by Lender; *provided*, that Accounts which are deemed to be ineligible solely by reason of this clause (xiv) shall be considered Eligible Accounts to the extent the amount of such Accounts does not exceed the lower of such credit limits;

(xv)    there are no facts or circumstances existing, or which could reasonably be anticipated to occur, which might result in any material adverse change in the Account Debtor's financial condition or materially impair or delay the collectability of all or any portion of such Account;

(xvi)    Lender has been furnished with all documents and other information pertaining to such Account which Lender has reasonably requested, or which such Loan Party Obligor is obligated to deliver to Lender, pursuant to this Agreement;

(xvii)    such Loan Party Obligor has not made an agreement with the Account Debtor to extend the time of payment thereof beyond the time periods set forth in clause (ii) above;

(xviii)    such Loan Party Obligor has not posted a surety or other bond in respect of the contract under which such Account arose; and

(xix)    the Account Debtor is not subject to any proceeding seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar applicable law.

*"Eligible Intellectual Property"* means, at any time of determination, United States registered Intellectual Property owned by the Loan Party Obligors which is included in the most recent appraisal of the Intellectual Property of the Loan Party Obligors received by Lender in form and substance acceptable to Lender, which is addressed to Lender and upon which Lender is expressly permitted to rely, that complies in all material respects with each of the representations and warranties respecting Intellectual Property made in the Loan Documents and which is otherwise acceptable to Lender in its sole discretion; *provided*, that unless and until (i) Lender obtains such an appraisal and (ii) either (x) an Event of Default or (y) the first anniversary of the Closing Date has occurred, the net orderly liquidation value of Eligible Intellectual Property shall be deemed to be $7,000,000, minus the amount of any mandatory prepayments required to be made pursuant to Section 2.6(a) as a result of the disposition or other loss of any Intellectual Property.

*"ERISA"* means the Employee Retirement Income Security Act of 1974 and all rules, regulations and orders promulgated thereunder.

*"ERISA Affiliate"* means any trade or business (whether or not incorporated) under common control with a Loan Party within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code and Section 302 of ERISA).

*"ERISA Event"* means: (a) a Reportable Event with respect to a Pension Plan; (b) the withdrawal of any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a *"substantial employer"* as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by a Loan Party or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Pension Plan amendment as a termination under Section 4041 or 4041A of ERISA; (e) the institution by the PBGC of proceedings to terminate a Pension Plan; (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (g) the determination that any Pension Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; or (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon a Loan Party or any ERISA Affiliate.

*"Event of Default"* has the meaning set forth in Section 11.1.

*"Excess Availability"* means the amount, calculated at any date, equal to the difference of (a) the lesser of (i) the Maximum Revolving Facility Amount, minus Reserves against the Maximum Revolving Facility Amount, and (ii) the Borrowing Base minus Reserves against the Borrowing Base, and minus (b) the outstanding balance of all Revolving Loans.

*"Excluded Property"* means each of the following: (i) any permit, lease, license, contract or other agreement (or any equipment owned by any Loan Party Obligor that is subject to a purchase money Lien or a Capitalized Lease that is permitted pursuant to this Agreement) to which any Loan Party Obligor is a party, which permit, lease, license, contract or other agreement (and in the case of any such equipment, the contract or other agreement in which the purchase money Lien is granted or the applicable Capitalized Lease) prohibits the creation by such Loan Party Obligor of a Lien thereon, but only, in each case, to the extent, and for so long as, such prohibition is not removed, terminated or rendered unenforceable or otherwise deemed ineffective by the UCC (including Sections 9-406, 9-407, 9-408 or 9-409 thereof) or any other applicable law and with respect to any such equipment, for so long as the Indebtedness secured by the applicable Lien or the applicable

-6-

Capitalized Lease has not been repaid in full, (ii) any intent-to-use trademark or service mark application if granting such Lien or the exercise of Lender's remedies under the Loan Documents would result in an assignment of such application to Lender that would be deemed to invalidate, void, cancel or abandon such application; provided, that the foregoing exclusion shall in no way be construed to include an amendment to allege use or statement of use and (iii) any voting stock (within the meaning of Treasury Regulations § 1.956-2(c)(2)) in excess of 65% of the outstanding voting stock of any Foreign Subsidiary or Disregarded Domestic Subsidiary which, pursuant to the terms of this Agreement, is not required to guaranty the Obligations. For the avoidance of doubt, any and all proceeds, products, substitutions or replacements of any property described in clauses (i), (ii) and (iii) above shall not constitute Excluded Property (unless such proceeds, products, substitutions or replacements would itself constitute property described in clauses (i), (ii) or (iii) above).

*"Excluded Taxes"* means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof); (b) in the case of a Non-U.S. Recipient (as defined in Section 13(e)), U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Non-U.S. Recipient with respect to an applicable interest in a Revolving Loan or commitment pursuant to a law in effect on the date on which Non-U.S. Recipient becomes a party to this Agreement or acquires a participation, except in each case to the extent that, pursuant to Section 13 amounts with respect to such Taxes were payable either to such Non-U.S. Recipient assignor (or Lender granting such participation) immediately before such assignment or grant of participation; (c) United States federal withholding Taxes that would not have been imposed but for such Recipient's failure to comply with Section 13(e) (except where the failure to comply with Section 13(e) was the result of a change in law, ruling, regulation, treaty, directive, or interpretation thereof by a Governmental Authority after the date the Recipient became a party to this Agreement or a Participant) and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

*"Extraordinary Receipts"* means any cash or cash equivalents received by or paid to or for the account of any Loan Party not in the ordinary course of business, including amounts received in respect of foreign, United States, state or local tax refunds, purchase price adjustments, indemnification payments and pension plan reversions.

*"FATCA"* means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof.

*"Fee Letter"* means that certain letter agreement regarding fees dated as of the Closing Date between Lender and Borrower.

*"FIRREA"* means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

*"Fiscal Year"* means the fiscal year of Borrower which ends on December 31 of each year.

*"Fixed Charges"* means, for the period in question, on a consolidated basis, the sum of (a) all principal payments scheduled or required to be made during or with respect to such period in respect of Indebtedness of the Loan Parties (but excluding mandatory prepayments of the Obligations), plus (b) all Interest Expense of the Loan Parties for such period paid or required to be paid in cash during such period, plus (c) all taxes of the Loan Parties paid or required to be paid for

such period and plus (d) all cash distributions, dividends, redemptions and other cash payments made or required to be made during such period with respect to equity securities issued by any Loan Party.

*"Foreign Subsidiary"* means any Subsidiary that is not incorporated or organized under the laws of a State within the United States of America or the District of Columbia, and that is a *"controlled foreign corporation"* within the meaning of Section 957 of the Code with respect to which a Loan Party is a *"U.S. shareholder"* within the meaning of Section 951(b) of the Code. Unless the context indicates otherwise, references to a Foreign Subsidiary shall be deemed to refer to a Foreign Subsidiary of Borrower.

*"FRB"* means the Board of Governors of the Federal Reserve System or any successor thereto.

*"GAAP"* means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the United States accounting profession) which are applicable to the circumstances as of the date of determination, in each case consistently applied.

*"Governing Documents"* means, with respect to any Person, the certificate of incorporation, articles of incorporation, certificate of formation, certificate of limited partnership, by-laws, operating agreement, limited liability company agreement, limited partnership agreement or other similar governance document of such Person.

*"Governmental Authority"* means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

*"Guaranty" or "Guarantied"*, as applied to any Indebtedness, liability or other obligation, means (a) a guaranty, directly or indirectly, in any manner, including by way of endorsement (other than endorsements of negotiable instruments for collection in the ordinary course of business), of any part or all of such Indebtedness, liability or obligation and (b) an agreement, contingent or otherwise, and whether or not constituting a guaranty, assuring, or intended to assure, the payment or performance (or payment of damages in the event of non-performance) of any part or all of such Indebtedness, liability or obligation by any means (including the purchase of securities or obligations, the purchase or sale of property or services or the supplying of funds).

*"Indebtedness"* means (without duplication), with respect to any Person, (a) all obligations or liabilities, contingent or otherwise, for borrowed money, (b) all obligations represented by promissory notes, bonds, debentures or the like, or on which interest charges are customarily paid, (c) all liabilities secured by any Lien on property owned or acquired, whether or not such liability shall have been assumed, (d) all obligations of such Person under conditional sale or other title-retention agreements relating to property or assets purchased by such Person, (e) all obligations of such Person issued or assumed as the deferred purchase price of property or services (excluding trade payables which are not ninety days past the invoice date incurred in the ordinary course of business, but including the maximum potential amount payable under any earn-out or similar obligations), (f) all Capitalized Leases of such Person, (g) all obligations (contingent or otherwise) of such Person as an account party or applicant in respect of letters of credit and bankers' acceptances or in respect of financial or other hedging obligations, (h) all equity interests issued by such Person subject to

-8-

repurchase or redemption at any time on or prior to the Scheduled Maturity Date, other than voluntary repurchases or redemptions that are at the sole option of such Person and other than the Warrant, (i) all principal outstanding under any synthetic lease, off-balance sheet loan or similar financing product and (j) all Guaranties, endorsements (other than for collection in the ordinary course of business) and other contingent obligations in respect of the obligations of others.

*"Indemnified Taxes"* means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

*"Intellectual Property"* means the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, trademarks and trademark licenses and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

*"Intellectual Property Advance Rate"* means 90%.

*"Interest Expense"* means, for the applicable period, for the Loan Parties on a consolidated basis, total interest expense (including interest attributable to Capitalized Leases in accordance with GAAP) and fees with respect to outstanding Indebtedness.

*"Investment Affiliate"* means any fund or investment vehicle that (a) is organized by a Person for the purpose of making equity or debt investments in one or more companies and (b) is controlled by, or under common control with, such Person. For purposes of this definition *"control"* means the power to direct or cause the direction of management and policies of a Person, whether by contract or otherwise.

*"Investment Property"* means the collective reference to (a) all *"investment property"* as such term is defined in Section 9-102 of the UCC, (b) all *"financial assets"* as such term is defined in Section 8-102(a)(9) of the UCC and (c) whether or not constituting *"investment property"* as so defined, all Pledged Equity.

*"Issuers"* means the collective reference to each issuer of Investment Property.

*"Judgment Currency"* has the meaning set forth in Section 10.3(b).

*"Lender"* has the meaning set forth in the preamble to this Agreement.

*"Lien"* means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or other), security interest or other security arrangement and any other preference, priority, or preferential arrangement in the nature of a security interest of any kind or nature whatsoever, including any conditional sale contract or other title-retention agreement, the interest of a lessor under a capital lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

*"Loan Account"* has the meaning set forth in Section 3.4.

*"Loan Documents"* means, collectively, this Agreement and all notes, guaranties, security agreements, mortgages, certificates, landlord's agreements, Control Agreements, Personal Guaranties, the Fee Letter, the Warrant, and all other agreements, documents and instruments now or hereafter executed or delivered by Borrower, any Loan Party, or any Other Obligor in connection with, or to evidence the transactions contemplated by, this Agreement.

*"Loan Guaranty"* means Section 12.

*"Loan Party"* means, individually, Borrower, or any Subsidiary; and *"Loan Parties"* means, collectively, Borrower and all Subsidiaries.

*"Loan Party Obligor"* means, individually, Borrower or any Obligor that is a Loan Party; and *"Loan Party Obligors"* means, collectively, Borrower and each Loan Party Obligor.

*"Loans"* means, collectively, the Revolving Loans and any Term Loan.

*"Lock Box"* has the meaning set forth in Section 6.1.

*"Master Licensing Agreement"* means one or more license agreements for the worldwide rights (or any part thereof) to use any one or more trademarks of the Loan Parties in connection with adult-themed clubs.

*"Material Adverse Effect"* means any event, act, omission, condition or circumstance which, which individually or in the aggregate, has or could reasonably be expected to have a material adverse effect on (a) the business, operations, properties, assets or condition, financial or otherwise, of any Loan Party or any Other Obligor, (b) the ability of any Loan Party or any Other Obligor, as applicable, to perform any of its obligations under any of the Loan Documents or (c) the validity or enforceability of, or Lender's rights and remedies under, any of the Loan Documents.

*"Material Contract"* means has the meaning set forth in Section 7.18.

*"Maturity Date"* means the Scheduled Maturity Date (or, if earlier, the Termination Date), or such earlier date as the Obligations may be accelerated in accordance with the terms of this Agreement (including pursuant to Section 11.2).

*"Maximum Lawful Rate"* has the meaning set forth in Section 3.5.

*"Maximum Liability"* has the meaning set forth in Section 12.9.

*"Maximum Revolving Facility Amount"* means $6,000,000.

*"Multiemployer Plan"* means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which a Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

*"Net Income"* means, for the applicable period, for Borrower individually or for the Loan Parties on a consolidated basis, as applicable, the net income (or loss) of Borrower individually or of the Loan Parties on a consolidated basis, as applicable, for such period, excluding any gains or non-cash losses from dispositions, any extraordinary gains or extraordinary non-cash losses and any gains or non-cash losses from discontinued operations, in each case of Borrower individually or of the Loan Parties on a consolidated basis, as applicable, for such period.

*"Non-Paying Guarantor"* has the meaning set forth in Section 12.10.

*"Non-U.S. Recipient"* has the meaning set forth in Section 13(e)(ii).

*"Notice of Borrowing"* has the meaning set forth in Section 2.3.

*"Obligations"* means all present and future Loans, advances, debts, liabilities, fees, expenses, obligations, guaranties, covenants, duties and indebtedness at any time owing by Borrower or any Loan Party Obligor to Lender, whether evidenced by this Agreement, any other Loan Document or otherwise, whether arising from an extension of credit, guaranty, indemnification or otherwise, whether direct or indirect (including those acquired by assignment and any participation by Lender in Borrower's indebtedness owing to others), whether absolute or contingent, whether due or to become due and whether arising before or after the commencement of a proceeding under the Bankruptcy Code or any similar statute.

*"Obligor"* means any guarantor, endorser, acceptor, surety or other Person liable on, or with respect to, any of the Obligations or who is the owner of any property which is security for any of the Obligations.

*"Other Obligor"* means any Obligor other than any Loan Party Obligor.

*"Other Taxes"* means all present or future stamp, court or documentary, property, excise, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

*"Participant"* has the meaning set forth in Section 14.10.

*"Paying Guarantor"* has the meaning set forth in Section 12.10.

*"PBGC"* means the Pension Benefit Guaranty Corporation.

*"Pension Act"* means the Pension Protection Act of 2006.

*"Pension Funding Rules"* means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and Multiemployer Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Section 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA, and any sections of the Code or ERISA related thereto that are enacted after the date of this Agreement.

*"Pension Plan"* means any employee pension benefit plan (including a Multiple Employer Plan or a Multiemployer Plan) that is maintained or is contributed to by a Loan Party and any ERISA Affiliate and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

*"Permitted Discretion"* means a determination made by Lender in the exercise of reasonable (from the perspective of an asset-based secured lender) business judgment.

*"Permitted Indebtedness"* means: (a) the Obligations; (b) the Indebtedness existing on the date hereof described in Section 7 of the Perfection Certificate; in each case along with extensions, refinancings, modifications, amendments and restatements thereof; *provided*, that (i) the principal amount thereof is not increased, (ii) if such Indebtedness is subordinated to any or all of the Obligations, the applicable subordination terms shall not be modified without the prior written consent of Lender and (iii) the terms thereof are not modified to impose more burdensome terms upon any Loan Party; (c) capitalized leases and purchase-money Indebtedness secured by Permitted Liens in an aggregate amount not exceeding $50,000 at any time outstanding; and (d) Indebtedness incurred as a result of endorsing negotiable instruments received in the ordinary course of business.

*"Permitted Liens"* means (a) purchase-money security interests in specific items of Equipment securing Permitted Indebtedness described under clause (c) of the definition of Permitted Indebtedness; (b) liens for taxes, fees, assessments, or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings (which proceedings have the effect of preventing the enforcement of such lien) for which adequate reserves in accordance with GAAP are being maintained provided the same have no priority over any of Lender's security interests; (c) liens of materialmen, mechanics, carriers, or other similar liens arising in the ordinary course of business and securing obligations which are not delinquent or are being contested in good faith by appropriate proceedings (which proceedings have the effect of preventing the enforcement of such lien) for which adequate reserves in accordance with GAAP are being maintained; (d) liens which constitute banker's liens, rights of set-off, or similar rights as to deposit accounts or other funds maintained with a bank or other financial institution (but only to the extent such banker's liens, rights of set-off or other rights are in respect of customary service charges relative to such deposit accounts and other funds, and not in respect of any loans or other extensions of credit by such bank or other financial institution to any Loan Party); and (e) cash deposits or pledges to secure the payment of worker's compensation, unemployment insurance, or other social security benefits or obligations, public or statutory obligations, surety or appeal bonds, bid or performance bonds, or other obligations of a like nature incurred in the ordinary course of business.

*"Person"* means any individual, sole proprietorship, partnership, joint venture, limited liability company, trust, unincorporated organization, association, corporation, government or any agency or political division thereof, or any other entity.

*"Personal Guaranties"* means the Guaranty Agreement dated as of the Closing Date executed by Kelly Holland in favor of Lender.

*"PIK Rate"* means a rate per annum of 5.00%.

*"Plan"* means any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan) maintained for employees of any Loan Party or any such plan to which any Loan Party (or with respect to any plan subject to Section 412 of the Code or Section 302 or Title IV of ERISA, any ERISA Affiliate) is required to contribute on behalf of any of its employees.

*"Pledged Equity"* means the equity interests listed on Sections 1(f) and 1(g) of the Perfection Certificate, together with any other equity interests, certificates, options, or rights or instruments of any nature whatsoever in respect of the equity interests of any Person that may be issued or granted to, or held by, any Loan Party Obligor while this Agreement is in effect, and including, to the extent attributable to, or otherwise related to, such pledged equity interests, all of such Loan Party Obligor's (a) interests in the profits and losses of each Issuer, (b) rights and interests to receive distributions of each Issuer's assets and properties and (c) rights and interests, if any, to participate in the management or each Issuer related to such pledged equity interests.

*"Prepayment Event"* means: (a) any sale (other than sales of inventory in the ordinary course of business), transfer or other disposition (including pursuant to a sale and leaseback transaction or any Master Licensing Agreement) of any property or asset of any Loan Party Obligor (excluding licenses of intellectual property in the ordinary course of business (but not pursuant to any Master Licensing Agreement) and transactions contemplated by the Closing Date Acquisition Agreement); (b) any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of any of any Loan Party Obligor; (c) the issuance by any Loan Party to any Person (other than to another Loan Party and other than issuances by Borrower permitted hereunder) of any equity interests after the Closing Date, or the receipt by any Loan Party of any capital contribution from any Person (other than from another Loan

-12-

Party) after the Closing Date; (d) the incurrence by any Loan Party of any Indebtedness not permitted by this Agreement; and (e) the receipt by any Loan Party of any Extraordinary Receipts.

*"Protective Advances"* has the meaning set forth in Section 2.2.

*"Qualified Cash"* means, as of any date of determination, the amount of immediately available unencumbered cash on hand of Borrower that is in a Deposit Account and is maintained by a branch office of the bank or securities intermediary located within the United States.

*"Recipient"* means any Lender, Participant, or any other recipient of any payment to be made by or on account of any Obligation of any Loan Party under this Agreement or any other Loan Document, as applicable.

*"Register"* has the meaning set forth in Section 14.9(a).

*"Released Parties"* has the meaning set forth in Section 10.1.

*"Reportable Event"* means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty day notice period has been waived.

*"Reserves"* has the meaning set forth in Section 2.1(b).

*"Restricted Accounts"* means Deposit Accounts (a) established and used (and at all times will be used) solely for the purpose of paying current payroll obligations of Loan Parties (and which do not (and will not at any time) contain any deposits other than those necessary to fund current payroll), in each case in the ordinary course of business, or (b) maintained (and at all times will be maintained) solely in connection with an employee benefit plan, but solely to the extent that all funds on deposit therein are solely held for the benefit of, and owned by, employees (and will continue to be so held and owned) pursuant to such plan.

*"Revolving Loans"* has the meaning set forth in Section 2.1(a).

*"Scheduled Maturity Date"* means February 19, 2017.

*"Securities Act"* means the Securities of Act of 1933, as amended.

*"Sellers"* means, collectively, FriendFinder Networks, Inc., a Delaware corporation, and Streamray, Inc., a Nevada corporation.

*"Stated Rate"* has the meaning set forth in Section 3.5.

*"Subsidiary"* means any corporation or other entity of which a Person owns, directly or indirectly, through one or more intermediaries, more than 50% of the capital stock or other equity interest at the time of determination. Unless the context indicates otherwise, references to a Subsidiary shall be deemed to refer to a Subsidiary of Borrower.

*"Tangible Net Worth"* shall have the meaning set forth in Section 9.3.

*"Taxes"* means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

*"Term Loan"* has the meaning set forth in Section 2.1(c).

-13-

*"Termination Date"* means the date on which all of the Obligations have been paid in full in cash and all of Lender's lending commitments under this Agreement and under each of the other Loan Documents have been terminated.

*"UCC"* means, at any given time, the Uniform Commercial Code as adopted and in effect at such time in the State of Illinois or other applicable jurisdiction.

*"Warrant"* shall mean the Common Stock Purchase Warrant to be issued by Borrower to the Lender on the Closing Date.

## 1.2. Accounting Terms and Determinations.

Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder (including determinations made pursuant to the exhibits hereto) shall be made, and all financial statements required to be delivered hereunder shall be prepared on a consolidated basis in accordance with GAAP consistently applied. If at any time any change in GAAP would affect the computation of any financial ratio or financial requirement set forth in any Loan Document, and either Borrower or Lender shall so request, Lender and Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP; *provided* that, until so amended, (a) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (b) Borrower shall provide to Lender financial statements and other documents required under this Agreement and the other Loan Documents which include a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (Codification of Accounting Standards 825-10) to value any Indebtedness or other liabilities of any Loan Party at *"fair value"*, as defined therein.

Notwithstanding anything to the contrary contained in the paragraph above or the definitions of Capital Expenditures or Capitalized Leases, in the event of a change in GAAP after the Closing Date requiring all leases to be capitalized, only those leases (assuming for purposes of this paragraph that they were in existence on the Closing Date) that would constitute Capitalized Leases on the Closing Date shall be considered Capitalized Leases (and all other such leases shall constitute operating leases) and all calculations and deliverables under this Agreement or the other Loan Documents shall be made in accordance therewith (other than the financial statements delivered pursuant to this Agreement; *provided* that all such financial statements delivered to Lender in accordance with the terms of this Agreement after the date of such change in GAAP shall contain a schedule showing the adjustments necessary to reconcile such financial statements with GAAP as in effect immediately prior to such change).

## 1.3. Other Definitional Provisions and References.

References in this Agreement to *"Articles"*, *"Sections"*, *"Annexes"*, *"Exhibits"* or *"Schedules"* shall be to Articles, Sections, Annexes, Exhibits or Schedules of or to this Agreement unless otherwise specifically provided. Any term defined herein may be used in the singular or plural. *"Include"*, *"includes"* and *"including"* shall be deemed to be followed by *"without limitation"*. *"Or"* shall be construed to mean *"and/or"*. Except as otherwise specified or limited herein, references to any Person include the successors and assigns of such Person. References *"from"* or *"through"* any date mean, unless otherwise specified, *"from and including"* or *"through and including"*, respectively. Unless otherwise specified herein, the settlement of all payments and fundings hereunder between or among the parties hereto shall be made in lawful money of the United

-14-

States and in immediately available funds. Time is of the essence for each performance obligation of the Loan Parties under this Agreement and each Loan Document. All amounts used for purposes of financial calculations required to be made herein shall be without duplication. References to any statute or act shall include all related current regulations and all amendments and any successor statutes, acts and regulations. References to any agreement, instrument or document (a) shall include all schedules, exhibits, annexes and other attachments thereto and (b) shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein or in any other Loan Document). The words *"asset"* and *"property"* shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. Unless otherwise specified herein Dollar ($) baskets set forth in the representations and warranty, covenants and event of default provisions of this Agreement (and other similar baskets) are calculated as of each date of measurement by the Dollar Equivalents thereof as of such date of measurement.

## 2.   LOANS.

### 2.1.   Amount of Loans.

(a)   **Revolving Loans.** Subject to the terms and conditions of this Agreement, Lender will, from time to time prior to the Maturity Date, at Borrower's request, make revolving loans to Borrower (*"Revolving Loans"*); *provided*, that after giving effect to each such Revolving Loan, the sum of the outstanding balance of all Revolving Loans will not exceed the lesser of (x) the Maximum Revolving Facility Amount and (y) the Borrowing Base. All Revolving Loans shall be made in and repayable in Dollars.

(b)   **Reserves.** Lender may, with or without notice to Borrower, from time to time establish and revise reserves against the Borrowing Base and the Maximum Revolving Facility Amount in such amounts and of such types as Lender deems appropriate in its Permitted Discretion (*"Reserves"*) to reflect (i) events, conditions, contingencies or risks which affect or may reasonably be expected to affect (A) the Collateral or its value, or the security interests and other rights of Lender in the Collateral or (B) the assets, business or prospects of Borrower or any Loan Party Obligor (including the Dilution Reserve), (ii) Lender's good faith concern that any Collateral report or financial information furnished by or on behalf of Borrower or any Loan Party Obligor to Lender is or may have been incomplete, inaccurate or misleading in any material respect, (iii) any fact or circumstance which Lender determines in good faith constitutes, or could reasonably be expected to constitute, a Default or Event of Default, or (iv) any other events or circumstances which Lender determines in good faith make the establishment or revision of a Reserve prudent. In no event shall the establishment of a Reserve in respect of a particular actual or contingent liability obligate Lender to make advances to pay such liability or otherwise obligate Lender with respect thereto.

(c)   **Term Loan.** Subject to the terms and conditions contained in this Agreement, Lender will, on the Closing Date, make a term loan to Borrower in the initial principal amount of $3,000,000 (the *"Term Loan"*). The Term Loan shall be advanced in a single borrowing on the Closing Date, and any principal amounts repaid in respect of the Term Loan may not be reborrowed. The Term Loan shall be made in and repayable in Dollars.

**2.2.   Protective Advances.** Notwithstanding any contrary provision of this Agreement or any other Loan Document, at any time (a) after the occurrence and during the continuance of a Default or Event of Default or (b) that any of the other applicable conditions precedent set forth in Section 4 or otherwise are not satisfied, Lender is authorized by Borrower, from time to time, in Lender's sole

-15-

discretion, to make such Revolving Loans to, or for the benefit of, Borrower, as Lender in its sole discretion deems necessary or desirable (i) to preserve or protect the Collateral, or any portion thereof, or (ii) to enhance the likelihood of repayment of the Obligations (the Revolving Loans described in this Section 2.2 shall be referred to as *"Protective Advances"*). Notwithstanding any contrary provision of this Agreement or any other Loan Document, Lender may disburse the proceeds of any Protective Advance to Borrower or to such other Person(s) as Lender determines in its sole discretion. All Protective Advances shall be payable immediately upon demand.

**2.3.    Notice of Borrowing; Manner of Revolving Loan Borrowing.** Borrower shall request each Revolving Loan by submitting a Notice of Borrowing to Lender substantially in the form of Exhibit A hereto (each such request a *"Notice of Borrowing"*). Subject to the terms and conditions of this Agreement, Lender shall, except as provided in Section 2.2, deliver the amount of the Revolving Loan requested in the Notice of Borrowing for credit to any account of Borrower as Borrower may specify at a bank acceptable to Lender (*provided,* that such account must be one identified on Section 3 of the Perfection Certificate and approved by Lender as an account to be used for funding of loan proceeds) by wire transfer of immediately available funds (a) on the same day if the Notice of Borrowing is received by Lender on or before 10:00 a.m. Central Time on a Business Day or (b) on the immediately following Business Day if the Notice of Borrowing is received by Lender after 10:00 a.m. Central Time on a Business Day or on a day that is not a Business Day. Lender shall charge to the Revolving Loan Lender's usual and customary fees for the wire transfer of each Loan.

**2.4.    [Intentionally Omitted.]**

**2.5.    Repayment.**

(a)    **Revolving Loans.** If at any time for any reason whatsoever (including as a result of currency fluctuations), the outstanding balance of all Revolving Loans exceeds the lesser of (x) the Maximum Revolving Facility Amount and (y) the Borrowing Base, Borrower will immediately pay to Lender such amounts as shall cause Borrower to eliminate such excess.

(b)    **Term Loan.** Principal of the Term Loan shall be repaid in equal consecutive monthly installments of $41,666.66, payable on the first day of each calendar month commencing March 1, 2016, with the entire unpaid balance due and payable on the Maturity Date.

(c)    **Maturity Date Payments.** All remaining outstanding monetary Obligations (including, all accrued and unpaid fees described in Section 3.2) shall be payable in full on the Maturity Date.

**2.6.    Prepayments / Voluntary Termination.**

(a)    **Certain Mandatory Prepayment Events.** Borrower shall be required to prepay the outstanding principal balance of the Loans upon the occurrence of each and every Prepayment Event (such prepayment to be made on any date thereafter on which proceeds pertaining thereto are received by any Loan Party), in each case without any demand or notice from Lender or any other Person, all of which is hereby expressly waived by Borrower, in the amount of 100% of the proceeds (net of documented reasonable out-of-pocket costs and expenses incurred in connection with the collection of such proceeds, in each case payable to Persons that are not Affiliates of any Loan Party, and net of estimated taxes incurred as a result of such Prepayment Event) received by any Loan Party with respect to such Prepayment Event. Prepayments of the Loans made pursuant to this Section 2.6(a) shall be applied in the manner set forth in Section 6.2 (disregarding for such purpose any instruction as to application provided by the Borrower).

-16-

(b) **Voluntary Termination of Loan Facilities.** Borrower may, on at least ten days prior written notice received by Lender, permanently terminate the Revolving Loan facilities by repaying all of the outstanding Obligations, including all principal, interest and fees with respect to the Revolving Loans and the Term Loan. From and after such date of termination, Lender shall have no obligation whatsoever to extend any additional Revolving Loans or make available any other extension of credit, and all of its lending commitments hereunder shall be terminated.

(c) **Voluntary Prepayment of the Term Loan.** Borrower may, on at least ten days prior written notice received by Lender, prepay all or any portion of the Term Loan.

### 2.7. Obligations Unconditional.

(a) The payment and performance of all Obligations shall constitute the absolute and unconditional obligations of each Loan Party Obligor, and shall be independent of any defense or right of set-off, recoupment or counterclaim that any Loan Party Obligor or any other Person might otherwise have against Lender or any other Person. All payments required (other than by Lender) by this Agreement or the other Loan Documents shall be made in Dollars (unless payment in a different currency is expressly provided otherwise in the applicable Loan Document) and paid free of any deductions or withholdings for any taxes or other amounts and without abatement, diminution or set-off. If any Loan Party Obligor is required by applicable law to make such a deduction or withholding from a payment under this Agreement or under any other Loan Document, such Loan Party Obligor shall pay to Lender such additional amount as shall be necessary to ensure that, after the making of such deduction or withholding, Lender receives (free from any liability in respect of any such deduction or withholding) a net sum equal to the sum which it would have received and so retained had no such deduction or withholding been made or required to be made. Each Loan Party Obligor shall (a) pay the full amount of any deduction or withholding that it is required to make by law, to the relevant authority within the payment period set by applicable law and (b) promptly after any such payment, deliver to Lender an original (or certified copy) official receipt issued by the relevant authority in respect of the amount withheld or deducted or, if the relevant authority does not issue such official receipts, such other evidence of payment of the amount withheld or deducted as is reasonably acceptable to Lender.

(b) If, at any time and from time to time after the Closing Date (or at any time before or after the Closing Date with respect to (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act or (y) Basel III or any similar accord promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any similar authority) and, in each case, all requests, rules, regulations, guidelines or directives thereunder or issued in connection therewith), (a) any change in any existing law, regulation, treaty or directive or in the interpretation or application thereof, (b) any new law, regulation, treaty or directive enacted or application thereof or (c) compliance by Lender with any request or directive (whether or not having the force of law) from any Governmental Authority, central bank or comparable agency (i) subjects Lender to any tax, levy, impost, deduction, assessment, charge or withholding of any kind whatsoever with respect to any Loan Document, or changes the basis of taxation of payments to Lender of any amount payable thereunder (except for net income taxes, or franchise taxes imposed in lieu of net income taxes, imposed generally by federal, state, local or other taxing authorities with respect to interest or fees payable hereunder or under any other Loan Document or changes in the rate of tax on the overall net income of Lender or its members) or (ii) imposes, modifies or deems applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by Lender or (iii) imposes on Lender any other condition or increased cost in connection with the transactions contemplated thereby or participations therein, and the result of any of the foregoing is to increase the cost to Lender of making or continuing any Loan or to reduce any amount receivable hereunder or under any other Loan Documents, then, in each such case, Borrower shall promptly pay to Lender, when notified to do so by Lender, any additional amounts necessary to compensate Lender, on an after-tax basis, for such additional cost or reduced amount as determined by

-17-

Lender. Each such notice of additional amounts payable pursuant to this Section 2.7(b) submitted by Lender to Borrower shall, absent manifest error, be final, conclusive and binding for all purposes.

(c)     This Section 2.7 shall remain operative even after the Termination Date and shall survive the payment in full of all of the Loans.

**2.8.     Reversal of Payments.** To the extent that any payment or payments made to or received by Lender pursuant to this Agreement or any other Loan Document are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to any trustee, receiver or other Person under any state, federal or other bankruptcy or other such applicable law, then, to the extent thereof, such amounts (and all Liens, rights and remedies relating thereto) shall be revived as Obligations (secured by all such Liens) and continue in full force and effect under this Agreement and under the other Loan Documents as if such payment or payments had not been received by Lender. This Section 2.8 shall remain operative even after the Termination Date and shall survive the payment in full of all of the Obligations.

## 3.     INTEREST AND FEES; LOAN ACCOUNT.

**3.1.     Interest.** All Loans and other monetary Obligations shall bear interest at the Cash Rate, plus the PIK Rate; *provided*, that after the occurrence and during the continuation of an Event of Default, all Loans and other monetary Obligations shall bear interest at a rate per annum equal to two (2) percentage points in excess of the rate otherwise applicable thereto (the *"Default Rate"*). Accrued interest shall be payable (a) on the first day of each month in arrears, (b) upon any prepayment of Loans in accordance with Section 2.6(a), (c) upon any prepayment of the Loans in accordance with Section 2.6(b), and (d) on the Maturity Date; *provided*, that interest accruing at the PIK Rate shall continue to accrue and not be payable in cash in connection with an interest payment pursuant to clause (a) or (b) above. After the occurrence and during the continuance of an Event of Default, all interest (including interest accruing at the PIK Rate) shall be payable in cash on demand. To the extent not paid in cash when due, interest accruing at the PIK Rate shall be added to the outstanding principal balance of the Term Loan on the date of such required payment.

**3.2.     Fees.** Borrower shall pay Lender each of the fees and other obligations set forth in the Fee Letter on the dates provided therein, which fees are in addition to all fees and other sums payable by Borrower or any other Person to Lender under this Agreement or under any other Loan Document and, in each case, are not refundable once paid.

**3.3.     Computation of Interest and Fees.** All interest and fees shall be calculated daily on the outstanding monetary Obligations based on the actual number of days elapsed in a year of 360 days.

**3.4.     Loan Account; Monthly Accountings.** Lender shall maintain a loan account for Borrower reflecting all outstanding Loans, along with interest accrued thereon and such other items reflected therein (the *"Loan Account"*), and shall provide Borrower with a monthly accounting reflecting the activity in the Loan Account. Each accounting shall be deemed correct, accurate and binding on Borrower and an account stated (except for reverses and reapplications of payments made and corrections of errors discovered by Lender), unless Borrower notifies Lender in writing to the contrary within thirty days after such account is rendered, describing the nature of any alleged errors or omissions. However, Lender's failure to maintain the Loan Account or to provide any such accounting shall not affect the legality or binding nature of any of the Obligations. Interest, fees and other monetary Obligations due and owing under this Agreement may, in Lender's discretion, be charged to the Loan Account, and will thereafter be deemed to be Revolving Loans and will bear interest at the same rate as other Revolving Loans (except for interest accruing at the PIK Rate, which shall be added to the outstanding balance of the Term Loan in accordance with Section 3.1).

**3.5.** **Further Obligations; Maximum Lawful Rate.** With respect to all monetary Obligations for which the interest rate is not otherwise specified herein (whether such Obligations arise hereunder or under any other Loan Document, or otherwise), such Obligations shall bear interest at the rate(s) in effect from time to time with respect to the Revolving Loans and shall be payable upon demand by Lender. In no event shall the interest charged with respect to any Loan or any other Obligation exceed the maximum amount permitted under applicable law. Notwithstanding anything to the contrary herein or elsewhere, if at any time the rate of interest payable or other amounts hereunder or under any other Loan Document (the *"Stated Rate"*) would exceed the highest rate of interest or other amount permitted under any applicable law to be charged (the *"Maximum Lawful Rate"*), then for so long as the Maximum Lawful Rate would be so exceeded, the rate of interest and other amounts payable shall be equal to the Maximum Lawful Rate; *provided*, that if at any time thereafter the Stated Rate is less than the Maximum Lawful Rate, Borrower shall, to the extent permitted by applicable law, continue to pay interest and such other amounts at the Maximum Lawful Rate until such time as the total interest and other such amounts received is equal to the total interest and other such amounts which would have been received had the Stated Rate been (but for the operation of this provision) the interest rate payable or such other amounts payable. Thereafter, the interest rate and such other amounts payable shall be the Stated Rate unless and until the Stated Rate again would exceed the Maximum Lawful Rate, in which event this provision shall again apply. In no event shall the total interest or other such amounts received by Lender exceed the amount which it could lawfully have received had the interest and other such amounts been calculated for the full term hereof at the Maximum Lawful Rate. If, notwithstanding the prior sentence, Lender has received interest or other such amounts hereunder in excess of the Maximum Lawful Rate, such excess amount shall be applied to the reduction of the principal balance of the Loans or to other Obligations (other than interest) payable hereunder, and if no such principal or other Obligations are then outstanding, such excess or part thereof remaining shall be paid to Borrower. In computing interest payable with reference to the Maximum Lawful Rate applicable to any Lender, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate divided by the number of days in the year in which such calculation is made.

## 4. CONDITIONS PRECEDENT.

### 4.1. Conditions to Initial Loans.

Lender's obligation to fund the initial Loans is subject to the following conditions precedent (as well as any other conditions set forth in this Agreement or any other Loan Document), all of which must be satisfied in a manner acceptable to Lender (and as applicable, pursuant to documentation which in each case is in form and substance acceptable to Lender):

(a) each Loan Party Obligor shall have duly executed and/or delivered, or, as applicable, shall have caused such other applicable Persons to have duly executed and or delivered, to Lender such agreements, instruments, documents, proxies and certificates as Lender may require, including such other agreements, instruments, documents and certificates listed on the closing checklist attached hereto as Exhibit B (other than any such items identified as "Post-Closing Items");

(b) Lender shall have completed its business and legal due diligence pertaining to the Loan Parties and their respective businesses and assets, with results thereof satisfactory to Lender in its sole discretion;

(c) Lender's obligations and commitments under this Agreement shall have been approved by Lender's Credit Committee;

(d) after giving effect to such Loans, as well as to the payment of all trade payables older than sixty days past due and the consummation of all transactions contemplated hereby to occur on

the Closing Date, closing costs and any book overdraft, Excess Availability plus Qualified Cash shall be no less than $750,000;

(e) no event shall have occurred which has had, or could reasonably be expected to have, a Material Adverse Effect on any Loan Party, as determined by Lender in its sole discretion, determined in good faith;

(f) Borrower shall have paid to Lender all fees due on the date hereof under the Fee Letter, and shall have paid or reimbursed Lender for all of Lender's costs, charges and expenses incurred through the Closing Date (and in connection herewith, Borrower hereby irrevocably authorizes Lender to charge such fees, costs, charges and expenses as Revolving Loans); and

(g) the Closing Date Acquisition shall have been consummated pursuant to the terms of the Closing Date Acquisition Agreement.

**4.2.** **Conditions to all Loans.** Lender shall not be obligated to fund any Loans, unless the following conditions are satisfied:

(a) Borrower shall have provided to Lender such information as Lender may reasonably require in order to determine the Borrowing Base (including the items set forth in Section 7.15(a), (b) and (c) (as applicable)), as of such borrowing or issue date, after giving effect to such Loans;

(b) each of the representations and warranties set forth in this Agreement and in the other Loan Documents shall be true and correct in all material respects as of the date such Loan is made (or, to the extent any representations or warranties are expressly made solely as of an earlier date, such representations and warranties shall be true and correct in all material respects as of such earlier date), both before and after giving effect thereto; and

(c) no Default or Event of Default shall be in existence, both before and after giving effect thereto.

Each request (or deemed request) by Borrower for funding of a Loan shall constitute a representation by Borrower that the foregoing conditions are satisfied on the date of such request and on the date of such funding or issuance. As an additional condition to any funding, issuance or grant, Lender shall have received such other information, documents, instruments and agreements as it reasonably requests in connection therewith.

## 5. COLLATERAL.

**5.1.** **Grant of Security Interest.** To secure the full payment and performance of all of the Obligations, each Loan Party Obligor hereby assigns to Lender and grants to Lender a continuing security interest in all property of each Loan Party Obligor, whether tangible or intangible, real or personal, now or hereafter owned, existing, acquired or arising and wherever now or hereafter located, and whether or not eligible for lending purposes, including: (a) all Accounts (whether or not Eligible Accounts) and all Goods whose sale, lease or other disposition by any Loan Party Obligor has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, any Loan Party Obligor; (b) all Chattel Paper (including Electronic Chattel Paper), Instruments, Documents, and General Intangibles (including all patents, patent applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, registrations, licenses, software, franchises, customer lists, tax refund claims, claims against carriers and shippers, guaranty claims, contracts rights, payment intangibles, security interests, security deposits and rights to indemnification); (c) all Inventory; (d) all Goods, including Equipment, Farm Products, Health-Care-Insurance Receivables, vehicles, and Fixtures; (e) all Investment Property, including all rights, privileges, authority, and powers of each Loan Party Obligor as

an owner or as a holder of Pledged Equity, including all economic rights, all control rights, authority and powers, and all status rights of each Loan Party Obligor as a member, equity holder or shareholder, as applicable, of each Issuer; (f) all Deposit Accounts, bank accounts, deposits and cash; (g) all Letter-of-Credit Rights; (h) all Commercial Tort Claims listed in Section 2 of the Perfection Certificate; (i) all Supporting Obligations; (j) any other property of any Loan Party Obligor now or hereafter in the possession, custody or control of Lender or any agent or any parent, Affiliate or Subsidiary of Lender or any Participant with Lender in the Loans, for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise) and (k) all additions and accessions to, substitutions for, and replacements, products and Proceeds of the foregoing property, including proceeds of all insurance policies insuring the foregoing property, and all of each Loan Party Obligor's books and records relating to any of the foregoing and to any Loan Party's business. Notwithstanding the foregoing, the grant of security set forth in this Section 5.1 shall not include any Excluded Property.

**5.2. Possessory Collateral.** Promptly, but in any event no later than five Business Days after any Loan Party Obligor's receipt of any portion of the Collateral evidenced by an agreement, Instrument or Document, including any Tangible Chattel Paper and any Investment Property consisting of certificated securities, such Loan Party Obligor shall deliver the original thereof to Lender together with an appropriate endorsement or other specific evidence of assignment thereof to Lender (in form and substance acceptable to Lender). If an endorsement or assignment of any such items shall not be made for any reason, Lender is hereby irrevocably authorized, as attorney and agent-in-fact (coupled with an interest) for each Loan Party Obligor, to endorse or assign the same on such Loan Party Obligor's behalf.

**5.3. Further Assurances.** Each Loan Party Obligor shall, at its own cost and expense, promptly and duly take, execute, acknowledge and deliver (or cause each other applicable Person to take, execute, acknowledge and deliver) all such further acts, documents, agreements and instruments as may from time to time be necessary or desirable or as Lender may from time to time require in order to (a) carry out the intent and purposes of the Loan Documents and the transactions contemplated thereby, (b) establish, create, preserve, protect and perfect a first priority lien (subject only to Permitted Liens) in favor of Lender in all real and personal property (wherever located) from time to time owned by the Loan Party Obligors and in all capital stock and other equity from time to time issued by the Loan Parties (including appraisals of real property in compliance with FIRREA), (c) cause each Subsidiary of Borrower to guaranty all of the Obligations, all pursuant to documentation that is in form and substance reasonably satisfactory to Lender and (d) facilitate the collection of the Collateral. Without limiting the foregoing, each Loan Party Obligor shall, at its own cost and expense, promptly and duly take, execute, acknowledge and deliver (or cause each other applicable Person to take, execute, acknowledge and deliver) to Lender all promissory notes, security agreements, agreements with landlords, mortgagees and processors and other bailees, subordination and intercreditor agreements and other agreements, instruments and documents, in each case in form and substance acceptable to Lender, as Lender may request from time to time to perfect, protect and maintain Lender's security interests in the Collateral, including the required priority thereof, and to fully carry out the transactions contemplated by the Loan Documents.

**5.4. UCC Financing Statements.** Each Loan Party Obligor authorizes Lender to file, transmit or communicate, as applicable, from time to time, Uniform Commercial Code financing statements, along with amendments and modifications thereto, in all filing offices selected by Lender, listing such Loan Party Obligor as the debtor and Lender as the secured party, and describing the collateral covered thereby in such manner as Lender may elect, including using descriptions such as "all personal property of debtor" or "all assets of debtor", or words of similar effect, in each case without such Loan Party Obligor's signature. Each Loan Party Obligor also hereby ratifies its authorization for Lender to have filed, in any filing office, any financing statements filed prior to the date hereof.

## 6.    CERTAIN    PROVISIONS    REGARDING    ACCOUNTS,    INVENTORY, COLLECTIONS AND APPLICATIONS OF PAYMENTS.

**6.1.    Lock Boxes and Blocked Accounts.**  Each Loan Party Obligor hereby represents and warrants that all Deposit Accounts and all other depositary and other accounts maintained by each Loan Party Obligor as of the Closing Date are described in Section 3 of the Perfection Certificate, which description includes for each such account the name of the Loan Party Obligor maintaining the account, the name of the financial institution at which the account is maintained, the account number and the purpose of the account.  After the Closing Date, no Loan Party Obligor shall open any new Deposit Account or any other depositary or other account without the prior written consent of Lender and without updating Section 3 of the Perfection Certificate to reflect such Deposit Account or other account.  No Deposit Account or other account of any Loan Party Obligor shall at any time constitute a Restricted Account other than accounts expressly indicated on Section 3 of the Perfection Certificate as being Restricted Accounts (and each Loan Party Obligor hereby represents and warrants that each such account shall at all times meet the requirements set forth in the definition of Restricted Account to qualify as a Restricted Account). Each Loan Party Obligor will, at its expense, establish (and revise from time to time as Lender may require) procedures acceptable to Lender, in Lender's sole discretion, for the collection of checks, wire transfers and all other proceeds of all of such Loan Party Obligor's Accounts and other Collateral (*"Collections"*), which shall include (a) directing all Account Debtors to send all Account proceeds (i) directly to a post office box designated by Lender either in the name of such Loan Party Obligor (but as to which Lender has exclusive access) or, at Lender's option following the occurrence of an Event of Default, in the name of Lender (a *"Lock Box"*) or (ii) in the case of wire transfers, to a Blocked Account and (b) depositing all Collections received by such Loan Party Obligor into one or more bank accounts maintained in the name of such Loan Party Obligor (but as to which Lender has exclusive access) or, at Lender's option, in the name of Lender (each, a *"Blocked Account"*), under an arrangement acceptable to Lender with a depository bank acceptable to Lender, pursuant to which all funds deposited into each Blocked Account are to be transferred to Lender in such manner, and with such frequency, as Lender shall specify.  Each Loan Party Obligor agrees to execute, and to cause its depository banks and other account holders to execute, such Control Agreements as Lender shall require from time to time in connection with the foregoing, all in form and substance acceptable to Lender; *provided,* that notwithstanding the foregoing, no Loan Party Obligor shall be obligated to deliver a Control Agreement to Lender or comply with the requirements set forth in clauses (a) and (b) of the preceding sentence (i) with respect to any Restricted Account or (ii) during the first 30 days after the Closing Date.

**6.2.    Application of Payments.**  All amounts paid to or received by Lender in respect of monetary Obligations, from whatever source (whether from Borrower or any other Loan Party Obligor pursuant to such other Loan Party Obligor's guaranty of the Obligations, any realization upon any Collateral or otherwise) shall, unless otherwise directed by Borrower with respect to any particular payment (unless an Event of Default shall then be continuing, in which event Lender may disregard Borrower's direction) be applied by Lender to the Obligations in such order as Lender may elect, and absent such election shall be applied as follows:

(i)    **FIRST**, to reimburse Lender for all out-of-pocket costs and expenses, and all indemnified losses, incurred by Lender which are reimbursable to Lender in accordance with this Agreement or any of the other Loan Documents;

(ii)    **SECOND**, to any accrued but unpaid interest on any Protective Advances;

(iii)    **THIRD**, to the outstanding principal of any Protective Advances;

-22-

(iv)    **FOURTH**, to any accrued but unpaid fees owing to Lender under this Agreement and/or any other Loan Documents;

(v)    **FIFTH**, to any unpaid accrued interest on the Obligations;

(vi)    **SIXTH**, (a) with respect to mandatory prepayments made pursuant to Section 2.6(a), (I) if such prepayment arises from a disposition, casualty event or otherwise from proceeds of Intellectual Property or Eligible Accounts, FIRST to the outstanding principal of the Revolving Loans then outstanding, and SECOND to the outstanding principal of the Term Loan and (II) for any prepayment to which the preceding clause (I) is not applicable, FIRST to the outstanding principal of the Term Loan, and SECOND to the outstanding principal of the Revolving Loans, and (b) with respect to any amounts paid or received to which the preceding clause (a) is not applicable, to the outstanding principal of the Loans on a pro rata basis as between the Loans; and

(vii)    **SEVENTH**, to the payment of any other outstanding Obligations; and after payment in full in cash of all of the outstanding monetary Obligations, any further amounts paid to or received by Lender in respect of the Obligations (so long as no monetary Obligations are outstanding) shall be paid over to Borrower or such other Person(s) as may be legally entitled thereto.

Notwithstanding anything to the contrary set forth herein, any prepayment applied to the outstanding principal of the Term Loan shall be applied to the remaining installments thereof (including any bullet payment due at maturity) in the inverse order of maturity.

For purposes of determining the Borrowing Base, such amounts will be credited to the Loan Account and the Collateral balances to which they relate upon Lender's receipt of an advice from Lender's Bank (set on Annex I) that such items have been credited to Lender's account at Lender's Bank (or upon Lender's deposit thereof at Lender's Bank in the case of payments received by Lender in kind), in each case subject to final payment and collection. However, for purposes of computing interest on the Obligations, such items shall be deemed applied by Lender five Business Days after Lender's receipt of advice of deposit thereof at Lender's Bank.

**6.3.    Notification; Verification.** Lender or its designee may, from time to time, whether or not a Default or Event of Default has occurred, verify directly with the Account Debtors of the Loan Party Obligors (or by any manner and through any medium Lender considers advisable) the validity, amount and other matters relating to the Accounts and Chattel Paper of the Loan Party Obligors, by means of mail, telephone or otherwise, either in the name of the applicable Loan Party Obligor or Lender or such other name as Lender may choose. Lender or its designee may, from time to time, after the occurrence and during the continuance of an Event of Default: (a) notify Account Debtors of the Loan Party Obligors that Lender has a security interest in the Accounts of the Loan Party Obligors and direct such Account Debtors to make payment thereof directly to Lender; and (b) demand, collect or enforce payment of any Accounts and Chattel Paper (but without any duty to do so). Each Loan Party Obligor hereby authorizes Account Debtors to make payments directly to Lender and to rely on notice from Lender without further inquiry. Lender may on behalf of each Loan Party Obligor endorse all items of payment received by Lender that are payable to such Loan Party Obligor for the purposes described above.

**6.4.    Power of Attorney.**

Without limiting any of Lender's other rights under this Agreement or any other Loan Document, each Loan Party Obligor hereby grants to Lender an irrevocable power of attorney, coupled with an interest, authorizing and permitting Lender (acting through any of its officers, employees, attorneys or agents), at Lender's option but without obligation, with or without notice to such Loan Party Obligor, and

-23-

at each Loan Party Obligor's expense, to do any or all of the following, in such Loan Party Obligor's name
or otherwise:

(a) at any time, whether or not an Event of Default has occurred or is continuing
(except as otherwise provided herein), (i) execute on behalf of such Loan Party Obligor any documents
that Lender may, in its sole discretion, deem advisable in order to perfect, protect and maintain Lender's
security interests, and priority thereof, in the Collateral and to fully consummate all the transactions
contemplated by this Agreement and the other Loan Documents (including such financing statements and
continuation financing statements, and amendments or other modifications thereto, as Lender shall deem
necessary or appropriate) and, upon the occurrence and during the continuance of an Event of Default, to
notify Account Debtors of the Loan Party Obligors in the manner contemplated by Section 6.3,
(ii) endorse such Loan Party Obligor's name on all checks and other forms of remittances received by
Lender, (iii) pay any sums required on account of such Loan Party Obligor's taxes or to secure the release
of any Liens therefor, (iv) pay any amounts necessary to obtain, or maintain in effect, any of the insurance
described in Section 7.14, (v) receive and otherwise take control in any manner of any cash or non-cash
items of payment or Proceeds of Collateral, (vi) receive, open and dispose of all mail addressed to such
Loan Party Obligor at any post office box or lockbox maintained by Lender for such Loan Party Obligor
or at any other business premises of Lender and (vii) endorse or assign to Lender on such Loan Party
Obligor's behalf any portion of Collateral evidenced by an agreement, Instrument or Document if an
endorsement or assignment of any such items is not made by such Loan Party Obligor pursuant to Section
5.2; and

(b) at any time, after the occurrence and during the continuance of an Event of
Default, (i) execute on behalf of such Loan Party Obligor any document exercising, transferring or
assigning any option to purchase, sell or otherwise dispose of or lease (as lessor or lessee) any real or
personal property which is part of the Collateral or in which Lender has an interest, (ii) execute on behalf
of such Loan Party Obligor any invoices relating to any Accounts, any draft against any Account Debtor,
any proof of claim in bankruptcy, any notice of Lien or claim, and any assignment or satisfaction of
mechanic's, materialman's or other Lien, (iii) execute on behalf of such Loan Party Obligor any notice to
any Account Debtor, (iv) pay, contest or settle any Lien, charge, encumbrance, security interest and
adverse claim in or to any of the Collateral, or any judgment based thereon, or otherwise take any action
to terminate or discharge the same, (v) grant extensions of time to pay, compromise claims relating to,
and settle Accounts, Chattel Paper and General Intangibles for less than face value and execute all
releases and other documents in connection therewith, (vi) settle and adjust, and give releases of, any
insurance claim that relates to any of the Collateral and obtain payment therefor, (vii) instruct any third
party having custody or control of any Collateral or books or records belonging to, or relating to, such
Loan Party Obligor to give Lender the same rights of access and other rights with respect thereto as
Lender has under this Agreement or any other Loan Document, (viii) change the address for delivery of
such Loan Party Obligor's mail, (ix) vote any right or interest with respect to any Investment Property, (x)
instruct any Account Debtor to make all payments due to any Loan Party Obligor directly to Lender, and
(xi) use any Intellectual Property of such Loan Party Obligor (including any licenses of such Intellectual
Property), including but not limited to any labels, patents, trademarks, trade names, URLs, domain names,
industrial designs, copyrights, or advertising matter, in preparing for sale, advertising for sale, or selling
Inventory or other Collateral and to collect any amounts due under Accounts, contracts or negotiable
Collateral of such Loan Party Obligor.

Any and all sums paid, and any and all costs, expenses, liabilities, obligations and reasonable
attorneys' fees incurred, by Lender with respect to the foregoing shall be added to and become part of
the Obligations, shall be payable on demand, and shall bear interest at a rate equal to the highest
interest rate applicable to any of the Obligations. Each Loan Party Obligor agrees that Lender's rights
under the foregoing power of attorney and any of Lender's other rights under this Agreement or the

-24-

other Loan Documents shall not be construed to indicate that Lender is in control of the business, management or properties of any Loan Party Obligor.

**6.5. Disputes.** Each Loan Party Obligor shall promptly notify Lender of any dispute or claim relating to its Accounts to the extent the value associated with such dispute or claim exceeds $10,000. Each Loan Party Obligor agrees that it will not, without Lender's prior written consent, compromise or settle any of its Accounts for less than the full amount thereof, grant any extension of time for payment of any of its Accounts, release (in whole or in part) any Account Debtor or other person liable for the payment of any of its Accounts or grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any of its Accounts; except (unless otherwise directed by Lender during the existence of a Default or an Event of Default) such Loan Party Obligor may take any of such actions in the ordinary course of its business consistent with past practices, provided that Borrower promptly reports the same to Lender.

**6.6. Invoices.** At Lender's request, each Loan Party Obligor will cause all invoices and statements that it sends to Account Debtors or other third parties to be marked, in a manner satisfactory to Lender, to reflect Lender's security interest therein and payment instructions.

**6.7. Inventory.**

(a) **Third Party Locations.** No Loan Party Obligor will, without Lender's prior written consent, at any time, store any Inventory with any warehouseman or other third party other than as set forth in Section 1(d) of the Perfection Certificate.

(b) **Sale on Return, etc.** No Loan Party Obligor will, without Lender's prior written consent, at any time, sell any Inventory on a sale-or-return, guarantied sale, consignment, or other contingent basis.

(c) **Fair Labor Standards Act.** Each Loan Party Obligor represents, warrants and covenants that, at all times, all of the Inventory of each Loan Party Obligor has been, at all times will be, produced only in accordance with the Fair Labor Standards Act of 1938 and all rules, regulations and orders promulgated thereunder.

## 7. REPRESENTATIONS, WARRANTIES AND AFFIRMATIVE COVENANTS.

To induce Lender to enter into this Agreement, each Loan Party Obligor represents, warrants and covenants as follows (it being understood and agreed that (a) each such representation and warranty (i) will be made as of the date hereof and be deemed remade as of each date on which any Loan is made (except to the extent any such representation or warranty expressly relates only to any earlier or specified date, in which case such representation or warranty will be made as of such earlier or specified date) and (ii) shall not be affected by any knowledge of, or any investigation by, Lender and (b) each such covenant shall continuously apply with respect to all times commencing on the date hereof and continuing until the Termination Date):

**7.1. Existence and Authority.** Each Loan Party is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization (which jurisdiction is identified in Section 1(a) of the Perfection Certificate) and is qualified to do business in each jurisdiction in which the operation of its business requires that it be qualified (which each such jurisdiction is identified in Section 1(a) of the Perfection Certificate). Each Loan Party has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby. The execution, delivery and performance by each Loan Party Obligor of this Agreement and all of the other Loan Documents to which such Loan Party Obligor is a party have been duly and validly

authorized, do not violate such Loan Party Obligor's Governing Documents or any law or any agreement or instrument or any court order which is binding upon any Loan Party or its property, do not constitute grounds for acceleration of any Indebtedness or obligation under any agreement or instrument which is binding upon any Loan Party or its property, and do not require the consent of any Person. No Loan Party is required to obtain any government approval, consent, or authorization from, or to file any declaration or statement with, any Governmental Authority in connection with or as a condition to the execution, delivery or performance of any of the Loan Documents. This Agreement and each of the other Loan Documents have been duly executed and delivered by, and are enforceable against, each of the Loan Party Obligors who have signed them, in accordance with their respective terms. Section 1(f) of the Perfection Certificate sets forth the ownership of Borrower and its Subsidiaries.

       **7.2.**    **Names; Trade Names and Styles.** The name of each Loan Party Obligor set forth on Section 1(b) of the Perfection Certificate is its correct and complete legal name as of the date hereof, and no Loan Party Obligor has used any other name at any time in the past five years, or at any time will use any other name, in any tax filing made in any jurisdiction. Listed in Section 1(b) of the Perfection Certificate are all prior names used by each Loan Party Obligor at any time in the past five years and all of the present and prior trade names used by any Loan Party Obligor at any time in the past five years. Borrower shall give Lender at least thirty days' prior written notice (and will deliver an updated Section 1(b) of the Perfection Certificate to reflect the same) before it or any other Loan Party Obligor changes its legal name or does business under any other name.

       **7.3.**    **Title to Collateral; Third Party Locations; Permitted Liens.** Each Loan Party Obligor has, and at all times will continue to have, good and marketable title to all of the Collateral. The Collateral now is, and at all times will remain, free and clear of any and all Liens, except for Permitted Liens. Lender now has, and will at all times continue to have, a first-priority perfected and enforceable security interest in all of the Collateral, subject only to the Permitted Liens, and each Loan Party Obligor will at all times defend Lender and the Collateral against all claims of others. None of the Collateral which is Equipment is, or will at any time, be affixed to any real property in such a manner, or with such intent, as to become a fixture. Upon Lender's request after the Closing Date, Borrower shall use good faith efforts to obtain a landlord's waiver in form and substance satisfactory to Lender with respect to any real property lease or sublease for which any Loan Party Obligor is or will be a lessee or sublessee. Upon Lender's request after the Closing Date, Borrower shall use good faith efforts to obtain a warehouseman's waiver in form and substance satisfactory to Lender, with respect to any warehouse at which any Loan Party Obligor is or will at any time be a bailor of any Goods. Prior to causing or permitting any Collateral to at any time be located upon premises in which any third party (including any landlord, warehouseman, or otherwise) has an interest, Borrower shall notify Lender and the applicable Loan Party Obligor shall cause each such third party to execute and deliver to Lender, in form and substance acceptable to Lender, such waivers, collateral access agreements, and subordinations as Lender shall specify, so as to, among other things, ensure that Lender's rights in the Collateral are, and will at all times continue to be, superior to the rights of any such third party and that Lender has access to such Collateral. Each applicable Loan Party Obligor will keep at all times in full force and effect, and will comply at all times with all the terms of, any lease of real property where any of the Collateral now or in the future may be located.

       **7.4.**    **Accounts and Chattel Paper.** As of each date reported by Borrower, all Accounts which Borrower has then reported to Lender as then being Eligible Accounts comply in all respects with the criteria for eligibility set forth in the definition of Eligible Accounts. All such Accounts, and all Chattel Paper owned by any Loan Party Obligor, are genuine and in all respects what they purport to be, arise out of a completed, bona fide and unconditional and non-contingent sale and delivery of goods or rendition of services by Borrower in the ordinary course of its business and in accordance with the terms and conditions of all purchase orders, contracts or other documents relating thereto, each Account Debtor thereunder had the capacity to contract at the time any contract or other document giving rise to such

Accounts and Chattel Paper were executed, and the transactions giving rise to such Accounts and Chattel Paper comply with all applicable laws and governmental rules and regulations.

**7.5.    Electronic Chattel Paper.**    To the extent that any Loan Party Obligor obtains or maintains any Electronic Chattel Paper, such Loan Party Obligor shall at all times create, store and assign the record or records comprising the Electronic Chattel Paper in such a manner that (a) a single authoritative copy of the record or records exists which is unique, identifiable and except as otherwise provided below, unalterable, (b) the authoritative copy identifies Lender as the assignee of the record or records, (c) the authoritative copy is communicated to and maintained by Lender or its designated custodian, (d) copies or revisions that add or change an identified assignee of the authoritative copy can only be made with the participation of Lender, (e) each copy of the authoritative copy and any copy of a copy is readily identifiable as a copy that is not the authoritative copy and (f) any revision of the authoritative copy is readily identifiable as an authorized or unauthorized revision.

**7.6.    Capitalization; Investment Property.**

(a)    No Loan Party, directly or indirectly, owns, or shall at any time own, any capital stock or other equity interests of any other Person except as set forth in Sections 1(f) and 1(g) of the Perfection Certificate, which Sections list all Investment Property owned by each Loan Party Obligor.

(b)    None of the Pledged Equity has been issued or otherwise transferred in violation of the Securities Act, or other applicable laws of any jurisdiction to which such issuance or transfer may be subject.

(c)    The Pledged Equity pledged by each Loan Party Obligor hereunder constitutes all of the issued and outstanding equity interests of each Issuer owned by such Loan Party Obligor.

(d)    All of the Pledged Equity has been duly and validly issued and is fully paid and non-assessable, and the holders thereof are not entitled to any preemptive, first refusal or other similar rights. There are no outstanding options, warrants or similar agreements, documents, or instruments with respect to any of the Pledged Equity.

(e)    Each Loan Party Obligor shall, at the request of Lender, cause each Issuer to amend or otherwise modify its Governing Documents, books, records, and related agreements, documents and instruments, as applicable, to reflect the rights and interests of Lender hereunder, and to the extent required to enable and empower Lender to exercise and enforce its rights and remedies hereunder in respect of the Pledged Equity and other Investment Property.

(f)    Each Loan Party Obligor will take any and all actions required or reasonably requested by Lender, from time to time, to (i) cause Lender to obtain exclusive control of any Investment Property in a manner acceptable to Lender and (ii) obtain from any Issuers and such other Persons as Lender shall specify, for the benefit of Lender, written confirmation of Lender's exclusive control over such Investment Property and take such other actions as Lender may request to perfect Lender's security interest in any Investment Property. For purposes of this Section 7.6, Lender shall have exclusive control of Investment Property if (A) pursuant to Section 5.2, such Investment Property consists of certificated securities and the applicable Loan Party Obligor delivers such certificated securities to Lender (with all appropriate endorsements), (B) such Investment Property consists of uncertificated securities and either (x) the applicable Loan Party Obligor delivers such uncertificated securities to Lender or (y) the Issuer thereof agrees, pursuant to documentation in form and substance satisfactory to Lender, that it will comply with instructions originated by Lender without further consent by the applicable Loan Party Obligor and (C) such Investment Property consists of security entitlements and either (x) Lender becomes the entitlement holder thereof or (y) the appropriate securities intermediary agrees, pursuant to documentation in form and substance satisfactory to Lender, that it will comply with entitlement orders

-27-

originated by Lender without further consent by the applicable Loan Party Obligor. Each Loan Party Obligor that is a limited liability company or a partnership hereby represents and warrants that it has not, and at no time will, elect pursuant to the provisions of Section 8-103 of the UCC to provide that its equity interests are securities governed by Article 8 of the UCC.

(g)      No Loan Party owns, or has any present intention of acquiring, any *"margin security"* or any *"margin stock"* within the meaning of Regulations T, U or X of the Board of Governors of the Federal Reserve System (herein called *"margin security"* and *"margin stock"*). None of the proceeds of the Loans will be used, directly or indirectly, for the purpose of purchasing or carrying, or for the purpose of reducing or retiring any Indebtedness which was originally incurred to purchase or carry, any margin security or margin stock or for any other purpose which might constitute the transactions contemplated hereby a *"purpose credit"* within the meaning of said Regulations T, U or X, or cause this Agreement to violate any other regulation of the Board of Governors of the Federal Reserve System or the Exchange Act, or any rules or regulations promulgated under such statutes.

(h)      No Loan Party Obligor shall vote to enable, or take any other action to cause or to permit, any Issuer to issue any equity interests of any nature, or to issue any other securities or interests convertible into or granting the right to purchase or exchange for any equity interests of any nature of any Issuer.

(i)      No Loan Party Obligor shall take, or fail to take, any action that would in any manner impair the value or the enforceability of Lender's Lien on any of the Investment Property, or any of Lender's rights or remedies under this Agreement or any other Loan Document with respect to any of the Investment Property.

(j)      In the case of any Loan Party Obligor which is an Issuer, such Issuer agrees that the terms of Section 11.3(g)(iii) shall apply to such Loan Party Obligor with respect to all actions that may be required of it pursuant to such Section 11.3(g)(iii) regarding the Investment Property issued by it.

7.7.      **Commercial Tort Claims**. As of the Closing Date, no Loan Party Obligor has any Commercial Tort Claims pending other than those listed in Section 2 of the Perfection Certificate. Each Loan Party Obligor shall promptly (but in any case no later than five Business Days thereafter) notify Lender in writing upon incurring or otherwise obtaining a Commercial Tort Claim after the Closing Date against any third party with a value in excess of $10,000. Such notice shall constitute such Loan Party Obligor's authorization to amend such Section 2 to add such Commercial Tort Claim and shall automatically be deemed to amend such Section 2 to include such Commercial Tort Claim.

7.8.      **Jurisdiction of Organization; Location of Collateral**. Sections 1(c) and 1(d) of the Perfection Certificate set forth (a) each place of business of each Loan Party Obligor (including its chief executive office), (b) all locations where all Inventory, Equipment, and other Collateral owned by each Loan Party Obligor is kept and (c) whether each such Collateral location and place of business (including each Loan Party Obligor's chief executive office) is owned by a Loan Party or leased (and if leased, specifies the complete name and notice address of each lessor). No Collateral is located outside the United States or in the possession of any lessor, bailee, warehouseman or consignee, except as expressly indicated in Sections 1(c), 1(d) and 3 (with respect to Deposit Accounts maintained outside the United States) of the Perfection Certificate. Each Loan Party Obligor will give Lender at least thirty days' prior written notice before changing its jurisdiction of organization, opening any additional place of business, changing its chief executive office or the location of its books and records, or moving any of the Collateral to a location other than one of the locations set forth in Sections 1(c) and 1(d) of the Perfection Certificate, and will execute and deliver all financing statements, landlord waivers, collateral access agreements, mortgages, and all other agreements, instruments and documents which Lender shall require in connection therewith prior to making such change, all in form and substance satisfactory to Lender.

Without the prior written consent of Lender, no Loan Party Obligor will at any time change its jurisdiction of organization.

## 7.9. Financial Statements and Reports; Solvency.

(a) All financial statements delivered to Lender by or on behalf of any Loan Party have been, and at all times will be, prepared in conformity with GAAP and completely and fairly reflect the financial condition of each Loan Party covered thereby, at the times and for the periods therein stated.

(b) As of the date hereof (after giving effect to the Loans to be made on the date hereof, and the consummation of the transactions contemplated hereby), and as of each other day that any Loan is made (after giving effect thereto), (i) the fair saleable value of all of the assets and properties of the Loan Parties, taken as a whole, exceeds the aggregate liabilities and Indebtedness of the Loan Parties, taken as a whole, including contingent liabilities, (ii) the Loan Parties, taken as a whole, are solvent and able to pay their debts as they come due, (iii) the Loan Parties, take as a whole, have sufficient capital to carry on their business as now conducted and as proposed to be conducted, (iv) no Loan Party is contemplating either the liquidation of all or any substantial portion of its assets or property, or the filing of any petition under any state, federal, or other bankruptcy or insolvency law and (v) no Loan Party has knowledge of any Person contemplating the filing of any such petition against any Loan Party.

**7.10. Tax Returns and Payments; Pension Contributions.** Each Loan Party has timely filed all tax returns and reports required by applicable law, has timely paid all applicable Taxes, assessments, deposits and contributions owing by such Loan Party and will timely pay all such items in the future as they became due and payable. Each Loan Party may, however, defer payment of any contested taxes; *provided*, that such Loan Party (a) in good faith contests its obligation to pay such Taxes by appropriate proceedings promptly and diligently instituted and conducted, (b) notifies Lender in writing of the commencement of, and any material development in, the proceedings, (c) posts bonds or takes any other steps required to keep the contested taxes from becoming a Lien upon any of the Collateral and (d) maintains adequate reserves therefor in conformity with GAAP. No Loan Party is aware of any claims or adjustments proposed for any prior tax years that could result in additional taxes becoming due and payable by any Loan Party. Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other applicable laws. Each Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter or opinion letter from the Internal Revenue Service to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the Internal Revenue Service. To the best knowledge of each Loan Party, nothing has occurred that would prevent or cause the loss of such tax-qualified status. There are no pending or, to the best knowledge of any Loan Party, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to result in liabilities individually or in the aggregate in excess of $100,000 of any Loan Party. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in liabilities individually or in the aggregate of any Loan Party in excess of $100,000. No ERISA Event has occurred, and no Loan Party is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event with respect to any Pension Plan, in each case that could reasonably be expected to result in liabilities individually or in the aggregate in excess of $100,000. Each Loan Party and each ERISA Affiliate has met all applicable requirements under the Pension Funding Rules in respect of each Pension Plan, and no waiver of the minimum funding standards under the Pension Funding Rules has been applied for or obtained, in each case except as could not reasonably be expected to result in liabilities individually or in the aggregate to the Loan Parties in excess of $100,000. As of the most recent valuation date for any Pension Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is 60% or higher and

no Loan Party knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below 60% as of the most recent valuation date. No Loan Party or any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid, except as could not reasonably be expected to result in liabilities individually or in the aggregate to the Loan Parties in excess of $100,000. No Loan Party or any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA except as could not reasonably be expected to result in liabilities individually or in the aggregate to the Loan Parties in excess of $100,000. No Pension Plan has been terminated by the plan administrator thereof or by the PBGC, and no event or circumstance has occurred or exists that could reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Pension Plan, except as could not reasonably be expected to result in liabilities individually or in the aggregate to the Loan Parties in excess of $100,000.

## 7.11. Compliance with Laws; Intellectual Property; Licenses.

(a) Each Loan Party has complied, and will continue at all times to comply, in all material respects with all provisions of all applicable laws and regulations, including those relating to the ownership of real or personal property, the conduct and licensing of each Loan Party's business, the payment and withholding of Taxes, ERISA and other employee matters, safety and environmental matters, and laws relating to child pornography, including, without limitation, 18 U.S.C. §§ 2251 through 2260.

(b) No Loan Party has received written notice of default or violation, or is in default or violation, with respect to any judgment, order, writ, injunction, decree, demand or assessment issued by any court or any federal, state, local, municipal or other Governmental Authority relating to any aspect of any Loan Party's business, affairs, properties or assets. No Loan Party has received written notice of or been charged with, or is, to the knowledge of any Loan Party, under investigation with respect to, any violation in any material respect of any provision of any applicable law.

(c) No Loan Party Obligor owns any registered Intellectual Property, except as set forth in Section 4 of the Perfection Certificate. Each Loan Party Obligor shall promptly (but in any event within thirty days thereafter) notify Lender in writing of any additional Intellectual Property rights acquired or arising after the Closing Date and shall submit to Lender a supplement to Section 4 of the Perfection Certificate to reflect such additional rights; *provided*, that such Loan Party Obligor's failure to do so shall not impair Lender's security interest therein. Each Loan Party Obligor shall execute a separate security agreement granting Lender a security interest in such Intellectual Property (whether owned on the Closing Date or thereafter), in form and substance acceptable to Lender and suitable for recording such security interest in such Intellectual Property with the United States Patent and Trademark Office, United States Copyright Office, or any Intellectual Property registrar in any other jurisdiction as applicable; *provided*, that such Loan Party Obligor's failure to do so shall not impair Lender's security interest therein. Each Loan Party owns or has, and will at all times continue to own or have, the valid right to use all material patents, trademarks, copyrights, software, computer programs, equipment designs, network designs, equipment configurations, technology and other Intellectual Property used, marketed and sold in such Loan Party's business, and each Loan Party is in compliance, and will continue at all times to comply, in all material respects with all licenses, user agreements and other such agreements regarding the use of Intellectual Property. No Loan Party has any knowledge that, or has received any notice claiming that, any of such Intellectual Property infringes upon or violates the rights of any other Person.

(d) Each Loan Party has and will continue at all times to have, all federal, state, local and other licenses and permits required to be maintained in connection with such Loan Party's business operations, and all such licenses and permits are valid and in full force and effect. Each Loan Party has, and will continue at all times to have, complied with the requirements of such licenses and permits in all

material respects, and has received no written notice of any pending or threatened proceedings for the suspension, termination, revocation or limitation thereof. No Loan Party is aware of any facts or conditions that could reasonably be expected to cause or permit any of such licenses or permits to be voided, revoked or withdrawn.

**7.12. Litigation.** Section 1(e) of the Perfection Certificate discloses all claims, proceedings, litigation or investigations pending or (to the best of each Loan Party Obligor's knowledge) threatened against any Loan Party as of the Closing Date. There is no claim, suit, litigation, proceeding or investigation pending or (to the best of each Loan Party Obligor's knowledge) threatened by or against or affecting any Loan Party in any court or before any Governmental Authority (or any basis therefor known to any Loan Party Obligor) which may result, either separately or in the aggregate, in liability in excess of $100,000 for the Loan Parties, in any Material Adverse Effect, or in any material impairment in the ability of any Loan Party to carry on its business in substantially the same manner as it is now being conducted.

**7.13. Use of Proceeds.** All proceeds of all Loans shall be used solely (a) for the repayment of indebtedness owing by the Borrower and the other Loan Party Obligors on the Closing Date, (b) for the payment of amounts due on the Closing Date in connection with the Closing Date Acquisition, (c) to pay the fees, costs, and expenses incurred in connection with this Agreement, the other Loan Documents, the Closing Date Acquisition Agreement and the transactions contemplated hereby and thereby, and (d) for Borrower's working capital purposes. All proceeds of all Revolving Loans will be used solely for lawful business purposes.

**7.14. Insurance.**

(a) Each Loan Party will at all times carry property, liability and other insurance, with insurers reasonably acceptable to Lender, in such form and amounts, and with such deductibles and other provisions, as Lender shall require, and Borrower will provide Lender with evidence satisfactory to Lender that such insurance is, at all times, in full force and effect. A true and complete listing of such insurance as of the Closing Date, including issuers, coverages and deductibles, is set forth in Section 5 of the Perfection Certificate. Each property insurance policy shall name Lender as lender loss payee and shall contain a lender's loss payable endorsement in form acceptable to Lender, each liability insurance policy shall name Lender as an additional insured, and each business interruption insurance policy shall be collaterally assigned to Lender, all in form and substance satisfactory to Lender. All policies of insurance shall provide that they may not be cancelled or changed without at least thirty days' prior written notice to Lender, and shall otherwise be in form and substance satisfactory to Lender. Borrower shall advise Lender promptly of any policy cancellation, non-renewal, reduction, or material amendment with respect to any insurance policies maintained by any Loan Party or any receipt by any Loan Party of any notice from any insurance carrier regarding any intended or threatened cancellation, non-renewal, reduction or material amendment of any of such policies, and Borrower shall promptly deliver to Lender copies of all notices and related documentation received by any Loan Party in connection with the same.

(b) Borrower shall deliver to Lender no later than fifteen days prior to the expiration of any then current insurance policies, insurance certificates evidencing renewal of all such insurance policies required by this Section 7.14. Borrower shall deliver to Lender, upon Lender's request, certificates evidencing such insurance coverage in such form as Lender shall specify.

(c) **IF ANY LOAN PARTY AT ANY TIME OR TIMES HEREAFTER SHALL FAIL TO OBTAIN OR MAINTAIN ANY OF THE POLICIES OF INSURANCE REQUIRED ABOVE (AND PROVIDE EVIDENCE THEREOF TO LENDER) OR TO PAY ANY PREMIUM RELATING THERETO, THEN LENDER, WITHOUT WAIVING OR RELEASING ANY OBLIGATION OR DEFAULT BY BORROWER HEREUNDER, MAY (BUT SHALL BE UNDER**

-31-

NO OBLIGATION TO) OBTAIN AND MAINTAIN SUCH POLICIES OF INSURANCE AND PAY SUCH PREMIUMS AND TAKE SUCH OTHER ACTIONS WITH RESPECT THERETO AS LENDER DEEMS ADVISABLE UPON NOTICE TO BORROWER. SUCH INSURANCE, IF OBTAINED BY LENDER, MAY, BUT NEED NOT, PROTECT ANY LOAN PARTY'S INTERESTS OR PAY ANY CLAIM MADE BY OR AGAINST ANY LOAN PARTY WITH RESPECT TO THE COLLATERAL. SUCH INSURANCE MAY BE MORE EXPENSIVE THAN THE COST OF INSURANCE ANY LOAN PARTY MAY BE ABLE TO OBTAIN ON ITS OWN AND MAY BE CANCELLED ONLY UPON THE APPLICABLE LOAN PARTY PROVIDING EVIDENCE THAT IT HAS OBTAINED THE INSURANCE AS REQUIRED ABOVE. ALL SUMS DISBURSED BY LENDER IN CONNECTION WITH ANY SUCH ACTIONS, INCLUDING COURT COSTS, EXPENSES, OTHER CHARGES RELATING THERETO AND REASONABLE ATTORNEY COSTS, SHALL CONSTITUTE LOANS HEREUNDER, SHALL BE PAYABLE ON DEMAND BY BORROWER TO LENDER AND, UNTIL PAID, SHALL BEAR INTEREST AT THE HIGHEST RATE THEN APPLICABLE TO LOANS HEREUNDER. THIS PROVISION SHALL CONSTITUTE THE NOTICE TO THE APPLICABLE LOAN PARTY REQUIRED PURSUANT TO PARAGRAPH (3) OF SECTION 180/10 OF CHAPTER 815 OF THE ILLINOIS COMPILED STATUTES (2004).

7.15. **Financial, Collateral and Other Reporting / Notices**. Each Loan Party has kept, and will at all times keep, adequate records and books of account with respect to its business activities and the Collateral in which proper entries are made in accordance with GAAP reflecting all its financial transactions. Each Loan Party Obligor will cause to be prepared and furnished to Lender, in each case in a form and in such detail as is reasonably acceptable to Lender the following items (the items to be provided under this Section 7.15 shall be delivered to Lender in writing):

(a) **Annual Financial Statements**. Not later than ninety days after the close of each Fiscal Year, unqualified, audited financial statements of each Loan Party as of the end of such Fiscal Year, including balance sheet, income statement, and statement of cash flow for such Fiscal Year, in each case on a consolidated and consolidating basis, certified by a firm of independent certified public accountants of recognized standing selected by Borrower but reasonably acceptable to Lender, together with a copy of any management letter issued in connection therewith. Concurrently with the delivery of such financial statements, Borrower shall deliver to Lender a Compliance Certificate, indicating whether (i) Borrower is in compliance with each of the covenants specified in Section 9, and setting forth a detailed calculation of such covenants and (ii) any Default or Event of Default is then in existence;

(b) **Interim Financial Statements**. Not later than thirty days after the end of each month hereafter, including the last month of each Fiscal Year, unaudited interim financial statements of each Loan Party as of the end of such month and of the portion of such Fiscal Year then elapsed, including balance sheet, income statement, statement of cash flow, and results of their respective operations during such month and the then-elapsed portion of the Fiscal Year, together with comparative figures for the same periods in the immediately preceding Fiscal Year and the corresponding figures from the budget for the Fiscal Year covered by such financial statements, in each case on a consolidated and consolidating basis, certified by the principal financial officer of Borrower as prepared in accordance with GAAP and fairly presenting the consolidated financial position and results of operations (including management discussion and analysis of such results) of each Loan Party for such month and period subject only to changes from ordinary course year-end audit adjustments and except that such statements need not contain footnotes. Concurrently with the delivery of such financial statements, Borrower shall deliver to Lender a Compliance Certificate, indicating whether (i) Borrower is in compliance with each of the covenants specified in Section 9, and setting forth a detailed calculation of such covenants, and (ii) any Default or Event of Default is then in existence;

(c)    **Borrowing Base / Collateral Reports / Insurance Certificates / Perfection Certificates / Other Items.** The items described on Annex II hereto by the respective dates set forth therein.

(d)    **Projections, Etc.** Not later than thirty days prior to the end of each Fiscal Year, monthly business projections for the following Fiscal Year for the Loan Parties on a consolidated and consolidating basis, which projections shall include for each such period Borrowing Base projections, profit and loss projections, balance sheet projections, income statement projections and cash flow projections;

(e)    **Shareholder Reports, Etc.** Promptly after the sending or filing thereof, as the case may be, copies of any proxy statements, financial statements or reports which each Loan Party has made available to its shareholders and copies of any regular, periodic and special reports or registration statements which any Loan Party files with the Securities and Exchange Commission or any Governmental Authority which may be substituted therefor, or any national securities exchange;

(f)    **ERISA Reports.** Copies of any annual report to be filed pursuant to the requirements of ERISA in connection with each plan subject thereto promptly upon request by Lender and in addition, each Loan Party shall promptly notify Lender upon having knowledge of any ERISA Event; and

(g)    **Tax Returns.** Each federal and state income tax return filed by any Loan Party or Other Obligor promptly (but in no event later than ten days following the filing of such return), together with such supporting documentation as is supplied to the applicable tax authority with such return and proof of payment of any amounts owing with respect to such return.

(h)    **Notification of Certain Changes.** Promptly (and in no case later than the earlier of (i) three Business Days after such Loan Party Obligor obtaining actual knowledge of the occurrence of any of the following and (ii) such other date that such information is required to be delivered pursuant to this Agreement or any other Loan Document) notification to Lender in writing of (A) the occurrence of any Default or Event of Default, (B) the occurrence of any event that has had, or may have, a Material Adverse Effect, (C) any change in any Loan Party's officers or directors (except those nominated by Lender), (D) any investigation, action, suit, proceeding or claim (or any material development with respect to any existing investigation, action, suit, proceeding or claim) relating to any Loan Party, any officer or director of a Loan Party, the Collateral or which may result in an adverse impact upon any Loan Party's business, assets or financial condition, (E) any material loss or damage to the Collateral, (F) any event or the existence of any circumstance that has resulted in, or could reasonably be expected to result in, any material adverse change in the business or financial affairs of any Loan Party, any Default, or any Event of Default, or which would make any representation or warranty previously made by any Loan Party to Lender untrue in any material respect or constitute a material breach if such representation or warranty was then being made, (G) any actual or alleged breaches of any Material Contract or termination or threat to terminate any Material Contract or any material amendment to or modification of a Material Contract, or the execution of any new Material Contract by any Loan Party and (H) any change in any Loan Party's certified accountant. In the event of each such notice under this Section 7.15(h), Borrower shall give notice to Lender of the action or actions that each Loan Party has taken, is taking, or proposes to take with respect to the event or events giving rise to such notice obligation.

(i)    **Other Information.** Promptly upon request, such other data and information (financial and otherwise) as Lender, from time to time, may reasonably request, bearing upon or related to the Collateral or each Loan Party's and each Other Obligor's business or financial condition or results of operations.

-33-

**7.16.** **Litigation Cooperation.** Should any third-party suit, regulatory action, or any other judicial, administrative, or similar proceeding be instituted by or against Lender with respect to any Collateral or in any manner relating to any Loan Party, this Agreement, any other Loan Document or the transactions contemplated hereby, each Loan Party Obligor shall, without expense to Lender, make available each Loan Party, such Loan Party's officers, employees and agents, and any Loan Party's books and records, without charge, to the extent that Lender may deem them reasonably necessary in order to prosecute or defend any such suit or proceeding.

**7.17.** **Maintenance of Collateral, Etc.** Each Loan Party Obligor will maintain all of the Collateral in good working condition, ordinary wear and tear excepted, and no Loan Party Obligor will use the Collateral for any unlawful purpose.

**7.18.** **Material Contracts.** Except as expressly disclosed in Section 1(h) of the Perfection Certificate, no Loan Party is (a) a party to any contract which has had or could reasonably be expected to have a Material Adverse Effect or (b) in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in (x) any contract to which it is a party or by which any of its assets or properties is bound, which default, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or result in liabilities in excess of $50,000 or (y) any Material Contract. Except for the contracts and other agreements listed in Section 1(h) of the Perfection Certificate, no Loan Party is party, as of the Closing Date, to any (i) employment agreements covering the management of any Loan Party, (ii) collective bargaining agreements or other labor agreements covering any employees of any Loan Party, (iii) agreements for managerial, consulting or similar services to which any Loan Party is a party or by which it is bound, (iv) agreements regarding any Loan Party, its assets or operations or any investment therein to which any of its equity holders is a party, (v) patent licenses, trademark licenses, copyright licenses or other lease or license agreements to which any Loan Party is a party, either as lessor or lessee, or as licensor or licensee, (vi) distribution, marketing or supply agreements to which any Loan Party is a party, (vii) customer agreements to which any Loan Party is a party (in each case with respect to any contract of the type described in the preceding clauses (i), (iii), (iv), (v), (vi) and (vii) requiring payments of more than $50,000 in the aggregate in any Fiscal Year), (viii) partnership agreements to which any Loan Party is a partner, limited liability company agreements to which any Loan Party is a member or manager, or joint venture agreements to which any Loan Party is a party, (ix) real estate leases, or (x) any other contract to which any Loan Party is a party, in each case with respect to this clause (x) the breach, nonperformance or cancellation of which, could reasonably be expected to have a Material Adverse Effect; (each such contract and agreement, described in the preceding clauses (i) to (x), a *"Material Contract"*).

**7.19.** **No Default.** No Default or Event of Default has occurred and is continuing.

**7.20.** **No Material Adverse Change.** Since the Closing Date, there has been no material adverse change in the financial condition, business, operations, or properties of any Loan Party or any Other Obligor.

**7.21.** **Full Disclosure.** No report, notice, certificate, information or other statement delivered or made (including, in electronic form) by or on behalf of any Loan Party, any Other Obligor or any of their respective Affiliates to Lender in connection with this Agreement or any other Loan Document contains or will at any time contain any untrue statement of a material fact, or omits or will at any time omit to state any material fact necessary to make any statements contained herein or therein not misleading. Except for matters of a general economic or political nature which do not affect any Loan Party or any Other Obligor uniquely, there is no fact presently known to any Loan Party Obligor which has not been disclosed to Lender, which has had or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

-34-

**7.22. Sensitive Payments.** No Loan Party (a) has made or will at any time make any contributions, payments or gifts to or for the private use of any governmental official, employee or agent where either the payment or the purpose of such contribution, payment or gift is illegal under the applicable laws of the United States or the jurisdiction in which made or any other applicable jurisdiction, (b) has established or maintained or will at any time establish or maintain any unrecorded fund or asset for any purpose or made any false or artificial entries on its books, (c) has made or will at any time make any payments to any Person with the intention that any part of such payment was to be used for any purpose other than that described in the documents supporting the payment or (d) has engaged in or will at any time engage in any *"trading with the enemy"* or other transactions violating any rules or regulations of the Office of Foreign Assets Control or any similar applicable laws, rules or regulations.

**7.23. Borrower as Holding Company.** Borrower does not and shall not at any time (a) engage in any business activities other than serving as a passive holding company for its Subsidiaries, (b) have any material assets other than the outstanding shares of equity interests issued by its direct Subsidiaries, or (c) have any material liabilities other than the Obligations.

**7.24. Access to Collateral, Books and Records.** At reasonable times, Lender and its representatives or agents shall have the right to inspect the Collateral and to examine and copy each Loan Party's books and records. Each Loan Party Obligor agrees to give Lender access to any or all of such Loan Party Obligor's, and each of its Subsidiaries', premises to enable Lender to conduct such inspections and examinations. Such inspections and examinations shall be at Borrower's expense and the charge therefor shall be $1,250 per person per day (or such higher amount as shall represent Lender's then current standard charge), plus out-of-pocket expenses ; *provided* that Borrower shall only be required to reimburse Lender for up to two such inspections and examinations in any Fiscal Year plus any additional inspections and examinations that are conducted during the existence of an Event of Default. Lender may, at Borrower's expense, use each Loan Party's personnel, computer and other equipment, programs, printed output and computer readable media, supplies and premises for the collection, sale or other disposition of Collateral to the extent Lender, in its Permitted Discretion, deems appropriate. Each Loan Party Obligor hereby irrevocably authorizes all accountants and third parties to disclose and deliver to Lender, at Borrower's expense, all financial information, books and records, work papers, management reports and other information in their possession regarding the Loan Parties.

**7.25. Appraisals.** Each Loan Party Obligor will permit Lender and each of its representatives or agents to conduct appraisals and valuations of the Collateral at such times and intervals as Lender may designate in its Permitted Discretion (including any appraisals that may be required to comply with FIRREA). Such appraisals and valuations shall be at Borrower's expense; *provided,* that Borrower shall only be required to reimburse Lender for up to one appraisal and valuation in any Fiscal Year plus any additional appraisals and valuations that are conducted during the existence of an Event of Default.

**7.26. Key-man Insurance.** Within thirty (30) days after the Closing Date, Borrower shall (a) obtain and thereafter maintain in effect and cause to be delivered to the Lender evidence of a current, valid and fully paid key man term life insurance policy in the amount of at least $7,000,000 that insures the life of Kelly Holland, for so long as she is the Chief Executive Officer (or any role with similar responsibilities and functions) of Borrower, for a term of at least one (1) year and in any event expiring later than the Scheduled Maturity Date at any time in effect, under policies of insurance in form and substance reasonably satisfactory to Lender, it being understood that any such policy initially delivered to and accepted by Lender hereunder is acceptable to Lender; (b) deliver to Lender the original of each of such policies of insurance and evidence of payment of all premiums therefor; (c) collaterally assign each such policy to Lender and, if applicable, name Lender as loss payee thereunder and (d) take such other action with respect thereto as Lender shall require. Each such policy of insurance shall name Borrower as the sole named beneficiary thereof and shall contain endorsements providing that (x) such policy may not be altered, amended, modified or canceled except after 30 days' prior written notice to Lender, and (y) the

-35-

beneficiary of such policy may not be changed, or additional beneficiaries named, without Lender's prior written consent. If Borrower at any time or times hereafter shall fail to obtain or maintain any of the policies of insurance required above or to pay any premium in whole or in part relating thereto, then Lender, without waiving or releasing any obligation of Borrower or Default or Event of Default arising therefrom, may at any time or times thereafter (but shall be under no obligation to do so) obtain and maintain such policies of insurance and pay such premiums and take any other action with respect thereto which Lender deems advisable.

        **8.**     **NEGATIVE COVENANTS**. No Loan Party Obligor shall, and no Loan Party Obligor shall permit any other Loan Party to, without Lender's prior written consent:

        (a)     (i) merge or consolidate with another Person, form any new Subsidiary or acquire any interest in any Person; *provided* that any Subsidiary of Borrower that is a Loan Party Obligor may merge with another Loan Party Obligor so long as Borrower is the survivor of any merger involving Borrower; or (ii) form or acquire any interest in any new Subsidiary unless such Subsidiary becomes a party hereto as a Loan Party Obligor;

        (b)     acquire any assets with a value in excess of $50,000 in any single transaction or series of related transactions, except in the ordinary course of business and as otherwise expressly permitted by this Agreement;

        (c)     enter into any material transaction outside the ordinary course of business that is not expressly permitted by this Agreement;

        (d)     sell, transfer, return, or dispose of any Collateral or other assets with an aggregate value in excess of $100,000 in any fiscal year, except that each Loan Party may sell Inventory and may enter into licenses of intellectual property (other than any Master Licensing Agreement), in each case, in the ordinary course of its business;

        (e)     make any loans to, or investments in, any Affiliate or other Person in the form of money or other assets; *provided*, that Borrower and each other Loan Party Obligor may make loans and investments in its wholly-owned domestic Subsidiaries that are Loan Party Obligors;

        (f)     incur any Indebtedness other than the Obligations and Permitted Indebtedness;

        (g)     create, incur, assume or suffer to exist any Lien or other encumbrance of any nature whatsoever on any of its assets whether now or hereafter owned, other than Liens in favor of Lender to secure the Obligations and Permitted Liens;

        (h)     guaranty or otherwise become liable with respect to the obligations of another party or entity (other than (i) the Obligations and (ii) any other obligations that such Loan Party Obligor would be permitted under this Agreement to incur as the primary obligor with respect thereto);

        (i)     pay or declare any dividends or other distributions on any Loan Party's stock or other equity interest (except for dividends payable solely in capital stock or other equity interests of such Loan Party and dividends and distributions (i) by a Loan Party that is not a Loan Party Obligor to any other Loan Party and (ii) by a Loan Party Obligor to another Loan Party Obligor);

        (j)     redeem, retire, purchase or otherwise acquire, directly or indirectly, any of Borrower's capital stock or other equity interests other than pursuant to the Warrant;

        (k)     make any change in any Loan Party's capital structure, except (i) to the extent expressly permitted pursuant to another clause of this Section 8 and (ii) the Borrower may issue equity

interests, and securities convertible into equity interests, in each case other than Disqualified Equity Interests and to the extent not otherwise prohibited hereunder, so long as such issuance does not result in a Change of Control;

      (l)     dissolve or elect to dissolve;

      (m)    engage, directly or indirectly, in a business other than the business which is being conducted on the date hereof, wind up its business operations or cease substantially all, or any material portion, of its normal business operations, or suffer any material disruption, interruption or discontinuance of a material portion of its normal business operations;

      (n)    pay any principal or other amount on any Indebtedness that is contractually subordinated to Lender in violation of the applicable subordination or intercreditor agreement;

      (o)    enter into any transaction with an Affiliate (other than another Loan Party Obligor) other than on arms-length terms disclosed to Lender in writing;

      (p)    change its jurisdiction of organization or enter into any transaction which has the effect of changing its jurisdiction of organization except as provided for in Section 7.8;

      (q)    agree, consent, permit or otherwise undertake to amend or otherwise modify any of the terms or provisions of any Loan Party's Governing Documents, except for such amendments or other modifications required by applicable law or that are not adverse to Lender, and then, only to the extent such amendments or other modifications are fully disclosed in writing to Lender no less than five Business Days prior to being effectuated;

      (r)    enter into or assume any agreement prohibiting the creation or assumption of any Lien to secure the Obligations upon its properties or assets, whether now owned or hereafter acquired; or

      (s)    create or otherwise cause or suffer to exist or become effective any encumbrance or restriction (other than any Loan Documents) of any kind on the ability of any such Person to pay or make any dividends or distributions to Borrower, to pay any of the Obligations, to make loans or advances or to transfer any of its property or assets to Borrower.

    **9.**    **FINANCIAL COVENANTS**. Each Loan Party Obligor shall at all times comply with the following Financial Covenants:

    **9.1.**    **Fixed Charge Coverage Ratio**. Borrower shall not permit the ratio of (a) EBITDA for each period set forth below, minus unfinanced Capital Expenditures (which shall not include the 2016 Website CapEx) of the Loan Parties on a consolidated basis for such period, to (b) Fixed Charges for such period to be less than the ratio set forth below for such period:

| Period | Ratio |
|---|---|
| the seven-month period ended September 30, 2016 | 0.70:1.00 |
| the eight-month period ended October 31, 2016 | 0.78:1.00 |
| the nine-month period ended November 30, 2016 | 0.90:1.00 |
| the ten-month period ended December 31, 2016 | 1.00:1.00 |

| the eleven-month period ended January 31, 2017 | 1.09:1.00 |
|---|---|
| the twelve-month period ended February 28, 2017, and the twelve-month period ended on the last day of each month thereafter | 1.20:1.00 |

**9.2.    Minimum EBITDA.** Borrower shall not permit EBITDA for any period set forth below to be less than the corresponding amount set forth below for such period:

| Period | Amount |
|---|---|
| Closing Date through July 31, 2016 | $498,000 |
| Closing Date through August 31, 2016 | $599,000 |
| Closing Date through September 30, 2016 | $731,000 |
| Closing Date through October 31, 2016 | $932,000 |
| Closing Date through November 30, 2016 | $1,212,000 |
| Closing Date through December 31, 2016 | $1,471,000 |
| Closing Date through February 19, 2017 | $2,122,000 |

**9.3.    Minimum Tangible Net Worth.** Borrower and Lender shall negotiate in good faith to agree on a required minimum Tangible Net Worth (as defined below) covenant (which shall be measured and tested monthly) on or before the date that is 90 days after the Closing Date and upon reaching agreement shall amend this Agreement to insert such covenant.

*"Tangible Net Worth"* shall mean, as to the Loan Parties, at any time, in accordance with GAAP (except as otherwise specifically set forth below), on a consolidated basis for the Loan Parties, the amount equal to the sum of: (a) the aggregate net book value of all assets of the Loan Parties (excluding the value of patents, trademarks, tradenames, copyrights, licenses, goodwill, leasehold improvements, prepaid assets and other intangible assets), calculating the book value of inventory for this purpose on a first-in-first-out basis, after deducting from such book values all appropriate reserves in accordance with GAAP (including all reserves for doubtful receivables, obsolescence, depreciation and amortization) minus (b) the aggregate amount of Indebtedness and other liabilities of the Loan Parties (including tax and other proper accruals).

## 10.    RELEASE, LIMITATION OF LIABILITY AND INDEMNITY.

**10.1.    Release.** Borrower and each other Loan Party Obligor on behalf of itself and its successors, assigns, heirs and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Lender and any and all Participants and Affiliates, and their respective successors and assigns, and their respective directors, officers, employees, attorneys and agents and any other Person affiliated with or representing Lender (collectively, the *"Released Parties"*) of and from any and all liability, including all actual or potential claims, demands or causes of action of any kind, nature or description whatsoever, whether arising in law or equity or under contract or tort or under any state or federal law or otherwise, which Borrower or any Loan Party or any of their successors, assigns or other legal representatives has had, now has or has made claim to have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever, including

-38-

any liability arising from acts or omissions pertaining to the transactions contemplated by this Agreement and the other Loan Documents, whether based on errors of judgment or mistake of law or fact, from the beginning of time to and including the Closing Date, whether such claims, demands and causes of action are matured or known or unknown. Notwithstanding any provision in this Agreement to the contrary, this Section 10.1 shall remain operative even after the Termination Date and shall survive the payment in full of all of the Obligations. Such release is made on the date hereof and remade upon each request for a Loan by Borrower.

**10.2.    Limitation of Liability.**  In no circumstance will any of the Released Parties be liable for lost profits or other special, punitive, or consequential damages.  Notwithstanding any provision in this Agreement to the contrary, this Section 10.2 shall remain operative even after the Termination Date and shall survive the payment in full of all of the Obligations.

**10.3.    Indemnity.**  Each Loan Party Obligor hereby agrees to indemnify the Released Parties and hold them harmless from and against any and all claims, debts, liabilities, demands, obligations, actions, causes of action, penalties, costs and expenses (including attorneys' fees), of every nature, character and description, which the Released Parties may sustain or incur based upon or arising out of any of the transactions contemplated by this Agreement or any other Loan Documents or any of the Obligations, or any other matter, cause or thing whatsoever, occurred, done, omitted or suffered to be done by Lender relating to any Loan Party or the Obligations (except any such amounts sustained or incurred solely as the result of the gross negligence or willful misconduct of such Released Parties, as finally determined by a court of competent jurisdiction).  Notwithstanding any provision in this Agreement to the contrary, this Section 10.3 shall remain operative even after the Termination Date and shall survive the payment in full of all of the Obligations.

## 11.    EVENTS OF DEFAULT AND REMEDIES.

**11.1.    Events of Default.**  The occurrence of any of the following events shall constitute an *"Event of Default"*:

(a)    **Payment.**  If any Loan Party Obligor or any Other Obligor fails to pay to Lender, when due, (i) any payment of principal or interest or any fees set forth in the Fee Letter or (ii) any other monetary Obligation required under this Agreement or any other Loan Document, and, solely with respect to this clause (ii), such failure continues for a period of 5 Business Days;

(b)    **Breaches of Representations and Warranties.**  If any warranty, representation, statement, report or certificate made or delivered to Lender by or on behalf of any Loan Party or any Other Obligor is untrue or misleading in any material respect;

(c)    **Breaches of Covenants.**  If any Loan Party or any Other Obligor breaches any covenant or obligation contained in this Agreement or any other Loan Document;

(d)    **Judgment.**  If one or more judgments aggregating in excess of $100,000 is obtained against any Loan Party or any Other Obligor which remains unstayed for more than thirty days or is enforced;

(e)    **Cross-Default.**  If any default occurs and is continuing with respect to any Indebtedness (other than the Obligations) of any Loan Party or any Other Obligor if (i) such default shall consist of the failure to pay such Indebtedness when due, whether by acceleration or otherwise or (ii) the effect of such default is to permit the holder, with or without notice or lapse of time or both, to accelerate the maturity of any such Indebtedness or to cause such Indebtedness to become due prior to the stated maturity thereof (without regard to the existence of any subordination or intercreditor agreements);

(f)  **Death or Dissolution**.  The dissolution, death, termination of existence, insolvency or business failure or suspension or cessation of business as usual of any Loan Party or any Other Obligor (or of any general partner of any Loan Party or any Other Obligor if it is a partnership);

(g)  **Voluntary Bankruptcy or Similar Proceedings**.  If any Loan Party or any Other Obligor shall apply for or consent to the appointment of a receiver, trustee, custodian or liquidator of it or any of its properties, admit in writing its inability to pay its debts as they mature, make a general assignment for the benefit of creditors, be adjudicated a bankrupt or insolvent or be the subject of an order for relief under the Bankruptcy Code or under any bankruptcy or insolvency law of a foreign jurisdiction, or file a voluntary petition in bankruptcy, or a petition or an answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute, or an answer admitting the material allegations of a petition filed against it in any proceeding under any such law, or take or permit to be taken any action in furtherance of or for the purpose of effecting any of the foregoing;

(h)  **Involuntary Bankruptcy or Similar Proceedings.**  The commencement of an involuntary case or other proceeding against any Loan Party or any Other Obligor seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar applicable law or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or if an order for relief is entered against any Loan Party or any Other Obligor under any bankruptcy, insolvency or other similar applicable law as now or hereafter in effect; *provided*, that if such commencement of proceedings is involuntary, such action shall not constitute an Event of Default unless such proceedings are not dismissed within sixty days after the commencement of such proceedings, though Lender shall have no obligation to make Revolving Loans to Borrower during such sixty day period or, if earlier, until such proceedings are dismissed;

(i)  **Revocation or Termination of Guaranty or Security Documents**.  The actual or attempted revocation or termination of, or limitation or denial of liability under, any guaranty of any of the Obligations, or any security document securing any of the Obligations, by any Loan Party or Other Obligor;

(j)  **Subordinated Indebtedness**.  If any Loan Party or Other Obligor makes any payment on account of any Indebtedness or obligation which has been contractually subordinated to the Obligations other than payments which are not prohibited by the applicable subordination provisions pertaining thereto, or if any Person who has subordinated such Indebtedness or obligations attempts to limit or terminate any applicable subordination provisions pertaining thereto;

(k)  **Criminal Indictment or Proceedings**.  If there is any actual or threatened indictment of any Loan Party, any Loan Party's officers, any Other Obligor or any Other Obligor's officers under any criminal statute or commencement or threatened commencement of criminal or civil proceedings against any such Person;

(l)  **Change of Control**.  If (i) Kelly Holland and her Investment Affiliates cease to, directly or indirectly, own and control at least 51% of the outstanding equity interests of Borrower on a fully diluted basis, (ii) Kelly Holland and her Investment Affiliates and Lender cease, collectively, to possess the right to elect (through contract, ownership of voting securities or otherwise) at all times a majority of the board of directors (or similar governing body) of Borrower and to direct the management policies and decisions of Borrower, or (iii) Borrower ceases to, directly or indirectly, own and control 100% of each class of the outstanding equity interests of each other Loan Party;

(m)  **Change of Management.**  If Kelly Holland ceases to be employed as, and actively perform the duties of, the chief executive officer of Borrower, unless a successor is appointed

within sixty days after the termination of such individual's employment and such successor is reasonably satisfactory to Lender;

(n) **Material Adverse Effect.** The occurrence of a Material Adverse Effect;

(o) **Invalid Liens.** If any Lien purported to be created by any Loan Document shall cease to be a valid perfected first priority Lien (subject only to any priority accorded by law to Permitted Liens) on any material portion of the Collateral, or any Loan Party or any Other Obligor shall assert in writing that any Lien purported to be created by any Loan Document is not a valid perfected first-priority lien (subject only to any priority accorded by law to Permitted Liens) on the assets or properties purported to be covered thereby;

(p) **Termination of Loan Documents.** If any of the Loan Documents shall cease to be in full force and effect (other than as a result of the discharge thereof in accordance with the terms thereof or by written agreement of all parties thereto);

(q) [Intentionally Omitted];

(r) **Loss of Collateral.** The loss, theft, damage or destruction of any of the Collateral in an amount in excess of $100,000 in the aggregate (except to the extent covered by insurance pursuant to which the insurer has not denied coverage) for all such events during any Fiscal Year as determined by Lender in its sole discretion determined in good faith, or (except as permitted hereby) the sale, lease or furnishing under a contract of service of, any of the Collateral;

(s) [Intentionally Omitted]; or

(t) **Plans.** (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party or any Subsidiary under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $100,000, (ii) the existence of any Lien under Section 430(k) or Section 6321 of the Code or Section 303(k) or Section 4068 of ERISA on any assets of a Loan Party, or (iii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $100,000.

**11.2.    Remedies with Respect to Lending Commitments/Acceleration, Etc.** Upon the occurrence and during the continuance of an Event of Default, Lender may, in Lender's sole discretion (a) terminate all or any portion of its commitment to lend to or extend credit to Borrower under this Agreement and/or any other Loan Document, without prior notice to any Loan Party and/or (b) demand payment in full of all or any portion of the Obligations (whether or not payable on demand prior to such Event of Default), and/or (c) take any and all other and further actions and avail itself of any and all rights and remedies available to Lender under this Agreement, any other Loan Document, under law or in equity. Notwithstanding the foregoing sentence, upon the occurrence of any Event of Default described in Section 11.1(g) or Section 11.1(h), without notice, demand or other action by Lender all of the Obligations shall immediately become due and payable whether or not payable on demand prior to such Event of Default.

**11.3.    Remedies with Respect to Collateral.** Without limiting any rights or remedies Lender may have pursuant to this Agreement, the other Loan Documents, under applicable law or otherwise, upon the occurrence and during the continuation of an Event of Default:

(a) **Any and All Remedies.** Lender may take any and all actions and avail itself of any and all rights and remedies available to Lender under this Agreement, any other Loan Document,

-41-

under law or in equity, and the rights and remedies herein and therein provided shall be cumulative and not exclusive of any rights or remedies provided by applicable law or otherwise.

(b)      **Collections; Modifications of Terms.**  Lender may, but shall be under no obligation to: (i) notify all appropriate parties that the Collateral, or any part thereof, has been assigned to, or is subject to a security interest in favor of, Lender; (ii) demand, sue for, collect and give receipts for and take all necessary or desirable steps to collect any Collateral or Proceeds in its or any Loan Party Obligor's name, and apply any such collections against the Obligations as Lender may elect; (iii) take control of any Collateral and any cash and non-cash Proceeds of any Collateral; (iv) enforce, compromise, extend, renew settle or discharge any rights or benefits of each Loan Party Obligor with respect to or in and to any Collateral, or deal with the Collateral as Lender may deem advisable; and (v) make any compromises, exchanges, substitutions or surrenders of Collateral Lender deems necessary or proper in its reasonable discretion, including extending the time of payment, permitting payment in installments, or otherwise modifying the terms or rights relating to any of the Collateral, all of which may be effected without notice to, consent of, or any other action of any Loan Party and without otherwise discharging or affecting the Obligations, the Collateral or the security interests granted to Lender under this Agreement or any other Loan Document.

(c)      **Insurance.**  Lender may file proofs of loss and claim with respect to any of the Collateral with the appropriate insurer, and may endorse in its own and each Loan Party Obligor's name any checks or drafts constituting Proceeds of insurance.  Any Proceeds of insurance received by Lender may be applied by Lender against payment of all or any portion of the Obligations as Lender may elect in its reasonable discretion.

(d)      **Possession and Assembly of Collateral.**  Lender may take possession of the Collateral and/or, without removal, render each Loan Party Obligor's Equipment unusable.  Upon Lender's request, each Loan Party Obligor shall assemble the Collateral and make it available to Lender at one or more places designated by Lender.

(e)      **Set-off.**  Lender may and, without any notice to, consent of or any other action by any Loan Party (such notice, consent or other action being expressly waived), set-off or apply (i) any and all deposits (general or special, time or demand, provisional or final) at any time held by or for the account of Lender or any Affiliate of Lender and (ii) any Indebtedness at any time owing by Lender or any Affiliate of Lender or any Participant in the Loans to or for the credit or the account of any Loan Party Obligor to the repayment of the Obligations, irrespective of whether any demand for payment of the Obligations has been made.

(f)      **Disposition of Collateral.**

(i)      *Sale, Lease, etc. of Collateral.*  Lender may, without demand, advertising or notice, all of which each Loan Party Obligor hereby waives (except as the same may be required by the UCC or other applicable law and is not waivable under the UCC or such other applicable law), at any time or times in one or more public or private sales or other dispositions, for cash, on credit or otherwise, at such prices and upon such terms as determined by Lender (provided such price and terms are commercially reasonable within the meaning of the UCC to the extent such sale or other disposition is subject to the UCC requirements that such sale or other disposition must be commercially reasonable), (A) sell, lease, license or otherwise dispose of any and all Collateral and/or (B) deliver and grant options to a third party to purchase, lease, license or otherwise dispose of any and all Collateral.  Lender may sell, lease, license or otherwise dispose of any Collateral in its then-present condition or following any preparation or processing deemed necessary by Lender in its reasonable discretion.  Lender may be the purchaser at any such public or private sale or other disposition of Collateral, and in such case Lender may make payment of all or any portion of the purchase price therefor by the application

of all or any portion of the Obligations due to Lender to the purchase price payable in connection
with such sale or disposition. Lender may, if it deems it reasonable, postpone or adjourn any sale
or other disposition of any Collateral from time to time by an announcement at the time and place
of the sale or disposition to be so postponed or adjourned without being required to give a new
notice of sale or disposition; *provided*, that Lender shall provide the applicable Loan Party
Obligor with written notice of the time and place of such postponed or adjourned sale or
disposition. Each Loan Party Obligor hereby acknowledges and agrees that Lender's compliance
with any requirements of applicable law in connection with a sale, lease, license or other
disposition of Collateral will not be considered to adversely affect the commercial reasonableness
of any sale, lease, license or other disposition of such Collateral.

(ii) *Deficiency.* Each Loan Party Obligor shall remain liable for all amounts
of the Obligations remaining unpaid as a result of any deficiency of the Proceeds of the sale,
lease, license or other disposition of Collateral after such Proceeds are applied to the Obligations
as provided in this Agreement.

(iii) *Warranties; Sales on Credit.* Lender may sell, lease, license or
otherwise dispose of the Collateral without giving any warranties and may specifically disclaim
any and all warranties, including but not limited to warranties of title, possession, merchantability
and fitness. Each Loan Party Obligor hereby acknowledges and agrees that Lender's disclaimer
of any and all warranties in connection with a sale, lease, license or other disposition of Collateral
will not be considered to adversely affect the commercial reasonableness of any such disposition
of the Collateral. If Lender sells, leases, licenses or otherwise disposes of any of the Collateral on
credit, Borrower will be credited only with payments actually made in cash by the recipient of
such Collateral and received by Lender and applied to the Obligations. If any Person fails to pay
for Collateral acquired pursuant this Section 11.3(f) on credit, Lender may re-offer the Collateral
for sale, lease, license or other disposition.

(iv) *License.* Lender is hereby granted a license or other right to use, without
liability for royalties or any other charge, each Loan Party Obligor's Intellectual Property,
including but not limited to, any labels, patents, trademarks, trade names, URLs, domain names,
industrial designs, copyrights, and advertising matter, whether owned by any Loan Party Obligor
or with respect to which any Loan Party Obligor has rights under license, sublicense, or other
agreements, as it pertains to the Collateral, in preparing for sale, advertising for sale and selling
any Collateral, and each Loan Party Obligor's rights under all licenses and all franchise
agreements shall inure to the benefit of Lender.

(g) **Investment Property; Voting and Other Rights; Irrevocable Proxy.**

(i) All rights of each Loan Party Obligor to exercise any of the voting and
other consensual rights which it would otherwise be entitled to exercise in accordance with the
terms hereof with respect to any Investment Property, and to receive any dividends, payments,
and other distributions which it would otherwise be authorized to receive and retain in accordance
with the terms hereof with respect to any Investment Property, shall immediately, at the election
of Lender (without requiring any notice) cease, and all such rights shall thereupon become vested
solely in Lender, and Lender (personally or through an agent) shall thereupon be solely
authorized and empowered, without notice, to (A) transfer and register in its name, or in the name
of its nominee, the whole or any part of the Investment Property, it being acknowledged by each
Loan Party Obligor that any such transfer and registration may be effected by Lender through its
irrevocable appointment as attorney-in-fact pursuant to Section 11.3(g)(ii) and Section 6.4, (B)
exchange certificates or instruments representing or evidencing Investment Property for
certificates or instruments of smaller or larger denominations, (C) exercise the voting and all
other rights as a holder with respect to all or any portion of the Investment Property (including all

-43-

economic rights, all control rights, authority and powers, and all status rights of each Loan Party Obligor as a member or as a shareholder (as applicable) of the Issuer), (D) collect and receive all dividends and other payments and distributions made thereon, (E) notify the parties obligated on any Investment Property to make payment to Lender of any amounts due or to become due thereunder, (F) endorse instruments in the name of each Loan Party Obligor to allow collection of any Investment Property, (G) enforce collection of any of the Investment Property by suit or otherwise, and surrender, release, or exchange all or any part thereof, or compromise or renew for any period (whether or not longer than the original period) any liabilities of any nature of any Person with respect thereto, (H) consummate any sales of Investment Property or exercise any other rights as set forth in Section 11.3(f), (I) otherwise act with respect to the Investment Property as though Lender was the outright owner thereof and (J) exercise any other rights or remedies Lender may have under the UCC, other applicable law or otherwise.

(ii) EACH LOAN PARTY OBLIGOR HEREBY IRREVOCABLY CONSTITUTES AND APPOINTS LENDER AS ITS PROXY AND ATTORNEY-IN-FACT FOR SUCH LOAN PARTY OBLIGOR WITH RESPECT TO ALL OF EACH SUCH LOAN PARTY OBLIGOR'S INVESTMENT PROPERTY WITH THE RIGHT, DURING THE CONTINUANCE OF AN EVENT OF DEFAULT, WITHOUT NOTICE, TO TAKE ANY OF THE FOLLOWING ACTIONS: (A) TRANSFER AND REGISTER IN LENDER'S NAME, OR IN THE NAME OF ITS NOMINEE, THE WHOLE OR ANY PART OF THE INVESTMENT PROPERTY, (B) VOTE THE PLEDGED EQUITY, WITH FULL POWER OF SUBSTITUTION TO DO SO, (C) RECEIVE AND COLLECT ANY DIVIDEND OR ANY OTHER PAYMENT OR DISTRIBUTION IN RESPECT OF, OR IN EXCHANGE FOR, THE INVESTMENT PROPERTY OR ANY PORTION THEREOF, TO GIVE FULL DISCHARGE FOR THE SAME AND TO INDORSE ANY INSTRUMENT MADE PAYABLE TO ANY LOAN PARTY OBLIGOR FOR THE SAME, (D) EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES, AND REMEDIES (INCLUDING ALL ECONOMIC RIGHTS, ALL CONTROL RIGHTS, AUTHORITY AND POWERS, AND ALL STATUS RIGHTS OF EACH LOAN PARTY OBLIGOR AS A MEMBER OR AS A SHAREHOLDER (AS APPLICABLE) OF THE ISSUER) TO WHICH A HOLDER OF THE PLEDGED COLLATERAL WOULD BE ENTITLED (INCLUDING, WITH RESPECT TO THE PLEDGED EQUITY, GIVING OR WITHHOLDING WRITTEN CONSENTS OF MEMBERS OR SHAREHOLDERS, CALLING SPECIAL MEETINGS OF MEMBERS OR SHAREHOLDERS, AND VOTING AT SUCH MEETINGS), AND (E) TAKE ANY ACTION AND TO EXECUTE ANY INSTRUMENT WHICH LENDER MAY DEEM NECESSARY OR ADVISABLE TO ACCOMPLISH THE PURPOSES OF THIS AGREEMENT. THE APPOINTMENT OF LENDER AS PROXY AND ATTORNEY-IN-FACT IS COUPLED WITH AN INTEREST AND SHALL BE VALID AND IRREVOCABLE UNTIL (x) ALL OF THE OBLIGATIONS HAVE BEEN INDEFEASIBLY PAID IN FULL IN CASH IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, (y) LENDER HAS NO FURTHER OBLIGATIONS UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, AND (z) THE COMMITMENTS UNDER THIS AGREEMENT HAVE EXPIRED OR HAVE BEEN TERMINATED (IT BEING UNDERSTOOD AND AGREED THAT SUCH OBLIGATIONS WILL BE AUTOMATICALLY REINSTATED IF AT ANY TIME PAYMENT, IN WHOLE OR IN PART, OF ANY OF THE OBLIGATIONS IS RESCINDED OR MUST OTHERWISE BE RESTORED OR RETURNED BY LENDER FOR ANY REASON WHATSOEVER, INCLUDING AS A PREFERENCE, FRAUDULENT CONVEYANCE, OR OTHERWISE UNDER ANY BANKRUPTCY, INSOLVENCY, OR SIMILAR LAW, ALL AS THOUGH SUCH PAYMENT HAD NOT BEEN MADE; IT BEING FURTHER UNDERSTOOD THAT IN THE EVENT PAYMENT OF ALL OR ANY PART OF THE OBLIGATIONS IS RESCINDED OR MUST BE RESTORED OR RETURNED, ALL REASONABLE OUT-OF-POCKET COSTS AND EXPENSES (INCLUDING ALL REASONABLE ATTORNEYS' FEES

AND DISBURSEMENTS) INCURRED BY LENDER IN DEFENDING AND ENFORCING SUCH REINSTATEMENT SHALL HEREBY BE DEEMED TO BE INCLUDED AS A PART OF THE OBLIGATIONS). SUCH APPOINTMENT OF LENDER AS PROXY AND AS ATTORNEY-IN-FACT SHALL BE VALID AND IRREVOCABLE AS PROVIDED HEREIN NOTWITHSTANDING ANY LIMITATIONS TO THE CONTRARY SET FORTH IN ANY GOVERNING DOCUMENTS OF ANY LOAN PARTY OBLIGOR, ANY ISSUER, OR OTHERWISE.

(iii)    In order to further effect the foregoing transfer of rights in favor of Lender, during the continuance of an Event of Default, each Loan Party Obligor hereby authorizes and instructs each Issuer of Investment Property pledged by such Loan Party Obligor to comply with any instruction received by such Issuer from Lender without any other or further instruction from such Loan Party Obligor, and each Loan Party Obligor acknowledges and agrees that each Issuer shall be fully protected in so complying, and to pay any dividends, distributions, or other payments with respect to any of the Investment Property directly to Lender.

(iv)    Upon exercise of the proxy set forth herein, all prior proxies given by any Loan Party Obligor with respect to any of the Pledged Equity or other Investment Property, other than to Lender, are hereby revoked, and no subsequent proxies, other than to Lender will be given with respect to any of the Pledged Equity or any of the other Investment Property unless Lender otherwise subsequently agrees in writing. Lender, as proxy, will be empowered and may exercise the irrevocable proxy to vote the Pledged Equity and the other Investment Property at any and all times during the existence of an Event of Default, including, at any meeting of shareholders or members, as the case may be, however called, and at any adjournment thereof, or in any action by written consent, and may waive any notice otherwise required in connection therewith. To the fullest extent permitted by applicable law, Lender shall have no agency, fiduciary or other implied duties to any Loan Party Obligor, any Issuer, any Loan Party or any other Person when acting in its capacity as such proxy or attorney-in-fact. Each Loan Party Obligor hereby waives and releases any claims that it may otherwise have against Lender with respect to any breach, or alleged breach, of any such agency, fiduciary or other duty.

(v)    Any transfer to Lender or its nominee, or registration in the name of Lender or its nominee, of the whole or any part of the Investment Property shall be made solely for purposes of effectuating voting or other consensual rights with respect to the Investment Property in accordance with the terms of this Agreement and is not intended to effectuate any transfer of ownership of any of the Investment Property unless Lender expressly agrees to the contrary in writing. Notwithstanding the delivery by Lender of any instruction to any Issuer or any exercise by Lender of an irrevocable proxy or otherwise, Lender shall not be deemed the owner of, or assume any obligations or any liabilities whatsoever of the owner or holder of, any Investment Property unless and until Lender expressly accepts such obligations in a duly authorized and executed writing and agrees in writing to become bound by the applicable Governing Documents or otherwise becomes the owner thereof under applicable law (including through a sale as described in Section 11.3(f)). The execution and delivery of this Agreement shall not subject Lender to, or transfer or pass to Lender, or in any way affect or modify, the liability of any Loan Party Obligor under the Governing Documents of any Issuer or any related agreements, documents, or instruments or otherwise. In no event shall the execution and delivery of this Agreement by Lender, or the exercise by Lender of any rights hereunder or assigned hereby, constitute an assumption of any liability or obligation whatsoever of any Loan Party Obligor to, under, or in connection with any of the Governing Documents of any Issuer or any related agreements, documents, or instruments or otherwise.

(h)     **Election of Remedies.** Lender shall have the right in Lender's sole discretion to determine which rights, security, Liens or remedies Lender may at any time pursue, foreclose upon, relinquish, subordinate, modify or take any other action with respect to, without in any way impairing, modifying or affecting any of Lender's other rights, security, Liens or remedies with respect to any Collateral or any of Lender's rights or remedies under this Agreement or any other Loan Document.

(i)     **Lender's Obligations.** Each Loan Party Obligor agrees that Lender shall not have any obligation to preserve rights to any Collateral against prior parties or to marshal any Collateral of any kind for the benefit of any other creditor of any Loan Party Obligor or any other Person. Lender shall not be responsible to any Loan Party Obligor or any other Person for loss or damage resulting from Lender's failure to enforce its Liens or collect any Collateral or Proceeds or any monies due or to become due under the Obligations or any other liability or obligation of any Loan Party Obligor to Lender.

(j)     **Waiver of Rights by Loan Party Obligors.** Except as otherwise expressly provided for in this Agreement or by non-waivable applicable law, each Loan Party waives (i) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which any Loan Party Obligor may in any way be liable, and hereby ratifies and confirms whatever Lender may do in this regard, (ii) all rights to notice and a hearing prior to Lender's taking possession or control of, or to Lender's replevy, attachment or levy upon, the Collateral or any bond or security which might be required by any court prior to allowing Lender to exercise any of its remedies and (iii) the benefit of all valuation, appraisal, marshaling and exemption laws.

## 12.     LOAN GUARANTY.

**12.1.     Guaranty.** Each Loan Party Obligor hereby agrees that it is jointly and severally liable for, and absolutely and unconditionally guaranties to Lender, the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, all of the Obligations and all costs and expenses, including all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by Lender in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, Borrower, any Loan Party Obligor or any Other Obligor of all or any part of the Obligations (and such costs and expenses paid or incurred shall be deemed to be included in the Obligations). Each Loan Party Obligor further agrees that the Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guaranty notwithstanding any such extension or renewal. All terms of this Loan Guaranty apply to and may be enforced by or on behalf of any branch or Affiliate of Lender that extended any portion of the Obligations.

**12.2.     Guaranty of Payment.** This Loan Guaranty is a guaranty of payment and not of collection. Each Loan Party Obligor waives any right to require Lender to sue or otherwise take action against Borrower, any other Loan Party Obligor, any Other Obligor, or any other Person obligated for all or any part of the Obligations, or otherwise to enforce its payment against any Collateral securing all or any part of the Obligations.

### 12.3.     No Discharge or Diminishment of Loan Guaranty.

(a)     Except as otherwise expressly provided for herein, the obligations of each Loan Party Obligor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of all of the Obligations), including: (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Obligations, by operation of law or otherwise; (ii) any change in

the corporate existence, structure or ownership of Borrower or any Obligor; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting Borrower or any Obligor or their respective assets or any resulting release or discharge of any obligation of Borrower or any Obligor; or (iv) the existence of any claim, setoff or other rights which any Loan Party Obligor may have at any time against Borrower, any Obligor, Lender, or any other Person, whether in connection herewith or in any unrelated transactions.

(b) The obligations of each Loan Party Obligor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by Borrower or any Obligor of the Obligations or any part thereof.

(c) Further, the obligations of any Loan Party Obligor hereunder shall not be discharged or impaired or otherwise affected by: (i) the failure of Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Obligations; (iii) any release, non-perfection or invalidity of any indirect or direct security for all or any part of the Obligations or all or any part of any obligations of any Obligor; (iv) any action or failure to act by Lender with respect to any Collateral; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Loan Party Obligor or that would otherwise operate as a discharge of any Loan Party Obligor as a matter of law or equity (other than the indefeasible payment in full in cash of all of the Obligations).

**12.4. Defenses Waived.** To the fullest extent permitted by applicable law, each Loan Party Obligor hereby waives any defense based on or arising out of any defense of any Loan Party Obligor or the unenforceability of all or any part of the Obligations from any cause, or the cessation from any cause of the liability of any Loan Party Obligor, other than the indefeasible payment in full in cash of all of the Obligations. Without limiting the generality of the foregoing, each Loan Party Obligor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against Borrower, any Obligor, or any other Person. Each Loan Party Obligor confirms that it is not a surety under any state law and shall not raise any such law as a defense to its obligations hereunder. Lender may, at its election, foreclose on any Collateral held by it by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any Collateral, compromise or adjust any part of the Obligations, make any other accommodation with Borrower or any Obligor or exercise any other right or remedy available to it against Borrower or any Obligor, without affecting or impairing in any way the liability of any Loan Party Obligor under this Loan Guaranty except to the extent the Obligations have been fully and indefeasibly paid in cash. To the fullest extent permitted by applicable law, each Loan Party Obligor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Loan Party Obligor against Borrower or any Obligor or any security.

**12.5. Rights of Subrogation.** No Loan Party Obligor will assert any right, claim or cause of action, including a claim of subrogation, contribution or indemnification that it has against Borrower or any Obligor, or any Collateral, until the Termination Date.

**12.6. Reinstatement; Stay of Acceleration.** If at any time any payment of any portion of the Obligations is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy or reorganization of Borrower or any other Person, or otherwise, each Loan Party Obligor's obligations under this Loan Guaranty with respect to that payment shall be reinstated at such time as though the

-47-

payment had not been made and whether or not Lender is in possession of this Loan Guaranty. If acceleration of the time for payment of any of the Obligations is stayed upon the insolvency, bankruptcy or reorganization of Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Obligations shall nonetheless be payable by the Loan Party Obligors forthwith on demand by Lender. This Section 12.6 shall remain operative even after the Termination Date and shall survive the payment in full of all of the Obligations.

**12.7.   Information.** Each Loan Party Obligor assumes all responsibility for being and keeping itself informed of Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Obligations and the nature, scope and extent of the risks that each Loan Party Obligor assumes and incurs under this Loan Guaranty, and agrees that Lender shall not have any duty to advise any Loan Party Obligor of information known to it regarding those circumstances or risks.

**12.8.   Termination.** To the maximum extent permitted by law, each Loan Party Obligor hereby waives any right to revoke this Loan Guaranty as to future Obligations. If such a revocation is effective notwithstanding the foregoing waiver, each Loan Party Obligor acknowledges and agrees that (a) no such revocation shall be effective until written notice thereof has been received by Lender, (b) no such revocation shall apply to any Obligations in existence on the date of receipt by Lender of such written notice (including any subsequent continuation, extension, or renewal thereof, or change in the interest rate, payment terms or other terms and conditions thereof), (c) no such revocation shall apply to any Obligations made or created after such date to the extent made or created pursuant to a legally binding commitment of Lender, (d) no payment by Borrower, any other Loan Party Obligor, or from any other source, prior to the date of Lender's receipt of written notice of such revocation shall reduce the maximum obligation of any Loan Party Obligor hereunder and (e) any payment, by Borrower or from any source other than a Loan Party Obligor which has made such a revocation, made subsequent to the date of such revocation, shall first be applied to that portion of the Obligations as to which the revocation is effective and which are not, therefore, guarantied hereunder, and to the extent so applied shall not reduce the maximum obligation of any Loan Party Obligor hereunder.

**12.9.   Maximum Liability.** The provisions of this Loan Guaranty are severable, and in any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Loan Party Obligor under this Loan Guaranty would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Loan Party Obligor's liability under this Loan Guaranty, then, notwithstanding any other provision of this Loan Guaranty to the contrary, the amount of such liability shall, without any further action by the Loan Party Obligors or Lender, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Loan Party Obligor's *"Maximum Liability"*). This Section 12.09 with respect to the Maximum Liability of each Loan Party Obligor is intended solely to preserve the rights of Lender to the maximum extent not subject to avoidance under applicable law, and no Loan Party Obligor or any other Person shall have any right or claim under this Section with respect to such Maximum Liability, except to the extent necessary so that the obligations of any Loan Party Obligor hereunder shall not be rendered voidable under applicable law. Each Loan Party Obligor agrees that the Obligations may at any time and from time to time exceed the Maximum Liability of each Loan Party Obligor without impairing this Loan Guaranty or affecting the rights and remedies of Lender hereunder; *provided,* that nothing in this sentence shall be construed to increase any Loan Party Obligor's obligations hereunder beyond its Maximum Liability.

**12.10.   Contribution.** In the event any Loan Party Obligor shall make any payment or payments under this Loan Guaranty or shall suffer any loss as a result of any realization upon any collateral granted by it to secure its obligations under this Loan Guaranty (such Loan Party Obligor a *"Paying Guarantor"*), each other Loan Party Obligor (each a *"Non-Paying Guarantor"*) shall contribute to such Paying

Guarantor an amount equal to such Non-Paying Guarantor's *"Applicable Percentage"* of such payment or payments made, or losses suffered, by such Paying Guarantor. For purposes of this Section 12.10, each Non-Paying Guarantor's *"Applicable Percentage"* with respect to any such payment or loss by a Paying Guarantor shall be determined as of the date on which such payment or loss was made by reference to the ratio of (x) such Non-Paying Guarantor's Maximum Liability as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder) or, if such Non-Paying Guarantor's Maximum Liability has not been determined, the aggregate amount of all monies received by such Non-Paying Guarantor from Borrower after the date hereof (whether by loan, capital infusion or by other means) to (y) the aggregate Maximum Liability of all Loan Party Obligors hereunder (including such Paying Guarantor) as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder), or to the extent that a Maximum Liability has not been determined for any Loan Party Obligor, the aggregate amount of all monies received by such Loan Party Obligors from Borrower after the date hereof (whether by loan, capital infusion or by other means). Nothing in this provision shall affect any Loan Party Obligor's several liability for the entire amount of the Obligations (up to such Loan Party Obligor's Maximum Liability). Each of the Loan Party Obligors covenants and agrees that its right to receive any contribution under this Loan Guaranty from a Non-Paying Guarantor shall be subordinate and junior in right of payment to the payment in full in cash of all of the Obligations. This provision is for the benefit of Lender and the Loan Party Obligors and may be enforced by any one, or more, or all of them, in accordance with the terms hereof.

**12.11. Liability Cumulative.** The liability of each Loan Party Obligor under this Section 12 is in addition to and shall be cumulative with all liabilities of each Loan Party Obligor to Lender under this Agreement and the other Loan Documents to which such Loan Party Obligor is a party or in respect of any obligations or liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

## 13. PAYMENTS FREE OF TAXES; OBLIGATION TO WITHHOLD; PAYMENTS ON ACCOUNT OF TAXES.

(a) Any and all payments by or on account of any obligation of the Loan Party Obligors hereunder or under any other Loan Document shall to the extent permitted by applicable laws be made free and clear of and without reduction or withholding for any Taxes. If, however, applicable laws require the Loan Party Obligors to withhold or deduct any Tax, such Tax shall be withheld or deducted in accordance with such laws as the case may be, upon the basis of the information and documentation to be delivered pursuant to subsection (e) below.

(b) If any Loan Party Obligor shall be required by applicable law to withhold or deduct any Taxes from any payment, then (i) such Loan Party Obligor shall withhold or make such deductions as are required based upon the information and documentation it has received pursuant to subsection (e) below, (ii) such Loan Party Obligor shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with the applicable law and (iii) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the Loan Party Obligors shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section) the Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made. Upon request by Lender or other Recipient, Borrower shall deliver to Lender or such other Recipient, as the case may be, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment of Indemnified Taxes, a copy of any return required by applicable law to report such payment or other evidence of such payment reasonably satisfactory to Lender or such other Recipient, as the case may be.

(c)     Without limiting the provisions of subsections (a) and (b) above, the Loan Party Obligors shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(d)     Without limiting the provisions of subsections (a) through (c) above, each Loan Party Obligor shall, and does hereby, on a joint and several basis, indemnify Lender and each other Recipient (and their respective directors, officers, employees, affiliates and agents) and shall make payment in respect thereof within ten days after demand therefor, for the full amount of any Indemnified Taxes and Other Taxes (including Indemnified Taxes and Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid or incurred by Lender or any other Recipient on account of, or in connection with any Loan Document or a breach by a Loan Party Obligor thereof, and any penalties, interest and related expenses and losses arising therefrom or with respect thereto (including the fees, charges and disbursements of any counsel or other tax advisor for Lender or any other Recipient (or their respective directors, officers, employees, affiliates, and agents)), whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of any such payment or liability delivered to Borrower shall be conclusive absent manifest error. Notwithstanding any provision in this Agreement to the contrary, this Section 13 shall remain operative even after the Termination Date and shall survive the payment in full of all of the Obligations.

(e)     Lender shall deliver to Borrower and each Participant shall deliver to Lender, at the time or times prescribed by applicable laws, such properly completed and executed documentation prescribed by applicable laws or by the taxing authorities of any jurisdiction and such other reasonably requested information as will permit Borrower or Lender, as the case may be, to determine (x) whether or not payments made hereunder or under any other Loan Document are subject to Taxes, (y) if applicable, the required rate of withholding or deduction and (z) such Lender's or Participant's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of all payments to be made to such Recipient by the Loan Party Obligors pursuant to this Agreement or otherwise to establish such Recipient's status for withholding tax purposes in the applicable jurisdiction; *provided*, that each Recipient shall only be required to deliver such documentation as it may legally provide. Without limiting the generality of the foregoing, if a Borrower is resident for tax purposes in the United States:

(i)     Lender (or Participant) that is a *"United States person"* within the meaning of Section 7701(a)(30) of the Code shall deliver to Borrower (or Lender granting a participation as applicable) an executed original of Internal Revenue Service Form W-9 or such other documentation or information prescribed by applicable law or reasonably requested by Borrower (or Lender granting a participation) as will enable Borrower (or Lender granting a participation) as the case may be, to determine whether or not Lender (or Participant) is subject to backup withholding or information reporting requirements under the Code;

(ii)     Lender (or Participant) that is not a *"United States person"* within the meaning of Section 7701(a)(30) of the Code (a *"Non-U.S. Recipient"*) shall deliver to Borrower (and Lender granting a participation in case the Non-U.S. Recipient is a Participant) on or prior to the date on which such Non-U.S. Person becomes a party to this Agreement or a Participant (and from time to time thereafter upon the reasonable request of Borrower or Lender but only if such Non-U.S. Recipient is legally entitled to do so), whichever of the following is applicable: (A) executed originals of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party; (B) executed originals of Internal Revenue Service Form W-8ECI; (C) executed originals of Internal Revenue Service Form W-8IMY and all required supporting documentation; (D) each Non-U.S. Recipient claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, shall provide (x) a certificate to the effect that such Non-U.S. Recipient is not (1) a *"bank"* within the meaning of

section 881(c)(3)(A) of the Code, (2) a *"10 percent shareholder"* of Borrower within the meaning of section 881(c)(3)(B) of the Code, or (3) a *"controlled foreign corporation"* described in section 881(c)(3)(C) of the Code and (y) executed originals of Internal Revenue Service Form W-8BEN; and/or (E) executed originals of any other form prescribed by applicable law (including FATCA) as a basis for claiming exemption from or a reduction in United States Federal withholding tax together with such supplementary documentation as may be prescribed by applicable law to permit Borrower or Lender to determine the withholding or deduction required to be made. Each Non-U.S. Recipient shall promptly notify Borrower (or any Lender granting a participation if the Non-U.S. Recipient is a Participant) of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

## 14. GENERAL PROVISIONS.

### 14.1. Notices.

All notices, requests, demands and other communications under or in respect of this Agreement or any transactions hereunder shall be in writing and shall be personally delivered or mailed (by prepaid registered or certified mail, return receipt requested), sent by prepaid recognized overnight courier service, or by email to the applicable party at its address or email address indicated below,

If to Lender:

EXWORKS CAPITAL FUND I, L.P.
333 W. Wacker Drive, Suite 1620
Chicago, IL 60606
Attention: Robert Richardson
Email: rrichardson@exworkscapital.com

with a copy to:

GOLDBERG KOHN LTD.
55 East Monroe Street, Suite 3300
Chicago, Illinois 60603
Attention: Richard Kohn
Email: richard.kohn@goldbergkohn.com

If to Borrower or any other Loan Party:

PENTHOUSE GLOBAL MEDIA, INC.
8944 Mason Street
Chatsworth, CA 91311
Attention: Kelly Holland
Email: chickmedia@gmail.com

with a copy to:

HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Attention: Barry L. Dastin
Email: barry.dastin@hoganlovells.com

or, as to each party, at such other address as shall be designated by such party in a written notice to the other party delivered as aforesaid. All such notices, requests, demands and other communications shall be deemed given (i) when personally delivered, (ii) three Business Days after being deposited in the mails with postage prepaid (by registered or certified mail, return receipt requested), (iii) one Business Day after being delivered to the overnight courier service, if prepaid and sent overnight delivery, addressed as aforesaid and with all charges prepaid or billed to the account of the sender or (iv) when sent by email transmission to an email address designated by such addressee and the sender receives a confirmation of transmission.

**14.2. Severability.** If any provision of this Agreement or any other Loan Document is held invalid or unenforceable, either in its entirety or by virtue of its scope or application to given circumstances, such provision shall thereupon be deemed modified only to the extent necessary to render same valid, or not applicable to given circumstances, or excised from this Agreement or such other Loan Document, as the situation may require, and this Agreement and the other Loan Documents shall be construed and enforced as if such provision had been included herein as so modified in scope or application, or had not been included herein or therein, as the case may be.

**14.3. Integration.** This Agreement and the other Loan Documents represent the final, entire and complete agreement between each Loan Party party hereto and thereto and Lender and supersede all prior and contemporaneous negotiations, oral representations and agreements, all of which are merged and integrated into this Agreement. THERE ARE NO ORAL UNDERSTANDINGS, REPRESENTATIONS OR AGREEMENTS BETWEEN THE PARTIES THAT ARE NOT SET FORTH IN THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS.

**14.4. Waivers.** The failure of Lender at any time or times to require any Loan Party to strictly comply with any of the provisions of this Agreement or any other Loan Documents shall not waive or diminish any right of Lender later to demand and receive strict compliance therewith. Any waiver of any default shall not waive or affect any other default, whether prior or subsequent, and whether or not similar. None of the provisions of this Agreement or any other Loan Document shall be deemed to have been waived by any act or knowledge of Lender or its agents or employees, but only by a specific written waiver signed by an authorized officer of Lender and delivered to Borrower. Once an Event of Default shall have occurred, it shall be deemed to continue to exist and not be cured or waived unless specifically waived in writing by an authorized officer of Lender and delivered to Borrower. Each Loan Party Obligor waives demand, protest, notice of protest and notice of default or dishonor, notice of payment and nonpayment, release, compromise, settlement, extension or renewal of any commercial paper, Instrument, Account, General Intangible, Document, Chattel Paper, Investment Property or guaranty at any time held by Lender on which such Loan Party Obligor is or may in any way be liable, and notice of any action taken by Lender, unless expressly required by this Agreement, and notice of acceptance hereof.

**14.5. Amendment.** This Agreement may not be amended or modified except in a writing executed by Borrower, the Loan Party Obligors party hereto (to the extent such amendment is directly adverse to such Loan Party Obligor), and Lender.

**14.6. Time of Essence.** Time is of the essence in the performance by each Loan Party Obligor of each and every obligation under this Agreement and the other Loan Documents.

**14.7. Expenses, Fee and Costs Reimbursement.** Borrower hereby agrees to promptly pay (a) all reasonable, documented out of pocket costs and expenses of Lender (including the out of pocket fees, costs and expenses of legal counsel to, and appraisers, accountants, consultants and other professionals and advisors retained by or on behalf of, Lender) in connection with (i) all loan proposals and commitments pertaining to the transactions contemplated hereby (whether or not such transactions are consummated), (ii) the examination, review, due diligence investigation, documentation, negotiation, and closing of the transactions contemplated by the Loan Documents (whether or not such transactions are

consummated), (iii) the creation, perfection and maintenance of Liens pursuant to the Loan Documents, (iv) the performance by Lender of its rights and remedies under the Loan Documents, (v) the administration of the Loans (including usual and customary fees for wire transfers and other transfers or payments received by Lender on account of any of the Obligations) and Loan Documents, (vi) any amendments, modifications, consents and waivers to and/or under any and all Loan Documents (whether or not such amendments, modifications, consents or waivers are consummated), (vii) any periodic public record searches conducted by or at the request of Lender (including, title investigations and public records searches), pending litigation and tax lien searches and searches of applicable corporate, limited liability company, partnership and related records concerning the continued existence, organization and good standing of certain Persons), (viii) protecting, storing, insuring, handling, maintaining, auditing, examining, valuing or selling any Collateral, (ix) any litigation, dispute, suit or proceeding relating to any Loan Document and (x) any workout, collection, bankruptcy, insolvency and other enforcement proceedings under any and all of the Loan Documents (it being agreed that such costs and expenses may include the costs and expenses of workout consultants, investment bankers, financial consultants, appraisers, valuation firms and other professionals and advisors retained by or on behalf of Lender), and (b) without limiting the preceding clause (a), all out of pocket costs and expenses of Lender in connection with Lender's reservation of funds in anticipation of the funding of the initial Loans to be made hereunder. Any fees, costs and expenses owing by Borrower or other Loan Party Obligor hereunder shall be due and payable within three days after written demand therefor.

**14.8.    Benefit of Agreement; Assignability**.   The provisions of this Agreement shall be binding upon and inure to the benefit of the respective successors, assigns, heirs, beneficiaries and representatives of Borrower, each other Loan Party Obligor party hereto and Lender; *provided*, that neither Borrower nor any other Loan Party Obligor may assign or transfer any of its rights under this Agreement without the prior written consent of Lender, and any prohibited assignment shall be void. No consent by Lender to any assignment shall release any Loan Party Obligor from its liability for any of the Obligations. Lender shall have the right to assign all or any of its rights and obligations under the Loan Documents to one or more other Persons (provided, that, so long as no Event of Default under Section 11.1(a), (g) or (h) has occurred, no such assignee shall be a direct competitor of any Loan Party), and each Loan Party Obligor agrees to execute all agreements, instruments and documents requested by Lender in connection with each such assignments. Notwithstanding any provision of this Agreement or any other Loan Document to the contrary, Lender may at any time pledge or grant a security interest in all or any portion of its rights under this Agreement and the other Loan Documents to secure any obligations of Lender, including any pledge or grant to secure obligations to a Federal Reserve Bank.

**14.9.    Recordation of Assignment**.   In respect of any assignment of all or any portion of any Lender's interest in this Agreement or any other Loan Documents at any time and from time to time, the following provisions shall be applicable:

(a)      Borrower, or any agent appointed by Borrower, shall maintain a register (the *"Register"*) in which there shall be recorded the name and address of each Person holding any Loans or any commitment to lend hereunder, and the principal amount and stated interest payable to such Person hereunder or committed by such Person under such Person's lending commitment. Borrower hereby irrevocably appoints Lender (and/or any subsequent Lender appointed by Lender then maintaining the Register) as Borrower's non-fiduciary agent for the purpose of maintaining the Register.

(b)      In connection with any negotiation, transfer or assignment as aforesaid, the transferor/assignor shall deliver to Lender then maintaining the Register an assignment and assumption agreement executed by the transferor/assignor and the transferee/assignee, setting forth the specifics of the subject transaction, including the amount and nature of Obligations and lending commitments being transferred or assigned (and being assumed, as applicable), and the proposed effective date of such transfer or assignment and the related assumption (if applicable).

(c)     Subject to receipt of any required tax forms reasonably required by Lender, such Person shall record the subject transfer, assignment and assumption in the Register. Anything contained in this Agreement or other Loan Document to the contrary notwithstanding, no negotiation, transfer or assignment shall be effective until it is recorded in the Register pursuant to this Section 14.9(c). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error; and Borrower and each Lender shall treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement and the other Loan Documents. The Register shall be available for inspection by Borrower and each Lender at any reasonable time and from time to time upon reasonable prior notice.

**14.10. Participations.** Anything in this Agreement or any other Loan Document to the contrary notwithstanding, Lender may, at any time and from time to time, without in any manner affecting or impairing the validity of any Obligations, sell to one or more Persons (provided, that, so long as no Event of Default under Section 11.1(a), (g) or (h) has occurred, no such participant shall be a direct competitor of any Loan Party) participating interests in its Loans, commitments or other interests hereunder or under any other Loan Document (any such Person, a *"Participant"*). In the event of a sale by Lender of a participating interest to a Participant, (a) such Lender's obligations hereunder and under the other Loan Documents shall remain unchanged for all purposes, (b) Borrower and Lender shall continue to deal solely and directly with each other in connection with Lender's rights and obligations hereunder and under the other Loan Documents and (c) all amounts payable by Borrower shall be determined as if Lender had not sold such participation and shall be paid directly to Lender; *provided,* that a Participant shall be entitled to the benefits of Section 13 as if it were a Lender if Borrower is notified of the Participation and the Participant complies with Section 13. Borrower agrees that if amounts outstanding under this Agreement or any other Loan Document are due and payable (as a result of acceleration or otherwise), each Participant shall be deemed to have the right of set-off in respect of its participating interest in amounts owing under this Agreement and the other Loan Documents to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement; *provided,* that such right of set-off shall not be exercised without the prior written consent of Lender and shall be subject to the obligation of each Participant to share with Lender its share thereof. Borrower also agrees that each Participant shall be entitled to the benefits of Section 14.9 as if it were Lender. Notwithstanding the granting of any such participating interests, (i) Borrower shall look solely to Lender for all purposes of this Agreement, the Loan Documents and the transactions contemplated hereby, (ii) Borrower shall at all times have the right to rely upon any amendments, waivers or consents signed by Lender as being binding upon all of the Participants and (iii) all communications in respect of this Agreement and such transactions shall remain solely between Borrower and Lender (exclusive of Participants) hereunder. If Lender grants a participation hereunder, Lender shall maintain, as a non-fiduciary agent of Borrower, a register as to the participations granted and transferred under this Section containing the same information specified in Section 14.9 on the Register as if each Participant were a Lender to the extent required to cause the Loans to be in registered form for the purposes of Sections 163(F), 165(J), 871, 881, and 4701 of the Code.

**14.11. Headings; Construction.** Section and subsection headings are used in this Agreement only for convenience and do not affect the meanings of the provisions that they precede. The existence of any covenant or required delivery set forth herein that takes place after the Scheduled Maturity Date shall not be construed to imply any intent to extend the Scheduled Maturity Date set forth herein.

**14.12. USA PATRIOT Act Notification.** Lender hereby notifies the Loan Parties that pursuant to the requirements of the USA PATRIOT Act, it may be required to obtain, verify and record certain information and documentation that identifies such Person, which information may include the name and address of each such Person and such other information that will allow Lender to identify such Persons in accordance with the USA PATRIOT Act.

**14.13. Counterparts; Fax/Email Signatures**. This Agreement may be executed in any number of counterparts, all of which shall constitute one and the same agreement. This Agreement may be executed by signatures delivered by facsimile or electronic mail, each of which shall be fully binding on the signing party.

**14.14. GOVERNING LAW**. THIS AGREEMENT, ALONG WITH ALL OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED OTHERWISE IN SUCH OTHER LOAN DOCUMENT) SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF ILLINOIS APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED THEREIN WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES. FURTHER, THE LAW OF THE STATE OF ILLINOIS SHALL APPLY TO ALL DISPUTES OR CONTROVERSIES ARISING OUT OF OR CONNECTED TO OR WITH THIS AGREEMENT AND ALL SUCH OTHER LOAN DOCUMENTS WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES.

**14.15. CONSENT TO JURISDICTION; WAIVER OF JURY TRIAL; CONSENT TO SERVICE OF PROCESS**. ANY LEGAL ACTION, SUIT OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT EXCLUSIVELY IN THE COURTS OF THE STATE OF ILLINOIS IN THE COUNTY OF COOK OR IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS OR IN ANY OTHER COURT (IN ANY JURISDICTION) SELECTED BY THE LENDER IN ITS SOLE DISCRETION, AND BORROWER AND EACH OTHER LOAN PARTY OBLIGOR HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFOREMENTIONED COURTS. BORROWER AND EACH OTHER LOAN PARTY OBLIGOR HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, OR BASED ON 28 U.S.C. § 1404, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING AND ADJUDICATION OF ANY SUCH ACTION, SUIT OR PROCEEDING IN ANY OF THE AFOREMENTIONED COURTS AND AMENDMENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT. BORROWER AND EACH OTHER LOAN PARTY OBLIGOR HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR UNDER ANY AMENDMENT, WAIVER, AMENDMENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE OTHER TRANSACTION DOCUMENTS, AND AGREES THAT ANY SUCH ACTION, PROCEEDING OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. BORROWER AND EACH OTHER LOAN PARTY OBLIGOR HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON BORROWER OR ANY OTHER LOAN PARTY OBLIGOR AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY CERTIFIED MAIL (RETURN RECEIPT REQUESTED) DIRECTED TO BORROWER'S NOTICE ADDRESS (ON BEHALF OF BORROWER OR SUCH LOAN PARTY OBLIGOR) SET FORTH IN SECTION 14.1 AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED FIVE DAYS AFTER THE SAME SHALL HAVE BEEN SO DEPOSITED IN THE MAIL, OR, AT THE LENDER'S OPTION, BY SERVICE UPON BORROWER OR ANY OTHER LOAN PARTY OBLIGOR IN ANY OTHER MANNER PROVIDED UNDER THE RULES OF ANY SUCH COURTS.

**14.16. Publication**. Borrower and each other Loan Party Obligor consents to the publication by Lender of a tombstone, press releases or similar advertising material relating to the financing transactions

contemplated by this Agreement, and Lender reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

**14.17. Confidentiality.** Lender agrees to use commercially reasonable efforts not to disclose Confidential Information to any Person without the prior consent of Borrower; *provided*, that nothing herein contained shall limit any disclosure of the tax structure of the transactions contemplated hereby, or the disclosure of any information (a) to the extent required by applicable law, statute, rule, regulation or judicial process or in connection with the exercise of any right or remedy under any Loan Document, or as may be required in connection with the examination, audit or similar investigation of the Lender or any of its Affiliates, (b) to examiners, auditors, accountants or any regulatory authority, (c) to the officers, partners, managers, directors, employees, agents and advisors (including independent auditors, lawyers and counsel) of the Lender or any of its Affiliates, (d) in connection with any litigation or dispute which relates to this Agreement or any other Loan Document to which the Lender is a party or is otherwise subject, (e) to a subsidiary or Affiliate of the Lender, (f) to any assignee or participant (or prospective assignee or participant) which agrees to be bound by this Section 14.17 and (g) to any lender or other funding source of the Lender (each reference to Lender in the foregoing clauses shall be deemed to include (i) the actual and prospective assignees and participants referred to in clause (f) and the lenders and other funding sources referred to in clause (g), as applicable for purposes of this Section 14.17), and further *provided*, that in no event shall Lender be obligated or required to return any materials furnished by or on behalf of Borrower or any other Loan Party or Obligor. The obligations of the Lender under this Section 14.17 shall supersede and replace the obligations of Lender under any confidentiality letter or provision in respect of this financing or any other financing previously signed and delivered by Lender to Borrower or any of its Affiliates.

[Signature page follows]

IN WITNESS WHEREOF, Borrower, each other Loan Party Obligor party hereto, and Lender have signed this Agreement as of the date first set forth above.

**Borrower:**

PENTHOUSE GLOBAL MEDIA, INC., a Delaware corporation

By: _Kelly Holland_
Name: _Kelly Holland_
Title: _CEO_

**Loan Party Obligors:**

GMCI INTERNET OPERATIONS, INC.

By: _Kelly Holland_
Name: _Kelly Holland_
Title: _CEO_

GMI ON-LINE VENTURES, LTD.

By: _Kelly Holland_
Name: _Kelly Holland_
Title: _CEO_

GENERAL MEDIA COMMUNICATIONS, INC.

By: _Kelly Holland_
Name: _Kelly Holland_
Title: _CEO_

GENERAL MEDIA ENTERTAINMENT, INC.

By: _Kelly Holland_
Name: _Kelly Holland_
Title: _CEO_

PMGI HOLDINGS INC.

By: _Kelly Holland_
Name: _Kelly Holland_
Title: _CEO_

Signature Page to Loan and Security Agreement

PENTHOUSE DIGITAL MEDIA PRODUCTIONS INC.

By: _____
Name: _____
Title: CEO

PENTHOUSE IMAGES ACQUISITIONS, LTD.

By: _____
Name: _____
Title: CEO

PURE ENTERTAINMENT TELECOMMUNICATIONS, INC.

By: _____
Name: _____
Title: CEO

XVHUB GROUP INC.

By: _____
Name: _____
Title: CEO

DANNI ASHE, INC.

By: _____
Name: _____
Title: CEO

STREAMRAY STUDIOS INC.

By: _____
Name: _____
Title: CEO

TAN DOOR MEDIA INC.

By: _____
Name: _____
Title: CEO

**Lender:**

**EXWORKS CAPITAL FUND I, L.P.**

By: _____
Name: Robert Richardson
Its: Authorized Signatory

# EXHIBIT "D"

## WAIVER, JOINDER AND FIRST AMENDMENT
## TO LOAN AND SECURITY AGREEMENT

THIS WAIVER, JOINDER AND FIRST AMENDMENT TO LOAN AND SECURITY AGREEMENT (this "Amendment") is entered into as of February 17, 2017, by and among EXWORKS CAPITAL FUND I, L.P. ("Lender"), PENTHOUSE GLOBAL MEDIA, INC., a Delaware corporation ("Borrower") and each of the parties signatory hereto as a Loan Party Obligor.

WHEREAS, Borrower, Lender and Loan Party Obligors are parties to that certain Loan and Security Agreement dated as of February 19, 2016 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement");

WHEREAS, Borrower has formed a wholly-owned subsidiary, Penthouse Global Licensing, Inc., a Delaware corporation ("PGLI"), and Borrower and PGLI desire to join PGLI to the Loan Agreement as a Loan Party Obligor, as required by Section 5.3 of the Loan Agreement.

WHEREAS, Borrower has requested and Lender has agreed, subject to the terms and conditions contained herein, to (i) waive certain Events of Default and (ii) amend the Loan Agreement in certain other respects, in each case as more fully detailed below;

NOW THEREFORE, in consideration of the premises and mutual agreements set forth in the Loan Agreement and this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Defined Terms.  Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Loan Agreement.

2.      Waiver.  Pursuant to the request of Borrower, subject to the satisfaction of the conditions set forth in Section 5 below and in reliance upon the representations and warranties set forth in Section 6 below, Lender hereby waives any Default or Event of Default that occurred prior to the date hereof as a result of (i) the failure of PGLI, prior to the effectiveness of this Amendment, to join the Loan Agreement as a Loan Party Obligor as required by Section 8(a) of the Loan Agreement and to grant liens in favor of Lender and guaranty the Obligations as required by Section 5.3 of the Loan Agreement; and (ii) the Loan Parties' failure to notify Lender of the occurrence of the Defaults or Events of Default described in the foregoing clause (i) as required by Section 7.15(h) of the Loan Agreement.  The foregoing is a limited waiver and except to the extent expressly set forth herein, shall not constitute a modification or alteration of the terms, conditions or covenants of the Loan Agreement or any other Loan Document or a waiver, release or limitation upon the exercise by Lender of any of its rights, legal or equitable, hereunder or under the Loan Agreement or any other Loan Document.

3.    <u>Joinder</u>.  PGLI, by its signature below, hereby is joined to  the Loan Agreement as a "Loan Party Obligor" with the same force and effect as if originally named therein as a "Loan Party Obligor" and PGLI hereby (a) agrees to all of the terms and provisions of the Loan Agreement applicable to it as a "Loan Party Obligor" thereunder, including, without limitation, the Loan Guaranty set forth in Section 12 of the Loan Agreement; and (b) represents and warrants that all of the representations and warranties made by it as a "Loan Party Obligor" thereunder are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that are already qualified or modified by materiality in the text thereof) on and as of the date hereof.  From and after the date hereof, each reference to a "Loan Party Obligor" in the Loan Agreement or any other Loan Document shall be deemed to include PGLI.

In furtherance of the foregoing, and without limitation of any of the terms and provisions of the Loan Agreement, to secure the full payment and performance of all of the Obligations, PGLI hereby assigns to Lender and grants to Lender a continuing security interest in all property of PGLI, whether tangible or intangible, real or personal, now or hereafter owned, existing, acquired or arising and wherever now or hereafter located, and whether or not eligible for lending purposes, including:  (a) all Accounts (whether or not Eligible Accounts) and all Goods whose sale, lease or other disposition by PGLI has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, PGLI; (b) all Chattel Paper (including Electronic Chattel Paper), Instruments, Documents, and General Intangibles (including all patents, patent applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, registrations, licenses, software, franchises, customer lists, tax refund claims, claims against carriers and shippers, guaranty claims, contracts rights, payment intangibles, security interests, security deposits and rights to indemnification); (c) all Inventory; (d) all Goods, including Equipment, Farm Products, Health-Care-Insurance Receivables, vehicles, and Fixtures; (e) all Investment Property, including all rights, privileges, authority, and powers of each Loan Party Obligor as an owner or as a holder of Pledged Equity, including all economic rights, all control rights, authority and powers, and all status rights of PGLI as a member, equity holder or shareholder, as applicable, of each Issuer; (f) all Deposit Accounts, bank accounts, deposits and cash; (g) all Letter-of-Credit Rights; (h) all Commercial Tort Claims listed in Section 2 of the Perfection Certificate; (i) all Supporting Obligations; (j) any other property of PGLI now or hereafter in the possession, custody or control of Lender or any agent or any parent, Affiliate or Subsidiary of Lender or any Participant with Lender in the Loans, for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise) and (k) all additions and accessions to, substitutions for, and replacements, products and Proceeds of the foregoing property, including proceeds of all insurance policies insuring the foregoing property, and all of PGLI's books and records relating to any of the foregoing and to PGLI's business.  Notwithstanding the foregoing, the grant of security set forth in this paragraph shall not include any Excluded Property.

4.    <u>Amendments to Loan Agreement</u>.    Subject to the satisfaction of the conditions set forth in Section 5 below and in reliance on the representations and

2

warranties set forth in Section 6 below, the Loan Agreement is hereby amended as follows:

(a)     Section 1.1 of the Loan Agreement is hereby amended by amending and restating the definition of "Scheduled Maturity Date" set forth therein as follows:

*"Scheduled Maturity Date"* means April 30, 2017.

(b)     The Perfection Certificate is hereby amended by adding thereto the information with respect to PGLI set forth in the Perfection Certificate Supplement attached hereto.

5.     Conditions to Effectiveness.  The effectiveness of Sections 2 and 4 of this Amendment shall be subject to the satisfaction of the following conditions precedent:

(a)     Lender shall have received a fully executed copy of this Amendment executed by each of the Loan Party Obligors (including PGLI), together with such other documents, agreements and instruments as Lender may require or reasonably request, all of which shall be in form and substance satisfactory to Lender;

(b)     Borrower shall have paid to Lender (i) the fee set forth in Section 7 below and (ii) to the extent requested by Lender on or prior to the date hereof, all other reasonable out-of-pocket expenses of Lender in connection with the preparation, negotiation, execution, delivery and administration of this Amendment and the transactions contemplated in connection herewith, as required by Section 14.7 of the Loan Agreement;

(c)     all proceedings taken in connection with the transactions contemplated by this Amendment and all documents, instruments and other legal matters incident thereto shall be reasonably satisfactory to Lender and its legal counsel; and

(d)     after giving effect to the waiver in Section 2, no Default or Event of Default shall have occurred and be continuing or shall be caused by the transactions contemplated by this Amendment.

6.     Representations and Warranties.  In order to induce Lender to enter into this Amendment, Borrower and each other Loan Party Obligor each hereby represents and warrants to Lender, after giving effect to this Amendment:

(a)     the execution, delivery and performance of this Amendment has been duly authorized by all requisite corporate action on the part of Borrower and each other Loan Party Obligor and that this Amendment has been duly executed and delivered by Borrower and each other Loan Party Obligor;

(b)     all representations and warranties of any Loan Party contained in the Loan Agreement and the other Loan Documents are true and correct in all material respects on and as of the date of this Amendment, in each case as if made on and as of such date, other than representations and warranties stated to relate to a specific earlier date (in

3

which case such representations and warranties were true and correct in all material respects on and as of such earlier date);

(c)     after giving effect to the waiver in Section 2, no Default or Event of Default has occurred and is continuing; and

(d)     this Amendment and the Loan Agreement, as amended hereby, constitute the legal, valid and binding obligations of Borrower and each other Loan Party Obligor and is enforceable against Borrower and each other Loan Party Obligor, each in accordance with its terms, subject to bankruptcy, insolvency and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity.

7.     Amendment Fee. In addition to and without limitation of any other fees set forth in and required to be paid pursuant to the Loan Agreement and the other Loan Documents, on the date hereof Borrower agrees to pay to Lender an amendment fee equal to $15,000, which shall be fully earned on the date hereof and non-refundable when paid.

8.     Post-Closing Covenant. In consideration for Lender's agreement to enter into this Amendment notwithstanding that certain requirements of Lender have not been satisfied as of the date hereof, Borrower and each Loan Party Obligor hereby agree to deliver to Lender, not later than May 1, 2017, each of the following:

(i)     a certificate of the Secretary or Assistant Secretary (or other equivalent officer, partner or manager) of PGLI in form and substance reasonably satisfactory to Lender dated as of the date hereof which shall certify (I) copies of resolutions in form and substance reasonably satisfactory to Lender, of the board of directors (or other equivalent governing body, member or partner) of PGLI authorizing the execution, delivery and performance of this Amendment, including the Joinder set forth in Section 4 of this Amendment, and each other Loan Document executed in connection herewith to which PGLI is a party, and including authorization of the guaranty of indebtedness of the Borrower on a joint and several basis with all Loan Party Obligors as provided for in the Credit Agreement as amended hereby and the granting by PGLI of the security interests in and liens upon the Collateral to secure all of the Obligations of PGLI (and such certificate shall state that such resolutions have not been amended, modified, revoked or rescinded as of the date of such certificate), (II) the incumbency and signature of the officers of PGLI authorized to execute the Amendment and the other Loan Documents, (III) copies of the Governing Documents of PGLI as in effect on such date, complete with all amendments thereto, and (IV) the good standing (or equivalent status) of PGLI in its jurisdiction of organization and each applicable jurisdiction where the conduct of PGLI's business activities or the ownership of its properties necessitates qualification, as evidenced by good standing certificate(s) (or the equivalent thereof issued by any applicable jurisdiction) dated not more than ten (10) days prior to the date of such certificate, issued by the Secretary of State or other appropriate official of each such jurisdiction;

4

(ii) an executed legal opinion of counsel to PGLI, in form and substance reasonably satisfactory to Lender, which shall cover the existence and legal status of PGLI, corporate power of PGLI to enter into this Amendment, due authorization, execution, delivery and enforceability of this Amendment as to PGLI, and an opinion that PGLI's execution, delivery and performance of this Amendment do no conflict with PGLI's Governing Documents, the Delaware Corporation Act or other applicable laws covered by the opinion; and

(iii) joinders to such other Loan Documents as may be reasonably requested by Lender, all in form and substance reasonably satisfactory to Lender.

It is understood and agreed that a breach of this Section 8 shall result in an immediate Event of Default under the Loan Agreement.

9. Release. Borrower and each other Loan Party Obligor on behalf of itself and its successors, assigns, heirs and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Lender and any and all Participants and Affiliates, and their respective successors and assigns, and their respective directors, officers, employees, attorneys and agents and any other Person affiliated with or representing Lender (collectively, the "Released Parties") of and from any and all liability, including all actual or potential claims, demands or causes of action of any kind, nature or description whatsoever, whether arising in law or equity or under contract or tort or under any state or federal law or otherwise, which Borrower or any Loan Party or any of their successors, assigns or other legal representatives has had, now has or has made claim to have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever, including any liability arising from acts or omissions pertaining to the transactions contemplated by this Amendment, the Loan Agreement and the other Loan Documents, whether based on errors of judgment or mistake of law or fact, from the beginning of time to and including the date hereof, whether such claims, demands and causes of action are matured or known or unknown.

10. Severability. Any provision of this Amendment held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Amendment and the effect thereof shall be confined to the provision so held to be invalid or unenforceable.

11. References. Any reference to the Loan Agreement contained in any document, instrument or agreement executed in connection with the Loan Agreement shall be deemed to be a reference to the Loan Agreement as modified by this Amendment.

12. Counterparts. This Amendment may be executed in one or more counterparts, each of which shall constitute an original, but all of which taken together shall be one and the same instrument. Receipt by telecopy or electronic mail of any executed signature page to this Amendment shall constitute effective delivery of such signature page.

5

13.   Ratification.  This Amendment, subject to satisfaction of the conditions set forth in Section 6, shall constitute an amendment to the Loan Agreement and all of the other Loan Documents as appropriate to achieve the intent of the agreements contained herein.  The terms and provisions set forth in this Amendment shall modify and supersede all inconsistent terms and provisions of the Loan Agreement and shall not be deemed to be a consent to the modification or waiver of any other term or condition of the Loan Agreement.  Except as expressly modified and superseded by this Amendment, the terms and provisions of the Loan Agreement and the other Loan Documents are ratified and confirmed and shall continue in full force and effect.

14.   Governing Law.  THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF ILLINOIS APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED THEREIN WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES.  FURTHER, THE LAW OF THE STATE OF ILLINOIS SHALL APPLY TO ALL DISPUTES OR CONTROVERSIES ARISING OUT OF OR CONNECTED TO OR WITH THIS AMENDMENT WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES.

15.   Consent to Jurisdiction; Waiver of Jury Trial.  ANY LEGAL ACTION, SUIT OR PROCEEDING WITH RESPECT TO THIS AMENDMENT SHALL BE BROUGHT EXCLUSIVELY IN THE COURTS OF THE STATE OF ILLINOIS IN THE COUNTY OF COOK OR IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS OR IN ANY OTHER COURT (IN ANY JURISDICTION) SELECTED BY THE LENDER IN ITS SOLE DISCRETION, AND BORROWER AND EACH OTHER LOAN PARTY OBLIGOR HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFOREMENTIONED COURTS. BORROWER AND EACH OTHER LOAN PARTY OBLIGOR HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, OR BASED ON 28 U.S.C. § 1404, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING AND ADJUDICATION OF ANY SUCH ACTION, SUIT OR PROCEEDING IN ANY OF THE AFOREMENTIONED COURTS AND AMENDMENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT.  BORROWER AND EACH OTHER LOAN PARTY OBLIGOR HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AMENDMENT AND AGREES THAT ANY SUCH ACTION, PROCEEDING OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  BORROWER AND EACH OTHER LOAN PARTY OBLIGOR HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON BORROWER OR ANY OTHER LOAN PARTY OBLIGOR AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY CERTIFIED MAIL (RETURN RECEIPT REQUESTED) DIRECTED TO BORROWER'S NOTICE ADDRESS (ON BEHALF OF BORROWER OR SUCH LOAN PARTY

6

OBLIGOR) SET FORTH IN SECTION 14.1 OF THE LOAN AGREEMENT AND
SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED FIVE DAYS
AFTER THE SAME SHALL HAVE BEEN SO DEPOSITED IN THE MAIL, OR, AT
THE LENDER'S OPTION, BY SERVICE UPON BORROWER OR ANY OTHER
LOAN PARTY OBLIGOR IN ANY OTHER MANNER PROVIDED UNDER THE
RULES OF ANY SUCH COURTS.

**[Signature pages follow]**

7

The parties hereto have caused this Amendment to be duly executed and delivered by their duly authorized officers as of the date first set forth above.

PENTHOUSE GLOBAL MEDIA, INC.,
as Borrower

By: _____
Name: _____
Title: _____

GMCI INTERNET OPERATIONS, INC.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____

GMI ON-LINE VENTURES, LTD.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____

GENERAL MEDIA COMMUNICATIONS, INC.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____

GENERAL MEDIA ENTERTAINMENT, INC.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____

Signature Page to Waiver, Joinder and First Amendment to Loan and Security Agreement

PMGI HOLDINGS INC.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____

PENTHOUSE DIGITAL MEDIA PRODUCTIONS
INC.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____

PENTHOUSE IMAGES ACQUISITIONS, LTD.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____

PURE ENTERTAINMENT
TELECOMMUNICATIONS, INC.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____

XVHUB GROUP INC.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____

DANNI ASHE, INC.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____

STREAMRAY STUDIOS INC.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____

TAN DOOR MEDIA INC.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____

PENTHOUSE GLOBAL LICENSING, INC.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____

EXWORKS CAPITAL FUND I, L.P.,
as Lender

By: _____

Name: Robert Richardson
Title: Authorized Signatory

## PERFECTION CERTIFICATE SUPPLEMENT

1. Loan Party Information:

   (a) Jurisdictions of Formation; Foreign Business Qualifications:

| LOAN PARTY | JURISDICTION OF FORMATION | FOREIGN BUSINESS QUALIFICATIONS |
|---|---|---|
| Penthouse Global Licensing, Inc. | Delaware | California |

   (b) Names:

| LOAN PARTY OBLIGOR LEGAL NAME | PRIOR LEGAL NAMES | EXISTING TRADE NAMES | PRIOR TRADE NAMES |
|---|---|---|---|
| Penthouse Global Licensing, Inc. | None. | None. | None. |

   (c) Collateral Locations:

| LOAN PARTY OBLIGOR | COLLATERAL DESCRIPTION | COLLATERAL LOCATION OR PLACE OF BUSINESS (INCLUDING CHIEF EXECUTIVE OFFICE) | OWNER/LESSOR (IF LEASED) |
|---|---|---|---|
| Penthouse Global Licensing, Inc. | Books and Records | 8944 Mason Avenue, Chatsworth, CA 91311 | Eli B. Dubrow Trustee, Eli B. Dubrow and Mary Collin Dubrow 1981 Trust dated 5/27/1981 |

   (d) Collateral in Possession of Lessor, Bailee, Consignee or Warehouseman:

None.

   (e) Litigation:                    None.

(f)   Capitalization of Loan Parties:

| **Loan Party** | **Equity-holder** | **Equity Description** | **Percentage of Outstanding Equity Issued by Loan Party** | **Certificate (Indicate No.)** |
|---|---|---|---|---|
| Penthouse Global Licensing, Inc. | Penthouse Global Media, Inc. | 100 Shares Common Stock 1.00 par value | 100% | 1 |

(g)   Other Investment Property:

| **Loan Party** | **Investment Property Description** |
|---|---|
| Penthouse Global Licensing, Inc. | None. |

(h)   Material Contracts:          None.

2.   Commercial Tort Claims:          None.

3.   Deposit Accounts / Other accounts:

| **Loan Party Obligor** | **Name of Financial Institution** | **Account Number** | **Purpose of Account** | **Is the Account a "Restricted Account" (Yes or No?)** |
|---|---|---|---|---|
| Penthouse Global Licensing, Inc. | East West Bank | 8088013845 | Collect revenues on various licensing deals | No |

4. Intellectual Property:

    (a) Patents and Patent Licenses

| Loan Party Obligor | Patent Registration Number | Registration Date | Patent Application Number | Application Date |
|---|---|---|---|---|
| Penthouse Global Licensing, Inc. | None. | None. | None. | None. |

    (b) Trademarks and Trademark Licenses:

| Loan Party Obligor | Trademark Title | Trademark Application Number | Trademark Registration Number | Date of Application | Date of Registration |
|---|---|---|---|---|---|
| Penthouse Global Licensing, Inc. | None. | None. | None. | None. | None. |

    (c) Copyrights and Copyright Licenses:

| Loan Party Obligor | Copyright Title | Copyright Registration Date | Copyright Registration Number | Copyright Application Number |
|---|---|---|---|---|
| Penthouse Global Licensing, Inc. | None. | None. | None. | None. |

# EXHIBIT "E"

## CONSENT AND SECOND AMENDMENT
## TO LOAN AND SECURITY AGREEMENT

THIS CONSENT AND SECOND AMENDMENT TO LOAN AND SECURITY AGREEMENT (this "Amendment") is entered into as of March 29, 2017, by and among EXWORKS CAPITAL FUND I, L.P. ("Lender"), PENTHOUSE GLOBAL MEDIA, INC., a Delaware corporation ("Borrower") and each of the parties signatory hereto as a Loan Party Obligor.

WHEREAS, Borrower, Lender and Loan Party Obligors are parties to that certain Loan and Security Agreement dated as of February 19, 2016 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement");

WHEREAS, Penthouse Global Licensing, Inc., a Delaware corporation ("PGLI"), a Loan Party Obligor and wholly-owned subsidiary of Borrower, desires to enter into a Master License Agreement (the "Club License Agreement"; and the transactions contemplated by the Club License Agreement, collectively, the "Club License Transaction") relating to certain of its intellectual property assets and certain existing third-party license agreements;

WHEREAS, Borrower has requested and Lender has agreed, subject to the terms and conditions contained herein, to (i) consent to PGLI entering into the Club License Agreement and the transactions contemplated thereby, (ii) make certain agreements regarding the application of proceeds from the Club License Transaction, and (iii) amend the Loan Agreement in certain other respects, in each case as more fully detailed below;

NOW THEREFORE, in consideration of the premises and mutual agreements set forth in the Loan Agreement and this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     Defined Terms.  Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Loan Agreement.

2.     Consent.  Pursuant to the request of Borrower, subject to the satisfaction of the conditions set forth in Section 5 below and in reliance upon the representations and warranties set forth in Section 6 below, Lender hereby consents to PGLI entering into the Club License Transaction pursuant to the terms and conditions set forth in the Club License Agreement.  The foregoing is a limited consent and except to the extent expressly set forth herein, shall not constitute a modification or alteration of the terms, conditions or covenants of the Loan Agreement or any other Loan Document or a waiver, release or limitation upon the exercise by Lender of any of its rights, legal or equitable, hereunder or under the Loan Agreement or any other Loan Document.

3.     Proceeds of the Club License Transaction.  Pursuant to the request of Borrower, subject to the satisfaction of the conditions set forth in Section 5 below and in reliance upon the representations and warranties set forth in Section 6 below, the parties hereto agree that, notwithstanding anything to the contrary set forth in the Loan Agreement,

8460277v8 3/29/2017 3:22 PM   7467.002

including Sections 2.6 and 6.2 of the Loan Agreement, the "Closing Consideration" (as defined in the Club License Agreement) shall be allocated as follows: on the "Closing Date" (as defined in the Club License Agreement), (a) $1,250,000 shall be remitted by Borrower to Lender for application to the outstanding principal balance of the Term Loan, and (b) the balance of the Closing Consideration shall be retained by Borrower and utilized for working capital and general corporate purposes.

    4.    Amendments to Loan Agreement. Subject to the satisfaction of the conditions set forth in Section 6 below and in reliance on the representations and warranties set forth in Section 6 below, the Loan Agreement is hereby amended as follows:

    (a)    Section 1.1 of the Loan Agreement is hereby amended by amending and restating the following defined terms set forth therein as follows:

        *"Excluded Property"* means each of the following: (i) any permit, lease, license, contract or other agreement (or any equipment owned by any Loan Party Obligor that is subject to a purchase money Lien or a Capitalized Lease that is permitted pursuant to this Agreement) to which any Loan Party Obligor is a party, which permit, lease, license, contract or other agreement (and in the case of any such equipment, the contract or other agreement in which the purchase money Lien is granted or the applicable Capitalized Lease) prohibits the creation by such Loan Party Obligor of a Lien thereon, but only, in each case, to the extent, and for so long as, such prohibition is not removed, terminated or rendered unenforceable or otherwise deemed ineffective by the UCC (including Sections 9-406, 9-407, 9-408 or 9-409 thereof) or any other applicable law and with respect to any such equipment, for so long as the Indebtedness secured by the applicable Lien or the applicable Capitalized Lease has not been repaid in full, (ii) any intent-to-use trademark or service mark application if granting such Lien or the exercise of Lender's remedies under the Loan Documents would result in an assignment of such application to Lender that would be deemed to invalidate, void, cancel or abandon such application; provided, that the foregoing exclusion shall in no way be construed to include an amendment to allege use or statement of use; (iii) any voting stock (within the meaning of Treasury Regulations § 1.956-2(c)(2)) in excess of 65% of the outstanding voting stock of any Foreign Subsidiary or Disregarded Domestic Subsidiary which, pursuant to the terms of this Agreement, is not required to guaranty the Obligations; and (iv) the Excluded Trademarks, but only to the extent that and for so long as the Club License Agreement prohibits a Lien thereon, and only for so long as, such prohibition is not removed, terminated or otherwise rendered inoperative. For the avoidance of doubt, any and all proceeds, products, substitutions or replacements of any property described in clauses (i), (ii) and (iii) above shall not constitute Excluded Property (unless such proceeds, products, substitutions or replacements would itself constitute property described in clauses (i), (ii) or (iii) above).

2

*"Master Licensing Agreement"* means one or more license agreements (including the Club License Agreement) for the worldwide rights (or any part thereof) to use any one or more trademarks of the Loan Parties in connection with adult-themed clubs.

*"Permitted Liens"* means (a) purchase-money security interests in specific items of Equipment securing Permitted Indebtedness described under clause (c) of the definition of Permitted Indebtedness; (b) liens for taxes, fees, assessments, or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings (which proceedings have the effect of preventing the enforcement of such lien) for which adequate reserves in accordance with GAAP are being maintained provided the same have no priority over any of Lender's security interests; (c) liens of materialmen, mechanics, carriers, or other similar liens arising in the ordinary course of business and securing obligations which are not delinquent or are being contested in good faith by appropriate proceedings (which proceedings have the effect of preventing the enforcement of such lien) for which adequate reserves in accordance with GAAP are being maintained; (d) liens which constitute banker's liens, rights of set-off, or similar rights as to deposit accounts or other funds maintained with a bank or other financial institution (but only to the extent such banker's liens, rights of set-off or other rights are in respect of customary service charges relative to such deposit accounts and other funds, and not in respect of any loans or other extensions of credit by such bank or other financial institution to any Loan Party); (e) cash deposits or pledges to secure the payment of worker's compensation, unemployment insurance, or other social security benefits or obligations, public or statutory obligations, surety or appeal bonds, bid or performance bonds, or other obligations of a like nature incurred in the ordinary course of business; and (f) Liens on the Excluded Trademarks to secure PGLI's payment obligations under the Club License Agreement, as set forth in the Club Licensing Agreement and the other documents entered into in connection therewith on the Second Amendment Date.

(b)     Section 1.1 of the Loan Agreement is hereby amended by adding the following terms thereto in their respective alphabetical order therein:

*"Club License Agreement"* means that certain Master License Agreement dated as of March 29, 2017, by and among PGLI, Kirkendoll Management, LLC and Penthouse Clubs Worldwide, LLC, as in effect on the Second Amendment Date.

*"Excluded Trademarks"* means each of the trademarks listed on Schedule 1 attached hereto.

*"Second Amendment Date"* means March 29, 2017.

3

*"PGLI"* means Penthouse Global Licensing, Inc., a Delaware corporation.

(c)     A new Schedule 1 is hereby attached to and incorporated into the Loan Agreement as set forth on Schedule 1 attached hereto.

5.     Conditions to Effectiveness. The effectiveness of Sections 2, 3 and 4 of this Amendment shall be subject to the satisfaction of the following conditions precedent:

(a)     Lender shall have received a fully executed copy of this Amendment executed by each of the Loan Party Obligors, together with such other documents, agreements and instruments as Lender may require or reasonably request, all of which shall be in form and substance satisfactory to Lender;

(b)     Borrower shall have paid to Lender all reasonable out-of-pocket expenses of Lender in connection with the preparation, negotiation, execution, delivery and administration of this Amendment and the transactions contemplated in connection herewith, as required by Section 14.7 of the Loan Agreement;

(c)     all proceedings taken in connection with the transactions contemplated by this Amendment and all documents, instruments and other legal matters incident thereto shall be reasonably satisfactory to Lender and its legal counsel;

(d)     no Default or Event of Default shall have occurred and be continuing or shall be caused by the transactions contemplated by this Amendment; and

(e)     Lender shall have received fully executed copies of the Club License Agreement and each other document, agreement and instrument entered into or delivered in connection therewith, true and correct copies of which shall be attached hereto as Exhibit A, and each of which shall be in form and substance reasonably satisfactory to Lender.

6.     Representations and Warranties. In order to induce Lender to enter into this Amendment, Borrower and each other Loan Party Obligor each hereby represents and warrants to Lender, after giving effect to this Amendment:

(a)     Attached hereto as Exhibit A are true and correct copies of the Club License Agreement and each other document, agreement and instrument entered into or delivered in connection therewith;

(b)     the execution, delivery and performance of this Amendment has been duly authorized by all requisite corporate action on the part of Borrower and each other Loan Party Obligor and that this Amendment has been duly executed and delivered by Borrower and each other Loan Party Obligor;

(c)     all representations and warranties of any Loan Party contained in the Loan Agreement and the other Loan Documents are true and correct in all material respects on and as of the date of this Amendment, in each case as if made on and as of such date, other than

4

representations and warranties stated to relate to a specific earlier date (in which case such representations and warranties were true and correct in all material respects on and as of such earlier date);

    (d)    no Default or Event of Default has occurred and is continuing; and

    (e)    this Amendment and the Loan Agreement, as amended hereby, constitute the legal, valid and binding obligations of Borrower and each other Loan Party Obligor and is enforceable against Borrower and each other Loan Party Obligor, each in accordance with its terms, subject to bankruptcy, insolvency and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity.

    7.    Release. Borrower and each other Loan Party Obligor on behalf of itself and its successors, assigns, heirs and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Lender and any and all Participants and Affiliates, and their respective successors and assigns, and their respective directors, officers, employees, attorneys and agents and any other Person affiliated with or representing Lender (collectively, the "Released Parties") of and from any and all liability, including all actual or potential claims, demands or causes of action of any kind, nature or description whatsoever, whether arising in law or equity or under contract or tort or under any state or federal law or otherwise, which Borrower or any Loan Party or any of their successors, assigns or other legal representatives has had, now has or has made claim to have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever, including any liability arising from acts or omissions pertaining to the transactions contemplated by this Amendment, the Loan Agreement and the other Loan Documents, whether based on errors of judgment or mistake of law or fact, from the beginning of time to and including the date hereof, whether such claims, demands and causes of action are matured or known or unknown.

    8.    Severability. Any provision of this Amendment held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Amendment and the effect thereof shall be confined to the provision so held to be invalid or unenforceable.

    9.    References. Any reference to the Loan Agreement contained in any document, instrument or agreement executed in connection with the Loan Agreement shall be deemed to be a reference to the Loan Agreement as modified by this Amendment.

    10.    Counterparts. This Amendment may be executed in one or more counterparts, each of which shall constitute an original, but all of which taken together shall be one and the same instrument. Receipt by telecopy or electronic mail of any executed signature page to this Amendment shall constitute effective delivery of such signature page.

    11.    Ratification. This Amendment, subject to satisfaction of the conditions set forth in Section 5, shall constitute an amendment to the Loan Agreement and all of the other Loan Documents as appropriate to achieve the intent of the agreements contained herein. The terms

and provisions set forth in this Amendment shall modify and supersede all inconsistent terms and provisions of the Loan Agreement and shall not be deemed to be a consent to the modification or waiver of any other term or condition of the Loan Agreement. Except as expressly modified and superseded by this Amendment, the terms and provisions of the Loan Agreement and the other Loan Documents are ratified and confirmed and shall continue in full force and effect.

12.    Governing Law. THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF ILLINOIS APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED THEREIN WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES. FURTHER, THE LAW OF THE STATE OF ILLINOIS SHALL APPLY TO ALL DISPUTES OR CONTROVERSIES ARISING OUT OF OR CONNECTED TO OR WITH THIS AMENDMENT WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES.

13.    Consent to Jurisdiction; Waiver of Jury Trial. ANY LEGAL ACTION, SUIT OR PROCEEDING WITH RESPECT TO THIS AMENDMENT SHALL BE BROUGHT EXCLUSIVELY IN THE COURTS OF THE STATE OF ILLINOIS IN THE COUNTY OF COOK OR IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS OR IN ANY OTHER COURT (IN ANY JURISDICTION) SELECTED BY THE LENDER IN ITS SOLE DISCRETION, AND BORROWER AND EACH OTHER LOAN PARTY OBLIGOR HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFOREMENTIONED COURTS. BORROWER AND EACH OTHER LOAN PARTY OBLIGOR HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, OR BASED ON 28 U.S.C. § 1404, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING AND ADJUDICATION OF ANY SUCH ACTION, SUIT OR PROCEEDING IN ANY OF THE AFOREMENTIONED COURTS AND AMENDMENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT. BORROWER AND EACH OTHER LOAN PARTY OBLIGOR HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AMENDMENT AND AGREES THAT ANY SUCH ACTION, PROCEEDING OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. BORROWER AND EACH OTHER LOAN PARTY OBLIGOR HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON BORROWER OR ANY OTHER LOAN PARTY OBLIGOR AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY CERTIFIED MAIL (RETURN RECEIPT REQUESTED) DIRECTED TO BORROWER'S NOTICE ADDRESS (ON BEHALF OF BORROWER OR SUCH LOAN PARTY OBLIGOR) SET FORTH IN SECTION 14.1 OF THE LOAN AGREEMENT AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED FIVE DAYS AFTER THE SAME SHALL HAVE BEEN SO DEPOSITED IN THE MAIL, OR, AT THE

6

LENDER'S OPTION, BY SERVICE UPON BORROWER OR ANY OTHER LOAN PARTY OBLIGOR IN ANY OTHER MANNER PROVIDED UNDER THE RULES OF ANY SUCH COURTS.

**[Signature pages follow]**

The parties hereto have caused this Amendment to be duly executed and delivered by their duly authorized officers as of the date first set forth above.

PENTHOUSE GLOBAL MEDIA, INC.,
as Borrower

By: _____
Name: _____
Title: _____

GMCI INTERNET OPERATIONS, INC.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____

GMI ON-LINE VENTURES, LTD.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____

GENERAL MEDIA COMMUNICATIONS, INC.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____

GENERAL MEDIA ENTERTAINMENT, INC.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____

PMGI HOLDINGS INC.
as a Loan Party Obligor

By:
Name: Kelly Holland
Title: CEO

PENTHOUSE DIGITAL MEDIA PRODUCTIONS
INC.
as a Loan Party Obligor

By:
Name: Kelly Holland
Title: CEO

PENTHOUSE IMAGES ACQUISITIONS, LTD.
as a Loan Party Obligor

By:
Name: Kelly Holland
Title: CEO

PURE ENTERTAINMENT
TELECOMMUNICATIONS, INC.
as a Loan Party Obligor

By:
Name: Kelly Holland
Title: CEO

XVHUB GROUP INC.
as a Loan Party Obligor

By:
Name: Kelly Holland
Title: CEO

DANNI ASHE, INC.
as a Loan Party Obligor

By: _____
Name: _____ Kelly Holland
Title: _____ CEO

STREAMRAY STUDIOS INC.
as a Loan Party Obligor

By: _____
Name: _____ Kelly Holland
Title: _____ CEO

TAN DOOR MEDIA INC.
as a Loan Party Obligor

By: _____
Name: _____ Kelly Holland
Title: _____ CEO

PENTHOUSE GLOBAL LICENSING, INC.
as a Loan Party Obligor

By: _____
Name: _____ Kelly Holland
Title: _____ CEO

EXWORKS CAPITAL FUND I, L.P.,
as Lender

By: _____

Name: Robert Richardsa

Title: Authorized Signatory

# SCHEDULE 1

## EXCLUDED TRADEMARKS

| | | |
|---|---|---|
| THE PENTHOUSE CLUB | Ukraine | 158069 |
| THE PENTHOUSE CLUB (w/ three key logo)  | Macao | 88956 |
| | New Zealand | 833185 |
| | U.S. | 2,810,417 |
| PENTHOUSE KEY SUITES | U.S. | (86/876606) |
| THE PENTHOUSE KEY SUITES (w/ one key logo)  | Not Registered | Not Registered |
| THE PENTHOUSE KEY SUITES (w/ three key logo)  | Not Registered | Not Registered |
| Three Key Logo  | Australia | 367684 |
| | Barbados | 81/20326 |
| | Brazil | 816873348 |
| | Canada | TMA748,728 |
| | China | 4281665 |
| | EU | 4018776 |

| | Germany | 2011612 |
|---|---|---|
| | Indonesia | IDM000076878 |
| | Liechtenstein | 8122 |
| | New Zealand | 717684 |
| | Russia | 128751 |
| | Trinidad & Tobago | 46293 |
| | Turks & Caicos | 14014 |
| | Turks & Caicos | 14015 |
| | Ukraine | 65800 |
| | UAE | 53386 |
| | Vietnam | 72640 |
| PENTHOUSE KEY GIRL | Ukraine | 158071 |
| KEY GIRL (Stylized)<br><br>**KEY**GIRL | Not Registered | Not Registered |
| PENTHOUSE KEY CLUB | Not Registered | Not Registered |
| KEY CLUB | Not Registered | Not Registered |
| CALIGULA CLUB | Not Registered | Not Registered |
| PENTHOUSE CLUB | Japan | 4384068 |
| | Mexico | 903392 |
| | Mexico | 921770 |
| THE PENTHOUSE BEACH CLUB | Ukraine | 158070 |

# EXHIBIT A

## CLUB LICENSE DOCUMENTATION

See attached.

**EXECUTION COPY**

## MASTER LICENSE AGREEMENT

**between**

**PENTHOUSE GLOBAL LICENSING, INC.**
**as Licensor**

**and**

**KIRKENDOLL MANAGEMENT, LLC,**
**and**
**PENTHOUSE CLUBS WORLDWIDE, LLC,**
**as Licensee**

**Dated as of March \_\_\_\_\_, 2017**

{N3339370.13}
*LA 132904749v2*

*LA 132974416v1*

## MASTER LICENSE AGREEMENT

This MASTER LICENSE AGREEMENT (this "Agreement"), dated and effective as of March _____, 2017 (the "Effective Date"), is entered into between Penthouse Global Licensing, Inc., a Delaware corporation ("Licensor"), on the one hand, and Kirkendoll Management, LLC, a Colorado limited liability company, and Penthouse Clubs Worldwide, LLC, a Delaware limited liability company (collectively, the "Licensee"), on the other hand.  Licensor and Licensee are each referred to herein as a "Party" and collectively, as the "Parties."

## WITNESSETH:

WHEREAS, Capitalized terms used and not otherwise defined in this Agreement shall have the meanings ascribed to such terms in Exhibit A hereto;

WHEREAS, Licensor has the right to license the trademarks PENTHOUSE in multiple variations, THE PENTHOUSE CLUB (and three key design), and CALIGULA CLUB in connection with a wide variety of goods and services, including but not limited to, magazines, printed materials, clothing, entertainment services, restaurants, bars and other adult entertainment-related goods and services (collectively, the "PENTHOUSE Marks");

WHEREAS, Licensee desires to use the Licensed Marks (as defined in Section 1.1(a)), including certain of the PENTHOUSE Marks, in connection with the ownership and operation of adult nightclub and cabaret establishments, and restaurants operated in or immediately adjacent thereto, featuring live entertainment provided by nude or semi-nude female dancers (the "Gentlemen's Clubs") and Licensor is willing to grant to Licensee a license to use the Licensed Marks solely in connection with such purpose subject to the terms and conditions set forth in this Agreement; and

WHEREAS, Licensor's predecessor-in-title to the Licensed Marks has previously entered into other license agreements with third parties to use the Licensed Marks in connection with Gentlemen's Clubs (the "Third-Party Licenses"), and Licensor desires to assign such Third-Party Licenses and all rights in and to such Third-Party Licenses to Licensee during the Term (as defined below) of this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, agreements and covenants contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE 1
## LICENSE GRANT; CONSIDERATION

**Section 1.1**  **Grant of Rights**.  Subject to the terms and conditions of this Agreement:

(a)  *License Grant*.  Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee (the "License Grant") an exclusive, transferable, sub-licensable, unlimited license, free and clear of all Liens, to use, sublicense, franchise (and sub-franchise), and otherwise monetize, exploit and commercialize the marks identified in Schedule 1.1(a), which are the subject of U.S. and foreign trademark registrations or applications to

register the Licensed Marks, or U.S. and foreign common law rights in and to the Licensed
Marks therein owned or controlled by Licensor (collectively, the "Licensed Marks"), anywhere
in the world during the Term (as defined in Section 1.2), in connection with the ownership,
operation, marketing, and promotion of Gentlemen's Clubs, and the advertising and promotion
through any media now known or hereafter devised, including the Internet, and restaurant, bar,
and cocktail lounge services directly related thereto (the "Licensed Services"); *provided,
however,* that Licensee (and all sub-licensees) shall utilize the Licensed Marks in substantial
conformity to their current use, and subject to the quality control provisions set forth in Section
5.9.

      (b)    *Sublicensing*. Licensee shall have the right to sublicense of any of its
rights under this Agreement, *provided* that (i) any sublicense shall be subject to the quality
control provisions set forth in Section 5.9, (ii) the terms of any sublicense and the obligations of
the sub-licensee shall be in substantial conformity to this Agreement, (iii) Licensee shall not
enter into any sublicense with any Person that is also a party to an Excluded License (as defined
below) (*provided,* that, notwithstanding this Section 1.1(b)(iii), Licensee shall have the right to
enter into one or more sublicenses with VCG Holding Corp. and its Affiliates), and (iv) each
sublicense shall automatically transfer to Licensor upon termination by Licensor or expiration of
this Agreement.

      (c)    *Reservation of Rights*. Licensor reserves the right to use the Licensed
Marks in connection with the advertising and promotion of the Gentlemen's Clubs and the
Licensed Services, and reserves to itself and for its sole benefit all other rights in and to the
Licensed Marks not expressly granted to Licensee under this Agreement.

      (d)    *Use of the Licensed Marks*.

      (i)    *Compliance with Licensor's Directions*. All use of the Licensed
Marks in connection with the Licensed Services shall comply with the usage guidelines set forth
by Licensor in writing in advance of the execution of this Agreement (as mutually updated from
time to time by the Parties, the "Style Guide"). Licensee shall submit all advertising,
promotional, or other business materials (excluding real-time social media advertising) bearing
the Licensed Marks to Licensor for approval prior to use (such approval not to be unreasonably
withheld), and if approval is not received within three (3) business days of submission, approval
will be deemed granted; *provided, however,* that any advertising, promotional, or other business
materials bearing the Licensed Marks that are approved by Licensor prior to the Effective Date
need not be submitted to Licensor.

      (ii)    *Trademark Notices*. All promotional and advertising materials
featuring the Licensed Marks shall incorporate the appropriate trademark notices in accordance
with Licensor's instructions set forth in the Style Guide.

      (e)    *Acknowledgement of Ownership*. Licensee acknowledges that Licensor is
the owner of the Licensed Marks. Any goodwill derived from the use of the Licensed Marks by
Licensee shall inure to the benefit of Licensor. Except for Licensee's rights contemplated by
Section 1.1(a) of this Agreement and the Transaction Documents, if Licensee acquires any rights
in the Licensed Marks, by operation of law, or otherwise, such rights shall be deemed and are

hereby irrevocably assigned to Licensor without further action by any of the Parties, and Licensee agrees not to dispute or challenge or assist any Person in disputing or challenging Licensor's rights in and to the Licensed Marks or the validity of the Licensed Marks.

(f)    *Assignment of Third-Party Licenses*.  Notwithstanding anything to the contrary set forth herein (including, but not limited to, pursuant to Section 1.1(a) above) or in any other Transaction Document (as defined below), but subject to Section 7.1 below, at the Closing, Licensor hereby assigns to Licensee (or, if and as applicable, shall cause the same), in each case free and clear of all Liens, all right, title and interest of Licensor and its Affiliates in, to and under the Third-Party Licenses, including the right to all sums due and payable to Licensor (the "Third-Party Revenue") under the Third-Party Licenses from the date of the Closing (the "Assignment", and together with the License Grant, the "Grant of Rights").  For purposes of clarification and for the avoidance of doubt, the licenses identified in Schedule 1.1(f) have expired or have been terminated by Licensor prior to the Effective Date of this Agreement and shall not be deemed Third-Party Licenses or included in the Assignment or Grant of Rights to Licensee hereunder (the "Excluded Licenses").

(i)    Except as provided in Section 1.1(b), nothing in the foregoing sentence shall limit Licensee's ability to (A) pursue New Contracts (as defined below) in the same geographic markets as the Excluded Licenses, and/or (B) enter into one or more sublicenses with VCG Holding Corp. or its Affiliates in the Denver, Colorado and/or St. Louis, Missouri geographic markets, each of which shall be deemed a novated Third-Party License for purposes of Section 1.4.

(ii)    For the avoidance of doubt, Licensor retains all rights to pursue Claims for, and collect for its sole account, any past-due royalties under the Excluded Licenses, or to otherwise pursue any and all Claims against the (sub)licensees or their Affiliates under the Excluded Licenses arising out of any events or circumstances occurring prior to the Effective Date (and any other Claims shall be subject to the parties' respective rights and obligations set forth in this Agreement, including pursuant to Section 5.8); *provided*, that Licensor shall not have the right to pursue any such Claims (including for past-due royalties) against VCG Holding Corp. or its Affiliates without the prior written consent of Licensee, unless otherwise expressly authorized by another provision of this Agreement.

(g)    *Additional Intellectual Property*.  In the event that Licensee reasonably requires any other intellectual property rights or assets owned or controlled by Licensor (the "Additional Intellectual Property") in order to monetize, exploit and commercialize the Licensed Marks and/or the Third-Party Licenses in accordance with the Licensed Services (as may be necessary to grant such rights to sub-licensees as provided for under the Third-Party Licenses), Licensee shall so notify Licensor in writing, and Licensor shall promptly execute, for no additional consideration, such instrument(s) of transfer as may be necessary to include such Additional Intellectual Property within the License Grant hereunder.

(h)    *Limitation*.  Notwithstanding anything to the contrary in this Agreement, Licensee shall have no right to use any trademarks owned by Licensor apart from the Licensed Marks (except as otherwise expressly contemplated by Section 1.1(g), Section 1.1(i) and Section 5.16 hereof) and no right to use the Licensed Marks outside of the Licensed Services.

Furthermore, nothing in this Agreement shall cause the PENTHOUSE mark, or any other related mark that does not include the word "club" or the three key logo, (except as otherwise may be expressly included on Schedule 1.1(a) hereto) to be considered Licensed Marks. For the avoidance of doubt, the marks PENTHOUSE, PENTHOUSE (with one key logo), PENTHOUSE (with three key logo), and One Key Logo are not Licensed Marks, and, therefore, except as otherwise expressly authorized by Section 1.1(i), are not to be used other than as part of THE PENTHOUSE CLUB marks. Licensee acknowledges and agrees that, subject to the terms and conditions of this Agreement (including, without limitation, Section 5.14 hereof), Licensor may use (or license others to use) marks other than the Licensed Marks that may contain the word penthouse and Licensee agrees that no consumer confusion is likely to result from any such use. Licensee further agrees not to dispute or challenge, or assist any Person in disputing or challenging, Licensor's rights in marks other than the Licensed Marks.

        (i)     *Use of Licensor's Other Trademarks*.    Licensor acknowledges that Licensee may desire from time to time to use (and to authorize its sub-licensees to use) certain of Licensor's other trademarks not specifically included in the Licensed Marks. Licensor hereby consents to Licensee's (and its sub-licensees') limited use of such marks, as more particularly identified in Schedule 1.1(f) (the "Additional Marks"); *provided, however*, that (A) any uses of the Additional Marks by Licensee shall be made only as reasonably necessary for Licensee's advertising and marketing of Gentlemen's Clubs and the Licensed Services ("Permitted Advertising"), (B) all Permitted Advertising shall use the mark THE PENTHOUSE CLUB in close proximity to the Additional Marks, to the extent applicable to the application and medium of such Permitted Advertising, (C) Licensee only uses as much of the Additional Marks as is necessary to identify Licensor and its goods and services, (D) Licensee uses the Additional Marks in good faith, (E) Licensee does not use the Additional Marks as a source identifier for Licensee's goods and services, and (F) Licensee does not use the Additional Marks in a manner that is likely to cause confusion with Licensor's use of the Additional Marks unrelated to Gentleman's Clubs (provided, that Licensor acknowledges and agrees that Licensee's use of the Additional Marks in Permitted Advertising as set forth herein is not likely to cause such confusion). In addition, Licensee must submit all Permitted Advertising incorporating the Additional Marks to Licensor for written approval prior to any use of the Additional Marks, and if approval is not received within seven (7) business days of submission, approval will be deemed granted; *provided, however*, that any Permitted Advertising, or other business materials, incorporating the Additional Marks that are approved in writing by Licensor prior to the Effective Date need not be submitted to Licensor. For the avoidance of doubt, and for non-inclusive, illustrative purposes only, Licensee shall be deemed to have the right to use (and shall be deemed authorized to permit its sub-licensees to use) the PENTHOUSE mark, alone, so long as such uses strictly comply with all of the requirements set forth in this Section 1.1(i) (other than clauses (C) and (E) above): (1) on the signage fronting Gentlemen's Clubs, (2) in brochures and pamphlets promoting the Gentlemen's Clubs, (3) in Internet and social media advertising and promotions of Gentlemen's Clubs and (4) on signage, advertisements, décor, utensils, matchbooks, swizzle sticks, cocktail napkins, table tents, name holders, tag holders and souvenirs provided, sold or otherwise utilized in connection with the operation of the Gentleman's Clubs and as reasonably necessary for the promotion of Gentlemen's Clubs.

        **Section 1.2    Term**.

(a)     The initial term of this Agreement and the Grant of Rights hereunder shall commence upon the Closing and shall terminate ten (10) years thereafter, unless earlier terminated by the Parties as specified herein (the "Initial Term"). Upon expiration of the Initial Term and each Renewal Term (as defined below), as applicable, Licensee shall have the right to renew this Agreement and the License Grant hereunder for additional successive ten-year periods upon the payment by Licensee to Licensor of the applicable renewal fee in accordance with Section 1.2(b) (each subsequent ten-year period, a "Renewal Term", and together with the Initial Term, the "Term").

(b)     In the event Licensee desires to renew this Agreement, it shall pay to Licensor within 120 days prior to the expiration of the then-current Term, by wire transfer of immediately available funds to the account set forth on Schedule 1.2(b) (the "Payment Account") an amount equal to: Three Hundred Fifty Thousand Dollars (U.S. $350,000.00) (the "Renewal Fee"), which Renewal Fee shall be fully recoupable to the extent that Royalties accrue in the amount of the Renewal Fee in accordance with Section 1.4(b).

**Section 1.3     NO LIABILITIES.** NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH HEREIN OR IN ANY OTHER TRANSACTION DOCUMENT, BUT SUBJECT IN ALL RESPECTS TO THE GRANT OF RIGHTS TO LICENSEE SET FORTH HEREIN (INCLUDING, BUT NOT LIMITED TO, LICENSEE'S RIGHTS TO ANY AND ALL CLAIMS AND CAUSES OF ACTION AGAINST OTHER PERSONS RELATING TO OR ARISING OUT OF ITS LICENSE HEREUNDER IN AND TO AND/OR OWNERSHIP OF THE LICENSED MARKS OR THIRD-PARTY LICENSES), LICENSEE DOES NOT ASSUME, SHALL NOT ASSUME, AND SHALL NOT BE DEEMED TO HAVE ASSUMED, (A) ANY LIABILITIES OR OBLIGATIONS OF ANY NATURE WHATSOEVER OF, OR ARISING OUT OF CLAIMS AGAINST LICENSOR OR ITS AFFILIATES OR ANY OF THEIR RESPECTIVE LICENSEES (AND SUB-LICENSEES) OR FRANCHISEES (AND SUB-FRANCHISEES) AT ANY TIME PRIOR TO OR AFTER THE CLOSING TO THE EXTENT NOT ARISING OUT OF OR BASED ON THE ACTIONS, OMISSIONS OR OTHER CONDUCT OF "LICENSEE" (AS DEFINED IN THIS AGREEMENT) OR ANY OF ITS LICENSEES (OR SUB-LICENSEES), OR (B) ANY LIABILITIES OR OBLIGATIONS WHATSOEVER ARISING OUT OF OR OTHERWISE ASSOCIATED WITH THE SUBJECT OF THE GRANT OF RIGHTS PROVIDED HEREIN PRIOR TO THE CLOSING **(INCLUDING, WITHOUT LIMITATION, ANY OBLIGATION TO REFUND OR OTHERWISE REPAY TO A THIRD-PARTY LICENSEE OR ANY OTHER PERSON ANY DEPOSIT, FEE, ADVANCE, UP-FRONT LICENSE PAYMENTS OR OTHER REFUNDABLE OR RECOUPABLE AMOUNT PAID OR PAYABLE BY SUCH PERSON PURSUANT TO AND/OR UPON ANY TERMINATION OR RENEWAL OF ANY THIRD-PARTY LICENSE, REGARDLESS OF WHETHER SUCH DEPOSITS, FEES OR OTHER PAYMENTS WERE RE-ALLOCATED AND/OR DISTRIBUTED UNDER A BANKRUPTCY ORDER AFFECTING LICENSOR OR ITS PREDECESSORS-IN-TITLE, OR OTHERWISE)** (COLLECTIVELY, THE "EXCLUDED LIABILITIES"), INCLUDING, WITHOUT LIMITATION, PERSONAL, PRODUCT, WARRANTY, INTELLECTUAL PROPERTY, CONTRACT OR RELATED LIABILITIES ARISING OUT OF GOODS, SERVICES OR CONTRACTS PROVIDED, MANUFACTURED OR PERFORMED BY OR ON BEHALF OF LICENSOR OR ITS AFFILIATES AND ANY LIABILITY OWED TO ANY ACTUAL OR ALLEGED DEBT OR EQUITY HOLDER OF

{N3339370.13}                          5
LA 132974416v1

LICENSOR OR ITS AFFILIATES IN RESPECT OF SUCH DEBT OR EQUITY OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS, BUT, FOR THE AVOIDANCE OF DOUBT, THE "EXCLUDED LIABILITIES" DO NOT INCLUDE ANY LIABILITIES OR OBLIGATIONS ARISING OUT OF OR BASED ON THE ACTIONS, OMISSIONS OR OTHER CONDUCT OF "LICENSEE" (AS DEFINED IN THIS AGREEMENT) OR ANY OF ITS LICENSEES (OR SUB-LICENSEES). LICENSOR AND ITS AFFILIATES AGREE TO PERFORM, PAY AND/OR DISCHARGE ANY AND ALL EXCLUDED LIABILITIES AND OBLIGATIONS PROMPTLY AS THEY BECOME DUE.

### Section 1.4 Consideration.

(a) *Closing Consideration.* The aggregate consideration payable at the Closing by Licensee for the Grant of Rights to Licensor hereunder shall be Two Million Six Hundred Thousand Dollars (U.S. $2,600,000.00), payable in cash at the Closing (the Closing Consideration"). At the Closing, the Closing Consideration shall be paid by Licensee to Licensor by wire transfer of immediately available funds to the Payment Account.

(b) *Royalties.* In addition to the Closing Consideration, in exchange for the License Grant from Licensor, Licensee agrees to pay to Licensor ten percent (10%) of all Net Third-Party License Fees (as defined below) received by Licensee pursuant to any New Contracts (as defined below) entered into with any sub-licensee (the "Royalties", and together with the Closing Consideration, the "Consideration"). The Royalties shall be paid by Licensee in accordance with the following provisions:

(i) During the Initial Term, within 60 days following the calendar quarter in which Licensee receives such Net Third-Party License Fees, Licensee shall furnish the corresponding Royalties to the Payment Account (or such other account designated in writing by Licensor upon reasonable notice).

(ii) During each Renewal Term, Licensee shall retain all Royalties until it has fully recouped, out of Royalties otherwise payable to Licensor hereunder, an amount equal to the Renewal Fee. Thereafter, within 60 days following the calendar quarter in which Licensee receives such Net Third-Party License Fees, Licensee shall furnish the corresponding Royalties to the Payment Account (or such other account designated in writing by Licensor upon reasonable notice).

(c) *Certain Definitions; Application.* As used in Section 1.4(b):

(i) "Net Third-Party License Fees" means Gross Third-Party License Fees, *less* all Third-Party License Expenses.

(ii) "Gross Third-Party License Fees" means all amounts received by Licensee from any sub-licensees pursuant to any New Contracts (as defined below). "Gross Third-Party License Fees" shall **not** include any deposit(s) paid by any licensee pursuant to a New Contract, Third-Party Revenue, or any other amounts received by Licensee pursuant to any Contract that is not a New Contract (including, without limitation, any management Contracts entered into by Licensee or its Affiliates with respect to any Gentlemen's Clubs, and/or any

{N3339370.13}                                     6
LA 132974416v1

license Contracts entered into by Licensee or its Affiliates that do not convey rights in and to the Licensed Marks, and/or any of the Third-Party Licenses acquired by Licensee pursuant to the Assignment hereunder, whether in their original form, as amended, amended and restated, extended, renewed or novated).

(iii)    "New Contracts" means any new Contract entered into after the Effective Date by Licensee related to the monetization, exploitation or other commercialization of the Licensed Marks in Gentlemen's Clubs. "New Contracts" shall not include any sub-licensee (or its successor(s) or assign(s)) that was previously a party to any Third-Party License, or any Gentlemen's Club (including if it moves to a new location in the same standard metropolitan statistical area) that was previously the subject of any Third-Party License.

(iv)    "Third-Party License Expenses" means Licensee's (i) costs to negotiate, and/or consummate any New Contracts, and (ii) reasonable out-of-pocket costs in its ownership, administration and operation of, and licensing of the Licensed Marks in connection with, the Licensed Services, including the reasonable costs and expenses of Licensee's legal and accounting.

## ARTICLE 2
## THE CLOSING

**Section 2.1    The Closing.** The closing of the Transaction (the "Closing") shall take place simultaneously with the execution and delivery of this Agreement at the offices of Jones Walker LLP, 201 St. Charles Ave., Suite 5100, New Orleans, Louisiana, or at such other place or by such other means, as may be mutually agreed by the Parties in writing.

**Section 2.2    Deliveries by Licensor.**    At the Closing, Licensor shall deliver to Licensee, as applicable, the following:

(a)    a security agreement, in the form attached hereto as Exhibit B (the "Security Agreement"), duly executed by Licensor;

(b)    an assignment and assumption agreement, in the form attached hereto as Exhibit C, with respect to the Third-Party Licenses (the "Assignment and Assumption Agreement"), duly executed by Licensor;

(c)    a certificate of the Secretary or other Person vested with similar duties and responsibilities of the Licensor in the form attached hereto as Exhibit D (the "Licensor Closing Certificate") certifying (i) that attached thereto are true and complete copies of all resolutions adopted by any necessary directors, officers, stockholders or other necessary Persons of the Licensor authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the Transaction and transactions contemplated hereby and thereby, (ii) that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the Transaction and the transactions contemplated hereby and thereby, (iii) the names and signatures of the Persons authorized on behalf of Licensor to execute and deliver this Agreement, the Transaction Documents and the other documents, certificates, or instruments to be delivered hereunder and thereunder, and (iv) that attached

thereto is a certificate of good standing, dated as of the Closing (or, as necessary, the most recent practicable date), for Licensor in its jurisdiction of organization;

(d)     a short-form trademark license agreement, in the form attached hereto as Exhibit E, with respect to the License Grant (the "Short-Form Trademark License Agreement"), duly executed by Licensor.

(e)     documentary evidence of the release and discharge of any Liens, including, without limitation, all appropriate UCC financing statement amendments and termination statements, affecting the Third-Party Licenses and the Licensed Marks, in form and substance reasonably satisfactory to Licensee;

(f)     the consent and acknowledgement substantially in the form of Exhibit F ("Certificate of Consent"); and

(g)     such other appropriately executed instruments of transfer, assumption, filings or documents as Licensee may reasonably request to effectuate the consummation of the Transaction and the transactions contemplated by this Agreement and the other Transaction Documents.

**Section 2.3   Deliveries by Licensee.**   At the Closing, Licensee shall deliver to Licensor the following:

(a)     a certificate of the Secretary or other Person vested with similar duties and responsibilities of the Licensee in the form attached hereto as Exhibit D (the "Licensee Closing Certificate") certifying (i) that attached thereto are true and complete copies of all resolutions adopted by any necessary directors, officers, stockholders or other necessary Persons of the Licensee authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the Transaction and transactions contemplated hereby and thereby, (ii) that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the Transaction and the transactions contemplated hereby and thereby, (iii) the names and signatures of the Persons authorized on behalf of Licensee to execute and deliver this Agreement, the Transaction Documents and the other documents, certificates, or instruments to be delivered hereunder and thereunder, and (iv) that attached thereto is a certificate of good standing, dated as of the Closing (or, as necessary, the most recent practicable date), for Licensee in its jurisdiction of organization;

(b)     the Closing Consideration;

(c)     the Security Agreement, duly executed by Licensee;

(d)     the Assignment and Assumption Agreement, duly executed by Licensee; and

(e)     the Short-Form Trademark License Agreement, duly executed by Licensee.

**Section 2.4    Post-Closing Further Assurances**. From time to time and at any time on or after the Closing, upon either Party's reasonable request and without further consideration, the other Party shall execute and deliver such further documents and instruments, and shall take such further actions as may be reasonably necessary to implement the Transaction and the transactions contemplated by this Agreement and the other Transaction Documents.

## ARTICLE 3
## LICENSOR'S REPRESENTATIONS AND WARRANTIES

Licensor hereby represents and warrants to Licensee as follows:

**Section 3.1    Organization and Standing**. Licensor is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware, has the requisite power and authority to own its properties and assets and to carry on its business as presently conducted, and is duly qualified and in good standing to do business in each jurisdiction in which the nature of the business conducted by it or the ownership or licensing of its assets makes such qualification necessary.

**Section 3.2    Authority; Enforceability**. Licensor has all requisite legal power, authority and legal capacity to execute and deliver this Agreement and each other agreement, certificate and instrument delivered or to be delivered pursuant hereto (collectively, the "Transaction Documents") to which Licensor is a party, and to consummate the Transaction and the transactions contemplated hereby and thereby. The execution, delivery and performance of the Transaction Documents by Licensor, and the consummation of the Transaction and the transactions contemplated thereby, have been duly authorized by all necessary corporate action on the part of Licensor. The Transaction Documents have been (or will be) duly executed and delivered by Licensor and constitute (or will constitute) its legal, valid and binding obligations, enforceable against Licensor in accordance with their respective terms, subject to applicable bankruptcy, insolvency and similar laws affecting generally the enforcement of creditors' rights and general principles of equity.

**Section 3.3    Consent; No Conflicts**. To the Knowledge of Licensor, no filing with or notice to, and no Permit, authorization, consent or approval of, any Governmental Authority or other Person is necessary for the execution and delivery by Licensor of the Transaction Documents or the consummation of the Transaction or the transactions contemplated thereby. The execution, delivery, and performance of Transaction Documents do not, and the consummation of the Transaction and the transactions contemplated thereby will not, with the passage of time or the giving of notice, or both, violate, conflict with or result in the breach of any term, condition or provision of, or require the consent of any Person under, (a) the certificate of incorporation, bylaws, stockholders agreement or similar organizational documents of Licensor, (b) any Law to which Licensor is subject or may become subject pursuant to the Transaction Documents, (c) any Order which is applicable to Licensor, or (d) any Contract to which Licensor is a party or by which Licensor or its assets is bound.

**Section 3.4    Absence of Litigation; Governmental Orders**. Except as set forth on Schedule 3.4, there are no Legal Proceedings pending or, to the Knowledge of Licensor, threatened against Licensor or any its Affiliates with respect to the Licensed Marks or Third-

Party Licenses, nor is there any Order outstanding with respect to the same. There are no Legal Proceedings pending or, to the Knowledge of Licensor, threatened against Licensor or any of its Affiliates seeking to enjoin, restrain, prohibit or otherwise delay the Transaction or the transactions contemplated by the Transaction Documents. No event has occurred or circumstances exist that could reasonably be expected to give rise to, or serve as a basis for, any such action, Order or Legal Proceeding.

**Section 3.5     [RESERVED]**

**Section 3.6     Third-Party Revenue and Other Accounts Receivable.** All Third-Party Revenue, and any other accounts receivable of Licensor with respect to the Third-Party Licenses, represent valid obligations arising from sales actually made, licenses actually granted, royalties actually earned or credited, or services actually performed by Licensor (or its predecessor(s)) in connection with the Third-Party Licenses. The Third-Party Revenue and such other accounts receivable are current and fully collectible in all respects. Each of the Third-Party Revenue and such other accounts receivable either has been or will be paid in full within 90 days after the day on which it first becomes due and payable. There is no contest, claim, defense or right of setoff with respect to the Third-Party Revenue or any other such account receivable of Licensor.

**Section 3.7     Accurate and Complete Records.** The books and records and other records of Licensor and its Affiliates relating specifically to the Third-Party Licenses and the Licensed Marks as they relate to the Licensed Services (a) have been made available to Licensee, (b) have been maintained in accordance with Applicable Laws and, to the extent applicable, GAAP, and (c) are accurate and complete and fairly reflect, in reasonable detail, the transactions and the assets and liabilities of Licensor with respect to the Third-Party Licenses and the Licensed Marks as they relate to the Licensed Services.

**Section 3.8     Third-Party Licenses.** Schedule 3.8 lists each of the Third-Party Licenses. Licensor owns, free and clear of all Liens, the Third-Party Licenses. To the Knowledge of Licensor, each Third-Party License is valid and binding on the parties thereto in accordance with its terms and is in full force and effect. None of Licensor or, to the Knowledge of Licensor, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under) in any material respect, or has provided or received any notice of any intention to terminate, any Third-Party License. No event or circumstance has occurred that, with notice or lapse of time or both, would constitute a default or event of default under any Third-Party License or result in a termination thereof or the loss of any benefit thereunder. Accurate and complete copies of each Third-Party License (including all modifications, amendments and supplements thereto and waivers thereunder) have been provided to Licensee. There are no material disputes pending or, to the Knowledge of Licensor, threatened under any Third-Party License.

**Section 3.9     Licensed Marks.**

(a)     Schedule 1.1(a) identifies the Licensed Marks that are used, or held for use, in connection with the ownership, operation or maintenance of the Gentlemen's Clubs and the Licensed Services. Such Licensed Marks represent all the trademarks and trade names that are currently used in connection with or necessary for the operation of the Gentlemen's Clubs

{N3339370.13}                                    10
*LA 132974416v1*

and Licensed Services, as currently conducted, and the performance of the Third-Party Licenses. The Licensed Marks are owned by Licensor, and all such Licensed Marks will be available for use by Licensee on identical terms and conditions immediately following the Closing. Licensor possesses all right, title and interest in and to the Licensed Marks, free and clear of any Liens.

(b) The Licensed Marks are not subject to any outstanding Order or Legal Proceeding (including any opposition, invalidation, or cancellation proceeding), and no such Order or Legal Proceeding is pending or, to the Knowledge of Licensor, threatened, that challenges the legality, validity, use or ownership of such Licensed Marks, including the Grant of Rights. To the Knowledge of Licensor, the Licensed Marks do not infringe, violate or misappropriate any patents, trademarks, copyrights or other intellectual property rights of any other Person, and no Legal Proceeding has been decided or is pending, and Licensor has not received any written Claim or notice, alleging any of the foregoing. Except as set forth on Schedule 3.9(b), to the Knowledge of Licensor, no Person has violated, infringed or misappropriated any of the Licensed Marks, or is threatening to do the same.

(c) Except for Licensee and its Affiliates pursuant to the License Grant hereunder and as otherwise set forth on Schedule 3.8, no other Person has any license, sub-license, franchise, sub-franchise, or similar right (or any reasonable basis for claiming any such right) with respect to any Licensed Marks.

(d) Except as otherwise noted on Schedule 1.1(a), all of the Licensed Marks have been registered with the United States Patent and Trademark Office and all applicable foreign copyright, patent and trademark registries maintained by any Governmental Entity, are in compliance with all applicable legal requirements (including the timely post-registration filing of affidavits of use and incontestability and renewal applications), are valid and enforceable, and are not subject to any maintenance fees, taxes or actions falling due.

(e) There is no potentially interfering trademark or trademark application of any Person with respect to any Licensed Mark.

(f) All products and materials containing a registered Licensed Mark bear the proper federal registration notice where permitted by Law.

**Section 3.10 Tax Matters.** There are no Taxes of any kind (whether assessed on, or measured by, income, gross receipts, intellectual property royalties, real and personal property, employment, excise, sales, use or otherwise) properly attributable to periods up to and including the Effective Date related to the Third-Party Licenses for which Licensee could be held liable which have not been or will not be paid by Licensor or its Affiliates. To the Knowledge of Licensor, there are no Liens on the Third-Party Licenses or Gentlemen's Clubs with respect to Taxes. Neither Licensor nor any of its Affiliates is a party to any Legal Proceeding by any Governmental Entity, nor are there any pending or threatened Legal Proceedings by any Governmental Entity, for any Taxes.

**Section 3.11 Absence of Certain Changes.** To the Knowledge of Licensor, there have been no changes in the operations, conditions (financial or otherwise), or results of operations of Licensor with respect to the Licensed Marks or the Third-Party Licenses.

{N3339370.13}
*LA 132974416v1*

11

**Section 3.12    Compliance with Laws.**

(a)    To the Knowledge of Licensor, the operations and activities of Licensor has complied with and currently comply, in all material respects, with all Applicable Laws with respect to its use of the Licensed Marks and Permits applicable to the Licensed Services as currently conducted or Licensor's ownership or use of the Licensed Marks.

(b)    In connection with the Third-Party Licenses and the Licensed Marks, Licensor has not, at any time, received any written notice from any Governmental Entity or other Person regarding (i) any violation of or failure to comply with, in some material respect, any Law or Permit, (ii) any withdrawal, suspension, cancellation, termination of, or modification of any permit held by Licensor or any licensee thereof, or (iii) any obligation on the part of Licensor to undertake, or to bear all or any portion of the cost of, any remedial action, excluding routine incidental or other minor actions involving *de minimis* costs.

(c)    To the Knowledge of Licensor, in connection with the Third-Party Licenses and the Licensed Marks, no event has occurred, nor does any circumstance exist, that constitutes, or with notice, the lapse of time or both (i) may constitute or result in a violation by Licensor of, or a failure on the part of Licensor to comply with, any Laws or any Permit, (ii) could result in the revocation, withdrawal, suspension, cancellation or termination of, or any modification to, any permit held by Licensor, or (iii) would give rise to an obligation on the part of Licensor to undertake, or to bear all or any portion of the costs of, any remedial action of a material nature.

**Section 3.13    Full Disclosure.**    No representation or warranty by Licensor in this Agreement and no statement contained in the Schedules to this Agreement or any certificate or other document furnished or to be furnished to Licensee pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading. Except as specifically provided in this Agreement, Licensor makes no representation or warranty, either express or implied, as to any matter whatsoever, including, without limitation, the design, merchantability, durability, suitability of any product, service or other item or the fitness of any product or other item for a particular purpose. Upon request, Licensor shall provide Licensee a written certification that all such representations and warranties not expressly qualified by date or time remain true and accurate as of the date of such certification.

### ARTICLE 4
### LICENSEE'S REPRESENTATIONS AND WARRANTIES

Licensee represents and warrants to Licensor as follows:

**Section 4.1    Organization and Standing.**    Licensee is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware and Colorado, and has the requisite power and authority to own its properties and assets and to carry on its business as presently conducted, and is duly qualified and in good standing to do business in each jurisdiction in which the nature of the business conducted by it or the ownership or leasing of its properties makes such qualification necessary.

{N3339370.13}
*LA 132974416v1*

12

**Section 4.2    Authority; Enforceability.**    Licensee has all requisite legal power, authority and legal capacity to execute and deliver this Agreement and the other Transaction Documents to which Licensee is a party, and to consummate the Transaction and the transactions contemplated hereby and thereby. The execution, delivery and performance of the Transaction Documents by Licensee, and the consummation of the Transaction and the transactions contemplated thereby, have been duly authorized by all necessary action on the part of Licensee. The Transaction Documents have been (or will be) duly executed and delivered by Licensee and constitute (or will constitute) its legal, valid and binding obligations, enforceable against it in accordance with their respective terms, subject to applicable bankruptcy, insolvency and similar laws affecting generally the enforcement of creditors' rights and general principles of equity.

**Section 4.3    Consent; No Conflicts.**    To the Knowledge of Licensee, no filing with or notice to, and no Permit, authorization, consent or approval of, any Governmental Authority or other Person is necessary for the execution and delivery by Licensee of the Transaction Documents or the consummation of the Transaction or the transactions contemplated thereby. The execution, delivery, and performance of the Transaction Documents do not, and the consummation of the Transaction and the transactions contemplated thereby will not, with the passage of time or the giving of notice, or both, violate, conflict with or result in the breach of any term, condition or provision of, or require the consent of any Person under, (a) the certificate of incorporation, bylaws, stockholders agreement or similar organizational documents of Licensee, (b) any Law to which Licensee is subject or may become subject pursuant to the Transaction Documents, (c) any Order which is applicable to Licensor, or (d) any Contract to which Licensee is a party or by which Licensee is bound as of the Effective Date. Any intellectual or industrial property materials that may be submitted by Licensee to Licensor for approval are original and do not infringe the rights of any other person, and are not confusingly similar to any other intellectual or industrial property.

**Section 4.4    Absence of Litigation; Governmental Orders.**    There are no Legal Proceedings pending or, to the Knowledge of Licensee, threatened against Licensee or any of its Affiliates seeking to enjoin, restrain, prohibit or otherwise delay the Transaction or the transactions contemplated by the Transaction Documents.    No event has occurred or circumstances exist that could reasonably be expected to give rise to, or serve as a basis for, any such action, Order or Legal Proceeding.

**Section 4.5    Compliance with Laws.**

(a)    To the Knowledge of Licensee, the operations and activities of Licensee have complied with and currently comply, in all material respects, with all Applicable Laws, with respect to its ownership and operation of Gentlemen's Clubs.

(b)    In connection with its ownership and operation of Gentlemen's Clubs, Licensee has not, at any time, received any written notice from any Governmental Entity or other Person regarding (i) any violation of or failure to comply with, in some material respect, any Law, (ii) any withdrawal, suspension, cancellation, termination of, or modification of any permit held by Licensee, or (iii) any obligation on the part of Licensee to undertake, or to bear all or any portion of the cost of, any remedial action, excluding routine incidental or other minor actions involving *de minimis* costs.

13

(c)     To the Knowledge of Licensee, in connection with its ownership and operation of Gentlemen's Clubs, no event has occurred, nor does any circumstance exist, that constitutes, or with notice, the lapse of time or both (i) may constitute or result in a violation by Licensee of, or a failure on the part of Licensee to comply with, any Laws, (ii) could result in the revocation, withdrawal, suspension, cancellation or termination of, or any modification to, any permit held by Licensee, or (iii) would give rise to an obligation on the part of Licensee to undertake, or to bear all or any portion of the costs of, any remedial action of a material nature.

**Section 4.6     Full Disclosure**.   No representation or warranty by Licensee in this Agreement and no statement contained in the Schedules to this Agreement or any certificate or other document furnished or to be furnished to Licensor pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading. Upon request, Licensee shall provide Licensor with a written certification that all such representations and warranties not expressly qualified by date or time remain true and accurate as of the date of such certification.

## ARTICLE 5
## OTHER COVENANTS AND AGREEMENTS

**Section 5.1     Disclosure of Books and Records Relating to Third-Party Licenses and Licensed Marks**.  Upon the Closing and throughout the Term, Licensor shall provide Licensee, upon Licensee's written request, originals, or where not available, copies, of all books and records necessary for Licensee to administer the Third-Party Licenses and to monetize, exploit and commercialize the Licensed Marks in connection with the Licensed Services, including but not limited to, books of account, ledgers, and general, financial and accounting records; list of the Licensed Marks and files directly relating thereto; licensee, franchisee and patron lists and purchasing histories; price lists, distribution lists and supplier lists; data; systems and procedures relating to the Licensed Marks in connection with the Licensed Services, quality control records and procedures and operating systems; patron complaints and inquiry files; strategic plans, research and development materials and files; records and data (including all correspondence with any Governmental Entity); sales and licensing and other revenue related material and records (including pricing history, total revenues, terms and conditions of sales, licenses, and pricing policies and practices); internal financial statements; marketing and promotional surveys; and all other books, records, licenses and other agreements in Licensor's possession relating specifically to the Third-Party Licenses to be assigned and the Licensed Marks to be licensed in connection with the Licensed Services to Licensee pursuant to this Agreement.

**Section 5.2     Efforts**.   Upon the Closing and throughout the Term, the Parties agree to use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective as promptly as practicable, the Transaction and the transactions contemplated by this Agreement and the other Transaction Documents, and to cooperate with each other in connection with the foregoing, including using their respective commercially reasonable efforts to effect all filings, obtain all assignments, waivers, consents, novation, amendments, approvals and

authorizations to properly effect, implement or fully consummate any of the matters contemplated by this Agreement or the other Transaction Documents.

**Section 5.3   Public Announcements.** Neither Party nor any of their Affiliates, agents, licensees, or representatives, shall issue any press release or otherwise make any public statements with respect to the Transaction Documents or the transactions contemplated thereby without the prior written consent of the other Party.

**Section 5.4   Use of the Restricted Names and Designs.** Licensor hereby agrees that, upon the Closing and throughout the Term, Licensor shall not, and shall not permit its Affiliates to, use the Licensed Marks in connection with such Person's ownership or operation of Gentlemen's Clubs; *provided* that Licensor shall have the right to use the Licensed Marks in connection with advertising and promotion of the Gentlemen's Clubs as set forth in this Agreement. Notwithstanding the foregoing, nothing contained herein shall prevent Licensor or its Affiliates from owning or operating bars, nightclubs or other entertainment venues, that are not Gentlemen's Clubs, bearing or utilizing Licensor's or its Affiliates' trademarks including, without limitation, the Licensed Marks and the Additional Marks; *provided*, that for the avoidance of doubt, the Licensor and its Affiliates shall only have the right to own or operate a bar, nightclub or other entertainment venue, that is not a Gentlemen's Club, under the name "THE PENTHOUSE CLUB", or under any name in which the word "PENTHOUSE" is immediately adjacent to the word "CLUB" (*e.g.*, "Club Penthouse" or "Penthouse Club") in jurisdictions where the ownership or operation of Gentlemen's Clubs is prohibited under Applicable Law.

**Section 5.5   Collection of Payments.** From and after the Closing, and notwithstanding any consideration payable to Licensor or any of its Affiliates pursuant to this Agreement or any other Transaction Document, if Licensor or any of its Affiliates receives or collects any funds relating to the Third-Party Licenses or any New Contracts (including, but not limited to, any royalties or other revenues with respect thereto and any proceeds from Claims brought against other Persons for any breach thereof), Licensor shall, or shall cause its Affiliates to, as applicable, notify Licensee or its representatives of the same and remit such funds to Licensee within ten (10) Business Days after Licensee's receipt of such notice.

**Section 5.6   Accounting and Audit Rights.**

(a)   Within 90 days following the end of each calendar year, Licensee shall deliver to Licensor an accounting statement (each, an "Accounting Statement") setting forth a description of Royalties paid, Gross Third-Party License Fees actually received, and Third-Party License Expenses deducted, during each immediately preceding calendar year. Licensor will be deemed to have consented to all Accounting Statements rendered by Licensee, which will be binding upon and not subject to objection by Licensor unless specific written objection to such Accounting Statement is received by Licensee within one year from the date such Accounting Statement was rendered.

(b)   Licensee shall keep books and records relating to the New Contracts and any Third-Party License Expenses incurred by Licensee ("Licensee Books and Records"). At Licensor's sole cost and expenses (except as otherwise expressly provided below), Licensor may

itself or through a certified public accountant audit the Licensee Books and Records directly relating to the immediately preceding Accounting Statement once annually during the Term to ensure the accuracy of Royalty accounting, reporting and payments. Any such audit shall take place at Licensee's principal place of business during normal business hours, and shall not unreasonably interfere with Licensee's course of business. No audit with respect to any Accounting Statement may commence later than 12 months from the rendition of the Accounting Statement nor continue for longer than 30 consecutive days. Licensor's right to examine Licensee Books and Records is limited to records specifically relating to the New Contracts and Third-Party License Expenses that form the basis of the corresponding Accounting Statement.

(c)     In the event Licensor is underpaid by Licensee, Licensor shall send written notice to Licensee specifically identifying such underpaid amount (along with reasonable supporting documentation, if requested by Licensee). If the Parties disagree as to the existence and/or amount of such underpayment, they shall use commercially reasonable efforts to resolve the dispute. If the Parties are unable to resolve any such dispute, then they shall submit to binding mediation with a mutually agreed upon mediator and associated procedures and rules for resolution in mediation. The underpaid amount agreed upon by the Parties or established in binding mediation, as applicable, shall be added to and included in the calculation of Royalties in the calendar quarter during which such underpayment is agreed upon or established in mediation, as applicable, and shall be furnished by Licensee in accordance with Section 1.4(b).

**Section 5.7**     **Transfer Taxes**. All transfer, documentary, sales, use, lease, consumption, stamp, registration, value added and other such transfer Taxes and fees (including any penalties and interest related thereto) (collectively, "Transfer Taxes") incurred in connection with this Agreement and the other Transaction Documents shall be borne and paid by Licensee when due, and Licensee shall, at its own expense, timely file any Tax Return or other document with respect to such Transfer Taxes (and Licensor shall cooperate with respect thereto as necessary); *provided, however*, that any Transfer Taxes incurred in connection with the reversion of rights and assets to Licensor upon termination by Licensee or expiration of this Agreement shall be borne and paid by Licensor when due, and Licensor shall, at its own expense, timely file any Tax Return or other document with respect to such Transfer Taxes (and Licensee shall cooperate with respect thereto as necessary). Each Party shall cooperate with the other Party in providing each other with any appropriate exemption certificates and other similar documentation related to the transactions contemplated in this Agreement and the other Transaction Documents.

**Section 5.8**     **Infringement and Maintenance of Licensed Marks**.

(a)     Licensee shall notify Licensor in writing of Licensee's actual knowledge of any infringements of the Licensed Marks, and Licensor shall have the sole right (except as expressly provided in this Section 5.8) to prosecute infringements and other similar actions or proceedings (collectively, "Assertions") against third parties in order to enforce its and Licensee's rights in the Licensed Marks. If requested to do so, Licensee and its Affiliates shall reasonably cooperate with Licensor, at Licensor's cost, in any such Assertion, including joining as a party in any Legal Proceeding. Licensee shall not institute any suit or take any action on account of any such infringements or imitations without first obtaining the written consent of the Licensor to do so; *provided*, that if Licensor fails to institute such Legal Proceeding and/or

{N3339370.13}
*LA 132974416v1*                                    16

diligently take any other commercially reasonable action on account of any such infringement, imitation or other Assertions within ten Business Days of becoming aware thereof, Licensee shall have the right, but not the obligation, at Licensee's cost, to institute Legal Proceedings or take any other reasonable action to protect its rights in the Licensed Marks, and upon request by Licensee, Licensor and its Affiliates shall reasonably cooperate with Licensee, at Licensee's cost, in any such Legal Proceeding or other action, including joining as a party in any Legal Proceeding. Except as otherwise contemplated by the Licensee Security Interest, Licensee shall not challenge or aid or assist others in challenging Licensor's exclusive ownership of the Licensed Marks. Licensee shall immediately notify Licensor of the receipt of any claim that Licensee's use of the Licensed Marks violates the rights of any third party and shall fully cooperate upon Licensor's request, at Licensor's cost, with the Licensor in any litigation, proceeding or settlement that the Licensor shall deem advisable in connection with any such claim. Any award, or portion of an award, recovered in any such Assertion or other Legal Proceeding shall be split proportionately among Licensor and Licensee to recoup the Parties' respective expenses actually paid in connection therewith and to compensate such Parties' respective pecuniary losses resulting therefrom.

(b)     Licensor shall take commercially reasonable steps to maintain all Licensed Marks registered with the United States Patent and Trademark Office and all applicable foreign trademark registries maintained by any Governmental Entity (the "<u>Registrations</u>"). Licensor may select counsel of its choice to conduct such maintenance, but, during the Term of this Agreement, if any maintenance fees or maintenance filings have not been made by the maintenance deadline, excluding the six-month grace period, then Licensee may, at Licensee's option, and without limitation to Licensee's other rights and remedies under this Agreement, pay such fees and make such filings, if allowable by the applicable Governmental Entity, and Licensor shall reimburse Licensee for all related fees and costs, including reasonable attorneys' fees and advisors' fees.

(c)     Upon Licensee's request in writing and at Licensee's cost (which, for the avoidance of doubt, shall be deemed a Third-Party License Expense hereunder), Licensor shall promptly (i) apply to register any or all of the Licensed Marks with any foreign trademark registries maintained by any Governmental Entity where the Licensed Marks are not registered as of the Effective Date, as requested by Licensee, and (ii) apply to register any or all heretofore unregistered marks and/or trade names with the United States Patent and Trademark Office and all applicable foreign trademark registries maintained by any Governmental Entity, as requested by Licensee (collectively, the "<u>New Registrations</u>"). Without limiting the generality of <u>Section 5.16</u>, any such New Registrations shall be deemed to be automatically included within the License Grant hereunder without the necessity of any action by Licensee or Licensor hereunder, and shall be subject to all of the terms and conditions of this Agreement, including, but not limited to, the Parties' rights and obligations with respect to infringements and maintenance set forth in this <u>Section 5.8</u>, Licensee's quality control obligations set forth in <u>Section 5.9</u>, and Licensee's rights and remedies set forth in <u>Section 5.12</u>. When requested, Licensor will cooperate with Licensee in amending <u>Schedule 1.1(a)</u> of this Agreement and <u>Exhibit A</u> to the Security Agreement, and perform any other acts deemed necessary or desirable to memorialize the foregoing and carry out the purposes of this <u>Section 5.8(c)</u>.

(d)    Licensor recognizes that a breach of any obligation in Section 5.8(b) could irreparably harm and prejudice Licensee's rights under this Agreement, and, to the extent allowable under Applicable Law, Licensor hereby appoints Licensee and Licensee's designees as its attorney-in-fact to take any reasonable steps necessary to maintain such Registrations and otherwise to exercise Licensee's rights under Section 5.8(b). Licensor agrees that the foregoing designation constitutes a power coupled with an interest, is irrevocable throughout the Term and may be exercised in Licensee's reasonable discretion. Licensee agrees to keep Licensor reasonably informed in writing of any material actions taken by Licensee pursuant to such designation, and Licensee shall not execute any documents as attorney-in-fact pursuant to this Section 5.8 unless Licensor fails to execute and deliver such documents within five (5) Business Days after request by Licensee to do so, unless a shorter period is reasonably required under the circumstances. Licensee shall not be liable to Licensor or any of its Affiliates for any action or failure to act on such Person's behalf within the scope of authority conferred on Licensee hereunder. Licensee shall have the right to settle or compromise any Claim relating to the maintenance of such Registrations on the basis that Licensee, in its good faith business judgment deems advisable.

### Section 5.9    Quality Control.

(a)    Licensee shall use its commercially reasonable efforts to (i) maintain the existing standards and quality of the products, goods and services provided by or on behalf of Licensee and parties to the Third-Party Licenses under, in connection with and utilizing the Licensed Marks (the "Branded Goods and Services"), consistent with the customary ownership and operation of Gentlemen's Clubs; and (ii) comply with and abide by all Laws applicable thereto and to correct any alleged violations thereof. In all sub-licenses of the Licensed Marks entered into and granted by Licensee during the Term, Licensee shall require that all sub-licensees thereunder contractually agree to adhere to the general scope of the quality control provisions set forth hereinbelow.

(b)    Licensee shall submit all of its advertising, promotional, or other business materials (excluding real-time social media advertising) bearing the Licensed Marks to Licensor for approval in accordance with Section 1.1(d)(i). Any use of the Licensed Marks by Licensee's sub-licensees must meet Licensor's quality control standards specified in this Section 5.9, and must continue to be of substantially the same quality during the Term, and Licensor reserves its rights to reasonably request and review specimens depicting the Licensed Marks throughout the Term for the purpose of reviewing the quality thereof. In the event that there is a substantial and adverse change in the quality of the usage of the Licensed Marks by such Persons, Licensor and Licensee will confer in an effort to resolve such dispute in accordance with this Section 5.9, and until such time as the dispute is resolved, Licensee shall cease any further sublicensing of the Licensed Marks to such Persons until the quality of the usage of the Licensed Marks by such Persons is corrected. Licensee agrees that it will use its commercially reasonable efforts to ensure that the quality of its and its sub-licensees' Gentleman's Club(s) utilizing the Licensed Marks will remain consistent with the high quality products and services currently offered by Licensor, and to promptly correct any of its uses, or require its sub-licensees to correct any of their uses, of the Licensed Marks in a manner that could reasonably be expected to adversely reflect upon or damage the goodwill or reputation of the Licensed Marks or Licensor. Licensor shall have a right of sufficient access at reasonable times, and upon at least three Business Days'

{N3339370.13}
LA 132974416v1

18

advance notice, to Licensee's facilities to permit Licensor or its representative to ensure that the quality of any location using the Licensed Marks is in accordance with these standards. Licensee acknowledges that the maintenance of the high quality of the Licensed Marks and the associated goods and services, and compliance with the foregoing quality control provisions, are material conditions of this Agreement.

(c)      Prior to entering into any New Contract, Licensee shall, at its own cost and expense, verify in writing to Licensor for each New Contract that the New Contract is in substantial conformity with this Agreement, the third-party sub-licensee qualifies for sub-licensing under the terms of this Agreement, and complies with the quality control provisions in this Section 5.9.

(d)      Licensee shall use commercially reasonable efforts to maintain the distinctiveness of the Licensed Marks, the image of the brand, and the image and high quality of the services and merchandise bearing the Licensed Marks presently manufactured and sold by Licensor and its other licensees, and Licensee agrees that anything bearing the Licensed Marks will be of high quality as to workmanship, fit, design and materials.

(e)      If Licensor reasonably determines that such Branded Goods and Services shall fail to conform with the standards of quality as contemplated herein, Licensor or its authorized representative shall so notify Licensee of the same in writing. Upon receipt of such notification, Licensee shall use its commercially reasonable efforts to cure any such deficiencies to the reasonable satisfaction of Licensor within 60 days thereafter (the "Quality Control Cure Period"). If, upon expiration of the Quality Control Cure Period, Licensor provides Licensee with written notice of its failure to reasonably cure such deficiency, the Parties shall continue to use their commercially reasonable efforts to resolve any disputes related thereto. If the Parties are still unable to resolve any dispute over the alleged deficiency, then they shall submit to binding mediation with a mutually agreed upon mediator and associated procedures and rules for resolution in mediation.

Section 5.10   Overpayments. If Licensee makes any overpayment to Licensor for any reason, or if Licensor is indebted to Licensee for any reason, Licensee shall send written notice to Licensor specifically identifying such overpayment (along with reasonable supporting documentation, if requested by Licensor). If the Parties disagree as to the existence and/or amount of such overpayment, they shall use commercially reasonable efforts to resolve the dispute. If the Parties are unable to resolve any such dispute, then they shall submit to binding mediation with a mutually agreed upon mediator and associated procedures and rules for resolution in mediation. Licensor shall pay Licensee such overpayment or indebtedness as agreed upon by the Parties or established in binding mediation, as applicable, after receiving a written demand from Licensee.

Section 5.11   Licensee's Right to Franchise. Licensor acknowledges and agrees that Licensee may desire to enter into franchise agreements with third parties to operate Gentlemen's Clubs utilizing the Licensed Marks. The Parties acknowledge and agree that they shall negotiate in good faith and promptly memorialize in writing any such additional agreements or documents that may be necessary to effectuate any such franchising agreements.

**Section 5.12    Security Interest.**

(a)    During the Term, and as security for the Secured Obligations (as defined in Section 5.12(d)), whether now or hereafter due or arising, Licensor hereby pledges, conveys, hypothecates, mortgages, assigns, sets over, delivers and grants to Licensee a continuing first priority security interest (the "Licensee Security Interest") in all of the right, title and interest of every kind or nature whatsoever of Licensor in and to, but none of its obligations with respect to, all intellectual property and industrial property rights to the trademark THE PENTHOUSE CLUB (as described more fully in Exhibit A to the Security Agreement, the "Secured Mark") in connection with Gentlemen's Clubs, including, without limitation, the following described items, whether now owned or existing or hereafter created, acquired or arising, and wherever located (collectively, the "Licensee Collateral"):

(i)    All of the right, title and interest of Licensor of every kind and nature (including, without limitation, trademarks and copyrights, and any extensions and renewals thereof and any rights related thereto and/or to neighboring rights recognized under the Laws of any jurisdiction with respect to the Secured Mark) in and to the Secured Mark and underlying rights therein and all like or similar rights that may now or hereafter be retained or recovered by Licensor with respect to the Secured Mark.

(b)    In addition to Licensor's obligation to execute and deliver to Licensee the Security Agreement hereunder, Licensor agrees, from time to time, to promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that Licensee may reasonably request, in order to perfect, protect, evidence, renew and/or continue the security interest granted or purported to be granted hereby and pursuant to the Security Agreement or to enable Licensee to exercise and enforce its rights and remedies hereunder with respect to the Licensee Collateral or otherwise effectuate the purpose and intent of this Agreement. Notwithstanding the foregoing, except as provided in the Security Agreement, nothing contained herein shall require Licensor to execute and deliver at any time an absolute irrevocable assignment transferring to Licensee all right, title and interest of Licensor (and its Affiliates, as applicable) in and to the Licensee Collateral. Licensee shall have the right to file and/or record with any relevant authority (i) the Security Agreement, (ii) upon providing prior written notice to Licensor, any financing statements and functionally similar instruments, and (iii) to the extent necessary to comply with any requirements or restrictions imposed in any applicable foreign jurisdiction, upon Licensor's consent (which shall not be unreasonably withheld), this Agreement, and, where permitted by Applicable Law, to do any of the foregoing with or without execution by or on behalf of Licensor.

(c)    To enforce its rights hereunder, Licensee shall have all rights and remedies as a secured creditor available to it at Law and in equity. In connection with Licensee's exercise of any and all such rights and remedies as a secured creditor, as and if applicable, Licensor hereby waives presentment for payment, protest and demand for payment and notice of protest, demand, dishonor and non-payment hereunder, and all other notices or demands otherwise required by Law that may lawfully be waived.

(d)    As used in this Section 5.12, "Secured Obligations" means an (i) Event of Default by Licensor under Section 7.1(a)(i) which continues beyond the cure period specified by

{N3339370.13}
*LA 132974416v1*                                         20

Section 7.3 and that results in a final, non-appealable judgment, and/or (ii) an Event of Default by Licensor under Sections 7.1(a)(ii) or (iii).

### Section 5.13   Right of First Refusal.

(a)     During the Term, if Licensor or any of its Affiliates (collectively, the "Seller") desires to sell or otherwise transfer all of its rights to title and ownership ("Transfer") in: (i) all or any portion of the Licensed Marks, (ii) all or substantially all of Seller's business or other assets, or (iii) all or a majority of Seller's capital stock or other equity interests (each of the Transfers identified in Section 5.13(a)(i)-(iii), the "Offered Business"), in each case to an entity other than an Affiliate of Seller in a transaction or series of transactions that results in a direct or indirect change of control of Licensor, excluding (A) a reorganization of the Licensor or other transaction the principal purpose of which is tax planning, (B) transfers by holders of the Seller's capital stock for estate or tax planning purposes, (C) a transaction (which may include a joint venture, strategic collaboration, partnership, license arrangement or similar structure) in connection with the licensing of any portion of Licensor's or its Affiliates' intellectual property rights (other than the Licensed Marks), (D) an initial public offering of the Seller, in which the gross proceeds are estimated to be at least $8 million, (E) a financing transaction (included, but not limited to, debt securities, promissory notes, term loans, revolving lines of credit, and similar instruments) and/or the re-financing thereof, and (F) the pledge or mortgage of all or any portion of Seller's business, assets or capital stock or other equity interests as collateral to secure its obligations in the ordinary course of business or in connection with any of the actions contemplated by clauses (A) through (E) hereof, then Seller shall first provide written notice (the "Initial Notice") to Licensee of such proposed Transfer (each, a "ROFR Event"), specifying in reasonable detail the Offered Assets (as defined below) that are the subject of such ROFR Event; *provided,* that with respect to clause (F), Licensor shall use its reasonable commercial efforts to obtain agreement from any such third-party pledgee or mortgagee that, in the event of a default under such pledge or mortgage, such pledgee or mortgagee shall take no action that would result in the termination of this Agreement in the absence of an assumption of Licensor's obligations hereunder. As used in this Section 5.13, "Offered Assets" shall mean that portion of the Offered Business proposed to be Transferred. For purposes of this Section 5.13, any Transfer proposed during the continuance of an event of default under a secured credit facility to which Licensor is party shall be referred to as a "Distressed Transfer".

(b)     During the sixty (60) day period (or, in the case of a Distressed Transfer, thirty (30) day period) following Licensee's receipt of an Initial Notice (or such other timeframe as may be mutually agreed upon) (the "Initial Offering Period"), Licensee, directly or indirectly through one or more of its Affiliates (collectively, "Licensee-Purchaser"), shall have the sole and exclusive right to negotiate with Seller regarding the acquisition of the Offered Assets that are the subject of the ROFR Event. Each of Seller and Licensee-Purchaser covenants and agrees to negotiate in good faith with the other party throughout the Initial Offering Period. In the event that Seller and Licensee-Purchaser are engaged in active good faith negotiations at the end of the Initial Offering Period with respect to the acquisition of all or any portion of the Offered Assets, then the Initial Offering Period shall be extended (and Licensee-Purchaser shall continue to have the exclusive right to negotiate with Seller regarding the acquisition of all or any portion of the Offered Assets) for an additional 10 days; *provided,* that this extension shall not apply to a Distressed Transfer.

{N3339370.13}
*LA 132974416v1*

21

(c)     In the event that Seller and Licensee-Purchaser do not enter into a definitive agreement prior to the expiration of the Initial Offering Period (as extended) with respect to the acquisition of all or any portion of the Offered Assets, then Seller shall have the right for a period of 30-days commencing on the expiration of such Initial Offering Period (such 30-day period, the "Solicitation Period") to solicit and negotiate with non-affiliated third parties (each, a "Potential Purchaser") for the acquisition of the Offered Assets. Seller must inform each Potential Purchaser of Licensee-Purchaser's rights under this Section 5.13. Notwithstanding the foregoing, the Solicitation Period with respect to any Distressed Transfer shall not be time limited and shall continue indefinitely, so long as Seller desires to pursue such Distressed Transfer.

(d)     In the event that Seller and Potential Purchaser reach a definitive binding agreement regarding the proposed Transfer to such Potential Purchaser of the Offered Assets (the "Transfer Proposal"), then Seller shall provide written notice (the "Final Notice") to Licensee of such Transfer Proposal (including a copy of the corresponding letter of intent, memorandum of understanding or other Contract, if any), specifying in reasonable detail the identity of the Potential Purchaser, the Offered Assets to be Transferred, and the terms and conditions of the proposed Transfer, including the proposed purchase price for such Offered Assets (the "Transfer Price").

(e)     During the 30-day period (or, in the case of a Distressed Transfer, fifteen (15) day period) following Licensee's receipt of a Final Notice (or such other timeframe as may be mutually agreed upon) (the "Matching Period"), Licensee-Purchaser shall have the exclusive right to acquire from Seller the Offered Assets proposed to be Transferred to Potential Purchaser under the Transfer Proposal, at the same Transfer Price, and subject to the same material terms and conditions, as described in the Final Notice. Licensee-Purchaser may exercise such right (and thereby have the exclusive right to negotiate and enter into a definitive agreement concerning the acquisition of such Offered Assets) by so notifying Licensor in writing prior to the expiration of the Matching Period. In the event that Seller and Licensee-Purchaser are engaged in active good faith negotiations at the end of the Matching Period with respect to the acquisition of all or any portion of the Offered Assets, then the Matching Period shall be extended (and Licensee-Purchaser shall continue to have the exclusive right to acquire the Offered Assets in accordance with this Section 5.13) until such time as such active negotiation is concluded; *provided*, that this extension shall not apply in the case of a Distressed Transfer.

(f)     If Licensee-Purchaser does not elect to purchase the Offered Assets in accordance with this Section 5.13 prior to the expiration of the Matching Period then Seller may Transfer the Offered Assets to the Person(s) named as transferee(s) in the Final Notice or any other Person; *provided*, that such Transfer (i) is at the Transfer Price (or a higher price), and subject to the same material terms and conditions as described in the Final Notice, (ii) is consummated within the later to occur of 120 days after the expiration of the Matching Period or receipt of any regulatory approvals required to consummate the Transfer, and (iii) is in accordance with all the terms of this Agreement, including, without limitation, Licensee's ownership of the Third-Party Licenses and exclusive worldwide license of the Licensed Marks hereunder which shall remain in full force and shall be binding, effective and enforceable against such transferee(s) as successor to Licensor hereunder. If Licensor's proposed Transfer of the Offered Assets does not comply with the terms and conditions of this Section 5.13(f), then Seller

may not Transfer any of the Offered Assets. Notwithstanding anything herein to the contrary, the provisions of this Section 5.13 shall not apply to a ROFR Event in respect of Offered Assets more than once within a 12-month period commencing upon the date of the Initial Notice; *provided*, that following the application of this Section 5.13 in any given 12-month period, during the remainder of such 12-month period Seller shall not be able to Transfer to any Person such Offered Assets at a lower price than the Transfer Price, or subject to materially different terms and conditions than those described in the Final Notice, without complying again with the provisions of Section 5.13(e) and (f).

(g)  This Section 5.13 shall terminate and have no further effect upon the consummation of an initial public offering of the Seller's capital stock in which the gross proceeds received are at least $8 million.

**Section 5.14  Non-Competition; Non-Solicitation; Non-Disparagement.**  Licensor hereby agrees to the restrictive covenants set forth in this Section 5.14.

(a)  From the Closing until the expiration of the Term, as renewed or otherwise terminated as provided herein, (the "Restricted Period"), each of Licensor and its Affiliates shall not, directly or indirectly, within the entire world (the "Restricted Territory") and in connection with Gentlemen's Clubs, for its own benefit or for the benefit of any other Person, in any capacity (as a principal, shareholder, partner, member, manager director, officer, agent, executive, consultant, contractor, employee, lender or otherwise):

(i)  induce, solicit, recruit or attempt to persuade any Person who is (or becomes during the Restricted Period) employed by, a licensee, or performs (or will perform during the Restricted Period) services for Licensee or its Affiliates at any time during the Restricted Period, to terminate such Person's employment, license, or other relationship with Licensee or its Affiliates or not to establish an employment, license, or other relationship with Licensee or its Affiliates, whether or not such Person is or would be during the Restricted Period an employee, licensee, consultant, contractor, manager, officer and/or director, whether or not such relationship is or would be pursuant to a written or oral agreement and whether or not such relationship is for a specific period or is at-will;

(ii)  employ or establish a business relationship with (or attempt to employ or establish a business relationship with), or encourage or assist any Person to employ or establish a business relationship with, any individual who is or was an employee, licensee, consultant, contractor, manager, officer or director of Licensee or its Affiliates during the Restricted Period;

(iii)  (A) direct or engage in any act which may interfere with or adversely affect, alter or change the relationship (contractual or otherwise) of Licensee or its Affiliates with any Person (1) for whom or which Licensee or its Affiliates at any time performed services or to whom or which Licensee or its Affiliates at any time sold, leased, distributed or licensed its products or services in connection with the Licensed Services during the Restricted Period; (2) whose business was solicited by, or who was otherwise in negotiations to enter into a business relationship with, Licensee or its Affiliates at any time during the Restricted Period in connection with the Licensed Services; or (3) that is or was a vendor,

{N3339370.13}
LA 132974416v1

23

supplier, lessor, licensor or contractor of, or who otherwise has a business relationship with, Licensee or its Affiliates during the Restricted Period in connection with the Licensed Services; (B) otherwise induce or attempt to induce any such Person to cease doing business, reduce or otherwise limit its business with Licensee or its Affiliates in connection with the Licensed Services; or (C) solicit business from any such Person during the Restricted Period; or

(iv)    directly or indirectly, for its or his own benefit or for the benefit of any other Person, in any capacity (as a principal, shareholder, partner, member, manager director, officer, agent, executive, consultant, contractor, employee, lender or otherwise), own, manage, operate, control, be employed by, engage or participate in, be financially interested or allow his skill, knowledge, experience or reputation to be used by, or otherwise be connected with the ownership, management, operation or control of any Person involved in a Gentlemen's Club or otherwise competes with the Gentlemen's Clubs.

Notwithstanding the foregoing, Sections 5.14(a)(i)-(iii) shall not preclude Licensor from soliciting, hiring, employing or otherwise engaging any employee, consultant, contractor or other Person who performed or performs services for Licensee who (1) responds to a general solicitation through a public medium or general or mass mailing by or on behalf of Licensor, or a Person controlled by Licensor, or (2) responds to a solicitation by a bona fide search or services firm; *provided,* such search or services firm has been directed not to solicit employees, consultants, contractors or such other Persons of Licensee.

(b)    From and after the Effective Date, each of the Parties and their Affiliates shall not make any statements, whether written or oral, directly or indirectly (or encourage others to make any such statements) that defame, disparage or demean the Licensed Marks, the other Party and their businesses, Affiliates, or their respective officers, directors, employees, shareholders, members, managers, partners, agents or products or services. The foregoing shall not be violated by truthful statements (i) in response to legal process, (ii) in required governmental testimony or filings, (iii) made pursuant to any applicable "whistleblower" Laws, or (iv) in administrative or other arbitral or other Legal Proceedings.

(c)    The Parties hereto agree that, if any court of competent jurisdiction in a final non-appealable judgment determines that a specified time period, a specified geographical area, a specified business limitation or any other relevant feature of this Section 5.14 is unreasonable, arbitrary or against public policy, then a lesser time period, geographical area, business limitation or other relevant feature determined by such court to be reasonable, not arbitrary and not against public policy may be enforced against the applicable Party.

### Section 5.15  Confidentiality.

(a)    As used in this Section 5.15, the term "Confidential Information" means any information, knowledge or data of any nature and in any form (including information that is electronically transmitted or stored on any form of magnetic or electronic storage media) relating to the subject matter of this Agreement or the past, current or prospective operations of the Parties or any of their respective predecessors or Affiliates, whether produced by the individual Party, its Affiliates or any of their respective consultants, employees, agents or independent contractors or by a Party or its predecessors or Affiliates, and whether or not marked

{N3339370.13}    24
*LA 132974416v1*

confidential, including, without limitation, research, plans and developments; prototypes, proposals, products and services; customer and/or patron lists and customers and/or patrons; operations manuals; prospective customers and/or patrons and contacts; customer, patron and licensee purchasing practices; prices, pricing methodology and cost information; terms and conditions of business relationships with customers, patrons and/or licensees; customer, patron and/or licensee research and other needs; markets and market demographics and other related information; software and other technology; developments, inventions, processes and formulas; engineering, concepts, designs and drawings; merchandising, marketing and advertising; distribution and sales methods and systems; sales and profit figures; and finances and personnel information (including information regarding compensation, skills, training, promotions, and duties).

(b)     Each Party shall hold for the benefit of the other Party and its Affiliates all Confidential Information which shall have been obtained by the receiving Party or its Affiliates (by whatever means) during or prior to the Term hereunder, and shall use such Confidential Information solely for the exclusive benefit of the disclosing Party and its Affiliates (except as otherwise expressly contemplated by this Agreement). Each Party acknowledges that such Confidential Information is specialized, unique in nature and of great value to each Party hereunder and its Affiliates, and that such information gives each Party and its Affiliates a competitive advantage. During, and following the end of, the Term, each Party agrees (i) not to disclose to any Person (other than the disclosing Party or its Affiliates) any Confidential Information, except upon the prior written authorization of the disclosing Party or as may be required by law or legal process, and (ii) upon request of a particular Party or its Affiliates or any of their respective representatives or advisors, to deliver promptly to the disclosing Party or its Affiliates any Confidential Information in a Party's or its Affiliates' possession, including any duplicates thereof and any notes or other records a Party or its Affiliates has prepared with respect thereto.

(c)     In the event a Party receives a request or demand, orally, in writing, electronically or otherwise, at any time for the disclosure or production of Confidential Information pursuant to a judicial, administrative, arbitral or other adversarial proceeding, such Person must promptly notify the other Party by telephone in accordance with Section 8.8. Regardless of whether such Person is successful in reaching the other Party by telephone, such Person also must promptly notify the Party that was called in writing in accordance with Section 8.8. A copy of the request or demand as well as any and all documents potentially responsive to the request or demand shall be included with the written notification. The telephoning Party will wait a minimum of ten days (or the maximum time permitted by such legal process, if less) after sending the letter before making a disclosure or production to give the other Party and its Affiliates time to determine whether the disclosure or production involves Confidential Information, in which event the particular Party or its Affiliates may seek to prohibit and/or restrict the production and/or disclosure and/or obtain a protective order with regard thereto. If the non-telephoning Party or its Affiliates elects to seek a protective order with respect to any Confidential Information, the other Party and its Affiliates shall assist the other Party or such Affiliate(s) in obtaining such protective order, as reasonably requested by said Party or such Affiliate(s). If the request or demand is in conjunction with judicial, administrative, arbitration or other adversarial proceedings, copies of all correspondence regarding the request or demand shall be included with the information sent to the non-telephoning Party.

{N3339370.13}
LA 132974416v1

25

(d) Following the expiration of the Term or other termination of this Agreement, or at any other time a Party or its Affiliates may request, each Party hereby agrees to furnish to the other Party all files, property, memoranda, notes, plans, records, reports and other documents and data (and all copies thereof) belonging to the other Party or any of its Affiliates that embody or relate to the Confidential Information or the business of the other Party or any of its Affiliates which the other Party or any of its Affiliates may then possess or have under its control (actual or constructive). Each Party shall take any and all reasonable actions deemed necessary or appropriate by the particular Party from time to time in its sole discretion to ensure the continued confidentiality and protection of the Confidential Information. Each Party shall notify the other Party promptly and in writing of any circumstances of which the Party has knowledge relating to any possession or use of the Confidential Information, or any part thereof, by any other Person as soon as practical in an orderly and organized fashion, but in any event no later than the expiration of the Term or other termination of this Agreement.

(e) Further, during the Term, Licensee will use commercially reasonable efforts to ensure that any party under a New Contract will: (i) comply with all applicable data protection laws; (ii) comply with all of Licensor's reasonable requirements regarding the data protection laws as provided in writing in advance to Licensee; (iii) upon Licensor's request and at Licensor's expense, do and execute, or arrange to be done and executed, each act, document and thing reasonably necessary to keep Licensor in compliance with any of the data protection laws as it relates to any actions or inactions of Licensee and its sub-licensees; and (iv) subject in all respects to Section 5.14 and the other paragraphs of this Section 5.15, permit Licensor and its Affiliates to use any data or other information each of them gathers concerning Licensee and its Affiliates in connection with Licensee's and its sub-licensee's establishment and operation of the Gentleman's Club(s).

### Section 5.16 After-Acquired Intellectual Property.

(a) Licensor hereby acknowledges and agrees that all After-Acquired IP (as defined below) shall be automatically deemed to be included in the Licensed Marks subject to and included in the License Grant pursuant to Section 1.1(a). If any of the After-Acquired IP may not, by operation of law, be deemed to be automatically included within the License Grant hereunder, or if all right, title and interest of the intellectual property rights therein shall not otherwise be deemed to be licensed to Licensee hereunder, Licensor hereby agrees to grant to Licensee, and does hereby grant to Licensee, without further consideration, an exclusive, sub-licensable, unlimited license, free and clear of all Liens, to use, sub-license, franchise (and sub-franchise) and otherwise monetize, exploit and/or commercialize anywhere in the world during the Term (subject to the terms and conditions of this Agreement) all of Licensor's and its Affiliates' right, title and interest in the After-Acquired IP.

(b) Licensor hereby agrees to perform, upon the reasonable request of Licensee or its Affiliates or any of their respective representatives or advisors, during the Term, such further acts as may be necessary or desirable to transfer, perfect and defend Licensee's foregoing license in such After-Acquired IP. When requested, Licensor will: (i) execute, acknowledge and deliver any requested declarations, affidavits and/or documents of license, assignment and conveyance; (ii) obtain and aid in the enforcement of copyrights, trade secrets and, if applicable, patents, trademarks or service marks with respect to the After-Acquired IP in

{N3339370.13}
LA 132974416v1

26

any countries in accordance with the other terms and conditions of this Agreement; (iii) provide testimony in connection with any proceeding affecting Licensee's foregoing license in any such After-Acquired IP; and (iv) perform any other acts deemed necessary or desirable to carry out the purposes of this Agreement. Licensee will reimburse all reasonable out-of-pocket expenses incurred by Licensor at Licensee's request in connection with the foregoing.

(c) For purposes of this Section 5.16, "After-Acquired IP" shall mean all intellectual property rights relating to, without limitation, all trade secrets, U.S. and international copyrights, trademarks and trademark applications, service marks, patents and patent applications, discoveries and improvements, and other rights in any formulations, products, apparatus, compositions of matter, operating manuals, methods, programming, documentation, technology or other information or work, whether registered or un-registered, and all common law rights therein (collectively, the "IP") that: (i) results from any work performed by Licensor for Licensee or its Affiliates relating to the Licensed Marks or the Third-Party Licenses limited to the Licensed Services; (ii) relates to the business and interests of Licensee or its Affiliates as it relates to the Licensed Marks or the Third-Party Licenses limited to the Licensed Services; or (iii) otherwise relates to the ownership, management and operation of Gentlemen's Clubs or the Licensed Services and licensing of intellectual property in connection therewith, in each case that Licensor or its Affiliates conceives, develops, purchases or otherwise acquires or delivers to Licensee or its Affiliates at any time during the Term.

(d) During the Term, Licensor shall promptly report the conception, development, purchase or other acquisition of any After-Acquired IP in writing to Licensee.

(e) This Section 5.16 is without limitation to, and does not relieve Licensor of, any of its obligations, agreements or covenants (including pursuant to Sections 5.14 – 5.15 hereof) otherwise set forth in and/or required pursuant to the Transaction Documents.

**Section 5.17 Bankruptcy.** The Parties acknowledge and agree that in connection with the License Grant and the Licensed Marks, (a) the Licensed Marks and rights therein licensed to Licensee hereunder are fundamentally in the nature of, and shall be deemed to be a license of rights to, "intellectual property" as defined in Section 101 of Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor statute (the "Bankruptcy Code"); (b) that Licensee's continued enjoyment of the Licensed Marks and rights therein licensed to Licensee hereunder is of the essence of this Agreement and fundamental to the rights granted hereunder, and therefore all of the Licensed Marks and rights therein licensed to Licensee hereunder shall be deemed intellectual property subject to Licensee's election under Section 365(n)(1)(B) of the Bankruptcy Code to the extent permitted by Applicable Law and acceptable to the bankruptcy court; and (c) in the event of any rejection or proposed rejection of this Agreement in any bankruptcy proceeding, to the extent permitted by Applicable Law and acceptable to the bankruptcy court, (i) Section 365(n) of the Bankruptcy Code shall be implicated and (ii) Licensee shall not be required to tender to Licensor any Royalties accrued after such rejection above and beyond the Minimum Guaranteed Royalties for the duration of the Term and any Renewal Term. Notwithstanding anything contained herein to the contrary, the Parties further agree that upon a valid election by Licensee pursuant to Section 365(n)(1)(B) of the Bankruptcy Code, to the extent permitted by Applicable Law and acceptable to the bankruptcy court, Licensee shall be entitled, on its own or through employees, contractors,

{N3339370.13}
*LA 132974416v1*

27

agents or otherwise, to upgrade, modify and develop derivative works based upon the Licensed Marks and rights therein granted to Licensee hereunder. In the event of the rejection of the Agreement under section 365 of the Bankruptcy Code, if Licensee engages in continued use of the Licensed Marks and rights licensed therein, Licensee shall pay all Consideration and Minimum Guaranteed Royalties due under the Agreement for the duration of such contract, including any Renewal Term, without any right of offset Licensee may have with respect to such contract under the Bankruptcy Code or other Applicable Law. For purposes of this Section 5.17 only, Licensor acknowledges Licensee's reasonable commercial interest in preserving its right to use the Additional Marks for Permitted Advertising as set forth in Section 1.1(i), and Licensor agrees to use its reasonable commercial efforts, to the extent permitted by Applicable Law and acceptable to the bankruptcy court, to assist Licensee in such preservation of rights.

Section 5.18  Exploitation; Sole Discretion.  Licensor hereby expressly acknowledges and agrees that, subject to the terms of this Agreement, including without limitation, Section 5.9 hereof, Licensee will have the right, as it may determine in good faith and in its sole, absolute discretion, (a) to determine the manner and means of its ownership and operation of the Gentlemen's Clubs; and (b) to determine the license fees, royalties, advance payments, admission fees, refunds, rebates, discounts, allowances and/or any and all amounts and forms of consideration (if any), parties, and all other terms and conditions of any Contract entered into, amended, amended and restated or otherwise (including any New Contract or Third-Party License), by Licensee for the monetization, exploitation and/or other commercialization of the Licensed Marks pursuant hereto.

## ARTICLE 6
## INSURANCE; INDEMNIFICATION

### Section 6.1  Insurance.

(a)  At all times during the Term of this Agreement, but only with respect to Licensee's ownership and operation of Gentlemen's Clubs utilizing the Licensed Marks, Licensee shall procure and maintain, at its sole cost and expense commercial general liability insurance with limits of no less than $1,000,000 per occurrence and $2,000,000 in the aggregate, including bodily injury and broad form property damage, and products and completed operations and advertising liability, which policy will include contractual liability coverage insuring the activities of Licensee under this Agreement. With respect to Licensee's ownership and operation of Gentlemen's Clubs utilizing the Licensed Marks, Licensee shall also maintain statutory worker's compensation coverage for each accident and for each occupational disease per employee with limits of not less than $1,000,000 per occurrence.

(b)  All insurance policies required pursuant to this Section 6.1 shall:

(i)  be issued by insurance companies licensed and admitted to do business in the State of California or otherwise reasonably acceptable to Licensor;

(ii)  provide that such insurance carriers give Licensor at least 30 days' prior written notice of cancellation or non-renewal of policy coverage; *provided* that, prior to

such cancellation, Licensee shall have new insurance policies in place that meet the requirements of this Section 6.1;

(iii)    waive any right of subrogation of the insurers against Licensor or any of its Affiliates; provide that such insurance be primary insurance and any similar insurance in the name or and/or for the benefit of Licensor shall be excess and non-contributory; and

(iv)    name Licensor and its Affiliates, including, in each case, all successors and assigns, as additional insureds.

(c)    Licensee shall provide Licensor with copies of the certificates of insurance and policy endorsements required by this Section 6.1 upon the written request of Licensor, and shall not do anything to invalidate such insurance.

(d)    Licensee shall ensure that all New Contracts contain this insurance clause.

**Section 6.2    Indemnification by Licensor.**    Licensor shall indemnify and hold harmless Licensee and its Affiliates, and their respective members, managers, directors, officers, employees, agents, successors and assigns (each, a "Licensee Indemnified Party") from and against any loss, liability, claim, damage, accrued and unpaid Taxes, expense (including costs of investigation and defense and reasonable attorneys' fees) or diminution of value, whether or not involving a third-party claim (collectively, "Damages"), suffered by such Licensee Indemnified Party and directly or indirectly arising from (a) any breach of the representations, warranties, covenants or other obligations or agreements of Licensor contained in this Agreement or any other Transaction Document; (b) any Event of Default (as defined below) of Licensor; (c) any fraud, intentional misrepresentation or other intentional misconduct of Licensor or any of its Affiliates; or (d) the Excluded Liabilities.

**Section 6.3    Indemnification by Licensee.**    Licensee shall indemnify and hold harmless Licensor and its Affiliates, and their respective members, managers, directors, officers, employees, agents, successors and assigns (each, a "Licensor Indemnified Party") from and against, and shall pay to each Licensor Indemnified Party the amount of, any Damages suffered by such Licensor Indemnified Party and directly or indirectly arising from (a) any breach of the representations, warranties, covenants and agreements of Licensee contained in this Agreement or any other Transaction Document; (b) any Event of Default (as defined below) of Licensee; (c) any fraud, intentional misrepresentation or other intentional misconduct of Licensee or any of its Affiliates; or (d) the construction, renovation, upgrading, alteration, remodeling, repair, operation, or use of the Gentlemen's Clubs or any other business conducted on, related to, or in connection by Licensee or any Person acting for or on behalf of Licensee, including those under any New Contract.

Each Party must promptly give notice to the other Party of any action, suit, proceeding, claim, demand, inquiry, or investigation related to the foregoing. Each party's obligations under Section 6.2 and Section 6.3 will survive the termination or expiration of this Agreement.

**Section 6.4    Limitations.**    Except as expressly set forth in this Agreement, all of the representations, warranties, and covenants of the Parties contained in this Agreement shall survive the expiration of the Term. Notwithstanding anything to the contrary set forth herein,

{N3339370.13}                                      29
*LA 132974416v1*

each Party acknowledges that nothing herein shall be construed as prohibiting the other Party from pursuing any other remedy to which the first Party may be entitled under Applicable Law (including injunctive relief or other equitable remedies) in the event of a breach or threatened breach of this Agreement or any other Transaction Documents by the breaching Party.

**Section 6.5   Tax Treatment of Indemnity Payments.** The Parties agree to treat any indemnity payment made pursuant to this Article 6 as an adjustment to the Consideration for all Tax purposes.

**Section 6.6   Right to Offset.** Notwithstanding anything to the contrary in this Agreement, any other Transaction Document, or otherwise each Party shall have the right (but not the obligation, and such right shall not limit or affect any other right or remedy it may have hereunder or otherwise), to satisfy any Damages suffered by it under this Agreement, by setting off such Damages against any payments or other consideration due or payable to the other Party or any of its Affiliates pursuant to this Agreement.

## ARTICLE 7
## TERMINATION; DEFAULT

### Section 7.1   Default; Termination.

(a)      Either Party will have the right to terminate this Agreement by written notice in accordance with Section 8.8, upon the occurrence of any of the following events (each, an "Event of Default") and failure by the defaulting Party to cure such Event of Default in accordance with Section 7.3:

(i)      any material breach by the defaulting Party of the representations, warranties, covenants or other obligations or agreements of such Party or any of its Affiliates contained in this Agreement (including, without limitation Article 5 hereof) or any other Transaction Document, in each case only to the extent such breach would cause a material adverse effect on the business and operations of the non-defaulting Party;

(ii)      except as provided in Section 5.17, the defaulting Party or its Affiliates shall commence a voluntary proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts, under the Bankruptcy Code or any other bankruptcy, insolvency or other similar law now or hereafter in effect seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of a substantial part of its property or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it or shall make a general assignment for the benefit of creditors or shall generally fail to pay its debts as they become due or shall take any action to authorize any of the foregoing; or

(iii)      except as provided in Section 5.17, an involuntary proceeding shall be commenced against the defaulting Party or any of its Affiliates seeking liquidation, reorganization or other relief with respect to itself or its debts, under the Bankruptcy Code or any other bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official for a substantial

{N3339370.13}                                                           30
*LA 132974416v1*

part of its property, and such involuntary proceeding shall remain un-dismissed and un-stayed for a period of 30 days.

(b) Upon the expiration of the Term or any other termination of this Agreement in accordance with its terms, the License Grant and all rights in and to the Licensed Marks and Third-Party Licenses shall automatically and immediately revert back to Licensor, and Licensee shall no longer have any right to enter into Contracts with respect to the Licensed Marks.

(c) Each of Licensor and Licensee covenants and agrees to use its commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to effectuate and implement the reversion of the Licensed Marks upon the expiration of the Term or any other termination of this Agreement in accordance with its terms. Without limiting the generality of the foregoing, as applicable, upon request by the other Party therefor, (i) Licensee agrees to execute an assignment or similar instrument reflecting the foregoing reversion of the License Grant, and (ii) Licensor agrees to execute an amendment, supplement or other similar instrument reflecting the continuity of any existing Contracts embodying the license to other Persons of rights in and to the Licensed Marks, including, without limitation, as may be necessary to substitute Licensor for Licensee as the licensor thereunder.

(d) Upon expiration or termination of this Agreement, Licensee shall cease and desist, within a reasonable time to be agreed upon by Licensee and Licensor, from all further use of the Licensed Marks; any other trademark owned by Licensor and which may during the course of this Agreement be authorized by Licensor to be used by Licensee in connection with the Gentleman's Clubs; or any trademark or service mark that is confusingly similar to the Licensed Marks or any other mark owned by Licensor. Licensee further agrees that upon expiration or termination of this Agreement, Licensee will not thereafter use any mark that incorporates the Licensed Marks, or any mark that is confusingly similar to the Licensed Marks, nor will Licensee challenge the ownership or validity of, or seek to cancel, the Licensed Marks or any other trademark of Licensor. Notwithstanding the foregoing, the expiration or termination of this Agreement shall in no way prohibit or interfere with Licensee's or its Affiliates ownership or operation of then-existing Gentlemen's Clubs that do not utilize the Licensed Marks.

(e) Upon the expiration or termination of this Agreement, Licensee shall immediately deliver to Licensor a complete and accurate inventory all New Contracts and any uses of the Licensed Marks as of the close of business on the date of such expiration or termination. Licensee hereby agrees that upon the termination or expiration of this Agreement, Licensee will be deemed to have assigned, transferred and conveyed to Licensor any trade rights, equities, goodwill, titles or other rights in and to the Licensed Marks, the domain name and any assumed business name incorporating the Licensed Marks which may have been obtained by Licensee or which may have vested in Licensee in pursuance of any endeavors covered hereby, and that Licensee shall execute any instrument requested by Licensor to accomplish or confirm the foregoing. Any such assignment, transfer or conveyance shall be without consideration other than the mutual covenants and considerations of this Agreement.

(f)    Notwithstanding anything contained in this Agreement to the contrary, in the event of a lawful foreclosure on the Secured Marks by Licensee in accordance with Section 5.12(e), the Third Party Licenses and New Contracts shall remain in full force and effect through the term of those Contracts, and Licensee shall continue to make its payments to Licensor under Section 1.4 with respect thereto.

Section 7.2    **Equitable Relief.**  Each Party acknowledges that a breach by the other Party of this Agreement may cause the non-breaching Party irreparable damages, for which an award of damages would not be adequate compensation and agrees that, in the event of such breach or threatened breach, the non-breaching Party will be entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance and any other relief that may be available from any court in addition to any other remedy to which the non-breaching Party may be entitled at law or in equity.  Such remedies shall not be deemed to be exclusive but shall be in addition to all other remedies available at law or in equity, subject to any express exclusions or limitations in this Agreement to the contrary.

Section 7.3    **Cure Period**.  Upon an Event of Default, the non-defaulting Party shall send to the defaulting Party written notice in accordance with Section 8.8, informing the defaulting Party of the specified Event of Default and a description of the circumstances giving rise to such Event of Default. Except as expressly provided in Section 5.9, the defaulting Party shall thereafter have 60 days from receipt of such notice, or such longer period as the Parties may mutually agree, in which to cure the Event of Default.  If, upon expiration of the applicable cure period, the non-defaulting Party provides the defaulting Party with written notice of its failure to reasonably cure such Event of Default, the Parties shall continue to use their commercially reasonable efforts to resolve any disputes related thereto or to otherwise affect a cure for such Event of Default. If the Parties are still unable to resolve any dispute over the alleged Event of Default or otherwise affect a cure therefor, then they shall submit to mediation with a mutually agreed-upon mediator and associated procedures and rules for resolution in mediation.

## ARTICLE 8
## MISCELLANEOUS

Section 8.1    **Successors and Assigns; Assignment**.

(a)    This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Except as otherwise expressly provided herein (including, without limitation, Section 5.17, Section 6.2 and Section 6.3), nothing in this Agreement, express or implied, is intended to confer upon any party other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement.

(b)    Except as set forth in Section 5.17, neither Party may assign this Agreement or any of its rights or obligations hereunder, in whole or in part, by operation of law or otherwise, without the other Party's prior written consent, which shall not be unreasonably withheld; *provided,* that Licensor or Licensee may assign, transfer, license or sub-license this Agreement and/or all or any portion of such Party's rights and obligations hereunder to the assignor's Affiliate without the prior written consent of the other Party, with the understanding

{N3339370.13}
*LA 132974416v1*                    32

that the assigning Party shall remain primarily liable for all of its obligations hereunder; and Licensee's Affiliate-assignee shall be adequately capitalized and beneficially owned directly or indirectly fifty-one percent (51%) or more by John Kirkendoll and/or his heirs (and/or a trust established for the benefit of such Persons) at the time of such assignment. Upon request therefor by the non-assigning Party, the assignee shall execute a counterpart to this Agreement assuming all of the assigning party's obligations hereunder.

**Section 8.2    Post-Closing Cooperation**. The Parties and their respective Affiliates shall cooperate with each other following the Closing and throughout the Term in (a) notifying customers, licensees, or vendors of the consummation of the transactions contemplated by this Agreement, (b) reconciling customer payments, licensing royalties, or other monies owed to one Party which may be received by the other Party, and (c) handling customer, licensee, vendor offset, deduction, allowance and similar claims which may be misdirected by such customer, licensee, or vendor.

**Section 8.3    No Joint Venture**. Neither Party owes the other any fiduciary duties, including duties of loyalty or care. This Agreement shall not be construed to form any partnership, joint venture or other regime of shared risks or profits between the Parties.

**Section 8.4    Severability**. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.

**Section 8.5    Expenses**. Except as provided in Section 8.7, each Party shall bear its own expenses in connection with the negotiation, execution, delivery and performance of this Agreement and the transactions contemplated hereby.

**Section 8.6    Governing Law; Jurisdiction; Waiver of Jury Trial**.

(a)    This Agreement and the other Transaction Documents shall be governed by, interpreted and enforced in accordance with the laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to any conflicts of law principles which might otherwise require the application of the law of another jurisdiction. The Parties expressly agree that the United Nations Convention on Contracts for the International Sale of Goods will not apply to this Agreement. The Parties hereby agree that, except as set forth in the last sentence of Section 5.17, any action brought with respect to this Agreement and the transactions contemplated hereunder, including, but not limited to, any action brought for injunctive relief, shall be heard and determined in the Delaware Court of Chancery or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Legal Proceeding, the United States District Court for the District of Delaware. In any such Legal Proceeding, each of the Parties irrevocably and unconditionally waives, and agrees not to assert by way of motion, as a defense or otherwise, any Claim that such party is not subject to the jurisdiction of the above courts, that such action or suit is brought in an inconvenient forum or that the venue of such Legal Proceeding is improper.

(b)    EACH    PARTY    HERETO    IRREVOCABLY    AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN

33

RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THE
TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY.
EACH PARTY HERETO CERTIFIES AND ACKNOWLEDGES THAT (i) NO
REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR
OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE
FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (ii) SUCH PARTY HAS
CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) SUCH PARTY MAKES THIS
WAIVER VOLUNTARILY, AND (iv) SUCH PARTY HAS BEEN INDUCED TO ENTER
INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND
CERTIFICATIONS IN THIS SECTION 8.6(b).

**Section 8.7    Attorneys' Fees and Costs.** In the event of a dispute between the Parties
which is adjudicated pursuant to **Section 8.6** above, the prevailing party shall be reimbursed by
the other party for all reasonable attorneys' fees, costs, and related expenses incurred by such
prevailing party. If each party prevails in a portion of any such dispute, the adjudicator of such
claim shall equitably allocate reasonable attorneys' fees, costs, and related expenses based upon
the extent to which each party prevailed in the dispute.

**Section 8.8    Notices.** Any notice and other communication required, permitted or
desired to be given under this Agreement shall be given in writing and shall be deemed
effectively given upon personal delivery, transmission by electronic means (*e.g.*, email or
facsimile with confirmation of receipt) or two Business Days after it is deposited with a
recognized overnight courier service, delivery prepaid and addressed, to such Person at its
address, e-mail or facsimile number as designated below:

| To Licensor: | Penthouse Global Licensing, Inc. | |
|---|---|---|
| | 8944 Mason Avenue | |
| | Chatsworth, California 91311 | |
| | Attention: | Donald J. Slaughter, Sr. |
| | *Telephone*: | (310) 280-1920 |
| | *Facsimile*: | |
| | *Email*: | dslaughter@penthouse.com |
| | | |
| With a copy to: | Greenberg Traurig, LLP | |
| | 1840 Century Park East, Suite 1900 | |
| | Los Angeles, CA 90067 | |
| | Attention: | Jeffrey Joyner, Esq. |
| | *Telephone*: | (310) 586-7700 |
| | *Facsimile*: | (310) 586-7800 |
| | *Email*: | joynerj@gtlaw.com |

34

To Licensee:                        Penthouse Clubs Worldwide, LLC
                                    201 St. Charles Avenue, Suite 3915
                                    New Orleans, Louisiana 70170
                                    Attention:    Tim Spratt, Esq.
                                    *Telephone*:   (504) 267-5498
                                    *Facsimile*:   (504) 324-6761
                                    *Email*:       tspratt@kirkmgmt.com

With a copy to:                     Jones Walker LLP
                                    201 St. Charles Ave., Suite 5100
                                    New Orleans, Louisiana 70170
                                    Attention:    Asher J. Friend, Esq.
                                    *Telephone*:   (504) 582-8362
                                    *Facsimile*:   (504) 589-8362
                                    *Email*:       afriend@joneswalker.com

or at such other address, facsimile number or email address as such Party may designate by written notice to the other Party in accordance with this Section 8.8.

**Section 8.9    Construction**. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. The use of "including" or "include" herein shall in all cases mean "including, without limitation" or "include, without limitation," respectively. The use of "or" is not intended to be exclusive unless the context requires otherwise. Reference to any agreement (including this Agreement), document or instrument shall mean such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof. Underscored references to Sections or clauses shall refer to those portions of this Agreement. The use of the terms "hereunder," "hereof," "hereto," "herein" and words of similar import shall refer to this Agreement as a whole and not to any particular section, paragraph, or clause of this Agreement. All references to "$" and dollars shall be deemed to refer to United States currency unless otherwise specifically provided.

**Section 8.10    Complete Agreement**. This Agreement (including all Exhibits and Schedules attached hereto) and the other Transaction Documents, agreements and instruments to be executed and delivered hereunder, constitute the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings relating to such subject matter, including that certain Confidential Term Sheet, dated November 8, 2016 by and between Licensor and Kirkendoll Management, LLC.

**Section 8.11    Amendments and Waivers**. Except as otherwise expressly set forth in this Agreement, any term of this Agreement may be amended or terminated only with the written consent of each of the Parties hereto. A waiver of any term of this Agreement is only enforceable if in writing and signed by the Party against whom the waiver is asserted. A waiver

of any term of this Agreement shall not be construed as a continuing waiver of further breaches of the same term.

**Section 8.12  Pronouns**.  Whenever the context may require, any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural, and vice versa.

**Section 8.13  Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which taken together shall constitute one and the same instrument.

**Section 8.14  Section Headings**.  The section headings are for the convenience of the parties and in no way alter, modify, amend, limit, or restrict the contractual obligations of the parties.

*[Signatures Appear on the Following Page]*

*Signature Page*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the day and year first above written.

**LICENSOR:**

PENTHOUSE GLOBAL LICENSING, INC.

By: _____

Name: Kelly Holland
Title: Chief Executive Officer

**LICENSEE:**

PENTHOUSE CLUBS WORLDWIDE, LLC
KIRKENDOLL MANAGEMENT, LLC

By: _____

Name: John Kirkendoll
Title: Manager

*Signature Page*
*Master License Agreement*
*Penthouse Global Licensing, Inc ; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the day and year first above written.

**LICENSOR:**

PENTHOUSE GLOBAL LICENSING, INC.

By:      _____
Name: Kelly Holland
Title:   Chief Executive Officer

**LICENSEE:**

PENTHOUSE CLUBS WORLDWIDE, LLC
KIRKENDOLL MANAGEMENT, LLC

By:  _____
Name: John Kirkendoll
Title:   Manager

{N3339370 13}

*LA 132974415v1*

*Exhibit A*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

### DEFINED TERMS

In addition to the other defined terms used herein, as used in this Agreement, the following terms when capitalized have the meanings indicated.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise; *provided* that (a) any director or executive officer of a corporation, manager of a limited liability company, general partner of a partnership, trustee of a trust, or owner of a fifty percent (50%) or more beneficial interest in any such entity shall be presumed to control that entity, and (b) no natural person shall be deemed to be controlled by, or under common control with, any other Person.

"Applicable Law" means any Law to which a specified Person or its property is subject.

"Business Day" means a day other than a Saturday, Sunday or other day on which banks located in New Orleans, Louisiana are authorized or required by Applicable Law to close.

"Claim" means all demands, claims (including third-party claims), actions or causes of action, suits, investigations, assessments, encumbrances, charges, complaints, directives, citations, information requests issued by government authorities, legal proceedings, orders, notices of potential responsibility, damages or sanctions.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, agreement, indenture, note, bond, mortgage, loan, instrument, lease, license, commitment or other arrangement, understanding or undertaking, commitment or obligation, whether written or oral.

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Governmental Entity" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Knowledge" (or similar phrases) of a given Person in this Agreement means the actual knowledge of such Person after due inquiry and reasonable investigation.

"Law" means any foreign, federal, state or local law (including common law), statute, code (including the Code and the Bankruptcy Code), ordinance, rule, regulation, Order or other requirement.

*Exhibit A*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, mediations, investigations, hearings, inquiries, proceedings or Claims (including counter-claims) by or before a Governmental Entity.

"Liens" means pledges, liens, leases, licenses, conditional sales contracts, Claims, encumbrances, activity or use restrictions, security interests, mortgages or deeds of trust, of any kind or nature whatsoever.

"Minimum Guaranteed Royalties" means Royalties in an amount equal to the Renewal Fee.

"Order" means any order, injunction, judgment, charge, doctrine, decree, rule, ruling, writ, assessment or arbitration award of a Governmental Entity.

"Permit" means any approval, permit (including as required by Applicable Law), order, certificate, variance and product license and license application, permit and any industry, certifying or other regulatory organization authorization or approval and any authorization or approval of any Governmental Entity (foreign, federal, state and local).

"Person" means an individual, firm, corporation, general or limited partnership, limited liability company, limited liability partnership, joint venture, trust, Governmental Entity, association, unincorporated organization or other entity.

"Taxes" means any income, corporation, gross receipts, profits, gains, capital stock, capital duty, withholding, social security, unemployment, disability, property, wealth, welfare, stamp, excise, occupation, sales, use, value added, royalty, alternative minimum, estimated or other similar tax (including any fee, assessment or other charge in the nature of or in lieu of any tax) imposed by any Governmental Entity (whether foreign, national, local, municipal or otherwise) or political subdivision thereof, and any interest, penalties, additions to tax or additional amounts in respect of the foregoing, and including any transferee or secondary liability in respect of any tax (whether imposed by law, contractual agreement or otherwise) and any liability in respect of any tax as a result of being a member of any affiliated, consolidated, combined, unitary or similar group.

"Tax Return" means any return, report or statement required to be filed with respect to any Tax (including any elections, declarations, schedules or attachments thereto, and any amendment thereof), including any information return, Claim for refund, amended return or declaration of estimated Tax, and including, where permitted or required, combined, consolidated or unitary returns for any group of entities that includes Licensor.

*[Schedule of Definitions Appears on the Following Page]*

*Exhibit A*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

## SCHEDULE OF DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings set forth in the sections indicated.

| DEFINED TERM | SECTION |
|---|---|
| **Accounting Statement** | 5.6 |
| **Additional Intellectual Property** | 1.1(g) |
| **Additional Marks** | 1.1(i) |
| **After-Acquired IP** | 5.16(c) |
| **Agreement** | Preamble |
| **Assertions** | 5.8(a) |
| **Assignment** | 1.1(f) |
| **Assignment and Assumption Agreement** | 2.2(b) |
| **Bankruptcy Code** | 5.17 |
| **Branded Goods and Services** | 5.9(a) |
| **Brothels** | Schedule 3.9(b) |
| **Certificate of Consent** | 2.2(f) |
| **Closing** | 2.1 |
| **Closing Consideration** | 1.4(a) |
| **Confidential Information** | 5.15(a) |
| **Consideration** | 1.4(b) |
| **Damages** | 6.2 |
| **Distressed Transfer** | 5.13(a) |
| **Effective Date** | Preamble |
| **Event of Default** | 7.1(a) |
| **Excluded Liabilities** | 1.3 |
| **Excluded Licenses** | 1.1(f) |
| **Final Notice** | 5.13(d) |
| **Gentlemen's clubs** | Recitals |
| **Grant of Rights** | 1.1(f) |
| **Gross Third-Party License Fees** | 1.4(c)(ii) |
| **Initial Notice** | 5.13(a) |
| **Initial Offering Period** | 5.13(b) |
| **Initial Term** | 1.2(a) |
| **IP** | 5.16(c) |
| **Lender** | 2.2(c) |
| **Licensed Marks** | 1.1(a) |
| **Licensed Services** | 1.1(a) |
| **Licensee** | Preamble |
| **Licensee Books and Records** | 5.6 |
| **Licensee Closing Certificate** | 2.3(a) |
| **Licensee Collateral** | 5.12(a) |

*Exhibit A*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

| | |
|---|---|
| **Licensee Indemnified Party** | 6.2 |
| **Licensee-Purchaser** | 5.13(b) |
| **Licensee Security Interest** | 5.12(a) |
| **Licensor** | Preamble |
| **Licensor Closing Certificate** | 2.2(c) |
| **Licensor Indemnified Party** | 6.3 |
| **Matching Period** | 5.13(e) |
| **Net Third-Party License Fees** | 1.4(c)(i) |
| **New Contracts** | 1.4(c)(ii) |
| **New Registrations** | 5.8(c) |
| **Offered Assets** | 5.13(a) |
| **Offered Business** | 5.13(a) |
| **Party; Parties** | Preamble |
| **Payment Account** | 1.2(b) |
| **PENTHOUSE Marks** | Recitals |
| **Permitted Advertising** | 1.1(i) |
| **Potential Purchaser** | 5.13(c) |
| **Quality Control Cure Period** | 5.9(e) |
| **Registrations** | 5.8(b) |
| **Renewal Fee** | 1.2(b) |
| **Renewal Term** | 1.2(a) |
| **Restricted Period** | 5.14(a) |
| **Restricted Territory** | 5.14(a) |
| **ROFR Event** | 5.13(a) |
| **Royalties** | 1.4(b) |
| **Secured Marks** | 5.12(a) |
| **Secured Obligations** | 5.12(d) |
| **Security Agreement** | 2.2(a) |
| **Seller** | 5.13(a) |
| **Short-Form Trademark License Agreement** | 2.2(d) |
| **Solicitation Period** | 5.13(c) |
| **Style Guide** | 1.1(d)(i) |
| **Term** | 1.2(a) |
| **Third-Party License Expenses** | 1.4(c)(iii) |
| **Third-Party Licenses** | Recitals |
| **Third-Party Revenue** | 1.1(f) |
| **Transaction Documents** | 3.2 |
| **Transfer** | 5.13(a) |
| **Transfer Price** | 5.13(d) |
| **Transfer Proposal** | 5.13(d) |

*Exhibit B*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

## SECURITY AGREEMENT

*Exhibit C*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

## ASSIGNMENT AND ASSUMPTION AGREEMENT

*Exhibit D*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

## FORM OF CLOSING CERTIFICATE

*Exhibit E*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

## SHORT-FORM TRADEMARK LICENSE AGREEMENT

*Exhibit F*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

## CERTIFICATE OF CONSENT

*Disclosure Schedules*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

## Schedule 1.1(a)

## LICENSED MARKS

| | | | |
|---|---|---|---|
| THE PENTHOUSE CLUB | Ukraine | 158069 | 43: Restaurant, night club and bar services (limited to the Licensed Services) |
| THE PENTHOUSE CLUB (w/ three key logo)  **PENTHOUSE**❀ | Macao | 88956 | 41: nightclub services;  entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners; (all of the foregoing limited to the Licensed Services) |
| | New Zealand | 833185 | 41: Entertainment services, dance and choreography, adult entertainment, nightclub and live performance services, model searches, special appearances by young women selected as centerfolds or annual award winners. (all of the foregoing limited to the Licensed Services) |
| | U.S. | 2,810,417 | 41: Entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners (limited to the Licensed Services)  43: Restaurant, night club and bar services (limited to the Licensed Services) |
| PENTHOUSE KEY SUITES | U.S. | (86/876606) | 43: Restaurant and bar services (limited to the Licensed Services) |
| THE PENTHOUSE KEY SUITES (w/ one key logo)  **PENTHOUSE KEY SUITES**❀  **PENTHOUSE KEY SUITES**❀ | Not Registered | Not Registered | Limited to the Licensed Services |
| THE PENTHOUSE KEY SUITES (w/ three key logo) | Not Registered | Not Registered | Limited to the Licensed Services |

*Disclosure Schedules*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

| PENTHOUSE KEY SUITES / PENTHOUSE KEY SUITES | | | |
|---|---|---|---|
| Three Key Logo | Australia | 367684 | 41: Entertainment services (limited to the Licensed Services) |
| | Barbados | 81/20326 | 41: nightclub services (limited to the Licensed Services) |
| | Brazil | 816873348 | 41: Amusement, entertainment and auxiliary services (limited to the Licensed Services). |
| | Canada | TMA748,728 | 41: nightclub services (limited to the Licensed Services) |
| | China | 4281665 | 41: nightclub services (limited to the Licensed Services) |
| | EU | 4018776 | 41: nightclub services (limited to the Licensed Services) |
| | Germany | 2011612 | 41: Entertainment (limited to the Licensed Services) |
| | Indonesia | IDM000076878 | 41: nightclub services (limited to the Licensed Services). |
| | Liechtenstein | 8122 | 41: Entertainment (limited to the Licensed Services) |
| | New Zealand | 717684 | 41: nightclub services (limited to the Licensed Services) |
| | Russia | 128751 | 41: adult night clubs (limited to the Licensed Services) 42: cocktail lounges (limited to the Licensed Services) |
| | Trinidad & Tobago | 46293 | 41: entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners; nightclub services (all of the foregoing limited to the Licensed Services) |
| | Turks & Caicos | 14014 | 41: nightclub services (limited to the Licensed Services) |
| | Turks & Caicos | 14015 | 42: (old class 42, now Class 43): All services in (old) International Class 42, (limited to the Licensed Services). |
| | Ukraine | 65800 | 41: nightclub services (limited to the Licensed Services) |
| | UAE | 53386 | 41: nightclub services (limited to the Licensed Services). |

*Disclosure Schedules*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

|  | Vietnam | 72640 | 41: nightclub services (limited to the Licensed Services). |
|---|---|---|---|
| PENTHOUSE KEY GIRL | Ukraine | 158071 | 41: Entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners and night club services (limited to the Licensed Services)  43: Restaurant, night club and bar services (limited to the Licensed Services) |
| KEY GIRL (Stylized)  **KEY**GIRL | Not Registered | Not Registered | Limited to the Licensed Services |
| PENTHOUSE KEY CLUB | Not Registered | Not Registered | Limited to the Licensed Services |
| KEY CLUB | Not Registered | Not Registered | Limited to the Licensed Services |
| CALIGULA CLUB | Not Registered | Not Registered | Limited to the Licensed Services |
| PENTHOUSE CLUB | Japan | 4384068 | 41: Limited to the Licensed Services  42: Serving food and drink (limited to the Licensed Services) |
|  | Mexico | 903392 | 41: night clubs (limited to the Licensed Services) |
|  | Mexico | 921770 | 43: Services rendered through restaurants in order to provide food and beverages inside and outside of establishments (limited to the Licensed Services) |
| THE PENTHOUSE BEACH CLUB | Ukraine | 158070 | 41: Entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners and night club services (limited to the Licensed Services)  43: Restaurant, night club and bar services (limited to the Licensed Services) |

*Disclosure Schedules*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

## Schedule 1.1(f)

### EXCLUDED LICENSES

1. <u>New York</u>. _____
   _____
   _____

2. <u>Chicago</u>. _____
   _____
   _____

3. <u>Pittsburgh</u>. _____
   _____
   _____

4. <u>Pompano Beach</u>. _____
   _____
   _____

5. <u>Nicosia, Cyprus</u>.      Adult Night Club License Agreement between General Media Communications, Inc. and Ierax, Ltd., dated August 13, 2015.

6. <u>St. Louis</u>.      Adult Night Club License Agreement between General Communications, Inc. and VCG Holding Corp., dated July 8, 2014, effective as of October 17, 2013, as amended on October 21, 2014, effective as of October 17, 2014, and on November 9, 2015, effective as of October 31, 2015.

7. <u>Denver</u>.      Adult Night Club License Agreement between General Communications, Inc. and VCG Holding Corp., dated July 8, 2014, effective as of October 17, 2013, as amended on October 21, 2014, effective as of October 17, 2014, and on November 9, 2015, effective as of October 31, 2015.

*Disclosure Schedules*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

## Schedule 1.1(j)

## ADDITIONAL MARKS

1. PENTHOUSE
2. PET OF THE YEAR
3. PET OF THE MONTH
4. CALIGULA
5. ONE KEY LOGO
6. PENTHOUSE & ONE KEY DESIGN
7. PENTHOUSE and KEYHOLE and ONE KEY DESIGNS
8. PENTHOUSE & One Key Logo
9. PENTHOUSE & Three Key Logo
10. PENTHOUSE PET
11. PENTHOUSE PETS
12. THE GIRLS OF PENTHOUSE
13. THE GIRLS OF PENTHOUSE (Stylized)

*Disclosure Schedules*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

### Schedule 1.2(b)

### PAYMENT ACCOUNT

### INCOMING WIRE INSTRUCTIONS FOR EAST WEST BANK

| | |
|---|---|
| **Beneficiary Name: (required)** | Penthouse Global Licensing, Inc. |
| **Beneficiary Account Number: (required)** | 8088013845 |
| **Beneficiary Address: (optional)** | |
| **Bank Routing Number: (domestic wires)** | 3 \| 2 \| 2 \| 0 \| 7 \| 0 \| 3 \| 8 \| 1 |
| **Bank Routing/ Swift Code: (international wires)** | **EWBKUS66XXX** |
| **Receiving Bank Name:** | **East West Bank** |
| **Receiving Bank Address: (branch address)** | **135 N. Los Robles Ave., Suite 600** |
| **Receiving Bank Address (branch city, state, zip)** | **Pasadena, CA 91101** |
| **Other Information: (optional)** | |

Note:

1. The beneficiary name and beneficiary account number must match for funds to be credited.

2. All Domestic wires for East West bank should be wired to bank routing no: 322070381.

3. All International wires for East West bank should be wired to Swift code: EWBKUS66XXX

*Disclosure Schedules*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

## Schedule 3.4

### LITIGATION DISCLOSURE AND OTHER THIRD-PARTY USES

1. General Media Communications, Inc. v. The Executive Club, LLC
   Supreme Court of the State of New York, County of New York
   Index No.: 653291/2016

2. Garay v. BT California, LLC dba The Penthouse Club & Steakhouse, et al.
   Superior Court of the State of California, County of San Francisco
   Case No. CGC-15-545795

3. Friendfinder Networks, Inc. v. Various, Inc. v. Penthouse Global Media, Inc.
   In the Court of Chancery of the State of Delaware
   C.A. No. 12436

*Disclosure Schedules*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

## Schedule 3.8

### THIRD-PARTY LICENSES

1. The Penthouse Club New Orleans – Club Licensing Agreement between General Media Communications, Inc. and American Club Restaurant, Inc., dated August 12, 2005

2. The Penthouse Club Tampa – Club Licensing Agreement between General Media Communications, Inc. and Tampa Food & Beverage, LLC, dated September 1, 2006, and amended by Amendment #1, Amendment #2 and Amendment #3, and that certain Amendment to Club Licensing Agreement dated November 30, 2012, effective as of October 31, 2012, and subsequently assigned to Westshore Food & Beverage, LLC on May 2016

3. The Penthouse Club Detroit – Club Licensing Agreement between General Media Communications, Inc. and ABCDE Land Development, LLC, dated January 10, 2007, and amended on October 30, 2010

4. The Penthouse Club Moscow – Club Licensing Agreement between General Media Communications, Inc. and Highland Group, LLC, dated April 2, 2010, and amended on April 30, 2015 and November 3, 2016

5. The Penthouse Club Baton Rouge – Adult Night Club Trademark License Agreement between General Media Communications, Inc. and Baton Rouge Sports Restaurant, LLC, dated April 15, 2010

6. The Penthouse Club Auckland – Adult Night Club License Agreement between General Media Communications, Inc. and Delores Properties Limited, dated January 30, 2011, and amended on September 19, 2013

7. The Penthouse Club San Francisco – Adult Night Club License Agreement between General Media Communications, Inc. and BT California, LLC, dated April 18, 2011

8. The Penthouse Club Paris – Trademark License Agreement between General Media Communications, Inc. and Sarl Sport Bar, dated April 1, 2012, and amended on October 31, 2012

9. The Penthouse Club Perth – Adult Night Club License Agreement between General Media Communications, Inc. and M&M Entertainment Pty Ltd., dated August 22, 2014

10. The Penthouse Club Philadelphia – Adult Night Club License Agreement between General Media Communications, Inc. and 3001 Castor, Inc., dated September 19, 2014

*Disclosure Schedules*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

## Schedule 3.9(b)

### INFRINGEMENTS AND OTHER USES

1. Licensee acknowledges the existence of a brothel currently operating in Sydney, Australia under the name of "The Penthouse" and a gentleman's club known as the "Penthouse Gentleman's Club" operating in Auckland, New Zealand (collectively the "Brothels") . The term "Brothels" shall include the establishments listed in the prior sentence and any and all subsidiaries, affiliates, licensee, joint ventures or any companies related to said establishments. Licensee agrees and acknowledges that: (i) the existence of the Brothels is not a violation of this Agreement or any other agreement between the parties; (ii) Licensor has no relationship, agreement or affiliation in any manner with regard to said brothels; and (iii) Licensee voluntarily and knowingly assumes the risks in operating a Gentlemen's Club under this Agreement with the knowledge of the existence of the Brothels as noted herein.

2. There is an infringer in Canada operating under THE PENTHOUSE NIGHTCLUB. It has been in business since 1947. http://www.penthousenightclub.com/.

3. There is another unauthorized, unrelated business in Ukraine: http://penthouse.net.ua/en/.

4. The Penthouse Club in Denver, Colorado – VCG Holding Corp. is continuing to use the mark THE PENTHOUSE CLUB despite the expiration of its license agreement with Licensor.

5. The Penthouse Club in St. Louis, Missouri – VCG Holding Corp. is continuing to use the mark THE PENTHOUSE CLUB despite the expiration of its license agreement with Licensor.

**EXECUTION COPY**

### SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Security Agreement") dated as of March ____, 2017 (the "Effective Date"), is executed by Penthouse Global Licensing, Inc., a Delaware corporation ("Grantor"), on the one hand, in favor of Kirkendoll Management, LLC, a Colorado limited liability company, and Penthouse Clubs Worldwide, LLC, a Delaware limited liability company (collectively, the "Secured Party"), on the other hand. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in that certain Master License Agreement, dated as of the Effective Date (the "Master License"), by and between Grantor and Secured Party.

### WITNESSETH:

WHEREAS, Grantor and Secured Party have entered into the Master License, pursuant to which, among other things, Grantor has (i) licensed to Secured Party, on an exclusive, worldwide, and transferable, sub-licensable and unlimited basis (subject to the rights reserved to the Grantor under the Master License), the Licensed Marks, and (ii) granted to Secured Party a continuing first priority security interest in all of the right, title and interest of every kind or nature whatsoever of Grantor in and to, but none of its obligations with respect to, the Licensee Collateral; and

WHEREAS, in connection with the Closing of the Transaction and the transactions contemplated by the Master License and the other Transaction Documents, Grantor is required to execute and deliver to Secured Party this Security Agreement to more fully describe the security interest granted by Grantor under the Master License and to grant to Secured Party a continuing first priority security interest in and to the Collateral (as defined in in Paragraph 1 of this Security Agreement).

NOW, THEREFORE, in consideration of the willingness of Secured Party to enter into the Master License and, subject to all of the terms and conditions set forth therein, to furnish the Consideration to Grantor thereunder, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

1.    **Grant of Security Interest**.    During the Term, and as security for the Secured Obligations (as defined in Paragraph 3(a) below), Grantor hereby pledges, conveys, hypothecates, mortgages, assigns, sets over, delivers and grants to Secured Party a continuing first priority security interest in all of the right, title and interest of Grantor of every kind or nature whatsoever in and to, but none of its obligations with respect to, all intellectual property and industrial property rights to the trademark, THE PENTHOUSE CLUB, as more fully described on Exhibit A hereto, in connection with Gentlemen's Clubs, including any and all of the following collateral, whether now owned or hereafter acquired (collectively, the "Collateral"):

(a)    All of the right, title and interest of Grantor of every kind and nature (including, without limitation, all trademarks and copyrights, and extensions and renewals thereof, and any rights related thereto and/or to neighboring rights recognized under the laws of any jurisdiction) in and to the marks set forth on Exhibit A attached hereto relating to the Gentlemen's Clubs, including (i) the U.S. and foreign applications associated with each such mark and any registrations issuing therefrom, and amendments, renewals, extensions, reissuances, continuations and replacements of any of the foregoing, and (ii) all U.S. and foreign common law rights owned or controlled by Grantor for or under such marks (collectively, the "Secured Mark");

(b)    Any and all goodwill, and rights under Applicable Law, connected with the use of, and symbolized by, the Secured Mark solely in connection with Gentlemen's Clubs;

{N3364105.7}                                    1

*LA 132974420v1*

**EXECUTION COPY**

(c)    Any and all rights or Claims and causes of action for past, present or future breach, violation or other infringement or dilution of, or injury to the goodwill associated with, any of the rights or assets set out in Paragraphs 1(a) and 1(b) above, whether known or unknown, whether arising by way of counterclaim or otherwise, with the right, but not the obligation, to sue for and collect damages with respect to the foregoing and to enforce any rights and file any Claims against other Persons associated therewith; and

(d)    Any and all products and proceeds of the foregoing, including, without limitation, any of the Claims described in Paragraph 1(c) above.

## 2.    Recordation and Filings; Authority.

(a)    Grantor hereby authorizes Secured Party: (i) to file and record with the United States Patent and Trademark Office and all applicable foreign trademark registries maintained by any Governmental Entity this Security Agreement (and any corresponding or separate forms of such jurisdictions) in order to publicly reflect the interests of Secured Party in the Collateral; and (ii) to take any other action reasonably necessary or advisable to perfect, maintain or continue Secured Party's interest in the Collateral, including, without limitation, executing and filing any financing statement, any continuation statement or any amendment thereto.

(b)    Except as otherwise set forth in Paragraph 3 below, Grantor hereby agrees to take any action and to execute any instrument that Secured Party may reasonably deem necessary to accomplish the purposes of this Security Agreement throughout the Term, or until the earlier termination, of the Master License, or release of the security interest granted hereunder and pursuant to the Master License, in accordance with the terms hereof and thereof. For purposes of this Paragraph 2(b), Grantor agrees to enter into separate written agreements with third parties as may be necessary to acknowledge Secured Party's rights in and to the Secured Mark ("Certificate of Consent").

## 3.    Secured Obligations; Assignment and Other Rights Upon an Event of Default.
Notwithstanding anything to the contrary set forth herein or in the Master License:

(a)    Upon (i) the continuance of an "Event of Default" by Grantor under Section 7.1(a)(i) of the Master License continuing beyond the cure period specified by Section 7.3 of the Master License (a "Payment Default") that results in a final, non-appealable judgment (collectively, the "Secured Payment Obligations"), or (ii) the occurrence of an "Event of Default" by Grantor under Sections 7.1(a)(ii) or (iii) of the Master License (subject to Paragraph 3(e) below) (the "Secured Solvency Obligations", and together with the Secured Payment Obligations, the "Secured Obligations"), Secured Party and its successors and assigns shall have all of the rights, powers and privileges set forth in this Paragraph 3.

(b)    Once the amount of Secured Payment Obligations are determined and fixed pursuant to a final non-appealable judgment, Grantor shall, at its discretion, either (i) promptly pay to Secured Party by wire transfer of immediately available funds the amount of such Secured Payment Obligations, or (ii) execute and deliver to Secured Party an absolute, irrevocable assignment transferring to Secured Party all right, title and interest of Grantor (and its Affiliates, as applicable) in and to the Collateral; *provided*, that in all respects, the Master License shall remain in full force and effect (subject to any amendment thereof pursuant to Paragraph 4 below) unless and until terminated in accordance with its terms. In the event Grantor fails to take the foregoing actions, Secured Party and its successors and assigns shall have all of the rights, power and privileges of a secured party under the Delaware

{N3364105.7}                                    2

LA 132974420v1

Commercial Code, the United States Copyright Act, and all other Applicable Laws in force from time to time, including, without limitation, the right to take any Enforcement Action (as defined below) in the Collateral in the manner deemed appropriate by Secured Party in its sole discretion to satisfy the then outstanding Secured Payment Obligations.

(c) Upon the occurrence and during the continuance of an Event of Default by Grantor under Sections 7.1(a)(ii) or (iii) of the Master License (subject to Paragraph 3(e) below), Secured Party and its successors and assigns shall have all of the rights, power and privileges of a secured party under the Delaware Commercial Code, the United States Copyright Act, and all other Applicable Laws in force from time to time. Without limiting the generality of the foregoing, Secured Party may take any Enforcement Action in the Collateral in the manner deemed appropriate by Secured Party in its sole discretion to satisfy the then outstanding Secured Solvency Obligations (which, for the avoidance of doubt, in the event that the Secured Solvency Obligations result in a final non-appealable order of a bankruptcy court, solely shall be deemed satisfied by the irrevocable, unconditional transfer to Secured Party of unencumbered ownership in the Collateral, unless otherwise provided by such court); *provided*, that in all respects, the Master License shall remain in full force and effect (subject to any amendment thereof pursuant to Paragraph 4 below) unless and until terminated in accordance with its terms.

(d) As used herein, "Enforcement Action" shall mean, with respect to any Collateral, repossessing and otherwise taking possession and ownership of, foreclosing upon, selling, leasing or otherwise disposing of all or any part of such Collateral, or attempting or agreeing to do so solely in satisfaction of the then outstanding Secured Obligations; or commencing the enforcement with respect to such Collateral of any of the default remedies available to the Secured Party under the Master License, this Security Agreement or any other Transaction Documents, as the case may be, or under the Uniform Commercial Code or other Applicable Laws solely in satisfaction of the then outstanding Secured Obligations. For the avoidance of doubt, in such event, the Grantor agrees not to protest or otherwise challenge the final non-appealable judgment by a court or final non-appealable order from a bankruptcy court obtained by Secured Party with respect to an Event of Default.

(e) For the avoidance of doubt, as used in this Security Agreement, an "Event of Default" under Section 7.1(a)(ii) and (iii) of the Master License shall include a voluntary proceeding commenced by Grantor or its Affiliates seeking liquidation, reorganization or other relief with respect to itself or its debts, under the Bankruptcy Code or any other applicable bankruptcy or insolvency law, a general assignment for the benefit of creditors, or an involuntary proceeding commenced against Grantor or its Affiliates seeking any similar relief that remains un-dismissed and un-stayed for a period of 30 days, in each case disregarding any application or interpretation of Section 5.17 of the Master License that would preclude Secured Party's rights to pursue or otherwise successfully effect an Enforcement Action.

(f) In the event that Secured Party takes any Enforcement Action arising out of an Event of Default that results in a Secured Obligation as to which Secured Party is expressly authorized under this Security Agreement to pursue an Enforcement Action and, upon and subject to foreclosure of the Collateral, Secured Party obtains an ownership interest in the Collateral to the extent necessary solely to satisfy the then-outstanding Secured Obligations (as and to the extent described in Paragraphs 3(b) and (c) above), Grantor shall, upon request, execute and deliver to Secured Party such documents as may be reasonably necessary to preserve Secured Party's ability to conduct and operate its Gentlemen's Club business as contemplated by and set forth in the Master License, including, if required, an absolute irrevocable assignment transferring to Secured Party such right, title and interest of Grantor (and its Affiliates, as applicable) in and to the Collateral in satisfaction of such Secured Obligations.

{N3364105.7} 3

**4.      Post-Closing Efforts**.  In the event that Secured Party exercises its rights under this Security Agreement arising out of an Event of Default, including, as applicable, taking any Enforcement Action arising out of an Event of Default that results in a Secured Obligation as to which Secured Party is expressly authorized under this Security Agreement to pursue an Enforcement Action, and upon and subject to foreclosure of the Collateral, Secured Party obtains possession and/or ownership of the Collateral, Grantor and Secured Party each agrees to use its commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things (including, without limitation, amending and/or restating the Master License and/or otherwise entering into such other instruments and agreements) as may be necessary, proper or advisable to promptly (a) (i) effectuate the transfer to Secured Party of all right, title and interest in and to the Collateral (as applicable), and (ii) as may be necessary or desirable to enable (A) Secured Party to exercise, own, use, monetize, exploit or otherwise commercialize the Secured Mark in connection with the Gentlemen's Clubs on an exclusive worldwide basis, and (B) Grantor to continue its undisturbed ownership and operation of all other aspects of its business; and (b) memorialize (i) Secured Party's and Grantor's mutual acknowledgement and agreement that no consumer confusion is likely to result therefrom, and (ii) Secured Party's agreement not to dispute or challenge, or assist any Person in disputing or challenging, Secured Party's rights in the Secured Mark resulting therefrom.

**5.      Termination and Release**.  Unless otherwise agreed in writing by Grantor and Secured Party, the security interest granted herein and in the Master License will terminate (and all rights to the Collateral will revert to Grantor) upon expiration of the Term, or the earlier termination of, the Master License, subject in all respects to the terms and provisions of the Master License (including Section 7.1 thereof). Upon any such expiration or termination, Secured Party (at Grantor's request and sole expense) shall promptly execute and deliver to Grantor such documents as Grantor may reasonably request and as are provided to Secured Party to evidence such termination of the security interests granted herein.

**6.      Miscellaneous**.

(a)      The rights and remedies of the Grantor and Secured Party with respect to the security interest granted herein are in addition and without prejudice to those set forth in the Master License and any other Transaction Documents, all terms and provisions of which are hereby incorporated herein by reference. In the event that any provisions of this Security Agreement are deemed to conflict with the Master License or any other Transaction Documents, the provisions of the Master License or such other Transaction Documents shall control.

(b)      This Security Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument.

(c)      THE VALIDITY, INTERPRETATION AND ENFORCEMENT OF THIS ASSIGNMENT AND SECURITY AGREEMENT AND ANY DISPUTE ARISING OUT OF OR IN CONNECTION WITH THIS SECURITY AGREEMENT, WHETHER SOUNDING IN CONTRACT, TORT, EQUITY OR OTHERWISE, SHALL BE GOVERNED BY, CONSTRUED UNDER AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ANY CONFLICTS OF LAW PRINCIPLES WHICH MIGHT OTHERWISE REQUIRE THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION.

*[Signatures Appear on the Following Page]*

**EXECUTION COPY**

IN WITNESS WHEREOF, this Security Agreement has been executed by the parties hereto as of the day and year first above written.

**GRANTOR:**

PENTHOUSE GLOBAL LICENSING, INC.

By: _____

Name: Kelly Holland
Title: Chief Executive Officer

\*        \*        \*        \*        \*

On 03/21/17 before me, R. Bclens, a notary public, personally appeared Kelly Holland, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the entity upon behalf of which the person acted executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of ___CA___ that the foregoing is true and correct. Witness my hand and official seal.

Signature _____ (Seal) * See attached Notarization

\*        \*        \*        \*        \*

ACKNOWLEDGED AND AGREED BY:

**SECURED PARTY:**

KIRKENDOLL MANAGEMENT, LLC                    PENTHOUSE CLUBS WORLDWIDE, LLC

By: _____                  By: _____
Name: John Kirkendoll                        Name: John Kirkendoll
Title: Manager                               Title: Manager

*Signature Page*
*Security Agreement*
*Master License Agreement between Penthouse Global Licensing, Inc., Kirkendoll Management, LLC and Penthouse Clubs Worldwide, LLC*

LA 132974420v1

**EXECUTION COPY**

IN WITNESS WHEREOF, this Security Agreement has been executed by the parties hereto as of the day and year first above written.

**GRANTOR:**

PENTHOUSE GLOBAL LICENSING, INC.

By: _____
Name: Kelly Holland
Title: Chief Executive Officer

*       *       *       *       *

On _____ before me, _____, a notary public, personally appeared Kelly Holland, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the entity upon behalf of which the person acted executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _____ that the foregoing is true and correct. Witness my hand and official seal.

Signature _____      (Seal)

*       *       *       *       *

ACKNOWLEDGED AND AGREED BY:

**SECURED PARTY:**

KIRKENDOLL MANAGEMENT, LLC

By: _____
Name: John Kirkendoll
Title: Manager

PENTHOUSE CLUBS WORLDWIDE, LLC

By: _____
Name: John Kirkendoll
Title: Manager

*Signature Page*
*Security Agreement*
*Master License Agreement between Penthouse Global Licensing, Inc., Kirkendoll Management, LLC and Penthouse Clubs Worldwide, LLC*

LA 132974420v1

EXECUTION COPY

## EXHIBIT A

### SECURED MARKS

THE PENTHOUSE CLUB, in all variations as used by Grantor in connection with Gentlemen's Clubs, including, but not limited to:

| Mark | Country | Class/Services | Reg. (Appl.) No. | Reg. (Appl.) Date |
|---|---|---|---|---|
| THE PENTHOUSE CLUB & THREE KEY LOGO DESIGN | Macao | 41: nightclub services; entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners. | 88956 | 1/26/2015 |
|  | | | | |
| THE PENTHOUSE CLUB (Stylized) & Three Key Design  | U.S. | 41: Entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners. 43: Restaurant, night club and bar services, limited to the Licensed Services. | 2,810,417 | 2/3/2004 |
| THE PENTHOUSE BEACH CLUB | Ukraine | 41: Entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners and night club services. | 158070 | 6/25/2012 |

*Exhibit A*
*Security Agreement*
*Master License Agreement between Penthouse Global Licensing, Inc., Kirkendoll Management, LLC and Penthouse Clubs Worldwide, LLC*

LA 132974420v1

State of California                    )          **CALIFORNIA ALL-PURPOSE**
County of _Los Angeles_   )          **CERTIFICATE OF ACKNOWLEDGMENT**

On _03|21|2017_ before me, _Relan. Belous, Notary_
(here insert name and title of the officer)

personally appeared _KELLY HolIAND_

_____ ,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the
State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

RELANI BELOUS
COMM. #2032672
Notary Public - California
Los Angeles County
My Comm. Expires July 6, 2017

Signature _____

                                                                    (Seal)

---------------------- *OPTIONAL INFORMATION* ----------------------

*Although the information in this section is not required by law, it could prevent fraudulent removal and reattachment of this acknowledgment to an unauthorized document and may prove useful to persons relying on the attached document.*

## Description of Attached Document

The preceding Certificate of Acknowledgment is attached to a document

titled/for the purpose of _Security Agreement (MSL)_

containing _____ pages, and dated _03|24|2017_.

The signer(s) capacity or authority is/are as:
☐ Individual(s)
☐ Attorney-in-Fact
☑ Corporate Officer _CEO_
                                    Title(s)

☐ Guardian/Conservator
☐ Partner - Limited/General
☐ Trustee(s)
☐ Other: _____

representing: _____
                Name(s) of Person(s) or Entity(ies) Signer Is Representing

**Additional Information**

Method of Signer Identification
Proved to me on the basis of satisfactory evidence:
☐ form(s) of identification ☐ credible witness(es)

Notarial event is detailed in notary journal on:
        Page #_____   Entry #_____

Notary contact:_____
Other
☐ Additional Signer(s)   ☐ Signer(s) Thumbprint(s)
☐ _____

© Copyright 2007-2012 Notary Rotary, Inc. PO Box 41400, Des Moines, IA 50311-0507. All Rights Reserved.  Part Number 101772.  Please contact your Authorized Reseller to purchase copies of this form.

**EXECUTION COPY**

### SHORT-FORM TRADEMARK LICENSE AGREEMENT

THIS SHORT-FORM TRADEMARK LICENSE AGREEMENT (this "License"), dated as of March ____, 2017 (the "Effective Date"), is entered into between Penthouse Global Licensing, Inc., a Delaware corporation ("Licensor"), on the one hand, and Kirkendoll Management, LLC, a Colorado limited liability company, and Penthouse Clubs Worldwide, LLC, a Delaware limited liability company (collectively, the "Licensee"), on the other hand. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in that certain Master License Agreement, dated as of the Effective Date (the "Master . License"), by and between Licensor and Licensee.

### WITNESSETH:

WHEREAS, Licensor and Licensee have entered into the Master License, pursuant to which, among other things, Licensor has licensed to Licensee, on an exclusive, worldwide, and transferable, sub-licensable and unlimited basis, the Licensed Marks.

NOW THEREFORE, in consideration of the mutual covenants and conditions contained herein, the Royalties and other consideration provided in the Master License, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Licensor and Licensee hereby agree as follows:

**1.** **License**. Licensor hereby grants to Licensee an exclusive, transferable, sub-licensable, unlimited license, free and clear of all Liens, to use, sublicense, franchise (and sub-franchise), and otherwise monetize, exploit and commercialize the Licensed Marks (as identified on Exhibit A hereto) anywhere in the world during the Term, in connection with the ownership, operation, marketing, and promotion of Gentlemen's Clubs, and restaurant, bar and cocktail lounge services directly related thereto (the "Licensed Services"), and the advertising and promotion of the Licensed Services through any media now known or hereafter devised, including the Internet, subject in all cases to all of the terms, conditions, and restrictions set forth in the Master License (the "License Grant").

**2.** **Reserved Rights**. Licensor reserves the right to use the Licensed Marks in connection with the advertising and promotion of Gentlemen's Clubs and the Licensed Services, and reserves to itself and for its sole benefit all other rights in and to the Licensed Marks not expressly granted to Licensee under the Master License.

**3.** **Acknowledgement of Ownership**. Licensee acknowledges that Licensor is the owner of the Licensed Marks. Any goodwill derived from the use of the Licensed Marks by Licensee shall inure to the benefit of Licensor. Except for Licensee's rights otherwise contemplated by Paragraph 1 above and the Transaction Documents, if Licensee acquires any rights in the Licensed Marks, by operation of law, or otherwise, such rights shall be deemed and are hereby irrevocably assigned to Licensor without further action by any of the Parties, and Licensee agrees not to dispute or challenge or assist any Person in disputing or challenging Licensor's rights in and to the Licensed Marks or the validity of the Licensed Marks.

{N3364269.4}
LA 132974574v1

1

**EXECUTION COPY**

**4.      Quality Control.**  Licensee (and all sub-licensees) shall utilize the Licensed Marks in substantial conformity to their current use, and subject to the quality control provisions set forth in the Master License.

**5.      Termination; Reversion.**  Except as otherwise provided in the Master License and the Transaction Documents, upon the expiration of the Term or any other termination of the Master License in accordance with its terms, among other effects, the License Grant and all rights in and to the Licensed Marks shall automatically and immediately revert back to Licensor, and this License shall terminate.

**6.      Recordation.**  Subject to Licensee's rights set forth in the Master License, upon Licensee's written request and at Licensee's reasonable expense, Licensor will file and record with the United States Patent and Trademark Office (the "USPTO") and all applicable foreign and other trademark registries maintained by any Governmental Entity this License (and any corresponding separate forms of such jurisdictions) with respect to a registration or application held by Licensor in the Licensed Marks in order to publicly reflect the License Grant to Licensee of the Licensed Marks for the Licensed Services as described herein.  In the event Licensor fails to file and record this License within five days of Licensee's written request, Licensor hereby authorizes Licensee to file and record this License in accordance with this Paragraph 6.  For the avoidance of doubt, the recordation of this License with the USPTO is merely intended to put third parties on notice of the License Grant and is not intended by the parties to be an assignment or transfer of ownership of Licensor's rights in and to the Licensed Marks.

**7.      Conflict.**  Notwithstanding anything to the contrary contained herein, the terms of this License are subject to the terms, conditions and limitations set forth in the Master License, and nothing contained in this License will be deemed to supersede, modify, limit or amend any of the rights, duties or obligations of Licensor or Licensee under the Master License, this License being intended only to memorialize the exclusive worldwide license to Licensee of the Licensed Marks in connection with the Licensed Services, as contemplated by the Master License.  In the event of any conflict or inconsistency between the terms of this License and the Master License, the terms of the Master License shall govern.

**8.      Successors and Assigns.**  The provisions of this License shall be binding upon and inure to the benefit of Licensor and Licensee, and their respective successors and permitted assigns.

**9.      Governing Law.**  This License shall be governed and construed in all respects under the laws of the State of Delaware (without regard to its conflict of laws rules).

**10.      Counterparts.**  This License may be executed in multiple counterparts, each of which shall be deemed to be an original, and all of which together will be one and the same instrument, and may be executed by facsimile, electronic or emailed signatures, all of which will be considered original signatures.

*[Signatures Appear on the Following Page]*

{N3364269.4}
*LA 132974574v1*

2

**EXECUTION COPY**

IN WITNESS WHEREOF, Licensor and Licensee have each caused this Short-Form Trademark License Agreement to be executed as of the Effective Date.

**LICENSOR:**

PENTHOUSE GLOBAL LICENSING, INC.

By: _Kelly Holland_

Name: Kelly Holland
Title:   Chief Executive Officer

**LICENSEE:**

KIRKENDOLL MANAGEMENT, LLC

By: _____
Name: John Kirkendoll
Title:  Manager

PENTHOUSE CLUBS WORLDWIDE, LLC

By: _____
Name: John Kirkendoll
Title:  Manager

*Signature Page*
*Short-Form Trademark License Agreement*
*Master License Agreement between Penthouse Global Licensing, Inc., Kirkendoll Management, LLC,*
*and Penthouse Clubs Worldwide, LLC*

LA 132974574v1

**EXECUTION COPY**

IN WITNESS WHEREOF. Licensor and Licensee have each caused this Short-Form Trademark License Agreement to be executed as of the Effective Date.

**LICENSOR:**

PENTHOUSE GLOBAL LICENSING, INC.

By: _____
Name: Kelly Holland
Title: Chief Executive Officer

**LICENSEE:**

KIRKENDOLL MANAGEMENT, LLC

By: _____
Name: John Kirkendoll
Title: Manager

PENTHOUSE CLUBS WORLDWIDE, LLC

By: _____
Name: John Kirkendoll
Title: Manager

*Signature Page*
*Short-Form Trademark License Agreement*
*Master License Agreement between Penthouse Global Licensing, Inc., Kirkendoll Management, LLC,*
*and Penthouse Clubs Worldwide, LLC*

LA 132974574v1

## EXHIBIT A

### LICENSED MARKS

| Mark | Country | Registration No. | Goods/Services (limited to the Licensed Services) |
|---|---|---|---|
| THE PENTHOUSE CLUB | Ukraine | 158069 | 43: Restaurant, night club and bar services (limited to the Licensed Services) |
| THE PENTHOUSE CLUB (w/ three key logo) | Macao | 88956 | 41: nightclub services; entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners; (all of the foregoing limited to the Licensed Services) |
| | New Zealand | 833185 | 41: Entertainment services, dance and choreography, adult entertainment, nightclub and live performance services, model searches, special appearances by young women selected as centerfolds or annual award winners. (all of the foregoing limited to the Licensed Services) |
| | U.S. | 2,810,417 | 41: Entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners (limited to the Licensed Services) 43: Restaurant, night club and bar services (limited to the Licensed Services) |
| PENTHOUSE KEY SUITES | U.S. | (86/876606) | 43: Restaurant and bar services (limited to the Licensed Services) |
| THE PENTHOUSE KEY SUITES (w/ one key logo) | Not Registered | Not Registered | Limited to the Licensed Services |
| THE PENTHOUSE KEY SUITES (w/ three key logo) | Not Registered | Not Registered | Limited to the Licensed Services |

*Exhibit A*
*Short-Form Trademark License Agreement*
*Master License Agreement between Penthouse Global Licensing, Inc., Kirkendoll Management, LLC,*
*and Penthouse Clubs Worldwide, LLC*

LA 132974574v1

**EXECUTION COPY**

| PENTHOUSE KEY SUITES / PENTHOUSE KEY SUITES | | | |
|---|---|---|---|
| Three Key Logo | Australia | 367684 | 41: Entertainment services (limited to the Licensed Services) |
| | Barbados | 81/20326 | 41: nightclub services (limited to the Licensed Services) |
| | Brazil | 816873348 | 41: Amusement, entertainment and auxiliary services (limited to the Licensed Services). |
| | Canada | TMA748,728 | 41: nightclub services (limited to the Licensed Services) |
| | China | 4281665 | 41: nightclub services (limited to the Licensed Services) |
| | EU | 4018776 | 41: nightclub services (limited to the Licensed Services) |
| | Germany | 2011612 | 41: Entertainment (limited to the Licensed Services) |
| | Indonesia | IDM000076878 | 41: nightclub services (limited to the Licensed Services). |
| | Liechtenstein | 8122 | 41: Entertainment (limited to the Licensed Services) |
| | New Zealand | 717684 | 41: nightclub services (limited to the Licensed Services) |
| | Russia | 128751 | 41: adult night clubs (limited to the Licensed Services) 42: cocktail lounges (limited to the Licensed Services) |
| | Trinidad & Tobago | 46293 | 41: entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners; nightclub services (all of the foregoing limited to the Licensed Services) |
| | Turks & Caicos | 14014 | 41: nightclub services (limited to the Licensed Services) |
| | Turks & Caicos | 14015 | 42: (old class 42, now Class 43): All services in (old) International Class 42, (limited to the Licensed Services). |
| | Ukraine | 65800 | 41: nightclub services (limited to the Licensed Services) |

*Exhibit A*
*Short-Form Trademark License Agreement*
*Master License Agreement between Penthouse Global Licensing, Inc., Kirkendoll Management, LLC,*
*and Penthouse Clubs Worldwide, LLC*

LA 132974574v1

| | UAE | 53386 | 41: nightclub services (limited to the Licensed Services). |
|---|---|---|---|
| | Vietnam | 72640 | 41: nightclub services (limited to the Licensed Services). |
| PENTHOUSE KEY GIRL | Ukraine | 158071 | 41: Entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners and night club services (limited to the Licensed Services)<br><br>43: Restaurant, night club and bar services (limited to the Licensed Services) |
| KEY GIRL (Stylized)<br><br>**KEY**GIRL | Not Registered | Not Registered | Limited to the Licensed Services |
| PENTHOUSE KEY CLUB | Not Registered | Not Registered | Limited to the Licensed Services |
| KEY CLUB | Not Registered | Not Registered | Limited to the Licensed Services |
| CALIGULA CLUB | Not Registered | Not Registered | Limited to the Licensed Services |
| PENTHOUSE CLUB | Japan | 4384068 | 41:  Limited to the Licensed Services<br><br>42: Serving food and drink (limited to the Licensed Services) |
| | Mexico | 903392 | 41:  night clubs (limited to the Licensed Services) |
| | Mexico | 921770 | 43: Services rendered through restaurants in order to provide food and beverages inside and outside of establishments (limited to the Licensed Services) |
| THE PENTHOUSE BEACH CLUB | Ukraine | 158070 | 41: Entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners and night club services (limited to the Licensed Services)<br><br>43: Restaurant, night club and bar services (limited to the Licensed Services) |

*Exhibit A*
*Short-Form Trademark License Agreement*
*Master License Agreement between Penthouse Global Licensing, Inc., Kirkendoll Management, LLC, and Penthouse Clubs Worldwide, LLC*

LA 132974574v1

**EXECUTION COPY**

### ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment and Assumption Agreement"), dated and effective as of March _____, 2017 (the "Effective Date"), is entered into between Penthouse Global Licensing, Inc., a Delaware corporation ("Assignor"), on the one hand, and Kirkendoll Management, LLC, a Colorado limited liability company, and Penthouse Clubs Worldwide, LLC, a Delaware limited liability company (collectively, the "Assignee"), on the other hand.  Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in that certain Master License Agreement, dated as of the Effective Date (the "Master License"), by and between Assignor and Assignee.

### W I T N E S S E T H :

WHEREAS, Assignor and Assignee have entered into the Master License, pursuant to which, among other things, Assignor has agreed to assign to Assignee, and Assignee has agreed to acquire from Assignor, the Third-Party Licenses (including the Third-Party Revenue).

NOW THEREFORE, in consideration of the mutual covenants and conditions contained herein, the Closing Consideration and other consideration provided in the Master License, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

**1.     Assignment and Transfer of Assets.**  Effective as of the Effective Date, but subject to Paragraph 3 below, Assignor hereby assigns to Assignee and its successors and assigns, free and clear of all Liens, and Assignee hereby accepts and acquires, all right, title and interest of Assignor and its Affiliates in, to and under the Third Party-Licenses set forth on Exhibit A hereto (including, without limitation, the Third-Party Revenue), together with all the rights and privileges pertaining thereto.  The foregoing assignment to Assignee is subject to and otherwise made in accordance with all of the representations, warranties, covenants and other agreements made by Assignor in the Master License.

**2.     No Assumption of Obligations.**  Subject in all respects to the Grant of Rights to Assignee set forth in the Master License (including the assignment of the Third-Party Licenses and rights appertaining thereto as described therein and herein), Assignee does not assume, shall not assume, and shall not be deemed to have assumed, (a) any liabilities or obligations of any nature whatsoever of, or arising out of Claims against, Assignor or its Affiliates or any of their respective licensees (and sub-licensees) or franchisees (and sub-franchisees) at any time prior to or after the Closing to the extent not arising out of or based on the actions, omissions or other conduct of Assignee or any of its licensees (or sub-licensees), or (b) any liabilities or obligations whatsoever arising out of or otherwise associated with the subject of the Grant of Rights provided in the Master License prior to the Closing, including, without limitation, any obligation to refund or otherwise repay to a third-party licensee or any other Person any deposit, fee, advance, up-front license payments or other refundable or recoupable amount paid or payable by such Person pursuant to and/or upon termination or renewal of any Third-Party License, regardless of whether such deposits, fees or other payments were re-allocated and/or distributed under a bankruptcy order affecting Assignor or its predecessors-in-title, or otherwise (as more fully set forth in, and subject to the terms and conditions of, Section 1.3 of the Master License).

**EXECUTION COPY**

**3.** **Termination; Reversion**. Except as otherwise provided in this Paragraph 3, upon the expiration of the Term or any other termination of the Master License in accordance with its terms, among other effects, all rights in and to the Third-Party Licenses shall automatically and immediately revert back to Assignor, and this Assignment and Assumption Agreement shall terminate. Notwithstanding the foregoing, in the event of a lawful foreclosure on the Secured Mark (as defined in the Security Agreement) by Assignee in accordance with the Master License and the Security Agreement, among other effects, the Third-Party Licenses shall not revert to Assignor and shall remain in full force and effect through the term of those Contracts, and Assignee shall continue to make its payments to Assignor under Section 1.4 of the Master License with respect thereto in accordance with the terms of the Master License and Security Agreement.

**4.** **Conflict**. Notwithstanding anything to the contrary contained herein, the terms of this Assignment and Assumption Agreement are subject to the terms, conditions and limitations set forth in the Master License, and nothing contained in this Assignment and Assumption Agreement will be deemed to supersede, modify, limit or amend any of the rights, duties or obligations of Assignor or Assignee under the Master License, this Assignment and Assumption Agreement being intended only to further effect the assignment to Assignee of the Third-Party Licenses and rights appertaining thereto, as contemplated by the Master License. In the event of any conflict or inconsistency between the terms of this Assignment and Assumption Agreement and the Master License, the terms of the Master License shall govern.

**5.** **Successors and Assigns**. The provisions of this Assignment and Assumption Agreement shall be binding upon and inure to the benefit of Assignor and Assignee, and their respective successors and assigns.

**6.** **Governing Law**. This Assignment and Assumption Agreement shall be governed and construed in all respects under the laws of the State of Delaware (without regard to its conflict of laws rules).

**7.** **Counterparts**. This Assignment and Assumption Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, and all of which together will be deemed to be one and the same instrument, and may be executed by facsimile, electronic or emailed signatures, all of which will be considered original signatures.

*[Signatures Appear on the Following Page]*

IN WITNESS WHEREOF, Assignor and Assignee each have caused this Assignment and Assumption Agreement to be executed as of the Effective Date.

**ASSIGNOR:**

PENTHOUSE GLOBAL LICENSING, INC.

By: _____

Name: Kelly Holland
Title:   Chief Executive Officer

**ASSIGNEE:**

KIRKENDOLL MANAGEMENT, LLC

By: _____
Name: John Kirkendoll
Title:  Manager

PENTHOUSE CLUBS WORLDWIDE, LLC

By: _____
Name: John Kirkendoll
Title:  Manager

*Signature Page*
*Assignment and Assumption Agreement*
*Master License Agreement between Penthouse Global Licensing, Inc., Kirkendoll Management, LLC,*
*and Penthouse Clubs Worldwide, LLC*

*LA 13297458Bv1*

IN WITNESS WHEREOF, Assignor and Assignee each have caused this Assignment and Assumption Agreement to be executed as of the Effective Date.

**ASSIGNOR:**

PENTHOUSE GLOBAL LICENSING, INC.

By: _____
Name: Kelly Holland
Title:   Chief Executive Officer

**ASSIGNEE:**

KIRKENDOLL MANAGEMENT, LLC

By: _____
Name: John Kirkendoll
Title: Manager

PENTHOUSE CLUBS WORLDWIDE, LLC

By: _____
Name: John Kirkendoll
Title: Manager

*Signature Page*
*Assignment and Assumption Agreement*
*Master License Agreement between Penthouse Global Licensing, Inc., Kirkendoll Management, LLC,*
*and Penthouse Clubs Worldwide, LLC*

LA 132574586v1

## EXHIBIT A

### THIRD-PARTY LICENSES

1. The Penthouse Club New Orleans – Club Licensing Agreement between General Media Communications, Inc. and American Club Restaurant, Inc., dated August 12, 2005

2. The Penthouse Club Tampa – Club Licensing Agreement between General Media Communications, Inc. and Tampa Food & Beverage, LLC, dated September 1, 2006, and amended by Amendment #1, Amendment #2 and Amendment #3, and that certain Amendment to Club Licensing Agreement dated November 30, 2012, effective as of October 31, 2012, and subsequently assigned to Westshore Food & Beverage, LLC on May 2016

3. The Penthouse Club Detroit – Club Licensing Agreement between General Media Communications, Inc. and ABCDE Land Development, LLC, dated January 10, 2007, and amended on October 30, 2010

4. The Penthouse Club Moscow – Club Licensing Agreement between General Media Communications, Inc. and Highland Group, LLC, dated April 2, 2010, and amended on April 30, 2015 and November 3, 2016

5. The Penthouse Club Baton Rouge – Adult Night Club Trademark License Agreement between General Media Communications, Inc. and Baton Rouge Sports Restaurant, LLC, dated April 15, 2010

6. The Penthouse Club Auckland – Adult Night Club License Agreement between General Media Communications, Inc. and Delores Properties Limited, dated January 30, 2011, and amended on September 19, 2013

7. The Penthouse Club San Francisco – Adult Night Club License Agreement between General Media Communications, Inc. and BT California, LLC, dated April 18, 2011

8. The Penthouse Club Paris – Trademark License Agreement between General Media Communications, Inc. and Sarl Sport Bar, dated April 1, 2012, and amended on October 31, 2012

9. The Penthouse Club Perth – Adult Night Club License Agreement between General Media Communications, Inc. and M&M Entertainment Pty Ltd., dated August 22, 2014

10. The Penthouse Club Philadelphia – Adult Night Club License Agreement between General Media Communications, Inc. and 3001 Castor, Inc., dated September 19, 2014

**EXECUTION COPY**

## KIRKENDOLL MANAGEMENT, LLC; PENTHOUSE CLUBS WORLDWIDE, LLC

### CLOSING CERTIFICATE

Pursuant to Section 2.3(a) of that certain Mater License Agreement (the "**Agreement**"), dated as of March _____, 2017, by and among Penthouse Global Licensing, Inc., a Delaware corporation (the "**Licensor**"), and Kirkendoll Management, LLC, a Colorado limited liability company ("**Kirkendoll**"), and Penthouse Clubs Worldwide, LLC, a Delaware limited liability company (together with Kirkendoll, the "**Licensee**"), the undersigned, on behalf of the Licensee, hereby certifies to the Licensor as follows. All capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Agreement.

1. The undersigned is an authorized person to act on behalf of the Licensee.

2. Attached hereto as Exhibit A are true and complete copies of all resolutions adopted by any necessary directors, officers, stockholders or other necessary Persons of the Licensee authorizing the execution, delivery and performance of the Agreement and the other Transaction Documents and the consummation of the Transaction and transactions contemplated by the Agreement, which resolutions have not been amended, rescinded or revoked and are in full force and effect as of the date hereof.

3. The individual listed below is the duly elected, qualified and acting Manager of the Licensee holding the offices set forth opposite his name, and the signature set forth opposite his name is the genuine signature of such Manager. The individual listed below has the authority to execute the Agreement and the other Transaction Documents, together with all certificates and documents to be delivered in connection with the Closing of the Agreement as set forth in Section 2.3 thereof.

| Name of Signatory | Office | Specimen Signature |
|---|---|---|
| John Kirkendoll | Manager of Kirkendoll Management, LLC and Penthouse Clubs Worldwide, LLC | |

4. Attached hereto as Exhibit B are certificates of good standing, dated as of the Closing (or, as necessary, the most recent practicable date), for the Licensee in its jurisdictions of organization.

IN WITNESS WHEREOF, this Closing Certificate has been executed as of the date first set forth above.

Name: Timothy Spratt
Title: Authorized Person

# EXHIBIT "F"

## WAIVER AND THIRD AMENDMENT
## TO LOAN AND SECURITY AGREEMENT

THIS WAIVER AND THIRD AMENDMENT TO LOAN AND SECURITY AGREEMENT (this "Amendment") is entered into as of May 19, 2017, by and among EXWORKS CAPITAL FUND I, L.P. ("Lender"), PENTHOUSE GLOBAL MEDIA, INC., a Delaware corporation ("Borrower") and each of the parties signatory hereto as a Loan Party Obligor.

WHEREAS, Borrower, Lender and Loan Party Obligors are parties to that certain Loan and Security Agreement dated as of February 19, 2016 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement");

WHEREAS, Borrower has requested and Lender has agreed, subject to the terms and conditions contained herein, to (i) waive certain Events of Default and (ii) amend the Loan Agreement in certain other respects, in each case as more fully detailed below;

NOW THEREFORE, in consideration of the premises and mutual agreements set forth in the Loan Agreement and this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Defined Terms.  Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Loan Agreement.

2.      Waiver.  Pursuant to the request of Borrower, subject to the satisfaction of the conditions set forth in Section 4 below and in reliance upon the representations and warranties set forth in Section 5 below, Lender hereby waives any Default or Event of Default that occurred prior to the date hereof as a result of the failure of Borrower to pay the outstanding balance of the Revolving Loans that exceeded the Maximum Revolving Facility Amount as required by Section 2.5(a) of the Loan Agreement.  The foregoing is a limited waiver and except to the extent expressly set forth herein, shall not constitute a modification or alteration of the terms, conditions or covenants of the Loan Agreement or any other Loan Document or a waiver, release or limitation upon the exercise by Lender of any of its rights, legal or equitable, hereunder or under the Loan Agreement or any other Loan Document.

3.      Amendments to Loan Agreement.  Subject to the satisfaction of the conditions set forth in Section 4 below and in reliance on the representations and warranties set forth in Section 5 below, the Loan Agreement is hereby amended as follows:

(a)      Section 1.1 of the Loan Agreement is hereby amended by amending and restating the following definitions set forth therein as follows:

*"PIK Rate"* means, from and after the Third Amendment Effective Date, a rate per annum of 0.00%.

*"Scheduled Maturity Date"* means April 30, 2018.

(b)     Section 1.1 of the Loan Agreement is hereby amended by inserting the following definitions in their appropriate alphabetical order therein as follows:

> *"Closing Date Term Loan"* has the meaning set forth in Section 2.1(c).

> *"Third Amendment"* means that certain Third Amendment to Loan and Security Agreement dated as of May 19, 2017, by and among Lender, Borrower and each Loan Party Obligor party thereto.

> *"Third Amendment Effective Date"* means May 19, 2017.

> *"Third Amendment Term Loan"* has the meaning set forth in Section 2.1(c).

(c)     Section 2.1(c) of the Loan Agreement is hereby amended and restated as follows:

> (c)     **Term Loan.** On the Closing Date, Lender made a term loan to Borrower in the initial amount of $3,000,000 (the "*Closing Date Term Loan*"). As of the Third Amendment Effective Date, immediately prior to giving effect to the Third Amendment, the outstanding balance of the Closing Date Term Loan is $1,667,415.68. Subject to the terms and conditions contained in this Agreement and the Third Amendment, Lender agrees to make an additional term loan to Borrower on the Third Amendment Effective Date in the initial principal amount of $590,143.64 (the "*Third Amendment Term Loan*", and, together with the Closing Date Term Loan, collectively, the "*Term Loan*"), which shall be utilized on the Third Amendment Effective Date to repay outstanding Revolving Loans in the amount of $590,143.64. After giving effect to the advance of the Third Amendment Term Loan on the Third Amendment Effective Date, the outstanding principal balance of the Term Loan is $2,257,559.32. Any principal amounts repaid in respect of the Term Loan may not be reborrowed. The Term Loan shall be made in and repayable in Dollars.

(d)     Section 3.1 of the Loan Agreement is hereby amended and restated as follows:

> **3.1.     Interest.** All Loans and other monetary Obligations shall bear interest at the Cash Rate, plus the PIK Rate; provided, that after the occurrence and during the continuation of an Event of Default, all Loans and other monetary Obligations shall bear interest at a rate per annum equal to two (2) percentage points in excess of the rate otherwise applicable thereto (the "Default Rate"). Accrued interest shall be payable (a) on the tenth day of each month in arrears for the prior month, (b) upon any prepayment of Loans in accordance with Section 2.6(a), (c) upon any prepayment of the Loans in accordance with Section 2.6(b), and (d) on the Maturity Date; provided, that interest accruing at the PIK Rate shall continue to accrue and not be payable in

2

cash in connection with an interest payment pursuant to clause (a) or (b) above. After the occurrence and during the continuance of an Event of Default, all interest (including interest accruing at the PIK Rate) shall be payable in cash on demand. To the extent not paid in cash when due, interest accruing at the PIK Rate shall be added to the outstanding principal balance of the Term Loan on the date of such required payment.

(e)     Section 9 of the Loan Agreement is hereby amended and restated as follows:

9.     **FINANCIAL COVENANTS.** Each Loan Party Obligor shall at all times comply with the following Financial Covenants:

9.1.     **[reserved].**

9.2.     **Minimum EBITDA.**     Borrower shall not permit EBITDA for any period set forth below to be less than the corresponding amount set forth below for such period:

| Period | Amount |
|---|---|
| the twelve-month period ended June 30, 2017 | $1,250,000 |
| the twelve-month period ended July 31, 2017 | $1,250,000 |
| the twelve-month period ended August 31, 2017 | $1,500,000 |
| the twelve-month period ended September 30, 2017 | $1,500,000 |
| the twelve-month period ended October 31, 2017 | $1,750,000 |
| the twelve-month period ended November 30, 2017 | $1,750,000 |
| the twelve-month period ended December 31, 2017 and the twelve-month period ending the last day of each calendar month thereafter | $2,000,000 |

9.3.     **[reserved].**

4.     Conditions to Effectiveness. The effectiveness of Sections 2, 3, and 7 of this Amendment shall be subject to the satisfaction of the following conditions precedent:

(a)     Lender shall have received a fully executed copy of this Amendment executed by each of the Loan Party Obligors, together with such other documents, agreements and instruments as Lender may require or reasonably request, all of which shall be in form and substance satisfactory to Lender;

(b)     Borrower shall have paid to Lender, to the extent requested by Lender on or prior to the date hereof, all reasonable out-of-pocket expenses of Lender in connection with the preparation, negotiation, execution, delivery and administration of this Amendment and

3

the transactions contemplated in connection herewith, as required by Section 14.7 of the Loan Agreement;

(c)     all proceedings taken in connection with the transactions contemplated by this Amendment and all documents, instruments and other legal matters incident thereto shall be reasonably satisfactory to Lender and its legal counsel; and

(d)     after giving effect to the waiver in Section 2, no Default or Event of Default shall have occurred and be continuing or shall be caused by the transactions contemplated by this Amendment.

5.     Representations and Warranties. In order to induce Lender to enter into this Amendment, Borrower and each other Loan Party Obligor each hereby represents and warrants to Lender, after giving effect to this Amendment:

(a)     the execution, delivery and performance of this Amendment has been duly authorized by all requisite corporate action on the part of Borrower and each other Loan Party Obligor and that this Amendment has been duly executed and delivered by Borrower and each other Loan Party Obligor;

(b)     all representations and warranties of any Loan Party contained in the Loan Agreement and the other Loan Documents are true and correct in all material respects on and as of the date of this Amendment, in each case as if made on and as of such date, other than representations and warranties stated to relate to a specific earlier date (in which case such representations and warranties were true and correct in all material respects on and as of such earlier date);

(c)     after giving effect to the waiver in Section 2, no Default or Event of Default has occurred and is continuing; and

(d)     this Amendment and the Loan Agreement, as amended hereby, constitute the legal, valid and binding obligations of Borrower and each other Loan Party Obligor and is enforceable against Borrower and each other Loan Party Obligor, each in accordance with its terms, subject to bankruptcy, insolvency and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity.

6.     Amendment Fee. In addition to and without limitation of any other fees set forth in and required to be paid pursuant to the Loan Agreement and the other Loan Documents, Borrower agrees to pay to Lender an amendment fee equal to $500,000, which shall be fully earned on the date hereof, payable on the Scheduled Maturity Date and non-refundable when paid.

7.     Extension of First Amendment Post-Closing Covenant.     Subject to the satisfaction of the conditions set forth in Section 4 of this Amendment and in reliance on the representations and warranties set forth in Section 5 of this Amendment, Borrower has requested and Lender hereby agrees to extend the due date of the following post-closing covenants required under the First Amendment to May 31, 2017 (or such later date as Lender may agree in writing in its sole discretion):

4

(i)     a certificate of the Secretary or Assistant Secretary (or other equivalent officer, partner or manager) of PGLI in form and substance reasonably satisfactory to Lender dated as of the date hereof which shall certify (I) copies of resolutions in form and substance reasonably satisfactory to Lender, of the board of directors (or other equivalent governing body, member or partner) of PGLI authorizing the execution, delivery and performance of the First Amendment, including the Joinder set forth in Section 4 of the First Amendment, and each other Loan Document executed in connection therewith to which PGLI is a party, and including authorization of the guaranty of indebtedness of the Borrower on a joint and several basis with all Loan Party Obligors as provided for in the Loan Agreement as amended thereby and the granting by PGLI of the security interests in and liens upon the Collateral to secure all of the Obligations of PGLI (and such certificate shall state that such resolutions have not been amended, modified, revoked or rescinded as of the date of such certificate), (II) the incumbency and signature of the officers of PGLI authorized to execute the First Amendment and the other Loan Documents, (III) copies of the Governing Documents of PGLI as in effect on such date, complete with all amendments thereto, and (IV) the good standing (or equivalent status) of PGLI in its jurisdiction of organization and each applicable jurisdiction where the conduct of PGLI's business activities or the ownership of its properties necessitates qualification, as evidenced by good standing certificate(s) (or the equivalent thereof issued by any applicable jurisdiction) dated not more than ten (10) days prior to the date of such certificate, issued by the Secretary of State or other appropriate official of each such jurisdiction;

(ii)    an executed legal opinion of counsel to PGLI, in form and substance reasonably satisfactory to Lender, which shall cover the existence and legal status of PGLI, corporate power of PGLI to enter into the First Amendment, due authorization, execution, delivery and enforceability of the First Amendment as to PGLI, and an opinion that PGLI's execution, delivery and performance of the First Amendment do no conflict with PGLI's Governing Documents, the Delaware Corporation Act or other applicable laws covered by the opinion; and

(iii)   joinders to such other Loan Documents as may be reasonably requested by Lender, all in form and substance reasonably satisfactory to Lender.

It is understood and agreed that a breach of this Section 7 shall result in an immediate Event of Default under the Loan Agreement.

8.      Release. Borrower and each other Loan Party Obligor on behalf of itself and its successors, assigns, heirs and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Lender and any and all Participants and Affiliates, and their respective successors and assigns, and their respective directors, officers, employees, attorneys and agents and any other Person affiliated with or representing Lender (collectively, the "Released Parties") of and from any and all liability, including all actual or potential claims, demands or causes of action of any kind, nature or description whatsoever, whether arising in law or equity or under contract or tort or under any state or federal law or otherwise, which Borrower or any Loan Party or any of their successors, assigns or other legal representatives has had, now has or has made claim to

5

have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever, including any liability arising from acts or omissions pertaining to the transactions contemplated by this Amendment, the Loan Agreement and the other Loan Documents, whether based on errors of judgment or mistake of law or fact, from the beginning of time to and including the date hereof, whether such claims, demands and causes of action are matured or known or unknown.

9.      Severability.  Any provision of this Amendment held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Amendment and the effect thereof shall be confined to the provision so held to be invalid or unenforceable.

10.     References.  Any reference to the Loan Agreement contained in any document, instrument or agreement executed in connection with the Loan Agreement shall be deemed to be a reference to the Loan Agreement as modified by this Amendment.

11.     Counterparts.  This Amendment may be executed in one or more counterparts, each of which shall constitute an original, but all of which taken together shall be one and the same instrument.  Receipt by telecopy or electronic mail of any executed signature page to this Amendment shall constitute effective delivery of such signature page.

12.     Ratification.  This Amendment, subject to satisfaction of the conditions set forth in Section 4, shall constitute an amendment to the Loan Agreement and all of the other Loan Documents as appropriate to achieve the intent of the agreements contained herein.  The terms and provisions set forth in this Amendment shall modify and supersede all inconsistent terms and provisions of the Loan Agreement and shall not be deemed to be a consent to the modification or waiver of any other term or condition of the Loan Agreement.  Except as expressly modified and superseded by this Amendment, the terms and provisions of the Loan Agreement and the other Loan Documents are ratified and confirmed and shall continue in full force and effect.

13.     Governing Law.  THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF ILLINOIS APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED THEREIN WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES.  FURTHER, THE LAW OF THE STATE OF ILLINOIS SHALL APPLY TO ALL DISPUTES OR CONTROVERSIES ARISING OUT OF OR CONNECTED TO OR WITH THIS AMENDMENT WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES.

14.     Consent to Jurisdiction; Waiver of Jury Trial.  ANY LEGAL ACTION, SUIT OR PROCEEDING WITH RESPECT TO THIS AMENDMENT SHALL BE BROUGHT EXCLUSIVELY IN THE COURTS OF THE STATE OF ILLINOIS IN THE COUNTY OF COOK OR IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS OR IN ANY OTHER COURT (IN ANY JURISDICTION) SELECTED BY THE LENDER IN ITS SOLE DISCRETION, AND BORROWER AND EACH OTHER LOAN PARTY OBLIGOR HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE

6

JURISDICTION OF THE AFOREMENTIONED COURTS. BORROWER AND EACH OTHER LOAN PARTY OBLIGOR HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, OR BASED ON 28 U.S.C. § 1404, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING AND ADJUDICATION OF ANY SUCH ACTION, SUIT OR PROCEEDING IN ANY OF THE AFOREMENTIONED COURTS AND AMENDMENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT. BORROWER AND EACH OTHER LOAN PARTY OBLIGOR HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AMENDMENT AND AGREES THAT ANY SUCH ACTION, PROCEEDING OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. BORROWER AND EACH OTHER LOAN PARTY OBLIGOR HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON BORROWER OR ANY OTHER LOAN PARTY OBLIGOR AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY CERTIFIED MAIL (RETURN RECEIPT REQUESTED) DIRECTED TO BORROWER'S NOTICE ADDRESS (ON BEHALF OF BORROWER OR SUCH LOAN PARTY OBLIGOR) SET FORTH IN SECTION 14.1 OF THE LOAN AGREEMENT AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED FIVE DAYS AFTER THE SAME SHALL HAVE BEEN SO DEPOSITED IN THE MAIL, OR, AT THE LENDER'S OPTION, BY SERVICE UPON BORROWER OR ANY OTHER LOAN PARTY OBLIGOR IN ANY OTHER MANNER PROVIDED UNDER THE RULES OF ANY SUCH COURTS.

**[Signature pages follow]**

7

The parties hereto have caused this Amendment to be duly executed and delivered by their duly authorized officers as of the date first set forth above.

PENTHOUSE GLOBAL MEDIA, INC.,
as Borrower

By: _Kelly Holland_
Name: _Kelly Holland_
Title: _CEO_

GMCI INTERNET OPERATIONS, INC.,
as a Loan Party Obligor

By: _Kelly Holland_
Name: _Kelly Holland_
Title: _CEO_

GMI ON-LINE VENTURES, LTD.,
as a Loan Party Obligor

By: _Kelly Holland_
Name: _Kelly Holland_
Title: _CEO_

GENERAL MEDIA COMMUNICATIONS, INC.,
as a Loan Party Obligor

By: _Kelly Holland_
Name: _Kelly Holland_
Title: _CEO_

GENERAL MEDIA ENTERTAINMENT, INC.,
as a Loan Party Obligor

By: _Kelly Holland_
Name: _Kelly Holland_
Title: _CEO_

PMGI HOLDINGS INC.,
as a Loan Party Obligor

By: _____
Name: Kelly Holland
Title: CEO

PENTHOUSE DIGITAL MEDIA PRODUCTIONS
INC.,
as a Loan Party Obligor

By: _____
Name: Kelly Holland
Title: CEO

PENTHOUSE IMAGES ACQUISITIONS, LTD.,
as a Loan Party Obligor

By: _____
Name: Kelly Holland
Title: CEO

PURE ENTERTAINMENT
TELECOMMUNICATIONS, INC.,
as a Loan Party Obligor

By: _____
Name: Kelly Holland
Title: CEO

XVHUB GROUP INC.,
as a Loan Party Obligor

By: _____
Name: Kelly Holland
Title: CEO

DANNI ASHE, INC.,
as a Loan Party Obligor

By: _____
Name: _____
Title: _CEO_____

STREAMRAY STUDIOS INC.,
as a Loan Party Obligor

By: _____
Name: _____
Title: _CEO_____

TAN DOOR MEDIA INC.,
as a Loan Party Obligor

By: _____
Name: _____
Title: _CEO_____

PENTHOUSE GLOBAL LICENSING, INC.,
as a Loan Party Obligor

By: _____
Name: _____
Title: _CEO_____

EXWORKS CAPITAL FUND I, L.P.,
as Lender

By: _____

Name: Robert Richardson
Title: Authorized Signatory

# EXHIBIT "G"

September 27, 2017

**VIA EMAIL AND FEDERAL EXPRESS**

PENTHOUSE GLOBAL MEDIA, INC.
8944 Mason Street
Chatsworth, CA 91311
Attention: Kelly Holland
Email: chickmedia@gmail.com

**Re:    Notice of Default and Reservation of Rights**

Ladies and Gentlemen:

Reference is made to that certain Loan and Security Agreement dated as of February 19, 2016 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), by and among ExWorks Capital Fund I, L.P. ("Lender"), Penthouse Global Media, Inc., a Delaware corporation ("Borrower") and each of the parties thereto as a Loan Party Obligor.  Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

Borrower is hereby notified of the occurrence and continuation of certain Events of Default under the Loan Agreement (the "Existing Events of Default") arising in each case pursuant to Section 11.1(a)(i) of the Loan Agreement as a result of Borrower's failure to (i) make payments of interest required to be paid by Section 3.1 of the Loan Agreement on each of June 10, 2017, July 10, 2017, August 10, 2017, and September 10, 2017, (ii) make payments certain fees set forth in the Fee Letter, required to be paid by Section 3.2 of the Loan Agreement on each of June 1, 2017, July 1, 2017, August 1, 2017, and September 1, 2017.

Lender is presently evaluating whether to exercise the rights and remedies available to it under the Loan Agreement, the other Loan Documents and applicable law in respect of the Existing Events of Default.  Lender has not waived, is not by this notice waiving, and has no current intention of waiving, the Existing Events of Default or any other Default or Event of Default which may be continuing on the date hereof or any Default or Event of Default which may occur after the date hereof (whether the same or similar to the Existing Events of Default or otherwise).  Lender has not agreed to forbear with respect to any of its rights or remedies concerning the Existing Events of Default or any other Event of Default occurring at any time.  Lender reserves the right, in its discretion, to exercise any or all of its rights and remedies under the Loan Agreement and the other Loan Documents as a result of the Existing Events of Default or any other Event of Default occurring at any time.  Lender has not waived any of such rights or remedies, and nothing herein, and no delay on Lender's part in exercising any such rights or remedies, should be construed as a waiver of any such rights or remedies.

Without limiting in any way the terms of the Loan Documents, Borrower is hereby notified that, as a result of the occurrence and continuation of the Existing Events of Default, among other things: (i) pursuant to Section 3.1 of the Loan Agreement, commencing on the earliest date on which an Existing Event of Default first occurred, all Loans and other monetary Obligations shall bear interest at a rate per annum equal to two (2) percentage points in excess of the rate otherwise applicable thereto, and (ii) except as may otherwise be agreed by Lender, pursuant to Section 4.2 of the Loan Agreement, Lender has no obligation to make further Loans or any other extensions of credit.

[Signature Page Follows]

-2-

Very truly yours,

**EXWORKS CAPITAL FUND I, L.P.**, as Lender

By: _____

Name: Robert Richardson
Title: Vice President

cc (by e-mail):     Richard M. Kohn, Esq.
                Christopher M. Swartout, Esq.
                Barry L. Dastin, Esq.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **DECLARATION OF ROBERT RICHARDSON IN SUPPORT OF DREAM MEDIA CORPORATION'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. §362 (PERSONAL PROPERTY)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **January 24, 2018**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Krikor J Meshefejian    kjm@lnbrb.com
- S Margaux Ross    margaux.ross@usdoj.gov
- Michael St James    ecf@stjames-law.com
- Howard Steinberg    steinbergh@gtlaw.com, pearsallt@gtlaw.com;laik@gtlaw.com
- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov
- Michael H Weiss    mw@weissandspees.com, lm@weissandspees.com
- Beth Ann R Young    bry@lnbyb.com

**2.  SERVED BY UNITED STATES MAIL**: On **January 24, 2018**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

S Margaux Ross
Office of the U.S. Trustee
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017

Debtor (Lead)
Penthouse Global Media, Inc., et al.
8944 Mason Ave.
Chatsworth, CA 91311

☒ *Service information continued on attached page*

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **January 24, 2018**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**SERVED BY PERSONAL DELIVERY**
Hon. Martin R. Barash
United States Bankruptcy Court
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA 91367

☒ *Service information continued on attached page* ***SERVED BY EMAIL***

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| January 24, 2018 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**

## SERVICE BY U.S. MAIL AND/OR E-MAIL

# Mailing list top 20 creditors

## Penthouse Global Media, Inc.

EXWORKS Capital Funds I LP
333 W Wacker Drive Suite 1620
Chicago, IL 60606

DREAM MEDIA Corporation
10990 Wilshire Blvd Penthouse
Los Angeles, CA 90024

Greenberg Traurig, LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067

Bayard, P.A.
222 Delaware Ave., Suite 900
P. O. Box 25130
Wilmington, DE 19899

TGG Accounting
10188 Telesis Court, Suite 130
San Diego, CA 92121

Hogan Lovells US, LLP
1999 Avenue of The Stars, Suite 1400
Los Angeles, CA 90067

Squar Milner LLP
4100 Newport Place, Suite 600
Newport Beach, CA 92660

Miller Law Group
111 Sutter Street, Suite 700
San Francisco, CA 94104

Sedgwick, LLP
2301 McGee Street, Suite 500
Kansas City, MO 64108-2662

Allen, Dyer, Dopplet, Milbrath & Gilchris
255 South Orange Ave., Suite 1401
Orlando, FL 32801

Bressler Law PLLC IOLTA Account
3 West 35th Street, 9th Floor
New York, NY 10001

Premium Assignment Corporation/Marsh USA
P. O. Box 8000
Tallahassee, FL 32314-8000

California Choice Benefit Administrators
721 South Parker, Suite 200
Orange, CA 92868

Tom Fox
P. O. Box 2402
Santa Cruz, CA 95063

Total Records Information Management LLC
371 Starke Road
Carlstadt, NJ 07072

Iron Mountain
1000 Campus Drive
Collegeville, PA 19426

Akerman LLP
601 West Fifth Street, Suite 300
Los Angeles, CA 90071

GRM Information Management Services, Inc.
P. O. Box 35539
Newark, NJ 07193-5539

C.Hocquel Inc.
8310 Jayseel Street
Sunland, CA 91040

Allgemeines Treuunternehmen (ATU)
Aeulestrasse 5 P. O. Box 83
9490 Vaduz
Furstentum, Liechtenstein

DSS Consulting Corporation
638 Lindero Canyon Road, Suite 117
Oak Park, CA 91377

Nextgen Reporting
999 Old Eagle School, Suite 118
Wayne, PA 19087

## Penthouse Global Broadcasting, Inc.

M7 Group
L1246 2 rue Albert Borschette
Luxembourg

Basmedia B.V.
Pluggematen2
8331TV
Steenwijk, The Netherlands

Mile High
8148 Devonshire
Ville Mont-Royal
Quebec, Canada H4P2K3

Elle et Lui, LLC
761 S. Rainbow # 120
Las Vegas, NV 89145

Interactive Media AG
Einsiedlestrasse 23
CH-8834 Schindellegi SZ
Switzerland

PHE, Inc.
302 Meadowland Drive
Hillsborough, NC 27278

Art Attack Productions/ReVideo Inc.
10945 Old Santa Susana Pass
Chatsworth, CA 91311

Fluffy White Dog Media
8033 Sunset Blvd., Suite 308
Los Angeles, CA 90046

Priority Workforce
2170 S Towne Center Pl, # 350
Anaheim, CA 92806

FedEx
P. O. Box 7221
Pasadena, CA 91109-7321

SESAC, Inc.
35 Music Square E
Nashville, TN 37203

Digital Media Consultants, LLC
21781 Ventura Blvd., Suite 644
Woodland Hills, CA 91364

Jason Bekoski
168 E. Port Hueneme Road
Port Hueneme, CA 93041

Arkena SAS
15 Rue Cognacq-Jay
75007 Paris, France

Combat Zone
9909 Topanga Canyon Blvd., #20
Chatsworth, CA 91311

Szili Miklos
Adademia Korut 67
6000, Kecskemet, Hungary

Emily Palan
2412 Delancey Place
Philadelphia, PA 19103

Bizarre Video
21621 Nordhoff St., Suite B
Chatsworth, CA 91311

Nathanael Kalfa Consulting
Chaussee de Gand, 443
1080 Brussels, Belgium

Verizon – UpLynk
13031 W Jefferson Blvd., Bldg 900
Los Angeles, CA 90094

## Penthouse Global Licensing, Inc.

Pryor Cashman LLP
7 Times Square
New York, NY 10036

Max J. Sprecher, Law Office of
5850 Canoga Ave., 4th Floor
Woodland Hills, CA 91367

Corsearch
P. O. Box 4349
Carol Stream, IL 60197-4349

E.D. Publications Inc.
2431 Estancia Blvd., Bldg B
Clearwater, FL 33761-2608

Dennemeyer & Associates
55, rue des Bruyeres
L-1274 Howald, Luxembourg

## Penthouse Global Digital, Inc.

MojoHost
30300 Telegraph Road, Suite 300
Bingham Farms, MI 48025

Mannassi IT Solutions
22222 Sherman Way, Suite 206
Canoga Park, CA 91303

Ninja Partners, Inc.
1621 E. 6th Street, Suite 1130
Austin, TX 78702

NetNames USA Inc.
2711 Centerville Rd
Wilmington, DE 19808

Corporation Service Company
P. O. Box 13397
Philadelphia, PA 19101-3397

Cyber Pro Hosting
P. O. Box 26203
Milwaukee, WI 53226

WebDot Calm
237 Town Center West, # 267
Santa Maria, CA 93458

Hollywood Vaults Inc.
742 Seward Street
Hollywood, CA 90038

Philip Tranker
adenamediacorp@gmail.com
David Tanguay
537 Rue Helene-Baillargeon
Montreal, Quebec H2J4E8
Canada

Christine Pevarnik
2863 Brookside Drive
Mobile, AL 36693

Qisheng Wu
adenamediacorp@gmail.com

Vladyslav Plashchevatyi
xfive@setds.net

Sergio Freixas
deicox@gmail.com

SternDoor Inc.
affiliate@idealgasm.com

Arash Dadashzadeh
contact@pornixe.com

EX Situ Marketing
penthousepartners@thebestpartner.com
Marcella Monteleon
Marcym25@sweetspicy.com

Steven Moser
601 Stevens St., SW
Watertown, MN 55388

Kelly Publishing
255 S Rengstorff Ave., Apt 132
Mountain View, CA 94040

## Penthouse Global Publishing, Inc.

Creel Printing
6330 West Sunset Road
Las Vegas, NV 89118

Palm Coast Data LLC
11 Commerce Blvd.
Palm Coast, FL 32164

DVD Factory
7230 Coldwater Canyon
North Hollywood, CA 91605

Barbara F. Pizio
2342 82nd Street, Apt 3
Brooklyn, NY 11214

Zinio, LLC
75 Remittance Dr., Dept 6825
Chicago, IL 60675-6825

Edgewood Paper
115A Floral Vale Blvd.
Yardley, PA 19067-5529
Hudson News Distributors, LLC
701-705 Jefferson Road
Parsippany, NJ 07054

PR Newswire Association LLC
G.P.O. Box 5897
New York, NY 10087-5897

Getty Images
P. O. Box 953604
St. Louise, MO 63195-3604

V&M Design/Amanda Flores
13226 Azores Ave
Sylmar, CA 91342

Todd Francis
4328 Grand View Blvd.
Los Angeles, CA 90066

Philip J. Hanrahan Jr.
6031 N lake Drive
Whitefish Bay, WI 53217

Alan Dershowitz Consulting LLC
1675 N. Military Trail, 5th floor
Boca Raton, FL 33486

Pretty Things Press
P. O. Box 55
Point Reyes Station, CA 94956

Thomas Morton
288 Graham Ave., #1
Brooklyn, NY 11211

Drew Millard
115 W Woodridge Drive
Durham, NC 27707

Michael Hingston
11203-71 Avenue
Edmonton, AB
Canada, AB T6G 0A5

Apparel Brand Consultants LLC
97-05 24th Avenue
East Elmhurst, NY 11369

Disgraceful Inc.
24303 Woolsey Cyn Rd, Spc 31
West Hills, CA 91304

Matt Gallagher
112 Withers Street, Apt 2
Brooklyn, NY 11211