Michael H. Weiss (State Bar Number 107481)
mw@weissandspees.com
Laura J. Meltzer (State Bar Number 151889)
lm@weissandspees.com
WEISS & SPEES, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067-2701
Telephone: 424-245-3100
Facsimile: 424-217-4160

[Proposed] Attorneys for Debtors and Debtors in Possession
Penthouse Global Media, Inc. et al.

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| IN RE<br><br>PENTHOUSE GLOBAL MEDIA, INC., a Delaware corporation<br><br>Debtor. | Case No. 1:18-bk-10098-MB<br><br>Chapter 11<br>Jointly Administered With:<br><br>Case No. 1:18-bk-10099-MB<br>Case No. 1:18-bk-10101-MB |
| In re:<br>  Penthouse Global Broadcasting, Inc.<br>  Penthouse Global Licensing, Inc.<br>  Penthouse Global Digital, Inc.<br>  Penthouse Global Publishing, Inc.<br>  GMI Online Ventures, Ltd.<br>  Penthouse Digital Media Productions, Inc.<br>  Tan Door Media, Inc.<br>  Penthouse Images Acquisitions, Ltd.<br>  Pure Entertainment Telecommunications, Inc.<br>  XVHUB Group, Inc.<br>  General Media Communications, Inc.<br>  General Media Entertainment, Inc.<br>  Danni Ashe, Inc.<br>  Streamray Studios, Inc.<br><br>    **X** Affects All Debtors<br>    □ Affects:<br>    □ Affects<br>    □ Affects<br>    □ Affects<br>    □ See attached for additional Debtors | Case No. 1:18-bk-10102-MB<br>Case No. 1:18-bk-10103-MB<br>Case No. 1:18-bk-10104-MB<br>Case No. 1:18-bk-10105-MB<br>Case No. 1:18-bk-10106-MB<br>Case No. 1:18-bk-10107-MB<br>Case No. 1:18-bk-10108-MB<br>Case No. 1:18-bk-10109-MB<br>Case No. 1:18-bk-10110-MB<br>Case No. 1:18-bk-10111-MB<br>Case No. 1:18-bk-10112-MB<br>Case No. 1:18-bk-10113-MB<br><br>**CORRECTED DECLARATIONS OF KELLY HOLLAND, CATHERINE BRANDT AND KEITH WHITWORTH RE: MOTIONS FOR APPROVAL OF LICENSING AGREEMENT OUT OF THE ORDINARY COURSE OF BUSINESS AND FOR INTERIM USE OF CASH COLLATERAL [BATES STAMPED EXHIBITS]**<br><u>Hearing:</u><br>Date:    February 5, 2018<br>Time:    1:00 PM<br>Place:    Room 303 |

1

# DECLARATION OF KELLY HOLLAND

I, KELLY HOLLAND, declare as follows:

1.     I am the Chief Executive Officer of debtor and debtor in possession Penthouse Global Media, Inc. [Case No. 1:18-bk-10098]("PGMI"). I have personal knowledge of the facts set forth herein and would competently testify thereto. This declaration is made in support of PGMI's motion for interim use of cash collateral and for approval of a licensing agreement with Androcles Entertainment PTY LTD ("Androcles") out of the ordinary course of business.

2.     I formed PGMI to acquire the stock of the various subsidiaries of Friend Finder Networks Inc. (the "Seller") that comprise the business and operations of the Penthouse brand. That acquisition closed on February 19, 2016.

3.     PGMI is currently comprised of 4 separate operating divisions:

   a) Penthouse Global Broadcasting, Inc. [Case No. 1:18-bk-10099]: PGMI operates 8 Channels in over 100 countries. The Broadcast division accounts for approximately 50% of the company's revenue;

   b) Penthouse Global Publishing, Inc. [Case No. 1:18-bk-10103]: PGMI is defined by the iconic Penthouse Magazine as well as Penthouse Letters;

   c) Penthouse Global Licensing, Inc. [Case No. 1:18-bk-10101]: PGMI has licensing agreements that rely on its extensive trademark and media library. Licenses range from apparel to fragrances and books; and

   d) Penthouse Global Digital, Inc. [Case No. 1:18-bk-10102]: PGMI runs membership sites as well as several free sites.

4.     Penthouse currently has 33 employees, multiple outside consultants and publishing contributors with gross annual revenues of about $10,000,000.

## ANDROCLES CONTRACT

5.     On January 15, 2018, my counsel, Michael Weiss, introduced me to Timothy Driver. I met with Mr. Driver at Penthouse's offices and discussed the possibility of how Penthouse could participate as crypto-currency offering (ICO) directed at the adult entertainment industry. I have no prior contact with Mr. Driver.

WEISS & SPEES, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067-2701
Tel: (424) 245-3100

6.      After about two weeks of negotiations, PGMI and Androcles Entertainment PTY

Ltd., an Australian company formed for the purposes of this transaction entered into the

agreement styled: TRADEMARK AND TRADE-NAME AND COPYRIGHT LICENSE

AGREEMENT (the "License Agreement").  A true and correct copy of the License Agreement is

attached as Exhibit "1".

7.      The License Agreement has a number of significant advantages for Penthouse:

    a.  It provides working capital to allow Penthouse to remain open and

      operating because as of February 7, 2018, Penthouse will run out of

      operating cash;

    b.  If the License fee under the License agreement is fully paid, Penthouse

      should sufficient operating capital until the end of the year.

    c.  The non-exclusive license granted to Androcles does not interfere with any

      other license currently in place.

    d.  By remaining open, Penthouse will preserve the value of 60 broadcasting

      and digital media contracts.  Those contracts represent approximately 60%

      of Penthouse's revenues and virtually all of its profits.

    e.  To keep the broadcasting contracts going, Penthouse has to create, acquire

      or license approximately 15 hours of content programming each month for

      delivery to broadcasters and other digital content distribution channels.

    f.  Should the supply of content programming cease, the revenues will cease

      as the broadcaster and related distribution channels will stop paying for

      content.

    g.  The License Agreement is very favorable because it supplies $1,000,000 in

      revenue with virtually no associated cost.

    h.  If the Initial Coin Offering contemplated by the License Agreement is

      successful, Penthouse own approximately 10% of the offering and stand to

      earn substantially more revenue both in digital coins and cash.  The exact

      amount of that will not be known until the offering occurs.

WEISS & SPEES, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067-2701
Tel: (424) 245-3100

I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct and that this declaration was executed on this 28th day of January 2018 at

Chatsworth, California.

KELLY HOLLAND

WEISS & SPIES, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067-2701
Tel: (424) 245-3100

# DECLARATION OF CATHERINE BRANDT

I, CATHERINE BRANDT, declare as follows:

1.    I am the Chief Operating Officer of debtor and debtor in possession Penthouse Global Media, Inc. [Case No. 1:18-bk-10098]("PGMI"). I have personal knowledge of the facts set forth herein and would competently testify thereto.  This declaration is made in support of PGMI's motion for interim use of cash collateral and for approval of a licensing agreement with Androcles Entertainment PTY LTD ("Androcles") out of the ordinary course of business.

2.    I am familiar with the books and records of PGMI and its subsidiaries.  I know these books and records are kept in the ordinary course of PGMI's business by its employees in the ordinary course and scope of their duties and that they record the transactions reflected in those books and records at or about the time of the transaction.

3.    Based on PGMI's books and records, I have a projected "cash flow." i.e., projected sources of and uses of cash, attached as Exhibit "2" hereto.

4.    Exhibit "3" tracks Debtors' daily bank balances since the Petition Date.  Debtors have used $175,557.72 in cash with the consent of Dream Media Corporation for the following uses:

| Payee | Amount | Date |
|---|---|---|
| Dali Lou Ranch Media (shooting expense) | $2,400.00 | 1/17/2018 |
| Priority Workforce (post-petition editing workers) | $3,157.20 | 1/17/2018 |
| PalmCoast Data (fulfillment for print) | $58,293.40 | 1/19/2018 |
| Creel Printing | $5,000.00 | 1/22/2018 |
| Cal Choice (employee health insurance) | $25,338.65 | 1/23/2018 |
| Choice Builder (employee health insurance) | $2,023.07 | 1/23/2018 |
| Paychex (payroll) | $45,021.40 | 1/26/2018 |
| Mile High (purchased video content) | $23,000.00 | 1/26/2018 |
| PalmCoast Data (fulfillment for print) | $11,324.00 | 1/26/2018 |
| Total | $175,557.72 | |

Dream Media Corporation approved $500.00 petty cash disbursement.  Attached Exhibit "4" reflects the emails and other correspondence from Dream Media Corporation or its counsel conveying such consent.

5.    In making that projections in Exhibit "2", I assumed the following:

a)    ExWorks/Dream Media will cease its sweep about $60,000 per month from

PGMI's pre-petition account at ending 9062 at East West Bank by PGMI.
ExWorks/Dream Media have received post-petition cash sweeps of $29,900.32
through January 26, 2018;

b) PGMI will receive $200,000 every thirty (30) days commencing on February
1, 2018 from the licensing agreement with Androcles (Exhibit "1");

c) Insiders, Kelly Holland, Keith Whitworth and I, will receive our normal
salaries after said insider compensation is approved (I understand that Debtors
will submit Notices of Setting Insider Compensation [Form USTLA-12]
simultaneously with this declaration);

d) The projected expenses and revenues consistent with the Debtors' actual
expenses of 4Q 2017 and since the beginning of this year;

e) The revenues include $30,000 to be paid at the end Februarys from Telenet
annual contract was not in original projections due to the fact that Telenet
payment for 2017 were differed to December 2017. In 2018 the contract
stipulates two payments, one in February for $ 30 000 and another $ 30 000 in
July;

f) The projected revenues are from customer invoices on due dates entered in
accounting by January 25th for the corresponding months, as well as contracted
schedules and the payment trends the customers have shown in 4Q 2017 and
since the beginning of the year;

g) Exhibit "2" reflects all payments and receipts through January 26, 2018.

I declare under the penalty of perjury under the laws of the United States that the
foregoing is true and correct and that I executed this declaration on January 28, 2018 in
Chatsworth, California.

Catherine Brandt

WEISS & SPEES, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067-2700
Tel 424-245-1100

## DECLARATION OF KEITH WHITWORTH

I, KEITH WHITWORTH, declare as follows:

1.     I am an individual and the Chief Financial Officer of Penthouse Global Media, Inc. I have personal knowledge of the facts set forth below and would competently testify thereto. This declaration is made in support of PGMI's motion for interim use of cash collateral and for approval of a licensing agreement with Androcles Entertainment PTY LTD ("Androcles") out of the ordinary course of business.

2.     As Chief Financial Officer, I am familiar with the books and records of PGMI and its subsidiaries.  I know these books and records are kept in the ordinary course of PGMI's business by its employees in the ordinary course and scope of their duties and that they record the transactions reflected in those books and records at or about the time of the transaction.

3.     Based on PGMI's books and records and the projected "cash flow." i.e., projected sources of and uses of cash attached as Exhibit "2" hereto prepared by Catherine Brandt, I prepared the table attached as Exhibit "5" which illustrates the bi-weekly adjustments to the "asset" side of PGMI's consolidated balance sheet over the period from January 11, 2018 to April 20, 2018 (the "Reporting Period").  The cash balances in Exhibit '2' do not reflect $713.28 that was in the Debtors' Bank of America account.

4.     Attached Exhibit "5", which I prepared, tracks the cash position of Debtors from the date of filing Debtors' petitions on January 11, 2018 through April 20, 2018.  In light of the Androcles licensing agreement, Debtors' will be able to maintain a cash balance on a bi-weekly basis on no less than $98,976 with projected cash balance of $495,831 at the end of the Reporting Period on April 20, 2018.

5.     The cash balances in Exhibit "5" reflect that Debtors had aggregate cash balances $103,641 on the Petition Date, and that Debtors have paid $30,000.00 to Dream Media Corporation/ExWorks Capital Fund I, L.P. (collectively, "Lenders") that was swept from PGMI account at East West Bank ending in 9062 through January 26, 2018.

6.     After Debtors discovered serious accounting irregularities in 2017, they engaged TGG Accounting to make suggestions for adjustments to Debtors' financial statements so that

WEISS & SPIES, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067-2701
Tel: (424) 245-3100

Debtors could file their 2016 tax returns. TGG updated and adjusted the opening balance in Debtors' QuickBooks accounting system to allow Debtors to file their returns. A copy of the financial statements report as adjusted are attached as Exhibit "6". My analysis uses Debtors' financial statements as adjusted and includes my subsequent adjustments to reflect changes that are appropriate since TGG adjusted opening balances.

7.    The accounts receivable balance of $663,386 on January 11, 2018, reflects the amount on the books and records of Debtors after adjustments recommended by TGG Accounting and my subsequent adjustments. Even without the Androcles agreement, I project accounts receivable will accrete by $425,705 during the Reporting Period. The value of accounts receivable reflect accruals for accounts that are paid on a quarterly and annual basis.

8.    After adjustments made to the book value of Debtors' film library recommended by TGG Accounting, I project the value of the library accrete by $203,000 during the Reporting Period from $4,073,324 to $4,276,324.

9.    I have assumed that the "Brand Value" remains at $7,000,000 as agreed in the ExWorks loan documents because Debtors continue to operate substantially in the manner they did when they entered into that loan agreement.

I declare under of penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on this 28th day of January, 2018 at Chatsworth, California.

KEITH WHITWORTH

WEISS & SPEES, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067-2701
Tel: (424) 245-3100

# EXHIBIT 1

# TRADEMARK AND TRADE - NAME AND COPYRIGHT LICENSE AGREEMENT

Made as of January 27th, 2018

**Between**

## PENTHOUSE GLOBAL MEDIA INC.

**as Licensor**

**and**

## ANDROCLES ENTERTAINMENT PTY LTD

**ACN 624 032 177**

**as Licensee**

---

**10**

# TRADEMARK & TRADE NAME & COPYRIGHT LICENSE AGREEMENT

Made as of January 27th, 2018

Between

## PENTHOUSE GLOBAL MEDIA INC.

as Licensor

and

## ANDROCLES ENTERTAINMENT PTY LTD

### ACN 624 032 177

as Licensee

## FOR VALUE RECEIVED, the parties agree as follows:

### 1. – DEFINITIONS

1.1.    In this Agreement

(1)    ***Person*** means a natural person, a corporation, a partnership, a trust, a joint venture, any governmental authority or any other entity or organization

(2)    ***Copyright*** means the copyrights listed in Schedule A.

(3)    ***Territory*** means the World.

(4)    ***Trade-marks*** means

    (a)    the trade-marks listed in Schedule "A"

    (b)    Trade Names listed in Schedule "A"

(5)    **Transfer** means any event pursuant to which the rights or obligations of the affected party under this Agreement are so affected that are sold, transferred or assigned, pledged, hypothecated, charged, mortgaged, encumbered, sub-licensed or transferred and includes any transfer by operation of law. But does not include any transfer under clause 7.(2).

(6)    **ICO** for the purposes of this Agreement means Initial Coin Offering(s) of Digital Coins or Digital Tokens and or any Initial Token Offering of Digital Securities, Digital Coin(s) or Token(s) whether offered as Utility Token(s) and or as Coin(s) or Token(s) or Digital Securities whether offered by way or pre sale, crowd sale, simple agreements for future tokens (SAFT) or simple agreements for future equity (SAFE), private placement or public offering and shall include but not be limited to all related digital wallets, digital coin exchange(s), digital smart contracts including blockchain and other forms of data encryption technology known and unknown. The term shall include the operating business of the ICO in the blockchain smart contract space as it relates to exploitation of the license(s) under this Agreement and all of the foregoing aspects.

(7)    **PENTHOUSE MEDIA GROUP INC** shall be deemed to include the company itself together with all operating and non operational corporate entities including wholly or partially owned subsidiaries and or related brother or sister entities who the company warrants will agree to be bound by and to have the obligations under the License Agreement, jointly and severally enforced by and against them.

## 2. - LICENSE

2.1.    **Grant of License.** Subject to the terms and conditions of this Agreement, the Licensor hereby grants to the Licensee a non-exclusive license, during the term of this Agreement, to use the marks, names and copyrights specified in Schedule A as Non Exclusive on a Non Exclusive basis, and in relation to those Trade Marks, Trade Names and Copyright interests specified in Schedule A marked as being for Exclusive Use license, during the term of this Agreement. The Licensor hereby grants to the Licensee an Exclusive License during the term of this agreement to use the Trade Marks, Trade-names and Copyrights listed in Schedule A on an exclusive basis for ICO use, that basis includes but is not limited to the exclusive right to such use trademarks, trade names and copyrights within the scope of the crypto currency, blockchain, smart contract and digital encryption use(s) envisaged under the ICO and on going business usage format(s) being advanced by way of this Agreement.

(a)    Specifically, the Licensor grants to the Licensee a right to use the Penthouse marks, trade names and copyrights for the purposes of Token Utility Offering, Pre Sale ICO, Crowd Sale, Private Placements and Public Offering efforts of the Licensee or its nominee and for the purposes of an Initial Coin Offering (ICO) and the related ongoing business to be developed, constructed, marketed and promoted by the Licensee.

(b)    Specially, the Licensor grants to the Licensee a right to use the Penthouse Mark(s) Name (s) and Copyright(s) in relation to both exclusive and non exclusive use(s)

**12**

as specified in Schedule A to develop blockchain, smart contract and data encryption technology for the use of future on going ICO businesses digital transactional footprint including but not limited to the ability to enjoy full access to all Licensor image archives and all Licensor published print, digital and film stock materials and digitize film stock for the purposes of the ICO.

(c)   Specifically, the Licensor grants to the Licensee the right to develop, establish, execute, market and promote an ICO in relation to the License and to create and publish a related ICO White Paper and where required by law ICO Offer Document(s) applicable to every nation where ICO coins or tokens may be traded as "Security" interests if and where they are so designated. The offeror has a preference to Offer Utility Token interests rather than Security Interests.

(d)   Specifically, the Licensor grants to the Licensee a right to develop, create, execute market and promote an ICO Offer and business in the United States of America through any Licensee related US domiciled entities. Conditional on the ICO format, offer structure and offeror entries - being  subject to and in compliance at all times with any and all applicable US Federal and State Securities Laws. The Licensee shall indemnify the Licensor for any damages that may flow from any breach of US Federal and or State Securities Laws and or breaches of any foreign nations domestic Securities Laws. The Licensor shall if requested by the Licensee use best efforts and reasonable endeavors to seek guidance from and the assistance of the Bankruptcy Court to assist in any ICO related compliance matters related to the Licensor being in Chapter 11 or going into Chapter 7 or Receivership.

(e)   Specifically, the Licensor grants to the Licensee a right within the context of the License footprint of rights, to develop and create Digital Currency - Digital Coins -Digital Tokens as either Utility Token and or Security Interests that may be made available for purchase by either US Persons within the United States and by Non US Persons in other  jurisdictions outside the United States that in the sole discretion of the Licensee are deemed appropriate - the following jurisdictions are pre-approved as being deemed appropriate outside the United States .  Australia - New Zealand - Canada - United Kingdom - France - Italy - Germany - Spain - Ireland - Israel - Singapore - Dubai. The Licensee shall have " Sole Discretion" as to which territories in which the ICO shall be offered and " Sole Discretion" to exclude any territories for any reason including but not limited to change of and or too unfavorable laws application(s) governing such ICO Offerings.

(f)   Specifically the Licensee covenants to the Licensor that the Licensee will where the ICO concerns the issuance in the US of Securities as defined under US Federal or State Law, that the Licensee will operate strictly within the scope of the exemptions granted under Regulation S of US Federal Securities Law and any applicable US State law equivalent exemptions to REG S. The Licensee further covenants to outside the United States  comply with the local Securities Laws, if

any that are applicable to buying and selling of the ICO digital currency - digital coin(s)- digital currencies and the domestic jurisdiction domestics of certain Person(s) participating in the ICO.

(2) **Initial Fee Structure $1,000,000 USD**. The Licensee shall pay the Licensor $1,000,0000 USD for the rights being Licensed under the terms of this Agreement. Installments shall be due and payable on the following terms and due dates. The Licensee shall make five payments of $200,000 each over a four month period for the purpose of providing working capital to the Licensor until the ICO matures and delivers further economic value.

(3) **Initial Fee Payment Order.** The first payment of $200,000 shall be due and payable upon the approval of the License by the Court on the terms required hereunder. The balance of $800,000 shall then be paid out by way of four installments of $200,000 every 30 days after the last payment in time. The Initial Fee Structure is set out by way of example in Schedule C.

(4) **The Licensee** on the date of signing of the Agreement shall deposit the equivalent of $200,000 USD or equivalent Australian Currency or BIT COIN into the Escrow Account of the legal counsel of the Licensee. The Licensee where BIT COIN is in Escrow may only trigger a transfer into cash upon receiving notice that the Bankruptcy Court has approved this license on the terms acceptable to the Licensee. The first payment of $200,000 shall be released in terms of Clause 10.24 from Escrow upon approval by the Court on terms the set out in Clause 10.22. Where collateral has not been released to the Licensor within 14 working days after notification of court approval. Then this agreement shall be deemed to be at an end and no damages shall flow either by or against either party.

    (a) **Payment Order.** The balance of $800,000 due after the first payment shall be paid in four payments of $200,000 each that shall be paid out every 30 days after the date of the last payment provided the pre conditions as specified to making each future payment after the first payment of $200,000 have been met as required in Clause 2.7. Failure to make any installment payment(s) (other than in the event of a Payment Suspension Notice being issued) shall enable the Licensor to issue a Notice To Terminate License if within a cure period of 90 days after the due date no payment has been received. The notice to terminate for non payment must be given in writing by the Licensor to the Licensee specifying the date and amount of the default and delivered to the offices of the Licensee by registered mail. In the event no payment is made by the Licensee within the cure period under the notice to terminate under this Agreement shall revert to Licensor.

    (b) **Initial License Fee - Conditions - Suspension Of Fee - ICO.** After the First Payment of $200,000 has been paid to the Licensor by the Licensee. Then all subsequent payments being 4 x $200,000 totaling ($800,000) are conditional upon the following conditions being met and continuing to be met across the payment

**14**

path by the Licensor up until the date of the ICO Offering close or other dates so specified - these are a condition are about to alter i referred to in (m) (n) (j) t (k) (l) (m) (n)(o) below.

(c)    **The Licensor** continuing to operate as a trading business up to the date of ICO close, including monthly publishing of Penthouse Magazine in both Print and Digital Form and Penthouse meeting all content supply obligations under any out put deals for Television or Digital Broadcasting.

(d)    **Kelly Holland** remaining the CEO and a Board Member and Sole Stockholder in the Licensor for a period of 24 months from the date of signing.

(e)    **Kelly Holland** having not entered into and agreeing not to enter into any deal to encumber, option or sell her stockholder interest(s) in the Licensor or agreeing in her capacity as a shareholder or director of the Licensor to the issuance of new new debt securities or new dilutive stockholder interests in the Licensor of any kind without offering the Licensee or its nominees the First and Last Refusal Rights on the standard terms set out in clause 7.3 and 7.4 respectively. Those right(s) include but are not limited to matching purchase, option and or encumbrance of her stockholding or licensor stock or debt security issuances offer price and terms.

(f)    **The Board Composition** of the Licensor remaining as is for a period of 12 months from the date of signing.

(g)    **No Material events** occurring in addition to the Chapter 11 filing that further damage value of the Licensor brands, business or business reputation that negatively impact the value of the license and prospective market value of the ICO Offering or the business model contemplated as being operable under the License. Without limiting the generality of the foregoing this includes any adverse filings by the Secured Creditors and or creditors that seek to or have have the affect of depriving the Licensor of the ability to operate their business or that imperil the value of the brand assets owned by the Licensor.

(h)    **Any licensed trademarks, trade-names or copyrights** subject to the license being found to be or becoming impaired before the completion of the ICO Offering.

(i)    **The Licensor** making weekly reports on financial status until the Licensor is out of Chapter 11 - covering all material matters including but not limited to Cashflow, Revenues, Reports of CRO, Forensic Reports and the ICO ITO progress.

(j)    **The Licensor post exit from Chapter 11** trading solvently with no material adverse changes to the business or its ability to meet its commitments having

taken place. The Licensor agrees to report monthly on this status post Chapter 11
and financial position must remain viable and to the satisfaction of the Licensee.

(k)    **The breach of any material** term or condition of this agreement by the Licensor.

(l)    **The Licensor** entering into any Debtor In Possession Agreement(s) during the
course of Chapter 11 without first giving the Licensee a first right of refusal and
last right of refusal on the standard terms set out in Clause 7.3 and 7.4 to provide
and or to match such financing in the same amounts and on the same terms as any
third party.

(m)    **The Secured Lender** assigning or triggering the existing Secured Lender held
warrant to buy stock in the Licensor prior to the close of the ICO Offer. Including
any trigger event(s) where the stock presently under the Secured Lender warrant
has either before signing this agreement or after been or does issue to the Secured
Lender or to any third party or where the Secured Lender assigns the warrant to
any third party and that third party exercises the warrant to obtain stock.

(n)    **The Licensor** entering Chapter 7 or being placed by the Federal Bankruptcy
Court into Receivership.

(o)    **The Federal Bankruptcy Court Ordering** a bulk sale of assets and or the
business either in part or In Toto.

(5)    **Where any of the above** conditions for Initial License Fee payments have not been met
by the Licensor. Then from the date of any the specified condition(s) non compliance(s)
all - future payments of the Initial License Fee Balance of $800,000 less payments to date
that remain then outstanding shall be deemed to be "Suspended Permanently." In such an
event the Licensee(s) shall be under no further obligation to make, the then outstanding
installments of the Initial License Fee on the nominated due dates.

(6)    **ICO Alternative Payor** Where any amount of the outstanding Initial License Fee is
subject to being "Suspended Permanently" then an amount equal to that outstanding
balance otherwise owed by the Licensee shall be deemed to be then a "non recourse" debt
of the prospective ICO if it proceeds. The obligation shall be listed as an outstanding debt
of the ICO Offering. The outstanding balance formerly owed by the Licensee to the
Licensor subject to being "Suspended Permanently" shall then only be due and paid out
from the ICO entity. The obligation shall be to paid out the Licensor 30 days after the
ICO Offer closes but only if sufficient ICO proceeds are raised to cover this obligation.

(7)    **Any outstanding License Fee** sum pertaining to the fee suspension shall rank in second
place behind the recapture of the ICO Offering Costs as defined herein. The non recourse
nature of the liability to make such payment(s) shall be expressed as a provision in the
formal White Paper and or ICO Offer documentation - in terms of both payout liability
and payout priority position in the ICO.

16

(8)  **Any financial liability** to pay outstanding sums subject to suspension to the Licensor from the ICO Offering entity shall cease - in the future event of the Licensee elects not to proceed with the ICO and in such event - no further payments from the ICO shall ever become due and payable.

(9)  **In the event of breach of condition(s)** leading to "Suspended Permanently" status of any outstanding Initial Fee amounts otherwise due to the Licensor hereunder. The Licensee and or the ICO Offering entity may in their sole discretion decide to proceed or not proceed with the ICO Offering - and the Licensor shall indemnify the Licensee and the ICO entity from any and all damage(s) or loss related claims by the Licensor and Kelly Holland flowing from the Licensee and or ICO entity decision not to proceed to and or to continue with the ICO.

(10)  **The Licensee** in the event of any breach of conditions specified above or in relation to any term of this agreement by the Licensor may if such a breach is deemed to be material in nature sue to recover the Offer costs of the ICO from the Licensor as well as to recapture the initial licensee fees paid to the Licensor along with any related transactional costs set out in the investor deal memo pertaining to the License creation and related ICO Offer.

(11)  **Long Tail License Fee - Structure and Payment.** Long Tail Licensee Fees should the ICO proceed shall become due and payable to the Licensor, as Founder Fees. The licensee fees are directly linked to the success of the ICO. Long Tail Fees will only become due and payable after the full repayment of all ICO Offering Costs invested by the Licensee and other third parties as detailed in the ICO White Paper and related Offer documents. Long Tail Fees are entirely subject to the satisfactory completion of the ICO and are conditional upon the Licensor remaining solvent and trading in the normal course of business until the completion of the ICO. Should the Licensor go into formal liquidation under Chapter 7 and or the business be placed in Receivership or be compromised by way of litigation and or become unable to meet its standard business commitments or ceases trading - then all existing and future payments due as Long Tail Fees under the license to the Licensor shall cease. The Licensee and or ICO entity may still in their sole discretion elect to continue the ICO and all Long Tail Fee payments shall be null and void at the election of the Licensee and the ICO offer entity and may be redeployed to payment of other ICO interests in the sole discretion of the Licensee.

(12)  **Long Tail Fees** are detailed by way of example in Schedule C hereof.

(13)  **Long Tail Fee Quantum and Priority Position.** The Licensor and Licensee agree that the following Long Tail License Fees shall become due payable to the Licensor by the Licensee. The priority of payments due and payable between the Licensor and the Licensee are as stated and must be set out in the ICO White Paper and related Offer Documents if any. First, 100% of all Offer Costs of the ICO as stated in White Paper/ Offer Document are to come off the top and shall be paid to the Licensee and third parties as per the White Paper/Offer Document. The projected offer costs are to be $1,000,000

and projected blockchain development and construction costs are $400,000. Second, shall be the full repayment of the license of any initial Licensee Fees - "Being Suspended Permanently" - if any "Being Licensee Fees relating to the License being suspended and remaining outstanding (capped at $800,000 being $1m less the first payment of $200,000) and shall be paid out of the ICO Proceeds after the Offer Costs. Third priority is the repayment of all Licensee and ICO initial license fee payments actually paid to the Licensor to obtain the license including all directly related license acquisition costs. In fourth priority the next $20m of ICO proceeds are to exclusively payable to the licensee and or its nominees as ICO Block Chain Creator(s) and deal Sponsor(s). In fifth priority are Founder/Adviser Fees - to be split 10% to the Licensor and 90% to the Licensee that represent the balance of the ICO Funds after allowance for capital needs paid progressively on the basis set out in the in White Paper and Offer Document(s) for the ICO.

(14)   **Long Tail Fee On Going - Net Revenue Shares.** The Licensor shall share in the on going Net Revenue Streams available to Founders of the ICO. The split shall be 10% of net revenue paid to the Licensor and 90% of the net revenue paid to the Licensee but conditional upon the

(15)   **Long Tail Fee - Capital Interests** - The Licensor shall be entitled to 10% of the Capital interests available to Founders for sponsoring and promoting the ICO subject to the Licensor remaining solvent and continuing to trade and not being in breach of any of the conditions specified in Clause 2.1 (4) (c) to (n).

(16)   **All Long Tail Fee(s)** are also subject to: First, ongoing Licensor compliance with the license conditions. Second, the Licensee in its sole discretion being convinced that the Licensor brand and business remains viable for association with the ICO. Third, adequate capital remaining within and or available to the ICO to operate the ongoing ICO business.

(17)   **Revenue Share Fees** - Non Exclusive Audio Visual Content - The Licensee shall pay in relation to filmed audio visual motion picture, television and digital network content that is used on the ICO site or DAPP to generate advertising related revenues 50% of all advertising or transactional related revenue. The Revenue Share for Aged Content over 10 years old shall be 25% instead of 50%.

(18)   **Free Content** - Audio Visual Content that is Penthouse Pet Photo shoot related to the ICO shall not attract a revenue sharing arrangement of any kind and shall be supplied free by the Licensor in support of the still image content license that is part of the overarching license fees paid under the Initial Licence Fee and Long Tail License Fee arrangements.

2.2    **The Licensee** undertakes that it will use best efforts and use reasonable endeavors to protect the Trademarks, trade- names and or copyrights subject to License and shall not knowingly infringe upon any other intellectual property owned by the Licensor.

# 3. INFRINGEMENT

3.1.    **Infringement of Trade-marks or Trade-names or Copyrights.** In the event of actual or threatened infringement of any of the Trade-marks or Trade-names or Copyrights during the term of this Agreement, the Licensor shall have the exclusive right, at its option, to take appropriate action to prevent and or to stop the infringement including, without limitation, instituting action against infringers. The Licensor shall have the" exclusive right, at its option, to defend all actions contesting the validity of or the Licensor's ownership of the Trade-marks or Trade-names or Copyrights or arising in any way from the use of one or more of the Trade-marks or Trade-names or Copyrights. The Licensee shall consent to the use of its name in all such litigation and shall sign such documents, swear such affidavits or declarations and take such other action as may be reasonably necessary to assist the Licensor in such litigation, at the expense of the Licensor.

3.2.    **The Licensee** undertakes that it will use best efforts and use reasonable endeavors to protect the Trademarks, trade- names and or copyrights subject to License and shall not knowingly infringe upon any other intellectual property owned by the Licensor.

# 4. ACKNOWLEDGEMENT

4.1    **Acknowledgement of Rights.** The Licensee acknowledges and agrees that:

(1)    **the Licensor** is the exclusive owner of all right, title and interest in and to the Trade-Marks, Trade Names and Copyrights and all goodwill associated therewith other than those set out in 4.1 (3).

(2)    **it shall acquire no right**, title or interest in and to any of the Trade-marks, trade-names or Copyrights other than the respective exclusive and non exclusive license rights under this agreement which shall attach to any new assignee who at any time becomes the underlying owner of such trademarks, trade names and or copyrights the stead of the existing Licensor.

(3)    **any and all goodwill** generated by the use of the Trade-marks, by the Licensee shall inure exclusively to the benefit of the Licensor other than for Goodwill that touches concerns the business of the ICO and downstream the Digital Tokens and or Coins generated by the ICO which shall be shared between the Licensor and Licensee on the basis set out herein.

# 5. – OBLIGATIONS OF THE LICENSEE

5.1.    **Obligations of the Licensee.** The Licensee shall have the following obligations:

(1)    **it shall maintain** the high standard of quality of the Wares and Services which is established by the Licensor from time to time (the "Quality Standard") and shall comply

(2)    **it shall allow authorized representatives** of the Licensor to inspect, during normal business hours, its inventory of the Wares in order to assess the Licensee's compliance with the Quality Standard and the other terms of this Agreement but not its digital technology;

(3)    **it shall, if requested by the Licensor** in writing, send to the Licensor specimens of the Wares for examination by the Licensor to ascertain whether the Wares meet the Quality Standard but this shall not apply to its digital technology including but not limited to technology pertaining to blockchain, encryption and ICO deployment engine, digital wallets, digital exchanges and DAPP applications nor will it affect the continuation of any ICO planned or on foot within the market place, and

(4)    **it shall give to authorized representatives** of the Licensor access to all relevant documents, materials and records pertaining to the Services and access to its business premises during normal business hours for the purpose of inspecting and examining the standard of the Services provided by it in order to determine whether such Services comply with the Quality Standard and the other terms of this Agreement. To avoid doubt such materials shall not include any access to confidential information pertaining to Blockchain - Smart Contracts - Digital Wallets - Digital Exchanges - DAAP Applications and other type of encryption technology and the ICO other than for how the Licensed materials are being utilized.

## 6. – STATUS OF PARTIES

6.1.    **Status of Parties.** Nothing contained in this Agreement shall constitute a party to be either the agent or partner of the other or shall empower a party to bind the other.

## 7. – TRANSFER

(1)    **Right of Licensor to Transfer.** The Licensor shall have the right to Transfer any or all of its rights and obligations under this Agreement and the Trade-marks,Trade names and Copyrights to any Person as it may in its sole discretion deem appropriate subject to the First and Last Right(s) Of Refusal on the standard terms in 7.3 and 7.4 in favor of the Licensee as detailed. In the event any such Transfer is to be made to any party other than the Licensee and or its nominee, the Licensor covenants to bind the prospective successor in title into an acknowledgement in writing of the existence of the license under this Agreement pertaining to the rights in Schedule A and the legal validity of the license herein. No transfer of the Trademark(s), Trade - name(s) or copyright(s) subject to License in Schedule A shall be able to perfected unless the Licensor first obtains a written acknowledgement of the License under this Agreement from the prospective successor in title and delivers a copy of that acknowledgment to the Licensee

7.2.    **Licensee Limited Right To Transfer.** The Licensee shall have no right to transfer or grant any sub-license in respect to any of the trademarks, trade name and copyright Rights specified in Schedule A of the Agreement (other than as provided herein) without the prior written consent of the Licensor and where so required the approval of the Federal Bankruptcy Court. The Licensee shall have an unfettered right to in its "Sole Discretion" to transfer and sub license by way of assignment or otherwise any mark(s) or copyright(s) interest(s) under the License to any entity related to the Licensee in the US domicile being legal entities that are nominated by the Licensee provided those nominated entities are clean skin Special Purpose Entities formed for the purpose(s) of deployment of the ICO Offer in the United States under the ICO Offering Structure. Any actual or purported Transfer other than to a nominated entity of the Licensee related to the ICO occurring without the Licensor's prior written consent shall constitute a default under this Agreement and shall be null and void

7.3    **First Right Of Refusal.** The Licensor shall grant the Licensee a First Right of Refusal in relation of the Licensor entering into any other ICO related media licensing activities that touch upon and are concerned with carrying on any form of Digital Token ICO or Blockchain Offerings, sale of trademarks, trade name and copyrights specified in Schedule A. Sale of Stock in the Licensor owned by Kelly Holland and issue of stock or debt ( including DIP Loans) or option securities by the Licensor for a period of 90 days or such other period as may be specified herein from the date of written notice by the Licensor to the Licensee to match the current third party offer on same and or better terms than offered by any third party. Where an Offer is refused by the Licensee the Licensor is free to accept a third party offer on identical terms. However if such an offer is not accepted by a third party on the same terms and at the same price as offered to the Licensee. Then the Licensor shall regrant a right of first refusal over all subsequent offers on a similar basis going forward.

7.4.    **Last Right(s) of Refusal.** The Licensor shall grant the Licensee a Last Right of Refusal to acquire any rights or interests specified under this agreement including but not limited to licensed trademarks, trade names and copyright subject to license under this agreement stock owned by Kelly Holland and or stock, debt( including DIP Loans) or option security interests in the Licensor. The Last Right of Refusal shall give the Licensee a window of 30 working days ( unless otherwise specified herein ) from the date of written notice by the Licensor to match or exceed the price and terms of any offer presented that the Licensor would otherwise accept. In the event an Offer is not matched by the Licensee and sale or license proceeds as the case may be fails to settle with on 90 days then the Licensee Last Right of Refusal shall be deemed to remain on foot and the Licensor must re offer any new offers to the Licensee

## 8. – TERM AND TERMINATION

8.1.    **Term of Agreement.** This Agreement shall be in perpetuity unless terminated by the parties on the following grounds

(a)   **Term shall commence** as of the date of signing and may be terminated at the sole discretion of the Licensor if the conditions and assumptions in this Agreement the Licensee has not completed the ICO envisaged here under.

(b)   **if the Licensee** commits or permits any material breach of any of the provisions of this Agreement and fails to remedy such breach within thirty (90) days following written notice thereof from the Licensor, but subject to to a (90) day cure window in favor of the Licensee or

(c)   **if the Licensor** commits or permits any material breach of any of the provisions of this Agreement and fails to remedy such breach within thirty (90) days following written notice thereof from the Licensee but subject to to a (90) day cure window in favor of the Licensor or

(d)   **if the Licensee** ceases to carry on business or is adjudicated bankrupt or insolvent or makes an assignment for the benefit of its creditors or if proceedings in bankruptcy are instituted against it or if a receiver of its property is appointed or if any judgment or execution against it or its property remains unsatisfied for such period as would permit its property or any substantial part thereof to be sold, or

8.2   **Other Relief.** Any termination under section 8.1 hereof shall be without prejudice to any other rights, remedy or relief vested in or to which the Licensor may otherwise be entitled against the Licensee

## 9. – RIGHTS AND OBLIGATIONS ON TERMINATION

9.1.   **Rights and Obligations on Termination.** Upon termination or expiration of this Agreement, the Licensee shall cease to be a licensee of the Licensor and shall:

(1)   **immediately cease** to use, directly or indirectly, in any manner whatsoever any of the Trade-marks or Trade-names or Copyright any name or mark similar to any of the Trade-marks or Trade-names; and

(2)   **remove the** Trade-marks and Trade-names or Copyrights a from or deliver up to the Licensor or its duly authorized representatives all materials including signs and advertising materials in its possession, custody or control on which any of the Trade-marks and Trade-names appear (except for documents not for public display or reasonably required for archival purposes)

(3)   **The party** in default under the agreement shall be liable to the other party for all and nay damages flowing from the default

(4)   **The Licensors** shall have no right or interest in or ability to cease or acquire any intellectual property, trade marks and or copyrights developed by the Licensee and or ICO offer entity that pertain to Block Chain, smart contracts, digital wallets, exchange

**22**

platforms DAPP application and smart encryption technology and ICO digital coin or token matters not developed by the Licensor

## 10. – GENERAL

10.1. **Time.** Time shall be of the essence of this Agreement.

10.2. **ICO Format.** The Licensee warrants the ICO format shall proceed as follows and the Licensor acknowledges full informed consent and acceptance of this format. Target Capital raise for the ICO is set at $40m or less but may be increased in the sole discretion of the Licensee. ICO - Offer Costs are to be 100% paid for by the Licensee but shall be recovered in first priority position from ICO offer proceeds. The ICO structure and legal compliance format is to be solely at the discretion of the Licensee and or the ICO offer entity. The Blockchain & Encryption Development and Construction Structure is to be at the sole discretion of the Licensee and ICO entity. Marketing, Development and Branding costs are to be at the sole discretion of the Licensee and ICO entity. Naming Rights of the ICO and related entities are to be at the sole discretion of Licensee and ICO entity - who shall take account of Licensor owned trademarks. The Licensee as a courtesy will seek informal written consent of the Licensor regarding said naming of the ICO offering. This consent is only in the interests of co-operation but will not be a formal requirement of the License. To avoid doubt the Licensee will remain the sole decision maker regarding all aspects of the ICO.Any reasonable Licensor out of pocket costs as they relate to the ICO will if pre-approved by the Licensee be paid for within 30 days following receipt of a tax invoice by the Licensee The Licensee and ICO irrevocably warrant to the Licensor that the ICO shall proceed as deflationary economy with the maximum coin threshold set at Token Issue in the sole discretion of the Licensee and the ICO offer entity.

10.3 **ICO - BLOCK CHAIN IP - OWNERSHIP** The Licensor acknowledges that it will have no role, interest, financial obligation to contribute to or financial interest in the development and construction of Block Chain Encryption Technology - Engine - Platform- Digital Coin Delivery - Coin Exchange - Digital Wallets - DAPP applications and any other ICO related intellectual property both existing and developed by the Licensee and or ICO Offering entity or entities other than as agreed herein The Licensee and ICO offeror entity shall be entirely responsible for funding the development and construction of all ICO intellectual property interests other than those being Licensed hereunder from the Licensor

10.4 **Waiver.** The failure at any time to require performance of any provision shall not affect the full right to require performance at any later time. The waiver of a breach of any provision shall not constitute a waiver of the provision or of any succeeding breach.

10.5. **Notice.** Any notice or other communication required or permitted under this Agreement shall be in writing and may be delivered personally, by fax, by courier or by prepaid registered or certified mail addressed, in the case of the Licensor, as follows

**23**

Penthouse Global Media Inc.
8944 Mason Avenue

Chatsworth, CA  91311 USA

and in the case of the Licensee, as follows

Androcles Entertainment Pty Ltd

433 North Camden Drive

Beverly Hills, CA  90210  USA

or to such other address as the addressee may have specified by a notice given under this provision. Any such notice or other communication, if delivered personally or by courier or mailed, shall be deemed to have been given when received and, if faxed, shall be deemed to have been given when the appropriate answer back is received

10.6   **Number and Gender.** In this Agreement words importing the singular include the plural and words importing gender include all genders

10.7   **Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter, supersedes all prior representations, negotiations and understandings and may not be amended, or any provision waived, except in writing signed by the party against whom the amendment or waiver is sought to be enforced.

10.8   **Severability.** Any provision which is illegal, invalid or unenforceable shall be severable and shall not affect the remaining provisions of this Agreement.

10.9   **Headings.** The headings in this Agreement do not affect its interpretation.

10.10. **Successors and Assigns.** This Agreement shall ensure to the benefit of and be binding upon the parties and their respective successors and permitted assigns

10.11. **Applicable Law.** This Agreement shall be governed by the laws and courts of the State of California for so long as the Licensor remains under the jurisdiction of the Federal Bankruptcy Court whether in Chapter 11 or Chapter 7 or Receivership. Post the bankruptcy of the Licensor or upon transfer by the Licensor of its rights under this agreement to any new successor in title who becomes Licensor that is solvent. This Agreement shall be governed by the County and State laws of domicile of the Non Breaching Party

10.12. **Counterparts.** This Agreement may be signed in counterparts, which together shall constitute the fully executed agreement.

**24**

10.13. **Survival.** All obligations of the Licensor and the Licensee which expressly or by their nature survive the termination or Transfer of this Agreement shall continue in full force and effect subject to and notwithstanding such termination or Transfer and until they are satisfied or by their nature expire.

10.14. **Further Assurances.** The parties agree to do or cause to be done all acts or things necessary to implement and carry into effect this Agreement to its full extent.

10.15. **Deal Costs.** Parties to bear own legal costs

10.16. **Cost Recovery.** In the event the Federal Bankruptcy Court does not approve the License under this Agreement and alternatively puts it up for bid. Then the Licensee shall if subsequently out bid, be entitled to recovery of all out of pocket costs expended in connection with the License and related ICO deal structure and Blockchain Development incurred to the date of non approval by the court.

10.17. **Public Profile.** The parties agree to keep the ICO development activity private and confidential until an election is made by the Licensee by way of written notification to the Licensor to make the ICO Offer and related business model a matter available for public knowledge. While the ICO remains private and confidential there shall be no discussions with or in any media about the ICO by the Licensor, its officers, advisors, affiliates, lenders or creditors without the prior written approval of the Licensee. No election can be made by the Licensee to make the ICO public prior to 1 July, 2018 unless mutual consent to do so before this date in writing is reached between the Licensor and Licensee.

10.18 **Confidentiality.** Pre and Post License. The Licensor on behalf of itself, its Officers, Staff, Creditors, Lenders and Advisors acknowledge and agree that all the ICO license fee deal related confidential information provided to the Licensor by the Licensee and or their advisors is to remain confidential. This includes any and all confidential information provided during pre deal license negotiations, prior to ICO offer and during the course of the ICO shall remain the sole property of the Licensee now and in perpetuity. The Licensor agrees to be held responsible for any release of confidential information and agrees to indemnify the Licensee and ICO entity for any and all damages caused by any unauthorized release of confidential information. The Licensor agrees to not release the existence of or copies of this agreement without the prior written consent of the Licensee to any third parties ( other than by way of filing in or throughFederal Bankruptcy Court ) to creditors of the Licensor, past or current or future secured lenders of the Licensor and shall impose this constraint on its advisors, officers, legal counsel, employees and independent contractors

10.19. **Marketing & Promotional Support.** The Licensor covenants to use best efforts and reasonable endeavors to assist with the marketing and promotion of the ICO subject to prior approval of any such efforts by the Licensee. This includes but is not limited to endorsement of the ICO, editorial support in Penthouse Magazine(s), Penthouse Web Site and Penthouse Audio Visual and other Penthouse publication. The Licensor shall upon

**25**

request by the Licensee, distribute to the Licensors print and digital subscribers promotional and advertising material provided to the Licensee pertaining to the ICO Offer. The Licensor for a period of not more than 120 days during the ICO Offering window ending upon the date of the ICO close shall grant the licensee direct access to the Licensor's subscriber galley list(s) for the last five years for the sole purpose of sending out the ICO promotional and advertising materials authorized by the ICO in relation to the offering.

10.20. **The Licensor** shall accord the Licensee the right to buy prime media spots in print, digital and audio visual publications of the Licensor at a 75% discount off "Rack Media" rates for such advertising and or sponsorship rights. The Licensor will allow the Licensee access to any other third party print, digital or audio visual media where the Licensor enjoys discount rates provided the Licensee pays up front for any advertising or sponsorship access. The Licensor shall at raw production cost provide the Licensee with video production and still production photographic support to advance the ICO. Costs of that production support to be paid up front by the Licensee.

10.21. **Ordinary Course Of Business.** The Licensor acknowledges the grant of rights under this License is within the ordinary course of business of the Licensor. The Licensor further warrants that it enjoys full legal capacity to enter into the contractual arrangement(s) detailed herein subject to Federal Bankruptcy Court Approval where required.

10.22. **Court Approval.** The Licensor shall seek the prior approval of the Federal Bankruptcy Court to proceed under the terms of this agreement. Court approval to proceed must at a minimum contain the following directions in a format that is wholly acceptable to the legal counsel of the Licensee. A direction that the license and this agreement as presented are acceptable to the Court. A direction that the Agreement shall be binding on and enforceable against any Trustee in Chapter 11, Chapter 7 and any Receiver under a Receivership or any of other successor in interest. A direction that the Licensee may begin immediately to exploit the License. A direction any sale of trademarks, trade names and copyrights are subject to the license remaining on foot and binding on and enforceable against any subsequent owners and or current or future holders of security interests. A direction that the License is approved by the court and that approval may be featured in any ICO White Paper and or Offer Documents. A direction that the court retains jurisdiction over matters pertaining to the License and the related exploitation at of it by way of an ICO in the event a need arises to confirm or perfect any matter concerning the license or the progress under it.

10.23. **Until Approval** is granted by the Federal Bankruptcy Court all collateral in Escrow and all down stream payments shall not become payable. Where the Court does not approve this agreement in the manner set out in Clause 10.22. Then this Agreement shall go into abeyance until either the Licensor becomes solvent or transfers the underlying subject matter of the License Grant to a Licensor that is solvent. The Licensee may in such event revive the License in its sole discretion.

10.24   **Escrow.** The Licensee upon signing this Agreement shall within 48 hours place a sum equal to the first payment under Initial License Fee being $200,000 USD or its equal in Australian Dollars or Bit Coin into the Escrow Account of its legal counsel. The Licensee shall authorize its duly appointed legal counsel to evidence the amounts in Escrow to the Licensor and the duly appointed legal counsel of the Licensor. The funds paid into Escrow by the Licensee shall remain in Escrow on the following terms - they will remain for a period of 14 working days until this Agreement in its entirety is either approved or not approved by the Federal Bankruptcy Court as per the terms of Clause 10.22 Upon approval of the Bankruptcy Court of the license acceptable to the Licensee under 10.22 the legal counsel of the Licensee shall make any payment due under the agreement to the court or to whomever the court directs. In the event approval to proceed is not obtained or if obtained is not acceptable to the Licensee under Clause 10.22. Then within 14 working days of the deposit of collateral into Escrow. The Licensee may demand the funds in Escrow be 100% released to the Licensee within 48 hours of making such a request.

10.25   **No Obligation To Proceed.** The Licensee shall be under no obligation to proceed to develop, build, operate, market or promote a Blockchain Encryption Engine, ICO White Paper or ICO Offering Document. The Licensee acknowledges the relevant License Fee payment obligations in relation to Initial License Fees - shall in such circumstances remain due and payable even where the Licensee elects not to proceed with or to progress an ICO after making an election to proceed. Other than in the case where the Licensee Fee payment obligations are under "suspension" under the terms of this Agreement due to breaches of the Licensor. In which case the Licensee shall no longer be liable to make any outstanding payment under the License as from the date of the breach by the Licensor.

10.26   **Election Not To Proceed.** If the Licensee elects not to proceed to an ICO or if having made such an election to proceed to an ICO has not progressed the ICO within 120 months of signing, then all rights subject to this license shall revert back to the Licensor. All prospective ICO efforts from whatever source during the time window specified will remain subject to First and Last Rights of Refusal in favor of the Licensee. Where after 24 months after July 1, 2018 if the Licensee has either elected to not proceed with an ICO or has having made an election to so proceed with an ICO has either abandoned the ICO or ceased to make material efforts to complete the ICO then the Licensor may enter into an other ICO or ITO or similar blockchain or digital coin offering in relation to other Licensor intellectual property rights not subject to this license but still subject to the Rights of First and Last Refusal on the standard terms as per Clause 7.3. and 7.4 under this Agreement in relation to such future ICO projects.

10.27.   **No Other ICO.** The Licensor will undertake to within a Priority Window of 24 months from July 1, 2018 not to issue, support or be part of any other ICO digital token Offering(s) and to not be part of or facilitate (by providing access to subscription lists or otherwise) participate in or accept money for or provide free advertising, marketing or

**27**

promotion of any other competing ICO or ITO project outside that of the Licensee related
ICO project that is contemplated under this Agreement.

Case 1:18-bk-10098-MB    Doc 96    Filed 01/31/18    Entered 01/31/18 17:45:24    Desc
Main Document    Page 28 of 86

10.28. **Withholding Taxes.** Where any License Fee is paid across border from Australia to the United States then under the terms of the US - Australia Treaty on double taxation a 5% holding tax will be due an payable. All such taxes are the responsibility of the Licensor and the Licensee may deduct from any payments due to the Licensor amounts equal to the withholding tax liability, if any.

10.29. **Licensee May Assist.** The Licensee shall be given a First Right of Refusal as per Clause 7.3 to assist the Licensor in perfecting any impairment to and or maintenance obligations required to keep the Licensor trade marks, trade names or copyrights in good standing. Any assistance is to be on terms mutually acceptable to the parties. All monetary payments advanced shall be recoverable by the Licensee. Where no agreement in relation to the First Right Of Refusal is reached by the parties. Then the Licensee will enjoy a Last Right Of Refusal on the terms set out in 7.4 for 30 days from date of notification to match any arrangement being proffered by a third party. Any assignment of the trade marks, trade names or copyright interest subject to this agreement shall require as a pre condition to such transfer the Licensor to procure from the new prospect assignee their written acknowledgement of the existence of License and their written affirmation and consent to be bound by the terms of this license.

10.30. **Licensee Access.** The Licensor at all times shall grant access to all trade mark, trade name, copyright material, original source materials, copies and or galley lists sufficient to enable the Licensee smooth transactional dealing(s) and without limiting the foregoing to assess their viability for use, their actual existence, the chain of title ownership rights, their quality and for their use in any valid ICO project related purpose(s). Without limiting the generality of the foregoing the Licensor shall allow the Licensee access to all digital and film images and all Licensor published content and to digitize non digital film stock content for the sole purpose of use in the ICO and on going business. The Licensor shall permit access to any film laboratory or digital storage facilities to allow the Licensee to do any of the foregoing providing the Licensee shall pay any third parties for such rights of access.

10.31. **Kelly Holland.** The Licensor shall nominate Kelly Holland to represent the Licensor subject to her acceptance and court approval of the transaction Kelly Holland will be appointed to the Board of the ICO Offering entity upon formation of said entity on the terms and conditions set out in Schedule 2. The Licensee shall use best efforts and reasonable endeavors to ensure Kelly Holland is appointed to the Board of the ICO Neither the Licensee nor any ICO entity shall be under any ongoing obligation to accept a board appointee nomination from the Licensor other than Kelly Holland. The Licensor shall approve and grant a conflict of interest waiver to allow her to assume the ICO Board appointment and allow her under the terms of the waiver and her contract to be promoted as the face of the ICO to any degree required by the Licensee. The Licensor specifically shall not be under any obligation to appoint to the ICO Offer entity Board any current or

10.32  **Chain of Title - Warranty & Verification.** The Licensor warrants that the Licensor is the owner of the underlying trademarks, trade-names and copyrights subject to the License as set out in Schedule A. The Licensor warrants that any license granted under this agreement shall bind any and all successors in title. To effect this result the Licensor shall seek Federal Bankruptcy Court approval to validate this result as part and parcel of the approval of this license directions as per clause 10.22. Further, the Licensor shall in relation to any sale, transfer, or assignment of underlying trademarks, trade names or copyrights to as a term of any such arrangements undertakes to bind any new owner to acknowledge the existence of and legal validity of the license under this agreement and to obligate any new owner to effect the same result on subsequent owners of the underlying rights that are the subject of this agreement. The Licensor upon written request shall provide the Licensee with full chain of title verification of ownership by the Licensor of all trade marks, trade names and copyright subject to the License as listed on Schedule "A" hereof.

10.33.  **No Outside Interests.** The Licensor and Kelly Holland acknowledge that there are no interests ancillary to the License and or related ICO that have been entered into or that exist beyond those documented and agreed to by and between the parties and as disclosed to the court.

10.34.  **Option to Finance New Content :** The Licensor shall provide the Licensee with a 60 day Option window that shall be triggered by way of notice in writing to the Licensee under this Agreement to finance 100% of all new content obligations of the Licensor to provide audio and audio visual content under various output deals between the Licensor and third party Television Broadcasters, Pay TV, Cable TV, Digital Network Channels and Radio Networks. The Licensor shall present content opportunities to the Licensee for financing by the Licensee. The Licensor and Licensee shall mutually approve the content production budget and production talent and crew. Kelly Holland and her crew are pre approved as being acceptable to the Licensee. New may include at the election of the Licensor in its sole discretion any pre existing film stock audio visual content that for broadcast standard compliance needs to be digitized into Standard Definition, High Definition or 4 k or better and or standard definition digital audio visual content that needs to be digitized into High Definition Content or 4 k or better. In which case the content financier will cover 100 percent of the newly digitized content production cost and shall own the copyright to the digitized version of the content. Licensee under this agreement if it elects to finance the new content presented under the Option shall pay 100% of the production budget or digitized cost that is mutually approved by the parties. The Licensee shall own 100% of the copyright to the New Content being financed subject to an exclusive license that shall provide that for the term of the License the parties shall revenue share 80:20 in favor of the content financier. The Licensor shall enjoy the right to purchase the copyright at any time upon giving notice and upon payment of a 20% premium uplift in purchase price per annum. Where the Licensee fails to proceed to

finance or elects not to finance new content then the Licensor shall be free to Offer the opportunity to any third party without reference back to the Licensee. The Licensor shall a first and last right of refusal to purchase the new content from the content financier. The Licensor shall if permitted by the scope of the content out put deal terms in relation to exclusivity of the output windows  shall allow subject to rights clearance obligations therein. The Licensee ICO access on a non exclusive basis to any and all of the content financed by the Licensee .

10.35. **Option To Finance Third Party Content :** The Licensor shall provide the Licensee with a 60 day Option Window that shall be triggered by way of notice in writing to the Licensee under this Agreement to finance all third party content obligations of the Licensor to provide audio and audio visual content  under various output deals between the Licensor and third party Television Broadcasters, Pay TV, Cable TV, Digital Network Channels and Radio Networks. The Licensor shall present existing third party produced audio and or audio visual content opportunities it wishes to supply under the respective output deals above to the Licensee that in the sole discretion of the Licensor is suitable for purchase or license to meet the out put obligations of the Licensor. The Licensor and Licensee shall mutually approve the content acquisition price and rights footprint of the third party content being acquired. The Licensee under this agreement if it elects to finance existing third party content presented under the Option shall pay 100% of the mutually agreed purchase price or license fee obligations as the case may be. The Licensee shall own 100% of the copyright or the license being acquired subject to a an exclusive on license that shall provide that for the term of the License the parties shall revenue share 50 50 in favor of the content financier. The Licensor shall have the right to purchase the copyright at any time upon payment of a 10 % premium uplift in purchase price per annum. Where the Licensee fails to proceed to finance or elects not to finance existing third party content then the Licensor shall be free to offer the opportunity to any other party without reference back to the Licensee. The Licensor shall enjoy a first and last right of refusal to purchase the new content from the content financier. The Licensee shall be under no obligation to accept this option or finance the content presented by the Licensor to the Licensee. The Licensor shall if permitted by the scope of the content out put deal terms in relation to exclusivity of the output windows shall allow subject to rights clearance obligations therein the Licensee ICO access on a non exclusive basis to any and all of the content financed by the Licensee.

The Parties have Executed this Agreement

**PENTHOUSE GLOBAL MEDIA INC.**

By:

Name:

Title: CEO

**ANDROCLES ENTERTAINMENT PTY LTD**
**ACN 624 032 177**

By:

Name: GRANT LENAARTS

Title: Director

SCHEDULES TO AGREEMENT A - C are attached to form part of and are to incorporated in by way of reference.

**31**

## SCHEDULE A

**NON EXCLUSIVE**

PENTHOUSE BRAND - TRADEMARKS AND NAME.

PENTHOUSE LOGO WITH KEY - TRADEMARKS AND NAME.

REVENUE SHARE - FILM CONTENT OF FILM LIBRARY FOR ICO USE.

STILL IMAGES OF ALL MOVIE & DVD & DIGITAL AUDIO VISUAL CONTENT ONE SHEETS.

PENTHOUSE PUBLISHED ARTICLES AND ARCHIVE SUPPORT MATERIALS.

**EXCLUSIVE CONTENT ( EXCLUSIVE BASIS IS FOR USE IN ICO ARENA ONLY )**

PHOTO SHOOTS AND STILL IMAGES - HELD AT PENTHOUSE AND IRON MOUNTAIN.

FILM AND DIGITAL BEHIND THE SCENES OF PHOTO SHOOTS - DVD - FILM - DIGITAL SHOOTS.

ALL PUBLICATION ARTICLES LINKED TO PENTHOUSE PET IMAGES WHETHER PETS OR OTHER FEATURED TALENT.

## SCHEDULE B

## KELLY HOLLAND  - PENTHOUSE MEDIA GROUP - STOCK

I warrant at the date hereof that I am the sole owner of 100% of the Stock in Penthouse Media Group Inc.

I warrant that there is no secured interest over my stock in Penthouse Media Group Inc.

I warrant I have not entered into any agreement as at the date of signing to sell or option my stock.

**Signed By Kelly Holland this**  *28*  **Day of**  *January*  **2018.**

**33**

| | | | | |
|---|---|---|---|---|
| INITIAL FEE | STRUCTURE | $1,000,000.00 | LICENSE FEE | |
| ESCROW | $200,000.00 | | | |
| RELEASE POST COURT APPROVAL | | $200,000.00 | | |
| 30 DAYS LATER | | | $200,000.00 | |
| 30 DAYS LATER | | | $200,000.00 | |
| 30 DAYS LATER | | | $200,000.00 | |
| 30 DAYS LATER | | | $200,000.00 | |
| | | $200,000.00 | $800,000.00 | $1,000,000.00 |
| LONG TAIL FEE | PAID FROM ICO | $40,000,000 | | |
| | FROM PROCEEDS | | | |
| PRIORITY LEVEL | | | | |
| FIRST Shortfall ITO out of ICO + 20% share in A&E ITO under $6m any shortfall - | OFFER COSTS | $1,400,000.00 | ($400,000.00) | BlockChain Development |
| SECOND | SUSPENDED to Licensor | $800,000.00 | ($800,000.00) | Capped to 800 K based on actual suspended amount |
| THIRD | LICENSE FEE recapture amounts actually paid | $1,000,000.00 | $1,000,000.00 | Recover License Fee paid less suspended sums plus deal costs |
| FOURTH | ICO UNDERWRITER | $20,000,000.00 | | |
| FIFTH | WORKING CAPITAL ICO | | | |
| | + DEVELOP COST OF ON GOING ICO | | | |
| SHARE BALANCE OF ICO CAPITAL PROCEEDS | | 90% LICENSEE | 10% LICENSOR | BASED ON SHARE AVAILABLE TO PROMOTER |
| SHARE NET REVENUE OF ONGOING ICO | | 90% LICENSEE | 10% LICENSOR | BASED ON SHARE AVAILABLE TO THE MANAGEMENT |
| SHARE ICO CAPITAL/COIN INTERESTS | | 90% LICENSEE | 10% LICENSOR | BASED ON SHARE AVAILABLE TO PROMOTER |
| | | | | SHARES ABOVE AS DETAILED IN THE ICO WHITE PAPER/OFFER DOC |

# EXHIBIT 2

**Cash Flow Projections January to April 2018 with $200,000 per month in Androcles Licensing Fees**

| REVENUES | January 1/15 to 1/19 | January 1/22 to 1/26 | Jan/Feb 1/29 to 2/2 | February 2/5 to 2/9 | February 2/12 to 2/16 | February 2/19 to 2/23 | Feb/March 2/26 to 3/2 |
|---|---|---|---|---|---|---|---|
| BROADCASTING | | | | | | | |
| Bulsatcom AD- high balance 2017- | | | | $ 2,163 | $ 8,847 | $ 8,848 | $ |
| CAIW Media B.V. | | | | | $ 15,720 | | . |
| Canal + International | | | | | | | |
| Canal Satellite Caraibes | | | | | | | |
| Canal+ REUNION | | $ 577 | $ 9,801 | | | $ 8,700 | $ 8,841 |
| Coditel Brabant sprl | $ 577 | | | | | $ 577 | $ 21,148 |
| Deutsche Telekom AG (DTAG) | | $ 500 | | | | $ 500 | |
| Digital Cable Group AG | | | | | | $ 498 | |
| Divan TV Service (EURO) | | | | | | | |
| Groupe Canal + | $ 12,284 | | $ 24,423 | | | | |
| Hot Telecommunication Systems Ltd | | | | $ 4,159 | | | |
| Joyne B.V. | | $ 594 | | | | $ 594 | |
| M7 | | | | | | $ 19,209 | |
| Monaco Telecom | | | $ 1,158 | | | | $ 1,158 |
| Net-TV Zrt | | | $ 2,355 | | | | $ 1,178 |
| Numericable | | $ 4,235 | $ 4,152 | | | $ 4,235 | |
| one.Vip DOO Skopje | | | $ 475 | | | | |
| Orange - BELGIUM | | | | $ 4,526 | | | |
| Orange SA - FRANCE | | | | | | $ 14,114 | |
| OTE SA – Hellenic Telecommunications | | | $ 3,725 | | | $ 3,721 | |
| OTE SA - TVOD | | $ 220 | | | | $ 249 | |
| PLAY boy LA/Quarterly | | | | | | | |
| Proximus – Belgacom SA | | | | | | $ 6,715 | |
| Sky Italia srl | | | | | | | |
| Skynet iMotion Activities SA | | | $ 229 | | | | |
| Tele2 Netherlands B.V. | | | | | $ 144 | | |
| Telenet BVBA | | | $ 20,362 | | $ 20,362 | | |
| Top Media Distribution Limited | | | | $ 588 | | | $ 588 |
| TVN Dist / Nordelink Bulgaria Ltd. | | | $ 1,345 | | | | $ 1,345 |

**36**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Unitymedia NRW GmbH (UM) | | | | | $ 20,462 | | |
| UPC Romania (RON) | | $ 970 | | | | $ 944 | |
| Vivacom TV | | | | | | $ 651 | |
| Vodafone Kabel Deutschland GmbH | | | | $ 354 | | $ 218 | |
| Vodafone Libertel (T-Mobile) | | $ 1,047 | | | | $ 267 | |
| Ziggo Services B.V. | | | | | | $ 19,603 | |
| COLORADO SATELLITE CONTRACT | | | $ 83,000 | | | | $ 83,000 |
| Fifth Dimensions | | | $ 12,771 | | | $ 12,771 | |
| 96 Entertaiment/DirectTV | | | $ 19,285 | | | $ 20,535 | |
| Telenet annual contrat | | | | | | | $ 30,000 |
| Bouygues | | | | | | $ 19,536 | |
| Telia | | | $ 3,212 | $ 1,776 | | | |
| Telia Lietuva | | | | | | | |
| VIASAT Ukraine | | $ 500 | | | | $ 500 | |
| Bizarre Video | | $ 9,000 | $ 9,000 | | | $ 9,000 | |
| salt | | | | | | | |
| **TOTAL BROADCAST** | $ - | $ 29,926 | $ 195,291 | $ 13,566 | $ 65,535 | $ 151,983 | $ 147,257 |
| | | | | | | | |
| DIGITAL | | | | | | | |
| Equinia | $ 8,000 | $ 8,000 | $ 8,000 | $ 8,000 | $ 8,000 | $ 8,000 | $ 8,000 |
| Epoch | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 |
| VS CAM / Affiliate | | $ 2,000 | | | | $ 2,000 | |
| SK Entertaiment - life selector | | | | | | | |
| MTACC - Dating | | | | | | | |
| Connected | | $ 1,500 | | | | $ 1,500 | |
| Digital Subscription Revenues (Exworks Sweep Account) | | $ 60,000 | | | | $ 60,000 | |
| **TOTAL DIGITAL** | $ 11,000 | $ 74,500 | $ 11,000 | $ 11,000 | $ 11,000 | $ 74,500 | $ 11,000 |
| PUBLISHING | | | | | | | |
| Curtis | | $ 7,800 | | | $ 8,600 | $ 37,000 | |
| POWERHOUSE | | $ 2,000 | | | | $ 2,000 | |
| Threehouse | | $ 7,121 | | | | $ 7,121 | |
| Subscription BoA -palm coast | $ 8,333 | $ 8,333 | $ 8,333 | $ 8,333 | $ 8,333 | $ 8,333 | $ 8,333 |
| Midwest list | | | | | | | |

| | January 1/15 to 1/19 | January 1/22 to 1/26 | Jan/Feb 1/29 to 2/2 | February 2/5 to 2/9 | February 2/12 to 2/16 (Total February) | February 2/19 to 2/23 | Feb/March 2/26 to 3/2 |
|---|---|---|---|---|---|---|---|
| Zinio | | $ 5,000 | | | | | $ 5,000 |
| Cybermania | | | | | | | $ 20,000 |
| **TOTAL PUBLISHING** | $ 8,333 | $ 30,254 | $ 8,333 | $ 8,333 | $ 16,933 | $ 79,454 | $ 8,333 |
| Licensing | | | | | | | |
| Topco | | | | | | | |
| **TOTAL LICENSING** | $ 19,333 | $ 134,680 | $ 214,624 | $ 32,899 | $ - | $ - | $ - |
| Revenue per week | $ 19,333 | $ 134,680 | $ 214,624 | $ 32,899 | $ 93,468 | $ 305,937 | $ - |
| Licensing Agreement for DIP Financing | | | $ 200,000 | | | | $ 166,590 |
| **TOTAL REVENUES PER WEEK** | $ 19,333 | $ 134,680 | $ 414,624 | $ 32,899 | $ 93,468 | $ 305,937 | $ 166,590 |
| Total Cash Projected per Month | | $ 154,013 | | | $ 846,928 | | |
| **EXPENSES** | | | | | | | |
| Payroll including taxes | | $ 45,021 | $ 25,547 | $ 80,000 | $ 80,000 | $ 80,000 | |
| Professional Fees: Media | | | | | | | |
| C.HOCQUEL Inc. Catherine brandt COO | | | | $ 7,500 | | $ 7,500 | |
| Keith withworth- CFO | | | | $ 3,333 | | $ 3,333 | |
| Safe Keeping Record | | $ 2,500 | | | $ 2,500 | $ 2,500 | |
| Professional Fees: Broadcast | | | | | | | |
| Sam Philips | | $ 2,000 | $ 2,000 | | $ 2,000 | $ 2,000 | |
| Jose Ponce | | $ 2,000 | $ 2,000 | | $ 2,000 | $ 2,000 | |
| Jason Bekoski | | $ 1,600 | | $ 1,600 | $ 1,600 | $ 1,600 | |
| Professional Fees: Publishing | | | | | | | |
| Barbara Pizio | | $ 7,000 | $ 6,000 | | $ 3,000 | | |
| Taxes others | | | | | | | |
| Rent | | $ 22,500 | $ 22,500 | | | | |
| Utilities/Storage/Securities/Phone: | | | | | | | |
| ADT Security | | | $ 222 | | | | |
| AT&T | | | $ 4,000 | | | | |
| Cybex Solution | | | $ 189 | | | | |
| Costco/Home Depot/Office Depot (Office Supplies) | | | $ 2,000 | | | | |
| LADWP | | | $ 5,500 | | | | |

38

| | | | | | |
|---|---|---|---|---|---|
| Orkin | $ 214 | | | | |
| Pitney Bowes | $ 300 | | | | |
| Ready Fresh by Nestle | $ 35 | | | | |
| Southern CAL Edison | $ 600 | | | | |
| Total Records Information Mgmt | $ 2,500 | | | | |
| Uline | $ 900 | | | | |
| Verizon Wireless | $ 200 | | | | |
| Waste Management | $ 360 | | | | |
| **Insurance** | | | | | |
| Marsh (Premium Assigment)-insurance | $ 10,000 | | | | $ 15,000 |
| Aflack | $ 2,554 | | $ 3,000 | | |
| Cal choice | | $ 26,000 | | | |
| Choice Builder | | | | $ 2,000 | |
| Lincoln National Life Insurance-Kelly's ins qtrly | | | | | |
| **Broadcast COG** | | | | | |
| M7 | | | | $ 64,000 | |
| Basmedia | | | | $ 10,000 | |
| Arkena | $ 3,000 | | | | $ 3,000 |
| Contents licensing & buy | $ 23,000 | | $ 15,000 | $ 15,000 | |
| Contents Production in house | | $ 15,000 | $ 15,000 | | |
| Agents Fees/ Europe OGUN /DMC US | $ 10,000 | | | | $ 8,000 |
| SPF Transfer | $ 1,400 | | $ 1,250 | | |
| **Publishing COG** | | | | | |
| Creel ( Printing /Paper ) | $ 59,000 | | $ 58,300 | | |
| Palm coast ( management subscription ) | $ 11,324 | | $ 9,803 | | $ 9,803 |
| Clark Freight -distribution/Willet Freight | $ 10,524 | | | | |
| USPS / Palm Coast Subscription postage | $ 13,000 | $ 7,000 | | $ 10,000 | $ 13,000 |
| Talents/editor/ art( Getty ) | $ 9,402 | $ 30,000 | | | |
| Professional fees/ Willet Associate | $ 4,250 | | | | $ 5,000 |
| **Digital COG** | | | | | |
| Mojohost | $ 11,000 | | $ 11,000 | | |
| Christine Pevarnik | $ 1,075 | | $ 864 | | $ 864 |
| Contractors : Webdot & Manassi | $ 3,080 | | $ 12,000 | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Affiliates platform/Paxum | | | $ 2,600 | | | $ 8,000 | |
| Outside-Legal - IP-Trademarks | | | $ 5,000 | | | $ 15,000 | |
| divers expenses( ex : travel- trade show ) | | | | | | $ 2,000 | |
| Total | | $ 79,345 | $ 218,835 | $ 191,853 | $ 118,014 | $ 226,333 | $ 78,767 |
| Payment of monthly interest to Exworks | | $ - | | | | | |
| Term Loan Payment to ExWorks | | | | | | | |
| PROFESSIONAL FEES | | | | | | | |
| TOTAL EXPENSES | | $ 79,345 | $ 218,835 | $ 191,853 | $ 118,014 | $ 226,333 | $ 78,767 |
| SUMMARY | | | | | | | |
| TOTAL EXPENSES PER WEEK | | $ 79,345 | $ 218,835 | $ 191,853 | $ 118,014 | $ 226,333 | $ 78,767 |
| TOTAL REVENUES PER WEEK | | $ 134,680 | $ 414,624 | $ 32,899 | $ 93,468 | $ 305,937 | $ 166,590 |
| Beginning cash Jan 26 | $ 204,279 | $ 124,934 | $ 320,723 | $ 161,769 | $ 137,223 | $ 216,827 | $ 304,650 |

| | March 3/5 to 3/9 | March 3/12 to 3/16 | March 3/19 to 3/23 | March 3/26 to 3/30 | April 4/2 to 4/6 | April 4/9 to 4/13 | April 4/16 to 4/20 | April 4/23 to 4/27 |
|---|---|---|---|---|---|---|---|---|
| | $ 2,163 | | | $ 8,848 | $ 2,163 | | | $ 8,848 |
| | | $ 4,914 | $ 15,720 | | | $ 4,914 | $ 15,720 | |
| | | | $ 8,700 | | | | $ 8,700 | |
| | | | $ 577 | | | | $ 577 | |
| | | | | | | | $ 21,148 | |
| | | | $ 500 | | | $ 500 | | |
| | | | $ 498 | | | | $ 498 | |
| | $ 12,757 | | $ 4,770 | | $ 4,903 | $ 12,263 | | $ 5,144 |
| | | | $ 594 | | | | $ 594 | |
| | | | $ 19,209 | | | | | $ 19,209 |
| | | | $ 1,158 | | $ 1,180 | | | $ 1,158 |
| | | | $ 475 | $ 4,235 | | | $ 475 | $ 4,235 |
| | | | $ 4,836 | | | | | $ 4,258 |
| | | | $ 14,114 | | | | $ 14,114 | |
| | | | $ 3,724 | | | | $ 3,724 | |
| | $ 260 | | | $ 260 | | | | $ 260 |
| | | | | $ 47,000 | | | | |
| | | | $ 6,741 | | | | $ 6,665 | |
| | | | $ 7,000 | | | | | |
| | $ 1,408 | | | $ 401 | | | $ 401 | |
| | | $ 144 | $ 588 | | | | $ 588 | $ 144 |
| | | $ 20,362 | | | | | $ 20,362 | |
| | | | | $ 1,345 | | | | $ 1,345 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | $ 20,129 | | | | | $ 21,129 | |
| | $ 930 | | | | | $ 930 | |
| | $ 651 | | | | | $ 651 | |
| | | $ 288 | | | | $ 288 | |
| | | $ 267 | | | | $ 267 | |
| | | $ 20,456 | | | | | $ 20,000 |
| | | | $ 12,771 | | | | $ 12,771 |
| | | | $ 20,535 | | | | $ 20,535 |
| | | | | | $ 3,750 | | |
| | | $ 19,536 | | | | $ 19,536 | |
| | | | | $ 83,000 | | | |
| | | | $ 500 | | | | $ 500 |
| | | | $ 9,000 | | | | $ 9,000 |
| $ 16,588 | $ 47,129 | $ 129,751 | $ 104,894 | $ 91,246 | $ 21,427 | $ 136,366 | $ 107,406 |
| $ 8,000 | $ 8,000 | $ 8,000 | $ 8,000 | $ 8,000 | $ 8,000 | $ 8,000 | |
| $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | |
| | | $ 2,000 | | | | $ 2,000 | |
| | | | $ 1,500 | | | $ 1,500 | |
| | | | $ 60,000 | | | | $ 60,000 |
| $ 11,000 | $ 11,000 | $ 13,000 | $ 72,500 | $ 11,000 | $ 11,000 | $ 14,500 | $ 60,000 |
| | $ 65,000 | $ 40,000 | | | $ 63,000 | $ 40,000 | |
| | | $ 2,000 | | | | $ 2,000 | |
| | | $ 7,121 | | | | $ 7,121 | |
| $ 8,333 | $ 8,333 | $ 8,333 | $ 8,333 | $ 8,333 | $ 8,333 | $ 8,333 | $ 8,333 |

| | March 3/5 to 3/9 | March 3/12 to 3/16 | March 3/19 to 3/23 | March 3/26 to 3/30 | April 4/2 to 4/6 | April 4/9 to 4/13 | April 4/16 to 4/20 | April 4/23 to 4/27 |
|---|---|---|---|---|---|---|---|---|
| | | Total March | | | | Total April | | |
| | $ 8,333 | $ 73,333 | $ 77,454 | $ 13,333 | $ 8,333 | $ 71,333 | $ 77,454 | $ 13,333 |
| | | | $ 20,000 | $ 5,000 | | | $ 20,000 | $ 5,000 |
| | $ - | $ - | $ - | $ - | 43,000 | $ - | $ - | $ - |
| | $ 35,921 | $ 131,462 | $ 220,205 | $ 190,727 | 43,000 | $ 103,760 | $ 228,320 | $ 180,739 |
| | $ 200,000 | | | | 153,579 | | | |
| | | | | | 200,000 | | | |
| | $ 235,921 | $ 131,462 | $ 220,205 | $ 190,727 | 353,579 | $ 103,760 | $ 228,320 | $ 180,739 |
| | | | 744,906 | | | Total April | 666,398 | |
| | $ 80,000 | $ 80,000 | $ 80,000 | | $ 80,000 | | $ 80,000 | |
| | $ 7,500 | $ 7,500 | $ 7,500 | | | $ 7,500 | | $ 7,500 |
| | $ 3,333 | $ 3,333 | $ 3,333 | | | $ 3,333 | | $ 3,333 |
| | $ 2,500 | $ 2,500 | $ 2,500 | | | $ 2,500 | | $ 2,500 |
| | $ 2,000 | $ 2,000 | $ 2,000 | | | $ 2,000 | | $ 2,000 |
| | $ 2,000 | $ 2,000 | $ 2,000 | | | $ 2,000 | | $ 2,000 |
| | | $ 1,600 | | $ 1,600 | | $ 1,600 | | $ 1,600 |
| | $ 3,000 | $ 3,000 | $ 3,000 | | | $ 3,000 | | $ 3,000 |
| | | | | $ 22,500 | | | | $ 22,500 |
| | $ 222 | | | | 222 | | | |
| | 4,000 | | | | 4,000 | | | |
| | 189 | | | | 189 | | | |
| | 2,500 | | | | 2,600 | | | |
| | 5,500 | | | | 5,500 | | | |

**43**

| Col 1 | Col 2 | Col 3 | Col 4 | Col 5 | Col 6 | Col 7 | Col 8 |
|---|---|---|---|---|---|---|---|
| | | | $ 214 | | | | $ 214 |
| | | | $ 300 | | | | $ 300 |
| | | | $ 35 | | | | $ 35 |
| | | | $ 600 | | | | $ 600 |
| | | | $ 2,500 | | | | $ 2,500 |
| | | | $ 900 | | | | $ 900 |
| | | | $ 200 | | | | $ 200 |
| | | | $ 360 | | | | |
| $ 15,000 | | $ 3,000 | | $ 15,000 | | $ 3,000 | |
| | $ 2,000 | | $ 26,000 | | $ 2,000 | | $ 26,000 |
| | | | | | $ 4,400 | | |
| $ 64,000 | | | | $ 64,000 | | | |
| $ 10,000 | | | | $ 10,000 | | | |
| | | $ 15,000 | $ 3,000 | | | $ 15,000 | $ 15,000 |
| | | $ 15,000 | $ 15,000 | | | $ 15,000 | $ 15,000 |
| $ 8,000 | | | $ 15,000 | $ 8,000 | | | |
| | | $ 1,250 | | | | $ 1,250 | |
| | $ 58,300 | $ 5,000 | $ 59,000 | | $ 58,300 | | $ 59,000 |
| | | $ 10,000 | $ 9,803 | | | | $ 5,000 |
| | $ 7,000 | | $ 13,000 | $ 10,000 | $ 7,000 | $ 10,000 | |
| | | | $ 30,000 | | | | $ 30,000 |
| $ 5,000 | | $ 11,000 | | $ 5,000 | | $ 11,000 | |
| $ 864 | | $ 864 | | $ 864 | | $ 864 | |
| | | $ 12,000 | | | | $ 12,000 | |

44

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | $ 8,000 | | | | $ 8,000 | |
| | | 15,000 | | | | 15,000 | |
| | | 2,000 | | | | 2,000 | |
| $ 267,853 | $ 69,714 | $ 197,033 | $ 136,964 | $ 268,423 | $ 95,047 | $ 172,300 | $ 147,297 |
| | | | | | | | |
| $ 267,853 | $ 69,714 | $ 197,033 | $ 136,964 | $ 268,423 | $ 95,047 | $ 172,300 | $ 147,297 |
| $ 267,853 | $ 69,714 | $ 197,033 | $ 136,964 | $ 268,423 | $ 95,047 | $ 172,300 | $ 147,297 |
| $ 235,921 | $ 131,462 | $ 220,205 | $ 190,727 | $ 353,579 | $ 103,760 | $ 228,320 | $ 180,739 |
| $ 272,719 | $ 334,467 | $ 357,639 | $ 411,402 | $ 496,557 | $ 505,270 | $ 561,290 | $ 594,733 |

# EXHIBIT 3

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (70,000.00) | (8,000.00) | (1,200.00) | (5,541.87) | | | 24,81 |
| | | | | (8,550.00) | (6,200.00) | (751.34) | (749.27) | | | |
| | | | | | | (4,106.08) | (15,000.00) | | | |
| (1,015.64) | (9,035.81) | (12,100.00) | (1,096.00) | (78,550.00) | (14,200.00) | (6,057.42) | (21,307.13) | 16,794.50 | 16,794.50 | 24,817.79 |
| 25,703.01 | 16,667.20 | 28,797.51 | 29,701.51 | 30,926.55 | 23,226.55 | 20,169.13 | 16,794.50 | 24,511.92 | 24,511.92 | 24,817.79 |
| 48,973.83 | 42,718.29 | 39,806.29 | 37,073.02 | 28,249.92 | 26,184.28 | 24,004.12 | 24,420.17 | 24,420.17 | 24,511.92 | |
| 191.19 | 225.55 | 8,500.00 | 7,955.97 | | | 10,500.00 | 344.88 | | | |
| 503.27 | 1,007.65 | 634.98 | 861.98 | 334.36 | 1,600.63 | 66,380.05 | 344.88 | | | |
| 694.46 | 1,233.20 | 9,134.98 | 8,817.95 | 334.36 | 1,600.63 | 76,880.05 | | | | |
| (950.00) | (4,145.20) | (11,868.25) | (2,370.00) | (2,400.00) | (543.29) | (74,000.00) | (253.13) | | | |
| (6,000.00) | | | (9,857.00) | | (3,237.50) | (2,464.00) | (253.13) | | | |
| (6,950.00) | (4,145.20) | (11,868.25) | (12,227.00) | (2,400.00) | (3,780.79) | (76,464.00) | 24,511.92 | 24,511.92 | 24,511.92 | |
| 42,718.29 | 39,806.29 | 37,073.02 | 33,663.97 | 26,184.28 | 24,004.12 | 24,420.17 | 24,817.79 | 24,817.79 | | |
| 15,324.39 | 16,489.34 | 22,533.68 | 22,533.68 | 23,579.38 | 30,888.85 | 23,256.96 | 25,624.00 | | | |
| 123.64 | | 2,085.69 | 7,998.60 | 7,084.92 | | 2,317.14 | | | | |
| 1,041.31 | 269.00 | 13,000.00 | | 224.55 | 374.10 | 49.90 | 24.95 | | | |
| | | 254.10 | 254.10 | | | | | | | |
| 1,164.95 | 269.00 | 15,339.79 | 8,252.70 | 7,309.47 | 374.10 | 2,367.04 | 24.95 | | | |
| (854.52) | (854.52) | (12.23) | (7,000.00) | | (5.99) | | | | | |
| | | | | | (4,000.00) | | (831.16) | | | |
| | | (8,697.70) | | | (4,000.00) | | (831.16) | | | |
| | | (8,709.93) | (7,000.00) | | (8,005.99) | | | | | |
| 16,489.34 | 15,903.82 | 22,533.68 | 23,786.38 | 23,579.38 | 23,256.96 | 25,624.00 | 24,817.79 | | | |
| 16,489.34 | 15,903.82 | 22,533.68 | 23,786.38 | 30,888.85 | | | | | | |

**47**

| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
|---:|---:|---:|---:|---:|---:|---:|---:|---:|
|  |  | 33,000.00 |  |  | 80,000.00 |  |  |  |
|  |  |  |  | 6,000.00 |  | 10,000.00 |  |  |
| - | - | 33,000.00 |  | 20.69 | 80,000.00 |  | 88.66 | - |
| (47.64) | (778.92) | (5,815.30) | - | 6,020.69 | (279.82) | 10,000.00 |  | - |
| (2,500.00) | (8,500.00) |  | (1,845.34) | (2,043.22) | (22,645.08) | (2,199.67) | 88.66 |  |
| (4,000.00) |  | (5,815.30) |  | (6,812.00) | (10,000.00) | (77,000.00) | (770.23) |  |
| (6,547.64) | (9,278.92) | 57,428.94 | (1,845.34) | (8,855.22) | (32,924.90) | (79,199.67) | (770.23) |  |
| 41,368.50 | 32,089.58 | 59,274.28 | 57,428.94 | 54,594.41 | 101,669.51 | 32,469.84 | 31,788.27 | 31,788.27 |
| 126,455.29 | 148,393.04 | 153,104.64 | 150,006.95 | 152,993.41 | 195,095.34 | 103,883.62 | 102,927.72 | 99,838.63 |
| **126,455.29** | **148,393.04** | **153,104.64** | **150,006.95** | **152,993.41** | **195,095.34** | **103,883.62** | **102,927.72** | **99,838.63** |

48

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | - | - |
| | | | | | | | - | - |
| 18,678.75 | 26,147.76 | | - | 26,147.76 | 59,092.95 | | | 59,092.95 |
| 18,678.75 | 26,147.76 | | - | 26,147.76 | 59,092.95 | | - | 59,092.95 |
| 18,678.75 | 26,147.76 | | - | 26,147.76 | 59,092.95 | | | 59,092.95 |
| 18,678.75 | 26,147.76 | | - | 26,147.76 | 59,092.95 | | - | 59,092.95 |
| 18,678.75 | 26,147.76 | | - | 26,147.76 | 59,092.95 | | - | 59,092.95 |
| (89,000.00) | | | | | | | | |
| (89,000.00) | 18,678.75 | 25,646.86 | 500.90 | 500.90 | | - | 26,147.76 | 52,468.21 | 6,360.99 | 263.75 | 6,624.74 | 59,092.95 |
| (100.00) | (100.00) | 107,678.75 | 2,134.99 | 20,320.61 | 3,291.26 | 23,611.87 | 25,646.86 | 49,620.87 | 52.92 | 2,599.86 | 194.56 | 2,847.34 | 52,468.21 |
| 15,905.84 | 1,609.96 | 525.03 | 525.03 | - | 2,134.99 | 49,346.82 | 274.05 | 274.05 | 49,620.87 |
| 15,905.84 | 1,388.59 | 221.37 | 221.37 | - | 1,609.96 | 49,157.57 | 189.25 | 189.25 | 49,346.82 |
| (30,000.00) | (1,200.00) | (31,200.00) | 15,905.84 | 29,408.19 | 273.94 | 30,000.00 | 30,273.94 | (58,293.54) | (58,293.54) | 1,388.59 | 48,399.66 | 757.91 | 757.91 | 49,157.57 |

**49**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| - | - | - | - | - | -49.07 | - | - | - | - |
| | | | | | 711.31 | | | |
| | | | | | (45,021.40) | | | |
| | | | | | (11,324.00) | | | |
| | | | | | (23,000.00) | | | |
| | | | | | 89,000.00 | | | |
| (27,361.72) | - | - | - | - | | - | - | - |
| (27,361.72) | - | (924.08) | (924.08) | (924.08) | (924.08) | (924.08) | (49.07) | (875.01) | (875.01) |
| (875.01) | | | | | | | | | |
| 26,486.71 | - | | | | | | | | - |
| 67,888.76 | 68,687.84 | 104,896.53 | 104,896.53 | 104,896.53 | 104,896.53 | 104,896.53 | 104,896.53 | 186,819.96 | 68,687.84 | 67,888.76 | 94,839.86 |
| | | 10,365.91 | 10,365.91 | 10,365.91 | 10,365.91 | 10,365.91 | 711.31 | 711.31 | | | |
| | | 10,365.91 | 10,365.91 | 10,365.91 | 10,365.91 | 10,365.91 | 10,365.91 | 711.31 | - | - | - |
| 67,888.76 | 68,687.84 | 115,262.44 | 115,262.44 | 115,262.44 | 115,262.44 | 115,262.44 | 115,262.44 | 187,531.27 | 68,687.84 | 67,888.76 | 94,839.86 |

# EXHIBIT 4

**Michael Weiss**

| | |
|---|---|
| **From:** | Michael Weiss <mw@weissandspees.com> |
| **Sent:** | Wednesday, January 17, 2018 9:56 AM |
| **To:** | Catherine Brandt |
| **Subject:** | RE: Cash needs for Thursday |

Yes, but just for these payments that Dream approved

**From:** Catherine Brandt [mailto:cbrandt@penthouse.com]
**Sent:** Wednesday, January 17, 2018 9:55 AM
**To:** Michael Weiss
**Cc:** Beth R. Young; Kelly Holland; Robert Campbell
**Subject:** Re: Cash needs for Thursday

Thanks Micheal.

Does it mean we CAN do checks and wire for this from the current accounts. Right?

**Catherine Brandt**
**PENTHOUSE GLOBAL MEDIA, INC.**
**Cell: (1) 203-536-4995**

CONFIDENTIALITY NOTICE:  The information contained in this electronic mail message, including attachments, is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It contains HIGHLY CONFIDENTIAL information that is legally privileged, proprietary in nature, or otherwise protected by law from certain disclosures.  If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED, and may subject you to liability.  If you have received this transmission in error, please immediately notify us by reply e-mail at cbrandt@penthouse.com or by telephone at (310) 280-1900 and destroy the original transmission and its attachments without reading them or saving them to disk.  Thank you.

On Jan 17, 2018, at 9:31 AM, Michael Weiss <mw@weissandspees.com> wrote:

Yes, that is acceptable.

**From:** Beth R. Young [mailto:bry@lnbyb.com]
**Sent:** Wednesday, January 17, 2018 9:31 AM
**To:** Michael Weiss
**Subject:** RE: Cash needs for Thursday

Hi Michael.

I have confirmed with Dream Media that it consents to the Debtors' limited use of cash collateral in the sum of $7,900 as outlined in your email below, without prejudice to, and in reservation of, the

parties' rights, claims and interests regarding any other requests for use of cash collateral going forward.  Please confirm that this is acceptable.

Best regards,

Beth

**BETH ANN R. YOUNG,** Esq.

**LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.**

10250 Constellation Blvd.  |  Suite 1700  |  Los Angeles, CA  90067

Phone  310 229 1234  |  Direct  310 229 3352  |  Mobile  310 409 6708

bry@lnbyb.com  |  **www.lnbyb.com**

The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Brill L.L.P.'s email policies which can be found at http://www.lnbyb.com/disclaimers.htm.

🌐 Please consider the environment before printing this email

**From:** Michael Weiss [mailto:mw@weissandspees.com]
**Sent:** Tuesday, January 16, 2018 7:39 PM
**To:** Beth R. Young
**Subject:** RE: Cash needs for Thursday

Obviously, any payment is without prejudice to either parties rights

**From:** Beth R. Young [mailto:bry@lnbyb.com]
**Sent:** Tuesday, January 16, 2018 7:38 PM
**To:** Michael Weiss
**Cc:** Laura Meltzer
**Subject:** RE: Cash needs for Thursday

I'll check with my client and get back to you shortly, but probably in the morning, given the time of day.  Is the total amount of funds requested $7,900 reflected below?

**BETH ANN R. YOUNG,** Esq.

**LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.**

10250 Constellation Blvd.  |  Suite 1700  |  Los Angeles, CA  90067

Phone  310 229 1234  |  Direct  310 229 3352  |  Mobile  310 409 6708

bry@lnbyb.com  |  **www.lnbyb.com**

The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Brill L.L.P.'s email policies which can be found at http://www.lnbyb.com/disclaimers.htm.

🌐 Please consider the environment before printing this email

**From:** Michael Weiss [mailto:mw@weissandspees.com]
**Sent:** Tuesday, January 16, 2018 7:23 PM
**To:** Beth R. Young
**Cc:** Laura Meltzer
**Subject:** Cash needs for Thursday

Beth:

We are fine allowing you to sweep our account without a formal cash collateral stip but we need a small amount of cash for tomorrow to keep productions goings so we can meet our broadcast contract obligations.  Can we agree on this informally or do we need a forma stipulation?

I am in around 8:15.

Broadcast :
We have a 2 day shoot this week and here are the "location" check we need to hand to the check to owner before having a chance to shoot.

The 2 checks $1,200.00 each for the location are going to:
Dali Lou Ranch, Media, LLC
9503 Clybourn Ave.
Sun Valley, CA  91352

Petty cash for shoot ( food for talents and crews ):
$ 500

Publishing :
This is the postage for the month for all the PH magazines subscribers
$5,000.00 wire transfer for Postage goes to:
Palm Coast Data, LLC
Attn:  Finance Dept
11 Commerce Blvd.
Palm Coast, FL 32164
Account Number 8026270005
ABA (Wire) 031207607

Michael H. Weiss
Weiss & Spees, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067
T: (424)245-3102 (direct)
C: (310)913-1774
F: (424) 217-4160
Email:mw@weissandpsees.com

3

**Michael Weiss**

| | |
|---|---|
| **From:** | Michael Weiss <mw@weissandspees.com> |
| **Sent:** | Thursday, January 18, 2018 12:15 PM |
| **To:** | Catherine Brandt |
| **Subject:** | RE: Cash needs for Thursday |

yes

**From:** Catherine Brandt [mailto:cbrandt@penthouse.com]
**Sent:** Thursday, January 18, 2018 11:44 AM
**To:** Michael Weiss
**Cc:** Laura Meltzer
**Subject:** Re: Cash needs for Thursday

Micheal ,

Just to let you know that we processed with the payment approved below.

Only glitch is that they needed a first check for $ 1200 for the location on Thursday morning and we did not have the approval in hand yet .So I went on location and paid myself $1200 to the location owner.

Can I get re-imbursed for the expense as it was approved for the amount of $1200 . Obviously will provide the copy of the check cashed by the owner of the location.

Let me know,

Thanks

Catherine

**Catherine Brandt**
**PENTHOUSE GLOBAL MEDIA, INC.**
**Cell: (1) 203-536-4995**

CONFIDENTIALITY NOTICE:  The information contained in this electronic mail message, including attachments, is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It contains HIGHLY CONFIDENTIAL information that is legally privileged, proprietary in nature, or otherwise protected by law from certain disclosures.  If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED, and may subject you to liability.  If you have received this transmission in error, please immediately notify us by reply e-mail at cbrandt@penthouse.com or by telephone at (310) 280-1900 and destroy the original transmission and its attachments without reading them or saving them to disk.  Thank you.

1

On Jan 17, 2018, at 9:55 AM, Michael Weiss <mw@weissandspees.com> wrote:

Yes, but just for these payments that Dream approved

**From:** Catherine Brandt [mailto:cbrandt@penthouse.com]
**Sent:** Wednesday, January 17, 2018 9:55 AM
**To:** Michael Weiss
**Cc:** Beth R. Young; Kelly Holland; Robert Campbell
**Subject:** Re: Cash needs for Thursday

Thanks Micheal.

Does it mean we CAN do checks and wire for this from the current accounts. Right?
**Catherine Brandt**
**PENTHOUSE GLOBAL MEDIA, INC.**
**Cell: (1) 203-536-4995**

CONFIDENTIALITY NOTICE: The information contained in this electronic mail message, including attachments, is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It contains HIGHLY CONFIDENTIAL information that is legally privileged, proprietary in nature, or otherwise protected by law from certain disclosures. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED, and may subject you to liability. If you have received this transmission in error, please immediately notify us by reply e-mail at cbrandt@penthouse.com or by telephone at (310) 280-1900 and destroy the original transmission and its attachments without reading them or saving them to disk. Thank you.

On Jan 17, 2018, at 9:31 AM, Michael Weiss <mw@weissandspees.com> wrote:

Yes, that is acceptable.

**From:** Beth R. Young [mailto:bry@lnbyb.com]
**Sent:** Wednesday, January 17, 2018 9:31 AM
**To:** Michael Weiss
**Subject:** RE: Cash needs for Thursday

Hi Michael.

I have confirmed with Dream Media that it consents to the Debtors' limited use of cash collateral in the sum of $7,900 as outlined in your email below, without prejudice to, and in reservation of, the parties' rights, claims and interests regarding any other requests for use of cash collateral going forward.  Please confirm that this is acceptable.

Best regards,

Beth

**BETH ANN R. YOUNG**, Esq.

**LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.**

10250 Constellation Blvd.   |   Suite 1700   |   Los Angeles, CA   90067

Phone  310 229 1234   |   Direct  310 229 3352   |   Mobile  310 409 6708

bry@lnbyb.com   |   **www.lnbyb.com**

The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Brill  L.L.P.'s
email policies which can be found at http://www.lnbyb.com/disclaimers.htm.

🌏 Please consider the environment before printing this email

**From:** Michael Weiss [mailto:mw@weissandspees.com]
**Sent:** Tuesday, January 16, 2018 7:39 PM
**To:** Beth R. Young
**Subject:** RE: Cash needs for Thursday

Obviously, any payment is without prejudice to either parties rights

**From:** Beth R. Young [mailto:bry@lnbyb.com]
**Sent:** Tuesday, January 16, 2018 7:38 PM
**To:** Michael Weiss
**Cc:** Laura Meltzer
**Subject:** RE: Cash needs for Thursday

I'll check with my client and get back to you shortly, but probably in the morning, given the time of
day.  Is the total amount of funds requested $7,900 reflected below?

**BETH ANN R. YOUNG**, Esq.

**LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.**

10250 Constellation Blvd.   |   Suite 1700   |   Los Angeles, CA   90067

Phone  310 229 1234   |   Direct  310 229 3352   |   Mobile  310 409 6708

bry@lnbyb.com   |   **www.lnbyb.com**

The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Brill  L.L.P.'s
email policies which can be found at http://www.lnbyb.com/disclaimers.htm.

🌏 Please consider the environment before printing this email

**From:** Michael Weiss [mailto:mw@weissandspees.com]
**Sent:** Tuesday, January 16, 2018 7:23 PM
**To:** Beth R. Young
**Cc:** Laura Meltzer
**Subject:** Cash needs for Thursday

Beth:

We are fine allowing you to sweep our account without a formal cash collateral stip but we need a small amount of cash
for tomorrow to keep productions goings so we can meet our broadcast contract obligations.  Can we agree on this
informally or do we need a forma stipulation?

I am in around 8:15.

3

Broadcast :
We have a 2 day shoot this week and here are the "location" check we need to hand to the check to owner before having a chance to shoot.

The 2 checks $1,200.00 each for the location are going to:
Dali Lou Ranch, Media, LLC
9503 Clybourn Ave.
Sun Valley, CA  91352

Petty cash for shoot ( food for talents and crews ):
$ 500


Publishing :
This is the postage for the month for all the PH magazines subscribers
$5,000.00 wire transfer for Postage goes to:
Palm Coast Data, LLC
Attn:  Finance Dept
11 Commerce Blvd.
Palm Coast, FL 32164
Account Number 8026270005
ABA (Wire) 031207607

Michael H. Weiss
Weiss & Spees, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067
T: (424)245-3102 (direct)
C: (310)913-1774
F: (424) 217-4160
Email:mw@weissandpsees.com

4

**58**

**Michael Weiss**

| | |
|---|---|
| **From:** | Michael Weiss <mw@weissandspees.com> |
| **Sent:** | Monday, January 22, 2018 11:07 AM |
| **To:** | Kelly Holland (kholland@penthouse.com); Catherine Brandt (cbrandt@penthouse.com); Keith Whitworth (whit_cpa@yahoo.com) |
| **Cc:** | Robert Campbell (rcampbell@penthouse.com) |
| **Subject:** | FW: LV33237 - Penthouse Magazine - March |

**From:** Beth R. Young [mailto:bry@lnbyb.com]
**Sent:** Monday, January 22, 2018 11:06 AM
**To:** Michael Weiss
**Subject:** RE: LV33237 - Penthouse Magazine - March

Michael:

When this case started, you indicated that the Debtors were working on obtaining an equity infusion of $1MM, and that you hoped to have that deal finalized with funds in your trust account by the beginning of last week.  That deal apparently has now morphed into some kind of license agreement that you have not finalized, but hope to shortly.  While we believe that any licensing agreement will be subject to Dream Media's security interests and would in any event require approval of the Court, the continuing concern is the lack of a coherent budget that has been approved by Dream Media and the Court.  While we have given the Debtors time to get their ducks in a row, it does not appear to be happening quickly, if at all, which is not a criticism of you, but just an observation.

Accordingly, Dream Media authorizes the Debtors use of cash collateral to pay the printer the sum of $58,293.54, ***but does not*** authorize use of cash collateral for any other purposes without a written stipulation with Dream Media and/or a Court Order approving a budget and the Debtors' use of cash collateral in accordance with the approved Budget.

I will send you shortly a more detailed list of the questions and concerns we have regarding the 90 day Budget provided by you on Friday, January 19, but want to point out now a significant discrepancy of this 90 day Budget showing a cash balance on January 19, 2018 of $112,282.10 as compared to the Cash Report you sent to me the day before, on January 18, 2018 at 4:26 pm, showing a higher cash balance of $140,475.95.  This $28,000 discrepancy needs to be accounted for, since the only consented use of cash collateral during this time which could have impacted the cash balance was the single

payment of $3,182, meaning that there is still $230,000 unaccounted for.  Please let me know.

Best regards,

Beth



BETH ANN R. YOUNG, ESQ.
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 CONSTELLATION BLVD.  |  SUITE 1700  |  LOS ANGELES, CA  90067
PHONE  310 229 1234  |  DIRECT  310 229 3352  |  MOBILE  310 409 6708
BRY@LNBYB.COM  |  WWW.LNBYB.COM

The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Brill L.L.P.'s
email policies which can be found at http://www.lnbyb.com/disclaimers.htm.

🌿 Please consider the environment before printing this email

**From:** Michael Weiss [mailto:mw@weissandspees.com]
**Sent:** Friday, January 19, 2018 3:19 PM
**To:** Beth R. Young
**Subject:** FW: LV33237 - Penthouse Magazine - March

Beth:

We are very close on the finalizing the DIP financing.
I hope it finalize it over the weekend.
As soon as we have a final term sheet, I will send it to you.
In the meantime, we are having trouble with the printers as descried below.
WE believe that the magazine is critical to maintaining the brand.
Please give us your client's view on this.

Michael

**From:** Catherine Brandt [mailto:cbrandt@penthouse.com]
**Sent:** Friday, January 19, 2018 2:24 PM
**To:** Michael Weiss
**Cc:** Kelly Holland; Accounting
**Subject:** Fwd: LV33237 - Penthouse Magazine - March

Micheal,

Per as our call with Creel earlier this week and our discussion , please find below the pro-format from Creel to print the magazine for $ 58 293.54.

We need to send this today to respect the printing and delivery schedule ( to be printed this weekend) . In not doing so we will incur the following risks and losses per as our discussion with Creel:

1/ The advance from our distributor will cost us 15 K more to deploy and will impact the cash flow schedule by two weeks.

2/ We will incur $ 2000 of additional cost to expedite the paper.

2/ The sales at newstands and the subscriptions delivery timing will be impacted ( customers satisfactions )

3/ We loose our pool spot with the freight company ( Clark ) , which will be at premium price. An additional $ 4 to 5K to the current estimated $ 10 000

4/ There is as well an additional cost that they are currently calculating and that I will forward later.

So all together and without counting in $ the impact on customers , this will impact financially the company with additional cost for this operation of minimum $ 6000 , with a two weeks delay in receiving $ 45k from Curtis next month.

Note that this is for the "Penthouse Magazine" and a similar situation will occur for "Penthouse Letters early next week.

Please advise

Thanks
**Catherine Brandt**
**PENTHOUSE GLOBAL MEDIA, INC.**
**Cell: (1) 203-536-4995**

CONFIDENTIALITY NOTICE: The information contained in this electronic mail message, including attachments, is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It contains HIGHLY CONFIDENTIAL information that is legally privileged, proprietary in nature, or otherwise protected by law from certain disclosures. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED, and may subject you to liability. If you have received this transmission in error, please immediately notify us by reply e-mail at cbrandt@penthouse.com or by telephone at (310) 280-1900 and destroy the original transmission and its attachments without reading them or saving them to disk. Thank you.

Begin forwarded message:

**From:** Christy Creel <christy.creel@creelprint.com>
**Subject: FW: LV33237 - Penthouse Magazine - March**
**Date:** January 16, 2018 at 3:08:11 PM PST
**To:** Daniel Pevonka <dan.pevonka@lsccom.com>, Catherine Brandt <cbrandt@penthouse.com>, Victor Gonzalez <vgonzalez@penthouse.com>

Attached is the Pro-Forma for the March Magazine. It came in a little below what we estimated. The only thing that has been "estimated" is the Fed Ex and Foreign postage, but it should be close.

There was a savings for not doing the spot gloss UV which attributed for the reduction as well as the reduced quantity.

**Christy Creel**   SENIOR SALES REPRESENTATIVE

PHONE: 702-784-4906    CELL: 702-204-3630
WEB: Corporate | Print Online | Our Blog

4

**Michael Weiss**

| | |
|---|---|
| **From:** | Michael Weiss <mw@weissandspees.com> |
| **Sent:** | Monday, January 22, 2018 2:45 PM |
| **To:** | Catherine Brandt (cbrandt@penthouse.com); Kelly Holland (kholland@penthouse.com); Robert Campbell (rcampbell@penthouse.com) |
| **Subject:** | FW: AVN Show : cash and checks needs |

Where are we on the immediate cash needs?

**From:** Beth R. Young [mailto:bry@lnbyb.com]
**Sent:** Monday, January 22, 2018 2:44 PM
**To:** Michael Weiss
**Subject:** RE: AVN Show : cash and checks needs

Michael:

Based upon and as stated in my email to you earlier today, Dream Media does not consent to use of cash collateral.  Please review my earlier email and let me know if you would like to discuss it further.

Beth

BETH ANN R. YOUNG, ESQ.
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 CONSTELLATION BLVD.   |   SUITE 1700   |   LOS ANGELES, CA   90067
PHONE  310 229 1234   |   DIRECT  310 229 3352   |   MOBILE  310 409 6708
BRY@LNBYB.COM   |   WWW.LNBYB.COM

The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Brill  L.L.P.'s
email policies which can be found at http://www.lnbyb.com/disclaimers.htm.

🌍 Please consider the environment before printing this email

**From:** Michael Weiss [mailto:mw@weissandspees.com]
**Sent:** Monday, January 22, 2018 2:42 PM
**To:** Beth R. Young
**Subject:** FW: AVN Show : cash and checks needs

This for a trade show, please advise if we can advance the cash.

**From:** Catherine Brandt [mailto:cbrandt@penthouse.com]
**Sent:** Monday, January 22, 2018 2:40 PM
**To:** Michael Weiss
**Cc:** Kelly Holland
**Subject:** Fwd: AVN Show : cash and checks needs

Hi Micheal,

Have you had a chance to send the AVN Discount approval

Our people are awaiting for us to get the cash to be able to go to Vegas tonight and tommorow.

I just signed a personal check ( $ 210 .06 ) for our photographer to go pick up some material  they absolutely need.

Thanks

Catherine

**Catherine Brandt**
**PENTHOUSE GLOBAL MEDIA, INC.**
**Cell: (1) 203-536-4995**

CONFIDENTIALITY NOTICE:  The information contained in this electronic mail message, including attachments, is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It contains HIGHLY CONFIDENTIAL information that is legally privileged, proprietary in nature, or otherwise protected by law from certain disclosures.  If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED, and may subject you to liability.  If you have received this transmission in error, please immediately notify us by reply e-mail at cbrandt@penthouse.com or by telephone at (310) 280-1900 and destroy the original transmission and its attachments without reading them or saving them to disk.  Thank you.

Begin forwarded message:

**From:** Catherine Brandt <cbrandt@penthouse.com>
**Subject: AVN Show : cash and checks needs**
**Date:** January 21, 2018 at 11:15:49 PM PST
**To:** Michael Weiss <mw@weissandspees.com>
**Cc:** Kelly Holland <kholland@penthouse.com>

Micheal ,

Per as our discussion we are still working on the "pay list" for next week as well as the critical vendors 'one and we expect to deliver tomorrow.

Nevertheless we have critical needs for approval tomorrow morning  for the AVN trade show in Vegas where we have our booth as every year.

Our crews are leaving on Tuesday.

Please find a detailed schedule of the checks and cash needs.

As All the cards have been cancelled, we will need to have a rush at the bank tomorrow with a check to ge the cash needed and deliver it on time to our trade show managers.

Let me know if you have any question,

2

**64**

Thanks Catherine

**Catherine Brandt**
**PENTHOUSE GLOBAL MEDIA, INC.**
**Cell: (1) 203-536-4995**

CONFIDENTIALITY NOTICE: The information contained in this electronic mail message, including attachments, is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It contains HIGHLY CONFIDENTIAL information that is legally privileged, proprietary in nature, or otherwise protected by law from certain disclosures. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED, and may subject you to liability. If you have received this transmission in error, please immediately notify us by reply e-mail at cbrandt@penthouse.com or by telephone at (310) 280-1900 and destroy the original transmission and its attachments without reading them or saving them to disk. Thank you.

**Michael Weiss**

| | |
|---|---|
| **From:** | Michael Weiss <mw@weissandspees.com> |
| **Sent:** | Thursday, January 25, 2018 9:59 AM |
| **To:** | Beth R. Young (bry@lnbyb.com) |
| **Cc:** | Kelly Holland (kholland@penthouse.com); Catherine Brandt (cbrandt@penthouse.com); Robert Campbell (rcampbell@penthouse.com); Laura Meltzer |
| **Subject:** | Cash Collateral |
| **Attachments:** | Broadcast.pdf; Digital 1.pdf; ListCriticalCashNeeds-10 days .xlsx; Media 1.pdf; Publishing 1.pdf; Penthouse Letter 1_19_18 (3).pdf |

Beth:

I have had a chance to discuss your proposal with Kelly.

Assuming that my client is interested, I don't think it can work on the timetable you suggest. We can't just dismiss the case without notice to creditors. Likewise, we can't simply install Adam and his group without notice to creditors and the consent of the OUST.

So, we would need to do something in the meantime to protect the company's assets. Given your doubts about Kelly, we are glad to agree to appoint Brad Smith as CRO if we can pay him from cash collateral. His retainer would be $15,000 and his hourly rate would be $395. Alternatively, we could appoint David Gottlieb.

In any event, Kelly is not willing to entertain that offer at this time. In fact, if given a choice between a trustee and your client taking over PH, Kelly would rather have a trustee.

Nevertheless, I do think that our clients do share one goal – the maximization of the value of the Penthouse brand. We believe that the brand could be irreparably injured should we cease production for our broadcast channels, cease publication of the magazine and fail to pay for insurance or taxes. To that end, please find a proposed use of cash collateral for the next 10 days that will prevent that from happening and insure a number of significant payments in the future.

Your clients best opportunity to monetize that debt quickly will be the deal with the Australians. I have been up most of the night with Australia. They are looking at my comments now. They went right to final documents without a term sheet. I hope we will have something to show you tomorrow afternoon when they get up. I also expect a more conventional DIP package tomorrow for $600,000. I think that the Court might allow the DIP lender to prime your client if it can keep sweeping the account for $60,000 per month.

As attached shows, we remain cash positive through that date. In particular, we ask that you note:

- Our clients have updated of payroll with the numbers provided by Paycheck this afternoon with the integration of three employees (film editors) from Priority Workforce into the payroll.
- No insiders will be paid at this time.
- Addition of $23,000 from our earlier list per the request from our content provider to be paid COD to deliver the 4 movies to complete our January order and to fulfill part of the content needs for February. Failure to this, will delay payment of $83,000 normally made on the first day of the month by Noof and will jeopardize $1,000,000 annual contract.
- Addition of $14,803 for PalmCoast Data for services rendered since January 11 to be paid on January 26 and COD for February for services and postage to be paid on January 31. PalmCoast is our fulfillment center and distribution platform for the PH Magazine and the PH Letter subscriptions. Revenues through PalmCoast are about $500,000 per year. See attached document sent from PalmCoast.

- Note that the delays or payments of interest will not on PGBI and PGBI but PGDM well. Contents produced by PGBI and PGBI are used on our digital platform at PGDI and the EXWORKS sweep account deposits amounts depends daily of the quality and the renewal of the contents provided online. In short The amount of the sweep account will be directly impacted as well.

-

As we have agreed in the past, we will allow ExWorks/Dream Media to sweep the account as in the past. I spoke with the US Trustee about that in connection with our bank account motion and that office wants a formal stipulation and order on that.

Lastly, we have yet to receive your accounting of the sums due under the loan and want to know why ExWorks is receiving the sweep instead of your client. Please also send your receivership papers because all I have is the complaint as well as proof that your client paid consideration for the loan.

Michael H. Weiss
Weiss & Spees, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067
T: (424)245-3102 (direct)
C: (310)913-1774
F: (424) 217-4160
Email:mw@weissandpsees.com

**Michael Weiss**

| | |
|---|---|
| **From:** | Michael Weiss <mw@weissandspees.com> |
| **Sent:** | Thursday, January 25, 2018 1:54 PM |
| **To:** | Catherine Brandt (cbrandt@penthouse.com) |
| **Subject:** | FW: Cash collateral |

Please provide this info

**From:** Beth R. Young [mailto:bry@lnbyb.com]
**Sent:** Thursday, January 25, 2018 12:54 PM
**To:** Michael Weiss
**Subject:** RE: Cash collateral

Michael:

Dream Media has concerns about the significant decline in income to the bank accounts. Has an account been closed or what is the basis for the decline in income? Please provide an explanation for this.

With regard to the payment of payroll, Dream Media has not approved any payment of payroll with its cash collateral. With regard to payroll:

1. you indicated that "insiders" will not be paid, please identify by name the "insiders" that will not be paid,

2. please provide a listing of the non-insider payroll that needs to be paid, by named individual.

Subject to receiving in acceptable form the previously requested information on the delivery of content by broadcaster/distribution partner, as well as pre and post-production schedules for print and video production, and the insider information requested above, Dream Media will consider the request for use of cash collateral for payment of non-insider payroll for this payroll period only. Future payroll will have to be considered separately.

As for your other requests for use of cash collateral, Dream Media approves of the below payments only:

1

**68**

1. Addition of $23,000 from our earlier list per the request from our content provider to be paid COD to deliver the 4 movies to complete our January order and to fulfill part of the content needs for February.

2. Addition of $14,803 for PalmCoast Data for services rendered since January 11 to be paid on January 26 and COD for February for services and postage to be paid on January 31.

3. There is $5,000 for the postage for the magazine,

4. $6,324 to be paid this week for the fulfillment

5. February to be paid COD on 1/31/18 = $9,803 for fufillment

Please be advised that Dream Media does not consent to use of cash collateral for anything else.

Beth

BETH ANN R. YOUNG, ESQ.
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 CONSTELLATION BLVD.  |  SUITE 1700  |  LOS ANGELES, CA  90067
PHONE  310 229 1234  |  DIRECT  310 229 3352  |  MOBILE  310 409 6708
BRY@LNBYB.COM  |  WWW.LNBYB.COM

The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Brill L.L.P.'s email policies which can be found at http://www.lnbyb.com/disclaimers.htm.

🌿 Please consider the environment before printing this email

**From:** Michael Weiss [mailto:mw@weissandspees.com]
**Sent:** Thursday, January 25, 2018 10:17 AM
**To:** Beth R. Young
**Subject:** Cash collateral

These are the MOST urgent needs:

There is $5,000 for the postage for the magazine,
Estimated : $6,324 to be paid this week for the fulfillment
Estimated February to be paid COD on 1/31/18 =:$9,803 for fufillment

Michael H. Weiss
Weiss & Spees, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067
T: (424)245-3102 (direct)

C: (310)913-1774

F: (424) 217-4160

Email:mw@weissandpsees.com

3

**70**

**Michael Weiss**

| | |
|---|---|
| **From:** | Michael Weiss <mw@weissandspees.com> |
| **Sent:** | Thursday, January 25, 2018 2:19 PM |
| **To:** | Catherine Brandt (cbrandt@penthouse.com) |
| **Cc:** | Kelly Holland (kholland@penthouse.com) |
| **Subject:** | RE: Cash collateral |

Haven't we provided this before?

**From:** Beth R. Young [mailto:bry@lnbyb.com]
**Sent:** Thursday, January 25, 2018 2:17 PM
**To:** Michael Weiss
**Subject:** RE: Cash collateral

Michael:

Before Dream Media can approve the non-insider payroll, we still need the following information, highlighted below, which has been requested many times, including again in my email this morning:

Subject to receiving in acceptable form the previously requested information on the delivery of content by broadcaster/distribution partner, as well as pre and post-production schedules for print and video production, and the insider information requested above, Dream Media will consider the request for use of cash collateral for payment of non-insider payroll for this payroll period only.  Future payroll will have to be considered separately.

Please advise.

Beth

BETH ANN R. YOUNG, ESQ.
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 CONSTELLATION BLVD.  |  SUITE 1700  |  LOS ANGELES, CA  90067
PHONE  310 229 1234  |  DIRECT  310 229 3352  |  MOBILE  310 409 6708
BRY@LNBYB.COM  |  WWW.LNBYB.COM

The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Brill  L.L.P.'s
email policies which can be found at http://www.lnbyb.com/disclaimers.htm.

🌿 Please consider the environment before printing this email

**From:** Michael Weiss [mailto:mw@weissandspees.com]
**Sent:** Thursday, January 25, 2018 2:12 PM

1

**71**

Per your request

From: Catherine Brandt [mailto:cbrandt@penthouse.com]
Sent: Thursday, January 25, 2018 2:11 PM
To: Michael Weiss
Cc: Kelly Holland; Keith Whitworth
Subject: Re: Cash collateral

Micheal

Insiders not to be paid:
Kelly Holland
Catherine Brandt
Keith Withworth

Paycheck document send already with employees in payroll period

I 'm passing the information of approval for the other than payroll to Ofie to prepare the checks and wires .

As for the bank accounts  and past and expected receivable for the month, I'll get to it as soon as I have a
chance this afternoon .


Thanks

Catherine


**Catherine Brandt**
**PENTHOUSE GLOBAL MEDIA, INC.**
**Cell: (1) 203-536-4995**


CONFIDENTIALITY NOTICE:  The information contained in this electronic mail message, including attachments, is covered by the Electronic Communications Privacy Act,
18 U.S.C. §§ 2510-2521. It contains HIGHLY CONFIDENTIAL information that is legally privileged, proprietary in nature, or otherwise protected by law from certain
disclosures.  If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying,
distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED, and may subject you to liability.  If you have received
this transmission in error, please immediately notify us by reply e-mail at cbrandt@penthouse.com or by telephone at (310) 280-1900 and destroy the original transmission and its
attachments without reading them or saving them to disk.  Thank you.


On Jan 25, 2018, at 1:54 PM, Michael Weiss <mw@weissandspees.com> wrote:

Please provide this info

**From:** Beth R. Young [mailto:bry@lnbyb.com]
**Sent:** Thursday, January 25, 2018 12:54 PM
**To:** Michael Weiss
**Subject:** RE: Cash collateral

Michael:

Dream Media has concerns about the significant decline in income to the bank accounts. Has an account been closed or what is the basis for the decline in income? Please provide an explanation for this.

With regard to the payment of payroll, Dream Media has not approved any payment of payroll with its cash collateral. With regard to payroll:

1. you indicated that "insiders" will not be paid, please identify by name the "insiders" that will not be paid,

2. please provide a listing of the non-insider payroll that needs to be paid, by named individual.

Subject to receiving in acceptable form the previously requested information on the delivery of content by broadcaster/distribution partner, as well as pre and post-production schedules for print and video production, and the insider information requested above, Dream Media will consider the request for use of cash collateral for payment of non-insider payroll for this payroll period only. Future payroll will have to be considered separately.

As for your other requests for use of cash collateral, Dream Media approves of the below payments only:

1. Addition of $23,000 from our earlier list per the request from our content provider to be paid COD to deliver the 4 movies to complete our January order and to fulfill part of the content needs for February.

2. Addition of $14,803 for PalmCoast Data for services rendered since January 11 to be paid on January 26 and COD for February for services and postage to be paid on January 31.

3

3. There is $5,000 for the postage for the magazine,

4. $6,324 to be paid this week for the fulfillment

5. February to be paid COD on 1/31/18 = $9,803 for fufillment

Please be advised that Dream Media does not consent to use of cash collateral for anything else.

Beth

BETH ANN R. YOUNG, ESQ.
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 CONSTELLATION BLVD.  |  SUITE 1700  |  LOS ANGELES, CA  90067
PHONE  310 229 1234  |  DIRECT  310 229 3352  |  MOBILE  310 409 6708
BRY@LNBYB.COM  |  WWW.LNBYB.COM

The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Brill  L.L.P.'s
email policies which can be found at http://www.lnbyb.com/disclaimers.htm.

🌿 Please consider the environment before printing this email

---

**From:** Michael Weiss [mailto:mw@weissandspees.com]
**Sent:** Thursday, January 25, 2018 10:17 AM
**To:** Beth R. Young
**Subject:** Cash collateral

These are the MOST urgent needs:

There is $5,000 for the postage for the magazine,
Estimated : $6,324 to be paid this week for the fulfillment
Estimated February to be paid COD on 1/31/18 =:$9,803 for fufillment


Michael H. Weiss
Weiss & Spees, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067
T: (424)245-3102 (direct)
C: (310)913-1774
F: (424) 217-4160
Email:mw@weissandpsees.com

**Michael Weiss**

| | |
|---|---|
| **From:** | Michael Weiss <mw@weissandspees.com> |
| **Sent:** | Friday, January 26, 2018 9:04 AM |
| **To:** | Beth R. Young |
| **Cc:** | Kelly Holland (kholland@penthouse.com); Catherine Brandt (cbrandt@penthouse.com); Robert Campbell (rcampbell@penthouse.com); Keith Whitworth (whit_cpa@yahoo.com) |
| **Subject:** | RE: Production Schedule and License Fulfillment for February |

This film production and license acquisition schedule is spread over two months as the in-house movie produced in this month, is in post-production but will be delivered in March. We do not have specific movie titles any further out than this so step repeat into the future. In months where cash flow is strong we decrease licensed titles and increase in-house production.

**Channel Titles Acquired/Edited in January for February Delivery 32K**
Lesbian Yoga Retreat – 4,000
Fantastic Foot Creams – 4000
Sexy Ways to Soak Her Feet – 4000
Fantasies in Pink – 3000
Two of a Kind – 3000
My Girlfriend's Mother – 3000
Young Hitchhikers – 11000

**Black Channel Titles Acquired/Edited in January for February Delivery – 17,000**
Sista' Swap
It's A Group Thing
Cuties With Booties
Black lesbian Affair 2
3 Way Chocolate Split

**Titles Produced by Penthouse in January/Edited for March Delivery – 15,000**
All talent and crew must be paid prior to release to clear compliance
Working Title 1 (tentatively, Petite Pets)

**From:** Beth R. Young [mailto:bry@lnbyb.com]
**Sent:** Friday, January 26, 2018 7:06 AM
**To:** Michael Weiss
**Cc:** Kelly Holland (kholland@penthouse.com); Keith Whitworth (whit_cpa@yahoo.com); Catherine Brandt (cbrandt@penthouse.com); Adam Levin; 'Paul Abramowitz'
**Subject:** Re: Approval to Pay Payroll

We are still waiting for you to provide the detailed information regarding the production status for both print and video by title. What is being worked on, where is it in the production process, what is left to do, what is the estimated timing to do it, when will it be completed. That was set forth in the emails from yesterday.

Beth Ann R. Young, Esq.
Levene, Neale, Bender, Yoo & Brill L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067

Direct Dial: (310) 229-3352
Mobile: (310) 409-6708
Email: BRY@LNBYB.COM

On Jan 26, 2018, at 6:45 AM, Michael Weiss <mw@weissandspees.com> wrote:

Beth:

Just so there is no mistake about this, please advise us ASAP what you require for PH to pay payroll, that we have not yet provided.

TO EXPEDITE THIS, PLEASE COPY MY CLIENTS ON YOUR CLIENT'S REQUIREMENTS.

WE are concerned about labor code violations if we don't make payroll on time.

Our deadline is 10:00, thanks.

Michael H. Weiss
Weiss & Spees, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067
T: (424)245-3102 (direct)
C: (310)913-1774
F: (424) 217-4160
Email:mw@weissandpsees.com

2

**Michael Weiss**

| | |
|---|---|
| **From:** | Michael Weiss <mw@weissandspees.com> |
| **Sent:** | Friday, January 26, 2018 10:27 AM |
| **To:** | Kelly Holland (kholland@penthouse.com); Catherine Brandt (cbrandt@penthouse.com); tim@contrarianvision.com; Robert Campbell (rcampbell@penthouse.com) |
| **Subject:** | FW: Payroll. |

-----Original Message-----
From: Beth R. Young [mailto:bry@lnbyb.com]
Sent: Friday, January 26, 2018 10:26 AM
To: Michael Weiss
Subject· Payroll.

Michael:

You have authority to use cash collateral pay today's payroll, no insiders, no prepetition. That's it. Also, we will be sending you a chart regarding production schedules and status that needs to be completed weekly.

Beth Ann R. Young, Esq.
Levene, Neale, Bender, Yoo & Brill L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067
Direct Dial: (310) 229-3352
Mobile: (310) 409-6708
Email: BRY@LNBYB.COM

# EXHIBIT 5

**Penthouse Global Media, Inc. (Consolidated)**
**From January 11, 2018 to April 20, 2018**
**Asset Value**

| Dates | Cash | | Accounts Receivable | Film Library | Brand Value | Total Asset Value After New Contract |
|-------|------|------|------|------|------|------|
| | Before Contract | After Contract | | | | |
| 11-Jan | $ 73,641 | $ 73,641 | $ 663,385 | $ 4,073,324 | $ 7,000,000 | $ 11,810,350 |
| 26-Jan | 68,976 | 68,976 | 717,414 | 4,096,324 | 7,000,000 | 11,882,714 |
| 9-Feb | (96,689) | 103,311 | 1,001,486 | 4,111,324 | 7,000,000 | 12,216,121 |
| 23-Feb | (41,631) | 158,369 | 886,929 | 4,156,324 | 7,000,000 | 12,201,622 |
| 9-Mar | (219,240) | 180,760 | 1,236,182 | 4,186,324 | 7,000,000 | 12,603,266 |
| 23-Mar | (134,320) | 265,680 | 1,044,610 | 4,216,324 | 7,000,000 | 12,526,614 |
| 6-Apr | (198,901) | 401,099 | 1,256,461 | 4,246,324 | 7,000,000 | 12,903,884 |
| 20-Apr | (134,169) | 465,831 | 1,089,090 | 4,276,324 | 7,000,000 | 12,831,245 |

**Note: New contract will infuse three payments of $200,000 (3 times $200,000 or $600,000 Total)**

   **Opening Cash Balance has been reduced by $30,000 due to the sweep account by ExWorks during**

# EXHIBIT 6

**Penthouse Global Media, Inc. (Consolidated)**
**Combined Balance Sheet**
**As of December 31, 2017**

| | Penthouse Global Media, Inc. | Penthouse Global Broadcasting, Inc. | Penthouse Global Digital, Inc. |
|---|---|---|---|
| **ASSETS** | | | |
| **Current Assets** | | | |
| **Checking/Savings** | | | |
| 3035 -PGMI *OPERATING* (EWB) | (100,872.58) | - | - |
| 5175 -PGMI PAYROLL (BofH) | (29,268.71) | - | - |
| 5305 -GMCI (WF) | - | - | - |
| 5313 -GMCI REFUNDS (WF) | - | - | 15.50 |
| 9503-PGMI PAYROLL (EWB) | 712.95 | - | - |
| BofA 8253 | (6,461.38) | - | - |
| PAXUM BANK | (16,308.54) | - | - |
| PAYPAL BANK | 2,408.55 | - | - |
| 0448 -PGBI (EURO) (EWB) | - | 15,644.44 | - |
| 3852 -PGBI *OPERATING* (EWB) | - | (3,878.17) | - |
| 3779 -PGDI *OPERATING* (EWB) | - | - | (3,006.82) |
| 6848 -PGDI SUB (EWB) | - | - | 493.38 |
| 0449 -PGLI (EURO) (EWB) | - | - | - |
| 3845 -PGLI *OPERATING* (EWB) | - | - | - |
| 9047 -PGLI CTRL (EWB) | - | - | - |
| 3795 -PGPI *OPERATING* (EWB) | - | - | - |
| 9054 -PGPI CTRL (EWB) | - | - | - |
| **Total Checking/Savings** | (149,789.71) | 11,766.27 | (2,497.94) |
| **Accounts Receivable** | | | |
| Accounts Receivable - AUD | - | 5,633.66 | - |
| Accounts Receivable - EURO | - | 444,497.09 | - |
| Accounts Receivable - RON | - | 5,439.29 | - |
| Accounts Receivable - US | - | 15,430.15 | 269.00 |
| Accounts Receivable Legal - EUR | - | 11,830.74 | - |
| Accounts Receivable Legal - US | - | 8,859.38 | - |
| **Total Accounts Receivable** | - | 491,690.31 | 269.00 |
| **Other Current Assets** | | | |
| **Prepaids** | | | |
| Editorial & Art Content | - | - | - |
| Paper | - | - | - |
| Printing | - | - | - |
| Prepaids - Other | 13,091.40 | 1,791.70 | 11,855.00 |
| **Total Prepaids** | 13,091.40 | 1,791.70 | 11,855.00 |
| **Transfers** | | | |
| 2016 | (4,107,249.88) | 2,583,419.88 | 308,481.76 |
| 2017 | (4,444,164.33) | 3,434,913.46 | 35,433.14 |
| BB | 6,512,735.39 | (2,264,022.85) | (84,300.06) |
| Exworks | (2,469,880.58) | - | 1,145,196.93 |
| PCD Deposit | (481,033.02) | - | - |
| **Total Transfers** | (4,989,592.42) | 3,754,310.49 | 1,404,811.77 |

10:59 AM
01/12/2018
Accrual Basis

Penthouse Global Media, Inc. (Consolidated)
Combined Balance Sheet
As of December 31, 2017

Case 1:18-bk-10098-MB    Doc 96    Filed 01/31/18    Entered 01/31/18 17:45:24    Desc
Main Document    Page 82 of 86

| | Penthouse Global Media, Inc. | Penthouse Global Broadcasting, Inc. | Penthouse Global Digital, Inc. |
|---|---|---|---|
| **A/R Adjustments** | | | |
| Bank Charge - 2016/2017 | - | 1,307.63 | 50.00 |
| Exchange - 2016/2017 | - | 1,070.29 | - |
| VAT - 2016/2017 | - | 171,385.37 | (6,083.62) |
| **Total A/R Adjustments** | - | 173,763.29 | (6,033.62) |
| **Total Other Current Assets** | (4,976,501.02) | 3,929,865.48 | 1,410,633.15 |
| **Total Current Assets** | (5,126,290.73) | 4,433,322.06 | 1,408,404.21 |
| **Fixed Assets** | | | |
| Accumulated Depreciation | (44,005.57) | (142,351.00) | (53,937.00) |
| Computer Equipment | 35,853.85 | 118,099.41 | 5,229.10 |
| Furniture and Equipment | - | 23,155.70 | |
| Leasehold Improvements | 16,155.43 | 231,111.22 | - |
| Archived Photography | - | - | - |
| **Total Fixed Assets** | 8,003.71 | 230,015.33 | (48,707.90) |
| **Other Assets** | | | |
| Employee Loans | 6,053.68 | - | |
| **Intangibles** | | | |
| Accumulated Amortization | (2,673,250.00) | (449,252.00) | - |
| Debt Acq Cost | 3,173,250.00 | | |
| Goodwill | 284,506.75 | - | 126,105.15 |
| Trademarks | - | - | |
| 2016 Film Costs (allocated) | - | 1,715,752.78 | - |
| 2017 Flim Costs (allocated) | - | 1,460,397.18 | - |
| Film Inventory | - | 894,971.46 | |
| Web Design Services | - | - | 140,450.00 |
| **Total Intangibles** | 784,506.75 | 3,621,869.42 | 266,555.15 |
| Security Deposits | 22,117.95 | - | - |
| **Total Other Assets** | 812,678.38 | 3,621,869.42 | 266,555.15 |
| **TOTAL ASSETS** | (4,305,608.64) | 8,285,206.81 | 1,626,251.46 |
| **LIABILITIES & EQUITY** | | | |
| **Liabilities** | | | |
| **Current Liabilities** | | | |
| **Accounts Payable** | | | |
| Accounts Payable - CHF | 9,882.80 | - | - |
| Accounts Payable - EUR | - | 255,027.80 | - |
| Accounts Payable - GBP | 2,463.82 | - | - |
| Accounts Payable - US | 1,141,095.61 | 218,648.45 | 93,256.40 |
| **Total Accounts Payable** | 1,153,442.23 | 473,676.25 | 93,256.40 |
| **Other Current Liabilities** | | | |
| Accrued Liabilities | 45,798.27 | 1,600.00 | 1,252.50 |
| Accrued Payroll | 25,363.72 | - | - |
| **EX Works** | | | |
| Deferred Liabilities | 1,430,000.00 | - | - |

# Penthouse Global Media, Inc. (Consolidated)
## Combined Balance Sheet
### As of December 31, 2017

| | Penthouse Global Media, Inc. | Penthouse Global Broadcasting, Inc. | Penthouse Global Digital, Inc. |
|---|---|---|---|
| Interest / Principal (ALLOC) | (759,357.90) | - | - |
| Short Term Loan Payable(PEGA01) | 6,922,943.50 | - | - |
| Short Term Loan Payable(PEGA10) | 2,708,333.38 | - | - |
| Total EX Works | 10,301,918.98 | - | - |
| Accrued Commissions | - | 231,888.37 | - |
| Deferred Revenue | - | 23,990.00 | - |
| Due to Kelly Holland | - | 5,288.00 | - |
| Total Other Current Liabilities | 10,373,080.97 | 262,766.37 | 1,252.50 |
| Total Current Liabilities | 11,526,523.20 | 736,442.62 | 94,508.90 |
| Total Liabilities | 11,526,523.20 | 736,442.62 | 94,508.90 |
| Equity | | | |
| Opening Balance Equity | 270,119.17 | - | - |
| Retained Earnings | (8,228,833.65) | 4,021,164.33 | 672,435.25 |
| Net Income | (7,873,417.36) | 3,527,599.86 | 859,307.31 |
| Total Equity | (15,832,131.84) | 7,548,764.19 | 1,531,742.56 |
| TOTAL LIABILITIES & EQUITY | (4,305,608.64) | 8,285,206.81 | 1,626,251.46 |

01/12/18
Accrual Basis

Case 1:18-bk-10098-MB   Doc 96   Filed 01/31/18   Entered 01/31/18 17:45:24   Desc
Main Document    Page 84 of 86

Penthouse Global Media, Inc. (Consolidated)
Combined Balance Sheet
As of December 31, 2017

| | Penthouse Global Licensing, Inc. | Penthouse Global Publishing, Inc | TOTAL |
|---|---|---|---|
| **ASSETS** | | | |
| **Current Assets** | | | |
| **Checking/Savings** | | | |
| 3035 -PGMI *OPERATING* (EWB) | - | - | (100,872.58) |
| 5175 -PGMI PAYROLL (BofH) | - | - | (29,268.71) |
| 5305 -GMCI (WF) | - | (4,481.13) | (4,481.13) |
| 5313 -GMCI REFUNDS (WF) | - | - | 15.50 |
| 9503-PGMI PAYROLL (EWB) | - | - | 712.95 |
| BofA 8253 | - | - | (6,461.38) |
| PAXUM BANK | - | - | (16,308.54) |
| PAYPAL BANK | - | - | 2,408.55 |
| 0448 -PGBI (EURO) (EWB) | - | - | 15,644.44 |
| 3852 -PGBI *OPERATING* (EWB) | - | - | (3,878.17) |
| 3779 -PGDI *OPERATING* (EWB) | - | - | (3,006.82) |
| 6848 -PGDI SUB (EWB) | - | - | 493.38 |
| 0449 -PGLI (EURO) (EWB) | 1,003.57 | - | 1,003.57 |
| 3845 -PGLI *OPERATING* (EWB) | 176.15 | - | 176.15 |
| 9047 -PGLI CTRL (EWB) | (64.11) | - | (64.11) |
| 3795 -PGPI *OPERATING* (EWB) | - | 28,082.36 | 28,082.36 |
| 9054 -PGPI CTRL (EWB) | - | (64.12) | (64.12) |
| **Total Checking/Savings** | 1,115.61 | 23,537.11 | (115,868.66) |
| **Accounts Receivable** | | | |
| Accounts Receivable - AUD | - | - | 5,633.66 |
| Accounts Receivable - EURO | 2,093.85 | - | 446,590.94 |
| Accounts Receivable - RON | - | - | 5,439.29 |
| Accounts Receivable - US | 43,750.00 | 15,275.00 | 74,724.15 |
| Accounts Receivable Legal - EUR | - | - | 11,830.74 |
| Accounts Receivable Legal - US | 126,071.91 | - | 134,931.29 |
| **Total Accounts Receivable** | 171,915.76 | 15,275.00 | 679,150.07 |
| **Other Current Assets** | | | |
| **Prepaids** | | | |
| Editorial & Art Content | - | 93,456.57 | 93,456.57 |
| Paper | - | 35,273.85 | 35,273.85 |
| Printing | - | 4,250.00 | 4,250.00 |
| Prepaids - Other | - | - | 26,738.10 |
| **Total Prepaids** | - | 132,980.42 | 159,718.52 |
| **Transfers** | | | |
| 2016 | 1,163,838.98 | 51,509.26 | - |
| 2017 | 1,504,051.78 | (486,369.65) | 43,864.40 |
| BB | (4,163,531.95) | (880.47) | 0.06 |
| Exworks | 1,273,523.20 | 51,160.45 | - |
| PCD Deposit | - | 481,033.02 | - |
| **Total Transfers** | (222,117.99) | 96,452.61 | 43,864.46 |

# Penthouse Global Media, Inc. (Consolidated)
## Combined Balance Sheet
### As of December 31, 2017

| | Penthouse Global Licensing, Inc. | Penthouse Global Publishing, Inc | TOTAL |
|---|---:|---:|---:|
| **A/R Adjustments** | | | |
| Bank Charge - 2016/2017 | 477.06 | - | 1,834.69 |
| Exchange - 2016/2017 | - | 270.00 | 1,340.29 |
| VAT - 2016/2017 | 1,341.04 | 1,765.77 | 168,408.56 |
| Total A/R Adjustments | 1,818.10 | 2,035.77 | 171,583.54 |
| Total Other Current Assets | (220,299.89) | 231,468.80 | 375,166.52 |
| **Total Current Assets** | (47,268.52) | 270,280.91 | 938,447.93 |
| **Fixed Assets** | | | |
| Accumulated Depreciation | - | (70,720.54) | (311,014.11) |
| Computer Equipment | - | 31,631.08 | 190,813.44 |
| Furniture and Equipment | - | - | 23,155.70 |
| Leasehold Improvements | - | 25,305.25 | 272,571.90 |
| Archived Photography | - | 174,353.00 | 174,353.00 |
| Total Fixed Assets | - | 160,568.79 | 349,879.93 |
| **Other Assets** | | | |
| Employee Loans | - | - | 6,053.68 |
| **Intangibles** | | | |
| Accumulated Amortization | (390,930.95) | - | (3,513,432.95) |
| Debt Acq Cost | - | - | 3,173,250.00 |
| Goodwill | 1,229,036.43 | - | 1,639,648.33 |
| Trademarks | 2,099,444.00 | - | 2,099,444.00 |
| 2016 Film Costs (allocated) | - | - | 1,715,752.78 |
| 2017 Flim Costs (allocated) | - | - | 1,460,397.18 |
| Film Inventory | - | - | 894,971.46 |
| Web Design Services | - | - | 140,450.00 |
| Total Intangibles | 2,937,549.48 | - | 7,610,480.80 |
| Security Deposits | - | - | 22,117.95 |
| Total Other Assets | 2,937,549.48 | - | 7,638,652.43 |
| **TOTAL ASSETS** | 2,890,280.96 | 430,849.70 | 8,926,980.29 |
| **LIABILITIES & EQUITY** | | | |
| **Liabilities** | | | |
| **Current Liabilities** | | | |
| **Accounts Payable** | | | |
| Accounts Payable - CHF | - | - | 9,882.80 |
| Accounts Payable - EUR | - | - | 255,027.80 |
| Accounts Payable - GBP | - | - | 2,463.82 |
| Accounts Payable - US | 69,559.41 | 535,241.16 | 2,057,801.03 |
| Total Accounts Payable | 69,559.41 | 535,241.16 | 2,325,175.45 |
| **Other Current Liabilities** | | | |
| Accrued Liabilities | - | 773.89 | 49,424.66 |
| Accrued Payroll | - | - | 25,363.72 |
| **EX Works** | | | |
| Deferred Liabilities | - | - | 1,430,000.00 |

Penthouse Global Media, Inc. (Consolidated)
Combined Balance Sheet
As of December 31, 2017

01/12/18
Accrual Basis

Case 1:18-bk-10098-MB   Doc 96   Filed 01/31/18   Entered 01/31/18 17:45:24   Desc
Main Document   Page 86 of 86

|  | Penthouse Global Licensing, Inc. | Penthouse Global Publishing, Inc | TOTAL |
|---|---|---|---|
| Interest / Principal (ALLOC) | - | - | (759,357.90) |
| Short Term Loan Payable(PEGA01) | - | - | 6,922,943.50 |
| Short Term Loan Payable(PEGA10) | - | - | 2,708,333.38 |
| Total EX Works | - | - | 10,301,918.98 |
| Accrued Commissions | - | - | 231,888.37 |
| Deferred Revenue | 2,623,703.06 | - | 2,647,693.06 |
| Due to Kelly Holland | - | - | 5,288.00 |
| Total Other Current Liabilities | 2,623,703.06 | 773.89 | 13,261,576.79 |
| Total Current Liabilities | 2,693,262.47 | 536,015.05 | 15,586,752.24 |
| Total Liabilities | 2,693,262.47 | 536,015.05 | 15,586,752.24 |
| Equity |  |  |  |
| Opening Balance Equity | - | - | 270,119.17 |
| Retained Earnings | 17,944.22 | 87,905.71 | (3,429,384.14) |
| Net Income | 179,074.27 | (193,071.06) | (3,500,506.98) |
| Total Equity | 197,018.49 | (105,165.35) | (6,659,771.95) |
| TOTAL LIABILITIES & EQUITY | 2,890,280.96 | 430,849.70 | 8,926,980.29 |