RON BENDER (SBN 143364)
BETH ANN R. YOUNG (SBN 143945)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: rb@lnbyb.com; bry@lnbyb.com; kjm@lnbyb.com

Attorneys for Dream Media Corporation

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>PENTHOUSE GLOBAL MEDIA, INC.,<br><br>Debtor.<br>_____<br>In re:<br>PENTHOUSE GLOBAL BROADCASTING, INC.<br>PENTHOUSE GLOBAL LICENSING, INC.<br>PENTHOUSE GLOBAL DIGITAL, INC.<br>PENTHOUSE GLOBAL PUBLISHING, INC.<br>GMI ONLINE VENTURES, LTD.<br>PENTHOUSE DIGITAL MEDIA PRODUCTIONS, INC.<br>TAN DOOR MEDIA, INC.<br>PENTHOUSE IMAGES ACQUISITIONS, LTD.<br>PURE ENTERTAINMENT TELECOMMUNICATIONS, INC., fka For Your Ears Only, Ltd.<br>XVHUB Group, Inc., fka Giant Swallowtail Inc.<br>GENERAL MEDIA COMMUNICATIONS, INC.<br>GENERAL MEDIA ENTERTAINMENT, INC., fka Penthouse Video, Inc.<br>DANNI ASHE, INC.<br>STREAMRAY STUDIOS, INC.,<br><br>Debtors.<br><br><u>X</u>  Affects All Debtors. | Lead Case No.: 1:18-bk-10098-MB<br><br>Jointly administered with:<br><br>Case No.: 1:18-bk-10099-MB<br>Case No: 1:18-bk-10101-MB<br>Case No: 1:18-bk-10102-MB<br>Case No: 1:18-bk-10103-MB<br>Case No: 1:18-bk-10104-MB<br>Case No: 1:18-bk-10105-MB<br>Case No: 1:18-bk-10106-MB<br>Case No: 1:18-bk-10107-MB<br>Case No: 1:18-bk-10108-MB<br>Case No: 1:18-bk-10109-MB<br>Case No: 1:18-bk-10110-MB<br>Case No: 1:18-bk-10111-MB<br>Case No: 1:18-bk-10112-MB<br>Case No. 1:18-bk-10113-MB<br><br>Chapter 11 Cases<br><br>PRELIMINARY OPPOSITION TO DEBTORS' MOTION FOR AUTHORITY TO ENTER INTO LICENSE AGREEMENT<br><br>Date:     February 5, 2018<br>Time:     1:00 pm<br>Place:    Courtroom 303<br>21041Burbank Blvd.<br>Woodland Hills, CA 91367 |

Although the Order setting the hearing on Debtors' Motion For Authority to Enter License Agreement ("Motion") provided that any opposition to the Motion could be presented orally at the hearing on February 5, 2018 (the "Hearing"), because of the numerous concerns regarding the nature of the proposed transaction, Secured Creditor, Dream Media Corporation ("Dream Media"), hereby submits its Preliminary Opposition to Debtors' Motion.  Dream Media reserves the right to present further opposition to the Motion at the Hearing.

## I.

## SUMMARY OF ARGUMENT

Dream Media has reviewed Debtors' Motion for Authority to Enter License Agreement (the "Motion") with Androcles Entertainment, PVY, LTD. ("Androcles"), a company apparently formed in Australia on January 25, 2018[1], with no operating history, no evidence that it is properly capitalized to fund the contemplated transaction, and only armed with a sketchy business model reliant on "cryptocurrency."[2]  What is readily evident is that the License Agreement is a fool hearted endeavor, does not reflect proper business judgment, and should be denied.

Although the reliance on cryptocurrency should end the analysis, it is also the case that the proposed License Agreement is a flawed end-run around Dream Media's security interest in the Debtors' collateral.  What Debtors appear to ignore is that the proceeds of the proposed License Agreement are not unencumbered funds available to the Debtors to use for post-

---

[1]  A true and correct copy of the Securities & Investments Commission for Australian Companies is attached hereto as Exhibit "A" and is incorporated herein by this reference.

[2]  On February 2, 2018, CNBC posted an article with the headline "Over $100 billion wiped off global cryptocurrency market in 24 hours" which may be the death-knell to Androcles or its business model, or both. A true and correct copy of the Article is attached hereto as Exhibit "B" and is incorporated herein by this reference.

petition operations, but rather Dream Media's cash collateral, which extends to the License Fees to be paid under the proposed License Agreement.  (See, 11 U.S.C. §552 (b).)

The proposed License Agreement also appears to be a sham transaction, giving away a license "in perpetuity" for the nominal sum of $1,000,000 which *decidedly does not* "add considerable revenue at no additional cost" or "present an opportunity for Debtor to receive substantial additional revenue beyond the initial license fee" as suggested by Debtors.[3]  Based upon the Debtors' cash flow statement, this money, if even paid, will be gone within a few months of the final payment, with no other money on the horizon.

As a business model, resting the Debtors' ability to reorganize based upon an ICO Offering conducted in Australia, premised upon "the fundraising mechanism in which new projects sell their underlying crypto tokens in exchange for bitcoin or similar crypto currencies in a manner similar to an IPO"[4] is foolhardy. (See, Exhibit "B.")  If Kelly Holland wants to engage in such a risky transaction, she should do so at her expense, not the Debtors' or the creditors' of this estate.  Indeed, Ms. Holland already has her toe in the water in this scheme,[5] and now wants to hold the Debtors and this estate hostage while she gives it a try.  However, this is not the type of business model that plans of reorganization are built on, or that creditors just wanting to be paid can reasonably rely upon.

---

[3] See, Motion, at page 6, ll. 18 – 20.

[4] See, Motion, at page 4, ll. 16 - 18.

[5] Kelly Holland, the CEO of Penthouse, is involved in another company, "Vice," which involves crypto currency, and describes its business model as a "blockchain-based content platform for the adult industry, that will enable all sorts of produces to monetize their content as well as paying consumers to watch porn." (Article, entitled "Penthouse and Exxxtasy to Launch Vice Token" dated November 25, 2017, a true and correct copy of which is attached hereto as Exhibit "C" and is incorporated herein by this reference and made a part hereof.)  The involvement of Vice and Ms. Holland are not discussed in the proposed License Agreement, and certainly more information is required.

Other obvious problems include the fact that the License Fee Payment is conditioned on a host of events which provide an "out" for Androcles to not make any payment to the Debtors and hold hostage the License; that's the "stealing" part.  In the event of any default by Androcles on any payment of the License Fee, there is a 90 day cure period before any action can be taken.  (See, License Agreement at ¶ 4(a).)  And then there is the inherent delay in the possibility of any future revenue, founded upon a risky ICO Offering in Australia, which will not even start until July 2018 at the earliest, if then, and could take upwards of 10 years to complete and only yield a 10% distribution to Debtors on an unknown sum after the payment of costs of the ICO Offering. So it is impossible to value this transaction on any level, which in any event is entirely speculative.  And this is before even considering the legality (or illegality) of the "cryptocurrency" that it is reliant upon.

While the terms of the proposed License Agreement certainly raise more questions than they answer, it also appears that the proposed License Agreement attempts to be a disguised sale transaction without going through the steps of actually marketing the assets, obtaining approval for bidding procedures and/or break-up fees, or even establishing a sale process, which is skewed toward advantaging insiders, without regard to the creditors of these estates. Sadly, there is also a complete lack of transparency regarding the actual interest of insider Kelly Holland in this transaction, particularly in light of her involvement in cryptocurrency. However, the vague reference in the Motion to the need to "more carefully examine whether the transaction unfairly benefits the insider at the expense of creditors"[6]  confirms that there is more to the License Agreement than meets the eye.

Additionally, the License Agreement directly interferes with or otherwise impairs any likely plan of reorganization or monetization of assets for the benefit of creditors where it

---

[6] See, Motion, at page 6, ll. 25 - 26.

expressly prohibits a sale of the companies and requires Holland to remain the 100% shareholder for the next 24 months.  So there is no possibility of any equity infusion, and no possibility of a sale to anyone other than Androcles (who has both a right of first refusal and last refusal).  The License Agreement facilitates substantial delay and puts at risk protection of the collateral which secures Dream Media's loans totaling more than $10,300,000.  The License Agreement has literally no sound business purpose.

## II.

## SPECIFIC OBJECTIONS TO

## TERMS OF THE LICENSE AGREEMENT

Many, if not most, of the provisions within the proposed License Agreement raise significant issues and cause serious concern about the proposed transaction, and whether alone or in conjunction with one another warrant denial of the Motion.  The following listing of objectionable provisions is preliminary and not intended to be exhaustive, but sets out major problems with the License Agreement which warrant denial of the Motion:

1.    Insufficient information is provided and there is an overall lack of clarity throughout the License Agreement as to most of the provisions, leaving the terms of the proposed License Agreement vague, ambiguous, and in many instances, entirely speculative.

a.    Exhibit "A" fails to properly identify the property that is subject to the License Agreement, but in any event it is all subject to Dream Media's security interest.

b.    Exhibit "C" is unintelligible, and fails to provide any information from which the estate can determine the financial interest that Debtors might recover from the License Agreement, and thus, the value of this transaction to the estate is undetermined and speculative.

c.      Reference on Exhibit "C" is made to an "ICO White Paper Offer Doc," but no such document is provided with the moving papers or annexed to the proposed License Agreement and appears to be relevant to the transaction.

d.      Given the number of conditions to funding the License Fee Payment, there is no guaranty of distribution of any or all of the $1,000,000, since Androcles can terminate its performance under the License Agreement at any time, including upon "any adverse filings by the Secured Creditors" which this pleading no doubt constitutes. (See, License at ¶ 4(g).)

e.      Reference in the Motion is made to "an unrelated ITO that Debtor has endorsed on June 28, 2018," however no information is provided regarding what this is, or how it impacts the proposed License Agreement.

f.      There is no information regarding how the License Fee of $1,000,000 was valued.  What are the terms of Debtors' other Licenses? What is the value of a License in "perpetuity?" (License Agreement at ¶ 8.1.)  It does not seem like $1,000,000 is a reasonable exchange of value to use this License *forever*. This term suggests that this is a disguised sale, since any sale of the Debtors' assets will literally forever be impacted by this License, with no future payment of any License Fee after the $1,000,000 payment, assuming the $1,000,000 is ever paid.

g.      There also is no information on the various United States laws that require compliance or any assurance that the proposed License Agreement comports with the laws of the United States, although it seems more than likely that it does not. (See, footnote 7, below).

i.   Although the License Agreement at ¶ 2(f) requires Androcles to "operate strictly within the scope of the exemptions granted under Regulation S of

the US Federal Securities Law and any applicable US State law equivalent exemptions to REG S" there is no indication of what Regulation S provides, or whether the exemptions apply.

ii. Where some of the Debtors are domiciled in Delaware, New York and California, there is no indication of which state law applies or might apply, and what impact the Federal and State laws have on the transaction, if any.

h.    There is reference to an "investor deal memo pertaining to the License creation and related ICO Offer" at ¶10 of the License Agreement, but no such document is provided and will likely contain necessary information to consider the overall transaction.

i.    Apparently, on monetization through the ICO Offering, the Debtors will recover only 10% of the Capital Interests with the balance going to Androcles.  A more fulsome discussion of this aspect of the transaction is required to understand the value of this potential 10% and when it will be paid, particularly where Androcles has 10 years to complete the ICO Offering.

j.    Apparently, the ICO Offering is not even going public until July 1, 2018, at the earliest, so the timing of any future payment, if any, is entirely unclear. (License Agreement at ¶10.17.)  Moreover, Androcles has 10 years to proceed with the ICO Offering. (License Agreement at ¶10.26.)   Thus, it is unclear what, if any, future value the Debtors will see, where at best (although tremendously unlikely) the Debtors receive the $1,000,000 but thereafter cannot monetize their assets pending the speculative ICO Offering.   Until the ICO Offering is completed, Debtors are prohibited from selling any assets or otherwise proceeding with reorganization.

2.    The premise of the proposed License Agreement relies up "cryptocurrency" which is considered "highly volatile, often associated with criminal enterprises," and may even be prohibited by law in the United States.[7]

3.    The License Agreement provides for payment of the deposit in "the equivalent of $200,000 USD, or equivalent Australian Currency or BIT COIN."[8]

4.    If for any reason, in the sole discretion of the Licensee, the ICO Offering is terminated, then Androcles shall be indemnified for all damages by the Debtors for any and all claims flowing from the decision to not proceed with the ICO Offering. (See License Agreement at ¶ 9.)  This is exposing the estates to a substantial risk and costs, given that Debtors are already out of compliance with numerous provisions of the License Agreement. Moreover, Debtors do not have the authority to have committed to any such indemnification claims.

5.    In the event that this License Agreement is not approved, then Androcles shall be entitled to recovery of all out of pocket costs expended.  (License Agreement at ¶ 10.16). There is no legal basis for such a provision.  The License Agreement, to be effective at all, can only be entered into "subject to Bankruptcy Court approval."  There cannot be penalties imposed upon the bankruptcy estate for NOT approving this flawed transaction.  Debtors have no authority to have signed such a provision and it most certainly is not enforceable.

---

[7] The Chairman of the Securities and Exchange Commission (SEC) warned investors of "the danger of putting their money into cryptocurrencies, saying trading and public offerings in the emerging asset class may be in violation of federal securities law." December 12, 2017 Article in Fortune, http://fortune.com/2017/12/11/sec-warns-public-about-initial-coin-offerings/

[8] On January 26, 2018, Debtors' counsel advised the Court that the DIP loan would be paid in US dollars, and there would be $6,000,000 to $8,000,000 paid to the estates as part of the transaction.  However, neither term made it into the signed License.  Thus, for the paltry sum of $1,000,000 in an undesignated form of currency, Debtors are tying up their assets while some just formed only days ago entity in Australia tries to raise capital through a sketchy ICO Offering.

6.      The License Agreement prohibits any "Federal Bankruptcy Court Ordering a bulk sale of assets and or the business either in part or in Toto." (See, License Agreement at ¶4(o).)  Thus, instead of promoting the possibility of reorganization, the License Agreement impairs any chance of reorganization because it will only be through the ICO Offering that the Debtors can monetize its assets, and not through any other means.  This causes further delay in an already failing estate and makes the prospect of reorganization remote and unlikely.

7.      The Debtors are obligated to provide Androcles "prime media spots in print, digital and audio visual publications of the Licensor at a 75% discount off "Rack Media Rates." (See, License Agreement at ¶10.20).  This might explain the Debtors' on-going business losses, but does not justify the provision, where Debtors have insufficient funds to operate their business, and advertising should be a source of revenue, not a source of loss.  Why would Debtors give away so cheaply its advertising revenue so that Androcles can sell it for a higher sum?  Is Ms. Holland getting a portion of these advertising revenues?

8.      There are so many conditions to Androcles' obligation to fund the installments of the License Fee Payments to the Debtors, such that it is unlikely that any or all of the proposed $1,000,000 will ever be paid.  Indeed, it appears that there are already numerous violations of the License Agreement which terminate the transaction, including ¶ 4(g) which terminates the transaction where there is any "further damage value of the Licensor brands, business or business reputation that negatively impacts the value of the license and prospective market value of the ICO Offering or the business model contemplated as being operable under the License" which includes "adverse filings by the Secured Creditors" which this Opposition certainly constitutes.

9.      Improper Insider Treatment: Paragraph 4(d) and (e): Kelly Holland is required to remain the sole stockholder of the Debtors for a period of 24 months, without dilution, which

means that there can be no contemplated plan of reorganization which sells the assets and/or brings in new money in the form of additional shareholders, thus impeding any chance of reorganization through a means other than the highly risky ICO Offering.

10.     Payment of the License Fee is entirely conditional, but in any event, if to be made, does not appear that it will be delivered in US dollars, but rather, might be in either Australian currency, or via Bitcoin. (See, License Agreement at ¶ 4.).  Anything other than US dollars would be risky.  But it stands to reason that a newly formed Australian company does not have US dollars, so that raises more concerns as well.

**III.**

**CRYPTO CURRECY IS NOT AN ACCEPTABLE FORM OF PAYMENT**

As indicated above, the License Agreement is nothing more than smoke and mirrors, without any likelihood of success, premised upon the ultra-risky "virtual currency" also known as "crypto currency." Debtors' CEO, Kelly Holland has been trying to launch a company, Vice, using a similar blockchain based content platform and "tokens" similar to Bitcoin. (See, Exhibit "C" attached hereto.)  It is unclear what interest Ms. Holland has in Androcles, and whether Vice is being used as a vehicle for the ICO Offering or otherwise involved in the relationship which would be another benefit to Ms. Holland and adverse to the interests of the estates. Certainly more information on this is required if the Court does not reject the License Agreement for those other reasons set forth at length above.

Here, given the vague language in the License Agreement, it might be the case that Androcles intends to pay the License Fees to the Debtors with virtual currency, and not US dollars.   If this is the case, then the value of the consideration to be received by the Debtors under the License Agreement is unclear. The License Agreement allows the Licensee to pay the Debtors in "the equivalent of $200,000 USD or equivalent Australian Currency, or BITCOIN."

(See, License Agreement at ¶ 4.)    However, using Bitcoin (or any other virtual coin), is problematic for a myriad of reasons.  Putting aside the risk inherent in payment with a virtual coin, the value is hard to measure. See, https://www.coindesk.com/bank-america-report-bitcoins-true-value-impossible-assess/. The value of Bitcoin is highly volatile, akin to a risky stock.    See,    https://www.forbes.com/sites/cbovaird/2017/08/30/bitcoin-cashs-price-volatility-shows-its-uncertain-nature/#18ce7f4c243c.    In other words, under the License Agreement, Debtors are agreeing to be paid in a currency similar to shares of stock whose value has a high chance to plummet at any given moment. Further, Bitcoin, as a virtual currency, is highly susceptible to online hackers who hack into the online system and empty out account holders' Bitcoin.    See,    https://www.csoonline.com/article/3241121/cyber-attacks-espionage/hacking-bitcoin-and-blockchain.html.    The highly susceptible account system of Bitcoin is in direct contradiction to the UST's requirement that Debtor open debtor-in-possession accounts, which are accounts that are more highly collateralized then regular bank accounts to ensure that a DIP's money is insured, safe and not susceptible to loss.

Dream Media cannot find any cases in which a bankruptcy court has authorized a debtor to use or sell its assets in exchange for a virtual currency – likely because there are none. Transactions conducted by a debtor-in-possession, a fiduciary to its estate and creditors, are subject to a more stringent standard that a business outside of bankruptcy, and for good reason. Dream Media does not believe that entering into the License Agreement is in the best interest of the Debtors' estate.  The transaction makes no sense, and should not be approved.

# IV.

## THE LICENSE AGREEMENT DOES NOT PASS

## THE BUSINESS JUDGMENT TEST

As outlined above and even admitted by the Debtors in their Motion, the License Agreement is not an ordinary transaction, but rather an unorthodox transaction. As such, the Court must employ the "business judgment" test in determining whether to approve a sale of estate property outside the ordinary course of business. *In re Railyard Co., LLC*, 572 B.R. 766, 770 (Bankr. D.N.M. 2017). Under the "business judgment" test, the Debtor must articulate a sound business reason for the terms of the transaction. *Id.* Clearly, a cursory review of the terms of the proposed License Agreement evidence a lack of any sound business reason for proceeding with a risky, potentially illegal transaction which does not augment the assets of the estate, but rather impairs them. Debtors' unsupported assertion that the "License is not a sale of all the Debtor's [sic] assets; it adds to Debtor's [sic] assets" fails to assess the implications of the terms of the transaction or the ramifications of a license "in perpetuity." Moreover, the Debtors do not have any legal authority for such a risky endeavor, and other than boilerplate statements, do not provide any evidence or argument to support such a risky transaction.

In addition to the sheer risk of the proposed License Agreement, because there is a real danger that a section 363 sale might deprive parties of substantial rights inherent in the plan confirmation process, sales of substantial portions of a debtor's assets under Section 363 must be scrutinized closely by the court. Attempts to determine plan issues in connection with the sale will be improper and should result in a denial of the relief requested. *See* 3 Collier on Bankruptcy ¶ 363.02[3], at p. 363–17 (15th ed. rev.2007). In re Dewey Ranch Hockey, LLC, 414 B.R. 577, 592 (Bankr. D. Ariz. 2009). Here, the terms of the proposed License Agreement

clearly impact reorganization issues, and appear to substantially interfere with or otherwise greatly impede reorganization in this case.

Appropriate factors to be weighed by the bankruptcy court in deciding on a Chapter 11 debtor's request for approval of transaction that is not in ordinary course of business, and that may have significant impact on reorganization efforts, are: (a) whether debtor has satisfied the business judgment test by demonstrating good and sound business reasons for proposed transaction; (b) whether the proposed transaction is in best interests of creditors; (c) whether the proposed transaction is premature; (d) whether debtor has other options available to reorganize; and (e) whether the proposed transaction will facilitate plan of reorganization. Bankr.Code, 11 U.S.C.A. § 363(b). Noticeably absent from Debtors' Motion is any analysis of these factors.

The premise that the License Agreement is warranted in the Debtors' exercise of reasonable and prudent business judgment" is unsupported by any evidence. The License Agreement only ties up the Debtors' assets without any promise of payment. Indeed, there is no guarantee that even the License Fee Payments will be made. Debtors have no ability to operate their business without immediate funding: "Debtors can be expected to run out of operating cash by February 5, 2018 unless the Agreement with Androcles is approved." (See, Holland Decl. at ¶ 2.) However, desperation does not justify a one-sided transaction that burdens the estate, yields nothing more than risk and uncertainty, and does not provide the ability for Debtors to continue operation uninterrupted. Indeed, the opposite is true where the License Agreement can be terminated by Androcles at literally the drop of a hat, leaving Debtors without the ability to operate, while Androcles continues to use the license "in perpetuity." Debtors do not have the luxury of time to devote to the folly that is the License Agreement, which will likely spawn litigation between the parties, all the while holding hostage the Debtors' intellectual property. Without question the License Agreement is neither

reasonable nor prudent, and certainly has not shown to evidence good and sound business reasons.

## V.

## <u>CONCLUSION</u>

Dream Media reserves the right to make further arguments and objections regarding grounds for denial of the Motion at the time of the Hearing on the Motion.

Dated:  February 2, 2018                    Levene, Neale, Bender, Yoo & Brill L.L.P.


By: _____*/s/ Beth Ann R. Young*_____
          Ron Bender
          Beth Ann R. Young
          Krikor J. Meshefejian
          Attorneys for Dream Media Corporation

# EXHIBIT "A"



**Australian Company**

ANDROCLES ENTERTAINMENT PTY LTD
ACN 624 032 177

ASIC
Australian Securities & Investments Commission

Extracted from ASIC's database at AEST 14:55:20 on 01/02/2018

| Company Summary | |
|---|---|
| Name: | ANDROCLES ENTERTAINMENT PTY LTD |
| ACN: | 624 032 177 |
| Registration Date: | 25/01/2018 |
| Next Review Date: | 25/01/2019 |
| | |
| Status: | Registered |
| Type: | Australian Proprietary Company, Limited By Shares |
| Locality of Registered Office: | COLLINGWOOD VIC 3066 |
| Regulator: | Australian Securities & Investments Commission |

Further information relating to this organisation may be purchased from ASIC.

# EXHIBIT "B"

TECH

# Over $100 billion wiped off global cryptocurrency market in 24 hours

- Over $100 billion was wiped off of the global cryptocurrency market in 24 hours on Friday.
- Concerns over tighter regulation, and worries that the bitcoin price was manipulated on a major exchange called Bitfinex by a cryptocurrency called Tether, weighed on prices.
- Bitcoin, ethereum and ripple all saw their prices tank.

Arjun Kharpal | @ArjunKharpal
Published 9 Hours Ago | Updated 1 Hour Ago



Chesnot | Getty Images

Over $100 billion was wiped off the global cryptocurrency market in 24 hours on Friday amid concerns over tighter regulation and worries that the bitcoin price was manipulated on a major exchange.

The total market capitalization or value of all cryptocurrencies in circulation stood at $405 billion Friday morning New York time, according to data from CoinMarketCap.com, which takes into account the prices of digital coins across a number of key exchanges. This was a fall of $112.6 billion in value from a day before.

Cryptocurrencies have seen a major sell-off this week. Bitcoin fell below $9,000 on Thursday and briefly dropped below $8,000 Friday morning, according to CoinDesk's bitcoin price index, which tracks prices from four major cryptocurrency exchanges.

Other major coins including ethereum and ripple were down 12 percent and 13 percent, respectively, compared to a day ago as of 9:58 a.m., ET, Friday.

The cryptocurrency world has been plagued by a spate of negative news.

India's Finance Minister Arun Jaitley said the country wants to "eliminate" the use of digital currencies in criminal activities, signaling

tighter regulation in the country.

The New York Times reported Wednesday that an increasing number of digital currency investors are worried the price of bitcoin and other digital currencies have been **inflated by cryptocurrency exchange Bitfinex**, which is included in CoinDesk's price index. Bloomberg reported Tuesday that in December, the U.S. Commodity Futures and Trading Commission subpoenaed Bitfinex and a cryptocurrency company called Tether, which is run by many of the same executives.



 **Bitcoin falls below $9,000 as crypto rout continues**
18 Hours Ago | 02:14

Representatives for Bitfinex and Tether did not immediately respond to a CNBC request for comment.

And last week, Japanese exchange **Coincheck was compromised** after hackers ran off with over $500 million worth of a cryptocurrency called NEM.

Key business leaders have poured cold water over the cryptocurrency world. Investing legend Warren Buffett told CNBC in a recent interview that the sector **"will come to a bad ending."**

Others still see the long-term potential of bitcoin and other coins.

Fundstrat's Tom Lee, the only major Wall Street strategist to issue formal price targets on bitcoin, said two weeks ago that $9,000 is a "major low" for bitcoin and **"the biggest buying opportunity in 2018."**

Lee issued **another report late Thursday** that maintained his $25,000 price target for bitcoin.

And Kay Van-Petersen, a Saxo Bank analyst who correctly predicted the cryptocurrency's rally at the start of last year **told CNBC recently** that bitcoin could hit between $50,000 and $100,000 this year.

— CNBC's **Evelyn Cheng** contributed to this report.

# EXHIBIT "C"

# Penthouse and Exxxtasy to launch Vice token

www.cryptoninjas.net/2017/11/25/penthouse-exxxtasy-launch-vice-token-blockchain-based-content-platform/

November 25, 2017



Global pioneers Penthouse and Exxxtasy have joined forces to launch Vice, a blockchain-based content platform for the adult industry, that will enable all sorts of producers to monetize their content as well as paying consumers to watch porn.

Vice's new model for the adult industry has been developed at a time when 62% of revenues generated in the adult industry come from traffic, with only 24% of that figure being made up by content. Vice aims to solve this monetization issue by establishing a traffic programme that will capture traffic, use it to create tokens and then distribute them back to viewers, curators and programmers.

Kelly Holland, CEO of Penthouse and Vice partner, stated:

> "Vice token is an exciting opportunity to bring a completely new and unique business model to the market and, for the first time, offer our customers the ability to be paid to interact directly with our brand. Vice tokens are a nuclear event. The catalyst of Vice and Penthouse will forever change the way the world watches TV and adult video online."

In a Vice transaction, the viewer earns tokens for watching, the producer earns tokens for creating content and the content curator earns tokens for identifying relevant content for the viewer.

Stuart Duncan, a Vice partner, stated:

> "What we are doing with Vice is going to eliminate the competition of the industry dinosaurs. Online video and TV is entering into a whole new phase no one ever dreamed of. The genie is out of the bottle and for many media companies, it could be an extinction event. We are changing the way people worldwide watch TV and video. I agree with Kelly Holland of Penthouse – this is a nuclear event. We have a universal cryptocurrency technology that pays people to watch video or TV."

The Vice Media Token is built using Smart Media Token protocols being developed by Vice and its partners. What Vice is building is unique and creates a simple engagement-oriented protocol used to facilitate the creation and exchange of tokens between participants in media consumption.

Paid blogging platforms like Steemit currently have roughly 400,000 users and a market cap of over $200 million. The potential for Vice websites video users ranges from 100s of millions of users including daily traffic to a potential user base of over one billion users and viewers worldwide.

**The pre-sale for the ICO starts next week and aims to raise between $25 million and $50 million. The public ICO was to begin on ~~January, 3rd 2018~~, latest updates from Vice now have the crowdsale commencing on Feb. 1st, 2018.**



Ms. Holland became sole owner and CEO of Penthouse Global Media Inc. (PGMI) in Feb 2016.



1. Opening of Vice Industry Token Whitelist sale

3. Launch of Vice Industry Crowdsale.

5. Launch of the Vice Industry Token MainNet and expiration of Refund Contract.

| Jan. 11 | Jan. 15 | Feb. 1 | Mar. 1 | June 1 | June 28 |

2. Launch of Vice Industry Token Presale

4. End of Crowdsale and distribution of ERC20 proxy Tokens.

6. Launch of Vice Industry Token video portal platform.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **PRELIMINARY OPPOSITION TO DEBTORS' MOTION FOR AUTHORITY TO ENTER INTO LICENSE AGREEMENT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **February 2, 2018**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Krikor J Meshefejian    kjm@lnbrb.com
- S Margaux Ross    margaux.ross@usdoj.gov
- Michael St James    ecf@stjames-law.com
- Howard Steinberg    steinbergh@gtlaw.com, pearsallt@gtlaw.com;laik@gtlaw.com
- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov
- Michael H Weiss    mw@weissandspees.com, lm@weissandspees.com
- Beth Ann R Young    bry@lnbyb.com

**2.  SERVED BY UNITED STATES MAIL**: On **February 2, 2018**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ *Service information continued on attached page*

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **February 2, 2018**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**SERVED BY PERSONAL DELIVERY**
Hon. Martin R. Barash
United States Bankruptcy Court
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA 91367

☐ *Service information continued on attached page*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| February 2, 2018 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                        **F 9013-3.1.PROOF.SERVICE**