Michael H. Weiss (State Bar Number 107481)
mw@weissandspees.com
Laura J. Meltzer (State Bar Number 151889)
lm@weissandspees.com
WEISS & SPEES, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067-2701
Telephone: 424-245-3100
Facsimile: 424-245-3199

[Proposed] Attorneys for Debtors and Debtors in Possession
Penthouse Global Media, Inc. et al.

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| IN RE<br><br>PENTHOUSE GLOBAL MEDIA, INC., a Delaware corporation<br><br>Debtor. | Case No. 1:18-bk-10098-MB<br><br>Chapter 11<br>Jointly Administered With:<br><br>Case No. 1:18-bk-10099-MB |

| | |
|---|---|
| In re:<br>    Penthouse Global Broadcasting, Inc.<br>    Penthouse Global Licensing, Inc.<br>    Penthouse Global Digital, Inc.<br>    Penthouse Global Publishing, Inc.<br>    GMI Online Ventures, Ltd.<br>    Penthouse Digital Media Productions, Inc.<br>    Tan Door Media, Inc.<br>    Penthouse Images Acquisitions, Ltd.<br>    Pure Entertainment Telecommunications, Inc.<br>    XVHUB Group, Inc.<br>    General Media Communications, Inc.<br>    General Media Entertainment, Inc.<br>    Danni Ashe, Inc.<br>    Streamray Studios, Inc.<br><br>    ☒ Affects All Debtors<br>    ☐ Affects<br>    ☐ Affects<br>    ☐ Affects<br>    ☐ Affects<br>☐ See attached for additional Debtors | Case No. 1:18-bk-10101-MB<br>Case No. 1:18-bk-10102-MB<br>Case No. 1:18-bk-10103-MB<br>Case No. 1:18-bk-10104-MB<br>Case No. 1:18-bk-10105-MB<br>Case No. 1:18-bk-10106-MB<br>Case No. 1:18-bk-10107-MB<br>Case No. 1:18-bk-10108-MB<br>Case No. 1:18-bk-10109-MB<br>Case No. 1:18-bk-10110-MB<br>Case No. 1:18-bk-10111-MB<br>Case No. 1:18-bk-10112-MB<br>Case No. 1:18-bk-10113-MB<br><br>**REPLY IN SUPPORT OF MOTION FOR AUTHORITY TO ENTER INTO LICENSE AGREEMENT WITH ANDROCLES ENTERTAINMENT, PVY LTD. OUTSIDE THE ORDINARY COURSE OF BUSINESS**<br><br>Hearing:<br>Date:       February 5, 2018<br>Time:       1:00 P.M.<br>Place:      Room 303<br>              21041 Burbank Blvd.<br>              Woodland Hills, CA |

TO THE HONORABLE MARTIN BARASH; THE OFFICE OF THE UNITED STATES TRUSTEE; THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE ABOVE-CAPTIONED DEBTOR; THE SECURED CREDITOR OF THE ABOVE-CAPTIONED DEBTORS; AND OTHER PARTIES ENTITLED TO NOTICE:

Debtor Penthouse Global Media, Inc. ("PGMI") submits the following reply to the opposition of Dream Media Corporation ("DMC") (the Opposition") [Dkt No. 107] to PGMI's Motion for Authority to Enter into a License Agreement with Androcles Entertainment PTY, Ltd. ("Androcles") (the "Motion") [Dkt. No. 70]:

# I.   INTRODUCTION

The License Agreement involves cutting edge technology and transaction structures.  Thus, it is no surprise that the Opposition makes a number of understandable, but absolutely incorrect, assertions about the agreement, the benefits of the agreement and its risks.  When these misapprehensions are explained and rebutted, it will become clear that the agreement provides an unmistakable benefit for the estate and its creditors, including DMC.

# II.   RESPONSES TO DMC'S SPECIFIC COMMENTS ABOUT THE LICENSE AGREEMENT

For the Court's convenience, Debtor has replicated the comments of DMC verbatim in italics.  Debtor's responses are indented.

*1. Insufficient information is provided and there is an overall lack of clarity throughout the License Agreement as to most of the provisions, leaving the terms of the proposed License Agreement vague, ambiguous, and in many instances, entirely speculative.*

    *a. Exhibit "A" fails to properly identify the property that is subject to the License Agreement, but in any event it is all subject to Dream Media's security interest.*

<u>Response</u>:  Debtors are sure that DMC wants more, not less collateral, especially cash collateral.  There is an issue of whether the proceeds of the Androcles license are "after acquired property" or "proceeds" of DMC's collateral under 11 U.S.C. § 552.  Debtors will bring a motion

on regular notice so the Court may determine that issue.  In the meantime, Debtors have no

problem treating the proceeds of the License as "cash collateral" of DMC pending that hearing.

> *Exhibit "C" is unintelligible, and fails to provide any information from which the estate can determine the financial interest that Debtors might recover from the License Agreement, and thus, the value of this transaction to the estate is undetermined and speculative.*

Response:  That is simply not true.  For sure, Debtors will receive $1,000,000 in five

monthly payments of $200,000.  This is an accelerated payment of the license fee to provide

bridge liquidity to assist Debtors to maintain operations during the period leading up to the ICO.

As discussed below, the timing of that payment may be returned to a normal payment program for

an ICO, i.e., when the ICO funds.  If certain conditions occur, the payments will return to normal

ICO payment timing if the need for liquidity ceases by a cessation of operations or the license is

damaged.

At that point, the License Agreement takes on more industry normal payment terms, i.e., it

becomes payable upon the funding of the ICO.  Compare this to (i) the current Vice Coin license

(Exhibit "A") which provides payment in clauses 2.1 of $10,0000,000 and 60 million tokens are

only due on the ICO completion, Exhibit 'A' at § 2.1(b)(c). and (ii) the current Kodak Coin

offering (Exhibit "B") where payment is made after the offering funds.  Androcles proposes to

invest $1,000,000 payable to Debtor NOW and to invest another $1,600,000 in marketing,

offering, technology, legal and accounting costs for which Androcles, and not the Debtor, is

completely at risk.  Androcles has no motive to stop funding, because once the License Agreement

begins it is spending money to develop an ICO infrastructure unique to Debtor.  If it stops payment

and damages Debtor and its brand, it destroys its own investment in the ICO.

When and if the ICO funds, Debtor will receive a percentage of the proceeds after the

recovery of the offering and block chain infrastructure costs.  If any sums are due to Debtor as

outlined in schedule C, Debtor gets ten percent of proceeds shared with Androcles after payment

of $20,000,000.  If the ICO raises $40,000,000, Debtor would be entitled to an additional 10% of

$17,400,000 or $1,740,000, i.e., $40,000,000 less $20,000,000, less $1,000,000 (paid to Debtor)

and $1,600,000 (projected offering and infrastructure costs).  Thus Debtor could be expected to receive a total of $2,740,000.  If the ICO raises $100,000,000, Debtors' share increases to $8,740,000 if offering and infrastructure costs remain constant.  In effect, Debtor receives customized block chain technology infrastructure for free.  Beyond that, Debtor also receives 10% of the ICO's net revenue and a ten percent "equity share" in the overall venture.  This is clearly superior to the Vice Coin transaction, where Debtor will only receive $10,000,000 in cash and $3,000,000 in crypto-currency tokens only if that offering closes.  Androcles provides up front certainty while Vice Coin does not and leaves no "back end" return for Debtor.

Androcles also provides off-balance sheet financing through production financing revenue sharing agreements under clauses 10.34 and 10.35 to create new content and purchase third party content.  Those agreements provide that Androcles will fund 100% of the production costs, a share of overhead attributable to the production and a profit.  This will help preserve present output deals, enhance cash flow, remove production risk and to allow Debtor to enter into new ones.

> *Reference on Exhibit "C" is made to an "ICO White Paper Offer Doc," but no such document is provided with the moving papers or annexed to the proposed License Agreement and appears to be relevant to the transaction.*

<u>Response</u>:      There is no reason to prepare a "white paper" until the Court approves the License Agreement.  The parties have known each other for two weeks, so no White Paper could possibly exist until such time the parties have formally agreed on the License Agreement.  Any such paper, must be fitted to the as yet to be implemented infrastructure tailored.  Androcles' principals bring significant block chain infrastructure expertise and capacity to the table that must be customized to Debtor's business and brand.  Attached as Exhibit "C" is the ICO white paper for Vice Coin to show what is required to create a White Paper.

> *b.      Given the number of conditions to funding the License Fee Payment, there is no guaranty of distribution of any or all of the $1,000,000, since Androcles can terminate its performance under the License Agreement at any time, including upon "any adverse filings by the Secured Creditors" which this pleading no doubt constitutes. (See, License at ¶ 4(g).)*

<u>Response</u>:       Of course, there is no guaranty of a complete distribution of the initial license fee.  If the case is converted, then Androcles reserves the right to a normal ICO payment structure, like the Vice Coin offering -- payment when the offering funds.  This no different than a condition in a DIP loan where a line of credit is cut-off upon the conversion of the case.  In fact, this is better because it does not irretrievably cut off the remaining payments; it merely delays them until the ICO funds.  The short 4 month window evidences Androcles' bona fide intent and ability to do an ICO.   So long as the Debtors continue to operate as they have and continue to produce content, publish their magazines and maintain their distribution channels during a short four-month window then Androcles will continue to fund.  If Debtor fails to honor its existing content obligations by failing to provide content, Debtor will lose 60% of its revenues as broadcasters start to cancel agreements.  If Androcles ceases funding, it loses the license.

> *c.  Reference in the Motion is made to "an unrelated ITO that Debtor has endorsed on June 28, 2018," however no information is provided regarding what this is, or how it impacts the proposed License Agreement.*

<u>Response</u>:  A complete description of how the Vice Coin offering works is attached as Exhibit "D".  If the Vice Coin offering succeeds, Debtors get $10,000,000 in cash and 60,000,000 of Vice Coins with a projected value of $0.005 or about $3,000,000.  However, to reach that payment, Debtors need to remain open.  The Licensing Agreement will allow Debtors to remain open until the Vice Coin offering can be completed.  If the Vice Coin offering fails or is abandoned before then, Androcles can accelerate its offering.  License Agreement ¶ 10.27.  The Vice Coin Offering is only best efforts, while the intent of Androcles is to do a substantially underwritten offering.

> *d.  There is no information regarding how the License Fee of $1,000,000 was valued. What are the terms of Debtors' other Licenses? What is the value of a License in "perpetuity?" (License Agreement at ¶ 8.1.) It does not seem like $1,000,000 is a reasonable exchange of value to use this License **forever**. This term suggests that this is a disguised sale, since any sale of the Debtors' assets will literally forever be impacted by this License, with no future payment of any License Fee after the $1,000,000 payment, assuming the $1,000,000 is ever paid.*

<u>Response</u>:        The initial License Agreement fee is for $1,000,000 plus infrastructure and technology provided by Androcles that Debtor would otherwise need to, but cannot, finance.  No other ICO, of which Debtor is aware, has provided or risked this level of capital in advance to third party content providers.  Actually, the License is found money and with all upside, but no downside, risks.  Its ultimate value is clearly uncertain and the potential returns are uncertain.  However, the risk of not entering into the License Agreement is that Debtors will not have cash to operate.  That will result in destruction of as much as 60% of its broadcast revenue in as little as 30 days.

The License Agreement is by no means a sale of all of Debtors' assets.  It is a nonexclusive license of trademarks and trade names and copyrights together with an exclusive narrow channel corridor to use the foregoing only within the four walls of the ICO Offer to be funded and underwritten by Androcles or its principals.  Indeed, much like the Vice Coin License it leaves 99 percent of Debtor's intellectual property in place and undisturbed.  After 24 months, Debtor can enter into another ICO, subject to Androcles' rights of first and last refusal.  The perpetuity only exists inside the ICO if it ends the rights end and there is no right to assign without Debtor's approval.

> *e.   There also is no information on the various United States laws that require compliance or any assurance that the proposed License Agreement comports with the laws of the United States, although it seems more than likely that it does not.*
>
> *i.   Although the License Agreement at ¶ 2(f) requires Androcles to "operate strictly within the scope of the exemptions granted under Regulation S of the US Federal Securities Law and any applicable US State law equivalent exemptions to REG S" there is no indication of what Regulation S provides, or whether the exemptions apply.*

<u>Response</u>:        This language simply means that Androcles will comply with US Securities laws in connection with the ICO.  How that might be accomplished must wait until Androcles actually elects to proceed with its offering.  The expectation is that Androcles will make a global offering from within the U.S.  U.S. securities law will control the offering outside under Reg S.  The License Agreement also provides that the Court has direct oversight over this transaction from

19

beginning to end.  If the ICO is in breach of U.S. or Foreign law, the Court can terminate it.

Androcles retains the right to offer a "utility token" that is not a security under *SEC v. Howey*, 328

U.S. 293 (1946).  If there is any issue with this Androcles will seek either SEC or court approval.

> ii.    *Where some of the Debtors are domiciled in Delaware, New York and California, there is no indication of which state law applies or might apply, and what impact the Federal and State laws have on the transaction, if any.*

Response:    Again, Androcles has undertaken to comply with all US laws in connection

with ICO, including any Blue Sky laws.  Importantly, the ICO is not an offering of the Debtors'

securities, but of an entirely different security -- ICO.  The agreement specifies compliance with

the Securities Act, the JOBS Act and all State Blue Sky Laws unless exempt under Federal law.

Androcles will allow formation of the offeror entity in California, report to and file timely progress

reports with the Court about any White Paper or Offering.

> f.    *There is reference to an "investor deal memo pertaining to the License creation and related ICO Offer" at ¶10 of the License Agreement, but no such document is provided and will likely contain necessary information to consider the overall transaction.*

Response:    That deal memo refers to an agreement between Androcles and its investors

and principals.

> g.    *Apparently, on monetization through the ICO Offering, the Debtors will recover only 10% of the Capital Interests with the balance going to Androcles.  A more fulsome discussion of this aspect of the transaction is required to understand the value of this potential 10% and when it will be paid, particularly where Androcles has 10 years to complete the ICO Offering.*

Response:    Debtors are taking no downside risk and have no internal capacity to

underwrite a complete coin offering of any kind.  If the offering succeeds, then the additional

proceeds from an offering will, in effect, be "found money."  Androcles is investing $1,000,000

over four months certain so long as Debtors continue to operate in addition to fronting another

$1,600,000 in offering and infrastructure costs, which includes $600,000 of marketing the

Penthouse brand after which, Debtor gets $2,740,000 if the offering is $40,000,000 plus ten

percent of net revenue and the venture itself.

> h.    *Apparently, the ICO Offering is not even going public until July 1, 2018, at the earliest, so the timing of any future payment, if any, is entirely unclear. (License*

20

*Agreement at ¶10.17.) Moreover, Androcles has 10 years to proceed with the ICO Offering. (License Agreement at ¶10.26.) Thus, it is unclear what, if any, future value the Debtors will see, where at best (although tremendously unlikely) the Debtors receive the $1,000,000 but thereafter cannot monetize their assets pending the speculative ICO Offering. Until the ICO Offering is completed, Debtors are prohibited from selling any assets or otherwise proceeding with reorganization.*

Response:        To preserve the value of the Vice Coin offering, the Androcles ICO cannot proceed before June 28, 2018 because it would damage the Vice Coin ITO and create damage claims from the Vice Coin ITO and its investors or underwriters. Androcles has 10 years in a narrow area. If Androcles does not proceed in 24 months, Debtor can do another ICO in any other area it likes**.** The deal is that Debtor gets a certain $1,000,000 up front if the Court and creditors let it live for another 120 days. For that, Androcles takes up front risk and merely wants to assure itself that Debtors' business and brand stays intact during that period of time.

If Debtor sells its assets, then Androcles can return to the normal industry payment structure of ICO under the Agreement. The most critical consideration for Androcles is that Debtors continue to operate as they are now while it assembles the technology and legal and accounting work necessary for the offering. Androcles is a business and it must operate in a commercially reasonable fashion. It is unclear why DMC would seek to deprive Debtor of substantial cash flow at no cost that will allow it to remain viable for the benefit of all creditors.

**2.** *The premise of the proposed License Agreement relies up "cryptocurrency" which is considered "highly volatile, often associated with criminal enterprises," and may even be prohibited by law in the United States.*

Response:        The IRS has classified digital currencies as property for capital gains tax. SEC has defined where circumstances dictate crypto mediums of exchange to be Securities under the test in *SEC v. Howey*, 328 U.S. 293 (1946). DMC's confusion comes from media hype over pure crypto currencies like Bitcoin, which are mediums of exchange, and nothing more. They are traceable contrary to what many think. The Department of Treasury has ant-money laundering rules and requires suspicious activity reports for financial institutions dealing with the proceeds of a BitCoin transaction.

The use of cryptocurrency is not inherently illegal.  Futures contracts in BitCoin now trade on the Chicago Mercantile Exchange as of December 17, 2017.  Reported at https://www.cnbc.com/.../worlds-largest-futures-exchange-set-to-launch-bitcoin-future.  DMC, like many others, confuses speculative risky crypto coin currency plays with crypto economy which is based upon block chain driven smart contract solutions to business problems.  The ICO here is designed to create a block chain smart contract driven offering, not a Bitcoin play, similar to the one issued by Kodak that is described in Exhibit "B".  The Androcles ICO seeks to develop an elegant solution to Debtor's business.

> **3.**  *The License Agreement provides for payment of the deposit in "the equivalent of $200,000 USD, or equivalent Australian Currency or BIT COIN."*

Response:    License payment will be made in dollars.

> *If for any reason, in the sole discretion of the Licensee, the ICO Offering is terminated, then Androcles shall be indemnified for all damages by the Debtors for any and all claims flowing from the decision to not proceed with the ICO Offering. (See License Agreement at ¶ 9.) This is exposing the estates to a substantial risk and costs, given that Debtors are already out of compliance with numerous provisions of the License Agreement.  Moreover, Debtors do not have the authority to have committed to any such indemnification claims.*

Response:    Debtor has clarified with Androcles that the indemnity only applies if Debtor affirmatively does something to harm the ICO or withdrawing while it is pending, and the Court can restrict indemnity as it sees fit.

> **4.**  *In the event that this License Agreement is not approved, then Androcles shall be entitled to recovery of all out of pocket costs expended. (License Agreement at ¶ 10.16).  There is no legal basis for such a provision. The License Agreement, to be effective at all, can only be entered into "subject to Bankruptcy Court approval." There cannot be penalties imposed upon the bankruptcy estate for NOT approving this flawed transaction.  Debtors have no authority to have signed such a provision and it most certainly is not enforceable.*

Response:    Debtor agrees that there is no binding agreement and no such liability, unless and until the Court approves the License Agreement.

> **5.**  *The Chairman of the Securities and Exchange Commission (SEC) warned investors of "the danger of putting their money into cryptocurrencies, saying trading and public offerings in the emerging asset class may be in violation of federal securities law." December 12, 2017 Article in Fortune, http://fortune.com/2017/12/11/sec-warns-public-about-initial-coin-offerings.*

Response:        Debtors are not risking their assets by investing in Bitcoins or other crypto-currencies.  Rather, they are licensing their brand and related content to an investor and sponsor of a crypto- economy block chain smart contract offering.  They are simply not taking the crypto-currency risk over which DMC is concerned.  The fear is misplaced.   The SEC is referring to currency speculation and investment, not real block chain smart contract solutions for active business problems that use brand related tokens or coins.  The Australian Stock Exchange (ASX) has recently adopted this technology for increasing trading security and transparency.

6.    *On January 26, 2018, Debtors' counsel advised the Court that the DIP loan would be paid in US dollars, and there would be $6,000,000 to $8,000,000 paid to the estates as part of the transaction. However, neither term made it into the signed License. Thus, for the paltry sum of $1,000,000 in an undesignated form of currency, Debtors are tying up their assets while some just formed only days ago entity in Australia tries to raise capital through a sketchy ICO Offering.*

Response:        Debtor is in discussions to find ways to monetize the Vice Coin offering.  However, given the pressing cash needs of this 25-day old case, the License Agreement took precedence.  Debtor's counsel has reviewed an early draft and expects to be able to circulate something more definitive in the next 15 days.

7.    *The License Agreement prohibits any "Federal Bankruptcy Court Ordering a bulk sale of assets and or the business either in part or in Toto." (See, License Agreement at ¶4(o).) Thus, instead of promoting the possibility of reorganization, the License Agreement impairs any chance of reorganization because it will only be through the ICO Offering that the Debtors can monetize its assets, and not through any other means. This causes further delay in an already failing estate and makes the prospect of reorganization remote and unlikely.*

Response:        Again, DMC misreads the agreement, any such sale would simply return the remaining payments to a more normal schedule, *i.e.*,  payment when the ICO funds.  At the time of any such sale, Debtors would have to decide whether it made more sense to proceed with the sale or continue in the License Agreement.  Debtor assumes that for the next 120 days, it can operate without harming any creditor if gets the proceeds under the License agreement.  Further, under clauses 10.34 and 10.35, Debtor can finance $1,000,000 to $3,000,000 of new content "off-balance" increasing its cash flow and enlarging its asset base.

23

**8.** *The Debtors are obligated to provide Androcles "prime media spots in print, digital and audio visual publications of the Licensor at a 75% discount off "Rack Media Rates." (See, License Agreement at ¶10.20). This might explain the Debtors' on-going business losses, but does not justify the provision, where Debtors have insufficient funds to operate their business, and advertising should be a source of revenue, not a source of loss. Why would Debtors give away so cheaply its advertising revenue so that Androcles can sell it for a higher sum? Is Ms. Holland getting a portion of these advertising revenues?*

    <u>Response</u>:        DMC does not seem to be familiar with publishing business.  No one pays rack rates, much like the medical and hotel businesses.  There are always discounts of between 60% and 80%.  This discount is to advertise the ICO.  Debtor has plenty of motivation to discount advertising that promotes the Brand.  Ms. Holland does not participate in the proceeds independently of her salary and as a shareholder of Debtors …

**9.** *There are so many conditions to Androcles' obligation to fund the installments of the License Fee Payments to the Debtors, such that it is unlikely that any or all of the proposed $1,000,000 will ever be paid.  Indeed, it appears that there are already numerous violations of the License Agreement which terminate the transaction, including ¶ 4(g) which terminates the transaction where there is any "further damage value of the Licensor brands, business or business reputation that negatively impacts the value of the license and prospective market value of the ICO Offering or the business model contemplated as being operable under the License" which includes "adverse filings by the Secured Creditors" which this Opposition certainly constitutes.*

    <u>Response</u>:        DMC does not understand the difference between a condition precedent and a condition subsequent.  The only condition precedent to the initial $200,000 funding is Court approval.  All of the other conditions are conditions subsequent.  All Androcles seeks is assurance that the brand is not damaged.  This is a completely normal and common provision in many trademark licenses.  Androcles is taking on significant risk by spending money on block chain infrastructure and advertising to further build the Penthouse brand.  Over and above the funds paid to Debtor, Androcles will start incurring costs immediately upon approval of the agreement.  The argument ignores clauses 10.34 and 10.35 under which Androcles will finance another $1,000,000 to $3,000,000 to fund acquisition of new content to keep Debtors' output deals current.

**10.** *Improper Insider Treatment: Paragraph 4(d) and (e): Kelly Holland is required to remain the sole stockholder of the Debtors for a period of 24 months, without dilution, which means that there can be no contemplated plan of reorganization which sells the assets and/or brings in new money in the form of additional shareholders, thus impeding any chance of reorganization through a means other than the highly risky ICO Offering.*

<u>Response</u>:        Though DMC has grave reservations about Ms. Holland's ability to run Debtors' operations and manage its brand, those reservations are not shared by Androcles.  Since Androcles is putting its money as risk, it is their view that is relevant.  Indeed, DMC is in no position to criticize her performance.  However, Adam Levin, the president of DMC, also controls *High Times* and its publishing division has seen its net publishing revenues drop by 20%.  See attached as Exhibit "E".

The Penthouse brand relies upon for most of its revenues from output deals with 120 channels.   If there is no new content or if that content quality falters, the output deal business will evaporate and so will Debtor.  Current broadcasters accept Debtor's content choice and production/ acquisition choices in large part because of Ms. Holland's long time association with and curation of the production of the content.  If that changes, there is a risk that the output deals will be canceled or cut.  In the entertainment business, times are hard, and only in adult entertainment do output continue to exist.  Androcles has indicated that in the short term Ms. Holland is key because she is often the writer, producer and director of the output and knows which people are needed to create the content.  For Androcles, losing Ms. Holland and her team is not a good short term option.  Thus, Androcles is willing to provide additional production financing of between $1,000,000 and $3,000,000.

**11.** *Payment of the License Fee is entirely conditional, but in any event, if to be made, does not appear that it will be delivered in US dollars, but rather, might be in either Australian currency, or via Bitcoin. (See, License Agreement at ¶ 4.). Anything other than US dollars would be risky. But it stands to reason that a newly formed Australian company does not have US dollars, so that raises more concerns as well.*

Payment will be made in USD, not Bitcoin.

## III.    CONCLUSION

The Opposition simply misstates the License Agreement and ignores its many benefits. The biggest risk in this case is not the License Agreement but the destruction of the Penthouse brand if Debtor ceases operations because it runs out of funds.  For at least 120 days, the License Agreement assures the Court and creditors that won't happen.

25

Dated:  February 5, 2018

WEISS & SPEES, LLP
/s/ *Michael H. Weiss*
Michael H. Weiss
[Proposed] Attorneys for Debtors and Debtors in
Possession Penthouse Global Media, Inc. et al.

# Exhibit A

---

# AMENDMENT TO TRADE-MARK AND TRADE-NAME LICENCE AGREEMENT

Made as of December 28, 2017 ("Effective Date")

Between

**PENTHOUSE GLOBAL MEDIA INC.**
as Licensor

and

**TOKKEN MSB INC. O/A VICE.ORG**
as Licensee

---



28

# TABLE OF CONTENTS

SECTION 1 – DEFINITIONS.................................................................................................
   1.1   Definitions..............................................................................................................
        (1)   Person ...............................................................................................
        (2)   Territory............................................................................................
        (3)   Trade-marks......................................................................................
        (4)   Trade-names.....................................................................................
        (5)   Transfer.............................................................................................
SECTION 2 – LICENCE ......................................................................................................
   2.1   Grant of Licence.....................................................................................................
SECTION 3 – INFRINGEMENT..........................................................................................
   3.1   Infringement of Trade-marks or Trade-names. ......................................................
SECTION 4 – ACKNOWLEDGEMENT ..............................................................................
   4.1   Acknowledgement of Rights. .................................................................................
SECTION 5 – OBLIGATIONS OF THE LICENSEE ...........................................................
   5.1   Obligations of the Licensee....................................................................................
SECTION 6 – STATUS OF PARTIES .................................................................................
   6.1   Status of Parties......................................................................................................
SECTION 7 – TRANSFER ..................................................................................................
   7.1   Right of Licensor to Transfer..................................................................................
   7.2   Acknowledgement of Licensee. .............................................................................
SECTION 8 – TERM AND TERMINATION ........................................................................
   8.1   Term of Agreement. ...............................................................................................
   8.2   Other Relief............................................................................................................
SECTION 9 – RIGHTS AND OBLIGATIONS ON TERMINATION ......................................
   9.1   Rights and Obligations on Termination. .................................................................
SECTION 10 – GENERAL ..................................................................................................
   10.1 Time. ......................................................................................................................
   10.2 Waiver....................................................................................................................
   10.3 Notice.....................................................................................................................
   10.4 Number and Gender. ..............................................................................................
   10.5 Entire Agreement. ..................................................................................................
   10.6 Severability.............................................................................................................
   10.7 Headings.................................................................................................................
   10.8 Successors and Assigns. .........................................................................................
   10.9 Applicable Law. .....................................................................................................
   10.10 Counterparts. ........................................................................................................
   10.11 Survival. ...............................................................................................................
   10.12 Further Assurances................................................................................................

(i)



# TRADE-MARK AND TRADE-NAME LICENCE AGREEMENT

Made as of December 28, 2017 ("Effective Date")

Between

PENTHOUSE GLOBAL MEDIA INC.
as Licensor

and

TOKKEN MSB INC. O/A VICE.ORG
as Licensee

FOR VALUE RECEIVED, the parties agree as follows:

## SECTION 1 – DEFINITIONS

1.1    In this Agreement:

(1)    *Person* means a natural person, a corporation, a partnership, a trust, a joint venture, any governmental authority or any other entity or organization.

(2)    *Territory* means World.

(3)    *Trade-marks* means:

   (a)    the trade-marks listed on Schedule "A".

(4)    *Transfer* means any event pursuant to which the rights or obligations of the affected party under this Agreement are or are attempted to be sold, disposed of, assigned, pledged, hypothecated, charged, mortgaged, encumbered, sublicensed or transferred and includes any transfer by operation of law.

## SECTION 2 – LICENCE

2.1    **Grant of Licence.**

(1)    Subject to the terms and conditions of this Agreement, the Licensor hereby grants to the Licensee a non-exclusive, non-transferable, royalty-free right and licence, during the term of this Agreement, to use:

   (a)    Specifically, the Licensor grants to the Licensee a right to use the Penthouse marks for the purposes of a crowd sale and crowd funding efforts of the Licensee and for the purposes of an Initial Token Offering (ITO). In return, the Licensor



- 2 -

will have the use of the Vice Smart Media Token blockchain for its own purposes and in addition the Licensee shall distribute within 15 days of completion to the Licensor:

(b)    10M (Ten Million Dollars US) raised during the Vice crowd sale; and

(c)    60,000,000 of the tokens generated in the ITO.

(2)    The Licensee shall have no right to transfer or grant any sub-licence with respect to any of the Trademarks.

## SECTION 3 – INFRINGEMENT

**3.1    Infringement of Trademarks or Tradenames.** In the event of actual or threatened infringement of any of the Trade-marks or Trade-names during the term of this Agreement, the Licensor shall have the exclusive right, at its option, to take appropriate action to prevent and/or to stop the infringement including, without limitation, instituting action against infringers. The Licensor shall have the exclusive right, at its option, to defend all actions contesting the validity of or the Licensor's ownership of the Trade-marks or Trade-names or arising in any way from the use of one or more of the Trade-marks or Trade-names. The Licensee shall consent to the use of its name in all such litigation and shall sign such documents, swear such affidavits or declarations and take such other action as may be reasonably necessary to assist the Licensor in such litigation, at the expense of the Licensor.

## SECTION 4 – ACKNOWLEDGEMENT

**4.1    Acknowledgement of Rights.** The Licensee acknowledges and agrees that:

(1)    the Licensor is the exclusive owner of all right, title and interest in and to the Trade-marks and all goodwill associated therewith;

(2)    it shall acquire no right, title or interest in and to any of the Trade-marks; and

(3)    any and all goodwill generated by the use of the Trade-marks by the Licensee shall enure exclusively to the benefit of the Licensor.

## SECTION 5 – OBLIGATIONS OF THE LICENSEE

**5.1    Obligations of the Licensee.** The Licensee shall have the following obligations:

(1)    it shall maintain the high standard of quality of the Wares and Services which is established by the Licensor from time to time (the "Quality Standard") and shall comply with all specifications supplied by the Licensor with respect to the Wares and/or the Services;

(2)    it shall allow authorized representatives of the Licensor to inspect, during normal business hours, its inventory of the Wares in order to assess the Licensee's compliance with the Quality Standard and the other terms of this Agreement;



– 3 –

(3)     it shall, if requested by the Licensor in writing, send to the Licensor specimens of the Wares for examination by the Licensor to ascertain whether the Wares meet the Quality Standard; and

(4)     it shall give to authorized representatives of the Licensor access to all relevant documents, materials and records pertaining to the Services and access to its business premises during normal business hours for the purpose of inspecting and examining the standard of the Services provided by it in order to determine whether such Services comply with the Quality Standard and the other terms of this Agreement.

## SECTION 6 – STATUS OF PARTIES

**6.1     Status of Parties.** Nothing contained in this Agreement shall constitute a party the agent or partner of the other or shall empower a party to bind the other.

## SECTION 7 – TRANSFER

**7.1     Right of Licensor to Transfer.** The Licensor shall have the right to Transfer any or all of its rights and obligations under this Agreement and the Trade-marks to any Person as it may in its sole discretion deem appropriate. In the event of any such Transfer, the Licensee agrees to release the Licensor from any further liability under this Agreement with respect to those rights and obligations or the Trade-marks, as the case may be.

**7.2     Acknowledgement of Licensee.** The Licensee acknowledges that the granting of the rights hereunder to the Licensee is based upon the Licensor's investigation of the Licensee's qualifications and that such rights are personal to the Licensee. The Licensee shall not Transfer its rights or obligations under this Agreement to any Person without the prior written consent of the Licensor. Any actual or purported Transfer occurring without the Licensor's prior written consent shall constitute a default under this Agreement and shall be null and void.

## SECTION 8 – TERM AND TERMINATION

**8.1     Term of Agreement.** This Agreement shall be of unlimited duration with respect to the Vice Smart Media Token block chain because it can never be erased, but the use of the trademarks by the Licensee shall be subject to:

(a)     Term shall commence as of the Effective Date and shall continue for a duration of eight (8) month (the "Term").

(b)     if the Licensee commits or permits any material breach of any of the provisions of this Agreement and fails to remedy such breach within thirty (30) days following written notice thereof from the Licensor, or

(c)     if the Licensee ceases to carry on business or is adjudicated bankrupt or insolvent or makes an assignment for the benefit of its creditors or if proceedings in bankruptcy are instituted against it or if a receiver of its property is appointed or if



32

- 4 -

any judgment or execution against it or its property remains unsatisfied for such period as would permit its property or any substantial part thereof to be sold, or

(d)     if the Licensor and the Licensee cease to be related companies within the meaning of the *Trade-marks Act*.

**8.2     Other Relief.**  Any termination under section 8.1 hereof shall be without prejudice to any other rights, remedy or relief vested in or to which the Licensor may otherwise be entitled against the Licensee.

## SECTION 9 – RIGHTS AND OBLIGATIONS ON TERMINATION

**9.1     Rights and Obligations on Termination.**  Upon termination or expiration of this Agreement, the Licensee shall cease to be a licensee of the Licensor and shall:

(1)     immediately cease to use, directly or indirectly, in any manner whatsoever any of the Trade-marks or Trade-names or any name or mark similar to any of the Trade-marks or Trade-names; and

(2)     remove the Trade-marks and Trade-names from or deliver up to the Licensor or its duly authorized representatives all materials including signs and advertising materials in its possession, custody or control on which any of the Trade-marks and Trade-names appear (except for documents not for public display or reasonably required for archival purposes).

## SECTION 10 – GENERAL

**10.1     Time.**  Time shall be of the essence of this Agreement.

**10.2     Waiver.**  The failure at any time to require performance of any provision shall not affect the full right to require performance at any later time. The waiver of a breach of any provision shall not constitute a waiver of the provision or of any succeeding breach.

**10.3     Notice.**  Any notice or other communication required or permitted under this Agreement shall be in writing and may be delivered personally, by fax, by courier or by prepaid registered or certified mail addressed, in the case of the Licensor, as follows:

> Penthouse Global Media Inc.
> 8944 Mason Avenue
> Chatsworth, CA  91311 USA

and in the case of the Licensee, as follows:

> Tokken MSB Inc. o/a Vice.Org
> 5582 Manotick Main Street
> Manotick, ON   K4M 1B3 Canada



- 5 -

or to such other address as the addressee may have specified by a notice given under this provision. Any such notice or other communication, if delivered personally or by courier or mailed, shall be deemed to have been given when received and, if faxed, shall be deemed to have been given when the appropriate answerback is received.

**10.4    Number and Gender.** In this Agreement words importing the singular include the plural and words importing gender include all genders.

**10.5    Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter, supersedes all prior representations, negotiations and understandings and may not be amended, or any provision waived, except in writing signed by the party against whom the amendment or waiver is sought to be enforced.

**10.6    Severability.** Any provision which is illegal, invalid or unenforceable shall be severable and shall not affect the remaining provisions of this Agreement.

**10.7    Headings.** The headings in this Agreement do not affect its interpretation.

**10.8    Successors and Assigns.** This Agreement shall ensure to the benefit of and be binding upon the parties and their respective successors and permitted assigns.

**10.9    Applicable Law.** This Agreement shall be governed by and interpreted in accordance with the laws of California applicable therein and each of the parties irrevocably attorns to the non-exclusive jurisdiction of the courts of the State of California.

**10.10    Counterparts.** This Agreement may be signed in counterparts, which together shall constitute the fully executed agreement.

**10.11    Survival.** All obligations of the Licensor and the Licensee which expressly or by their nature survive the termination or Transfer of this Agreement shall continue in full force and effect subject to and notwithstanding such termination or Transfer and until they are satisfied or by their nature expire.

**10.12    Further Assurances.** The parties agree to do or cause to be done all acts or things necessary to implement and carry into effect this Agreement to its full extent.

The parties have executed this Agreement.

PENTHOUSE GLOBAL MEDIA INC.

By: _____
Name: Kelly Holland
Title: CEO

34

– 6 –

**TOKKEN MSB INC. O/A VICE.ORG**

By: _____

Name: Stuart Duncan

Title:

SCHEDULE "A"

TRADE-MARKS

PENTHOUSE



# Exhibit B

According to the White Paper, the minimum amount to close the KODAKCoin ICO is set at $2 million. We anticipate no issue in achieving a close (as we discussed in our article "Kodak: Crypto-Mania Crash Countdown"), a $2 million "investment" has already been announced by the lead investor in the Pre-Sale 1 round.

Below is a chart showing the key highlights, timelines, and milestones of the KODAKCoin ICO. The total tokens and proceeds below are for each stage to have a fully subscribed offering in the amounts shown totaling $20 million and 36.5 million tokens.

### HIGHLIGHTS, TIMELINES & MILESTONES

| TOKEN | ANTICIPATED LAUNCH DATE | ANTICIPATED CLOSING DATE | TOKEN PRICE | TOTAL TOKENS OFFERED | PROCEEDS IF OFFERING FULLY SUBSCRIBED |
|---|---|---|---|---|---|
| PRE-SALE 1 (REG D) | 29.12.2017 | 07.01.2018 | US $ 0.25 | 13,000,000 | US $ 3,250,000 |
| PRE-SALE 2 (REG D) | 10.01.2018 | 30.01.2018 | US $ 0.50 | 13,500,000 | US $ 6,750,000 |
| ICO (REG D) | 31.01.2018 | 28.02.2018 | US $ 1.00 | 10,000,000 | US $ 10,000,000 |
| | | | | 36,500,000 | US $ 20,000,000 |

The Pre-Sale 1 will be priced at $0.25 per token, Pre-Sale 2 at $0.50 per token, and then the public ICO at $1.00 per token - welcome to the "interesting" world of ICOs.

The White Paper further states, WENN expects to authorize 500 million tokens and plans to sell up to 100 million tokens (with a 100 million token over allotment). The number of tokens to be sold (100 million) is confusing in that it does not jive with any of the other figures in the White Paper, including the chart above or use of proceeds discussion.

The White Paper also notes, the management of WENN is not restricted in its ability to increase the number of authorized tokens above 500 million in the future.

The tokens WILL be distributed accordingly:

- 50% Token Sale (Marketing, Operations, Acquisitions, Legal, etc.)
- 30% Investors
- 10% Treasury
- 10% Employees

It is unclear how many tokens will be issued after the transaction, for example, will employees get all of the allotment indicated above at the time of the offering?

The token distribution percentages bring up another inconsistency. If there are 500 million authorized tokens and 100 million are to be sold to investors with a 100 million over allotment available, that is 200 million, or 40% of the total tokens available for sale to investors (not the 30% listed above).

38

# Exhibit C



**WHITEPAPER**

# Vice Industry Token

# Table of Contents

Is the Vice Industry Ripe for Disruption..........................................2

    Too many hands in the pot .......................................................3

    Not about the viewer................................................................3

    Limited user engagement.........................................................3

    Rethinking monetization for the Vice Industry...........................4

    The Rise of the Attention Economy...........................................6

Vice Industry Token..................................................................8

Vice Industry Token Portal.......................................................12

Token Sale Distribution...........................................................15

Proxy Token and Refund Contract Period..................................16

Timeline.................................................................................17

Team.....................................................................................18

    Stuart Duncan - CEO..............................................................18

    Kelly Holland - President ........................................................19

    Bill Heilmann - CSO ...............................................................20

    Eric Helsel - CMO .................................................................21

    Andry Kostin - CTO ...............................................................22

FAQ.......................................................................................23

# Is the Vice Industry Ripe for Disruption

The moving image has existed for over a century. With evolutions in technology to capture and display moving images, there have also been evolutions in business models used to distribute and facilitate transactions pertaining to them.

Todays viewers buy admission tickets to a movie, or purchase the rights to view an event as pay-per-view.  Content producers and distributors, from cable and satellite providers like DirecTV, Spectrum and Comcast to large communications enterprises like Verizon and AT&T, all forecast revenues based on how many paying viewers they can attract.

This 100 year old revenue model is used across many video content categories, where users pay to watch. The model has been used since video technology first came about, and even when the Internet first became popular.

These days it is also clear that advertisers are willing to pay for their promotions to be shown in or near the point of interest in websites; namely, the video being offered. The proximity of advertising to video enables video providers to offer content for free. Sponsors pay for screen space to display their advertisements. The advertisement catches the attention of the viewer. This subsidizes the video provider's operating expenses. This permits viewers to watch without paying. These days people watch videos for free, just for having to look at a few advertisements.

Today, the ad-supported free viewing model is the Internet industry standard. However, there are three major problems with this model in its current state...

## 1. Too many hands in the pot

It isn't as simple as the advertiser paying the content producer. More often, it involves the advertiser paying an advertising network. The advertising network pays the agent of the content producer. Revenue eventually trickles down to the content producer. Each of these parties along the way takes a cut. Because the content producer often does not control or own the distribution network, very little of the revenue is shared with the content producer.

Instead of improving the quality of content production, the current business frustrates producers and reduces the incentive to create quality content as net revenues dwindle to nothing. This is a problem for content producers VS Tube sites globally.

## 2. It's not about the viewer

Since the viewer isn't paying for content, advertisers call the shots. This includes having a say in what content is sponsored. What content is made available for free is primarily left up to advertisers. The viewer may have the benefit of getting to watch video content for free but it won't probably be exactly what the viewer wants to watch. Today, viewer interests are a secondary concern at best.

## 3. Limited user engagement

While most video platforms show ads, this doesn't necessarily mean viewers watch ads. Viewers often switch windows or use ad blocking software. Viewers even skip and may not even watch an ad. As a result, the value advertisers get for their advertising dollars is questionable. As a direct consequence, ad costs may go down

43

but advertisers are forced to showing more ads or even lengthier ads. A failing of viewers to pay attention to ads is indeed forcing advertisers to rethink the monetization model.

## Rethinking Monetization for the Vice Industry

ViceToken.com wants to disrupt and rebuild the monetization of free adult content through a better understanding of adult content users, the entire Vice Industry ecosystem and what we describe in more detail below as the emerging Internet Attention Economy. Our launch into the Vice Industry will initially center around the monetization of Adult Pornography (Adult) content.  Surprisingly, the bulk of revenue in the online adult pornographic industry is not generated by content. The bulk of online adult revenues are generated by traffic.  62% of today's online adult revenue is generated by traffic. Very little of that revenue is earned by advertisers, almost none by content producers and absolutely none is given to viewers. Advertisers pay the traffic companies. Only 24% of adult revenue is actually generated from adult content, or from adult content affiliated websites and programs. The remainder of adult revenue is generated from webcam shows, and the sale of merchandise such as lubes and toys.

What does a new monetization model for the Vice Industry look like? Our solution to this problem is to offer a cryptocurrency token for the Vice Industry that rewards all aspects of engagement in the newly emerging Attention Economy. Built on the same base technology that powers the Steem blockchain, tokens are generated as a direct result of user engagement on a "proof of brain" basis.

Our token efficiently captures the attention of viewers by paying them through the blockchain in a tokenized transaction where all

44

parties are rewarded for participating. We registered the trademark "Get Paid To Watch Porn" to emphasize this fact.

By utilizing our blockchain, any viewer earns tokens for watching, any video producer earns tokens for creating content, and any content curator earns tokens for streamlining the identification of relevant content to the most important party in this equation; the viewer.

It cannot be emphasized enough that the viewer (and more importantly, their attention) is the star of the show especially in the context of online adult video and adult tube sites. With so many adult websites to choose from (over 150,000 worldwide according to AVN and XBIZ), there are only so many websites a viewer can give their attention to. With 24 hours in a day, and only a fraction of those hours available for a person to watch video, there is only so much human attention that can be given to adult video content of any kind, on any website.

We understand that free content is no longer good enough to attract viewers since it's widely available everywhere. Anybody can offer free ad-supported content and "Free" is no longer a unique value proposition. What we have created with the Vice Industry Token is an entirely new and completely disruptive, revolutionary incentive to engage viewers pay content producers and pay curators or distributors of content using the Vice Industry Token blockchain. Using tokens, everybody gets paid, including the viewer.

45

# The Rise of the Attention Economy

### *"Free was good, it's just not good enough anymore."*

- Stuart Duncan, CEO, Vice Industry Token and Blockchain

Historically, all video business models - past and present - have relied on people to view video content. The whole point is to get the attention of viewers. Viewers are central to the entire ecosystem. Without viewer attention, the whole online video ecosystem would collapse. Video producers wouldn't make videos if nobody watched them. Video content is specifically made to be watched. That's an unchanging fact.

What the Vice Industry Token and Blockchain does specifically in terms of the future is disrupt the entire adult video viewing ecosystem. We do so by capitalizing on the dynamics of the new Attention Economy and changing how monetization in the adult pronographic content ecosystem occurs.

Back when the supply of adult pornographic video content was limited, it was easy to get users to pay to watch. As more content became available, it was easy to provide content for free with supporting ads and banners, pop ups and pop unders. This is how business is done today.  However, the "watch for free" market has become saturated. With so many websites now clamoring for attention, there exists an imbalance between the supply and demand for human attention. The Vice Industry Token blockchain throws that ecosystem out the window making it a dead end. How? In addition to paying creators and curators, Vice Industry Tokens will enable viewers of content on websites powered by the Vice Industry Token to be paid just for viewing, as well as commenting and rating various forms of content.

46

The Vice Industry Token is the first business model of its kind to tokenize a viewer relationship with content, which makes the old models unsustainable. Why would anyone watch something for free when they could be paid?

When time is taken to understand how limited of a commodity the attention of viewers is, it becomes abundantly clear the adult content sphere is ripe for tokenization.

The Vice Industry Token will enjoy maximum disruption with top-of-the-line technology, strong partnerships with some of the biggest adult content brands, and a huge 'first token' advantage. Existing adult websites can quickly and easily power their own websites with the help of the Vice Industry Token Blockchain and our B2B assistance program to help any business integrate our blockchain into their web monetization strategy. While we will initially operating in the adult sphere, our blockchain and implementation teams can easily benefit and cross over into other industry verticals and help many types of video content distribution businesses, not just adult pornography.

The online entertainment and especially the adult pornographic industry cannot continue to do business without disruption using a 100 year old business strategy. Offering ad-supported video content was a good deal for everybody involved before the industry became saturated. But with unlimited choice, and strictly limited human attention, the forces of supply and demand are putting the media industry to the test. Do we continue to play games with free, or do we pay users to watch? There isn't much doubt that people will choose to be paid. This is the future.

47

# Vice Industry Token

*"The Vice Industry Token and its blockchain will revolutionize the entire online traffic Industry"*

- Stuart Duncan, CEO, Vice Industry Token and Blockchain"

Cryptocurrency tokens have rapidly evolved as a method of transacting and establishing value. Established tokens such as Bitcoin are gaining greater traction than ever before as institutional investors seek to expand holdings with cryptocurrency assets. In fact, recent increases in the value of Bitcoin have highlighted the fragility of existing fiat currencies like the US dollar, the Euro and all other fiat currencies. BitCoin is simply reflecting the fact that fiat currencies are not properly valued in the sense they are not worth very much and declining in value relative to a BitCoin's value.

New tokens are entering the market on a regular basis, each with their own unique value propositions but with many similarities between tokens and their applications. While cryptocurrencies do indeed share many properties, there is one key technical element of the Vice Industry Token that causes it to function and behave very differently from all other cryptocurrencies. It is the design of its engine - its blockchain.

The key technical element that materially differentiates the Vice Industry Token blockchain is that it is an engagement-oriented protocol that is designed to facilitate the exchange of tokens between all participants in media consumption.

As described previously in this whitepaper, people that benefit in the Vice Industry Token include creators, viewers, curators, and

commenters. It even benefits people who recommend or upvote content. At first glance, it may appear that this is something that could be done with any cryptocurrency. However, the ability to align incentives between users and applications, while still functioning as a financial instrument, is one that is not native to any regular cryptocurrency for the simple reason that they exist specifically for the transaction of value, as in quid-pro-quo "sale of goods" transactions. Monetizing attention and traffic and gathering the attention metrics that matter to website operators requires a very different set of functionality.

The "smart and social" nature of the Vice Industry Token has two dimensions of functionality that would not be needed in straight-line value transactions. The first revolves around a  "rewards pool" function. The second dimension revolves around the fact that more is being transacted than just tokens.

The first dimension - the "rewards pool" function - allocates token distribution among participants according to a fixed structure. This is necessary to ensure prompt and transparent compensation for all participants. It also requires a sophisticated, specially-designed blockchain. This is facilitated by the use of next-generation blockchain platforms that we are using and developing. We are implementing the world's most scalable public blockchain software platform capable of over 100,000 transactions per second similar to that powering the Steem and EOS blockchains.

The second dimension involves transaction dynamics and metadata collection. For media websites, the collective dynamics of wisdom, opinions, and attention of participants is invaluable as a matter of assessing audience reaction to website video content through metadata or what we call Rich Data. Rich Data is generally not

attainable beyond "quantity" data such as view counts, which are not particularly informative to website operators. Since users of websites that use the Vice Industry Token will be incentivized to do such things as comment and vote, website operators implementing the Vice Industry Blockchain into their sites will benefit from much richer, more insightful data including web traffic tools being developed for them as part of the incentive to use the Vice Industry Token blockchain. Aside from this "traffic data" being useful to the website operator on a firsthand basis, most forms of this data are saleable across many other verticals.

The Vice Industry Token and the functions built into it are created based on the sentiment that human attention is the most valuable commodity; a notion that has been sustained all throughout the existence of modern media. We acknowledge this by providing users with the opportunity to be compensated for their viewership and participation. In kind, we anticipate that users will give more of their attention both qualitatively (by giving their undivided attention), and quantitatively (by spending more time watching). The corresponding actions that come from this will provide them with meaning token rewards and blockchain ecosystem incentives, and websites that use the Vice Industry Token blockchain will benefit with valuable, meaningful, useful traffic tools and rich data metrics. Most importantly, we think it will cultivate higher volumes of better-engaged traffic, which carry a higher net value than traffic from viewers of ad-supported videos.

Given the specialized nature of transactions that occur using the Vice Industry Token blockchain, it is key for it to run on an application-specific blockchain instead of on an application-general blockchain. As a matter of scalability, we need to adapt to predictable needs, as opposed to just any need. Because of this, block time frequencies will be considerably higher allowing

transactions to take place in real time.

The Vice Industry Token offers immediate liquidity by offering two conversion methods. The first is through a decentralized exchange as part of the Vice Industry Token Protocol utilizing automated market makers to standardize the value of tokens relative to other currencies (both crypto and fiat). This allows users to have a real-time sense of the value of their tokens, and the ability to convert them on demand. The second method is through existing exchange markets, where bids and asks are done by human participants, enabling transactions of tokens for conversion to other currencies.

We anticipate that by late 2018, a large number of content partners and website operators will have embedded support for the Vice Industry Token in their online portals. Vice Industry Tokens will also be supported by a growing number of Vice Industry Token decentralized video portals in exactly same way. Once this takes place, all aspects of delivering and using adult content will change as users become capable of being rewarded for their attention and engagement. We expect that this change will ultimately spread beyond the adult ecosystem into other video genres, and possibly even into mainstream media.

In summary, traditional cryptocurrencies are designed for exchanging funds. The Vice Industry Token is designed for transacting and rewarding attention. With countless qualitative elements that go with this, the Vice Industry Token addresses everything that must be done differently to fulfill this specialized purpose. As a convertible cryptocurrency, it is effectively equivalent to any other crypto currency on the open market. But as an engagement optimization tool, it offers a breakthrough by doing exactly what both viewers and website operators have always wanted.

# Vice Industry Token Portal

- Vicetoken.com portal websites will all be decentralized video platforms, offering familiar and relatable watching interfaces similar to existing tube websites. They will utilize the the ChainBase/ Graphene blockchain platform for social interactions and text, as well as the IPFS for hosting and delivering media. The portals will be powered by the Vice Industry Token which will facilitate user rewards for engagement, while enabling portal operators to collect fees for transactions.

- The IPFS content storage and delivery platform gives users numerous advantages. Being distributed (as opposed to centralized), users with sporadic or unreliable Internet service can access files in the exact same way as users with stronger Internet connectivity. This removes barriers for users in remote or nonmetropolitan areas, in addition to enabling offline access. This should benefit users around the world and help make Vice Industry Tokens that much more valuable in the context of a global economy, where accessibility is a key factor in obtaining reach. On regular HTTP, this is not possible due to the dependency on specific servers, necessitating a strong, constant Internet connection. Accordingly, users will find that the IPFS delivers files much faster and more reliably. Because of these advantages, IPFS is widely used in the open-source world, and it has routinely been endorsed by the Internet Archive as the future of the web.

1.



CENTRALIZED
(A)

DECENTRALIZED
(B)

DISTRIBUTED
(C)

- Participants in all aspects of the Vicetoken.com portal will be eligible to earn Vice Industry Tokens.

- Viewers, curators, and content creators can earn Vice Industry Tokens as described in the Token section of this whitepaper. IPFS node operators will also be able to earn Vice Tokens by providing storage resources to portal operators.

- The Vicetoken.com portal will primarily operate as a channel for supporting the Vice Industry Token blockchain and its related adult content websites and affiliates. Since its functionality can equally benefit viewers and creators of all types of video content, we will enable any party to duplicate the portal to run their own Vicetoken.com node under their own brand, and in any language. They will also have the flexibility to modify their version of the portal at their discretion, and add other off-chain features.

1. https://ipfs.io/ipfs/QmNhFJjGcMPqpuYfxL62VVB9528NXqDNMFXiqN5bgFYiZ1/its-time-for-the-permanent-web.html

53

- The re-branding option is offered to provide ample opportunity for enterprising parties worldwide to create specialized versions of the Vicetoken.com portal with their own unique flair, in the interest of enriching the overall network of users of both the portal, and the Vice Industry Token. Those who operate Vice Industry Token Portal nodes will be able to earn Vice  Industry Tokens as transaction fees for all tokens transacted on their node.

- Just as Vice Industry Token will revolutionize how video content is consumed by viewers, the Vice Industry Token portal will revolutionize how video content is distributed around the world. Based on current estimates, the Vicetoken.com portal will launch in late 2018.

# Token Sale Distribution

Four billion tokens will be created in the genesis (initial) block. These tokens will be allocated in the following manner;



| | |
|---|---|
| ■ **Tokken MSB Inc:** | 1,000,000,000 Tokens |
| ■ **Strategic Partners, Advisors & Presales:** | 600,000,000 Tokens |
| ■ **Crowdsale:** | 2,000,000,000 Tokens |
| ■ **Steem Holders:** | 400,000,000 Tokens |

Furthermore, of the two billion tokens allocated for the crowdsale, any unsold tokens remaining at end of the crowdsale shall be retained by Vice Industry Token.

The Vice Industry Token network is an inflationary system, in which new token generation (inflation) will start at a 10%, degrading to 1% over ten years, at which point it remains constant. These new tokens will be generated by the system as rewards for producers, participants and curators.

It should be noted that as part of the Vice Industry Network protocol, website operators that utilize this blockchain are free to retain a percentage of rewards distributed. Current Vice Industry partner websites will be collecting 3% of all rewards paid out to users of their web properties on the Vice Industry Network.

The price of each proxy token will be sold at at a fixed amount of ETH equivalent to ~$0.05 of ETH at the beginning of the crowdsale.

Upon the token's launch, 400,000,000 (10%) of the genesis tokens will be air dropped to Steem holders of block number 18,500,000 on the Steem Blockchain.

55

# Proxy Token and Refund Contract Period

Vice Industry Token will use Ethereum to generate Vice Industry Proxy Tokens in the Vice Industry Token crowdsale, powered by a unique crowdsale contract which includes refund capabilities which will allow any holder of a proxy token, who purchased the tokens in the public crowdsale only and did not move it from the account they received it at, to redeem each Vice Industry Token for the original price paid of in ETH at the beginning of the crowdsale, until its expiration after which time the proxy tokens will be redeemable for the native Vice Industry Tokens from Vicetoken.com.

# Timeline

1. **January 11, 2018**:  Opening of Vice Industry Token Whitelist sale
2. **January 15, 2018**:  Launch of Vice Industry Token Presale
3. **February 1, 2018**:  Launch of Vice Industry Crowdsale.
4. **March 1, 2018**:  End of Crowdsale and distribution of ERC20 proxy Tokens.
5. **June 1, 2018**:  Launch of the Vice Industry Token MainNet and expiration of Refund Contract.
6. **June 28, 2018**:  Launch of Vice Industry Token video portal platform.



1. Opening of Vice Industry Token Whitelist sale
3. Launch of Vice Industry Crowdsale.
5. Launch of the Vice Industry Token MainNet and expiration of Refund Contract.

| Jan. 11 | Jan. 15 | Feb. 1 | Mar. 1 | June 1 | June 28 |

2. Launch of Vice Industry Token Presale
4. End of Crowdsale and distribution of ERC20 proxy Tokens.
6. Launch of Vice Industry Token video portal platform.

# Team



### Stuart Duncan – CEO

Stuart Duncan is an adult visionary, broadcast pioneer and former C+ developer. Stuart started his career at Canadian Aviation Electronics (CAE), moved to Mitel corporation and ended his corporate career at Telesat Canada before leaving to found 5D.com (5D Communications), which founded the world's first explicit adult TV network, Exxxtasy.

By 1999, Stuart was running the largest set of adult networks in North America. The network of TV and cable channels was sold to New Frontier Media and listed on NASDAQ in 1999. Stuart continued technical operations for New Frontier and sat on the New Frontier board until 2001. Stuart was the Chairman of the North American Broadcasters Association Internet Committee from early 1999 to late 2001. During this time, Stuart successfully broadcasted MPEG1 and MPEG2 across the Internet using the 5D infrastructure to an unbelieving audience of mainstream US broadcasters and cable systems, proving that the Internet was capable of becoming the broadcast medium it is today.

In 2000, Stuart was granted the first adult television broadcast license in Canada. During the next 14 years, Stuart started some of the top adult brands in broadcast and cable today. These brands include Exxxtasy TV (2000), Hustler TV (2003), Penthouse TV (2005), Red Hot TV (2008), Skinemax TV (2009), and Playmen TV (2010). In 2015, Stuart launched Media Vision Partners in the USA. MVP's broadcast brands are the fastest-growing adult broadcast networks in the USA. Stuart also owns and operates successful adult film production studios.

For the past two years, Stuart has been working to evolve online adult TV into a model where people in an attention economy "Get Paid to Watch Porn ®" using a proprietary cryptocurrency.



## Kelly Holland – President

A former mainstream award winning documentary filmmaker, Kelly Holland has been an adult film director and executive since 1994. In her early adult career, Kelly directed for Vivid but went on to direct for numerous other companies including Adam and Eve.

In 2005, Kelly became the Executive Producer for Playgirl TV, where she also served as the spokesperson for the brand, appearing in several mainstream media outlets.

In 2006, she became the Executive Producer for Penthouse Broadcast. Shortly thereafter, Kelly became the President of Penthouse TV, where she built a global broadcast operation that is now the largest adult broadcaster in the world.

In 2016, Kelly acquired Penthouse and all of its assets, including its licensing, publishing, broadcast, and digital divisions.

In a process that has lasted eight years, Kelly has overhauled the Penthouse brand. She has redesigned and refined its various properties and licensees around the world, and reorganized the publishing division to bring it to a profitable status. Kelly also pioneered the way for Penthouse into over-the-top platforms worldwide.

Penthouse is now an expanding empire of ten satellite channels in over 100 countries around the world. In addition to its video and television empire, Penthouse continues to grow product licensing and international publications, in addition to developing location based entertainment.

59



## Bill Heilmann - CSO

Bill Heilmann recently served as a Managing Partner at MEC, one of the largest media agencies in the world ($27 billion in billings), with a client roster that includes the likes of Marriott, Paramount Pictures, and IKEA. Prior to joining MEC, Bill was the Lead Global Strategist at BAV Consulting where he oversaw the global repositioning of Lexus.

Bill has been the founder of two separate digital ventures, and has a wealth of tech and marketing experience from working with brands that include AOL, US Robotics, and MSNBC. His wide-reaching category experience at various global advertising agencies includes luxury, retail, spirits, sports, pharmaceuticals, financial services, health/beauty, and home goods. A graduate of the University of Chicago, Bill has been the strategic force behind a number of EFFIE and Cannes-award winning campaigns, and was the recipient of the Ogilvy Award for advertising excellence.

## Eric Helsel – CMO

Eric Helsel joins Vice Industry Token as Chief Internet Media Officer celebrating his 20th year in Internet marketing.

Eric's career has involved creating online marketing and sales funnels for international brands such as Red Bull, Snapple, Coors, and the NFL.

More recently, Eric was the Vice President of Online Sales and Internet Marketing for Vivid Entertainment of Los Angeles for eight years. Eric engineered the online release and traffic generation plan of the "Kim Kardashian, Superstar" sex tape. Eric's guidance and management at Vivid resulted in a massive online success. Traffic generated by the Kardashian video was in the multiple billions of impressions. Sales of the "Kim Kardashian, Superstar" sex tape (viewed over 210 million times online, and watched on average once every 1.5 seconds) earned over $100 million since its release.

Eric has developed, managed, and overseen teams that have produced over 200 products in the Internet marketing space since 1997. His efforts have been responsible for PNL revenues in excess of $280 million throughout his career.

Before joining Victoken.com, Eric founded and managed the digital media agency Community 32, where he developed some of the most extreme product pursuits in digital marketing.



## Andrey Kostin – CTO

Andrey Kostin is a Java Software Engineer and Java Architect with 10+ years of experience in Java development, and 5+ years experience in architecture development in the big data, banking and finance industries.

Andrey has specialized in the development of distributed, highly-loaded, multi-threaded solutions, and was involved in the full application lifecycle. This includes pre-sale activity, architecture design, POC development, team construction, and development of core application modules. He has also given lectures in Core Java, GWT and Java EE.

Andrey has experience in P2P cryptography platforms, and was involved as architect and senior developer for Deutsche Bank and OTP Bank.

# FAQ

**When Will the Vice Industry Token Sale Start?**

The Vice Industry Token Crowdsale commence on February 1, 2018. Stay updated on times and dates by following social platforms and subscribing to the newsletter.

**Is there a Presale?**

Yes, there is a private presale event for the Vice Industry Token. The presale will be open on January 15, 2018.

**What Blockchain is Vice Industry Token run off?**

Vice Industry Token will be run as its own Blockchain, powered by the same underlying software that the Steem Blockchain uses.

**How Much Is a Vice Industry Token?**

The price of each proxy token will be sold at at a fixed amount of ETH equivalent to ~$0.05 of ETH at the beginning of the crowdsale

**How Many Vice Industry Tokens Will Be Available in the Token Sale and How Many Created in Total?**

Four billion tokens will be created in the genesis (initial) block. These tokens will be allocated in the following manner;

     - Vice Industry Token Inc: 1,000,000,000 Tokens

     - Strategic Partners, Advisors & Presales: 600,000,000 Tokens

     -Crowdsale: 2,000,000,000 Tokens

     -Steem Holders: 400,000,000 Tokens

Furthermore, of the two billion tokens allocated for the crowdsale, any unsold tokens remaining at end of the crowdsale shall be retained by Vice Industry Token Inc..

63

**Are There Any Discounts Available During the Crowdsale?**

No. there is a very limited presale open to accredited investors with discounts depending on quantity purchased. There is also a bounty campaign.

**Can I Submit ETH from an Exchange Account?**

No, please only send your purchased ETH to a compatible wallet whose private keys you own and control, before sending to the token sale.

**How can I enter the Bounty Campaign?**

Stay updated with the Newsletter, Telegram and other Social Platforms, when the campaign is live you will be notified. Follow the links to the BitcoinTalk page and fully understand the bounty requirements before committing to the campaign and entering.

**What is the Steem Holder's Airdrop?**

Upon the token's launch, 400,000,000 (10%) of the genesis tokens will be air dropped to Steem holders of block number 18,500 on the Steem Blockchain.

**Proxy Token and Refund Contract Period**

The refund contract will allow any holder of a proxy token, who purchased their token in the public crowdsale and who did not move their funds from the account they received it at, to redeem each Vice Industry Proxy Token for the original price paid of in ETH at the beginning of the crowdsale, until its expiration after which time the proxy tokens will be redeemable for the native Vice Industry Tokens from Vice Industry Tokens inc..

**How is Vice Industry Token different from Spankchain and other similar cryptocurrencies? What's special about Vice Industry Token?**

A user has to pay for Spankchain, which is a small target, small user audience, single use token. In comparison Vice is a multi use token that can pay participants, with a large global target and billions of global users.

**What are your supports in the industry?**

Vice Industry Token is partnered with Penthouse, Exxxtasy, Playmen, RedHot TV, SkineMaxHD, to name just a few. More details are located on our website https://vicetoken.com/

**How does content tracking work?**

If someone steals content and publishes on the Vice Industry Blockchain the original content creator is paid, this negates the issue of pirating.

**How do I sign up for the Whitelist?**

The whitelist will be available soon, however in the meantime sign up to the newsletters and follow the social accounts and you will be notified when the Whitelist begins.

**Will Vice Industry Tokens be released on Ethos?**

No. We have our own wallet and a built in exchange that allows similar tokens built on graphene/chainbase/bitshares platform to be exchanged internally using our exchange function as part of our application stack.

**How does Vice Industry Network function differently from Tube sites?**

Vice will put a stop to tube site piracy and non payment to content creators. All participants can benefit from Vice Industry Token as it strives to push back against the Tube sites and Traffic monsters.

65

**What is the 'Proof of Brain' concept?**

The Proof of Brain concept allows Vice Industry Token to be positioned as a growing community which encourages user participation and creation to add value to the overall community through the inbuilt rewards structure. Token systems such as Steem and Vice Token require this Proof of Brain concept to evaluate and establish the value of content.

# Exhibit D

# Background Deal Facts

The parties agree the following facts represent the background and the deal was and is predicated upon the existence and the viability of the following factual matters being as stated:

PHMG granted a Non Exclusive License on 12/28/17 to carry on an Initial Token Offering hereinafter (ITO) to TOKKEN MBS INC of Canada. Under which the Penthouse Brand & Kelly Holland name & expertise was
associated with an ITO that concerned the issuance of so called VICE Coin Tokens.  We note Kelly Holland is no longer associated with that Offering withdrawing from it in late January,2018.

The VICE Coin Offering under the ITO is for Issuance of Digital Tokens that are Utility Tokens created under an inflationary Bit Coin economic model as the term applies generically to Digital Token Crypto Coin economies.

The nature of the ITO is as described in the White Paper set out in Schedule One.

The VICE Coin Offering is proceeding as a Utility Digital Token Crowd Sale Offering on June 28th, 2018.

68

The Crowd sale is being carried on solely through the auspices of the
White Paper. No other formal offer document concerning the ITO exists.
The issuer is a Canadian company who has represented to the Buyer
And A&E that the legal advice to them has been and is that the ITO -
Utility Coin Offer in the context of the VICE Coin business overall model
does not represent an Offering of Securities under either the laws of
Canada and or the United States.

The VICE Coin Crowd Sale has been orchestrated ostensibly to create a
new way to monetize adult entertainment industry related media.

The concept is allegedly novel in that it changes via block chain
encryption under the STEEM IT blockchain methodology potentially how
adult entertainment media content may be distributed, consumed and
monetized.

ITO tokens are the key to transacting all New Media business aspects
under the VICE Coin ecosystem. In the context of this new Adult
Entertainment Industry media disputative economic model.

VICE Coins are heralded as being Utility Tokens designed to operate as
the trading currency that makes the proposed system work. This is the
glue upon which the VICE Coin Crowd Sale proceeds. Simply, stated the
glue is that VICE Coin tokens are a tradable currency within the
proposed ecosystem and not a security interest per se.

This ITO Crowd Sale will be complete on 6-28-18.

In essence there is no pre sale of ITO tokens. Buyers under the White Paper Offer document may express interest and or may reserve their ability to buy coins by way of a small deposit of 10 EH coins. No tokens will be issued before the date of the actual Crowd Sale.

Under the PHMG license for the ITO - PHMG will as license fees - be paid the following:

1.  $10,000,000 in cash out of the ITO proceeds - if they eventuate.
2.  60,000,000 VICE Coins issued at 0.05 cents pre crowd sale which will only be issued upon crowd sale launch valued at $3,000,000.

The prospective value of the ITO License Revenue Streams that are receivable by PHMG are $13,000,000 made up of a prospective cash payment of $10,000,000 that is contingent upon the ITO cash raising creating this sum for PHMG and Tokens issued as at the date of the Crowd Sale with a pre launch market value of $3,000,000.

70

**The Parties Acknowledge :**

- that the ITO may fail to reach the $100m target or even a minimal one.
- that PHMG may only collect a portion of the $10m cash fee in that event.
- that PHMG VICE Coin Tokens may have a value post crowd sale that is less than $3,000,000 due to market forces impacting the ITO economy.

The parties agree and acknowledge that the $13m in potential license fee revenue is both highly uncertain and at full market risk.

Crypto currency token offerings are inherently risky - most fail.

The VICE Coin Offering to succeed will need to reach a wide community of  adult entertainment content providers and consumers. The offering associates the start up VICE Coin brand with the Penthouse Brand and Kelly Holland but has nothing to do with Penthouse media assets per se, other than as potential media content provider and payee in the ITO community.

The lack of a pre existing community, narrow scope of marketing of the ITO, adult entertainment industry risk profile and the fact the ITO is created under an inflationary economic token model - all conspire to create levels of economic uncertainty that do not comport with PHMG investment risk profile in the context of a Chapter 11 filing.

71

Further their is no certainty in the minds of the PHMG and A&E as to whether or not VICE Coin tokens represent a "Security" when and if tokens are transacted by or between US persons before, during or after the Crowd Sale

The parties have not researched nor formed any opinion on this matter at the date of signing hereof.

The Utility Token argument - crowd sale method - statements from the Offeror TOKKEN MSB INC that Canadian Regulators and their legal outside counsel have looked at the matter and all deem this to be a " Utility Token" crowd sale and not an offer of a security interest. Have been the genus of the deal between the parties proceeding as documented. The buyer and seller collectively have relied upon these the facts and representations made by TOKKEN MSB INC.

# Exhibit E

## Summary

Files for new $11 a share offering.

Company is trying to restructure date in the face of a looming August payment.

More debt than money coming in.

High Times Holding Corporation (OACQ) issued a preliminary prospectus on recently to raise $50 million at a price of $11 a share. The company is highly dependent on getting listed on the NASDAQ exchange in order to meet its capital raising goals. To meet the NASDAQ listing requirements, High Times will need $17.2 million from this offering. At the minimum, the company is raising $5 million, with the ability to go to $50 million.The company is starting to run a campaign offering 10% discounts on the offering, which leads market watchers to believe that interest in the deal is low. The company is saddled with a mountain of debt as a result of the initial acquisition and while High Times is planning on increasing the number of events it offers, the revenue at this time, comes nowhere near enough to cover the debt payments.

To be fair, High Times said in the filing that it was addressing its debt obligations. To partially finance the High Times Group acquisition, Hightimes Holding, Trans-High and each of the other members of the High Times Group executed a loan and security agreement with ExWorks Capital Fund I, L.P. High Times is working on extending a loan payment for a principal amount of $11.5 million that it owes to ExWorks from August 2017 to August 2018. It made a down payment of $2.7 million but is still staring at this huge looming payment due in months. At the time of the filing though ExWorks had not agreed to extend the loan payment. The plan is that the company will now have a new note of $12.2 million due in February 2021.

**Just How Much Do They Owe?**High Times owes $17.6 million in payments this year alone. $8.7 million in long-term debt obligations, $2.8 million in interest payments, $6 million in convertible note obligations and $72,000 in lease commitments.

# How Much Money Is Coming In?

For the nine months ending in September, the company reported total revenues of $12.4 million. Over 70% of the revenues come from events like the Cannabis Cup, which the company wants to increase. The magazine only brought in $2.6 million during this time for a decline of 20% and merchandising declined 58% to $138,000.

The event space is getting crowded and many people have complained that the High Times' events were poorly organized and didn't run on time. Newer entrants like the Emerald Cup have seized on this as an opportunity. Print media overall is in decline and competitors like Dope Magazine have come on strong with impressive writing and a fresh look.

In the offering, High Times says, "During the three-year period from 2014 to 2016, the net income of THC and its subsidiaries declined from $3,421,592 in 2014 to net loss of ($2,926,000) in 2016. For the nine months ended September 30, 2017, the consolidated net loss of the Hightimes Group was ($15,955,000)."

It went on to state, "Although $6,689,000 of the net loss for the nine months ended September 30, 2017 resulted from a non-recurring non-cash stock compensation charge, and an additional $2,744,000 non-cash charge for debt discount and change in derivate value for the same period, High Times Group is anticipating a return to profitability commencing in the fiscal year 2018."

## A Little History

Hightimes Holding Corp. was established in December 2016 to acquire Trans-High and the THC Group. Founded in 1974, the THC Group published the famous High Times magazine and sponsored the Cannabis Cup events. The deal was valued at $70 million. Then, Hightimes Holding entered into a merger agreement, dated August 4, 2017, as amended on September 25, 2017, with Origo Acquisition Corp., a Cayman Islands corporation whose shares are currently listed on Nasdaq under the symbol ORAC. This was the way that High Times would become a NASDAQ listed company. This deal was valued at a whopping $250 million.

The merger with Origo Acquisition was expected to be closed months ago and the stock would've been listed on NASDAQ and all would be good. Instead, the merger has dragged on for months and the clock has been ticking away. It has an end date of March 2018 to close.

**The Takeaway**

As the cannabis industry matures, High Times is viewed as a "stoner" magazine and many people in the industry are trying to move towards legitimacy and professionalism. High Times must raise money fast and if it can't extend the debt payment and can't raise enough money, the acquisition will probably not close. If it doesn't close, it will not be a NASDAQ listed stock. There are too many red flags and this company relies on perfect execution of all these plans in order to succeed. It seems time is running out for High Times.