RON BENDER (SBN 143364)
BETH ANN R. YOUNG (SBN 143945)
LINDSEY L. SMITH (SBN 265401)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: rb@lnbyb.com; bry@lnbyb.com; lls@lnbyb.com

Attorneys for Dream Media Corporation

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>PENTHOUSE GLOBAL MEDIA, INC.,<br><br>Debtor.<br><br>In re:<br>PENTHOUSE GLOBAL BROADCASTING, INC.<br>PENTHOUSE GLOBAL LICENSING, INC.<br>PENTHOUSE GLOBAL DIGITAL, INC.<br>PENTHOUSE GLOBAL PUBLISHING, INC.<br>GMI ONLINE VENTURES, LTD.<br>PENTHOUSE DIGITAL MEDIA PRODUCTIONS, INC.<br>TAN DOOR MEDIA, INC.<br>PENTHOUSE IMAGES ACQUISITIONS, LTD.<br>PURE ENTERTAINMENT TELECOMMUNICATIONS, INC., fka For Your Ears Only, Ltd.<br>XVHUB Group, Inc., fka Giant Swallowtail Inc.<br>GENERAL MEDIA COMMUNICATIONS, INC.<br>GENERAL MEDIA ENTERTAINMENT, INC., fka Penthouse Video, Inc.<br>DANNI ASHE, INC.<br>STREAMRAY STUDIOS, INC.,<br><br>Debtors.<br><br> X  Affects All Debtors. | Lead Case No.: 1:18-bk-10098-MB<br><br>Jointly administered with:<br>Case No.:1:18-bk-10099-MB<br>Case No: 1:18-bk-10101-MB<br>Case No: 1:18-bk-10102-MB<br>Case No: 1:18-bk-10103-MB<br>Case No: 1:18-bk-10104-MB<br>Case No: 1:18-bk-10105-MB<br>Case No: 1:18-bk-10106-MB<br>Case No. 1:18-bk-10107-MB<br>Case No. 1:18-bk-10108-MB<br>Case No. 1:18-bk-10109-MB<br>Case No. 1:18-bk-10110-MB<br>Case No. 1:18-bk-10111-MB<br>Case No. 1:18-bk-10112-MB<br>Case No. 1:18-bk-10113-MB<br><br>Chapter 11 Cases<br><br>**REPLY TO OPPOSITION TO DREAM MEDIA CORPORATION'S MOTION FOR RELIEF FROM STAY**<br><br>Date:    February 14, 2018<br>Time:   1:30 pm<br>Place:   Courtroom 303<br>            21041Burbank Blvd.<br>            Woodland Hills CA, 91367 |

Secured Creditor, Dream Media Corporation ("Dream Media"), respectfully submits this reply to the opposition (the "Opposition") filed by Debtors Penthouse Global Media, Inc., Penthouse Global Broadcasting, Inc., Penthouse Global Licensing, Inc., and Penthouse Global Digital, Inc., Penthouse Global Publishing, Inc. (collectively, the "Debtors") to Dream Media's motion for relief from stay (the "Motion")[1] as follows:

## SUMMARY OF ARGUMENT

Over the course of two days, the Court has been presented with substantial testimony and argument regarding the Debtors' dire financial condition and general day to day operations. During this time, the Debtors have readily admitted that without the immediate infusion of cash, Debtors will be out of money by the week ending February 9, 2018.[2]

Although it did not appear that the proposed Androcles License Agreement would be approved over the objections outlined by Dream Media, and the stated objection by Counsel for the Creditors Committee, the hearing on that motion for approval has been continued to February 14, 2018, giving the Debtors the opportunity to try and re-craft the proposed Androcles transaction to cure the objections and grave concerns outlined during the hearing. Whether that comes to pass remains unknown, but does not provide a basis to conclude that the Debtors have any equity in the property or that Dream Media is adequately protected or that the property is necessary for reorganization. By February 14, 2018, or perhaps a few days earlier, when the deadline to propose any amendment to the Androcles transaction passes, the Court and the parties will have a more clear picture of the Debtors' position. What is certain now, however, is that other than the proposed Androcles transaction, Debtors have no other source of funds or path to a potential reorganization.

Debtors do not provide any valuation of the collateral other than reference to the Whitworth Declaration, which was presented to the Court during the February 6, 2018 hearing, at which time Mr. Whitworth confirmed that he had no personal knowledge of the value of the

---

[1] All capitalized terms not otherwise defined herein shall have the same meanings afforded to them as in the Motion.

[2] See, Exhibit 8 submitted at the February 5 – 6, 2018, hearing on Debtors' Cash Collateral Motion.

1

assets and merely reported book entries from the Debtors' records, which had no foundation. Importantly, the Whitworth Declaration (although largely refuted during cross-examination on February 6, 2018, or at least shown to be of little evidentiary value) does not evidence adequate protection, which the Debtors have the burden of proof to establish, and contradicts the Debtors' other statements of value made during this case. The Debtors do not explain the contradictions, and ignoring them does not resolve the evidentiary problems that they present.

Where the only evidence of record indicates that the assets purchased by the Debtors for the sum of $6,500,000 in February 2016 have declined in value due to not only the sale of assets and reduction of annual revenue that would otherwise flow from those sold assets, coupled with the continuing financial losses suffered by Debtors during the approximately 2 years of Debtors' operations, there is no question that, where Dream Media is owed more than $10,300,000 (an amount which Debtors do not dispute), Debtors lack equity in the property, Dream Media lacks adequate protection, and the property is not necessary for reorganization. Thus, relief from stay should be granted.

**A.**     **Cause Exists to Grant Relief From Stay Under 11 U.S.C. § 362(d)(1).**

In the Motion, Dream Media asserts that cause exists to grant relief from stay pursuant to 11 U.S.C. § 362(d)(1) because (1) the Debtors' cases were filed in bad faith and (2) Dream Media's interest in the collateral is not adequately protected because there is no equity cushion and the fair market value of the collateral is declining and payments are not being made to Dream Media. (See, Levin Declaration at Exhibit "I" to Motion for Relief.)

In support of Dream Media's argument that the Debtor's case was filed in bad faith, Dream Media submitted the following evidence, among other evidence, that:

1.     Debtors' filed their cases on the eve of Dream Media's *ex parte* application for appointment of a receiver in the State Court Action (in the Opposition, the Debtors incorrectly assert that the Debtors' bankruptcy filings were "precipitated by DMC [Dream Media] seeking

1 | to foreclose on essentially two days' notice."),³ which evidences that Debtors filed their bankruptcy cases for the sole, and bad faith, purpose of stopping the appointment of a receiver.

2. The Debtors have no available source of income to sustain a plan of reorganization or make adequate protection payments.

In the Opposition, the Debtors admit that the foregoing was true on the date of the filing of the Motion.⁴ The Debtors, however, contend that at the time of the filing of the Opposition, as a result of a license agreement with Androcles, the Debtors will be cash flow positive through the end of April. ⁵ Since Debtors' filed their Opposition, the proposed Androcles' License Agreement has not been approved and Debtors identify no other source of funding if the Androcles transaction (as proposed or amended) fails to be approved. Moreover, even if the Debtors' contentions are correct, this does not itself evidence that the Debtors will have enough income to sustain a plan of reorganization or make adequate protection payments to Dream Media.

The Debtors then further contend that Androcles has also offered to "finance all of the Debtors' content acquisitions on a cash-free revenue sharing basis."⁶ The alleged offer by Androcles to finance the Debtors' content acquisitions is speculative at best. The Debtors have not provided any evidence that Androcles has actually made this offer (by way of testimony or a copy of the offer or any other evidence) nor have the Debtors submitted the offer to finance for Court approval. Moreover, where the only testimony of record during hearing on February 6, 2018 indicated that Androcles does not even have the $1,000,000 necessary to fund the proposed License Agreement, it is incomprehensible how Androcles, a company formed on January 25, 2018, could provide film financing. But assuming *arguendo* that this financing offer actually comes to fruition, the Debtors have not provided enough information in their Opposition for the Court to determine how this agreement would aid the Debtors' cash flow and

---

³ *See*, Opposition page 3 lines 1-2.
⁴ *See*, Opposition page 3 line 6.
⁵ *See*, Opposition page 3 lines 7-9.
⁶ *See*, Opposition page 3 lines 9-10.

income as the Debtors only discuss the upside of the alleged agreement (saving in expenses) but do not discuss the downside (at what loss of income).

       3.      Debtors' admission of falsifying its internal and external books and records since at least 2016.

Admission of the fraud is not a substitute for rectifying it or dealing with the consequences of it having occurred.  Instead of explaining the Debtors actual financial status and detailing how the Debtors intend to insure that this fraud does not occur again in the future, in response to Dream Media's pointing out that the Debtors' books and records were falsified, the Debtors attempt to point the finger at Dream Media and argue that Dream Media should have known about the Debtors' falsified records because Dream Media had its own independent auditors looking at Debtors' books; and that Dream Media has no ability to complain since Dream Media acquired the loan from Exworks in November 2017, which was well after the misfeasance was uncovered by Ms. Holland.[7]

However, what the Debtors do not consider is that ExWorks' quarterly audits of the Debtors' books and records were based upon false information given to the auditors by the Debtors. Given the information that the auditors had to work with, there was no way for the auditors to determine that the Debtors' books and records were falsified.  It defies logic to understand how Ms. Holland could be at the company on a daily basis, but not know of the internal fraud, yet outside auditors performing a quarterly review should have caught it.

In summary, instead of trying to provide comfort to Dream Media or the Court about the Debtors' falsified records by detailing the Debtors current financial status and protections in place to stop these actions from happening, the Debtors seek to blame others, including ExWorks and its auditors for the Debtors' falsified records, which makes absolutely no sense.

---

[7] *See*, Opposition page 3 line 18 and page 4 lines 1-6.  What Ms. Holland ignores is that the Debtors' admission of internal fraud was months after it was uncovered by Ms. Holland, and after Dream Media acquired the loan.

Based upon all of the evidence in the record, the Court should conclude that the Dream Media is entitled to relief from stay under Section 362(d)(1) of the Bankruptcy Code.

### B. Cause Also Exists to Grant Relief From Stay Under 11 U.S.C. § 362(d)(2).

The Motion also asserts that cause exists to grant relief from stay under 11 U.S.C. § 362(d)(2) because the Debtors have no equity in the collateral and the collateral is not necessary to an effective reorganization.

#### (1) There is No Evidence of Any Equity in the Collateral

In support of Dream Media's contention that there is no equity in the collateral, Dream Media submitted the Declaration of Adam Levin in which Mr. Levin testifies as to his opinion as to the value of the collateral, which he opines is less than $6,000,000. (See, Levin Declaration at ¶ 6.) Debtors argue that Mr. Levin's opinion as to value cannot be admitted, though they submit no evidence to refute it. In support of their argument, the Debtors' cite to *Davis v. Carroll,* 937 F.Supp 2d 390 (S.D.N.Y. 2013) for the proposition that Mr. Levin's opinion of value should not be admitted. However, the *Davis* case does not support exclusion of Mr. Levin's opinion of value for several reasons.

**First**, Mr. Levin has indicated in his declaration his vast experience in valuing collateral similar to the Debtors' collateral, when he states that: "For the past 10 years, I have been actively involved in buying and selling assets such as those which comprise the Collateral for Dream Media's loans to the Debtors. I have reviewed the patents, trademarks and copyrights, as well as the film library, and am experienced in how these assets are valued and monetized in the open market place." (See, Levin Declaration at ¶ 2.) **Second**, Mr. Levin's Declaration comports with Federal Rule of Evidence 702. Specifically, Mr. Levin has provided information indicating his specialized knowledge (ten years of buying and selling similar assets); that his testimony is based upon sufficient facts or data ("As part of Dream Media's acquisition of the ExWorks Loan Assignment, I valued the Debtors' assets which comprise the Collateral subject to the Security Agreement" (Levin Declaration at ¶ 4)); that his testimony is the product of reliable principles and methods (his "analysis included the fact that in 2016, PMGI acquired all of the assets of the Penthouse Group of Companies for the sum of $6,500,000," and that

"Debtors sold a large portion of the assets through that certain Club License Transaction reflected in the Second Amendment to Loan Agreement, thereby reducing the Debtors' asset pool by the sum of at least $2,000,000, and also reducing the cash flow of the company by the sum of $1,500,000 annually" in addition to the fact that "PMGI has reported losses in excess of $2,000,000") (Levin Declaration at ¶4, 5 and 6); and that he has applied the principles and methods to the facts. None of the facts and data upon which Mr. Levin relies is disputed by Debtors. Indeed, the most widely accepted method for determining the value of the assets transferred is based on the contract price. *See In re Villa Roel, Inc.,* 57 B.R. 835, 839 (Bankr.D.D.C.1985) ("The price paid for the items transferred is generally used as the yardstick for determining fair value."); *In re Pritchard,* 8 B.R. 688 (Bankr.C.D.Cal.1981). Thus, where the Debtors purchased the assets in February 2016 for the sum of $6,500,000, there is no better evidence of value than that. Moreover, where Debtors sold some of their collateral since that time, and that reduced not only the collateral, but also the revenue source, there is no question but that there was a diminution in the value of the Debtors' assets since the date of purchase. And importantly, Debtors have not provided any evidence of valuation to refute this conclusion of value.

The only argument regarding valuation was provided in a Declaration of Keith Whitworth, the Debtors' Chief Financial Officer, who testified before this Court on February 6, 2018 that: (1) he held no appraisal designations; (2) did not appraise the Accounts Receivables, Film Library or Brand Value; (3) took numbers from the Debtors' books, without any independent review or analysis; (4) had no opinion of value; (5) would need to go back and review each film title to determine its value, and any level of impairment; and (6) the alleged $7,000,000 Brand value was not reflected in any documents (contrary to his declaration), but was based upon an oral statement he heard during the time that Debtors were in process of obtaining funding from ExWorks in or about 2016 or perhaps earlier, as the contemplated transaction started in 2014. Indeed, in connection with Debtor's use of cash collateral, the only

valuation relied upon by the Court was the cash value on the Petition Date, and none of the other valuations alleged by Debtors.[8]

"Sometimes, expert testimony does not rest on traditional scientific methods. In such cases, where a proposed expert witness bases her testimony on practical experience rather than scientific analysis, courts recognize that experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called general truths derived from…specialized experience." *Davis v. Carroll,* 937 F.Supp 2d at 412 (citations and internal quotations omitted). Here, as clearly laid out in Mr. Levin's Declaration, his testimony as to the value of the collateral is based on his vast experience over the past ten years in selling and buying assets similar to the collateral at issue. Mr. Levin's Declaration further details how he came up with his opinion of value, which includes the consideration of undisputable facts surrounding the Debtors' business (including the fact that PMGI acquired all of the assets of the Penthouse Group of Companies for the sum of $6,500,000). Thus, it is Dream Media's position that it has compiled with Federal Rule of Evidence 702 and based upon the case law cited by the Debtors in the Opposition, Mr. Levin's opinion as to value of the collateral is admissible. Indeed, an opinion is not objectionable just because it embraces an ultimate issue. (See, Federal Rule of Evidence 704.) Moreover, a witness can state an opinion, and be cross-examined upon the facts or data on which he relies. (See, Federal Rule of Evidence 705.)  In contrast, the Debtors' opinion as to value is not supported by any admissible evidence and Debtors' previous statements in the record of this case as to value serve to impeach the Debtors' opinion of value set forth in the Opposition. Clearly, Debtors have not met their burden of proof on the issue of adequate protection, or even submitted evidence sufficient to overcome Dream Media's showing that Debtors do not have any equity in the property.

---

[8] Importantly, Debtors indicate in their Opposition that the Debtors' Cash Balance on the Petition Date was $103,641, and not the $13,000 indicated to the Court on February 6, 2018. (See, Opposition at page 4, ll. 22.) Thus, for a determination of adequate protection, where the cash balance drops below $103,641, and Debtors have no evidence of value on the other assets, Debtors cannot establish adequate protection. Debtors have the burden of proof on this point and have failed to satisfy it. (See, 11 U.S.C. §362(g)(2).)

7

1    In the Opposition, the Debtors state that the value of the collateral is at least
2 $11,840,360.[9] However, to date, in the few weeks that this case has been pending, the Debtors
3 have represented three different values for the collateral. First, the Debtors represented in their
4 status report two different opinions as to the value of the collateral, one being that the Debtors
5 have no idea what the value of the collateral is and the other being $17,000,000 based upon an
6 outdated appraisal (and which appraisal was clearly discredited by the actual market value of
7 $6,000,000 paid for the Debtors' assets in 2016).  Given the Debtors' erratic opinion as to the
8 value of the collateral during this case, the Court should give little weight to this latest opinion
9 of value of $11.8 million which is not supported but any sound reasoning or accurate data.

**(2)    There is No Evidence That the Property is Necessary to an Effective Reorganization**

Further, the Debtor has not met its burden of showing that an effective reorganization is both feasible and based on more than speculative assumptions and projections. The Opposition's sole argument in support of its contention that an effective reorganization is both feasible and based on more than speculative assumptions and projections is that with the Androcles license, the value of the Debtors' assets and cash flow are increasing and that increase makes reorganization possible.[10] However, the proposed Androcles License Agreement has not been approved by the Court, and faces significant opposition from not just Dream Media, but also the Creditors Committee.  Although Dream Media is highly skeptical whether there is any amendment to the proposed Androcles License Agreement that would pass muster or make Debtors' business viable going forward, the Court has given the Debtors the opportunity to try and resuscitate the transaction and file an amended or revised proposal by February 11, 2018, with a hearing scheduled concurrently with this hearing on February 14, 2018.  Without any proposed Androcles License Agreement or other infusion of capital immediately, the Debtors are out of funds by February 9, 2018.  Even with an infusion of funds in a proposed Androcles transaction, the Debtors readily admit that under the Androcles deal

---

[9] *See*, Opposition page 5 line 2.
[10] *See*, Opposition page 3 line 18 and page 4 lines 1-6.

(as originally proposed, but not approved) the Debtors' will only remain cash positive through April, 2018. After that, the Debtors have not set forth any evidence or suggestion as to how the Debtors would continue to operate or fund a plan after that date. Thus, Debtors have fallen far short of meeting their burden that an effective reorganization is feasible. All of the Debtors' eggs are in the single basket of the proposed Androcles License Agreement. Debtors' have not identified any other paths to a reorganization.

Based on the foregoing, the Court should conclude that relief from stay under Section 362(d)(2) is warranted.

Wherefore, Dream Media respectfully requests that the Court enter an order granting the motion in its entirety and granting such other and further relief as the Court deems just and proper.

Dated: February 7, 2018            Levene, Neale, Bender, Yoo & Brill L.L.P.


By:    /s/ *Beth Ann R. Young*
       Ron Bender
       Beth Ann R. Young
       Lindsey L. Smith
       Attorneys for Dream Media Corporation

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **REPLY TO OPPOSITION TO DREAM MEDIA CORPORATION'S MOTION FOR RELIEF FROM STAY** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **February 7, 2018**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Krikor J Meshefejian    kjm@lnbrb.com
- S Margaux Ross    margaux.ross@usdoj.gov
- Michael St James    ecf@stjames-law.com
- Howard Steinberg    steinbergh@gtlaw.com, pearsallt@gtlaw.com;laik@gtlaw.com
- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov
- Michael H Weiss    mw@weissandspees.com, lm@weissandspees.com
- Beth Ann R Young    bry@lnbyb.com

**2. SERVED BY UNITED STATES MAIL**: On **February 7, 2018**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ *Service information continued on attached page*

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **February 7, 2018**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**SERVED BY OVERNIGHT DELIVERY (GS0)**
Hon. Martin R. Barash
United States Bankruptcy Court
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA 91367

☐ *Service information continued on attached page*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| February 7, 2018 | John Berwick | /s/ John Berwick |
|---|---|---|
| *Date* | *Type Name* | *Signature* |
This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                **F 9013-3.1.PROOF.SERVICE**