Michael H. Weiss (State Bar Number 107481)
mw@weissandspees.com
Laura J. Meltzer (State Bar Number 151889)
lm@weissandspees.com
WEISS & SPEES, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067-2701
Telephone: 424-245-3100
Facsimile: 424-245-3199

[Proposed] Attorneys for Debtors and Debtors in Possession
Penthouse Global Media, Inc. et al.

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| IN RE<br><br>    PENTHOUSE GLOBAL MEDIA, INC., a<br>    Delaware corporation<br><br>                Debtor. | Case No. 1:18-bk-10098-MB<br><br>Chapter 11<br>Jointly Administered With:<br><br>Case No. 1:18-bk-10099-MB |
| In re:<br>   Penthouse Global Broadcasting, Inc.<br>   Penthouse Global Licensing, Inc.<br>   Penthouse Global Digital, Inc.<br>   Penthouse Global Publishing, Inc.<br>   GMI Online Ventures, Ltd.<br>   Penthouse Digital Media Productions, Inc.<br>   Tan Door Media, Inc.<br>   Penthouse Images Acquisitions, Ltd.<br>   Pure Entertainment Telecommunications, Inc.<br>   XVHUB Group, Inc.<br>   General Media Communications, Inc.<br>   General Media Entertainment, Inc.<br>   Danni Ashe, Inc.<br>   Streamray Studios, Inc.<br><br>      [X] Affects All Debtors<br>      □ Affects<br>      □ Affects<br>      □ Affects<br>      □ Affects<br>  □ See attached for additional Debtors | Case No. 1:18-bk-10101-MB<br>Case No. 1:18-bk-10102-MB<br>Case No. 1:18-bk-10103-MB<br>Case No. 1:18-bk-10104-MB<br>Case No. 1:18-bk-10105-MB<br>Case No. 1:18-bk-10106-MB<br>Case No. 1:18-bk-10107-MB<br>Case No. 1:18-bk-10108-MB<br>Case No. 1:18-bk-10109-MB<br>Case No. 1:18-bk-10110-MB<br>Case No. 1:18-bk-10111-MB<br>Case No. 1:18-bk-10112-MB<br>Case No. 1:18-bk-10113-MB<br><br>**DEBTORS' EXHIBITS 13 AND 14 IN FURTHER SUPPORT OF MOTION FOR AUTHORITY TO ENTER INTO LICENSE AGREEMENT WITH ANDROCLES ENTERTAINMENT, PVY LTD. OUTSIDE THE ORDINARY COURSE OF BUSINESS**<br><br>Hearing:<br>Date:     February 14, 2018<br>Time:    1:30 P.M.<br>Place:   Room 303<br>         21041 Burbank Blvd.<br>         Woodland Hills, CA |

Debtors hereby submit the attached Exhibits in further support of their Motion for

Authority to Enter into a License Agreement with Androcles Entertainment PTY, Ltd.

("Androcles") (the "Motion") [Dkt. No. 70].

Exhibit 13 is the AMENDED TRADE MARK AND TRADE - NAME  AND

COPYRIGHT  LICENSE AGREEMENT Made as of January 27th, 2018.

Exhibit 14 is the redline version of the AMENDED TRADE MARK AND TRADE -

NAME  AND COPYRIGHT  LICENSE AGREEMENT Made as of January 27th, 2018, marked to

show changes against Exhibit 1 to the Motion.

Dated:  February 11, 2018                          WEISS & SPEES, LLP
                                                   /s/ Michael H. Weiss
                                                   Michael H. Weiss
                                                   [Proposed] Attorneys for Debtors and Debtors in
                                                   Possession Penthouse Global Media, Inc. et al.

# EXHIBIT 13

# AMENDED TRADE-MARK AND TRADE - NAME  AND COPYRIGHT  LICENSE AGREEMENT

Made as of January 27th, 2018

**Between**

## PENTHOUSE GLOBAL MEDIA INC.

as Licensor

**and**

## ANDROCLES ENTERTAINMENT PTY LTD

### ACN 624 032 177

as Licensee

s:\penthouse\androcles\amended androcles trademark licensing agreement (v7).docx

KH [_____ | GL [_____] WS [_____]

# AMENDED TRADE-MARK & TRADE NAME & COPYRIGHT LICENSE AGREEMENT

Made as of January 27th, 2018

Between

## PENTHOUSE GLOBAL MEDIA INC.

as Licensor

and

## ANDROCLES ENTERTAINMENT PTY LTD

### ACN 624 032 177

as Licensee

**FOR VALUE RECEIVED, the parties agree as follows:**

**1. – DEFINITIONS**

**1.1.**    In this Agreement:

(1)    *Person* means a natural person, a corporation, a partnership, a trust, a joint venture, any governmental authority or any other entity or organization.

(2)    *Copyright* means the copyrights listed in Schedule A.

(3)    *Territory* means the World.

(4)    *Trade-marks* means:

      (a)    the trade-marks listed in Schedule "A"

amended androcles trademark licensing agreement (v7).docx

KH [    ] [ GLL    ] WS

(b)    Trade Names listed in Schedule "A"

(5)    *Transfer* means any event pursuant to which the rights or obligations of the affected party under this Agreement are or are attempted to be sold, disposed of, assigned, pledged, hypothecated, charged, mortgaged, encumbered, sub licensed or transferred and includes any transfer by operation of law. But does not include any transfer under clause 7.(2).

(6)    ICO for the purposes of this Agreement means Initial Coin Offering(s) of Digital Coins or Digital Tokens and or any Initial Token Offering of Digital Securities, Digital Coin(s) or Token(s) whether offered as Utility Token(s) and or as Coin(s) or Token(s) or Digital Securities whether offered by way or pre sale, crowd sale, simple agreements for future tokens (SAFT) or simple agreements for future equity (SAFE), private placement or public offering and shall include but not be limited to all related digital wallets, digital coin exchange(s), digital smart contracts including blockchain and other forms of data encryption technology known and unknown. The term shall include the operating business of the ICO in the blockchain smart contract space as it relates to exploitation of the license(s) under this Agreement and all of the foregoing aspects.

(7)    **PENTHOUSE MEDIA GROUP INC (Licensor)** means (i) Penthouse Global Media, Inc., a Delaware corporation, Penthouse Global Broadcasting, Inc., Penthouse Global Licensing, Inc., Penthouse Global Digital, Inc., Penthouse Global Publishing, Inc., GMI Online Ventures, Ltd., Penthouse Digital Media Productions, Inc., Tan Door Media, Inc., Penthouse Images Acquisitions, Ltd., Pure Entertainment Telecommunications, Inc., XVHUB Group, Inc., General Media Communications, Inc., General Media Entertainment, Inc., Danni Ashe, Inc., and Streamray Studios, Inc. (collectively, "Licensee") are debtors in possession in the several bankruptcy cases now pending in the United States Bankruptcy Court for the Central District of California and any and all other all operating and non operational corporate entities including wholly or partially owned subsidiaries and or related brother or sister entities who the company warrants will agree to be bound by and to have the obligations under the License Agreement, jointly and severally enforced by and against them.

s:\penthouse\androcles\amended androcles trademark licensing agreement (v7).docx

KH [      ] | GL [      ] WS [      ]

## 2. – LICENSE

**2.1.**    **Grant of License.** Subject to the terms and conditions of this Agreement, the Licensor hereby grants to the Licensee a non-exclusive license, during the term of this Agreement, to use the marks, names and copyrights specified in Schedule A as Non Exclusive on a Non Exclusive basis, and in relation to those Trade Marks, Trade Names and Copyright interests specified in Schedule A marked as being for Exclusive Use license, during the term of this Agreement. The Licensor hereby grants to the Licensee an Exclusive License during the term of this agreement to use the Trade Marks, Trade-names and Copyrights listed in Schedule A on an exclusive basis for ICO use, that basis includes but is not limited to the exclusive right to such use trademarks, trade names and copyrights within the scope of the crypto currency, blockchain, smart contract and digital encryption use(s) envisaged under the ICO and on going business usage format(s) being advanced by way of this Agreement.

(a)    Specifically, the Licensor grants to the Licensee a right to use the Penthouse marks, trade names and copyrights for the purposes of Token Utility Offering, Pre Sale ICO, Crowd Sale, Private Placements and Public Offering efforts of the Licensee or its nominee and for the purposes of an Initial Coin Offering (ICO) and the related ongoing business to be developed, constructed, marketed and promoted by the Licensee.

(b)    Specially, the Licensor grants to the Licensee a right to use the Penthouse Mark(s) Name (s) and Copyright(s) in relation to both exclusive and non exclusive use(s) as specified in Schedule A to develop blockchain, smart contract and data encryption technology for an ICO and for use within the on going ICO businesses digital transactional footprint including but not limited to the ability to enjoy full access to all Licensor image archives and all Licensor published print, digital and film stock materials and digitize film stock for the purposes of the ICO.

(c)    Specifically, the Licensor grants to the Licensee the right to develop, establish, execute, market and promote an ICO in relation to the License and to create and publish a related ICO White Paper and where required by law ICO Offer Document(s) applicable to every nation where ICO coins or tokens may be traded as "Security" interests if and where they are so designated. The offeror has a preference to Offer Utility Token interests rather than Security Interests.

(d)    Specifically, the Licensor grants to the Licensee a right to develop, create, execute market and promote an ICO Offer and business in the United States of America through any Licensee related US domiciled entities. Conditional on the ICO format, offer structure and offeror entries - being subject to and in compliance at all times with any and all applicable US Federal and State Securities Laws. The Licensee shall indemnify the Licensor for any damages that may flow from any breach of US Federal and or State Securities Laws and or breaches of any foreign nations domestic Securities Laws. The Licensor shall if requested by the Licensee use best efforts and reasonable endeavors to seek guidance from and the assistance of the Bankruptcy Court to assist in any ICO related compliance

3

matters related to the Licensor being in Chapter 11 or going into Chapter 7 or Receivership.

(e)    Specifically, the Licensor grants to the Licensee a right within the context of the License footprint of rights, to develop and create Digital Currency - Digital Coins -Digital Tokens as either Utility Token and or Security Interests that may be made available for purchase by either US Persons within the United States and by Non US Persons in other jurisdictions outside the United States that in the sole discretion of the Licensee are deemed appropriate - the following jurisdictions are pre-approved as being deemed appropriate outside the United States : Australia - New Zealand - Canada - United Kingdom - France - Italy - Germany - Spain - Ireland - Israel - Singapore - Dubai. The Licensee shall have " Sole Discretion" as to which territories in which the ICO shall be offered and " Sole Discretion" to exclude any territories for any reason including but not limited to change of and or too unfavorable laws application(s) governing such ICO Offerings.

(f)    Specifically the Licensee covenants to the Licensor that the Licensee will where the ICO concerns the issuance in the US of Securities as defined under US Federal or State Law, that the Licensee will operate strictly within the scope of the exemptions granted under Regulation S of US Federal Securities Law and any applicable US State law equivalent exemptions to REG S. The Licensee further covenants to outside the United States comply with the local Securities Laws, if any, that are applicable to buying and selling of the ICO digital currency - digital coin(s)- digital token(s) in the domestic jurisdictional domicile(s) of any Non US Person(s) participating in the ICO.

(2)    **Initial Fee Structure $1,000,000 USD.** The Licensee shall pay the Licensor $1,000,0000 USD for the rights being Licensed under the terms of this Agreement. Installments shall be due and payable on the following terms and due dates. The Licensee shall make five payments of $200,000 each over a four month period for the purpose of providing working capital to the Licensor until the ICO matures and delivers further economic value.

(3)    **Initial Fee Payment Order.** The first payment of $200,000 shall be due and payable upon the approval of the License by the Court on the terms required hereunder.The balance of $800,000 shall then be paid out by way of four installments of $200,000 every 30 days after the last payment in time. The Initial Fee Structure is set out by way of example in Schedule C.

(4)    **The Licensee** on the date of signing of the Agreement shall deposit the equivalent of $200,000 USD or equivalent Australian Currency or BIT COIN into the Escrow Account of the legal counsel of the Licensee. The Licensee where BIT COIN is in Escrow may only trigger a transfer into cash upon receiving notice that the Bankruptcy Court has approved this license on the terms acceptable to the Licensee. The first payment of $200,000 shall be released in terms of Clause 10.24 from Escrow upon approval by the Court on terms the set out in Clause 10.22. Where collateral has not been released to the Licensor within 14 working days after notification of court approval. Then this agreement

s:\penthouse\androcles\amended androcles trademark licensing agreement (v7).docx

KH [///] | GL [ ] | WS [ ]

shall be deemed to be at an end and no damages shall flow either by or against either party.

(a)     **Payment Order.** The balance of $800,000 due after the first payment shall be paid in four payments of $200,000 each that shall be paid out every 30 days after the date of the last payment provided the pre conditions as specified to making each future payment after the first payment of $200,000 have been met as required in Clause 2.7. Failure to make any installment payment(s) (other than in the event of a Payment Suspension Notice being issued) shall enable the Licensor to issue a Notice To Terminate License if within a cure period of 90 days after the due date no payment has been received. The notice to terminate for non payment must be given in writing by the Licensor to the Licensee specifying the date and amount of the default and delivered to the offices of the Licensee by registered mail.  In the event no payment is made by the Licensee within the cure period under the notice to terminate under this Agreement shall revert to Licensor.

(b)     **Initial License Fee - Conditions - Suspension Of Fee - ICO.** After the First Payment of $200,000 has been paid to the Licensor by the Licensee. Then all subsequent payments being 4 x $200,000 totaling ($800,000) are conditional upon the following conditions being met and continuing to be met across the payment path by the Licensor up until the date of the ICO Offering close or other dates so specified  - these deal conditions are set out below.

(c)     **The Licensor** continuing to  operate as a trading business up to the date of ICO close, including monthly publishing of Penthouse Magazine in both Print and Digital Form and Penthouse meeting all content supply obligations under any out put deals for Television or Digital Broadcasting.

(d)     ~~**Kelly Holland** remaining the CEO and a Board Member and Sole Stockholder in the Licensor for a period of 24 months from the date of signing.~~

(e)     ~~**Kelly Holland** having not entered into and agreeing not to enter into any deal to encumber, option or sell her stockholder interest(s) in the Licensor or agreeing in her capacity as a shareholder or director of the Licensor to the issuance of new new debt securities or new dilutive stockholder interests in the Licensor of any kind without offering the Licensee or its nominees the First and Last Refusal Rights  on the standard terms set out in clause 7.3 and 7.4 respectively. Those right(s) include but are not limited to matching purchase, option and or encumbrance of her stockholding or licensor stock or debt security issuances offer price and terms~~.

(f)     ~~**The Board Composition** of the Licensor remaining as is for a period of 12 months from the date of signing.~~

(g)     **No Material events** occurring in addition to the Chapter 11 filing that further damage value of the Licensor brands, business or business reputation that negatively impact the value of the license and prospective market value of the

5

KH [      ] | GL [      ], WS [      ]

ICO Offering or the business model contemplated as being operable under the License. Without limiting the generality of the foregoing this includes any events ~~any adverse filings by the Secured Creditors and or creditors that seek to or have~~ that have the effect of depriving the Licensor of the ability to operate its business or that imperil the value of the brand assets owned by the Licensor.

(h)    **Any licensed trademarks, trade-names or copyrights** subject to the license being found to be or becoming impaired before the completion of the ICO Offering.

(i)    **The Licensor** filing Monthly Operating Reports as required by the Office of the United States Trustee in a timely fashion and delivering bi-weekly reports on the progress of the Vice Coin offering. ~~making weekly reports on financial status until the Licensor is out of Chapter 11 - covering all material matters including but not limited to Cashflow, Revenues, Reports of CRO, Forensic Reports and the ICO/ITO progress.~~

(j)    **Chapter 11 Plan.** Nothing herein is intended to limit any party from proposing or opposing a subsequent filed chapter 11 plan of reorganization.~~The Licensor post exit from Chapter 11 trading solvently with no material adverse changes to the business or its ability to meet its commitments having taken place. The Licensor agrees to report monthly on this status post Chapter 11 and financial position must remain viable and to the satisfaction of the Licensee.~~

(k)    ·  **The breach of any material term** or condition of this agreement by the Licensor.

(l)    ~~**The Licensor** entering into any Debtor In Possession Agreement(s) during the course of Chapter 11 without first giving the Licensee a first right of refusal and last right of refusal on the standard terms set out in Clause 7.3 and 7.4 to provide and or to match such financing in the same amounts and on the same terms as any third party.~~

(m)    **The Secured Lender** assigning or triggering the existing Secured Lender held warrant to buy stock in the Licensor prior to the close of the ICO Offer. Including any trigger event(s) where the stock presently under the Secured Lender warrant has either before signing this agreement or after been or does issue to the Secured Lender or to any third party or where the Secured Lender assigns the warrant to any third party and that third party exercises the warrant to obtain stock.

(n)    **The Licensor** entering Chapter 7. ~~or being placed by the Federal Bankruptcy Court into Receivership.~~

(o)    ~~**The Federal Bankruptcy Court Ordering** a bulk sale of assets and or the business either in part or In Toto.~~

(5)    **Where any of the above** conditions for Initial License Fee payments have not been met by the Licensor. Then from the date of any the specified condition(s) non compliance(s)

6

all - future payments of the Initial License Fee Balance of $800,000 less payments to date that remain then outstanding shall be deemed to be "Suspended Permanently." In such an event the Licensee(s) shall be under no further obligation to make, the then outstanding installments of the Initial License Fee on the nominated due dates.

(6) **ICO Alternative Payor.** Where any amount of the outstanding Initial License Fee is subject to being "Suspended Permanently" then an amount equal to that outstanding balance otherwise owed by the Licensee shall be deemed to be then a "non recourse" debt of the prospective ICO if it proceeds. The obligation shall be listed as an outstanding debt of the ICO Offering. The outstanding balance formerly owed by the Licensee to the Licensor subject to being "Suspended Permanently" shall then only be due and paid out from the ICO entity. The obligation shall be to paid out the Licensor 30 days after the ICO Offer closes but only if sufficient ICO proceeds are raised to cover this obligation.

(7) **Any outstanding License Fee** that is "Suspened Permanently" ~~sum pertaining to the fee suspension~~ shall rank in second place behind the recapture of the ICO Offering Costs as defined herein. The nonrecourse nature of the liability to make such payment(s) shall be expressed as a provision in the formal White Paper and or ICO Offer documentation - in terms of both payout liability and payout priority position in the ICO.

(8) **Any financial liability** to pay outstanding sums subject to suspension to the Licensor from the ICO Offering entity shall cease in its entirety if the Licensee elects not to proceed with the ICO and in such event - no further payments from the ICO shall ever become due and payable unless otherwise provided for in this agreement.

(9) **In the event of breach of condition(s)** leading to "Suspended Permanently" status of any outstanding Initial Fee amounts otherwise due to the Licensor hereunder. The Licensee and or the ICO Offering entity may in their sole discretion decide to proceed or not proceed with the ICO Offering.

(10) ~~The Licensee in the event of any breach of conditions specified above or in relation to any term of this agreement by the Licensor may if such a breach is deemed to be material in nature sue to recover the Offer costs of the ICO from the Licensor as well as to recapture the initial licensee fees paid to the Licensor along with any related transactional costs set out in the investor deal memo pertaining to the License creation and related ICO Offer.~~

(11) **Long Tail License Fee - Structure and Payment.** Long Tail License Fees should the ICO proceed shall become due and payable to the Licensor, as Founder Fees. The licensee fees are directly linked to the success of the ICO. Long Tail Fees will only become due and payable after the full repayment of all ICO Offering Costs invested by the Licensee and other third parties as detailed in the ICO White Paper and related Offer documents. Long Tail Fees: are entirely subject to the satisfactory completion of the ICO and are conditional upon the Licensor remaining solvent and trading in the normal course of business until the completion of the ICO. Should the Licensor go into formal liquidation under Chapter 7 and or the business be placed in Receivership or be compromised by way of litigation and or become unable to meet its standard business

s:\penthouse\androcles\amended androcles trademark licensing agreement (v7).docx

KH [   ] | GL[   ] WS [   ]

commitments or ceases trading - then all existing and future payments due as Long Tail Fees under the license to the Licensor shall cease. The Licensee and or ICO entity may still in their sole discretion elect to continue the ICO and all Long Tail Fee payments shall be null and void at the election of the Licensee and the ICO offer entity and may be redeployed to payment of other ICO interests in the sole discretion of the Licensee.

(12)    **Long Tail Fees** are detailed by way of example in Schedule C hereof.

(13)    **Long Tail Fee Quantum and Priority Position.** The Licensor and Licensee agree that the following Long Tail License Fees shall become due payable to the Licensor by the Licensee. The priority of payments due and payable between the Licensor and the Licensee are as stated and must be set out in the ICO White Paper and related Offer Documents if any. First, 100% of all Offer Costs of the ICO as stated in White Paper/Offer Document are to come off the top and shall be paid to the Licensee and third parties as per the White Paper/Offer Document. The projected offer costs are to be $1,000,000 and projected blockchain development and construction costs are $400,000. Second, shall be the full repayment to the Licensor of any Initial Licensee Fees "Suspended Permanently" - if any. Being Licensee Fees relating to the License being suspended and remaining outstanding (capped at $800,000 being $1m less the first payment of $200,000) and shall be paid out of the ICO Proceeds after the Offer Costs. Third priority is the repayment of all Licensee and ICO initial license fee payments actually paid to the Licensor to obtain the license including all directly related license acquisition costs. In fourth priority the next $20m of ICO proceeds are to exclusively payable to the licensee and or its nominees as ICO Block Chain Creator(s) and deal Sponsor(s). In fifth priority are Founder/Adviser Fees - to be split 10% to the Licensor and 90% to the Licensee that represent the balance of the ICO Funds after allowance for capital needs paid progressively on the basis set out in the in White Paper and Offer Document(s) for the ICO.

(14)    **Long Tail Fee On Going - Net Revenue Shares.** The Licensor shall share in the on going Net Revenue Streams available to Founders of the ICO. The split shall be 10% of net revenue paid to the Licensor and 90% of the net revenue paid to the Licensee but conditional upon the Licensor continuing to trade.

(15)    **Long Tail Fee - Capital Interests** - The Licensor shall be entitled to 10% of the Capital interests available to Founders for sponsoring and promoting the ICO subject to the Licensor remaining solvent and continuing to trade and not being in breach of any of the conditions specified in Clause 2.1(4) (e) to (n).

(16)    **All Long Tail Fee(s)** are also subject to: First, ongoing Licensor compliance with the license conditions. Second, the Licensee in its sole discretion being convinced that the Licensor brand and business remains viable for association with the ICO. Third, adequate capital remaining within and or available to the ICO to operate the ongoing ICO business.

(17)    **Revenue Share Fees** - Non Exclusive Audio Visual Content - The Licensee shall pay in relation to filmed audio visual motion picture, television and digital network content that is used on the ICO site or DAPP to generate advertising related revenues 50% of all

8

s:\penthouse\androcles\amended androcles trademark licensing agreement (v7).docx

KH [ XW ] | GL [ ] | WS [ ]

advertising or transactional related revenue. The Revenue Share for Aged Content over 10 years old shall be 25% instead of 50%.

(18)     **Free Content** - Audio Visual Content that is Penthouse Pet Photo shoot related to the ICO shall not attract a revenue sharing arrangement of any kind and shall be supplied free by the Licensor in support of the still image content license that is part of the overarching license fees paid under the Initial License Fee and Long Tail License Fee arrangements.

2.2.    **The Licensee** undertakes that it will use best efforts and use reasonable endeavors to protect the Trademarks, trade- names and or copyrights subject to License and shall not knowingly infringe upon any other intellectual property owned by the Licensor.

## 3. INFRINGEMENT

3.1.    **Infringement of Trade-marks or Trade-names or Copyrights.** In the event of actual or threatened infringement of any of the Trade-marks or Trade-names or Copyrights during the term of this Agreement, the Licensor shall have the exclusive right, at its option, to take appropriate action to prevent and/or to stop the infringement including, without limitation, instituting action against infringers. The Licensor shall have the" exclusive right, at its option, to defend all actions contesting the validity of or the Licensor's ownership of the Trade-marks or Trade-names or Copyrights or arising in any way from the use of one or more of the Trade-marks or Trade-names or Copyrights. The Licensee shall consent to the use of its name in all such litigation and shall sign such documents, swear such affidavits or declarations and take such other action as may be reasonably necessary to assist the Licensor in such litigation, at the expense of the Licensor.

3.2.    **The Licensee** undertakes that it will use best efforts and use reasonable endeavors to protect the Trademarks, trade- names and or copyrights subject to License and shall not knowingly infringe upon any other intellectual property owned by the Licensor.

## 4. ACKNOWLEDGEMENT

4.1.    **Acknowledgement of Rights.** The Licensee acknowledges and agrees that:

(1)     **the Licensor** is the exclusive owner of all right, title and interest in and to the Trade-Marks, Trade Names and Copyrights and all goodwill associated therewith other than those set out in 4.1 (3) ;

(2)     **it shall acquire no right,** title or interest in and to any of the Trade-marks, trade-names or Copyrights other than the respective exclusive and non exclusive license rights under this agreement which shall attach to any new assignee who at any time becomes the underlying owner of such trademarks, trade names and or copyrights the stead of the existing Licensor.

(3)     **any and all goodwill** generated by the use of the Trade-marks, by the Licensee shall inure exclusively to the benefit of the Licensor other than for Goodwill that touches

9

KH _____ ] | GL[____ ] WS [____ ]

concerns the business of the ICO and downstream the Digital Tokens and or Coins generated by the ICO which shall be shared between the Licensor and Licensee on the basis set out herein.

## 5. – OBLIGATIONS OF THE LICENSEE

**5.1.  Obligations of the Licensee.**  The Licensee shall have the following obligations :

(1)    **it shall maintain** the high standard of quality of the Wares and Services which is established by the Licensor from time to time (the "Quality Standard") and shall comply with all specifications supplied by the Licensor with respect to the Wares and/or the Services;

(2)    **it shall allow authorized representatives** of the Licensor to inspect, during normal business hours, its inventory of the Wares in order to assess the Licensee's compliance with the Quality Standard and the other terms of this Agreement but not its digital technology;

(3)    **it shall, if requested by the Licensor** in writing, send to the Licensor specimens of the Wares for examination by the Licensor to ascertain whether the Wares meet the Quality Standard but this shall not apply to its digital technology including but not limited to technology pertaining to blockchain, encryption and ICO deployment engine, digital wallets, digital exchanges and DAPP applications nor will it affect the continuation of any ICO planned or on foot within the market place; and

(4)    **it shall give to authorized representatives** of the Licensor access to all relevant documents, materials and records pertaining to the Services and access to its business premises during normal business hours for the purpose of inspecting and examining the standard of the Services provided by it in order to determine whether such Services comply with the Quality Standard and the other terms of this Agreement. To avoid doubt such materials shall not include any access to confidential information pertaining to Blockchain - Smart Contracts - Digital Wallets - Digital Exchanges - DAAP Applications and other type of encryption technology and the ICO other than for how the Licensed materials are being utilized.

## 6. – STATUS OF PARTIES

**6.1.  Status of Parties.**  Nothing contained in this Agreement shall constitute a party to be either the agent or partner of the other or shall empower a party to bind the other.

## 7. – TRANSFER

(1)    **Right of Licensor to Transfer.** The Licensor shall have the right to Transfer any or all of its rights and obligations under this Agreement and the Trade-marks, Trade names and Copyrights to any Person as it may in its sole discretion deem appropriate subject to the First ~~and Last~~ Right(s) Of Refusal on the standard terms in 7.3.~~and 7.4~~ in favor of the Licensee as detailed. In the event any such Transfer is to be made to any party other than

10

the Licensee and or its nominee, the Licensor covenants to bind the prospective successor in title into an acknowledgement in writing of the existence of the license under this Agreement pertaining to the rights in Schedule A and the legal validity of the license herein. No transfer of the Trademark(s), Trade - name(s) or copyright(s) subject to License in Schedule A shall be able to be perfected unless the Licensor first obtains a written acknowledgement of the License under this Agreement from the prospective successor in title and delivers a copy of that acknowledgment to the Licensee.

7.2.   **Licensee Limited Right To Transfer.** The Licensee shall have no right to transfer or grant any sub-license with respect to any of the Trademarks, Trade-Names & Copy Rights specified in Schedule A of the Agreement (other than as provided herein) without the prior written consent of the Licensor and where so required the approval of the Federal Bankruptcy Court. The Licensee shall have an unfettered right to in its "Sole Discretion" to transfer and sub license by way of assignment or otherwise any mark(s) or copyright(s) interest(s) under the License to any entity related to the Licensee in the US domicile being legal entities that are nominated by the Licensee provided those nominated entities are clean skin Special Purpose Entities formed for the purpose(s) of deployment of the ICO Offer in the United States under the ICO Offering Structure. Any actual or purported Transfer other than to a nominated entity of the Licensee related to the ICO occurring without the Licensor's prior written consent shall constitute a default under this Agreement and shall be null and void.

7.3.   **First Right Of Refusal.** The Licensor shall grant the Licensee a First Right of Refusal exclusively in relation of the Licensor entering into any other ICO ~~related media~~ licensing activities that touch upon and are concerned with carrying on any form of Digital Token ICO or Blockchain Offerings, ~~sale of trademarks, trade name and copyrights specified in Schedule A, Sale of Stock in the Licensor owned by Kelly Holland and issue of stock or debt ( including DIP Loans) or option securities by the Licensor~~ for a period of 30 days or such other period as may be specified herein from the date of written notice by the Licensor to the Licensee to match the current third party offer on same and or better terms than offered by any third party.  Where an Offer is refused by the Licensee the Licensor is free to accept a third party offer on identical terms. However if such an offer is not accepted by a third party on the same terms and at the same price as offered to the Licensee.  Then the Licensor shall regrant a right of first refusal over all subsequent offers on a similar basis going forward.

7.4.   ~~**Last Right(s) of Refusal.** The Licensor shall grant the Licensee a Last Right of Refusal to acquire any rights or interests specified under this agreement including but not limited to licensed trademarks, trade names and copyright subject to license under this agreement stock owned by Kelly Holland and or stock, debt( including DIP Loans) or option security interests in the Licensor. The Last Right of Refusal shall give the Licensee a window of 30 working days (unless otherwise specified herein ) from the date of written notice by the Licensor to match or exceed the price and terms of any offer presented that the Licensor would otherwise accept.  In the event an Offer is not matched by the Licensee and sale or license proceeds as the case may be fails to settle with on 90 days then the Licensee Last Right of Refusal shall be deemed to remain on foot and the Licensor must re offer any new offers to the Licensee.~~

11

KH [     ] | GL [     ] WS [     ]

## 8. – TERM AND TERMINATION

8.1.    **Term of Agreement.** This Agreement shall be in perpetuity unless terminated by the parties on the following grounds.

(a)    **Term shall commence** as of the date of signing and may be terminated at the sole discretion of the Licensor after 120 months from the date of signing if the Licensee has not completed the ICO envisaged here under.

(b)    **if the Licensee** commits or permits any material breach of any of the provisions of this Agreement and fails to remedy such breach within ninety (90) days following written notice thereof from the Licensor, but subject to to a ninety (90) day cure window in favor of the Licensee or

(c)    **if the Licensor** commits or permits any material breach of any of the provisions of this Agreement and fails to remedy such breach within ninety (90) days following written notice thereof from the Licensee but subject to a ninety (90) day cure window in favor of the Licensor or

(d)    **if the Licensee** ceases to carry on business or is adjudicated bankrupt or insolvent or makes an assignment for the benefit of its creditors or if proceedings in bankruptcy are instituted against it or if a receiver of its property is appointed or if any judgment or execution against it or its property remains unsatisfied for such period as would permit its property or any substantial part thereof to be sold, or

8.2.    **Other Relief.** Any termination under section 8.1 hereof shall be without prejudice to any other rights, remedy or relief vested in or to which the Licensor may otherwise be entitled against the Licensee.

## 9. – RIGHTS AND OBLIGATIONS ON TERMINATION

9.1.    **Rights and Obligations on Termination.** Upon termination or expiration of this Agreement, the Licensee shall cease to be a licensee of the Licensor and shall:

(1)    **immediately cease** to use, directly or indirectly, in any manner whatsoever any of the Trade-marks or Trade-names or Copyright any name or mark similar to any of the Trade-marks or Trade-names; and

(2)    **remove the** Trade-marks and Trade-names or Copyrights a from or deliver up to the Licensor or its duly authorized representatives all materials including signs and advertising materials in its possession, custody or control on which any of the Trade-marks and Trade-names appear (except for documents not for public display or reasonably required for archival purposes).

(3)    **The party** in default under the agreement shall be liable to the other party for all and nay damages flowing from the default.

s:\penthouse\androcles\amended androcles trademark licensing agreement (v7).docx

KH [      ] | GL [      ] WS [      ]

(4)    The **Licensors** shall have no right or interest in or ability to cease or acquire any intellectual property, trade marks and or copyrights developed by the Licensee and or ICO offer entity that pertain to Block Chain, smart contracts, digital wallets, exchange platforms, DAPP application and smart encryption technology and ICO digital coin or token matters not developed by the Licensor.

### 10. – GENERAL

**10.1.    Time.**    Time shall be of the essence of this Agreement.

**10.2.    ICO Format.**    The Licensee warrants the ICO format shall proceed as follows and the Licensor acknowledges full informed consent and acceptance of this format. Target Capital raise for the ICO is set at $40m or less but may be increased in the sole discretion of the Licensee. ICO - Offer Costs are to be 100% paid for by the Licensee but shall be recovered in first priority position from ICO offer proceeds. The ICO structure and legal compliance format is to be solely at the discretion of the Licensee and or the ICO offer entity. The Blockchain & Encryption Development and Construction Structure is to be at the sole discretion of the Licensee and ICO entity. Marketing, Development and Branding costs are to be at the sole discretion of the Licensee and ICO entity. Naming Rights of the ICO and related entities are to be at the sole discretion of Licensee and ICO entity - who shall take account of Licensor owned trademarks. The Licensee as a courtesy will seek informal written consent of the Licensor regarding said naming of the ICO offering. This consent is only in the interests of co-operation but will not be a formal requirement of the License. To avoid doubt the Licensee will remain the sole decision maker regarding all aspects of the ICO. Any reasonable Licensor out of pocket costs as they relate to the ICO will if pre-approved by the Licensee be paid for within 30 days following receipt of a tax invoice by the Licensee. The Licensee and ICO irrevocably warrant to the Licensor that the ICO shall proceed as deflationary economy with the maximum coin threshold set at Token Issue in the sole discretion of the Licensee and the ICO offer entity.

**10.3.    ICO - BLOCK CHAIN IP - OWNERSHIP.** The Licensor acknowledges that it will have no role, interest, financial obligation to contribute to or financial interest in the development and construction of Block Chain Encryption Technology - Engine - Platform- Digital Coin Delivery - Coin Exchange - Digital Wallets - DAPP applications and any other ICO related intellectual property both existing and developed by the Licensee and or ICO Offering entity or entities other than as agreed herein. The Licensee and ICO offeror entity shall be entirely responsible for funding the development and construction of all ICO intellectual property interests other than those being Licensed hereunder from the Licensor.

**10.4.    Waiver.** The failure at any time to require performance of any provision shall not affect the full right to require performance at any later time. The waiver of a breach of any provision shall not constitute a waiver of the provision or of any succeeding breach.

KH [_____ ] | GL [_____ ] WS. [_____ ]

**10.5.   Notice.** Any notice or other communication required or permitted under this Agreement shall be in writing and may be delivered personally, by fax, by courier or by prepaid registered or certified mail addressed, in the case of the Licensor, as follows:

Penthouse Global Media Inc.

8944 Mason Avenue

Chatsworth, CA  91311 USA

and in the case of the Licensee, as follows

Androcles Entertainment Pty Ltd

433 North Camden Drive

Beverly Hills, CA  90210  USA

or to such other address as the addressee may have specified by a notice given under this provision.  Any such notice or other communication, if delivered personally or by courier or mailed, shall be deemed to have been given when received and, if faxed, shall be deemed to have been given when the appropriate answer back is received.

**10.6.   Number and Gender.** In this Agreement words importing the singular include the plural and words importing gender include all genders.

**10.7.   Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter, supersedes all prior representations, negotiations and understandings and may not be amended, or any provision waived, except in writing signed by the party against whom the amendment or waiver is sought to be enforced.

**10.8.   Severability.** Any provision which is illegal, invalid or unenforceable shall be severable and shall not affect the remaining provisions of this Agreement.

**10.9.   Headings.** The headings in this Agreement do not affect its interpretation.

**10.10.  Successors and Assigns.** This Agreement shall ensure to the benefit of and be binding upon the parties and their respective successors and permitted assigns.

**10.11.  Applicable Law.** This Agreement shall be governed by the laws and courts of the State of California for so long as the Licensor remains under the jurisdiction of the Federal Bankruptcy Court ~~whether in Chapter 11 or Chapter 7 or Receivership~~.  Post the bankruptcy of the Licensor or upon transfer by the Licensor of its rights under this agreement to any new successor in title who becomes Licensor that is solvent.  This Agreement shall be governed by the County and State laws of domicile of the Non Breaching Party.

14

KH [     ] | GL [     ] WS [     ]

10.12. **Counterparts.** This Agreement may be signed in counterparts, which together shall constitute the fully executed agreement.

10.13. **Survival.** All obligations of the Licensor and the Licensee which expressly or by their nature survive the termination or Transfer of this Agreement shall continue in full force and effect subject to and notwithstanding such termination or Transfer and until they are satisfied or by their nature expire.

10.14. **Further Assurances.** The parties agree to do or cause to be done all acts or things necessary to implement and carry into effect this Agreement to its full extent.

10.15. **Deal Costs.** Parties to bear own legal costs.

10.16. **Cost Recovery.** ~~n the event the Federal Bankruptcy Court does not approve the License under this Agreement and alternatively puts it up for bid. Then the Licensee shall if subsequently out bid, be entitled to recovery of all out of pocket costs expended in connection with the License and related ICO deal structure and Blockchain Development incurred to the date of non approval by the court.~~

10.17. **Public Profile.** The parties agree to keep the ICO development activity private and confidential until an election is made by the Licensee by way of written notification to the Licensor to make the ICO Offer and related business model a matter available for public knowledge. While the ICO remains private and confidential there shall be no discussions with or in any media about the ICO by the Licensor, its officers, advisors, affiliates, lenders or creditors without the prior written approval of the Licensee. No election can be made by the Licensee to make the ICO public prior to 1 July, 2018 unless mutual consent to do so before this date in writing is reached between the Licensor and Licensee.

10.18. **Confidentiality.** Pre and Post License. The Licensor on behalf of itself, its Officers, Staff, Creditors, Lenders and Advisors acknowledge and agree that all the ICO license fee deal related confidential information provided to the Licensor by the Licensee and or their advisors is to remain confidential. This includes any and all confidential information provided during pre deal license negotiations, prior to ICO offer and during the course of the ICO shall remain the sole property of the Licensee now and in perpetuity. The Licensor agrees to be held responsible for any release of confidential information and agrees to indemnify the Licensee and ICO entity for any and all damages caused by any unauthorized release of confidential information. The Licensor agrees to not release the existence of or copies of this agreement without the prior written consent of the Licensee to any third parties (other than by way of filing in or throughFederal Bankruptcy Court) to creditors of the Licensor, past or current or future secured lenders of the Licensor and shall impose this constraint on its advisors, officers, legal counsel, employees and independent contractors.

10.19. **Marketing & Promotional Support.** The Licensor covenants to use best efforts and reasonable endeavors to assist with the marketing and promotion of the ICO subject to prior approval of any such efforts by the Licensee. This includes but is not limited to

15


KH [   ] | GL [   ] WS [   ]

endorsement of the ICO, editorial support in Penthouse Magazine(s), Penthouse Web Site and Penthouse Audio Visual and other Penthouse publication. The Licensor shall upon request by the Licensee, distribute to the Licensors print and digital subscribers promotional and advertising content provided by the Licensee pertaining to the ICO Offer. The Licensor for a period of not more than 120 days during the ICO Offering window ending upon the date of the ICO close shall grant the licensee direct access to the Licensor's subscriber galley list(s) for the last five years for the sole purpose of sending out the ICO promotional and advertising materials authorized by the ICO in relation to the offering

10.20.   **The Licensor** shall accord the Licensee the right to buy prime media spots in print, digital and audio visual publications of the Licensor at a 75% discount off "Rack Media" rates for such advertising and or sponsorship rights. The Licensor will allow the Licensee access to any other third party print, digital or audio visual media where the Licensor enjoys discount rates provided the Licensee pays up front for any advertising or sponsorship access. The Licensor shall at raw production cost provide the Licensee with video production and still production photographic support to advance the ICO. Costs of that production support to be paid up front by the Licensee.

10.21.   **Ordinary Course Of Business.** The Licensor acknowledges the grant of rights under this License is within the ordinary course of business of the Licensor. The Licensor further warrants that it enjoys full legal capacity to enter into the contractual arrangement(s) detailed herein subject to Federal Bankruptcy Court Approval where required.

10.22.   **Court Approval.** The Licensor shall seek the prior approval of the Federal Bankruptcy Court to proceed under the terms of this agreement.  Any order approving this agreement must be in a form wholly acceptable to the legal counsel of the Licensee.  Said order shall provide, inter alia, (i) the license granted to Licensee is subject to all existing licenses and rights; (ii) nothing in the order is intended to convey and rights to Licensee free and clear of any pre-bankruptcy liens, rights and interests under section 363(f) of the Bankruptcy Code, (iii) the the license and this agreement as presented are acceptable to the Court, (iv). the Agreement shall be binding on and enforceable against any chapter 11 or 7 trustee ~~in Chapter 11, Chapter 7 and any Receiver under a Receivership or any of other successor in interest.~~(v) the Licensee may begin immediately to exploit the License, (vi). any sale, license or trnasfer of  trademarks, trade names and copyrights that are the subject to the license shall be binding on and enforceable against any subsequent owners and or current or future holders of security interests, (vii). the License may state in any ICO White Paper and or Offering Documents that the Court has approved the License and (viii)  the Court retains jurisdiction over matters pertaining to the License and the related exploitation at of it by way of an ICO in the event a need arises to confirm or perfect any matter concerning the license or the progress under it.  In the event the Court does not approve the License under this Agreement, the Licensee reserves all rights to present an offer to purchase the property subject to the License or any other property of the Licensor as a "stalking horse" entitled to a "break up" or "topping" fee as allowed by the Court that will allow recovery of all of Licensee's out of pocket costs expended in connection with the License and related ICO deal structure and subject to any bidding procedures approved by the Court.

16

**10.23. Until Approval** is granted by the Federal Bankruptcy Court all collateral in Escrow and all down stream payments shall not become payable. Where the Court does not approve this agreement in the manner set out in Clause 10.22. Then this Agreement shall go into abeyance until either the Licensor becomes solvent or transfers the underlying subject matter of the License Grant to a Licensor that is solvent. The Licensee may in such event revive the License in its sole discretion.

**10.24. Escrow.** The Licensee upon signing this Agreement shall within 48 hours place a sum equal to the first payment under the Initial Fee Structure being $200,000 USD or its equal in Australian Dollars or Bit Coin into the Escrow Account of its legal counsel. The Licensee shall authorize its duly appointed legal counsel to evidence the amounts in Escrow to the Licensor and the duly appointed legal counsel of the Licensor. The funds paid into Escrow by the Licensee shall remain in Escrow on the following terms - they will remain for a period of 21 working days until this Agreement in its entirety is either approved or not approved by the Federal Bankruptcy Court as per the terms of Clause 10.22 Upon approval of the Bankruptcy Court of the license acceptable to the Licensee under 10.22 the legal counsel of the Licensee shall make any payment due under the agreement to the court or to whomever the court directs. In the event approval to proceed is not obtained or if obtained is not acceptable to the Licensee under Clause 10.22. Then within 21 working days of the deposit of collateral into Escrow. The Licensee may demand the funds in Escrow be 100% released to the Licensee within 48 hours of making such a request.

**10.25. No Obligation To Proceed.** The Licensee shall be under no obligation to proceed to develop, build, operate, market or promote a Blockchain Encryption Engine, ICO White Paper or ICO Offering Document. The Licensee acknowledges the relevant License Fee payment obligations in relation to Initial License Fees - shall in such circumstances remain due and payable even where the Licensee elects not to proceed with or to progress an ICO after making an election to proceed. Other than in the case where the Licensee Fee payment obligations are under "suspension" under the terms of this Agreement due to breaches of the Licensor. In which case the Licensee shall no longer be liable to make any outstanding payment under the License as from the date of the breach by the Licensor.

**10.26. Election Not To Proceed.** If the entire Initial License Fee has been paid in full and the Licensee elects not to proceed to an ICO ~~or if having made such an election to proceed to an ICO has not progressed the ICO~~ within 120 months of the date the Bankruptcy Court enters an order approving this agreement, then all rights subject to this license shall revert back to the Licensor. If after 36 months from the approval of this agreement by the Bankruptcy Court and the entire Initial License Fee has not been paid, the License shall revert back to the Licensor. Nevertheless, the Licensee may retain the License for the next 84 months if the Licensee pays all of the unpaid Initial License Fee before the third anniversary of the order approving this Agreement. All prospective ICO efforts from whatever source during the time window specified will remain subject to First ~~and Last~~ Rights of Refusal in favor of the Licensee. Where after 24 months after July 1, 2018 if the Licensee has either elected to not proceed with an ICO or has having made an election to so proceed with an ICO has abandoned the ICO. Then the Licensor may enter

17

KH [  ] | GL [  ] | WS [  ]

into an other ICO or ITO or similar blockchain or digital coin offering in relation to other Licensor intellectual property rights not subject to this license but still subject to the Right of First ~~and Last~~ Refusal on the standard terms as per Clause 7.3 ~~and 7.4~~ under this Agreement in relation to such future ICO projects.

10.27. **No Other ICO.** Except for the pending Vice Coin offering, the Licensor will undertake to within a Priority Window of 24 months from July 1, 2018 not to issue, support or be part of any other ICO digital token Offering(s) and to not be part of or facilitate (by providing access to subscription lists or otherwise) participate in or accept money for or provide free advertising, marketing or promotion of any other competing ICO or ITO project outside that of the Licensee related ICO project that is contemplated under this Agreement.

10.28. **Withholding Taxes.** Where any License Fee is paid across border from Australia to the United States then under the terms of the US - Australia Treaty on double taxation a 5% holding tax will be due an payable. All such taxes are the responsibility of the Licensor and the Licensee may deduct from any payments due to the Licensor amounts equal to the withholding tax liability, if any.

10.29. **Licensee May Assist.** The Licensee shall be given a First Right of Refusal ~~as per Clause 7.3~~ to assist the Licensor in perfecting any impairment to and or maintenance obligations required to keep the Licensor trade marks, trade names or copyrights in good standing. Any assistance is to be on terms mutually acceptable to the parties. All monetary payments advanced shall be recoverable by the Licensee where no agreement in relation to the First Right Of Refusal is reached by the parties. Then the Licensee will enjoy a Last Right Of Refusal ~~on the terms set out in 7.4~~ for 30 days from date of notification to match any arrangement being proffered by a third party. Any assignment of the trade marks, trade names or copyright interest subject to this agreement shall require as a pre condition to such transfer the Licensor to procure from the new prospective assignee their written acknowledgement of the existence of License and their written affirmation and consent to be bound by the terms of this license.

10.30. **Licensee Access.** The Licensor at all times shall grant access to all trade mark, trade name, copyright material, original source materials, copies and or galley lists sufficient to enable the Licensee smooth transactional dealing(s) and without limiting the foregoing to assess their viability for use, their actual existence, the chain of title ownership rights, their quality and for their use in any valid ICO project related purpose(s). Without limiting the generality of the foregoing the Licensor shall allow the Licensee access to all digital and film images and all Licensor published content and to digitize non digital film stock content for the sole purpose of use in the ICO and on going business. The Licensor shall permit access to any film laboratory or digital storage facilities to allow the Licensee to do any of the foregoing providing the Licensee shall pay any third parties for such rights of access.

10.31. **Kelly Holland.** The Licensor shall nominate Kelly Holland to represent the Licensor subject to her acceptance and court approval of the transaction Kelly Holland will be appointed to the Board of the ICO Offering entity upon formation of said entity on the

s:\penthouse\androcles\amended androcles trademark licensing agreement (v7).docx

KH [ ] | GL [ ] WS [ ]

terms and conditions set out in Schedule 2. The Licensee shall use best efforts and reasonable endeavors to ensure Kelly Holland is appointed to the Board of the ICO. Neither the Licensee nor any ICO entity shall be under any ongoing obligation to accept a board appointee nomination from the Licensor other than Kelly Holland. Any compensation of Kelly Holland shall be disclosed and approved by the Bankruptcy Court. subject to further Bankruptcy Court approval, the Licensor shall approve and grant a conflict of interest waiver to allow her to assume the ICO Board appointment and allow her under the terms of the waiver and her contract to be promoted as the face of the ICO to any degree required by the Licensee. The Licensee specifically shall not be under any obligation to appoint to the ICO Offer entity Board any current or former Officer, employee, advisor or agent of any former, current or future Secured Lender.

10.32. **Chain of Title - Warranty & Verification.** The Licensor warrants that the Licensor is the owner of the underlying trademarks, trade-names and copyrights subject to the License as set out in Schedule A and subject to any existing liens, interests and licenses of the said trademarks, trade-names and copyrights. The Licensor warrants that any license granted under this agreement shall bind any and all successors in title. To effect this result the Licensor shall seek further Federal Bankruptcy Court approval to validate this result as part and parcel of the approval of this license directions as per clause 10.22. Further, the Licensor shall in relation to any sale, transfer, or assignment of underlying trademarks, trade names or copyrights to as a term of any such arrangements undertakes to bind any new owner to acknowledge the existence of and legal validity of the license under this agreement and to obligate any new owner to effect the same result on subsequent owners of the underlying rights that are the subject of this agreement. The Licensor upon written request shall provide the Licensee with full chain of title verification of ownership by the Licensor of all trade marks, trade names and copyright subject to the License as listed on Schedule "A" hereof.

10.33. **No Outside Interests.** The Licensor and Kelly Holland acknowledge that there are no interests ancillary to the License and or related ICO that have been entered into or that exist beyond those documented and agreed to by and between the parties and as disclosed to the court.

10.34. **Option to Finance New Content:** The Licensor shall provide the Licensee with a 60 day Option window that shall be triggered by way of notice in writing to the Licensee under this Agreement to finance 100% of all new content obligations of the Licensor to provide audio and audio visual content under various output deals between the Licensor and third party Television Broadcasters, Pay TV, Cable TV, Digital Network Channels and Radio Networks. The Licensor shall present content opportunities to the Licensee for financing by the Licensee. The Licensor and Licensee shall mutually approve the content production budget and production talent and crew. Kelly Holland and her crew are pre approved as being acceptable to the Licensee. New may include at the election of the Licensor in its sole discretion any pre existing film stock audio visual content that for broadcast standard compliance needs to be digitized into Standard Definition, High Definition or 4 k or better and or standard definition digital audio visual content that needs to be digitized into High Definition Content or 4 k or better. In which case the content financier will cover 100 percent of the newly digitized content production cost

19

and shall own the copyright to the digitized version of the content. Licensee under this agreement if it elects to finance the new content presented under the Option shall pay 100% of the production budget or digitized cost that is mutually approved by the parties. The Licensee shall own 100% of the copyright to the New Content being financed subject to an exclusive license that shall provide that for the term of the License the parties shall revenue share 80/20 in favor of the content financier. The Licensor shall enjoy the right to purchase the copyright at any time upon giving notice and upon payment of a 20% premium uplift in purchase price per annum. Where the Licensee fails to proceed to finance or elects not to finance new content then the Licensor shall be free to Offer the opportunity to any third party without reference back to the Licensee. The Licensor shall a first and last right of refusal to purchase the new content from the content financier. The Licensor shall if permitted by the scope of the content output deal terms in relation to exclusivity of the output windows shall allow subject to rights clearance obligations therein. The Licensee ICO shall have access on a nonexclusive basis to any and all of the content financed by the Licensee .

10.35. **Option To Finance Third Party Content:** The Licensor shall provide the Licensee with a 60 day Option Window that shall be triggered by way of notice in writing to the Licensee under this Agreement to finance all third party content obligations of the Licensor to provide audio and audio visual content under various output deals between the Licensor and third party Television Broadcasters, Pay TV, Cable TV, Digital Network Channels and Radio Networks. The Licensor shall present existing third party produced audio and or audio visual content opportunities it wishes to supply under the respective output deals above to the Licensee that in the sole discretion of the Licensor is suitable for purchase or license to meet the out put obligations of the Licensor. The Licensor and Licensee shall mutually approve the content acquisition price and rights footprint of the third party content being acquired. The Licensee under this agreement if it elects to finance existing third party content presented under the Option shall pay 100% of the mutually agreed purchase price or license fee obligations as the case may be. The Licensee shall own 100% of the copyright or the license being acquired subject to a an exclusive on license that shall provide that for the term of the License the parties shall revenue share 50/50 in favor of the content financier. The Licensor shall have the right to purchase the copyright at any time upon payment of a 10 % premium uplift in purchase price per annum. Where the Licensee fails to proceed to finance or elects not to finance existing third party content then the Licensor shall be free to offer the opportunity to any other party without reference back to the Licensee. The Licensor shall enjoy a first and last right of refusal to purchase the new content from the content financier. The Licensee shall be under no obligation to accept this option or finance the content presented by the Licensor to the Licensee. The Licensor shall if permitted by the scope of the content out put deal terms in relation to exclusivity of the output windows shall allow subject to rights clearance obligations therein the Licensee ICO access on a non exclusive basis to any and all of the content financed by the Licensee .

s:\penthouse\androcles\amended androcles trademark licensing agreement (v7).docx

KH [    ] | GL[    ] | WS [    ]

## The Parties have Executed this Agreement.

### PENTHOUSE GLOBAL MEDIA INC.

By: _Kelly Holland_

Name: _Kelly Holland_

Title: _CEO_

### ANDROCLES ENTERTAINMENT PTY LTD

ACN 624 032 177

By: _G Lenaarts_

Name: _GRANT LENAARTS_

Title: _DIRECTOR_

Name: _WILLIAM SAUNDERS_

Title: _DIRECTOR SECRETARY_

**SCHEDULES TO AGREEMENT A - C are attached to form part of and are to incorporated in by way of reference.**

s:\penthouse\androcles\amended androcles trademark licensing agreement (v7).docx

KH [____] | GL[____] | WS [____]

## SCHEDULE A


**NON EXCLUSIVE**

s:\penthouse\androcles\amended androcles trademark licensing agreement (v7).docx

KH [____] | GL[____] | WS [____]

PENTHOUSE BRAND - TRADEMARKS AND NAME.

PENTHOUSE LOGO WITH KEY - TRADEMARKS AND NAME.

REVENUE SHARE - FILM CONTENT OF FILM LIBRARY FOR ICO USE.

STILL IMAGES OF ALL MOVIE & DVD & DIGITAL AUDIO VISUAL CONTENT ONE SHEETS.

PENTHOUSE PUBLISHED ARTICLES AND ARCHIVE SUPPORT MATERIALS.


**EXCLUSIVE CONTENT ( EXCLUSIVE BASIS IS FOR USE IN ICO ARENA ONLY )**

PHOTO SHOOTS AND STILL IMAGES - HELD AT PENTHOUSE AND IRON MOUNTAIN.

FILM AND DIGITAL BEHIND THE SCENES OF PHOTO SHOOTS - DVD - FILM -DIGITAL
SHOOTS.

ALL PUBLICATION ARTICLES LINKED TO PENTHOUSE PET IMAGES WHETHER PETS OR
OTHER FEATURED TALENT.

s:\penthouse\androcles\amended androcles trademark licensing agreement (v7).docx

KH [ XX ] GL [ XX ] WS [ XX ]

## SCHEDULE B

## KELLY HOLLAND  - PENTHOUSE MEDIA GROUP - STOCK

I warrant at the date hereof that I am the sole owner of 100% of the Stock in Penthouse Media Group Inc.

I warrant that there is no secured interest over my stock in Penthouse Media Group Inc.

I warrant I have not entered into any agreement as at the date of signing to sell or option my stock.

**Signed By Kelly Holland this** /0      **Day of 2018.**

s:\penthouse\androcles\amended androcles trademark licensing agreement (v7).docx

KH [ ] | GL [ ] WS [ ]

s:\penthouse\androcles\amended androcles trademark licensing agreement (v7).docx

KH [____] | GL[____] | WS [____]

| INITIAL FEE | STRUCTURE | $1,000,000.00 | LICENSE FEE | |
|---|---|---|---|---|
| ESCROW | $200,000.00 | | | |
| RELEASE POST COURT APPROVAL | | $200,000.00 | | |
| 30 DAYS LATER | | | $200,000.00 | |
| 30 DAYS LATER | | | $200,000.00 | |
| 30 DAYS LATER | | | $200,000.00 | |
| 30 DAYS LATER | | | $200,000.00 | |
| | | $200,000.00 | $800,000.00 | $1,000,000.00 |
| LONG TAIL FEE | PAID FROM ICO | $40,000,000 | | |
| | FROM PROCEEDS | | | |
| PRIORITY LEVEL | | | | |
| FIRST Shortfall ITO out of ICO + 20% share in A&E ITO under $6m any shortfall – | OFFER COSTS | $1,400,000.00 | ($400,000.00) | BlockChain Development |
| SECOND | SUSPENDED to Licensor | $800,000.00 | ($800,000.00) | Capped to 800 K based on actual suspended amount |
| THIRD | LICENSE FEE recapture amounts actually paid | $1,000,000.00 | $1,000,000.00 | Recover License Fee paid less suspended sums plus deal costs |
| FOURTH | ICO UNDERWRITER | $20,000,000.00 | | |
| FIFTH | WORKING CAPITAL ICO | | | |
| | + DEVELOP COST OF ON GOING ICO | | | |
| SHARE BALANCE OF ICO CAPITAL PROCEEDS | | 90% LICENSEE | 10% LICENSOR | BASED ON SHARE AVAILABLE TO PROMOTER |
| SHARE NET REVENUE OF ONGOING ICO | | 90% LICENSEE | 10% LICENSOR | BASED ON SHARE AVAILABLE TO THE MANAGEMENT |
| SHARE ICO CAPITAL/COIN INTERESTS | | 90% LICENSEE | 10% LICENSOR | BASED ON SHARE AVAILABLE TO PROMOTER |
| | | | | SHARES ABOVE AS DETAILED IN THE ICO WHITE PAPER/OFFER DOC |

SCH
s.wpe

KH [ ] | GL [ ] | WS [ ]

# EXHIBIT 14

# AMENDED TRADE-MARK AND TRADE - NAME  AND COPYRIGHT  LICENSE AGREEMENT

Made as of January 27th, 2018

**Between**

**PENTHOUSE GLOBAL MEDIA INC.**

**as Licensor**

**and**

**ANDROCLES ENTERTAINMENT PTY LTD**

**ACN 624 032 177**

**as Licensee**

# AMENDED TRADE-MARK & TRADE NAME & COPYRIGHT LICENSE AGREEMENT

Made as of January 27th, 2018

Between

**PENTHOUSE GLOBAL MEDIA INC.**

as Licensor

and

**ANDROCLES ENTERTAINMENT PTY LTD**

**ACN 624 032 177**

as Licensee

**FOR VALUE RECEIVED, the parties agree as follows:**

**1. – DEFINITIONS**

**1.1.**    In this Agreement:

(1)    *Person* means a natural person, a corporation, a partnership, a trust, a joint venture, any governmental authority or any other entity or organization.

(2)    *Copyright* means the copyrights listed in Schedule A.

(3)    *Territory* means the World.

(4)    *Trade-marks* means:

(a)    the trade-marks listed in Schedule "A"

(b)      Trade Names listed in Schedule "A"

(5)      *Transfer* means any event pursuant to which the rights or obligations of the affected party under this Agreement are or are attempted to be sold, disposed of, assigned, pledged, hypothecated, charged, mortgaged, encumbered, sub licensed or transferred and includes any transfer by operation of law. But does not include any transfer under clause 7.(2).

(6)      **ICO** for the purposes of this Agreement means Initial Coin Offering(s) of Digital Coins or Digital Tokens and or any Initial Token Offering of Digital Securities, Digital Coin(s) or Token(s) whether offered as Utility Token(s) and or as Coin(s) or Token(s) or Digital Securities whether offered by way or pre sale, crowd sale, simple agreements for future tokens (SAFT) or simple agreements for future equity (SAFE), private placement or public offering and shall include but not be limited to all related digital wallets, digital coin exchange(s), digital smart contracts including blockchain and other forms of data encryption technology known and unknown. The term shall include the operating business of the ICO in the blockchain smart contract space as it relates to exploitation of the license(s) under this Agreement and all of the foregoing aspects.

(7)      **PENTHOUSE MEDIA GROUP INC** ~~shall be deemed to include the company itself together with~~**(Licensor)** means (i) Penthouse Global Media, Inc., a Delaware corporation, Penthouse Global Broadcasting, Inc., Penthouse Global Licensing, Inc., Penthouse Global Digital, Inc., Penthouse Global Publishing, Inc., GMI Online Ventures, Ltd., Penthouse Digital Media Productions, Inc., Tan Door Media, Inc., Penthouse Images Acquisitions, Ltd., Pure Entertainment Telecommunications, Inc., XVHUB Group, Inc., General Media Communications, Inc., General Media Entertainment, Inc., Danni Ashe, Inc., and Streamray Studios, Inc. (collectively, "Licensee") are debtors in possession in the several bankruptcy cases now pending in the United States Bankruptcy Court for the Central District of California and any and all other all operating and non operational corporate entities including wholly or partially owned subsidiaries and or related brother or sister entities who the company warrants will agree to be bound by and to have the obligations under the License Agreement, jointly and severally enforced by and against them.

## 2. – LICENSE

**2.1.**    **Grant of License.** Subject to the terms and conditions of this Agreement, the Licensor hereby grants to the Licensee a non-exclusive license, during the term of this Agreement, to use the marks, names and copyrights specified in Schedule A as Non Exclusive on a Non Exclusive basis, and in relation to those Trade Marks, Trade Names and Copyright interests specified in Schedule A marked as being for Exclusive Use license, during the term of this Agreement. The Licensor hereby grants to the Licensee an Exclusive License during the term of this agreement to use the Trade Marks, Trade-names and Copyrights listed in Schedule A on an exclusive basis for ICO use, that basis includes but is not limited to the exclusive right to such use trademarks, trade names and copyrights within the scope of the crypto currency, blockchain, smart contract and digital encryption use(s)

2

envisaged under the ICO and on going business usage format(s) being advanced by way of this Agreement.

(a)        Specifically, the Licensor grants to the Licensee a right to use the Penthouse marks, trade names and copyrights for the purposes of Token Utility Offering, Pre Sale ICO, Crowd Sale, Private Placements and Public Offering efforts of the Licensee or its nominee and for the purposes of an Initial Coin Offering (ICO) and the related ongoing business to be developed, constructed, marketed and promoted by the Licensee.

(b)        Specially, the Licensor grants to the Licensee a right to use the Penthouse Mark(s) Name (s) and Copyright(s) in relation to both exclusive and non exclusive use(s) as specified in Schedule A to develop blockchain, smart contract and data encryption technology for an ICO and for use within the on going ICO businesses digital transactional footprint including but not limited to the ability to enjoy full access to all Licensor image archives and all Licensor published print, digital and film stock materials and digitize film stock for the purposes of the ICO.

(c)        Specifically, the Licensor grants to the Licensee the right to develop, establish, execute, market and promote an ICO in relation to the License and to create and publish a related ICO White Paper and where required by law ICO Offer Document(s) applicable to every nation where ICO coins or tokens may be traded as "Security" interests if and where they are so designated. The offeror has a preference to Offer Utility Token interests rather than Security Interests.

(d)        Specifically, the Licensor grants to the Licensee a right to develop, create, execute market and promote an ICO Offer and business in the United States of America through any Licensee related US domiciled entities. Conditional on the ICO format, offer structure and offeror entries - being  subject to and in compliance at all times with any and all applicable US Federal and State Securities Laws. The Licensee shall indemnify the Licensor for any damages that may flow from any breach of US Federal and or State Securities Laws and or breaches of any foreign nations domestic Securities Laws. The Licensor shall if requested by the Licensee use best efforts and reasonable endeavors to seek guidance from and the assistance of the Bankruptcy Court to assist in any ICO related compliance matters related to the Licensor being in Chapter 11 or going into Chapter 7 or Receivership.

(e)        Specifically, the Licensor grants to the Licensee a right within the context of the License footprint of rights, to develop and create Digital Currency - Digital Coins -Digital Tokens as either Utility Token and or Security Interests that may be made available for purchase by either US Persons within the United States and by Non US Persons in other  jurisdictions outside the United States that in the sole discretion of the Licensee are deemed appropriate - the following jurisdictions are pre-approved as being deemed appropriate outside the United States :  Australia - New Zealand - Canada - United Kingdom - France - Italy - Germany - Spain -

3

Ireland - Israel - Singapore - Dubai. The Licensee shall have " Sole Discretion" as to which territories in which the ICO shall be offered and " Sole Discretion" to exclude any territories for any reason including but not limited to change of and or too unfavorable laws application(s) governing such ICO Offerings.

(f)    Specifically the Licensee covenants to the Licensor that the Licensee will where the ICO concerns the issuance in the US of Securities as defined under US Federal or State Law, that the Licensee will operate strictly within the scope of the exemptions granted under Regulation S of US Federal Securities Law and any applicable US State law equivalent exemptions to REG S. The Licensee further covenants to outside the United States  comply with the local Securities Laws, if any, that are applicable to buying and selling of the ICO digital currency - digital coin(s)- digital token(s) in the domestic jurisdictional domicile(s) of any Non US Person(s) participating in the ICO.

(2)    **Initial Fee Structure $1,000,000 USD**.  The Licensee shall pay the Licensor $1,000,0000 USD for the rights being Licensed under the terms of this Agreement. Installments shall be due and payable on the following terms and due dates.  The Licensee shall make five payments of $200,000 each over a four month period for the purpose of providing working capital to the Licensor until the ICO matures and delivers further economic value.

(3)    **Initial Fee Payment Order.** The first payment of $200,000 shall be due and payable upon the approval of the License by the Court on the terms required hereunder.The balance of $800,000 shall then be paid out by way of four installments of $200,000 every 30 days after the last payment in time.  The Initial Fee Structure is set out by way of example in Schedule C.

(4)    **The Licensee** on the date of signing of the Agreement shall deposit the equivalent of $200,000 USD or equivalent Australian Currency or BIT COIN into the Escrow Account of the legal counsel of the Licensee.  The Licensee where BIT COIN is in Escrow may only trigger a transfer into cash upon receiving notice that the Bankruptcy Court has approved this license on the terms acceptable to the Licensee.  The first payment of $200,000 -shall be released in terms of Clause 10.24 from Escrow upon approval by the Court on terms the set out in Clause 10.22.  Where collateral has not been released to the Licensor within 14 working days after notification of court approval. Then this agreement shall be deemed to be at an end and no damages shall flow either by or against either party.

(a)    **Payment Order.** The balance of  $800,000 due after the first payment shall be paid in four payments of $200,000 each that shall be paid out every 30 days after the date of the last payment provided the pre conditions as specified to making each future payment after the first payment of $200,000 have been met as required in Clause 2.7. Failure to make any installment payment(s) (other than in the event of a Payment Suspension Notice being issued) shall enable the Licensor to issue a Notice To Terminate License if within a cure period of 90 days after the

4

due date no payment has been received. The notice to terminate for non payment must be given in writing by the Licensor to the Licensee specifying the date and amount of the default and delivered to the offices of the Licensee by registered mail.  In the event no payment is made by the Licensee within the cure period under the notice to terminate under this Agreement shall revert to Licensor.

(b)   **Initial License Fee - Conditions - Suspension Of Fee - ICO.** After the First Payment of $200,000 has been paid to the Licensor by the Licensee. Then all subsequent payments being 4 x $200,000 totaling ($800,000) are conditional upon the following conditions being met and continuing to be met across the payment path by the Licensor up until the date of the ICO Offering close or other dates so specified  - these deal conditions are set out ~~in (c) (d) (e) (f) (g) (h) (i) (j) (k)(l)(m)(n)(o)~~ below.

(c)   **The Licensor** continuing to  operate as a trading business up to the date of ICO close, including monthly publishing of Penthouse Magazine in both Print and Digital Form and Penthouse meeting all content supply obligations under any out put deals for Television or Digital Broadcasting.

(d)   ~~**Kelly Holland** remaining the CEO and a Board Member and Sole Stockholder in the Licensor for a period of 24 months from the date of signing.~~

(e)   ~~**Kelly Holland** having not entered into and agreeing not to enter into any deal to encumber, option or sell her stockholder interest(s) in the Licensor or agreeing in her capacity as a shareholder or director of the Licensor to the issuance of new new debt securities or new dilutive stockholder interests in the Licensor of any kind without offering the Licensee or its nominees the First and Last Refusal Rights  on the standard terms set out in clause 7.3 and 7.4 respectively. Those right(s) include but are not limited to matching purchase, option and or encumbrance of her stockholding or licensor stock or debt security issuances offer price and terms.~~

(f)   ~~**The Board Composition** of the Licensor remaining as is for a period of 12 months from the date of signing.~~

(g)   **No Material** ~~events~~ occurring in addition to the Chapter 11 filing that further damage value of the Licensor brands, business or business reputation that negatively impact the value of the license and prospective market value of the ICO Offering or the business model contemplated as being operable under the License.  Without limiting the generality of the foregoing this includes any events ~~any~~ adverse filings by the Secured Creditors and or creditors that seek to or have that ~~have~~ the ~~affect~~effect of depriving the Licensor of the ability to operate ~~their~~its business or that imperil the value of the brand assets owned by the Licensor.

5

(h)  **Any licensed trademarks, trade-names or copyrights** subject to the license being found to be or becoming impaired before the completion of the ICO Offering.

(i)  ~~The Licensor~~**The Licensor** filing Monthly Operating Reports as required by the Office of the United States Trustee in a timely fashion and delivering bi-weekly reports on the progress of the Vice Coin offering. ~~making weekly reports on financial status until the Licensor is out of Chapter 11 - covering all material matters including but not limited to Cashflow, Revenues, Reports of CRO, Forensic Reports and the ICO/ITO progress.~~

(j)  **Chapter 11 Plan.**  Nothing herein is intended to limit any party from proposing or opposing a subsequent filed chapter 11 plan of reorganization.~~The Licensor post exit from Chapter 11 trading solvently with no material adverse changes to the business or its ability to meet its commitments having taken place. The Licensor agrees to report monthly on this status post Chapter 11 and financial position must remain viable and to the satisfaction of the Licensee.~~

(k)  **The breach of any material** term or condition ~~of~~ this agreement by the Licensor.

(l)  ~~The Licensor entering into any Debtor In Possession Agreement(s) during the course of Chapter 11 without first giving the Licensee a first right of refusal and last right of refusal on the standard terms set out in Clause 7.3 and 7.4 to provide and or to match such financing in the same amounts and on the same terms as any third party.~~

(m)  **The Secured Lender** assigning or triggering the existing Secured Lender held warrant to buy stock in the Licensor prior to the close of the ICO Offer. Including any trigger event(s) where the stock presently under the Secured Lender warrant has either before signing this agreement or after been or does issue to the Secured Lender or to any third party or where the Secured Lender assigns the warrant to any third party and that third party exercises the warrant to obtain stock.

(n)  **The Licensor** entering Chapter 7. ~~or being placed by the Federal Bankruptcy Court into Receivership.~~

(o)  ~~**The Federal Bankruptcy Court Ordering** a bulk sale of assets and or the business either in part or In Toto.~~

(5)  **Where any of the above** conditions for Initial License Fee payments have not been met by the Licensor. Then from the date of any the specified condition(s) non compliance(s) all - future payments of the Initial License Fee Balance of $800,000 less payments to date that remain then outstanding shall be deemed to be "Suspended Permanently."  In such an event the Licensee(s) shall be under no further obligation to make, the then outstanding installments of the Initial License Fee on the nominated due dates.

6

(6)     **ICO Alternative Payor**. Where any amount of the outstanding Initial License Fee is subject to being "Suspended Permanently" then an amount equal to that outstanding balance otherwise owed by the Licensee shall be deemed to be then a "non recourse" debt of the prospective ICO if it proceeds. The obligation shall be listed as an outstanding debt of the ICO Offering. The outstanding balance formerly owed by the Licensee to the Licensor subject to being "Suspended Permanently" shall then only be due and paid out from the ICO entity. The obligation shall be to paid out the Licensor 30 days after the ICO Offer closes but only if sufficient ICO proceeds are raised to cover this obligation.

(7)     **Any outstanding License Fee** that is "Suspened Permanently" sum pertaining to the fee suspension shall rank in second place behind the recapture of the ICO Offering Costs as defined herein. The non recourse nonrecourse nature of the liability to make such payment(s) shall be expressed as a provision in the formal White Paper and or ICO Offer documentation - in terms of both payout liability and payout priority position in the ICO.

(8)     **Any financial liability** to pay outstanding sums subject to suspension to the Licensor from the ICO Offering entity shall cease in its entirety if the Licensee elects not to proceed with the ICO and in such event - no further payments from the ICO shall ever become due and payable. unless otherwise provided for in this agreement.

(9)     **In the event of breach of condition(s)** leading to "Suspended Permanently" status of any outstanding Initial Fee amounts otherwise due to the Licensor hereunder. The Licensee and or the ICO Offering entity may in their sole discretion decide to proceed or not proceed with the ICO Offering and the Licensor shall indemnify the Licensee and the ICO entity from any and all damage(s) or loss related claims by the Licensor and Kelly Holland flowing from the Licensee and or ICO entity decision not to proceed to and or to continue with the ICO. .

(10)    The Licensee in the event of any breach of conditions specified above or in relation to any term of this agreement by the Licensor may if such a breach is deemed to be material in nature sue to recover the Offer  costs of the ICO from the Licensor as well as to recapture the initial licensee fees paid to the Licensor along with any related transactional costs set out in the investor deal memo pertaining to the License creation and related ICO Offer.

(11)    **Long Tail License Fee - Structure and Payment.** Long Tail Licensee License Fees should the ICO proceed shall become due and payable to the Licensor, as Founder Fees. The licensee fees are directly linked to the success of the ICO.  Long Tail Fees will only become due and payable after the full repayment of all ICO Offering Costs invested by the Licensee and other third parties as detailed in the ICO White Paper and related Offer documents. Long Tail Fees: are entirely subject to the satisfactory completion of the ICO and are conditional upon the Licensor remaining solvent and trading in the normal course of business until the completion of the ICO.  Should the Licensor go into formal liquidation under Chapter 7 and or the business be placed in Receivership or be compromised by way of litigation and or become unable to meet its standard business commitments or ceases trading - then all existing and future payments due as Long Tail

7

Fees under the license to the Licensor shall cease.  The Licensee and or ICO entity may still in their sole discretion elect to continue the ICO and all Long Tail Fee payments shall be null and void at the election of the Licensee and the ICO offer entity and may be redeployed to payment of other ICO interests in the sole discretion of the Licensor.

(12)   **Long Tail Fees** are detailed by way of example in Schedule C hereof.

(13)   **Long Tail Fee Quantum and Priority Position.**  The Licensor and Licensee agree that the following Long Tail License Fees shall become due payable to the Licensor by the Licensee. The priority of payments due and payable between the Licensor and the Licensee are as stated and must be set out in the ICO White Paper and related Offer Documents if any.  First, 100% of all Offer Costs of- the ICO as stated in White Paper/Offer Document are to come off the top and shall be paid to the Licensee and third parties as per the White Paper/Offer Document. The projected offer costs are to be $1,000,000 and projected blockchain development and construction costs are $400,000. Second, shall be the full repayment to the Licensor of any Initial Licensee Fees "Suspended Permanently" -- if any. Being Licensee Fees relating to the License being suspended and remaining outstanding (capped at $800,000 being $1m less the first payment of $200,000) and shall be paid out of the ICO Proceeds after the Offer Costs. Third priority is the repayment of all Licensee and ICO initial license fee payments actually paid to the Licensor to obtain the license including all directly related license acquisition costs. In fourth priority the next $20m of ICO proceeds are to exclusively payable to the licensee and or its nominees as ICO Block Chain Creator(s) and deal Sponsor(s). In fifth priority are Founder/Adviser Fees - to be split 10% to the Licensor and 90% to the Licensee that represent the balance of the ICO Funds after allowance for capital needs paid progressively on the basis set out in the in White Paper and Offer Document(s) for the ICO.

(14)   **Long Tail Fee On Going - Net Revenue Shares.**  The Licensor shall share in the on going Net Revenue Streams available to Founders of the ICO. The split shall be 10% of net revenue paid to the Licensor and 90% of the net revenue paid to the Licensee but conditional upon the Licensor continuing to trade.

(15)   -**Long Tail Fee - Capital Interests** - The Licensor shall be entitled to 10% of the Capital interests available to Founders for sponsoring and promoting the ICO subject to the Licensor remaining solvent and continuing to trade and not being in breach of any of the conditions specified in Clause 2.1-(4) (e) to (n).

(16)   **All Long Tail Fee(s)** are also subject to: First, ongoing Licensor compliance with the license conditions. Second, the Licensee in its sole discretion being convinced that the Licensor brand and business remains viable for association with the ICO. Third, adequate capital remaining within and or available to the ICO to operate the ongoing ICO business.

(17)   **Revenue Share Fees** - Non Exclusive Audio Visual Content - The Licensee shall pay in relation to filmed audio visual motion picture, television and digital network content that is used on the ICO site or DAPP to generate advertising related revenues 50% of all

8

advertising or transactional related revenue. The Revenue Share for Aged Content over 10 years old shall be 25% instead of 50%.

(18)     **Free Content** - Audio Visual Content that is Penthouse Pet Photo shoot related to the ICO shall not attract a revenue sharing arrangement of any kind and shall be supplied free by the Licensor in support of the still image content license that is part of the overarching license fees paid under the Initial License Fee and Long Tail License Fee arrangements.

**2.2.**     **The Licensee** undertakes that it will use best efforts and use reasonable endeavors to protect the Trademarks, trade- names and or copyrights subject to License and shall not knowingly infringe upon any other intellectual property owned by the Licensor.

## 3. INFRINGEMENT

**3.1.**     **Infringement of Trade-marks or Trade-names or Copyrights.**  In the event of actual or threatened infringement of any of the Trade-marks or Trade-names or Copyrights during the term of this Agreement, the Licensor shall have the exclusive right, at its option, to take appropriate action to prevent and/or to stop the infringement including, without limitation, instituting action against infringers. The Licensor shall have the" exclusive right, at its option, to defend all actions contesting the validity of or the Licensor's ownership of the Trade-marks or Trade-names or Copyrights or arising in any way from the use of one or more of the Trade-marks or Trade-names or Copyrights.  The Licensee shall consent to the use of its name in all such litigation and shall sign such documents, swear such affidavits or declarations and take such other action as may be reasonably necessary to assist the Licensor in such litigation, at the expense of the Licensor.

**3.2.**     **The Licensee** undertakes that it will use best efforts and use reasonable endeavors to protect the Trademarks, trade- names and or copyrights subject to License and shall not knowingly infringe upon any other intellectual property owned by the Licensor.

## 4. ACKNOWLEDGEMENT

**4.1.**     **Acknowledgement of Rights.**  The Licensee acknowledges and agrees that:

(1)     **the Licensor** is the exclusive owner of all right, title and interest in and to the Trade-Marks, Trade Names and Copyrights and all goodwill associated therewith other than those set out in 4.1 (3) ;

(2)     **it shall acquire no right**, title or interest in and to any of the Trade-marks, trade-names or Copyrights other than the respective exclusive and non exclusive license rights under this agreement which shall attach to any new assignee who at any time becomes the underlying owner of such trademarks, trade names and or copyrights the stead of the existing Licensor.

9

(3)    **any and all goodwill** generated by the use of the Trade-marks, by the Licensee shall inure exclusively to the benefit of the Licensor other than for Goodwill that touches concerns the business of the ICO and downstream the Digital Tokens and or Coins generated by the ICO which shall be shared between the Licensor and Licensee on the basis set out herein.

## 5. – OBLIGATIONS OF THE LICENSEE

**5.1.    Obligations of the Licensee.**  The Licensee shall have the following obligations :

(1)    **it shall maintain** the high standard of quality of the Wares and Services which is established by the Licensor from time to time (the "Quality Standard") and shall comply with all specifications supplied by the Licensor with respect to the Wares and/or the Services;

(2)    **it shall allow authorized representatives** of the Licensor to inspect, during normal business hours, its inventory of the Wares in order to assess the Licensee's compliance with the Quality Standard and the other terms of this Agreement but not its digital technology;

(3)    **it shall, if requested by the Licensor** in writing, send to the Licensor specimens of the Wares for examination by the Licensor to ascertain whether the Wares meet the Quality Standard but this shall not apply to its digital technology including but not limited to technology pertaining to blockchain, encryption and ICO deployment engine, digital wallets, digital exchanges and DAPP applications nor will it affect the continuation of any ICO planned or on foot within the market place; and

(4)    **it shall give to authorized representatives** of the Licensor access to all relevant documents, materials and records pertaining to the Services and access to its business premises during normal business hours for the purpose of inspecting and examining the standard of the Services provided by it in order to determine whether such Services comply with the Quality Standard and the other terms of this Agreement. To avoid doubt such materials shall not include any access to confidential information pertaining to Blockchain - Smart Contracts - Digital Wallets - Digital Exchanges - DAAP Applications and other type of encryption technology and the ICO other than for how the Licensed materials are being utilized.

## 6. – STATUS OF PARTIES

**6.1.    Status of Parties.**  Nothing contained in this Agreement shall constitute a party to be either the agent or partner of the other or shall empower a party to bind the other.

## 7. – TRANSFER

(1)    **Right of Licensor to Transfer.** The Licensor shall have the right to Transfer any or all of its rights and obligations under this Agreement and the Trade-marks, Trade names and

s:\penthouse\androcles\amended androlcles trademark licensing agreement (v.7) (redline).docx

KH [      ] | GL [      ] WS [      ]

Copyrights to any Person as it may in its sole discretion deem appropriate subject to the First and Last Right(s) Of Refusal on the standard terms in 7.3.and 7.4 in favor of the Licensee as detailed. In the event any such Transfer is to be made to any party other than the Licensee and or its nominee, the Licensor covenants to bind the prospective successor in title into an acknowledgement in writing of the existence of the license under this Agreement pertaining to the rights in Schedule A and the legal validity of the license herein. No transfer of the Trademark(s), Trade - name(s) or copyright(s) subject to License in Schedule A shall be able to be perfected unless the Licensor first obtains a written acknowledgement of the License under this Agreement from the prospective successor in title and delivers a copy of that acknowledgment to the Licensee.

**7.2.** **Licensee Limited Right To Transfer.** The Licensee shall have no right to transfer or grant any sub-license with respect to any of the Trademarks, Trade-Names & Copy Rights specified in Schedule A of the Agreement (other than as provided herein) without the prior written consent of the Licensor and where so required the approval of the Federal Bankruptcy Court. The Licensee shall have an unfettered right to in its "Sole Discretion" to transfer and sub license by way of assignment or otherwise any mark(s) or copyright(s) interest(s) under the License to any entity related to the Licensee in the US domicile being legal entities that are nominated by the Licensee provided those nominated entities are clean skin Special Purpose Entities formed for the purpose(s) of deployment of the ICO Offer in the United States under the ICO Offering Structure. Any actual or purported Transfer other than to a nominated entity of the Licensee related to the ICO occurring without the Licensor's prior written consent shall constitute a default under this Agreement and shall be null and void.

**7.3.** **First Right Of Refusal.** The Licensor shall grant the Licensee a First Right of Refusal exclusively in relation of the Licensor entering into any other ICO related media licensing activities that touch upon and are concerned with carrying on any form of Digital Token ICO or Blockchain Offerings, sale of trademarks, trade name and copyrights specified in Schedule A, Sale of Stock in the Licensor owned by Kelly Holland and issue of stock or debt ( including DIP Loans) or option securities by the Licensor for a period of 9030 days or such other period as may be specified herein from the date of written notice by the Licensor to the Licensee to match the current third party offer on same and or better terms than offered by any third party. Where an Offer is refused by the Licensee the Licensor is free to accept a third party offer on identical terms. However if such an offer is not accepted by a third party on the same terms and at the same price as offered to the Licensee. Then the Licensor shall regrant a right of first refusal over all subsequent offers on a similar basis going forward.

**7.4.** **Last Right(s) of Refusal.** The Licensor shall grant the Licensee a Last Right of Refusal to acquire any rights or interests specified under this agreement including but not limited to licensed trademarks, trade names and copyright subject to license under this agreement stock owned by Kelly Holland and or stock, debt( including DIP Loans) or option security interests in the Licensor. The Last Right of Refusal shall give the Licensee a window of 30 working days (unless otherwise specified herein ) from the date of written notice by the Licensor to match or exceed the price and terms of any offer presented that

11

~~the Licensor would otherwise accept.  In the event an Offer is not matched by the Licensee and sale or license proceeds as the case may be fails to settle with on 90 days then the Licensee Last Right of Refusal shall be deemed to remain on foot and the Licensor must re offer any new offers to the Licensee.~~

## 8. – TERM AND TERMINATION

**8.1.    Term of Agreement.**  This Agreement shall be in perpetuity unless terminated by the parties on the following grounds.

(a)    **Term shall commence** as of the date of signing and may be terminated at the sole discretion of the Licensor after 120 months from the date of signing if the Licensee has not completed the ICO envisaged here under.

(b)    **if the Licensee** commits or permits any material breach of any of the provisions of this Agreement and fails to remedy such breach within ~~thirty~~ninety (90) days following written notice thereof from the Licensor, but subject to to a ninety (90) day cure window in favor of the Licensee or

(c)    **if the Licensor** commits or permits any material breach of any of the provisions of this Agreement and fails to remedy such breach within ~~thirty~~ninety (90) days following written notice thereof from the Licensee but subject to ~~to a~~ ninety (90) day cure window in favor of the Licensor or

(d)    **if the Licensee** ceases to carry on business or is adjudicated bankrupt or insolvent or makes an assignment for the benefit of its creditors or if proceedings in bankruptcy are instituted against it or if a receiver of its property is appointed or if any judgment or execution against it or its property remains unsatisfied for such period as would permit its property or any substantial part thereof to be sold~~.~~, or

**8.2.    Other Relief.**  Any termination under section 8.1 hereof shall be without prejudice to any other rights, remedy or relief vested in or to which the Licensor may otherwise be entitled against the Licensee.

## 9. – RIGHTS AND OBLIGATIONS ON TERMINATION

**9.1.    Rights and Obligations on Termination.**  Upon termination or expiration of this Agreement, the Licensee shall cease to be a licensee of the Licensor and shall:

(1)    **immediately cease** to use, directly or indirectly, in any manner whatsoever any of the Trade-marks or Trade-names or Copyright any name or mark similar to any of the Trade-marks or Trade-names; and

(2)    **remove the** Trade-marks and Trade-names or Copyrights a from or deliver up to the Licensor or its duly authorized representatives all materials including signs and advertising materials in its possession, custody or control on which any of the Trade-

s:\penthouse\androcles\amended androlcles trademark licensing agreement (v.7) (redline).docx
KH [      ] | GL [      ] WS [      ]

marks and Trade-names appear (except for documents not for public display or reasonably required for archival purposes).

(3)     **The party** in default under the agreement shall be liable to the other party for all and nay damages flowing from the default.

(4)     The **Licensors** shall have no right or interest in or ability to cease or acquire any intellectual property, trade marks and or copyrights developed by the Licensee and or ICO offer entity that pertain to Block Chain, smart contracts, digital wallets, exchange platforms, DAPP application and smart encryption technology and ICO digital coin or token matters not developed by the Licensor.

## 10. – GENERAL

**10.1.    Time.**   Time shall be of the essence of this Agreement.

**10.2.    ICO Format.**  The Licensee warrants the ICO format shall proceed as follows and the Licensor acknowledges full informed consent and acceptance of this format. Target Capital raise for the ICO is set at $40m or less but may be increased in the sole discretion of the Licensee. ICO - Offer Costs are to be 100% paid for by the Licensee but shall be recovered in first priority position from ICO offer proceeds. The ICO structure and legal compliance format is to be solely at the discretion of the Licensee and or the ICO offer entity. The Blockchain & Encryption Development and Construction Structure is to be at the sole discretion of the Licensee and ICO entity. Marketing, Development and Branding costs are to be at the sole discretion of the Licensee and ICO entity. Naming Rights of the ICO and related entities are to be at the sole discretion of Licensee and ICO entity  - who shall take account of Licensor owned trademarks. The Licensee as a courtesy will seek informal written consent of the Licensor regarding said naming of the ICO offering. This consent is only in the interests of co-operation but will not be a formal requirement of the License. To avoid doubt the Licensee will remain the sole decision maker regarding all aspects of the ICO.Any reasonable Licensor out of pocket costs as they relate to the ICO will if pre-approved by the Licensee be paid for within 30 days following receipt of a tax invoice by the Licensee.The Licensee and ICO irrevocably warrant to the Licensor that the ICO shall proceed as deflationary economy with the maximum coin threshold set at Token Issue in the sole discretion of the Licensee and the ICO offer entity.

**10.3.    ICO - BLOCK CHAIN IP - OWNERSHIP**. The Licensor acknowledges that it will have no role, interest, financial obligation to contribute to or financial interest in the development and construction of Block Chain Encryption Technology - Engine - Platform- Digital Coin Delivery - Coin Exchange - Digital Wallets - DAPP applications and any other ICO related intellectual property both existing and developed by the Licensee and or ICO Offering entity or entities other than as agreed herein. The Licensee and ICO offeror entity shall be entirely responsible for funding the development and construction of all ICO intellectual property interests other than those being Licensed hereunder from the Licensor.

10.4.   **Waiver.**  The failure at any time to require performance of any provision shall not affect the full right to require performance at any later time.  The waiver of a breach of any provision shall not constitute a waiver of the provision or of any succeeding breach.

10.5.   **Notice.**  Any notice or other communication required or permitted under this Agreement shall be in writing and may be delivered personally, by fax, by courier or by prepaid registered or certified mail addressed, in the case of the Licensor, as follows:

Penthouse Global Media Inc.

8944 Mason Avenue

Chatsworth, CA  91311 USA

and in the case of the Licensee, as follows

Androcles Entertainment Pty Ltd

433 North Camden Drive

Beverly Hills, CA  90210  USA

or to such other address as the addressee may have specified by a notice given under this provision.  Any such notice or other communication, if delivered personally or by courier or mailed, shall be deemed to have been given when received and, if faxed, shall be deemed to have been given when the appropriate answer back is received.

10.6.   **Number and Gender.**  In this Agreement words importing the singular include the plural and words importing gender include all genders.

10.7.   **Entire Agreement.**  This Agreement constitutes the entire agreement between the parties with respect to the subject matter, supersedes all prior representations, negotiations and understandings and may not be amended, or any provision waived, except in writing signed by the party against whom the amendment or waiver is sought to be enforced.

10.8.   **Severability.**  Any provision which is illegal, invalid or unenforceable shall be severable and shall not affect the remaining provisions of this Agreement.

10.9.   **Headings.**  The headings in this Agreement do not affect its interpretation.

10.10. **Successors and Assigns.**  This Agreement shall ensure to the benefit of and be binding upon the parties and their respective successors and permitted assigns.

10.11. **Applicable Law.**  This Agreement shall be governed by the laws and courts of the State of California for so long as the Licensor remains under the jurisdiction of the Federal

Bankruptcy Court ~~whether  in Chapter 11 or Chapter 7 or Receivership~~. Post the bankruptcy of the Licensor or upon transfer by the Licensor of its rights under this agreement to any new successor in title who becomes Licensor that is solvent. This Agreement shall be governed by the County and State laws of domicile of the Non Breaching Party.

**10.12.   Counterparts.**  ~~~~This Agreement may be signed in counterparts, which together shall constitute the fully executed agreement.

**10.13.   Survival.**  All obligations of the Licensor and the Licensee which expressly or by their nature survive the termination or Transfer of this Agreement shall continue in full force and effect subject to and notwithstanding such termination or Transfer and until they are satisfied or by their nature expire.

**10.14.   Further Assurances.**  The parties agree to do or cause to be done all acts or things necessary to implement and carry into effect this Agreement to its full extent.

**10.15.   Deal Costs.**  Parties to bear own legal costs.

**10.16.   Cost Recovery.** ~~In n~~ the event the Federal Bankruptcy Court does not approve the License under this Agreement and alternatively puts it up for bid. Then the Licensee shall if subsequently out bid, be entitled to recovery of all out of pocket costs expended in connection with the License and related ICO deal structure and Blockchain Development incurred to the date of non approval by the court.

**10.17.   Public Profile.** The parties agree to keep the ICO development activity private and confidential until an election is made by the Licensee by way of written notification to the Licensor to make the ICO Offer and related business model a matter available for public knowledge. While the ICO remains private and confidential there shall be no discussions with or in any media about the ICO by the Licensor, its officers, advisors, affiliates, lenders or creditors without the prior written approval of the Licensee. No election can be made by the Licensee to make the ICO public prior to 1 July, 2018 unless mutual consent to do so before this date in writing is reached between the Licensor and Licensee.

**10.18.   Confidentiality.** Pre and Post License. The Licensor on behalf of itself, its Officers, Staff, Creditors, Lenders and Advisors acknowledge and agree that all the ICO license fee deal related confidential information provided to the Licensor by the Licensee and or their advisors is to remain confidential. This includes any and all confidential information provided during pre deal license negotiations, prior to ICO offer and during the course of the ICO shall remain the sole property of the Licensee now and in perpetuity.  The Licensor agrees to be held responsible for any release of confidential information and agrees to indemnify the Licensee and ICO entity for any and all damages caused by any unauthorized release of confidential information. The Licensor agrees to not release the existence of or copies of this agreement without the prior written consent of the Licensee to any third parties (~~~~other than by way of filing in or throughFederal Bankruptcy Court~~-~~)

s:\penthouse\androcles\amended androlcles trademark licensing agreement (v.7) (redline).docx

KH [     ] | GL [     ] WS [     ]

to creditors of the Licensor, past or current or future secured lenders of the Licensor and shall impose this constraint on its advisors, officers, legal counsel, employees and independent contractors.

**10.19. Marketing & Promotional Support.** The Licensor covenants to use best efforts and reasonable endeavors to assist with the marketing and promotion of the ICO subject to prior approval of any such efforts by the Licensee. This includes but is not limited to endorsement of the ICO, editorial support in Penthouse Magazine(s), Penthouse Web Site and Penthouse Audio Visual and other Penthouse publication. The Licensor shall upon request by the Licensee, distribute to the Licensors print and digital subscribers promotional and advertising content provided by the Licensee pertaining to the ICO Offer. The Licensor for a period of not more than 120 days during the ICO Offering window ending upon the date of the ICO close shall grant the licensee direct access to the Licensor's subscriber galley list(s) for the last five years for the sole purpose of sending out the ICO promotional and advertising materials authorized by the ICO in relation to the offering

**10.20. The Licensor** shall accord the Licensee the right to buy prime media spots in print, digital and audio visual publications of the Licensor at a 75% discount off "Rack Media" rates for such advertising and or sponsorship rights. The Licensor will allow the Licensee access to any other third party print, digital or audio visual media where the Licensor enjoys discount rates provided the Licensee pays up front for any advertising or sponsorship access. The Licensor shall at raw production cost provide the Licensee with video production and still production photographic support to advance the ICO. Costs of that production support to be paid up front by the Licensee.

**10.21. Ordinary Course Of Business.** The Licensor acknowledges the grant of rights under this License is within the ordinary course of business of the Licensor. The Licensor further warrants that it enjoys full  legal capacity to enter into the contractual arrangement(s) detailed herein subject to Federal Bankruptcy Court Approval where required.

**10.22. Court Approval.** The Licensor shall seek the prior approval of the Federal Bankruptcy Court to proceed under the terms of this agreement. ~~Court approval to proceed~~ Any order approving this agreement must ~~at a minimum contain the following directions~~ be in a ~~format that is~~form wholly acceptable to the legal counsel of the Licensee.~~A direction that~~ Said order shall provide, inter alia, (i) the license granted to Licensee is subject to all existing licenses and rights; (ii) nothing in the order is intended to convey and rights to Licensee free and clear of any pre-bankruptcy liens, rights and interests under section 363(f) of the Bankruptcy Code, (iii) the the license and this agreement as presented are acceptable to the Court.~~A direction that,~~ (iv). the Agreement shall be binding on and enforceable against any ~~Trustee~~chapter 11 or 7 trustee ~~in Chapter 11, Chapter 7 and any Receiver under a Receeivership or any of other successor in interest. A direction that.~~(v) the Licensee may begin immediately to exploit the License.~~A direction that,~~ (vi). any sale, license or trnasfer of  trademarks, trade names and copyrights that are the subject to the license ~~remaining on foot and~~shall be binding on and enforceable against any subsequent owners and or current or future holders of security interests.~~A direction that,~~ (vii). the

s:\penthouse\androcles\amended androlcles trademark licensing agreement (v.7) (redline).docx

KH [     ] | GL[     ] WS [     ]

License is approved by the court and that approval may be featuredstate in any ICO White Paper and or OfferOffering Documents. A direction that the Court has approved the courtLicense and (viii)  the Court retains jurisdiction over matters pertaining to the License and the related exploitation at of it by way of an ICO in the event a need arises to confirm or perfect any matter concerning the license or the progress under it.  In the event the Court does not approve the License under this Agreement, the Licensee reserves all rights to present an offer to purchase the property subject to the License or any other property of the Licensor as a "stalking horse" entitled to a "break up" or "topping" fee as allowed by the Court that will allow recovery of all of Licensee's out of pocket costs expended in connection with the License and related ICO deal structure and subject to any bidding procedures approved by the Court.

10.23.  **Until Approval** is granted by the Federal Bankruptcy Court all collateral in Escrow and all down stream payments shall not become payable.  Where the Court does not approve this agreement in the manner set out in Clause 10.22. Then this Agreement shall go into abeyance until either the Licensor becomes solvent or transfers the underlying subject matter of the License Grant to a Licensor that is solvent. The Licensee may in such event revive the License in its sole discretion.

10.24.  **Escrow.**  The Licensee upon signing this Agreement shall within 48 hours place a sum equal to the first payment under the Initial Fee Structure being $200,000 USD or its equal in Australian Dollars or Bit Coin into the Escrow Account of its legal counsel. The Licensee shall authorize its duly appointed legal counsel to evidence the amounts in Escrow to the Licensor and the duly appointed legal counsel of the Licensor. The funds paid into Escrow by the Licensee shall remain in Escrow on the following terms - they will remain for a period of 1421 working days until this Agreement in its entirety is either approved or not approved by the Federal Bankruptcy Court as per the terms of Clause 10.22 Upon approval of the Bankruptcy Court of the license acceptable to the Licensee under 10.22  the legal counsel of the Licensee shall make any payment due under the agreement to the court or to whomever the court directs. In the event approval to proceed is not obtained or if obtained is not acceptable to the Licensee under Clause 10.22. Then within 1421 working days of the deposit of collateral into Escrow. The Licensee may demand the funds in Escrow be 100% released to the Licensee within 48 hours of making such a request.

10.25.  **No Obligation To Proceed.**  The Licensee shall be under no obligation to proceed to develop, build, operate, market or promote a Blockchain Encryption Engine, ICO White Paper or  ICO Offering Document. The Licensee acknowledges the relevant License Fee payment obligations in relation to Initial License Fees - shall in such circumstances remain due and payable even where the Licensee elects not to proceed with or to progress an ICO after making an election to proceed.  Other than in the case where the Licensee Fee payment obligations are under "suspension" under the terms of this Agreement due to breaches of the Licensor. In which case the Licensee shall no longer be liable to make any outstanding payment under the License as from the date of the breach by the Licensor.

17

**10.26.  Election Not To Proceed.**  ~~If~~If the entire Initial License Fee has been paid in full and the Licensee elects not to proceed to an ICO ~~or if having made such an election to proceed to an ICO has not progressed the ICO~~ within 120 months of ~~signing, then all rights subject to this license shall revert back to the Licensor.~~ the date the Bankruptcy Court enters an order approving this agreement, then all rights subject to this license shall revert back to the Licensor.  If after 36 months from the approval of this agreement by the Bankruptcy Court and the entire Initial License Fee has not been paid, the License shall revert back to the Licensor.  Nevertheless, the Licensee may retain the License for the next 84 months if the Licensee pays all of the unpaid Initial License Fee before the third anniversary of the order approving this Agreement. All prospective ICO efforts from whatever source during the time window specified will remain subject to First ~~and Last~~ Rights of Refusal in favor of the Licensee.  Where after 24 months after July 1, 2018 if the Licensee has either elected to not proceed with an ICO or has having made an election to so proceed with an ICO has ~~either~~ abandoned the ICO ~~or ceased to make material efforts to complete the ICO then~~.  Then the Licensor may enter into an other ICO or ITO or similar blockchain or digital coin offering in relation to other Licensor intellectual property rights not subject to this license but still subject to the ~~Rights~~Right of First ~~and Last~~ Refusal on the standard terms as per Clause 7.3 ~~and 7.4~~ under this Agreement in relation to such future ICO projects.

**10.27.  No Other ICO.** ~~The~~ Except for the pending Vice Coin offering, the Licensor will undertake to within a Priority Window of 24 months from July 1, 2018 not to issue, support or be part of any other ICO digital token Offering(s) and to not be part of or facilitate (by providing access to subscription lists or otherwise) participate in or accept money for or provide free advertising, marketing or promotion of any other competing ICO or ITO project outside that of the Licensor related ICO project that is contemplated under this Agreement.

**10.28.  Withholding Taxes.** Where any License Fee is paid across border from Australia to the United States then under the terms of the US - Australia Treaty on double taxation a 5% holding tax will be due an payable. All such taxes are the responsibility of the Licensor and the Licensee may deduct from any payments due to the Licensor amounts equal to the withholding tax liability, if any.

**10.29.  Licensee May Assist.** The Licensee shall be given a First Right of Refusal ~~as per Clause 7.3~~ to assist the Licensor in perfecting any impairment to and or maintenance obligations required to keep the Licensor trade marks, trade names or copyrights in good standing. Any assistance is to be on terms mutually acceptable to the parties.  All monetary payments advanced shall be recoverable by the Licensee. ~~Where~~ where no agreement in relation to the First Right Of Refusal is reached by the parties. Then the Licensee will enjoy a Last Right Of Refusal ~~on the terms set out in 7.4~~ for 30 days from date of notification to match any arrangement being proffered by a third party.  Any assignment of the trade marks, trade names or copyright interest subject to this agreement shall require as a pre condition to such transfer the Licensor to procure from the new ~~prospect~~prospective assignee their written acknowledgement of the existence of License and their written affirmation and consent to be bound by the terms of this license~~;~~.

18

10.30. **Licensee Access**. The Licensor at all times shall grant access to all trade mark, trade name, copyright material, original source materials, copies and or galley lists sufficient to enable the Licensee smooth transactional dealing(s) and without limiting the foregoing to assess their viability for use, their actual existence, the chain of title ownership rights, their quality and for their use in any valid ICO project related purpose(s). Without limiting the generality of the foregoing the Licensor shall allow the Licensee access to all digital and film images and all Licensor published content and to digitize non digital film stock content for the sole purpose of use in the ICO and on going business. The Licensor shall permit access to any film laboratory or digital storage facilities to allow the Licensee to do any of the foregoing providing the Licensee shall pay any third parties for such rights of access.

10.31. **Kelly Holland.** The Licensor shall nominate Kelly Holland to represent the Licensor subject to her acceptance and court approval of the transaction Kelly Holland will be appointed to the Board of the ICO Offering entity upon formation of said entity on the terms and conditions set out in Schedule 2. The Licensee shall use best efforts and reasonable endeavors to ensure Kelly Holland is appointed to the Board of the ICO. Neither the Licensee nor any ICO entity shall be under any ongoing obligation to accept a board appointee nomination from the Licensor other than Kelly Holland. ~~The~~ Any compensation of Kelly Holland shall be disclosed and approved by the Bankruptcy Court. subject to further Bankruptcy Court approval, the Licensor shall approve and grant a conflict of interest waiver to allow her to assume the ICO Board appointment and allow her under the terms of the waiver and her contract to be promoted as the face of the ICO to any degree required by the Licensee. The ~~Licensor~~Licensee specifically shall not be under any obligation to appoint to the ICO Offer entity Board any current or former Officer, employee, advisor or agent of ~~the~~ any former, current or future Secured Lender ~~other than Kelly Holland~~.

10.32. **Chain of Title - Warranty & Verification.** The Licensor warrants that the Licensor is the owner of the underlying trademarks, trade-names and copyrights subject to the License as set out in Schedule A~~.~~ and subject to any existing liens, interests and licenses of the said trademarks, trade-names and copyrights. The Licensor warrants that any license granted under this agreement shall bind any and all successors in title. To effect this result the Licensor shall seek further Federal Bankruptcy Court approval to validate this result as part and parcel of the approval of this license directions as per clause 10.22. Further, the Licensor shall in relation to any sale, transfer, or assignment of underlying trademarks, trade names or copyrights to as a term of any such arrangements undertakes to bind any new owner to acknowledge the existence of and legal validity of the license under this agreement and to obligate any new owner to effect the same result on subsequent owners of the underlying rights that are the subject of this agreement. The Licensor upon written request shall provide the Licensee with full chain of title verification of ownership by the Licensor of all trade marks, trade names and copyright subject to the License as listed on Schedule "A" hereof.

10.33. **No Outside Interests.** The Licensor and Kelly Holland acknowledge that there are no interests ancillary to the License and or related ICO that have been entered into or that

19

exist beyond those documented and agreed to by and between the parties and as disclosed to the court.

**10.34.  Option to Finance New Content :** The Licensor shall provide the Licensee with a 60 day Option window that shall be triggered by way of notice in writing to the Licensee under this Agreement to finance 100% of all new content obligations of the Licensor to provide audio and audio visual content under various output deals between the Licensor and third party Television Broadcasters, Pay TV, Cable TV, Digital Network Channels and Radio Networks. The Licensor shall present content opportunities to the Licensee for financing by the Licensee. The Licensor and Licensee shall mutually approve the content production budget and production talent and crew. Kelly Holland and her crew are pre approved as being acceptable to the Licensee. New may include at the election of the Licensor in its sole discretion any pre existing film stock audio visual content that for broadcast standard compliance needs to be digitized into Standard Definition, High Definition or 4 k or better and or standard definition digital audio visual content that needs to be digitized into High Definition Content or 4 k or better. In which case the content financier will cover 100 percent of the newly digitized content production cost and shall own the copyright to the digitized version of the content. Licensee under this agreement if it elects to finance the new content presented under the Option shall pay 100% of the production budget or digitized cost that is mutually approved by the parties. The Licensee shall own 100% of the copyright to the New Content being financed subject to an exclusive license that shall provide that for the term of the License the parties shall revenue share 80/20 in favor of the content financier. The Licensor shall enjoy the right to purchase the copyright at any time upon giving notice and upon payment of a 20% premium uplift in purchase price per annum. Where the Licensee fails to proceed to finance or elects not to finance new content then the Licensor shall be free to Offer the opportunity to any third party without reference back to the Licensee. The Licensor shall a first and last right of refusal to purchase the new content from the content financier. The Licensor shall if permitted by the scope of the content ~~out put~~output deal terms in relation to exclusivity of the output windows shall allow subject to rights clearance obligations therein. The Licensee ICO shall have access on a ~~non exclusive~~nonexclusive basis to any and all of the content financed by the Licensee .

**10.35.  Option To Finance Third Party Content :** The Licensor shall provide the Licensee with a 60 day Option Window that shall be triggered by way of notice in writing to the Licensee under this Agreement to finance all third party content obligations of the Licensor to provide audio and audio visual content under various output deals between the Licensor and third party Television Broadcasters, Pay TV, Cable TV, Digital Network Channels and Radio Networks. The Licensor shall present existing third party produced audio and or audio visual content opportunities it wishes to supply under the respective output deals above to the Licensee that in the sole discretion of the Licensor is suitable for purchase or license to meet the out put obligations of the Licensor. The Licensor and Licensee shall mutually approve the content acquisition price and rights footprint of the third party content being acquired. The Licensee under this agreement if it elects to finance existing third party content presented under the Option shall pay 100%

of the mutually agreed purchase price or license fee obligations as the case may be. The Licensee shall own 100% of the copyright or the license being acquired subject to a an exclusive on license that shall provide that for the term of the License the parties shall revenue share 50/50 in favor of the content financier. The Licensor shall have the right to purchase the copyright at any time upon payment of a 10 % premium uplift in purchase price per annum. Where the Licensee fails to proceed to finance or elects not to finance existing third party content then the Licensor shall be free to offer the opportunity to any other party without reference back to the Licensee. The Licensor shall enjoy a first and last right of refusal to purchase the new content from the content financier. The Licensee shall be under no obligation to accept this option or finance the content presented by the Licensor to the Licensee. The Licensor shall if permitted by the scope of the content out put deal terms in relation to exclusivity of the output windows shall allow subject to rights clearance obligations therein the Licensee ICO access on a non exclusive basis to any and all of the content financed by the Licensee .

# The Parties have Executed this Agreement.

### PENTHOUSE GLOBAL MEDIA INC.

By: _____

Name: _____

Title: _____

### ANDROCLES ENTERTAINMENT PTY LTD
### ACN 624 032 177

By: _____

Name: _____

Title: _____

15

**SCHEDULES TO AGREEMENT A - C are attached to form part of and are to incorporated in by way of reference.**

s:\penthouse\androcles\amended androlcles trademark licensing agreement (v.7) (redline).docx
KH [     ] | GL [     ] WS [     ]

15

# SCHEDULE A

**NON EXCLUSIVE**

PENTHOUSE BRAND - TRADEMARKS AND NAME.

PENTHOUSE LOGO WITH KEY - TRADEMARKS AND NAME.

REVENUE SHARE - FILM CONTENT OF FILM LIBRARY FOR ICO USE.

STILL IMAGES OF ALL MOVIE & DVD & DIGITAL AUDIO VISUAL CONTENT ONE SHEETS.

PENTHOUSE PUBLISHED ARTICLES AND ARCHIVE SUPPORT MATERIALS.

**EXCLUSIVE CONTENT ( EXCLUSIVE BASIS IS FOR USE IN ICO ARENA ONLY )**

PHOTO SHOOTS AND STILL IMAGES - HELD AT PENTHOUSE AND IRON MOUNTAIN.

s:¥penthouse¥androcles¥amended androlcles trademark licensing agreement (v.7) (redline).docx

KH [    ] | GL [    ] WS [    ]

FILM AND DIGITAL BEHIND THE SCENES OF PHOTO SHOOTS - DVD - FILM -DIGITAL SHOOTS.

ALL PUBLICATION ARTICLES LINKED TO PENTHOUSE PET IMAGES WHETHER PETS OR OTHER FEATURED TALENT.

## SCHEDULE B

## KELLY HOLLAND  - PENTHOUSE MEDIA GROUP - STOCK

I warrant at the date hereof that I am the sole owner of 100% of the Stock in Penthouse Media Group Inc.

24

I warrant that there is no secured interest over my stock in Penthouse Media Group Inc.

I warrant I have not entered into any agreement as at the date of signing to sell or option my stock.

## Signed By Kelly Holland this          Day of 2018.

15

s:\penthouse\androcles\amended androlcles trademark licensing agreement (v.7) (redline).docx

KH [      ] | GL [      ] WS [      ]

| INITIAL FEE | STRUCTURE | $1,000,000.00 | LICENSE FEE | |
|---|---|---|---|---|
| | | | | |
| **ESCROW** | $200,000.00 | | | |
| **RELEASE POST COURT APPROVAL** | | $200,000.00 | | |
| **30 DAYS LATER** | | | $200,000.00 | |
| **30 DAYS LATER** | | | $200,000.00 | |
| **30 DAYS LATER** | | | $200,000.00 | |
| **30 DAYS LATER** | | | $200,000.00 | |
| | | | | |
| | | $200,000.00 | $800,000.00 | $1,000,000.00 |
| | | | | |
| **LONG TAIL FEE** | **PAID FROM ICO** | $40,000,000 | | |
| | **FROM PROCEEDS** | | | |
| PRIORITY LEVEL | | | | |
| **FIRST** Shortfall ITO out of ICO + 20% share in A&E ITO under $6m any shortfall - | **OFFER COSTS** | $1,400,000.00 | ($400,000.00) | BlockChain Development |
| **SECOND** | **SUSPENDED** to Licensor | $800,000.00 | ($800,000.00) | Capped to 800 K based on actual suspended amount |
| **THIRD** | **LICENSE FEE** recapture amounts actually  paid | $1,000,000.00 | $1,000,000.00 | Recover License Fee paid less suspended sums plus deal costs |
| **FOURTH** | **ICO UNDERWRITER** | $20,000,000.00 | | |
| **FIFTH** | **WORKING CAPITAL ICO** | | | |
| | **+ DEVELOP COST OF ON GOING ICO** | | | |
| SHARE BALANCE OF ICO CAPITAL PROCEEDS | | **90% LICENSEE** | **10% LICENSOR** | BASED ON SHARE AVAILABLE TO PROMOTER |
| SHARE NET REVENUE OF ONGOING ICO | | **90% LICENSEE** | **10% LICENSOR** | BASED ON SHARE AVAILABLE TO THE MANAGEMENT |
| SHARE ICO CAPITAL/COIN INTERESTS | | **90% LICENSEE** | **10% LICENSOR** | BASED ON SHARE AVAILABLE TO PROMOTER |
| | | | | SHARES ABOVE AS DETAILED IN THE ICO WHITE PAPER/OFFER DOC |

# SCH

s:\pe