Timotny Driver

433 North Camden Drive

Suite 970

Beverly Hills, CA  90210

(310) 447-4209

In Pro Per

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| IN RE<br>    PENTHOUSE GLOBAL MEDIA, INC., a Delaware corporation,<br><br>    Debtor,<br><br>―――――――――――――――――<br><br>Jointly Administered Petitions | **Case No.: 1:18-BK-10098-mb**<br><br>**BRIEF AMICUS CURIAE OF TIMOTHY DRIVER IN SUPPORT OF ANDROCLES ENTERTAINMENT PTY LTD THE LICENSEE**<br><br>Date: February 21, 2018<br>Time: 1:00 PM<br>Place: Room 303<br>         21041 Burbank Blvd.<br>         Woodland Hills, CA |

I.  QUESTION PRESENTED

Whether the License between Androcles Entertainment Pty Ltd and Penthouse Media Group Inc. dated 27 January 2018 should be approved by the Federal Bankruptcy Court.

II.  AMICUS CURIAE REQUEST

Pursuant to the Federal Bankuptcy Court Rules the Petitioner. Respectfully asks the court for leave to file this AMICUS CURIAE Brief on in support of Androcles Entertainment. Timothy Drive worked on the License Agreement and has a financial interest in the outcome of the Court's decision. Timothy Driver was called to give testimony in the case and was heard by the court.

Timothy Driver has expertise in accounting, accounting and finance in relation to the media industry generally and in relation to the ICO space, international tax and Securities law compliance issues. The following arguments counter the motions filed on behalf of the Dream Time Media LLC and the Creditors' Committee counsel to the court. Given the foregoing facts the Petitioner asks the court accept this brief, arguments and exhibits contained in.

III.   ARGUMENT

AMICUS considers this case to be a watershed moment. The Licensee has put in to Escrow 1299 Bit Coin $14,000,000 at the time of writing. This sum has been at market risk for over eight days. The parties have attempted to force Androcles Entertainment in return for License Approval to buy out the Secured Lender and or the Unsecured Creditors. AMICUS cannot be see what one has to do with the other.

AMICUS have presented to the Debtor in Possession Counsel the comments attached in Exhibit One.

AMICUS have attended belated meetings with the Debtor in Possession Counsel and Counsel for the Creditors Committee. Belated as no comments to the Amended License were tendered by the Committee despite being given an opportunity to do so until after the Amended License was filed.

AMICUS has been amazed at the logic presented at those meetings for a simple license that is a better offer in terms of scope, value and terms compared to the VICE COIN Initial Toke Offering on foot. Indeed Counsel for the Creditors Committee objected to boiler plate language lifted straight from the existing license given to TOKKEN MBS LLC who is orchestrating this offering.

AMICUS points out the vastly different standard being applied to the License as opposed to that in the Club STIPULATION which is far wider ranging rights deal, of unknown shape and on

financial terms that make the Debtor In Possession vulnerable to the whims of all parties in terms of certainty moving forward.

AMICUS respectfully asks the court to consider the arguments and facts present in Exhibit One and advises AMICUS is available for further argument and or testimony should the Court require it.

AMICUS is concerned that the full facts of matters before the court are not yet known nor in any way fully presented. Facts AMICUS has extensively researched and believes appropriate to be heard by the court that will impact the proceedings moving forward.

AMICUS appreciates the procedural aspects in play. However, those process aspects in certain circumstances can give way to leave by the court to hear matters out of normal order.

AMICUS asks the court to allow this motion and to have the brief accepted into the proceedings.

IV. <u>CONCLUSION</u>

For the reasons stated above, the AMICUS asks the court to approve the License before the Court.

Attached:

EXHBIT ONE – Timothy Driver – Response to Creditors Committee and Secured Lender

Dated: February 21, 2018

/s/ Timothy Driver
_____

# AMICUS CURIAE - EXHIBIT ONE

# ANDROCLES ENTERTAINMENT (AE) : RESPONSE TO CREDITORS COMMITTEE CONCERNS AND SECURED LENDER OF MOMENT . . .

The Fable Of Androcles - does not end with Boy who plucked the thorn from the Lions Paw being eaten by the once removed relatives of the Lion . . .

AE has placed in escrow 1299 Bitcoin and has submitted evidence of this to the court. The, parties have resisted the court being able to view what is currently valued at circa $14,087,085.17 USD

We note that as advised to all legal counsel, AE is at market risk in relation to the Collateral pool now in Escrow while the parties to this case contrive to further delay proceedings the Court.

Counsel collectively project commercial amnesia in relation to this risk factors in play.

We have advised all parties to the case of our deep and abiding concern that further delays of any kind in the proceedings will inflict even greater economic damage upon AE.
K
The extent and shape of those damages are directly referable to the Bit Coin Market price that shapes the value of the collateral pool in escrow.

Over the week the price hit $11,847 USD per Bitcoin creating a paper profit of $4,000,000 USD over the cost base at the point of entry into escrow last week.

Now as of writing this unrealized profit itself remains at market risk. The cavalier attitude of all parties to the, risk to core collateral and now the unrealized paper profit is deeply concerning to AE.

It speaks volumes about both the commercial acumen and agenda driven posturing that is now unfolding before the court. The high of $11,200 over the weekend dropped and AE has endured a paper loss of between $750,000 and $1,000,000.
 The loss has now moved back in the zone of $1,000,000 off the high. AE did sustain real economic loss in this weekend window because is could not trade the coin. The bets on the up would have earned more than another $1,000,000.

We note the recent Bill Passage at a State Senate Level in ARIZONA to allow people to pay State Taxes in Bitcoin.

We note the SPANISH GOVERNMENT's decision to make Spain the ICO Capital of the world and to provide tax incentives for ICO development and offerings.

We note that 20% of the world's central Banks plan to issue their own crypto currency by the end of 2019 and 40% by the end of 2024.

Bitcoin was been continually derided by all counsel opposing the AE license both in and out of the court room.

We note, Counsel advised AE (at the door of the court on 2/14/ 2018) that the secured lender represented by Mr Adam Levin was prepared for DreamMedia to ascent to the AE license application if AE were to "BUY OUT" the DreamMedia loan for $10 million dollars - some $3,000,000 more than the prior lender.  Most tellingly Mr Levin was prepared to accept Bit Coin instead of FIAT currency to complete the transaction but only if AE agreed immediately i.e.on the spot.We have learned a childhood friend of Mr Levin is a crypto currency guru in Los Angeles, and that Mr Levin is a Bitcoin FAN. Making the representations by his counsel to the court moot.

Androcles did not see what approving a license has to do with such an offer. Indeed by not accepting the collateral in Escrow increased by $4,000,000 over the next few days before sinking back to near a $3,000,000 paper profit as at the time of
writing.

This demand for "money" by DreamMedia was presented by the UCC Counsel and DIP Counsel on behalf of Counsel for Dream Time to AE after hours of negotiation between all counsel representing the parties to the bankruptcy hearing who were present on 2/14/2018. The demand for money was as a direct response to AE having provided clear documented proof of 1299 Bitcoin (Circa $12m USD on this day) being held in Escrow by AE's  respected senior counsel in Melbourne Victoria.

AT NO STAGE DID AE REQUEST A DESIRE TO NEGOTIATION for taking over the loan of DreamMedia. AE are open to longer term involvement but not in exchange for a license that stands on the merits. Indeed the quality of the License Rights have nothing to do the offers being made. The License stands or falls on the merits.

AE has been subject to the most abhorrent behavior by those involved in this bankruptcy proceedings and is concerned at the lengths the parties appear to be going to in order to keep critical information from the Court. Indeed AE have been derided for being Australian, called thieves, scam artists, operating out of a Beverly Hills virtual office and AE's well respected

senior counsel in Australia has been referred to by UCC Counsel as being nothing more than as fake as a Nigerian General.

AE is most concerned that all of the recent court theatrics are designed to ensure the Court was not and is not made aware of the value of the collateral pool now held in escrow.

Unfortunately and most tellingly this behavior is but the tip of the iceberg of what has transpired to affect a mere License that AE considers to be the normal course of business.

It comes with cash upfront to run the enterprise with the promise of future revenues

Some would welcome such a prospect, none in this matter have other than for the Debtor in Possession.

Other Issues:

AE have been advised by a Director of OVREVA Capital that they are the 100% owner of DreamMedia and the "PH Secured loan" is creative accounting by ExWorks - a note within a note. OREVA Capital through another associated entity owes ExWorks Circa $13M USD - HIGH TIMES.

In the normal course of business these items in isolation would likely be insignificant. However, after suffering Counsel's collectively aggressive posturing and UCC continuing demands for AE to reduce their safeguards in the license, these items at a minimum require investigating. .

These issues may be completely unrelated but it has definitely given AE course to draw breath.

In the "yet to be clear" circumstances AE make no apology for the safeguards in our agreement which AE believes is only prudent commercial behavior.


AE Direct Responses to the Creditors Committee Filing:

1. In relation to 2.1 (4) – AE if it were to move the Bitcoin control into a US based Escrow Agent would face the following consequences. The movement could itself be deemed a realization of assets exposing the transfer to Income Taxes outside the USA. Once control of BITCOIN were domiciled within US Borders any gain or loss in value over the Strike price, at the moment of control transfer being the cost basis, would expose the Transferor to severe internal US tax consequences. Any gain would, under current IRS rules, amount to a gain on "property" under the code. This would trigger Capital Gains tax in the US which may or may not be credited to parties outside the US due to BITCOIN being taxed in many jurisdictions as an income gain not a capital gain. Worse is the fact that any loss in the market value of the Bitcoin would trap that Capital Loss inside US Borders for Tax purposes. As the loss could not be offset outside the US. The

License only requires $200,000 USD in collateral that can be offered in BITCOIN. The intent some three weeks ago was to get these funds immediately to the DIP. The escrow was to be 3 days, now three weeks later, circa $15,000,000 USD remains at market risk as long as this collateral pool remains in Escrow. AE have demonstrated their ability and willingness to fund the license, the offering and do cover substantial underwriting costs. Further AE have shown extreme good faith in leaving millions of dollars at market risk for the benefit of all parties. We note no other party represented here has done this nor with respect, is likely to be capable of doing so. Further why would any sane person agree to this without first having the license on foot? AE at the present time has acted effectively as a self funded SPAC awaiting an asset in the form of a license to emerge.

2. In relation to 2.1.4 - The Fees incurred by the DIP and AE have been incurred as a direct result of objection by the Secured Lender and UCC protests to a non exclusive License that is in the ordinary course of business. If AE breaches the agreement then the DIP can sue in the normal course of commercial conduct outside of the 14 day protective window. Inside the window no harm no foul. We would point out the funds put at risk here make such objections moot. AE has already lost more than the whole license fee payment structure just attempting to seek court approval Again contrast the UCC position on both the Club Stipulation and Secured Lender Offers to the UCC. In essence $200,000 in one case and $300,000 in the other is Loan Levered off PGMI existing collateral pool. The Club Stipulation will if a long form is ever reached mature into revenue. The Secured Lender Offer will not. Why is the UCC onboard with lending PGMI its own money versus fresh non repayable funds?

3. In relation to 2.1 4 (a) - The 90 day window is a commercial protection for AE in the event of adverse circumstance or events impacting AE's ability to use the License. AE will not entertain a green mail situation where if it objects to a course of conduct it opens the door to a short fuse loss of the entire AE investment. Indeed the very suggestion of such a thing gives pause for thought as to the underlying commercial intent behind it. Given the protracted costly proceedings to date and financial risks AE has incurred for a simple license. AE rightly fears the commercial intent of the parties outside of the DIP. We note in contrast the posture of the UCC to the club license stipulation being supported by the UCC. The Club Stipulation provides that PGMI does not even get revenue but rather a loan as DIP finance upfront that carries with it the stark commercial reality that the loan can be recovered. The protection being afforded under that deal is understandable and supported by AE as the risks justify such a stance. However, AE are at market risk of the license being worthless once even an initial payment is made. AE do not enjoy the ability to recover our payment(s) as they are revenue to PMGI not a Capital ON BALANCE SHEET liability item as is the case with the Club DIP loan and Secured Lender stance. Given this fact pattern, our position in relation to time is unwavering. If AE were to change it we would consider going up not down given what AE have been put through in these court proceedings. A short window as suggested merely attempts to diminish the commercial value of the license. Where

AE in situations where AE objects to making payment(s) until matters were put right. A prime example being the area of chain to title, access to actual physical materials are just some of the risks AE face if a bad actor or poor management team replaces current management.

4. In relation to 2.1(4) (h) in relation to impairment, this is a standard media industry term. The concern is either PGMI do not have complete chain of title to various underlying subject matter IP being licensed or where PGMI do, they fail to file or protect that title and or obtain legal opinion to validate their underlying rights. Impairment damage to the physical materials, Chain of Title that could render any AE ability to use the license moot. Under US Securities Law and Consumer Laws AE have deep obligations in branding the ICO to utilize only intellectual property owned by PGMI and licensed to AE by PGMI. Where the title to that property cannot be established or validated or kept current then AE face the prospect of civil ligation from third parties and or criminal liability for using such intellectual property under the license. We note the specious argument by the UCC that we could suspect payment if one image was impaired. This would destroy our own investment. We are only paying advance prepayment as a favor to help the creditors if we smell a rat that largesse ends. Given what we have been put through there is no shortage of fear on this side of the table about what unknown damages lay ahead. If we see something bad we will revert to the safe harbor of a normative payment model. The substance of our commercial conduct compared with every other party is peerless. We wonder what is the hidden agenda behind those who question this reality. Contrasted with the terms the UCC is prepared to give to the club deal.

5. In relation to 2.1 (4) (m) - AE experience of the current court proceedings is evidence of the concern behind this provision. Stockholder change to a party, who has adverse interest(s) to AE, will deeply impact the ability of AE to utilize the license. We fear in such an instance future adverse actions to commercially negate the license value and progress. We have no objection to any party at this time, we have not raised any objection to any party to these proceeding. In testimony the AE fears were set out as follows: First- Fear of a Bad Actor getting control and negatively impacting the brand "ME TOO" impacts. Second, any illegal activity impacting FFC broadcast rules or those of Foreign Broadcasters (Australian Media Ownership Rules) are one example - another would be (MRB) Businesses operating in Breach of FCC rules. Third unknown lender re title to the loan, terms of the loan and current enforcement of the loan agenda. All three raise severe concerns and motivate our caution. We note the Club Stipulation may have similar concerns as can be seen by the terms in and tenor of that agreement. We note the UCC support for the Club Stipulation Deal and those concerns. Yet in identical circumstances the UCC refuse to support for AE's mirrored stance. AE believes what is valid for one is valid for the other.

6. In relation to 2.1(6) again as per our testimony, we would point out that the KODAK ICO and most ICO's issue only COIN upon an ICO Offering actually proceeding and being completed. Normally, PGMI would grant a license and not get any compensation upfront. AE are providing an upfront liquidity bridge to PGMI for one reason and one reason only, which is to assist in sustaining PGMI so the AE ICO can proceed without risk. Where adverse actions happen that offer of upfront liquidity returns to the standard ICO offerings. We note the current ITO entered into for VICE coin had no up front payment. We further note the different standards being applied against AE compacted to the Club stipulation. PH get $200,000 from AE as revenue that cannot be taken back and the market place reality that as PH remains trading and acts in good faith that $800,000 more is forthcoming. Even if it the ICO were delayed for any reason PH has an absolute right to enjoy $800,000 plus $1,740,000 on top if the License were to proceed. Contrast this to the UCC supported Club stipulation. The $200k is a DIP loan not revenue. The whole $800,000 being proffered is subject to a future deal being negotiated and consummated. In the event that does not happen there are zero funds to PGMI and any initial funds must be repaid ahead of unsecured creditors. Further we appreciate the UCC concern of AE being able to exploit the License from the get go. However, this only happens after the initial payment. AE must be a legal capacity to exploit the ICO from day one. How else can one ever conclude an ICO? In the MEDIA business we option screenplays and enter into prospective exploitation deals to obtain finance without that ability there would be no media business. AE will exploit the license from day one indeed that is why it is paying a license fee. The UCC wants AE to pay a fee but delay the ability to exploit the license to make money so the license is worthless. AE will as stated start exploiting the license day one but will be incurring millions in costs not earning one dime. Revenue only flows from the day of the ICO close. AE are not profiting until the date of the ICO close. We would point out that the UCC notion would block AE from claiming tax deductions from payments until the date of close. This can be evidenced by the HMRC case against Micro Fusion and Future Films in the UK Court of Appeal. Further under the new Trump Tax code media licensing deductions cannot be claimed until an asset is put into service. AE plan to put the License into service day one. To prevent AE doing so causes massive tax problems that may be permanent timing differences not merely temporary ones. This is because in Australia unlike US there are no carry back loss provisions akin to the US net operating loss rules.

7. In relation to 2.18 - This is incorrect. If the License proceeds to an ICO than PGMI will get the $800,000 that is delayed through the events specified. In no circumstance will an ICO proceed and PGMI not receive the $800,000. This will be paid as per the $10,000,000 in the Vice Coin ITO currently on foot. In essence there are no differences.

8. In relation to 2.11 - This is incorrect. There is only economic detriment to the Licensee until an ICO Offer is consummated. Until that time the Licensee incurs only costs eg. The license fee, ICO infra structure costs, offering costs and marketing costs upon ICO

launch. AE do not make any returns until an ICO is completed and then only if it raises money more than the Offer Costs.

9. In relation to 2.15 – This is incorrect. The signed document fixed this error. We note Net Revenues will be determined by the White Paper and Offer Documents and will be submitted to the Court. Given the whole process will be under Court review all parties have a voice.

10. In relation to. 2.16 - This is incorrect.  AE will incur circa $3m USD in offer costs and the ICO requires expertise in the Blockchain arena. The ICO will remain under AE control as the risk is entirely that of AE. AE will only pay Long Tail Fees where PGMI conduct merits them and where the ICO can pay them. If AE has to rebrand the ICO or fails to raise capital sufficient to operate the ICO business. Then there is no ability to pay fees. We point out that AE also would not be enjoying Long Tail Fees in such a situation. AE cannot be placed in a situation where it has to pay PGMi for "Bad Conduct' that damages the ICO out of money that does not exist and yet not pay itself. Simply where "Bad Conduct"occurs neither party gets paid. The WHITE PAPER given to the court will outline all of these realities. The UCC is effectively asking the public to underwrite future "bad conduct" such provisions would never pass regulator scrutiny.

In relation to 8.1- In testimony on behalf of AE we covered the fact that like object licensing, once an image is used in physical or digital asset format it is normatively there in perpetuity. We note the misplaced concerns of the UCC about the License being in perpetuity. Perpetuity in this case means only for the life of the ICO and for use within the eco-system. Nothing here is different the image on a physical coin or note is there also for the life of that object. Here the life of the digital coin is the life of the ICO. Just like a paper note the image the real period is life of the object. The perpetuity construct is a false construct that does not mirror reality. In the media business intellectual property of all type is licensed regularly in the ordinary course of business in perpetuity. No one expects that means until the end of time which is the notion being advanced by the UCC. The Club License the UCC supports the assumption of in terms of Club product rights creates an identical outcome.

11. In relation to 8.1 (a) – This is incorrect. Under the signed Amendment the License is for 120 months, but if after 3 years there has been no ICO then PGMI can terminate the License if AE has not paid the full license fee of $1,000,000. AE can extend from the three year drop dead date if it pays any outstanding license fees. Such payment then adds a further seven years to return the License to 120 months. We note $1,000,000 to do a non exclusive ICO for ten years is high compared to the existing Club License which is exclusive before the yet to be negotiated long tail agreement. AE face the VICE COIN ITO and other PGMI ICO deals the Club owners do not.

12. In relation to 8.1 (b) - Previously answered above, to be clear, 90 days is justified given this is a commercial venture replete with commercial risks relating to the ability to both obtain and verify the as yet unknown underlying subject matters of the license. AE has

yet to even do due Diligence and yet the UCC want AE to pay no matter what we find to be the case. The UCC are basically saying pay us sight unseen no matter what. This is the definition of a set up. Contrast this with the UCC approval of the Club Deal where the even the deposit can be recovered as a loan and where there is no requirement for the Club Owner to proceed if he does not find what he likes or circumstances change. A sane position for the club owner is not being afforded to AE. The question remains WHY? The agenda here is plain for all to see.

13. In relation to 8.1 (d) - Disagree. AE are paying up front against industry norms. Refer to the KODAK COIN ICO in testimony where KODAK does not get $3,000,000 cash only $3,000,000 Offer coins but only if the Offer proceeds. Reference also the Vice Coin ITO where payment is conditional on offer success. Why again is the UCC insisting that AE depart from industry norms - what is the Agenda?

14. In relation to 9.1 (3) - AE is an Australian Company with an Australian domicile, it has $15,000,000 USD in escrow as proof of financial capability. In such circumstances the DIP face zero risk. We contrast AE with DreamMedia a company formed on the 14th of November that as described by counsel "acquired the" secured loan sum 14 days later. The shareholders and directors of DreamMedia media are unknown, the capitalization structure of DreamMedia is unknown. We are advised that DreamMedia acquired the loan via creative accounting which has yet to be defined and detailed to the court. The double standard here is at the very least concerning.

15. In relation to 10.2 – The court retains jurisdiction to ensure the License is being used in the manner outlined in the License and to ensure all US commercial and securities laws are being adhered to.

16. In relation 10.11 –   The choice of law post Bankruptcy will depend on the State of the ICO. Australia pre-election to do the ICO and USA once ICO is on foot. In testimony before the court the expressed intent was California to ensure adequate court oversight of the ICO process.

17. In relation 10.18 –   Unconditional. If a bad actor were to control PGMI now or in the future then they and or their officers must be held liable for any breaches of confidentiality. This is a commercial venture we will not be exposed to this type of risk in relation.

18. 10.23 Disagree We point to extensive language in all media industry agreements that impose this normatively including the UCC sanctioned Club License they agreeing to assume. AE will not be exposed to the risk that a third party, acting in good faith, takes over the underlying "subject matter(s)" of this license without notice of the AE license and without such protection. To accept such a situation is to reduce the license value to zero in the hands of a bad actor. The Media business is rife with litigation on this very issue and AE are not going to agree to be exposed to such problems more than is

necessary. In fact we note it must be a term of the license approval by the court that no one attempts to on sell or assign without notice of the AE license agreement being on foot. The Club Owners we know feel very much the same given the extensive provisions to stop such an event in the proposed agreement the UCC have advised AE they will support the court assuming. The double standard is as stated palpable.

19. In relation to 10.25 - AE are paying money for the license and must incur millions of dollars to exploit it before earning one dollar. AE have ten years to do so. If AE chooses not to then it faces market forces after two years because PGMI may do other ICO offers with third parties. UCC supported Club stipulation is exclusive but contains no such obligations for the same reasons.

20. In relation to 10.26 - The answer is the same. UCC supported Club stipulation ups the terms and in fact discounts significant future revenue streams potentially worth millions of dollars forever. We note the UCC support advances under the club license which in terms of value transfer is as stated very significant. AE has a narrow and non exclusive set of ICO rights where as the Club Licensing deal controls all club licensing for less money than AE is prepared to pay. Unlike the UCC supported club deal the court will be invited to assume. AE are at market risk from the VICE COIN ITO already on foot whereas the Club owner faces no such dilemma.

21. In relation to 10.28 - The DIP taxes are PGMIs not that of AE.  Paying tax obligations of someone else is a transfer payment and income, as in additional license fee.

22. In relation to 10.29 - The DIP has the right to fix impaired property itself, AE cannot impact that choice. However, where the DIP elects not to then AE has first choice to fix and will fix impaired property impacting the AE deal generically and or specifically. Advancing such sums and recovering them are on identical terms as the UCC approved CLUB deal before the court. The contrast is palpable. The assignee provision is a standard media industry requirement as evidenced in the Club license deal the UCC support for court approval to be assumed.

23. In relation top 10.32 - As above. The DIP can control the contract they sign with a third party. Where a third party signs the agreement then the DIP can control that parties actions for breach by way of damages and or specific performance if possible.

24. In relation 10.34 – This is Standard Revenue Share level. The example is incorrect. The DIP is under no obligation to offer the content in the first place. Where the DIP wants a different split it can do so outside the terms of the License by making another offer.  AE would have to pay 100% of all content costs to AE lenders and investors. Currently AE is obtaining $5m Slate Finance to do this> the $5,000,000 USD must be recovered. Investors take the risk on content investment and the split is normal. Conflicting the AE License investment of $1m with $5m Slate Film Financing is with respect unrelated and shows a misunderstanding of the Deal. AE would not be profiting from the License for

    the ICO under 10.34 and 10.35. AE is simply offering where and if the DIP requires it off Balance Sheet Finance to keep the content pipeline filled and current. If there is no content then PGMI output deals and licenses lapse and the core asset of the company ends eventually leaving no money for the creditors.

25. In relation 10.35 - Same – answers as in 10.34 above in relation to third party content to be purchased or licensed.  Only if DIP asks and PGMI and AE mutually agree on content price for each film and terms. This Off Balance Sheet Finance is additional to the $1,000,000 License Fee. The motivation, is as with the upfront fee being offered, is to keep the company afloat for all including  AE's ICO. AE cannot understand the UCC's motivation in objecting to protecting the creditors core asset on standard industry terms. The industry terms are the industry terms. Investors in production content that provide 100% of the cost get these types of economic interests. The UCC are asking investors in content to get lesser terms and in doing so negate the possibility anyone would even approve a deal under either 10.34 and 10.35. Why would any unsecured creditor or lender block financial resources from coming to rescue the company on commercial terms that do not require On Balance Sheet finance. PGMI every day licenses from outside interests content on a revenue share basis on similar terms. Why, now object to the very nature of that business model in the case of AE. We can only think that is because AE has money and for some agenda reasons the aim is push PGMI into default and kill off all the output deals and licenses its holds.

RESPONSE TO CREDITORS COMMITTEE AND SECURED LENDERS

The UCC Objections to the AE License stand in stark contrast to the Club License Assumption which AE is highly supportive of.

- We note the AE license is Upfront Revenue that adds to After Tax Capital.

- The terms of the AE license are known.

- Contrast this to the Club License Stipulation where the $200,000 initial payment is a Super Priority DIP loan not revenue and repayable in light of non agreement.

-  The CLUB LICENSE deal under the Stipulation is uncertain until a long form agreement exists. Until one does there is no deal certainty of the $800,000 under that prospective Club License arrangement. Indeed there is in fact no $800,000 even due until such a deal is concluded via a long form agreement. Contrast this with a certain deal as to value in the AE license.

- The AE License gives certainty as to money out of the gate, certainty as to deal terms as the agreement lists all known factors.

- AE has $15,000,000 USD in Escrow as proof of ability and intent to proceed. The AE license in the light of that action and AE enduring weeks of unneeded litigation is evidence of bonafide intent.

- AE is playing much more than the Club Owners for fewer and much more tenuous and as yet unknown rights to intellectual property that may or may not be flawed.

- AE will be promoting the PGMI brand and that will assist all parties.

- The AE license deal brings with it new younger demographic of generation Z and millennial buyers that PGMI does not enjoy and cannot tap.

- AE initial license fee is not recoverable whereas the Club Stipulation Super Priority DIP Loan is a no lose deal where the Club owner can get back his deposit over everyone - while at the same time having Carte Blanche to consummate a future deal. We applaud the commercial smarts of the club owner and support his position.  However, AE is being asked by the UCC to assume absurd financial risks for no justifiable reasons in identical circumstances. Why?

AE are the only party with proven resources on the table and at deep commercial risk.

Not even the secured lender filing assures the court that Dream Media have even one dollar at commercial risk despite the theatrical nature of the legal posturing.

Even the party claiming to the court to be the Secured Lender has not proven in fact that they are the Secured Lender at this time. Dream Media has to date not proven that it is anything more than a virtual office in Delaware and or has any financial capacity and or has even made a financial investment and or has an actual financial interests in the loan.

AE has to date endured huge transactional and financial costs to obtain a License without Dream Media providing any evidence of the foregoing.

AE are looking very carefully at this situation to assess the legal consequences should the filings before the court turn out to be other than as presented to the court.AE maintaining the real lender is Ex Works Capital and or the Limited Partners in Ex Works Capital Fund One LLP who we understand are Foreign National John DOE investors.

AE are aware of the following commercial reality in relation to PGMI LOAN first advanced by Ex Works Capital. The Loan Agreement portends to be a loan but in substance has all the indica of an equity investment. The interest rate of 18% plus 5% penalty interest could not possibly be serviced by PGMI under normal lender terms and conditions. The right to appoint Board

Members and virtually free option to buy 40% of the PGMI stock for a nominal sum point to an equity investment not a loan.

We note EXWORKS loans to HIGH TIMES and HERE MEDIA two other OREVA CAPITAL ventures take equity shares and or convertible notes for little value in terms of equity pricing. Yet create ability to appoint directors and wide equity interests through the loan document. AE points to this conduct as a serial attempt to posture equity investments and loans. The common thread is that none of the companies mentioned have the current normal EBIT interest coverage ratios needed to sustain such borrowings.

AE are aware of the following business arrangements that add substance to AE fears about the identity of the true lender and nature of the investment. The filing before the court portends that Dream Media are the Secured Lender acting as a principal in the transaction. However AE have been made aware that payments made by PGMI are still going to PGMI.

The implication is that Dream Media are a principal and EXWORKS is the former principal is a management agent - this prima facie and absurd notion

However, there is no evidence Dream Media ever paid for the loan.

If in fact Dream Media paid, the loan ledger will show that.

Yet, we have an email copy from Dream Media Counsel saying Dream Media will provide a summary not an original copy.

We suspect a note for a note deal, if that occurred to not be a real deal in substance over form argument with a company with no financial capacity or intent or ability to pay. Dream Media is merely a conduit entity and nothing more. Dream Media is also a flawed entity due to OREVA Capital Holding Company business practices.

The transaction seems to hide reality from Ex Works investors of an impaired loan as well as mass of downstream impaired loans all to the same core borrower who has the same personal guarantor.

The credibility of this transaction is close to zero. The reality is Ex Works is not as portrayed a past lender or record. Rather EX WORKS are the real undisclosed principal hiding from the court and is in operative reality a Net Lender to the web of OREVA CAPITAL business ventures and here is not as postured an arms length seller for value to their assumed by us agent OREVA CAPITAL.

Ex Works Capital we contend are the real principal who has in the last year lent millions to High Times and Here Media to salvage deals that are deep underwater.

EXHIBIT "1"

15

OREVA Capital in our view is under water and so why would Ex Works sell to Dream Media a Secured Loan for Value to a wholly owned subsidiary of OREVA CAPITAL and entity that absent evidence to the contrary is still underwater.  The answer we heard from an OREVA CAPITAL director was "creative finance".

In short we suspect that Dream Media are merely an undisclosed agent of EXWORKS and not as filed the real Principal orchestrating what is happening with CAPITAL and or others

AE has the financial and media business resources to protect the content pipeline and media expertise to even take over the distribution mechanics if called to do so. The Slate Finance access path set up under 10.34 and 10.35. open the door to $5,000,000 USD on top of the License Fee.

The UCC and Secured Lender expressed concerns of the the scope of the AE License. The License scope is a narrowly focused use of PGMI intellectual property within the scope of the ICO.

The Agreement itself contemplates PGMI having the ability to do other ICO offerings of PGMI intellectual property. The only caveat on that ability is for the first two years where PGMI gives AE a First Right of Refusal to do other ICO offerings where AE has not proceeded with the initial ICO. The reality is that if AE does not proceed after two years that PGMI has an unlimited right to do ICO Offerings.

Why AE if it did not proceed with an initial ICO would then do another one is a business reality that cannot be ignored.  AE unlike the Club Owner License Deal do not control of have the ability under the license to stop PGMI from doing as many ICO offerings as PGMI choose to do

AE have offered to the UCC to identify and confirm these resources. To date that offer has been rejected out of hand. We can only wonder why this is so.

AE intent is throw a life line to protect if needed the core business asset of PGMI being the digital business output and licensing deals that bring in cash flow.

No other party in the form of the secured lender claimants, the UCC or Club Owner enjoys such ability or capacity to perform either financially or practically these tasks.

Again the AE Offer to provide proof of such capability has been rejected out of hand by the UCC. AE questions why parties in interest would not even look at ways to save the core collateral and to protect all creditors and stockholder interests. AE believe there is something else in play.

AE find it very strange that every door to give PGMI money by AE on better than normal commercial terms is being thwarted. While every door on adverse non commercial terms is being opened.

AE understand the ICO world is new. AE appreciate legal counsel for the UCC rightly fears for his creditors something that is a creature of the new media and Fin Tech finance world.

AE are happy to do anything to educate the UCC on the any aspects of the license deal and on AE ability to complete the deal either financially or intellectually.

AE remain open to proving to UCC that AE enjoy the media skill sets, finance and practical distribution resources to protect core PGMI assets if needed. AE has no Agenda to do so, AE simply have self interest in protecting the Brand.

In this respect our motivation is identical to the Club Owner who like AE reasonably fears millions of dollars of his assets are highly vulnerable to what happens next to the PGMI business and brand.

**TIMOTHY DRIVER in support of**
**Androcles Entertainment Pty Ltd**
**19 February 2018**