Michael H. Weiss (State Bar Number 107481)
mw@weissandspees.com
Laura J. Meltzer (State Bar Number 151889)
lm@weissandspees.com
WEISS & SPEES, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067-2701
Telephone: 424-245-3100
Facsimile: 424-217-4160

[Proposed] Attorneys for Debtors and Debtors in Possession
Penthouse Global Media, Inc. et al.

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| IN RE<br><br>PENTHOUSE GLOBAL MEDIA, INC., a Delaware corporation<br><br>Debtor. | Case No. 1:18-bk-10098-MB<br><br>Chapter 11<br>Jointly Administered With:<br><br>Case No. 1:18-bk-10099-MB, Case No. 1:18-bk-10101-MB, Case No. 1:18-bk-10102-MB, Case No. 1:18-bk-10103-MB, Case No. 1:18-bk-10104-MB, Case No. 1:18-bk-10105-MB, Case No. 1:18-bk-10106-MB, Case No. 1:18-bk-10107-MB, Case No. 1:18-bk-10108-MB, Case No. 1:18-bk-10109-MB, Case No. 1:18-bk-10110-MB, Case No. 1:18-bk-10111-MB, Case No. 1:18-bk-10112-MB and Case No. 1:18-bk-10113-MB |
| In re:<br>Penthouse Global Broadcasting, Inc., Penthouse Global Licensing, Inc., Penthouse Global Digital, Inc., Penthouse Global Publishing, Inc. GMI Online Ventures, Ltd., Penthouse Digital Media Productions, Inc., Tan Door Media, Inc. Penthouse Images Acquisitions, Ltd., Pure Entertainment Telecommunications, Inc., XVHUB Group, Inc., General Media Communications, Inc., General Media Entertainment, Inc., Danni Ashe, Inc. Streamray Studios, Inc.,<br><br>[X] Affects All Debtors<br>□ Affects:<br>□ Affects<br>□ Affects<br>□ Affects<br>□ See attached for additional Debtors | **MOTION TO APPROVE POST-PETITION FINANCING AND TO ASSUME EXECUTORY CONTRACT**<br><br>Hearing:<br>Date:      February 27, 2018<br>Time:      10:00 a.m.<br>Place:     Room 303<br>            21041 Burbank Blvd.<br>            Woodland Hills, CA |

TO THE HONORABLE MARTIN BARASH; THE OFFICE OF THE UNITED STATES TRUSTEE; THE TWENTY LARGEST UNSECURED CREDITORS OF THE ABOVE-CAPTIONED DEBTOR; THE SECURED CREDITOR OF THE ABOVE-CAPTIONED DEBTORS; AND OTHER PARTIES ENTITLED TO NOTICE:

PLEASE TAKE NOTICE that at the time and place noted above and pursuant to Local Bankruptcy Rule 9075-1, 11 U.S.C. §§ 364 & 365, and Rule 9014 of the Federal Rules of Bankruptcy Procedure and at the time and place noted above, Penthouse Global Licensing, Inc., Penthouse Global Media, Inc., Penthouse Global Broadcasting, Inc., Penthouse Global Digital, Inc., Penthouse Global Publishing, Inc., GMI Online Ventures, Ltd., Penthouse Digital Media Productions, Inc., Tan Door Media, Inc., Penthouse Images Acquisitions, Ltd., Pure Entertainment Telecommunications, Inc., XVHUB Group, Inc., General Media Communications, Inc., General Media Entertainment, Inc., Danni Ashe, Inc., and Streamray Studios, Inc. (each a "Debtor" and collectively, "Debtors"), hereby moves this Court by this emergency motion (the "Motion") for an order approving;

1. Debtors borrowing $200,000 under that certain DIP Loan Agreement(the "DIP Loan"), attached hereto as Exhibit "A", between Debtors, as borrowers, and Penthouse Clubs Worldwide, LLC, a Delaware limited liability company ("Lender") pursuant to section 364 of the Bankruptcy Code; and

2. The assumption by Debtor Penthouse Global Licensing Inc. ("Licensor") of that certain Master License Agreement ("MLA") by and between, and Kirkendoll Management, LLC, a California limited liability company and Penthouse Clubs Worldwide, a Delaware limited liability Company (collectively, "Licensee") pursuant to section 365 of the Bankruptcy Code.  A copy of the License Agreement is attached as Exhibit "B" hereto.

This motion is based upon the papers and pleading on file with this Court, the attached exhibits, the points and authorities discussed below, the accompanying declaration of Kelly Holland and Keith Whitworth, and any evidence or argument of counsel presented at the hearing on the Motion.

The Dip Loan will provide $200,000 of working capital to Debtor over the next four weeks and allow Debtor to complete its sale of the trademarks that are the subject of the MLA (the "MLA Marks")

for an additional $600,000.  The outstanding balance of the DIP loan will be a credit for the sale of the MLA marks to Licensee.  Once the sale of the MLA Marks is completed, Debtors will be able to propose a plan of reorganization.

The MLA Marks and the MLA are the only assets of the Debtor, not encumbered by the pre-petition lien of Dream Media Corporation ("DMC").  As such, the proceeds from the loan and the contemplated sale of the MLA Marks will allow Debtors the time to propose a plan of reorganization.

**A.    Compliance with Fed. R. Bankr. Pro 4001(c).**

Debtors submit that they have complied with Rule 4001(c) as follows:

1.    A copy of the DIP Loan Agreement is attached as Exhibit "A".

2.    A copy of the proposed order approving the financing and the assumption of the MLA is attached as Exhibit "C".

3.    The DIP Loan Agreement at § 2(e) provides for a priority under section 364(c)(1) of the Bankruptcy Code over all administrative expenses.

4.    The DIP Loan Agreement at § 2(f) provides for a grant of a lien on the MLA under section 364 (d) of the Bankruptcy Code;

5.    The only party having an interest in the MLA is the Licensee, and the Licensee has consented to the granting of lien in the MLA under § 2(f) of the DIP Loan Agreement.  As such, there is no need for any adequate protection.

6.    DMC does not have lien in the MLA; and therefore does not need any adequate protection in connection with the DIP Loan Agreement.  On or about March 29, 2017, the Licensee, the Debtors and DMC's predecessor in interest ExWorks Capital Fund I, Ltd. ("ExWorks") entered into an agreement styled; Consent and Second Amendment to Loan and Security Agreement (the "ExWorks Consent") which is attached as Exhibit "E".

7.    The ExWorks' Consent at § 4(a) specifically provides that the lien of ExWorks (and thus DMC, as its assignee) in the property of the Debtors is excluded from that lien, as follows:

"Excluded Property" means each of the following: (i) any permit, lease, license, contract or other agreement (or any equipment owned by any Loan Party Obligor that is subject to a purchase money Lien or a Capitalized Lease that is permitted pursuant to this Agreement) to which any Loan Party Obligor is a party, which permit, lease, license, contract or other agreement (and in the case of any such equipment, the contract or other

3

agreement in which the purchase money Lien is granted or the applicable Capitalized Lease) prohibits the creation by such Loan Party Obligor of a Lien thereon, but only, in each case, to the extent, and for so long as, such prohibition is not removed, terminated or rendered unenforceable or otherwise deemed ineffective by the VCC (including Sections 9-406, 9-407, 9-408 or 9-409 thereof) or any other applicable law and with respect to any such equipment, for so long as the Indebtedness secured by the applicable Lien or the applicable Capitalized Lease has not been repaid in full, (ii) any intent-to-use trademark or service mark application if granting such Lien or the exercise of Lender's remedies under the Loan Documents would result in an assignment of such application to Lender that would be deemed to invalidate, void, cancel or abandon such application; provided, that the foregoing exclusion shall in no way be construed to include an amendment to allege use or statement of use; (iii) any voting stock (within the meaning of Treasury Regulations § 1.956-2(c)(2» in excess of 65% of the outstanding voting stock of any Subsidiary or Disregarded Domestic Subsidiary which, pursuant to the terms of this of this Agreement, is not required to guaranty the Obligations; and (iv) Excluded Trademarks, but only to the extent that and for so long the License Agreement prohibits a Lien thereon, and only for so Ion , such prohibition is not removed, terminated or otherwise rendered inoperative. For the avoidance of doubt, any and all proceeds, products, substitutions or replacements of any property described in clauses (i), (ii) and (iii) above shall not constitute Excluded Property (unless such proceeds, products, substitutions or replacements would itself constitute property described in clauses (i), (Ii) or (iii) above).

8.     Given this exclusion there is no need to provide DMC with any adequate protection. Indeed, the proceeds of the DIP Loan will provide Debtors with the liquidity to insure that DMC's cash collateral is not dissipated.  See Whitworth Decl. at ¶¶ 3-10, Ex. "D".

9.     The DIP Loan Agreement does not provide for any determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim.

10.     The DIP Loan Agreement at § 2(h) provides for the following modification of Code provisions or applicable rules relating to the automatic stay to allow Lender to enforce its rights in the event of a default and to perfect any rights conferred under the DIP Loan Agreement;

11.     The DIP Loan Agreement does not provide for a waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under §363(c), or request authority to obtain credit under section 364 of the Bankruptcy Code;

12.     The DIP Loan Agreement the does provide for the establishment of deadlines for filing a

plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order. However, it does provide deadlines for the Debtors to seek and obtain approval of a sale of the MLA Marks to Lender or Licensee as may be the case.

13.   The DIP Loan Agreement has no waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien.

14.   The DIP Loan Agreement has no release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action.

15.   The DIP Loan Agreement provides for no additional duty to indemnify any entity, except those already provided in the MLA.

16.   The DIP Loan Agreement provides for no release, waiver, or limitation of any right under section 506(c) of the Bankruptcy Code.

17.   The DIP Loan Agreement does not grant a lien on any claim or cause of action arising under sections 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a) of the Bankruptcy Code.

**B.    Need for Emergency Interim Relief**

Fed. R. Bankr. Pro. 4001(c)(2) permits a court to approve on an interim basis a debtor's request for authorization to use cash collateral during the 14-day period following the filing of a motion seeking such authorization, "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2); see also Local Bankr. R. 4001-2(e) ("The court may grant interim relief to prevent immediate and irreparable harm to the estate pending a final hearing."). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. See *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) (deferring to the debtor's business judgment as to necessary financing); see also *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19-20 (9th Cir. BAP 1987).

Here, emergency relief is needed to allow the Debtors the 30 days window to complete the sale of

the MLA Marks.

**C.**    **Assumption of the MLA is a reasonable exercise of Debtor's business judgment.**

The DIP Loan Agreement § 4(b)(iv) requires assumption of MLA.  The assumption or rejection of executory contracts such as the MLA is done pursuant to section 365 of the Bankruptcy Code pursuant to the business judgment standard.  E.g., *In re S. Cal. Sound Sys., Inc.*, 69 B.R. 893, 896 (Bankr. S.D. Cal. 1987) ("The decision to assume or reject is committed to the Debtors' sound business judgment. does not set forth the criteria that should be utilized to determine whether rejection of an executory contract is appropriate.  Most courts have allowed the trustees to exercise their business judgment in determining which contracts to assume or reject.  *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul and Pacific R.R. Co.*, 318 U.S. 523, 550, 63 S. Ct. 727, 87 L. Ed. 959 (1943); *In re Huang*, 23 B.R. 798, 800-801 (BAP 9th Cir. 1982) ... ")

The Licensee is not in default.  Under the MLA, the Licensee has obligations to pay certain license fees in the future:

    a.   A renewal fee of $300,000 payable on or about March 29, 2027; and

    b.   10% of license fees that Licensee receives from any new club licenses.

The amount of these fees are uncertain.  Indeed, none of them may ever be paid because there is no requirement that the Licensee enter into new club licenses or renew the MLA.  To date, in the first year of operation , the licensee has opened no new clubs.  Holland Decl. ¶ 4.  Debtor's estimate of the fees to be received over the remaining 9-year term of the MLA is that fees are likely to be less than $1,000,000.  Id. at ¶ 4.  The DIP Loan does not affect Debtors' rights to any payments under the MLA.  However, payment of $200,000 under the DIP Loan as an advance payment against $800,000 proposed purchase is eminently reasonable.

///

///

///

///

**D.**        **Conclusion**

For the reasons set forth above, the Debtors request that the Court enters orders approving the

DIP loan and the assumption of the MLA.

Dated:  February 23, 2018                            WEISS & SPEES, LLP
                                                     /s/ *Michael H. Weiss*
                                                     Michael H. Weiss
                                                     Attorneys for Debtors and Debtors in Possession
                                                     Penthouse Global Media, Inc. et al.

1

## DECLARATION OF KELLY HOLLAND

2    I, KELLY HOLLAND, declare as follows:

3    1.    I am the Chief Executive Officer of debtor and debtor in possession Penthouse

4    Global Media, Inc. [Case No. 1:18-bk-10098]("Debtor").  I have personal knowledge of the facts

5    set forth herein and would competently testify thereto.  This declaration is made in support of

6    Debtor's Motion To Approve Post-Petition Financing With Penthouse Clubs Worldwide And To

7    Assume Executory Contract With Kirkendoll Management, LLC And Penthouse Clubs

8    Worldwide, Inc.

9    2.    Attached as Exhibit "A" is that certain DIP Loan Agreement (the "DIP Loan"), by

10    and between Debtors, as borrowers, and Penthouse Clubs Worldwide, LLC, a Delaware limited

11    liability company ("Lender").

12    3.    Attached as Exhibit "B" is that certain Master License Agreement ("MLA") by

13    and between by and between, and Kirkendoll Management, LLC, a California limited liability

14    company and Penthouse Clubs Worldwide, a Delaware limited liability Company (collectively,

15    "Licensee").

16    4.    The Licensee is not in default.  Under the MLA, the Licensee has obligations to

17    pay certain license fees in the future:

18        a.    A renewal fee of $300,000 payable on or about March 29, 2027; and

19        b.    10% of license fees that Licensee receives from any new club licenses.

20    The amount of these fees that will be received is uncertain.  None of them may ever be paid

21    because there is no requirement that the Licensee enter into new club licenses or renew the MLA.

22    To date, in the first year of operation, the Licensee has opened no new clubs.  I estimate the fees

23    payable to be received over the remaining 9-year term of the MLA are likely to be less than

24    $1,000,000.

25    ///

26    ///

27    ///

28    ///

WEISS & SPEES, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067-2701
Tel: (424) 245-3100

- 2 -

1

2          I declare under penalty of perjury under the laws of the United States that the foregoing is

3   true and correct and that this declaration was executed on this 28th day of January 2018 at

4   Chatsworth, California.

5                                                          KELLY HOLLAND

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WEISS & SPEES, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067-2701
Tel: (424) 245-3100

- 3 -

**DECLARATION OF KEITH WHITWORTH**

I, KEITH WHITWORTH, declare as follows:

1.    I am an individual and the Chief Financial Officer of Penthouse Global Media, Inc. and related companies (the "Debtors").  I have personal knowledge of the facts set forth below and would competently testify thereto.  This declaration is made in support of Debtor's Motion To Approve Post-Petition Financing With Penthouse Clubs Worldwide And To Assume Executory Contract With Kirkendoll Management, LLC And Penthouse Clubs Worldwide, Inc.

2.    As Chief Financial Officer, I am familiar with the books and records of Debtors and its subsidiaries.  I know these books and records are kept in the ordinary course of Debtor's business by its employees in the ordinary course and scope of their duties and that they record the transactions reflected in those books and records at or about the time of the transaction.

3.    Based on Debtor's books and records I prepared a projected "cash flow" i.e., projected sources of and uses of cash for the next sixty days.  That projection is attached as Exhibit "D".  This is not an accrual based projection.

4.    Except for payroll, which is funded on Thursday, the attached projections assume that all bills are paid on Friday and all receipts for the preceding week are received by Thursday, except for the payments made by the Penthouse Worldwide under its DIP Loan and its proposed purchase of the Debtor's club license.

5.    My staff reviewed, reformatted and restated the projections and compilations used to make projections previously submitted to the Court.  Before incorporating any projected income or payment in the attached projections, I reviewed the underlying detail such as invoices and payment history for each entry.

6.    No unsigned contracts have been incorporated into the projections.

7.    The following insider compensation is included in the projections:

a.    Kelly Holland -- $0.00

b.    Keith Whitworth -- $6,667 per month

c.    Catherine Brandt-- $10,000 per month, a temporary reduction of $5,000 per month

WEISS & SPEES, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067-2701
Tel: (424) 245-3100

- 4 -

8.     No sums are shown for professionals because I understand that such fees will not be payable until May.

9.     US Trustee fees are included as being payable on April 15, 2018.

10.    The projections for the first three weeks reflect payments of all accrued unpaid post-petition obligations incurred in the ordinary course of business but for which Dream Media Corporation has refused consent to their payment.

I declare under of penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on this 23rd day of February, 2018 at Chatsworth, California.

KEITH WHITWORTH

WEISS & SPIES, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067-2701
Tel: (424) 245-3100

# Exhibit A

## DIP CREDIT AGREEMENT

This **DIP CREDIT AGREEMENT** (this "Agreement"), dated as of February 23, 2018, is entered into by and between Penthouse Global Licensing, Inc., Penthouse Global Media, Inc., Penthouse Global Broadcasting, Inc., Penthouse Global Digital, Inc., Penthouse Global Publishing, Inc., GMI Online Ventures, Ltd., Penthouse Digital Media Productions, Inc., Tan Door Media, Inc., Penthouse Images Acquisitions, Ltd., Pure Entertainment Telecommunications, Inc., XVHUB Group, Inc., General Media Communications, Inc., General Media Entertainment, Inc., Danni Ashe, Inc., and Streamray Studios, Inc. (each a "Borrower" and collectively, "Borrowers"), each as a debtor-in-possession in the below-referenced Chapter 11 Case, and Penthouse Clubs Worldwide, LLC, a Delaware limited liability company ("Lender").

## W I T N E S S E T H:

**WHEREAS**, on January 11, 2018 (the "Petition Date"), Borrowers commenced those certain Chapter 11 bankruptcy cases that are being jointly administered as Case No. 18-10098 (collectively, the "Chapter 11 Case") by filing voluntary petitions for reorganization under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"). Borrowers continue to operate their business and manage their property as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, Borrowers have requested that Lender provide a loan to Borrowers in an aggregate principal amount of Two Hundred Thousand Dollars ($200,000.00), pursuant to Section 364(c)(1), (c)(2), (c)(3) and (d) of the Bankruptcy Code for such purposes as are hereinafter described in this Agreement (the "Loan");

**WHEREAS**, one of the Borrowers, PGLI (as hereinafter defined), and Lender are parties to that certain Master License Agreement dated March 29, 2017, a copy of which is attached hereto as Exhibit B (the "License Agreement"), whereby (among other things) Lender acquired an exclusive, transferable, sublicensable, unlimited license, free and clear of all Liens (as defined in the License Agreement), to use, sublicense, franchise (and subfranchise), and otherwise monetize, exploit and commercialize the Collateral (as defined and further described herein and that is identified on Exhibit A attached hereto);

**WHEREAS,** in connection with the consummation of the transactions contemplated by the License Agreement, ExWorks Capital Fund I, L.P. (as predecessor in interest to certain secured debt of Borrowers currently owned by Dream Media Corporation, "ExWorks") agreed to exclude, and did so exclude from its collateral, the Collateral described hereunder by entering into that certain Consent and Second Amendment to Loan and Security Agreement, dated March 29, 2017, (the "Second Amendment") whereby ExWorks agreed, inter alia, to amend the definitions of "Excluded Property" and "Permitted Liens" as such terms are used in that certain Loan Agreement and Security Agreement, dated as of February 19, 2016 (as amended from time to time, the "Loan Agreement"), the effect and intent being to carve out from the ExWorks's security interests under the Loan Agreement, the Collateral identified hereunder;

**WHEREAS**, Dream Media Corporation filed true and correct copies of (i) the Loan Agreement as Exhibit C [Docket No. 62 at 16-79 of 214] and (ii) the Second Amendment as Exhibit E [Docket No. 62 at 95-188 of 241] to the Declaration of Robert Richardson in Support of Dream Media Corporation's Motion for Relief from the Automatic Stay under 11 U.S.C. § 362 (Personal Property) [Docket No. 62] (the "Richardson Declaration") together with an affidavit by Mr. Richardson, Senior Portfolio Manager of ExWorks, swearing to the authenticity of the Second Amendment and Loan Agreement in the Chapter 11 Case;[1]

**WHEREAS**, to provide security for, and to assure the repayment of the Obligations (as hereinafter defined), Borrowers have agreed (A) to provide to Lender Liens (as hereinafter defined) upon the Collateral (as hereinafter defined) as set forth herein and in accordance with Section 364(c)(1), (c)(2), (c)(3) and (d) of the Bankruptcy Code and the other Loan Documents and (B) to assume the License Agreement (as provided hereunder) pursuant to Section 365(a) of the Bankruptcy Code;

**WHEREAS,** Borrowers intend to file a motion seeking a Sale Order from the Bankruptcy Court, on an expedited basis, pursuant to Section 363(b) of the Bankruptcy Code authorizing a private sale by Borrowers of the Collateral to Lender for the sum of Eight Hundred Thousand Dollars ($800,000.00), inclusive of a credit for the amounts due under this Agreement;

**WHEREAS,** in connection with seeking approval of the sale of the Collateral to Lender, Borrowers also intend to seek approval of entry by Borrowers into an exclusive license agreement of certain trademarks and copyrights that are not Collateral (as defined hereunder) that Lender currently has the right to use under the License Agreement in connection with Lender's use of the Collateral in the scope of Lender's business, such exclusive license agreement being necessary to avoid future litigation or contestment by third parties of the validity, enforceability or use by Lender of the Collateral or such other trademarks and copyrights that are not Collateral (*e.g.*, litigation based on theories of trademark confusion or other theories of law or equity);

**WHEREAS,** Borrowers intend to utilize the total proceeds from the Loan and the sale of the Collateral—a cumulative amount of Eight Hundred Thousand Dollars ($800,000.00)—to effectuate a reorganization pursuant to Chapter 11 of the Bankruptcy Code;

**WHEREAS,** the Official Committee of Unsecured Creditors (the "Committee") has indicated that it intends to support, in principle, the Bankruptcy Court's approval of this Loan (according to the terms set forth hereunder) and of the expedited sale of the Collateral to the Lender for a cumulative amount of Eight Hundred Thousand Dollars ($800,000.00), but without, in any way, limiting the Committee's right to object or otherwise respond to the specific terms of any sale of the Collateral; and

---

[1] The carve out of the Collateral can be found at Docket No. 62 at 40-21 of 214 (grant of collateral to ExWorks in the Loan Agreement; "Notwithstanding the foregoing, the grant of security set forth in this Section 5.1 shall not include any Excluded Property"), at 97 of 214 (amending the definition of "Excluded Property" to include the Collateral described herein).

**WHEREAS**, Lender is willing to make the Loan to Borrowers, subject to the terms and conditions set forth in the Agreement.

**NOW, THEREFORE,** in consideration of the foregoing recitals, and of the mutual covenants, conditions and provisions hereinafter set forth, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lender and Borrowers hereby agree as follows:

1.    <u>Definitions</u>.    As used in this Agreement, and in addition to terms defined elsewhere herein, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"<u>Amended License Agreement</u>" shall mean a mutually-agreed to amendment to and restatement of the License Agreement providing for, among other things, an exclusive license of certain trademarks and copyrights that are not Collateral (as defined hereunder) that Lender currently has the right to use under the License Agreement in connection with Lender's use of the Collateral in the scope of Lender's business, such exclusive license agreement being necessary to avoid future litigation or contestment by third parties of the validity, enforceability or use by Lender of the Collateral or such other trademarks and copyrights that are not Collateral (*e.g.*, litigation based on theories of trademark confusion or other theories of law or equity).

"<u>Budget</u>" means the monthly budget delivered to Lender by Borrowers pursuant to <u>Section 2(k)</u>.

"<u>Business Day</u>" shall mean any day other than a Saturday, Sunday or a public or bank holiday or the equivalent for banks generally under the laws of state of California.

"<u>Collateral</u>" means the marks and trademarks and related property identified on <u>Exhibit A</u> attached hereto.

"<u>Cure Amounts</u>" means all (a) cure costs required to be paid and all defaults required to be cured as a condition to assumption and assignment of any contracts pursuant to Section 365 of Bankruptcy Code and (b) all contingent, unliquidated or unmatured liabilities under such contracts or under any subcontracts related thereto arising prior to the date hereof.

"<u>Default Rate</u>" means a fixed rate of eight and one half percent (8.5%) per annum.

"<u>Final Order</u>" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to Lender (including such additional provisions not present in the Interim Order as Lender shall require), and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied (unless Lender waives such requirement), together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes Borrowers to obtain credit, incur (or guarantee) debt, and grants Liens under this Agreement and provides for the super priority of

Lender's claim with respect to amounts borrowed hereunder, subject to the Permitted Liens and fees of the US Trustee and Clerk of the Court.

"Financing Order" means, the Interim Order or the Final Order, whichever is in effect at the time of any determination hereunder, and "Financing Orders" means the Interim Order and the Final Order, collectively.

"Governmental Authority" means any nation or government, any state, city, province or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Interest Rate" shall mean a fixed rate of six and one half percent (6.5%) per annum.

"Interim Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extension, modifications, and amendments thereto, in form and substance satisfactory to Lender, which, among other matters but not by way of limitation, authorizes, on an interim basis, Borrowers to execute and perform under the terms of this Agreement and grants Liens under this Agreement and provides for the super priority state of Lender's claim with respect to amounts borrowed hereunder, subject to the Permitted Liens and fees of the US Trustee and Clerk of the Court.

"License Agreement" shall have the meaning ascribed to such term in the Recitals hereof.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever.

"Loan" shall have the meaning ascribed to such term in the Recitals hereof.

"Loan Documents" means this Agreement, the Note and any agreements, documents or filings that Lender reasonably may request to perfect or continue to perfect Lender's Liens on the Collateral and any other agreement entered into, now or in the future, in connection with this Agreement.

"Material Budget Deviation" means a deviation in actual cash disbursements with respect to any category identified in the Budget, as "Payroll including Taxes", "Professional Fees: Media", "Professional Fees: Broadcast", "Professional Fees: Publishing", "Insurance", "Broadcast COG", "Publishing COG", "Digital COG", " in each case exceeding one hundred fifteen percent (115%) of the amount projected in the Budget during any period stated in the Budget prior to the Maturity Date.

"Maturity Date" means the earliest of (a) May 5, 2018, (b) the Sale Date, and (c) the date of acceleration of the Obligations of Borrower hereunder pursuant to Section 6.

"<u>Note</u>" shall have the meaning ascribed to such term in <u>Section 2(b)</u> hereof.

"<u>Obligations</u>" means all unpaid principal of and accrued and unpaid interest on the Loan and all other expenses, reimbursements, indemnities and other obligations of Borrowers to Lender hereunder.

"<u>Permitted Liens</u>" means those certain Liens described on Schedule II.

"<u>Person</u>" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or Governmental Authority.

"<u>PGLI</u>" means Penthouse Global Licensing, Inc., a Delaware limited liability company.

"<u>Property</u>" means any kind of property or asset and any interest therein, whether real, personal or mixed, tangible or intangible.

"<u>PTO</u>" means the United States Patent and Trademark Office.

"<u>Sale Agreement</u>" shall mean a mutually-agreed to sale and purchase agreement between Borrowers and Lender consummating a private sale by Borrowers of the Collateral to Lender pursuant to Section 363(b) of the Bankruptcy Code for the sum of Eight Hundred Thousand Dollars ($800,000.00), inclusive of a credit for the amounts due under this Agreement.

"<u>Sale Date</u>" means the effective date of the sale of the Collateral to Lender pursuant to Section 363 of the Bankruptcy Code and approved by the Sale Order.

"<u>Sale Order</u>" means the order of the Bankruptcy Court approving (i) the sale of the Collateral to Lender pursuant to Section 363 of the Bankruptcy Code according to the terms of the Sale Agreement and (ii) entry by Borrowers into the Amended License Agreement.

"<u>Superpriority Claims</u>" shall have the meaning ascribed to such term in <u>Section 2(e)</u>.

2.    <u>The Loan</u>.

(a)    <u>Loan</u>. On the basis of the representations, warranties and covenants of Borrowers contained herein and subject to the terms and conditions set forth herein and in the other Loan Documents, Lender agrees to lend to Borrowers the Loan, the proceeds of which will be used, in accordance with the Budget, to (a) fund the costs of operating the Borrowers' ongoing business, (b) pay professional fees for purposes of (i) selling some or all of the Borrowers' assets in one or more sales conducted pursuant to Section 363 of the Bankruptcy Code, including, but not limited to the sale of the Collateral to the Lender, (ii) effectuating a plan of reorganization under Chapter 11 of the Bankruptcy Code, and (iii) such other uses that Lender may reasonably agree to in writing; <u>provided</u> that, Borrowers shall be entitled to use the

proceeds from the Loan in a manner that deviates from the Budget so long as such use does not constitute a Material Budget Deviation; provided further that, neither the Loan nor any proceeds therefrom shall be used for any of the Prohibited Uses (as hereinafter defined). Provided that all conditions precedent set forth in Section 4(b) hereof have been met, the Loan proceeds shall be advanced in full by Lender to Borrowers within three (3) Business Days upon the Bankruptcy Court's entry of the Interim Order in form and substance satisfactory to Lender and shall be used by Borrowers for the purposes and pursuant to the terms and conditions of this Agreement. Borrowers may not repay and reborrow amounts advanced hereunder.

(b)     Note.     The Loan made by Lender to Borrowers hereunder shall be evidenced by the promissory note of Borrowers, substantially in the form of Exhibit C attached hereto and made a part hereof, with appropriate insertions, payable to the order of Lender and in a principal amount of Two Hundred Thousand Dollars ($200,000.00) (as amended, endorsed, renewed, extended, or otherwise modified from time to time, the "Note").

(c)     Limitation on Use of Loan Proceeds.     Notwithstanding anything herein to the contrary, no Loan proceeds may be used to (collectively, such uses being the "Prohibited Uses") (i) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under this Agreement, the Liens or claims granted to Lender under the Financing Orders or this Agreement, (ii) assert any action for preferences, fraudulent conveyances, other avoidance power claims, subordination or any other any claims, counterclaims or causes of action, objections, contests or defenses against Lender or its affiliates or their respective agents, affiliates, representatives, attorneys or advisors, (iii) prevent, hinder or otherwise delay Lender's enforcement or realization on its Collateral in accordance with the Loan Documents or Financing Orders, (iv) seek to modify any of the rights granted to Lender under the Loan Documents or the Financing Orders, (v) pay any Cure Amounts, (vi) pay any expenses not in the ordinary course of the business and in the lines of Borrowers' business that is unprofitable or (vii) pay or fund any retainer or similar amount to any professional, finder, broker or banker, in each of the foregoing cases without Lender's prior written consent.

(d)     Interest.     The Loan shall bear interest from the respective date of borrowing until the date of repayment by maturity, acceleration or otherwise. Interest shall accrue on the principal balance of the Loan outstanding hereunder at the per annum rate equal to the Interest Rate. Borrowers shall pay all accrued and unpaid interest in cash on the Loan in arrears on the Maturity Date; provided, however, that, and not withstanding anything to the contrary, Borrowers shall not be liable for any interest upon title of the Collateral transferring to the Lender in connection with a sale of the Collateral to Lender in accordance with the Sale Order.  FOR THE AVOIDANCE OF DOUBT, IN NO EVENT SHALL BORROWERS BE REQUIRED TO PAY ANY FORM OF INTEREST (EITHER AT THE INTEREST RATE OR AT THE DEFAULT RATE) TO LENDER UPON SALE OF THE COLLATERAL AND THE TRANSFER OF TITLE TO THE COLLATERAL TO

THE LENDER IN ACCORDANCE WITH THE SALE ORDER PROVIDED THAT TITLE TO THE COLLATERAL IS TRANSFERRED TO LENDER NO LATER THAN THE MATURITY DATE.  If the Borrowers fail to repay or otherwise satisfy all of the Obligations in accordance with this Agreement on the Maturity Date, then interest shall accrue on the unpaid balance of the Obligations at the Default Rate.  In no event shall the interest rate under this Section 2(d) exceed the maximum rate permitted under applicable law.

(e)    Superpriority Claims.  Pursuant to Section 364(c)(1) of the Bankruptcy Code, all of the Obligations shall constitute allowed superpriority claims within the meaning of the Bankruptcy Code against each Borrower with priority over any and all administrative expenses, including any diminution claim or adequate protection obligation, and all other claims against each Borrower, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 364(c)(i), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, 1114 or any other provision of the Bankruptcy Code (the "Superpriority Claims"), whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre-petition and post-petition Property of each Borrower and all proceeds thereof, subject only to the payment of the Bankruptcy Expenses to the extent specifically provided for herein.

(f)    Lender's Liens.  Borrowers own the Collateral, free and clear of all Liens, and hereby grants to Lender a security interest and continuing Liens on all right, title, and interest of each Borrower in and to the Collateral, which shall be effective and perfected upon the date the Bankruptcy Court so orders, in order to secure prompt repayment of the Obligations and in order to secure prompt performance by each Borrower of each of its covenants and duties under the Loan Documents.  For avoidance of doubt, the Liens granted in this Agreement are in addition to any Liens Lender may have against any assets of any Borrower and shall not be deemed to replace or otherwise relinquish any such existing Lien.

(g)    Delivery of Additional Documentation Required.  At any time upon the request of Lender, each Borrower shall, execute and deliver to Lender all financing statements, trademark filings, copyright filings, collateral assignments, continuation financing statements, security agreements, pledges, assignments, mortgages, applications for title, affidavits, reports, notices, letters of authority, and all other documents, including any documents for filing with the PTO or any applicable foreign, federal or state office, that Lender reasonably may request, in form satisfactory to Lender, to perfect and continue the perfection of Lender's Liens on the Collateral or to give notice of perfection of Lender's Liens on the Collateral, and in order to consummate fully all of the transactions contemplated hereby or under the other Loan Documents or the Financing Orders.  Borrower may record this Agreement, an abstract thereof, or any other document describing Lender's interest in

the Collateral with the PTO, at the expense of the Borrowers.  In addition, each Borrower authorizes Lender to file financing statements describing the Collateral in any Uniform Commercial Code filing office deemed appropriate by Lender.  If Borrowers shall at any time hold or acquire a commercial tort claim arising with respect to the Collateral, Borrowers shall immediately notify Lender in a writing signed by Borrowers of the brief details thereof and grant to Lender in such a writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to Lender.

(h)    Perfection of Lender's Liens.    Lender's Liens shall be effective and considered perfected upon the date of the Interim Order.  Notwithstanding Section 362(a) of the Bankruptcy Code, the Interim Order shall authorize, but not require, Lender to execute, file or record or cause any Borrower to execute, file or record, as appropriate, any financing statements, trademark filings, copyright filings, collateral assignments, continuation financing statements, security agreements, pledges, assignments, mortgages, applications for title, affidavits, reports, notices, letters of authority, and any other documents, including any documents for filing with the PTO or any applicable state office, that Lender may reasonably request to perfect and continue the perfection of Lender's Liens or take any other action in order to validate and perfect Lender's Liens.  Whether or not Lender shall, in its sole discretion, choose to file any such instruments or otherwise confirm perfection of Lender's Liens, Lender's Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of the Interim Order.   Upon the request of Lender, each Borrower shall execute, deliver, file and record such instruments to enable Lender to further validate, perfect, preserve and enforce Lender's Liens.  A certified copy of the Interim Order may, in the discretion of Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such instruments, and all filing offices are hereby authorized to accept such certified copy of the Interim Order for filing and recording.

(i)    Preservation of Rights Granted Under the Financing Orders.    The Financing Orders shall contain terms and conditions acceptable to Lender, including but not limited to the following:

(i)    No claim or Lien having a priority superior to or pari passu with those granted to Lender shall be granted or allowed while any portion of the Loan (or any refinancing thereof) or the commitments thereunder or the Obligations remain outstanding, whether under Section 364(d) of the Bankruptcy Code or otherwise.

(ii)    Unless all Obligations shall have been paid in full in cash or otherwise satisfied in accordance with this Agreement and this Agreement shall have been terminated, no Borrower shall seek, and it shall constitute an Event of Default (in addition to any

other Event of Default contained in the Loan Documents) if any Borrower seeks, or if there is entered, (A) any modifications or extensions of the Financing Orders without the prior written consent of Lender, and no such consent shall be implied by any other action, inaction or acquiescence by Lender, or (B) an order dismissing the Chapter 11 Case.

(iii)    Except as expressly provided in the Financing Orders or in this Agreement, Lender's Liens and the Superpriority Claims and all other rights and remedies of Lender granted by the provisions of this Agreement shall survive, and shall not be modified, impaired or discharged by the entry of an order converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, dismissing the Chapter 11 Case, or by any other act or omission, nor shall Lender's Liens or the Superpriority Claims or any of the other rights and remedies of the Lender granted by the provisions of this Agreement be modified, impaired or discharged by the entry of an order confirming a plan of reorganization in the Chapter 11 Case and, pursuant to Section 1141(d)(4) of the Bankruptcy Code, each Borrower has waived any discharge as to any remaining Obligations and such waiver is hereby approved.

(iv)    The terms and provisions of the this Agreement shall continue in the Chapter 11 Case, or in any superseding Chapter 7 case under the Bankruptcy Code, and Lender's Liens, the Superpriority Claims and all other rights and remedies of Lender granted by the provisions of this Agreement shall continue in full force and effect until the Obligations are indefeasibly paid in full or otherwise satisfied in accordance with this Agreement.

(v)    Lender, the property securing the Loan and the Liens and security interests granted to Lender hereunder shall not be subject to any charge or claim under Section 506(c) of the Bankruptcy Code or any similar provisions of the Bankruptcy Code or applicable law.

(vi)    Lender shall have a right to credit the amounts due under this Agreement in any sale of the Collateral, including, but not limited to, the sale of the Collateral to the Lender as contemplated hereunder.

(vii)    A finding by the Bankruptcy Court that the Lender has acted in good faith in connection with the Financing Order and are entitled to rely upon the protections granted by Section 364(e) of the Bankruptcy Code.

(j)      Power of Attorney.  Each Borrower hereby irrevocably makes, constitutes, and appoints Lender (and any of Lender's officers, employees, or agents designated by Lender) as such Borrower's true and lawful attorney, with power to, if such Borrower refuses to, or fails timely to execute and deliver any of the documents described in Section 2(g), sign the name of such Borrower on any of the documents described in Section 2(g).  The appointment of Lender as each Borrower's attorney, and each and every one of Lender's rights and powers, being coupled with an interest, is irrevocable until all of the Obligations have been fully and finally repaid and performed or otherwise satisfied in accordance with this Agreement.

(k)      Budget.  Borrowers have provided Lender with the Budget, a true and correct copy of which is attached hereto as Exhibit D.

3.      Payment.

(a)      Payment at Maturity.  The Loan shall be repaid by Borrowers on the Maturity Date together with any accrued and unpaid interest on the principal being repaid on the Maturity Date; provided, however, that upon title of the Collateral transferring to the Lender in connection with a sale of the Collateral to Lender in accordance with the Sale Order, then (i) all principal shall be applied to the purchase price of the Collateral and (ii) Borrowers shall not be liable for any interest.  FOR THE AVOIDANCE OF DOUBT, IN NO EVENT SHALL BORROWERS BE REQUIRED TO PAY ANY FORM OF INTEREST (EITHER AT THE INTEREST RATE OR AT THE DEFAULT RATE) TO LENDER UPON SALE OF THE COLLATERAL AND THE TRANSFER OF TITLE TO THE COLLATERAL TO THE LENDER IN ACCORDANCE WITH THE SALE ORDER PROVIDED THAT TITLE TO THE COLLATERAL IS TRANSFERRED TO LENDER NO LATER THAN THE MATURITY DATE.

(b)      Method of Payment.   All payments hereunder, including without limitation all payments of principal of and interest on the Loan, shall be made to Lender at its address referred to in Section 7(a) (or as otherwise agreed between Borrowers and Lender) in immediately available funds.  Whenever any payment hereunder becomes due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the interest due.  Any payment made to Lender shall be applied in the following order: first, to the payment of any expenses owing to Lender; second, to the payment of interest on the Loan; third, to the payment of the principal amount of the Loan outstanding; and fourth, to any other amounts owing to Lender hereunder.

4.      Conditions Precedent.

(a)      Agreement.  This Agreement shall become effective as of the date first above written upon satisfaction of each of the following:

> (i) <u>Agreement</u>.  This Agreement or counterparts hereof shall have been duly executed by, and delivered to, Borrowers and Lender.
>
> (ii) <u>Approvals</u>.  Lender shall have received satisfactory evidence that each Borrower has obtained all required consents and approvals of all Persons, including all requisite Governmental Authorities, to the execution, delivery and performance of this Agreement.
>
> (iii) <u>Interim Order</u>.  Entry by the Bankruptcy Court of the Interim Order by no later than February 26, 2018 in form and substance satisfactory to Lender.

(b) <u>Loan</u>.  The following shall be conditions precedent to advancement of the Loan proceeds under this Agreement:

> (i) <u>No Event of Default</u>.  No Event of Default shall have occurred and be continuing on the date of such Loan, nor shall any result from the making thereof.
>
> (ii) <u>No Injunction, etc.</u>  No injunction, writ, restraining order, or other order of any nature prohibiting, directly or indirectly, the extending of such credit shall have been issued and remain in force by any Governmental Authority against any Borrower or Lender.
>
> (iii) <u>Financing Orders in Effect</u>.  The Interim Order or the Final Order (unless the Loan is made prior to the entry of the Final Order) shall be in full force and effect and shall not have been vacated, reversed, modified, or stayed in any respect (and if such Financing Order is the subject of any pending appeal, no performance of any obligation of any party hereto shall have been stayed pending such appeal).
>
> (iv) <u>Assumption of Licensing Agreement</u>.  PGLI shall have assumed the Licensing Agreement pursuant to Section 365 of the Bankruptcy Code, which assumption shall be approved by the Bankruptcy Court.

5. <u>Events of Default</u>.  Each of the following events shall be referred to herein as an "<u>Event of Default</u>":

(a) failure to repay or otherwise satisfy in accordance with this Agreement all Obligations on or before the Maturity Date; or

(b) either Lender or any Borrower shall have failed to receive, as and when required, any consent or approval from any Governmental Authority necessary in order for such party to perform its obligations hereunder in accordance with all applicable laws, rules and regulations; or

(c)     any event occurs that has, or could reasonably be expected to have, a material adverse effect on the business, assets, operations, prospects or financial or other condition of any Borrower;

(d)     the failure of the occurrence of any the following events in the Chapter 11 Case by the date described below (collectively, the "Case Benchmarks" and each a "Case Benchmark"):

(i)     by no later than March 2, 2018, Borrowers shall file a motion (or otherwise petition the Bankruptcy Court in a manner agreeable to the Lender) seeking authority to retain a Chief Restructuring Officer of the Borrowers;

(ii)     by no later than March 2, 2018, Borrowers shall file a motion (or otherwise petition the Bankruptcy Court in manner agreeable to the Lender) seeking a Sale Order from the Bankruptcy Court, on an expedited basis, authorizing (i) a private sale by Borrowers of the Collateral pursuant to Section 363(b) of the Bankruptcy Code of the Collateral to Lender for the sum of Eight Hundred Thousand Dollars ($800,000.00), inclusive of a credit for the amounts due under this Agreement, and (ii) entry by Borrowers into the Amended License Agreement;

(iii)     by no later than March 21, 2018, Borrowers shall have secured the Final Order; and

(iv)     by no later than April 9, 2018, Borrowers shall have secured a Sale Order from the Bankruptcy Court authorizing a private sale by Borrowers of the Collateral pursuant to Section 363(b) of the Bankruptcy Code of the Collateral to Lender for the sum of Eight Hundred Thousand Dollars ($800,000.00), inclusive of a credit for the amounts due under this Agreement, the terms of such Sale Order being agreeable to Lender in its sole discretion;

(e)     the occurrence of any of the following in the Chapter 11 Case:

(i)     the entry of an order amending, supplementing, staying, vacating, reversing, revoking or otherwise modifying this Agreement or any Loan Document or the Interim Order or the Final Order without the written consent of Lender (other than the replacement of the Interim Order with the Final Order);

(ii)     the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a responsible person or an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of any Borrower;

(iii)     the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code;

(iv)    the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (A) to allow any creditor to execute upon or enforce a Lien on any Collateral, or (B) to permit the perfection of any Lien on the Collateral;

(v)    the entry of an order in the Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement;

(vi)    the entry of an order in the Chapter 11 Case granting any other super priority administrative claim or Lien equal or superior to that granted to Lender;

(vii)    the Financing Order ceases to be in full force and effect, any material provision of the Financing Order ceases to be valid, binding and enforceable against any Borrower or any Borrower fails to comply with any material provision of the Financing Order; or

(viii)    the filing by any Borrower of any plan of reorganization or arrangement without the prior consent of Lender.

(f)    any Borrower forms any new subsidiary without causing such new subsidiary, contemporaneously with the formation thereof, to join this Agreement as a Borrower hereunder by executing a joinder to this Agreement in form satisfactory to the Lender; or

(g)    any Borrower seeks to, or supports any other party's motion to (by way of motion, other pleadings filed with the Bankruptcy Court or otherwise), disallow the Obligations in whole or in part or otherwise challenge the validity or enforceability of Lender's Liens on the Collateral by this Agreement; or

(h)    entry of an order avoiding or requiring disgorgement by Lender of any amounts received in respect of the Obligations; or

(i)    any Borrower executes any agreement including, without limitation, any letter of intent for the sale of the Collateral (except as contemplated hereunder and with the express written permission of Lender) or any other material assets of any Borrower including, without limitation, sale of substantially all of the assets of any Borrower, any merger, consolidation or acquisition of, with or by any Borrower with by or into any other Person and any change in the ownership of more than fifty percent (50%) of the beneficial voting stock or other equity interest of any Borrower in a single transaction or series of transactions; or

(j)    any Borrower conducts its business in a manner that materially deviates from the Budget or ceases its business operations: or.

(k)    a Material Budget Deviation shall have occurred.

6.    <u>Remedies</u>.

(a)    <u>Certain Action Following a Default</u>.  If any Event of Default shall occur, then in each and every such case, Lender may, in its sole discretion (i) by notice in writing to Borrowers (with copies to the Committee and the Office of the United States Trustee; provided, however, that failure to deliver such copies shall not in any way affect the validity or effectiveness of such notice) declare all or any part of the unpaid balance of the Loan then outstanding to be immediately due and payable, and (ii) subject to such limitations, if any, set forth in the Financing Order, exercise any rights and remedies of Lender under this Agreement or any other document executed in connection with this Agreement or applicable non-bankruptcy law including, without limitation, foreclosure on the Collateral or exercise of any rights or remedies as allowed by the applicable Uniform Commercial Code without further order of the Bankruptcy Court.

(b)    <u>Cumulative Remedies</u>.  To the extent not prohibited by applicable law which cannot be waived, all of Lender's rights hereunder and under any other document between Lender and any Borrower shall be cumulative.

(c)    <u>Waivers</u>.    To the extent that such waiver is not prohibited by the provisions of applicable law that cannot be waived, each Borrower hereby waives (1) all presentments, demands for performance, notices of nonperformance (except to the extent required by this Agreement), protests, notices of protest and notices of dishonor; (2) any requirement of diligence or promptness on the part of Lender in the enforcement of its rights under this Agreement; (3) any and all notices of every kind and description which may be required to be given by any statute or rule of law; and (4) any defense (other than indefeasible payment in full) which it may now or hereafter have with respect to its liability under this Agreement.

7.    <u>Miscellaneous</u>.

(a)    <u>Notices</u>.  Any communication, notice or demand required or permitted to be given hereunder shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier at the address or telecopier number set forth in <u>Schedule I</u> hereto.  Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).

(b)    <u>Entire Agreement; Severability</u>.  This Agreement sets forth the parties' entire agreement and understanding in respect of the subject matter contained herein. Notwithstanding the foregoing, however, the Financing Order shall continue to govern the terms and conditions of the transactions contemplated hereby to the extent inconsistent with, or address matters not addressed in, this Agreement.  If any term or provision hereof, or its application to any person or circumstance, shall to any extent be

invalid or unenforceable, the remainder of this Agreement, or the application of such terms to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby and each term hereof shall be valid and enforceable to the fullest extent permitted by applicable law.

(c)     <u>Assignment</u>.  Neither this Agreement nor any of the rights, interests or obligations of any Borrower hereunder shall be assigned or otherwise transferred by any Borrower, nor may any Borrower delegate performance hereunder, except with Lender's prior written consent.  Lender may assign this Agreement to any of its subsidiaries or to its or their successors or survivors without Borrowers' prior consent.

(d)     <u>Amendments; Waivers</u>.    All amendments, supplements or other modifications hereof must be made by written agreement of the parties hereto.

(e)     <u>APPLICABLE LAW</u>.   THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF LOUISIANA.  EACH PARTY HERETO HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN ANY BORROWER AND LENDER PERTAINING TO THIS AGREEMENT OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT; <u>PROVIDED</u>, THAT LENDER AND BORROWERS ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; <u>PROVIDED FURTHER</u>, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF LENDER.

(f)     <u>WAIVER OF VENUE</u>.  EACH BORROWER IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY COURT REFERRED TO IN <u>SECTION 7(e)</u>.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(g)     <u>SERVICE OF PROCESS</u>.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN <u>SECTION 7(a)</u>.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(h)    <u>WAIVER OF JURY TRIAL</u>.    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

(i)    <u>Counterparts</u>.    This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  A facsimile copy of a signature hereto shall have the same effect as the original of such signature.

(j)    <u>Reinstatement</u>.    In the event that any payment hereunder, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

(k)    <u>Binding Agreement</u>.    This Agreement and all Liens created hereby or pursuant hereto shall be binding upon each Borrower, the estate of each Borrower, and any trustee or successor in interest of any Borrower in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code.  This Agreement shall be binding upon, and inure to the benefit of, the successors of Lender and its assigns, transferees and endorsees.  The Liens created by this Agreement and the Financing Orders shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of any Borrower to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that Lenders file financing statements or otherwise perfect its security interests or Liens under applicable law.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, and intending to be legally bound, the Borrowers have executed, issued and delivered this Note as of [_____], 2018.

BORROWERS:

Penthouse Global Licensing, Inc.

By: _Kelly Holland_____
Name:
Title: CEO

Penthouse Global Media, Inc.

By: _Kelly Holland_____
Name:
Title: CEO

Penthouse Global Broadcasting, Inc.

By: _Kelly Holland_____
Name:
Title: CEO

Penthouse Global Digital, Inc.

By: _Kelly Holland_____
Name:
Title: CEO

Penthouse Global Publishing, Inc.

By: _Kelly Holland_____
Name:
Title: CEO

GMI Online Ventures, Ltd.

By: _Kelly Holland_____
Name:
Title: CEO

{JX309107.2}

Penthouse Digital Media Productions, Inc.

By: _Kelly Holland_
Name:
Title: CEO

Tan Door Media, Inc.

By: _Kelly Holland_
Name:
Title: CEO

Penthouse Images Acquisitions, Ltd.

By: _Kelly Holland_
Name:
Title: CEO

Pure Entertainment Telecommunications, Inc.

By: _Kelly Holland_
Name:
Title: CEO

XVHUB Group, Inc.

By: _Kelly Holland_
Name:
Title: CEO

General Media Communications, Inc.

By: _Kelly Holland_
Name:
Title: CEO

General Media Entertainment, Inc.

By: _Kelly Holland_
Name:
Title: CEO

Danni Ashe, Inc.

By: _Kelly Holland_____

Name:

Title: *CEO*

Streamray Studios, Inc.

By: _Kelly Holland_____

Name:

Title: *CEO*

General Media Communications, Inc.

By: _____
Name:
Title:

General Media Entertainment, Inc.

By: _____
Name:
Title:

Danni Ashe, Inc.

By: _____
Name:
Title:

Streamray Studios, Inc.

By: _____
Name:
Title:

LENDER:

Penthouse Clubs Worldwide, LLC

By: _____
Name: *JOHN KIRKENDOLL*
Title: *MANAGER*

## SCHEDULE I

Notice Information

Borrower

Penthouse Global Media, Inc.
Attn: Kelly Holland, Catherine Brandt
8944 Mason Ave.
Chatsworth, California 91311

with copies to:

Michael H. Weiss
Weiss & Spees, LLP
1925 Century Park East
Suite 650
Los Angeles, California 90064

-and-

Hamid R. Rafatjoo
Raines Feldman LLP
1800 Avenue of the Stars, 12th Floor
Los Angeles CA 90067

Lender

Penthouse Clubs Worldwide, LLC
Attn: Tim Spratt
201 St. Charles Ave, Suite 3915
New Orleans, Louisiana 70170

with copies to:

Jones Walker LLP
Attn: Asher Friend, Mark A. Mintz
201 St. Charles Ave.
New Orleans, Louisiana 70170

-and-

Jones Walker LLP
Attn: Joseph E. Bain
811 Main Street, Suite 2900
Houston, Texas 77008

## SCHEDULE II

None

# EXHIBIT A

## Collateral

(i)   All state (including common law), federal and foreign trademarks, service marks and application for registration of the trademarks, services marks and trade names on <u>Exhibit A-1</u> attached hereto (the "<u>Trademarks</u>") whether registered or unregistered and wherever registered, all rights to sue for past, present or future infringement or unconsented use thereof, all rights arising therefrom and pertaining thereto and all reissues, extension and renewals thereof;

(ii)  The entire goodwill of or associated with the businesses now or hereafter conducted by Borrowers connected with and symbolized by any of the aforementioned properties and assets;

(iii) All general intangibles and all intangible intellectual or other similar property of Borrowers of any kind or nature, associated with or arising out of any of the aforementioned properties and assets and not otherwise described above; and

(iv)  All proceeds of any and all of the foregoing Collateral (including license royalties, rights to payment, accounts receivable and proceeds of infringement suits) and, to the extent not otherwise included, all payments under insurance (whether or not Lender is the loss payee thereof) or any indemnity, warranty or guaranty payable by reason of loss or damage to or otherwise with respect to the foregoing Collateral.

EXHIBIT A-1

<u>Trademarks</u>

| Mark | Country | Registration No. (Application Ser. No.) | Registration/Application Class: Services Limited to Licensed Services |
|---|---|---|---|
| THE PENTHOUSE CLUB | Ukraine | 158069 | 43: Restaurant, night club and bar services (limited to the Licensed Services) |
| THE PENTHOUSE CLUB (w/ three key logo) | Macao | 88956 | 41: nightclub services;  entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners; (all of the foregoing limited to the Licensed Services) |
| | New Zealand | 833185 | 41: Entertainment services, dance and choreography, adult entertainment, nightclub and live performance services, model searches, special appearances by young women selected as centerfolds or annual award winners. (all of the foregoing limited to the Licensed Services) |
| | U.S. | 2,810,417 | 41: Entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners (limited to the Licensed Services)

43: Restaurant, night club and bar services (limited to the Licensed Services) |
| PENTHOUSE KEY SUITES | U.S. | (86/876606) | 43: Restaurant and bar services (limited to the Licensed Services) |
| THE PENTHOUSE KEY SUITES (w/ one key logo) | Not Registered | Not Registered | Limited to the Licensed Services |
| THE PENTHOUSE KEY SUITES (w/ three key logo) | Not Registered | Not Registered | Limited to the Licensed Services |

| | | | |
|---|---|---|---|
| PENTHOUSE KEY SUITES / PENTHOUSE KEY SUITES | | | |
| Three Key Logo | Australia | 367684 | 41: Entertainment services (limited to the Licensed Services) |
| | Barbados | 81/20326 | 41: nightclub services (limited to the Licensed Services) |
| | Brazil | 816873348 | 41: Amusement, entertainment and auxiliary services (limited to the Licensed Services). |
| | Canada | TMA748,728 | 41: nightclub services (limited to the Licensed Services) |
| | China | 4281665 | 41: nightclub services (limited to the Licensed Services) |
| | EU | 4018776 | 41: nightclub services (limited to the Licensed Services) |
| | Germany | 2011612 | 41: Entertainment (limited to the Licensed Services) |
| | Indonesia | IDM000076878 | 41: nightclub services (limited to the Licensed Services). |
| | Liechtenstein | 8122 | 41: Entertainment (limited to the Licensed Services) |
| | New Zealand | 717684 | 41: nightclub services (limited to the Licensed Services) |
| | Russia | 128751 | 41: adult night clubs (limited to the Licensed Services) 42: cocktail lounges (limited to the Licensed Services) |
| | Trinidad & Tobago | 46293 | 41: entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners; nightclub services (all of the foregoing limited to the Licensed Services) |
| | Turks & Caicos | 14014 | 41: nightclub services (limited to the Licensed Services) |
| | Turks & Caicos | 14015 | 42: (old class 42, now Class 43): All services in (old) International Class 42, (limited to the Licensed Services). |
| | Ukraine | 65800 | 41: nightclub services (limited to the Licensed Services) |

| | UAE | 53386 | 41: nightclub services (limited to the Licensed Services). |
|---|---|---|---|
| | Vietnam | 72640 | 41: nightclub services (limited to the Licensed Services). |
| PENTHOUSE KEY GIRL | Ukraine | 158071 | 41: Entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners and night club services (limited to the Licensed Services)<br><br>43: Restaurant, night club and bar services (limited to the Licensed Services) |
| KEY GIRL (Stylized)<br><br>**KEY**GIRL | Not Registered | Not Registered | Limited to the Licensed Services |
| PENTHOUSE KEY CLUB | Not Registered | Not Registered | Limited to the Licensed Services |
| KEY CLUB | Not Registered | Not Registered | Limited to the Licensed Services |
| CALIGULA CLUB | Not Registered | Not Registered | Limited to the Licensed Services |
| PENTHOUSE CLUB | Japan | 4384068 | 41: Limited to the Licensed Services<br><br>42: Serving food and drink (limited to the Licensed Services) |
| | Mexico | 903392 | 41: night clubs (limited to the Licensed Services) |
| | Mexico | 921770 | 43: Services rendered through restaurants in order to provide food and beverages inside and outside of establishments (limited to the Licensed Services) |
| THE PENTHOUSE BEACH CLUB | Ukraine | 158070 | 41: Entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners and night club services (limited to the Licensed Services)<br><br>43: Restaurant, night club and bar services (limited to the Licensed Services) |

EXHIBIT B

<u>License Agreement</u>

EXHIBIT C

<u>Form of Note</u>

Exhibit C
DIP Credit Agreement

EXHIBIT D

<u>Budget</u>

# Exhibit B

**EXECUTION COPY**

---

### MASTER LICENSE AGREEMENT

**between**

**PENTHOUSE GLOBAL LICENSING, INC.**
**as Licensor**

**and**

**KIRKENDOLL MANAGEMENT, LLC,**
**and**
**PENTHOUSE CLUBS WORLDWIDE, LLC,**
**as Licensee**

**Dated as of March 29, 2017**

---

{N3339370.13}
*LA 132904749v2*

*LA 132974416v1*

# MASTER LICENSE AGREEMENT

This MASTER LICENSE AGREEMENT (this "Agreement"), dated and effective as of March 29, 2017 (the "Effective Date"), is entered into between Penthouse Global Licensing, Inc., a Delaware corporation ("Licensor"), on the one hand, and Kirkendoll Management, LLC, a Colorado limited liability company, and Penthouse Clubs Worldwide, LLC, a Delaware limited liability company (collectively, the "Licensee"), on the other hand.  Licensor and Licensee are each referred to herein as a "Party" and collectively, as the "Parties."

## W I T N E S S E T H:

WHEREAS, Capitalized terms used and not otherwise defined in this Agreement shall have the meanings ascribed to such terms in Exhibit A hereto;

WHEREAS, Licensor has the right to license the trademarks PENTHOUSE in multiple variations, THE PENTHOUSE CLUB (and three key design), and CALIGULA CLUB in connection with a wide variety of goods and services, including but not limited to, magazines, printed materials, clothing, entertainment services, restaurants, bars and other adult entertainment-related goods and services (collectively, the "PENTHOUSE Marks");

WHEREAS, Licensee desires to use the Licensed Marks (as defined in Section 1.1(a)), including certain of the PENTHOUSE Marks, in connection with the ownership and operation of adult nightclub and cabaret establishments, and restaurants operated in or immediately adjacent thereto, featuring live entertainment provided by nude or semi-nude female dancers (the "Gentlemen's Clubs") and Licensor is willing to grant to Licensee a license to use the Licensed Marks solely in connection with such purpose subject to the terms and conditions set forth in this Agreement; and

WHEREAS, Licensor's predecessor-in-title to the Licensed Marks has previously entered into other license agreements with third parties to use the Licensed Marks in connection with Gentlemen's Clubs (the "Third-Party Licenses"), and Licensor desires to assign such Third-Party Licenses and all rights in and to such Third-Party Licenses to Licensee during the Term (as defined below) of this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, agreements and covenants contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE 1
## LICENSE GRANT; CONSIDERATION

**Section 1.1**     **Grant of Rights**.  Subject to the terms and conditions of this Agreement:

(a)     *License Grant*.  Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee (the "License Grant") an exclusive, transferable, sub-licensable, unlimited license, free and clear of all Liens, to use, sublicense, franchise (and sub-franchise), and otherwise monetize, exploit and commercialize the marks identified in Schedule 1.1(a), which are the subject of U.S. and foreign trademark registrations or applications to

1

register the Licensed Marks, or U.S. and foreign common law rights in and to the Licensed Marks therein owned or controlled by Licensor (collectively, the "Licensed Marks"), anywhere in the world during the Term (as defined in Section 1.2), in connection with the ownership, operation, marketing, and promotion of Gentlemen's Clubs, and the advertising and promotion through any media now known or hereafter devised, including the Internet, and restaurant, bar, and cocktail lounge services directly related thereto (the "Licensed Services"); *provided*, *however*, that Licensee (and all sub-licensees) shall utilize the Licensed Marks in substantial conformity to their current use, and subject to the quality control provisions set forth in Section 5.9.

(b)    *Sublicensing*.    Licensee shall have the right to sublicense of any of its rights under this Agreement, *provided* that (i) any sublicense shall be subject to the quality control provisions set forth in Section 5.9, (ii) the terms of any sublicense and the obligations of the sub-licensee shall be in substantial conformity to this Agreement, (iii) Licensee shall not enter into any sublicense with any Person that is also a party to an Excluded License (as defined below) (*provided*, that, notwithstanding this Section 1.1(b)(iii), Licensee shall have the right to enter into one or more sublicenses with VCG Holding Corp. and its Affiliates), and (iv) each sublicense shall automatically transfer to Licensor upon termination by Licensor or expiration of this Agreement.

(c)    *Reservation of Rights*.    Licensor reserves the right to use the Licensed Marks in connection with the advertising and promotion of the Gentlemen's Clubs and the Licensed Services, and reserves to itself and for its sole benefit all other rights in and to the Licensed Marks not expressly granted to Licensee under this Agreement.

(d)    *Use of the Licensed Marks*.

(i)    *Compliance with Licensor's Directions*.    All use of the Licensed Marks in connection with the Licensed Services shall comply with the usage guidelines set forth by Licensor in writing in advance of the execution of this Agreement (as mutually updated from time to time by the Parties, the "Style Guide").    Licensee shall submit all advertising, promotional, or other business materials (excluding real-time social media advertising) bearing the Licensed Marks to Licensor for approval prior to use (such approval not to be unreasonably withheld), and if approval is not received within three (3) business days of submission, approval will be deemed granted; *provided*, *however*, that any advertising, promotional, or other business materials bearing the Licensed Marks that are approved by Licensor prior to the Effective Date need not be submitted to Licensor.

(ii)    *Trademark Notices*.    All promotional and advertising materials featuring the Licensed Marks shall incorporate the appropriate trademark notices in accordance with Licensor's instructions set forth in the Style Guide.

(e)    *Acknowledgement of Ownership*.    Licensee acknowledges that Licensor is the owner of the Licensed Marks.    Any goodwill derived from the use of the Licensed Marks by Licensee shall inure to the benefit of Licensor.    Except for Licensee's rights contemplated by Section 1.1(a) of this Agreement and the Transaction Documents, if Licensee acquires any rights in the Licensed Marks, by operation of law, or otherwise, such rights shall be deemed and are

hereby irrevocably assigned to Licensor without further action by any of the Parties, and Licensee agrees not to dispute or challenge or assist any Person in disputing or challenging Licensor's rights in and to the Licensed Marks or the validity of the Licensed Marks.

(f)    *Assignment of Third-Party Licenses*.    Notwithstanding anything to the contrary set forth herein (including, but not limited to, pursuant to Section 1.1(a) above) or in any other Transaction Document (as defined below), but subject to Section 7.1 below, at the Closing, Licensor hereby assigns to Licensee (or, if and as applicable, shall cause the same), in each case free and clear of all Liens, all right, title and interest of Licensor and its Affiliates in, to and under the Third-Party Licenses, including the right to all sums due and payable to Licensor (the "Third-Party Revenue") under the Third-Party Licenses from the date of the Closing (the "Assignment", and together with the License Grant, the "Grant of Rights").    For purposes of clarification and for the avoidance of doubt, the licenses identified in Schedule 1.1(f) have expired or have been terminated by Licensor prior to the Effective Date of this Agreement and shall not be deemed Third-Party Licenses or included in the Assignment or Grant of Rights to Licensee hereunder (the "Excluded Licenses").

(i)    Except as provided in Section 1.1(b), nothing in the foregoing sentence shall limit Licensee's ability to (A) pursue New Contracts (as defined below) in the same geographic markets as the Excluded Licenses, and/or (B) enter into one or more sublicenses with VCG Holding Corp. or its Affiliates in the Denver, Colorado and/or St. Louis, Missouri geographic markets, each of which shall be deemed a novated Third-Party License for purposes of Section 1.4.

(ii)    For the avoidance of doubt, Licensor retains all rights to pursue Claims for, and collect for its sole account, any past-due royalties under the Excluded Licenses, or to otherwise pursue any and all Claims against the (sub)licensees or their Affiliates under the Excluded Licenses arising out of any events or circumstances occurring prior to the Effective Date (and any other Claims shall be subject to the parties' respective rights and obligations set forth in this Agreement, including pursuant to Section 5.8); *provided*, that Licensor shall not have the right to pursue any such Claims (including for past-due royalties) against VCG Holding Corp. or its Affiliates without the prior written consent of Licensee, unless otherwise expressly authorized by another provision of this Agreement.

(g)    *Additional Intellectual Property*.    In the event that Licensee reasonably requires any other intellectual property rights or assets owned or controlled by Licensor (the "Additional Intellectual Property") in order to monetize, exploit and commercialize the Licensed Marks and/or the Third-Party Licenses in accordance with the Licensed Services (as may be necessary to grant such rights to sub-licensees as provided for under the Third-Party Licenses), Licensee shall so notify Licensor in writing, and Licensor shall promptly execute, for no additional consideration, such instrument(s) of transfer as may be necessary to include such Additional Intellectual Property within the License Grant hereunder.

(h)    *Limitation*.    Notwithstanding anything to the contrary in this Agreement, Licensee shall have no right to use any trademarks owned by Licensor apart from the Licensed Marks (except as otherwise expressly contemplated by Section 1.1(g), Section 1.1(i) and Section 5.16 hereof) and no right to use the Licensed Marks outside of the Licensed Services.

Furthermore, nothing in this Agreement shall cause the PENTHOUSE mark, or any other related mark that does not include the word "club" or the three key logo, (except as otherwise may be expressly included on Schedule 1.1(a) hereto) to be considered Licensed Marks.  For the avoidance of doubt, the marks PENTHOUSE, PENTHOUSE (with one key logo), PENTHOUSE (with three key logo), and One Key Logo are not Licensed Marks, and, therefore, except as otherwise expressly authorized by Section 1.1(i), are not to be used other than as part of THE PENTHOUSE CLUB marks.  Licensee acknowledges and agrees that, subject to the terms and conditions of this Agreement (including, without limitation, Section 5.14 hereof), Licensor may use (or license others to use) marks other than the Licensed Marks that may contain the word penthouse and Licensee agrees that no consumer confusion is likely to result from any such use. Licensee further agrees not to dispute or challenge, or assist any Person in disputing or challenging, Licensor's rights in marks other than the Licensed Marks.

(i)      *Use of Licensor's Other Trademarks*.    Licensor acknowledges that Licensee may desire from time to time to use (and to authorize its sub-licensees to use) certain of Licensor's other trademarks not specifically included in the Licensed Marks.  Licensor hereby consents to Licensee's (and its sub-licensees') limited use of such marks, as more particularly identified in Schedule 1.1(f) (the "Additional Marks"); *provided, however*, that (A) any uses of the Additional Marks by Licensee shall be made only as reasonably necessary for Licensee's advertising and marketing of Gentlemen's Clubs and the Licensed Services ("Permitted Advertising"), (B) all Permitted Advertising shall use the mark THE PENTHOUSE CLUB in close proximity to the Additional Marks, to the extent applicable to the application and medium of such Permitted Advertising, (C) Licensee only uses as much of the Additional Marks as is necessary to identify Licensor and its goods and services, (D) Licensee uses the Additional Marks in good faith, (E) Licensee does not use the Additional Marks as a source identifier for Licensee's goods and services, and (F) Licensee does not use the Additional Marks in a manner that is likely to cause confusion with Licensor's use of the Additional Marks unrelated to Gentleman's Clubs (provided, that Licensor acknowledges and agrees that Licensee's use of the Additional Marks in Permitted Advertising as set forth herein is not likely to cause such confusion).  In addition, Licensee must submit all Permitted Advertising incorporating the Additional Marks to Licensor for written approval prior to any use of the Additional Marks, and if approval is not received within seven (7) business days of submission, approval will be deemed granted; *provided, however*, that any Permitted Advertising, or other business materials, incorporating the Additional Marks that are approved in writing by Licensor prior to the Effective Date need not be submitted to Licensor.  For the avoidance of doubt, and for non-inclusive, illustrative purposes only, Licensee shall be deemed to have the right to use (and shall be deemed authorized to permit its sub-licensees to use) the PENTHOUSE mark, alone, so long as such uses strictly comply with all of the requirements set forth in this Section 1.1(i) (other than clauses (C) and (E) above): (1) on the signage fronting Gentlemen's Clubs, (2) in brochures and pamphlets promoting the Gentlemen's Clubs, (3) in Internet and social media advertising and promotions of Gentlemen's Clubs and (4) on signage, advertisements, décor, utensils, matchbooks, swizzle sticks, cocktail napkins, table tents, name holders, tag holders and souvenirs provided, sold or otherwise utilized in connection with the operation of the Gentleman's Clubs and as reasonably necessary for the promotion of Gentlemen's Clubs.

**Section 1.2    Term**.

(a)    The initial term of this Agreement and the Grant of Rights hereunder shall commence upon the Closing and shall terminate ten (10) years thereafter, unless earlier terminated by the Parties as specified herein (the "Initial Term").  Upon expiration of the Initial Term and each Renewal Term (as defined below), as applicable, Licensee shall have the right to renew this Agreement and the License Grant hereunder for additional successive ten-year periods upon the payment by Licensee to Licensor of the applicable renewal fee in accordance with Section 1.2(b) (each subsequent ten-year period, a "Renewal Term", and together with the Initial Term, the "Term").

(b)    In the event Licensee desires to renew this Agreement, it shall pay to Licensor within 120 days prior to the expiration of the then-current Term, by wire transfer of immediately available funds to the account set forth on Schedule 1.2(b) (the "Payment Account") an amount equal to: Three Hundred Fifty Thousand Dollars (U.S. $350,000.00) (the "Renewal Fee"), which Renewal Fee shall be fully recoupable to the extent that Royalties accrue in the amount of the Renewal Fee in accordance with Section 1.4(b).

**Section 1.3    NO  LIABILITIES**.    NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH HEREIN OR IN ANY OTHER TRANSACTION DOCUMENT, BUT SUBJECT IN ALL RESPECTS TO THE GRANT OF RIGHTS TO LICENSEE SET FORTH HEREIN (INCLUDING, BUT NOT LIMITED TO, LICENSEE'S RIGHTS TO ANY AND ALL CLAIMS AND CAUSES OF ACTION AGAINST OTHER PERSONS RELATING TO OR ARISING OUT OF ITS LICENSE HEREUNDER IN AND TO AND/OR OWNERSHIP OF THE LICENSED MARKS OR THIRD-PARTY LICENSES), LICENSEE DOES NOT ASSUME, SHALL NOT ASSUME, AND SHALL NOT BE DEEMED TO HAVE ASSUMED, (A) ANY LIABILITIES OR OBLIGATIONS OF ANY NATURE WHATSOEVER OF, OR ARISING OUT OF CLAIMS AGAINST LICENSOR OR ITS AFFILIATES OR ANY OF THEIR RESPECTIVE LICENSEES (AND SUB-LICENSEES) OR FRANCHISEES (AND SUB-FRANCHISEES) AT ANY TIME PRIOR TO OR AFTER THE CLOSING TO THE EXTENT NOT ARISING OUT OF OR BASED ON THE ACTIONS, OMISSIONS OR OTHER CONDUCT OF "LICENSEE" (AS DEFINED IN THIS AGREEMENT) OR ANY OF ITS LICENSEES (OR SUB-LICENSEES), OR (B) ANY LIABILITIES OR OBLIGATIONS WHATSOEVER ARISING OUT OF OR OTHERWISE ASSOCIATED WITH THE SUBJECT OF THE GRANT OF RIGHTS PROVIDED HEREIN PRIOR TO THE CLOSING **(INCLUDING, WITHOUT LIMITATION, ANY OBLIGATION TO REFUND OR OTHERWISE REPAY TO A THIRD-PARTY LICENSEE OR ANY OTHER PERSON ANY DEPOSIT, FEE, ADVANCE, UP-FRONT LICENSE PAYMENTS OR OTHER REFUNDABLE OR RECOUPABLE AMOUNT PAID OR PAYABLE BY SUCH PERSON PURSUANT TO AND/OR UPON ANY TERMINATION OR RENEWAL OF ANY THIRD-PARTY LICENSE, REGARDLESS OF WHETHER SUCH DEPOSITS, FEES OR OTHER PAYMENTS WERE RE-ALLOCATED AND/OR DISTRIBUTED UNDER A BANKRUPTCY ORDER AFFECTING LICENSOR OR ITS PREDECESSORS-IN-TITLE, OR OTHERWISE)** (COLLECTIVELY, THE "EXCLUDED LIABILITIES"), INCLUDING, WITHOUT LIMITATION, PERSONAL, PRODUCT, WARRANTY, INTELLECTUAL PROPERTY, CONTRACT OR RELATED LIABILITIES ARISING OUT OF GOODS, SERVICES OR CONTRACTS PROVIDED, MANUFACTURED

OR PERFORMED BY OR ON BEHALF OF LICENSOR OR ITS AFFILIATES AND ANY
LIABILITY OWED TO ANY ACTUAL OR ALLEGED DEBT OR EQUITY HOLDER OF
LICENSOR OR ITS AFFILIATES IN RESPECT OF SUCH DEBT OR EQUITY OR THE
TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT AND THE OTHER
TRANSACTION DOCUMENTS, BUT, FOR THE AVOIDANCE OF DOUBT, THE
"EXCLUDED LIABILITIES" DO NOT INCLUDE ANY LIABILITIES OR OBLIGATIONS
ARISING OUT OF OR BASED ON THE ACTIONS, OMISSIONS OR OTHER CONDUCT
OF "LICENSEE" (AS DEFINED IN THIS AGREEMENT) OR ANY OF ITS LICENSEES (OR
SUB-LICENSEES).    LICENSOR AND ITS AFFILIATES AGREE TO PERFORM, PAY
AND/OR DISCHARGE ANY AND ALL EXCLUDED LIABILITIES AND OBLIGATIONS
PROMPTLY AS THEY BECOME DUE.

> **Section 1.4**    **Consideration**.

> (a)    _Closing Consideration_.    The aggregate consideration payable at the
Closing by Licensee for the Grant of Rights to Licensor hereunder shall be Two Million Six
Hundred Thousand Dollars (U.S. $2,600,000.00), payable in cash at the Closing (the <u>Closing
Consideration</u>").    At the Closing, the Closing Consideration shall be paid by Licensee to
Licensor by wire transfer of immediately available funds to the Payment Account.

> (b)    _Royalties_.    In addition to the Closing Consideration, in exchange for the
License Grant from Licensor, Licensee agrees to pay to Licensor ten percent (10%) of all Net
Third-Party License Fees (as defined below) received by Licensee pursuant to any New
Contracts (as defined below) entered into with any sub-licensee (the "<u>Royalties</u>", and together
with the Closing Consideration, the "<u>Consideration</u>"). The Royalties shall be paid by Licensee in
accordance with the following provisions:

> (i)    During the Initial Term, within 60 days following the calendar
quarter in which Licensee receives such Net Third-Party License Fees, Licensee shall furnish the
corresponding Royalties to the Payment Account (or such other account designated in writing by
Licensor upon reasonable notice).

> (ii)    During each Renewal Term, Licensee shall retain all Royalties
until it has fully recouped, out of Royalties otherwise payable to Licensor hereunder, an amount
equal to the Renewal Fee. Thereafter, within 60 days following the calendar quarter in which
Licensee receives such Net Third-Party License Fees, Licensee shall furnish the corresponding
Royalties to the Payment Account (or such other account designated in writing by Licensor upon
reasonable notice).

> (c)    _Certain Definitions; Application_.    As used in <u>Section 1.4(b)</u>:

> (i)    "<u>Net Third-Party License Fees</u>" means Gross Third-Party License
Fees, _less_ all Third-Party License Expenses.

> (ii)    "<u>Gross Third-Party License Fees</u>" means all amounts received by
Licensee from any sub-licensees pursuant to any New Contracts (as defined below). "Gross
Third-Party License Fees" shall **not** include any deposit(s) paid by any licensee pursuant to a
New Contract, Third-Party Revenue, or any other amounts received by Licensee pursuant to any

Contract that is not a New Contract (including, without limitation, any management Contracts entered into by Licensee or its Affiliates with respect to any Gentlemen's Clubs, and/or any license Contracts entered into by Licensee or its Affiliates that do not convey rights in and to the Licensed Marks, and/or any of the Third-Party Licenses acquired by Licensee pursuant to the Assignment hereunder, whether in their original form, as amended, amended and restated, extended, renewed or novated).

     (iii) "<u>New Contracts</u>" means any new Contract entered into after the Effective Date by Licensee related to the monetization, exploitation or other commercialization of the Licensed Marks in Gentlemen's Clubs. "New Contracts" shall not include any sub-licensee (or its successor(s) or assign(s)) that was previously a party to any Third-Party License, or any Gentlemen's Club (including if it moves to a new location in the same standard metropolitan statistical area) that was previously the subject of any Third-Party License.

     (iv) "<u>Third-Party License Expenses</u>" means Licensee's (i) costs to negotiate, and/or consummate any New Contracts, and (ii) reasonable out-of-pocket costs in its ownership, administration and operation of, and licensing of the Licensed Marks in connection with, the Licensed Services, including the reasonable costs and expenses of Licensee's legal and accounting.

**ARTICLE 2**
**<u>THE CLOSING</u>**

  **Section 2.1** **<u>The Closing</u>**. The closing of the Transaction (the "<u>Closing</u>") shall take place simultaneously with the execution and delivery of this Agreement at the offices of Jones Walker LLP, 201 St. Charles Ave., Suite 5100, New Orleans, Louisiana, or at such other place or by such other means, as may be mutually agreed by the Parties in writing.

  **Section 2.2** **<u>Deliveries by Licensor</u>**. At the Closing, Licensor shall deliver to Licensee, as applicable, the following:

     (a) a security agreement, in the form attached hereto as <u>Exhibit B</u> (the "<u>Security Agreement</u>"), duly executed by Licensor;

     (b) an assignment and assumption agreement, in the form attached hereto as <u>Exhibit C</u>, with respect to the Third-Party Licenses (the "<u>Assignment and Assumption Agreement</u>"), duly executed by Licensor;

     (c) a certificate of the Secretary or other Person vested with similar duties and responsibilities of the Licensor in the form attached hereto as <u>Exhibit D</u> (the "Licensor <u>Closing Certificate</u>") certifying (i) that attached thereto are true and complete copies of all resolutions adopted by any necessary directors, officers, stockholders or other necessary Persons of the Licensor authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the Transaction and transactions contemplated hereby and thereby, (ii) that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the Transaction and the transactions contemplated hereby and thereby, (iii) the names and signatures of the Persons authorized on behalf of Licensor to execute and deliver this Agreement, the Transaction Documents and the other documents,

certificates, or instruments to be delivered hereunder and thereunder, and (iv) that attached thereto is a certificate of good standing, dated as of the Closing (or, as necessary, the most recent practicable date), for Licensor in its jurisdiction of organization.

(d)    a short-form trademark license agreement, in the form attached hereto as Exhibit E, with respect to the License Grant (the "Short-Form Trademark License Agreement"), duly executed by Licensor.

(e)    documentary evidence of the release and discharge of any Liens, including, without limitation, all appropriate UCC financing statement amendments and termination statements, affecting the Third-Party Licenses and the Licensed Marks, in form and substance reasonably satisfactory to Licensee;

(f)    the consent and acknowledgement substantially in the form of Exhibit F ("Certificate of Consent"); and

(g)    such other appropriately executed instruments of transfer, assumption, filings or documents as Licensee may reasonably request to effectuate the consummation of the Transaction and the transactions contemplated by this Agreement and the other Transaction Documents.

**Section 2.3    Deliveries by Licensee**.    At the Closing, Licensee shall deliver to Licensor the following:

(a)    a certificate of the Secretary or other Person vested with similar duties and responsibilities of the Licensee in the form attached hereto as Exhibit D (the "Licensee Closing Certificate") certifying (i) that attached thereto are true and complete copies of all resolutions adopted by any necessary directors, officers, stockholders or other necessary Persons of the Licensee authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the Transaction and transactions contemplated hereby and thereby, (ii) that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the Transaction and the transactions contemplated hereby and thereby, (iii) the names and signatures of the Persons authorized on behalf of Licensee to execute and deliver this Agreement, the Transaction Documents and the other documents, certificates, or instruments to be delivered hereunder and thereunder, and (iv) that attached thereto is a certificate of good standing, dated as of the Closing (or, as necessary, the most recent practicable date), for Licensee in its jurisdiction of organization;

(b)    the Closing Consideration;

(c)    the Security Agreement, duly executed by Licensee;

(d)    the Assignment and Assumption Agreement, duly executed by Licensee; and

(e)    the Short-Form Trademark License Agreement, duly executed by Licensee.

Section 2.4    **Post-Closing Further Assurances**.  From time to time and at any time on or after the Closing, upon either Party's reasonable request and without further consideration, the other Party shall execute and deliver such further documents and instruments, and shall take such further actions as may be reasonably necessary to implement the Transaction and the transactions contemplated by this Agreement and the other Transaction Documents.

## ARTICLE 3
## LICENSOR'S REPRESENTATIONS AND WARRANTIES

Licensor hereby represents and warrants to Licensee as follows:

Section 3.1    **Organization and Standing**.  Licensor is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware, has the requisite power and authority to own its properties and assets and to carry on its business as presently conducted, and is duly qualified and in good standing to do business in each jurisdiction in which the nature of the business conducted by it or the ownership or licensing of its assets makes such qualification necessary.

Section 3.2    **Authority; Enforceability**.    Licensor has all requisite legal power, authority and legal capacity to execute and deliver this Agreement and each other agreement, certificate and instrument delivered or to be delivered pursuant hereto (collectively, the "Transaction Documents") to which Licensor is a party, and to consummate the Transaction and the transactions contemplated hereby and thereby.  The execution, delivery and performance of the Transaction Documents by Licensor, and the consummation of the Transaction and the transactions contemplated thereby, have been duly authorized by all necessary corporate action on the part of Licensor.  The Transaction Documents have been (or will be) duly executed and delivered by Licensor and constitute (or will constitute) its legal, valid and binding obligations, enforceable against Licensor in accordance with their respective terms, subject to applicable bankruptcy, insolvency and similar laws affecting generally the enforcement of creditors' rights and general principles of equity.

Section 3.3    **Consent; No Conflicts**.  To the Knowledge of Licensor, no filing with or notice to, and no Permit, authorization, consent or approval of, any Governmental Authority or other Person is necessary for the execution and delivery by Licensor of the Transaction Documents or the consummation of the Transaction or the transactions contemplated thereby. The execution, delivery, and performance of Transaction Documents do not, and the consummation of the Transaction and the transactions contemplated thereby will not, with the passage of time or the giving of notice, or both, violate, conflict with or result in the breach of any term, condition or provision of, or require the consent of any Person under, (a) the certificate of incorporation, bylaws, stockholders agreement or similar organizational documents of Licensor, (b) any Law to which Licensor is subject or may become subject pursuant to the Transaction Documents, (c) any Order which is applicable to Licensor, or (d) any Contract to which Licensor is a party or by which Licensor or its assets is bound.

Section 3.4    **Absence of Litigation; Governmental Orders**.  Except as set forth on Schedule 3.4, there are no Legal Proceedings pending or, to the Knowledge of Licensor, threatened against Licensor or any its Affiliates with respect to the Licensed Marks or Third-

Party Licenses, nor is there any Order outstanding with respect to the same.  There are no Legal Proceedings pending or, to the Knowledge of Licensor, threatened against Licensor or any of its Affiliates seeking to enjoin, restrain, prohibit or otherwise delay the Transaction or the transactions contemplated by the Transaction Documents.  No event has occurred or circumstances exist that could reasonably be expected to give rise to, or serve as a basis for, any such action, Order or Legal Proceeding.

**Section 3.5    [RESERVED]**

**Section 3.6    Third-Party Revenue and Other Accounts Receivable**.  All Third-Party Revenue, and any other accounts receivable of Licensor with respect to the Third-Party Licenses, represent valid obligations arising from sales actually made, licenses actually granted, royalties actually earned or credited, or services actually performed by Licensor (or its predecessor(s)) in connection with the Third-Party Licenses.  The Third-Party Revenue and such other accounts receivable are current and fully collectible in all respects.  Each of the Third-Party Revenue and such other accounts receivable either has been or will be paid in full within 90 days after the day on which it first becomes due and payable.  There is no contest, claim, defense or right of setoff with respect to the Third-Party Revenue or any other such account receivable of Licensor.

**Section 3.7    Accurate and Complete Records**.  The books and records and other records of Licensor and its Affiliates relating specifically to the Third-Party Licenses and the Licensed Marks as they relate to the Licensed Services (a) have been made available to Licensee, (b) have been maintained in accordance with Applicable Laws and, to the extent applicable, GAAP, and (c) are accurate and complete and fairly reflect, in reasonable detail, the transactions and the assets and liabilities of Licensor with respect to the Third-Party Licenses and the Licensed Marks as they relate to the Licensed Services.

**Section 3.8    Third-Party Licenses**.  Schedule 3.8 lists each of the Third-Party Licenses.  Licensor owns, free and clear of all Liens, the Third-Party Licenses.  To the Knowledge of Licensor, each Third-Party License is valid and binding on the parties thereto in accordance with its terms and is in full force and effect.  None of Licensor or, to the Knowledge of Licensor, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under) in any material respect, or has provided or received any notice of any intention to terminate, any Third-Party License.  No event or circumstance has occurred that, with notice or lapse of time or both, would constitute a default or event of default under any Third-Party License or result in a termination thereof or the loss of any benefit thereunder.  Accurate and complete copies of each Third-Party License (including all modifications, amendments and supplements thereto and waivers thereunder) have been provided to Licensee.  There are no material disputes pending or, to the Knowledge of Licensor, threatened under any Third-Party License.

**Section 3.9    Licensed Marks**.

(a)    Schedule 1.1(a) identifies the Licensed Marks that are used, or held for use, in connection with the ownership, operation or maintenance of the Gentlemen's Clubs and the Licensed Services.  Such Licensed Marks represent all the trademarks and trade names that are currently used in connection with or necessary for the operation of the Gentlemen's Clubs

and Licensed Services, as currently conducted, and the performance of the Third-Party Licenses. The Licensed Marks are owned by Licensor, and all such Licensed Marks will be available for use by Licensee on identical terms and conditions immediately following the Closing.  Licensor possesses all right, title and interest in and to the Licensed Marks, free and clear of any Liens.

(b)    The Licensed Marks are not subject to any outstanding Order or Legal Proceeding (including any opposition, invalidation, or cancellation proceeding), and no such Order or Legal Proceeding is pending or, to the Knowledge of Licensor, threatened, that challenges the legality, validity, use or ownership of such Licensed Marks, including the Grant of Rights.  To the Knowledge of Licensor, the Licensed Marks do not infringe, violate or misappropriate any patents, trademarks, copyrights or other intellectual property rights of any other Person, and no Legal Proceeding has been decided or is pending, and Licensor has not received any written Claim or notice, alleging any of the foregoing.  Except as set forth on Schedule 3.9(b), to the Knowledge of Licensor, no Person has violated, infringed or misappropriated any of the Licensed Marks, or is threatening to do the same.

(c)    Except for Licensee and its Affiliates pursuant to the License Grant hereunder and as otherwise set forth on Schedule 3.8, no other Person has any license, sub-license, franchise, sub-franchise, or similar right (or any reasonable basis for claiming any such right) with respect to any Licensed Marks.

(d)    Except as otherwise noted on Schedule 1.1(a), all of the Licensed Marks have been registered with the United States Patent and Trademark Office and all applicable foreign copyright, patent and trademark registries maintained by any Governmental Entity, are in compliance with all applicable legal requirements (including the timely post-registration filing of affidavits of use and incontestability and renewal applications), are valid and enforceable, and are not subject to any maintenance fees, taxes or actions falling due.

(e)    There is no potentially interfering trademark or trademark application of any Person with respect to any Licensed Mark.

(f)    All products and materials containing a registered Licensed Mark bear the proper federal registration notice where permitted by Law.

Section 3.10    **Tax Matters.**  There are no Taxes of any kind (whether assessed on, or measured by, income, gross receipts, intellectual property royalties, real and personal property, employment, excise, sales, use or otherwise) properly attributable to periods up to and including the Effective Date related to the Third-Party Licenses for which Licensee could be held liable which have not been or will not be paid by Licensor or its Affiliates.  To the Knowledge of Licensor, there are no Liens on the Third-Party Licenses or Gentlemen's Clubs with respect to Taxes.  Neither Licensor nor any of its Affiliates is a party to any Legal Proceeding by any Governmental Entity, nor are there any pending or threatened Legal Proceedings by any Governmental Entity, for any Taxes.

Section 3.11    **Absence of Certain Changes.**  To the Knowledge of Licensor, there have been no changes in the operations, conditions (financial or otherwise), or results of operations of Licensor with respect to the Licensed Marks or the Third-Party Licenses.

**Section 3.12    Compliance with Laws**.

(a)    To the Knowledge of Licensor, the operations and activities of Licensor has complied with and currently comply, in all material respects, with all Applicable Laws with respect to its use of the Licensed Marks and Permits applicable to the Licensed Services as currently conducted or Licensor's ownership or use of the Licensed Marks.

(b)    In connection with the Third-Party Licenses and the Licensed Marks, Licensor has not, at any time, received any written notice from any Governmental Entity or other Person regarding (i) any violation of or failure to comply with, in some material respect, any Law or Permit, (ii) any withdrawal, suspension, cancellation, termination of, or modification of any permit held by Licensor or any licensee thereof, or (iii) any obligation on the part of Licensor to undertake, or to bear all or any portion of the cost of, any remedial action, excluding routine incidental or other minor actions involving *de minimis* costs.

(c)    To the Knowledge of Licensor, in connection with the Third-Party Licenses and the Licensed Marks, no event has occurred, nor does any circumstance exist, that constitutes, or with notice, the lapse of time or both (i) may constitute or result in a violation by Licensor of, or a failure on the part of Licensor to comply with, any Laws or any Permit, (ii) could result in the revocation, withdrawal, suspension, cancellation or termination of, or any modification to, any permit held by Licensor, or (iii) would give rise to an obligation on the part of Licensor to undertake, or to bear all or any portion of the costs of, any remedial action of a material nature.

**Section 3.13    Full Disclosure**.    No representation or warranty by Licensor in this Agreement and no statement contained in the Schedules to this Agreement or any certificate or other document furnished or to be furnished to Licensee pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading. Except as specifically provided in this Agreement, Licensor makes no representation or warranty, either express or implied, as to any matter whatsoever, including, without limitation, the design, merchantability, durability, suitability of any product, service or other item or the fitness of any product or other item for a particular purpose. Upon request, Licensor shall provide Licensee a written certification that all such representations and warranties not expressly qualified by date or time remain true and accurate as of the date of such certification.

## ARTICLE 4
## LICENSEE'S REPRESENTATIONS AND WARRANTIES

Licensee represents and warrants to Licensor as follows:

**Section 4.1    Organization and Standing**.  Licensee is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware and Colorado, and has the requisite power and authority to own its properties and assets and to carry on its business as presently conducted, and is duly qualified and in good standing to do business in each jurisdiction in which the nature of the business conducted by it or the ownership or leasing of its properties makes such qualification necessary.

**Section 4.2    Authority; Enforceability**.    Licensee has all requisite legal power, authority and legal capacity to execute and deliver this Agreement and the other Transaction Documents to which Licensee is a party, and to consummate the Transaction and the transactions contemplated hereby and thereby.  The execution, delivery and performance of the Transaction Documents by Licensee, and the consummation of the Transaction and the transactions contemplated thereby, have been duly authorized by all necessary action on the part of Licensee. The Transaction Documents have been (or will be) duly executed and delivered by Licensee and constitute (or will constitute) its legal, valid and binding obligations, enforceable against it in accordance with their respective terms, subject to applicable bankruptcy, insolvency and similar laws affecting generally the enforcement of creditors' rights and general principles of equity.

**Section 4.3    Consent; No Conflicts**.  To the Knowledge of Licensee, no filing with or notice to, and no Permit, authorization, consent or approval of, any Governmental Authority or other Person is necessary for the execution and delivery by Licensee of the Transaction Documents or the consummation of the Transaction or the transactions contemplated thereby. The execution, delivery, and performance of the Transaction Documents do not, and the consummation of the Transaction and the transactions contemplated thereby will not, with the passage of time or the giving of notice, or both, violate, conflict with or result in the breach of any term, condition or provision of, or require the consent of any Person under, (a) the certificate of incorporation, bylaws, stockholders agreement or similar organizational documents of Licensee, (b) any Law to which Licensee is subject or may become subject pursuant to the Transaction Documents, (c) any Order which is applicable to Licensor, or (d) any Contract to which Licensee is a party or by which Licensee is bound as of the Effective Date.  Any intellectual or industrial property materials that may be submitted by Licensee to Licensor for approval are original and do not infringe the rights of any other person, and are not confusingly similar to any other intellectual or industrial property.

**Section 4.4    Absence of Litigation; Governmental Orders**.  There are no Legal Proceedings pending or, to the Knowledge of Licensee, threatened against Licensee or any of its Affiliates seeking to enjoin, restrain, prohibit or otherwise delay the Transaction or the transactions contemplated by the Transaction Documents.  No event has occurred or circumstances exist that could reasonably be expected to give rise to, or serve as a basis for, any such action, Order or Legal Proceeding.

**Section 4.5    Compliance with Laws**.

(a)    To the Knowledge of Licensee, the operations and activities of Licensee have complied with and currently comply, in all material respects, with all Applicable Laws, with respect to its ownership and operation of Gentlemen's Clubs.

(b)    In connection with its ownership and operation of Gentlemen's Clubs, Licensee has not, at any time, received any written notice from any Governmental Entity or other Person regarding (i) any violation of or failure to comply with, in some material respect, any Law, (ii) any withdrawal, suspension, cancellation, termination of, or modification of any permit held by Licensee, or (iii) any obligation on the part of Licensee to undertake, or to bear all or any portion of the cost of, any remedial action, excluding routine incidental or other minor actions involving *de minimis* costs.

(c)    To the Knowledge of Licensee, in connection with its ownership and operation of Gentlemen's Clubs, no event has occurred, nor does any circumstance exist, that constitutes, or with notice, the lapse of time or both (i) may constitute or result in a violation by Licensee of, or a failure on the part of Licensee to comply with, any Laws, (ii) could result in the revocation, withdrawal, suspension, cancellation or termination of, or any modification to, any permit held by Licensee, or (iii) would give rise to an obligation on the part of Licensee to undertake, or to bear all or any portion of the costs of, any remedial action of a material nature.

Section 4.6    **Full Disclosure**.    No representation or warranty by Licensee in this Agreement and no statement contained in the Schedules to this Agreement or any certificate or other document furnished or to be furnished to Licensor pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading. Upon request, Licensee shall provide Licensor with a written certification that all such representations and warranties not expressly qualified by date or time remain true and accurate as of the date of such certification.

## ARTICLE 5
## OTHER COVENANTS AND AGREEMENTS

Section 5.1    **Disclosure of Books and Records Relating to Third-Party Licenses and Licensed Marks**.    Upon the Closing and throughout the Term, Licensor shall provide Licensee, upon Licensee's written request, originals, or where not available, copies, of all books and records necessary for Licensee to administer the Third-Party Licenses and to monetize, exploit and commercialize the Licensed Marks in connection with the Licensed Services, including but not limited to, books of account, ledgers, and general, financial and accounting records; list of the Licensed Marks and files directly relating thereto; licensee, franchisee and patron lists and purchasing histories; price lists, distribution lists and supplier lists; data; systems and procedures relating to the Licensed Marks in connection with the Licensed Services, quality control records and procedures and operating systems; patron complaints and inquiry files; strategic plans, research and development materials and files; records and data (including all correspondence with any Governmental Entity); sales and licensing and other revenue related material and records (including pricing history, total revenues, terms and conditions of sales, licenses, and pricing policies and practices); internal financial statements; marketing and promotional surveys; and all other books, records, licenses and other agreements in Licensor's possession relating specifically to the Third-Party Licenses to be assigned and the Licensed Marks to be licensed in connection with the Licensed Services to Licensee pursuant to this Agreement.

Section 5.2    **Efforts**.    Upon the Closing and throughout the Term, the Parties agree to use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective as promptly as practicable, the Transaction and the transactions contemplated by this Agreement and the other Transaction Documents, and to cooperate with each other in connection with the foregoing, including using their respective commercially reasonable efforts to effect all filings, obtain all assignments, waivers, consents, novation, amendments, approvals and

authorizations to properly effect, implement or fully consummate any of the matters contemplated by this Agreement or the other Transaction Documents.

Section 5.3    **Public Announcements**.  Neither Party nor any of their Affiliates, agents, licensees, or representatives, shall issue any press release or otherwise make any public statements with respect to the Transaction Documents or the transactions contemplated thereby without the prior written consent of the other Party.

Section 5.4    **Use of the Restricted Names and Designs**.  Licensor hereby agrees that, upon the Closing and throughout the Term, Licensor shall not, and shall not permit its Affiliates to, use the Licensed Marks in connection with such Person's ownership or operation of Gentlemen's Clubs; *provided* that Licensor shall have the right to use the Licensed Marks in connection with advertising and promotion of the Gentlemen's Clubs as set forth in this Agreement.  Notwithstanding the foregoing, nothing contained herein shall prevent Licensor or its Affiliates from owning or operating bars, nightclubs or other entertainment venues, that are not Gentlemen's Clubs, bearing or utilizing Licensor's or its Affiliates' trademarks including, without limitation, the Licensed Marks and the Additional Marks; *provided*, that for the avoidance of doubt, the Licensor and its Affiliates shall only have the right to own or operate a bar, nightclub or other entertainment venue, that is not a Gentlemen's Club, under the name "THE PENTHOUSE CLUB", or under any name in which the word "PENTHOUSE" is immediately adjacent to the word "CLUB" (*e.g.*, "Club Penthouse" or "Penthouse Club") in jurisdictions where the ownership or operation of Gentlemen's Clubs is prohibited under Applicable Law.

Section 5.5    **Collection of Payments**.  From and after the Closing, and notwithstanding any consideration payable to Licensor or any of its Affiliates pursuant to this Agreement or any other Transaction Document, if Licensor or any of its Affiliates receives or collects any funds relating to the Third-Party Licenses or any New Contracts (including, but not limited to, any royalties or other revenues with respect thereto and any proceeds from Claims brought against other Persons for any breach thereof), Licensor shall, or shall cause its Affiliates to, as applicable, notify Licensee or its representatives of the same and remit such funds to Licensee within ten (10) Business Days after Licensee's receipt of such notice.

Section 5.6    **Accounting and Audit Rights**.

(a)    Within 90 days following the end of each calendar year, Licensee shall deliver to Licensor an accounting statement (each, an "Accounting Statement") setting forth a description of Royalties paid, Gross Third-Party License Fees actually received, and Third-Party License Expenses deducted, during each immediately preceding calendar year. Licensor will be deemed to have consented to all Accounting Statements rendered by Licensee, which will be binding upon and not subject to objection by Licensor unless specific written objection to such Accounting Statement is received by Licensee within one year from the date such Accounting Statement was rendered.

(b)    Licensee shall keep books and records relating to the New Contracts and any Third-Party License Expenses incurred by Licensee ("Licensee Books and Records").  At Licensor's sole cost and expenses (except as otherwise expressly provided below), Licensor may

itself or through a certified public accountant audit the Licensee Books and Records directly relating to the immediately preceding Accounting Statement once annually during the Term to ensure the accuracy of Royalty accounting, reporting and payments. Any such audit shall take place at Licensee's principal place of business during normal business hours, and shall not unreasonably interfere with Licensee's course of business. No audit with respect to any Accounting Statement may commence later than 12 months from the rendition of the Accounting Statement nor continue for longer than 30 consecutive days. Licensor's right to examine Licensee Books and Records is limited to records specifically relating to the New Contracts and Third-Party License Expenses that form the basis of the corresponding Accounting Statement.

(c)     In the event Licensor is underpaid by Licensee, Licensor shall send written notice to Licensee specifically identifying such underpaid amount (along with reasonable supporting documentation, if requested by Licensee). If the Parties disagree as to the existence and/or amount of such underpayment, they shall use commercially reasonable efforts to resolve the dispute. If the Parties are unable to resolve any such dispute, then they shall submit to binding mediation with a mutually agreed upon mediator and associated procedures and rules for resolution in mediation. The underpaid amount agreed upon by the Parties or established in binding mediation, as applicable, shall be added to and included in the calculation of Royalties in the calendar quarter during which such underpayment is agreed upon or established in mediation, as applicable, and shall be furnished by Licensee in accordance with Section 1.4(b).

**Section 5.7    Transfer Taxes**. All transfer, documentary, sales, use, lease, consumption, stamp, registration, value added and other such transfer Taxes and fees (including any penalties and interest related thereto) (collectively, "Transfer Taxes") incurred in connection with this Agreement and the other Transaction Documents shall be borne and paid by Licensee when due, and Licensee shall, at its own expense, timely file any Tax Return or other document with respect to such Transfer Taxes (and Licensor shall cooperate with respect thereto as necessary); *provided*, *however*, that any Transfer Taxes incurred in connection with the reversion of rights and assets to Licensor upon termination by Licensee or expiration of this Agreement shall be borne and paid by Licensor when due, and Licensor shall, at its own expense, timely file any Tax Return or other document with respect to such Transfer Taxes (and Licensee shall cooperate with respect thereto as necessary). Each Party shall cooperate with the other Party in providing each other with any appropriate exemption certificates and other similar documentation related to the transactions contemplated in this Agreement and the other Transaction Documents.

**Section 5.8    Infringement and Maintenance of Licensed Marks**.

(a)     Licensee shall notify Licensor in writing of Licensee's actual knowledge of any infringements of the Licensed Marks, and Licensor shall have the sole right (except as expressly provided in this Section 5.8) to prosecute infringements and other similar actions or proceedings (collectively, "Assertions") against third parties in order to enforce its and Licensee's rights in the Licensed Marks. If requested to do so, Licensee and its Affiliates shall reasonably cooperate with Licensor, at Licensor's cost, in any such Assertion, including joining as a party in any Legal Proceeding. Licensee shall not institute any suit or take any action on account of any such infringements or imitations without first obtaining the written consent of the Licensor to do so; *provided*, that if Licensor fails to institute such Legal Proceeding and/or

diligently take any other commercially reasonable action on account of any such infringement, imitation or other Assertions within ten Business Days of becoming aware thereof, Licensee shall have the right, but not the obligation, at Licensee's cost, to institute Legal Proceedings or take any other reasonable action to protect its rights in the Licensed Marks, and upon request by Licensee, Licensor and its Affiliates shall reasonably cooperate with Licensee, at Licensee's cost, in any such Legal Proceeding or other action, including joining as a party in any Legal Proceeding.  Except as otherwise contemplated by the Licensee Security Interest, Licensee shall not challenge or aid or assist others in challenging Licensor's exclusive ownership of the Licensed Marks.  Licensee shall immediately notify Licensor of the receipt of any claim that Licensee's use of the Licensed Marks violates the rights of any third party and shall fully cooperate upon Licensor's request, at Licensor's cost, with the Licensor in any litigation, proceeding or settlement that the Licensor shall deem advisable in connection with any such claim. Any award, or portion of an award, recovered in any such Assertion or other Legal Proceeding shall be split proportionately among Licensor and Licensee to recoup the Parties' respective expenses actually paid in connection therewith and to compensate such Parties' respective pecuniary losses resulting therefrom.

(b)      Licensor shall take commercially reasonable steps to maintain all Licensed Marks registered with the United States Patent and Trademark Office and all applicable foreign trademark registries maintained by any Governmental Entity (the "Registrations").  Licensor may select counsel of its choice to conduct such maintenance, but, during the Term of this Agreement, if any maintenance fees or maintenance filings have not been made by the maintenance deadline, excluding the six-month grace period, then Licensee may, at Licensee's option, and without limitation to Licensee's other rights and remedies under this Agreement, pay such fees and make such filings, if allowable by the applicable Governmental Entity, and Licensor shall reimburse Licensee for all related fees and costs, including reasonable attorneys' fees and advisors' fees.

(c)      Upon Licensee's request in writing and at Licensee's cost (which, for the avoidance of doubt, shall be deemed a Third-Party License Expense hereunder), Licensor shall promptly (i) apply to register any or all of the Licensed Marks with any foreign trademark registries maintained by any Governmental Entity where the Licensed Marks are not registered as of the Effective Date, as requested by Licensee, and (ii) apply to register any or all heretofore unregistered marks and/or trade names with the United States Patent and Trademark Office and all applicable foreign trademark registries maintained by any Governmental Entity, as requested by Licensee (collectively, the "New Registrations").  Without limiting the generality of Section 5.16, any such New Registrations shall be deemed to be automatically included within the License Grant hereunder without the necessity of any action by Licensee or Licensor hereunder, and shall be subject to all of the terms and conditions of this Agreement, including, but not limited to, the Parties' rights and obligations with respect to infringements and maintenance set forth in this Section 5.8, Licensee's quality control obligations set forth in Section 5.9, and Licensee's rights and remedies set forth in Section 5.12.   When requested, Licensor will cooperate with Licensee in amending Schedule 1.1(a) of this Agreement and Exhibit A to the Security Agreement, and perform any other acts deemed necessary or desirable to memorialize the foregoing and carry out the purposes of this Section 5.8(c).

(d)    Licensor recognizes that a breach of any obligation in <u>Section 5.8(b)</u> could irreparably harm and prejudice Licensee's rights under this Agreement, and, to the extent allowable under Applicable Law, Licensor hereby appoints Licensee and Licensee's designees as its attorney-in-fact to take any reasonable steps necessary to maintain such Registrations and otherwise to exercise Licensee's rights under <u>Section 5.8(b)</u>.  Licensor agrees that the foregoing designation constitutes a power coupled with an interest, is irrevocable throughout the Term and may be exercised in Licensee's reasonable discretion.    Licensee agrees to keep Licensor reasonably informed in writing of any material actions taken by Licensee pursuant to such designation, and Licensee shall not execute any documents as attorney-in-fact pursuant to this <u>Section 5.8</u> unless Licensor fails to execute and deliver such documents within five (5) Business Days after request by Licensee to do so, unless a shorter period is reasonably required under the circumstances.  Licensee shall not be liable to Licensor or any of its Affiliates for any action or failure to act on such Person's behalf within the scope of authority conferred on Licensee hereunder.  Licensee shall have the right to settle or compromise any Claim relating to the maintenance of such Registrations on the basis that Licensee, in its good faith business judgment deems advisable.

**Section 5.9    <u>Quality Control</u>.**

(a)    Licensee shall use its commercially reasonable efforts to (i) maintain the existing standards and quality of the products, goods and services provided by or on behalf of Licensee and parties to the Third-Party Licenses under, in connection with and utilizing the Licensed Marks (the "<u>Branded Goods and Services</u>"), consistent with the customary ownership and operation of Gentlemen's Clubs; and (ii) comply with and abide by all Laws applicable thereto and to correct any alleged violations thereof.  In all sub-licenses of the Licensed Marks entered into and granted by Licensee during the Term, Licensee shall require that all sub-licensees thereunder contractually agree to adhere to the general scope of the quality control provisions set forth hereinbelow.

(b)    Licensee shall submit all of its advertising, promotional, or other business materials (excluding real-time social media advertising) bearing the Licensed Marks to Licensor for approval in accordance with <u>Section 1.1(d)(i)</u>.  Any use of the Licensed Marks by Licensee's sub-licensees must meet Licensor's quality control standards specified in this <u>Section 5.9</u>, and must continue to be of substantially the same quality during the Term, and Licensor reserves its rights to reasonably request and review specimens depicting the Licensed Marks throughout the Term for the purpose of reviewing the quality thereof.  In the event that there is a substantial and adverse change in the quality of the usage of the Licensed Marks by such Persons, Licensor and Licensee will confer in an effort to resolve such dispute in accordance with this <u>Section 5.9</u>, and until such time as the dispute is resolved, Licensee shall cease any further sublicensing of the Licensed Marks to such Persons until the quality of the usage of the Licensed Marks by such Persons is corrected.  Licensee agrees that it will use its commercially reasonable efforts to ensure that the quality of its and its sub-licensees' Gentleman's Club(s) utilizing the Licensed Marks will remain consistent with the high quality products and services currently offered by Licensor, and to promptly correct any of its uses, or require its sub-licensees to correct any of their uses, of the Licensed Marks in a manner that could reasonably be expected to adversely reflect upon or damage the goodwill or reputation of the Licensed Marks or Licensor. Licensor shall have a right of sufficient access at reasonable times, and upon at least three Business Days'

advance notice, to Licensee's facilities to permit Licensor or its representative to ensure that the quality of any location using the Licensed Marks is in accordance with these standards. Licensee acknowledges that the maintenance of the high quality of the Licensed Marks and the associated goods and services, and compliance with the foregoing quality control provisions, are material conditions of this Agreement.

(c)     Prior to entering into any New Contract, Licensee shall, at its own cost and expense, verify in writing to Licensor for each New Contract that the New Contract is in substantial conformity with this Agreement, the third-party sub-licensee qualifies for sub-licensing under the terms of this Agreement, and complies with the quality control provisions in this Section 5.9.

(d)     Licensee shall use commercially reasonable efforts to maintain the distinctiveness of the Licensed Marks, the image of the brand, and the image and high quality of the services and merchandise bearing the Licensed Marks presently manufactured and sold by Licensor and its other licensees, and Licensee agrees that anything bearing the Licensed Marks will be of high quality as to workmanship, fit, design and materials.

(e)     If Licensor reasonably determines that such Branded Goods and Services shall fail to conform with the standards of quality as contemplated herein, Licensor or its authorized representative shall so notify Licensee of the same in writing.  Upon receipt of such notification, Licensee shall use its commercially reasonable efforts to cure any such deficiencies to the reasonable satisfaction of Licensor within 60 days thereafter (the "Quality Control Cure Period").  If, upon expiration of the Quality Control Cure Period, Licensor provides Licensee with written notice of its failure to reasonably cure such deficiency, the Parties shall continue to use their commercially reasonable efforts to resolve any disputes related thereto.  If the Parties are still unable to resolve any dispute over the alleged deficiency, then they shall submit to binding mediation with a mutually agreed upon mediator and associated procedures and rules for resolution in mediation.

    **Section 5.10    Overpayments**.  If Licensee makes any overpayment to Licensor for any reason, or if Licensor is indebted to Licensee for any reason, Licensee shall send written notice to Licensor specifically identifying such overpayment (along with reasonable supporting documentation, if requested by Licensor).  If the Parties disagree as to the existence and/or amount of such overpayment, they shall use commercially reasonable efforts to resolve the dispute.  If the Parties are unable to resolve any such dispute, then they shall submit to binding mediation with a mutually agreed upon mediator and associated procedures and rules for resolution in mediation.   Licensor shall pay Licensee such overpayment or indebtedness as agreed upon by the Parties or established in binding mediation, as applicable, after receiving a written demand from Licensee.

    **Section 5.11    Licensee's Right to Franchise**.  Licensor acknowledges and agrees that Licensee may desire to enter into franchise agreements with third parties to operate Gentlemen's Clubs utilizing the Licensed Marks.  The Parties acknowledge and agree that they shall negotiate in good faith and promptly memorialize in writing any such additional agreements or documents that may be necessary to effectuate any such franchising agreements.

**Section 5.12    Security Interest**.

        (a)     During the Term, and as security for the Secured Obligations (as defined in Section 5.12(d)), whether now or hereafter due or arising, Licensor hereby pledges, conveys, hypothecates, mortgages, assigns, sets over, delivers and grants to Licensee a continuing first priority security interest (the "Licensee Security Interest") in all of the right, title and interest of every kind or nature whatsoever of Licensor in and to, but none of its obligations with respect to, all intellectual property and industrial property rights to the trademark THE PENTHOUSE CLUB (as described more fully in Exhibit A to the Security Agreement, the "Secured Mark") in connection with Gentlemen's Clubs, including, without limitation, the following described items, whether now owned or existing or hereafter created, acquired or arising, and wherever located (collectively, the "Licensee Collateral"):

        (i)     All of the right, title and interest of Licensor of every kind and nature (including, without limitation, trademarks and copyrights, and any extensions and renewals thereof and any rights related thereto and/or to neighboring rights recognized under the Laws of any jurisdiction with respect to the Secured Mark) in and to the Secured Mark and underlying rights therein and all like or similar rights that may now or hereafter be retained or recovered by Licensor with respect to the Secured Mark.

        (b)     In addition to Licensor's obligation to execute and deliver to Licensee the Security Agreement hereunder, Licensor agrees, from time to time, to promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that Licensee may reasonably request, in order to perfect, protect, evidence, renew and/or continue the security interest granted or purported to be granted hereby and pursuant to the Security Agreement or to enable Licensee to exercise and enforce its rights and remedies hereunder with respect to the Licensee Collateral or otherwise effectuate the purpose and intent of this Agreement.  Notwithstanding the foregoing, except as provided in the Security Agreement, nothing contained herein shall require Licensor to execute and deliver at any time an absolute irrevocable assignment transferring to Licensee all right, title and interest of Licensor (and its Affiliates, as applicable) in and to the Licensee Collateral.  Licensee shall have the right to file and/or record with any relevant authority (i) the Security Agreement, (ii) upon providing prior written notice to Licensor, any financing statements and functionally similar instruments, and (iii) to the extent necessary to comply with any requirements or restrictions imposed in any applicable foreign jurisdiction, upon Licensor's consent (which shall not be unreasonably withheld), this Agreement, and, where permitted by Applicable Law, to do any of the foregoing with or without execution by or on behalf of Licensor.

        (c)     To enforce its rights hereunder, Licensee shall have all rights and remedies as a secured creditor available to it at Law and in equity.  In connection with Licensee's exercise of any and all such rights and remedies as a secured creditor, as and if applicable, Licensor hereby waives presentment for payment, protest and demand for payment and notice of protest, demand, dishonor and non-payment hereunder, and all other notices or demands otherwise required by Law that may lawfully be waived.

        (d)     As used in this Section 5.12, "Secured Obligations" means an (i) Event of Default by Licensor under Section 7.1(a)(i) which continues beyond the cure period specified by

Section 7.3 and that results in a final, non-appealable judgment, and/or (ii) an Event of Default by Licensor under Sections 7.1(a)(ii) or (iii).

### Section 5.13    Right of First Refusal.

(a)    During the Term, if Licensor or any of its Affiliates (collectively, the "Seller") desires to sell or otherwise transfer all of its rights to title and ownership ("Transfer") in:  (i) all or any portion of the Licensed Marks, (ii) all or substantially all of Seller's business or other assets, or (iii) all or a majority of Seller's capital stock or other equity interests (each of the Transfers identified in Section 5.13(a)(i)-(iii), the "Offered Business"), in each case to an entity other than an Affiliate of Seller in a transaction or series of transactions that results in a direct or indirect change of control of Licensor, excluding (A) a reorganization of the Licensor or other transaction the principal purpose of which is tax planning, (B) transfers by holders of the Seller's capital stock for estate or tax planning purposes, (C) a transaction (which may include a joint venture, strategic collaboration, partnership, license arrangement or similar structure) in connection with the licensing of any portion of Licensor's or its Affiliates' intellectual property rights (other than the Licensed Marks), (D) an initial public offering of the Seller, in which the gross proceeds are estimated to be at least $8 million, (E) a financing transaction (included, but not limited to, debt securities, promissory notes, term loans, revolving lines of credit, and similar instruments) and/or the re-financing thereof, and (F) the pledge or mortgage of all or any portion of Seller's business, assets or capital stock or other equity interests as collateral to secure its obligations in the ordinary course of business or in connection with any of the actions contemplated by clauses (A) through (E) hereof, then Seller shall first provide written notice (the "Initial Notice") to Licensee of such proposed Transfer (each, a "ROFR Event"), specifying in reasonable detail the Offered Assets (as defined below) that are the subject of such ROFR Event; provided, that with respect to clause (F), Licensor shall use its reasonable commercial efforts to obtain agreement from any such third-party pledgee or mortgagee that, in the event of a default under such pledge or mortgage, such pledgee or mortgagee shall take no action that would result in the termination of this Agreement in the absence of an assumption of Licensor's obligations hereunder.  As used in this Section 5.13, "Offered Assets" shall mean that portion of the Offered Business proposed to be Transferred.  For purposes of this Section 5.13, any Transfer proposed during the continuance of an event of default under a secured credit facility to which Licensor is party shall be referred to as a "Distressed Transfer".

(b)    During the sixty (60) day period (or, in the case of a Distressed Transfer, thirty (30) day period) following Licensee's receipt of an Initial Notice (or such other timeframe as may be mutually agreed upon) (the "Initial Offering Period"), Licensee, directly or indirectly through one or more of its Affiliates (collectively, "Licensee-Purchaser"), shall have the sole and exclusive right to negotiate with Seller regarding the acquisition of the Offered Assets that are the subject of the ROFR Event.  Each of Seller and Licensee-Purchaser covenants and agrees to negotiate in good faith with the other party throughout the Initial Offering Period.  In the event that Seller and Licensee-Purchaser are engaged in active good faith negotiations at the end of the Initial Offering Period with respect to the acquisition of all or any portion of the Offered Assets, then the Initial Offering Period shall be extended (and Licensee-Purchaser shall continue to have the exclusive right to negotiate with Seller regarding the acquisition of all or any portion of the Offered Assets) for an additional 10 days; provided, that this extension shall not apply to a Distressed Transfer.

(c)      In the event that Seller and Licensee-Purchaser do not enter into a definitive agreement prior to the expiration of the Initial Offering Period (as extended) with respect to the acquisition of all or any portion of the Offered Assets, then Seller shall have the right for a period of 30-days commencing on the expiration of such Initial Offering Period (such 30-day period, the "Solicitation Period") to solicit and negotiate with non-affiliated third parties (each, a "Potential Purchaser") for the acquisition of the Offered Assets. Seller must inform each Potential Purchaser of Licensee-Purchaser's rights under this Section 5.13. Notwithstanding the foregoing, the Solicitation Period with respect to any Distressed Transfer shall not be time limited and shall continue indefinitely, so long as Seller desires to pursue such Distressed Transfer.

(d)      In the event that Seller and Potential Purchaser reach a definitive binding agreement regarding the proposed Transfer to such Potential Purchaser of the Offered Assets (the "Transfer Proposal"), then Seller shall provide written notice (the "Final Notice") to Licensee of such Transfer Proposal (including a copy of the corresponding letter of intent, memorandum of understanding or other Contract, if any), specifying in reasonable detail the identity of the Potential Purchaser, the Offered Assets to be Transferred, and the terms and conditions of the proposed Transfer, including the proposed purchase price for such Offered Assets (the "Transfer Price").

(e)      During the 30-day period (or, in the case of a Distressed Transfer, fifteen (15) day period) following Licensee's receipt of a Final Notice (or such other timeframe as may be mutually agreed upon) (the "Matching Period"), Licensee-Purchaser shall have the exclusive right to acquire from Seller the Offered Assets proposed to be Transferred to Potential Purchaser under the Transfer Proposal, at the same Transfer Price, and subject to the same material terms and conditions, as described in the Final Notice. Licensee-Purchaser may exercise such right (and thereby have the exclusive right to negotiate and enter into a definitive agreement concerning the acquisition of such Offered Assets) by so notifying Licensor in writing prior to the expiration of the Matching Period.  In the event that Seller and Licensee-Purchaser are engaged in active good faith negotiations at the end of the Matching Period with respect to the acquisition of all or any portion of the Offered Assets, then the Matching Period shall be extended (and Licensee-Purchaser shall continue to have the exclusive right to acquire the Offered Assets in accordance with this Section 5.13) until such time as such active negotiation is concluded; provided, that this extension shall not apply in the case of a Distressed Transfer.

(f)      If Licensee-Purchaser does not elect to purchase the Offered Assets in accordance with this Section 5.13 prior to the expiration of the Matching Period then Seller may Transfer the Offered Assets to the Person(s) named as transferee(s) in the Final Notice or any other Person; provided, that such Transfer (i) is at the Transfer Price (or a higher price), and subject to the same material terms and conditions as described in the Final Notice, (ii) is consummated within the later to occur of 120 days after the expiration of the Matching Period or receipt of any regulatory approvals required to consummate the Transfer, and (iii) is in accordance with all the terms of this Agreement, including, without limitation, Licensee's ownership of the Third-Party Licenses and exclusive worldwide license of the Licensed Marks hereunder which shall remain in full force and shall be binding, effective and enforceable against such transferee(s) as successor to Licensor hereunder.  If Licensor's proposed Transfer of the Offered Assets does not comply with the terms and conditions of this Section 5.13(f), then Seller

may not Transfer any of the Offered Assets.  Notwithstanding anything herein to the contrary, the provisions of this Section 5.13 shall not apply to a ROFR Event in respect of Offered Assets more than once within a 12-month period commencing upon the date of the Initial Notice; *provided*, that following the application of this Section 5.13 in any given 12-month period, during the remainder of such 12-month period Seller shall not be able to Transfer to any Person such Offered Assets at a lower price than the Transfer Price, or subject to materially different terms and conditions than those described in the Final Notice, without complying again with the provisions of Section 5.13(e) and (f).

(g)    This Section 5.13 shall terminate and have no further effect upon the consummation of an initial public offering of the Seller's capital stock in which the gross proceeds received are at least $8 million.

**Section 5.14    Non-Competition;  Non-Solicitation;  Non-Disparagement**.  Licensor hereby agrees to the restrictive covenants set forth in this Section 5.14.

(a)    From the Closing until the expiration of the Term, as renewed or otherwise terminated as provided herein, (the "Restricted Period"), each of Licensor and its Affiliates shall not, directly or indirectly, within the entire world (the "Restricted Territory") and in connection with Gentlemen's Clubs, for its own benefit or for the benefit of any other Person, in any capacity (as a principal, shareholder, partner, member, manager director, officer, agent, executive, consultant, contractor, employee, lender or otherwise):

(i)    induce, solicit, recruit or attempt to persuade any Person who is (or becomes during the Restricted Period) employed by, a licensee, or performs (or will perform during the Restricted Period) services for Licensee or its Affiliates at any time during the Restricted Period, to terminate such Person's employment, license, or other relationship with Licensee or its Affiliates or not to establish an employment, license, or other relationship with Licensee or its Affiliates, whether or not such Person is or would be during the Restricted Period an employee, licensee, consultant, contractor, manager, officer and/or director, whether or not such relationship is or would be pursuant to a written or oral agreement and whether or not such relationship is for a specific period or is at-will;

(ii)    employ or establish a business relationship with (or attempt to employ or establish a business relationship with), or encourage or assist any Person to employ or establish a business relationship with, any individual who is or was an employee, licensee, consultant, contractor, manager, officer or director of Licensee or its Affiliates during the Restricted Period;

(iii)    (A) direct or engage in any act which may interfere with or adversely affect, alter or change the relationship (contractual or otherwise) of Licensee or its Affiliates with any Person (1) for whom or which Licensee or its Affiliates at any time performed services or to whom or which Licensee or its Affiliates at any time sold, leased, distributed or licensed its products or services in connection with the Licensed Services during the Restricted Period; (2) whose business was solicited by, or who was otherwise in negotiations to enter into a business relationship with, Licensee or its Affiliates at any time during the Restricted Period in connection with the Licensed Services; or (3) that is or was a vendor,

supplier, lessor, licensor or contractor of, or who otherwise has a business relationship with, Licensee or its Affiliates during the Restricted Period in connection with the Licensed Services; (B) otherwise induce or attempt to induce any such Person to cease doing business, reduce or otherwise limit its business with Licensee or its Affiliates in connection with the Licensed Services; or (C) solicit business from any such Person during the Restricted Period; or

(iv)    directly or indirectly, for its or his own benefit or for the benefit of any other Person, in any capacity (as a principal, shareholder, partner, member, manager director, officer, agent, executive, consultant, contractor, employee, lender or otherwise), own, manage, operate, control, be employed by, engage or participate in, be financially interested or allow his skill, knowledge, experience or reputation to be used by, or otherwise be connected with the ownership, management, operation or control of any Person involved in a Gentlemen's Club or otherwise competes with the Gentlemen's Clubs.

Notwithstanding the foregoing, <u>Sections 5.14(a)(i)-(iii)</u> shall not preclude Licensor from soliciting, hiring, employing or otherwise engaging any employee, consultant, contractor or other Person who performed or performs services for Licensee who (1) responds to a general solicitation through a public medium or general or mass mailing by or on behalf of Licensor, or a Person controlled by Licensor, or (2) responds to a solicitation by a bona fide search or services firm; <u>*provided*</u>, such search or services firm has been directed not to solicit employees, consultants, contractors or such other Persons of Licensee.

(b)    From and after the Effective Date, each of the Parties and their Affiliates shall not make any statements, whether written or oral, directly or indirectly (or encourage others to make any such statements) that defame, disparage or demean the Licensed Marks, the other Party and their businesses, Affiliates, or their respective officers, directors, employees, shareholders, members, managers, partners, agents or products or services. The foregoing shall not be violated by truthful statements (i) in response to legal process, (ii) in required governmental testimony or filings, (iii) made pursuant to any applicable "whistleblower" Laws, or (iv) in administrative or other arbitral or other Legal Proceedings.

(c)    The Parties hereto agree that, if any court of competent jurisdiction in a final non-appealable judgment determines that a specified time period, a specified geographical area, a specified business limitation or any other relevant feature of this <u>Section 5.14</u> is unreasonable, arbitrary or against public policy, then a lesser time period, geographical area, business limitation or other relevant feature determined by such court to be reasonable, not arbitrary and not against public policy may be enforced against the applicable Party.

**Section 5.15    <u>Confidentiality</u>**.

(a)    As used in this <u>Section 5.15</u>, the term "<u>Confidential Information</u>" means any information, knowledge or data of any nature and in any form (including information that is electronically transmitted or stored on any form of magnetic or electronic storage media) relating to the subject matter of this Agreement or the past, current or prospective operations of the Parties or any of their respective predecessors or Affiliates, whether produced by the individual Party, its Affiliates or any of their respective consultants, employees, agents or independent contractors or by a Party or its predecessors or Affiliates, and whether or not marked

confidential, including, without limitation, research, plans and developments; prototypes, proposals, products and services; customer and/or patron lists and customers and/or patrons; operations manuals; prospective customers and/or patrons and contacts; customer, patron and licensee purchasing practices; prices, pricing methodology and cost information; terms and conditions of business relationships with customers, patrons and/or licensees; customer, patron and/or licensee research and other needs; markets and market demographics and other related information; software and other technology; developments, inventions, processes and formulas; engineering, concepts, designs and drawings; merchandising, marketing and advertising; distribution and sales methods and systems; sales and profit figures; and finances and personnel information (including information regarding compensation, skills, training, promotions, and duties).

(b)    Each Party shall hold for the benefit of the other Party and its Affiliates all Confidential Information which shall have been obtained by the receiving Party or its Affiliates (by whatever means) during or prior to the Term hereunder, and shall use such Confidential Information solely for the exclusive benefit of the disclosing Party and its Affiliates (except as otherwise expressly contemplated by this Agreement).  Each Party acknowledges that such Confidential Information is specialized, unique in nature and of great value to each Party hereunder and its Affiliates, and that such information gives each Party and its Affiliates a competitive advantage.  During, and following the end of, the Term, each Party agrees (i) not to disclose to any Person (other than the disclosing Party or its Affiliates) any Confidential Information, except upon the prior written authorization of the disclosing  Party  or as may be required by law or legal process, and (ii) upon request of a particular Party or its Affiliates or any of their respective representatives or advisors, to deliver promptly to the disclosing Party or its Affiliates any Confidential Information in a Party's or its Affiliates' possession, including any duplicates thereof and any notes or other records a Party or its Affiliates has prepared with respect thereto.

(c)    In the event a Party receives a request or demand, orally, in writing, electronically or otherwise, at any time for the disclosure or production of Confidential Information pursuant to a judicial, administrative, arbitral or other adversarial proceeding, such Person must promptly notify the other Party by telephone in accordance with <u>Section 8.8</u>. Regardless of whether such Person is successful in reaching the other Party by telephone, such Person also must promptly notify the Party that was called in writing in accordance with <u>Section 8.8</u>.  A copy of the request or demand as well as any and all documents potentially responsive to the request or demand shall be included with the written notification.  The telephoning Party will wait a minimum of ten days (or the maximum time permitted by such legal process, if less) after sending the letter before making a disclosure or production to give the other Party and its Affiliates time to determine whether the disclosure or production involves Confidential Information, in which event the particular Party or its Affiliates may seek to prohibit and/or restrict the production and/or disclosure and/or obtain a protective order with regard thereto.  If the non-telephoning Party or its Affiliates elects to seek a protective order with respect to any Confidential Information, the other Party and its Affiliates shall assist the other Party or such Affiliate(s) in obtaining such protective order, as reasonably requested by said Party or such Affiliate(s).  If the request or demand is in conjunction with judicial, administrative, arbitration or other adversarial proceedings, copies of all correspondence regarding the request or demand shall be included with the information sent to the non-telephoning Party.

(d)    Following the expiration of the Term or other termination of this Agreement, or at any other time a Party or its Affiliates may request, each Party hereby agrees to furnish to the other Party all files, property, memoranda, notes, plans, records, reports and other documents and data (and all copies thereof) belonging to the other Party or any of its Affiliates that embody or relate to the Confidential Information or the business of the other Party or any of its Affiliates which the other Party or any of its Affiliates may then possess or have under its control (actual or constructive).  Each Party shall take any and all reasonable actions deemed necessary or appropriate by the particular Party from time to time in its sole discretion to ensure the continued confidentiality and protection of the Confidential Information.  Each Party shall notify the other Party promptly and in writing of any circumstances of which the Party has knowledge relating to any possession or use of the Confidential Information, or any part thereof, by any other Person as soon as practical in an orderly and organized fashion, but in any event no later than the expiration of the Term or other termination of this Agreement.

(e)    Further, during the Term, Licensee will use commercially reasonable efforts to ensure that any party under a New Contract will: (i) comply with all applicable data protection laws; (ii) comply with all of Licensor's reasonable requirements regarding the data protection laws as provided in writing in advance to Licensee; (iii) upon Licensor's request and at Licensor's expense, do and execute, or arrange to be done and executed, each act, document and thing reasonably necessary to keep Licensor in compliance with any of the data protection laws as it relates to any actions or inactions of Licensee and its sub-licensees; and (iv) subject in all respects to Section 5.14 and the other paragraphs of this Section 5.15, permit Licensor and its Affiliates to use any data or other information each of them gathers concerning Licensee and its Affiliates in connection with Licensee's and its sub-licensee's establishment and operation of the Gentleman's Club(s).

**Section 5.16    After-Acquired Intellectual Property.**

(a)    Licensor hereby acknowledges and agrees that all After-Acquired IP (as defined below) shall be automatically deemed to be included in the Licensed Marks subject to and included in the License Grant pursuant to Section 1.1(a).  If any of the After-Acquired IP may not, by operation of law, be deemed to be automatically included within the License Grant hereunder, or if all right, title and interest of the intellectual property rights therein shall not otherwise be deemed to be licensed to Licensee hereunder, Licensor hereby agrees to grant to Licensee, and does hereby grant to Licensee, without further consideration, an exclusive, sub-licensable, unlimited license, free and clear of all Liens, to use, sub-license, franchise (and sub-franchise) and otherwise monetize, exploit and/or commercialize anywhere in the world during the Term (subject to the terms and conditions of this Agreement) all of Licensor's and its Affiliates' right, title and interest in the After-Acquired IP.

(b)    Licensor hereby agrees to perform, upon the reasonable request of Licensee or its Affiliates or any of their respective representatives or advisors, during the Term, such further acts as may be necessary or desirable to transfer, perfect and defend Licensee's foregoing license in such After-Acquired IP.  When requested, Licensor will:  (i) execute, acknowledge and deliver any requested declarations, affidavits and/or documents of license, assignment and conveyance; (ii) obtain and aid in the enforcement of copyrights, trade secrets and, if applicable, patents, trademarks or service marks with respect to the After-Acquired IP in

any countries in accordance with the other terms and conditions of this Agreement; (iii) provide testimony in connection with any proceeding affecting Licensee's foregoing license in any such After-Acquired IP; and (iv) perform any other acts deemed necessary or desirable to carry out the purposes of this Agreement.  Licensee will reimburse all reasonable out-of-pocket expenses incurred by Licensor at Licensee's request in connection with the foregoing.

(c)    For purposes of this Section 5.16, "After-Acquired IP" shall mean all intellectual property rights relating to, without limitation, all trade secrets, U.S. and international copyrights, trademarks and trademark applications, service marks, patents and patent applications, discoveries and improvements, and other rights in any formulations, products, apparatus, compositions of matter, operating manuals, methods, programming, documentation, technology or other information or work, whether registered or un-registered, and all common law rights therein (collectively, the "IP") that: (i) results from any work performed by Licensor for Licensee or its Affiliates relating to the Licensed Marks or the Third-Party Licenses limited to the Licensed Services; (ii) relates to the business and interests of Licensee or its Affiliates as it relates to the Licensed Marks or the Third-Party Licenses limited to the Licensed Services; or (iii) otherwise relates to the ownership, management and operation of Gentlemen's Clubs or the Licensed Services and licensing of intellectual property in connection therewith, in each case that Licensor or its Affiliates conceives, develops, purchases or otherwise acquires or delivers to Licensee or its Affiliates at any time during the Term.

(d)    During the Term, Licensor shall promptly report the conception, development, purchase or other acquisition of any After-Acquired IP in writing to Licensee.

(e)    This Section 5.16 is without limitation to, and does not relieve Licensor of, any of its obligations, agreements or covenants (including pursuant to Sections 5.14 – 5.15 hereof) otherwise set forth in and/or required pursuant to the Transaction Documents.

**Section 5.17  Bankruptcy**.  The Parties acknowledge and agree that in connection with the License Grant and the Licensed Marks, (a) the Licensed Marks and rights therein licensed to Licensee hereunder are fundamentally in the nature of, and shall be deemed to be a license of rights to, "intellectual property" as defined in Section 101 of Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor statute (the "Bankruptcy Code"); (b) that Licensee's continued enjoyment of the Licensed Marks and rights therein licensed to Licensee hereunder is of the essence of this Agreement and fundamental to the rights granted hereunder, and therefore all of the Licensed Marks and rights therein licensed to Licensee hereunder shall be deemed intellectual property subject to Licensee's election under Section 365(n)(1)(B) of the Bankruptcy Code to the extent permitted by Applicable Law and acceptable to the bankruptcy court; and (c) in the event of any rejection or proposed rejection of this Agreement in any bankruptcy proceeding, to the extent permitted by Applicable Law and acceptable to the bankruptcy court, (i) Section 365(n) of the Bankruptcy Code shall be implicated and (ii) Licensee shall not be required to tender to Licensor any Royalties accrued after such rejection above and beyond the Minimum Guaranteed Royalties for the duration of the Term and any Renewal Term.  Notwithstanding anything contained herein to the contrary, the Parties further agree that upon a valid election by Licensee pursuant to Section 365(n)(1)(B) of the Bankruptcy Code, to the extent permitted by Applicable Law and acceptable to the bankruptcy court, Licensee shall be entitled, on its own or through employees, contractors,

agents or otherwise, to upgrade, modify and develop derivative works based upon the Licensed Marks and rights therein granted to Licensee hereunder.  In the event of the rejection of the Agreement under section 365 of the Bankruptcy Code, if Licensee engages in continued use of the Licensed Marks and rights licensed therein, Licensee shall pay all Consideration and Minimum Guaranteed Royalties due under the Agreement for the duration of such contract, including any Renewal Term, without any right of offset Licensee may have with respect to such contract under the Bankruptcy Code or other Applicable Law.  For purposes of this <u>Section 5.17</u> only, Licensor acknowledges Licensee's reasonable commercial interest in preserving its right to use the Additional Marks for Permitted Advertising as set forth in <u>Section 1.1(i)</u>, and Licensor agrees to use its reasonable commercial efforts, to the extent permitted by Applicable Law and acceptable to the bankruptcy court, to assist Licensee in such preservation of rights.

**Section 5.18    <u>Exploitation; Sole Discretion</u>**.  Licensor hereby expressly acknowledges and agrees that, subject to the terms of this Agreement, including without limitation, <u>Section 5.9</u> hereof, Licensee will have the right, as it may determine in good faith and in its sole, absolute discretion, (a) to determine the manner and means of its ownership and operation of the Gentlemen's Clubs; and (b) to determine the license fees, royalties, advance payments, admission fees, refunds, rebates, discounts, allowances and/or any and all amounts and forms of consideration (if any), parties, and all other terms and conditions of any Contract entered into, amended, amended and restated or otherwise (including any New Contract or Third-Party License), by Licensee for the monetization, exploitation and/or other commercialization of the Licensed Marks pursuant hereto.

**ARTICLE 6**
**<u>INSURANCE; INDEMNIFICATION</u>**

**Section 6.1    <u>Insurance</u>**.

(a)    At all times during the Term of this Agreement, but only with respect to Licensee's ownership and operation of Gentlemen's Clubs utilizing the Licensed Marks, Licensee shall procure and maintain, at its sole cost and expense commercial general liability insurance with limits of no less than $1,000,000 per occurrence and $2,000,000 in the aggregate, including bodily injury and broad form property damage, and products and completed operations and advertising liability, which policy will include contractual liability coverage insuring the activities of Licensee under this Agreement.  With respect to Licensee's ownership and operation of Gentlemen's Clubs utilizing the Licensed Marks, Licensee shall also maintain statutory worker's compensation coverage for each accident and for each occupational disease per employee with limits of not less than $1,000,000 per occurrence.

(b)    All insurance policies required pursuant to this <u>Section 6.1</u> shall:

(i)    be issued by insurance companies licensed and admitted to do business in the State of California or otherwise reasonably acceptable to Licensor;

(ii)    provide that such insurance carriers give Licensor at least 30 days' prior written notice of cancellation or non-renewal of policy coverage; *provided* that, prior to

such cancellation, Licensee shall have new insurance policies in place that meet the requirements of this <u>Section 6.1</u>;

           (iii)     waive any right of subrogation of the insurers against Licensor or any of its Affiliates; provide that such insurance be primary insurance and any similar insurance in the name or and/or for the benefit of Licensor shall be excess and non-contributory; and

           (iv)     name Licensor and its Affiliates, including, in each case, all successors and assigns, as additional insureds.

        (c)     Licensee shall provide Licensor with copies of the certificates of insurance and policy endorsements required by this <u>Section 6.1</u> upon the written request of Licensor, and shall not do anything to invalidate such insurance.

        (d)     Licensee shall ensure that all New Contracts contain this insurance clause.

**Section 6.2**    <u>**Indemnification by Licensor**</u>.  Licensor shall indemnify and hold harmless Licensee and its Affiliates, and their respective members, managers, directors, officers, employees, agents, successors and assigns (each, a "<u>Licensee Indemnified Party</u>") from and against any loss, liability, claim, damage, accrued and unpaid Taxes, expense (including costs of investigation and defense and reasonable attorneys' fees) or diminution of value, whether or not involving a third-party claim (collectively, "<u>Damages</u>"), suffered by such Licensee Indemnified Party and directly or indirectly arising from (a) any breach of the representations, warranties, covenants or other obligations or agreements of Licensor contained in this Agreement or any other Transaction Document; (b) any Event of Default (as defined below) of Licensor; (c) any fraud, intentional misrepresentation or other intentional misconduct of Licensor or any of its Affiliates; or (d) the Excluded Liabilities.

**Section 6.3**    <u>**Indemnification by Licensee**</u>.  Licensee shall indemnify and hold harmless Licensor and its Affiliates, and their respective members, managers, directors, officers, employees, agents, successors and assigns (each, a "<u>Licensor Indemnified Party</u>") from and against, and shall pay to each Licensor Indemnified Party the amount of, any Damages suffered by such Licensor Indemnified Party and directly or indirectly arising from (a) any breach of the representations, warranties, covenants and agreements of Licensee contained in this Agreement or any other Transaction Document; (b) any Event of Default (as defined below) of Licensee; (c) any fraud, intentional misrepresentation or other intentional misconduct of Licensee or any of its Affiliates; or (d) the construction, renovation, upgrading, alteration, remodeling, repair, operation, or use of the Gentlemen's Clubs or any other business conducted on, related to, or in connection by Licensee or any Person acting for or on behalf of Licensee, including those under any New Contract.

Each Party must promptly give notice to the other Party of any action, suit, proceeding, claim, demand, inquiry, or investigation related to the foregoing.  Each party's obligations under <u>Section 6.2</u> and <u>Section 6.3</u> will survive the termination or expiration of this Agreement.

**Section 6.4**    <u>**Limitations**</u>.  Except as expressly set forth in this Agreement, all of the representations, warranties, and covenants of the Parties contained in this Agreement shall survive the expiration of the Term.  Notwithstanding anything to the contrary set forth herein,

each Party acknowledges that nothing herein shall be construed as prohibiting the other Party from pursuing any other remedy to which the first Party may be entitled under Applicable Law (including injunctive relief or other equitable remedies) in the event of a breach or threatened breach of this Agreement or any other Transaction Documents by the breaching Party.

    Section 6.5    <u>**Tax Treatment of Indemnity Payments**</u>.  The Parties agree to treat any indemnity payment made pursuant to this <u>Article 6</u> as an adjustment to the Consideration for all Tax purposes.

    Section 6.6    <u>**Right to Offset**</u>.  Notwithstanding anything to the contrary in this Agreement, any other Transaction Document, or otherwise each Party shall have the right (but not the obligation, and such right shall not limit or affect any other right or remedy it may have hereunder or otherwise), to satisfy any Damages suffered by it under this Agreement, by setting off such Damages against any payments or other consideration due or payable to the other Party or any of its Affiliates pursuant to this Agreement.

# ARTICLE 7
## <u>TERMINATION; DEFAULT</u>

    Section 7.1    <u>**Default; Termination**</u>.

        (a)    Either Party will have the right to terminate this Agreement by written notice in accordance with <u>Section 8.8</u>, upon the occurrence of any of the following events (each, an "<u>Event of Default</u>") and failure by the defaulting Party to cure such Event of Default in accordance with <u>Section 7.3</u>:

            (i)    any material breach by the defaulting Party of the representations, warranties, covenants or other obligations or agreements of such Party or any of its Affiliates contained in this Agreement (including, without limitation <u>Article 5</u> hereof) or any other Transaction Document, in each case only to the extent such breach would cause a material adverse effect on the business and operations of the non-defaulting Party;

            (ii)    except as provided in <u>Section 5.17</u>, the defaulting Party or its Affiliates shall commence a voluntary proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts, under the Bankruptcy Code or any other bankruptcy, insolvency or other similar law now or hereafter in effect seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of a substantial part of its property or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it or shall make a general assignment for the benefit of creditors or shall generally fail to pay its debts as they become due or shall take any action to authorize any of the foregoing; or

            (iii)    except as provided in <u>Section 5.17</u>, an involuntary proceeding shall be commenced against the defaulting Party or any of its Affiliates seeking liquidation, reorganization or other relief with respect to itself or its debts, under the Bankruptcy Code or any other bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official for a substantial

part of its property, and such involuntary proceeding shall remain un-dismissed and un-stayed for a period of 30 days.

(b)    Upon the expiration of the Term or any other termination of this Agreement in accordance with its terms, the License Grant and all rights in and to the Licensed Marks and Third-Party Licenses shall automatically and immediately revert back to Licensor, and Licensee shall no longer have any right to enter into Contracts with respect to the Licensed Marks.

(c)    Each of Licensor and Licensee covenants and agrees to use its commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to effectuate and implement the reversion of the Licensed Marks upon the expiration of the Term or any other termination of this Agreement in accordance with its terms. Without limiting the generality of the foregoing, as applicable, upon request by the other Party therefor, (i) Licensee agrees to execute an assignment or similar instrument reflecting the foregoing reversion of the License Grant, and (ii) Licensor agrees to execute an amendment, supplement or other similar instrument reflecting the continuity of any existing Contracts embodying the license to other Persons of rights in and to the Licensed Marks, including, without limitation, as may be necessary to substitute Licensor for Licensee as the licensor thereunder.

(d)    Upon expiration or termination of this Agreement, Licensee shall cease and desist, within a reasonable time to be agreed upon by Licensee and Licensor, from all further use of the Licensed Marks; any other trademark owned by Licensor and which may during the course of this Agreement be authorized by Licensor to be used by Licensee in connection with the Gentleman's Clubs; or any trademark or service mark that is confusingly similar to the Licensed Marks or any other mark owned by Licensor. Licensee further agrees that upon expiration or termination of this Agreement, Licensee will not thereafter use any mark that incorporates the Licensed Marks, or any mark that is confusingly similar to the Licensed Marks, nor will Licensee challenge the ownership or validity of, or seek to cancel, the Licensed Marks or any other trademark of Licensor. Notwithstanding the foregoing, the expiration or termination of this Agreement shall in no way prohibit or interfere with Licensee's or its Affiliates ownership or operation of then-existing Gentlemen's Clubs that do not utilize the Licensed Marks.

(e)    Upon the expiration or termination of this Agreement, Licensee shall immediately deliver to Licensor a complete and accurate inventory all New Contracts and any uses of the Licensed Marks as of the close of business on the date of such expiration or termination. Licensee hereby agrees that upon the termination or expiration of this Agreement, Licensee will be deemed to have assigned, transferred and conveyed to Licensor any trade rights, equities, goodwill, titles or other rights in and to the Licensed Marks, the domain name and any assumed business name incorporating the Licensed Marks which may have been obtained by Licensee or which may have vested in Licensee in pursuance of any endeavors covered hereby, and that Licensee shall execute any instrument requested by Licensor to accomplish or confirm the foregoing. Any such assignment, transfer or conveyance shall be without consideration other than the mutual covenants and considerations of this Agreement.

(f)    Notwithstanding anything contained in this Agreement to the contrary, in the event of a lawful foreclosure on the Secured Marks by Licensee in accordance with Section 5.12(e), the Third Party Licenses and New Contracts shall remain in full force and effect through the term of those Contracts, and Licensee shall continue to make its payments to Licensor under Section 1.4 with respect thereto.

**Section 7.2    Equitable Relief**.  Each Party acknowledges that a breach by the other Party of this Agreement may cause the non-breaching Party irreparable damages, for which an award of damages would not be adequate compensation and agrees that, in the event of such breach or threatened breach, the non-breaching Party will be entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance and any other relief that may be available from any court in addition to any other remedy to which the non-breaching Party may be entitled at law or in equity.  Such remedies shall not be deemed to be exclusive but shall be in addition to all other remedies available at law or in equity, subject to any express exclusions or limitations in this Agreement to the contrary.

**Section 7.3    Cure Period**.  Upon an Event of Default, the non-defaulting Party shall send to the defaulting Party written notice in accordance with Section 8.8, informing the defaulting Party of the specified Event of Default and a description of the circumstances giving rise to such Event of Default.  Except as expressly provided in Section 5.9, the defaulting Party shall thereafter have 60 days from receipt of such notice, or such longer period as the Parties may mutually agree, in which to cure the Event of Default.  If, upon expiration of the applicable cure period, the non-defaulting Party provides the defaulting Party with written notice of its failure to reasonably cure such Event of Default, the Parties shall continue to use their commercially reasonable efforts to resolve any disputes related thereto or to otherwise affect a cure for such Event of Default.  If the Parties are still unable to resolve any dispute over the alleged Event of Default or otherwise affect a cure therefor, then they shall submit to mediation with a mutually agreed-upon mediator and associated procedures and rules for resolution in mediation.

# ARTICLE 8
# MISCELLANEOUS

**Section 8.1    Successors and Assigns; Assignment**.

(a)    This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Except as otherwise expressly provided herein (including, without limitation, Section 5.17, Section 6.2 and Section 6.3), nothing in this Agreement, express or implied, is intended to confer upon any party other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement.

(b)    Except as set forth in Section 5.17, neither Party may assign this Agreement or any of its rights or obligations hereunder, in whole or in part, by operation of law or otherwise, without the other Party's prior written consent, which shall not be unreasonably withheld; *provided*, that Licensor or Licensee may assign, transfer, license or sub-license this Agreement and/or all or any portion of such Party's rights and obligations hereunder to the assignor's Affiliate without the prior written consent of the other Party, with the understanding

that the assigning Party shall remain primarily liable for all of its obligations hereunder; and Licensee's Affiliate-assignee shall be adequately capitalized and beneficially owned directly or indirectly fifty-one percent (51%) or more by John Kirkendoll and/or his heirs (and/or a trust established for the benefit of such Persons) at the time of such assignment.  Upon request therefor by the non-assigning Party, the assignee shall execute a counterpart to this Agreement assuming all of the assigning party's obligations hereunder.

Section 8.2    **Post-Closing Cooperation**.  The Parties and their respective Affiliates shall cooperate with each other following the Closing and throughout the Term in (a) notifying customers, licensees, or vendors of the consummation of the transactions contemplated by this Agreement, (b) reconciling customer payments, licensing royalties, or other monies owed to one Party which may be received by the other Party, and (c) handling customer, licensee, vendor offset, deduction, allowance and similar claims which may be misdirected by such customer, licensee, or vendor.

Section 8.3    **No Joint Venture**.  Neither Party owes the other any fiduciary duties, including duties of loyalty or care.  This Agreement shall not be construed to form any partnership, joint venture or other regime of shared risks or profits between the Parties.

Section 8.4    **Severability**.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.

Section 8.5    **Expenses**.  Except as provided in Section 8.7, each Party shall bear its own expenses in connection with the negotiation, execution, delivery and performance of this Agreement and the transactions contemplated hereby.

Section 8.6    **Governing Law; Jurisdiction; Waiver of Jury Trial**.

(a)    This Agreement and the other Transaction Documents shall be governed by, interpreted and enforced in accordance with the laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to any conflicts of law principles which might otherwise require the application of the law of another jurisdiction.  The Parties expressly agree that the United Nations Convention on Contracts for the International Sale of Goods will not apply to this Agreement.  The Parties hereby agree that, except as set forth in the last sentence of Section 5.17, any action brought with respect to this Agreement and the transactions contemplated hereunder, including, but not limited to, any action brought for injunctive relief, shall be heard and determined in the Delaware Court of Chancery or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Legal Proceeding, the United States District Court for the District of Delaware.  In any such Legal Proceeding, each of the Parties irrevocably and unconditionally waives, and agrees not to assert by way of motion, as a defense or otherwise, any Claim that such party is not subject to the jurisdiction of the above courts, that such action or suit is brought in an inconvenient forum or that the venue of such Legal Proceeding is improper.

(b)    EACH    PARTY    HERETO    IRREVOCABLY    AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN

RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY. EACH PARTY HERETO CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (ii) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 8.6(b).

**Section 8.7** **Attorneys' Fees and Costs**.  In the event of a dispute between the Parties which is adjudicated pursuant to Section 8.6 above, the prevailing party shall be reimbursed by the other party for all reasonable attorneys' fees, costs, and related expenses incurred by such prevailing party.  If each party prevails in a portion of any such dispute, the adjudicator of such claim shall equitably allocate reasonable attorneys' fees, costs, and related expenses based upon the extent to which each party prevailed in the dispute.

**Section 8.8** **Notices**.  Any notice and other communication required, permitted or desired to be given under this Agreement shall be given in writing and shall be deemed effectively given upon personal delivery, transmission by electronic means (*e.g.*, email or facsimile with confirmation of receipt) or two Business Days after it is deposited with a recognized overnight courier service, delivery prepaid and addressed, to such Person at its address, e-mail or facsimile number as designated below:

|  |  |
|---|---|
| To Licensor: | Penthouse Global Licensing, Inc.<br>8944 Mason Avenue<br>Chatsworth, California 91311<br>Attention:     Donald J. Slaughter, Sr.<br>*Telephone*:   (310) 280-1920<br>*Facsimile*:<br>*Email*:         dslaughter@penthouse.com |
| With a copy to: | Greenberg Traurig, LLP<br>1840 Century Park East, Suite 1900<br>Los Angeles, CA 90067<br>Attention:     Jeffrey Joyner, Esq.<br>*Telephone*:   (310) 586-7700<br>*Facsimile*:   (310) 586-7800<br>*Email*:         joynerj@gtlaw.com |

| | |
|---|---|
| To Licensee: | Penthouse Clubs Worldwide, LLC |
| | 201 St. Charles Avenue, Suite 3915 |
| | New Orleans, Louisiana 70170 |
| | Attention:    Tim Spratt, Esq. |
| | *Telephone*:  (504) 267-5498 |
| | *Facsimile*:  (504) 324-6761 |
| | *Email*:      tspratt@kirkmgmt.com |
| | |
| With a copy to: | Jones Walker LLP |
| | 201 St. Charles Ave., Suite 5100 |
| | New Orleans, Louisiana 70170 |
| | Attention:    Asher J. Friend, Esq. |
| | *Telephone*:  (504) 582-8362 |
| | *Facsimile*:  (504) 589-8362 |
| | *Email*:      afriend@joneswalker.com |

or at such other address, facsimile number or email address as such Party may designate by written notice to the other Party in accordance with this <u>Section 8.8</u>.

**Section 8.9    Construction**.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  The use of "including" or "include" herein shall in all cases mean "including, without limitation" or "include, without limitation," respectively.  The use of "or" is not intended to be exclusive unless the context requires otherwise.  Reference to any agreement (including this Agreement), document or instrument shall mean such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof.  Underscored references to Sections or clauses shall refer to those portions of this Agreement.  The use of the terms "hereunder," "hereof," "hereto," "herein" and words of similar import shall refer to this Agreement as a whole and not to any particular section, paragraph, or clause of this Agreement.  All references to "$" and dollars shall be deemed to refer to United States currency unless otherwise specifically provided.

**Section 8.10    Complete Agreement**.  This Agreement (including all Exhibits and Schedules attached hereto) and the other Transaction Documents, agreements and instruments to be executed and delivered hereunder, constitute the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings relating to such subject matter, including that certain Confidential Term Sheet, dated November 8, 2016 by and between Licensor and Kirkendoll Management, LLC.

**Section 8.11    Amendments and Waivers**.  Except as otherwise expressly set forth in this Agreement, any term of this Agreement may be amended or terminated only with the written consent of each of the Parties hereto.  A waiver of any term of this Agreement is only enforceable if in writing and signed by the Party against whom the waiver is asserted.  A waiver

of any term of this Agreement shall not be construed as a continuing waiver of further breaches of the same term.

      **Section 8.12**  **Pronouns**.  Whenever the context may require, any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural, and vice versa.

      **Section 8.13**  **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which taken together shall constitute one and the same instrument.

      **Section 8.14**  **Section Headings**.  The section headings are for the convenience of the parties and in no way alter, modify, amend, limit, or restrict the contractual obligations of the parties.

*[Signatures Appear on the Following Page]*

*Signature Page*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the day and year first above written.

LICENSOR:

PENTHOUSE GLOBAL LICENSING, INC.

By: *Kelly Holland*

Name: Kelly Holland

Title:   Chief Executive Officer

LICENSEE:

PENTHOUSE CLUBS WORLDWIDE, LLC
KIRKENDOLL MANAGEMENT, LLC

By: _____

Name: John Kirkendoll

Title:   Manager

*Signature Page*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the day and year first above written.

LICENSOR:

PENTHOUSE GLOBAL LICENSING, INC.

By: _____
Name: Kelly Holland
Title:   Chief Executive Officer

LICENSEE:

PENTHOUSE CLUBS WORLDWIDE, LLC
KIRKENDOLL MANAGEMENT, LLC

By: _____
Name: John Kirkendoll
Title:   Manager

{N3339370.13}

*LA 132974416v1*

*Exhibit A*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

**DEFINED TERMS**

In addition to the other defined terms used herein, as used in this Agreement, the following terms when capitalized have the meanings indicated.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise; *provided* that (a) any director or executive officer of a corporation, manager of a limited liability company, general partner of a partnership, trustee of a trust, or owner of a fifty percent (50%) or more beneficial interest in any such entity shall be presumed to control that entity, and (b) no natural person shall be deemed to be controlled by, or under common control with, any other Person.

"Applicable Law" means any Law to which a specified Person or its property is subject.

"Business Day" means a day other than a Saturday, Sunday or other day on which banks located in New Orleans, Louisiana are authorized or required by Applicable Law to close.

"Claim" means all demands, claims (including third-party claims), actions or causes of action, suits, investigations, assessments, encumbrances, charges, complaints, directives, citations, information requests issued by government authorities, legal proceedings, orders, notices of potential responsibility, damages or sanctions.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, agreement, indenture, note, bond, mortgage, loan, instrument, lease, license, commitment or other arrangement, understanding or undertaking, commitment or obligation, whether written or oral.

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Governmental Entity" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Knowledge" (or similar phrases) of a given Person in this Agreement means the actual knowledge of such Person after due inquiry and reasonable investigation.

"Law" means any foreign, federal, state or local law (including common law), statute, code (including the Code and the Bankruptcy Code), ordinance, rule, regulation, Order or other requirement.

*Exhibit A*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, mediations, investigations, hearings, inquiries, proceedings or Claims (including counter-claims) by or before a Governmental Entity.

"Liens" means pledges, liens, leases, licenses, conditional sales contracts, Claims, encumbrances, activity or use restrictions, security interests, mortgages or deeds of trust, of any kind or nature whatsoever.

"Minimum Guaranteed Royalties" means Royalties in an amount equal to the Renewal Fee.

"Order" means any order, injunction, judgment, charge, doctrine, decree, rule, ruling, writ, assessment or arbitration award of a Governmental Entity.

"Permit" means any approval, permit (including as required by Applicable Law), order, certificate, variance and product license and license application, permit and any industry, certifying or other regulatory organization authorization or approval and any authorization or approval of any Governmental Entity (foreign, federal, state and local).

"Person" means an individual, firm, corporation, general or limited partnership, limited liability company, limited liability partnership, joint venture, trust, Governmental Entity, association, unincorporated organization or other entity.

"Taxes" means any income, corporation, gross receipts, profits, gains, capital stock, capital duty, withholding, social security, unemployment, disability, property, wealth, welfare, stamp, excise, occupation, sales, use, value added, royalty, alternative minimum, estimated or other similar tax (including any fee, assessment or other charge in the nature of or in lieu of any tax) imposed by any Governmental Entity (whether foreign, national, local, municipal or otherwise) or political subdivision thereof, and any interest, penalties, additions to tax or additional amounts in respect of the foregoing, and including any transferee or secondary liability in respect of any tax (whether imposed by law, contractual agreement or otherwise) and any liability in respect of any tax as a result of being a member of any affiliated, consolidated, combined, unitary or similar group.

"Tax Return" means any return, report or statement required to be filed with respect to any Tax (including any elections, declarations, schedules or attachments thereto, and any amendment thereof), including any information return, Claim for refund, amended return or declaration of estimated Tax, and including, where permitted or required, combined, consolidated or unitary returns for any group of entities that includes Licensor.

*[Schedule of Definitions Appears on the Following Page]*

*Exhibit A*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

## SCHEDULE OF DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings set forth in the sections indicated.

| DEFINED TERM | SECTION |
|---|---|
| Accounting Statement | 5.6 |
| Additional Intellectual Property | 1.1(g) |
| Additional Marks | 1.1(i) |
| After-Acquired IP | 5.16(c) |
| Agreement | Preamble |
| Assertions | 5.8(a) |
| Assignment | 1.1(f) |
| Assignment and Assumption Agreement | 2.2(b) |
| Bankruptcy Code | 5.17 |
| Branded Goods and Services | 5.9(a) |
| Brothels | Schedule 3.9(b) |
| Certificate of Consent | 2.2(f) |
| Closing | 2.1 |
| Closing Consideration | 1.4(a) |
| Confidential Information | 5.15(a) |
| Consideration | 1.4(b) |
| Damages | 6.2 |
| Distressed Transfer | 5.13(a) |
| Effective Date | Preamble |
| Event of Default | 7.1(a) |
| Excluded Liabilities | 1.3 |
| Excluded Licenses | 1.1(f) |
| Final Notice | 5.13(d) |
| Gentlemen's clubs | Recitals |
| Grant of Rights | 1.1(f) |
| Gross Third-Party License Fees | 1.4(c)(ii) |
| Initial Notice | 5.13(a) |
| Initial Offering Period | 5.13(b) |
| Initial Term | 1.2(a) |
| IP | 5.16(c) |
| Lender | 2.2(c) |
| Licensed Marks | 1.1(a) |
| Licensed Services | 1.1(a) |
| Licensee | Preamble |
| Licensee Books and Records | 5.6 |
| Licensee Closing Certificate | 2.3(a) |
| Licensee Collateral | 5.12(a) |

*Exhibit A*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

| | |
|---|---|
| **Licensee Indemnified Party** | 6.2 |
| **Licensee-Purchaser** | 5.13(b) |
| **Licensee Security Interest** | 5.12(a) |
| **Licensor** | Preamble |
| **Licensor Closing Certificate** | 2.2(c) |
| **Licensor Indemnified Party** | 6.3 |
| **Matching Period** | 5.13(e) |
| **Net Third-Party License Fees** | 1.4(c)(i) |
| **New Contracts** | 1.4(c)(ii) |
| **New Registrations** | 5.8(c) |
| **Offered Assets** | 5.13(a) |
| **Offered Business** | 5.13(a) |
| **Party; Parties** | Preamble |
| **Payment Account** | 1.2(b) |
| **PENTHOUSE Marks** | Recitals |
| **Permitted Advertising** | 1.1(i) |
| **Potential Purchaser** | 5.13(c) |
| **Quality Control Cure Period** | 5.9(e) |
| **Registrations** | 5.8(b) |
| **Renewal Fee** | 1.2(b) |
| **Renewal Term** | 1.2(a) |
| **Restricted Period** | 5.14(a) |
| **Restricted Territory** | 5.14(a) |
| **ROFR Event** | 5.13(a) |
| **Royalties** | 1.4(b) |
| **Secured Marks** | 5.12(a) |
| **Secured Obligations** | 5.12(d) |
| **Security Agreement** | 2.2(a) |
| **Seller** | 5.13(a) |
| **Short-Form Trademark License Agreement** | 2.2(d) |
| **Solicitation Period** | 5.13(c) |
| **Style Guide** | 1.1(d)(i) |
| **Term** | 1.2(a) |
| **Third-Party License Expenses** | 1.4(c)(iii) |
| **Third-Party Licenses** | Recitals |
| **Third-Party Revenue** | 1.1(f) |
| **Transaction Documents** | 3.2 |
| **Transfer** | 5.13(a) |
| **Transfer Price** | 5.13(d) |
| **Transfer Proposal** | 5.13(d) |

*Exhibit B*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

**SECURITY AGREEMENT**

{N3339370.13}
*LA 132974416v1*

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Security Agreement") dated as of  March 29, 2017 (the "Effective Date"), is executed by Penthouse Global Licensing, Inc., a Delaware corporation ("Grantor"), on the one hand, in favor of Kirkendoll Management, LLC, a Colorado limited liability company, and Penthouse Clubs Worldwide, LLC, a Delaware limited liability company (collectively, the "Secured Party"), on the other hand.  Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in that certain Master License Agreement, dated as of the Effective Date (the "Master License"), by and between Grantor and Secured Party.

### W I T N E S S E T H :

WHEREAS, Grantor and Secured Party have entered into the Master License, pursuant to which, among other things, Grantor has (i) licensed to Secured Party, on an exclusive, worldwide, and transferable, sub-licensable and unlimited basis (subject to the rights reserved to the Grantor under the Master License), the Licensed Marks, and (ii) granted to Secured Party a continuing first priority security interest in all of the right, title and interest of every kind or nature whatsoever of Grantor in and to, but none of its obligations with respect to, the Licensee Collateral; and

WHEREAS, in connection with the Closing of the Transaction and the transactions contemplated by the Master License and the other Transaction Documents, Grantor is required to execute and deliver to Secured Party this Security Agreement to more fully describe the security interest granted by Grantor under the Master License and to grant to Secured Party a continuing first priority security interest in and to the Collateral (as defined in in Paragraph 1 of this Security Agreement).

NOW, THEREFORE, in consideration of the willingness of Secured Party to enter into the Master License and, subject to all of the terms and conditions set forth therein, to furnish the Consideration to Grantor thereunder, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

1.     **Grant of Security Interest**.  During the Term, and as security for the Secured Obligations (as defined in Paragraph 3(a) below), Grantor hereby pledges, conveys, hypothecates, mortgages, assigns, sets over, delivers and grants to Secured Party a continuing first priority security interest in all of the right, title and interest of Grantor of every kind or nature whatsoever in and to, but none of its obligations with respect to, all intellectual property and industrial property rights to the trademark, THE PENTHOUSE CLUB, as more fully described on Exhibit A hereto, in connection with Gentlemen's Clubs, including any and all of the following collateral, whether now owned or hereafter acquired (collectively, the "Collateral"):

(a)     All of the right, title and interest of Grantor of every kind and nature (including, without limitation, all trademarks and copyrights, and extensions and renewals thereof, and any rights related thereto and/or to neighboring rights recognized under the laws of any jurisdiction) in and to the marks set forth on Exhibit A attached hereto relating to the Gentlemen's Clubs, including (i) the U.S. and foreign applications associated with each such mark and any registrations issuing therefrom, and amendments, renewals, extensions, reissuances, continuations and replacements of any of the foregoing, and (ii) all U.S. and foreign common law rights owned or controlled by Grantor for or under such marks (collectively, the "Secured Mark");

(b)     Any and all goodwill, and rights under Applicable Law, connected with the use of, and symbolized by, the Secured Mark solely in connection with Gentlemen's Clubs;

{N3364105.7}                                   1

*LA 132974420v1*

**EXECUTION COPY**

(c)     Any and all rights or Claims and causes of action for past, present or future breach, violation or other infringement or dilution of, or injury to the goodwill associated with, any of the rights or assets set out in <u>Paragraphs 1(a) and 1(b)</u> above, whether known or unknown, whether arising by way of counterclaim or otherwise, with the right, but not the obligation, to sue for and collect damages with respect to the foregoing and to enforce any rights and file any Claims against other Persons associated therewith; and

(d)     Any and all products and proceeds of the foregoing, including, without limitation, any of the Claims described in <u>Paragraph 1(c)</u> above.

## 2.    <u>Recordation and Filings; Authority</u>.

(a)     Grantor hereby authorizes Secured Party: (i) to file and record with the United States Patent and Trademark Office and all applicable foreign trademark registries maintained by any Governmental Entity this Security Agreement (and any corresponding or separate forms of such jurisdictions) in order to publicly reflect the interests of Secured Party in the Collateral; and (ii) to take any other action reasonably necessary or advisable to perfect, maintain or continue Secured Party's interest in the Collateral, including, without limitation, executing and filing any financing statement, any continuation statement or any amendment thereto.

(b)     Except as otherwise set forth in <u>Paragraph 3</u> below, Grantor hereby agrees to take any action and to execute any instrument that Secured Party may reasonably deem necessary to accomplish the purposes of this Security Agreement throughout the Term, or until the earlier termination, of the Master License, or release of the security interest granted hereunder and pursuant to the Master License, in accordance with the terms hereof and thereof.  For purposes of this <u>Paragraph 2(b)</u>, Grantor agrees to enter into separate written agreements with third parties as may be necessary to acknowledge Secured Party's rights in and to the Secured Mark ("<u>Certificate of Consent</u>").

## 3.    <u>Secured Obligations; Assignment and Other Rights Upon an Event of Default</u>. Notwithstanding anything to the contrary set forth herein or in the Master License:

(a)     Upon (i) the continuance of an "Event of Default" by Grantor under Section 7.1(a)(i) of the Master License continuing beyond the cure period specified by Section 7.3 of the Master License (a "<u>Payment Default</u>") that results in a final, non-appealable judgment (collectively, the "<u>Secured Payment Obligations</u>"), or (ii) the occurrence of an "Event of Default" by Grantor under Sections 7.1(a)(ii) or (iii) of the Master License (subject to <u>Paragraph 3(e)</u> below) (the "<u>Secured Solvency Obligations</u>", and together with the Secured Payment Obligations, the "<u>Secured Obligations</u>"), Secured Party and its successors and assigns shall have all of the rights, powers and privileges set forth in this <u>Paragraph 3</u>.

(b)     Once the amount of Secured Payment Obligations are determined and fixed pursuant to a final non-appealable judgment, Grantor shall, at its discretion, either (i) promptly pay to Secured Party by wire transfer of immediately available funds the amount of such Secured Payment Obligations, or (ii) execute and deliver to Secured Party an absolute, irrevocable assignment transferring to Secured Party all right, title and interest of Grantor (and its Affiliates, as applicable) in and to the Collateral; <u>*provided*</u>, that in all respects, the Master License shall remain in full force and effect (subject to any amendment thereof pursuant to <u>Paragraph 4</u> below) unless and until terminated in accordance with its terms. In the event Grantor fails to take the foregoing actions, Secured Party and its successors and assigns shall have all of the rights, power and privileges of a secured party under the Delaware

EXECUTION COPY

Commercial Code, the United States Copyright Act, and all other Applicable Laws in force from time to time, including, without limitation, the right to take any Enforcement Action (as defined below) in the Collateral in the manner deemed appropriate by Secured Party in its sole discretion to satisfy the then outstanding Secured Payment Obligations.

        (c)      Upon the occurrence and during the continuance of an Event of Default by Grantor under Sections 7.1(a)(ii) or (iii) of the Master License (subject to <u>Paragraph 3(e)</u> below), Secured Party and its successors and assigns shall have all of the rights, power and privileges of a secured party under the Delaware Commercial Code, the United States Copyright Act, and all other Applicable Laws in force from time to time.  Without limiting the generality of the foregoing, Secured Party may take any Enforcement Action in the Collateral in the manner deemed appropriate by Secured Party in its sole discretion to satisfy the then outstanding Secured Solvency Obligations (which, for the avoidance of doubt, in the event that the Secured Solvency Obligations result in a final non-appealable order of a bankruptcy court, solely shall be deemed satisfied by the irrevocable, unconditional transfer to Secured Party of unencumbered ownership in the Collateral, unless otherwise provided by such court); <u>provided</u>, that in all respects, the Master License shall remain in full force and effect (subject to any amendment thereof pursuant to <u>Paragraph 4</u> below) unless and until terminated in accordance with its terms.

        (d)      As used herein, "<u>Enforcement Action</u>" shall mean, with respect to any Collateral, repossessing and otherwise taking possession and ownership of, foreclosing upon, selling, leasing or otherwise disposing of all or any part of such Collateral, or attempting or agreeing to do so solely in satisfaction of the then outstanding Secured Obligations; or commencing the enforcement with respect to such Collateral of any of the default remedies available to the Secured Party under the Master License, this Security Agreement or any other Transaction Documents, as the case may be, or under the Uniform Commercial Code or other Applicable Laws solely in satisfaction of the then outstanding Secured Obligations.  For the avoidance of doubt, in such event, the Grantor agrees not to protest or otherwise challenge the final non-appealable judgment by a court or final non-appealable order from a bankruptcy court obtained by Secured Party with respect to an Event of Default.

        (e)      For the avoidance of doubt, as used in this Security Agreement, an "Event of Default" under Section 7.1(a)(ii) and (iii) of the Master License shall include a voluntary proceeding commenced by Grantor or its Affiliates seeking liquidation, reorganization or other relief with respect to itself or its debts, under the Bankruptcy Code or any other applicable bankruptcy or insolvency law, a general assignment for the benefit of creditors, or an involuntary proceeding commenced against Grantor or its Affiliates seeking any similar relief that remains un-dismissed and un-stayed for a period of 30 days, in each case disregarding any application or interpretation of Section 5.17 of the Master License that would preclude Secured Party's rights to pursue or otherwise successfully effect an Enforcement Action.

        (f)      In the event that Secured Party takes any Enforcement Action arising out of an Event of Default that results in a Secured Obligation as to which Secured Party is expressly authorized under this Security Agreement to pursue an Enforcement Action and, upon and subject to foreclosure of the Collateral, Secured Party obtains an ownership interest in the Collateral to the extent necessary solely to satisfy the then-outstanding Secured Obligations (as and to the extent described in <u>Paragraphs 3(b) and (c)</u> above), Grantor shall, upon request, execute and deliver to Secured Party such documents as may be reasonably necessary to preserve Secured Party's ability to conduct and operate its Gentlemen's Club business as contemplated by and set forth in the Master License, including, if required, an absolute irrevocable assignment transferring to Secured Party such right, title and interest of Grantor (and its Affiliates, as applicable) in and to the Collateral in satisfaction of such Secured Obligations.

EXECUTION COPY

4.      **Post-Closing Efforts**.  In the event that Secured Party exercises its rights under this Security Agreement arising out of an Event of Default, including, as applicable, taking any Enforcement Action arising out of an Event of Default that results in a Secured Obligation as to which Secured Party is expressly authorized under this Security Agreement to pursue an Enforcement Action, and upon and subject to foreclosure of the Collateral, Secured Party obtains possession and/or ownership of the Collateral, Grantor and Secured Party each agrees to use its commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things (including, without limitation, amending and/or restating the Master License and/or otherwise entering into such other instruments and agreements) as may be necessary, proper or advisable to promptly (a) (i) effectuate the transfer to Secured Party of all right, title and interest in and to the Collateral (as applicable), and (ii) as may be necessary or desirable to enable (A) Secured Party to exercise, own, use, monetize, exploit or otherwise commercialize the Secured Mark in connection with the Gentlemen's Clubs on an exclusive worldwide basis, and (B) Grantor to continue its undisturbed ownership and operation of all other aspects of its business; and (b) memorialize (i) Secured Party's and Grantor's mutual acknowledgement and agreement that no consumer confusion is likely to result therefrom, and (ii) Secured Party's agreement not to dispute or challenge, or assist any Person in disputing or challenging, Secured Party's rights in the Secured Mark resulting therefrom.

5.      **Termination and Release**.  Unless otherwise agreed in writing by Grantor and Secured Party, the security interest granted herein and in the Master License will terminate (and all rights to the Collateral will revert to Grantor) upon expiration of the Term, or the earlier termination of, the Master License, subject in all respects to the terms and provisions of the Master License (including Section 7.1 thereof).  Upon any such expiration or termination, Secured Party (at Grantor's request and sole expense) shall promptly execute and deliver to Grantor such documents as Grantor may reasonably request and as are provided to Secured Party to evidence such termination of the security interests granted herein.

6.      **Miscellaneous**.

        (a)      The rights and remedies of the Grantor and Secured Party with respect to the security interest granted herein are in addition and without prejudice to those set forth in the Master License and any other Transaction Documents, all terms and provisions of which are hereby incorporated herein by reference.  In the event that any provisions of this Security Agreement are deemed to conflict with the Master License or any other Transaction Documents, the provisions of the Master License or such other Transaction Documents shall control.

        (b)      This Security Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument.

        (c)      THE VALIDITY, INTERPRETATION AND ENFORCEMENT OF THIS ASSIGNMENT AND SECURITY AGREEMENT AND ANY DISPUTE ARISING OUT OF OR IN CONNECTION WITH THIS SECURITY AGREEMENT, WHETHER SOUNDING IN CONTRACT, TORT, EQUITY OR OTHERWISE, SHALL BE GOVERNED BY, CONSTRUED UNDER AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ANY CONFLICTS OF LAW PRINCIPLES WHICH MIGHT OTHERWISE REQUIRE THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION.

*[Signatures Appear on the Following Page]*

**EXECUTION COPY**

IN WITNESS WHEREOF, this Security Agreement has been executed by the parties hereto as of the day and year first above written.

**GRANTOR:**

PENTHOUSE GLOBAL LICENSING, INC.

By: _Kelly Holland_

Name:   Kelly Holland

Title:   Chief Executive Officer

\*          \*          \*          \*          \*

On _03|21|17_ before me, _R. Belens_ ✳, a notary public, personally appeared Kelly Holland, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the entity upon behalf of which the person acted executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _CA_ that the foregoing is true and correct. Witness my hand and official seal.

Signature _____                    (Seal)   ✳ see attached Notarization

\*          \*          \*          \*          \*

ACKNOWLEDGED AND AGREED BY:

**SECURED PARTY:**

KIRKENDOLL MANAGEMENT, LLC            PENTHOUSE CLUBS WORLDWIDE, LLC

By: _____            By: _____

Name:  John Kirkendoll                Name:  John Kirkendoll

Title:  Manager                       Title:  Manager

*Signature Page*
*Security Agreement*
*Master License Agreement between Penthouse Global Licensing, Inc., Kirkendoll Management, LLC and Penthouse Clubs Worldwide, LLC*

LA 132974420v1

State of California            )
County of _Los Angeles_       )

## CALIFORNIA ALL-PURPOSE CERTIFICATE OF ACKNOWLEDGMENT

On _03/21/2017_ before me, _Relani. Belous, Notary_

<span style="font-size:smaller">(here insert name and title of the officer)</span>

personally appeared _KELLY HOLLAND_

_____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the
State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

RELANI BELOUS
COMM. #2032672
Notary Public · California
Los Angeles County
My Comm. Expires July 6, 2017

(Seal)

## OPTIONAL INFORMATION

*Although the information in this section is not required by law, it could prevent fraudulent removal and reattachment of this acknowledgment to an unauthorized document and may prove useful to persons relying on the attached document.*

### Description of Attached Document

The preceding Certificate of Acknowledgment is attached to a document
titled/for the purpose of _Security Agreement (MSL)_

containing _6_ pages, and dated _03/21/2017_.

The signer(s) capacity or authority is/are as:
- [ ] Individual(s)
- [ ] Attorney-in-Fact
- [x] Corporate Officer(s)  _CEO_
  <span style="font-size:smaller">Title(s)</span>

- [ ] Guardian/Conservator
- [ ] Partner - Limited/General
- [ ] Trustee(s)
- [ ] Other: _____

representing: _____
<span style="font-size:smaller">Name(s) of Person(s) or Entity(ies) Signer is Representing</span>

**Additional Information**

Method of Signer Identification
Proved to me on the basis of satisfactory evidence:
- [ ] form(s) of identification  ○ credible witness(es)

Notarial event is detailed in notary journal on:
Page # _____ Entry # _____

Notary contact: _____

Other
- [ ] Additional Signer(s)    [ ] Signer(s) Thumbprint(s)
- [ ] _____

© Copyright 2007-2012 Notary Rotary, Inc. PO Box 41400, Des Moines, IA 50311-0507. All Rights Reserved. Part Number 101772. Please contact your Authorized Reseller to purchase copies of this form.

EXECUTION COPY

IN WITNESS WHEREOF, this Security Agreement has been executed by the parties hereto as of the day and year first above written.

GRANTOR:

PENTHOUSE GLOBAL LICENSING, INC.

By: _____
Name:  Kelly Holland
Title:    Chief Executive Officer


\*          \*          \*          \*          \*


On _____ before me, _____, a notary public, personally appeared Kelly Holland, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the entity upon behalf of which the person acted executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _____ that the foregoing is true and correct. Witness my hand and official seal.

Signature _____          (Seal)


\*          \*          \*          \*          \*


ACKNOWLEDGED AND AGREED BY:

SECURED PARTY:

KIRKENDOLL MANAGEMENT, LLC                    PENTHOUSE CLUBS WORLDWIDE, LLC

By: _____          By: _____
Name:  John Kirkendoll                                    Name:  John Kirkendoll
Title:    Manager                                              Title:    Manager


*Signature Page*
*Security Agreement*
*Master License Agreement between Penthouse Global Licensing, Inc., Kirkendoll Management, LLC and Penthouse Clubs Worldwide, LLC*

LA 132974420v1

EXECUTION COPY

## EXHIBIT A

### SECURED MARKS

THE PENTHOUSE CLUB, in all variations as used by Grantor in connection with Gentlemen's Clubs, including, but not limited to:

| Mark | Country | Class/Services | Reg. (Appl.) No. | Reg. (Appl.) Date |
|------|---------|----------------|------------------|-------------------|
| **THE PENTHOUSE CLUB & THREE KEY LOGO DESIGN** | Macao | 41: nightclub services; entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners. | 88956 | 1/26/2015 |
| **The PENTHOUSE CLUB (& Devices)**  | New Zealand | 41: Entertainment services, dance and choreography, adult entertainment, nightclub and live performance services, model searches, special appearances by young women selected as centerfolds or annual award winners. | 833185 | 11/12/2010 |
| **THE PENTHOUSE CLUB (Stylized) & Three Key Design**  | U.S. | 41: Entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners. 43: Restaurant, night club and bar services, limited to the Licensed Services. | 2,810,417 | 2/3/2004 |
| **PENTHOUSE CLUB** | Mexico | 41: night clubs | 903392 | 10/8/2005 |
| **THE PENTHOUSE BEACH CLUB** | Ukraine | 41: Entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners and night club services. | 158070 | 6/25/2012 |

*Exhibit A*
*Security Agreement*
*Master License Agreement between Penthouse Global Licensing, Inc., Kirkendoll Management, LLC and Penthouse Clubs Worldwide, LLC*

LA 132974420v1

# ASSIGNMENT AND ASSUMPTION AGREEMENT

EXECUTION COPY

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment and Assumption Agreement"), dated and effective as of March 29, 2017 (the "Effective Date"), is entered into between Penthouse Global Licensing, Inc., a Delaware corporation ("Assignor"), on the one hand, and Kirkendoll Management, LLC, a Colorado limited liability company, and Penthouse Clubs Worldwide, LLC, a Delaware limited liability company (collectively, the "Assignee"), on the other hand.  Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in that certain Master License Agreement, dated as of the Effective Date (the "Master License"), by and between Assignor and Assignee.

## W I T N E S S E T H:

WHEREAS, Assignor and Assignee have entered into the Master License, pursuant to which, among other things, Assignor has agreed to assign to Assignee, and Assignee has agreed to acquire from Assignor, the Third-Party Licenses (including the Third-Party Revenue).

NOW THEREFORE, in consideration of the mutual covenants and conditions contained herein, the Closing Consideration and other consideration provided in the Master License, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.    **Assignment and Transfer of Assets**.  Effective as of the Effective Date, but subject to Paragraph 3 below, Assignor hereby assigns to Assignee and its successors and assigns, free and clear of all Liens, and Assignee hereby accepts and acquires, all right, title and interest of Assignor and its Affiliates in, to and under the Third Party-Licenses set forth on Exhibit A hereto (including, without limitation, the Third-Party Revenue), together with all the rights and privileges pertaining thereto.  The foregoing assignment to Assignee is subject to and otherwise made in accordance with all of the representations, warranties, covenants and other agreements made by Assignor in the Master License.

2.    **No Assumption of Obligations**.  Subject in all respects to the Grant of Rights to Assignee set forth in the Master License (including the assignment of the Third-Party Licenses and rights appertaining thereto as described therein and herein), Assignee does not assume, shall not assume, and shall not be deemed to have assumed, (a) any liabilities or obligations of any nature whatsoever of, or arising out of Claims against, Assignor or its Affiliates or any of their respective licensees (and sub-licensees) or franchisees (and sub-franchisees) at any time prior to or after the Closing to the extent not arising out of or based on the actions, omissions or other conduct of Assignee or any of its licensees (or sub-licensees), or (b) any liabilities or obligations whatsoever arising out of or otherwise associated with the subject of the Grant of Rights provided in the Master License prior to the Closing, including, without limitation, any obligation to refund or otherwise repay to a third-party licensee or any other Person any deposit, fee, advance, up-front license payments or other refundable or recoupable amount paid or payable by such Person pursuant to and/or upon termination or renewal of any Third-Party License, regardless of whether such deposits, fees or other payments were re-allocated and/or distributed under a bankruptcy order affecting Assignor or its predecessors-in-title, or otherwise (as more fully set forth in, and subject to the terms and conditions of, Section 1.3 of the Master License).

**EXECUTION COPY**

3.     **Termination; Reversion**.  Except as otherwise provided in this <u>Paragraph 3</u>, upon the expiration of the Term or any other termination of the Master License in accordance with its terms, among other effects, all rights in and to the Third-Party Licenses shall automatically and immediately revert back to Assignor, and this Assignment and Assumption Agreement shall terminate.  Notwithstanding the foregoing, in the event of a lawful foreclosure on the Secured Mark (as defined in the Security Agreement) by Assignee in accordance with the Master License and the Security Agreement, among other effects, the Third-Party Licenses shall not revert to Assignor and shall remain in full force and effect through the term of those Contracts, and Assignee shall continue to make its payments to Assignor under Section 1.4 of the Master License with respect thereto in accordance with the terms of the Master License and Security Agreement.

4.     **Conflict**.  Notwithstanding anything to the contrary contained herein, the terms of this Assignment and Assumption Agreement are subject to the terms, conditions and limitations set forth in the Master License, and nothing contained in this Assignment and Assumption Agreement will be deemed to supersede, modify, limit or amend any of the rights, duties or obligations of Assignor or Assignee under the Master License, this Assignment and Assumption Agreement being intended only to further effect the assignment to Assignee of the Third-Party Licenses and rights appertaining thereto, as contemplated by the Master License.  In the event of any conflict or inconsistency between the terms of this Assignment and Assumption Agreement and the Master License, the terms of the Master License shall govern.

5.     **Successors and Assigns**.  The provisions of this Assignment and Assumption Agreement shall be binding upon and inure to the benefit of Assignor and Assignee, and their respective successors and assigns.

6.     **Governing Law**.   This Assignment and Assumption Agreement shall be governed and construed in all respects under the laws of the State of Delaware (without regard to its conflict of laws rules).

7.     **Counterparts**.  This Assignment and Assumption Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, and all of which together will be deemed to be one and the same instrument, and may be executed by facsimile, electronic or emailed signatures, all of which will be considered original signatures.

*[Signatures Appear on the Following Page]*

IN WITNESS WHEREOF, Assignor and Assignee each have caused this Assignment and Assumption Agreement to be executed as of the Effective Date.

**ASSIGNOR:**

PENTHOUSE GLOBAL LICENSING, INC.

By: _Kelly Holland_
Name:  Kelly Holland
Title:   Chief Executive Officer


**ASSIGNEE:**

KIRKENDOLL MANAGEMENT, LLC

By: _____
Name:  John Kirkendoll
Title:   Manager

PENTHOUSE CLUBS WORLDWIDE, LLC

By: _____
Name:  John Kirkendoll
Title:   Manager

*Signature Page*
*Assignment and Assumption Agreement*
*Master License Agreement between Penthouse Global Licensing, Inc., Kirkendoll Management, LLC,*
*and Penthouse Clubs Worldwide, LLC*

LA 132974588v1

IN WITNESS WHEREOF, Assignor and Assignee each have caused this Assignment and Assumption Agreement to be executed as of the Effective Date.

ASSIGNOR:

PENTHOUSE GLOBAL LICENSING, INC.

By: _____
Name: Kelly Holland
Title:   Chief Executive Officer

ASSIGNEE:

KIRKENDOLL MANAGEMENT, LLC

By: _____
Name:  John Kirkendoll
Title:   Manager

PENTHOUSE CLUBS WORLDWIDE, LLC

By: _____
Name: John Kirkendoll
Title:  Manager

*Signature Page*
*Assignment and Assumption Agreement*
*Master License Agreement between Penthouse Global Licensing, Inc., Kirkendoll Management, LLC,*
*and Penthouse Clubs Worldwide, LLC*

LA 132974588v1

## <u>EXHIBIT A</u>

## **THIRD-PARTY LICENSES**

1. <u>The Penthouse Club New Orleans</u> –  Club Licensing Agreement between General Media Communications, Inc. and American Club Restaurant, Inc., dated August 12, 2005

2. <u>The Penthouse Club Tampa</u> – Club Licensing Agreement between General Media Communications, Inc. and Tampa Food & Beverage, LLC, dated September 1, 2006, and amended by Amendment #1, Amendment #2 and Amendment #3, and that certain Amendment to Club Licensing Agreement dated November 30, 2012, effective as of October 31, 2012, and subsequently assigned to Westshore Food & Beverage, LLC on May 2016

3. <u>The Penthouse Club Detroit</u> – Club Licensing Agreement between General Media Communications, Inc. and ABCDE Land Development, LLC, dated January 10, 2007, and amended on October 30, 2010

4. <u>The Penthouse Club Moscow</u> – Club Licensing Agreement between General Media Communications, Inc. and Highland Group, LLC, dated April 2, 2010, and amended on April 30, 2015 and November 3, 2016

5. <u>The Penthouse Club Baton Rouge</u> – Adult Night Club Trademark License Agreement between General Media Communications, Inc. and Baton Rouge Sports Restaurant, LLC, dated April 15, 2010

6. <u>The Penthouse Club Auckland</u> – Adult Night Club License Agreement between General Media Communications, Inc. and Delores Properties Limited, dated January 30, 2011, and amended on September 19, 2013

7. <u>The Penthouse Club San Francisco</u> – Adult Night Club License Agreement between General Media Communications, Inc. and BT California, LLC, dated April 18, 2011

8. <u>The Penthouse Club Paris</u> – Trademark License Agreement between General Media Communications, Inc. and Sarl Sport Bar, dated April 1, 2012, and amended on October 31, 2012

9. <u>The Penthouse Club Perth</u> – Adult Night Club License Agreement between General Media Communications, Inc. and M&M Entertainment Pty Ltd., dated August 22, 2014

10. <u>The Penthouse Club Philadelphia</u> – Adult Night Club License Agreement between General Media Communications, Inc. and 3001 Castor, Inc., dated September 19, 2014

*Exhibit A*
*Assignment and Assumption Agreement*
*Master License Agreement between Penthouse Global Licensing, Inc., Kirkendoll Management, LLC,*
*and Penthouse Clubs Worldwide, LLC*

LA 132974588v1

# FORM OF CLOSING CERTIFICATE

**EXECUTION COPY**

## KIRKENDOLL MANAGEMENT, LLC; PENTHOUSE CLUBS WORLDWIDE, LLC

### CLOSING CERTIFICATE

Pursuant to Section 2.3(a) of that certain Mater License Agreement (the "**Agreement**"), dated as of March _____, 2017, by and among Penthouse Global Licensing, Inc., a Delaware corporation (the "**Licensor**"), and Kirkendoll Management, LLC, a Colorado limited liability company ("**Kirkendoll**"), and Penthouse Clubs Worldwide, LLC, a Delaware limited liability company (together with Kirkendoll, the "**Licensee**"), the undersigned, on behalf of the Licensee, hereby certifies to the Licensor as follows. All capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Agreement.

1.  The undersigned is an authorized person to act on behalf of the Licensee.

2.  Attached hereto as <u>Exhibit A</u> are true and complete copies of all resolutions adopted by any necessary directors, officers, stockholders or other necessary Persons of the Licensee authorizing the execution, delivery and performance of the Agreement and the other Transaction Documents and the consummation of the Transaction and transactions contemplated by the Agreement, which resolutions have not been amended, rescinded or revoked and are in full force and effect as of the date hereof.

3.  The individual listed below is the duly elected, qualified and acting Manager of the Licensee holding the offices set forth opposite his name, and the signature set forth opposite his name is the genuine signature of such Manager. The individual listed below has the authority to execute the Agreement and the other Transaction Documents, together with all certificates and documents to be delivered in connection with the Closing of the Agreement as set forth in Section 2.3 thereof.

| <u>Name of Signatory</u> | <u>Office</u> | <u>Specimen Signature</u> |
|---|---|---|
| John Kirkendoll | Manager of Kirkendoll Management, LLC and Penthouse Clubs Worldwide, LLC | *(signature)* |

4.  Attached hereto as <u>Exhibit B</u> are certificates of good standing, dated as of the Closing (or, as necessary, the most recent practicable date), for the Licensee in its jurisdictions of organization.

IN WITNESS WHEREOF, this Closing Certificate has been executed as of the date first set forth above.

Name: Timothy Spratt

Title:   Authorized Person

**EXECUTION COPY**

## PENTHOUSE GLOBAL LICENSING, INC.

### SECRETARY'S CERTIFICATE

March ___, 2017

Pursuant to Section 2.2(c) of that certain Master License Agreement (the "**Agreement**"), dated as of March ___, 2017, by and among Penthouse Global Licensing, Inc., a Delaware corporation (the "**Licensor**"), and Kirkendoll Management, LLC, a Colorado limited liability company ("**Kirkendoll**"), and Penthouse Clubs Worldwide, LLC, a Delaware limited liability company (together with Kirkendoll, the "**Licensee**"), the undersigned, on behalf of the Licensor, hereby certifies to the Licensee as follows.  All capitalized terms used but not defined herein have the meanings ascribed to such terms in the Agreement.

1.  The undersigned is the Secretary of the Licensor.

2.  Attached hereto as <u>Exhibit A</u> are true and complete copies of all resolutions adopted by any necessary directors, officers, stockholders or other necessary Persons of the Licensor authorizing the execution, delivery and performance of the Agreement and the other Transaction Documents and the consummation of the Transaction and the transactions contemplated by the Agreement, which resolutions have not been amended, rescinded or revoked and are in full force and effect as of the date hereof;

3.  The individual(s) listed below are the duly elected, qualified, and acting officers of the Licensor holding the offices set forth opposite their respective names, and the signatures set forth opposite their names are the genuine signatures of such officers.   The individual(s) listed below have the authority to execute the Agreement and the other Transaction Documents, together with all certificates and documents to be delivered in connection with the Closing of the Agreement as set forth in Section 2.2 thereof:

| Name of Signatory | Office | Specimen Signature |
|---|---|---|
| Tamara Villamar | Secretary | _(signature)_ |
| | | |
| | | |

4.  Attached hereto as <u>Exhibit B</u> is a certificate of good standing, dated as of the Closing (or, as necessary, the most recent practicable date), for the Licensor in its jurisdiction of organization.

**EXECUTION COPY**

     IN WITNESS WHEREOF, this Secretary's Certificate has been executed as of the date first set forth above.

_____

Name: Tamara Villamar

Title:   Secretary

## Exhibit A

**Authorizing Resolutions**

(Attached)

# UNANIMOUS WRITTEN CONSENT
# OF DIRECTORS IN LIEU OF MEETING
# OF
# PENTHOUSE GLOBAL LICENSING, INC.,
### a Delaware corporation

### March ___, 2017

The undersigned, being all of the members of the Board of Directors (the "Board) of Penthouse Global Licensing, Inc., a Delaware corporation (the "Corporation"), and acting in accordance with Section 141(f) of the Delaware General Corporation Law, hereby consent to the adoption of the following actions and resolutions as if taken at a special meeting.

## AUTHORIZATION OF LICENSING OF CERTAIN INTELLECTUAL PROPERTY

**WHEREAS,** the Board deems it to be in the best interest of the Corporation to enter into a transaction with Kirkendoll Management, LLC ("Kirkendoll"), a Colorado limited liability company, and Penthouse Clubs Worldwide, LLC ("PCW"), a Delaware limited liability company pursuant to which the Corporation will license certain of its intellectual property to Kirkendoll and PCW (the "Transaction"); and

**WHEREAS,** pursuant to the closing of the Transaction, the Board deems it advisable and in the best interests of the Corporation to enter into certain licensing and other transaction documents with Kirkendoll and PCW; and

**WHEREAS,** the Corporation shall enter into that certain Master License Agreement, dated and effective as of March ___, 2017 with Kirkendoll and PCW, substantially in the form as set forth in the attached "Exhibit A" (the "Master License Agreement"); and

**WHEREAS,** the Corporation shall enter into additional documents and ancillary agreements in connection with the Master License Agreement, including, but not limited to (i) a Security Agreement, (ii) an Assignment and Assumption Agreement, (iii) a Short Form Trademark License Agreement, (iv) a Form of Closing Certificate; and (v) such other documents, instruments and certificates to be executed pursuant to the foregoing or as otherwise required for the consummation of the transactions contemplated under the Master License Agreement and such ancillary documents set forth above (collectively, the "Transaction Documents").

**NOW, THEREFORE, BE IT RESOLVED,** that the Board hereby authorizes, approves and adopts the forms, terms and provisions of the Transaction Documents, each substantially in the form presented to the Board on or before the date hereof, with such additions, changes and deletions thereto that any officer of the Corporation shall determine to be necessary or advisable (such determination to be conclusively, but not exclusively, evidenced by the execution thereof by any officer); and

**RESOLVED FURTHER,** that the officers of the Corporation be, and each hereby is authorized, empowered and directed on behalf of the Corporation to (i) negotiate, execute, deliver and perform the Transaction Documents, including any and all such agreements, instruments, documents and certificates arising under, related to, or made in connection with the foregoing resolutions as the officers may deem necessary or appropriate; and (ii) to do and perform all other acts and things deemed by the officers to be necessary or appropriate to carry out the foregoing resolutions; and

**RESOLVED FURTHER,** that, in addition to and not in limitation of the foregoing, each officer of the Corporation be, and he hereby is, authorized, empowered, and directed to make, sign, execute, acknowledge, deliver, file, record and publish any and all permits, orders, directions, requests, receipts, certificates or other instruments, papers and documents and any amendments, supplements, restatements or other modifications to any of the corporations' permits, licenses, authorizations, agreements and to perform any and all such acts and things as may be required or appropriate to carry out the terms and provisions of each of the foregoing resolutions and the transactions contemplated thereby.

## GENERAL AUTHORIZATION

**RESOLVED FURTHER,** that all actions previously taken and all agreements, instruments, documents, and certificates executed, delivered and filed through the date hereof by any officer of the Corporation in connection with the transactions described in or contemplated by the resolutions set forth herein, are hereby authorized, approved, ratified and confirmed in all respects; and

**RESOLVED FURTHER,** that this Written Consent may be executed by facsimile or otherwise in one or more counterparts, each of which shall be deemed an original, but which shall together constitute one and the same document; and

**RESOLVED FURTHER,** that this Written Consent, after execution by the undersigned, shall be inserted in appropriate order in the minute book of the Corporation.

*[Signature page follows]*

**IN WITNESS WHEREOF,** the undersigned have duly executed this Written Consent effective as of the first day written above.

PENTHOUSE GLOBAL
LICENSING, INC.

_____
Kelly Holland, Director


_____
Don Slaughter, Director

_____
Kelly Holland, Director


_____
Don Slaughter, Director

# EXHIBIT A

# MASTER LICENSE AGREEMENT

## **Exhibit B**

**Certificate of Good Standing**

(Attached)

# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY "PENTHOUSE GLOBAL LICENSING, INC." IS
DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN
GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE
RECORDS OF THIS OFFICE SHOW, AS OF THE TWENTY-THIRD DAY OF MARCH,
A.D. 2017.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL REPORTS HAVE
BEEN FILED TO DATE.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "PENTHOUSE GLOBAL
LICENSING, INC." WAS INCORPORATED ON THE TWENTY-SIXTH DAY OF
FEBRUARY, A.D. 2016.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES HAVE
BEEN PAID TO DATE.

Jeffrey W. Bullock, Secretary of State

5974624  8300

SR# 20171973808

Authentication: 202255890

Date: 03-23-17

You may verify this certificate online at corp.delaware.gov/authver.shtml

# SHORT-FORM TRADEMARK LICENSE AGREEMENT

**EXECUTION COPY**

## SHORT-FORM TRADEMARK LICENSE AGREEMENT

THIS SHORT-FORM TRADEMARK LICENSE AGREEMENT (this "License"), dated as of March 29, 2017 (the "Effective Date"), is entered into between Penthouse Global Licensing, Inc., a Delaware corporation ("Licensor"), on the one hand, and Kirkendoll Management, LLC, a Colorado limited liability company, and Penthouse Clubs Worldwide, LLC, a Delaware limited liability company (collectively, the "Licensee"), on the other hand. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in that certain Master License Agreement, dated as of the Effective Date (the "Master License"), by and between Licensor and Licensee.

### W I T N E S S E T H :

WHEREAS, Licensor and Licensee have entered into the Master License, pursuant to which, among other things, Licensor has licensed to Licensee, on an exclusive, worldwide, and transferable, sub-licensable and unlimited basis, the Licensed Marks.

NOW THEREFORE, in consideration of the mutual covenants and conditions contained herein, the Royalties and other consideration provided in the Master License, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Licensor and Licensee hereby agree as follows:

1. **License**.  Licensor hereby grants to Licensee an exclusive, transferable, sub-licensable, unlimited license, free and clear of all Liens, to use, sublicense, franchise (and sub-franchise), and otherwise monetize, exploit and commercialize the Licensed Marks (as identified on Exhibit A hereto) anywhere in the world during the Term, in connection with the ownership, operation, marketing, and promotion of Gentlemen's Clubs, and restaurant, bar and cocktail lounge services directly related thereto (the "Licensed Services"), and the advertising and promotion of the Licensed Services through any media now known or hereafter devised, including the Internet, subject in all cases to all of the terms, conditions, and restrictions set forth in the Master License (the "License Grant").

2. **Reserved Rights**.  Licensor reserves the right to use the Licensed Marks in connection with the advertising and promotion of Gentlemen's Clubs and the Licensed Services, and reserves to itself and for its sole benefit all other rights in and to the Licensed Marks not expressly granted to Licensee under the Master License.

3. **Acknowledgement of Ownership**.  Licensee acknowledges that Licensor is the owner of the Licensed Marks.  Any goodwill derived from the use of the Licensed Marks by Licensee shall inure to the benefit of Licensor.  Except for Licensee's rights otherwise contemplated by Paragraph 1 above and the Transaction Documents, if Licensee acquires any rights in the Licensed Marks, by operation of law, or otherwise, such rights shall be deemed and are hereby irrevocably assigned to Licensor without further action by any of the Parties, and Licensee agrees not to dispute or challenge or assist any Person in disputing or challenging Licensor's rights in and to the Licensed Marks or the validity of the Licensed Marks.

**EXECUTION COPY**

4.    **Quality Control**.  Licensee (and all sub-licensees) shall utilize the Licensed Marks in substantial conformity to their current use, and subject to the quality control provisions set forth in the Master License.

5.    **Termination; Reversion**.  Except as otherwise provided in the Master License and the Transaction Documents, upon the expiration of the Term or any other termination of the Master License in accordance with its terms, among other effects, the License Grant and all rights in and to the Licensed Marks shall automatically and immediately revert back to Licensor, and this License shall terminate.

6.    **Recordation**.  Subject to Licensee's rights set forth in the Master License, upon Licensee's written request and at Licensee's reasonable expense, Licensor will file and record with the United States Patent and Trademark Office (the "USPTO") and all applicable foreign and other trademark registries maintained by any Governmental Entity this License (and any corresponding separate forms of such jurisdictions) with respect to a registration or application held by Licensor in the Licensed Marks in order to publicly reflect the License Grant to Licensee of the Licensed Marks for the Licensed Services as described herein.  In the event Licensor fails to file and record this License within five days of Licensee's written request, Licensor hereby authorizes Licensee to file and record this License in accordance with this Paragraph 6.  For the avoidance of doubt, the recordation of this License with the USPTO is merely intended to put third parties on notice of the License Grant and is not intended by the parties to be an assignment or transfer of ownership of Licensor's rights in and to the Licensed Marks.

7.    **Conflict**.  Notwithstanding anything to the contrary contained herein, the terms of this License are subject to the terms, conditions and limitations set forth in the Master License, and nothing contained in this License will be deemed to supersede, modify, limit or amend any of the rights, duties or obligations of Licensor or Licensee under the Master License, this License being intended only to memorialize the exclusive worldwide license to Licensee of the Licensed Marks in connection with the Licensed Services, as contemplated by the Master License.  In the event of any conflict or inconsistency between the terms of this License and the Master License, the terms of the Master License shall govern.

8.    **Successors and Assigns**.  The provisions of this License shall be binding upon and inure to the benefit of Licensor and Licensee, and their respective successors and permitted assigns.

9.    **Governing Law**.  This License shall be governed and construed in all respects under the laws of the State of Delaware (without regard to its conflict of laws rules).

10.   **Counterparts**.  This License may be executed in multiple counterparts, each of which shall be deemed to be an original, and all of which together will be one and the same instrument, and may be executed by facsimile, electronic or emailed signatures, all of which will be considered original signatures.

*[Signatures Appear on the Following Page]*

EXECUTION COPY

IN WITNESS WHEREOF, Licensor and Licensee have each caused this Short-Form Trademark License Agreement to be executed as of the Effective Date.

LICENSOR:

PENTHOUSE GLOBAL LICENSING, INC.

By: _Kelly Holland_____

Name: Kelly Holland

Title:   Chief Executive Officer

LICENSEE:

KIRKENDOLL MANAGEMENT, LLC

By: _____

Name: John Kirkendoll

Title:   Manager

PENTHOUSE CLUBS WORLDWIDE, LLC

By: _____

Name: John Kirkendoll

Title:   Manager

*Signature Page*
*Short-Form Trademark License Agreement*
*Master License Agreement between Penthouse Global Licensing, Inc., Kirkendoll Management, LLC,*
*and Penthouse Clubs Worldwide, LLC*

LA 132974574v1

**EXECUTION COPY**

IN WITNESS WHEREOF, Licensor and Licensee have each caused this Short-Form Trademark License Agreement to be executed as of the Effective Date.

**LICENSOR:**

PENTHOUSE GLOBAL LICENSING, INC.

By: _____
Name: Kelly Holland
Title:   Chief Executive Officer


**LICENSEE:**

KIRKENDOLL MANAGEMENT, LLC

By: _____
Name: John Kirkendoll
Title:  Manager

PENTHOUSE CLUBS WORLDWIDE, LLC

By: _____
Name: John Kirkendoll
Title:   Manager


*Signature Page*
*Short-Form Trademark License Agreement*
*Master License Agreement between Penthouse Global Licensing, Inc., Kirkendoll Management, LLC,*
*and Penthouse Clubs Worldwide, LLC*

LA 132974574v1

**EXECUTION COPY**

## EXHIBIT A

## LICENSED MARKS

| Mark | Country | Registration No. (Application Ser. No.) | Registration/Application Class: Services Limited to Licensed Services |
|---|---|---|---|
| THE PENTHOUSE CLUB | Ukraine | 158069 | 43: Restaurant, night club and bar services (limited to the Licensed Services) |
| THE PENTHOUSE CLUB (w/ three key logo) | Macao | 88956 | 41: nightclub services;   entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners; (all of the foregoing limited to the Licensed Services) |
| | New Zealand | 833185 | 41: Entertainment services, dance and choreography, adult entertainment, nightclub and live performance services, model searches, special appearances by young women selected as centerfolds or annual award winners. (all of the foregoing limited to the Licensed Services) |
| | U.S. | 2,810,417 | 41: Entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners (limited to the Licensed Services)<br><br>43: Restaurant, night club and bar services (limited to the Licensed Services) |
| PENTHOUSE KEY SUITES | U.S. | (86/876606) | 43: Restaurant and bar services (limited to the Licensed Services) |
| THE PENTHOUSE KEY SUITES (w/ one key logo) | Not Registered | Not Registered | Limited to the Licensed Services |
| THE PENTHOUSE KEY SUITES (w/ three key logo) | Not Registered | Not Registered | Limited to the Licensed Services |

*Exhibit A*
*Short-Form Trademark License Agreement*
*Master License Agreement between Penthouse Global Licensing, Inc., Kirkendoll Management, LLC,*
*and Penthouse Clubs Worldwide, LLC*

LA 132974574v1

**EXECUTION COPY**

| PENTHOUSE KEY SUITES / PENTHOUSE KEY SUITES | | | |
|---|---|---|---|
| Three Key Logo | Australia | 367684 | 41: Entertainment services (limited to the Licensed Services) |
| | Barbados | 81/20326 | 41: nightclub services (limited to the Licensed Services) |
| | Brazil | 816873348 | 41: Amusement, entertainment and auxiliary services (limited to the Licensed Services). |
| | Canada | TMA748,728 | 41: nightclub services (limited to the Licensed Services) |
| | China | 4281665 | 41: nightclub services (limited to the Licensed Services) |
| | EU | 4018776 | 41: nightclub services (limited to the Licensed Services) |
| | Germany | 2011612 | 41: Entertainment (limited to the Licensed Services) |
| | Indonesia | IDM000076878 | 41: nightclub services (limited to the Licensed Services). |
| | Liechtenstein | 8122 | 41: Entertainment (limited to the Licensed Services) |
| | New Zealand | 717684 | 41: nightclub services (limited to the Licensed Services) |
| | Russia | 128751 | 41: adult night clubs (limited to the Licensed Services) 42: cocktail lounges (limited to the Licensed Services) |
| | Trinidad & Tobago | 46293 | 41: entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners; nightclub services  (all of the foregoing limited to the Licensed Services) |
| | Turks & Caicos | 14014 | 41: nightclub services (limited to the Licensed Services) |
| | Turks & Caicos | 14015 | 42: (old class 42, now Class 43): All services in (old) International Class 42, (limited to the Licensed Services). |
| | Ukraine | 65800 | 41: nightclub services (limited to the Licensed Services) |

*Exhibit A*
*Short-Form Trademark License Agreement*
*Master License Agreement between Penthouse Global Licensing, Inc., Kirkendoll Management, LLC,*
*and Penthouse Clubs Worldwide, LLC*

LA 132974574v1

**EXECUTION COPY**

| | UAE | 53386 | 41: nightclub services (limited to the Licensed Services). |
|---|---|---|---|
| | Vietnam | 72640 | 41: nightclub services (limited to the Licensed Services). |
| PENTHOUSE KEY GIRL | Ukraine | 158071 | 41: Entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners and night club services (limited to the Licensed Services)<br><br>43: Restaurant, night club and bar services (limited to the Licensed Services) |
| KEY GIRL (Stylized)<br><br>**KEY**GIRL | Not Registered | Not Registered | Limited to the Licensed Services |
| PENTHOUSE KEY CLUB | Not Registered | Not Registered | Limited to the Licensed Services |
| KEY CLUB | Not Registered | Not Registered | Limited to the Licensed Services |
| CALIGULA CLUB | Not Registered | Not Registered | Limited to the Licensed Services |
| PENTHOUSE CLUB | Japan | 4384068 | 41: Limited to the Licensed Services<br><br>42: Serving food and drink (limited to the Licensed Services) |
| | Mexico | 903392 | 41: night clubs (limited to the Licensed Services) |
| | Mexico | 921770 | 43: Services rendered through restaurants in order to provide food and beverages inside and outside of establishments (limited to the Licensed Services) |
| THE PENTHOUSE BEACH CLUB | Ukraine | 158070 | 41: Entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners and night club services (limited to the Licensed Services)<br><br>43: Restaurant, night club and bar services (limited to the Licensed Services) |

*Exhibit A*
*Short-Form Trademark License Agreement*
*Master License Agreement between Penthouse Global Licensing, Inc., Kirkendoll Management, LLC,*
*and Penthouse Clubs Worldwide, LLC*

LA 132974574v1

*Exhibit F*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

# CERTIFICATE OF CONSENT

EXECUTION COPY

### ACKNOWLEDGEMENT AND CONSENT

**EXWORKS CAPITAL FUND I, L.P.** ("ExWorks"), in its capacity as lender under that certain Loan and Security Agreement, dated February 19, 2016 (the "Loan Agreement"), by and between ExWorks, as lender, and Penthouse Global Media, Inc., as borrower, is delivering this Acknowledgement and Consent pursuant to Section 2.2(f) of that certain Master Licensing Agreement, dated as of the date hereof (the "MLA"), by and among Penthouse Global Licensing, Inc., a Delaware corporation ("Licensor"), on the one hand, and Kirkendoll Management, LLC, a Colorado limited liability company, and Penthouse Clubs Worldwide, LLC, a Delaware limited liability company (collectively, the "Licensee").   Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the MLA.

ExWorks hereby (a) consents to the execution and delivery by Licensor of the MLA and the other Transaction Documents, and the consummation of the transactions contemplated thereby; (b) agrees that, in the event of any transaction or occurrence that would transfer to or vest in ExWorks or any of its Affiliates, directly or indirectly, any or all right, title and interest to the Licensed Marks, Third-Party Licenses or New Contracts, ExWorks, on behalf of itself and its Affiliates, covenants not to dispute or challenge, or assist any Person in disputing or challenging, in any Legal Proceeding or otherwise, the enforceability of the MLA or the other Transaction Documents; and (c) agrees that, in the event that ExWorks enforces its rights against Licensor and/or its Affiliates under the Loan Agreement, it shall not seek to challenge the enforceability of or otherwise invalidate the MLA or the other Transaction Documents.

This Consent is executed this 21 day of March_____, 2017.


**EXWORKS CAPITAL FUND I, L.P.**


By: _____
        Authorized Signatory

*Disclosure Schedules*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

## Schedule 1.1(a)

## LICENSED MARKS

| Mark | Country | Registration No. (Application Ser. No.) | Registration/Application Class: Services Limited to Licensed Services |
|---|---|---|---|
| THE PENTHOUSE CLUB | Ukraine | 158069 | 43: Restaurant, night club and bar services (limited to the Licensed Services) |
| THE PENTHOUSE CLUB (w/ three key logo)  | Macao | 88956 | 41: nightclub services; entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners; (all of the foregoing limited to the Licensed Services) |
| | New Zealand | 833185 | 41: Entertainment services, dance and choreography, adult entertainment, nightclub and live performance services, model searches, special appearances by young women selected as centerfolds or annual award winners. (all of the foregoing limited to the Licensed Services) |
| | U.S. | 2,810,417 | 41: Entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners (limited to the Licensed Services)<br><br>43: Restaurant, night club and bar services (limited to the Licensed Services) |
| PENTHOUSE KEY SUITES | U.S. | (86/876606) | 43: Restaurant and bar services (limited to the Licensed Services) |
| THE PENTHOUSE KEY SUITES (w/ one key logo)  | Not Registered | Not Registered | Limited to the Licensed Services |
| THE PENTHOUSE KEY SUITES (w/ three key logo) | Not Registered | Not Registered | Limited to the Licensed Services |

*Disclosure Schedules*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

| | | | |
|---|---|---|---|
| PENTHOUSE KEY SUITES / PENTHOUSE KEY SUITES | | | |
| Three Key Logo | Australia | 367684 | 41: Entertainment services (limited to the Licensed Services) |
| | Barbados | 81/20326 | 41: nightclub services (limited to the Licensed Services) |
| | Brazil | 816873348 | 41: Amusement, entertainment and auxiliary services (limited to the Licensed Services). |
| | Canada | TMA748,728 | 41: nightclub services (limited to the Licensed Services) |
| | China | 4281665 | 41: nightclub services (limited to the Licensed Services) |
| | EU | 4018776 | 41: nightclub services (limited to the Licensed Services) |
| | Germany | 2011612 | 41: Entertainment (limited to the Licensed Services) |
| | Indonesia | IDM000076878 | 41: nightclub services (limited to the Licensed Services). |
| | Liechtenstein | 8122 | 41: Entertainment (limited to the Licensed Services) |
| | New Zealand | 717684 | 41: nightclub services (limited to the Licensed Services) |
| | Russia | 128751 | 41: adult night clubs (limited to the Licensed Services) 42: cocktail lounges (limited to the Licensed Services) |
| | Trinidad & Tobago | 46293 | 41: entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners; nightclub services  (all of the foregoing limited to the Licensed Services) |
| | Turks & Caicos | 14014 | 41: nightclub services (limited to the Licensed Services) |
| | Turks & Caicos | 14015 | 42: (old class 42, now Class 43): All services in (old) International Class 42, (limited to the Licensed Services). |
| | Ukraine | 65800 | 41: nightclub services (limited to the Licensed Services) |
| | UAE | 53386 | 41: nightclub services (limited to the Licensed Services). |

*Disclosure Schedules*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

| | Vietnam | 72640 | 41: nightclub services (limited to the Licensed Services). |
|---|---|---|---|
| PENTHOUSE KEY GIRL | Ukraine | 158071 | 41: Entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners and night club services (limited to the Licensed Services)<br><br>43: Restaurant, night club and bar services (limited to the Licensed Services) |
| KEY GIRL (Stylized)<br><br>**KEY**GIRL | Not Registered | Not Registered | Limited to the Licensed Services |
| PENTHOUSE KEY CLUB | Not Registered | Not Registered | Limited to the Licensed Services |
| KEY CLUB | Not Registered | Not Registered | Limited to the Licensed Services |
| CALIGULA CLUB | Not Registered | Not Registered | Limited to the Licensed Services |
| PENTHOUSE CLUB | Japan | 4384068 | 41:  Limited to the Licensed Services<br><br>42: Serving food and drink (limited to the Licensed Services) |
| | Mexico | 903392 | 41:  night clubs (limited to the Licensed Services) |
| | Mexico | 921770 | 43: Services rendered through restaurants in order to provide food and beverages inside and outside of establishments (limited to the Licensed Services) |
| THE PENTHOUSE BEACH CLUB | Ukraine | 158070 | 41: Entertainment services, namely, providing live dance performances, model searches and special appearances by young women selected as centerfolds or annual award winners and night club services (limited to the Licensed Services)<br><br>43: Restaurant, night club and bar services (limited to the Licensed Services) |

*Disclosure Schedules*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

### Schedule 1.1(f)

### EXCLUDED LICENSES

1. <u>New York</u>. _____
   _____
   _____


2. <u>Chicago</u>. _____
   _____
   _____


3. <u>Pittsburgh</u>. _____
   _____
   _____


4. <u>Pompano Beach</u>. _____
   _____
   _____


5. <u>Nicosia, Cyprus</u>.    Adult Night Club License Agreement between General Media Communications, Inc. and Ierax, Ltd., dated August 13, 2015.


6. <u>St. Louis</u>.    Adult Night Club License Agreement between General Communications, Inc. and VCG Holding Corp., dated July 8, 2014, effective as of October 17, 2013, as amended on October 21, 2014, effective as of October 17, 2014, and on November 9, 2015, effective as of October 31, 2015.


7. <u>Denver</u>.    Adult Night Club License Agreement between General Communications, Inc. and VCG Holding Corp., dated July 8, 2014, effective as of October 17, 2013, as amended on October 21, 2014, effective as of October 17, 2014, and on November 9, 2015, effective as of October 31, 2015.

## Schedule 1.1(i)

## ADDITIONAL MARKS

1. PENTHOUSE
2. PET OF THE YEAR
3. PET OF THE MONTH
4. CALIGULA
5. ONE KEY LOGO
6. PENTHOUSE & ONE KEY DESIGN
7. PENTHOUSE and KEYHOLE and ONE KEY DESIGNS
8. PENTHOUSE & One Key Logo
9. PENTHOUSE & Three Key Logo
10. PENTHOUSE PET
11. PENTHOUSE PETS
12. THE GIRLS OF PENTHOUSE
13. THE GIRLS OF PENTHOUSE (Stylized)

*Disclosure Schedules*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

## Schedule 1.2(b)

## PAYMENT ACCOUNT

**INCOMING WIRE INSTRUCTIONS FOR EAST WEST BANK**

| | |
|---|---|
| **Beneficiary Name: (required)** | Penthouse Global Licensing, Inc. |
| **Beneficiary Account Number: (required)** | 8088013845 |
| **Beneficiary Address: (optional)** | |
| **Bank Routing Number: (domestic wires)** | **3 \| 2 \| 2 \| 0 \| 7 \| 0 \| 3 \| 8 \| 1** |
| **Bank Routing/ Swift Code: (international wires)** | **EWBKUS66XXX** |
| **Receiving Bank Name:** | **East West Bank** |
| **Receiving Bank Address: (branch address)** | **135 N. Los Robles Ave., Suite 600** |
| **Receiving Bank Address (branch city, state, zip)** | **Pasadena, CA 91101** |
| **Other Information: (optional)** | |

Note:

1. The beneficiary name and beneficiary account number must match for funds to be credited.

2. All Domestic wires for East West bank should be wired to bank routing no: 322070381.

3. All International wires for East West bank should be wired to Swift code: EWBKUS66XXX

*Disclosure Schedules*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

## Schedule 3.4

### LITIGATION DISCLOSURE AND OTHER THIRD-PARTY USES

1. General Media Communications, Inc. v. The Executive Club, LLC
   Supreme Court of the State of New York, County of New York
   Index No.: 653291/2016

2. Garay v. BT California, LLC dba The Penthouse Club & Steakhouse, et al.
   Superior Court of the State of California, County of San Francisco
   Case No. CGC-15-545795

3. Friendfinder Networks, Inc. v. Various, Inc. v. Penthouse Global Media, Inc.
   In the Court of Chancery of the State of Delaware
   C.A. No. 12436

*Disclosure Schedules*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

## Schedule 3.8

## THIRD-PARTY LICENSES

1. <u>The Penthouse Club New Orleans</u> –  Club Licensing Agreement between General Media Communications, Inc. and American Club Restaurant, Inc., dated August 12, 2005

2. <u>The Penthouse Club Tampa</u> – Club Licensing Agreement between General Media Communications, Inc. and Tampa Food & Beverage, LLC, dated September 1, 2006, and amended by Amendment #1, Amendment #2 and Amendment #3, and that certain Amendment to Club Licensing Agreement dated November 30, 2012, effective as of October 31, 2012, and subsequently assigned to Westshore Food & Beverage, LLC on May 2016

3. <u>The Penthouse Club Detroit</u> – Club Licensing Agreement between General Media Communications, Inc. and ABCDE Land Development, LLC, dated January 10, 2007, and amended on October 30, 2010

4. <u>The Penthouse Club Moscow</u> – Club Licensing Agreement between General Media Communications, Inc. and Highland Group, LLC, dated April 2, 2010, and amended on April 30, 2015 and November 3, 2016

5. <u>The Penthouse Club Baton Rouge</u> – Adult Night Club Trademark License Agreement between General Media Communications, Inc. and Baton Rouge Sports Restaurant, LLC, dated April 15, 2010

6. <u>The Penthouse Club Auckland</u> – Adult Night Club License Agreement between General Media Communications, Inc. and Delores Properties Limited, dated January 30, 2011, and amended on September 19, 2013

7. <u>The Penthouse Club San Francisco</u> – Adult Night Club License Agreement between General Media Communications, Inc. and BT California, LLC, dated April 18, 2011

8. <u>The Penthouse Club Paris</u> – Trademark License Agreement between General Media Communications, Inc. and Sarl Sport Bar, dated April 1, 2012, and amended on October 31, 2012

9. <u>The Penthouse Club Perth</u> – Adult Night Club License Agreement between General Media Communications, Inc. and M&M Entertainment Pty Ltd., dated August 22, 2014

10. <u>The Penthouse Club Philadelphia</u> – Adult Night Club License Agreement between General Media Communications, Inc. and 3001 Castor, Inc., dated September 19, 2014

*Disclosure Schedules*
*Master License Agreement*
*Penthouse Global Licensing, Inc.; Kirkendoll Management, LLC; Penthouse Clubs Worldwide, LLC*

## Schedule 3.9(b)

### INFRINGEMENTS AND OTHER USES

1.  Licensee acknowledges the existence of a  brothel currently operating in Sydney, Australia under the name of "The Penthouse" and a gentleman's club known as the "Penthouse Gentleman's Club" operating in Auckland, New Zealand (collectively the "Brothels") . The term "Brothels" shall include the establishments listed in the prior sentence and any and all subsidiaries, affiliates, licensee, joint ventures or any companies related to said establishments.  Licensee agrees and acknowledges that: (i) the existence of the Brothels is not a violation of this Agreement or any other agreement between the parties; (ii) Licensor has no relationship, agreement or affiliation in any manner with regard to said brothels; and (iii) Licensee voluntarily and knowingly assumes the risks in operating a Gentlemen's Club under this Agreement with the knowledge of the existence of the Brothels as noted herein.

2.  There is an infringer in Canada operating under THE PENTHOUSE NIGHTCLUB.  It has been in business since 1947.  http://www.penthousenightclub.com/.

3.  There is another unauthorized, unrelated business in Ukraine:  http://penthouse.net.ua/en/.

4.  The Penthouse Club in Denver, Colorado – VCG Holding Corp. is continuing to use the mark THE PENTHOUSE CLUB despite the expiration of its license agreement with Licensor.

5.  The Penthouse Club in St. Louis, Missouri – VCG Holding Corp. is continuing to use the mark THE PENTHOUSE CLUB despite the expiration of its license agreement with Licensor.

Exhibit C

1

WEISS & SPEES LLP
Michael H. Weiss (SBN 107481)
mw@weissandspees.com
Laura J. Meltzer (SBN 151889)
1925 Century Park East, Suite 650
Los Angeles, California 90067
Telephone: 424-245-3100
Facsimile: 424-217-4160

2

3

4

5

6

[Proposed] Attorneys for Debtors and Debtors
in Possession

7

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

8

9

10

In re:

    Penthouse Global Media, Inc.,
        Debtor.

11

12

13

In re:

    Penthouse Global Broadcasting, Inc.,
    Penthouse Global Licensing, Inc.,
    Penthouse Global Digital, Inc., Penthouse
    Global Publishing, Inc.
    GMI Online Ventures, Ltd. Penthouse
    Digital Media Productions, Inc., Tan
    Door Media, Inc.
    Penthouse Images Acquisitions, Ltd.,
    Pure Entertainment Telecommunications,
    Inc., XVHUB Group, Inc., General
    Media Communications, Inc., General
    Media Entertainment, Inc., Danni Ashe,
    Inc. and Streamray Studios, Inc.
        Debtors.

14

15

16

17

18

19

20

21

22

**X** Affects All Debtors
    □ Affects
    □ Affects
    □ Affects
    □ Affects
□ See attached for additional Debtors

23

24

25

26

27

28

Lead Case No.  1:18-bk-10098-MB
Chapter 11
Jointly Administered With:

Case No. 1:18-bk-10099-MB
Case No. 1:18-bk-10101-MB
Case No. 1:18-bk-10102-MB
Case No. 1:18-bk-10103-MB
Case No. 1:18-bk-10104-MB
Case No. 1:18-bk-10105-MB
Case No. 1:18-bk-10106-MB
Case No. 1:18-bk-10107-MB
Case No. 1:18-bk-10108-MB
Case No. 1:18-bk-10109-MB
Case No. 1:18-bk-10110-MB
Case No. 1:18-bk-10111-MB
Case No. 1:18-bk-10112-MB
Case No. 1:18-bk-10113-MB

**[PROPOSED] ORDER FOR APPROVAL
OF DIP FINANCING AND ASSUMPTION
OF EXECUTORY CONTRACT**

Hearing:
Date:     February 27, 2018
Time:     2:30. P.M.
Place:    Room 303
        21041 Burbank Boulevard
        Woodland Hills, CA

s:\penthouse\club transaction\[proposed order].docx

WEISS & SPEES, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067-2701
Tel: (424) 245-3100

At the time and place noted above, the Court conducted a hearing on Debtors' Motion for Order: Approving DIP Financing and Authorizing Debtor to Assume an Executory Contract (the Motion'). [DKT. No. ___]  The Court adopts its findings of fact and conclusions of law as stated on the record at the conclusion of the hearing.  Having considered the evidence and argument offered in support of and against the Motion and good cause appearing, it is hereby ORDERED:

1.    Debtors are authorized to borrow $200,000 on the terms and conditions set forth in the DIP Loan Agreement with Penthouse Clubs Worldwide, Inc. ("Lender") attached as Exhibit "A" to the Motion.  All capitalized terms have the same meaning as those in the DIP Loan Agreement, unless otherwise noted.

2.    All of the terms of the DIP Loan Agreement are approved.

3.    Debtors are authorized to assume the Master License Agreement attached as Exhibit "B" to the Motion.

4.    Without limiting the foregoing;  the Court further orders:

a.    No claim or Lien having a priority superior to or pari passu with those granted to Lender shall be granted or allowed while any portion of the Loan (or any refinancing thereof) or the commitments thereunder or the Obligations remain outstanding, whether under Section 364(d) of the Bankruptcy Code or otherwise.

b.    Unless all Obligations shall have been paid in full in cash or otherwise satisfied in accordance with the DIP Loan Agreement and that agreement shall have been terminated, no Borrower shall seek, and it shall constitute an Event of Default (in addition to any other Event of Default contained in the Loan Documents) if any Borrower seeks, or if there is entered, (I) any modifications or extensions of the Financing Orders without the prior written consent of Lender, and no such consent shall be implied by any other action, inaction or acquiescence by Lender, or (II) an order dismissing the Chapter 11 Case.

c.    Except as expressly provided herein or in the DIP Loan Agreement,

- 2 -

Case 1:18-bk-10098-MB    Doc 181    Filed 02/23/18    Entered 02/23/18 22:09:29    Desc
Main Document    Page 136 of 155

1  Lender's Liens and the Superpriority Claims and all other rights and

2  remedies of Lender granted by the provisions of the DIP Loan Agreement

3  shall survive, and shall not be modified, impaired or discharged by the

4  entry of an order converting the Chapter 11 Case to a case under Chapter 7

5  of the Bankruptcy Code, dismissing the Chapter 11 Case, or by any other

6  act or omission, nor shall Lender's Liens or the Superpriority Claims or

7  any of the other rights and remedies of the Lender granted by the

8  provisions of the DIP Loan Agreement be modified, impaired or

9  discharged by the entry of an order confirming a plan of reorganization in

10  the Chapter 11 Case and, pursuant to Section 1141(d)(4) of the Bankruptcy

11  Code, each Borrower has waived any discharge as to any remaining

12  Obligations and such waiver is hereby approved.

13  d.    The terms and provisions of the DIP Loan Agreement shall continue in the

14  Chapter 11 Case, or in any superseding Chapter 7 case under the

15  Bankruptcy Code, and Lender's Liens, the Superpriority Claims and all

16  other rights and remedies of Lender granted by the provisions of the DIP

17  Loan Agreement shall continue in full force and effect until the Obligations

18  are indefeasibly paid in full or otherwise satisfied in accordance with this

19  Agreement.

20  e.    Lender, the property securing the Loan and the Liens and security interests

21  granted to Lender hereunder shall not be subject to any charge or claim

22  under Section 506(c) of the Bankruptcy Code or any similar provisions of

23  the Bankruptcy Code or applicable law.

24  f.    Lender shall have a right to credit the amounts due under the DIP Loan

25  Agreement in any sale of the Collateral, including, but not limited to, the

26  sale of the Collateral to the Lender as contemplated hereunder.

27  g.    The Court hereby finds that the Lender has acted in good faith in

28  connection with the Motion and is entitled to rely upon the protections

WEISS & SPEES, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067-2701
Tel: (424) 245-3100

- 3 -

granted by Section 364(e) of the Bankruptcy Code.

h.  Pursuant to Fed. R. Bakr. Pro. 4001(c)(2), the Court finds that the entire amount of credit granted under the DIP Loan Agreement is necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

i.  Subject to a 15% variance, the Debtors re authorized to cash as set forth in Exhibit "D" until March ___, 2018.

j.  A final hearing on the Motion is set for _____, 2018 at _____ in the Courtroom noted above.

#### 

WEISS & SPEES, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067-2701
Tel: (424) 245-3100

- 4 -

# Exhibit D

Penthouse Global Media Inc
60 Day Projections

2/23/2018

| REVENUES | 26-Feb | 27-Feb | 28-Feb | 1-Mar | 2-Mar | Sat/Sun | 5-Mar | 6-Mar | 7-Mar | 8-Mar | 9-Mar | Sat/Sun | 12-Mar | 13-Mar | 14-Mar | 15-Mar | 16-Mar | Sat/Sun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BROADCAST | - | - | - | 273,735 | - | | - | - | - | 85,114 | - | | - | - | - | 102,013 | - | |
| DIGITAL | - | - | - | 34,658 | - | | - | - | - | 29,325 | - | | - | - | - | 29,799 | - | |
| PUBLISHING | - | - | - | 51,331 | - | | - | - | - | 14,933 | - | | - | - | - | 20,433 | - | |
| LICENSING | - | 200,000 | - | 10,000 | | | - | - | - | - | | | - | - | - | - | | |
| TOTAL REVENUES | - | 200,000 | - | 369,724 | - | | - | - | - | 129,372 | - | | - | - | - | 152,245 | - | |
| TOTAL COST OF GOODS SOLD | - | - | - | - | 203,743 | | - | - | - | - | 71,964 | | - | - | - | - | 108,864 | |
| GROSS PROFITS | - | 200,000 | - | 369,724 | (203,743) | | - | - | - | 129,372 | (71,964) | | - | - | - | 152,245 | (108,864) | |
| | | | | | | | | | | | | | | | | | | |
| **EXPENSES** | | | | | | | | | | | | | | | | | | |
| Payroll including taxes | - | - | - | - | - | | - | - | - | 75,000 | - | | - | - | - | - | - | |
| Bank Fees | - | - | - | - | 2,420 | | - | - | - | - | - | | - | - | - | - | - | |
| Professional Fees | | | | | | | | | | | | | | | | | | |
| Catherine Brandt COO | - | - | - | - | 10,000 | | - | - | - | - | - | | - | - | - | - | 5,000 | |
| Keith Whitworth- CFO | - | - | - | - | 6,667 | | - | - | - | - | - | | - | - | - | - | 3,333 | |
| Safe Keeping Record | - | - | - | - | 3,000 | | - | - | - | - | 2,500 | | - | - | - | - | - | |
| Accounting / Legal | - | - | - | - | 2,000 | | - | - | - | - | - | | - | - | - | - | 2,000 | |
| Art Attack - Hardware rental | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | - | |
| Sam Philips | - | - | - | - | 2,500 | | - | - | - | - | - | | - | - | - | - | 2,500 | |
| Jose Ponce | - | - | - | - | 2,500 | | - | - | - | - | 1,500 | | - | - | - | - | 1,500 | |
| Jason Bekoski | - | - | - | - | 1,600 | | - | - | - | - | 1,600 | | - | - | - | - | 1,600 | |
| Barbara Pizio | - | - | - | - | 6,000 | | - | - | - | - | - | | - | - | - | - | 6,000 | |
| Taxes | - | - | - | - | 300 | | - | - | - | - | - | | - | - | - | - | - | |
| Rent | - | - | - | - | 39,315 | | - | - | - | - | - | | - | - | - | - | - | |
| Utilities/Storage/Securities/Phone | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | - | |
| ADT Security | - | - | - | - | 222 | | - | - | - | - | - | | - | - | - | - | - | |
| AT&T | - | - | - | - | 4,000 | | - | - | - | - | - | | - | - | - | - | - | |
| Adobe | | | | | 2,199 | | | | | | | | | | | | | |
| Cybex Solution | - | - | - | - | 189 | | - | - | - | - | - | | - | - | - | - | - | |
| Staples Etc. | - | - | - | - | 2,000 | | - | - | - | - | 500 | | - | - | - | - | 500 | |
| LADWP | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | - | |
| Orkin | - | - | - | - | 214 | | - | - | - | - | - | | - | - | - | - | - | |
| Pitney Bowes | - | - | - | - | 300 | | - | - | - | - | - | | - | - | - | - | - | |
| Ready Fresh by Nestle | - | - | - | - | 35 | | - | - | - | - | - | | - | - | - | - | - | |
| Southern Ca Edison | - | - | - | - | 500 | | - | - | - | - | - | | - | - | - | - | - | |
| Iron Mountain | - | - | - | - | 4,702 | | - | - | - | - | - | | - | - | - | - | - | |
| Uline | - | - | - | - | 484 | | - | - | - | - | - | | - | - | - | - | - | |
| Verizon Wireless | - | - | - | - | 200 | | - | - | - | - | - | | - | - | - | - | - | |
| Waste Management | - | - | - | - | 1,089 | | - | - | - | - | - | | - | - | - | - | - | |
| Insurance | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | - | |
| Marsh | - | - | - | - | - | | - | - | - | - | 57,000 | | - | - | - | - | - | |
| Aflack | - | - | - | - | 2,654 | | - | - | - | - | - | | - | - | - | - | - | |
| Cal Choice | - | - | - | - | 26,000 | | - | - | - | - | - | | - | - | - | - | - | |
| Choice Builder | - | - | - | - | - | | - | - | - | - | 2,023 | | - | - | - | - | - | |
| Lincoln National Life Insurance | - | - | - | - | - | | - | - | - | - | 4,400 | | - | - | - | - | - | |
| Outside-Legal - IP-Trademarks | - | - | - | - | 5,000 | | - | - | - | - | - | | - | - | - | - | 5,000 | |
| Other | - | - | - | - | 3,000 | | - | - | - | - | - | | - | - | - | - | 3,000 | |
| | | | | | | | | | | | | | | | | | | |
| TOTAL EXPENSE | - | - | - | - | 129,090 | | $ - | $ - | $ - | $ 75,000 | $ 69,523 | | $ - | $ - | $ - | $ - | $ 30,433 | |
| EBITDA | $ - | $ 200,000 | $ - | $ 369,724 | $ (332,833) | | $ - | $ - | $ - | $ 54,372 | $ (141,487) | | $ - | $ - | $ - | $ 152,245 | $ (139,297) | |
| | | | | | | | | | | | | | | | | | | |
| Contents licensing & buy | $ - | $ - | $ - | $ - | $ (46,000) | | $ - | $ - | $ - | $ - | $ (15,000) | | $ - | $ - | $ - | $ - | $ (15,000) | |
| Contents Production in house | $ - | $ - | $ - | $ - | $ (17,462) | | $ - | $ - | $ - | $ - | $ (15,000) | | $ - | $ - | $ - | $ - | $ (15,000) | |

Ending Cash $ 257,332          Ending Cash $ 140,217          Ending Cash $ 123,165

| REVENUES | 19-Mar | 20-Mar | 21-Mar | 22-Mar | 23-Mar | Sat/Sun | 26-Mar | 27-Mar | 28-Mar | 29-Mar | 30-Mar | Sat/Sun | 2-Apr | 3-Apr | 4-Apr | 5-Apr | 6-Apr | Sat/Sun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BROADCAST | - | - | - | 69,388 | - | | - | - | - | 134,536 | - | | - | - | - | 154,221 | - | |
| DIGITAL | - | - | - | 29,325 | - | | - | - | - | 29,728 | - | | - | - | - | 29,325 | - | |
| PUBLISHING | - | - | - | 58,415 | - | | - | - | - | 102,933 | - | | - | - | - | 15,433 | - | |
| LICENSING | - | - | - | - | - | | - | 600,000 | - | - | - | | - | - | - | 46,007 | - | |
| TOTAL REVENUES | - | - | - | 157,128 | - | | - | 600,000 | - | 267,197 | - | | - | - | - | 244,986 | - | |
| TOTAL COST OF GOODS SOLD | - | - | - | - | 90,364 | | - | - | - | - | 56,614 | | - | - | - | - | 170,435 | |
| GROSS PROFITS | - | - | - | 157,128 | (90,364) | | - | 600,000 | - | 267,197 | (56,614) | | - | - | - | 244,986 | (170,435) | |
| | | | | | | | | | | | | | | | | | | |
| EXPENSES | | | | | | | | | | | | | | | | | | |
| Payroll including taxes | - | - | - | 75,000 | - | | - | - | - | - | - | | - | - | - | 75,000 | - | |
| Bank Fees | - | - | - | - | - | | - | - | - | - | 2,444 | | - | - | - | - | - | |
| Professional Fees | | | | | | | | | | | | | | | | | | |
| Catherine Brandt COO | - | - | - | - | - | | - | - | - | - | 5,000 | | - | - | - | - | - | |
| Keith Whitworth- CFO | - | - | - | - | - | | - | - | - | - | 3,333 | | - | - | - | - | - | |
| Safe Keeping Record | - | - | - | - | 2,500 | | - | - | - | - | - | | - | - | - | - | 2,500 | |
| Accounting / Legal | - | - | - | - | - | | - | - | - | - | 2,000 | | - | - | - | - | - | |
| Art Attack - Hardware rental | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | - | |
| Sam Philips | - | - | - | - | - | | - | - | - | - | 2,500 | | - | - | - | - | - | |
| Jose Ponce | - | - | - | - | 1,500 | | - | - | - | - | 1,500 | | - | - | - | - | 1,500 | |
| Jason Bekoski | - | - | - | - | 1,600 | | - | - | - | - | 1,600 | | - | - | - | - | 1,600 | |
| Barbara Pizio | - | - | - | - | - | | - | - | - | - | 6,000 | | - | - | - | - | - | |
| Taxes | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | - | |
| Rent | - | - | - | - | - | | - | - | - | - | 22,500 | | - | - | - | - | - | |
| Utilities/Storage/Securities/Phone | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | - | |
| ADT Security | - | - | - | - | - | | - | - | - | - | 222 | | - | - | - | - | - | |
| AT&T | - | - | - | - | - | | - | - | - | - | 4,000 | | - | - | - | - | - | |
| Adobe | - | - | - | - | - | | - | - | - | - | 2,199 | | - | - | - | - | - | |
| Cybex Solution | - | - | - | - | - | | - | - | - | - | 189 | | - | - | - | - | - | |
| Staples Etc. | - | - | - | - | 500 | | - | - | - | - | 500 | | - | - | - | - | 500 | |
| LADWP | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | 5,500 | |
| Orkin | - | - | - | - | - | | - | - | - | - | 214 | | - | - | - | - | - | |
| Pitney Bowes | - | - | - | - | - | | - | - | - | - | 300 | | - | - | - | - | - | |
| Ready Fresh by Nestle | - | - | - | - | - | | - | - | - | - | 35 | | - | - | - | - | - | |
| Southern Ca Edison | - | - | - | - | - | | - | - | - | - | 600 | | - | - | - | - | - | |
| Iron Mountain | - | - | - | - | - | | - | - | - | - | 5,000 | | - | - | - | - | - | |
| Uline | - | - | - | - | - | | - | - | - | - | 484 | | - | - | - | - | - | |
| Verizon Wireless | - | - | - | - | - | | - | - | - | - | 200 | | - | - | - | - | - | |
| Waste Management | - | - | - | - | - | | - | - | - | - | 1,089 | | - | - | - | - | - | |
| Insurance | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | - | |
| Marsh | - | - | - | - | - | | - | - | - | - | 12,239 | | - | - | - | - | - | |
| Aflack | - | - | - | - | - | | - | - | - | - | 2,660 | | - | - | - | - | - | |
| Cal Choice | - | - | - | - | - | | - | - | - | - | 26,000 | | - | - | - | - | 26,000 | |
| Choice Builder | - | - | - | - | - | | - | - | - | - | 2,023 | | - | - | - | - | 2,023 | |
| Lincoln National Life Insurance | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | - | |
| Outside-Legal - IP-Trademarks | - | - | - | - | - | | - | - | - | - | 5,000 | | - | - | - | - | - | |
| Other | - | - | - | - | - | | - | - | - | - | 3,000 | | - | - | - | - | 3,000 | |
| | | | | | | | | | | | | | | | | | | |
| TOTAL EXPENSE | - | - | - | 75,000 | 6,100 | | - | - | - | - | 112,831 | | - | - | - | 75,000 | 42,623 | |
| | | | | | | | | | | | | | | | | | | |
| EBITDA | - | - | - | 82,128 | (96,464) | | - | 600,000 | - | 267,197 | (169,445) | | - | - | - | 169,986 | (213,058) | |
| | | | | | | | | | | | | | | | | | | |
| Contents licensing & buy | - | - | - | - | (15,000) | | - | - | - | - | (15,000) | | - | - | - | - | (15,000) | |
| Contents Production in house | - | - | - | - | (15,000) | | - | - | - | - | (15,000) | | - | - | - | - | (15,000) | |

| | Ending Cash | $ 78,829 | | Ending Cash | $ 746,580 | | Ending Cash | $ 673,508 |
|---|---|---|---|---|---|---|---|---|

Penthouse Global Media, Inc.
90 Day Projections

| REVENUES | 9-Apr | 10-Apr | 11-Apr | 12-Apr | 13-Apr | Sat/Sun | 16-Apr | 17-Apr | 18-Apr | 19-Apr | 20-Apr | Sat/Sun | 23-Apr | 24-Apr | 25-Apr | 26-Apr | 27-Apr | Sat/Sun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *BROADCAST* | - | - | - | 21,427 | - | | - | - | - | 136,366 | - | | - | - | - | 88,197 | - | |
| *DIGITAL* | - | - | - | 11,000 | - | | - | - | - | 14,500 | - | | - | - | - | 15,000 | - | |
| *PUBLISHING* | - | - | - | 71,333 | - | | - | - | - | 77,454 | - | | - | - | - | 13,333 | - | |
| *LICENSING* | - | - | - | - | - | | - | - | - | - | - | | - | - | - | 10,000 | - | |
| **TOTAL REVENUES** | - | - | - | 103,760 | - | | - | - | - | 228,320 | - | | - | - | - | 126,530 | - | |
| **TOTAL COST OF GOODS SOLD** | - | - | - | - | 29,114 | | - | - | - | - | 66,300 | | - | - | - | - | 102,864 | |
| **GROSS PROFITS** | - | - | - | 103,760 | (29,114) | | - | - | - | 228,320 | (66,300) | | - | - | - | 126,530 | (102,864) | |
| | | | | | | | | | | | | | | | | | | |
| **EXPENSES** | | | | | | | | | | | | | | | | | | |
| *Payroll including taxes* | - | - | - | - | - | | - | - | - | 75,000 | - | | - | - | - | - | - | |
| *Bank Fees* | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | 2,450 | |
| *Professional Fees* | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | - | |
| Catherine Brandt COO | - | - | - | - | 5,000 | | - | - | - | - | - | | - | - | - | - | 5,000 | |
| Keith Whitworth- CFO | - | - | - | - | 3,333 | | - | - | - | - | - | | - | - | - | - | - | |
| Safe Keeping Record | - | - | - | - | - | | - | - | - | - | 2,500 | | - | - | - | - | - | |
| Accounting  / Legal | - | - | - | - | 2,000 | | - | - | - | - | - | | - | - | - | - | 2,000 | |
| Art Attack - Hardware rental | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | - | |
| Sam Philips | - | - | - | - | 2,500 | | - | - | - | - | - | | - | - | - | - | 2,500 | |
| Jose Ponce | - | - | - | - | 1,500 | | - | - | - | - | 1,500 | | - | - | - | - | 1,500 | |
| Jason Bekoski | - | - | - | - | 1,600 | | - | - | - | - | 1,600 | | - | - | - | - | 1,600 | |
| Barbara Pizio | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | 6,000 | |
| *Taxes* | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | - | |
| *Rent* | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | 22,500 | |
| *Utilities/Storage/Securities/Phone* | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | - | |
| ADT Security | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | 222 | |
| AT&T | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | 4,000 | |
| Adobe | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | 2,199 | |
| Cybex Solution | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | 189 | |
| Staples Etc. | - | - | - | - | 500 | | - | - | - | - | 500 | | - | - | - | - | 500 | |
| LADWP | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | - | |
| Orkin | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | 214 | |
| Pitney Bowes | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | 300 | |
| Ready Fresh by Nestle | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | 35 | |
| Southern Ca Edison | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | 600 | |
| Iron Mountain | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | 5,000 | |
| Uline | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | 484 | |
| Verizon Wireless | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | 200 | |
| Waste Management | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | 1,089 | |
| *Insurance* | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | - | |
| Marsh | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | 12,239 | |
| Aflack | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | 2,660 | |
| Cal Choice | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | 26,000 | |
| Choice Builder | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | 2,023 | |
| Lincoln National Life Insurance | - | - | - | - | - | | - | - | - | - | - | | - | - | - | - | - | |
| *Outside-Legal - IP-Trademarks* | - | - | - | - | 24,175 | | - | - | - | - | - | | - | - | - | - | 5,000 | |
| *Other* | - | - | - | - | 3,000 | | - | - | - | - | - | | - | - | - | - | 3,000 | |
| | | | | | | | | | | | | | | | | | | |
| **TOTAL EXPENSE** | $ - | $ - | $ - | $ - | $ 43,608 | | $ - | $ - | $ - | $ 75,000 | $ 6,100 | | $ - | $ - | $ - | $ - | $ 109,504 | |
| | | | | | | | | | | | | | | | | | | |
| **EBITDA** | $ - | $ - | $ - | $ 103,760 | $ (72,722) | | $ - | $ - | $ - | $ 153,320 | $ (72,400) | | $ - | $ - | $ - | $ 126,530 | $ (212,368) | |
| | | | | | | | | | | | | | | | | | | |
| Contents licensing & buy | $ - | $ - | $ - | $ - | $ (15,000) | | $ - | $ - | $ - | $ - | $ (15,000) | | $ - | $ - | $ - | $ - | $ (15,000) | |
| Contents Production in house | $ - | $ - | $ - | $ - | $ (15,000) | | $ - | $ - | $ - | $ - | $ (15,000) | | $ - | $ - | $ - | $ - | $ (15,000) | |

|  | Ending Cash | $ 674,546 |  | Ending Cash | $ 725,466 |  | Ending Cash | $ 609,628 |
|---|---|---|---|---|---|---|---|---|

Exhibit E

## CONSENT AND SECOND AMENDMENT
## TO LOAN AND SECURITY AGREEMENT

THIS CONSENT AND SECOND AMENDMENT TO LOAN AND SECURITY AGREEMENT (this "Amendment") is entered into as of March 29, 2017, by and among EXWORKS CAPITAL FUND I, L.P. ("Lender"), PENTHOUSE GLOBAL MEDIA, INC., a Delaware corporation ("Borrower") and each of the parties signatory hereto as a Loan Party Obligor.

WHEREAS, Borrower, Lender and Loan Party Obligors are parties to that certain Loan and Security Agreement dated as of February 19, 2016 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement");

WHEREAS, Penthouse Global Licensing, Inc., a Delaware corporation ("PGLI"), a Loan Party Obligor and wholly-owned subsidiary of Borrower, desires to enter into a Master License Agreement (the "Club License Agreement"; and the transactions contemplated by the Club License Agreement, collectively, the "Club License Transaction") relating to certain of its intellectual property assets and certain existing third-party license agreements;

WHEREAS, Borrower has requested and Lender has agreed, subject to the terms and conditions contained herein, to (i) consent to PGLI entering into the Club License Agreement and the transactions contemplated thereby, (ii) make certain agreements regarding the application of proceeds from the Club License Transaction, and (iii) amend the Loan Agreement in certain other respects, in each case as more fully detailed below;

NOW THEREFORE, in consideration of the premises and mutual agreements set forth in the Loan Agreement and this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Defined Terms.   Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Loan Agreement.

2.    Consent.   Pursuant to the request of Borrower, subject to the satisfaction of the conditions set forth in Section 5 below and in reliance upon the representations and warranties set forth in Section 6 below, Lender hereby consents to PGLI entering into the Club License Transaction pursuant to the terms and conditions set forth in the Club License Agreement. The foregoing is a limited consent and except to the extent expressly set forth herein, shall not constitute a modification or alteration of the terms, conditions or covenants of the Loan Agreement or any other Loan Document or a waiver, release or limitation upon the exercise by Lender of any of its rights, legal or equitable, hereunder or under the Loan Agreement or any other Loan Document.

3.    Proceeds of the Club License Transaction.   Pursuant to the request of Borrower, subject to the satisfaction of the conditions set forth in Section 5 below and in reliance upon the representations and warranties set forth in Section 6 below, the parties hereto agree that, notwithstanding anything to the contrary set forth in the Loan Agreement,

8460277v8 3/29/2017 3:22 PM   7467.002

including Sections 2.6 and 6.2 of the Loan Agreement, the "Closing Consideration" (as defined in the Club License Agreement) shall be allocated as follows: on the "Closing Date" (as defined in the Club License Agreement), (a) $1,250,000 shall be remitted by Borrower to Lender for application to the outstanding principal balance of the Term Loan, and (b) the balance of the Closing Consideration shall be retained by Borrower and utilized for working capital and general corporate purposes.

4.    Amendments to Loan Agreement.  Subject to the satisfaction of the conditions set forth in Section 6 below and in reliance on the representations and warranties set forth in Section 6 below, the Loan Agreement is hereby amended as follows:

(a)    Section 1.1 of the Loan Agreement is hereby amended by amending and restating the following defined terms set forth therein as follows:

"Excluded Property" means each of the following: (i) any permit, lease, license, contract or other agreement (or any equipment owned by any Loan Party Obligor that is subject to a purchase money Lien or a Capitalized Lease that is permitted pursuant to this Agreement) to which any Loan Party Obligor is a party, which permit, lease, license, contract or other agreement (and in the case of any such equipment, the contract or other agreement in which the purchase money Lien is granted or the applicable Capitalized Lease) prohibits the creation by such Loan Party Obligor of a Lien thereon, but only, in each case, to the extent, and for so long as, such prohibition is not removed, terminated or rendered unenforceable or otherwise deemed ineffective by the UCC (including Sections 9-406, 9-407, 9-408 or 9-409 thereof) or any other applicable law and with respect to any such equipment, for so long as the Indebtedness secured by the applicable Lien or the applicable Capitalized Lease has not been repaid in full, (ii) any intent-to-use trademark or service mark application if granting such Lien or the exercise of Lender's remedies under the Loan Documents would result in an assignment of such application to Lender that would be deemed to invalidate, void, cancel or abandon such application; provided, that the foregoing exclusion shall in no way be construed to include an amendment to allege use or statement of use; (iii) any voting stock (within the meaning of Treasury Regulations § 1.956-2(c)(2)) in excess of 65% of the outstanding voting stock of any Foreign Subsidiary or Disregarded Domestic Subsidiary which, pursuant to the terms of this Agreement, is not required to guaranty the Obligations; and (iv) the Excluded Trademarks, but only to the extent that and for so long as the Club License Agreement prohibits a Lien thereon, and only for so long as, such prohibition is not removed, terminated or otherwise rendered inoperative. For the avoidance of doubt, any and all proceeds, products, substitutions or replacements of any property described in clauses (i), (ii) and (iii) above shall not constitute Excluded Property (unless such proceeds, products, substitutions or replacements would itself constitute property described in clauses (i), (ii) or (iii) above).

2

*"Master Licensing Agreement"* means one or more license agreements (including the Club License Agreement) for the worldwide rights (or any part thereof) to use any one or more trademarks of the Loan Parties in connection with adult-themed clubs.

*"Permitted Liens"* means (a) purchase-money security interests in specific items of Equipment securing Permitted Indebtedness described under clause (c) of the definition of Permitted Indebtedness; (b) liens for taxes, fees, assessments, or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings (which proceedings have the effect of preventing the enforcement of such lien) for which adequate reserves in accordance with GAAP are being maintained provided the same have no priority over any of Lender's security interests; (c) liens of materialmen, mechanics, carriers, or other similar liens arising in the ordinary course of business and securing obligations which are not delinquent or are being contested in good faith by appropriate proceedings (which proceedings have the effect of preventing the enforcement of such lien) for which adequate reserves in accordance with GAAP are being maintained; (d) liens which constitute banker's liens, rights of set-off, or similar rights as to deposit accounts or other funds maintained with a bank or other financial institution (but only to the extent such banker's liens, rights of set-off or other rights are in respect of customary service charges relative to such deposit accounts and other funds, and not in respect of any loans or other extensions of credit by such bank or other financial institution to any Loan Party); (e) cash deposits or pledges to secure the payment of worker's compensation, unemployment insurance, or other social security benefits or obligations, public or statutory obligations, surety or appeal bonds, bid or performance bonds, or other obligations of a like nature incurred in the ordinary course of business; and (f) Liens on the Excluded Trademarks to secure PGLI's payment obligations under the Club License Agreement, as set forth in the Club Licensing Agreement and the other documents entered into in connection therewith on the Second Amendment Date.

(b)     Section 1.1 of the Loan Agreement is hereby amended by adding the following terms thereto in their respective alphabetical order therein:

*"Club License Agreement"* means that certain Master License Agreement dated as of March 29, 2017, by and among PGLI, Kirkendoll Management, LLC and Penthouse Clubs Worldwide, LLC, as in effect on the Second Amendment Date.

*"Excluded Trademarks"* means each of the trademarks listed on Schedule 1 attached hereto.

*"Second Amendment Date"* means March 29, 2017.

3

*"PGLI"* means Penthouse Global Licensing, Inc., a Delaware corporation.

(c)    A new Schedule 1 is hereby attached to and incorporated into the Loan Agreement as set forth on Schedule 1 attached hereto.

5.    <u>Conditions to Effectiveness</u>.  The effectiveness of Sections 2, 3 and 4 of this Amendment shall be subject to the satisfaction of the following conditions precedent:

(a)    Lender shall have received a fully executed copy of this Amendment executed by each of the Loan Party Obligors, together with such other documents, agreements and instruments as Lender may require or reasonably request, all of which shall be in form and substance satisfactory to Lender;

(b)    Borrower shall have paid to Lender all reasonable out-of-pocket expenses of Lender in connection with the preparation, negotiation, execution, delivery and administration of this Amendment and the transactions contemplated in connection herewith, as required by Section 14.7 of the Loan Agreement;

(c)    all proceedings taken in connection with the transactions contemplated by this Amendment and all documents, instruments and other legal matters incident thereto shall be reasonably satisfactory to Lender and its legal counsel;

(d)    no Default or Event of Default shall have occurred and be continuing or shall be caused by the transactions contemplated by this Amendment; and

(e)    Lender shall have received fully executed copies of the Club License Agreement and each other document, agreement and instrument entered into or delivered in connection therewith, true and correct copies of which shall be attached hereto as <u>Exhibit A</u>, and each of which shall be in form and substance reasonably satisfactory to Lender.

6.    <u>Representations and Warranties</u>.  In order to induce Lender to enter into this Amendment, Borrower and each other Loan Party Obligor each hereby represents and warrants to Lender, after giving effect to this Amendment:

(a)    Attached hereto as <u>Exhibit A</u> are true and correct copies of the Club License Agreement and each other document, agreement and instrument entered into or delivered in connection therewith;

(b)    the execution, delivery and performance of this Amendment has been duly authorized by all requisite corporate action on the part of Borrower and each other Loan Party Obligor and that this Amendment has been duly executed and delivered by Borrower and each other Loan Party Obligor;

(c)    all representations and warranties of any Loan Party contained in the Loan Agreement and the other Loan Documents are true and correct in all material respects on and as of the date of this Amendment, in each case as if made on and as of such date, other than

4

representations and warranties stated to relate to a specific earlier date (in which case such representations and warranties were true and correct in all material respects on and as of such earlier date);

(d)   no Default or Event of Default has occurred and is continuing; and

(e)   this Amendment and the Loan Agreement, as amended hereby, constitute the legal, valid and binding obligations of Borrower and each other Loan Party Obligor and is enforceable against Borrower and each other Loan Party Obligor, each in accordance with its terms, subject to bankruptcy, insolvency and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity.

7.   Release.   Borrower and each other Loan Party Obligor on behalf of itself and its successors, assigns, heirs and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Lender and any and all Participants and Affiliates, and their respective successors and assigns, and their respective directors, officers, employees, attorneys and agents and any other Person affiliated with or representing Lender (collectively, the "Released Parties") of and from any and all liability, including all actual or potential claims, demands or causes of action of any kind, nature or description whatsoever, whether arising in law or equity or under contract or tort or under any state or federal law or otherwise, which Borrower or any Loan Party or any of their successors, assigns or other legal representatives has had, now has or has made claim to have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever, including any liability arising from acts or omissions pertaining to the transactions contemplated by this Amendment, the Loan Agreement and the other Loan Documents, whether based on errors of judgment or mistake of law or fact, from the beginning of time to and including the date hereof, whether such claims, demands and causes of action are matured or known or unknown.

8.   Severability.   Any provision of this Amendment held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Amendment and the effect thereof shall be confined to the provision so held to be invalid or unenforceable.

9.   References.   Any reference to the Loan Agreement contained in any document, instrument or agreement executed in connection with the Loan Agreement shall be deemed to be a reference to the Loan Agreement as modified by this Amendment.

10.   Counterparts.   This Amendment may be executed in one or more counterparts, each of which shall constitute an original, but all of which taken together shall be one and the same instrument.   Receipt by telecopy or electronic mail of any executed signature page to this Amendment shall constitute effective delivery of such signature page.

11.   Ratification.   This Amendment, subject to satisfaction of the conditions set forth in Section 5, shall constitute an amendment to the Loan Agreement and all of the other Loan Documents as appropriate to achieve the intent of the agreements contained herein.   The terms

and provisions set forth in this Amendment shall modify and supersede all inconsistent terms and provisions of the Loan Agreement and shall not be deemed to be a consent to the modification or waiver of any other term or condition of the Loan Agreement. Except as expressly modified and superseded by this Amendment, the terms and provisions of the Loan Agreement and the other Loan Documents are ratified and confirmed and shall continue in full force and effect.

12.   Governing Law. THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF ILLINOIS APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED THEREIN WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES. FURTHER, THE LAW OF THE STATE OF ILLINOIS SHALL APPLY TO ALL DISPUTES OR CONTROVERSIES ARISING OUT OF OR CONNECTED TO OR WITH THIS AMENDMENT WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES.

13.   Consent to Jurisdiction; Waiver of Jury Trial. ANY LEGAL ACTION, SUIT OR PROCEEDING WITH RESPECT TO THIS AMENDMENT SHALL BE BROUGHT EXCLUSIVELY IN THE COURTS OF THE STATE OF ILLINOIS IN THE COUNTY OF COOK OR IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS OR IN ANY OTHER COURT (IN ANY JURISDICTION) SELECTED BY THE LENDER IN ITS SOLE DISCRETION, AND BORROWER AND EACH OTHER LOAN PARTY OBLIGOR HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFOREMENTIONED COURTS. BORROWER AND EACH OTHER LOAN PARTY OBLIGOR HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, OR BASED ON 28 U.S.C. § 1404, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING AND ADJUDICATION OF ANY SUCH ACTION, SUIT OR PROCEEDING IN ANY OF THE AFOREMENTIONED COURTS AND AMENDMENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT. BORROWER AND EACH OTHER LOAN PARTY OBLIGOR HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AMENDMENT AND AGREES THAT ANY SUCH ACTION, PROCEEDING OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. BORROWER AND EACH OTHER LOAN PARTY OBLIGOR HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON BORROWER OR ANY OTHER LOAN PARTY OBLIGOR AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY CERTIFIED MAIL (RETURN RECEIPT REQUESTED) DIRECTED TO BORROWER'S NOTICE ADDRESS (ON BEHALF OF BORROWER OR SUCH LOAN PARTY OBLIGOR) SET FORTH IN SECTION 14.1 OF THE LOAN AGREEMENT AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED FIVE DAYS AFTER THE SAME SHALL HAVE BEEN SO DEPOSITED IN THE MAIL, OR, AT THE

LENDER'S OPTION, BY SERVICE UPON BORROWER OR ANY OTHER LOAN
PARTY OBLIGOR IN ANY OTHER MANNER PROVIDED UNDER THE RULES OF
ANY SUCH COURTS.

**[Signature pages follow]**

The parties hereto have caused this Amendment to be duly executed and delivered by their duly authorized officers as of the date first set forth above.

PENTHOUSE GLOBAL MEDIA, INC.,
as Borrower

By: _____
Name: _____
Title: _____CEO_____

GMCI INTERNET OPERATIONS, INC.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____CEO_____

GMI ON-LINE VENTURES, LTD.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____CEO_____

GENERAL MEDIA COMMUNICATIONS, INC.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____CEO_____

GENERAL MEDIA ENTERTAINMENT, INC.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____CEO_____

PMGI HOLDINGS INC.
as a Loan Party Obligor

By: _____
Name: _____ Kelly Holland
Title: _____ C E O

PENTHOUSE DIGITAL MEDIA PRODUCTIONS
INC.
as a Loan Party Obligor

By: _____
Name: _____ Kelly Holland
Title: _____ C E O

PENTHOUSE IMAGES ACQUISITIONS, LTD.
as a Loan Party Obligor

By: _____
Name: _____ Kelly Holland
Title: _____ C E O

PURE ENTERTAINMENT
TELECOMMUNICATIONS, INC.
as a Loan Party Obligor

By: _____
Name: _____ Kelly Holland
Title: _____ C E O

XVHUB GROUP INC.
as a Loan Party Obligor

By: _____
Name: _____ Kelly Holland
Title: _____ C E O

Signature Page to Consent and Second Amendment to Loan and Security Agreement

DANNI ASHE, INC.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____

STREAMRAY STUDIOS INC.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____

TAN DOOR MEDIA INC.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____

PENTHOUSE GLOBAL LICENSING, INC.
as a Loan Party Obligor

By: _____
Name: _____
Title: _____

EXWORKS CAPITAL FUND I, L.P.,
as Lender

By: _____
Name: Robert Richrdsa
Title: Authorized Signatory

## SCHEDULE 1

## EXCLUDED TRADEMARKS

| | | |
|---|---|---|
| THE PENTHOUSE CLUB | Ukraine | 158069 |
| THE PENTHOUSE CLUB (w/ three key logo)  | Macao | 88956 |
| | New Zealand | 833185 |
| | U.S. | 2,810,417 |
| PENTHOUSE KEY SUITES | U.S. | (86/876606) |
| THE PENTHOUSE KEY SUITES (w/ one key logo)  | Not Registered | Not Registered |
| THE PENTHOUSE KEY SUITES (w/ three key logo)  | Not Registered | Not Registered |
| Three Key Logo  | Australia | 367684 |
| | Barbados | 81/20326 |
| | Brazil | 816873348 |
| | Canada | TMA748,728 |
| | China | 4281665 |
| | EU | 4018776 |

|  | Germany | 2011612 |
|  | Indonesia | IDM000076878 |
|  | Liechtenstein | 8122 |
|  | New Zealand | 717684 |
|  | Russia | 128751 |
|  | Trinidad & Tobago | 46293 |
|  | Turks & Caicos | 14014 |
|  | Turks & Caicos | 14015 |
|  | Ukraine | 65800 |
|  | UAE | 53386 |
|  | Vietnam | 72640 |
| PENTHOUSE KEY GIRL | Ukraine | 158071 |
| KEY GIRL (Stylized)  | Not Registered | Not Registered |
| PENTHOUSE KEY CLUB | Not Registered | Not Registered |
| KEY CLUB | Not Registered | Not Registered |
| CALIGULA CLUB | Not Registered | Not Registered |
| PENTHOUSE CLUB | Japan | 4384068 |
|  | Mexico | 903392 |
|  | Mexico | 921770 |
| THE PENTHOUSE BEACH CLUB | Ukraine | 158070 |