MARK A. MINTZ, admitted pro hac vice
mmintz@joneswalker.com
JONES WALKER LLP
201 St. Charles Ave., Suite 5100
New Orleans, LA  70170
Tel: (504) 582-8000 / Fax: (504) 589-8368

JOSEPH E. BAIN, admitted pro hac vice
jbain@joneswalker.com
JONES WALKER LLP
811 Main St., Suite 2900
Houston, TX  77002
Tel: (713) 437-1820 / Fax: (713) 437-1917

General Counsel for Penthouse Clubs Worldwide, LLC,
Penthouse Clubs Worldwide, LLC, and
Kirkendoll Management, LLC

MARC J. WINTHROP – State Bar No. 63218
mwinthrop@wcghlaw.com
PETER W. LIANIDES – State Bar No. 160517
plianides@wcghlaw.com
WINTHROP COUCHOT GOLUBOW HOLLANDER, LLP
1301 Dove Street, Suite 500
Newport Beach, CA 92660
Tel:  (949) 720-4100 / Fax: (949) 720-4111

Local Counsel for Penthouse Clubs Worldwide, LLC,
Penthouse Clubs Worldwide, LLC, and
Kirkendoll Management, LLC

## UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA
### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>PENTHOUSE GLOBAL MEDIA, INC.,<br><br>    Debtor. | Case No.  1:18-bk-10098-MB<br><br>Chapter:  11 |
| In re:<br><br>Penthouse Global Broadcasting, Inc.<br>Penthouse Global Licensing, Inc.<br>Penthouse Global Digital, Inc.<br>Penthouse Global Publishing, Inc.<br>GMI Online Ventures, Ltd.<br>Penthouse Digital Media Productions, Inc.<br>Tan Door Media, Inc.<br>Penthouse Images Acquisitions, Ltd.<br>Pure Entertainment Telecommunications, Inc.<br>XVHUB Group, Inc.<br>General Media Communications, Inc.<br>General Media Entertainment, Inc.<br>Danni Ashe, Inc.<br>Streamray Studios, Inc.,<br><br>    Debtors. | Jointly Administered With:<br>          1:18-bk-10099-MB<br>          1:18-bk-10101-MB<br>          1:18-bk-10102-MB<br>          1:18-bk-10103-MB<br>          1:18-bk-10104-MB<br>          1:18-bk-10105-MB<br>          1:18-bk-10106-MB<br>          1:18-bk-10107-MB<br>          1:18-bk-10108-MB<br>          1:18-bk-10109-MB<br>          1:18-bk-10110-MB<br>          1:18-bk-10111-MB<br>          1:18-bk-10112-MB<br>          1:18-bk-10113-MB<br><br>Chapter 11 Cases |

☒ Affects all Debtors
☐ Affects PENTHOUSE GLOBAL MEDIA, INC.

**JOINT OBJECTION OF PENTHOUSE CLUBS WORLDWIDE, LLC, PENTHOUSE CLUBS GLOBAL LICENSING, LLC, AND KIRKENDOLL MANAGEMENT, LLC TO (I) MOTION FOR ORDER APPROVING SETTLEMENT WITH DREAM MEDIA, INC. AND (II) MOTION FOR ORDER (A) APPROVING SALE OF SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) SCHEDULING AUCTION AND SALE HEARING; (C)APPROVING SALE PROCEDURES AND NOTICE OF SALE; AND (D) GRANTING RELATED RELIEF; DECLARATION OF JOSEPH E. BAIN**

Date:    May 9, 2018
Time:    1:30 p.m.
Place:    Courtroom 303,
          21041 Burbank Blvd.
          Woodland Hills, CA 91367

**TO THE HONORABLE MARTIN R. BARASH, UNITED STATES BANKRUPTCY JUDGE FOR THE CENTRAL DISTRICT OF CALIFORNIA, THE TRUSTEE, AND HIS COUNSEL, THE DEBTORS AND THEIR COUNSEL OF RECORD, THE OFFICE OF THE UNITED STATES TRUSTEE, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND ITS COUNSEL, AND ALL OTHER PARTIES IN INTEREST:**

Creditor Penthouse Clubs Global Licensing, LLC and its affiliates Penthouse Clubs Worldwide, LLC and Kirkendoll Management, LLC (collectively, "Penthouse Clubs" or simply "Clubs")[1] hereby submits this joint objection ("Objection")[2] to the *Motion for Order Approving Settlement with Dream Media, Inc.* (Dkt. No. 325) (the "Settlement Motion") and the *Motion for Order (A) Approving Sale of Substantially All Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (B) Scheduling Auction and Sale Hearing; (C) Approving Sale Procedures and Notice of Sale; and (D) Granting Related Relief* (Dkt. No. 327) (the "Sale Motion" and together with the Settlement Motion, the "Motions") filed by David K. Gottlieb, in his capacity as Chapter 11 Trustee (in such capacity, "Trustee") of the estates of the above-captioned debtors ("Debtors"). In support thereof, Clubs respectfully state as follows:

---

[1] Pursuant to Rule 2019(b)(1), Penthouse Clubs Worldwide, LLC, Penthouse Clubs Global Licensing, LLC, and Kirkendoll Management, LLC are each affiliates of one another.

[2] Pursuant to an agreed extension granted by the Trustee, this Objection is timely.

1

2

# I.
## INTRODUCTION[3]

3    In February of this year, this Court ruled that a Chapter 11 trustee should be appointed

4    with the hope that a neutral third party may be able to calm the waters in these cases.  At the time,

5    a large number of the active parties had come close to negotiating a potential deal aimed at

6    preserving the value of the Debtors.  However, the Trustee—by this Motion to Convert (which he

7    withdrew four days later) and his Sale and Settlement Motions—has only caused the Debtors'

8    cases to become more fractured and left the estates in an even-more precarious position.

9    By his Motions, the Trustee insists that a quick sale of the Debtors' assets to Dream Media

10    is the only feasible result.  This position, however, glosses over the fact that a plan of

11    reorganization can be filed that would pay unsecured creditors a substantial portion of their claim

12    (along with administrative claims).  Clubs is in the process of collecting the required information

13    for such a plan and has communicated its intentions to the Trustee.  However, the Trustee and

14    Dream Media continue to stymie and prevent Clubs from receiving sufficient information to

15    formulate a plan or to investigate claims.  For example, Dream Media has threatened to file a

16    Motion for a Protective Order specifically to prevent Clubs and other creditors from making an

17    independent assessment of Dream Media's so-called "blanket" lien or determining the nature of

18    the settlement considered in these Motions.  The primary beneficiaries of these motions should

19    not be allowed to stymie discovery while at the same time arguing that there are no other

20    alternatives than the proposed fire sale.

21    The Motions must be denied because the Settlement fails to satisfy both the standard

22    under Fed. R. Bankr. P. 9019 and the even-more stringent standard that applies in considering a

23    negotiated "quick sale" when the only consideration being paid is a carve-out.[4]  Moreover,

24    because Clubs has not received the information necessary for a full and complete defense, the

25

26    _____
[3] Capitalized terms used in this introduction are defined elsewhere in this Objection.

27    [4] As explained infra, this more stringent standard is generally applied in the context of Chapter 7.  However, given

28    the Trustee's treatment of these cases (and his stated intention of converting these cases to Chapter 7) application of the more stringent standard is appropriate here.

PENTHOUSE CLUBS' JOINT OBJECTION TO
TRUSTEE'S SALE MOTION AND
SETTLEMENT MOTION

1   Motions must be denied at this early stage.[5]  This is especially alarming given the lack of

2   disclosure contained within the Motions.  In the end, the Motions must be denied.

## II.
## RELEVANT BACKGROUND

After a series of hearings on, *inter alia*, the Debtors' use of cash collateral and a motion

for relief from stay filed by secured lender Dream Media Corp. ("Dream Media"), the Bankruptcy

Court ruled, on February 28, 2018, that a Chapter 11 Trustee should be appointed in these cases

pursuant to Section 1104(a)(2) of the U.S. Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the

"Bankruptcy Code" or "Code").[6]  In doing so, the Court expressed the following regarding the

desired outcome for these cases:

> [T]he whole idea of coming into a Chapter 11 is to stabilize
> the situation and to use the tools in Chapter 11, if the
> economics are right, to get the money in the door that will
> allow you to be free from the crisis.  It's supposed to be a
> relief. … I think a Chapter 11 trustee, as a neutral third
> party, would at least offer the prospect of reducing the
> amount of litigation and hopefully preventing this case
> from drowning in administrative expenses. … I want to see
> the company stabilized and the number of fire drills
> eliminated so everybody can go about the business of
> maximizing value.

2/28/2018 Hr'g Tr. at 172:4-8, 176:16-19, and 183:7-9.[7]

Pursuant to the Court's ruling, David K. Gottlieb was appointed Trustee on March 6, 2018. Dkt.

No. 236.

On April 5, 2018, the Trustee filed applications to retain Pachulski Stang Ziehl & Jones

LLP as his general counsel and Province, Inc. ("Province") as his financial advisor. Dkt. Nos. 292

and 297.

---

[5] Clubs reserves all rights in this regard including the right to raise any additional argument or legal theory if discovered after discovery is complete.

[6] The Court held that appointment of a Chapter 11 Trustee was appropriate under Code § 1104(a)(2) based on the Court's finding that doing so would be in the "best interests of the estate."  The Court declined Dream Media's invitation to appoint a Chapter 11 Trustee under Code § 1104(a)(1).

[7] An excerpt from February 28, 2018 hearing (containing the entirety of the Court's ruling and comments) is attached hereto as Exhibit A.

Less than one month later (on April 12, 2018), the Trustee filed his motion to covert these cases to Chapter 7 (Dkt. No. 302) (the Trustee's "Motion to Convert"), which the Trustee sought to have heard on shortened time (by the filing of his "OST Application"). *See* Dkt. No. 303. The Debtors, the Official Committee of Unsecured Creditors, and Clubs each objected to the OST Application. *See* Dkt. Nos. 308, 309, and 310.

On April 16, 2018, the Court denied, in part, the Trustee's request to have the Motion to Convert heard on an expedited basis and entered a scheduling order. *See* Dkt. Nos. 311 and 321. In response, the Trustee withdrew the Motion to Convert on April 18, 2018, Dkt. No. 319, and filed the Settlement Motion and the Sale Motion on the same day. Dkt. Nos. 325 and 327.[8]

Since the Trustee's appointment, Clubs has consistently communicated to the Trustee its intention of sponsoring a Chapter 11 plan. *See* Dkt. No. 334 (declaration of John Kirkendoll). In this regard, Clubs has engaged 8020 Consulting and Stout to provide a valuation in support of such a plan. *See id.* Clubs intends to file its proposed plan (which is discussed further herein) as soon as reasonably possible after the 8020 Consulting and Stout are able to complete a valuation.[9] Attached hereto as Exhibit B is a copy of the term sheet that is the basis for the Clubs plan.

## III.
## LAW AND ARGUMENT

In considering the Sale Motion, the bankruptcy court is obliged to "assure that optimal value is realized by the estate under the circumstances." *Sterling v. Green (In re Esterlina Vineyards & Winery, LLC)*, No. 16-1428, 2018 Bankr. LEXIS 760, at *12-13 (BAP 9th Cir. Mar. 31, 2018) (*citing In re Lahijani*, 325 B.R. 282, 288 (BAP 9th Cir. 2005)). The Sale Motion is inextricably linked to the Settlement Motion. [10] Thus, the Court's consideration of the Sale Motion must be against the background of the Settlement Motion.

Rule 9019 provides that "on motion by the trustee and after notice and a hearing, the court

---

[8] The Motions seek to implement the terms of a settlement agreement ("Settlement Agreement") between the Trustee and Dream Media that is attached to each Motion as Exhibit A.

[9] In this regard, Penthouse Clubs anticipates filing its proposed Chapter 11 plan prior to the hearing on the Motions.

[10] *See, e.g.,* Sale Motion at 9:2-7 ("The Assets shall be sold free and clear … subject to the terms of the proposed settlement agreement by and between the Trustee and Dream Media Corporation …").

1    may approve a compromise or a settlement." Fed. R. Bankr. P. 9019(a).  While the bankruptcy

2    court has great latitude in approving compromise agreements, the Ninth Circuit has recognized

3    that such discretion is "not unlimited."  *Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*,

4    839 F.2d 610, 620 (9th Cir. 1998) (emphasis added; holding that bankruptcy court erred in

5    approving settlement).  Indeed "creditors' objections to a compromise must be afforded due

6    deference."  *Esterlina Vineyards*, 2018 Bankr. LEXIS 760 at *20 (quoting *Martin v. Kane (In re*

7    *A & C Props.)*, 784 F.2d 1377, 1382 (9th Cir. 1986)

8        A bankruptcy court "may approve a compromise only if it is fair and equitable."  *Esterlina*

9    *Vineyards & Winery, LLC*, 2018 Bankr. LEXIS 760, at *10 (quoting *Woodson*, 839 F.2d at 620;

10   *In re A & C Props., Inc.*, 784 F.2d at 1381 ).  In making such determination, the Court must

11   consider (a) the probability of success in the litigation; (b) the difficulties, if any, to be

12   encountered in the matter of collection; (c) the complexity of the litigation involved, and the

13   expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the

14   creditors and a proper deference to their reasonable views in the premises. *Woodson*, 839 F.2d at

15   620.

16       In the Chapter 7 context, courts have applied an even higher standard when analyzing a

17   settlement between a trustee and a debtor's secured lender to sell property that is believed to be

18   fully encumbered when the only consideration being given to the debtor's estate is a carve-out.

19   *See In re KVN Corp.*, 514 B.R. 1, 7 (BAP 9th Cir. 2014) (collecting cases) ("It is universally

20   recognized … that the sale of a fully encumbered asset is generally prohibited.").[11]  Greater

21   scrutiny is warranted in such circumstances because trustees and secured lenders may be

22   incentivized to agree to such sales even though they have no benefit to the estates.  *Id.* at 5-6

23   (citing U.S. DOJ Exec. Office for U.S. Trs. Handbook for Chapter 7 Trs., at 4-1) ("[T]he trustee

24   must consider whether sufficient funds will be generated to make a meaningful distribution to

25   unsecured creditors …").  A 9th Circuit bankruptcy appellate panel has recently held that a

26

---

27   [11] "A carve-out agreement is generally understood to be an agreement by a party secured by all or some of the assets
of the estate to allow some portion of its lien proceeds to be paid to others, i.e., to carve out its lien position." *KVN*

28   *Corp.*, 514 B.R. at 10

"presumption of impropriety" arises when a trustee—at least in the Chapter 7 context—seeks to sell property and the only consideration being granted is a carve-out. *Id.* at 7-8. To rebut the presumption, the trustee must demonstrate that (i) the trustee has fulfilled his basic duties in administering the estate, (ii) the compromise and sale will generate a meaningful distribution to unsecured creditors, and (iii) the terms of the carve-out agreement have been fully disclosed. *Id.*

While the Motions are being brought under the auspices of Chapter 11, the Trustee has already demonstrated that he is treating the Debtors' cases like a Chapter 7 bankruptcy case. *See, e.g.,* Sale Motion at 16 (specifically referencing potential that the Trustee may seek conversion of these cases). Indeed, one of the Trustee's first substantive actions in these cases was to file the Motion to Convert.[12]  Moreover, the Motions effectively take the position that the assets are fully encumbered. *See* Sale motion at 9 ("The Trustee is aware of only one prepetition lien against the Assets …").  As such, the heightened standard is appropriate since the only consideration being paid to the estate is a carve-out.

Even so, the Motions fail to satisfy both standards and should be denied.

### A.  The Settlement Is Not in the Best Interest of Creditors And Will Likely Provide No Meaningful Recovery to the Unsecured Creditors

Both Motions are based on the Trustee's contention that there are "no alternatives presented[.]" *E.g.,* Settlement Motion at 13. This contention is factually misleading and completely ignores the efforts undertaken by Clubs to sponsor a Chapter 11 plan.  Clubs has consistently communicated to the Trustee its intention of sponsoring a Chapter 11 plan. *See, e.g.,* Dkt. No. 334 (declaration of John Kirkendoll).

Even still, the basic terms of the plan are attached.  These terms have not materially changed since Mr. Kirkendoll told the Trustee of his terms in numerous conversations. Clubs has retained 8020 Consulting and Stout as its financial advisors.  These firms are currently working on an expedited basis to finalize the support for the plan.  Indeed, Clubs intends to file its proposed plan prior to the hearing on the Trustee's Motions.

---

[12] While the Trustee has withdrawn the Motion to Convert, the Trustee has communicated to parties that he intends to convert these cases to Chapter 7 if the Sale Motion and Settlement Motion are approved.

PENTHOUSE CLUBS' JOINT OBJECTION TO
TRUSTEE'S SALE MOTION AND
SETTLEMENT MOTION

1   The plan term sheet (attached hereto as <u>Exhibit B</u>) provides that administrative claimants

2   will be paid in full.  Further, unsecured claims will be paid a substantial portion of their claims.

3   The secured claim of Dream Media will be limited to the value of its collateral and paid over time

4   pursuant to sections 506 and 1129 of the Bankruptcy Code. This plan will provide payments to

5   administrative claimants and will treat unsecured claimants fairly.  Instead of helping Clubs move

6   into a position to make this filing, the Trustee has rushed into this sale process which will pay

7   creditors significantly less and leave the estate administratively insolvent.

8   In juxtaposing the plan term sheet (and Clubs' efforts to sponsor a plan) against the sale

9   procedures and the Trustee's Motions, it is clear that a Clubs-sponsored plan would leave

10  creditors is a materially better position than the Trustee's proposed sale.  Indeed the $1.8 million[13]

11  carve-out provided in the Motions (as compared to the Projections set forth in the Motion to

12  Convert) demonstrate that no meaningful recovery will be enjoyed by any creditor except the

13  Trustee's professionals.[14] On the other hand, a Clubs plan would pay administrative claims in full

14  and pay a meaningful recovery to most creditors.

15  Under the heightened standard for evaluating a compromise set forth in *KVN Corp.*, the

16  Motions should be denied simply based on the fact that, at the conclusion of the sale

17  contemplated therein, there would likely be no material recovery to unsecured creditors.  *KVN*

18  *Corp.,* 514 B.R. at 7-8.  Even under the general Rule 9019 standard, the Motions should be denied

19  as the sale described in the Motions is a poor substitute for a Chapter 11 reorganization plan

20  proposed by Clubs. *Woodson*, 839 F.2d at 620.

21  The sale of all of the estate assets at this point is simply premature.  Moreover, the

22  Trustee's Motions seek to foreclose the rights of creditors (such as Clubs) from proposing a plan

23  that will pay administrative claims and will provide meaningful recovery to the unsecured

24  creditors.[15]

---

[13]  Bear in mind that $1.8 million is the maximum amount of the carve-out.  If there are no bids other than Dream Media's then the carve-out is limited to $550,000.

[14] The Trustee has communicated his intent to hire yet more professionals, e.g. an Investment Banker.

[15] Even worse, the Trustee has not been forthcoming in providing Clubs with information necessary to support its plan and has resisted efforts by Clubs to take discovery of the Trustee.

**B.  The Trustee Failed to Consider All Claims Against Dream Media**

In seeking approval of the Settlement Motion, it is incumbent on the Trustee to describe all of the relevant claims that are being disposed of.  A bankruptcy court may only approve a compromise under Fed. R. Bankr. P. 9019 if it concludes that the compromise is "fair and equitable." *Woodson*, 839 F.2d at 620 (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)). But, as the Supreme Court has noted, "[t]here can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary  for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *TMT Trailer*, 309 U.S. at 424-25. While it is true that a bankruptcy court need not hold a "mini-trial" over the relevant claims to approve a sale, the Trustee must, at minimum, fully disclose any claims that are being disposed of and demonstrate that such disposal is in the best interests of the estate. *Woodson*, 839 F.2d at 620.

Here, the Trustee merely claims that there are "two potential litigations with Dream Media over its claim"—the first in contesting the priority and perfection of Dream Media's security interests and the second in pursuing the Debtors' claim for usurious interest. Settlement Motion at 11.  However, the Trustee's Settlement Motion fails to address:

(i) the legal ramifications for the fact that the following operating subsidiaries are not signatories to the Dream Media loan: (1) Penthouse Global Broadcasting, Inc. ("Penthouse Broadcasting"), (2) Penthouse Global Digital Inc. ("Penthouse Digital"), and (3) Penthouse Global Publishing, Inc. ("Penthouse Publishing" and collectively with Penthouse Broadcasting and Penthouse Digital, the "Unencumbered Operating Companies");

(ii) the legal ramifications for the fact that—as has been previously disclosed at a prior hearing—Dream Media's predecessor in interest, ExWorks Capital Fund I, L.P. ("ExWorks"), explicitly carved out from Dream Media's collateral certain assets of Penthouse Global Licensing, Inc. ("Penthouse Licensing") and filed lien releases

regarding the release collateral;

(iii) why Dream Media is entitled to liens over content that has been created since the Petition Date; amd

(iv) whether the Trustee did any independent analysis whatsoever of potential claims that Debtors may have against Dream Media.

Rather than address the foregoing, the Settlement Motion simply makes a blanket statement that the Trustee "has been informed that no clear issue" was found regarding Dream Media's so-called blanket lien. Settlement Motion at 11.[16] Such statement falls woefully short of providing the court with any basis to determine whether the Trustee's settlement is reasonable.

### 1. Dream Media Does Not Have a Lien on the Unencumbered Companies

As explained by the Debtors in their objection to the Motions (Dkt. 378), Dream Media does not have lien on the Unencumbered Companies. Clubs adopts and incorporates by reference section II (Dkt. 378 at 3-7) of the Debtors' objection on this point. The Trustee has not addressed the legal ramifications of this argument or adequately explained in the Motions how or why the settlement of this issue is warranted. Further, the Trustee fails to explain how the assets of the Unencumbered Companies can be sold at auction with the assets of Penthouse Global Media, Inc. (the only entity that seems to have its assets encumbered).[17]

Finally, the Settlement Motion and the Sale Motion are hindered by the potential conflict of the Trustee administering the estates of the Unencumbered Companies, on the one hand, and the remaining Debtors, on the other. Indeed, what is in the best interests of the bankruptcy estates of the Unencumbered Companies is at odds with what is in the best interests of the other Debtors, as demonstrated by the Dream Media-friendly Settlement.

### 2. Dream Media Does Not Have a Lien on the Carved-Out Collateral

As explained by Clubs in its *Reply in Support of the Debtors' Motion to Approve Post-*

---

[16] To be fair, the Settlement Motion discloses that a dispute may exist regarding the "Penthouse Club License trademarks." However, no discussion is given regarding the release by ExWorks of these liens and/or whether the settlement may adversely affect the rights of Clubs under its Master License Agreement.

[17] A Motion to Approve Compromise pursuant to Rule 9019 cannot be used to circumvent the priority scheme in the Code. *See In re Fryar*, 570 B.R. 602, 610 (Bankr. E.D. Tenn. 2017)(refusing to approve a settlement that ignored the Bankruptcy Code's distribution scheme)(*citing Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (U.S. 2017)).

*Petition Financing and Assume Executory Contract* (Dkt. 210) Dream Media's own evidence demonstrates that the Penthouse Clubs Marks have been carved out of Dream Media's collateral. Clubs adopts and incorporates by reference section II.A of its previous pleadings on this point. (Dkt. 210 at 3-6).  Nevertheless, the Trustee is attempting to sell the Penthouse Clubs Marks to Dream Media and allowing Dream Media to credit bid on such Marks.  The Trustee has provided no authority that permits Dream Media to credit bid on such Marks when they do not have a lien over that collateral.

### 3. Dream Media Does Not Have a Lien on Cash Acquired Post Petition

The Trustee argues that the settlement is necessary because without "cash collateral relief from Dream Media, the Trustee cannot continue to operate the Debtors' business."  (Dkt. 325 at 13).  The Trustee continues to assume that all cash and all cash receivables, even those generated post-petition, constitute Dream Media's cash collateral.  The Trustee is mistaken.

The genesis of post-petition cash is material.  Penthouse continues to operate post-petition by, among other things, publishing new magazines, making new films, and producing new digital content.  Each of these actions produces receivables and cash.  Despite the fact that it is Dream Media's burden to provide their interest in these post -petition receivables and cash, no such proof has been provided.  *See* 11 U.S.C. § 363(p)(2)(providing that the "entity asserting an interest in property has the burden of proof on the issue of validity, priority, or extent of such interest.").  Instead, Dream Media and the Trustee likely will argue that Dream Media has a lien on the post-petition cash pursuant to 11 U.S.C. § 552(b).  Dream Media's reliance on section 552 is misplaced.

Congress enacted section 552 to limit legislatively the effect of pre-petition liens on post-petition property.  *In re Cafeteria Operators, LP*, 299 B.R. 400, 405 (Bankr. N.D. Tex. 2003).  Under section 552 of the Bankruptcy Code, post-petition property acquired by the debtor's estate, such as revenues generated by operations, is not subject to any liens resulting from pre-petition security agreements unless the pre-petition secured interest creates a security interest in pre-petition property and its proceeds, product, offspring, rent or profits.  *Id.*

"From a plain reading of [section 552] revenues generated post-petition solely as a result

of the debtor's labor are not subject to a pre-petition lender's security interest." *Id.* Indeed, courts have confirmed that section 552(b) is "intended to cover after-acquired property that is directly attributable to pre-petition collateral, without addition of estate resources." *In re Premier Golf Props.*, 477 B.R. 767, 776 (BAP 9th Cir. 2012).

In *Premier*, the appellate panel explained that revenue generated by operation of a debtor's business is not considered proceeds if such revenue represents compensation for goods and services rendered by the debtor in its everyday business performance. *Id.* (*citing In re Skagit Pac. Corp.*, 316 B.R. 330, 336 (BAP 9th Cir. 2004)). In *Premier*, the court held that because the debtor golf club must maintain the golf course as part of its business operation by mowing, planting, watering fertilizing and repairing the grass, raking sand traps, etc., the revenue that it generates post-petition from greens fees are not merely incidental to the Land, but are generated from the debtor's own labor. Therefore, the green fees were not proceeds of the bank's collateral.

Similarly, here, the Debtor produces new content, which include new films, new magazines, and new digital content. The Debtors acquire talent and produce such films through its staff and its own labor. The Debtors edit videos, maintain broadcast schedules, and facilitate, and print a magazine all using its own labor. Any payments the Debtors receive on account of its labor therefore are not subject to Dream Media's collateral.

The Trustee's failure to investigate the nature and extent of Dream Media's lien on post-petition collateral is fatal to the Motions.

### 5.  The Motions Fail to Disclose Whether the Trustee Has Reviewed Potential Claims Against Dream Media

The Trustee has failed to disclose whether he has reviewed any other potential claims against Dream Media. While the Trustee explains why it does not want to pursue the usury claim objection filed by the Debtors, he does not adequately explain if he has investigated any bankruptcy causes of action or any other cause of action against Dream Media related to their loan or any other matter.[18]

---

[18] The Motions also fail to disclose the tax ramifications of the sale. It is not clear whether the sale to Dream Media has the potential for creating a material tax liability that the Debtors' estates would be saddled with.

For the foregoing reasons, Clubs requests that the Trustee's Motion to Sell and the Motion to Approve Settlement be denied and for all other relief to which they are entitled.

Dated: April 26, 2018

JONES WALKER LLP

and

WINTHROP COUCHOT
GOLUBOW HOLLANDER, LLP


By:  /s/ *Marc J. Winthrop*
    Marc J. Winthrop, Esq.
    Peter W. Lianides, Esq.
Local Counsel for Local Counsel for
Penthouse Clubs Worldwide, LLC, Penthouse
Clubs Worldwide, LLC, and Kirkendoll
Management, LLC

## DECLARATION OF JOSEPH E. BAIN

I, Joseph E. Bain, hereby declare and state as follows:

1.      I am an attorney authorized to practice law in the states of Texas and New York. I have been admitted pro hac vice to practice before the United States Bankruptcy Court for the Central District of California. I am a Partner of Jones Walker, LLP, counsel to Kirkendoll Management, LLC, Penthouse Clubs Global Licensing, LLC and Penthouse Clubs Worldwide, LLC (collectively, "Clubs"). I am over the age of 18 and, except as set forth herein, have personal knowledge of all facts stated herein. If called as a witness, I could and would testify to the following under oath.

2.      I make this declaration in support of Penthouse Clubs' joint objection to the *Motion for Order Approving Settlement with Dream Media, Inc.* (Dkt. No. 325) (the "Settlement Motion") and the *Motion for Order (A) Approving Sale of Substantially All Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (B) Scheduling Auction and Sale Hearing; (C) Approving Sale Procedures and Notice of Sale; and (D) Granting Related Relief* (Dkt. No. 327) (the "Sale Motion" and together with the Settlement Motion, the "Motions") filed by David K. Gottlieb, in his capacity as Chapter 11 Trustee (in such capacity, "Trustee") of the estates of the above-captioned debtors ("Debtors").

3.      A true and correct copy of an excerpt from February 28, 2018 hearing transcript (containing the entirety of the Court's ruling and comments) is attached hereto as Exhibit A and incorporated herein by this reference.

4.      Attached hereto as Exhibit B is a true and correct copy of the term sheet that is the basis for the Clubs' proposed plan, which is incorporated herein by this reference.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and corrected. Executed this 26th date of April, 2018, in Houston, Texas.

Joseph E. Bain

# Exhibit A

1                      UNITED STATES BANKRUPTCY COURT

2                      CENTRAL DISTRICT OF CALIFORNIA

3                                --oOo--

4   In Re:                        ) Case No. 1:18-bk-10098-MB
                                   )
5   PENTHOUSE GLOBAL MEDIA INC.,   ) Chapter 11
                                   )
6           Debtor.                ) Woodland Hills, California
    _____) Wednesday, February 28, 2018
7                                    1:30 p.m.

8                                  MOTION FOR ORDER (A) GRANTING
                                   (1) USE OF CASH COLLATERAL
9                                  (11) ADEQUATE PROTECTION AND
                                   (111) OTHER RELATED RELIEF:
10                                 AND (8) ESTABLISHING A FINAL
                                   HEARING PURSUANT TO BANKRUPTCY
11                                 RULE 4001

12                                 MOTION FOR RELIEF FROM STAY
                                   [PP] DREAM MEDIA CORPORATION
13
                                   MOTION TO APPROVE POST-
14                                 PETITION FINANCING AND TO
                                   ASSUME EXECUTORY CONTRACT
15
                                   SCHEDULING AND CASE MANAGEMENT
16                                 CONFERENCE RE CHAPTER 11
                                   VOLUNTARY PETITION NON-
17                                 INDIVIDUAL

18                      TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE MARTIN R. BARASH
19                    UNITED STATES BANKRUPTCY JUDGE

20  APPEARANCES:

21  For the Debtor:               MICHAEL H. WEISS, ESQ.
                                  Weiss & Spees
22                                1925 Century Park East
                                  Suite 650
23                                Los Angeles, California 90067
                                  (424) 245-3100
24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

ii

1  APPEARANCES:  (cont'd.)

2  For Dream Media:              BETH ANN YOUNG, ESQ.
                                 RON BENDER, ESQ.
3                                Levene, Neale, Bender, Yoo
                                    & Brill, LLP
4                                10250 Constellation Boulevard
                                 Suite 1700
5                                Los Angeles, California 90067
                                 (310) 229-1234
6

7  For Penthouse Clubs:         MARK A. MINTZ, ESQ.
                                 Jones Walker, LLP
8                                201 St. Charles Avenue
                                 New Orleans, Louisiana 70170
9                                (504) 582-8368

10                               JOSEPH BAIN, ESQ.
                                 Jones Walker, LLP
11                               811 Main Street
                                 Suite 2900
12                               Houston, Texas 77002
                                 (713) 437-1820
13

14 For the Committee:           HAMID RAFATJOO, ESQ.
                                 Raines Feldman, LLP
15                               1800 Avenue of the Stars
                                 12th Floor
16                               Los Angeles, California 90067
                                 (310) 440-4100
17

18 For the United States        S. MARGAUX ROSS, ESQ.
      Trustee:                   Office of the United States
19                                  Trustee
                                 915 Wilshire Boulevard
20                               Suite 1850
                                 Los Angeles, California 90017
21                               (213) 894-4494

22

23

24

25

iii

1  Court Recorder:            Ana Gasparian
                              United States Bankruptcy Court
2                             21041 Burbank Boulevard
                              Woodland Hills, California
3                               91367

4  Transcriber:               Briggs Reporting Company, Inc.
                              4455 Morena Boulevard
5                             Suite 104
                              San Diego, California 92117
6                             (310) 410-4151

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

iv

1                    I N D E X

2 WITNESSES            DIRECT    CROSS    REDIRECT   RECROSS

3 Kelly Holland          11       16        --         --

4 Keith Whitworth        --       29        76         90

5

6 EXHIBITS                              IDENTIFIED   RECEIVED

7 (None.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

170

1  collect my thoughts.  I will try to do that in a

2  reasonably -- as timely as I can.

3          This is obviously a big deal to a lot of people,

4  and I want to, you know, just express myself clearly.  So I

5  need a few minutes.  Okay.

6          MR. BENDER:  Your Honor, do you mind of Ms. Young

7  is excused and I'll stay?

8          MS. YOUNG:  I've got to hear the finale.

9          UNIDENTIFIED SPEAKER:  Dial in.

10         MS. YOUNG:  No, that's okay.

11         THE COURT:  I don't know long it will take me.

12         MS. YOUNG:  Take your time, your Honor, seriously.

13         THE COURT:  If you choose to go, you are excused.

14         MS. YOUNG:  No worries.

15         THE COURT:  If not, I'll see in a little bit.

16         The Court is in recess.

17     (Proceedings recessed briefly.)

18         THE COURT:  Okay.  All right.  I'm not too big on

19 suspense, so I'm going to start by telling you what my

20 conclusions are, and then I'll give you the explanation.

21         With respect to the cash collateral motion, I'm

22 denying the cash collateral motion.

23         I will authorize the DIP motion.  I'll explain in

24 a minute what that means in this context.

25         And I am going to appoint a Chapter 11 trustee.

1         In terms of the relief from stay motion that

2    remains pending, it will remain pending and I will continue

3    it to a later date.

4         On the cash collateral, the testimony was that in

5    the next four weeks -- at the end of the four weeks, the

6    cash would be about the same.  That's one of the things you

7    look for.  I think there was enough testimony from Mr.

8    Whitworth today to conclude that the receivables would be

9    about the same.

10        And as I said earlier, I found Mr. Whitworth

11   credible as a witness.  Credible and earnest, and I

12   appreciate the work that he and everybody has been doing.

13        But it's not enough in my view -- at least on the

14   facts presented, it's not enough simply for the cash to end

15   up in the same place and the receivables to end up in the

16   same place.  I'm looking at the entire picture and all of

17   the relevant circumstances.

18        This budget is a -- I think it's fair to say, or

19   at least in my judgment it is at best a live-to-fight-

20   another-day budget.

21        It doesn't have -- you know, the debtors put into

22   evidence the EBITDA analysis.  The debtors put that into

23   evidence and when asked about it, Mr. Whitworth explained

24   that that entire analysis was -- his testimony was that's

25   the out-of-bankruptcy, what I would call the ideal budget,

172

1 because the company is in bankruptcy.

2          But see, the -- what I expect while there are

3 certain challenges about being in bankruptcy, the liquidity

4 may not be perfect, the whole idea of coming into a Chapter

5 11 is to stabilize the situation and to use the tools in

6 Chapter 11, if the economics are right, to get the money in

7 the door that will allow you to be free from the crisis.

8 It's supposed to be a relief.

9          Only the -- my take-away from the record as whole

10 is that it buys four weeks of operations, but just barely,

11 and the company would still be operating on a sub-optimal

12 basis in terms of its liquidity.

13          Now, I'm not relying on the suggestions that's

14 been made a few times that the secured lender might be

15 willing to advance money under this circumstance or that

16 circumstance.  I don't know whether those offers are true

17 either.  But it seems to me that this budget doesn't do

18 enough to stabilize the company and therefore provide

19 adequate protection of the creditors' interests and the

20 debtor's interests in the collateral.

21          Now, it's not just the bare bones nature.  I don't

22 want to overemphasize that.  It's the fact that it's a bare

23 bones budget that also doesn't account for administrative

24 expenses.

25          We've had seven hearings in this case already, and

173

1   it was weeks into the case before we had a first-day

2   hearing, which was fairly minor.  And I understand some of

3   that has to do with things that happen outside this Court.

4   I'm not being critical.  But it's -- we're two months into

5   the case.

6           And for some time the debtor was surviving on

7   expenditure-by-expenditure approvals that the secured

8   creditor was willing to pay.  And then finally there was --

9   and I heard and I -- I don't criticize the debtor's lawyer

10  for being optimistic that there's a DIP coming or there's

11  something coming.  But what we got what the Androcles deal.

12          The Androcles deal still sounds like a concept

13  that could be doable.  It could make good business sense,

14  but it wasn't executed.  It wasn't in a form I could

15  approve.

16          I raised those issues and thought in particular

17  the committee, whose objections I thought were well taken,

18  would sit down and the deal would get fixed.  But it didn't.

19  And that was ultimately withdrawn.

20          So this budget that we have -- I got off track

21  here.  There's a lot of things I'm trying to work in.

22          The budget -- the nine weeks the four weeks --

23  there are no -- there's no indication that administrative

24  expenses can be addressed in this budget.  Let me put it

25  this way.  This budget does not address administrative

174

1 expenses.

2       Now, I know Mr. Weiss argued that if I approved

3 the interim use, there would be a new budget that accounts

4 for those expenses, and I believe you are sincere in your

5 hope that that's what would happen.  But I don't have

6 confidence in this debtor or in the ability to -- for

7 various contingencies to happen that would make that

8 plausible.

9       If it were within reach, and not, well, just kind

10 of a hope, I think those amounts would have been in this

11 budget to begin with.

12       And by the way, in the meantime, in those 30 days,

13 there will be more litigation, litigation over the

14 Kirkendoll deal and other matters, mounting administrative

15 expenses.  And while there's a hope that they may be able to

16 raise money and to fund the case properly and to fund a

17 reorganization, I think right now it's a hope.

18       I've been doing this long enough.  I know when you

19 have a deal, you have a deal.  You don't have a deal yet.  I

20 understand that.

21       And ordinarily early in a case, you might say,

22 well, give them a chance.  But we're two months into the

23 case.  And I have to say that the -- maybe call it a false

24 start or the dead end that was the Androcles deal, it's

25 probably colored my impression of where the case is going

175

1  under the existing management, which is why also I've

2  concluded to appoint a Chapter 11 trustee.

3         I was, for most of my career, a debtor's lawyer.

4  I know that management hopes -- you know, you play whatever

5  cards you have.  And my impression is that the Androcles

6  deal, those were the cards they had.  But I'm cognizant of

7  the fact that this particular company, the equity is held by

8  one individual who is also its CEO and who has been making

9  those decisions.  And as a result, there's been a lot of

10 contention.

11        In a case called In re Marvel Entertainment Group,

12 a Third Circuit case, 140 F.3d 463 at 472 -- oh, I guess I

13 started with the Third Circuit case.  There's also a Fifth

14 Circuit case called Cajun Electric which stands for the same

15 proposition.

16        Basically the Third Circuit holds, following this

17 case called Cajun Electric, that a court may find cause to

18 appoint a trustee for acrimony on a case-by-case basis, when

19 the inherent conflicts extend beyond the healthy conflicts

20 that always exist between debtor and creditor, whereas it

21 found in that case, when the parties begin working at cross

22 purposes.

23        By the way, those two cases have been followed by

24 Judge Carlson before he retired in the Northern District of

25 California in a case called In re National Farm Financial

176

1  Corp., which is February 12, 2008, unpublished.

2         Anyway, the point is I think I have discretion to

3  appoint a trustee.  And I think we've gotten to that point

4  in this case, because if I were to approve the DIP and not

5  appoint a trustee, we'd be three months into the case and

6  any hope -- any hope of seeing what might be behind the next

7  door would hinge on another furiously contested motion to

8  approve the contemplated Kirkendoll deal.

9         I think what also goes into the mix for me is that

10  this is not just about the secured lender and the unsecured

11  creditors.  The fact that the committee stood up and

12  indicated that they support the appointment of a Chapter 11

13  trustee and that they believe that a Chapter 11 trustee is a

14  sort of neutral third party -- could bring some peace or at

15  least some structure to the process.

16         I think a Chapter 11 trustee, as a neutral third

17  party, would at least offer the prospect of reducing the

18  amount of litigation and hopefully preventing this case from

19  drowning in administrative expenses.

20         I'm not happy about this.  I mentioned I was a

21  debtor's lawyer, and I take no pleasure in this.  But I just

22  don't think that this case will survive without some sort of

23  a -- and by "survive" I mean have any kind of reasonable

24  expectation of maximizing value if it drowns in

25  administrative expenses.  And I just see a future of more

177

1  fighting.

2          At the same time, I believe, as has been pointed

3  out, that the debtor out of possession or the equity holder,

4  if equity has valuable equity, is more likely to see that

5  equity realized if a neutral third party comes in and takes

6  over the estate.

7          I believe that the equity holder can, as has been

8  mentioned, file a plan, can contest the secured lender's

9  claim.  There are a lot of things they can do, or she can

10 do, but not necessarily with the estate's money or the

11 estate's monopoly money.

12         I acknowledge it's not clear today whether the

13 case is actually administratively insolvent.  This is about

14 preventing that from happening.

15         I thought Mr. Weiss made a constructive suggestion

16 when he suggested mediation.  And I want to explain why I'm

17 not doing that in this case.  And that is because of the

18 very tight time frame and the amount of litigation,

19 financing dispositive, case dispositive litigation that

20 would happen between now and a month from now.

21         And I just don't see -- it's not a situation where

22 I can tell everybody to put their pens down and go to

23 mediation.  It's not that kind of dispute.

24         It's about who is in control and where will the

25 money come from to keep the operation going.  And I just --

178

1  I'm not prepared to risk the interests of the secured

2  creditor or the interests of the unsecured creditors on hope

3  that some good stuff will fall into place.  I hope it does.

4          Let's see, I covered cash collateral.  I talked

5  about the trustee.

6          The DIP motion.  What I'm prepared to do today on

7  the DIP motion because having concluded that the appointment

8  of a Chapter 11 trustee is appropriate -- I believe that the

9  secured creditor doesn't object to the DIP.  Is that right?

10          MR. BENDER:  That's correct, your Honor.

11          THE COURT:  Okay.  And the unsecured creditors

12  never objected to -- are not objecting to the DIP?

13          MR. BENDER:  That is correct, your Honor.

14          THE COURT:  Okay.  I am prepared to authorize the

15  DIP but leave it up to the Chapter 11 trustee whether to

16  implement that deal, whether they enter the deal or ratify

17  it, whatever you want to call it, and move forward with it.

18          I understand that puts some pressure on the United

19  States Trustee to appoint someone very quickly, because

20  otherwise, the company is operating on fumes and may not be

21  able to make its expenditures.

22          But I was concerned -- I was persuaded by the U.S.

23  Trustee's -- I know there are some modifications that they

24  agreed to, so maybe it's not a big deal.  But I am concerned

25  about appointing a Chapter 11 trustee and immediately tying

179

1  her or his hands with a deal that they didn't negotiate.

2          So I guess there's -- I think I've covered

3  everything.

4          Relief from stay I would continue.

5          Are there any questions about what my ruling is?

6          MR. MINTZ:  Your Honor, the motion to assume

7  therefore is --

8          THE COURT:  Mr. Mintz, why don't you go to the --

9          MR. MINTZ:  Oh, I apologize.

10          Your Honor, Mark Mintz on behalf of the clubs.

11          THE COURT:  Is his microphone off?  I can't hear

12  him.

13          MR. MINTZ:  I'm not sure.  No, I don't think it's

14  on, your Honor.

15          THE COURT:  Try the other one.

16          MR. MINTZ:  This one?  No, I don't --

17          THE RECORDER:  I can hear him.

18          THE COURT:  Are you getting a recording?

19          THE RECORDER:  Yes.

20          THE COURT:  All right.  That's what's important.

21  I can hear you.  Go ahead.

22          MR. MINTZ:  Okay.  Oh, there it is.

23          Your Honor, Mark Mintz on behalf of --

24          THE COURT:  Was.

25          MR. MINTZ:  -- the Kirkendoll entities.  We

180

1 believe that the -- the only question that we would have is

2 the motion to assume part of that, that was part of the DIP

3 motion, are you conditionally --

4          THE COURT:  I'm going to --

5          MR. MINTZ:  -- granting that part or are you --

6          THE COURT:  I'm authorizing it.

7          MR. MINTZ:  Okay.

8          THE COURT:  But I'm not authorizing the debtor to

9 implement it.

10          MR. MINTZ:  Okay.

11          THE COURT:  I'm authorizing a Chapter 11 trustee,

12 once appointed, to ratify and effectuate the deal or to

13 reject it and come up with some other means to finance the

14 company.

15          MR. MINTZ:  That's what I just wanted to make

16 sure.

17          THE COURT:  Yes.  If --

18          MR. MINTZ:  Thank you.

19          THE COURT:  If the Chapter 11 trustee ratifies the

20 deal, it can step into the shoes of the debtor and

21 effectuate it, including the assumption.

22          MR. MINTZ:  Okay.

23          THE COURT:  Okay?

24          MR. MINTZ:  Without further order of the Court at

25 that point?

181

1          THE COURT:  Without further order of the Court at

2     that point, yes.

3          MR. MINTZ:  Okay.  Thank you, your Honor.

4          THE COURT:  And if there's a -- now, it's

5     possible -- I guess it's possible that the trustee would say

6     yes to that and still not come up with a budget that the

7     secured lender consents to, in which case I'll entertain an

8     emergency hearing if I need to.

9          I am hoping -- there's no guarantee and it's not

10    the basis of my ruling, but I am hoping, based on things

11    I've heard the last so many days, that once a trustee is in

12    place, that the secured creditor is likely to work

13    cooperatively with the Chapter 11 trustee and try to come up

14    with consensual use of cash.

15          Now, if there are any conditions to that or

16    whatnot and you need to come in and get me to approve them,

17    I will -- you know, I will consider it.  But I want to give

18    the Chapter 11 trustee the flexibility to step into this DIP

19    deal or to say "No thank you."

20          MR. MINTZ:  Thank you, your Honor.  We just wanted

21    to get clarity.

22          THE COURT:  All right.  Yes, Ms. Ross.

23          MS. ROSS:  And with respect to them being able to

24    step into this DIP deal and not seek further Court approval,

25    if there are certain terms that change -- and I'm just going

182

1 to throw out the ones that I discussed like the events of

2 default, that sort of thing, they can -- do they need to

3 come back into Court and seek further approval of those

4 change in terms?

5          THE COURT:  Not the three things that I heard

6 today.

7          MS. ROSS:  They were the -- yeah, the three.

8          THE COURT:  Or the three things we talked about.

9          MS. ROSS:  Today.  The CRO --

10          THE COURT:  So appointment of a trustee being an

11 immediate default, the CRO.  If they agree to cut that,

12 that's fine.  And then there was the issue about the --

13          MS. ROSS:  Sale being private or public.

14          THE COURT:  About the sale being private.  I'll

15 leave that up to --

16          MS. ROSS:  The trustee.

17          THE COURT:  I'll leave that up to the trustee to

18 decide whether that --

19          MS. ROSS:  Makes sense.

20          THE COURT:  -- whether that makes sense.

21          MS. ROSS:  Okay.

22          THE COURT:  I also want to again emphasize for the

23 record that I understand -- it seems to me that the debtor

24 and its current management who would prefer -- most

25 management, particularly owner management want to stay,

183

1 having been doing the best that they could.  They brought

2 the deal they had.  They brought the Androcles deal.

3          I'm not being critical of trying to do it.  I just

4 think we've gotten too deep into it and it hasn't been very

5 successful yet.

6          So we're deep into the case and we're still having

7 fire drills.  And I want to see the company stabilized and

8 the number of fire drills eliminated so everybody can go

9 about the business of maximizing value.

10          Okay.  Any other questions?

11          Yes, Ms. Ross.

12          MS. ROSS:  It's not a question but to expedite the

13 process, I need to consult -- the Code requires me to and we

14 also want to consult with all the attorneys here, any party

15 who wants to be heard on the qualifications of that trustee.

16          THE COURT:  Right.

17          You don't need to do that on the record, though,

18 do you?

19          MS. ROSS:  No, I don't.  I'm inviting them

20 afterwards, and I apologize, your Honor, to stay if they

21 don't mind, and speak to me.

22          THE COURT:  Okay.

23          MS. ROSS:  And I'm willing to start that process

24 tonight.

25          THE COURT:  Ms. Ross invites you to stay and talk

184

1  to her after the hearing.  But you -- we will have to kick

2  you out.

3          MS. ROSS:  Okay.  We can go out in the cold.

4          THE COURT:  Seriously, the CSOs have to go home so

5  don't stay too long and if you --

6          MS. ROSS:  We can go outside.

7          THE COURT:  Yeah, as long as it's not raining.

8          Let me also just say for the record, 1104(a)(2) is

9  the basis of which I'm appointing a trustee, not (a)(1).

10  (a)(1) is, as I said earlier, cause including fraud,

11  dishonesty, incompetence, or gross mismanagement of the

12  affairs of the debtor.

13          I'm not concluding that.  I'm concluding that the

14  appointment is in the best interest of creditors and the

15  equity holder and the other interests of the estate, which

16  include by the way, licensees, although I know they

17  didn't -- they weren't in favor of the trustee.

18          I think, again, reducing the fire drills and

19  bringing some order here, what I hope will be order, should

20  inure to their best interests as well.

21          Okay.

22          MR. BENDER:  Your Honor, two things.  One, who

23  will prepare the order?  You will or do you want to direct

24  somebody to prepare that order?

25          THE COURT:  You will.

185

1        MR. BENDER:  I will and I'll circulate it to

2   everybody?

3        THE COURT:  Yes, please.

4        MR. BENDER:  Do you need signatures or no?

5        THE COURT:  Yeah, I need signatures.  I mean I

6   don't -- so I don't know -- yeah, please signatures.

7        MS. ROSS:  Your Honor, perhaps --

8        THE COURT:  Because otherwise -- like for,

9   instance, in Delaware, they have certification of counsel.

10  If you want to --

11       MR. BENDER:  No.

12       THE COURT:  -- declare under penalty of perjury

13  that everyone agreed to it -- yeah, I didn't think so, so

14  just get everybody's signature as to form.  Nobody's being

15  asked to agree with my ruling, and I understand that.

16       MS. ROSS:  I might volunteer to appoint the

17  Chapter 11 -- or to prepare the Chapter 11 trustee order if

18  we want to expedite this and possibly walk it through --

19       MR. BENDER:  I would recommend you do that.

20       MS. ROSS:  -- and walk it through and I would

21  simply put in that that the Court has ordered the U.S.

22  Trustee to appoint a Chapter 11 trustee under 1104(b) (sic)

23  for the reasons stated on the record.

24       THE COURT:  (a)(2).

25       MS. ROSS:  Excuse me, yes.

*Briggs Reporting Company, Inc.*

186

1          MR. BENDER:  Your Honor, that makes sense to do

2  that.

3          MS. ROSS:  1104(a)(2).

4          THE COURT:  All right.  However --

5          MS. ROSS:  (a)(2) for the reasons stated on the

6  record and not -- if I keep it that simple for what I just

7  stated, not circulated if parties here are willing to waive

8  that.  And, again, I can repeat it.

9          THE COURT:  Does any have any objection to Ms.

10  Ross doing that?

11          MR. BENDER:  No, your Honor.

12          MR. WEISS:  No, your Honor.

13          MR. RAFATJOO:  No, your Honor.

14          MR. MINTZ:  No, your Honor.

15          THE COURT:  Okay.

16          MS. ROSS:  I still nonetheless will circulate it

17  before I upload it but not obtain signatures.

18          MR. BENDER:  Your Honor, just for calendaring,

19  number one, can we have the continued hearing which we can

20  set far out, and the other is whether you want to --

21          THE COURT:  The continued hearing?

22          MR. BENDER:  On the relief from stay motion.

23          THE COURT:  Oh, yes.  Yes, I did say that --

24          MR. BENDER:  And it may be wise, it's up to your

25  Honor if you want to set a status conference relatively soon

187

1 for the Chapter 11 trustee.

2          THE COURT:  Yes.  Okay.

3          Okay.  I'm going to continue the status conference

4 in this case to March 13, 2018 at 1:30.

5          MR. BENDER:  March 13th at what time, your Honor?

6          THE COURT:  1:30.

7          Now, my procedures, my status conference order

8 says that typically a status conference report is due two

9 weeks before the status conference.  I'm waiving that

10 requirement.  But I hope you will all -- but if nobody, Ms.

11 Ross -- communicate to whoever is appointed that I'm waiving

12 that, but if they want to file a piece of paper in advance

13 of the hearing so I have a preview of what's going on, I'll

14 appreciate it.

15          Otherwise I'll just get the oral report.  And it

16 could be the day before.  I like to -- if they can, tell me

17 what's going on.

18          All right.  Then -- why don't I just have it trail

19 with the status conference.  Okay?  And based on what I hear

20 at the status conference, I can decide what to do with that

21 because my concern is that things stabilize.

22          MR. BENDER:  I suspect there's a good chance we

23 will withdraw that motion without prejudice.

24          THE COURT:  Yeah, okay.  All right.  So, yeah,

25 just have it trail for now.

188

1          MR. BENDER:  Your Honor, thanks very much.

2          THE COURT:  All right.  Are there any other

3    questions?

4          MS. ROSS:  One last detail.

5          THE COURT:  Go ahead.

6          MS. ROSS:  One last detail for the Court.  When

7    I'm submitting the order, I usually start out, "There was a

8    hearing on."  I can reference every single hearing based on

9    the record or --

10          THE COURT:  No, this was -- well, that's true.  By

11   the way, it was at a status conference.

12          MS. ROSS:  And I'm looking at the status

13   conference --

14          THE COURT:  It ties to my status conference order.

15          MS. ROSS:  Tie it to the status conference?

16          THE COURT:  Yes.  Where was that list of the --

17          MS. ROSS:  I have the --

18          THE COURT:  You gave me the list of hearings.

19          MS. ROSS:  I have the calendar with the list of

20   hearings, your Honor.

21          THE COURT:  I think it would be adequate -- it's

22   really at the hearing February 21st.  Okay.  So the Court

23   held a status conference and case management hearings on

24   February 21, 27 and 28, and at the latest of those, ordered

25   what I ordered.

*Briggs Reporting Company, Inc.*

Exhibit A, Page 37

189

1          And the reason why I think that's appropriate is

2    that it was at the hearing on the 21st that I let the debtor

3    and everyone else know that I was considering appointing a

4    Chapter 11 trustee if the DIP wasn't approved.

5          Okay.

6          MS. ROSS:  Okay.  And this is --

7          MR. BENDER:  I think it was at the cash

8    collateral, wasn't it?

9          THE COURT:  Cash collateral, yes.

10          MS. ROSS:  And this is very technical, but when

11   we've uploaded orders before and tried to attach them to

12   scheduling in case management conference hearings, sometimes

13   it doesn't work and --

14          THE COURT:  Doesn't like that because it's looking

15   for a motion?

16          MS. ROSS:  No, but sometimes we will attach it

17   then to the voluntary petition.

18          THE COURT:  Yeah, yeah.  Just do whatever --

19          MS. ROSS:  But I will take care of that, yes.

20          THE COURT:  Do whatever you need to do to get it

21   uploaded.

22          MS. ROSS:  Uploaded, yes.

23          THE COURT:  And the excellent team downstairs

24   will --

25          MS. ROSS:  Assist.

190

1          THE COURT:  -- fix it.

2          MS. ROSS:  They do.

3          THE COURT:  Don't take it personally if they tell

4   you you did it wrong.

5          MS. ROSS:  I understand.

6          THE COURT:  The judge said do it any way you can

7   do it.

8          MS. ROSS:  Okay.  Thank you.

9          THE COURT:  Anything else?  All right.  Court's

10  adjourned.  Thank you.

11          Oh, I want -- no, I'm sorry.  One more thing I

12  wanted to say.  I try to make a habit of letting people

13  know.  I really appreciate good lawyering.  I know there's

14  been fighting.  We've been here a long time.  We've been

15  here a lot and for a long time.

16          But I do appreciate the work that everyone's been

17  doing, people at the company, the lawyers.  That's

18  irrespective of how I came down on the issues in front of

19  me.

20          I appreciate the hard work that you've done and

21  the hard work to come.  Thank you.

22          MR. BENDER:  Thank you, your Honor.

23          MR. MINTZ:  Thank you, your Honor.

24          MR. RAFATJOO:  Thank you, your Honor.

25          MR. WEISS:  Thank you, your Honor.

191

1      (Proceedings concluded.)

2

3

4        I certify that the foregoing is a correct

5  transcript from the electronic sound recording of the

6  proceedings in the above-entitled matter.

7

8  /s/ Holly Martens_____     3-12-18_____
   Transcriber                    Date
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit B

**Non-Binding Restructuring Term Sheet**

This term sheet (the "**Term Sheet**") is not a complete list of all the terms and conditions of the restructuring transaction contemplated herein.  Without limiting the generality of the foregoing, this Term Sheet shall in all cases be deemed non-binding, and the undertakings contemplated herein are subject in all respects to the negotiation, execution and delivery of mutually acceptable definitive documentation consistent herewith and approvals by all parties to the transactions described herein.  In the event of an inconsistency between this Term Sheet and the definitive documentation, the provisions of such definitive documentation shall govern.

**THIS TERM SHEET IS NOT AN OFFER, NOR SOLICITATION OF AN OFFER, WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN.  ANY SUCH OFFER OR SOLICITATION WILL ONLY BE MADE IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAWS AND THE UNITED STATES BANKRUPTCY CODE.**

**THIS TERM SHEET IS BEING PROVIDED AS PART OF A PROPOSED COMPREHENSIVE COMPROMISE AND SETTLEMENT, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE PROPOSED RESTRUCTURING.  NOTHING IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, WITH A FULL RESERVATION OF ALL RIGHTS, REMEDIES, CLAIMS AND DEFENSES OF ALL PARTIES.**

| TERMS AND CONDITIONS |
|---|

| **A.   Defined Terms, General Terms, and Capital Structure** |
|---|

| **Debtors and Restructuring** | Penthouse Global Media, Inc. ("**PGMI**"), Penthouse Global Broadcasting, Inc. ("**PGBI**"); Penthouse Global Licensing, Inc. ("**PGLI**"); Penthouse Global Digital, Inc. ("**PGDI**"); Penthouse Global Publishing, Inc. ("**PGPI**"); GMI Online Ventures, Ltd. ("**GMI**"); Penthouse Digital Media Productions, Inc. ("**PDMP**"); Tan Door Media, Inc. ("**TDM**"); Penthouse Images Acquisitions, Ltd. ("**PIA**"); Pure Entertainment Telecommunications, Inc. ("**PETI**"); XVHUB Group Inc. ("**XVHUB**"); General Media Communications, Inc. ("**GMC**"); General Media Entertainment, Inc. ("**GME**"); Dani Ashe, Inc. ("**DA**"); and Steamray Studios, Inc. ("Stemaray") (collectively, "**Debtors**") filed for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division (the "**Bankruptcy Court**") (such filing, the "**Chapter 11 Cases**") on January 11, 2018 (the "**Petition Date**").  For the purposes of this term sheet, PGMI, PGBI, PGDI, and PGPI shall be referred to as the **Operating Debtors**, and the remaining Debtors shall be referred to as the **Non-operating Debtors**.

The Operating Debtors and their outstanding indebtedness shall be restructured (the "**Penthouse Restructuring**") through a joint chapter 11 plan of reorganization with terms and conditions consistent with this Term Sheet and otherwise acceptable to the Bankruptcy Court and applicable parties (the "**Penthouse Plan**").

The "**Effective Date**" of the Penthouse Plan shall be the date on which all the conditions to consummation of the Penthouse Plan have been satisfied in full or waived, and the Penthouse Plan becomes effective. On the Effective Date, the Operating Debtors shall be reorganized pursuant to the Penthouse Plan in accordance with and pursuant to the Bankruptcy Code.

After the Effective Date, the Operating Debtors shall be referred to herein collectively as the "**Operating Reorganized Debtors**,"

Either:      (i) the Non-operating Debtors and the outstanding indebtedness of the Non-operating Debtors shall be restructured (the "**Non-operating Restructuring**") through a joint chapter 11 plan of reorganization with terms and conditions consistent with this Term Sheet and otherwise acceptable to the Bankruptcy Court and applicable parties (the "**Non-operating Plan**") or (ii) in the alternative, at the option of the Plan Sponsor (as defined herein), certain of the Non-operating Debtors' assets shall be sold (the "**363 Sale**"), following which the Non-operating Debtors will either convert their Bankruptcy Cases to cases under Chapter 7 of the Bankruptcy Code ("**Chapter 7**") or the Non-operating Debtors will seek confirmation of a Non- |

| | |
|---|---|
| | operating Plan.<br><br>The "**Non-operating Effective Date**" of the Non-operating Plan or of the 363 Sale shall be the date on which all the conditions to consummation of the Non-operating Plan have been satisfied in full or waived, and the Non-operating Plan becomes effective, or the date on which the 363 Sale is consummated.  On the Non-operating Effective Date, the Reorganized Non-operating Debtors (as defined below) shall be reorganized pursuant to the Non-operating Plan in accordance with and pursuant to the Bankruptcy Code or the indicated assets will be sold pursuant to the 363 Sale.<br><br>After the Non-operating Effective Date, following a Non-operating Restructuring, the Non-operating Debtors shall be referred to herein collectively as the "**Non-operating Reorganized Debtors**." As used herein, the term **"Reorganized Penthouse"** shall collectively refer to the Operating Reorganized Debtors and, to the extent that a Non-operating Restructuring occurs, the Non-Operating Reorganized Debtors. |
| **Current Capital Structure** | The current capital structure of the Debtors includes:<br><br>    (a)  Indebtedness under that certain Loan Agreement in the original principal amount of $9 million in favor of ExWorks Capital Fund I, LP, which was assigned to Dream Media Corp. on November 21, 2017, secured by all of the Debtors' assets less Assets Carved Out.  The Current amount owed is asserted to be $10.3 million;<br><br>    (b)  all equity interests in the Debtors (the "**Existing Equity**"). |
| **Penthouse Plan** | Penthouse Clubs Worldwide, LLC ("**PCW**") or its designee shall be the sponsor (the "**Plan Sponsor**") of the Penthouse Plan.<br><br>The Penthouse Plan shall be filed by the Plan Sponsor by May 9, 2018, the approval of the disclosure statement shall occur within 45 days after plan filing, and plan confirmation shall occur within 45 days of the filing of the disclosure statement, subject to the Bankruptcy Court's schedule.<br><br>The Penthouse Plan will pay Dream Media the full value of its secured claim in an amount not to exceed $7 million.  Dream Media will receive the indubitable equivalent of the value of its secured claim. The Dream Media debt will be evidenced by a new Note, secured by all assets of Reorganized Penthouse.  Such Note will be payable in five (5) years and will be amortized over 20 years.  Interest on such Note will be fixed at 7.5% per annum in accordance with *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004). |

| | Scheduled trade creditors (which will exclude all Insiders as that term is defined by the Bankruptcy Code and Dream Media's unsecured claim, if any) will be paid their pro rata share of the following, on a date that is 30 days after the Effective Date: |
| --- | --- |
| | (a) Creditors of PGMI will receive their pro rata share of $1.3 million.[1] |
| | (b) Creditors of PGBI will receive their pro rata share of $438,000. |
| | (c) Creditors of PGLI will receive their pro rata share of $66,000. |
| | (d) Creditors of PGPI will receive their pro rata share of $678,000. |
| | On a date that is 30 days after the Effective Date, Dream Media shall be paid an amount not to exceed [__]% of the amount of its allowed deficiency claim. |
| | All Equity Interests in the Operating Companies will be cancelled and reissued to the Plan Sponsor. |
| **Retention of Kelly Holland** | [Kelly Holland shall be employed by Reorganized Penthouse in an executive capacity on terms that are to be negotiated between Ms. Holland and PCW, but that shall include some form of equity compensation that will be earned over a set period of time.[2]] |
| | Pursuant to Bankruptcy Code § 1129(a)(5)(B), the contemplated retention of Ms. Holland and the nature of her compensation shall be disclosed. |
| **Releases** | The Penthouse Plan shall include customary and usual releases to the fullest extent permitted by applicable law. |

---

[1] The numbers placed here are based on the schedules of the debtors.  These are subject to change.

[2] Under Bankruptcy Code § 1129(b)(2)(B), Ms. Holland in not allowed to receive any property on account of her existing stock. However, the Bankruptcy Code does not preclude Ms. Holland from receiving stock in the Reorganized Penthouse over time as part of her compensation.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  1301 Dove Street, Suite 500, Newport Beach, CA 92660.

A true and correct copy of the foregoing document entitled:  **JOINT OBJECTION OF PENTHOUSE CLUBS WORLDWIDE, LLC, PENTHOUSE CLUBS GLOBAL LICENSING, LLC, AND KIRKENDOLL MANAGEMENT, LLC TO (I) MOTION FOR ORDER APPROVING SETTLEMENT WITH DREAM MEDIA, INC. AND (II) MOTION FOR ORDER (A) APPROVING SALE OF SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) SCHEDULING AUCTION AND SALE HEARING; (C)APPROVING SALE PROCEDURES AND NOTICE OF SALE; AND (D) GRANTING RELATED RELIEF; DECLARATION OF JOSEPH E. BAIN** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  <u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**</u>:
Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On April 26, 2018 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  <u>SERVED BY UNITED STATES MAIL</u>**:  On April 26, 2018, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒  Service information continued on attached page

**3.  <u>SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL</u>** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on April ___, 2018, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 26, 2018 | Stacy Ly | /s/ Stacy Ly |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

NEF SERVICE LIST

- **Ron Bender**    rb@lnbyb.com
- **Linda F Cantor**    lcantor@pszjlaw.com, lcantor@pszjlaw.com
- **Russell Clementson**    russell.clementson@usdoj.gov
- **Brian L Davidoff**    bdavidoff@greenbergglusker.com,
  calendar@greenbergglusker.com;jking@greenbergglusker.com
- **James A Dumas**    jdumas@dumas-law.com, jdumas@ecf.inforuptcy.com
- **Jeffrey K Garfinkle**    jgarfinkle@buchalter.com,
  docket@buchalter.com;dcyrankowski@buchalter.com
- **Allan B Gelbard**    xxxesq@aol.com, Allan@GelbardLaw.com
- **David Keith Gottlieb (TR)**    dkgtrustee@dkgallc.com,
  dgottlieb@iq7technology.com,rjohnson@dkgallc.com,akuras@dkgallc.com
- **Mirco J Haag**    mhaag@buchalter.com, dcyrankowski@buchalter.com
- **Mark S Horoupian**    mhoroupian@sulmeyerlaw.com,
  ppenn@sulmeyerlaw.com;mhoroupian@ecf.inforuptcy.com;dperez@sulmeyerlaw.com;ppenn@ecf.inforuptcy.com
- **Peter W Lianides**    plianides@wcghlaw.com, pj@wcghlaw.com;sly@wcghlaw.com
- **David W. Meadows**    david@davidwmeadowslaw.com
- **Krikor J Meshefejian**    kjm@lnbrb.com
- **Alan I Nahmias**    anahmias@mbnlawyers.com, jdale@mbnlawyers.com
- **Iain A W Nasatir**    inasatir@pszjlaw.com, jwashington@pszjlaw.com
- **Hamid R Rafatjoo**    hrafatjoo@raineslaw.com,
  bclark@raineslaw.com;cwilliams@raineslaw.com
- **S Margaux Ross**    margaux.ross@usdoj.gov
- **Michael St James**    ecf@stjames-law.com
- **Howard Steinberg**    steinbergh@gtlaw.com, pearsallt@gtlaw.com;laik@gtlaw.com
- **Cathy Ta**    cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;lisa.spencer@bbklaw.com
- **United States Trustee (SV)**    ustpregion16.wh.ecf@usdoj.gov
- **Michael H Weiss**    mw@weissandspees.com, lm@weissandspees.com
- **Michael H Weiss**    lm@weissandspees.com, lm@weissandspees.com
- **Marc J Winthrop**    mwinthrop@wcghlaw.com, pj@wcghlaw.com;sly@wcghlaw.com
- **Christopher K.S. Wong**    christopher.wong@arentfox.com
- **Beth Ann R Young**    bry@lnbyb.com

SERVICE BY FIRST CLASS MAIL

Honorable Martin R. Barash
United States Bankruptcy Court
Central District of California
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA 91367

PENTHOUSE CLUBS' JOINT OBJECTION TO
TRUSTEE'S SALE MOTION AND
SETTLEMENT MOTION