1  Linda F. Cantor (CA Bar No. 153762)
   Iain A.W. Nasatir (CA Bar No. 148977)
2  Harry D. Hochman (CA Bar No. 132515)
   PACHULSKI STANG ZIEHL & JONES LLP
3  10100 Santa Monica Blvd., 13th Floor
   Los Angeles, CA  90067
4  Telephone: (310) 277-6910
   Facsimile: (310) 201-0760
5  lcantor@pszjlaw.com
   inasatir@pszjlaw.com
6
7  Attorneys for David K. Gottlieb, Chapter 11 Trustee

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10             SAN FERNANDO VALLEY DIVISION

11  In re:                                    Cases No.: 1:18-BK-10098-MB

12  PENTHOUSE GLOBAL MEDIA, INC.,             Chapter 11

13                          Debtor.           Jointly Administered with Cases Nos.:
                                              1:18-bk-10099-MB; 1:18-bk-10101-MB;
14                                            1:18-bk-10102-MB; 1:18-bk-10103-MB;
                                              1:18-bk-10104-MB; 1:18-bk-10105-MB;
15  ⊠ Affects All Debtors                     1:18-bk-10106-MB; 1:18-bk-10107-MB;
    ☐ Affects Penthouse Global Broadcasting, Inc.  1:18-bk-10108-MB; 1:18-bk-10109-MB;
16                                            1:18-bk-10110-MB; 1:18-bk-10111-MB;
    ☐ Affects Penthouse Global Licensing, Inc.   1:18-bk-10112-MB; 1:18-bk-10113-MB
17  ☐ Affects Penthouse Global Digital, Inc.
    ☐ Affects Penthouse Global Publishing, Inc.   **TRUSTEE'S REPLY TO OBJECTIONS**
18  ☐ Affects GMI Online Ventures, Ltd.       **TO (1) MOTION FOR ORDER**
                                              **APPROVING SETTLEMENT WITH**
19  ☐ Affects Penthouse Digital Media Productions, Inc.  **DREAM MEDIA, INC., AND (2) MOTION**
    ☐ Affects Tan Door Media, Inc.            **FOR ORDER APPROVING SALE OF**
20  ☐ Affects Penthouse Images Acquisitions, Ltd.  **SUBSTANTIALLY ALL ASSETS AND**
                                              **RELATED RELIEF; DECLARATIONS**
    ☐ Affects Pure Entertainment Telecommunications, Inc.  **OF WALTER BOWSER AND LINDA F.**
21  ☐ Affects XVHUB Group, Inc.               **CANTOR**
22  ☐ Affects General Media Communications, Inc.
    ☐ Affects General Media Entertainment, Inc.  **Hearing:**
23  ☐ Affects Danni Ashe, Inc.                Date:     May 9, 2018
                                              Time:     1:30 p.m.
24  ☐ Affects Streamray Studios, Inc.         Place:    United States Bankruptcy Court
                                                        21041 Burbank Boulevard
25                                                      Courtroom 303
                                                        Woodland Hills, California
26
                                              Judge:    Hon. Martin R. Barash
27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    David K. Gottlieb, in his capacity as Chapter 11 Trustee (the "Trustee") of the above-

2   captioned bankruptcy estates (the "Estates") of Penthouse Global Media, Inc. and its debtor

3   subsidiaries (the "Debtors"), replies as follows to the objections to (1) *Motion for Order Approving*

4   *Settlement With Dream Media, Inc.* (the "Settlement Motion") and (2) *Motion for Order Approving*

5   *Sale of Substantially All Assets of the Debtors*, and related relief (the "Sale Motion"), filed by (a) the

6   Debtors, and (b) Penthouse Clubs Worldwide, LLC, Penthouse Clubs Global Licensing, LLC and

7   Kirkendoll Management, LLC (collectively "Clubs").

8   **A.    INTRODUCTION**

9        The objections of the Debtors and Clubs have the following premises: (1) Debtors  Penthouse

10  Global Broadcasting, Inc. ("Broadcasting") and Penthouse Global Publishing, Inc. ("Publishing") are

11  not Loan Obligors[1] and their assets are unencumbered and they generate 80% or more of the

12  Debtors' aggregate revenue; therefore, a settlement that allows secured creditor Dream Media

13  Corporation ("DMC") to credit bid equates to de facto substantive consolidation (and moreover is a

14  bad deal); (2) there is a superior alternative in the form of a plan that Clubs wants to file (but has

15  been stymied by lack of cooperation); and (3) cash collateral is not a problem because postpetition

16  revenue is the product of postpetition services and thus is not proceeds of DMC's collateral.

17       The Trustee welcomes a viable strategy that produces a better outcome in these cases, but the

18  Debtors and Clubs do not provide such a solution or raise any meritorious arguments that he did not

19  consider that increase his settlement leverage.  They also do not raise any issues that require or

20  warrant delay – and ***further delay is impossible without the use of cash collateral***.

21       1.    Broadcasting and Publishing were formed exactly one week after the existing Debtors

22  pledged their assets to DMC's predecessor, ExWorks Capital Fund ("ExWorks") on February 19,

23  2016.  These newly formed entities were not new businesses with new capital or assets, but appear

24  from the Debtors' descriptions to be umbrella entities under which preexisting entities and assets are

25  grouped.  They have no copyrights or trademarks in their names.  Cash passes in and out, but to the

26  extent they "operate," it is with whatever assets were held by the existing Debtors (including money

---

[1]  The other two entities that the Debtors refer to as their "divisions" were formed at the same time: Penthouse Global
Licensing, Inc. ("Licensing") and Penthouse Global Digital, Inc. ("Digital").  Clubs asserts that Digital is not a Loan
Obligor, but simply refers to the Debtors' objection, and the Debtors do not make any such assertion.

2

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    and trademarks).  Moreover, they executed control agreements in favor of ExWorks with respect to

2    the bank accounts that hold such cash.  Until now, not even the Debtors have taken the position their

3    assets were unencumbered: they specifically represented the opposite.  At bottom, the Trustee does

4    not assign much value to his right to litigate the position that Broadcasting and Publishing are

5    holding unencumbered cash or other assets when: (1) they executed control agreements; and (2) the

6    purportedly unencumbered assets are generated either by (a) assets that predate 2016 (which are *ipso*

7    *facto* DMC's collateral), or (b) post-acquisition property that is made with encumbered assets and/or

8    by entities that are Loan Obligors as to which liens have been perfected.  The Trustee also has no

9    way to finance the litigation in which he would litigate such an untenable claim.

10            2.        Furthermore, the Debtors' argument that Broadcasting and Publishing are not Loan

11    Obligors raises serious credibility issues, or worse.  The argument is that they would be Loan

12    Obligors under the Loan and Security Agreement as subsidiaries of the borrower, Penthouse Global

13    Media, Inc. ("PGMI"), but for the surprise fact that PGMI does not own them, notwithstanding the

14    sworn statements and pleadings in these cases representing that PGMI owns the other Debtors.

15    Rather, their stock is said to be owned by Kelly Holland.  As subsidiaries of Holland, Broadcasting

16    and Publishing would still be Loan Obligors, as subsidiaries of Holland, a guarantor.  But Holland

17    claims she owns the majority of their stock as trustee of a family trust, and so they are not her

18    subsidiaries.

19            These surprising new contentions were not considered in the negotiations because they had

20    not been made, but they do not enhance the Estates' position.  It does not matter if Broadcasting and

21    Publishing are Loan Obligors if they are holding DMC's collateral or proceeds, or if the control

22    agreements are effective.  And they are almost certainly Loan Obligors anyway, even if Ms. Holland

23    owns them as she now claims, because they are her subsidiaries: the fact that she holds a portion of

24    her stock in trust for contingent beneficiaries under a presumptively revocable family trust

25    agreement does not mean she is not a stockholder.[2]  The bottom line is whether Ms. Holland's

26

27

28    _____
[2] As noted *infra* at 8, a trust is not a property-holding entity like a corporation.  It is a contractual relationship; Ms.
Holland is still the shareholder.

DOCS_LA:313974.5 32277/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

assertion of ownership of these entities adds settlement value against DMC, and the Trustee does not believe it does, nor does he have the funds to litigate it.

3.    Ironically, PGMI's attempt to disclaim ownership of Broadcasting and Publishing undercuts its "de facto substantive consolidation" argument.  If it were not enough that the Debtors do not appear to have intercompany license agreements and commingle their assets rampantly, PGMI is evidently allowing entities that it does not even own to collect money generated by assets they do not own, comprising 80% of the Debtors' revenue!  The Trustee has already reported concerning the Debtors' haphazard accounting, and he is unaware of licenses or other agreements that would reflect lines of financial demarcation between the PGMI subsidiaries, much less between PGMI and "subsidiaries" it does not own.  Based on the information now known to the Trustee, it would be time-consuming and perhaps impossible to unscramble the Debtors' finances, and the economics of the cases do not justify it.  In sum, (1) the Trustee does not believe that any entity is having unencumbered assets sold by credit bid, and thus no prejudice is likely to accrue to creditors of any particular Debtor, and (2) substantive consolidation would be justified were it an issue.

4.    The Trustee is well aware that Clubs has expressed interest in proposing a plan. Clubs did not begin requesting information until early April and the Trustee has cooperated 100% in providing information since that time.  Any suggestion to the contrary is inaccurate, and is likely intended solely as a tactic for obtaining more time for Clubs to meet *its burden* of proving it has a viable, ready-to-implement alternative.  Critically, that includes funding, not just for the plan but to *operate until confirmation*.  The Trustee cannot operate the business without cash, particularly one that is losing money and can only be kept open by becoming increasingly administratively insolvent.

5.    The argument that post-petition receipts can be declared unencumbered because they are the product of post-petition services is not a solution.  Certain post-petition revenue is generated exclusively from prepetition collateral, and other adult entertainment products such as magazines that are made in part with post-petition services derive at least a significant portion of their value from their use of the Penthouse or associated trademarks, which are DMC's collateral.  Regardless, the problem is not just the use of cash collateral, it is administrative insolvency.  The Debtors are losing money and can extend operations only by creating an ever-larger administrative shortfall.

4

**B.**  **The New Argument That 80% of the Debtors' Revenue is Generated by**
     **"Unencumbered Entities" Does Not Improve the Trustee's Bargaining Position Or**
     **Facilitate Reorganization**

The Trustee took into account that no UCC-1's were filed against Publishing and Broadcasting.  But although the Debtors previously represented that "[t]here are blanket liens from lenders that encumber all of the Debtors in these cases," [*Motion for Joint Administration*, Dkt. No. 15 at 2],[3] they and Clubs now contend that the argument had much greater settlement value.  The Trustee disagrees.  He believes its strength was limited.  In particular, the new argument that Publishing and Broadcasting are not Loan Obligors and their assets are unencumbered, while accounting for 80% of aggregate revenue, strikes the Trustee as disingenuous.  The entities to which the Debtors attribute 80% of their revenue are amalgams of preexisting entities and assets, and rights in collateral do not disappear when the collateral is used by and/or receipts are booked in the name of a subsequently created affiliate.  Further, the assets Publishing and Broadcasting hold are cash, and Ms. Holland executed control agreements.  Her new argument that they are not Loan Obligors is likely wrong and relies in part on new representations that contradict previous sworn representations.  The Debtors did not make the argument previously, despite having ample opportunity.  Unless the Debtors and Clubs find and fund litigators who are willing to prosecute claims that may be found to have been brought in bad faith, and are willing to finance continued operations in the meantime, the arguments do not change the settlement calculus.

   **1.**    **Publishing and Broadcasting Are Not "Unencumbered Entities"**

In her Master Declaration [Dkt. No. 42] Kelly Holland states that she formed PGMI to acquire the stock of the various subsidiaries of Friend Finder Networks Inc. that comprise the business and operations of the Penthouse brand, which acquisition closed on February 19, 2016.  Concurrently, the $9 million ExWorks loans with which she financed the acquisition closed, with $6.5 million going to acquire the company and most of the rest going to loan costs and fees; $756,750 was left for working capital for the entire business.  *Id*. at 3.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

---

[3] The Trustee requests that the Court take judicial notice of the pleadings filed in these cases and all other matters of record pursuant to Rule 201 of the Federal Rules of Evidence.

DOCS_LA:313974.5 32277/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   Publishing, Broadcasting, Licensing and Digital were each incorporated one week later, on

2   February 26, 2016. They were not formed as new businesses with new assets, but as the basis of

3   new corporate structure, each being an umbrella under which preexisting assets and entities are

4   grouped (all such assets being ExWork's collateral). They handle cash, but Holland executed

5   control agreements. *See* Declaration of Linda F. Cantor, appended hereto, at ¶ 2 and Exhibit "B"

6   thereto.

7        In any event, their assets are encumbered, just as the Debtors themselves have been claiming,

8   because their assets derive from DMC's collateral. As Holland explains in her Master Declaration,

9   "PGMI is currently comprised of 4 separate operating divisions," listing Broadcasting, Publishing,

10  Licensing and Digital as conducting the four extant aspects of *PGMI's* business operations. *Id.* at 2-

11  3. In the Debtors' objection, they are referred to as "Operating Affiliates." Debtors' Obj. at 8, n. 5.

12       The *Debtor's First Status Report* [Dkt. No. 55] reflects how the four new entities are

13  comprised of preexisting entities and assets (*i.e.*, collateral), including the most obvious – the

14  Penthouse trademark and other intellectual property (all of which continue to be held by Debtors that

15  are loan obligors and "encumbered entities"). The enterprise is described as follows:

16
17       The primary Penthouse entity is Penthouse Global Media, Inc., ("PGMI") (Case No.
    1: 18-bk-10098). It owns all of the shares of all of the other Debtors. Its sole shareholder is
18  Kelly Holland ("Holland").

19       PGMI is comprised of four operating divisions:

20  i. Penthouse Global Broadcasting, Inc. (PGBI) (CASE No. 1:18-1 0099): Penthouse operates
    eight channels in over 100 countries. PGBI accounts for approximately 50% of the
21  companies' revenue. Its divisions are

22       1. General Media Entertainment Inc. (CASE NO. 1:18-10111) holds the legacy
23  copyrights, movies, remake rights etc., acquired prior to the first Penthouse chapter
    11in 2004. The Debtors will move to transfer all of its assets to PGBI and then
24  dismiss this case. The only known creditor is Dream Media/Exworks.

25       2. Penthouse Digital Media, Inc. (CASE NO. NO. 1:18-101 05) holds the copyrights,
    moves, remake rights created between 2006 and 2016. The Debtors will transfer all of
26  its assets to PGBI and then dismiss the case. The only known creditor is Dream
27  Media/Exworks.

28       3. Pure Entertainment Telecommunications (CASE NO. 1: 18-101 08) holds "1-800"

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

telephone numbers, all assets will be transferred to PGBI and then case will be dismissed. The Debtors will transfer all of its assets to PGBI and then dismiss the case. The only known creditor is Dream Media/Exworks.

ii. Penthouse Global Publishing, Inc. {CASE NO. 1:18-101 03) ("PGPI"): PGPI publishes Penthouse Magazine as well as Penthouse Letters magazine upon which the Penthouse brand is based.

iii. Penthouse Global Licensing, Inc. ("PGLI") (Case No. 1:18-10101): PGLI has licensing agreements that rely on its extensive trademark and media library. Licenses range from apparel to fragrances and books. Penthouse Images Acquisitions, Inc. (Case No. 1:18-2016. PGMI plans to transfer all of PIAI's assets to PGLI and then dismiss the case. The only known creditor is Dream Media/Exworks.

iv. Penthouse Global Digital, Inc. (CASE NO. 1: 18-10102) ("PGD I"): Penthouse runs membership websites as well as several free websites.

v. Legacy companies without assets. PGMI acquired the following companies in 2017 in connection with the acquisition of the Penthouse group of companies from FriendFinder: Danni Ashe Inc. (Case No. 1:18-10112); General Media Communications, Inc. (Case No. 1:18-10110); Streamray Studios, Inc. (Case No. 1:18-10113); XVHUB Group (Case No. 1:18-10109). The Debtors believe that none of these companies has any assets of any value and will soon seek to dismiss them for cause under 11 U.S.C. § 1112(b)(1).

[Dkt. No. 55 at 2-3]. In other words, receipts may be booked in the name of a newly created entity against which no financing statement has been filed, but the receipts of these "Operating Affiliates" are generated by "encumbered entities" and/or using "legacy assets" that are DMC's collateral; in this case, "legacy assets" are only two years old! In the Trustee's estimation, Clubs' and the Debtors' new arguments do not merit the expense or risk of litigation, particularly when there is no money to do so.

### 2.    Publishing and Broadcasting Are Very Likely Loan Obligors

Part of the Debtors' and Clubs' alchemy is a new argument that Publishing and Broadcasting are not even loan obligors in the first place. The reasoning is that although Publishing and Broadcasting would be on the hook to DMC if they were subsidiaries of the borrower (PGMI) or a loan party (Ms. Holland as guarantor), they are not subsidiaries because: (a) PGMI does not actually own any part of them; and (b) Holland only has a minority interest because 54.45% is held by her as trustee of the Kelly Holland Family Trust, which she contends does not count.

DOCS_LA:313974.5 32277/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    From the inception of these cases, the Debtors' pleadings have consistently stated and

2    Holland has repeatedly issued sworn statements that PGMI owns 100% of all the Debtors, including

3    Publishing and Broadcasting. PGMI's Schedule A/B, signed by Holland under penalty of perjury,

4    states in the Attachment to Part 13, "Debtor is the 100% shareholder of all jointly administered Ch.

5    11 cases." [Case No. 1:18-bk-10098-MB; Dkt. No. 183 at p. 21 of 22]. The Debtors' *Motion for*

6    *Joint Administration* states: "PGMI is the parent company of each of the above debtors and debtors

7    in possession listed in paragraph 2." [Dkt. No. 15 at 2]. The Corporate Ownership Statement for

8    PGMI represents under penalty of perjury that the only owner of more than 10% equity is "Kelly

9    Holland, an individual." [Case No. 1:18-bk-10098-MB; Dkt. No. 145]. The Corporate Ownership

10    Statement for Broadcasting represents the only owner with an interest of 10% or more to be

11    Penthouse Global Media, Inc. [Case No. 1:18-bk-10099-MB; Dkt. No. 20]. The same holds for

12    Publishing [Case No. 1:18-bk-10103-MB; Dkt. No. 17], and for Digital [Case No. 1:18-bk-10102-

13    MB; Dkt. No. 16]. Amended Corporate Ownership Statements were filed for Broadcasting and

14    Publishing on April 25, 2018, concurrently with the Debtors' Objection.

15    Assuming the veracity of Holland's most recent declaration and not the previous ones, stock

16    certificates for Publishing and Broadcasting were issued not to PGMI but to Holland, in her personal

17    capacity (500 shares) and in her capacity as trustee of a Kelly Holland Family Trust (600 shares).

18    Given the credibility issue, it is worth noting that three of the stock certificates are dated March 26,

19    **2016** while a fourth that appears to have been executed at the same time (based on the handwriting

20    being identical) bears a different year, March 26, **2017**. *See* Debtors' Ex. 6. The confusion over the

21    year, in context, triggers some concern about when all four were actually executed. Meanwhile, for

22    some reason, the stock in Licensing and Digital, though contemporaneously formed, was apparently

23    issued to PGMI, inasmuch as the Debtors concede that those two entities *are* Loan Party Obligors,

24    probably as subsidiaries. Debtors' Obj. at 8, n.5.

25    Again, in the Trustee's estimation this argument does not move the settlement needle. First,

26    regardless of whether Publishing and Broadcasting are loan obligors, their receipts are being

27    generated by the use of assets that are DMC's collateral and then booked in the name of a party

28    against which no UCC-1 has been filed.

8

1    Furthermore, the fact that Holland holds some of her stock in trust for unknown contingent

2    beneficiaries under a (presumably revocable) family trust agreement does not mean that she is not a

3    stockholder.  It is axiomatic that a trust is not a legal entity that holds property in the manner of a

4    corporation.  It denotes a contractual relationship between the trustee and the beneficiary; the trustee

5    is still the legal owner of the property.  *Galdjie v. Darwish*, 7 Cal.Rptr.3d 178, 187 (2003).  It is

6    unlikely that a probate avoidance device could be successfully put to such a use.

7    **C.    The Settlement Does Not Effectuate Substantive Consolidation But It Would be**

8    **Justified**

9    The Debtors contend that because DMC purportedly does not have a perfected security

10    interest in the assets of Broadcasting or Publishing, to permit DMC to credit bid for the assets of all

11    the Debtors is effectively to lump all assets into a single pot, to the disadvantage of creditors of

12    Broadcasting and Publishing.  They argue that there is no evidence to support substantive

13    consolidation, such as "spillover of assets from entity to another, *i.e.*, the Motions present no

14    evidence that assets acquired by Broadcasting were used by Digital or Publishing."  Debtors' Obj. at

15    7.

16    The premise of this objection is that unencumbered assets of Broadcasting and Publishing are

17    being included in a credit bid sale.  As set forth above, the Trustee does not believe that

18    unencumbered assets are being sold.  Notably, Clubs is incorrect in claiming that unencumbered

19    Penthouse Clubs Marks are being sold.  Clubs Obj. at 10-11.  While the settlement provides for a

20    division of their proceeds when they are sold, they are not part of this sale.

21    Furthermore, the Trustee has acquired sufficient familiarity with the Debtors' record-keeping

22    to assess that it would be economically impractical to attempt to create or resurrect separate records

23    for the Debtors, if it is even possible.  As set forth in the Declaration of Walter Bowser appended

24    hereto, the Debtors' records are in extremely poor condition.[4]  That is particularly so with respect to

25    intercompany accounting.  Intercompany receivables are booked in haphazard fashion and appear

26    facially unreliable.  Commingling is rampant.  Intercompany transactions that do appear are

27

28

---

[4] As of last week, for example, the Debtors did not have a list of the film titles they produced since the acquisition in 2016, *i.e.*, non-legacy assets that are asserted to be a source of unencumbered cash (albeit even the value of those assets would be questionable without the use of the legacy trademarks).  Bowser Dec., ¶ 3.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:313974.5 32277/001

1   sometimes described as being for the purpose of one entity paying the bills of another … without

2   any further explanation as to why.  There is no institutional knowledge that would facilitate going

3   through backup source materials and bank records, even if that were an economically justifiable

4   endeavor.  *See* Bowser Dec., ¶ 3.

5        The Trustee's review to date does not reveal any records tracking or charging for the use of

6   trademarks by other entities, other than possibly the Club license when they owned it.  Bowser Dec.,

7   ¶ 3.  The most valuable trademarks – the Penthouse marks – are owned by General Media

8   Communications.  They are used in virtually every product and would typically represent a key

9   component of the value of such product.  There is no indication of internal license agreements.  *Id.*

10  That glaring shortcoming is now magnified because the Debtors are claiming that they do not even

11  own two entities that purportedly account for 80% of its revenue – yet they are apparently not

12  charged license fees.

13  **D.    The Trustee is Cooperating Fully With Clubs' Due Diligence Efforts**

14       Clubs objects on the basis that it promises a plan of reorganization that is a superior

15  alternative.  It states that it is "in the process of collecting the required information for such a plan

16  and has communicated its intentions to the Trustee.  However, the Trustee and Dream Media

17  continue to stymie and prevent Clubs from receiving sufficient information to formulate a plan or to

18  investigate claims."  Clubs Obj. at 3.

19       The Trustee has cooperated fully.  Clubs first advised that on March 30, 2018 that was in the

20  process of engaging an accounting firm to review books and records and prepare a valuation for plan

21  purposes.  On April 3, 2018, Club's counsel advised that Clubs had retained CNM to perform the

22  forensic accounting work, and that they were preparing a list of items that they wanted.  The

23  Trustee's counsel responded immediately that "The Trustee's financial advisors will be on the

24  premises tomorrow morning and they are available to meet with your representatives."  That

25  evening, however, CNM resigned because it did not want to be associated with the adult

26  entertainment industry.

27       At the close business on April 4, 2018, Clubs advised that it had hired 8020 Consulting to

28  replace CNM.  A due diligence list was transmitted to Trustee's counsel at 8:00 p.m. in the evening

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:313974.5 32277/001

1  on Thursday, April 5. At midnight, Province transmitted the list to the Debtors and asked that the

2  information be compiled. Unfortunately the Province team that had been available to meet Thursday

3  could not meet again until Tuesday, April 10.

4      The Trustee has not resisted discovery. To the contrary, he was originally given 2 ½

5  business days to produce documents pursuant to document requests delivered late in the afternoon on

6  Friday, April 27, 2018. The Trustee produced documents the following Thursday at noon per an

7  agreement for a 24 hour extension, and completed its rolling production by the end of that day.

8  DMC opposed disclosure of privileged settlement communications, which the Trustee has withheld

9  pending a resolution of DMC's objection, which has not yet been taken up with the Court.

10  **E.    Even if the Trustee Could Use Cash Collateral Without Consent, The Estates Do Not**

11        **Have Sufficient Cash to Operate Beyond June Without Becoming Hopelessly**

12        **Administratively Insolvent**

13      As set forth in the Trustee's Motion to Convert [Dkt. No. 302] and in the appended Bowser

14  Declaration, the Debtors are losing significant amounts of money. The Projections show the

15  Debtors' ongoing operating expenses significantly exceeding their income. Bowser Dec., ¶ 5 and

16  Ex. A thereto. According to the Projections, the Debtors will lose approximately $545,000 over the

17  next two months, and were projected to reach administrative insolvency by June (if they have not

18  done so already). Any further operations could be sustained only by failing to pay bills and

19  generating a fast-growing administrative shortfall. Further, approximately $400,000 of post-petition

20  operating obligations incurred between January 11 and March 5, 2018 remain unpaid, and

21  professional fees incurred prior to the Trustee's appointment were reported as being approximately

22  $305,755. *Id.*

23      Clubs purports to have a solution. It contends that DMC has no liens on post-petition cash

24  because it derives from content that is produced by post-petition services and is not attributable to

25  DMC's collateral, and thus the lien on cash is cut off by operation of section 552 of the Bankruptcy

26  Code. It appears to suggest that the Trustee should simply use the cash, and put the onus on DMC to

27  enforce its remedies.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:313974.5 32277/001

1       Most fundamentally, the solution fails because, as set forth above, the Estates are losing

2 money and will soon be administratively insolvent, if they are not already, whether or not the

3 Trustee is entitled to use cash collateral.  As well, the relationship between the value of the Debtors'

4 adult entertainment and the Penthouse trademarks that are DMC's collateral is qualitatively different

5 than the relationship between the greens fees and the real property lien in *In re Premier Golf Props.*,

6 477 B.R. 767 (9th Cir. BAP 2012).  And certain types of revenue are not at all the product of post-

7 petition services, such as Licensing revenue or Digital or other revenues deriving from prepetition

8 content and trademarks.   Perhaps that is why the Debtors never attempted this stratagem when they

9 were in possession.

10 **F.**    **Conclusion**

11       Based on the foregoing, the Trustee respectfully requests that this Court enter an order (a)

12 approving the Settlement; (b) authorizing the Parties to enter into and take any and all actions

13 reasonably necessary to effectuate the Settlement; and (c) granting the Trustee such other and further

14 relief as the Court deems just and proper.

15 Dated:  May 2, 2018                 PACHULSKI STANG ZIEHL & JONES LLP

16

17                          By: */s/ Linda F. Cantor*
                             Linda F. Cantor

18                          Attorneys for David K. Gottlieb, Chapter 11 Trustee

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:313974.5 32277/001

# DECLARATION OF WALTER BOWSER

I, Walter Bowser, declare as follows:

1.      I am a Director with the firm of Province, Inc., proposed financial advisory firm for David K. Gottlieb, solely in his capacity as the duly appointed chapter 11 trustee (the "Trustee") in the above-captioned bankruptcy cases.  I am a certified public accountant and a member in good standing in the American Institute of Certified Public Accountants and also a Certified Fraud Examiner and member in good standing of the Association of Certified Fraud Examiners.  I received my M.B.A. at Carnegie Mellon University in 1989 and I have over 28 years of experience providing consulting and accounting services to clients in a broad range of industries, including performing the role of CFO.  Over the course of my career, I have prepared hundreds of financial projections, including cash flow projections for clients in bankruptcy proceedings.

2.      Except as otherwise stated, each of the facts set forth in this Declaration are based on either (a) my personal knowledge, (b) information gathered by professionals working with me, (c) my review of relevant documents, or (d) my opinion based upon my experience and knowledge of the circumstances, as described in the Motion.  If I were called to testify thereto, I could and would competently do so.

3.      Beginning on the day after his appointment, I along with my colleague David Roberts and the Trustee's proposed counsel met extensively with the Debtors' CEO, Kelly Holland, and with the Debtors' accounting and other staff members regarding day-to-day operations and the Debtors' financial management.   For the first five weeks after the Trustee Appointment Date, David Roberts and I worked full time on-site at the Debtors' premises on a daily basis (including weekends) reviewing and reconciling the Debtors' books and records, analyzing cash flow and developing projections.  This was a time intensive task because the Debtors' books and records were in disarray, for example:

a.   The historical records for 2016 and 2017 were incomplete and reportedly inaccurate.   The prior CFO was terminated for cause in September 2017; the other accounting staff also resigned or otherwise ended their employment with the Debtors around this same time creating a vacuum of institutional

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

knowledge within the accounting organization, which includes among other things, unfamiliarity with customers and vendors, and the chart of accounts. This sudden and extensive turnover of staff resulted in numerous recording errors and subsequent correcting adjustments when such errors were discovered. The accounting staff has limited availability because of family and other health-related issues. Each member of the current accounting staff has less than 6 months' tenure with Penthouse.

b. Many of the reports in the accounting system are out of synch because cash postings of collections against receivables; payment posting to payables; invoicing customers and entering vendor invoices into payables are not performed on a timely basis.

c. After the dismissal of the former CFO and in a race against the tax filing deadline, the Debtors engaged an outside accounting firm to assist them in filing their 2016 tax returns. To compile the acounting data required for the tax returns, this firm made multiple summarizing adjusting entries to the books that aggregated numerous transactions, which subsequently makes it impossible to review the details of these entries, consequently many historical details were lost that might have reduced the amount of time required to assess the situation.

d. We encountered hundreds of entries to the cash receipts and disbursements journal with blank descriptions for the payor, which required us to resort to bank statements and invoices to test the accuracy of certain revenue streams in the cash projections.

e. Starting in November 2017, the Debtors' current accounting staff and CFO reconstructed much of and continue their efforts to reconstruct the books and records; however, the books and records have not been audited and given their history cannot be relied on at face value.

f. Given the state of the Debtors' general ledgers, source documents have to be

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2

reviewed to investigate many transactions.   Province compiled cash receipts and disbursements from the Debtors' books and records.  Although the amounts of the transactions are available and are believed to generally reconcile to the bank statements – many of the transactions, particularly cash receipts do not have names associated with them making it difficult to determine the nature of the transactions.  To investigate, other reports or source documents need to be reviewed and analyzed.

g.  Source files for vendors are frequently incomplete and in some cases cannot be located.

h.  The Debtors did not establish a new set of books and records starting with the petition date to record post-petition activity.  Fundamental reporting systems and processes for tracking cash, payables, and receivables had to be modified or established to meet the needs of the Trustee.

i.  The Debtors use QuickBooks as their accounting system, which requires a separate data file for each of the five operational debtor entities.  Because only one entity's data file can be open at a time, this causes excessive delay in recording transactions.

j.  Because many payments are made by Penthouse Global Media, Inc., the accounting methods used by the company require extensive use of intercompany transactions.  Again, because only one entity's data file can be open at a time, it is not unusual to find only one side of a transaction recorded on a certain entity, while the recording of the same transaction on the correspondent entity is waiting to be recorded.

k.  It appears that after the departure of the former CFO and his staff, there has been a general lack of a sense of ownership for the records from top to bottom and, on a day-to-day basis, Debtors have maintained a reactive rather than proactive role in the management of their accounting records.

l.  As of last week, the Debtors did not have a list of the film titles they

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

3

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    produced since the acquisition in 2016.

2        m.  Intercompany receivables are booked in haphazard fashion and appear facially

3            unreliable.  Commingling is common.  Intercompany transactions that do

4            appear are sometimes described as being for the purpose of one entity paying

5            the bills of another, without any further explanation as to why.  There is no

6            institutional knowledge that would facilitate the task of going through backup

7            source materials and bank records.

8        n.  Our review to date does not reveal any records tracking or charging for the use

9            of trademarks by other entities, other than possibly the Club license during the

10           period they owned it.

11       4.     Based upon a lengthy and detailed analysis of the Debtors' books and accounting

12   records, including a review of 2017 revenues and expenses, bank statements, and numerous

13   discussions with Debtors' management, we prepared cash flow projections for the period March 7

14   through June 2018 (the "Projections").  A true and correct copy of the Projections is appended hereto

15   as **Exhibit A**.  To the best of my knowledge and understanding of the Debtors' operations and based

16   on my review of 2017 revenues and expenses, bank statements, and numerous discussions with

17   Debtors' management, the Projections accurately reflect the Debtors' operations from March 7

18   through June 2018.  As shown on the Projections, the Debtors are not meeting their obligations as

19   they come due on a post-petition basis, resulting in a diminution of the value of the Debtors' assets.

20       5.     The Projections show that Debtors' ongoing expenses of operating their businesses

21   exceed the income generated by such operation.  Approximately $400,000 of post-petition

22   operating obligations incurred between January 11 and March 5, 2018 remain unpaid.  I am also

23   informed and believe that professional fees incurred prior to the Trustee's appointment amount to

24   approximately $305,755.  According to the Projections, the Debtors will lose approximately

25   $545,000 over the next two months.  Accordingly, there exists a substantial or continuing loss to or

26   diminution of the estates.  Based upon the Debtors' current operations and as confirmed by the

27   Projections, there is currently no reasonable likelihood of rehabilitation of the Debtors' businesses.

28

4

1    I declare under penalty of perjury under the laws of the United States of America that the

2    forgoing is true and correct.

3    Executed this 2nd day of May, 2018, at Los Angeles, California.

4

5    _____
     Walter Bowser

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

5

# Exhibit A

# In Re: Penthouse Global Media, Inc. et al (Lead Case No. 1:18-10098-MB)
## Analysis - Estimated Post-petition Revenues and Expenses (01-11-18 to 06-30-18)

| | From 01-11-18 to 03-05-18 | | | | From 03-06-18 to 06-30-18 | | | | | Post-petition Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Jan | Feb | Mar 1 to 5 | Subtotal | Mar 6 to 31 | April | May | June | Subtotal | |
| **REVENUES** (Note 1) | | | | | | | | | | |
| Broadcast | 178,870 | 287,063 | 10,180 | 476,113 | 382,529 | 357,490 | 370,595 | 410,556 | 1,521,171 | 1,997,283 |
| Digital | 97,584 | 78,732 | 9,018 | 185,333 | 96,309 | 128,973 | 116,181 | 116,151 | 457,644 | 642,978 |
| Publishing | 188,445 | 116,460 | 2,133 | 307,038 | 199,352 | 168,882 | 188,706 | 155,706 | 712,645 | 1,019,683 |
| Licensing | 71,983 | 2,258 | - | 74,241 | 7,515 | 53,413 | 1,000 | 1,000 | 62,928 | 137,169 |
| **Total Revenues** | 536,882 | 484,512 | 21,331 | 1,042,725 | 685,705 | 708,758 | 676,482 | 683,444 | 2,754,388 | 3,797,113 |
| **OPERATING EXPENSES** (Note 1) | | | | | | | | | | |
| Payroll & taxes | 93,061 | 134,172 | - | 227,234 | 144,634 | 186,194 | 82,000 | 246,000 | 658,828 | 886,062 |
| Rent | - | 22,411 | 37,183 | 59,594 | 22,411 | - | 22,411 | 22,411 | 67,234 | 126,829 |
| Corporate expenses | 26,165 | 17,855 | 2,576 | 46,596 | 35,017 | 61,155 | 34,353 | 58,119 | 188,644 | 235,240 |
| Insurance | 27,362 | 25,183 | 28,763 | 81,308 | 53,968 | 116,384 | 64,439 | 44,706 | 279,496 | 360,805 |
| Broadcast costs | 41,503 | 114,317 | 18,500 | 174,320 | 101,839 | 92,546 | 170,338 | 143,073 | 507,795 | 682,116 |
| Publishing costs | 84,421 | 183,356 | 28,777 | 296,554 | 139,210 | 173,795 | 189,220 | 212,182 | 714,407 | 1,010,961 |
| Digital costs | 5,129 | 12,160 | - | 17,289 | 68,906 | 46,148 | 50,353 | 50,741 | 216,148 | 233,436 |
| Outside legal for IP | - | - | - | - | - | 15,500 | 20,000 | 10,000 | 45,500 | 45,500 |
| Miscellaneous expenses | 155,352 | 248 | - | 155,599 | 6,711 | 45,000 | 60,000 | 60,000 | 171,711 | 327,311 |
| **Total Operating Expenses** | 432,993 | 509,703 | 115,799 | 1,058,495 | 572,696 | 736,722 | 693,114 | 847,232 | 2,849,764 | 3,908,259 |
| **Net Cash Basis Operating Income (Loss)** | 103,889 | (25,191) | (94,468) | (15,770) | 113,009 | (27,964) | (16,632) | (163,789) | (95,376) | (111,146) |
| **ACCRUED REVENUES AND EXPENSES** | | | | | | | | | | |
| Accrued revenues | 43,670 | 35,744 | 17,685 | 97,099 | (74,938) | (51,342) | (84,447) | (99,150) | (309,877) | (212,778) |
| Accrued expenses | (348,054) | 23,200 | (76,597) | (401,451) | 73,241 | (108,172) | (16,632) | (163,788) | (215,351) | (616,802) |
| **Change in Accrued Revenues and Expenses** | (304,384) | 58,944 | (58,912) | (304,352) | (1,697) | (159,514) | (101,079) | (262,938) | (525,228) | (829,580) |
| **Net Accrual Basis Operating Income (Loss)** | (200,495) | 33,753 | (153,380) | (320,122) | 111,312 | (187,478) | (117,711) | (426,727) | (620,604) | (940,726) |
| **ADMINISTRATIVE EXPENSES** (Note 1) | | | | | | | | | | |
| Debtor counsel (Note 2) | 72,863 | 112,757 | 20,135 | 205,755 | - | - | - | - | - | 205,755 |
| UCC counsel | - | 80,000 | 20,000 | 100,000 | 20,968 | 25,000 | 25,000 | 25,000 | 95,968 | 195,968 |
| Special Litigation I | - | - | - | - | - | 6,000 | 30,000 | 30,000 | 66,000 | 66,000 |
| Special Litigation II | - | - | - | - | - | - | 3,050 | 3,050 | 6,100 | 6,100 |
| UST Quarterly fee | - | - | - | - | - | 20,346 | - | - | 20,346 | 20,346 |
| Ch. 11 Trustee bond | - | - | - | - | 5,000 | - | - | - | 5,000 | 5,000 |
| Trustee | - | - | - | - | 31,885 | 29,688 | 19,173 | 24,097 | 104,843 | 104,843 |
| Trustee counsel | - | - | - | - | 264,266 | 100,021 | 75,000 | 50,000 | 489,288 | 489,288 |
| Trustee's financial advisor | - | - | - | - | 170,000 | 100,000 | 50,000 | 30,000 | 350,000 | 350,000 |
| **Total Administrative Expenses** | 72,863 | 192,757 | 40,135 | 305,755 | 492,119 | 281,055 | 202,223 | 162,147 | 1,137,544 | 1,443,299 |
| **NON-OPERATING RECEIPTS (DISBURSEMENTS)** | | | | | | | | | | |
| Humboldt credit card reserve | - | - | - | - | 368,191 | 50,000 | - | - | 418,191 | 418,191 |
| Eworks interest | (38,533) | (34,844) | - | (73,377) | - | - | - | - | - | (73,377) |
| **Total Non-operating Receipts (Disbursements)** | (38,533) | (34,844) | - | (73,377) | 368,191 | 50,000 | - | - | 418,191 | 344,814 |
| **Net Expenses in Excess of Receipts** | (311,891) | (193,848) | (193,516) | (699,254) | (12,616) | (418,533) | (319,934) | (588,874) | (1,339,957) | (2,039,211) |

Prepared by Province, Inc.

# In Re: Penthouse Global Media, Inc. et al (Lead Case No. 1:18-10098-MB)
Analysis - Estimated Post-petition Revenues and Expenses (01-11-18 to 06-30-18)

| | From 01-11-18 to 03-05-18 | | | | From 03-06-18 to 06-30-18 | | | | | Post-petition Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Jan | Feb | Mar 1 to 5 | Subtotal | Mar 6 to 31 | April | May | June | Subtotal | |
| **WORKING CAPITAL SUMMARY** | | | | | | | | | | |
| **CASH** | | | | | | | | | | |
| Cash - beginning book balance | $ 152,219 | $ 217,575 | $ 157,540 | $ 152,219 | $ 63,072 | $ 171,081 | $ 175,496 | $ 175,496 | $ 63,072 | $ 152,219 |
| Cash receipts from operations | 536,882 | 484,512 | 21,331 | 1,042,725 | 685,705 | 708,758 | 676,482 | 683,444 | 2,754,388 | 3,797,113 |
| Cash disbursements for operations | (432,993) | (509,703) | (115,800) | (1,058,495) | (572,697) | (683,996) | (676,482) | (683,444) | (2,616,618) | (3,676,113) |
| Cash disbursements for non-operations | (38,553) | (34,844) | | (73,377) | (5,000) | (20,346) | | | (25,346) | (98,723) |
| Cash - ending book balance | $ 217,575 | $ 157,540 | $ 63,072 | $ 63,072 | $ 171,081 | $ 175,496 | $ 175,496 | $ 175,496 | $ 175,496 | $ 175,496 |
| **ACCOUNTS RECEIVABLE** | | | | | | | | | | |
| Beginning balance | $ 456,781 | $ 500,451 | $ 536,195 | $ 456,781 | $ 553,880 | $ 478,942 | $ 427,600 | $ 363,153 | $ 553,880 | $ 456,781 |
| Sales on account | 222,540 | 322,807 | 27,865 | 573,212 | 307,591 | 306,148 | 306,148 | 291,406 | 1,211,294 | 1,784,505 |
| Collections | (178,870) | (287,063) | (10,180) | (476,113) | (382,529) | (357,490) | (370,595) | (410,556) | (1,521,171) | (1,997,283) |
| Ending balance | 500,451 | 536,195 | 553,880 | 553,880 | 478,942 | 427,600 | 363,153 | 244,003 | 244,003 | 244,003 |
| **POST-PETITION A/P** | | | | | | | | | | |
| Post-petition accrued - beginning balance | $ 348,054 | $ 348,054 | $ 324,854 | $ - | $ 401,451 | $ 328,210 | $ 436,381 | $ 453,013 | $ 401,451 | $ - |
| Post-petition expenses | | | 76,597 | 424,651 | 103,031 | 137,969 | 16,632 | 163,789 | 421,421 | 846,072 |
| Post-petition payments (included in operations) | | (23,200) | | (23,200) | (176,272) | (29,798) | | (206,070) | (206,070) | (229,270) |
| Post-petition accrued - ending balance | 348,054 | 324,854 | 401,451 | 401,451 | 328,210 | 436,381 | 453,013 | 616,802 | 616,802 | 616,802 |
| **RESTRICTED CASH** | | | | | | | | | | |
| Beginning balance | $ - | $ - | $ - | $ - | $ - | $ 368,191 | $ 418,191 | $ 418,191 | $ - | $ - |
| Humboldt credit card reserve recoveries | | | | | 368,191 | 50,000 | | | 418,191 | 418,191 |
| Ending balance | - | - | - | - | 368,191 | 418,191 | 418,191 | 418,191 | 418,191 | 418,191 |

Notes:
1. Post-petition revenues and expenses have been estimated from available debtor data. Actual revenue receipts and expense disbursements are included from the petition date of January 11 through April 7, 2018. Operating revenues and expenses are presented on a cash basis. Administrative expenses are a mix of accrued professional fees and cash payments.

2. Debtor's counsel's fees and expenses are included net of unused retainer. Prepetition fees of $10,260 and expenses of $25,755 are assumed offset against $70,000 retainer - leaving an unused retainer of $33,985. For purposes of this analysis, the unused retainer was applied pro-rata based on days in the month.

Prepared by Province, Inc.

Printed: 4/12/2018 - 10:51 AM

## DECLARATION OF LINDA F. CANTOR

I, Linda F. Cantor, declare as follows:

1.    I am a partner of Pachulski Stang Ziehl & Jones LLP, counsel for chapter 11 trustee David K. Gottlieb (the "Trustee") in the above-captioned cases. I am an attorney duly admitted to practice before this Court, and am one of the attorneys with principal responsibility for this representation. Unless otherwise stated, the facts stated herein are within my personal knowledge, and if called upon to do so, I could and would testify competently thereto.

2.    In the course of our lien validity and perfection analysis, I obtained Control Agreements from counsel for Dream Media Corporation respecting cash accounts of Penthouse Global Broadcasting, Inc. and Penthouse Global Publishing, Inc. that appear to be executed by Kelly Holland on behalf of those entities. True and correct copies of those two agreements are appended hereto as Exhibit "B".

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

Executed this 2nd day of May, 2018, at Los Angeles, California.

Linda F. Cantor

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

# Exhibit B

# DEPOSIT ACCOUNT CONTROL AGREEMENT

This Deposit Account Control Agreement (this "Agreement") is entered into as of April 19, 2016 by **Penthouse Global Publishing, Inc., a Delaware corporation** ("Borrower"), ExWorks Capital Fund I, L.P., a Delaware limited partnership ("Lender"), and East West Bank, a California banking corporation ("Deposit Holder").

## RECITALS

A.    Lender has a first-priority security interest in Borrower's deposit accounts identified as account numbers ▮▮▮▮▮▮ held by Deposit Holder, and related rights and property (collectively, the "Accounts") pursuant to the Loan and Security Agreement dated as of February 19, 2016 (the "Security Agreement") by and among Borrower, certain affiliates of Borrower party thereto, and Lender.

B.    Borrower and Lender are requesting that Deposit Holder enter into this Agreement to perfect Lender's security interests in the Accounts by control.

C.    Deposit Holder is willing to act as Deposit Holder, but only under the terms of this Agreement. Deposit Holder has no obligation or duties with respect to any other agreements between Lender and Borrower to which it is not a party.

## AGREEMENT

1.    **Security Interest**

Deposit Holder acknowledges Lender's security interest in the Accounts. Borrower ratifies and confirms the security interests it has granted to Lender in the Accounts.

2.    **Control of Account by Lender; Borrower's Rights in Account**

2.1    This Agreement evidences Lender's control over the Accounts. Notwithstanding any separate agreement Borrower may have with Deposit Holder, Lender shall be entitled at any time to give Deposit Holder instructions as to the withdrawal or disposition of funds from time to time credited to the Accounts, or as to any other matters relating to the Accounts, all without further consent of Borrower. Deposit Holder shall, and is fully entitled to, rely upon any such instructions from Lender even if such instructions are contrary to any instructions or demands that Borrower may give to Deposit Holder.

2.2    Deposit Holder acknowledges and agrees that (i) in accordance with paragraph 2.1 above, it shall comply with the instructions originated by Lender in each case directing disposition of any funds from time to time credited to the Accounts without further consent of Borrower; (ii) Lender now has exclusive control of the Accounts for purposes of Sections 9312(b) and 9314 of the Uniform Commercial Code in effect in the State of California, (iii) commencing on the date hereof until the termination of this Agreement, Borrower shall have no right to make withdrawals or otherwise transact on the Accounts, and (iv) the Accounts will be maintained in the state of California as "deposit accounts" as defined in Section 9102(a)(29) of the Uniform Commercial Code in effect in the State of California. Notwithstanding anything to the contrary contained herein, if at any time Deposit Holder shall receive conflicting orders or instructions from Lender and

1

Borrower, Deposit Holder shall follow the orders or instructions of Lender, as applicable in accordance with paragraph 2.1, and not the orders or instructions of Borrower.

2.3    Borrower represents and warrants to Lender and Deposit Holder that it has not assigned or granted a security interest in the Accounts, except to Lender. Borrower will not permit the Accounts to become subject to any other pledge, assignment, lien, charge or encumbrance of any kind, other than Lender's security interests referred to herein.

## 3.    Deposit Holder's Responsibility

3.1    Deposit Holder shall have no duty to inquire or determine whether Borrower's obligations to Lender are in default or whether Lender is entitled, under any separate agreement between Lender and Borrower, to give any instructions relating to the Accounts. Deposit Holder shall not have any liability to Borrower or Lender for losses or liabilities resulting from any failure to comply with instructions relating to the Accounts or delay in complying with such instructions if the failure or delay is due to circumstances beyond Deposit Holder's reasonable control. Without limiting the foregoing, in no event shall Deposit Holder have any liability for indirect, punitive, exemplary or consequential loss or damages, including without limitation lost profits, whether or not any claim for such loss or such damages is based on tort or contract or Deposit Holder knew or should have known the likelihood of such damages in any circumstances.

__ 3.2    Commencing on the date hereof and continuing on each Business Day thereafter, Deposit Holder shall transfer all available balances in the Accounts to Lender at its account specified on Annex I attached hereto, or to such other account as Lender may specify to Deposit Holder from time to time. Borrower and Lender agree that Deposit Holder may deduct from the balances transferred reasonable and customary wire transfer fees for the transfer of such funds.

A "Business Day" is each day except Saturdays, Sundays and federal or state holidays on which commercial banks in Pasadena, California are permitted to close. Funds are not available if, in the reasonable determination of Deposit Holder, they are subject to a dispute or legal process preventing their withdrawal.

3.3    Deposit Holder may rely on notices and communications it believes in good faith to be genuine and given by the appropriate party.

3.4    Secured Party acknowledges and agrees that Deposit Holder's duties and obligations under this Agreement do not include any obligation to ensure Borrower's compliance with its obligation under the Security Agreement to deposit collections of its accounts receivable or any other proceeds of the Collateral (as defined in the Security Agreement) to an Account governed by this Agreement or to any other Account.

## 4.    Priority of Lender's Security Interests; Rights Reserved by Deposit Holder

4.1    Deposit Holder agrees that all of its present and future rights against the Accounts are subordinate to Lender's security interests therein; provided, however, that Lender agrees that nothing herein subordinates or waives, and that Deposit Holder expressly reserves, all of its present and future rights (whether described as rights of setoff, banker's lien, chargeback or otherwise, and whether available to Deposit Holder under the law or under any other agreement between Deposit

2

Holder and Borrower concerning the Accounts) with respect to (a) items deposited to the Accounts and returned unpaid, whether for insufficient funds or for any other reason, and without regard to the timeliness of return of any such item; (b) automated clearing house entries which are rejected or returned unpaid; (c) claims of breach of the Uniform Commercial Code's transfer or presentment warranties made against Deposit Holder in connection with items deposited to the Accounts; and (d) Deposit Holder's usual and customary charges for services rendered in connection with the Accounts, to the extent that, in each case, Borrower has not separately paid or reimbursed Deposit Holder therefore.

5.    **Statements**

5.1    In addition to the original deposit account statement for the Accounts which is provided to Borrower, Deposit Holder will send duplicate statements to Lender. Borrower authorizes Deposit Holder to provide any additional information relating to the Accounts to the Lender upon its request without Borrower's further consent.

6.    **Notice of Adverse Claims; Record of Security Interest**

6.1    Deposit Holder represents to Lender that Deposit Holder has not received notice of any lien, encumbrance or other claim to the Accounts from any other person and has not entered into, and covenants with Lender that it will not enter into, any agreement with any other person by which Deposit Holder is obligated to comply with instructions from such other person as to the disposition of funds from the Accounts or other dealings with the Accounts. Deposit Holder will use commercially reasonable efforts, subject to applicable law, to promptly notify Lender if any other person claims that it has a property interest in the Accounts or seeks to enter into a deposit account control agreement or similar agreement with respect to the Accounts.

6.2    Deposit Holder further represents and warrants that it has marked its books and records to indicate Lender's security interests in and liens upon the Accounts.

7.    **Returned Items**

Borrower and Lender understand and agree that Deposit Holder will pay returned items by debiting the applicable Account. Borrower agrees to pay the amount of any returned item immediately upon demand to the extent that there are not sufficient funds in the applicable Account to cover such amount on the day of the debit. Lender agrees that Lender will pay within twenty (20) days after demand on Lender any such amount that is not paid in full by Borrower within twenty (20) days after demand on Borrower by Deposit Holder, up to the amount of proceeds of the Accounts received by Lender under this Agreement; provided that any such demand is made on Lender no later than 60 days after the termination of this Agreement.

8.    **Indemnity**

Borrower will indemnify Deposit Holder its officers, directors, employees, and Lender and its officers, directors and employees against claims, liabilities and expenses arising out of this Agreement including all fees and costs incurred by Deposit Holder in complying with instructions' or requests given by Lender hereunder, and including reasonable attorneys' fees and disbursements and the reasonable estimate of the allocated costs and expenses of in-house legal counsel and staff, except to the extent the claims, liabilities or expenses are caused by Lender or Deposit Holder's

3

gross negligence or willful misconduct.

9.    **Termination**

Lender may terminate this Agreement at any time by written notice to Deposit Holder and Borrower. Deposit Holder may terminate this Agreement on thirty (30) days' prior written notice to Lender and Borrower. Borrower may not terminate this Agreement except with written consent of Lender.

10.    **Governing Law.**

10.1    This Agreement will be governed by the internal laws of the state of California, without regard to principles of conflict of laws.

10.2    Deposit Holder's jurisdiction for purposes of Section 9304 of the Uniform Commercial Code shall be California.

11.    **Entire Agreement.** This Agreement is the entire agreement among the parties regarding the subject matter hereof and supersedes any prior agreements and contemporaneous oral agreements of the parties concerning its subject matter. This Agreement will control over any conflicting agreement between Deposit Holder and Borrower.

12.    **Amendments.** No amendment of, or waiver of a right under, this Agreement will be binding unless it is in writing and signed by Borrower, Lender and Deposit Holder.

13.    **Severability.** To the extent a provision of this Agreement is unenforceable, this Agreement will be construed as if the unenforceable provision were omitted.

14.    **Successors and Assigns.** The provisions of this Agreement shall be binding upon and inure to the benefit of Deposit Holder, Lender and Borrower and their respective successors and assigns.

15.    **Notices.** All notices, instructions and/or communications to a party under this Agreement will be in writing and will be sent to the party's address set forth below or to such other address as the party may notify the other parties.

Lender:                    EXWORKS CAPITAL FUND I, L.P.
                           333 W. Wacker Drive, Suite 1620
                           Chicago, IL 60606
                           Attention: Robert Richardson
                           Email: rrichardson@exworkscapital.com

Borrower:                  PENTHOUSE GLOBAL PUBLISHING, INC.
                           8944 Mason Street
                           Chatsworth, CA 91311
                           Attention: Kelly Holland
                           Email: chickmedia@gmail.com

Deposit Holder:            East West Bank
                           9300 Flair Drive, Suite 100W

El Monte, CA 91731
Attention: Central Relationship Service
Fax: 626.316.1175

16.    **Deposit Account Agreement.**

The account shall also be governed by the Deposit Holder's Deposit Account Agreement and applicable fee schedules, provided however that in event of conflict, this Agreement shall control.

17.    **No agency, etc.**

Nothing contained in this Agreement shall create any agency, fiduciary, joint venture or partnership relationship between or among Borrower, Lender and Deposit Holder.

18.    **Counterparts.**

This Agreement may be executed in counterparts, each of which shall be an original, and all of which shall constitute one and the same agreement.

19.    **JUDICIAL REFERENCE**. ALL DISPUTES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE RESOLVED BY A JUDICIAL REFERENCE PROCEEDING PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE § 638. THE JUDICIAL REFEREE APPOINTED TO DECIDE THE JUDICIAL REFERENCE PROCEEDING SHALL BE EMPOWERED TO HEAR AND RESOLVE ANY OR ALL ISSUES IN THE PROCEEDING, WHETHER OF FACT OR LAW.

[Signature Pages Follow]

**LENDER:**
EXWORKS CAPITAL FUND I, L.P.

By: _____
Robert Richardson
Vice President


**BORROWER:**
PENTHOUSE GLOBAL PUBLISHING, INC.,
a Delaware corporation

By: _____
Name: _____
Its: _CEO_____


**DEPOSIT HOLDER:**
East West Bank, a California banking
corporation

By: _____
~~Doug Krause~~ Maita Prout, SVP + Deputy GC
~~Executive Vice President-Chief Risk~~ Officer
~~& General Counsel~~

# DEPOSIT ACCOUNT CONTROL AGREEMENT

This Deposit Account Control Agreement (this "Agreement") is entered into as of April 19, 2016 by **Penthouse Global Broadcasting, Inc., a Delaware corporation** ("Borrower"), ExWorks Capital Fund I, L.P., a Delaware limited partnership ("Lender"), and East West Bank, a California banking corporation ("Deposit Holder").

## RECITALS

A.    Lender has a first-priority security interest in Borrower's deposit accounts identified as account numbers ██████████ held by Deposit Holder, and related rights and property (collectively, the "Accounts") pursuant to the Loan and Security Agreement dated as of February 19, 2016 (the "Security Agreement") by and among Borrower, certain affiliates of Borrower party thereto, and Lender.

B.    Borrower and Lender are requesting that Deposit Holder enter into this Agreement to perfect Lender's security interests in the Accounts by control.

C.    Deposit Holder is willing to act as Deposit Holder, but only under the terms of this Agreement. Deposit Holder has no obligation or duties with respect to any other agreements between Lender and Borrower to which it is not a party.

## AGREEMENT

1.    **Security Interest**

Deposit Holder acknowledges Lender's security interest in the Accounts. Borrower ratifies and confirms the security interests it has granted to Lender in the Accounts.

2.    **Control of Account by Lender; Borrower's Rights in Account**

2.1    This Agreement evidences Lender's control over the Accounts. Notwithstanding any separate agreement Borrower may have with Deposit Holder, Lender shall be entitled at any time to give Deposit Holder instructions as to the withdrawal or disposition of funds from time to time credited to the Accounts, or as to any other matters relating to the Accounts, all without further consent of Borrower. Deposit Holder shall, and is fully entitled to, rely upon any such instructions from Lender even if such instructions are contrary to any instructions or demands that Borrower may give to Deposit Holder.

2.2    Deposit Holder acknowledges and agrees that (i) in accordance with paragraph 2.1 above, it shall comply with the instructions originated by Lender in each case directing disposition of any funds from time to time credited to the Accounts without further consent of Borrower; (ii) Lender now has control of the Accounts for purposes of Sections 9312(b) and 9314 of the Uniform Commercial Code in effect in the State of California, (iii) unless and until Lender delivers an instruction to Deposit Holder to the contrary, Borrower shall have the right to make withdrawals or otherwise transact on the Accounts, and (iv) the Accounts will be maintained in the state of California as "deposit accounts" as defined in Section 9102(a)(29) of the Uniform Commercial Code in effect in the State of California. Notwithstanding anything to the contrary contained herein, if at any time Deposit Holder shall receive conflicting orders or instructions from Lender and

1

Borrower, Deposit Holder shall follow the orders or instructions of Lender, as applicable in accordance with paragraph 2.1, and not the orders or instructions of Borrower.

      2.3    Borrower represents and warrants to Lender and Deposit Holder that it has not assigned or granted a security interest in the Accounts, except to Lender. Borrower will not permit the Accounts to become subject to any other pledge, assignment, lien, charge or encumbrance of any kind, other than Lender's security interests referred to herein.

## 3.    Deposit Holder's Responsibility

      3.1    Deposit Holder shall have no duty to inquire or determine whether Borrower's obligations to Lender are in default or whether Lender is entitled, under any separate agreement between Lender and Borrower, to give any instructions relating to the Accounts. Deposit Holder shall have no responsibility or liability to Lender for complying with any order or instruction, whether oral or written, concerning the Accounts, except to the extent such compliance would violate (i) the provisions of this Agreement, or (ii) written instructions or orders previously received from Lender, but only if Deposit Holder had reasonable opportunity to act thereon (which, in any event, shall not exceed two Business Days). Deposit Holder shall not have any liability to Borrower or Lender for losses or liabilities resulting from any failure to comply with instructions relating to the Accounts or delay in complying with such instructions if the failure or delay is due to circumstances beyond Deposit Holder's reasonable control. Without limiting the foregoing, in no event shall Deposit Holder have any liability for indirect, punitive, exemplary or consequential loss or damages, including without limitation lost profits, whether or not any claim for such loss or such damages is based on tort or contract or Deposit Holder knew or should have known the likelihood of such damages in any circumstances.

      3.2    Upon reasonable opportunity (which, in any event, shall not exceed two Business Days) for Deposit Holder to act after receipt of Lender's instructions to that effect and continuing on each Business Day thereafter, Deposit Holder shall transfer all available balances in the Accounts to Lender at its account specified in such instructions. Borrower and Lender agree that Deposit Holder may deduct from the balances transferred reasonable and customary wire transfer fees for the transfer of such funds.

A "Business Day" is each day except Saturdays, Sundays and federal or state holidays on which commercial banks in Pasadena, California are permitted to close. Funds are not available if, in the reasonable determination of Deposit Holder, they are subject to a dispute or legal process preventing their withdrawal.

      3.3    Deposit Holder may rely on notices and communications it believes in good faith to be genuine and given by the appropriate party.

      3.4    Secured Party acknowledges and agrees that Deposit Holder's duties and obligations under this Agreement do not include any obligation to ensure Borrower's compliance with its obligation under the Security Agreement to deposit collections of its accounts receivable or any other proceeds of the Collateral (as defined in the Security Agreement) to an Account governed by this Agreement or to any other Account.

## 4.    Priority of Lender's Security Interests; Rights Reserved by Deposit Holder

4.1    Deposit Holder agrees that all of its present and future rights against the Accounts are subordinate to Lender's security interests therein; provided, however, that Lender agrees that nothing herein subordinates or waives, and that Deposit Holder expressly reserves, all of its present and future rights (whether described as rights of setoff, banker's lien, chargeback or otherwise, and whether available to Deposit Holder under the law or under any other agreement between Deposit Holder and Borrower concerning the Accounts) with respect to (a) items deposited to the Accounts and returned unpaid, whether for insufficient funds or for any other reason, and without regard to the timeliness of return of any such item; (b) automated clearing house entries which are rejected or returned unpaid; (c) claims of breach of the Uniform Commercial Code's transfer or presentment warranties made against Deposit Holder in connection with items deposited to the Accounts; and (d) Deposit Holder's usual and customary charges for services rendered in connection with the Accounts, to the extent that, in each case, Borrower has not separately paid or reimbursed Deposit Holder therefore.

5.    **Statements**

5.1    In addition to the original deposit account statement for the Accounts which is provided to Borrower, Deposit Holder will send duplicate statements to Lender. Borrower authorizes Deposit Holder to provide any additional information relating to the Accounts to the Lender upon its request without Borrower's further consent.

6.    **Notice of Adverse Claims; Record of Security Interest**

6.1    Deposit Holder represents to Lender that Deposit Holder has not received notice of any lien, encumbrance or other claim to the Accounts from any other person and has not entered into, and covenants with Lender that it will not enter into, any agreement with any other person by which Deposit Holder is obligated to comply with instructions from such other person as to the disposition of funds from the Accounts or other dealings with the Accounts. Deposit Holder will use commercially reasonable efforts, subject to applicable law, to promptly notify Lender if any other person claims that it has a property interest in the Accounts or seeks to enter into a deposit account control agreement or similar agreement with respect to the Accounts.

6.2    Deposit Holder further represents and warrants that it has marked its books and records to indicate Lender's security interests in and liens upon the Accounts.

7.    **Returned Items**

Borrower and Lender understand and agree that Deposit Holder will pay returned items by debiting the applicable Account. Borrower agrees to pay the amount of any returned item immediately upon demand to the extent that there are not sufficient funds in the applicable Account to cover such amount on the day of the debit. Lender agrees that Lender will pay within twenty (20) days after demand on Lender any such amount that is not paid in full by Borrower within twenty (20) days after demand on Borrower by Deposit Holder, up to the amount of proceeds of the Accounts received by Lender under this Agreement; provided that any such demand is made on Lender no later than 60 days after the termination of this Agreement.

8.    **Indemnity**

Borrower will indemnify Deposit Holder its officers, directors, employees, and Lender and

3

its officers, directors and employees against claims, liabilities and expenses arising out of this Agreement including all fees and costs incurred by Deposit Holder in complying with instructions' or requests given by Lender hereunder, and including reasonable attorneys' fees and disbursements and the reasonable estimate of the allocated costs and expenses of in-house legal counsel and staff, except to the extent the claims, liabilities or expenses are caused by Lender or Deposit Holder's gross negligence or willful misconduct.

9.    **Termination**

Lender may terminate this Agreement at any time by written notice to Deposit Holder and Borrower. Deposit Holder may terminate this Agreement on thirty (30) days' prior written notice to Lender and Borrower. Borrower may not terminate this Agreement except with written consent of Lender.

10.    **Governing Law.**

10.1    This Agreement will be governed by the internal laws of the state of California, without regard to principles of conflict of laws.

10.2    Deposit Holder's jurisdiction for purposes of Section 9304 of the Uniform Commercial Code shall be California.

11.    **Entire Agreement.** This Agreement is the entire agreement among the parties regarding the subject matter hereof and supersedes any prior agreements and contemporaneous oral agreements of the parties concerning its subject matter. This Agreement will control over any conflicting agreement between Deposit Holder and Borrower.

12.    **Amendments.** No amendment of, or waiver of a right under, this Agreement will be binding unless it is in writing and signed by Borrower, Lender and Deposit Holder.

13.    **Severability.** To the extent a provision of this Agreement is unenforceable, this Agreement will be construed as if the unenforceable provision were omitted.

14.    **Successors and Assigns.** The provisions of this Agreement shall be binding upon and inure to the benefit of Deposit Holder, Lender and Borrower and their respective successors and assigns.

15.    **Notices.** All notices, instructions and/or communications to a party under this Agreement will be in writing and will be sent to the party's address set forth below or to such other address as the party may notify the other parties.

Lender:            EXWORKS CAPITAL FUND I, L.P.
                   333 W. Wacker Drive, Suite 1620
                   Chicago, IL 60606
                   Attention: Robert Richardson
                   Email: rrichardson@exworkscapital.com

Borrower:          PENTHOUSE GLOBAL BROADCASTING, INC.
                   8944 Mason Street
                   Chatsworth, CA 91311

4

Attention: Kelly Holland
Email: chickmedia@gmail.com

Deposit Holder:         East West Bank
9300 Flair Drive, Suite 100W
El Monte, CA 91731
Attention: Central Relationship Service
Fax: 626.316.1175

16.    **Deposit Account Agreement.**

    The account shall also be governed by the Deposit Holder's Deposit Account Agreement and applicable fee schedules, provided however that in event of conflict, this Agreement shall control.

17.    **No agency, etc.**

    Nothing contained in this Agreement shall create any agency, fiduciary, joint venture or partnership relationship between or among Borrower, Lender and Deposit Holder.

18.    **Counterparts.**

    This Agreement may be executed in counterparts, each of which shall be an original, and all of which shall constitute one and the same agreement.

19. **JUDICIAL REFERENCE.** ALL DISPUTES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE RESOLVED BY A JUDICIAL REFERENCE PROCEEDING PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE § 638. THE JUDICIAL REFEREE APPOINTED TO DECIDE THE JUDICIAL REFERENCE PROCEEDING SHALL BE EMPOWERED TO HEAR AND RESOLVE ANY OR ALL ISSUES IN THE PROCEEDING, WHETHER OF FACT OR LAW.

[Signature Pages Follow]

**LENDER:**

EXWORKS CAPITAL FUND I, L.P.

By: _____

Robert Richardson
Vice President


**BORROWER:**

PENTHOUSE GLOBAL BROADCASTING,
INC., a Delaware corporation

By: _____
Name: _____
Its: _____


**DEPOSIT HOLDER:**

East West Bank, a California banking
corporation

By: _____
~~Doug Krause~~ Maita Prout, SVP & Deputy GC
~~Executive Vice President, Chief Risk Officer~~
~~& General Counsel~~

Signature Page to Deposit Account Control Agreement (Springing)

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

**10100 Santa Monica Boulevard, 13ᵗʰ Floor, Los Angeles, California  90067**

A true and correct copy of the foregoing document entitled **TRUSTEE'S REPLY TO OBJECTIONS TO (1) MOTION FOR ORDER APPROVING SETTLEMENT WITH DREAM MEDIA, INC., AND (2) MOTION FOR ORDER APPROVING SALE OF SUBSTANTIALLY ALL ASSETS AND RELATED RELIEF; DECLARATIONS OF WALTER BOWSER AND LINDA F. CANTOR** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On <u>May 2, 2018</u>, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL:**
On_____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method <u>for each person or entity served</u>): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on <u>May 2, 2018</u> served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

*Tobe Served Via Legal Vision Messenger on May 3, 2018*
Honorable Martin R. Barash
U.S. Bankruptcy Court - Central District of California
21041 Burbank Boulevard, Suite  342/ Courtroom 303
Woodland Hills, California  91367

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 2, 2018 | Janice G. Washington | /s/ Janice G. Washington |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
DOCS_LA:313974.5 32277/001

**F 9013-3.1.PROOF.SERVICE**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**

Russell Clementson on behalf of U.S. Trustee United States Trustee (SV)
russell.clementson@usdoj.gov

James A Dumas, Jr on behalf of Creditor NOA Productions SPRL
jdumas@dumas-law.com,
jdumas@ecf.inforuptcy.com

James A Dumas, Jr on behalf of Creditor Penthouse Global Broadcasting, Inc.
jdumas@dumas-law.com,
jdumas@ecf.inforuptcy.com

Allan B Gelbard on behalf of Other Professional Allan B. Gelbard
xxxesq@aol.com,
Allan@GelbardLaw.com

David Keith Gottlieb (TR)
dkgtrustee@dkgallc.com,
dgottlieb@iq7technology.com,rjohnson@dkgallc.com,akuras@dkgallc.com

David W. Meadows on behalf of Interested Party Courtesy NEF
david@davidwmeadowslaw.com

Krikor J Meshefejian on behalf of Creditor Interested Party
kjm@lnbrb.com

Alan I Nahmias on behalf of Interested Party Courtesy NEF
anahmias@mbnlawyers.com,
jdale@mbnlawyers.com

Aram Ordubegian on behalf of Creditor LSC Communications US, LLC / Creel Printing
ordubegian.aram@arentfox.com

Hamid R Rafatjoo on behalf of Creditor Committee The Official Committee of Unsecured Creditors
hrafatjoo@raineslaw.com,
bclark@raineslaw.com;cwilliams@raineslaw.com

S Margaux Ross on behalf of U.S. Trustee United States Trustee (SV)

margaux.ross@usdoj.gov

Michael St James on behalf of Creditor Interested Party
ecf@stjames-law.com

Michael St James on behalf of Interested Party Michael St. James
ecf@stjames-law.com

Howard Steinberg on behalf of Creditor Greenberg Traurig, LLP
steinbergh@gtlaw.com,
pearsallt@gtlaw.com;laik@gtlaw.com

Cathy Ta on behalf of Interested Party Penthouse Clubs Worldwide, LLC
cathy.ta@bbklaw.com,
Arthur.Johnston@bbklaw.com;lisa.spencer@bbklaw.com

United States Trustee (SV)
ustpregion16.wh.ecf@usdoj.gov

Michael H Weiss on behalf of Attorney Weiss & Spees, LLP
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor Danni Ashe, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor GMI Online Ventures, Ltd.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor General Media Communications, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor General Media Entertainment, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
DOCS_LA:313974.5 32277/001

F 9013-3.1.PROOF.SERVICE

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Penthouse Digital Media Productions,
Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Global Broadcasting, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Global Digital, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Global Licensing, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Global Media, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Global Publishing, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Images Acquisitions, Ltd.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Pure Entertainment Telecommunications,
Inc. fka For Your Ears Only, Ltd.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Streamray Studios, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor Tan
Door Media, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
XVHUB Group, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Christopher K.S. Wong on behalf of
Creditor LSC Communications US, LLC
/ Creel Printing
christopher.wong@arentfox.com

Beth Ann R Young on behalf of Creditor
Dream Media Corporation
bry@lnbyb.com

Beth Ann R Young on behalf of Creditor
Interested Party
bry@lnbyb.com

Brian L. Davidoff
bdavidoff@greenbergglusker.com

Jonathan Hayes
jhayes@SRHLawFirm.com

Peter W. Lianides
plianides@wcghlaw.com

Mark S. Horoupian
mhoroupian@sulmeyerlaw.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012
DOCS_LA:313974.5 32277/001

F 9013-3.1.PROOF.SERVICE

1
2

**U.S. Bankruptcy Court**
**Central District of California (San Fernando Valley)**
**In re Penthouse Global Media, Inc., Case No. 18-10098-MB**

3

**3.   SERVED VIA ELECTRONIC MAIL**
**PDF FORMAT**: *Via Electronic Mail*

4

MARK A. MINTZ, admitted pro hac vice
mmintz@joneswalker.com
JONES WALKER LLP
201 St. Charles Ave., Suite 5100
New Orleans, LA  70170
Tel: (504) 582-8000 / Fax: (504) 589-8368

Brian L. Davidoff
bdavidoff@greenbergglusker.com

Mark S. Horoupian
mhoroupian@sulmeyerlaw.com

5
6
7

8

General Counsel for Penthouse Clubs Global Licensing, LLC, Penthouse Clubs Worldwide,
LLC, and Kirkendoll Management, LLC

9

JOSEPH E. BAIN, admitted pro hac vice
jbain@joneswalker.com
JONES WALKER LLP
811 Main St., Suite 2900
Houston, TX  77002
Tel: (713) 437-1820 / Fax: (713) 437-1917

10
11
12

13

General Counsel for Penthouse Clubs Global Licensing, LLC, Penthouse Clubs Worldwide,
LLC, and Kirkendoll Management, LLC

14

MARC J. WINTHROP, State Bar No. 63218
mwinthrop@wcghlaw.com
PETER W. LIANIDES, State Bar No. 160517
mwinthrop@wcghlaw.com
WINTHROP COUCHOT GOLUBOW HOLLANDLLP
1301 Dove Street, Suite 500
Newport Beach, CA 92660
Tel: (949) 720-4100 / Fax: (949) 720-4111

15
16
17
18

19

Local Counsel for Penthouse Clubs Global Licensing, LLC, Penthouse Clubs Worldwide, LLC,
and Kirkendoll Management, LLC

20

John Kirkendoll
jkirkendoll@kirkmgmt.com

21

22

Kelly Holland
kholland@penthouse.com

23

24

Walter Bowser
wbowser@provincefirm.com

25

26

Aram Ordubegian
aram.ordubegian@arentfox.com

27

28

Allan Benjamin Gelbard
XXXEsq@AOL.com

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

5