| | |
|---|---|
| PAUL SIGELMAN, SBN 45954<br><br>433 NORTH CAMDEN DRIVE<br><br>Suite 970<br><br>Beverly Hills, CA  90201<br><br>(310) 278-8011<br><br>FAX: (310) 278-2254<br><br><br><br>☐ Individual *appearing without an attorney*<br>☒ *Attorneys for: Androcles Entertainment Pty Ltd,* | FOR COURT USE ONLY |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA -  SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>      PENTHOUSE GLOBAL MEDIA, INC., a<br>      Delaware corporation,<br><br>               Debtor.<br>------------------------------------------------------------<br>Penthouse Global Broadcasting, Inc.,<br>Penthouse Global Licensing, Inc.,<br>Penthouse Global Digital, Inc.,<br>Penthouse Global Publishing, Inc.<br>GMI Online Ventures, Ltd.,<br>Penthouse Digital Media Productions, Inc.,<br>Tan Door Media, Inc.<br>Penthouse Images Acquisitions, Ltd.,<br>Pure Entertainment Telecommunications, Inc.,<br>XVHUB Group, Inc.,<br>General Media Communications, Inc.,<br>General Media Entertainment, Inc.,<br>Danni Ashe, Inc. Streamray Studios, Inc.,<br><br>☒ Affects All Debtors<br><br><br><br><br><br>                       Debtor(s) | CASE NO.: 1:18-bk-10098-MB<br>Jointly Administered With:<br><br>Case No. 1:18-bk-10099-MB,<br>Case No. 1:18-bk-10101-MB,<br>Case No. 1:18-bk-10102-MB,<br>Case No. 1:18-bk-10103-MB,<br>Case No. 1:18-bk-10104-MB,<br>Case No. 1:18-bk-10105-MB,<br>Case No. 1:18-bk-10106-MB,<br>Case No. 1:18-bk-10107-MB,<br>Case No. 1:18-bk-10108-MB,<br>Case No. 1:18-bk-10109-MB,<br>Case No. 1:18-bk-10110-MB,<br>Case No. 1:18-bk-10111-MB,<br>Case No. 1:18-bk-10112-MB and<br>Case No. 1:18-bk-10113-MB<br><br>CHAPTER: 11<br><br>**ANDROCLES ENTERTAINMENT PTY LTD.**<br>**PROPOSED CHAPTER 11 PLAN**<br>**DATED May 9th 2018**<br><br>Confirmation Hearing/Status Conference<br>Date:      May 9,2018<br>Time:      1.30pm<br>Courtroom: 303<br>Address:   21041 Burbank Blvd<br>               Woodland Hills,  California |

THE PLAN – The Plan Proponent is Androcles Entertainment Pty Ltd a creditor of the Debtor.

The Plan proponent purchased by assignment a claim from Spiegler Girls Inc a creditor claim owed by Penthouse Global Broadcasting Inc.

This Chapter 11 Plan (Plan) proposes to restructure the financial affairs of the above-named Debtor(s) (collectively, Debtor).  If confirmed, this Plan will bind all persons it provides for, whether or not they accept this Plan, object to confirmation, file a proof of claim or interest, or have their claims or interests allowed.

   **Voting:**  You may be entitled to vote on this Plan.  A Chapter 11 Disclosure Statement (Disclosure Statement) that accompanies this Plan explains the voting rules and provides additional information.

   **Caution:** *Your rights may be affected.  Read these papers carefully and discuss them with your attorney. (If you do not have an attorney, you may wish to consult one.)*

   **Effective date:**  This Plan becomes effective (Effective Date) on the 15th day following the entry of a non-stayed and non-appealed confirmation order on the docket, or, if that is not a business day, then the next business day.  *Exception:*  the Plan proponent may waive the condition that the confirmation order not be subject to a pending appeal.

   **Definitions and rules of construction** are as set forth in the Bankruptcy Code (11 U.S.C. section (§) 101 and following) and in the Federal Rules of Bankruptcy Procedure (FRBP or Rules).  *See* §§ 101, 102 and 1101 and Rule 9001.  All exhibits to this Plan are considered part of this Plan but, in the event of any conflict between this Plan and its exhibits, the terms of this Plan control.


## INTRODUCTION


The Plan recognizes that the Debtor entities listed for the purposes of hearing are Administratively Consolidated but have not, as at the date of filing, been substantively consolidated into one group of corporate entities. This means that under The Plan they cannot be addressed as a single Debtor for the purposes of The Plan, Payment or Voting Structure(s), as they represent distinct economic and legal units.

The Plan addresses four distinct Debtor Groups being:

## Group A


PENTHOUSE GLOBAL MEDIA INC and all wholly owned subsidiaries that include

Penthouse Global Digital, Inc.,
GMI Online Ventures, Ltd.,
Penthouse Digital Media Productions, Inc.,
Tan Door Media, Inc.
Penthouse Images Acquisitions, Ltd.,
Pure Entertainment Telecommunications, Inc.,
XVHUB Group, Inc.,
General Media Communications, Inc.,
General Media Entertainment, Inc.,
Danni Ashe, Inc.
Streamray Studios, Inc.

## Group B

**Penthouse Global Licensing Inc**

Owned 10 percent by Penthouse Global Media Inc and 90 percent by Kelly Holland and Kelly Holland Trust.


## Group C

**Penthouse Global Broadcasting Inc**

Owned 100 percent by Kelly Holland and Kelly Holland Trust.


## Group D

**Penthouse Global Publishing Inc**

Owned 100 percent by Kelly Holland and Kelly Holland Trust.


The word Debtor in The Plan includes all four groups unless the context demands otherwise.

Debtor Groups B, C and D are treated as stand alone entities under The Plan as they are not legally wholly owned subsidiaries of Penthouse Global Media Inc.

The Plan treats the creditors of each group distinctly for payment and voting purposes. The Plan proponent reserves the right to amend The Plan should the court rule to substantively consolidate in law, Debtor Groups A, B, C and D into a single debtor pool.

The following realities flow from The Plan structure that creditors of respective group entities must be made aware of.

The Secured Lender Dream Media Inc has finance agreements and filed UCC, Patent and Copyright Security interests against Group A and Group B entities via assignments of the Loan Agreement previously held by ExWorks Capital Fund No 1 (ExWorks). In those entities within those groups, if and to the extent the secured lender enjoys a perfected security interest, it shall rank ahead of other creditors claims as detailed under The Plan.

In relation to groups C and D these entities have not executed the Secured Lender finance documents and the Secured Lender has not filed UCC claims over collateral in these entities.

The Secured Lender, if they enjoy a perfected interest in relation to Groups A and B, may be able to assert a claim against the Group C and D entities collateral assets.

The Plan is conditional upon a court finding that Dream Media Inc secured lenders claims are capable of perfection, are in fact perfected and are perfected against Group C and D entities in addition to Group A and B entities.

Under The Plan creditors other than the Secured Lender of Group A entities only enjoy claims against Group A.

Under The Plan creditors other than the Secured Lender of Group B entities only enjoy claims against Group B.

Under The Plan creditors of the Group C entity only enjoy claims against the Group C entity.

Under The Plan creditors of the Group D entity only enjoy claims against the Group D entity.

The Plan proceeds upon the basis of the following approach which best creates a fair and equitable outcome for all creditor claimants relative to each distinct creditor pool of each respective debtor group. Indeed given the facts in play no other approach is tenable absent the certainty afforded from the yet to be ruled upon Court issues.

The Plan confines all Administrative Claims as defined under The Plan to Group A for both technical legal and practical purposes given that The Plan pays out such claims 100% on the Effective Date of the Plan.

The Plan confines all Priority Claims as defined under The Plan relating to employees to Group A as, on information provided, Penthouse employees were contracted through Group A entities.

The Plan confines all Unsecured Creditor Claims as defined under The Plan to the respective debtor group that incurred the respective debt. *For Example, a creditor claimant of Penthouse Global Broadcasting Inc only claims against that entity and a creditor claimant of Penthouse Global Publishing Inc against that entity.* The Plan in seeking equity between claimants, absent a Court Order for substantive consolidation, matches creditor claims and the offer made under The Plan to the respective assets and liability profile of each debtor group.

The Secured Lender Dream Media Inc has finance agreements, UCC security interest filings, USPTO trademark security interest filings and Copyright Office security interest filings against various entities but not ALL Group A and B debtor entities. The Plan proceeds upon account for various legal outcomes that, at the date of Plan filing, are unknown in relation to the Secured Lender. The outcomes envisaged include but are limited to court findings that a proposed settlement with the secured lender is within the legal capacity of parties, code and court, that the amount currently claimed as being due, is correct and claimable, that the loan is perfected over all collateral that has been to date claimed. That if perfected, the liquidation value can in the current legal climate be assessed and or is even capable of legitimate valuation and determination given composition of the debtor group pool referenced.

Debtor Assets: The Plan references collateral that is currently owned by distinct debtor groups. Absent a court ruling the respective entity assets remain subject to as yet unknown legal outcomes. The Plan addresses the current reality of the following factual matters as informed by Penthouse executive officers.

The major asset engine of the Penthouse Group flows from legacy trademarks and copyrights owned by Group A entities. Currently no licensing agreement(s) or board minutes to use these marks exists between Group A entities and the separately owned Group B, Group C and Group D entities.

Since formation of the current operations in early 2016 given no formal licenses exist, the operating entities have operated via presumably implied licenses between Debtor Group A entities and the separately owned entities in Group B, Group C and Group D whilst having distinctly different stock ownership.

Post petition filing, such use has continued while in the Debtor In Possession phase and after the appointment of a Chapter 11 Trustee. The technical problem is how such lack of licensing impacts third party Licensees relying upon the legal viability of Penthouse Licenses. Without a license agreement structure, formalizing the use of legacy trademarks and copyrights owned by Group A entities, the business value of and ability to operate, Group B, Group C and Group D entities in Licensing, Broadcasting and Publishing remains highly problematic. Indeed without such a license, these entities remain media operating businesses devoid of media assets to exploit. The case may be that a license may be implied where appropriate for the term of any current third party license. The Plan seeks, in the plan structure, to solve this problem.

LANHAM Act Section 10 provides no trademark may be assigned without related business goodwill. A technical problem The Plan addresses, is the fact that legacy trade marks are held in various Group A entities *but* current business operating goodwill is owned primarily  in Group B, Group C and Group D entities. To assign trademarks under The Plan the trademarks owned in Group A entities must move with the business goodwill owned by Debtor Group entities in Groups B, Group C and Group D.  Movement of trademarks by sale of the entity or trademark divorced from underlying business goodwill of the mark terminates the trademark. The factual reality of Group entity separation is the the value of all Penthouse business entities is

hostage to this constraint. Nothing can be sold separately without damaging individual entity value and over all Penthouse business value. This fact alone pervades any ability to split these business entities up for the purpose of sale.

## Trademark Security

The Plan proponent due diligence team has done an initial review and confirmed security interests, in favor of the previous secured lender Ex Works Capital Fund One LP (ExWorks), are filed against a wide range of legacy trademarks owned by various Group A Debtor entities. Ongoing due diligence review is still underway. The Plan proponent reserves the right to amend The Plan in light of any adverse due diligence findings. To date, the Plan proponent can find no assignment of the Secured Lender Dream Media Inc on the trademark security interest records. One issue revealed in due diligence was the assignment of Penthouse Clubs trademark owned by Group A entity General Media Communications Inc to Penthouse Global Licensing Inc a Group C entity. This is somewhat problematic in that no new security interest was filed on behalf of the then secured lender of record ExWorks against the moved mark now owned by Penthouse Global Licensing Inc which as outlined has significantly different shareholding.

The Plan proponent has to date found two UCC security interest filings by ExWorks (an initial filing dated 2/19/2016 and an Amendment dated 3/30/2017) and one assignment to DreamMedia dated 11/22/2017 against the major legacy trademark owning entities General Media Communications Inc and General Media Entertainment Inc in New York which is the domestic state in which both entities were organized and where UCC filings should be made. The assignment of the filing to Dream Media may be problematic if the trademarks moved inside the Penthouse Club Deal to Penthouse Global Licensing are found to be part of a fraudulent transfer. Likewise incorrect movements may render the trademark voidable. This could severely impact the collateral or indeed render it void. Due diligence continues on this matter.

The substantive economic value of Penthouse is in legacy trademarks, legacy copyrights, new copyrights and business goodwill in licensing and related out-put agreements. The Secured Lender has no filed UCC interests against Group C and D entities and limited UCC filing in relation to Group B entities. Given this collective reality The Plan seeks to address the economic implications of potential defects in the Secured Lender claims to a perfected interest in collateral.

## Club License

The Penthouse Club License granted in 2017, for $2,600,000 for ten years is currently an executory contract subject to rejection or assumption. Due diligence to date revealed that the only trademark moved from General Media Communications Inc to Penthouse Global Licensing Inc was Penthouse Club Trademark . The Penthouse Club License proceeded upon the factual representation that Penthouse Global Licensing Inc had legal capacity via direct legal ownership in eight key legacy trademarks. Unfortunately only one, being the Penthouse Clubs trademark is owned by that entity according to USPTO records. The other seven marks licensed through Penthouse Global Licensing Inc appear in fact to be still owned by General Media Communications Inc a Group A entity. In result, the Penthouse Club License, effectively Licenses trademarks not owned by the Licensor. The License is potentially void due to material defect and fraudulent conveyance. The ability to move assets being any of the trademarks including the Penthouse Club mark is highly problematic due to the Lanham Act and creditor probity.

To move trademarks from Group A entities and the grasp of creditor claimants of Group A to a legally unrelated Group C creditor claimant pool, create, potential creditor class inequality. Penthouse Global Licensing Inc is an affiliate not a legal subsidiary. The Secured Lender and Club License sought to move the key economic value of Group A entities outside the grasp of Group A creditors other than the Secured Lender and the Club Licensee. The Plan addresses the potential problem of recapture of The Penthouse Club mark as a fraudulent transfer. Due diligence revealed Group A was technically insolvent at the time of the transfer. Indeed a sum of $590,000 was redrawn following receipt of the proceeds of the Penthouse Club Fee (via the formation of a new Term Loan Account) to repay overdue interest on the Revolver loan. Part of the initial Fee

sum ($1,250,000) received was applied to  principal reduction of the term debt . Group A debts were at this time under default interest rates from the Secured Lender and had been for many months. This behavior indicates the Secured Lender was aware of the perilous position it held in relation to its security interests.

Penthouse Global Licensing : any third party licenses granted by this entity face the reality that the Licensor entity does not own the trademark and at best may only enjoy an implied right to enter such licenses. Until the fate of such licenses is resolved The Plan must proceed on the cautionary basis that this entity must be liquidated.

## Cash Collateral

Post petition, numerous court rulings have been contested by Dream Media Inc as secured lender, asserting a claim to all filed Debtor entity cash flow. The formal finance agreements, filed UCC and control account agreements show that the Secured Lender has NO perfected interests in the cash flow of Penthouse Broadcasting (Group C) and Penthouse Publishing (Group D) and only a tenuous claim over Licensing.  These entities represent 75% of all revenues. The Trustees filings of Group cash flow as filed do not account for this reality. The Plan seeks to reflect the legal reality of entity asset ownership balanced against creditor claimants per entity. The Plan reflects high payments to asset rich entities relative to creditor claimant. Indeed, due diligence may reveal Publishing and Broadcasting were, subject to legal findings, never legally insolvent entities

## The Plan Structure

The Plan has been crafted as stated to adapt to four potential legal realities yet to mature. The Plan will operate to change in light of any of the following

## Lack of Legal Capacity To Approve Secured Lender Settlement.

First, the Trustee and Secured Lender have tendered a Settlement Agreement for the court to sanction. This assumes legal capacity in the Trustee exists to make such a settlement and in the Court to sanction it. The US Trustee through a Department of Justice Statement in December 2017 stated that it would not sanction any Bankruptcy Court filings involving breaches of The Controlled Substances Act. This in effect barred cannabis companies from Federal Court Bankruptcy court filing. Past this, it also barred the US Trustee and all appointed by them from entertaining transactions that would involve, dealing with or making payments too, businesses in breach of the Controlled Substances Act. Recent decisions in Federal Bankruptcy Court reflect this stance on the basis that a crime in one Federal Court jurisdiction cannot use another Federal Court jurisdiction to perfect that crime. In essence cases, known as the accomplice cases, bar Chapter 11 Trustee from entering into or dealing with transactions that would breach the Controlled Substances Act. A recent trademark case barred a chapter 11 Trustee from Licensing a Trademark to a Cannabis business operating in breach of the Controlled Substances Act.

The Court, during sworn evidence heard that Dream Media Inc purchased in November 2017 the Secured Loan held by ExWorks via a note for note deal. This deal was supported by $1,000,000 in Stock in Stony Hill Inc, a known cannabis company. Dream Media Board members in due diligence asserted that Dream Media Inc was a wholly owned subsidiary of Oreva Capital Inc. Oreva Capital Inc consults to, owns stock in and is prime Reg A promoter for High Times Inc a self confessed known cannabis industry company as stated in related SEC Filings that themselves echo such sentiments.

The Plan seeks a ruling as to whether the purchase of the note by use of Stony Hill Capital as Side Collateral and involvement of Dream Media Inc parent in the cannabis industry amount under Federal Law to breaches of the Controlled Substances Act.

In the event the court finds in the affirmative then The Plan seeks clarification that the ,Trustee (under DOJ policy and recent court cases) has the  legal ability and capacity to enter into and complete a settlement

agreement. The settlement additionally contemplated a set aside of Vice Token and Club Licenses based off trademarks that would instantly disappear if owned by a Cannabis company operating in breach of the Controlled Substances Act.

Further, the remaining licenses depend on visibility of the Penthouse Brand through broadcast visibility and magazine profile. Cannabis company status may  lead to FCC determination and other negative global broadcast license determinations as well as potential marketing and advertising breaches under the CSA.

Such a finding could void the Secured Loan in its entirety. In the event the court determines the loan is not enforceable the sum set aside in the Plan for the Secured Lender would then be paid to make all creditors unimpaired.

## Inability to determine Secured Loan Balance and Validity.

Second : the perfected claim is a major legal issue in terms of the initial amount of the claim . Despite hours of due diligence, still no certainty exists in the ability to perfect the claim and therefore determine the accurate value or standing of the secured loan. To date the only statements of value have been filings by and limited testimony of the Secured Lender who purchased the loan within a week of incorporation and relied upon others to conduct due diligence on the lien and attached collateral. Despite direct requests to see the actual loan ledger all that has been offered is a summary of debt and value. The trustee in depositions admitted to merely accepting a spread sheet. In due diligence, executive officers of Penthouse revealed, the initial lender was no longer interested in providing such data as it was no longer their loan despite the the current Secured Lender DreamMedia's claims that it does not know, ever had or currently has, access to such data and that ExWorks continues to manage the debt for them.

Despite a lack of such evidence a comprehensive review of loan documents, statements and court filings has been undertaken and reveals a conflicted picture, one where no certainty as to the true debt amount can be immediately arrived at. The Plan proponent for the benefit of all creditors will seek detailed affirmation of the loan Value. The Court has been told by the Secured Lender, which has to date been accepted by the Trustee and who seemingly proceeded under the notion, that the lender has only one claim being the total loan value. The Plan due diligence team has uncovered debts comprises of three loans, a six million dollar interest only revolver, a three million dollar principal and interest term loan and a third loan which is unsecured, undocumented and unperfected.   The term loan agreement provides that it cannot be amended to, added to or redrawn therefore the third loan cannot be connected to the original term loan and impacts the veracity of the lending documentation and collateral. Further documents of the Secured Lender shoe clearly the establishment of the third loan.

The Penthouse Club Licensee Agreement fee of 2,600,000 was held hostage by the Secured Lender demanding a bulk reduction to the Term Loan of $1,250,000, a success fee to ExWorks of $500,000 and a new Term Loan of $590,000 to clear defaults on the revolver OR the transaction would not be sanctioned effected by ExWorks and the trademarks would not be moved. This effectively makes the Lender party to the commercial transaction which resulted in the moving of significant collateral to a third party, to effect the License Agreement. The Secured Lender appears to have conducted this transaction in the full knowledge that the Debtor was in default as evidenced by the default interest rate of 23%. The NEW Term Loan was not documented as a new advance and instead was redrawn on the existing Term Loan immediately following the Bulk reduction of $1250000. Principal repayments were not reset.   This now places the original loan agreements in breach of the loan covenants and without court ruling we are unable to conclude if either or both of the Term Loans are void or if the entire loan structure is now irrevocably compromised.

It is clear that had the license fee payments been placed to the Revolver and the Term Loan remained without amendments and within its remaining approved term more than ample monies would have been available to meet the business day to day needs and all creditors of the business would have had equal standing. It is likely that the business would not  be in the default situation that it finds itself today.

The Plan Proponent seek clarification of these arrangements as, it relates to fees, a potential  fraudulent transfer designed to place the secured lender in a preferential position over other creditors and the standing of

the loan following the covenant breach. The execution of the preferential creditor position  is now what the secured lender and trustee seek court approval of, under the mooted settlement agreement.

The reality is that even the deepest due diligence has still not revealed the true facts the court are now being asked to bless and assume as fact. The Plan Proponent has over three months of due diligence asked many, many times to see the ExWorks ledger. The mystery ledger promised by counsel for the secured lender has never been produced. Every time, it literally fails to appear.

Indeed, the best effort was the offer of a summary. The effort the Trustee took and blessed as per his recent deposition. The most basic standard of proof by the Secured Lender has not been met. Indeed, there appears to have been a concerted effort to NOT  produce either witness statements form Ex Works NOR the ledger.

The facts presented in the light of no other answer than those portended by the facts above. A math application cannot as yet reveal the true loan balance in a way that gives any confidence.

Lack of certainty over the Loan balance in relating to each separate note has not been addressed or resolved to date to the satisfaction of The Plan Proponent. In fact the first Term Loan if it can be perfected was over 12 months in advance when Dream Media Inc launched State court action against the Debtor.


The perfection of the security and a lack of ability to perfect said security has been discussed by the Trustee, the Trustees lawyers with DreamMedia according to testimony from the Trustee who stated insufficient money exists to challenge DreamMedia.  This will clearly be to the detriment of all unsecured creditors allowing an unperfected and likely unenforceable lender to take precedent over legitimate creditors.


The net results is The Plan Proponent awaits a court determination on all the foregoing matters that touch upon the amount and validity of the loan and or related security interest perfections under the note and related notes. The Plan has been orchestrated to account for multiple outcomes to address various court findings. The Plan Proponent reserves the right to further amend The Plan in light of future court rulings on the Secure Loan and related notes.

## Ranking of Creditors-Secured Interest Perfection.

Third, a key factor in Chapter 11 proceedings is determination of any Secured Lender security perfection over debtor collateral ahead of other classes of creditor claimant. The Secure Lender appears based on due diligence performed for the Plan proponent to not have perfected security interests over much of the core collateral. If this is in fact the case then the Secured Lender must compete if they have a viable loan claim with other creditors classes to be paid from the collateral they do not have a perfected security interest in.

UCC filings over trademarks owned by General Media Communications Inc and General Media Entertainment Inc must be clarified in light of the dubious transaction effectively causing the lender a preference position against other creditors and the movement of core collateral to a third party. . Both entities filed extensive security interest claims over key Penthouse marks in the USPTO. However, trademark office filings while giving notice of security interests do not perfect them, only proper UCC filings do. If there turns out to be an improperly filed UCC filing relating to these two entities then the high asset value marks they contain are not perfected security interests.

No Finance Agreements or UCC filings have been entered into by either Penthouse Broadcasting or Publishing.

This collectively appears to mean the goodwill of those entities is not subject to the secured lender security interest. The business reality is that both businesses enjoy goodwill as media entities including on licenses, subscription agreements and output deals. Goodwill can be sold without trademark or copyright licenses going forward regardless of whether or not those businesses continue to distribute Penthouse trademarked and copyright materials The reverse however is not true. None of the legal media entities in Group A can sell the marks they own without the active goodwill of these enterprises as to do so would be to void the mark under the provisions of the Lanham Act.

Copyright interests in all material whether, written or filmed since the February 2016 belong as new creative works exclusively to Penthouse Broadcasting and Publishing respectively. Such works are NOT under a filed or perfected UCC.

The secured lender may claim that it has a perfected security interest in property transferred from Group A entities to Group B, C and D entities. However, the legal reality is that this claim may not be established by the facts as presently known. The Group A entities own all legacy trademarks and copyrights that have been used by those entities in day to day operations other than for the penthouse club marks that were moved without named and valuable consideration.

The marks used are used on an implied basis and can be ended without court order instantly. In a real sense no ongoing right to use marks or copyright exists meaning that the property has never left the security interest if it exists relating to Group A UCC filings to the degree they exist. The use of the marks and copyrights has been more than paid for by millions of dollars of payments for their use by Group C and D. New works created, absent Penthouse Branding, are the sole property of those entities and as such the new Film Library created since 2016 and magazine content is beyond the security umbrella of any UCC filing. We note that to even assert a perfect security interest in transferred property that the property would have to first be subject to a valid UCC filing. This, is at the time of filing is still not at a level of due diligence that the Plan proponent can attest to.

The ability to enjoy a perfected UCC filing assumes a loan that is both valid from inception and is not a fraudulent transfer at the time of creation. Each new loan requires a new UCC to perfect a security interest. No UCC was filed for  the new loan and if filing of March 2017 is  for the botched existing Term Loan it is likely to be in breach of the lending covenants. . As noted, the USPTO does not show a security interest being filed over the Penthouse Club license. The USPTO on all security interests only lists Ex Works as lender of record and not Dream Media Inc as assignee. The Plan Proponent due diligence has yet to identify, absent much needed court ruling on, the loan value and loan legal composition as to either a one, two, three or no loan status what the answer may be to the perfected security question. The Plan addresses, as best it can, the legal vulnerability identified by what flows from past and current court filings by the Debtor In Possession, Secured Lender and Trustee.

The Plan Proponent notes that three debtor entities exist outside the United States that have not been subject to Chapter 11 filings. The argument that the UCC applies to Broadcast and Publishing fails to account for the fact that these entities also have not been subject to perfected UCC filings. The factual reality is that  Ex Works when secured lender ,charged for monthly collateral audits. Ex Works did not identify the operating assets of these entities or choose to secure same as part of their collateral pool during their tenure as secured lender. Further, the CLUB license deal mechanics points to the fact that Ex Works well knew in 2017 that the three revenue entities were beyond the reach of any existing filed UCC. ExWorks required Penthouse Global Licensing in March 2017 an affiliated non debtor group A consolidated entity to become a loan obligor but did not seek that status for either Publishing or Broadcasting. The Plan Proponent believes the UCC register to the extent it exists must be notice to all creditors. The facts import that the Secured Lender knew but failed to register a UCC and so unsecured creditor claimants should in such a circumstance prevail.

## Liquidation Value  Analysis

Four, a key Bankruptcy Code provision impacting the proposing of any plan and related disclosure statement is the need to provide a liquidation value analysis of debtor collateral value.

The Plan Proponent seeks to amend The Plan subsequent to and contingent upon, court rulings that must in the circumstances flow before any form of Court ready liquidation analysis can be reasonably provided. Currently there is, in the view of The Plan Proponent, a lack of sufficient legal or accounting or valuation fact certainty that could enable such an analysis to be done. Simply the facts as they stand cannot be reasonably relied upon by The Plan Proponent nor any Creditor claimants considering The Plan.

The basis for this assertion comes from the facts that Group B, C and D debtor entities are separate legal entities from each other and from all Group A entities. Each entity in these three groups own assets that

themselves are problematic as to ownership due to undocumented use of trademarks and licenses owned by other entities in all groups. Inter company debts of Group B, C and D are technically at this point separate levels of respective assets and creditor claim against or for each respective entity. The technical validity of the debt or asset is problematic as some may or may not amount to fraudulent transfers as and between each other. The inability to see defined accounting for all four groups that actually reflects the true facts is a major handbrake on any attempt at valuation. A further problem is the application of the Lanham Act as it impacts goodwill assessment, ownership and valuation. No professional accounting or valuation firm could or should in the opinion of The Plan proponent provide a viable liquidation analysis given the facts and legal uncertainty in play. This reality is yet another reason to not approve a Settlement with the Secured Lender without determination of the many legal problems referenced in the Plan. Different valuation out comes may flow from as yet unknown facts and court rulings.

## THE PLAN MECHANICS

The legal, business, accounting and valuation uncertainties as identified by The Plan proponent create the need for a clean certain legal structure, payment method and voting path for all creditor claims. A mechanical solution that creates equity and fairness is the key behind The Plan and the only way to address creditor claimants fairly.

The ability to create a business buyout that solves rather than adds to the chaos on foot is a critical Plan focus.

The ability to get clean accounting data and viable liquidation analysis absent court rulings has shaped The Plan.

Given the uncertainties at play, the Plan proponent will file an amended plan specifying detailed financial information once the ability to create it with legal certainty exists.

The Plan in the face of this imprecise fact scenario cannot and has not proceeded to be based upon or secured by any debtor entity assets and their related financial feasibility, legal existence or actual value.

Instead The Plan is all cash and or cash equivalents based on funds and collateral that are not part of the debtor entities of any group. Specifically no existing or future Penthouse Group Assets are being used to fund The Plan other than by condition that any intra debtor entity be applied to pay existing entity debts in the entity holding that cash if any. The purpose of the plan approach is to avoid the impossible. Essentially it is possible to provide to creditors viable financial data or adequate valuation as at the date of filing of the plan. This being the case it is impossible to offer creditors debt interest in ongoing debtor current assets that may or may not exist.

The Plan proponent has elected instead to introduce fresh capital that is certain and to make the offers contained in the plan to pay off creditor claimants.

### Hybrid

The Plan combines both elements of a Business Going Concern buy out and a Liquidation of Going Concern Buy Out. The hybrid approach is due to the separate legal interest in play as identified in the different debtor groups identified under the plan.

The ability to liquidate key Group A entities is a core plan condition as to do otherwise is to invite uncertain legal outcomes.

### The Buy Out Process

The Plan Proponent will form a California domiciled entity Penthouse Capital to act as The Plan buy out entity and to become upon formation the The Plan Proponent.

All payments under the Plan shall, whether made in cash or in cash equivalents, occur on the Effective Date of The Plan and shall act as satisfaction in full of all payment obligations made under The Plan.

The Plan Proponent shall infuse Penthouse Capital Inc the buy out entity with cash and cash equivalents sufficient to meet the Plan Buy Out obligations due on the Effective Date of The Plan. Such infusions at the sole discretion of the plan proponent manifest in equity and or debt interests in the Buy Out entity.

## Business Operating Debtor Entity Business Stock Buy Outs

The buy out entity shall purchase  the following debtor business entities in full by way of acquisition of stock and by confirmed investment funding in each entity being acquired for that entity to upon the Effective Date pay out all valid creditor claims as certified by the Court as at the Effective Date.

## Penthouse Global Broadcasting Inc

The buy out entity shall acquire 100% of the stock for $1,100 dollars from the current stock holders conditional on providing sufficient investment funding to the entity to payout all creditor claims certified by the Court under the Plan as being due on the effective date.

## Penthouse Publishing Inc

The buy out entity shall acquire 100% of the stock for $1,100 dollars from the current stock holders conditional on providing sufficient investment funding to the entity to payout all creditor claims certified by the Court under the Plan as being due on the effective date.

## Penthouse Global Media Inc

Penthouse Global Media Inc shall sell 100% of the Stock in the following entities to the Buy Out Entity for a stock price to be agreed under a tax sharing agreement with the Trustee that is acceptable to the Trustee, the purchaser and court together with the obligation under The Plan to provide investment funding to pay the collective entity credit claims as detailed under the plan to the creditor claimants.  Entities to be sold by Penthouse Global Media Inc to the Buy Out Entity include the following:

 , .
GMI Online Ventures, Ltd.,
Penthouse Digital Media Productions, Inc.,
Tan Door Media, Inc.
Penthouse Images Acquisitions, Ltd.,
Pure Entertainment Telecommunications, Inc.,
XVHUB Group, Inc.,
General Media Communications, Inc.,
General Media Entertainment, Inc.,
Danni Ash Inc
Steamray Studio Inc.

*The purchase of all entities will be subject to the following conditions under The Plan,*

- Approval by the Court on the Confirmation Date of the Plan.
- The Plan not being withdrawn on or before the Effective Date of the Plan.
- The Buy Out entity reserves the right to delete or add to the entities being purchased that are currently owned by Penthouse Global Media Inc that may or may not be the subject to the debtor court filings to date.
- All entities and assets being acquired and liquidation of entities proceeding as per the plan on the Effective Date.
- The Plan being approved on the Confirmation Date.

- Due Diligence not revealing in the sole opinion of the Plan Proponent any adverse information impacting The Plan.
- Legal rulings or lack thereof making The Plan unworkable in the sole opinion of The Plan Proponent.
- Amended Filings being made to address the Code Disclosure Statement obligations.
- Ability of the Plan Proponent to Amend the Plan and entity acquisition and related funding detailed under The Plan.
- The Liquidation of Business entities envisaged under the Plan proceeding.
- Transfer of all entities to be free and clear of all creditor claimant liabilities under the Plan and all law suits as at the Effective Date of the Plan.
- The full release of Kelly Holland and any all interests of Holland and her trust under the guarantee /obligor.
- Subject to transfer of all Licenses in the existing entities as at the date of filing remaining in those entities without grant of material licenses not sanctioned under The Plan.

### Debtor Business Entity Assets being acquired by the Buy Out Entity.

The Buyout entity shall acquire under a tax sharing agreement approved of by the Trustee and the Court (100%) one hundred percent of the assets in the following entities free and clear of all liens, debts and encumbrances.

The purchase price in each case shall be sufficient to meet that entities creditor claims as detailed under the payment structure detailed in the Plan.

The following entities shall sell assets as a going concern including all tangible and intangible assets owned by the entity as at the Confirmation Date of the Plan.

The assets shall include but not be limited to all physical plant and equipment, office furniture and lessee fixture and fittings, accounts receivable, trademarks, trade names, copyrights whether registered or unregistered, real estate leases, licenses, output agreements, subscription agreements, all business goodwill, web site digital names and related content, cash, the Humboldt Lock Box Account, the Secured Lender Sweep Account Lock Box, Caligula License Agreement and due fee, ICO License Agreement and fee once approved of by the Court, Vice Token License Agreement assumed and all proceeds. The buy out entity may elect to assume or reject the Club License subject to court ruling as to legal validity and related legal claims being resolved to the entire satisfaction of The Plan Proponent.

### The Business Liquidation Obligations

The Plan is conditional on the Stock Owners of the entities specified electing to as from the Effective Date to Liquidate the following entities so they no longer exist.

- Penthouse Global Media Inc;
- Penthouse Global Licensing, Inc.,
- Penthouse Global Digital, Inc.,
- Penthouse Digital Media Productions, Inc.,

The liquidation of the above mentioned entities is conditional upon all creditor claimants under the Plan being paid in full on The Effective Date of The Plan.

The Plan Proponent reserves the right to amend The Plan to add to or reduce the number of entities that are subject to liquidation at the date of the Plan.

The Plan Buy Out mechanics as detailed set up the basis for funding the payment of all creditor claimants out of non debtor assets other than for cash assets being acquired and identified under the plan to the extent they exist. No security over debtor stock or assets acquired under The Plan is being given to creditors to satisfy Plan payment obligations. This in the opinion of the Plan Proponent is the only way to proceed given the uncertainties in play and as identified under The Plan.

**CREDITOR PAYOUTS UNDER THE PLAN**

The following Pay Out Schedule details the payouts offered under The Plan to each creditor class relative to each entity group. The Plan details each group and each creditor class separately for the purposes of the Plan due to the current legal status of the legal entities involved.

The Plan proceeds on the basis that court and all creditor classes accept as a term of The Plan that all Administrative Claims detailed under The Plan are due and payable by Penthouse Global Media Inc.

The Plan proceeds on the basis that court and all creditor classes accept as a term of The Plan that all Priority Claims detailed under The Plan are due and payable by Penthouse Global Media Inc.

The Plan proceeds on the basis that court and all creditor classes accept as a term of The Plan that the Secured Lender Claims under The Plan are due and payable by Penthouse Global Media Inc and wholly owned entities to the extent the claim is UCC perfected within each entity over each collateral asset class.

The Plan Proceeds on the basis that there are no administrative, priority or secured lender claims due and payable by any group B,C and D entities.

In short, each of those entities are liable only to unsecured creditor claims incurred by and within each entity and confined to that entity collateral pool that is being acquired under The Plan whether by stock or asset purchase.

**Penthouse Global Licensing Inc** 98% - Impaired as to 2% Voting - $65,276  in Claims

As at the date of filing Penthouse Global Licensing Inc subject to further due diligence and claim bar creditor claims as per Schedule A of $65,276

Payment under The Plan shall be made equal to 98% of creditor claims on the effective date in cash.

**Cash Payment $63,970**

**Penthouse Global Publishing Inc** – 98% - Impaired as to 2% Voting - $677,220 in Claims

As at the date of filing Penthouse Global Publishing Inc subject to further due diligence and claim bar creditor claims as per Schedule A of $677,720.

Payment under The Plan shall be made equal to 98% of creditor claims on the effective date in cash.

**Cash Payment $663,675**

**Penthouse Global Broadcasting  Inc** – 98%– Impaired as to 2% Voting $437,436

As at the date of filing Penthouse Global Broadcasting.  Inc subject to further due diligence and claim bar creditor claims as per Schedule A of $437,436.

Payment under The Plan shall be made equal to 98% of creditor claims on the effective date in cash.

**Cash Payment $428,688**

**Group A Creditors include PGMI +Digital**

**Penthouse Global Digital Inc** 50%– Impaired as to 2% Voting $128,554

As at the date of filing Penthouse Global Digital.  Inc subject to further due diligence and claim bar creditor claims as per Schedule A of $128,554

Payment under The Plan shall be made equal to 50% of creditor claims on the effective date in cash.

**Cash Payment $64,252**

**Penthouse Global Media Inc** as holding entity for all wholly owned entities shall be paid as follows upon the Effective Date:

**Administrative Expenses  $1,443,299**  100% non impaired non voting as per Schedule A

The prospective level of Administrative Expenses as detailed to the court as at June 30th, 2018 is projected to be $ 1,443,299 subject to legal challenge and court approval The Plan proposes to pay all Administrative creditor claims 100% in cash upon the Effective Date Of The Plan.

**Priority  Expenses $50,000** 100% non impaired non voting as per Schedule A

The prospective level of Priority Expenses as detailed are projected to be $ 50,000 subject to legal challenge and court approval The Plan proposes to pay all priority creditor claims 100% in cash upon the Effective Date Of The Plan.

**Secured Lender $3,000,000** Impaired – Voting as stated in Schedule A.

The Plan Proponent subject to approval of the Secure Lender and legal consent in relation to the Court of the capacity to sanction the payment to settle the Secured Lender claim under The Plan offer $3,000,000 to settle the secured lender claims under the Revolver Note, Term Loan and any other loan whether secured or not.

Payment to be made **$2,000,000 in cash and by way of $1,000,000 c**ash equivalents approved by The Plan Proponent and Secured Lender both paid and supplied on the Effective Date of the Plan.

The Secured Lender to have no ongoing claim over, secured or non secured interests of the Buy Out Entity, entities acquired under the Plan or Assets being acquired under The Plan.

The Offer is subject to proof and court ruling that the Secure Lender has a free and clear perfected security interests and the loan covenants for all three advances are not impaired.

The Offer is subject to the Secured Lender releasing all claims to collateral in Penthouse Global Media wholly owned entities, entities not in Chapter 11 proceedings, and all Group B, C and D entities, Kelly Holland and the Kelly Holland trust holdings

**Unsecured Creditors Group A**   impaired  as to 50% voting – Claims $1,303,278

As at the date of filing Penthouse Global Media Inc and all wholly owned entities subject to further due diligence and claim bar creditor claims as per Schedule A of  $1,303,278

Payment under The Plan shall be made equal to 50% of creditor claims on the effective date in cash.

**Cash Payment $651,394**

**Insider Claims**

Currently are subject to determination by the Trustee as to quantum and validity. The Plan will be amended to reflect the settlement of these claims once resolved.

**Plan Offer Conditions**

*The Plan offer to creditors is made subject to the following conditions:*

- The Claims per creditor class if they exceed the levels stated under the plan must be approved of before the plan confirmation date by the Plan proponent.

- The Claims being paid being validated as due and owing by the court.

- The acquisition of all entities and assets proceeding on the Effective Date as intended

- The liquidation of all entities nominated being liquidated on the Effective Date

- Subject to The Plan Proponent right to amend The Plan at any time before the Confirmation Date.

- The Plan due diligence in the sole discretion of The Plan proponent finding matters adverse to The Plan.

- Legal rulings post the filing of the plan impacting the value of the plan or target buyout stocks or assets being acquired.

- The ability in the sole discretion of The Plan proponent to develop adequate financial data, confirmation of assets and liquidation value analysis to support a disclosure statement to the degree required under The Plan.


**PLAN FUNDING – Payments - Funds**

The ability to complete the funding of creditor sources comes from the following sources that are either in cash or cash equivalents approved as per The Plan.

**Total Plan Payments On The Effective Date Of The Plan**

**Payments**

$2,000,000   Secured Lender – Cash Portion Group A

$1,443,299   Administrative Creditors – Group A

$50,000   Priority Creditors Group A

$715,646   Unsecured Creditors Group A  - PGMI $ 651,394 + Digital $64,252

$63,970   Unsecured Creditors Group B – Licensing

$428,688   Unsecured Creditors Group C – Broadcasting

$663,675   Unsecured Creditors Group D -  Publishing


$5,365,278

**Payment in Cash Equivalents**

$1,000,000 Secured Lender  - Group A


**On the effective date of the Plan. The Plan Proponent to fund The Plan Requires $5,365,278 in cash and $1,000,000 in cash equivalents for Total Plan Funding Of $6,365,278.**

## Sources Of Funding

The Plan Proponent on or before the date of confirmation the plan must fund The Plan.

Plan Funding shall come from the following resources that shall be utilized at the Effective Date of the Plan to make the payments due under The Plan.

The Plan funding and payment needs may or may not change before the confirmation date.

The Plan proponent reserves the right to amend, withdraw or resubmit The Pla

**Cash Resources**

$400,000  Humboldt Lock Box

$50,000  Sweep Account Lock Box

$200,000  Caligula License Fee

$1,000,000  Androcles License Fee

$3,715,278 Cash Infusion Into Buy Out Entity by Plan Proponent.


**$5,365,278 Total Cash Required At The Effective Date**

**Cash Equivalents $1,000,000 infusion to the Buy Out Entity by Plan Proponent**

**Cash Infusion $3,715,278 + $1,000,000  cash equivalents create $4,715,278 infusion to match funding needs required as at the Effective Date of The Plan.**

No account has been taken of Vice Token Proceeds and or Club License Fees, these revenues if they occur will incur for the sole benefit of the buy out entity.

Alternate Plan Funding Dispositions

In the event the court finds the secured lender claim to be unsecured and or unperfected then the following Plan outcomes shall flow.

The amount made available to the Secured Lender as an impaired and voting party shall not proceed.

Instead the cash sum of $2,000,000 currently slated as being paid to the Secured Lender under The Plan shall be paid to the Unsecured Creditor pool of Group A creditors to be added to the existing sum dedicated to payment of Group A unsecured creditors. The added sums will be tendered as full and final satisfaction of all unsecured creditors in that pool divided pro rata. This will change the payout from 50% to another number dependent  upon the level of proven secured lender debt that than ranks as an unsecured creditor.

In the event the Secured Lender debt is recast as subordinate creditor debt the sum offered to the Secured Lender shall be withdrawn. The amount payable to unsecured creditors upon such an event shall be increased to 98%.

In the event the Secure Lender debt is negated and the loans slated as unenforceable by the court then the amount payable to unsecured creditors upon such an event shall be increased to 98% of those Group A creditor claims.

## THE PLAN

The Plan is conditional upon the following conditions being met on or before the Confirmation Date:

- Assumption of Vice Token License.
- Assumption of the premises lease at 8944 Mason Ave.
- Rejection of Club License.
- Approval of Caligula License.
- Receipt of Caligula License Fee of $200,000.
- Approval of Androcles Entertainment Pty Ltd License
- Recipient of Androcles License Fee of  $1,000,000.
- Agreement to transfer Humboldt lock box of $400,000 minimum on the Effective Date.

- Agreement to Transfer Sweep Account Lock Box $50,000 minimum on the Effective Date.
- Approval of the settlement with the Secured Lender for $3,000,000 on Plan Terms.
- All creditor classes able to vote, voting for the Plan.
- The Plan Disclosure Statement  being approved by the Court in limited form due to nature of plan buyout and existing facts.
- The Plan buy Out, creditor class structure and payment mechanic being approved by the court.
- The court making sufficient legal decisions to provide clarity in relation to debtor assets and liabilities.
- Court rulings not adversely impacting the plan.
- Due diligence not revealing materially adverse facts detrimental to the plan.
- All major license, subscription and output agreements remaining on foot.
- All major broadcast license and deliver capability remaining viable.
- A tax sharing agreement being reached with the Trustee and approved by the Court.
- Approval by the court of the legal ability under the Controlled Substances Act to make and or facilitate a payment to the Secured Lender.
- Transfer of all assets being purchased free and clear of all encumbrances, liens and liabilities.
- No settlements being made by the Trustee the negatively impact the value of The Plan Asset Buy Out
- The consent of Kelly Holland the Kelly Holland Trust to sell stock in Penthouse Global Publishing Inc and Penthouse Global Broadcasting Inc under the Plan Terms,
- The consent of Kelly Holland and the Kelly Holland Trust to liquidate Penthouse Global Licensing Inc.
- All inter entity inter group debts being determined and resolved to the entire of satisfaction of The Plan Proponent and approved by the courts.
- Kelly Holland being released from all personal liability under the secure loan.
- Kelly Holland obtaining an employment contract acceptable to her and the court with Penthouse Capital Inc as at the effective date.
- The Secured Lender releasing the 40% Stock Warrant in full together with any rights including a right to appoint directors to any current debtor entities.

## PLAN RISKS

The Plan Proponent has identified the following Risks that may negatively impact creditors of the debtor:

- A court ruling to substantively consolidate all the debtors will effectively require a new plan be filed. In such an event some creditors will be paid lower sums than under the plan presented.
- The court approving a settlement with the secured lender and or penthouse club license that negatively impacts the plan as proposed.
- The Plan not being approved by the court.
- The Plan Disclosure Statement not being approved by the court.
- Plan creditors not voting for the Plan.
- Secured lender not accepting the Plan terms.

- The Plan Proponent electing to not proceed with the Plan prior to the confirmation date.

- Key elements of the Plan Funding not being in place on or before the Confirmation Date.

- The Plan being amended negatively in relation to payment of creditor claims.

- Delay in progressing and non approval of The Plan negatively impacting asset values and administrative liabilities thereby decreasing the pay out to creditors from the debtor estate.

- Inability to create a tax sharing arrangement favorable to the debtor and Plan Proponent

- The Plan being unable to be perfected due to insufficient legal certainty relating to debtor asset and liabilities.

- Inability of the debtor to sustain ongoing administrative liabilities in the event the plan is delayed for more than 120 days.

- Supervening negative events impacting the debtor and The Plan prior to the date of The Plan Confirmation including but not limited to loss of broadcast licenses, broadcast capability, output deals, subscription refunds due to magazine delivery cancellations and loss of printing capability. Loss of trademark registration due to loss of business goodwill under the Lanham Act.

- Increased law suit liability due to secured lender and Penthouse Clubs License litigation.

- Loss of key stuff in operating entities prior to the Confirmation Date negatively impacting The Plan.

- Loss of CEO Kelly Holland and or key management prior to the Confirmation Date negatively impacting The Plan.

**The Plan Proponent -** Certificate of Incorporation is attached.

**The Buy Out Entity -** Board Of Directors shall include Kelly Holland and three directors nominated by The Plan Proponent who reserves the right to amend The Plan to add Director details upon appointment. The nature and terms of Kelly Holland appointment will be disclosed in subsequent Plan Amendments.

## PLAN ARTICLES

### ARTICLE I.  TREATMENT OF CLAIMS AND INTERESTS

SUMMARY:  Exhibit A to this Plan shows how claims and interests are treated, as qualified and explained below.

A. Unclassified claims.  Some claims are unclassified (because they cannot vote and, unless the claim holder agrees otherwise, their treatment is fixed by the Bankruptcy Code).  These claims include costs of administering this bankruptcy case (Administrative Claims), such as professionals' fees and expenses. Administrative Claims bar date:  The last day to file a request for payment of Administrative Claims is 28 days after the Effective Date or such other date as the court may order

B. Classified claims.  All other claims and interests are separated into one of the following classes. Classes 1 and 2 are for claims "secured" by collateral – such as a mortgage/deed of trust (DOT), a secured car loan, or any other claim secured by a lien on property of the bankruptcy estate (Collateral).  Class 3 is for "priority" unsecured claims, class 4 is for general (nonpriority) unsecured claims, and class 5 is for "interests" (defined below).  All classes are divided into subclasses for each unique type of claim (class 1A, 1B, 2A, 2B, etc.).

**Class 1: Claims secured by principal residence.** This class is reserved for claims secured *only* by real estate that is an individual Debtor's principal residence.  If you hold that type of claim then it cannot be modified by this Plan unless you consent. *See* § 1123(b)(5).  (If Debtor is not an individual, or if there is no such claim, then class 1 should be left blank.)

**Class 2: Other secured claims.**  Dream Media Inc as Secured Lender under The Plan is being offered $3,000,000 on the Effective Date of the Plan to settle their claim. In the event. Settlement of the Secured Lender claim is not accepted and approved by the Court the Plan proponent reserves the right to amend The Plan to reduce or increase the offer or to adjust a The Plan Terms to all for a Cram Down under the Code provisions relating to that procedure.

**Class 3: Priority Claims.**  A claim has "priority" if it is entitled to certain special treatment under § 507.  For example, if Debtor owes you wages that you earned within 180 days before the bankruptcy petition was filed, then you may hold a priority claim for those unpaid wages.  Under past group net operating tax losses no tax priority claims are currently being claimed by the IRS against any debtor entity.

**Class 4: General Unsecured Claims.**  If you hold a claim that is not secured and is not entitled to priority, then you hold a general unsecured claim. The plan proposes all unsecured claims in group B, C and D entities being paid 98% of their claim. The Plan proposes all Group A unsecured creditors being paid 50% of their claim. The Plan provides for a change in unsecured creditor payment if the secured loan is reduced to unsecured status.

**Class 5 consists of "interests."**  If Debtor is an organization then "interests" means ownership interests (such as corporate stock, or a partner's interest in a partnership).  The Plan envisaged either the 100 percent sale of stock in entities specified or liquidation of all entities not being acquired. Under the Plan the Buy Out entity Penthouse Capital Inc will be the 100% Owner of all acquired entities. In the event the Secured Lender claim is Subordinated to an equity level interest the Plan envisages nonpayment of the claim.

**C. Disputed claims or interests.**  A claim or interest is Disputed if (1) an objection has been filed against it or (2)(a) it is not listed on Debtor's bankruptcy schedules, or it is listed as disputed, contingent, or unliquidated, and (b) no proof of claim or interest has been filed.  *See* §§ 502(a), 1111(a).  *Exception:* a claim or interest ceases to be Disputed once it is allowed by a final non-appealable order.

**D. Distributions.**

The Trustee shall distribute the cash and cash equivalents on the Effective Date of Plan to the Creditors as provided under The Plan as per the Terms of The Plan Confirmation Order.

**E. Settlement.**

Debtor will have the power and authority to settle or compromise any claim by or against Debtor, subject to notice and court approval under Rule 9019 for as long as the court retains jurisdiction, except that for any claims *against* Debtor no notice or court approval is necessary if the allowed amount of such claim under the settlement or compromise will be less than $10,000.

## ARTICLE II.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES

On the Effective Date, Debtor's "executory" contracts (described in the Disclosure Statement) and unexpired leases will be

(a) assumed (*i.e.,* cured and reinstated) as obligations of the reorganized Debtor operating entities being purchased under the Plan as operating entities all existing licenses, subscription, output agreements and related business contracts Or

(b) in relation to asset purchases from all entities being liquidated under The Plan all existing licenses, leases, contracts, subscription agreements, output agreements are deemed to be assumed and then instantaneously assigned as follows including but not limited to The Vice Token License, Caligula

License, Androcles Entertainment Pty Ltd license, and the lease of premises at 8944 Mason Ave but excluding the Penthouse Club License Agreement as rejected in (c).

(c) In relation to asset purchases the Penthouse Club License in Penthouse Global Licensing shall be rejected on the grounds of imperfection and inability to perfect.  In the event the Penthouse License by way of Court Order is assumed then the License will be purchased under the Plan. The purchase of the Penthouse Club License under a The Plan is conditional upon the rejection of the License not being upheld.

The order confirming this Plan will constitute an order approving this paragraph's treatment of executory contracts and unexpired leases.

**Rejection bar date.**  Any claim arising from the rejection of an executory contract or unexpired lease under the immediately preceding paragraph must be filed by the later of (1) the general bar date for claims or (2) 28 days after the date of the order confirming this Plan.  Rejection claims are general unsecured claims in class 4, unless the claim is allowed as a priority claim in class 3.

## ARTICLE III.  MEANS OF IMPLEMENTATION

**Funding.**  This Plan will be funded as explained herein and as further described in the Disclosure Statement. All transfers of property under this Plan shall be made in accordance with any applicable provisions of non-bankruptcy law to the extent required by § 1129(a)(16).

The Disbursing Agent  shall be the Trustee as the context for each Debtor Group  requires  under the terms of the Plan in relation.

## ARTICLE IV.  DISCHARGE; EFFECTS OF CONFIRMATION

**A. Discharge.**   Debtor shall receive a discharge of debts to the extent and at the time provided in § 1141(d), whether or not a party in interest has filed a proof of claim or interest, or accepts this Plan, unless the court orders otherwise.

**B. Vesting of Property.**   On the Effective Date, all property of the bankruptcy estate will vest in the reorganized Debtor pursuant to § 1141(b) & (c), free and clear of all claims and interests except as otherwise provided in this Plan. In the case of Debtor entities being acquired as going concerns the transfer of those entities shall be subject to approval of the Plan Proponent as to title to assets and liabilities being assumed.

**C. Plan Creates New No Obligations.**   Post the effective date of The Plan upon payment as provided for under The Plan the debtor entities being acquired, the buyout entity and all assets being acquired shall not be subject to any claims that have been settled and paid for under the Plan.

## ARTICLE V.  GENERAL PROVISIONS

**A. Modification of Plan.**   The Plan proponent may modify this Plan at any time before confirmation, subject to § 1127 and Rule 3019(a), but in that event the court may require a new disclosure statement and/or revoting on the Plan.  The Plan proponent or the reorganized Debtor also may seek to modify this Plan at any time *after* confirmation (1) if this Plan has not been substantially consummated and (2) if the court authorizes the proposed modifications after notice and a hearing (§ 1127(b)).  In addition, if Debtor is an individual then Debtor or other persons may seek to modify this Plan after confirmation pursuant to § 1127(e).

**B. Cramdown.**   The Plan proponent reserves the right to seek to amend The Plan and related confirmation notwithstanding the rejection of this Plan by one or more classes of creditors or interest holders, pursuant to § 1129(b).

**C. Governing Law and Binding Effect.**   Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or Rules), the laws of the State of California govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided

in this Plan. The rights and obligations of any entity named or referred to in this Plan shall be binding upon and shall inure to the benefit of the successors and assigns of such entity.

**D. Quarterly Fees.**  Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) after confirmation shall be paid to the United States Trustee in accordance with that statute until entry of a final decree, or entry of an order of dismissal or conversion to chapter 7.

**E. Closing Case, and Post-Confirmation Status Report.**  As soon as practicable under Rule 3022, the Plan proponent shall file a motion with the court to obtain a final decree to close this bankruptcy case, unless good cause is shown to keep this case open.  As long as this case is not closed, the Plan proponent must file status reports every 120 days explaining what progress has been made toward substantial consummation of the confirmed Plan.  The status report must be served on the United States Trustee, the official creditors' committee (or, if none, then the twenty largest general unsecured creditors), and those parties who have requested special notice.

**F. Retention of Jurisdiction.**  After confirmation, the court retains and may exercise jurisdiction over proceedings concerning:  (1) whether Debtor is in material default under this Plan, (2) whether the time for performing any Plan obligation should be extended, (3) adversary proceedings and contested matters pending as of the Effective Date or specifically contemplated in this Plan or in the Disclosure Statement to be filed with the court, (4) whether the case should be dismissed or converted to one under chapter 7, (5) any proceedings to allow or disallow claims or administrative expenses (the court will not review professional fees incurred after the Effective Date, unless otherwise stated in attached exhibits to the Plan or Disclosure Statement), (6) settlements or compromises under Rule 9019, (7) any proceedings under §§ 110, 329, or 362, or regarding sanctions, and (8) any other proceedings, whether or not commenced or contemplated as of the Effective Date, regarding the implementation, interpretation, or enforcement of this Plan or the administration of the bankruptcy case or estate.  This retention of jurisdiction, however, will end on the later of (a) two year(s) (if blank, then two years) after the Effective Date, (b) as to any then-pending adversary proceeding or contested matter, when it is finally resolved by a judgment or order, or (c) as to an individual Debtor's discharge, when that discharge is granted or denied by final order.

# SCHEDULE A CREDITORS BY CLASS

Debtor Unsecured Creditors By Group as per Court filings:

To the contrary, the facts show that PGMI's operating affiliates are separate entities having

separate creditors and separate assets.  For example, PGMI and its operating affiliates have the following

unsecured creditors:

| PGMI | $1,303,788.77 | Schedule E/F 18-10098 Dkt. No. 164 at p. 2 |
|------|---------------|---------------------------------------------|
| Broadcasting | $437,435.73 | Schedule E/F 18-10099 Dkt. No. 30-2 at p. 2 |
| Publishing | $677,219.31 | Schedule E/F 18-10103 Dkt. No. 23 at p. 3 |
| Digital | $128,553.63 | Schedule E/F 18-10102 Dkt. No. 25-1 at p. 2 |
| Licensing | $65,275.86 | Schedule E/F 18-10101 Dkt. No. 25-2 at p. 2 |
| Total | $2,612,273.30 | |

Likewise, because they are in different lines of business, they have very different assets.  Holland Decl. ¶

9.  Broadcasting and Publishing generated revenues of $5,186,340 and $2,659,327 respectively in 2017.

Id. at ¶ 10.  Whereas, the Debtors total revenues for that year were $10,221,887.  Id.  This shows that a

substantial portion of the aggregate value of the Debtors can be attributed to Broadcasting and Licensing.

Taken as whole, these facts demonstrate that the Trustee and DMC cannot meet the steep requirements of

**Penthouse Global Licensing Inc** 98% - Impaired as to 2% Voting - $65,276  in Claims

As at the date of filing Penthouse Global Publishing Inc subject to further due diligence and claim bar creditor claims as per Schedule A of $65,276

Payment under The Plan shall be made equal to 98% of creditor claims on the effective date in cash.

Cash Payment $63,970

**Penthouse Global Publishing Inc** – 98% - Impaired as to 2% Voting - $677,220 in Claims

As at the date of filing Penthouse Global Publishing Inc subject to further due diligence and claim bar creditor claims as per Schedule A of $677,720.

Payment under The Plan shall be made equal to 98% of creditor claims on the effective date in cash.

**Cash Payment $663,675**

 **Penthouse Global Broadcasting  Inc** – 98%– Impaired as to 2% Voting $437,436

As at the date of filing Penthouse Global Broadcasting.  Inc subject to further due diligence and claim bar creditor claims as per Schedule A of $437,436.

Payment under The Plan shall be made equal to 98% of creditor claims on the effective date in cash.

**Cash Payment $428,688**


## Group A Creditors include PGMI +Digital

**Penthouse Global Digital Inc** 50%– Impaired as to 2% Voting $128,554

As at the date of filing Penthouse Global Broadcasting.  Inc subject to further due diligence and claim bar creditor claims as per Schedule A of $128,554

Payment under The Plan shall be made equal to 50% of creditor claims on the effective date in cash.

**Cash Payment $64,252**


**Penthouse Global Media Inc** as holding entity for all wholly owned entities shall be paid as follows upon the Effective Date:


**Administrative Expenses  $1,443,299**  100% non impaired non voting


As Per Trustee Court Filing

| ADMINISTRATIVE EXPENSES (Note 1) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Debtor counsel  (Note 2) | 72,863 | 112,757 | 20,135 | 205,755 | - | - | - | - | - | 205,755 |
| UCC counsel | - | 80,000 | 20,000 | 100,000 | 20,968 | 25,000 | 25,000 | 25,000 | 95,968 | 195,968 |
| Special Litigation I | - | - | - | - | - | 6,000 | 30,000 | 30,000 | 66,000 | 66,000 |
| Special Litigation II | - | - | - | - | - | - | 3,050 | 3,050 | 6,100 | 6,100 |
| UST Quarterly fee | - | - | - | - | - | 20,346 | - | - | 20,346 | 20,346 |
| Ch.11 Trustee bond | - | - | - | - | 5,000 | - | - | - | 5,000 | 5,000 |
| Trustee | - | - | - | - | 31,885 | 29,688 | 19,173 | 24,097 | 104,843 | 104,843 |
| Trustee counsel | - | - | - | - | 264,266 | 100,021 | 75,000 | 50,000 | 489,288 | 489,288 |
| Trustee's financial advisor | - | - | - | - | 170,000 | 100,000 | 50,000 | 30,000 | 350,000 | 350,000 |
| **Total Administrative Expenses** | 72,863 | 192,757 | 40,135 | 305,755 | 492,119 | 281,055 | 202,223 | 162,147 | 1,137,544 | 1,443,299 |


The prospective level of Administrative Expenses as detailed to the court as at June 30th, 2018 is projected to be $ 1,443,299 subject to legal challenge and court approval The Plan proposes to pay all Administrative creditor claims 100% in cash upon the Effective Date Of The Plan.

**Priority  Expenses $50,000** 100% non impaired non voting

The prospective level of Priority Expenses as detailed are projected to be $ 50,000 subject to legal challenge and court approval The Plan proposes to pay all priority creditor claims 100% in cash upon the Effective Date Of The Plan.

**Secured Lender $3,000,000** Impaired – Voting.

The Plan Proponent subject to approval of the Secure Lender and legal consent in relation to the Court of the capacity to sanction the payment to settle the Secured Lender claim under The Plan offer $3,000,000 to settle the secured lender claims under the Revolver Note, Term Loan and any other loan whether secured or not.

Payment to be made **$2,000,000 in cash and by way of $1,000,000 c**ash equivalents approved by The Plan Proponent and Secured Lender both paid and supplied on the Effective Date of the Plan.

The Secured Lender to have no ongoing claim over, secured or non secured interests of the Buy Out Entity, entities acquired under the Plan or Assets being acquired under The Plan.

The Offer is subject to proof and court ruling that the Secure Lender has a free and clear perfected security interests and the loan covenants for all three advances are not impaired.

The Offer is subject the Secured Lender releasing all claims to collateral in Penthouse Global Media wholly owned entities, entities not in Chapter 11 proceedings, and all Group B, C and D entities,Kelly Holland and the Kelly Holland trust

**Unsecured Creditors Group A**   impaired  as to 50% voting – Claims $1,303,278

As at the date of filing Penthouse Global Media Inc and all wholly owned entities subject to further due diligence and claim bar creditor claims as per Schedule A of  $1,303,278


Payment under The Plan shall be made equal to 50% of creditor claims on the effective date in cash.

**Cash Payment $651,394**

**Insider Claims**

Currently are subject to determination by the Trustee as to quantum and validity. The Plan will be amended to reflect the settlement of these claims once resolved.

Summary – Total Claims Paid At Effective Date $5,365,278

$3,000,000 Secured Creditor Settlement

$1,443,299 Administrative Claims

   $50,000 Priority Claims

$1,871,979 Unsecured Creditor Over Groups A, B,C and D

# SCHEDULE B
# CERTIFICATE
# INCORPORATION

# Certificate of Registration of a Company

**ASIC**
Australian Securities & Investments Commission

This is to certify that

**ANDROCLES ENTERTAINMENT PTY LTD**

**Australian Company Number 624 032 177**

is a registered company under the Corporations Act 2001 and is taken to be registered in Victoria.

The company **is limited by shares.**

The company is a **proprietary** company.

The day of commencement of registration is **the twenty-fifth day of January 2018.**

CERTIFICATE

Issued by the
Australian Securities and Investments Commission
on this twenty-fifth day of January, 2018.

Peter Kell
Acting Chairman

# SCHEDULE C
# CLAIM ASSIGNMENT

## CLAIM ASSIGNMENT

Spieglergirls, Inc. and Mark Spiegler, being a creditor claimant under the Penthouse Global Broadcasting Inc Chapter 11 proceeding, hereby assign full interest in and title to my claim for $500 to Androcles Entertainment Pty Ltd for full consideration provided this 8th day of May, 2018.

Mark Spiegler

CEO

Spieglergirls, Inc

# SCHEDULE D
# CORPORATE EXECUTION

Signature

Debtor or other Plan proponent

Date: 7/5/2018

Printed name of signer:
WILLIAM SAUNDERS & GRANT LENAARTS

Organization (if applicable):
ANDROCLES ENTERTAINMENT PTY LTD

Title (*e.g.*, President): DIRECTORS

# PROOF OF SERVICE OF DOCUMENT

I am 18 years old or older and not a party to this bankruptcy case or adversary proceeding.  My business address is:

433 NORTH CAMDEN DRIVE, Suite 970, Beverly Hills, CA  90201

A true and correct copy of the foregoing document entitled: **ANDROCOLES ENTERTAINMENT PTY LTD PROPOSED CHAPTER 11 PLAN DATED MAY 9 2018** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 05/09/2018, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

See NEF for confirmation of electronic transmission to the U.S. Trustee and any trustee in this case, and to any attorneys who receive service by NEF

☐ Service information continued on attached page

**2.  <u>SERVED BY UNITED STATES MAIL</u>**:  On (*date*) 05/09/2018, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  <u>SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL</u>** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) 05/09/2018, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Chambers of the Honorable Martin R. Barash, Bankruptcy Judge, 21041 Burbank Boulevard, Woodland Hills, CA  91367

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 05/09/2018 | Paul Sigelman | /s/ Paul Sigelman |
|------------|---------------|-------------------|
| *Date* | *Printed Name* | *Signature* |

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**

Russell Clementson on behalf of U.S. Trustee United States Trustee (SV)
russell.clementson@usdoj.gov

James A Dumas, Jr on behalf of Creditor NOA Productions SPRL
jdumas@dumas-law.com,
jdumas@ecf.inforuptcy.com

James A Dumas, Jr on behalf of Creditor Penthouse Global Broadcasting, Inc.
jdumas@dumas-law.com,
jdumas@ecf.inforuptcy.com

Allan B Gelbard on behalf of Other Professional Allan B. Gelbard
xxxesq@aol.com, Allan@GelbardLaw.com

David Keith Gottlieb (TR)
dkgtrustee@dkgallc.com,
dgottlieb@iq7technology.com,rjohnson@dkgallc.com,akuras@dkgallc.com

David W. Meadows on behalf of Interested Party Courtesy NEF
david@davidwmeadowslaw.com

Krikor J Meshefejian on behalf of Creditor Interested Party
kjm@lnbrb.com

Alan I Nahmias on behalf of Interested Party Courtesy NEF
anahmias@mbnlawyers.com,
jdale@mbnlawyers.com

Aram Ordubegian on behalf of Creditor LSC Communications US, LLC / Creel Printing
ordubegian.aram@arentfox.com

Hamid R Rafatjoo on behalf of Creditor Committee The Official Committee of Unsecured Creditors
hrafatjoo@raineslaw.com,
bclark@raineslaw.com;cwilliams@raineslaw.com

S Margaux Ross on behalf of U.S. Trustee United States Trustee (SV)
margaux.ross@usdoj.gov

Michael St James on behalf of Creditor Interested Party
ecf@stjames-law.com

Michael St James on behalf of Interested Party Michael St. James
ecf@stjames-law.com

Howard Steinberg on behalf of Creditor Greenberg Traurig, LLP
steinbergh@gtlaw.com,
pearsallt@gtlaw.com;laik@gtlaw.com

Cathy Ta on behalf of Interested Party Penthouse Clubs Worldwide, LLC
cathy.ta@bbklaw.com,
Arthur.Johnston@bbklaw.com;lisa.spencer@bbklaw.com

United States Trustee (SV)
ustpregion16.wh.ecf@usdoj.gov

Michael H Weiss on behalf of Attorney Weiss & Spees, LLP
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor Danni Ashe, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor GMI Online Ventures, Ltd.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor General Media Communications, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor General Media Entertainment, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor

Penthouse Digital Media Productions, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Global Broadcasting, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Global Digital, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Global Licensing, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Global Media, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Global Publishing, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Images Acquisitions, Ltd.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor Pure
Entertainment Telecommunications, Inc.
fka For Your Ears Only, Ltd.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Streamray Studios, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor Tan
Door Media, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
XVHUB Group, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Christopher K.S. Wong on behalf of
Creditor LSC Communications US, LLC /
Creel Printing
christopher.wong@arentfox.com

Beth Ann R Young on behalf of Creditor
Dream Media Corporation
bry@lnbyb.com

Beth Ann R Young on behalf of Creditor
Interested Party
bry@lnbyb.com