Linda F. Cantor (CA Bar No. 153762)
Iain A.W. Nasatir (CA Bar No. 148977)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Telephone: 310/277-6910
Facsimile: 310/201-0760
E-mail:  lcantor@pszjlaw.com

Attorneys for David K. Gottlieb, Chapter 11 Trustee

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>PENTHOUSE GLOBAL MEDIA, INC.,<br><br>Debtor.<br><br>☒ Affects All Debtors<br>☐ Affects Penthouse Global Broadcasting, Inc.<br>☐ Affects Penthouse Global Licensing, Inc.<br>☐ Affects Penthouse Global Digital, Inc.<br>☐ Affects Penthouse Global Publishing, Inc.<br>☐ Affects GMI Online Ventures, Ltd.<br>☐ Affects Penthouse Digital Media Productions, Inc.<br>☐ Affects Tan Door Media, Inc.<br>☐ Affects Penthouse Images Acquisitions, Ltd.<br>☐ Affects Pure Entertainment Telecommunications, Inc.<br>☐ Affects XVHUB Group, Inc.<br>☐ Affects General Media Communications, Inc.<br>☐ Affects General Media Entertainment, Inc.<br>☐ Affects Danni Ashe, Inc.<br>☐ Affects Streamray Studios, Inc. | Cases No.: 1:18-BK-10098-MB<br><br>Chapter 11<br><br>Jointly Administered with Cases Nos.:<br>1:18-bk-10099-MB; 1:18-bk-10101-MB;<br>1:18-bk-10102-MB; 1:18-bk-10103-MB;<br>1:18-bk-10104-MB; 1:18-bk-10105-MB;<br>1:18-bk-10106-MB; 1:18-bk-10107-MB;<br>1:18-bk-10108-MB; 1:18-bk-10109-MB;<br>1:18-bk-10110-MB; 1:18-bk-10111-MB;<br>1:18-bk-10112-MB; 1:18-bk-10113-MB<br><br>**NOTICE OF MOTION AND MOTION FOR ORDER APPROVING SETTLEMENT WITH KIRKENDOLL MANAGEMENT, LLC AND ITS RELATED AFFILIATES; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF DAVID K. GOTTLIEB IN SUPPORT THEREOF**<br><br>**Hearing:** <u>Set by Court on Shortened Notice</u><br>Date:     May 30, 2018<br>Time:     1:00 p.m.<br>Place:    United States Bankruptcy Court<br>          21041 Burbank Boulevard<br>          Courtroom 303<br>          Woodland Hills, California<br><br>Judge:   Hon. Martin R. Barash |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**TO THE HONORABLE MARTIN R. BARASH, UNITED STATES BANKRUPTCY JUDGE; ALL PARTIES RECEIVING CM/ECF NOTICE; THE OFFICE OF THE UNITED STATES TRUSTEE; AND PARTIES REQUESTING SPECIAL NOTICE:**

**PLEASE TAKE NOTICE** that David K. Gottlieb, in his capacity as Chapter 11 Trustee (the "Trustee") of the above-captioned bankruptcy estates (the "Estates") of Penthouse Global Media, Inc. and its debtor subsidiaries (the "Debtors"), hereby moves (by this "Settlement Motion") the Court for entry of an order pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to approve a settlement ("Settlement") between the Trustee, on the one hand, and Kirkendoll Management, LLC, Penthouse Clubs Global Licensing, LLC, Penthouse Clubs Worldwide, LLC, and their related affiliates (collectively, "Clubs" and together with the Trustee, the "Parties"), on the other.  The terms of the Settlement are forth in the Settlement Motion.

**PLEASE TAKE FURTHER NOTICE** that the Settlement Motion is based on this Notice of Motion and Settlement Motion, the Memorandum of Points and Authorities and Declaration of David K. Gottlieb annexed thereto (the "Motion Pleadings"), the record in these chapter 11 cases ("Cases"), the argument of counsel, as well as any other documentary evidence as may be presented to this Court prior to or at the hearing.

**PLEASE TAKE FURTHER NOTICE** that the Court has set the hearing on this Motion on shortened time.  The hearing (the "Hearing") on the Motion will be held on **May 30, 2018 at 1:00 p.m. (Pacific time)** before the Honorable Martin Barash, United States Bankruptcy Judge, 21041 Burbank Boulevard, Courtroom 303, Woodland Hills, CA 91367.  Oppositions, if any, to the Motion may be raised at the Hearing however any written opposition to the Motion must be filed with the clerk of the Bankruptcy Court and served upon the Trustee's counsel, Linda Cantor, Esq., Pachulski Stang Ziehl & Jones LLP, 13th Floor, Los Angeles, CA 90067, facsimile: 310-201-0760, lcantor@pszjlaw.com, no later than **May 29, 2018 at 5:00 p.m. (Pacific time).**  Any written reply to an opposition to the Motion must be filed with the Court no later than 11:00 a.m. on **May 30, 2018,** provided that replies to any oppositions may also be stated on the record at the Hearing on the Motion.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2

1    **UNLESS AN OBJECTION IS TIMELY SERVED AND FILED OR PRESENTED AT**

2    **THE HEARING IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE**

3    **CONSIDERED BY THE BANKRUPTCY COURT AND THE BANKRUPTCY COURT MAY**

4    **GRANT THE RELIEF REQUESTED.**

5        **WHEREFORE**, the Trustee respectfully requests that the Court (a) grant the Settlement

6    Motion, (b) approve the Settlement described therein, (c) authorize the Trustee to take such actions

7    as are reasonable and necessary to implement the Settlement, and (d) grant such other relief as is just

8    and proper under the circumstances.

9

DATED: May 21, 2018                    PACHULSKI STANG ZIEHL & JONES LLP

10

11

By:   _/s/ Iain A.W. Nasatir_
12    Attorneys for David K. Gottlieb, Chapter 11
Trustee

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DOCS_LA:314463.1 32277/001

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

By way of this Settlement Motion, the Trustee, in his capacity as Chapter 11 Trustee of the above-captioned debtors (collectively, the "Debtors" and each a "Debtor") and the Debtors' estates ("Estates"), seeks approval of the resolution and compromise of certain disputes and claims by way of the Settlement (as further described and defined below) between the Estates, on the one hand, and Kirkendoll Management, LLC, Penthouse Clubs Global Licensing, LLC, Penthouse Clubs Worldwide, LLC, and their related affiliates (collectively, "Clubs" and together with the Trustee, the "Parties"), on the other.

Absent the Settlement, Clubs' stated objective in these cases has been to sponsor a Chapter 11 plan—an objective that has been fiercely criticized by the Debtor's senior lender, Dream Media Corp. ("Dream Media"). In order to avoid a potential confirmation battle (and in furtherance of the Trustee's obligations to maximize the value of the Debtors' Estates), the Trustee negotiated settlements with Dream Media and Clubs. These settlements have culminated in (i) the Settlement with Clubs and the Clubs Sale (as defined below) each as described herein and (ii) the previously-approved settlement with Dream Media and the upcoming auction of the substantial majority of the Debtors' assets pursuant to the Court's *Order: (A) Approving Sale Motion, (B) Scheduling Auction and Hearing for Sale of Substantially All Assets of the Debtors; (C) Approving Sale Procedures; and (D) Granting Related Relief* [Dkt. No. 477] (the "Sale Order").[1]

The Settlement with Clubs resolves all issues between the Parties concerning that certain Master License Agreement, dated March 29, 2017, (the "Original MLA") wherein Clubs paid $2.6 million to the Debtor Penthouse Global Licensing, Inc. ("PGLI") in exchange for an exclusive license to use THE PENTHOUSE CLUB mark, certain other trademarks and copyrighted materials, and granted other rights pertaining thereto (as further described in the Clubs Sale Motion, the "Acquired Penthouse Club IP"). In order to resolve issues stemming from the Original MLA (and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

---

[1] The material terms of this Settlement (and the associated Clubs Sale) were initially reported to the Court at the May 9, 2018 hearing (when the Court approved the Dream Media settlement) and in the term sheet filed at Docket No. 461.

4

the Debtors' obligations thereunder), the Settlement effectuates a private sale (the "Clubs Sale") between the Parties wherein (a) Clubs will pay the Debtors an additional $1.075 million in exchange for (b)(i) a transfer of all rights, title, and interests of the Debtors in the Acquired Penthouse Club IP coupled with (ii) a license agreement (the "Clubs License Agreement") granting Clubs a perpetual license to use certain other copyrights, trademarks, and other intellectual property (the "Related Penthouse IP") in the operation of gentleman's clubs.[2] The Settlement also contains broad mutual releases and waivers by the Trustee and Clubs.

Contemporaneously herewith, the Trustee is filing a motion (the "Clubs Sale Motion") to approve the Clubs Sale pursuant to Section 363(b) of the U.S. Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code" or "Code"). Attached to the Clubs Sale Motion is a declaration by the Trustee (the "Sale Declaration") and attached thereto are the following effectuating documentation pertaining to the Clubs Sale (collectively, the "Clubs Sale Documents"):

| Exhibits to the Sale Declaration[3] | |
|---|---|
| A | Purchase and Sale Agreement Effectuating Clubs Sale (the "PSA") |
| B | Clubs License Agreement |
| C | Consent to Use and Registration Agreement |

Given the potential for a costly plan confirmation fight, the status of the Original MLA (and the Debtors obligations thereunder), the threat and cost of litigation if the Trustee were to seek to reject the Original MLA under Bankruptcy Code § 365 (and the risks associated with the application of Bankruptcy Code § 365(n)), and the additional consideration being paid to the Estates under the Clubs Sale, the Trustee submits that the Settlement is beneficial to the Estates and satisfies the prevailing legal standard of falling within the lowest range of reasonableness. Thus, the Trustee requests that the Settlement with Clubs be approved.

---

[2] As further described herein, the Related Penthouse IP is not being acquired by Clubs and is not "Acquired Penthouse Club IP." Rather, the Trustee intends to sell the Related Penthouse IP pursuant to the Sale Order and, pursuant to such order, to require the acquirer of the Related Penthouse IP to assume the Clubs License Agreement. Such assumption is necessary to both (a) preserve Clubs' current rights under the Original MLA regarding the ability to use the Related Penthouse Club IP and (b) to avoid litigation between Clubs and the acquirer of the Related Penthouse IP.

[3] Any description contained herein of the Clubs Sale and the Clubs License Agreement is subject to the specific terms of the PSA and the Clubs License Agreement.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## II.

## FACTUAL BACKGROUND

1.      The instant cases were commenced by the filing of voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 *et seq.* (the "Bankruptcy Code") on January 11, 2018 (the "Petition Date").

2.      This Court has jurisdiction of this matter under 28 U.S.C. § 1334 and this is a core proceeding under 28 U.S.C. § 157(b)(2)(M).

3.      Prior to the appointment of the Trustee, the Estates acted as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On January 30, 2018, the Official Committee of Unsecured Creditors ("Committee") was appointed.

4.      The Court entered an Order Approving the Motion for Joint Administration of the Debtors' cases on January 16, 2018 [Dkt. No. 17], thereby designating the case of In re Penthouse Global Media, Inc., Case No. 1:18-bk-10098 as the "Lead Case."

5.      A description of the Debtors' background, capital structure and the events leading to these bankruptcy filings are set forth in the Declaration of Kelly Holland filed on January 23, 2018 (the "Master Declarations of Kelly Holland and Catherine Brandt") [Dkt. No. 42].

6.      On February 23, 2018, the Debtors filed a motion [Dkt. No. 181] (the "DIP Motion") to approve an infusion of $800,000 in capital to the Debtors' Estates, through a combination of financing, assumption of the MLA, and a sale of certain marks that were already licensed to Clubs on an exclusive basis. As stated therein, the purpose of the relief sought in the DIP Motion was to provide initial funding so that the Debtors could propose a Chapter 11 plan of reorganization. *See* DIP motion at 3 ("Once the sale of the MLA Marks is completed, Debtors will be able to propose a plan of reorganization.").

7.      Dream Media fiercely objected to the DIP Motion. *See* Dkt. No. 195; *see also, e.g.,* Dkt. No. 210 (Clubs reply).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:314463.1 32277/001

8.       After multiple hearings on, *inter alia*, the DIP Motion, the Court determined that the appointment of a chapter 11 trustee of the Estates was appropriate.[4] As stated by the Court, the primary impetus for appointing a chapter 11 trustee was to avoid contentious bankruptcy litigation that threatened to bury the Estates in administrative expenses:

> I think a Chapter 11 trustee, as a neutral third party, would at least offer
> the prospect of reducing the amount of litigation and hopefully preventing
> this case from drowning in administrative expenses. … I just don't think
> that this case will survive … and by 'survive' I mean have any kind of
> reasonable expectation of maximizing value if it drowns in administrative
> expenses. And I just see a future of more fighting.

2/28/18 Hr'g Tr. at 176:16-177:1.

9.       On March 2, 2018, the Court entered its order directing the appointment of a chapter 11 trustee [Docket No. 231]. On March 6, 2018, the Office of the United States Trustee appointed David K. Gottlieb as the chapter 11 trustee in the cases [Dkt. No. 239].

10.      The Trustee settled its disputes with Dream Media and, on April 18, 2018, filed (i) a motion [Dkt. No. 325] seeking to approve its Settlement Agreement (as such term is defined therein) with Dream Media and (ii) a motion [Dkt. No. 327] seeking an order approving procedures to sell substantially all of the Debtors' assets (collectively such motions being the "Dream Media Settlement Motions").

11.      On April 26, 2018, Clubs filed its written opposition to the Dream Media Settlement Motions [Dkt. No. 395]. Shortly thereafter, Clubs and the Trustee served each other with discovery concerning the Settlement Motions and, on May 2-3, 2018, Clubs deposed a number of persons and entities concerning the Dream Media Settlement Motions.

12.      Shortly thereafter, the Trustee began to engage in substantive discussions with Clubs regarding a resolution of the issues concerning the direction of the Debtors' bankruptcy cases, in the hopes of avoiding further litigation. Specifically, the Parties discussed certain business issues

---

[4] The Court also authorized the relief sought in the DIP Motion, subject to the Trustee choosing to enter into the transactions described therein. At this point, the Trustee has not chosen to enter such transactions.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

relating to the relationship between the Debtors and Clubs and how to structure a transaction that would (i) be mutually beneficial to the Estates and to Clubs and (ii) avoid a prolonged confirmation fight or other litigation. Through the good faith efforts of the Trustee, Clubs, the Committee, and Dream Media, the Parties agreed to the Settlement, the material terms of which were initially reported to the Court at the May 9, 2018 hearing.  The Trustee filed a term sheet ("Term Sheet") documenting the material terms of the Settlement on May 10, 2018 [Dkt. No. 461].

13.    As a result of the Settlement, Clubs conditionally withdrew its opposition to the Dream Media Settlement Motions and the Court, on May 16, 2018, entered (i) an *Order Approving Settlement with Dream Media Corporation* [Dkt. No. 478] and (ii) an *Order (A) Approving Sale Motion, (B) Scheduling Auction and Hearing for Sale of Substantially All Assets of the Debtors; (C) Approving Sale Procedures; and (D) Granting Related Relief* [Dkt. No. 477] (the "Sale Order").

14.    Pursuant to the Auction Procedures Order, the Trustee intends to sell the substantial majority of the Debtors' assets (the "Auctioned Assets") pursuant to an auction that is scheduled to commence on June 4, 2018.[5]

### III.

### STATEMENT OF FACTS

**A.    The Settlement**

The Trustee solely in his authority as trustee for the Estates of the Debtors, has reached an agreement with Clubs to settle various disputes related to the outcome of the Debtors' bankruptcy cases.  As described above, the Debtors' bankruptcy cases were on the precipice of falling into a long, drawn-out battle with, on the one hand, Dream Media seeking to liquidate its collateral and, on the other, Clubs (along with the Debtors) seeking to cram down Dream Media's claim through a Chapter 11 plan.  As described in the Dream Media Settlement Motions and as further explained in the Declaration of David K. Gottlieb in support of the Motion ("Trustee Dec."), the Trustee, in relying on the analysis of his advisors, has concluded that such battle must be averted in order to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

---

[5] Notably, the Auctioned Assets include the Related Penthouse IP (subject to the Clubs License Agreement).  However, the Auctioned Assets do not include the Acquired Penthouse IP that the Trustee, pursuant to the Settlement Motion and the Clubs Sale Motion, is seeking to sell to Clubs.

maintain the maximum value available to the Debtors' creditors. As discussed in more detail in the Trustee's declaration and supported in its exhibits, the Estates' financial situation is deteriorating, and they are currently losing money.

In the hopes of averting such an expensive battle with an uncertain outcome, the Trustee and Clubs negotiated the resolution of a number of business issues relating to the relationship between the Debtors and Clubs that were apparently the primary motivation for Clubs in supporting a chapter 11 cram down plan. Key among the issues is that, in entering into the Original MLA, the Debtors granted Clubs the exclusive right to operate gentleman's clubs (the "Penthouse Clubs") under THE PENTHOUSE CLUBS brand and granted Clubs a number of rights relating thereto. An inherent symbiotic, business relationship naturally exists between the operation of the Penthouse Clubs and the operation of the Debtors' businesses. Additionally, there appears to be a lack of clear case law concerning Clubs' rights under Code § 365(n) if the Trustee were to reject the Original MLA. Given this landscape, the Parties, in order to avoid litigation, sought to structure a transaction that (i) preserved Clubs' rights and expectations (i.e., the ability to operate the Penthouse Clubs) under the Original MLA; (ii) was mutually beneficial to the Estates and to Clubs; and (iii) avoided litigation.

Accordingly, the Parties have agreed to resolve and settle their disputes according to the following terms (collectively such terms being the "Settlement") with such terms to be contained within an order to be submitted to this Court for its approval and entry:

a.    The Trustee will sell the Acquired Penthouse IP to Clubs in a private sale (the Clubs Sale) in exchange for a payment of $1,075,000 in cash to the Estates on mutually agreeable terms, as such terms are contained within the Clubs Sale Documents and as such terms are further described in the Clubs Sale Motion.

b.    As part of the Clubs Sale, the Parties will enter into the Clubs License Agreement, whereby Clubs will be granted, for no additional consideration, a license to use

DOCS_LA:314463.1 32277/001

1    certain other intellectual property (the Related Penthouse IP) in support of the

2    operation of the Penthouse Clubs.

3    c.    As a condition to selling and/or transferring the Related Penthouse IP, any purchaser

4    thereof will be required to acquire and assume the Clubs License Agreement.

5    d.    The obligations of each Party contained herein is conditioned on the entry by the

6    Court of an order granting this Settlement Agreement and containing terms that are

7    satisfactory to each Party.

8    e.    Conditioned on the satisfaction of the foregoing obligations and the consummation

9    and approval of the Clubs Sale and the consummation and assumption of the Clubs

10    License Agreement, Clubs will not object to the sale of the Auctioned Assets as

11    authorized under the Sales Order.

**IV.**

**ARGUMENT**

**A.    The Standard of Review**

Bankruptcy Rule 9019(a) sets forth the requirements for the settlement or compromise of controversies after notice to all creditors and a hearing upon each such proposed compromise. Bankruptcy courts favor compromise.  *See In re Sassalos*, 160 B.R. 646, 653 (D. Or. 1993) (stating that "compromises are favored in bankruptcy, and the decision of the bankruptcy judge to approve or disapprove a compromise … rests in the sound discretion of the bankruptcy judge.").  In reviewing a settlement, bankruptcy courts must determine whether the settlement is "fair and equitable" based on an "educated estimate of the complexity, expense, and likely duration of . . . litigation, the possible difficulties of collecting on any judgment which might be obtained and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Protective Committee v. Anderson*, 390 U.S. 414, 424 (1968).  When deciding whether to approve a settlement, the bankruptcy court must determine if the settlement is reasonable under the circumstances of the case, fair and equitable, and in the best interest of the estate. *See Martin v. Kane (In re A & C Props.)*, 784 F.2d 1377, 1381 (9th Cir. 1986).  Here, it seems clear that under the circumstances of this case, the Settlement between the Trustee and Clubs meets this standard.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:314463.1 32277/001

The United States Court of Appeals for the Ninth Circuit has indicated that in determining the fairness, reasonableness, and adequacy of a proposed settlement agreement, a court should consider the following factors:  (1) the probability of success in litigation; (2) the difficulties, if any, to be encountered in the matter of collection; (3) the complexity of the litigation involved and the expense, inconvenience, and delay necessarily attending it; and (4) the paramount interest of the creditors and the proper deference to their reasonable views in the premises (collectively, the "Woodson Factors").  *See Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*, 839 F.2d 610, 620 (9th Cir. 1988) (quoting *A & C Props.*, 784 F.2d at 1380).  It is not necessary that all of the conclusions reached in the consideration of each of the Woodson Factors support the settlement, but taken as a whole, those conclusions must favor the approval of the settlement. *See In re Pacific Gas & Elec. Co*, 304 B.R. 395, 417 (Bankr. N.D. Cal. 2004) (citing *In re WCI Cable, Inc.*, 282 B.R. 457, 473-74 (Bankr. D. Or. 2002)). "Ultimately, the court must determine whether the individual settlement sought to be approved under Bankruptcy Rule 9019(a) falls within the lowest range of reasonableness." *In re TCI2 Holdings, LLC*, 428 B.R. 117, 136 (Bankr. D.N.J. 2010).

**B.    The Settlement Agreement Satisfies the Rule 9019(a) Standard**

As discussed below, consideration of the Woodson Factors supports Court approval of the proposed Settlement.

1.    **Probability of Success**

There are two alternatives to selling the Acquired Penthouse Club IP to Clubs through the Clubs Sale that were explored by the Trustee.  First, the Trustee could seek to reject the Original MLA under Bankruptcy Code § 365 and then sell the Acquired Penthouse Club IP to a third party.  Second, rather than seeking to sell the Acquired Penthouse Club IP to Clubs through a private sale, the Trustee explored the potential for selling the Acquired Penthouse Club IP through an auction.  Ultimately, however, the Trustee, upon consulting his advisors, determined to proceed with the Settlement because of the potential for litigation with Clubs under either of these alternatives.

The fundamental impediment to selling the Acquired Penthouse Club IP to a third party is the existence of the Original MLA which granted to Clubs an exclusive license to use certain intellectual property (*i.e.*, the Acquired Penthouse Club IP) in connection with the operation of the Penthouse

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

11

Clubs. Said differently, the Original MLA effectively carved out from the Debtors' operations the operation of gentlemen's clubs bearing THE PENTHOUSE CLUB marks. Initially, the Trustee did examine the potential for rejecting the Original MLA in an effort to facilitate a competitive sale of the Acquired Penthouse Club IP. However, the law is not clear on whether Bankruptcy Code § 365(n) would apply to allow Clubs to retain its rights under the Original MLA even if the MLA were rejected. *See Code* § 365(n)(1)(B). <u>Compare</u> In re *Tempnology LLC, 879 F.3d 389 (1ˢᵗ Cir. 2018)* (holding that a debtor's rejection of an agreement negated the licensee's rights to use certain trademarks) <u>with</u> *In re Sima Int'l,* 2018 Bankr. LEXIS 1455 (D.Conn.Bankr., May 17, 2018) (reading contrary result) ("<u>Sima</u>"). Compounding this uncertainty is the Trustee's concern that— given Clubs' business approach and demonstrated resources—any litigation with Clubs regarding the rejection of the Original MLA would be costly and uncertain (*see* discussion in <u>Sima</u>, *supra*). Further, Dream Media Corporation, Debtors' secured lender, asserted a lien against the original MLA as a general intangible. The Trustee, therefore, determined that the cost and uncertainty of rejecting the Original MLA and litigating with the parties in these cases outweighed any potential benefit.

Subjecting any sale of the Acquired Penthouse Club IP to an overbid is likewise not feasible. First, the pool of potential buyers of the Acquired Penthouse Club IP (even if such property were not subject to the Original MLA) would likely be limited even if the Trustee had the resources to locate alternative buyers and additional time to market these assets. Even so, in order to sell the Acquired Penthouse Club IP to anyone other than Clubs, the Trustee would invariably have to reject the Original MLA, resulting in certain litigation. As previously mentioned, the costs and risks for doing so simply outweigh any benefit.

Relying on this due diligence and the advice of his advisors, the Trustee has concluded that rejection of the Original MLA is simply untenable and would invite further litigation with no clear benefit to the Estates. Further, a private sale to Clubs is the most feasible and efficient means for monetizing the Debtors' rights in the Acquired Penthouse Club IP given the presence of the Original MLA and the obligations on the Debtors contained therein.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

12

2.    **Difficulties With Collection**

This factor does not apply.

3.    **The Complexity of the Litigation**

The discussion with factor no.1 covers this factor.

4.    **Interests of Creditors**

While the prospects of a Chapter 11 plan may have initially been appealing (given Clubs'

stated commitments to funding such a plan), it became apparent to the Trustee that (a) a plan of

reorganization is not feasible; (b) any confirmation fight would be lengthy and expensive; and (c) the

Estates simply did not have the resources to endure a confirmation fight with Clubs. The Settlement

is in the best interests of Estates because a consensual resolution of the issues between the Debtors

and Clubs (when coupled with the successful resolution of the issues with Dream Media) allows the

Trustee to devote the Estates' resources toward monetizing the Estates' assets through the Clubs Sale

and Auction.

Regarding the consideration being paid to the Estate under the Clubs Sale, the Trustee

examined the Debtors' books and records and examined certain proprietary financial information

provided by Clubs concerning the value of the Acquired Penthouse Clubs IP.  Based on such

analysis, the Trustee negotiated a cash payment by Clubs of $1,075,000 in the context of the Clubs

Sale.  Notably, this payment is materially higher (more than 30% higher) than what Clubs had been

willing to pay in February (in the context of the DIP Motion).  Moreover, Dream Media participated

in the negotiation of this cash payment and agreed that such payment by Clubs was sufficient.

**C.    Adequate Notice of the Motion Has Been Given**

Notice of the Motion the hearing thereon has been given to (1) the Debtors; (2) all parties

receiving notice through the Court's CM/ECF electronic notification system; (3) the Office of the

United States Trustee; (4) Dream Media; and (5) all parties who have requested special notice of

matters arising in the Case.  A separate notice  of this Motion is being mailed to all creditors.

Accordingly, adequate notice of the Motion has been given.

DOCS_LA:314463.1 32277/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  **The Relief Granted Should Be Enforceable in a Chapter 7**

2      In the event that these cases are converted to cases under chapter 7 of the Bankruptcy Code,

3  the Trustee requests that the authorizations and approvals with respect to the proposed Sale be

4  enforceable in the Chapter 7 cases.  Such relief will enable the Trustee to dispose of the Assets as

5  promptly and efficiently as possible.

6  **D.    The Relief Granted Should Be Enforceable in a Chapter 7**

7      In the event that these cases are converted to cases under chapter 7 of the Bankruptcy Code,

8  the Trustee requests that the authorizations and approvals with respect to the proposed Sale be

9  enforceable in the Chapter 7 cases.  Such relief will enable the Trustee to dispose of the Assets as

10  promptly and efficiently as possible.

11                                          **V.**

12                                     **CONCLUSION**

13      **WHEREFORE,** the Trustee respectfully requests that this Court enter an order (a)

14  approving the Settlement; (b) authorizing the Parties to enter into and take any and all actions

15  reasonably necessary to effectuate the Settlement; and (c) granting the Trustee such other and further

16  relief as the Court deems just and proper.

17  Dated: May 21, 2018                PACHULSKI STANG ZIEHL & JONES LLP

18                                     By:    _/s/ Iain A.W. Nasatir_
                                       Attorneys for David K. Gottlieb, Chapter 11
19                                     Trustee

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### DECLARATION OF DAVID K. GOTTLIEB

I, David K. Gottlieb, declare as follows:

1.     I am the duly appointed chapter 11 trustee ("Trustee") of the estates of Penthouse Global Media, Inc. ("PGMI") and its affiliated debtor entities whose cases are being jointly administered with the PGMI case.

2.     Unless otherwise indicated, all facts set forth in this Declaration are based on either (a) my personal knowledge, (b) information gathered by professionals rendering services to me), (c) my review of relevant documents including, without limitation, the court file in these Cases, or (d) my opinion based upon my experience and knowledge of the circumstances as described in the Motion.  If I were called to testify thereto, I could and would competently do so. I make this Declaration in support of the preceding *Notice Of Motion And Motion For Order Approving Settlement With Kirkendoll Management, LLD And Its Related Affiliates; Memorandum Of Points And Authorities; Declaration Of David K. Gottlieb* in support thereof (the "Motion").  Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

3.     The Settlement with Penthouse Clubs Worldwide, LLC, Penthouse Clubs Global Licensing, LLC and Kirkendoll Management, LLC (the "Clubs") resolves certain issues between the Parties concerning that certain Master License Agreement, dated March 29, 2017, (the "Original MLA") wherein Clubs paid $2.6 million to the Debtor Penthouse Global Licensing, Inc. ("PGLI") in exchange for an exclusive license to use THE PENTHOUSE CLUB mark, certain other trademarks and copyrighted materials, and granted other rights pertaining thereto (as further described in the Clubs Sale Motion, the "Acquired Penthouse Club IP").  In order to resolve issues stemming from the Original MLA (and the Debtors' obligations thereunder), the Settlement effectuates a private sale (the "Clubs Sale") between the Parties wherein (a) Clubs will pay the Debtors an additional $1.075 million in exchange for (b) (i) a transfer of all rights, title, and interests of the Debtors in the Acquired Penthouse Club IP coupled with (ii) a license agreement (the "Clubs License Agreement") granting Clubs a perpetual license to use certain other copyrights, trademarks, and other intellectual

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:314463.1 32277/001

property (the "Related Penthouse IP") in the operation of gentleman's clubs.[6] The Settlement also contains broad mutual releases and waivers by the Trustee and Clubs.

4.    Shortly after filing the 9019 Motion to approve the Dream Media Settlement, I directed my counsel to engage in substantive discussions with Clubs regarding a resolution of the issues concerning the direction of the Debtors' bankruptcy cases, in the hopes of avoiding further litigation. Specifically, the Parties discussed certain business issues relating to the relationship between the Debtors and Clubs and how to structure a transaction that would (i) be mutually beneficial to the Estates and to Clubs and (ii) avoid a prolonged confirmation fight or other litigation. Through the good faith efforts of all affected parties and Clubs, I agreed to the Settlement, the material terms of which were initially reported to the Court at the May 9, 2018 hearing. I filed a term sheet ("Term Sheet") documenting the material terms of the Settlement on May 10, 2018 [Dkt. No. 461].

5.    While the prospects of a Chapter 11 plan may have initially been appealing (given Clubs' statements about funding such a plan), it became apparent that (a) a plan of reorganization is not feasible; (b) any confirmation fight with Clubs would be lengthy and expensive; and (c) the Estates simply did not have the resources to endure a confirmation fight. As I have stated before, and as my advisors have found, the Estates' resources are limited and are currently diminishing because they are losing money. See Exhibit A (Declaration of Walter Bowser and attached Exhibit A).[7] The Settlement is in the best interests of Estates and their creditors because a consensual resolution of the issues between the Debtors and Clubs (when coupled with the successful resolution of the issues with Dream Media) allows me to devote the Estates' resources toward monetizing the Estates' assets through the Clubs Sale and Auction.

6.    I am informed that the fundamental impediment to selling the Acquired Penthouse Club IP to a third party is the existence of the Original MLA which granted to Clubs an exclusive

---

[6] As further described herein, the Related Penthouse IP is not being acquired by Clubs and is not "Acquired Penthouse Club IP." Rather, the Trustee intends to sell the Related Penthouse IP pursuant to the Sale Order and, pursuant to such order, to require the acquirer of the Related Penthouse IP to assume the Clubs License Agreement. Such assumption is necessary to both (a) preserve Clubs' current rights under the Original MLA regarding the ability to use the Related Penthouse Club IP and (b) to avoid litigation between Clubs and the acquirer of the Related Penthouse IP.

[7] The Bowser Declaration was previously filed in connection with the Motion to Convert and the 9019 Motion on the Dream Media Settlement.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

16

license to use certain intellectual property (i.e., the Acquired Penthouse Club IP) in connection with the operation of the Penthouse Clubs, because the Original MLA effectively carved out from the Debtors' operations the operation of gentlemen's clubs bearing THE PENTHOUSE CLUB marks. Initially, I considered the potential for rejecting the Original MLA in an effort to facilitate a competitive sale of the Acquired Penthouse Club IP. However, my understanding from counsel is that the law is not clear on whether Bankruptcy Code § 365(n) would apply to allow Clubs to retain its rights under the Original MLA even if the MLA were rejected. Compounding this uncertainty is the concern that—given Clubs' business approach and demonstrated resources—any litigation with Clubs regarding the rejection of the Original MLA would be costly and uncertain. Further, Dream Media, the Debtors 'secured lender', asserted a lien against the Original MLA as a general intangible. Ultimately I determined that the cost and uncertainty of rejecting the Original MLA and litigating with the Parties in these Cases outweighed any potential benefit.

7.    Subjecting any sale of the Acquired Penthouse Club IP to an overbid is likewise not feasible. First, the pool of potential buyers of the Acquired Penthouse Club IP (even if such property were not subject to the Original MLA) would likely be limited even if the Estates had the resources to locate alternative buyers and additional time to market these assets. Even so, in order to sell the Acquired Penthouse Club IP to anyone other than Clubs, I would invariably have to reject the Original MLA, resulting in certain litigation. As previously mentioned, the costs and risks for doing so simply outweigh any benefit.

8.    Relying on this due diligence and the advice of my advisors, I concluded that rejection of the Original MLA is simply untenable and would invite further litigation with no clear benefit to the Estates. Further, a private sale to Clubs is the most feasible and efficient means for monetizing the Debtors' rights in the Acquired Penthouse Club IP given the presence of the Original MLA and the obligations on the Debtors contained therein.

9.    Regarding the consideration being paid to the Estate under the Clubs Sale, my advisors examined the Debtors' books and records and (as previously mentioned) examined certain proprietary financial information provided by Clubs concerning the value of the Acquired Penthouse Clubs IP. Based on such analysis, my counsel negotiated a cash payment by Clubs of $1,075,000 in

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

17

the context of the Clubs Sale.  Notably, this payment is materially higher (more than 30% higher) than what Clubs had been willing to pay in February (in the context of the DIP Motion).  Moreover, Dream Media participated in the negotiation of this cash payment and agreed that such payment by Clubs was sufficient.

10.    The context in which I determined a settlement with the Parties was in the best interests of creditors are as follows:  the Debtors' bankruptcy cases were on the precipice of falling into a long, drawn-out battle with, on the one hand, Dream Media seeking to liquidate its collateral and, on the other, Clubs (along with the Debtors) seeking to cram down Dream Media's claim through a Chapter 11 plan.  I concluded, after considering the analysis of my advisors, that such battle must be averted in order to maintain the maximum value available to the Debtors' creditors.

11.    Given the potential for a costly plan confirmation fight, the status of the Original MLA (and the Debtors obligations thereunder), the threat and cost of litigation if the Penthouse Estates were to seek to reject the Original MLA under Bankruptcy Code § 365 (and the risks associated with the application of Bankruptcy Code § 365(n)), and the additional consideration being paid to the Estates under the Clubs Sale, I submit that the Settlement is beneficial to the Estates and satisfies the prevailing legal standard of falling within the lowest range of reasonableness.  Thus, I request that the Settlement with Clubs be approved.

12.    In the event that these cases are converted to cases under chapter 7 of the Bankruptcy Code, I request that the authorizations and approvals with respect to the proposed Sale and License be enforceable in the Chapter 7 cases.  Such relief will enable a chapter 7 trustee to dispose of the Assets as promptly and efficiently as possible.

13.    A true and correct copy of the Declaration of Walter Bowser filed in connection with the Motion to Convert and with the Dream Media settlement is attached hereto as Exhibit "A".

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

18

1         I declare under penalty of perjury under the laws of the United States of America that the

2   foregoing is true and correct.

3         Executed this 21st day of May, 2018 at Encino, California.

4

5                        David K. Gottlieb

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:314463.1 32277/001

# Exhibit A

## DECLARATION OF WALTER BOWSER

I, Walter Bowser, declare as follows:

1.      I am a Director with the firm of Province, Inc., proposed financial advisory firm for David K. Gottlieb, solely in his capacity as the duly appointed chapter 11 trustee (the "Trustee") in the above-captioned bankruptcy cases.  I am a certified public accountant and a member in good standing in the American Institute of Certified Public Accountants and also a Certified Fraud Examiner and member in good standing of the Association of Certified Fraud Examiners..  I received my M.B.A. at Carnegie Mellon University in 1989 and I have over 28 years of experience providing consulting and accounting services to clients in a broad range of industries, including performing the role of CFO.  Over the course of my career, I have prepared hundreds of financial projections, including cash flow projections for clients in bankruptcy proceedings.

2.      I am authorized to make this Declaration in support of the preceding *Notice of Motion and Motion of David K. Gottlieb, Chapter 11 Trustee, For Order Converting Case to Chapter 7 Nunc Pro Tunc To March 6, 2018* (the "Motion").  Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.  Except as otherwise stated, each of the facts set forth in this Declaration are based on either (a) my personal knowledge, (b) information gathered by professionals working with me, (c) my review of relevant documents, or (d) my opinion based upon my experience and knowledge of the circumstances, as described in the Motion.  If I were called to testify thereto, I could and would competently do so.

3.      Beginning on the day after his appointment, I along with my colleague David Roberts and the Trustee's proposed counsel met extensively with the Debtors' CEO, Kelly Holland, and with the Debtors' accounting and other staff members regarding day-to-day operations and the Debtors' financial management.   For the first five weeks after the Trustee Appointment Date, David Roberts and I worked full time on-site at the Debtors' premises on a daily basis (including weekends) reviewing and reconciling the Debtors' books and records, analyzing cash flow and developing projections.  This was a time intensive task because the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:313495.5 32277/001

1

1    Debtors' books and records were in disarray, for example:

2      a. The historical records for 2016 and 2017were incomplete and reportedly

3       inaccurate.   The prior CFO was terminated for cause in September 2017; the

4       other accounting staff also resigned or otherwise ended their employment with

5       the Debtors around this same time creating a vacuum of institutional

6       knowledge within the accounting organization, which includes among other

7       things, unfamiliarity with customers and vendors, and the chart of accounts.

8       This sudden and extensive turnover of staff resulted in numerous recording

9       errors and subsequent correcting adjustments when such errors were

10      discovered.  The accounting staff has limited availability because of family

11      and other health-related issues.  Each member of the current accounting staff

12      has less than 6 months' tenure with Penthouse.

13      b. Many of the reports in the accounting system are out of synch because cash

14       postings of collections against receivables; payment posting to payables;

15       invoicing customers and entering vendor invoices into payables are not

16       performed on a timely basis.

17      c. After the dismissal of the former CFO and in a race against the tax filing

18       deadline, the Debtors engaged an outside accounting firm to assist them in

19       filing their 2016 tax returns.  To compile the acounting data required for the

20       tax returns, this firm made multiple summarizing adjusting entries to the

21       books that aggregated numerous transactions, which subsequently makes it

22       impossible to review the details of these entries, consequently many historical

23       details were lost that might have reduced the amount of time required to

24       assess the situation.

25      d. We encountered hundreds of entries to the cash receipts and disbursements

26       journal with blank descriptions for the payor, which required us to resort to

27       bank statements and invoices to test the accuracy of certain revenue streams in

28       the cash projections.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

e. Starting in November 2017, the Debtors' current accounting staff and CFO reconstructed much of and continue their efforts to reconstruct the books and records; however, the books and records have not been audited and given their history cannot be relied on at face value.

f. Given the state of the Debtors' general ledgers, source documents have to be reviewed to investigate many transactions.   Province compiled cash receipts and disbursements from the Debtors' books and records.  Although the amounts of the transactions are available and are believed to generally reconcile to the bank statements – many of the transactions, particularly cash receipts do not have names associated with them making it difficult to determine the nature of the transactions.  To investigate, other reports or source documents need to be reviewed and analyzed.

g. Source files for vendors are frequently incomplete and in some cases cannot be located.

h. The Debtors did not establish a new set of books and records starting with the petition date to record post-petition activity.  Fundamental reporting systems and processes for tracking cash, payables, and receivables had to be modified or established to meet the needs of the Trustee.

i. The Debtors use QuickBooks as their accounting system, which requires a separate data file for each of the five operational debtor entities.  Because only one entity's data file can be open at a time, this causes excessive delay in recording transactions.

j. Because many payments are made by Penthouse Global Media, Inc., the accounting methods used by the company require extensive use of intercompany transactions.  Again, because only one entity's data file can be open at a time, it is not unusual to find only one side of a transaction recorded on a certain entity, while the recording of the same transaction on the correspondent entity is waiting to be recorded.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

k.   It appears that after the departure of the former CFO and his staff, there has
been a general lack of a sense of ownership for the records from top to bottom
and, on a day-to-day basis, Debtors have maintained a reactive rather than
proactive role in the management of their accounting records.

4.   Based upon a lengthy and detailed analysis of the Debtors' books and accounting
records, including a review of 2017 revenues and expenses, bank statements, and numerous
discussions with Debtors' management, we prepared cash flow projections for the period March
7 through June 2018 (the "Projections"). A true and correct copy of the Projections is appended
hereto as **Exhibit A**. To the best of my knowledge and understanding of the Debtors' operations
and based on my review of 2017 revenues and expenses, bank statements, and numerous
discussions with Debtors' management, the Projections accurately reflect the Debtors' operations
from March 7 through June 2018. As shown on the Projections, the Debtors are not meeting
their obligations as they come due on a post-petition basis, resulting in a diminution of the value
of the Debtors' assets.

5.   The Projections show that Debtors' ongoing expenses of operating their
businesses exceed the income generated by such operation. Approximately $400,000 of post-
petition operating obligations incurred between January 11 and March 5, 2018 remain unpaid. I
am also informed and believe that professional fees incurred prior to the Trustee's appointment
amount to approximately $305,755. According to the Projections, the Debtors will lose
approximately $732,000 over the next three months. Accordingly, there exists a substantial or
continuing loss to or diminution of the estates. Based upon the Debtors' current operations and
as confirmed by the Projections, there is currently no reasonable likelihood of rehabilitation of
the Debtors' businesses.

I declare under penalty of perjury under the laws of the United States of America that the
forgoing is true and correct.

Executed this _12th_ day of April, 2018, at Los Angeles, California.

Walter Bowser

# Exhibit A

**In Re: Penthouse Global Media, Inc. et al** (Lead Case No. 1:18-10098-MB)

**Analysis - Estimated Post-petition Revenues and Expenses (01-11-18 to 06-30-18)**

| | From 01-11-18 to 03-05-18 | | | | From 03-06-18 to 06-30-18 | | | | | Post-petition Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Jan | Feb | Mar 1 to 5 | Subtotal | Mar 6 to 31 | April | May | June | Subtotal | |
| **REVENUES** (Note 1) | | | | | | | | | | |
| Broadcast | $178,870 | $287,063 | $10,180 | $476,113 | $382,529 | $357,490 | $370,595 | $410,556 | $1,521,171 | $1,997,283 |
| Digital | 97,584 | 78,732 | 9,018 | 185,333 | 96,309 | 128,973 | 116,181 | 116,181 | 457,644 | 642,978 |
| Publishing | 188,445 | 116,460 | 2,133 | 307,038 | 199,352 | 168,882 | 188,706 | 155,706 | 712,645 | 1,019,683 |
| Licensing | 71,983 | 2,258 | - | 74,241 | 7,515 | 53,413 | 1,000 | 1,000 | 62,928 | 137,169 |
| **Total Revenues** | 536,882 | 484,512 | 21,331 | 1,042,725 | 685,705 | 708,758 | 676,482 | 683,444 | 2,754,388 | 3,797,113 |
| **OPERATING EXPENSES** (Note 1) | | | | | | | | | | |
| Payroll & taxes | 93,061 | 134,172 | - | 227,234 | 144,634 | 186,194 | 82,000 | 246,000 | 658,828 | 886,062 |
| Rent | 26,165 | 22,411 | 11,018 | 59,594 | 22,411 | - | 22,411 | 22,411 | 67,234 | 126,829 |
| Corporate expenses | 27,362 | 17,855 | 1,379 | 46,596 | 35,017 | 61,155 | 34,353 | 58,119 | 188,644 | 235,240 |
| Insurance | 41,503 | 25,183 | 14,622 | 81,308 | 53,968 | 116,384 | 64,439 | 44,706 | 279,496 | 360,805 |
| Broadcast costs | - | 114,317 | 60,003 | 174,320 | 101,839 | 92,546 | 170,338 | 143,073 | 507,795 | 682,116 |
| Publishing costs | 84,421 | 183,356 | 28,777 | 296,554 | 139,210 | 173,795 | 189,220 | 212,182 | 714,407 | 1,010,961 |
| Digital costs | 5,129 | 12,160 | - | 17,289 | 68,906 | 46,148 | 50,353 | 50,741 | 216,148 | 233,436 |
| Outside legal for IP | - | - | - | - | - | 15,500 | 20,000 | 10,000 | 45,500 | 45,500 |
| Miscellaneous expenses | 155,352 | 248 | - | 155,599 | 6,711 | 45,000 | 60,000 | 60,000 | 171,711 | 327,311 |
| **Total Operating Expenses** | 432,993 | 509,703 | 115,800 | 1,058,495 | 572,697 | 736,722 | 693,114 | 847,232 | 2,849,764 | 3,908,259 |
| **Net Cash Basis Operating Income (Loss)** | 103,889 | (25,191) | (94,468) | (15,770) | 113,009 | (27,964) | (16,632) | (163,789) | (95,376) | (111,146) |
| **ACCRUED REVENUES AND EXPENSES** | | | | | | | | | | |
| Accrued revenues | 43,670 | 35,744 | 17,685 | 97,099 | (74,938) | (61,342) | (64,447) | (119,150) | (309,877) | (212,778) |
| Accrued expenses | (348,054) | 23,200 | (76,697) | (401,451) | 73,241 | (108,172) | (81,079) | (282,939) | (215,351) | (616,802) |
| **Change in Accrued Revenues and Expenses** | (304,384) | 58,944 | (58,512) | (304,352) | (187,478) | (159,514) | (81,079) | (282,939) | (525,226) | (829,580) |
| **Net Accrual Basis Operating Income (Loss)** | $(200,495) | $33,753 | $(153,380) | $(320,122) | $111,312 | $(187,478) | $(97,711) | $(446,727) | $(620,604) | $(940,726) |
| **ADMINISTRATIVE EXPENSES** (Note 1) | | | | | | | | | | |
| Debtor counsel (Note 2) | 72,853 | 112,757 | 20,135 | 205,755 | | | | | | 205,755 |
| UCC counsel | | 80,000 | 20,000 | 100,000 | 20,958 | 25,000 | 25,000 | 25,000 | 95,988 | 195,988 |
| Special Litigation I | | | | | | 6,000 | 30,000 | 30,000 | 66,000 | 66,000 |
| Special Litigation II | | | | | | 3,050 | 3,050 | | 6,100 | 6,100 |
| UST Quarterly fee | | | | | | 20,346 | | | 20,346 | 20,346 |
| Ch.11 Trustee bond | | | | | | 5,000 | | | 5,000 | 5,000 |
| Trustee | | | | | 31,885 | 29,688 | 19,173 | 24,097 | 104,843 | 104,843 |
| Trustee counsel | | | | | 264,266 | 100,021 | 75,000 | 50,000 | 489,288 | 489,288 |
| Trustee's financial advisor | | | | | 170,000 | 100,000 | 50,000 | 30,000 | 350,000 | 350,000 |
| **Total Administrative Expenses** | 72,853 | 192,757 | 40,135 | 305,755 | 492,119 | 281,065 | 202,223 | 162,147 | 1,137,544 | 1,443,299 |
| **NON-OPERATING RECEIPTS (DISBURSEMENTS)** | | | | | | | | | | |
| Humboldt credit card reserve | (38,533) | (34,844) | | (73,377) | 368,191 | 50,000 | | | 418,191 | 344,814 |
| Exworks interest | | | | | | | | | | |
| **Total Non-operating Receipts (Disbursements)** | (38,533) | (34,844) | | (73,377) | 368,191 | 50,000 | | | 418,191 | 344,814 |
| **Net Expenses in Excess of Receipts** | $(311,891) | $(193,848) | $(193,515) | $(699,254) | $(12,616) | $(418,533) | $(299,934) | $(608,874) | $(1,339,957) | $(2,039,211) |

# In Re: Penthouse Global Media, Inc. et al (Lead Case No. 1:18-10098-MB)
## Analysis - Estimated Post-petition Revenues and Expenses (01-11-18 to 06-30-18)

| | From 01-11-18 to 03-05-18 | | | | From 03-06-18 to 06-30-18 | | | | | Post-petition Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Jan | Feb | Mar 1 to 5 | Subtotal | Mar 6 to 31 | April | May | June | Subtotal | |
| **WORKING CAPITAL SUMMARY** | | | | | | | | | | |
| **CASH** | | | | | | | | | | |
| Cash - beginning book balance | $ 152,219 | $ 217,575 | $ 157,540 | $ 152,219 | $ 63,072 | $ 171,081 | $ 175,496 | $ 175,496 | $ 63,072 | $ 152,219 |
| Cash receipts from operations | 536,882 | 484,512 | 21,331 | 1,042,725 | 685,705 | 708,758 | 676,482 | 683,444 | 2,754,388 | 3,797,113 |
| Cash disbursements for operations | (432,993) | (509,703) | (115,800) | (1,058,495) | (572,697) | (683,996) | (676,482) | (683,444) | (2,516,618) | (3,675,113) |
| Cash disbursements for non-operations | (38,533) | (34,844) | - | (73,377) | (5,000) | (20,346) | - | - | (25,346) | (98,723) |
| Cash - ending book balance | $ 217,575 | $ 157,540 | $ 63,072 | $ 63,072 | $ 171,081 | $ 175,496 | $ 175,496 | $ 175,496 | $ 175,496 | $ 175,496 |
| **ACCOUNTS RECEIVABLE** | | | | | | | | | | |
| Beginning balance | $ 456,781 | $ 500,451 | $ 536,195 | $ 456,781 | $ 553,880 | $ 478,942 | $ 427,600 | $ 363,153 | $ 553,880 | $ 456,781 |
| Sales on account | 222,540 | 322,807 | 27,865 | 573,212 | 307,591 | 306,148 | 306,148 | 291,406 | 1,211,294 | 1,784,505 |
| Collections | (178,870) | (287,063) | (10,180) | (476,113) | (382,529) | (357,490) | (370,595) | (410,556) | (1,521,171) | (1,997,283) |
| Ending balance | 500,451 | 536,195 | 553,880 | 553,880 | 478,942 | 427,600 | 363,153 | 244,003 | 244,003 | 244,003 |
| **POST-PETITION A/P** | | | | | | | | | | |
| Post-petition accrued - beginning balance | $ - | $ 348,054 | $ 324,854 | $ - | $ 401,451 | $ 328,210 | $ 436,381 | $ 453,013 | $ 401,451 | $ - |
| Post-petition expenses | 348,054 | - | 76,597 | 424,651 | 103,031 | 137,969 | 16,632 | 163,789 | 421,421 | 846,072 |
| Post-petition payments (included in operations) | - | (23,200) | - | (23,200) | (176,272) | (29,798) | - | - | (206,070) | (229,270) |
| Post-petition accrued - ending balance | 348,054 | 324,854 | 401,451 | 401,451 | 328,210 | 436,381 | 453,013 | 616,802 | 616,802 | 616,802 |
| **RESTRICTED CASH** | | | | | | | | | | |
| Beginning balance | $ - | $ - | $ - | $ - | $ - | $ 368,191 | $ 418,191 | $ 418,191 | $ - | $ - |
| Humbolt credit card reserve recoveries | - | - | - | - | 368,191 | 50,000 | - | - | 418,191 | 418,191 |
| Ending balance | - | - | - | - | 368,191 | 418,191 | 418,191 | 418,191 | 418,191 | 418,191 |

Notes:

1. Post-petition revenues and expenses have been estimated from available debtor data. Actual revenue receipts and expense disbursements are included from the petition date of January 11 through April 7, 2018. Operating revenues and expenses are presented on a cash basis. Administrative expenses are a mix of accrued professional fees and cash payments.

2. Debtor's counsel's fees and expenses are included net of unused retainer. Prepetition fees of $10,260 and expenses of $25,755 are assumed offset against $70,000 retainer - leaving an unused retainer of $33,985. For purposes of this analysis, the unused retainer was applied pro-rata based on days in the month.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

**10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California 90067**

A true and correct copy of the foregoing document entitled **NOTICE OF MOTION AND MOTION FOR ORDER APPROVING SETTLEMENT WITH KIRKENDOLL MANAGEMENT, LLC AND ITS RELATED AFFILIATES; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF DAVID K. GOTTLIEB IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:
Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On May 21, 2018, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On May 21, 2018, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.4

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on May 21, 2018, served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

*Via Federal Express*
Honorable Martin R. Barash
U.S. Bankruptcy Court - Central District of California
21041 Burbank Boulevard, Suite  342/ Courtroom 303
Woodland Hills, California  91367

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 21, 2018 | Janice G. Washington | */s/ Janice G. Washington* |
|---|---|---|
| Date | Printed Name | Signature |

{N3597620.4}This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

## 1.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**

Russell Clementson on behalf of U.S. Trustee
United States Trustee (SV)
russell.clementson@usdoj.gov

James A Dumas, Jr on behalf of Creditor NOA
Productions SPRL
jdumas@dumas-law.com,
jdumas@ecf.inforuptcy.com

James A Dumas, Jr on behalf of Creditor
Penthouse Global Broadcasting, Inc.
jdumas@dumas-law.com,
jdumas@ecf.inforuptcy.com

Allan B Gelbard on behalf of Other
Professional Allan B. Gelbard
xxxesq@aol.com, Allan@GelbardLaw.com

David Keith Gottlieb (TR)
dkgtrustee@dkgallc.com,
dgottlieb@iq7technology.com,rjohnson@dkgal
lc.com,akuras@dkgallc.com

David W. Meadows on behalf of Interested
Party Courtesy NEF
david@davidwmeadowslaw.com

Krikor J Meshefejian on behalf of Creditor
Interested Party
kjm@lnbrb.com

Alan I Nahmias on behalf of Interested Party
Courtesy NEF
anahmias@mbnlawyers.com,
jdale@mbnlawyers.com

Aram Ordubegian on behalf of Creditor LSC
Communications US, LLC / Creel Printing
ordubegian.aram@arentfox.com

Hamid R Rafatjoo on behalf of Creditor
Committee The Official Committee of
Unsecured Creditors
hrafatjoo@raineslaw.com,
bclark@raineslaw.com;cwilliams@raineslaw.c
om
S Margaux Ross on behalf of U.S. Trustee
United States Trustee (SV)
margaux.ross@usdoj.gov

Michael St James on behalf of Creditor
Interested Party
ecf@stjames-law.com

Michael St James on behalf of Interested Party
Michael St. James
ecf@stjames-law.com

Howard Steinberg on behalf of Creditor
Greenberg Traurig, LLP
steinbergh@gtlaw.com,
pearsallt@gtlaw.com;laik@gtlaw.com

Cathy Ta on behalf of Interested Party
Penthouse Clubs Worldwide, LLC
cathy.ta@bbklaw.com,
Arthur.Johnston@bbklaw.com;lisa.spencer@b
bklaw.com

United States Trustee (SV)
ustpregion16.wh.ecf@usdoj.gov

Michael H Weiss on behalf of Attorney Weiss
& Spees, LLP
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor Danni
Ashe, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor GMI
Online Ventures, Ltd.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor General
Media Communications, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor General
Media Entertainment, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Digital Media Productions, Inc.

{N3597620.4} This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012
DOCS_LA:314463.1 32277/001

**F 9013-3.1.PROOF.SERVICE**

mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Global Broadcasting, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Global Digital, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Global Licensing, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Global Media, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Global Publishing, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Images Acquisitions, Ltd.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor Pure
Entertainment Telecommunications, Inc. fka
For Your Ears Only, Ltd.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Streamray Studios, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor Tan
Door Media, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor XVHUB
Group, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Christopher K.S. Wong on behalf of Creditor
LSC Communications US, LLC / Creel
Printing
christopher.wong@arentfox.com

Beth Ann R Young on behalf of Creditor
Dream Media Corporation
bry@lnbyb.com

Beth Ann R Young on behalf of Creditor
Interested Party
bry@lnbyb.com

Brian L. Davidoff
bdavidoff@greenbergglusker.com

Jonathan Hayes jhayes@SRHLawFirm.com

Peter W. Lianides plianides@wcghlaw.com

Mark S. Horoupian
mhoroupian@sulmeyerlaw.com

{N3597620.4}This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**U.S. Bankruptcy Court**
**Central District of California (San Fernando Valley)**
**In re Penthouse Global Media, Inc., Case No. 18-10098-MB**

2.    <u>**SERVED BY UNITED STATES MAIL**</u>:

*Debtor*
Penthouse Global Media, Inc.
8944 Mason Ave.
Chatsworth, CA 91311

*Counsel for Debtor*
Michael H. Weiss, Esq.
WEISS & SPEES LLP
6310 San Vicente Boulevard, Suite 401
Los Angeles, CA  90048

*Trustee*
David Keith Gottlieb, Managing
Member
D. Gottlieb & Associates, LLC
17000 Ventura Blvd., Suite 300
Encino, California, 91403

*Office of U.S. Trustee*
Margaux S. Ross
915 Wilshire Blvd. , Suite 1850
Los Angeles, CA 90017

*Counsel for The Official Committee of
Unsecured Creditors*
c/o Hamid R. Rafatjoo
Raines Feldman LLP
1800 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067

*Committee Members*
DVD Factory Inc.
Representative: Steve Kalson
7230 Coldwater Canyon Ave.
North Hollywood, CA 91605

LSC Communications US, LLC / Creel Printing.
Representative: Dan Pevonk
4101 Winfield Rd.
Warrenville, IL 60555

TGG
Representative: Matthew A. Garrett, CEO
10188 Telesis Court
Suite 130
San Diego, CA 92121

Miller Law Group
Representative: Walter M. Stella
111 Sutter Street
San Francisco, CA 94104

Palm Coast Data
Representative: Neil Gordon
11 Commerce Blvd.
Palm Coast, FL 32164

*Interested Parties*
Kelly Holland
President and Chief Executive Officer
Penthouse Global Media, Inc.
8944 Mason Ave.
Chatsworth, CA 91311

Robert W. Campbell
Penthouse Global Media, Inc.
8944 Mason Ave.
Chatsworth, CA 91311

Allan B. Gelbard
Attorney at Law
15760 Ventura Boulevard, Suite 801
Encino, CA  91436

Mark A. Mintz
Attorney at Law
JONES WALKER
201 St. Charles Avenue
New Orleans, LA  70170-5100

John D. Kirkendoll
Founder/CEO
Kirkendoll Management, LLC
201 St Charles Ave., Suite 3915
New Orleans, LA 70170

*Requests for Special Notice*
Howard J. Steinberg (CA SBN 89291)
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, CA  90067

{N3597620.4}This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
DOCS_LA:314463.1 32277/001

**F 9013-3.1.PROOF.SERVICE**

Aram Ordubegian (SBN 185142)
Robert M. Hirsh (*pro hac vice*
application to be submitted)
**ARENT FOX LLP**
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013-1065

Joseph E Bain
Jones Walker LLP
811 Main St., Ste 2900
Houston, TX 77002

Timothy Driver
433 North Camden, Suite 970
Beverly Hills, CA 90210

---

{N3597620.4}This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
DOCS_LA:314463.1 32277/001                    **F 9013-3.1.PROOF.SERVICE**