PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Linda F. Cantor (CA Bar No. 153762)
   Victoria A. Newmark (CA Bar No. 183581)
2  PACHULSKI STANG ZIEHL & JONES LLP
   10100 Santa Monica Blvd., 13th Floor
3  Los Angeles, CA  90067
   Telephone: 310/277-6910
4  Facsimile: 310/201-0760
   E-mail:  lcantor@pszjlaw.com
5           vnewmark@pszjlaw.com

6  Attorneys for David K. Gottlieb, Chapter 11 Trustee

7              **UNITED STATES BANKRUPTCY COURT**
                 **CENTRAL DISTRICT OF CALIFORNIA**
8                **SAN FERNANDO VALLEY DIVISION**

9  In re:                                Cases No.: 1:18-BK-10098-MB

10 PENTHOUSE GLOBAL MEDIA, INC.,         Chapter 11

11              Debtor.                  Jointly Administered with Cases Nos.:
                                         1:18-bk-10099-MB; 1:18-bk-10101-MB;
12                                       1:18-bk-10102-MB; 1:18-bk-10103-MB;
   ☒ Affects All Debtors                 1:18-bk-10104-MB; 1:18-bk-10105-MB;
13                                       1:18-bk-10106-MB; 1:18-bk-10107-MB;
   ☐ Affects Penthouse Global Broadcasting, Inc.   1:18-bk-10108-MB; 1:18-bk-10109-MB;
14 ☐ Affects Penthouse Global Licensing, Inc.      1:18-bk-10110-MB; 1:18-bk-10111-MB;
   ☐ Affects Penthouse Global Digital, Inc.        1:18-bk-10112-MB; 1:18-bk-10113-MB
15 ☐ Affects Penthouse Global Publishing, Inc.
16 ☐ Affects GMI Online Ventures, Ltd.   **NOTICE OF MOTION AND MOTION FOR**
   ☐ Affects Penthouse Digital Media Productions, Inc.   **ORDER (A) APPROVING THE ESTATES'**
17 ☐ Affects Tan Door Media, Inc.        **SALE OF CERTAIN TRADEMARKS TO**
                                         **PENTHOUSE CLUBS GLOBAL**
18 ☐ Affects Penthouse Images Acquisitions, Ltd.   **LICENSING, LLC, FREE AND CLEAR OF**
   ☐ Affects Pure Entertainment Telecommunications, Inc.   **ALL LIENS, CLAIMS, ENCUMBRANCES**
19 ☐ Affects XVHUB Group, Inc.          **AND INTERESTS; (B) APPROVING THE**
                                         **ESTATES' LICENSE OF CERTAIN**
20 ☐ Affects General Media Communications, Inc.   **RELATED INTELLECTUAL PROPERTY**
   ☐ Affects General Media Entertainment, Inc.    **TO PENTHOUSE CLUBS GLOBAL**
21 ☐ Affects Danni Ashe, Inc.           **LICENSING, LLC; AND (C)  GRANTING**
                                         **RELATED RELIEF; MEMORANDUM OF**
22 ☐ Affects Streamray Studios, Inc.    **POINTS AND AUTHORITIES;**
                                         **DECLARATION OF DAVID K. GOTTLIEB**
23
                                         **Hearing:**  **Set by Court on Shortened Notice**
24
                                         Date:      May 30, 2018
25                                       Time:      1:00 p.m.
                                         Place:     United States Bankruptcy Court
26                                                  21041 Burbank Boulevard
                                                    Courtroom 303
27                                                  Woodland Hills, California

28                                       Judge:  Hon. Martin R. Barash

1  **TO THE HONORABLE MARTIN R. BARASH, UNITED STATES BANKRUPTCY JUDGE,**

2  **THE OFFICE OF THE UNITED STATES TRUSTEE, THE OFFICIAL COMMITTEE OF**

3  **UNSECURED CREDITOR AND ITS COUNSEL, THE DEBTORS, COUNSEL TO THE**

4  **PURCHASER, DREAM MEDIA CORPORATION AND PARTIES THAT HAVE FILED**

5  **REQUESTS FOR SPECIAL NOTICE:**

6      **PLEASE TAKE NOTICE** that David K. Gottlieb, Chapter 11 Trustee (the "Trustee") of

7  the above-captioned bankruptcy estates (the "Estates") of Penthouse Global Media, Inc. and its

8  debtor subsidiaries (the "Debtors"), hereby moves (the "Motion") the Court for the entry of an

9  order, pursuant to sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy

10  Code") and Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the

11  "Bankruptcy Rules"):

12      (a)    authorizing the Trustee to sell (the "Sale") certain intellectual property of the

13  Estates, consisting of the Penthouse Clubs Marks[1], the Penthouse Club Domain Names and the

14  rights to use such Penthouse Clubs Marks and Penthouse Clubs Domain Names (collectively, the

15  "Assets") to Penthouse Clubs Global Licensing, LLC (the "Purchaser"), as described in and

16  pursuant to the terms and conditions set forth in the Purchase and Sale Agreement in the form of

17  Exhibit A attached hereto (the "Purchase Agreement"), free and clear of all liens, claims, interests

18  and encumbrances pursuant to sections 363(b) and (f) of the Bankruptcy Code in accordance with

19  the terms of the settlement agreement (the "Settlement Agreement") approved by the Court[2], as

20  described more fully below;

21      (b)    authorizing the Trustee to license (the "License") to Purchaser certain

22  intellectual property of the Estates (the "Licensed Assets") as described in and pursuant to the terms

23  and conditions of that certain Master Intellectual Property License Agreement (the "License

24  Agreement") in the form of Exhibit B attached hereto;

25      (c)    authorizing the Trustee, in connection with the Sale and License, to enter into

26

27  [1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Purchase Agreement and the License Agreement (as hereinafter defined).

28  [2] *See* Order Approving Settlement With Dream Media Corporation dated May 16, 2018 [Dkt. No. 478] (the "Settlement Order").

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  that certain Consent to Use and Registration Agreement (the "Consent Agreement") in the form of

2  Exhibit C hereto; and

3          (d)    granting such other relief as is just and proper under the circumstances.

4       **PLEASE TAKE FURTHER NOTICE** that, as explained more fully in the attached

5  Memorandum of Points and Authorities, the Trustee determined in his sound business judgment that

6  the proposed Sale of the Assets and License to the Purchaser are in the best interests of the Estates.

7       **PLEASE TAKE FURTHER NOTICE** that there should be no negative tax implications to

8  the Estates as a result of the Sale.

9       **PLEASE TAKE FURTHER NOTICE** that the Motion is based on this Notice and Motion,

10  the attached Memorandum of Points and Authorities and Declaration of David K. Gottlieb (the

11  "Gottlieb Declaration"), the arguments of counsel and other admissible evidence properly brought

12  before the Court at or before the hearing on this Motion.  In addition, the Trustee requests that the

13  Court take judicial notice of all documents filed with the Court in these cases.

14       **PLEASE TAKE FURTHER NOTICE** that the Court has set the hearing on this Motion on

15  shortened time.  The hearing (the "Hearing") on the Motion will be held on **May 30, 2018 at 1:00**

16  **p.m. (Pacific time)** before the Honorable Martin Barash, United States Bankruptcy Judge, 21041

17  Burbank Boulevard, Courtroom 303, Woodland Hills, CA  91367.  Oppositions, if any, to the

18  Motion may be raised at the Hearing however any written opposition to the Motion must be filed

19  with the clerk of the Bankruptcy Court and served upon the Trustee's counsel, Linda Cantor, Esq.,

20  Pachulski Stang Ziehl & Jones LLP, 13th Floor, Los Angeles, CA 90067, facsimile: 310-201-0760,

21  lcantor@pszjlaw.com, no later than **May 29, 2018 at 5:00 p.m. (Pacific time).**  Any written reply to

22  an opposition to the Motion must be filed with the Court **no later than 11:00 a.m. on May 30,**

23  **2018.**  Replies to any oppositions may also be stated on the record at the hearing on the Motion.

24       **UNLESS AN OPPOSITION IS TIMELY SERVED AND FILED OR PRESENTED AT**

25  **THE HEARING IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE**

26  **CONSIDERED BY THE BANKRUPTCY COURT AND THE BANKRUPTCY COURT MAY**

27  **GRANT THE RELIEF REQUESTED.**

28       **PLEASE TAKE FURTHER NOTICE** that counsel to the Trustee will serve this Notice

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

and Motion, the attached Memorandum of Points and Authorities and the Gottlieb Declaration on:

(1) the Office of the United States Trustee, (2) the Official Committee of Unsecured Creditors and

its counsel, (3) the Debtors, (4) counsel to the Purchaser, (5) Dream Media Corporation and (6)

parties that have filed with the Court and requested special notice.  The Trustee will also serve notice

of the Motion and the hearing date on all creditors and parties in interest.  The Trustee submits that

such notice is sufficient and that no other or further notice be given.

WHEREFORE, the Trustee respectfully requests that the Court enter an order (a)

approving the Sale of the Assets to the Purchaser, free and clear of all liens, claims, encumbrances

and interests in accordance with the terms of the Settlement Order; (b) authorizing the Trustee to

License the Licensed Asses to Purchaser; (c) authorizing the Trustee to enter into the Purchase

Agreement, the License Agreement and the Consent Agreement in the forms appended hereto as

Exhibits A, B and C, respectively; and (d) granting such other relief as is fair and equitable.

Dated:    May 21, 2018

PACHULSKI STANG ZIEHL & JONES LLP

By    /s/ Linda F. Cantor
     Linda F. Cantor

Attorneys for David K. Gottlieb, Chapter 11
Trustee

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

4

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

The Trustee seeks authorization to sell to Penthouse Clubs Global Licensing, LLC, as Purchaser, certain trademarks that are currently licensed to Purchaser pursuant to the terms of a Master License Agreement dated as of March 29, 2017 (the "MLA").  In addition to the Sale, the Trustee seeks to license to Purchaser certain related intellectual property rights that Purchaser currently uses under the MLA.  In order to specify the rights of the Estates (and their successors) and Purchaser with respect to future registrations and use of the trademarks that are the subject of the Sale and License, the Trustee also seeks authorization to enter into the Consent Agreement which will govern such future use and registration.  The purchase price for the Sale of the Assets is $1,075,000.  The funds received from the Purchaser will be distributed to the Trustee, on behalf of the Estates, and to Dream Media Corporation in accordance with the terms of the Settlement Agreement between Dream Media Corporation and the Trustee entered into on May 10, 2018, and approved by the Court by order entered May 16, 2018.

### II.

### JURISDICTION AND VENUE

The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 157 and 1334.  This proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (N).  Venue of these cases and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, and 363(b), (f) and (m) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 9014.

### III.

### BACKGROUND

A description of the Debtors' background, capital structure, and the events leading to these bankruptcy filings are set forth in the Declaration of Kelly Holland filed on January 23, 2018 (Dkt. No. 42).  A description of the negotiations that led to the Sale and License that are the subject of this

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Motion is provided in the *Notice Of Motion And Motion For Order Approving Settlement With Kirkendoll Management LLC And Its Related Affiliates; Memorandum Of Points And Authorities; Declaration Of David K Gottlieb In Support Thereof* (the "<u>Kirkendoll Settlement Motion</u>") filed concurrently herewith.

**IV.**

**THE PROPOSED SALE AND LICENSE**

**A.    The Assets to Be Sold**

The Trustee is proposing to sell to the Purchaser certain Assets as listed in the Purchase Agreement. The Assets to be sold are comprised primarily of intellectual property. The Assets include the Penthouse Club Marks and the Penthouse Club Domain Names as those terms are defined in the Purchase Agreement.

The Purchaser is the licensee of certain trademarks of the Debtors under the MLA. Other than its involvement with the Debtors as a licensee of intellectual property and being a holder of a general unsecured claim, to the Trustee's knowledge Purchaser has no connections with the Debtors or the Trustee and is not an insider of the Debtors as that term is defined in Section 101(31) of the Bankruptcy Code.

**B.    Consideration**

The consideration to be paid by the Purchaser (the "<u>Consideration</u>") consists of $1,075,000, and other consideration as set forth in the Purchase Agreement and as described in the Notice of Motion and Motion for Order Approving Settlement with Kirkendoll Management LLC and its Related Affiliates; Memorandum of Points and Authorities; Declaration of David K. Gottlieb in Support Thereof (the "<u>Kirkendoll Settlement Motion</u>") filed concurrently herewith.

**C.    Assets to be Sold Free and Clear of Interests**

The Assets shall be sold free and clear of all liens, claims, rights, interests and encumbrances whatsoever ("<u>Interests</u>"), in accordance with section 363(b) and (f) of the Bankruptcy Code, pursuant to the terms of the Settlement Agreement by and between the Trustee and Dream Media Corporation approved by the Court pursuant to the Settlement Order dated May 16, 2018. The Settlement Order provides, *inter alia*, for the release of Dream Media Corporation's Interests as to a

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  portion of the Sale proceeds which will be paid to the Trustee for the benefit of the Estates, and

2  payment to Dream Media Corporation of the remainder of the Sale Proceeds in partial satisfaction of

3  its secured claims.

4  **D.    Master License Agreement and Consent Agreement**[3]

5  In addition to the Purchase Agreement, the Trustee seeks authority to enter into the License

6  Agreement with Purchaser, as Licensee, in the form attached hereto as Exhibit B and the Consent

7  Agreement in the form attached hereto as Exhibit C.  Subject to the terms and conditions of the

8  License Agreement, the Estates, as Licensor, grants to Licensee (the "License Grant") a fully

9  prepaid, irrevocable, exclusive, transferable, sub-licensable, license, to use, sublicense, franchise

10  (and sub-franchise), anywhere in the world for a perpetual term, solely in connection with the

11  ownership, operation, marketing, and promotion of Gentlemen's Clubs, and the advertising and

12  promotion through any media now known or hereafter devised, including the Internet, and

13  restaurant, bar, and cocktail lounge services directly related thereto (the "Licensed Services"): (i) all

14  copyrights and other intellectual property owned or controlled by Licensor in and to the Penthouse

15  Media, illustrative examples of which are set forth in Schedule 1.1(a) of the License Agreement, but

16  only for the purpose of displaying such material in Licensee's Gentlemen's Clubs or to advertise or

17  promote services offered in or events occurring at Licensees Gentlemen's Clubs consistent with

18  historical practice of Licensee, its Affiliates, and their sub-licensees (the "Additional Intellectual

19  Property"); and (ii) the marks identified in Schedule 1.1(a) of the License Agreement, which are the

20  subject of U.S. and foreign trademark registrations or applications to register such marks, or U.S.

21  and foreign common law rights in and to such marks therein owned or controlled by Licensor (the

22  "Additional Marks"), *provided, however,* that Licensee (and all sub-licensees) shall utilize the

23  Additional Marks in accordance with the provisions of Section 1.1(g) of the License Agreement and

24  the quality control provisions set forth in Section 5.6 of the License Agreement.  Under the terms of

25  the License Agreement, the Licensee has agreed to only use the Additional Intellectual Property in

26  relation to the Gentlemen's Clubs (all as defined in the License Agreement).

27

28  [3]  The following discussion is a summary only, and is subject to the more specific provisions set forth in the License Agreement and the Consent Agreement, attached hereto as Exhibits B and C, respectively.

1    In order to specify the rights of the Estates (and their successors) and Purchaser with respect

2  to future registrations and use of the trademarks that are the subject of the Sale and License, the

3  Trustee also seeks authorization to enter into the Consent Agreement which will govern such future

4  use and registration, in the form of Exhibit "C" hereto

5    The License Agreement and the Consent Agreement shall be assigned to the Successful

6  Bidder at the Auction scheduled to be held before the Court in connection with the hearing to

7  approve the sale of other assets of the Estates on June 4, 2018 at 12:00 noon Pacific time (and, if not

8  completed, to be continued to June 5, 2018 at 9:00 a.m.).

9    **V.**

10    <u>**ARGUMENT**</u>

11  **A.    <u>The Proposed Sale and License Are in the Best Interests of the Estates and Should be</u>**

12  <u>**Approved as a Reasonable Exercise of the Trustee's Business Judgment**</u>

13    Bankruptcy Rule 6004(f)(1) expressly allows sales outside the ordinary course of business to

14  be done through either a public auction or a private sale. "This particular Rule, which is entitled

15  'Conduct of Sale Not in the Ordinary Course of Business,' expressly sets forth, in pertinent part, the

16  following: 'All sales not in the ordinary course of business may be by private sale or by public

17  auction.' (emphasis added).    Case law supports this conclusion. *See In re Bakalis*, 220 B.R. 525, 531

18  (Bankr. E.D. N.Y. 1998) ("Unlike judicial sales under the former Bankruptcy Act, the sale [**38]  of

19  estate property under the Bankruptcy Code is conducted by a trustee, who 'has ample discretion to

20  administer the estate, including authority to conduct public or private sales of estate property.")

21  (citations omitted); *Penn Mut. Life Ins. Co. v. Woodscape Ltd., P'ship (In re Woodscape Ltd. P'ship)*,

22  134 B.R. 165, 174 (Bankr. D. Md. 1991) ("There is no prohibition against a private sale . . . and

23  there is no requirement that the sale be by public auction.")." *In re 9 Houston LLC* , 578 B.R. 600,

24  618 (Bankr. S.D. Tex. 2017).

25    Purchaser is the licensee under the MLA for the trademarks that are the subject of the Sale,

26  having paid $2.6 million for its license in March of 2017.  Based upon the record in these cases and

27  the Trustee's professionals' review of the liens asserted against the Debtors' assets, the Trustee is

28  informed and believes that any liens asserted against the trademarks that are the subject of the MLA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    are unperfected.  However, Purchaser holds a license to use those trademarks under the MLA and the

2    Trustee is informed and believes that there is a conflict among the courts as to the rights of a licensee

3    upon rejection of a trademark license under Section 365 of the Bankruptcy Code.  Therefore, there is

4    no certainty that the Trustee could sell the Assets to a third party free and clear of the license claims

5    of the Purchaser.  Moreover, if the Trustee were to reject the MLA and seek to sell the licensed

6    trademarks to a third part through a public auction, litigation with the Purchaser would likely ensue.

7    As set forth in the record of these cases, there are insufficient funds in the Estates to litigate these

8    issues including litigating an appeal of any successful outcome at the Bankruptcy Court level.  Based

9    upon the extant interests of Purchaser in the trademarks that are the subject of the Sale and License,

10    the Trustee's determination to sell the Assets by private sale is squarely within the reasonable

11    exercise of the Trustee's business judgment and should be approved by the Court.

12    **B.**    **The Proposed Sale and License Should be Approved Under Section 363(b) of the**

13    **Bankruptcy Code**

14        A trustee, after notice and a hearing, may use, sell, or lease property, other than in the

15    ordinary course of business.  11 U.S.C. § 363(b)(1).  The application of the trustee's sound business

16    judgment in the use, sale, or lease of property is subject to great judicial deference.  *See, e.g., In re*

17    *Moore*, 110 B.R. 924 (Bankr. C.D. Cal. 1990); *In re Canyon P'ship*, 55 B.R. 520 (Bankr. S.D. Cal.

18    1985); *see also Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1988)

19    ("[T]here must be some articulated business justification for using, selling, or leasing the property

20    outside the ordinary course of business . . . whether the proffered business justification is sufficient

21    depends on the facts of the case.  As the Second Circuit held in *Lionel*, the bankruptcy judge should

22    consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse

23    interests of the debtor, creditors and equity holders, alike.").

24        In interpreting section 363(b)(1) of the Bankruptcy Code, courts have held that a transaction

25    involving property of the estate generally should be approved where the debtor or trustee can

26    demonstrate "some articulated business justification for using, selling, or leasing property outside of

27    the ordinary course of business."  *In re Continental Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir.

28    1986); *accord In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *Walter*, 83 B.R. at 19-20; *In*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  *re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981). Among other factors, courts

2  should consider the consideration to be paid, the financial condition and needs of the debtor, the

3  qualifications of the buyer, and whether a risk exists that the assets proposed to be sold would

4  decline in value if left in the debtor's possession. *See Equity Funding Corp. of Am. v. Fin. Assocs.*

5  *(In re Equity Funding Corp.)*, 492 F.2d 793, 794 (9th Cir. 1974) (affirming trial court's finding that

6  the proposed sale of the debtor's assets would be in the best interest of the estate in light of

7  impending deterioration of market value of debtor's assets).

8          As chapter 11 trustee, the Trustee's goal is to maximize value from the disposition of the

9  Debtors' assets. The Trustee believes that the consideration to be paid by the Purchaser pursuant to

10  the terms of the Purchase Agreement, represents a fair and reasonable offer in light of all the terms

11  of the proposed Sale and the settlement described in the Kirkendoll Settlement Motion.

12  Accordingly, the Sale of the Assets and the License of intellectual property in accordance with the

13  terms of the Sale Agreement and the License Agreement, as described herein, are fair and reasonable

14  and in the best interests of the Estates and their creditors and should be authorized by the Court.

15  **C.    The Purchaser Acted in Good Faith in Connection With the Sale**

16          The Sale and License were negotiated in good faith, at arms' length and, to the best of the

17  Trustee's information and belief, without collusion or fraud of any kind in connection with the

18  settlement of certain issues as set forth in the Term Sheet filed with the Court as Docket No. 461.

19  Accordingly, this Court should find that the Purchaser acted in good faith within the meaning of

20  section 363(m) of the Bankruptcy Code. *See generally Ewell v. Diebert (In re Ewell)*, 958 F.2d 276,

21  280 (9th Cir. 1992); *Marin v. Coated Sales, Inc.(In re Coated Sales, Inc.)*, No. 89 Civ. 3704 (KMW),

22  1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding that to show lack of good faith, a party must

23  demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); *see*

24  *also In re Sassoon Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (quoting *In re Bel Air Assocs.,*

25  *Ltd.*, 706 F.2d 301, 305 (10th Cir. 1983)); *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y.

26  1986) (examining the facts of each case, concentrating on the "integrity of [an actor's] conduct

27  during the sale proceedings" (quoting *In re Rock Indus. Machinery Corp.*, 572 F.2d 1195, 1998 (7th

28  Cir. 1978)).

**D.**    **The Sale of the Assets Free and Clear of Liens, Claims, And Interests Pursuant to 11**

**U.S.C. § 363(f) Should Be Approved**

The Trustee requests that the Court approve the sale of the Assets free and clear of all

Interests, subject to the terms of the Settlement Agreement.

Section 363(f) of the Bankruptcy Code expressly authorizes a trustee to sell property outside

the ordinary course of business "free and clear of any interest in such property of an entity" if any

one of the five following conditions is met:

> 1.    applicable non-bankruptcy law permits sale of such property free and clear of
> such interest;
>
> 2.    such entity consents;
>
> 3.    such interest is a lien and the price at which such property is to be sold is
> greater than the aggregate value of all liens on such property; and
>
> 4.    such interest is in bona fide dispute; or
>
> 5.    such entity could be compelled, in a legal or equitable proceeding, to accept a
> money satisfaction of such interest.

11 U.S.C. § 363(f). Because section 363(f) of the Bankruptcy Code is written in the disjunctive, any

one of these five conditions provides authority to sell the Assets free and clear of liens. *See Citicorp*

*Homeowners Servs., Inc. v. Elliot (In re Elliot),* 94 B.R. 343, 345 (E.D. Pa. 1988).

Dream Media, which asserts a lien against the MLA as a general intangible, has consented to

the sale of the Assets to Purchaser free and clear of Interests pursuant to the terms of the Settlement

Agreement.  There are no other liens asserted against the Assets to be purchased (other than an

unperfected security interest held by Purchaser).  Therefore, to the extent applicable, the

requirements of section 363(f) of the Bankruptcy Code have been met.

In any event, if a holder of a lien or claim receives notice of the sale and fails to object,

section 363(f)(2) of the Bankruptcy Code would also apply and allow the Assets may be sold free

and clear of that lien or claim.  Thus, a sale free of Interests is permitted.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**F.    The Relief Granted Should Be Enforceable in a Chapter 7**

In the event that these cases are converted to cases under chapter 7 of the Bankruptcy Code, the Trustee requests that the authorizations and approvals with respect to the proposed Sale and License be enforceable in the Chapter 7 cases. Such relief will enable the Trustee to dispose of the Assets as promptly and efficiently as possible.

**G.    Waiver of the Stay Is Appropriate**

Moreover, the Trustee seeks a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."

As expressed above, the Trustee's goal is to efficiently administer the Estates' financial and business affairs for the benefit of their creditors. An expedient conclusion to the sale process will inure to the benefit of the Estates and their creditors. Waiver of Bankruptcy Rule 6004(h) will permit the Sale to take place as early as possible under the circumstances.

**VI.**

**CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests that the Court enter an order (a) approving the Sale of the Assets to the Purchaser free and clear of all Interests, pursuant to the terms of the Settlement Agreement; (b) authorizing the Trustee to enter into the Purchase Agreement with the Purchaser, in the form attached hereto as Exhibit A; (c) authorizing the Trustee to License to Purchaser the Licensed Assets under the terms and conditions set forth in that certain License Agreement attached hereto as Exhibit B and to execute the License Agreement on behalf of the Estates;(d) authorizing the Trustee to enter into the Consent Agreement governing the future use and

//

//

//

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  registration of the trademarks that are the subject of the Sale and the License in the form of <u>Exhibit</u>

2  <u>C</u>, and (e) granting such other relief as is fair and equitable.

3

4  Dated:    May 21, 2018                          PACHULSKI STANG ZIEHL & JONES LLP

5                                                  By    <u>*/s/ Linda F. Cantor*</u>
                                                          Linda F. Cantor

6                                                  Attorneys for David K. Gottlieb, Chapter 11
                                                   Trustee
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## DECLARATION OF DAVID K. GOTTLIEB

I, David K. Gottlieb, declare:

1.      I am the duly appointed chapter 11 trustee (the "Trustee") in the bankruptcy cases of Penthouse Global Media, Inc. and its debtor subsidiaries (the "Debtors").

2.      I make this Declaration in support of the *Notice Of Motion and Motion for Order (A) Approving the Estates' Sale of Certain Trademarks to Penthouse Clubs Global Licensing, LLC, Free and Clear of All Liens, Claims, Encumbrances and Interests; (B) Approving the Estates' License of Certain Related Intellectual Property to Penthouse Clubs Global Licensing, LLC; and (C) Granting Related Relief; Memorandum Of Points And Authorities and Declaration of David K. Gottlieb* (the "Motion"). All matters set forth in this Declaration are based on my personal knowledge and my review of relevant documents, including, without limitation, information supplied to me by my professionals, the Debtor and by others, as well as matters for which judicial notice is sought. If called upon to testify, I could and would testify competently to the facts set forth herein. Capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Motion.

3.      By the Motion, I am proposing to sell to the Purchaser certain Assets as listed in the Purchase Agreement. The Assets to be sold are comprised primarily of intellectual property. The Assets include the Penthouse Club Marks and the Penthouse Club Domain Names as those terms are defined in the Purchase Agreement.

4.      The Purchaser is the licensee of certain trademarks of the Debtors under the MLA. Other than its involvement with the Debtors as a licensee of intellectual property and being a holder of a general unsecured claim, to the best of my knowledge Purchaser has no connections with the Debtors or the Trustee and is not an insider of the Debtors as that term is defined in Section 101(31) of the Bankruptcy Code.

5.      The Consideration to be paid by the Purchaser consists of $1,075,000, and other consideration as set forth in the Purchase Agreement and as described in the Kirkendoll Settlement Motion filed concurrently herewith.

6.      The Assets will be sold free and clear of Interests in accordance with section 363(b) and (f) of the Bankruptcy Code, subject to the terms of the Settlement Agreement entered into with

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Dream Media Corporation which was approved by the Court pursuant to the Settlement Order dated

2  May 16, 2018.  That settlement provides, *inter alia*, for the release of Dream Media Corporation's

3  Interests as to a portion of the Sale proceeds to be paid to the Estates, and payment to Dream Media

4  Corporation of the remainder of the Sale Proceeds in partial satisfaction of its secured claim.

5        7.      In addition to the Purchase Agreement, I am seeking authority to enter into the

6  License Agreement with Purchaser, as Licensee, in the form attached hereto as Exhibit B and the

7  Consent Agreement in the form attached hereto as Exhibit C.  The general terms of the License

8  Agreement and the Consent Agreement are set forth in the Motion; however, in the event of any

9  inconsistency between the summary set forth in the Motion and the terms of the License Agreement

10  and the Consent Agreement, the terms of the License Agreement and the Consent Agreement

11  attached to the Motions as Exhibits B and C, respectively, will prevail.

12        8.      The License Agreement and the Consent Agreement will be assigned to the

13  Successful Bidder at the Auction scheduled to be held before the Court in connection with the

14  hearing to approve the sale of other assets of the Estates on June 4, 2018 at 12:00 noon (Pacific time)

15  (and, if not completed, to be continued to June 5, 2018 at 9:00 a.m. (Pacific Time)).

16        9.      Purchaser is the licensee under the MLA for the trademarks that are the subject of the

17  Sale, having paid $2.6 million for its license in March of 2017.  Based upon the record in these cases

18  and my professionals' review of the liens asserted against the Debtors' assets, I am informed and

19  believe that any liens asserted against the trademarks that are the subject of the MLA are

20  unperfected.  However, Purchaser holds a license to use those trademarks under the MLA and I am

21  informed and believe that there is a conflict among the courts as to the rights of a licensee upon

22  rejection of a trademark license under Section 365 of the Bankruptcy Code.  Therefore, there is no

23  certainty that I would be able to sell the Assets to a third party free and clear of the license claims of

24  the Purchaser.  Moreover, if I were to reject the MLA and seek to sell the licensed trademarks to a

25  third part through a public auction, litigation with the Purchaser would likely ensue.  As set forth in

26  the record of these cases, there are insufficient funds in the Estates to litigate these issues including

27  litigating an appeal of any successful outcome at the Bankruptcy Court level.  Based upon the extant

28  interests of Purchaser in the trademarks that are the subject of the Sale and License, I determined in

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    the exercise of my business judgment to sell the Assets by private sale.

2         10.    As chapter 11 trustee, my goal is to maximize value from the disposition of the

3    Debtors' assets. I believe that the consideration to be paid by the Purchaser pursuant to the terms of

4    the Purchase Agreement represents a fair and reasonable offer in light of all the terms of the

5    proposed Sale and the settlement described in the Kirkendoll Settlement Motion. Accordingly, I

6    believe that the Sale of the Assets and the License of intellectual property in accordance with the

7    terms of the Sale Agreement and the License Agreement, as described herein, are fair and reasonable

8    and in the best interests of the Estates and their creditors and should be authorized by the Court.

9         11.    The Sale and License were negotiated in good faith, at arms' length and, to the best of

10   my information and belief, without collusion or fraud of any kind in connection with the settlement

11   of certain issues as set forth in the Term Sheet filed with the Court as Docket No. 461. Accordingly,

12   I support a finding that the Purchaser acted in good faith within the meaning of section 363(m) of the

13   Bankruptcy Code in any order approving this Motion.

14        12.    Dream Media, which asserts a lien against the MLA as a general intangible, has

15   consented to the sale of the Assets to Purchaser free and clear of Interests pursuant to the terms of

16   the Settlement Agreement. I am aware of no other liens asserts against the Assets to be purchased

17   (other than an unperfected security interest held by Purchaser). Therefore, to the extent applicable, I

18   am informed and believe that the requirements of section 363(f) of the Bankruptcy Code have been

19   met.

20        13.    In the event that these cases are converted to cases under chapter 7 of the Bankruptcy

21   Code, I request that the authorizations and approvals with respect to the proposed Sale and License

22   be enforceable in the Chapter 7 cases. Such relief will enable a chapter 7 trustee to dispose of the

23   Assets as promptly and efficiently as possible.

24        14.    I am seeking a waiver of any stay of the effectiveness of the order approving this

25   Motion in accordance with the terms of the settlement outlined in the Term Sheet. The Auction of

26   the Estates' remaining assets will be held on June 4, 2018 and a closing will occur as soon as

27   reasonably practicable thereafter. A waiver of the stay under Rule 6004(h) of the Bankruptcy Rules

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:314443.1 32277/001                         3

1    will comport with my goal to efficiently administer the Estates' financial and business affairs for the

2    benefit of their creditors.

3        I declare under penalty of perjury under the laws of the United States of America that the

4    foregoing is true and correct.

5        Executed on this 21st day of May, 2018 at Encino, California.

6

7                                        DAVID K. GOTTLIEB

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:314443.1 32277/001                                4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## EXHIBIT A

**Purchase Agreement**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

EXECUTION COPY

---

# PURCHASE AND SALE AGREEMENT

by and between

## PENTHOUSE CLUBS GLOBAL LICENSING, LLC,
as Purchaser

and

## DAVID K. GOTTLIEB, SOLELY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE FOR PENTHOUSE GLOBAL MEDIA, INC., A DELAWARE CORPORATION AND THE OTHER ENTITIES IDENTIFIED AS "DEBTORS" IN THE FOLLOWING AGREEMENT,
as Seller

Dated as of May 21, 2018

---

{N3595157.5}

# PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "Agreement"), dated as of May 21, 2018 (the "Execution Date"), is entered into by and between David K. Gottlieb, solely in his capacity as Chapter 11 Trustee (acting in such capacity, Mr. Gottlieb is referred to herein as the "Seller") for Penthouse Global Licensing, Inc., a Delaware corporation ("PGLI"), and those affiliates of PGLI set forth on Appendix A attached hereto (individually, a "Debtor" and collectively, "Debtors"), on the one hand, and Penthouse Clubs Global Licensing, LLC, a Delaware limited liability company ("Purchaser"), on the other hand. Seller and Purchaser are each referred to herein as a "Party" and collectively, as the "Parties."

## WITNESSETH:

WHEREAS, capitalized terms used and not otherwise defined in the body of this Agreement shall have the meanings ascribed to such terms in Exhibit A hereto;

WHEREAS, Purchaser, its affiliates, and its officers and employees have decades of experience owning and operating Gentlemen's Clubs;

WHEREAS, on March 29, 2017, PGLI, on the one hand, and Kirkendoll Management and Penthouse Clubs Worldwide, LLC (collectively, "KM"), on the other hand, which are Affiliates of Purchaser, entered into that certain Master License Agreement (the "Original MLA"), and currently KM, either directly or indirectly, owns, manages, and/or licenses all Gentlemen's Clubs licensed to operate under the mark THE PENTHOUSE CLUB in the United States and other countries;

WHEREAS, on January 11, 2018, Debtors commenced those certain bankruptcy cases that are being jointly administered for procedural purposes only in the case captioned as *In re Penthouse Global Media, Inc.,* Case No. 18-10098 (collectively, the "Bankruptcy Cases") by the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") pursuant to Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code");

WHEREAS, David K. Gottlieb has been duly appointed as the Chapter 11 Trustee (in such capacity, the "Trustee") over Debtors' bankruptcy estates;

WHEREAS, the Trustee filed a *Notice of Motion and Motion for Order (A) Approving Sale of Substantially All Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (B) Scheduling Auction and Sale Hearing; (C) Approving Sale Procedures and Notice of Sale; and (D) Granting Related Relief* as Docket No. 327 in the Bankruptcy Cases (the "Sale Motion");

WHEREAS, the Bankruptcy Court granted the Trustee's Sale Motion by entry of the Bankruptcy Court's Order: (A) Approving Sale Motion, (B) Scheduling Auction And Hearing For Sale Of Substantially All Assets Of The Debtors; (C) Approving Sale Procedures; and (D) Granting Related Relief, entered May 16, 2018 as Docket No 477 (the "Sale Order") and pursuant to the Sale Order, an auction ("Auction") of certain of the Debtors' other assets (such assets that specifically exclude the Acquired Penthouse Club IP (as defined in Section 1.1 below), the "Remaining Assets"), with such Auction being scheduled to commence on June 4, 2018 (the date of such Auction, the "Auction Date"), it being contemplated that the sale to the

winning bidder of the Auction shall be approved by the Bankruptcy Court through entry of an order in form and substance reasonably satisfactory to Purchaser (the "Remaining Assets Order");

WHEREAS, contemporaneously with the Closing (as defined in Section 2.1 below), Seller and Purchaser (or its Affiliates, as applicable) are entering into a perpetual, prepaid intellectual property license agreement (the "License Agreement") pursuant to which Seller is granting to Purchaser, its Affiliates, and their sub-licensees certain rights in the Additional Intellectual Property, Additional Marks, and After-Acquired IP (collectively, the "Related Penthouse IP"), each term as defined in and as set forth more fully in the License Agreement (the "License Agreement Transaction"); and

WHEREAS, it is the intent of the Parties to effect and memorialize the sale and assignment of Debtors' line of business associated with Gentlemen's Clubs and to assign the goodwill of the business connected with the use and symbolized by the Penthouse Club Marks (as defined below) used in connection therewith, and, in connection with the Bankruptcy Cases, Seller desires to engage in a private sale transaction pursuant to which Seller would, and Seller hereby desires to, sell, transfer and assign to Purchaser, and Purchaser would, and hereby desires to, purchase and accept from Seller, the Acquired Penthouse Club IP, on the terms and subject to the conditions set forth in this Agreement (the "Transaction").

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, agreements and covenants contained in this Agreement, the Parties hereby agree as follows:

## ARTICLE 1
## PURCHASE AND SALE

**Section 1.1    Purchase and Sale of Assets**.  Subject to the terms and conditions of this Agreement, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Purchaser (or, if and as applicable, shall cause the same), in each case, free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, and Purchaser shall purchase and acquire from Seller, all right, title and interest of Debtors in the following:

(a)    those marks set forth on Schedule 1.1(a) hereto, whether unregistered or registered with the United States Patent and Trademark Office or other Governmental Entity or office thereof, and all common law rights therein, including all such trade names, trademarks, service marks, and trade dress historically used by Purchaser, its Affiliates, and their sub-licensees with their Gentlemen's Clubs, together with all goodwill associated with the foregoing (collectively, the "Penthouse Club Marks");

(b)    the U.S., state and foreign trademark, trade name, and service mark registrations and applications associated with the Penthouse Club Marks, including, without limitation, all common-law rights related to, and goodwill associated with, the foregoing, and the right to apply to register the Penthouse Club Marks worldwide;

(c)    the domain names either incorporating the Penthouse Club Marks or a location where a club operates, including without limitation those domain names set forth on

Schedule 1.1(c) (collectively, the "Penthouse Club Domain Names"); *provided, however*, for the avoidance of doubt, that the foregoing domain names do not include penthouse.com; and

(d)    all rights under warranties, indemnities and all similar rights against third parties to the extent related to any the Penthouse Club Marks or Penthouse Club Domain Names, and any and all Claims and causes of action, of whatever nature, known or unknown, for past, present or future infringement of any of the foregoing, with the right, but not the obligation, to sue for and collect damages for infringement of the foregoing, whether arising by way of counterclaim or otherwise, and the right to enforce any rights and file any Claims against other Persons associated therewith (collectively, the foregoing (a) through (d), the "Acquired Penthouse Club IP").

**Section 1.2    Purchase Price.**  The aggregate consideration payable by Purchaser to Seller for the Acquired Penthouse Club IP at the Closing (as defined below) shall be One Million Seventy Five Thousand Dollars (U.S. $1,075,000.00) (the "Purchase Price") in cash or other immediately available same day funds of the United States of America ("Good Funds").

**Section 1.3    Acknowledgement of Ownership; Limitation.**

(a)    Subject to Section 1.3(b), Seller acknowledges that, upon the Closing, Purchaser shall be the sole and exclusive owner throughout the Acquired Penthouse Club IP, and any and all goodwill arising from the use of the Acquired Penthouse Club IP shall inure to the benefit of Purchaser. If, following the Closing, Seller or Successor-in-Interest (by virtue of the Bankruptcy Cases or otherwise) acquires any rights or interest in the Acquired Penthouse Club IP, by operation of law or otherwise, such rights or interest shall be deemed and are hereby irrevocably assigned to Purchaser, without further action by any of the Parties. Effective in each case upon the Closing,  Seller agrees on its behalf and on behalf of any of Successor-in-Interest (by virtue of the Bankruptcy Cases or otherwise) not to, and hereby waives any past, present or future right to, dispute or challenge or assist any Person in disputing or challenging Purchaser's ownership of or exclusive rights in and to the Acquired Penthouse Club IP, or the validity or enforceability of the Acquired Penthouse Club IP (including the validity or enforceability of any applications or registrations included therein, whether currently pending or applied-for after the Closing) or this Agreement and each other agreement, certificate and instrument delivered or to be delivered pursuant hereto (collectively, the "Transaction Documents"), including, without limitation, any claims that the transactions contemplated by the Transaction Documents (including the terms thereof) or Purchaser's and (without limiting the Consent To Use and Registration Agreement) its Affiliates' use of the Acquired Penthouse Club IP is likely to cause confusion with, dilute or tarnish any of the Remaining Assets or any of Debtors'' other retained assets.

(b)    FOR THE AVOIDANCE OF DOUBT AND NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, THIS TRANSACTION IS ONLY INTENDED TO VEST IN PURCHASER AND ITS AFFILIATES, AS APPLICABLE, THOSE RIGHTS (WHETHER BY OWNERSHIP PURSUANT TO THIS AGREEMENT OR BY LICENSE PURSUANT TO THE LICENSE AGREEMENT TRANSACTION) NECESSARY TO OWN, OPERATE AND LICENSE GENTLEMEN'S CLUBS IN THE ORDINARY COURSE OF BUSINESS THROUGHOUT THE WORLD, CONSISTENT WITH HISTORICAL PRACTICE BETWEEN DEBTORS AND PURCHASER, AND NONE OF  PURCHASER, SELLER NOR ANY SUCCESSOR-IN-INTEREST CONTEMPLATES NOR INTENDS THAT PURCHASER WILL COMMERCIALIZE OR USE ANY OF THE

{N3595157.5}                                              3

ACQUIRED PENTHOUSE CLUB IP IN CONNECTION WITH ANY OTHER INDEPENDENT BUSINESS LINES OTHER THAN GENTLEMEN'S CLUBS, INCLUDING WITHOUT LIMITATION ANY MERCHANDISING, HOTEL, GAMBLING, BARS OR RESTAURANTS, THAT ARE NOT OTHERWISE NECESSARY FOR THE OWNERSHIP, OPERATION, MARKETING AND PROMOTION OF GENTLEMEN'S CLUBS, OR THE ADVERTISING AND PROMOTION THROUGH ANY MEDIA NOW KNOWN OR HEREAFTER DEVISED, INCLUDING VIA THE INTERNET, AND ANY RESTAURANT, BAR AND COCKTAIL LOUNGE SERVICES DIRECTLY RELATED THERETO, IN ALL CASES IN A MANNER CONSISTENT WITH HISTORICAL PRACTICE.

## ARTICLE 2
## THE CLOSING

**Section 2.1    The Closing**. The closing of the Transaction (the "Closing") shall take place immediately upon, and without the necessity of any further action by or on behalf of any Party, satisfaction of the conditions to Closing set forth in Section 2.4. The Closing shall take place electronically (or by such other means and at such other place as may be mutually agreed by the Parties). The date on which the Closing occurs shall be defined herein as the "Closing Date".

**Section 2.2    Deliveries by Seller**.  At the Closing, Seller shall deliver to Purchaser (or cause the delivery of), as applicable, the following:

(a)    the Acquired Penthouse Club IP, free and clear of all Liens;

(b)    the Penthouse Club Domain Names, free and clear of all Liens;

(c)    an intellectual property assignment in the form attached hereto as Exhibit B (the "Intellectual Property Assignment"), duly executed by Seller;

(d)    (i) a consent to use and registration agreement in the form attached hereto as Exhibit C (the "Consent To Use and Registration Agreement"), duly executed by Seller, and which shall form a part of the License Agreement and (ii) the Remaining Assets Order (in a form and containing such terms and conditions as are reasonably acceptable to Purchaser, in the capacity that such Remaining Assets Order relates to the assignment described herein), that shall assign the Consent To Use and Registration Agreement to any Successors-in-Interest to the ownership of the Related Penthouse IP (the "Related Penthouse IP Owner(s)");

(e)    (i) the License Agreement, duly executed by Seller, and (ii) the Remaining Assets Order (in a form and containing such terms and conditions as are reasonably acceptable to Purchaser, in the capacity that such Remaining Assets Order relates to the assignment described herein), that shall assign the License Agreement (and all related ancillary agreements thereto) to any Related Penthouse IP Owner(s) (the "License Agreement Assignment and Assumption");

(f)    documentary evidence, in form and substance reasonably satisfactory to Purchaser, that upon the Closing Purchaser will have all right and authority (including, as necessary, power-of-attorney coupled with an interest) to effectuate the release and discharge of any Liens (including, without limitation, all appropriate UCC financing statement amendments and termination statements) affecting the Acquired Penthouse Club IP, including, without limitation, the release and discharge of any such Liens held by or in favor of any Successor-in-

Interest (including, without limitation, Dream Media Corporation, a Delaware corporation ("Dream Media"), or its predecessors, successors or assigns); and

       (g)     such other appropriately executed instruments of transfer, assumption, filings or documents as Purchaser may reasonably request in order to effectuate the consummation of the transactions contemplated by this Agreement.

     **Section 2.3**    **Deliveries by Purchaser**. At or prior to the Closing, Purchaser shall deliver to Seller the following:

       (a)     at least three (3) business days prior to the Auction Date (as provided for in the Sale Order), Purchaser shall deliver to the Trustee Good Funds in an amount equal to the Purchase Price as and in the manner instructed in writing by the Trustee prior thereto, to be held in escrow by the Trustee until the earlier to occur of the Closing Date or the Termination Date as provided herein;

       (b)     the Intellectual Property Assignment, duly executed by Purchaser;

       (c)     the Consent To Use and Registration Agreement, duly executed by Purchaser; and

       (d)     the License Agreement, duly executed by KM.

     **Section 2.4**    **Conditions to Closing**.

       (a)     Conditions of all Parties. The respective obligations of each Party to consummate the transactions contemplated hereby shall be subject to the Penthouse Club IP Sale Order at or prior to the Closing and the Penthouse Club IP Sale Order not having been stayed or reversed.

       (b)     Conditions of Obligations of Purchaser. In addition to the condition specified in Section 2.4(a), Purchaser's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction, at or prior to Closing, of each of the following conditions (any of which may be waived by Purchaser, in whole or in part):

       (i)     Seller shall have performed and complied in all material respects with the covenants and agreements required to be performed and complied with by Seller pursuant to this Agreement at or prior to the Closing.

       (ii)     Purchaser shall have received each of the deliverables required to be delivered or furnished by Seller under Section 2.2; *provided*, however, that if the Purchase Price has not been delivered to the Trustee at least three (3) business days prior to the Auction Date in accordance with Section 2.3(a), the delivery of the License Agreement Assignment and Assumption shall not be a condition to Purchaser's obligation to consummate the transactions contemplated hereby.

       (c)     Conditions of the Obligations of Seller. In addition to the conditions specified in Section 2.4(a), the obligations of the Seller to consummate the transactions

contemplated by this Agreement shall be subject to the satisfaction, at or prior to Closing, of each of the following conditions (any of which may be waived by Seller, in whole or in part):

   (i) Purchaser shall have performed and complied in all material respects with the covenants and agreements required to be performed and complied with by Purchaser pursuant to this Agreement at or prior to the Closing.

   (ii) Seller shall have received each of the deliverables required to be delivered or furnished by Purchaser or its Affiliates under <u>Section 2.3</u>.

  **Section 2.5 Post-Closing Registrations**.  Without limitation to the Consent To Use and Registration Agreement, Purchaser may maintain and apply to register any of the Penthouse Club Marks with the United States Patent and Trademark Office or any other applicable Governmental Entity or office thereof; Seller (and any Successors-in-Interest) shall be estopped and will not, directly or indirectly, oppose any such application, or cancel or otherwise challenge the validity, enforceability, or registration of any Penthouse Club Marks, or Purchaser's ownership thereof; and Purchaser (and its Successors-in-Interest) shall be estopped and will not, directly or indirectly, oppose any application, or cancel or otherwise challenge the validity, enforceability, or registration of any Retained Assets, or Seller's ownership thereof.

  **Section 2.6 Pre-Closing Covenant to Seek Bankruptcy Court Approval**.  Seller and Purchaser acknowledge and agree that (a) this Agreement and the sale to Purchaser of the Acquired Penthouse Club IP and the transactions contemplated by the Transaction Documents are subject to Bankruptcy Court approval, and (b) they will use commercially reasonable efforts to obtain such approval following the Execution Date.

## ARTICLE 3
## MISCELLANEOUS

  **Section 3.1 Limited Representations, Warranties, Covenants and Agreements**.

   (a) <u>Authority</u>. Purchaser has the requisite legal power, authority and capacity to execute and deliver this Agreement and the other Transaction Documents to which Purchaser is a party, and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of the Transaction Documents by Purchaser, and the consummation of the transactions contemplated thereby, have been duly authorized by all necessary action on the part of Purchaser.

   (b) <u>Acquired Penthouse Club IP</u>. Seller represents, warrants, covenants and agrees that (i) Schedule 1.1(a) and Schedule 1.1(c), respectively, includes every application and registration with any Government Entity in the world of which he is presently aware for (A) the marks that are otherwise included in the Acquired Penthouse Club IP, and (B) registered domain names that incorporate the marks and domain names that are otherwise included in the Acquired Penthouse Club IP, (ii) if any other application for or registration of Acquired Penthouse Club IP was omitted from Schedule 1.1(a) or Schedule 1.1(c), respectively, it shall be deemed, without the necessity of any further action by or on behalf of the Parties, to have be included within Schedule 1.1(a) or Schedule 1.1(c) (as applicable) at and as of the Execution Date and subject to the assignment and other provisions of Section 1.1 generally, (iii) Seller will not apply for, file or

obtain any new applications or registrations for the same marks or domain names that are otherwise included in the Acquired Penthouse Club IP, or marks that are confusingly similar to the Acquired Penthouse Club IP and historically used to promote Gentlemen's Clubs, and (iv) in the event of a breach of this <u>Section 3.1(b)</u>, Seller will (upon Purchaser's written request and at Seller's expense), either (A) assign and transfer to Purchaser such applications or registrations for no additional consideration, or (B) expressly abandon or cancel such applications or registrations.

(c)    <u>"AS IS" Transaction</u>.  Purchaser hereby acknowledges and agrees that, except only as provided in this <u>Section 3.1</u>, Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Acquired Penthouse Club IP and/or the Penthouse Club Domain Names (including, without limitation, income to be derived or expenses to be incurred in connection with the Acquired Penthouse Club IP and/or Penthouse Club Domain Names (collectively, the "<u>Applicable IP</u>") , the value of the Applicable IP (or any portion thereof), the transferability of the Applicable IP, the title of the Applicable IP (or any portion thereof), or any other matter or thing relating to the Applicable IP (or any portion thereof)).  Without in any way limiting the foregoing, Seller hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Applicable IP.  Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation of the Applicable IP and all such other matters relating to or affecting the Applicable IP as Purchaser deemed necessary or appropriate and that in proceeding with its acquisition of the Applicable IP, Purchaser is doing so based solely upon such independent inspections and investigations and the limited representations set forth in this <u>Section 3.1</u>.  Accordingly, except with respect to the representations set forth in this <u>Section 3.1</u>, Purchaser will accept the Applicable IP at the Closing "AS IS, "WHERE IS," and "WITH ALL FAULTS."

**Section 3.2    Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Except as otherwise expressly provided herein, nothing in this Agreement, express or implied, is intended to confer upon any Person other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement; *provided*, that, for the avoidance of doubt, this Agreement, and the rights of Purchaser and its Affiliates (including, without limitation, Purchaser's and its Affiliates' absolute unencumbered (except as set forth in and limited by Section 1.3(b)) ownership of the Acquired Penthouse Club IP) and obligations and covenants of Seller hereunder, are expressly intended to bind all of Seller' successors and assigns arising directly or indirectly out of the Bankruptcy Cases and the Sale Motion, including, without limitation, the Successors-in-Interest (including Dream Media, if and as applicable).

**Section 3.3    Severability**.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.

**Section 3.4    Expenses**.  Each Party shall bear its own expenses in connection with the negotiation, execution, delivery and performance of this Agreement and the transactions contemplated hereby.

**Section 3.5**    **Governing Law; Jurisdiction; Waiver of Jury Trial**.

       (a)    This Agreement and the other Transaction Documents shall be governed by, interpreted and enforced in accordance with the laws of the State of California applicable to agreements made and to be performed entirely within such State, without regard to any conflicts of law principles which might otherwise require the application of the law of another jurisdiction. The Parties hereby agree that any action brought with respect to this Agreement and the transactions contemplated shall be heard and determined in the Bankruptcy Court while the Bankruptcy Cases remain open.

       (b)    EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY. EACH PARTY HERETO CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (ii) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 3.5(b).

       **Section 3.6**    **Notices**.  Any notice and other communication required, permitted or desired to be given under this Agreement shall be given in writing and shall be deemed effectively given upon personal delivery, transmission by electronic means (*e.g.*, email or facsimile with confirmation of receipt) or two business days after it is deposited with a recognized overnight courier service, delivery prepaid and addressed, to such Person at its address, e-mail or facsimile number as designated below:

| | |
|---|---|
| Seller: | c/o David K. Gottlieb, Chapter 11 Trustee<br>Gottlieb & Associates, LLC<br>17000 Ventura Blvd., Suite 300<br>Encino, California, 91403<br>*Telephone*:    818.539.7980<br>*Facsimile*:    818.436.0729<br>*Email*:    dgottlieb@dkgallc.com |
| To Purchaser: | Penthouse Clubs Global Licensing, LLC<br>201 St. Charles Avenue, Suite 3915<br>New Orleans, Louisiana 70170<br>Attention:    Tim Spratt, Esq.<br>*Telephone*:    (504) 267-5498<br>*Facsimile*:    (504) 324-6761<br>*Email*:    tspratt@kirkmgmt.com |
| With a copy to: | Jones Walker LLP<br>201 St. Charles Ave., Suite 5100 |

{N3595157.5}    8

New Orleans, Louisiana 70170
Attention:    Asher J. Friend, Esq.
*Telephone*:    (504) 582-8362
*Facsimile*:    (504) 589-8362
*Email*:    afriend@joneswalker.com

or at such other address, facsimile number or email address as such Party may designate by written notice to the other Party in accordance with this <u>Section 3.6</u>.

Section 3.7    <u>**Complete Agreement**</u>. This Agreement (including all Exhibits and Schedules attached hereto or otherwise referenced herein) and the other Transaction Documents, agreements and instruments to be executed and delivered hereunder, constitute the entire agreement and understanding of the Parties hereto with respect to the subject matter hereof.

Section 3.8    <u>**Exclusivity**</u>. From the Execution Date until the earlier of (i) the Closing Date, or (ii) the Termination Date, Seller and his counsel and agents (collectively, "<u>Representatives</u>") shall immediately terminate all discussions, directly or indirectly, with third parties or their Representatives regarding any transaction (an "<u>Alternative Transaction</u>") involving the transfer or acquisition of the assets included in the Acquired Penthouse Club IP (including by means of a merger, sale of equity, sale of assets, other business combination or like transaction (or series of transactions)), and neither Seller nor any of his Representatives will directly or indirectly solicit, initiate, negotiate with or in any manner encourage any inquiries or proposals with respect to, or furnish any information relating to, or participate in any negotiations or discussions concerning, or enter into any agreement with respect to, an Alternative Transaction.

Section 3.9    <u>**Termination**</u>.

(a)    Notwithstanding anything to the contrary contained in this Agreement, this Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing (the date of any such termination and abandonment as provided in this <u>Section 3.9</u>, the "<u>Termination Date</u>"):

(i)    by mutual written consent of Seller and Purchaser;

(ii)    by Seller if (x) any of the conditions set forth in <u>Section 2.4(a)</u> or <u>2.4(c)</u> shall have become, or are reasonably expected to be, incapable of fulfillment, and shall not have been waived by Seller or (y) in the case of <u>Section 2.4(c)(i)</u>, Purchaser is in material breach thereof and Purchaser has failed to cure such breach within 10 days following receipt of written notice thereof from Seller;

(iii)    by Purchaser if (x) any of the conditions set forth in <u>Section 2.4(a)</u> or <u>2.4(b)</u> shall have become, or are reasonably expected to be, incapable of fulfillment, and shall not have been waived by Purchaser, or (y) in the case of <u>Section 2.4(b)(i)</u>, Seller is in material breach thereof and Seller has failed to cure such breach within 10 days following receipt of written notice thereof from Purchaser; or

(iv)      by Purchaser or Seller, if the Closing does not occur on or prior to June 15, 2018, unless extended by Purchaser in its sole discretion;

provided, however, that the Party seeking termination pursuant to clause (ii), (iii), or (iv) is not then in material breach of any of its representations, warranties, covenants or agreements contained in this Agreement.

(b)      In the event of termination by either Party pursuant to this Section 3.9, written notice shall be given promptly to the other Party and the transactions contemplated by this Agreement shall be terminated on the date of such termination, without the necessity of any further action by any Party.

(c)      If the transactions contemplated by this Agreement are terminated as provided herein, the Trustee shall remit the full Purchase Price in Good Funds to those account(s) designated by Purchaser, no later than two (2) business day immediately following the Termination Date.

**Section 3.10    Effect of Termination.** If this Agreement is terminated as described in Section 3.9, this Agreement shall become null and void, except for the provisions of this Article 3. Nothing in this Section 3.10 shall be deemed to release any Party from any liability for any breach by it of the terms, conditions, covenants and other provisions of this Agreement or to impair the right of any Party to compel specific performance by any other Party of its obligations under this Agreement.

**Section 3.11    Amendments and Waivers.** Except as otherwise expressly set forth in this Agreement, any term of this Agreement may be amended or terminated only with the written consent of each of the Parties. A waiver of any term of this Agreement is only enforceable if in writing and signed by the Party against whom the waiver is asserted. A waiver of any term of this Agreement shall not be construed as a continuing waiver of further breaches of the same term.

**Section 3.12    Pronouns.** Whenever the context may require, any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural, and vice versa.

**Section 3.13    Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which taken together shall constitute one and the same instrument.

**Section 3.14    Section Headings.** The section headings are for the convenience of the parties and in no way alter, modify, amend, limit, or restrict the contractual obligations of the parties.

**Section 3.15    No Recourse to Seller.** The Purchaser expressly acknowledges and agrees that the Seller is executing this Agreement and entering into the transaction contemplated herein solely in his capacity as Chapter 11 Trustee for Debtors' bankruptcy estates and that in the event of any default in the performance of any of the Seller's or any Debtors' estates' obligations under this Agreement or in the event that any other claim is asserted against the Seller or such

{N3595157.5}                                                10

estates in connection with this Agreement or the transactions contemplated herein, Seller shall in no event have any personal liability whatsoever (whether in his individual capacity or otherwise), it being expressly understood and agreed that Purchaser's sole recourse, if any, in such event shall be to the assets of such estates.

*[Signatures appear on the following page]*

*Signature Page*
*Purchase and Sale Agreement*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the day and year first above written.

**SELLER:**

David K. Gottlieb, solely in his capacity as
Chapter 11 Trustee for the estates of the Debtors

**PURCHASER:**

PENTHOUSE CLUBS GLOBAL LICENSING, LLC

By: _____
Name: John Kirkendoll
Title:  Manager

*Signature Page*
*Purchase and Sale Agreement*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the day and year first above written.

**SELLER:**

_____

David K. Gottlieb, solely in his capacity as
Chapter 11 Trustee for the estates of the Debtors

**PURCHASER:**

PENTHOUSE CLUBS GLOBAL LICENSING, LLC

By: _____
Name: John Kirkendoll
Title: Manager

*Exhibit A*
*Purchase and Sale Agreement*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

## EXHIBIT A

## DEFINED TERMS

In addition to the other defined terms used herein, as used in this Agreement, the following terms when capitalized have the meanings indicated.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "<u>control</u>" (including the terms "<u>controlled by</u>" and "<u>under common control with</u>") means the ownership, directly or indirectly, of not less than fifty-one percent (51%) of the beneficial interests of such Person.

"<u>Claim</u>" means all demands, claims (including third-party claims), actions or causes of action, suits, investigations, assessments, encumbrances, charges, complaints, directives, citations, information requests issued by government authorities, legal proceedings, orders, notices of potential responsibility, damages or sanctions.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Contract</u>" means  any contract, agreement, indenture, note, bond, mortgage, loan, instrument, lease, license, permit, franchise, commitment or other arrangement, understanding or undertaking, commitment or obligation, whether written or oral.

"<u>Gentlemen's Clubs</u>" means adult nightclub and cabaret establishments, and restaurants operated in or immediately adjacent thereto, featuring live entertainment provided by nude or semi-nude female dancers.

"<u>Governmental Entity</u>" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"<u>Law</u>" means any foreign, federal, state or local law (including common law), statute, code (including the Code), ordinance, rule, regulation, Order or other requirement.

"<u>Legal Proceeding</u>" means any judicial, administrative or arbitral actions, suits, mediations, investigations, hearings, inquiries, proceedings or Claims (including counter-claims) by or before a Governmental Entity, including any adversary proceeding relating to the Bankruptcy Cases, but not including (i) the Bankruptcy Cases themselves and (ii) any contested matter(s) in the Bankruptcy Cases.

"<u>Liens</u>" means pledges, liens, leases, licenses, conditional sales contracts, Claims, encumbrances, activity or use restrictions, security interests, mortgages or deeds of trust, of any kind or nature whatsoever.

"<u>Order</u>" means any order, injunction, judgment, charge, doctrine, decree, rule, ruling, writ, assessment or arbitration award of a Governmental Entity.

"<u>Penthouse Club IP Sale Order</u>" means an order entered by the Bankruptcy Court authorizing the Agreement and approving the transfer and sale by Seller of the Acquired

*Exhibit A*
*Purchase and Sale Agreement*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

Penthouse Club IP to Purchaser; *provided that*, and notwithstanding anything to the contrary, such order is in a form and contains such terms and conditions as are reasonably acceptable to Purchaser and Seller.

"Person" means an individual, firm, corporation, general or limited partnership, limited liability company, limited liability partnership, joint venture, trust, Governmental Entity, association, unincorporated organization or other entity.

"Successor-in-Interest" means any Person, other than Purchaser or its Affiliates, who, directly or indirectly in connection with the Bankruptcy Cases, acquires or otherwise becomes any successor to or assignee of any assets, equity or debt of Debtors.

*[Table of Definitions appears on the following page]*

*Exhibit A*
*Purchase and Sale Agreement*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

## TABLE OF DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings set forth in the sections indicated.

| DEFINED TERM | SECTION |
|---|---|
| Acquired Penthouse Club IP | 1.1 |
| Agreement | Preamble |
| Auction | Recitals |
| Auction Date | Recitals |
| Bankruptcy Cases | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bidding Procedures Order | Recitals |
| Bid Deposit Condition | 1.3 |
| Closing | 2.1 |
| Closing Date | 2.1 |
| Club Licenses | Recitals |
| Consent To Use and Registration Agreement | 2.2(d) |
| Deposit | 1.3 |
| Dream Media | 2.2(f) |
| Execution Date | Preamble |
| Good Funds | 1.2 |
| Intellectual Property Assignment | 2.2(c) |
| License Agreement | Recitals |
| License Agreement Assignment and Assumption | Recitals |
| License Agreement Transaction | Recitals |
| KM | Recitals |
| Original MLA | Recitals |
| Party; Parties | Preamble |
| Penthouse Club Domain Names | 1.1(c); Schedule 1.1(c) |
| Penthouse Club Marks | 1.1(a); Schedule 1.1(a) |
| PGLI | Preamble |
| Purchase Price | 1.2 |
| Purchaser | Preamble |
| Remaining Assets | Recitals |
| Remaining Assets Order | Recitals |
| Related Penthouse IP | Recitals |
| Related Penthouse IP Owner(s) | 2.2(d)(ii) |
| Sale Motion | Recitals |
| Sale Order | Recitals |
| Seller | Preamble |
| Termination Date | Section 3.9 |
| Transaction | Recitals |
| Transaction Documents | 1.4 |

*Exhibit A*
*Purchase and Sale Agreement*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

| Trustee | Recitals |
|---------|----------|

*Exhibit B*
*Purchase and Sale Agreement*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

## Exhibit B

### Form of Assignment of Penthouse Club Marks and Assets

(See Attached)

*Exhibit B to*
*Purchase and Sale Agreement*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

## ASSIGNMENT OF PENTHOUSE CLUB MARKS AND ASSETS

This ASSIGNMENT OF PENTHOUSE CLUB MARKS AND ASSETS (this "Agreement"), dated as of May 21, 2018 (the "Execution Date"), is entered into by and between David K. Gottlieb, solely in his capacity as Chapter 11 Trustee (acting in such capacity, Mr. Gottlieb is referred to herein as the "Seller") for Penthouse Global Licensing, Inc., a Delaware corporation ("PGLI"), and those affiliates of PGLI set forth on Appendix A attached hereto (individually, a "Debtor" and collectively, "Debtors"), on the one hand, and Penthouse Clubs Global Licensing, LLC, a Delaware limited liability company ("Purchaser"), on the other hand. Seller and Purchaser are each referred to herein as a "Party" and collectively, as the "Parties."

### RECITALS:

A.      Seller and Purchaser have entered into that certain Purchase and Sale Agreement, dated as of the Execution Date (the "PSA"), pursuant to which Seller has agreed to sell certain intellectual property and other assets to Purchaser on the terms and conditions set forth therein. All capitalized terms used herein but not otherwise defined herein shall have the meanings provided in the PSA.

B.      Pursuant to the PSA, Seller shall assign all right, title and interest in and to the Acquired Penthouse Club IP (as defined in the PSA) to Purchaser, and Seller desires to further evidence the assignment of such right, title and interest in and to the Acquired Penthouse Club IP to Purchaser on the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.      Assignment. Subject to the terms and conditions of the PSA, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Purchaser (or, if and as applicable, shall cause the same), in each case, free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, and Purchaser shall purchase and acquire from Seller, all right, title and interest of Debtors in the following:

(a)      those marks set forth on Schedule 1.1(a) hereto, whether unregistered or registered with the United States Patent and Trademark Office or other Governmental Entity or office thereof, and all common law rights therein, including all such trade names, trademarks, service marks, and trade dress historically used by Purchaser, its Affiliates, and their sub-licensees with their Gentlemen's Clubs, together with all goodwill associated with the foregoing (collectively, the "Penthouse Club Marks");

(b)      the U.S., state and foreign trademark, trade name, and service mark registrations and applications associated with the Penthouse Club Marks, including, without limitation, all common-law rights related to, and goodwill associated with, the foregoing, and the right to apply to register the Penthouse Club Marks worldwide;

*Exhibit B to*
*Purchase and Sale Agreement*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

(c) the domain names either incorporating the Penthouse Club Marks or a location where a club operates, including without limitation those domain names set forth on Schedule 1.1(c) (collectively, the "Penthouse Club Domain Names"); *provided, however,* for the avoidance of doubt, that the foregoing domain names do not include penthouse.com; and

(d) all rights under warranties, indemnities and all similar rights against third parties to the extent related to any the Penthouse Club Marks or Penthouse Club Domain Names, and any and all Claims and causes of action, of whatever nature, known or unknown, for past, present or future infringement of any of the foregoing, with the right, but not the obligation, to sue for and collect damages for infringement of the foregoing, whether arising by way of counterclaim or otherwise, and the right to enforce any rights and file any Claims against other Persons associated therewith (collectively, the foregoing (a) through (d), the "Acquired Penthouse Club IP").

2. Other Terms. The provisions of the PSA are incorporated herein by this reference. In the event of any conflict or inconsistency between the terms of this Agreement and the PSA, the terms of the PSA shall govern.

3. Successors and Assigns.  The provisions of this Agreement shall be binding upon and inure to the benefit of each of Sellers and Purchaser and their respective successors and permitted assigns, subject to the terms and conditions of the PSA.

4. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

*[Signatures appear on the following page.]*

*Signature Page*
*Assignment of Penthouse Club Marks and Assets*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the day and year first above written.

SELLER:

David K. Gottlieb, solely in his capacity as
Chapter 11 Trustee for the estates of the Debtors

PURCHASER:

PENTHOUSE CLUBS GLOBAL LICENSING, LLC

By: _____
Name: John Kirkendoll
Title:  Manager

*Signature Page*
*Assignment of Penthouse Club Marks and Assets*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

   IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the day and year first above written.

**SELLER:**

_____
David K. Gottlieb, solely in his capacity as
Chapter 11 Trustee for the estates of the Debtors

**PURCHASER:**

PENTHOUSE CLUBS GLOBAL LICENSING, LLC

By: _____
Name: John Kirkendoll
Title: Manager

*Appendix A*
*Assignment of Penthouse Club Marks and Assets*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

## APPENDIX A

## PGLI AFFILIATES

- PENTHOUSE GLOBAL MEDIA, INC.
- PENTHOUSE GLOBAL BROADCASTING, INC.
- PENTHOUSE GLOBAL DIGITAL, INC.
- PENTHOUSE GLOBAL PUBLISHING, INC.
- GMI ONLINE VENTURES, LTD.
- PENTHOUSE DIGITAL MEDIA PRODUCTIONS, INC.
- TAN DOOR MEDIA, INC.
- PENTHOUSE IMAGES ACQUISITIONS, LTD.
- PURE ENTERTAINMENT TELECOMMUNICATIONS, INC.
- XVHUB GROUP, INC.
- GENERAL MEDIA COMMUNICATIONS, INC.
- GENERAL MEDIA ENTERTAINMENT, INC.
- DANNI ASHE, INC.
- STREAMRAY STUDIOS, INC.

*Schedule 1.1(a)*
*Assignment of Penthouse Club Marks and Assets*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

## Schedule 1.1(a)

## PENTHOUSE CLUB MARKS

The term "Penthouse Club Marks" as used in this Agreement includes the marks set forth below, together with all variations thereof owned, used or held for use by any Seller and/or Debtors, whether registered or unregistered, and all common law rights therein, including without limitation (*provided, however* the listing of trademark registrations or applications in this Schedule is not a representation by Seller that the listed registration or application is currently valid or has been maintained with the applicable government trademark office):

| Mark | Country | Registration No. (Application Ser. No.) |
|---|---|---|
| THE PENTHOUSE CLUB | Ukraine | 158069 |
| THE PENTHOUSE CLUB (w/ three key logo) | Macao | 88956 |
| | New Zealand | 833185 |
| | U.S. | 2,810,417 |
| | U.S. | 3,778,363 (registration cancelled) |
| PENTHOUSE EXECUTIVE CLUB | U.S. | (85/497737) (application abandoned) |
| | U.S. | (76/588435) (application abandoned) |
| | U.S. | (76/498693) (application abandoned) |
| PENTHOUSE MENS CLUB | U.S. | 2,450,888 (registration cancelled) |
| PENTHOUSE KEY SUITES | U.S. | (86/876606) (application abandoned) |
| THE PENTHOUSE KEY SUITES (w/ one key logo) | Not Registered | Not Registered |
| THE PENTHOUSE KEY SUITES (w/ three key logo) | Not Registered | Not Registered |
| | U.S. | (76/478036) (application abandoned) |
| PENTHOUSE w/ three key logo | Spain | 916115 |
| | United Kingdom | 2025235 |
| Three Key Logo | Antigua & Barbuda | 6506 |
| | Antigua & Barbuda | 6504 |
| | Australia | 362565 |
| | Australia | 367684 |
| | Australia | 346912 |
| | Austria | 138240 |
| | Bahamas | 27567 |
| | Bahamas | 27566 |
| | Barbados | 81/20326 |
| | Benelux | 494088 |
| | Benelux | 385146 |
| | Brazil | 816873348 |
| | Brazil | 810912961 |
| | Brazil | 821732323 |
| | Brazil | 826936458 |
| | Brazil | 816873330 |
| | British Virgin Islands | 4346 |

*Schedule 1.1(a)*
*Assignment of Penthouse Club Marks and Assets*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

| Mark | Country | Registration No. (Application Ser. No.) |
|---|---|---|
| Three Key Logo | Bulgaria | 36987 |
| | Canada | TMA748,728 |
| | Canada | TMA435,218 |
| | China | 14399513 |
| | China | 4281665 |
| | China | 4572565 |
| | China | 4281666 |
| | China | 4281667 |
| | Costa Rica | 170817 |
| | Costa Rica | 170816 |
| | Croatia | Z990076 |
| | Czech Republic | 174670 |
| | Czech Republic | 229518 |
| | Dominican Republic | 147153 |
| | Estonia | 31746 |
| | EU | 4018776 |
| | France | 1227319 |
| | France | 92442392 |
| | Germany | 2011612 |
| | Greece | 73494 |
| | Greece | 110542 |
| | Guernsey | GGGT3215 |
| | Guyana | 20649 |
| | Guyana | 20648 |
| | Hong Kong | 199205266 |
| | Hong Kong | 1993B00888 |
| | Hungary | 134425 |
| | Hungary | 175948 |
| | Indonesia | IDM000076878 |
| | Ireland | 161375 |
| | Israel | 54443 |
| | Italy | 1512785 |
| | Italy | 1485134 |
| | Japan | 4895752 |
| | Japan | 4182461 |
| | Japan | 1326898 |
| | Japan | 1990279 |
| | Japan | 4417662 |
| | Japan | 1984934 |
| | Liechtenstein | 8122 |
| | Macedonia | 09063 |
| | Mexico | 326286 |
| | Mexico | 417973 |
| | New Zealand | 717684 |
| | Paraguay | 419405 |
| | Poland | 81793 |
| | Romania | 042030 |
| | Russia | 248189 |
| | Russia | 142620 |
| | Russia | 128751 |
| | Russia | 119758 |
| | Sebia | 48054 |

Schedule 1.1(a)
*Assignment of Penthouse Club Marks and Assets*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

| Mark | Country | Registration No. (Application Ser. No.) |
|---|---|---|
| Three Key Logo | Slovak Republic | 172762 |
| | Slovak Republic | 172762 |
| | Slovenia | 9870199 |
| | South Korea | 17618 |
| | South Korea | 132550 |
| | Spain | 3043867 |
| | Spain | 1629525 |
| | Spain | 1629524 |
| | Switzerland | 323052 |
| | Switzerland | 391805 |
| | Taiwan | 756607 |
| | Taiwan | 544069 |
| | Thailand | 59803 |
| | Thailand | 106860 |
| | Trinidad & Tobago | 46293 |
| | Turks & Caicos | 14014 |
| | Turks & Caicos | 14015 |
| | Turks & Caicos | 14013 |
| | Turks & Caicos | 14012 |
| | Ukraine | 38757 |
| | Ukraine | 65800 |
| | UAE | 53386 |
| | United Kingdom | 1187468 |
| | United Kingdom | 2240679 |
| | U.S. | 1,073,618 |
| | Vietnam | 72640 |
| THREE KEY LOGO (word mark) | Bulgaria | 36307 |
| PENTHOUSE KEY GIRL | Ukraine | 158071 |
| KEY GIRL (Stylized) **KEY**GIRL | Not Registered | Not Registered |
| PENTHOUSE KEY CLUB | Not Registered | Not Registered |
| | U.S. | (76/439605) (application abandoned) |
| KEY CLUB | Not Registered | Not Registered |
| CALIGULA CLUB | Not Registered | Not Registered |
| PENTHOUSE CLUB | Japan | 4384068 |
| | Mexico | 903392 |
| | Mexico | 921770 |
| THE PENTHOUSE BEACH CLUB | Ukraine | 158070 |

*Schedule 1.1(c)*
*Assignment of Penthouse Club Marks and Assets*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

**Schedule 1.1(c)**

**PENTHOUSE CLUB DOMAIN NAMES**

- penthouseclub-bangkok.com
- penthouseclub-la.com
- penthouseclub-losangeles.com
- penthouseclub-macao.com
- penthouseclub-seoul.com
- penthouseclub-shanghai.com
- penthouseclub-singapore.com
- penthouseclub-taiwan.com
- penthouseclub.com
- penthouseclub.mobi
- penthouseclub.org
- penthouseclubac.com
- penthouseclubac.net
- penthouseclubanaheim.com
- penthouseclubanaheim.net
- penthouseclubatlanticcity.com
- penthouseclubatlanticcity.net
- penthouseclubauckland.co.nz
- penthouseclubauckland.com
- penthouseclubaussie.com
- penthouseclubbaltimore.com
- penthouseclubbaltimore.net
- penthouseclubbangkok.com
- penthouseclubbatonrouge.com
- penthouseclubbirmingham.com
- penthouseclubboston.com
- penthouseclubcalendar.com
- penthouseclubcalendars.com
- penthouseclubcalgary.ca
- penthouseclubcalgary.com
- penthouseclubchicagomidway.com
- penthouseclubchicagomidway.net
- penthouseclubdetroit.com
- penthouseclubdetroit.net
- penthouseclubftlauderdale.com
- penthouseclubftlauderdale.net
- penthouseclubkharkiv.com
- penthouseclubkharkov.com
- penthouseclubkiev.com

*Schedule 1.1(c)*
*Assignment of Penthouse Club Marks and Assets*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

- penthouseclubla.com
- penthouseclublasvegas.com
- penthouseclublondon.com
- penthouseclublondon.net
- penthouseclublosangeles.com
- penthouseclubmacao.com
- penthouseclubmacau.com
- penthouseclubmelbourne.com
- penthouseclubmiami.com
- penthouseclubmidway.com
- penthouseclubmidway.net
- penthouseclubmilwaukee.net
- penthouseclubmoscow.com
- penthouseclubmyrtlebeach.com
- penthouseclubnz.co.nz
- penthouseclubnz.com
- penthouseclubparis.com
- penthouseclubparties.com
- penthouseclubparty.com
- penthouseclubphiladelphia.net
- penthouseclubphilly.net
- penthouseclubphiladelphia.com
- penthousephiladelphia.com
- penthouseclubphilly.com
- penthousephilly.com
- penthouseclubpittsburgh.com
- penthouseclubreno.com
- penthouseclubrussia.com
- penthouseclubs.co
- penthouseclubs.com
- penthouseclubsandiego.com
- penthouseclubsanfrancisco.com
- penthouseclubscalendar.com
- penthouseclubscalendars.com
- penthouseclubsf.com
- penthouseclubsingapore.com
- penthouseclubsinternational.com
- penthouseclubsrussia.com
- penthouseclubsydney.com
- penthouseclubwellington.co.nz
- penthouseclubwellington.com

*Exhibit C*
*Purchase and Sale Agreement*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

## EXHIBIT C

### CONSENT TO USE AND REGISTRATION AGREEMENT

**DOCUMENT IS NOT ATTACHED IN THE INTEREST OF ECONOMY.**

**THE CONSENT TO USE AND REGISTRATION AGREEMENT IS ATTACHED TO THE MOTION AS EXHIBIT C.**

{N3595157.5}

**APPENDIX A**

**PGLI AFFILIATES**

- PENTHOUSE GLOBAL MEDIA, INC.
- PENTHOUSE GLOBAL BROADCASTING, INC.
- PENTHOUSE GLOBAL DIGITAL, INC.
- PENTHOUSE GLOBAL PUBLISHING, INC.
- GMI ONLINE VENTURES, LTD.
- PENTHOUSE DIGITAL MEDIA PRODUCTIONS, INC.
- TAN DOOR MEDIA, INC.
- PENTHOUSE IMAGES ACQUISITIONS, LTD.
- PURE ENTERTAINMENT TELECOMMUNICATIONS, INC.
- XVHUB GROUP, INC.
- GENERAL MEDIA COMMUNICATIONS, INC.
- GENERAL MEDIA ENTERTAINMENT, INC.
- DANNI ASHE, INC.
- STREAMRAY STUDIOS, INC.

*Schedules*
*Purchase and Sale Agreement*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

## Schedule 1.1(a)

## PENTHOUSE CLUB MARKS

The term "Penthouse Club Marks" as used in this Agreement includes the marks set forth below, together with all variations thereof owned, used or held for use by any Seller and/or Debtors, whether registered or unregistered, and all common law rights therein, including without limitation (*provided, however* the listing of trademark registrations or applications in this Schedule is not a representation by Seller that the listed registration or application is currently valid or has been maintained with the applicable government trademark office):

| Mark | Country | Registration No. (Application Ser. No.) |
|---|---|---|
| THE PENTHOUSE CLUB | Ukraine | 158069 |
| THE PENTHOUSE CLUB (w/ three key logo) | Macao | 88956 |
| | New Zealand | 833185 |
| | U.S. | 2,810,417 |
| | U.S. | 3,778,363 (registration cancelled) |
| PENTHOUSE EXECUTIVE CLUB | U.S. | (85/497737) (application abandoned) |
| | U.S. | (76/588435) (application abandoned) |
| | U.S. | (76/498693) (application abandoned) |
| PENTHOUSE MENS CLUB | U.S. | 2,450,888 (registration cancelled) |
| PENTHOUSE KEY SUITES | U.S. | (86/876606) (application abandoned) |
| THE PENTHOUSE KEY SUITES (w/ one key logo) | Not Registered | Not Registered |
| THE PENTHOUSE KEY SUITES (w/ three key logo) | Not Registered | Not Registered |
| | U.S. | (76/478036) (application abandoned) |
| PENTHOUSE w/ three key logo | Spain | 916115 |
| | United Kingdom | 2025235 |
| Three Key Logo | Antigua & Barbuda | 6506 |
| | Antigua & Barbuda | 6504 |
| | Australia | 362565 |
| | Australia | 367684 |
| | Australia | 346912 |
| | Austria | 138240 |
| | Bahamas | 27567 |
| | Bahamas | 27566 |
| | Barbados | 81/20326 |
| | Benelux | 494088 |
| | Benelux | 385146 |
| | Brazil | 816873348 |
| | Brazil | 810912961 |
| | Brazil | 821732323 |
| | Brazil | 826936458 |
| | Brazil | 816873330 |
| | British Virgin Islands | 4346 |

{N3595157.5}

Schedule 1.1(a) – page 1

*Schedules*
*Purchase and Sale Agreement*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

| Mark | Country | Registration No. (Application Ser. No.) |
|---|---|---|
| Three Key Logo  | Bulgaria | 36987 |
| | Canada | TMA748,728 |
| | Canada | TMA435,218 |
| | China | 14399513 |
| | China | 4281665 |
| | China | 4572565 |
| | China | 4281666 |
| | China | 4281667 |
| | Costa Rica | 170817 |
| | Costa Rica | 170816 |
| | Croatia | Z990076 |
| | Czech Republic | 174670 |
| | Czech Republic | 229518 |
| | Dominican Republic | 147153 |
| | Estonia | 31746 |
| | EU | 4018776 |
| | France | 1227319 |
| | France | 92442392 |
| | Germany | 2011612 |
| | Greece | 73494 |
| | Greece | 110542 |
| | Guernsey | GGGT3215 |
| | Guyana | 20649 |
| | Guyana | 20648 |
| | Hong Kong | 199205266 |
| | Hong Kong | 1993B00888 |
| | Hungary | 134425 |
| | Hungary | 175948 |
| | Indonesia | IDM000076878 |
| | Ireland | 161375 |
| | Israel | 54443 |
| | Italy | 1512785 |
| | Italy | 1485134 |
| | Japan | 4895752 |
| | Japan | 4182461 |
| | Japan | 1326898 |
| | Japan | 1990279 |
| | Japan | 4417662 |
| | Japan | 1984934 |
| | Liechtenstein | 8122 |
| | Macedonia | 09063 |
| | Mexico | 326286 |
| | Mexico | 417973 |
| | New Zealand | 717684 |
| | Paraguay | 419405 |
| | Poland | 81793 |
| | Romania | 042030 |
| | Russia | 248189 |
| | Russia | 142620 |
| | Russia | 128751 |
| | Russia | 119758 |
| | Sebia | 48054 |

*Schedules*
*Purchase and Sale Agreement*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

| Mark | Country | Registration No. (Application Ser. No.) |
|---|---|---|
| Three Key Logo  | Slovak Republic | 172762 |
| | Slovak Republic | 172762 |
| | Slovenia | 9870199 |
| | South Korea | 17618 |
| | South Korea | 132550 |
| | Spain | 3043867 |
| | Spain | 1629525 |
| | Spain | 1629524 |
| | Switzerland | 323052 |
| | Switzerland | 391805 |
| | Taiwan | 756607 |
| | Taiwan | 544069 |
| | Thailand | 59803 |
| | Thailand | 106860 |
| | Trinidad & Tobago | 46293 |
| | Turks & Caicos | 14014 |
| | Turks & Caicos | 14015 |
| | Turks & Caicos | 14013 |
| | Turks & Caicos | 14012 |
| | Ukraine | 38757 |
| | Ukraine | 65800 |
| | UAE | 53386 |
| | United Kingdom | 1187468 |
| | United Kingdom | 2240679 |
| | U.S. | 1,073,618 |
| | Vietnam | 72640 |
| THREE KEY LOGO (word mark) | Bulgaria | 36307 |
| PENTHOUSE KEY GIRL | Ukraine | 158071 |
| KEY GIRL (Stylized)  | Not Registered | Not Registered |
| PENTHOUSE KEY CLUB | Not Registered | Not Registered |
| | U.S. | (76/439605) (application abandoned) |
| KEY CLUB | Not Registered | Not Registered |
| CALIGULA CLUB | Not Registered | Not Registered |
| PENTHOUSE CLUB | Japan | 4384068 |
| | Mexico | 903392 |
| | Mexico | 921770 |
| THE PENTHOUSE BEACH CLUB | Ukraine | 158070 |

*Schedules*
*Purchase and Sale Agreement*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

## Schedule 1.1(c)

## PENTHOUSE CLUB DOMAIN NAMES

- penthouseclub-bangkok.com
- penthouseclub-la.com
- penthouseclub-losangeles.com
- penthouseclub-macao.com
- penthouseclub-seoul.com
- penthouseclub-shanghai.com
- penthouseclub-singapore.com
- penthouseclub-taiwan.com
- penthouseclub.com
- penthouseclub.mobi
- penthouseclub.org
- penthouseclubac.com
- penthouseclubac.net
- penthouseclubanaheim.com
- penthouseclubanaheim.net
- penthouseclubatlanticcity.com
- penthouseclubatlanticcity.net
- penthouseclubauckland.co.nz
- penthouseclubauckland.com
- penthouseclubaussie.com
- penthouseclubbaltimore.com
- penthouseclubbaltimore.net
- penthouseclubbangkok.com
- penthouseclubbatonrouge.com
- penthouseclubbirmingham.com
- penthouseclubboston.com
- penthouseclubcalendar.com
- penthouseclubcalendars.com
- penthouseclubcalgary.ca
- penthouseclubcalgary.com
- penthouseclubchicagomidway.com
- penthouseclubchicagomidway.net
- penthouseclubdetroit.com
- penthouseclubdetroit.net
- penthouseclubftlauderdale.com
- penthouseclubftlauderdale.net
- penthouseclubkharkiv.com
- penthouseclubkharkov.com
- penthouseclubkiev.com
- penthouseclubla.com

{N3595157.5}    Schedule 1.1(c) – page 1

*Schedules*
*Purchase and Sale Agreement*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

- penthouseclublasvegas.com
- penthouseclublondon.com
- penthouseclublondon.net
- penthouseclublosangeles.com
- penthouseclubmacao.com
- penthouseclubmacau.com
- penthouseclubmelbourne.com
- penthouseclubmiami.com
- penthouseclubmidway.com
- penthouseclubmidway.net
- penthouseclubmilwaukee.net
- penthouseclubmoscow.com
- penthouseclubmyrtlebeach.com
- penthouseclubnz.co.nz
- penthouseclubnz.com
- penthouseclubparis.com
- penthouseclubparties.com
- penthouseclubparty.com
- penthouseclubphiladelphia.net
- penthouseclubphilly.net
- penthouseclubphiladelphia.com
- penthousephiladelphia.com
- penthouseclubphilly.com
- penthousephilly.com
- penthouseclubpittsburgh.com
- penthouseclubreno.com
- penthouseclubrussia.com
- penthouseclubs.co
- penthouseclubs.com
- penthouseclubsandiego.com
- penthouseclubsanfrancisco.com
- penthouseclubscalendar.com
- penthouseclubscalendars.com
- penthouseclubsf.com
- penthouseclubsingapore.com
- penthouseclubsinternational.com
- penthouseclubsrussia.com
- penthouseclubsydney.com
- penthouseclubwellington.co.nz
- penthouseclubwellington.com

1

## **EXHIBIT B**

2

**Master License Agreement**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

EXECUTION COPY

MASTER INTELLECTUAL PROPERTY LICENSE AGREEMENT

by and between

**DAVID K. GOTTLIEB, SOLELY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE FOR
PENTHOUSE GLOBAL MEDIA, INC., A DELAWARE CORPORATION AND THE
OTHER ENTITIES IDENTIFIED AS "LICENSORS" IN THE FOLLOWING
AGREEMENT**
as Licensor

and

**PENTHOUSE CLUBS GLOBAL LICENSING, LLC,**
as Licensee

Dated as of May 21, 2018

{N3598883.1}}

## MASTER INTELLECTUAL PROPERTY LICENSE AGREEMENT

This MASTER INTELLECTUAL PROPERTY LICENSE AGREEMENT (this "Agreement"), dated as of May 21, 2018 (the "Execution Date"), is entered into by and between David K. Gottlieb, solely in his capacity as Chapter 11 Trustee for Penthouse Global Licensing, Inc., a Delaware corporation, ("PGLI") and those Affiliates of PGLI set forth on Appendix A (collectively, and including the Related Penthouse IP Owner(s), the "Licensor" or "PH Parties"), on the one hand, and Penthouse Clubs Global Licensing, LLC, a Delaware limited liability company (the "Licensee"), on the other hand.  Licensor and Licensee are each referred to herein as a "Party" and collectively, as the "Parties."

### W I T N E S S E T H:

WHEREAS, capitalized terms used and not otherwise defined in the body of this Agreement shall have the meanings ascribed to such terms in Exhibit A hereto or the PSA (defined below);

WHEREAS, Licensee and/or its Affiliates, and their respective officers and employees have decades of experience owning and operating successful Gentlemen's Clubs;

WHEREAS, Licensor owns certain Additional Marks (enumerated in Schedule 1.1(a) hereto) utilized in connection with the production, distribution, and licensing of a wide variety of copyrighted media content, including magazines, photographs, images, film, audiovisual content, and other works (collectively, "Penthouse Media"), certain of which may be required, used or useful by Licensee, its Affiliates or sub-licensees from time to time in connection with the operation of Gentlemen's Clubs, consistent with historical practice;

WHEREAS, PGLI, on the one hand, and Kirkendoll Management, LLC and Penthouse Clubs Worldwide, LLC, each Affiliates of Licensee (collectively, the "Original MLA Licensees"), on the other hand, entered into to that certain Master License Agreement, dated as of March 29, 2017 (the "Original MLA"), pursuant to which, among other things, the Original MLA Licensees (a) obtained an exclusive worldwide license from PGLI in and to certain PENTHOUSE marks, and (b) purchased all right, title and interest of PGLI and its predecessor(s)-in-title in and to certain license agreements entered into with third parties (defined in the Original MLA as the *Third-Party Licenses*) permitting the Original MLA Licensees the right to provide such third-parties the right to use such PENTHOUSE marks in connection with the operation of Gentlemen's Clubs;

WHEREAS, on January 11, 2018, PGLI and its affiliates set forth on Appendix A (collectively, "Debtors") commenced those certain Chapter 11 bankruptcy cases that are being jointly administered for procedural purposes only in the case captioned as *In re Penthouse Global Media, Inc.,* Case No. 18-10098 (collectively, the "Bankruptcy Cases") by the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") pursuant to Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code");

WHEREAS, David K. Gottlieb has been duly appointed as the Chapter 11 Trustee (in such capacity, the "Trustee") over Licensor's bankruptcy estates;

WHEREAS, contemporaneously with the transactions contemplated by this Agreement, in connection with the Bankruptcy Cases, the PH Parties are engaging in a private sale transaction pursuant to which the Trustee, on behalf of the PH Parties, is transferring and assigning to Licensee all of the assets and goodwill associated with the Gentlemen's Club line of business owned and/or operated by the PH Parties (to the extent, and on the terms and conditions, as set forth in the PSA defined below), including but not limited to certain intellectual property owned by the PH Parties (as defined therein and as used herein, as the "Acquired Penthouse Club IP"), on the terms and subject to the conditions set forth in that certain Purchase and Sale Agreement (the "PSA"), dated as of the Execution Date;

WHEREAS, the PSA requires the PH Parties to deliver the Remaining Assets Order that shall assign this Agreement (and all related ancillary agreements hereto) pursuant to Section 363 of the Bankruptcy Code to the Related Penthouse IP Owner(s);

WHEREAS, Licensor desires to grant to Licensee a perpetual, irrevocable, prepaid, sublicensable, and exclusive license, for no additional consideration (apart from the consideration set forth in the PSA) and subject to the provisions of this Agreement, certain other copyrights, trademarks, and other intellectual property that are not included as part of the Acquired Penthouse Club IP but may otherwise be reasonably required, used, or useful by Licensee, its Affiliates or sub-licensees in connection with the operation of Gentlemen's Clubs; and

WHEREAS, it is the intent of the Parties to effect and memorialize the sale and assignment of the PH Parties' line of business associated with Gentlemen's Clubs and to assign the goodwill of the business connected with the use and symbolized by the Penthouse Club Marks used in connection therewith.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, agreements and covenants contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE 1
## LICENSE GRANT; CONSIDERATION

**Section 1.1    Grant of Rights.** Subject to the terms and conditions of this Agreement:

(a)    *Intellectual Property License Grant*.    Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee (the "License Grant") a fully prepaid, irrevocable, exclusive, transferable, sub-licensable, license, to use, sublicense, franchise (and sub-franchise), anywhere in the world for a perpetual term, solely in connection with the ownership, operation, marketing, and promotion of Gentlemen's Clubs, and the advertising and promotion through any media now known or hereafter devised, including the Internet, and restaurant, bar, and cocktail lounge services directly related thereto (the "Licensed Services"): (i) all copyrights and other intellectual property owned or controlled by Licensor in and to the Penthouse Media, illustrative examples of which are set forth in Schedule 1.1(a), but only for the purpose of displaying such material in Licensee's, its Affiliates', and their sub-licensees' Gentlemen's Clubs or to advertise or promote services offered in or events occurring at such

{N3598883.1}    2

Gentlemen's Clubs consistent with historical practice of Licensee, its Affiliates, and their sub-licensees (the "Additional Intellectual Property"); and (ii) the marks identified in Schedule 1.1(a), which are the subject of U.S. and foreign trademark registrations or applications to register such marks, or U.S. and foreign common law rights in and to such marks therein owned or controlled by Licensor (the "Additional Marks"), *provided*, *however*, that Licensee (and all sub-licensees) shall utilize the Additional Marks in accordance with the provisions of Section 1.1(g) and the quality control provisions set forth in Section 5.6.

(b)    *Sublicensing*.  Licensee shall have the right to sublicense of any its rights under this Agreement, *provided* that (i) any sublicense shall be subject to the quality control provisions set forth in Section 5.6, and (ii) the terms of any sublicense and the obligations of the sub-licensee shall be in substantial conformity to this Agreement.

(c)    *Reservation of Rights*.  Licensor reserves to itself and for its sole benefit all other rights in and to the Additional Marks and Additional Intellectual Property (collectively, the "Licensed IP") not expressly granted to Licensee under this Agreement. For avoidance of doubt, the exclusivity of the License Grant shall be limited solely to the Licensed Services, and shall not apply to the advertising or promotion of goods or services, or restaurant, bar and cocktail lounge services, that are not directly related to Gentlemen's Clubs.

(d)    [Omitted]

(e)    *Acknowledgement of Ownership*.  Licensee acknowledges that Licensor is the owner of the Licensed IP.  Except for goodwill in connection with the Licensed Services, any other goodwill derived from the use of the Additional Marks by Licensee shall inure to the benefit of Licensor.  Except for Licensee's rights contemplated by Section 1.1(a) of this Agreement, the PSA, and the Transaction Documents, if Licensee acquires any rights in the Additional Marks, by operation of law, or otherwise, such rights shall be deemed and are hereby irrevocably assigned to Licensor without further action by any of the Parties, and Licensee agrees not to dispute or challenge or assist any Person in disputing or challenging Licensor's rights in and to, or the validity of, the Licensed IP.

(f)    *Limitation*.  Subject to the other provisions of this Agreement, including Sections 1.1(a), Section 1.1(g), and Section 5.9, and the other Transaction Documents, Licensee shall have no right to use any trademarks owned by Licensor apart from the Additional Marks and no right to use the Additional Marks outside of the Licensed Services.

(g)    *Use of Licensor's Other Trademarks*.  Licensee agrees that: (A) any uses of the Additional Marks by Licensee shall be made only as reasonably necessary for Licensee's advertising and marketing of Gentlemen's Clubs and the Licensed Services ("Permitted Advertising"), (B) all Permitted Advertising shall use the mark THE PENTHOUSE CLUB in close proximity to the Additional Marks, to the extent applicable to the application and medium of such Permitted Advertising, (C) Licensee only uses as much of the Additional Marks as is necessary to identify Licensor and its goods and services, (D) Licensee uses the Additional Marks in good faith, (E) Licensee does not use the Additional Marks as a source identifier for Licensee's goods and services, (F) Licensee does not use the Additional Marks in a manner that is likely to cause confusion with Licensor's use of the Additional Marks unrelated to Gentleman's Clubs (provided that Licensor acknowledges and agrees that Licensee's use of the Additional Marks in Permitted Advertising as set forth herein and the Consent to Use and

Register Agreement is not likely to cause such confusion), and (G) all promotional and advertising materials featuring the Additional Marks shall incorporate the appropriate trademark notices in accordance with Licensor's instructions.    In addition, Licensee must submit all Permitted Advertising incorporating the Additional Marks to Licensor for written approval (such approval not to be unreasonably withheld) prior to any use of the Additional Marks, and if approval is not received within seven (7) business days of submission, approval will be deemed granted; *provided*, *however*, that any Permitted Advertising, or other business materials, incorporating the Additional Marks that are approved in writing by Licensor prior to the Execution Date need not be submitted to Licensor.  Notwithstanding the foregoing, and for non-inclusive, illustrative purposes only, Licensor hereby approves, without any further approval necessary, and Licensee shall be deemed to have the right to use (and shall be deemed authorized to permit its sub-licensees to use) the PENTHOUSE mark, alone, so long as such uses strictly comply with all of the requirements set forth in this <u>Section 1.1(g)</u> (other than clauses (C) and (E) above): (1) on the signage fronting Gentlemen's Clubs, (2) in brochures and pamphlets promoting the Gentlemen's Clubs, (3) in Internet and social media advertising and promotions of Gentlemen's Clubs and (4) on signage, advertisements, décor, utensils, matchbooks, swizzle sticks, cocktail napkins, table tents, name holders, tag holders and souvenirs provided, sold or otherwise utilized in connection with the operation of the Gentleman's Clubs and as reasonably necessary for the promotion of Gentlemen's Clubs.

      **Section 1.2**    **Perpetual Term; No Royalties**.  The term of the License Grant (the "<u>Term</u>") shall be perpetual, unless, if, and until terminated by Licensee in writing in its sole discretion upon thirty (30) days' advance written notice.  For the avoidance of doubt, this Agreement and the License Grant hereunder is deemed to be fully prepaid, and Licensee shall not owe any royalties to Licensor or any other Person on account of its use or commercialization (including any sub-licenses of) the Licensed IP in accordance with the terms and conditions of this Agreement.

      **Section 1.3**    **Consideration**. The consideration furnished in connection with the PSA also supports this Agreement.

**ARTICLE 2**
**THE CLOSING**

      **Section 2.1**    **The Closing**. The closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place contemporaneously with, but not until, the consummation of the transactions contemplated by the PSA (and in the manner set forth therein). For the avoidance of doubt, <u>Section 2.4</u> of the PSA ('<u>Conditions to Closing</u>') requires, as a condition precedent to the obligations of each Party to consummate the transactions contemplated therein, that the Sale Order shall have been entered by the Bankruptcy Court; *provided that*, the Sale Order shall authorize the Trustee to enter into this Agreement.

      **Section 2.2**    **Deliveries by Licensor**. At or prior to the Closing, Licensor shall deliver to Licensee, as applicable, the following:

           (a)    a short-form agreement, in the form attached hereto as <u>Exhibit B</u>, with respect to the License Grant (the "<u>Short-Form Exclusive IP License Agreement</u>"), duly executed by Licensor; and

(b)    the Consent to Use and Registration Agreement substantially in the form of Exhibit C to the PSA ("Consent to Use and Registration Agreement" and together with this Agreement, the PSA, and the Short-Form Intellectual Property License Agreement, and any other instruments, documents or certificates required to be executed or delivered in connection herewith or therewith, collectively, the "Transaction Documents"), and which is incorporated by reference in this Agreement as if fully set forth herein; and

(c)    such other appropriately executed instruments of transfer, assumption, filings or documents as Licensee may reasonably request to effectuate the consummation of the transactions contemplated by this Agreement and the other Transaction Documents.

**Section 2.3    Deliveries by Licensee**.  At or prior to the Closing, Licensee shall deliver to Licensor the following:

(a)    the Short-Form Intellectual Property License Agreement, duly executed by Licensee; and

(b)    the Consent to Use and Registration Agreement, duly executed by Licensee.

**Section 2.4    Condition to Closing**.  The respective obligations of each Party to consummate the transaction contemplated hereby shall be subject to the satisfaction at, or prior to the Closing, that the transactions contemplated by the PSA have been consummated (and in the manner set forth therein) including that the Remaining Assets Order and the Penthouse Clubs IP Sale Order shall have been entered by the Bankruptcy Court and that such applicable order shall authorize the Trustee to enter into this Agreement.

**Section 2.5    Post-Closing Further Assurances**.  From time to time and at any time on or after the Closing, upon either Party's reasonable request and without further consideration, the other Party shall execute and deliver such further documents and instruments, and shall take such further actions as may be reasonably necessary to implement the Transaction and the transactions contemplated by this Agreement and the other Transaction Documents. Licensee has the right, but not the obligation, to record copies of the Short-Form Intellectual Property License Agreement and Consent to Use and Registration Agreement with applicable Governmental Authority, including the U.S. Patent and Trademark Office and U.S. Copyright Office.

# ARTICLE 3
# LIMITED REPRESENTATIONS AND WARRANTIES; "AS IS"

**Section 3.1 Licensed IP**.  (a) To the Trustee's knowledge, the Licensed IP is owned by Licensor, and Licensor possesses all right, title and interest in and to the Licensed IP.

(b)    To the Trustee's knowledge, and subject to the entry of the Penthouse Clubs IP Sale Order, the execution and delivery by the Trustee on behalf of the Licensor, the consummation of the transactions contemplated hereby and the performance by Licensor of this Agreement in accordance with its terms will not (with or without notice or lapse of time or both) (i) require the Licensor to obtain any consent, approval, authorization or actions of, or make any filings with or give any notices to, any Governmental Bodies, except for consents, approvals, or

authorizations of, or declarations or filings with, the Bankruptcy Court; or (ii) violate any requirement of law to which Licensor is subject.

(c)    "AS IS" Transaction.  Licensee hereby acknowledges and agrees that, except only as provided in this Section 3.1, the Trustee makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Licensed IP (including, without limitation, income to be derived or expenses to be incurred in connection with the Licensed IP, the value of the Licensed IP (or any portion thereof), the transferability of the Licensed IP, the title of the Licensed IP (or any portion thereof), or any other matter or thing relating to the Licensed IP (or any portion thereof)).  Without in any way limiting the foregoing, the Trustee on behalf of Licensor hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Licensed IP. Licensee further acknowledges that Licensee has conducted an independent inspection and investigation of the Licensed IP and all such other matters relating to or affecting the Licensed IP as Licensee deemed necessary or appropriate and that in proceeding with its license of the Licensed IP, Licensee is doing so based solely upon such independent inspections and investigations and the limited representations set forth in this Section 3.1.  Accordingly, except with respect to the representations set forth in this Section 3, Licensee will accept the Licensed IP at the Closing "AS IS," "WHERE IS," and "WITH ALL FAULTS."

Section 3.2 Authority/ Enforceability Licensee represents and warrants to Licensor as follows: Licensee has all requisite legal power, authority and legal capacity to execute and deliver this Agreement and the other Transaction Documents to which Licensee is a party, and to consummate the Transaction and the transactions contemplated hereby and thereby.  The execution, delivery and performance of the Transaction Documents by Licensee, and the consummation of the Transaction and the transactions contemplated thereby, have been duly authorized by all necessary action on the part of Licensee.  The Transaction Documents have been (or will be) duly executed and delivered by Licensee and constitute (or will constitute) its legal, valid and binding obligations, enforceable against it in accordance with their respective terms, subject to applicable bankruptcy, insolvency and similar laws affecting generally the enforcement of creditors' rights and general principles of equity.

## ARTICLE 4
## RESERVED

## ARTICLE 5
## OTHER COVENANTS AND AGREEMENTS

**Section 5.1    Efforts**.  Upon the Closing and throughout the Term, the Parties agree to use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective as promptly as practicable, the transactions contemplated by this Agreement and the other Transaction Documents, and to cooperate with each other in connection with the foregoing, including using their respective commercially reasonable efforts to effect all filings, recordals, obtain all assignments, waivers, consents, novation, amendments, approvals and authorizations to properly effect, implement or fully consummate any of the matters contemplated by this Agreement or the other Transaction Documents.

{N3598883.1}                                    6

**Section 5.2    Public Announcements**. Neither Party nor any of their Affiliates, agents, licensees, or representatives, shall issue any press release or otherwise make any public statements with respect to the Transaction Documents or the transactions contemplated thereby without the prior written consent of the other Party.

**Section 5.3    Obligation Not to Use Penthouse Club Marks**. Licensor and its Affiliates agree they will not, directly or indirectly, use the Penthouse Club Marks or any other Acquired Penthouse Club IP for any good or service anywhere in the world, except with Licensee's prior written consent.

**Section 5.4    Limitations on Use of Additional Marks**.  Licensor hereby agrees that, upon the Closing and throughout the Term, and without limitation to Section 5.8, Licensor shall not, directly or indirectly, and shall not permit its Affiliates, successors-in-interest, assigns, or other licensees to, use, license, or commercialize in any way the Additional Marks in connection with such Person's ownership, operation, or promotion of Gentlemen's Clubs.  Notwithstanding the foregoing, but subject to Section 5.8, nothing contained herein shall prevent Licensor or its Affiliates, successors-in-interest, assigns, or other licensees from owning or operating bars, nightclubs or other entertainment venues, that are not Gentlemen's Clubs, bearing or utilizing Licensor's or its Affiliates' or such other Person's trademarks including, without limitation, the Additional Marks.

**Section 5.5    Third Party Infringement**.  Licensee shall notify Licensor in writing of Licensee's actual knowledge of any infringements of the Additional Marks, and Licensor shall have the sole right (except as expressly provided in this Section 5.5) to prosecute infringements and other similar actions or proceedings (collectively, "Assertions") against third parties in order to enforce its and Licensee's rights in the Additional Marks.  If requested to do so, Licensee and its Affiliates shall reasonably cooperate with Licensor, at Licensor's cost, in any such Assertion, including joining as a party in any Legal Proceeding.  Licensee shall not institute any suit or take any action on account of any such infringements or imitations without first obtaining the written consent of the Licensor to do so; _provided_, that if Licensor fails to institute such Legal Proceeding and/or diligently take any other commercially reasonable action on account of any such infringement, imitation or other Assertions within ten Business Days of becoming aware thereof, Licensee shall have the right, but not the obligation, at Licensee's cost, to institute Legal Proceedings or take any other reasonable action to protect its rights in the Additional Marks, and upon request by Licensee, Licensor and its Affiliates shall reasonably cooperate with Licensee, at Licensee's cost, in any such Legal Proceeding or other action, including joining as a party in any Legal Proceeding.  Licensee shall not challenge or aid or assist others in challenging Licensor's exclusive ownership of the Additional Marks.  Licensee shall immediately notify Licensor of the receipt of any claim that Licensee's use of the Additional Marks violates the rights of any third party and shall fully cooperate upon Licensor's request, at Licensor's cost, with the Licensor in any litigation, proceeding or settlement that the Licensor shall deem advisable in connection with any such claim. Any award, or portion of an award, recovered in any such Assertion or other Legal Proceeding shall be split proportionately among Licensor and Licensee to recoup the Parties' respective expenses actually paid in connection therewith and to compensate such Parties' respective pecuniary losses resulting therefrom.

**Section 5.6    Quality Control.**

(a)    Licensee shall use its commercially reasonable efforts to (i) maintain the existing standards and quality of the products, goods and services provided by or on behalf of Licensee under, in connection with and utilizing the Additional Marks (the "Branded Goods and Services"), consistent with the customary ownership and operation of Gentlemen's Clubs; and (ii) comply with and abide by all Laws applicable thereto and to correct any alleged violations thereof.  In all sub-licenses of the Additional Marks entered into and granted by Licensee during the Term, Licensee shall require that all sub-licensees thereunder contractually agree to adhere to the general scope of the quality control provisions set forth hereinbelow.

(b)    Licensee shall submit all of its advertising, promotional, or other business materials (excluding real-time social media advertising) bearing the Additional Marks to Licensor for approval in accordance with Section 1.1(g).  Any use of the Additional Marks by Licensee's sub-licensees must meet Licensor's quality control standards specified in this Section 5.6, and must continue to be of substantially the same quality during the Term, and Licensor reserves its rights to reasonably request and review specimens depicting the Additional Marks throughout the Term for the purpose of reviewing the quality thereof.  In the event that there is a substantial and adverse change in the quality of the usage of the Additional Marks by Licensee or its sub-licensee(s), Licensor and Licensee will confer in an effort to resolve such dispute in accordance with this Section 5.6, and until such time as the dispute is resolved, Licensee shall cease any further use and/or sublicensing of the Additional Marks to such Persons (except as such use and/or sublicensing is otherwise permitted during the Quality Control Cure Period, defined below) until the quality of the usage of the Additional Marks by Licensee or such Persons is corrected.  Licensee agrees that it will use its commercially reasonable efforts to ensure that the quality of its and its sub-licensees' Gentleman's Club(s) utilizing the Additional Marks will remain consistent with the high quality products and services currently offered by Licensor, and to promptly correct any of its uses, or require its sub-licensees to correct any of their uses, of the Additional Marks in a manner that could reasonably be expected to adversely reflect upon or damage the goodwill or reputation of the Additional Marks or Licensor.  Licensor shall have a right of sufficient access at reasonable times, and upon at least three Business Days' advance notice, to Licensee's facilities to permit Licensor or its representatives to ensure that the quality of any location using the Additional Marks is in accordance with these standards.  Licensee acknowledges that the maintenance of the high quality of the Additional Marks and the associated goods and services, and compliance with the foregoing quality control provisions, are material conditions of this Agreement.

(c)    Licensee shall use commercially reasonable efforts to maintain the distinctiveness of the Additional Marks, the image of the brand, and the image and high quality of the services and merchandise bearing the Additional Marks presently manufactured and sold by Licensor and its other licensees, and Licensee agrees that anything bearing the Additional Marks will be of high quality as to workmanship, fit, design and materials.

(d)    If Licensor reasonably determines that such Branded Goods and Services shall fail to conform with the standards of quality as contemplated herein, Licensor or its authorized representatives shall so notify Licensee of the same in writing.  Upon receipt of such notification, Licensee shall use its commercially reasonable efforts to cure any such deficiencies to the reasonable satisfaction of Licensor within 60 days thereafter (the "Quality Control Cure Period").  If, upon expiration of the Quality Control Cure Period, Licensor provides Licensee

{N3598883.1}    8

with written notice of its failure to reasonably cure such deficiency, the Parties shall continue to use their commercially reasonable efforts to resolve any disputes related thereto. If the Parties are still unable to resolve any dispute over the alleged deficiency, then they shall submit to binding mediation with a mutually agreed upon mediator and associated procedures and rules for resolution in mediation. In his or her award, the mediator may award damages to the prevailing party and/or enjoin Licensee to conform such Branded Goods and Services to the standards of quality as contemplated herein, but in no event may the mediator terminate the License Grant or this Agreement.

**Section 5.7    Licensee's Right to Franchise**.  Licensor acknowledges and agrees that Licensee may desire to enter into franchise agreements with third parties to operate Gentlemen's Clubs utilizing the Licensed IP.  The Parties acknowledge and agree that they shall negotiate in good faith and promptly memorialize in writing any such additional agreements or documents that may be necessary to effectuate any such franchising agreements.

**Section 5.8    Non-Competition; Non-Solicitation; Non-Disparagement**.  Licensor hereby agrees to the restrictive covenants set forth in this <u>Section 5.8</u>.

(a)    During the Term (the "<u>Restricted Period</u>"), each of Licensor and its Affiliates shall not, directly or indirectly, within the entire world (the "<u>Restricted Territory</u>") and in connection with Gentlemen's Clubs, for its own benefit or for the benefit of any other Person, in any capacity (as a principal, shareholder, partner, member, manager director, officer, agent, executive, consultant, contractor, employee, lender or otherwise):

(i)    induce, solicit, recruit or attempt to persuade any Person who is (or becomes during the Restricted Period) employed by, a licensee, or performs (or will perform during the Restricted Period) services for Licensee or its Affiliates at any time during the Restricted Period, to terminate such Person's employment, license, or other relationship with Licensee or its Affiliates or not to establish an employment, license, or other relationship with Licensee or its Affiliates, whether or not such Person is or would be during the Restricted Period an employee, licensee, consultant, contractor, manager, officer and/or director, whether or not such relationship is or would be pursuant to a written or oral agreement and whether or not such relationship is for a specific period or is at-will;

(ii)    employ or establish a business relationship with (or attempt to employ or establish a business relationship with), or encourage or assist any Person to employ or establish a business relationship with, any individual who is or was an employee, licensee, consultant, contractor, manager, officer or director of Licensee or its Affiliates during the Restricted Period, until at least six months after the date that Licensee's or its Affiliates' employment of or business relationship with such Person has terminated;

(iii)    (A) direct or engage in any act which may interfere with or adversely affect, alter or change the relationship (contractual or otherwise) of Licensee or its Affiliates with any Person (1) for whom or which Licensee or its Affiliates at any time performed services or to whom or which Licensee or its Affiliates at any time sold, leased, distributed or licensed its products or services in connection with the Licensed Services during the Restricted Period; (2) whose business was solicited by, or who was otherwise in negotiations to enter into a business relationship with, Licensee or its Affiliates at any time during the Restricted Period in connection with the Licensed Services; or (3) that is or was a vendor,

{N3598883.1}                                             9

supplier, lessor, licensor or contractor of, or who otherwise has a business relationship with, Licensee or its Affiliates during the Restricted Period in connection with the Licensed Services; (B) otherwise induce or attempt to induce any such Person to cease doing business, reduce or otherwise limit its business with Licensee or its Affiliates in connection with the Licensed Services; or (C) solicit business from any such Person during the Restricted Period; or

        (iv)    directly or indirectly, for its or his own benefit or for the benefit of any other Person, in any capacity (as a principal, shareholder, partner, member, manager director, officer, agent, executive, consultant, contractor, employee, lender or otherwise), own, manage, operate, control, be employed by, engage or participate in, be financially interested or allow his skill, knowledge, experience or reputation to be used by, or otherwise be connected with the ownership, management, operation or control of any Person involved in a Gentlemen's Club or otherwise competes with the Gentlemen's Clubs.

Notwithstanding the foregoing, <u>Sections 5.8(a)(i)-(iii)</u> shall not preclude Licensor from soliciting, hiring, employing or otherwise engaging any employee, consultant, contractor or other Person who performed or performs services for Licensee who (1) responds to a general solicitation through a public medium or general or mass mailing by or on behalf of Licensor, or a Person controlled by Licensor, or (2) responds to a solicitation by a bona fide search or services firm; <u>*provided*</u>, such search or services firm has been directed not to solicit employees, consultants, contractors or such other Persons of Licensee.

        (b)    From and after the Effective Date, each of the Parties and their Affiliates shall not make any statements, whether written or oral, directly or indirectly (or encourage others to make any such statements) that defame, disparage or demean the Penthouse Club Marks or the Additional Marks, the other Party and their businesses, Affiliates, or their respective officers, directors, employees, shareholders, members, managers, partners, agents or products or services. The foregoing shall not be violated by truthful statements (i) in response to legal process, (ii) in required governmental testimony or filings, (iii) made pursuant to any applicable "whistleblower" Laws, or (iv) in administrative or other arbitral or other Legal Proceedings.

        (c)    The Parties hereto agree that, if any court of competent jurisdiction in a final non-appealable judgment determines that a specified time period, a specified geographical area, a specified business limitation or any other relevant feature of this <u>Section 5.8</u> is unreasonable, arbitrary or against public policy, then a lesser time period, geographical area, business limitation or other relevant feature determined by such court to be reasonable, not arbitrary and not against public policy may be enforced against the applicable Party.

**Section 5.9**    <u>**After-Acquired Intellectual Property**</u>.

        (a)    Licensor hereby acknowledges and agrees that all After-Acquired IP shall be automatically deemed to be included in the Licensed IP, subject to and included in the License Grant pursuant to <u>Section 1.1(a)</u>. If any of the After-Acquired IP may not, by operation of law, be deemed to be automatically included within the License Grant hereunder, or if all right, title and interest of the intellectual property rights therein shall not otherwise be deemed to be licensed to Licensee hereunder, Licensor hereby agrees to grant to Licensee, and does hereby grant to Licensee, a license to use the After-Acquired IP, without further consideration, on the same terms as the License Grant.

(b) Licensor hereby agrees to perform, upon the reasonable request of Licensee or its Affiliates or any of their respective representatives or advisors, during the Term, such further acts as may be necessary or desirable to transfer, perfect and defend Licensee's foregoing license in such After-Acquired IP. When requested, Licensor will: (i) execute, acknowledge and deliver any requested declarations, affidavits and/or documents of license, assignment and conveyance; (ii) obtain and aid in the enforcement of copyrights, trade secrets and, if applicable, patents, trademarks or service marks with respect to the After-Acquired IP in any countries in accordance with the other terms and conditions of this Agreement; (iii) provide testimony in connection with any proceeding affecting Licensee's foregoing license in any such After-Acquired IP; and (iv) perform any other acts deemed necessary or desirable to carry out the purposes of this Agreement. Licensee will reimburse all reasonable out-of-pocket expenses incurred by Licensor at Licensee's request in connection with the foregoing, including attorneys' fees and costs.

(c) "After-Acquired IP" shall mean all intellectual property rights relating to, all U.S. and international copyrights, trademarks and trademark applications, service marks, , whether registered or un-registered, and all common law rights therein that: (i) results from any mutually agreed upon collaboration between Licensor and Licensee, such as, without limitation, a public performance at one of Licensee's clubs or a work of joint authorship, relating to the Licensed IP limited to the Licensed Services; (ii) relate to the business and interests of Licensee or its Affiliates as it relates to the Licensed IP limited to the Licensed Services; or (iii) otherwise relates to the ownership, management and operation of Gentlemen's Clubs or the Licensed Services and licensing of intellectual property in connection therewith, in each case that Licensor or its Affiliates conceives, develops, purchases or otherwise acquires or delivers to Licensee or its Affiliates at any time during the Term.

(d) During the Term, Licensor shall promptly report the conception, development, purchase or other acquisition of any After-Acquired IP in writing to Licensee.

(e) This Section 5.9 is without limitation to, and does not relieve Licensor of, any of its obligations, agreements or covenants otherwise set forth in and/or required pursuant to the Transaction Documents.

**Section 5.10   Exploitation; Sole Discretion**. Licensor hereby expressly acknowledges and agrees that, subject to the terms of this Agreement, including without limitation Section 5.6 hereof, Licensee will have the right, as it may determine in good faith and in its sole, absolute discretion, to determine the manner and means of its ownership and operation of the Gentlemen's Clubs, and to determine all of the terms and conditions of any contract entered into by Licensee for the monetization, exploitation and/or other commercialization of the Licensed IP.

**ARTICLE 6**
**RESERVED**

**ARTICLE 7**
**TERM; DISPUTE RESOLUTION**

**Section 7.1    Term**. The Term of this Agreement is perpetual.

**Section 7.2    Equitable Relief**. Subjection to Section 5.6(d), each Party acknowledges that in the event of a breach by the other Party of this Agreement will cause the non-breaching Party irreparable damages, for which an award of damages would not be adequate compensation, and each Party agrees that, in the event of such breach or threatened breach, the non-breaching Party will be entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance and any other relief that may be available from any court in addition to any other remedy to which the non-breaching Party may be entitled at law or in equity. Such remedies shall not be deemed to be exclusive but shall be in addition to all other remedies available at law or in equity, subject to any express exclusions or limitations in this Agreement to the contrary.

**Section 7.3    Cure Period; Mediation**. In the event of an alleged breach, the non-breaching Party shall send to the allegedly breaching Party written notice in accordance with Section 8.6, informing the defaulting Party of the specified breach and a description of the circumstances giving rise to such breach. Except as provided in Section 5.6(d), the breaching Party shall thereafter have 60 days from receipt of such notice, or such longer period as the Parties may mutually agree, in which to cure the breach. If, upon expiration of the applicable cure period, the non-breaching Party provides the breaching Party with written notice of its failure to reasonably cure such breach, the Parties shall continue to use their commercially reasonable efforts to resolve any disputes related thereto or to otherwise affect a cure for such breach. If the Parties are still unable to resolve any dispute over the alleged breach or otherwise affect a cure therefor, then they shall submit to mediation with a mutually agreed-upon mediator and associated procedures and rules for resolution in mediation.

## ARTICLE 8
## MISCELLANEOUS

**Section 8.1    Successors and Assigns; Assignment**. Neither Party may assign this Agreement or any of its rights or obligations hereunder, in whole or in part, by operation of law or otherwise without prior written notice to the other Party in accordance with Section 8.6. This Agreement shall be binding upon and inure to the benefit of the Parties and any of their successors and permitted assigns, including any successors and assigns to any of the Licensed IP. Except as otherwise expressly provided herein or the other Transaction Documents, nothing in this Agreement, express or implied, is intended to confer upon any party other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement.

**Section 8.2    No Joint Venture**. Neither Party owes the other any fiduciary duties, including duties of loyalty or care. This Agreement shall not be construed to form any partnership, joint venture or other regime of shared risks or profits between the Parties.

**Section 8.3    Severability**. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.

**Section 8.4    Expenses**. Each Party shall bear its own expenses in connection with the negotiation, execution, delivery and performance of this Agreement and the transactions contemplated hereby.

**Section 8.5    <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>.**

(a)    This Agreement shall be governed by, interpreted and enforced in accordance with the laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to any conflicts of law principles which might otherwise require the application of the law of another jurisdiction.  The Parties expressly agree that the United Nations Convention on Contracts for the International Sale of Goods will not apply to this Agreement.  The Parties hereby agree that, except as set forth in <u>Section 5.6(d)</u>, any action brought with respect to this Agreement and the transactions contemplated hereunder, including, but not limited to, any action brought for injunctive relief, shall be heard and determined in the Delaware Court of Chancery or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Legal Proceeding, the United States District Court for the District of Delaware.  In any such Legal Proceeding, each of the Parties irrevocably and unconditionally waives, and agrees not to assert by way of motion, as a defense or otherwise, any Claim that such party is not subject to the jurisdiction of the above courts, that such action or suit is brought in an inconvenient forum or that the venue of such Legal Proceeding is improper.

(b)    EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY.  EACH PARTY HERETO CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (ii) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 8.5(b)</u>.

**Section 8.6    <u>Notices</u>.**  Any notice and other communication required, permitted or desired to be given under this Agreement shall be given in writing and shall be deemed effectively given upon personal delivery, transmission by electronic means (*e.g.*, email or facsimile with confirmation of receipt) or two Business Days after it is deposited with a recognized overnight courier service, delivery prepaid and addressed, to such Person at its address, e-mail or facsimile number as designated below:

To Licensor:    c/o David K. Gottlieb, Chapter 11 Trustee
Gottlieb & Associates, LLC
17000 Ventura Blvd., Suite 300
Encino, California, 91403
Attention:  David Gottlieb
Facsimile: (818) 436-0729
Email Address: dgottlieb@dkgallc.com

With a copy to:    Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor

Los Angeles, California 90067
Attention: Linda Cantor, Esq.
Facsimile: (310) 201-0760
Email Address: lcantor@pszjlaw.com

To Licensee:    Penthouse Clubs Global Licensing, LLC
201 St. Charles Avenue, Suite 3915
New Orleans, Louisiana 70170
Attention:    Tim Spratt, Esq.
*Telephone*:    (504) 267-5498
*Facsimile*:    (504) 324-6761
*Email*:    tspratt@kirkmgmt.com

With a copy to:    Jones Walker LLP
201 St. Charles Ave., Suite 5100
New Orleans, Louisiana 70170
Attention:    Asher J. Friend, Esq.
*Telephone*:    (504) 582-8362
*Facsimile*:    (504) 589-8362
*Email*:    afriend@joneswalker.com

or at such other address, facsimile number or email address as such Party may designate by written notice to the other Party in accordance with this Section 8.6.

**Section 8.7    Construction**. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. The use of "including" or "include" herein shall in all cases mean "including, without limitation" or "include, without limitation," respectively. The use of "or" is not intended to be exclusive unless the context requires otherwise. Reference to any agreement (including this Agreement), document or instrument shall mean such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof. Underscored references to Sections or clauses shall refer to those portions of this Agreement. The use of the terms "hereunder," "hereof," "hereto," "herein" and words of similar import shall refer to this Agreement as a whole and not to any particular section, paragraph, or clause of this Agreement. All references to "$" and dollars shall be deemed to refer to United States currency unless otherwise specifically provided.

**Section 8.8    Complete Agreement**. This Agreement (including all Exhibits and Schedules attached hereto) and the other Transaction Documents, agreements and instruments to be executed and delivered hereunder, constitute the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings relating to such subject matter.

**Section 8.9    Amendments and Waivers**. Except as otherwise expressly set forth in this Agreement, any term of this Agreement may be amended or terminated only with the written

{N3598883.1}    *14*

consent of each of the Parties hereto.  A waiver of any term of this Agreement is only enforceable if in writing and signed by the Party against whom the waiver is asserted.  A waiver of any term of this Agreement shall not be construed as a continuing waiver of further breaches of the same term.

Section 8.10  **Pronouns**.  Whenever the context may require, any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural, and vice versa.

Section 8.11  **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which taken together shall constitute one and the same instrument.

Section 8.12  **Section Headings**.  The section headings are for the convenience of the parties and in no way alter, modify, amend, limit, or restrict the contractual obligations of the parties.

Section 8.13  **No Recourse to Trustee as Licensor**.    The Licensee expressly acknowledges and agrees that the Trustee is executing this Agreement and entering into the transaction contemplated herein solely in his capacity as Chapter 11 Trustee for Licensor's bankruptcy estates and that in the event of any default in the performance of any of the Licensor's or its estates' obligations under this Agreement or in the event that any other claim is asserted against the Trustee or such estates in connection with this Agreement or the transactions contemplated herein, the Trustee shall in no event have any personal liability whatsoever (whether in his individual capacity or otherwise), it being expressly understood and agreed that Licensee's sole recourse, if any, in such event shall be to the assets of such estates.

Section 8.14  **Non-Executory Contract; IP License**.  Consistent with and in reliance on the holding of *In re Exide Techs.*, 607 F.3d 957 (3rd Cir. 2009), the Parties acknowledge and agree that: (a) this Agreement is a prepaid license granted in connection with a transaction by which Licensor has sold Licensee its line of business relating to Gentlemen's Clubs; (b) that after payment of the Purchase Price set forth in the PSA, Licensee will not have any unperformed material obligations that would excuse the Licensor's performance under this Agreement; (c) that no default by the Licensee of any provision of this Agreement shall be a material default that permits the Licensor to terminate this Agreement; (d) this Agreement is not an executory contract; and (e) such license includes "Intellectual Property," including copyrights, within the meaning of Section 101 and Section 365(n) of the Bankruptcy Code.

*[Signatures Appear on the Following Page]*

*Signature Page*
*Master Intellectual Property License Agreement*

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the day and year first above written.

LICENSOR:

BY: _____

DAVID K. GOTTLIEB, SOLELY IN HIS CAPACITY AS
CHAPTER 11 TRUSTEE FOR THE ESTATES OF THE
LICENSOR

LICENSEE:

PENTHOUSE CLUBS GLOBAL LICENSING , LLC

By: _____
Name: John Kirkendoll
Title:  Manager

*Signature Page*
*Master Intellectual Property License Agreement*

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the day and year first above written.

LICENSOR:

BY: _____
DAVID K. GOTTLIEB, SOLELY IN HIS CAPACITY AS
CHAPTER 11 TRUSTEE FOR THE ESTATES OF THE
LICENSOR

LICENSEE:

PENTHOUSE CLUBS GLOBAL LICENSING , LLC

By: _____
Name: John Kirkendoll
Title:  Manager

*Exhibit A*
*Master Intellectual Property License Agreement*

# DEFINED TERMS

In addition to the other defined terms used herein, as used in this Agreement, the following terms when capitalized have the meanings indicated.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the ownership, directly or indirectly, of not less than fifty-one percent (51%) of the beneficial interests of such Person."

"Applicable Law" means any Law to which a specified Person or its property is subject.

"Business Day" means a day other than a Saturday, Sunday or other day on which banks located in New Orleans, Louisiana are authorized or required by Applicable Law to close.

"Claim" means all demands, claims (including third-party claims), actions or causes of action, suits, investigations, assessments, encumbrances, charges, complaints, directives, citations, information requests issued by government authorities, legal proceedings, orders, notices of potential responsibility, damages or sanctions.

"Contract" means any contract, agreement, indenture, note, bond, mortgage, loan, instrument, lease, license, commitment or other arrangement, understanding or undertaking, commitment or obligation, whether written or oral.

"Governmental Entity" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Knowledge" (or similar phrases) of a given Person in this Agreement means the actual knowledge of such Person after due inquiry and reasonable investigation.

"Law" means any foreign, federal, state or local law (including common law), statute, code (including the Code and the Bankruptcy Code), ordinance, rule, regulation, Order or other requirement.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, mediations, investigations, hearings, inquiries, proceedings or Claims (including counter-claims) by or before a Governmental Entity.

"Order" means any order, injunction, judgment, charge, doctrine, decree, rule, ruling, writ, assessment or arbitration award of a Governmental Entity.

"Permit" means any approval, permit (including as required by Applicable Law), order, certificate, variance and product license and license application, permit and any industry, certifying or other regulatory organization authorization or approval and any authorization or approval of any Governmental Entity (foreign, federal, state and local).

*Exhibit A*
*Master Intellectual Property License Agreement*

## SCHEDULE OF DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings set forth in the sections indicated.

| DEFINED TERM | SECTION OR DOCUMENT |
|---|---|
| Acquired Penthouse Club IP | PSA |
| Additional Intellectual Property | 1.1(a) |
| Additional Marks | 1.1(a) |
| After-Acquired IP | 5.9(c) |
| Agreement | Preamble |
| Assertions | 5.5 |
| Bankruptcy Cases | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Branded Goods and Services | 5.6(a) |
| Closing | 2.1 |
| Confidential Information | 5.15(a) |
| Consent to Use and Registration Agreement | 2.2(b) |
| Debtors | Recitals |
| Execution Date | Preamble |
| Gentlemen's Clubs | PSA |
| License Grant | 1.1(a) |
| Licensed IP | 1.1(c) |
| Licensed Services | 1.1(a) |
| Licensee | Preamble |
| Licensor | Preamble |
| Original MLA | Recitals |
| Original MLA Licensees | Recitals |
| Party; Parties | Preamble |
| PENTHOUSE Marks | Recitals |
| Penthouse Clubs IP Sale Order | PSA |
| Penthouse Club Marks | PSA |
| Penthouse Media | Recitals |
| Permitted Advertising | 1.1(g) |
| PGLI | Preamble |
| PH Parties | Preamble |
| PSA | Recitals |
| Quality Control Cure Period | 5.6(d) |
| Related Penthouse IP Owner(s) | PSA |
| Remaining Assets Order | PSA |
| Restricted Period | 5.8(a) |
| Restricted Territory | 5.8(a) |
| Sale Order | PSA |
| Short-Form Exclusive IP License Agreement | 2.2(a) |

*Exhibit A*
*Master Intellectual Property License Agreement*

| DEFINED TERM | SECTION OR DOCUMENT |
| --- | --- |
| **Term** | 1.2(a) |
| **Third-Party Licenses** | Recitals |
| **Transaction Documents** | 2.2(b) |
| **Trustee** | Recitals |

*Exhibit B*
*Master Intellectual Property License Agreement*


# SHORT-FORM EXCLUSIVE IP LICENSE AGREEMENT

Exhibit B to
*Master Intellectual Property License Agreement*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

## EXCLUSIVE INTELLECTUAL PROPERTY LICENSE

This Exclusive Intellectual Property License (this "Agreement"), dated as of May 21, 2018 (the "Execution Date"), is entered into by and between David K. Gottlieb, solely in his capacity as Chapter 11 Trustee for Penthouse Global Licensing, Inc., a Delaware corporation, ("PGLI") and those Affiliates of PGLI set forth on Appendix A (collectively, and including the Related Penthouse IP Owner(s), the "Licensor"), on the one hand, and Penthouse Clubs Global Licensing, LLC, a Delaware limited liability company (the "Licensee"), on the other hand. Licensor and Licensee are each referred to herein as a "Party" and collectively, as the "Parties."

## RECITALS:

A.      Licensor and Licensee have entered into that certain Master Intellectual Property License Agreement, dated as of the Execution Date (the "MIPLA"), pursuant to which Licensor is granting to Licensee a perpetual, irrevocable, prepaid, sublicensable, and exclusive license to certain marks that include the term "PENTHOUSE", key logos, and other terms and designs for a variety of goods and services (as defined in the MIPLA and used herein, the "Additional Marks"), including the marks for the applications and registrations set forth on Schedule 1.1(a) attached hereto.

B.      All capitalized terms used herein but not otherwise defined herein shall have the meanings provided in the MIPLA or that certain Purchase and Sale Agreement, dated as of the Execution Date, by and between Licensor and Licensee (the "PSA"), as applicable.

C.      Pursuant to the MIPLA, Licensor shall grant the License Grant (as defined below) to Licensee, and Licensor desires to further evidence the foregoing License Grant to Licensee on the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Licensor and Licensee hereby agree as follows:

1.      Grant of Rights. Subject to the terms and conditions of the MIPLA:

(a)      *Intellectual Property License Grant*. Subject to the terms and conditions of this Agreement and the MIPLA, Licensor hereby grants to Licensee (the "License Grant") a fully prepaid, irrevocable, exclusive, transferable, sub-licensable, license, to use, sublicense, franchise (and sub-franchise), anywhere in the world for a perpetual term, solely in connection with the ownership, operation, marketing, and promotion of Gentlemen's Clubs, and the advertising and promotion through any media now known or hereafter devised, including the Internet, and restaurant, bar, and cocktail lounge services directly related thereto (the "Licensed Services"): (i) all copyrights and other intellectual property owned or controlled by Licensor in and to the Penthouse Media, illustrative examples of which are set forth in Schedule 1.1(a), but only for the purpose of displaying such material in Licensee's, its Affiliates', and their sub-licensees' Gentlemen's Clubs or to advertise or promote services offered in or events occurring

*Exhibit B to*
*Master Intellectual Property License Agreement*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

at such Gentlemen's Clubs consistent with historical practice of Licensee, its Affiliates, and their sub-licensees (the "Additional Intellectual Property"); and (ii) the marks identified in Schedule 1.1(a), which are the subject of U.S. and foreign trademark registrations or applications to register such marks, or U.S. and foreign common law rights in and to such marks therein owned or controlled by Licensor (the "Additional Marks"), *provided, however*, that Licensee (and all sub-licensees) shall utilize the Additional Marks in accordance with the provisions of Section 1.1(g) hereof and the quality control provisions set forth in Section 5.6 of the MIPLA.

(b)     *Sublicensing*.  Licensee shall have the right to sublicense of any its rights under this Agreement and the MIPLA, *provided* that (i) any sublicense shall be subject to the quality control provisions set forth in Section 5.6 of the MIPLA, and (ii) the terms of any sublicense and the obligations of the sub-licensee shall be in substantial conformity to this Agreement and the MIPLA, as applicable.

(c)     *Reservation of Rights*. Licensor reserves to itself and for its sole benefit all other rights in and to the Additional Marks and Additional Intellectual Property (collectively, the "Licensed IP") not expressly granted to Licensee under this Agreement and the MIPLA, as applicable. For avoidance of doubt, the exclusivity of the License Grant shall be limited solely to the Licensed Services, and shall not apply to the advertising or promotion of goods or services, or restaurant, bar and cocktail lounge services, that are not directly related to Gentlemen's Clubs.

(d)     [Omitted]

(e)     *Acknowledgement of Ownership*.  Licensee acknowledges that Licensor is the owner of the Licensed IP.  Except for goodwill in connection with the Licensed Services, any other goodwill derived from the use of the Additional Marks by Licensee shall inure to the benefit of Licensor.  Except for Licensee's rights contemplated by Section 1.1(a) of this Agreement, the PSA, and the Transaction Documents, if Licensee acquires any rights in the Additional Marks, by operation of law, or otherwise, such rights shall be deemed and are hereby irrevocably assigned to Licensor without further action by any of the Parties, and Licensee agrees not to dispute or challenge or assist any Person in disputing or challenging Licensor's rights in and to, or the validity of, the Licensed IP.

(f)     *Limitation*.  Subject to the other provisions of this Agreement, including Sections 1.1(a) and Section 1.1(g) hereof, Section 5.9 of the MIPLA, and the other Transaction Documents, Licensee shall have no right to use any trademarks owned by Licensor apart from the Additional Marks and no right to use the Additional Marks outside of the Licensed Services.

(g)     *Use of Licensor's Other Trademarks*.  Licensee agrees that: (A) any uses of the Additional Marks by Licensee shall be made only as reasonably necessary for Licensee's advertising and marketing of Gentlemen's Clubs and the Licensed Services ("Permitted Advertising"), (B) all Permitted Advertising shall use the mark THE PENTHOUSE CLUB in close proximity to the Additional Marks, to the extent applicable to the application and medium of such Permitted Advertising, (C) Licensee only uses as much of the Additional Marks as is necessary to identify Licensor and its goods and services, (D) Licensee uses the Additional Marks in good faith, (E) Licensee does not use the Additional Marks as a source identifier for

*Exhibit B to*
*Master Intellectual Property License Agreement*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

Licensee's goods and services, (F) Licensee does not use the Additional Marks in a manner that is likely to cause confusion with Licensor's use of the Additional Marks unrelated to Gentleman's Clubs (provided that Licensor acknowledges and agrees that Licensee's use of the Additional Marks in Permitted Advertising as set forth herein and the Consent to Use and Register Agreement is not likely to cause such confusion), and (G) all promotional and advertising materials featuring the Additional Marks shall incorporate the appropriate trademark notices in accordance with Licensor's instructions. In addition, Licensee must submit all Permitted Advertising incorporating the Additional Marks to Licensor for written approval (such approval not to be unreasonably withheld) prior to any use of the Additional Marks, and if approval is not received within seven (7) business days of submission, approval will be deemed granted; *provided*, *however*, that any Permitted Advertising, or other business materials, incorporating the Additional Marks that are approved in writing by Licensor prior to the Execution Date need not be submitted to Licensor. Notwithstanding the foregoing, and for non-inclusive, illustrative purposes only, Licensor hereby approves, without any further approval necessary, and Licensee shall be deemed to have the right to use (and shall be deemed authorized to permit its sub-licensees to use) the PENTHOUSE mark, alone, so long as such uses strictly comply with all of the requirements set forth in this Section 1.1(g) (other than clauses (C) and (E) above): (1) on the signage fronting Gentlemen's Clubs, (2) in brochures and pamphlets promoting the Gentlemen's Clubs, (3) in Internet and social media advertising and promotions of Gentleman's Clubs and (4) on signage, advertisements, décor, utensils, matchbooks, swizzle sticks, cocktail napkins, table tents, name holders, tag holders and souvenirs provided, sold or otherwise utilized in connection with the operation of the Gentleman's Clubs and as reasonably necessary for the promotion of Gentlemen's Clubs.

2.    Other Terms. The provisions of the MIPLA are incorporated herein by this reference. In the event of any conflict or inconsistency between the terms of this Agreement and the MIPLA, the terms of the MIPLA shall govern.

3.    Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of each of Sellers and Purchaser and their respective successors and permitted assigns, subject to the terms and conditions of the MIPLA.

4.    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

*[Signatures appear on the following page.]*

*Signature Page*
*Exclusive Intellectual Property License*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the day and year first above written.

**SELLER:**

_____

David K. Gottlieb, solely in his capacity as
Chapter 11 Trustee for the estates of the Debtors

**PURCHASER:**

PENTHOUSE CLUBS GLOBAL LICENSING, LLC

By: _____
Name: John Kirkendoll
Title: Manager

*Signature Page*
*Exclusive Intellectual Property License*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the day and year first above written.

**SELLER:**

_____

David K. Gottlieb, solely in his capacity as
Chapter 11 Trustee for the estates of the Debtors

**PURCHASER:**

PENTHOUSE CLUBS GLOBAL LICENSING, LLC

By: _____
Name: John Kirkendoll
Title: Manager

*Appendix A*
*Exclusive Intellectual Property License*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

## APPENDIX A

## PGLI AFFILIATES

- PENTHOUSE GLOBAL MEDIA, INC.
- PENTHOUSE GLOBAL BROADCASTING, INC.
- PENTHOUSE GLOBAL DIGITAL, INC.
- PENTHOUSE GLOBAL PUBLISHING, INC.
- GMI ONLINE VENTURES, LTD.
- PENTHOUSE DIGITAL MEDIA PRODUCTIONS, INC.
- TAN DOOR MEDIA, INC.
- PENTHOUSE IMAGES ACQUISITIONS, LTD.
- PURE ENTERTAINMENT TELECOMMUNICATIONS, INC.
- XVHUB GROUP, INC.
- GENERAL MEDIA COMMUNICATIONS, INC.
- GENERAL MEDIA ENTERTAINMENT, INC.
- DANNI ASHE, INC.
- STREAMRAY STUDIOS, INC.

*Schedule 1.1(a)*
*Exclusive Intellectual Property License*
*Penthouse Global Licensing, Inc. and Affiliates; Penthouse Clubs Global Licensing, LLC*

## Schedule 1.1(a)

## ADDITIONAL MARKS

1. PENTHOUSE
2. PET OF THE YEAR
3. PET OF THE MONTH
4. CALIGULA
5. ONE KEY LOGO
6. PENTHOUSE & ONE KEY DESIGN
7. PENTHOUSE and KEYHOLE and ONE KEY DESIGNS
8. PENTHOUSE & One Key Logo
9. PENTHOUSE PET
10. PENTHOUSE PETS
11. THE GIRLS OF PENTHOUSE
12. THE GIRLS OF PENTHOUSE (Stylized)
13. WHERE THE MAGAZINE COMES TO LIFE!

## ADDITIONAL IP

1. Penthouse Magazine
2. Penthouse.com
3. Pet of the Year
4. Pet of the Month
5. Penthouse Pets
6. The Girls of Penthouse

1

## EXHIBIT C

2

**Consent To Use And Registration Agreement**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## CONSENT TO USE AND REGISTRATION AGREEMENT

This CONSENT TO USE AND REGISTRATION AGREEMENT (this "Consent Agreement"), dated May 21, 2018 (the "Execution Date"), is entered into by and between David K. Gottlieb, solely in his capacity as Chapter 11 Trustee for Penthouse Global Licensing, Inc., a Delaware corporation, ("PGLI"), General Media Communications, Inc., a New York corporation ("GMCI"), and those affiliates of PGLI and GMCI set forth on Appendix A (each a "Registrant", and collectively, the "Registrants" or "PH Parties"), on the one hand, and Penthouse Clubs Global Licensing, LLC, a Delaware limited liability company ("Applicant"), on the other hand.

### W I T N E S S E T H:

WHEREAS, capitalized terms used and not otherwise defined herein shall have the meanings ascribed thereto in the PSA or Master Intellectual Property License, as applicable (each as defined below);

WHEREAS, on January 11, 2018, the PH Parties commenced those certain Chapter 11 bankruptcy cases that are being jointly administered for procedural purposes only in the case captioned as *In re Penthouse Global Media, Inc.,* Case No. 18-10098 (collectively, the "Bankruptcy Cases") by the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") pursuant to Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code");

WHEREAS, David K. Gottlieb has been duly appointed as the Chapter 11 Trustee (in such capacity, the "Trustee") over the PH Parties' bankruptcy estates;

WHEREAS, contemporaneously with the execution of this Consent Agreement and in connection with the Bankruptcy Cases, the PH Parties are engaging in a private sale transaction pursuant to which the Trustee, on behalf of the PH Parties, is transferring and assigning to Applicant all of the assets and goodwill associated with the PH Parties' Gentlemen's Club (as defined below) line of business owned and/or operated by the PH Parties on a worldwide basis, including but not limited to certain intellectual property owned by the PH Parties (as defined in the PSA and as used herein, the "Acquired Penthouse Club IP"), on the terms and subject to the conditions set forth in that certain Purchase and Sale Agreement (the "PSA"), dated as of the Execution Date;

WHEREAS, upon consummation of the transactions contemplated by the PSA, Applicant will own the Acquired Penthouse Club IP, including certain marks, related common law rights, and their associated goodwill, including the marks, applications, and registrations set forth on Schedule 1.1(a) to the PSA and attached as Exhibit 1 hereto (as defined therein and used herein, the "Penthouse Club Marks");

WHEREAS, except for the Acquired Penthouse Club IP, following the consummation of the transactions contemplated by the PSA, the Registrants have and will retain all right, title, and interest to all other marks and intellectual property (as defined in the PSA and as used herein, the "Remaining Assets");

WHEREAS, under the PSA, Registrants agreed that Applicant may maintain and apply to register any of the Penthouse Club Marks with the United States Patent and Trademark Office or any other applicable Governmental Entity or office thereof, and Registrants will not, directly or indirectly, oppose any such application, or cancel or otherwise challenge the validity, enforceability, or registration of any Penthouse Club Marks or Applicant's ownership thereof;

WHEREAS, contemporaneously with the execution of this Consent Agreement and in connection with the Bankruptcy Cases, the PH Parties are granting to Applicant a perpetual, irrevocable, prepaid, sublicensable, and exclusive license ("Master Intellectual Property License") to certain other marks that include the term "PENTHOUSE", key logos, and other terms and designs for a variety of goods and services (as defined in the Master Intellectual Property License and used herein, the "Additional Marks"), including the marks for the applications and registrations set forth on Exhibit 2 attached hereto (collectively, the "Retained Registrations");

WHEREAS, the License Grant under the Master Intellectual Property License grants Applicant the right to use the Retained Registrations *solely* in connection with: adult nightclub and cabaret establishments, and restaurants operated in or immediately adjacent thereto, featuring live entertainment provided by nude or semi-nude female dancers ("Gentlemen's Clubs"), the ownership, operation, marketing, and promotion of Gentlemen's Clubs, and the advertising and promotion through any media now known or hereafter devised, including the Internet, and restaurant, bar, and cocktail lounge services directly related to Gentlemen's Clubs (collectively, "Applicant's Services");

WHEREAS, because the License Grant under the Master Intellectual Property License is exclusive to Applicant, Registrants are prohibited from using the Retained Registrations in connection with Gentlemen's Clubs or Applicant's Services, but are not prohibited from using the Retained Registrations in connection with restaurant, bar, or cocktail lounge services not directly related to Gentlemen's Clubs;

WHEREAS, under the Master Intellectual Property License, Registrants are further expressly prohibited from, among other things, owning, managing, operating, controlling, or otherwise being connected with the ownership, management, operation or control of any Person involved in or with a Gentlemen's Club or in a business that otherwise competes with the Gentlemen's Clubs, whether directly or indirectly; and

WHEREAS, this Consent Agreement is a required deliverable of Registrants under, and is being executed and delivered by Registrants pursuant to, the PSA.

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein and the PSA, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Registrants and Applicant hereby agree as follows:

1.     Each of the recitals, above, is binding; provided, however, that to the extent there is a conflict between this Consent Agreement and any provision of either the PSA or the Master Intellectual Property License, the latter agreements shall control.

2.      Each Registrant hereby consents to the use and registration by Applicant of the
Penthouse Club Marks, and such consent shall apply to prospective marks and registration of
applications as may be adopted and filed by Applicant, its related companies, or its successors in
interest for other marks, anywhere in the word, consisting or inclusive of the Penthouse Club
Marks. Within 30 days of the filing of any such application, Applicant shall give Registrant
notice thereof in accordance with the notice provisions of the Master Intellectual Property
License Agreement.

3.      For example, while a Registrant owns U.S. Reg. No. 4,808,739 for the mark
PENTHOUSE for cabaret services ("the '739 Registration"), such Registrant is prohibited from
using such mark for cabaret services *but only to the extent they are rendered in connection with
Applicant's Services, including Gentlemen's Clubs*, the License Grant to Applicant includes the
exclusive right to use such mark for cabaret services rendered in connection with Gentlemen's
Clubs, and Applicant owns the Penthouse Club Marks for cabaret services. Accordingly,
consumers are protected because Applicant has exclusive control over the nature and quality of
such cabaret services rendered under the Penthouse Club Marks, and the Parties agree such use
will not create confusion with the '739 Registration.

4.      In a second example, while a Registrant owns U.S. Reg. No. 3,779,465 for the
mark PENTHOUSE for bar and restaurant services ("the '465 Registration"), such Registrant is
prohibited from using such mark for bar and restaurant services *but only to the extent they are
rendered in connection with Applicant's Services, including Gentlemen's Clubs*, the License
Grant to Applicant includes the exclusive right to use such mark for bar and restaurant services
rendered in connection with Gentlemen's Clubs, and Applicant owns U.S. Reg. No. 2,810,417
for THE PENTHOUSE CLUB (with three key logo) for bar and restaurant services.
Accordingly, consumers are protected because Applicant has exclusive control over the nature
and quality of such bar and restaurant services rendered in connection with Applicant's Services,
including Gentlemen's Clubs, under the Penthouse Club Marks, and the Parties agree such use
will not create confusion with the '465 Registration.

5.      In a third example, while a Registrant owns U.S. Reg. No. 4,259,336 for the mark
PENTHOUSE for clothing ("the '336 Registration"),  such Registrant is prohibited from using
such mark for clothing *but only to the extent they are sold in connection with Applicant's
Services, including Gentlemen's Clubs*, the License Grant to Applicant includes the exclusive
right to use such mark for clothing sold in connection with Gentlemen's Clubs, and Applicant
owns the common law rights and associated goodwill for U.S. Reg. No. 3,778,363 for THE
PENTHOUSE CLUB (with three key logo) for clothing. Accordingly, consumers are protected
because Applicant has exclusive control over the nature and quality of such clothing goods
rendered in connection with Applicant's Services, including Gentlemen's Clubs, under the
Penthouse Club Marks, and the Parties agree such use will not create confusion with the '336
Registration.

6.      For avoidance of doubt, the Retained Registrations include without limitation the
'739 Registration, the '465 Registration, and the '336 Registration, and, in the likelihood of
confusion analysis between any of the Retained Registrations and the Penthouse Club Marks, the
Parties' rights and obligations under the PSA, Master Intellectual Property Agreement, and this
Consent Agreement would result in the same conclusion that no confusion is likely.

{N3557474.6}

7.      Each Registrant further covenants, on behalf of itself and its Affiliates, employees, officers, directors, members, successors-in-Interest, and assigns, that they will not interfere with, contest, or otherwise challenge or assist another party in challenging, the validity or enforceability of any application or registration of the Penthouse Club Marks anywhere in the world, and Applicant covenants, on behalf of itself and its Affiliates, employees, officers, directors, members, successors-in-Interest, and assigns, that they will not interfere with, contest, or otherwise challenge or assist another party in challenging, the validity or enforceability of any application or registration of the Retained Registrations anywhere in the world.

8.      The basis for this consent is the Parties' mutual determination that there is no likelihood that consumers will be confused by the use and registration of the Penthouse Clubs Marks and the Retained Registrations. The marks are different, they create different commercial impressions, the goods and services are different, and/or they are rendered in different channels of trade.

9.      In order to carry out the intent of this Consent Agreement, the Parties agree to cooperate in taking reasonable actions to avoid confusion, if any, and to correct instances of confusion that come to their attention, if any.

10.      The term of this Consent Agreement is perpetual, and it shall be binding on Registrants' successors-in-interest and assigns. Applicant expressly acknowledges and agrees that the Trustee is executing this Agreement and entering into the transaction contemplated herein solely in his capacity as Chapter 11 Trustee for the PH Parties' bankruptcy estates and that in the event of any default in the performance of any of the Registrants or their estates' obligations under this Consent Agreement or in the event that any other claim is asserted against the Trustee or such estates in connection with this Consent Agreement or the transactions contemplated herein, the Trustee shall in no event have any personal liability whatsoever (whether in his individual capacity or otherwise), it being expressly understood and agreed that Applicant's sole recourse, if any, in such event shall be to the assets of such estates.

11.      Article 8 of the Master Intellectual Property License, providing miscellaneous provisions, is hereby incorporated by reference.

[*Signatures appear on the following page*]

EXECUTION COPY

IN WITNESS WHEREOF, this Consent Agreement has been executed by the parties hereto as of the day and year first above written.

REGISTRANTS:

By: _____

DAVID K. GOTTLIEB, SOLELY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE FOR THE ESTATES OF THE REGISTRANTS

APPLICANT:

PENTHOUSE CLUBS GLOBAL LICENSING, LLC

By: _____
Name:   John Kirkendoll
Title:    Manager

EXECUTION COPY

IN WITNESS WHEREOF, this Consent Agreement has been executed by the parties hereto as of the day and year first above written.

**REGISTRANTS:**

BY: _____

DAVID K. GOTTLIEB, SOLELY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE FOR THE ESTATES OF THE REGISTRANTS

**APPLICANT:**

PENTHOUSE CLUBS GLOBAL LICENSING, LLC

By: _____

Name: John Kirkendoll
Title: Manager

EXECUTION COPY

## Appendix A

## AFFILIATES

- Penthouse Global Licensing, Inc.
- Penthouse Global Media, Inc.
- Penthouse Global Broadcasting, Inc.
- Penthouse Global Digital, Inc.
- Penthouse Global Publishing, Inc.
- GMI Online Ventures, Ltd.
- Penthouse Digital Media Productions, Inc.
- Tan Door Media, Inc.
- Penthouse Images Acquisitions, Ltd.
- Pure Entertainment Telecommunications, Inc.
- XVHUB Group, Inc.
- General Media Communications, Inc.
- General Media Entertainment, Inc.
- Danni Ashe, Inc.
- Streamray Studios, Inc.

## EXHIBIT 1

## PENTHOUSE CLUB MARKS

The term "Penthouse Club Marks" as used in this Agreement includes the marks set forth below, together with all variations thereof owned, used or held for use by any Seller, whether registered or unregistered, and all common law rights therein, including without limitation (*provided, however* the listing of trademark registrations or applications in this Schedule is not a representation that the listed registration or application is currently valid or has been maintained with the applicable government trademark office):

| Mark | Country | Registration No. (Application Ser. No.) |
|---|---|---|
| THE PENTHOUSE CLUB | Ukraine | 158069 |
| THE PENTHOUSE CLUB (w/ three key logo) | Macao | 88956 |
| | New Zealand | 833185 |
| | U.S. | 2,810,417 |
|  | U.S. | 3,778,363 (registration cancelled) |
| PENTHOUSE EXECUTIVE CLUB | U.S. | (85/497737) (application abandoned) |
| | U.S. | (76/588435) (application abandoned) |
|  | U.S. | (76/498693) (application abandoned) |
| PENTHOUSE MENS CLUB | U.S. | 2,450,888 (registration cancelled) |
| PENTHOUSE KEY SUITES | U.S. | (86/876606) (application abandoned) |
| THE PENTHOUSE KEY SUITES (w/ one key logo) | Not Registered | Not Registered |
| THE PENTHOUSE KEY SUITES (w/ three key logo) | Not Registered | Not Registered |
| | U.S. | (76/478036) (application abandoned) |
| PENTHOUSE w/ three key logo | Spain | 916115 |
| | United Kingdom | 2025235 |
| Three Key Logo  | Antigua & Barbuda | 6506 |
| | Antigua & Barbuda | 6504 |
| | Australia | 362565 |
| | Australia | 367684 |
| | Australia | 346912 |
| | Austria | 138240 |
| | Bahamas | 27567 |
| | Bahamas | 27566 |
| | Barbados | 81/20326 |
| | Benelux | 494088 |
| | Benelux | 385146 |
| | Brazil | 816873348 |
| | Brazil | 810912961 |
| | Brazil | 821732323 |
| | Brazil | 826936458 |
| | Brazil | 816873330 |

| Mark | Country | Registration No. (Application Ser. No.) |
|---|---|---|
| | British Virgin Islands | 4346 |
| Three Key Logo | Bulgaria | 36987 |
|  | Canada | TMA748,728 |
| | Canada | TMA435,218 |
| | China | 14399513 |
| | China | 4281665 |
| | China | 4572565 |
| | China | 4281666 |
| | China | 4281667 |
| | Costa Rica | 170817 |
| | Costa Rica | 170816 |
| | Croatia | Z990076 |
| | Czech Republic | 174670 |
| | Czech Republic | 229518 |
| | Dominican Republic | 147153 |
| | Estonia | 31746 |
| | EU | 4018776 |
| | France | 1227319 |
| | France | 92442392 |
| | Germany | 2011612 |
| | Greece | 73494 |
| | Greece | 110542 |
| | Guernsey | GGGT3215 |
| | Guyana | 20649 |
| | Guyana | 20648 |
| | Hong Kong | 199205266 |
| | Hong Kong | 1993B00888 |
| | Hungary | 134425 |
| | Hungary | 175948 |
| | Indonesia | IDM000076878 |
| | Ireland | 161375 |
| | Israel | 54443 |
| | Italy | 1512785 |
| | Italy | 1485134 |
| | Japan | 4895752 |
| | Japan | 4182461 |
| | Japan | 1326898 |
| | Japan | 1990279 |
| | Japan | 4417662 |
| | Japan | 1984934 |
| | Liechtenstein | 8122 |
| | Macedonia | 09063 |
| | Mexico | 326286 |
| | Mexico | 417973 |
| | New Zealand | 717684 |
| | Paraguay | 419405 |
| | Poland | 81793 |
| | Romania | 042030 |
| | Russia | 248189 |
| | Russia | 142620 |
| | Russia | 128751 |
| | Russia | 119758 |

| Mark | Country | Registration No. (Application Ser. No.) |
|---|---|---|
| | Sebia | 48054 |
| Three Key Logo | Slovak Republic | 172762 |
| | Slovak Republic | 172762 |
| | Slovenia | 9870199 |
| | South Korea | 17618 |
| | South Korea | 132550 |
| | Spain | 3043867 |
| | Spain | 1629525 |
| | Spain | 1629524 |
| | Switzerland | 323052 |
| | Switzerland | 391805 |
| | Taiwan | 756607 |
| | Taiwan | 544069 |
| | Thailand | 59803 |
| | Thailand | 106860 |
| | Trinidad & Tobago | 46293 |
| | Turks & Caicos | 14014 |
| | Turks & Caicos | 14015 |
| | Turks & Caicos | 14013 |
| | Turks & Caicos | 14012 |
| | Ukraine | 38757 |
| | Ukraine | 65800 |
| | UAE | 53386 |
| | United Kingdom | 1187468 |
| | United Kingdom | 2240679 |
| | U.S. | 1,073,618 |
| | Vietnam | 72640 |
| THREE KEY LOGO (word mark) | Bulgaria | 36307 |
| PENTHOUSE KEY GIRL | Ukraine | 158071 |
| KEY GIRL (Stylized) **KEY**GIRL | Not Registered | Not Registered |
| PENTHOUSE KEY CLUB | Not Registered | Not Registered |
| | U.S. | (76/439605) (application abandoned) |
| KEY CLUB | Not Registered | Not Registered |
| CALIGULA CLUB | Not Registered | Not Registered |
| PENTHOUSE CLUB | Japan | 4384068 |
| | Mexico | 903392 |
| | Mexico | 921770 |
| THE PENTHOUSE BEACH CLUB | Ukraine | 158070 |

# EXHIBIT 2

## RETAINED REGISTRATIONS

The term "Retained Registrations" as used in this Consent Agreement includes all applications and registrations for the following marks, including without limitation the records set forth on the schedule below (*provided, however,* the listing of trademark registrations or applications in this Schedule is not a representation that the listed registration or application is currently valid or has been maintained with the applicable government trademark office):

- PENTHOUSE
- PET OF THE YEAR
- PET OF THE MONTH
- CALIGULA
- ONE KEY LOGO
- PENTHOUSE & ONE KEY DESIGN
- PENTHOUSE and KEYHOLE and ONE KEY DESIGNS
- PENTHOUSE & One Key Logo
- PENTHOUSE PET
- PENTHOUSE PETS
- THE GIRLS OF PENTHOUSE
- THE GIRLS OF PENTHOUSE (Stylized)
- WHERE THE MAGAZINE COMES TO LIFE!

| Mark | Country | Registration No. (Application Ser. No.) |
|---|---|---|
| CALIGULA | U.S. | (85/966471) |
| CALIGULA | U.S. | (86/803795) |
| CALIGULA | U.S. | (87/284418) |
| CALIGULA | Costa Rica | (2014-4986) |
| One Key Logo | U.S. | 4310731 |
| One Key Logo | U.S. | 1323232 |
| One Key Logo | U.S. | 3431806 |
| One Key Logo | U.S. | 4846266 |
| One Key Logo | U.S. | 4310732 |
| One Key Logo | U.S. | 4383782 |
| One Key Logo | U.S. | 4787483 |
| One Key Logo | U.S. | 4310739 |
| One Key Logo | Albania | 13079 |
| One Key Logo | Andorra | 28011 |
| One Key Logo | Armenia | 15625 |
| One Key Logo | Australia | 404598 |
| One Key Logo | Australia | 346911 |
| One Key Logo | Australia | 404599 |

| Mark | Country | Registration No. (Application Ser. No.) |
|---|---|---|
| One Key Logo | Australia | 404602 |
| One Key Logo | Australia | 404603 |
| One Key Logo | Australia | 404606 |
| One Key Logo | Australia | 404595 |
| One Key Logo | Australia | 404596 |
| One Key Logo | Azerbaijan | 1298 |
| One Key Logo | Belarus | 33469 |
| One Key Logo | Benelux | 385147 |
| One Key Logo | Benelux | 0879564 |
| One Key Logo | Bosnia | BAZ0914238 |
| One Key Logo | Brazil | 810912953 |
| One Key Logo | Bulgaria | 36985 |
| One Key Logo | Bulgaria | 36308 |
| One Key Logo | China | 12300384 |
| One Key Logo | China | (15426145) |
| One Key Logo | China | 14399544 |
| One Key Logo | China | (15426357) |
| One Key Logo | China | 12302678 |
| One Key Logo | Croatia | Z990075 |
| One Key Logo | Croatia | Z20091500 |
| One Key Logo | Cyprus | 41622 |
| One Key Logo | Czech Republic | 167770 |
| One Key Logo | Czech Republic | 229517 |
| One Key Logo | Estonia | 31745 |
| One Key Logo | European Union | 41210 |
| One Key Logo | European Union | 8631806 |
| One Key Logo | France | 1227318 |
| One Key Logo | France & French Polynesia | 1304720 |
| One Key Logo | Georgia | 20753 |
| One Key Logo | Germany | 1101848 |
| One Key Logo | Germany | 2011613 |
| One Key Logo | Greece | 73493 |
| One Key Logo | Guernsey | GGGT3214 |
| One Key Logo | Hong Kong | 199204002 |
| One Key Logo | Hungary | 129192 |
| One Key Logo | Iceland | 111/2010 |
| One Key Logo | India | (2364652) |
| One Key Logo | India | (2364650) |
| One Key Logo | India | (2364658) |
| One Key Logo | India | (2364653) |
| One Key Logo | India | (2369648) |
| One Key Logo | India | 2364651 |
| One Key Logo | International | 1241019 |
| One Key Logo | Israel | 54442 |

Exhibit 2 – page 2

| Mark | Country | Registration No. (Application Ser. No.) |
|------|---------|------------------------------------------|
| One Key Logo | Italy | 1250873 |
| One Key Logo | Japan | 1991887 |
| One Key Logo | Japan | 4381834 |
| One Key Logo | Japan | 1307387 |
| One Key Logo | Japan | 1326897 |
| One Key Logo | Japan | 2115473 |
| One Key Logo | Japan | 2066442 |
| One Key Logo | Kazakhstan | 34351 |
| One Key Logo | Kazakhstan | 10229 |
| One Key Logo | Liechtenstein | 15525 |
| One Key Logo | Macedonia | 09062 |
| One Key Logo | Macedonia | 17997 |
| One Key Logo | Mexico | 323731 |
| One Key Logo | Mexico | 887266 |
| One Key Logo | Mexico | 887736 |
| One Key Logo | Mexico | 887737 |
| One Key Logo | Mexico | 903759 |
| One Key Logo | Mexico | 899742 |
| One Key Logo | Moldova | 20287 |
| One Key Logo | Monaco | 27657 |
| One Key Logo | Montenegro | 02416 |
| One Key Logo | Montenegro | 06807 |
| One Key Logo | New Zealand | 132880 |
| One Key Logo | Norway | 254864 |
| One Key Logo | Poland | R-66066 |
| One Key Logo | Portugal | 371776 |
| One Key Logo | Romania | 042029 |
| One Key Logo | Russia | 89626 |
| One Key Logo | Russia | 128750 |
| One Key Logo | Russia | 440513 |
| One Key Logo | Serbia | 48059 |
| One Key Logo | Serbia | 61401 |
| One Key Logo | Slovak Republic | 167770 |
| One Key Logo | Slovenia | 9870198 |
| One Key Logo | South Korea | 40-824192 |
| One Key Logo | South Korea | 40-805600 |
| One Key Logo | South Korea | 40-805601 |
| One Key Logo | South Korea | 40-805602 |
| One Key Logo | South Korea | 40-805603 |
| One Key Logo | South Korea | 40-805604 |
| One Key Logo | South Korea | 40-805599 |
| One Key Logo | South Korea | 41-191007 |
| One Key Logo | South Korea | 132549 |
| One Key Logo | Spain | 3043869 |
| One Key Logo | Switzerland | 323051 |

| Mark | Country | Registration No. (Application Ser. No.) |
|---|---|---|
| One Key Logo | Switzerland | 604707 |
| One Key Logo | Taiwan | 300692 |
| One Key Logo | Thailand | 32037 |
| One Key Logo | Thailand | 106838 |
| One Key Logo | Turkey | 2009 50486 |
| One Key Logo | Turkmenistan | 11150 |
| One Key Logo | Ukraine | 4338 |
| One Key Logo | Ukraine | 132837 |
| One Key Logo | United Kingdom | 1187467 |
| One Key Logo | Uzbekistan | MGU 20167 |
| One Key Logo | International extension in China | 1241019 |
| PENTHOUSE (w/ one key logo) | China | (15123444) |
| PENTHOUSE (w/ one key logo) | China | (14988276) |
| PENTHOUSE | U.S. | 2686386 |
| PENTHOUSE | U.S. | 4310737 |
| PENTHOUSE | U.S. | 1074534 |
| PENTHOUSE | U.S. | 880922 |
| PENTHOUSE | U.S. | 4310741 |
| PENTHOUSE | U.S. | 4310726 |
| PENTHOUSE | U.S. | 4645457 |
| PENTHOUSE | U.S. | 4259336 |
| PENTHOUSE | U.S. | 4548739 |
| PENTHOUSE | U.S. | 4154587 |
| PENTHOUSE | U.S. | (86/668256) |
| PENTHOUSE | U.S. | (86/426998) |
| PENTHOUSE | U.S. | (86/116552) |
| PENTHOUSE | U.S. | 4782367 |
| PENTHOUSE | U.S. | 4319011 |
| PENTHOUSE | U.S. | 1064636 |
| PENTHOUSE | U.S. | 3548339 |
| PENTHOUSE | U.S. | 4135170 |
| PENTHOUSE | U.S. | 3067272 |
| PENTHOUSE | U.S. | 4808739 |
| PENTHOUSE | U.S. | 3007070 |
| PENTHOUSE | U.S. | 3779465 |
| PENTHOUSE | U.S. | 2435702 |
| PENTHOUSE | U.S. | 4194118 |
| PENTHOUSE | U.S. | 3728779 |
| PENTHOUSE | U.S. | 4314172 |
| PENTHOUSE | U.S. | 4258930 |
| PENTHOUSE | Albania | 6535 |
| PENTHOUSE | Albania | 13081 |
| PENTHOUSE | Andorra | 28009 |
| PENTHOUSE | Antigua & Barbuda | 6505 |

| Mark | Country | Registration No. (Application Ser. No.) |
|------|---------|------------------------------------------|
| PENTHOUSE | Antigua & Barbuda | 6501 |
| PENTHOUSE | Argentina | 2160209 |
| PENTHOUSE | Argentina | 2380863 |
| PENTHOUSE | Argentina | 2539858 |
| PENTHOUSE | Argentina | 2311748 |
| PENTHOUSE | Argentina | 2181068 |
| PENTHOUSE | Argentina | 1743034 |
| PENTHOUSE | Argentina | 2539859 |
| PENTHOUSE | Argentina | 2079073 / 3492279 |
| PENTHOUSE | Armenia | 5137 |
| PENTHOUSE | Armenia | 15623 |
| PENTHOUSE | Aruba | 25457 |
| PENTHOUSE | Australia | 266228 |
| PENTHOUSE | Australia | 362329 |
| PENTHOUSE | Australia | 362330 |
| PENTHOUSE | Australia | 362323 |
| PENTHOUSE | Australia | 1018047 |
| PENTHOUSE | Austria | 138239 |
| PENTHOUSE | Azerbaijan | 991478 |
| PENTHOUSE | Azerbaijan | 2011 0320 |
| PENTHOUSE | Bahamas | 21633 |
| PENTHOUSE | Bahamas | 27565 |
| PENTHOUSE | Bahamas | 27564 |
| PENTHOUSE | Bahrain | TM 18597 |
| PENTHOUSE | Barbados | 81/20311 |
| PENTHOUSE | Barbados | 81/20312 |
| PENTHOUSE | Barbados | 81/20313 |
| PENTHOUSE | Barbados | 81/20310 |
| PENTHOUSE | Belarus | 33470 |
| PENTHOUSE | Belarus | 24752 |
| PENTHOUSE | Belize | 3197.05 |
| PENTHOUSE | Benelux | 316372 |
| PENTHOUSE | Benelux | 201124 |
| PENTHOUSE | Benelux | 0879562 |
| PENTHOUSE | Benelux | 493592 |
| PENTHOUSE | Bolivia | 103044-C |
| PENTHOUSE | Bolivia | 103564-C |
| PENTHOUSE | Bolivia | 103236-C |
| PENTHOUSE | Bolivia | 102886-C |
| PENTHOUSE | Bosnia | BAZ0914239 |
| PENTHOUSE | Brazil | 006294618 |
| PENTHOUSE | Brazil | 831293306 |
| PENTHOUSE | Brazil | 811001610 |
| PENTHOUSE | Brazil | 822042622 |
| PENTHOUSE | Brazil | 816873372 |

| Mark | Country | Registration No. (Application Ser. No.) |
|---|---|---|
| PENTHOUSE | Brazil | 200039881 |
| PENTHOUSE | Brazil | 816873364 |
| PENTHOUSE | British Virgin Islands | 4347 |
| PENTHOUSE | Bulgaria | 36309 |
| PENTHOUSE | Bulgaria | 27929 |
| PENTHOUSE | Bulgaria | 58454 |
| PENTHOUSE | Canada | (1658828) |
| PENTHOUSE | Canada | 116455 |
| PENTHOUSE | Canada | 212193 |
| PENTHOUSE | Canada | 196356 |
| PENTHOUSE | Canada | TMA435219 |
| PENTHOUSE | Canada | TMA748290 |
| PENTHOUSE | Chile | 1.103.642 |
| PENTHOUSE | Chile | 1.182.512 |
| PENTHOUSE | Chile | 785511 / 1206051 |
| PENTHOUSE | Chile | 724130 |
| PENTHOUSE | Chile | 724129 |
| PENTHOUSE | China | 12300383 |
| PENTHOUSE | China | 869568 |
| PENTHOUSE | China | 859637 |
| PENTHOUSE | China | 9351274 |
| PENTHOUSE | China | 9429567 |
| PENTHOUSE | China | 9351275 |
| PENTHOUSE | China | 13325553 |
| PENTHOUSE | China | 13325584 |
| PENTHOUSE | China | 13594526 |
| PENTHOUSE | China | 843952 |
| PENTHOUSE | China | 4281668 |
| PENTHOUSE | China | 14000344 |
| PENTHOUSE | China | 14000250 |
| PENTHOUSE | China | 12302583 |
| PENTHOUSE | China | 877464 |
| PENTHOUSE | Colombia | 301985 |
| PENTHOUSE | Colombia | 498126 |
| PENTHOUSE | Colombia | 327647 |
| PENTHOUSE | Colombia | 303030 |
| PENTHOUSE | Colombia | 301983 |
| PENTHOUSE | Costa Rica | 158980 |
| PENTHOUSE | Costa Rica | 158960 |
| PENTHOUSE | Costa Rica | 158961 |
| PENTHOUSE | Costa Rica | 185674 |
| PENTHOUSE | Croatia | Z20091498 |
| PENTHOUSE | Croatia | Z990071 |
| PENTHOUSE | Croatia | Z20041380A |
| PENTHOUSE | Cyprus | 41624 |

| Mark | Country | Registration No.<br>(Application Ser. No.) |
|---|---|---|
| PENTHOUSE | Czech Republic | 167765 |
| PENTHOUSE | Czech Republic | 229516 |
| PENTHOUSE | Czech Republic | 193257 |
| PENTHOUSE | Czech Republic | 174574 |
| PENTHOUSE | Denmark | 3555/1973 |
| PENTHOUSE | Denmark | 201102299 |
| PENTHOUSE | Denmark | 04717/1995 |
| PENTHOUSE | Dominican Republic | 147024 |
| PENTHOUSE | Dominican Republic | 195059 |
| PENTHOUSE | Dominican Republic | 147006 |
| PENTHOUSE | Dominican Republic | 147216 |
| PENTHOUSE | Dominican Republic | 147086 |
| PENTHOUSE | Ecuador | 11308 |
| PENTHOUSE | Ecuador | 2864 / 1293 |
| PENTHOUSE | Ecuador | 1066 / 1292 |
| PENTHOUSE | Ecuador | 777-06 |
| PENTHOUSE | Ecuador | 2865 / 1294 |
| PENTHOUSE | El Salvador | 233 BOOK 50 |
| PENTHOUSE | El Salvador | 53 Book 81 |
| PENTHOUSE | El Salvador | 51 BOOK 51 |
| PENTHOUSE | El Salvador | 115 Book 53 |
| PENTHOUSE | El Salvador | 24 BOOK 51 |
| PENTHOUSE | Estonia | 31744 |
| PENTHOUSE | European Union | 4558581 |
| PENTHOUSE | European Union | 4558607 |
| PENTHOUSE | European Union | 4558664 |
| PENTHOUSE | European Union | 4558771 |
| PENTHOUSE | European Union | 4558797 |
| PENTHOUSE | European Union | 4558524 |
| PENTHOUSE | European Union | 4558813 |
| PENTHOUSE | European Union | 4558839 |
| PENTHOUSE | European Union | 4558508 |
| PENTHOUSE | European Union | 4558888 |
| PENTHOUSE | European Union | 4558541 |
| PENTHOUSE | European Union | 1302959 |
| PENTHOUSE | European Union | 004012027 |
| PENTHOUSE | European Union | 4481172 |
| PENTHOUSE | European Union | 4558912 |
| PENTHOUSE | European Union | 1264126 |
| PENTHOUSE | European Union | 4558491 |
| PENTHOUSE | European Union | 12329553 |
| PENTHOUSE | European Union | 41194 |
| PENTHOUSE | European Union | 8631707 |
| PENTHOUSE | European Union | 3682821 |
| PENTHOUSE | Finland | 213745 |

| Mark | Country | Registration No. (Application Ser. No.) |
|---|---|---|
| PENTHOUSE | France | 1228040 |
| PENTHOUSE | France | 92442393 |
| PENTHOUSE | France & French Polynesia | 1304719 |
| PENTHOUSE | Georgia | 20713 |
| PENTHOUSE | Germany | 30204685 |
| PENTHOUSE | Germany | 913772 |
| PENTHOUSE | Germany | 931068 |
| PENTHOUSE | Germany | 885 614 |
| PENTHOUSE | Germany | 1114518 |
| PENTHOUSE | Germany | 2011614 |
| PENTHOUSE | Greece | 73492 |
| PENTHOUSE | Guatemala | 138418 |
| PENTHOUSE | Guatemala | 139169 |
| PENTHOUSE | Guatemala | 138533 |
| PENTHOUSE | Guyana | 20647 |
| PENTHOUSE | Guyana | 20646 |
| PENTHOUSE | Honduras | 95593 |
| PENTHOUSE | Honduras | 127.179 |
| PENTHOUSE | Honduras | 11467 |
| PENTHOUSE | Honduras | 97548 |
| PENTHOUSE | Hong Kong | 300300879 |
| PENTHOUSE | Hong Kong | 0198/86 |
| PENTHOUSE | Hong Kong | 1298/85 |
| PENTHOUSE | Hong Kong | 0199/86 |
| PENTHOUSE | Hong Kong | 1145/87 |
| PENTHOUSE | Hong Kong | 480/69 |
| PENTHOUSE | Hong Kong | 1299/85 |
| PENTHOUSE | Hong Kong | 1297/85 |
| PENTHOUSE | Hong Kong | 302793619 |
| PENTHOUSE | Hong Kong | 0200/86 |
| PENTHOUSE | Hong Kong | 300277515 |
| PENTHOUSE | Hong Kong | 19861612 |
| PENTHOUSE | Hungary | 129191 |
| PENTHOUSE | Hungary | 144090 |
| PENTHOUSE | Hungary | 134424 |
| PENTHOUSE | Iceland | 109/2010 |
| PENTHOUSE | India | 286302 |
| PENTHOUSE | India | (2364656) |
| PENTHOUSE | India | (2364654) |
| PENTHOUSE | India | 2364657 |
| PENTHOUSE | India | 2364659 |
| PENTHOUSE | India | (2625321) |
| PENTHOUSE | India | 2369647 |
| PENTHOUSE | India | 2364655 |

Exhibit 2 – page 8

| Mark | Country | Registration No. (Application Ser. No.) |
|------|---------|------------------------------------------|
| PENTHOUSE | India | 1308619 |
| PENTHOUSE | Indonesia | IDM000076875 |
| PENTHOUSE | Indonesia | IDM000076874 |
| PENTHOUSE | International | 1120274 |
| PENTHOUSE | International | 1190119 |
| PENTHOUSE | Ireland | 107214 |
| PENTHOUSE | Ireland | 146272 |
| PENTHOUSE | Israel | 37157 |
| PENTHOUSE | Israel | 174410 |
| PENTHOUSE | Italy | 1598310 |
| PENTHOUSE | Italy | 1289154 |
| PENTHOUSE | Italy | 1504757 |
| PENTHOUSE | Italy | 1485133 |
| PENTHOUSE | Jamaica | 46334 |
| PENTHOUSE | Japan | 1975555 |
| PENTHOUSE | Japan | 1906524 |
| PENTHOUSE | Japan | 5592022 |
| PENTHOUSE | Japan | 2008063 |
| PENTHOUSE | Japan | 1974433 |
| PENTHOUSE | Japan | 4904952 |
| PENTHOUSE | Kazakhstan | 34349 |
| PENTHOUSE | Kyrgyzstan | 10227 |
| PENTHOUSE | Latvia | M 46 162 |
| PENTHOUSE | Liechtenstein | 15527 |
| PENTHOUSE | Liechtenstein | 8131 |
| PENTHOUSE | Macao | 056439 |
| PENTHOUSE | Macao | 056440 |
| PENTHOUSE | Macao | 056438 |
| PENTHOUSE | Macao | N/003879 |
| PENTHOUSE | Macedonia | 08242 |
| PENTHOUSE | Macedonia | 17289 |
| PENTHOUSE | Malaysia | 2011020276 |
| PENTHOUSE | Malaysia | (2011020277) |
| PENTHOUSE | Mexico | 305783 |
| PENTHOUSE | Mexico | 882791 |
| PENTHOUSE | Mexico | 882790 |
| PENTHOUSE | Mexico | 882792 |
| PENTHOUSE | Mexico | 876964 |
| PENTHOUSE | Mexico | 924677 |
| PENTHOUSE | Mexico | 404780 |
| PENTHOUSE | Moldova | 18657 |
| PENTHOUSE | Moldova | 21077 |
| PENTHOUSE | Monaco | 10.27656 |
| PENTHOUSE | Montenegro | 02395 |
| PENTHOUSE | Montenegro | 06808 |

| Mark | Country | Registration No. (Application Ser. No.) |
|---|---|---|
| PENTHOUSE | Montenegro | 02399P |
| PENTHOUSE | New Zealand | 103347 |
| PENTHOUSE | New Zealand | 849226 |
| PENTHOUSE | New Zealand | 833184 |
| PENTHOUSE | New Zealand | 717683 |
| PENTHOUSE | Nicaragua | 47.099 C.C. |
| PENTHOUSE | Nicaragua | 0600384 LM |
| PENTHOUSE | Nicaragua | 0600213 LM |
| PENTHOUSE | Norway | 259978 |
| PENTHOUSE | Norway | 255206 |
| PENTHOUSE | Norway | 228086 |
| PENTHOUSE | Oman | 10815 |
| PENTHOUSE | Panama | 19416 |
| PENTHOUSE | Panama | 140805 |
| PENTHOUSE | Panama | 140803 |
| PENTHOUSE | Panama | 140806 |
| PENTHOUSE | Panama | 140804 |
| PENTHOUSE | Paraguay | 304547 |
| PENTHOUSE | Paraguay | 304548 |
| PENTHOUSE | Paraguay | 304549 |
| PENTHOUSE | Paraguay | 289810 |
| PENTHOUSE | Paraguay | 410223 |
| PENTHOUSE | Peru | 103419 |
| PENTHOUSE | Peru | |
| PENTHOUSE | Peru | 37359 |
| PENTHOUSE | Peru | 38002 |
| PENTHOUSE | Peru | 103418 |
| PENTHOUSE | Philippines | (4-2016-003150) |
| PENTHOUSE | Poland | R-66068 |
| PENTHOUSE | Poland | 254651 |
| PENTHOUSE | Poland | 104267 |
| PENTHOUSE | Poland | R-81792 |
| PENTHOUSE | Portugal | 181048 |
| PENTHOUSE | Qatar | 33474 |
| PENTHOUSE | Romania | 046057 |
| PENTHOUSE | Romania | 76353 |
| PENTHOUSE | Russia | 325950 |
| PENTHOUSE | Russia | 140935 |
| PENTHOUSE | Saint Kitts & Nevis | 2005/0111 |
| PENTHOUSE | Saint Lucia | 85/2005 |
| PENTHOUSE | Serbia | 61402 |
| PENTHOUSE | Serbia | 48051 |
| PENTHOUSE | Serbia | 54794 |
| PENTHOUSE | Singapore | T1115999Z |
| PENTHOUSE | Singapore | 40201517864T |

| Mark | Country | Registration No.<br>(Application Ser. No.) |
| --- | --- | --- |
| PENTHOUSE | Singapore | T04/14920H |
| PENTHOUSE | Slovak Republic | 167765 |
| PENTHOUSE | Slovak Republic | 182475 |
| PENTHOUSE | Slovak Republic | 174144 |
| PENTHOUSE | Slovenia | 9870197 |
| PENTHOUSE | South Africa | 1973/0955 |
| PENTHOUSE | South Africa | 2004/14931 |
| PENTHOUSE | South Africa | 2004/14932 |
| PENTHOUSE | South Africa | 2004/14930 |
| PENTHOUSE | South Korea | 40-846396 |
| PENTHOUSE | South Korea | 40-907180 |
| PENTHOUSE | South Korea | 40-873429 |
| PENTHOUSE | South Korea | (40-2015-13352) |
| PENTHOUSE | South Korea | 40-845584 |
| PENTHOUSE | South Korea | 41-191134 |
| PENTHOUSE | South Korea | 41-17617 |
| PENTHOUSE | South Korea | 132553 |
| PENTHOUSE | South Korea | 237286 |
| PENTHOUSE | South Korea | 13422 |
| PENTHOUSE | Spain | 916114 |
| PENTHOUSE | Spain | 2850278 |
| PENTHOUSE | Spain | 2850278 |
| PENTHOUSE | Spain | 2850278 |
| PENTHOUSE | Spain | 1629519 |
| PENTHOUSE | Suriname | 19612 |
| PENTHOUSE | Sweden | 500330 |
| PENTHOUSE | Sweden | 385184 |
| PENTHOUSE | Switzerland | 404857 |
| PENTHOUSE | Switzerland | 612870 |
| PENTHOUSE | Switzerland | 391844 |
| PENTHOUSE | Switzerland | 612593 |
| PENTHOUSE | Switzerland | 529076 |
| PENTHOUSE | Switzerland | 629156 |
| PENTHOUSE | Taiwan | 1243916 |
| PENTHOUSE | Taiwan | 300691 |
| PENTHOUSE | Taiwan | 931397 |
| PENTHOUSE | Taiwan | 00697827 |
| PENTHOUSE | Taiwan | 738998 |
| PENTHOUSE | Taiwan | 1165103 |
| PENTHOUSE | Taiwan | 544068 |
| PENTHOUSE | Thailand | 32038 |
| PENTHOUSE | Thailand | 106899 |
| PENTHOUSE | Thailand | SM26932 |
| PENTHOUSE | Thailand | TM231766 |
| PENTHOUSE | Trinidad & Tobago | 35933 |

| Mark | Country | Registration No. (Application Ser. No.) |
|---|---|---|
| PENTHOUSE | Turkey | 131913 |
| PENTHOUSE | Turkey | 2009 50485 |
| PENTHOUSE | Turkey | 2004/28234 |
| PENTHOUSE | Turkmenistan | 11148 |
| PENTHOUSE | Turks & Caicos | 14009 |
| PENTHOUSE | Turks & Caicos | 14010 |
| PENTHOUSE | Turks & Caicos | 14011 |
| PENTHOUSE | Turks & Caicos | 14008 |
| PENTHOUSE | Ukraine | 4339 |
| PENTHOUSE | Ukraine | 132836 |
| PENTHOUSE | Ukraine | 65801 |
| PENTHOUSE | United Arab Emirates | 53390 |
| PENTHOUSE | United Arab Emirates | 8928 |
| PENTHOUSE | United Arab Emirates | 53389 |
| PENTHOUSE | United Arab Emirates | 53391 |
| PENTHOUSE | United Kingdom | 2397514 |
| PENTHOUSE | United Kingdom | 2397515 |
| PENTHOUSE | United Kingdom | 1557075 |
| PENTHOUSE | United Kingdom | 893678 |
| PENTHOUSE | United Kingdom | 2397516 |
| PENTHOUSE | United Kingdom | 2397517 |
| PENTHOUSE | United Kingdom | 2397518 |
| PENTHOUSE | United Kingdom | 2262327 |
| PENTHOUSE | United Kingdom | 2397519 |
| PENTHOUSE | United Kingdom | 2397512 |
| PENTHOUSE | United Kingdom | 2397520 |
| PENTHOUSE | United Kingdom | 2397521 |
| PENTHOUSE | United Kingdom | 2397522 |
| PENTHOUSE | United Kingdom | 2397523 |
| PENTHOUSE | United Kingdom | 2397513 |
| PENTHOUSE | United Kingdom | 2397525 |
| PENTHOUSE | United Kingdom | 2396891 |
| PENTHOUSE | United Kingdom | 2377869 |
| PENTHOUSE | United Kingdom | 2397524 |
| PENTHOUSE | Uruguay | 360132 |
| PENTHOUSE | Uzbekistan | MGU 20164 |
| PENTHOUSE | Venezuela | S031517 |
| PENTHOUSE | Venezuela | S031518 |
| PENTHOUSE | Vietnam | 72639 |
| PENTHOUSE | Zimbabw (rhodesia) | 166/73 |
| PENTHOUSE & PENTHOUSE South Korea (in Korean Characters) | South Korea | (Pending) |
| PENTHOUSE (Chinese Characters) | China | 9383755 |
| PENTHOUSE (Chinese Characters) | China | 9429568 |

| Mark | Country | Registration No. (Application Ser. No.) |
|---|---|---|
| PENTHOUSE (Chinese Characters) | China | 9383756 |
| PENTHOUSE (Chinese Characters) | China | (14000349) |
| PENTHOUSE (Chinese Characters) | China | 14000272 |
| PENTHOUSE (Chinese Characters) | Hong Kong | 199801521 |
| PENTHOUSE (Chinese Characters) | Macao | 056442 |
| PENTHOUSE (Chinese Characters) | Macao | N/056443 |
| PENTHOUSE (Chinese Characters) | Macao | 056441 |
| PENTHOUSE (Ge Lou) in Chinese Characters | Hong Kong | 199509595 |
| PENTHOUSE (Ge Lou) in Chinese Characters | Hong Kong | 200015996AA |
| PENTHOUSE (Ge Lou) in Chinese Characters | Taiwan | 950552 |
| PENTHOUSE (Ge Lou) in Chinese Characters | Taiwan | 942900 |
| PENTHOUSE (Ge Lou) in Chinese Characters | Taiwan | 151564 |
| PENTHOUSE (in Cyrillic) | Ukraine | 67020 |
| PENTHOUSE 3D | U.S. | 4255423 |
| PENTHOUSE 3D | European Union | 9519844 |
| PENTHOUSE ALIVE! | Costa Rica | 240893 |
| PENTHOUSE BLACK | European Union | 11453388 |
| PENTHOUSE BLACK LABEL | Australia | 731696 |
| PENTHOUSE BRAZIL | Brazil | 821732315 |
| PENTHOUSE COLLECTORS SERIES | Italy | 1598311 |
| PENTHOUSE COMIX | U.S. | (86/357365) |
| PENTHOUSE COMIX | Canada | 498403 |
| PENTHOUSE COMIX | European Union | 014061469 |
| PENTHOUSE COMIX | France | 95570056 |
| PENTHOUSE COMIX | French Polynesia | 95570056 |
| PENTHOUSE COMIX | Mexico | 882793 |
| PENTHOUSE COMIX | New Zealand | 271510 |
| PENTHOUSE FORUM | U.S. | 4186232 |
| PENTHOUSE FORUM | U.S. | 3668322 |
| PENTHOUSE FORUM | Benelux | 636271 |
| PENTHOUSE FORUM | Brazil | 006294600 |
| PENTHOUSE FORUM | Canada | TMA233324 |
| PENTHOUSE FORUM | Germany | 935766 |
| PENTHOUSE FORUM | Hungary | 157465 |
| PENTHOUSE FORUM | Israel | 39395 |
| PENTHOUSE FORUM | New Zealand | 111254 |
| PENTHOUSE FORUM | Poland | R-118389 |
| PENTHOUSE FORUM | Portugal | 187531 |
| PENTHOUSE FORUM | Turkey | 152534 |
| PENTHOUSE HD | U.S. | 3698477 |
| PENTHOUSE HD | Albania | 13080 |
| PENTHOUSE HD | Andorra | 28010 |
| PENTHOUSE HD | Armenia | 15624 |
| PENTHOUSE HD | Azerbaijan | 2013 1621 |
| PENTHOUSE HD | Belarus | 33471 |

| Mark | Country | Registration No. (Application Ser. No.) |
| --- | --- | --- |
| PENTHOUSE HD | Benelux | 0879563 |
| PENTHOUSE HD | Bosnia | BAZ0914237 |
| PENTHOUSE HD | Croatia | Z20091499 |
| PENTHOUSE HD | European Union | 8631756 |
| PENTHOUSE HD | Georgia | 20714 |
| PENTHOUSE HD | Iceland | 110/2010 |
| PENTHOUSE HD | Kazakhstan | 34350 |
| PENTHOUSE HD | Kyrgyzstan | 10228 |
| PENTHOUSE HD | Liechtenstein | 15526 |
| PENTHOUSE HD | Macedonia | 18768 |
| PENTHOUSE HD | Moldova | 21078 |
| PENTHOUSE HD | Monaco | 10.27655 |
| PENTHOUSE HD | Montenegro | 06809 |
| PENTHOUSE HD | Norway | 255208 |
| PENTHOUSE HD | Russia | (2009726232) |
| PENTHOUSE HD | Serbia | 61403 |
| PENTHOUSE HD | Switzerland | 604586 |
| PENTHOUSE HD | Turkey | 2009 50484 |
| PENTHOUSE HD | Turkmenistan | 11149 |
| PENTHOUSE HD | Ukraine | 132835 |
| PENTHOUSE HD | Uzbekistan | MGU 20168 |
| PENTHOUSE LETTERS | U.S. | 3052851 |
| PENTHOUSE LETTERS | U.S. | 3638217 |
| PENTHOUSE LETTERS | U.S. | 4189969 |
| PENTHOUSE LETTERS | U.S. | 3625761 |
| PENTHOUSE LETTERS | Canada | TM505123 |
| PENTHOUSE LETTERS | Singapore | T93/04751A |
| PENTHOUSE LIMITED EDITION | Australia | 731694 |
| PENTHOUSE LINGERIE | U.S. | 3512920 |
| PENTHOUSE LINGERIE | Canada | 754421 |
| PENTHOUSE LINGERIE (& Design) | European Union | 4840401 |
| PENTHOUSE LINGERIE (Stylized) | European Union | 4840393 |
| PENTHOUSE LOUNGE | U.S. | (87/525276) |
| PENTHOUSE LOUNGE | U.S. | (86/141935) |
| PENTHOUSE MAG | U.S. | 4498546 |
| PENTHOUSE PALACE | U.S. | (86/106787) |
| PENTHOUSE PALACE | U.S. | (87/449864) |
| PENTHOUSE PET | U.S. | (87/646763) |
| PENTHOUSE PET | Ukraine | 158068 |
| PENTHOUSE PETS | Brazil | 810912970 |
| PENTHOUSE PETS | Italy | 1512784 |
| PENTHOUSE PETS | Spain | 2487068 |
| PENTHOUSE PETS | United Kingdom | 2025241 |
| PENTHOUSE POP SHOTS & One Key Logo | U.S. | 5230434 |
| PENTHOUSE PUB | China | 14000347 |

| Mark | Country | Registration No. (Application Ser. No.) |
|---|---|---|
| PENTHOUSE PUB | China | 14000267 |
| PENTHOUSE SECRET SERVICE | U.S. | (87/031222) |
| PENTHOUSE SHOES | U.S. | 4186310 |
| PENTHOUSE TV | U.S. | 3600434 |
| PENTHOUSE TV | U.S. | 3641290 |
| PENTHOUSE VARIATIONS | South Africa | 2001/05639 |
| PENTHOUSE VARIATIONS | Switzerland | 649239 |
| PENTHOUSE VARIATIONS | United Kingdom | 1182538 |
| PENTHOUSE VARIATIONS | United Kingdom | 2350936 |
| PENTHOUSE VIDEO | Benelux | 493593 |
| PENTHOUSE VIDEO | Hong Kong | 199203518 |
| PENTHOUSE VIDEO | Liechtenstein | 8132 |
| PENTHOUSE VIDEO | Mexico | 404806 |
| PENTHOUSE VIDEO | South Korea | 17619 |
| PENTHOUSE VIDEO | South Korea | 237287 |
| PENTHOUSE VIDEO | Spain | 1629522 |
| PENTHOUSE VIDEO | Switzerland | 391845 |
| PENTHOUSE VIDEO | United Kingdom | 1460954 |
| PENTHOUSE VIDEOS | Ireland | 146271 |
| PENTHOUSE.COM | U.S. | 4179403 |
| PENTHOUSE.HU | Hungary | 186828 |
| PENTHOUSE: Extension of Protection in Australia | International | 1190119 |
| PENTHOUSE: Extension of Protection in New Zealand | International | 1190119/991520 |
| PENTHOUSE: Extension of Protection in Russia | International | (2011715908) |
| PENTHOUSE: Extension of Protection in Singapore | International | 1120274 |
| PENTHOUSE: Extension of Protection in Turkey | International | 1190119 |
| PENTHOUSE: Extension of Protection in Ukraine | International | (A0028962) |
| PENTHOUSEFORUM.COM | U.S. | 4335810 |
| PENTHOUSELETTERS.COM | U.S. | 3221067 |
| PENTHOUSESTORE.COM | U.S. | 3289312 |
| PET | Benelux | 385962 |
| PET | Bulgaria | 36334 |
| PET | Croatia | Z990072 |
| PET | Estonia | 31743 |
| PET | France | 1227320 |
| PET | Hungary | 175 950 |
| PET | Ireland | 111076 |
| PET | Macedonia | 08379 |
| PET | New Zealand | 145356 |
| PET | Romania | 042599 |
| PET | Serbia | 48052 |
| PET | Slovenia | 9870200 |
| PET | Ukraine | 35480 |

| Mark | Country | Registration No. (Application Ser. No.) |
|---|---|---|
| PET CONFESSIONS | U.S. | 4526195 |
| PET OF THE MONTH | U.S. | 1128612 |
| PET OF THE MONTH | Australia | 418098 |
| PET OF THE MONTH | Croatia | Z990073 |
| PET OF THE MONTH | Czech Republic | 167775 |
| PET OF THE MONTH | Estonia | 31742 |
| PET OF THE MONTH | European Union | 9519638 |
| PET OF THE MONTH | Hungary | 129190 |
| PET OF THE MONTH | Japan | 3291185 |
| PET OF THE MONTH | Macedonia | 08380 |
| PET OF THE MONTH | Poland | R-66067 |
| PET OF THE MONTH | Portugal | 371779 |
| PET OF THE MONTH | Russia | 89624 |
| PET OF THE MONTH | Slovak Republic | 167775 |
| PET OF THE MONTH | Slovenia | 9870201 |
| PET OF THE MONTH | Ukraine | 4337 |
| PET OF THE MONTH (Katakana) | Japan | 3340274 |
| PET OF THE YEAR | U.S. | 1121403 |
| PET OF THE YEAR | Croatia | Z990074 |
| PET OF THE YEAR | Estonia | 31741 |
| PET OF THE YEAR | European Union | 9519703 |
| PET OF THE YEAR | Japan | 3291184 |
| PET OF THE YEAR | Macedonia | 08377 |
| PET OF THE YEAR | Slovenia | 9870202 |
| PET OF THE YEAR | Ukraine | 35479 |
| PET OF THE MONTH (Katakana) | Japan | 3340273 |
| PETS | Cyprus | 41625 |
| PETS | Greece | 73495 |
| PETS | Hong Kong | 1183/91 |
| PETS | United Kingdom | 1250671 |
| PETS (Katakana) | Japan | 3291183 |
| THE GIRLS OF PENTHOUSE | U.S. | 2701927 |
| THE GIRLS OF PENTHOUSE (Stylized) | U.S. | 3052850 |
| WHERE THE MAGAZINE COMES TO LIFE! | U.S. | 3273185 |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

**10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California 90067**

A true and correct copy of the foregoing document entitled **NOTICE OF MOTION AND MOTION FOR ORDER (A) APPROVING THE ESTATES' SALE OF CERTAIN TRADEMARKS TO PENTHOUSE CLUBS GLOBAL LICENSING, LLC, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) APPROVING THE ESTATES' LICENSE OF CERTAIN RELATED INTELLECTUAL PROPERTY TO PENTHOUSE CLUBS GLOBAL LICENSING, LLC; AND (C) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF DAVID K. GOTTLIEB** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

## 1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):
Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On May 21, 2018, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

## 2. SERVED BY UNITED STATES MAIL:
On May 21, 2018, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

## 3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on May 21, 2018 served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

*Via Federal Express*
Honorable Martin R. Barash
U.S. Bankruptcy Court - Central District of California
21041 Burbank Boulevard, Suite 342/ Courtroom 303
Woodland Hills, California 91367

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 21, 2018 | Janice G. Washington | /s/ Janice G. Washington |
|---|---|---|
| Date | Printed Name | Signature |

{N3598827.1}This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
DOCS_LA:314443.1 32277/001

**F 9013-3.1.PROOF.SERVICE**

## 1.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**

Russell Clementson on behalf of U.S. Trustee
United States Trustee (SV)
russell.clementson@usdoj.gov

James A Dumas, Jr on behalf of Creditor NOA
Productions SPRL
jdumas@dumas-law.com,
jdumas@ecf.inforuptcy.com

James A Dumas, Jr on behalf of Creditor
Penthouse Global Broadcasting, Inc.
jdumas@dumas-law.com,
jdumas@ecf.inforuptcy.com

Allan B Gelbard on behalf of Other
Professional Allan B. Gelbard
xxxesq@aol.com, Allan@GelbardLaw.com

David Keith Gottlieb (TR)
dkgtrustee@dkgallc.com,
dgottlieb@iq7technology.com,rjohnson@dkgal
lc.com,akuras@dkgallc.com

David W. Meadows on behalf of Interested
Party Courtesy NEF
david@davidwmeadowslaw.com

Krikor J Meshefejian on behalf of Creditor
Interested Party
kjm@lnbrb.com

Alan I Nahmias on behalf of Interested Party
Courtesy NEF
anahmias@mbnlawyers.com,
jdale@mbnlawyers.com

Aram Ordubegian on behalf of Creditor LSC
Communications US, LLC / Creel Printing
ordubegian.aram@arentfox.com

Hamid R Rafatjoo on behalf of Creditor
Committee The Official Committee of
Unsecured Creditors
hrafatjoo@raineslaw.com,
bclark@raineslaw.com;cwilliams@raineslaw.c
om
S Margaux Ross on behalf of U.S. Trustee
United States Trustee (SV)
margaux.ross@usdoj.gov

Michael St James on behalf of Creditor
Interested Party
ecf@stjames-law.com

Michael St James on behalf of Interested Party
Michael St. James
ecf@stjames-law.com

Howard Steinberg on behalf of Creditor
Greenberg Traurig, LLP
steinbergh@gtlaw.com,
pearsallt@gtlaw.com;laik@gtlaw.com

Cathy Ta on behalf of Interested Party
Penthouse Clubs Worldwide, LLC
cathy.ta@bbklaw.com,
Arthur.Johnston@bbklaw.com;lisa.spencer@b
bklaw.com

United States Trustee (SV)
ustpregion16.wh.ecf@usdoj.gov

Michael H Weiss on behalf of Attorney Weiss
& Spees, LLP
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor Danni
Ashe, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor GMI
Online Ventures, Ltd.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor General
Media Communications, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor General
Media Entertainment, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Digital Media Productions, Inc.

{N3598827.1}This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
DOCS_LA:314443.1 32277/001                                          **F 9013-3.1.PROOF.SERVICE**

mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Global Broadcasting, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Global Digital, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Global Licensing, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Global Media, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Global Publishing, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Penthouse Images Acquisitions, Ltd.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor Pure
Entertainment Telecommunications, Inc. fka
For Your Ears Only, Ltd.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor
Streamray Studios, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor Tan
Door Media, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Michael H Weiss on behalf of Debtor XVHUB
Group, Inc.
mw@weissandspees.com,
lm@weissandspees.com

Christopher K.S. Wong on behalf of Creditor
LSC Communications US, LLC / Creel
Printing
christopher.wong@arentfox.com

Beth Ann R Young on behalf of Creditor
Dream Media Corporation
bry@lnbyb.com

Beth Ann R Young on behalf of Creditor
Interested Party
bry@lnbyb.com

Brian L. Davidoff
bdavidoff@greenbergglusker.com

Jonathan Hayes jhayes@SRHLawFirm.com

Peter W. Lianides plianides@wcghlaw.com

Mark S. Horoupian
mhoroupian@sulmeyerlaw.com

---

{N3598827.1}This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**U.S. Bankruptcy Court**
**Central District of California (San Fernando Valley)**
**In re Penthouse Global Media, Inc., Case No. 18-10098-MB**

2.  **SERVED BY UNITED STATES MAIL:**

*Debtor*
Penthouse Global Media, Inc.
8944 Mason Ave.
Chatsworth, CA 91311

*Counsel for Debtor*
Michael H. Weiss, Esq.
WEISS & SPEES LLP
6310 San Vicente Boulevard, Suite 401
Los Angeles, CA 90048

*Trustee*
David Keith Gottlieb, Managing
Member
D. Gottlieb & Associates, LLC
17000 Ventura Blvd., Suite 300
Encino, California, 91403

*Office of U.S. Trustee*
Margaux S. Ross
915 Wilshire Blvd. , Suite 1850
Los Angeles, CA 90017

*Counsel for The Official Committee of*
*Unsecured Creditors*
c/o Hamid R. Rafatjoo
Raines Feldman LLP
1800 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067

*Committee Members*
DVD Factory Inc.
Representative: Steve Kalson
7230 Coldwater Canyon Ave.
North Hollywood, CA 91605

LSC Communications US, LLC / Creel Printing.
Representative: Dan Pevonk
4101 Winfield Rd.
Warrenville, IL 60555

TGG
Representative: Matthew A. Garrett, CEO
10188 Telesis Court
Suite 130
San Diego, CA 92121

Miller Law Group
Representative: Walter M. Stella
111 Sutter Street
San Francisco, CA 94104

Palm Coast Data
Representative: Neil Gordon
11 Commerce Blvd.
Palm Coast, FL 32164

*Interested Parties*
Kelly Holland
President and Chief Executive Officer
Penthouse Global Media, Inc.
8944 Mason Ave.
Chatsworth, CA 91311

Robert W. Campbell
Penthouse Global Media, Inc.
8944 Mason Ave.
Chatsworth, CA 91311

Allan B. Gelbard
Attorney at Law
15760 Ventura Boulevard, Suite 801
Encino, CA 91436

Mark A. Mintz
Attorney at Law
JONES WALKER
201 St. Charles Avenue
New Orleans, LA 70170-5100

John D. Kirkendoll
Founder/CEO
Kirkendoll Management, LLC
201 St Charles Ave., Suite 3915
New Orleans, LA 70170

*Requests for Special Notice*
Howard J. Steinberg (CA SBN 89291)
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067

{N3598827.1}This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
DOCS_LA:314443.1 32277/001

**F 9013-3.1.PROOF.SERVICE**

Aram Ordubegian (SBN 185142)
Robert M. Hirsh (*pro hac vice*
application to be submitted)
**ARENT FOX LLP**
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013-1065

Joseph E Bain
Jones Walker LLP
811 Main St., Ste 2900
Houston, TX 77002

Timothy Driver
433 North Camden, Suite 970
Beverly Hills, CA 90210

{N3598827.1}This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.