1  Linda F. Cantor (CA Bar No. 153762)
   Iain A.W. Nasatir (CA Bar No. 148977)
2  PACHULSKI STANG ZIEHL & JONES LLP
   10100 Santa Monica Blvd., 13th Floor
3  Los Angeles, CA  90067
   Telephone: 310/277-6910
4  Facsimile: 310/201-0760
   E-mail:  lcantor@pszjlaw.com
5            inasatir@pszjlaw.com

6  Attorneys for David K. Gottlieb, Chapter 11 Trustee

7              UNITED STATES BANKRUPTCY COURT
               CENTRAL DISTRICT OF CALIFORNIA
8              SAN FERNANDO VALLEY DIVISION

9  In re:                                    Cases No.: 1:18-BK-10098-MB

10 PENTHOUSE GLOBAL MEDIA, INC.,             Chapter 11

11                          Debtor.          Jointly Administered with Cases Nos.:
                                             1:18-bk-10099-MB; 1:18-bk-10101-MB;
12 ─────────────────────────────            1:18-bk-10102-MB; 1:18-bk-10103-MB;
                                             1:18-bk-10104-MB; 1:18-bk-10105-MB;
13 ☒ Affects All Debtors                     1:18-bk-10106-MB; 1:18-bk-10107-MB;
                                             1:18-bk-10108-MB; 1:18-bk-10109-MB;
14 ☐ Affects Penthouse Global Broadcasting, Inc.   1:18-bk-10110-MB; 1:18-bk-10111-MB;
   ☐ Affects Penthouse Global Licensing, Inc.      1:18-bk-10112-MB; 1:18-bk-10113-MB
15 ☐ Affects Penthouse Global Digital, Inc.

   ☐ Affects Penthouse Global Publishing, Inc.     EXHIBIT 1 (ASSET PURCHASE
16 ☐ Affects GMI Online Ventures, Ltd.             AGREEMENT) TO ORDER (A)
                                                   APPROVING SALE OF SUBSTANTIALLY
   ☐ Affects Penthouse Digital Media Productions, Inc.   ALL ASSETS FREE AND CLEAR OF ALL
17 ☐ Affects Tan Door Media, Inc.                  LIENS, CLAIMS, ENCUMBRANCES AND
                                                   INTERESTS TO SUCCESSFUL BIDDER;
18 ☐ Affects Penthouse Images Acquisitions, Ltd.   (B) APPROVING THE ESTATES'
   ☐ Affects Pure Entertainment Telecommunications, Inc.   ASSUMPTION AND ASSIGNMENT OF
19 ☐ Affects XVHUB Group, Inc.                      CERTAIN UNEXPIRED LEASES AND
                                                   EXECUTORY CONTRACTS; AND
20 ☐ Affects General Media Communications, Inc.    (C)  GRANTING RELATED RELIEF
   ☐ Affects General Media Entertainment, Inc.
21 ☐ Affects Danni Ashe, Inc.                      **Hearing:**
                                                   Date:       June 4, 2018
22 ☐ Affects Streamray Studios, Inc.               Time:       12:00 p.m.
                                                   Place:      United States Bankruptcy Court
23                                                             21041 Burbank Boulevard
                                                               Courtroom 303
24                                                             Woodland Hills, California
25
                                                   Judge:  Hon. Martin R. Barash
26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:314737.6 32277/001
DOCS_LA:314975.1 32277/001

1

**Successful Bidder APA**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

ASSET PURCHASE AGREEMENT

AMONG

DAVID K. GOTTLIEB, SOLELY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE
FOR PENTHOUSE GLOBAL MEDIA, INC., A DELAWARE CORPORATION AND
THE OTHER ENTITIES IDENTIFIED AS "DEBTORS" IN THE FOLLOWING
AGREEMENT

AND

PENTHOUSE WORLD MEDIA, LLC,
PENTHOUSE WORLD BROADCASTING, LLC,
PENTHOUSE WORLD LICENSING, LLC,
PENTHOUSE WORLD DIGITAL, LLC, AND
PENTHOUSE WORLD PUBLISHING, LLC

DATED AS OF JUNE 4, 2018

ASSET PURCHASE AGREEMENT dated as of June 4, 2018 (the "Agreement"), by and among David K. Gottlieb, solely in his capacity as Chapter 11 Trustee (acting in such capacity, Mr. Gottlieb is referred to herein as the "Seller") for Penthouse Global Media, Inc., a Delaware corporation ("PGMI") and its affiliated debtor entities Penthouse Global Broadcasting, Inc., Penthouse Global Licensing, Inc., Penthouse Global Digital, Inc., Penthouse Global Publishing, Inc., GMI Online Ventures, Ltd., Penthouse Digital Media Productions, Inc., Tan Door Media, Inc., Penthouse Images Acquisitions, Ltd., Pure Entertainment Telecommunications, Inc., XVHUB Group, Inc., General Media Communications, Inc., General Media Entertainment, Inc., Danni Ashe, Inc. and Streamray Studios, Inc, each of such entities being a debtor in a pending Chapter 11 Case (each of the foregoing entities is referred to herein as a "Debtor" and all are collectively referred to herein as the "Debtors") in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") under Case Nos. 1:18-bk-10098-MB; 1:18-bk-10099-MB; Case No. 1:18-bk-10101-MB; Case No. 1:18-bk-10102-MB; Case No. 1:18-bk-10103-MB; Case No. 1:18-bk-10104-MB; Case No. 1:18-bk-10105-MB; Case No. 1:18-bk-10106-MB; Case No. 1:18-bk-10107-MB; Case No. 1:18-bk-10108-MB; Case No. 1:18-bk-10109-MB; Case No. 1:18-bk-10110-MB; Case No. 1:18-bk-10111-MB; Case No. 1:18-bk-10112-MB and Case No. 1:18-bk-10113-MB, all of which are jointly administered (such Chapter 11 Cases are collectively referred to herein as, the "Case"), Penthouse World Media, LLC, a Delaware limited liability company, Penthouse World Broadcasting, LLC, a Delaware limited liability company, Penthouse World Licensing, LLC, a Delaware limited liability company, Penthouse World Digital, LLC, a Delaware limited liability company, and Penthouse World Publishing, LLC, a Delaware limited liability company (each individually and collectively referred to herein as (the "Purchaser"). Capitalized terms used herein but not defined in the provisions in which they first appear shall have the meanings ascribed to them in Section 8.1(a).

W I T N E S S E T H:

WHEREAS, the Purchaser desires to purchase substantially all assets of the Debtors' Chapter 11 bankruptcy estates (collectively, the "Estates") and to assume certain liabilities of the Estates, and the Seller desires to sell such assets to the Purchaser and to assign such liabilities to the Purchaser and have the Purchaser assume the same, all on the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 of Title 11 of the United States Code (as in effect for cases filed on the Petition Date, the "Bankruptcy Code") and other applicable provisions of the Bankruptcy Code (the "Acquisition");

WHEREAS, on January 11, 2018 (the "Petition Date"), Debtors filed their respective voluntary bankruptcy petitions with the Bankruptcy Court initiating the Case; and

WHEREAS, the Assets will be sold to Purchaser free and clear of Encumbrances (other than Permitted Encumbrances) to the extent provided in an order of the Bankruptcy Court approving the Acquisition under Section 363 of the Bankruptcy Code to be entered in the Case, and such Acquisition will include (a) the assumption of the

Club Owner's Related Penthouse IP License Agreement (defined below), if such license is approved by the Bankruptcy Court, and (b) the assumption by the Purchaser of the Assumed Contracts under Section 365 of the Bankruptcy Code, all in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the parties hereto agree as follows:

1.    <u>Purchase and Sale.</u>

1.1    <u>Assets to Be Transferred.</u>

On the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell, assign, transfer, convey and deliver (or cause to be sold, assigned, transferred, conveyed and delivered) to the Purchaser, and Purchaser shall purchase and assume from Seller, free and clear of Encumbrances (other than Permitted Encumbrances, as and if applicable) pursuant to Section 363(f) of the Bankruptcy Code, all of the right, title and interest in and to substantially all of the Estates' properties, assets, and rights, tangible and intangible (including goodwill) associated with the ownership, operation, conduct or business of the Estates (collectively, the "<u>Business</u>"), wherever such properties, assets and rights are located, whether real, personal or mixed, whether accrued, fixed, contingent or otherwise, other than the Excluded Assets (collectively, other than the Excluded Assets, the "<u>Assets</u>"), in accordance with Sections 363 and 365 of the Bankruptcy Code.  Subject to Section 1.2 below, the Assets shall include all of the Estates' right, title, and interest in and to the following:

    (a)    Any real property lease listed on **Schedule 1.1(a)** (the "<u>Assumed Lease</u>"), subject to the provisions of Section 1.8(B) below;

    (b)    The Contracts listed on **Schedule 1.1(b)** (subject to the provisions of Section 1.8 regarding Purchaser's right to add or eliminate from **Schedule 1.1(b)** additional Contracts) (collectively, including the Assumed Leases, and as **Schedule 1.1(b)** may be augmented, the "<u>Assumed Contracts</u>");

    (c)    to the extent transferable and assignable, all Intellectual Property and all income, royalties, damages and payments due or payable at the Closing or thereafter relating to the Intellectual Property (including damages and payments for past or future infringements or misappropriations thereof), but specifically excluding the Intellectual Property that is the subject of the Club Owner's Purchase Agreement (the "<u>Club IP</u>") and all income, royalties, damages and payments due or payable at the Closing or thereafter relating to the Club IP (including damages and payments for past or future infringements or misappropriations thereof);

    (d)    all Fixed Assets, if any;

    (e)    all Inventory;

2

(f)     Subject to the provisions of <u>Section 1.2(t)</u> below, Accounts Receivable;

(g)     all Security Deposits, if any;

(h)     to the extent transferable without violating any privacy rights of any Business Employee, all Books and Records, including electronic records and communications;

(i)     to the extent transferable and assignable, all material licenses, franchises, permits, variances, exemptions, orders, approvals, and authorizations issued by Governmental Bodies in connection with the conduct of the Business (collectively, "<u>Permits</u>");

(j)     all Equipment;

(k)     all telephone numbers, addresses (including electronic mail addresses) used by the Debtors in connection with the Business;

(l)     all goodwill to the extent relating to the Assets;

(m)     all rights to causes of action, lawsuits, judgments and Claims of any nature available to Debtors (whether or not such cause of action, lawsuit, judgment or Claim is being pursued) with respect to the ownership, use, function or value of any Asset, whether arising by way of counterclaim, set off, or rights of self-help under Assumed Leases or otherwise;

(n)     all right, title and interest of PGMI in and to those entities listed on **Schedule 1.1(n)** attached hereto and incorporated herein by this reference, including all capital stock or equivalent ownership interest of such entities.

(o)     all advertising, marketing and promotional materials and all other printed or written materials;

(p)     all representations, warranties, guarantees, indemnities, undertakings, covenants not to compete benefiting the Assets, certificates, covenants, agreements and all security therefor received by the Debtors on the purchase or other acquisition of any part of the Assets;

(q)     the Club Owner's Related Penthouse IP License Agreement;

(r)     the post-petition agreements listed on **Schedule 1.1(r)** attached hereto as incorporated herein by this reference; and

1.2     <u>Excluded Assets.</u>

Notwithstanding anything to the contrary contained in Section 1.1 or any other provision of this Agreement, the following assets, properties and rights of the Seller

(collectively, the "Excluded Assets") shall not be included in the Assets and shall be (i) retained by the Seller or (ii) in the case of the Club IP, shall be transferred by the Seller and Estates separate, apart and independent of the Acquisition contemplated by this Agreement, in accordance with the Club Owner's Purchase Agreement:

(a)     any cash, bank deposits and cash equivalents including without limitation any cash, deposits and reserves held by Humboldt Merchant Services *(but excluding Security Deposits)*;

(b)     any assets, rights, claims, and interests expressly excluded pursuant to the provisions of Section 1.1 above;

(c)     all amounts owing (whether as an intercompany claim, loan, receivable or otherwise) to any Debtor by any other Debtor or any other Affiliate of such Debtor;

(d)     all leases, subleases, licenses or other agreements under which any Debtor uses or occupies or has the right to use or occupy, now or in the future, any Real Property which is not the subject of an Assumed Lease;

(e)     all fixed assets and Books and Records to the extent specifically identifiable to the ownership, business or conduct of any Real Property which is not the subject of an Assumed Lease;

(f)     any swap or hedge Contracts, or subject to Section 1.1(n) in all respects, any capital stock or membership interests in other Persons held by Seller or Debtors;

(g)     the Club Owner's License Agreement and all other Contracts (including Real Property Leases) not described in Section 1.1 or otherwise listed on **Schedule 1.1(a) or 1.1(b)** (subject to the provisions of Section 1.8) (collectively, the "Excluded Contracts");

(h)     all of the rights and claims of the Estates (or any of them) for preference or avoidance actions available to the Estates (or any of them) under the Bankruptcy Code, of whatever kind or nature, including, without limitation, those set forth in Sections 544 through 551 and any other applicable provisions of the Bankruptcy Code, and any related claims and actions arising under such sections by operation of law or otherwise, including any and all proceeds of the foregoing;

(i)     all rights, claims and causes of action of any Debtor against former officers, directors, employees, members, principals, agents, and representatives of such Debtor;

(j)     the Vice Coin Receivable;

(k)    the Seller's rights under this Agreement and all cash and non-cash consideration payable or deliverable to the Seller pursuant to the terms and provisions hereof;

(l)    any letters of credit or similar financial accommodations issued to any third party(ies) for the account of any Debtor and all collateral or security of any kind posted with or held by any such third party in connection therewith;

(m)    all deposits and prepaid amounts of Seller held by or paid to third parties in connection with any Excluded Asset,

(n)    any Real Property or tangible or intangible personal property held by any Debtor pursuant to a lease, license or other Contract to the extent that the associated lease, license or other Contract is not among the Assumed Leases or Assumed Contracts;

(o)    all rights, claims, credits and rebates of or with respect to (i) income Taxes that were paid or will be paid (whether prior to or after the Closing), and (ii) any taxes, assessments or similar charges paid by or on behalf of any Debtor to the extent applicable to any period prior to the Closing;

(p)    insurance proceeds, claims and causes of action with respect to or arising in connection with (A) any Contract which is not assigned to Purchaser at the Closing, (B) any item of tangible or intangible property not acquired by Purchaser at the Closing, (C) any loss, damage or casualty to any item of tangible or intangible property to the extent the same is repaired, restored or replaced prior to the Closing, or (D) any claims or causes of action of third parties where any associated liabilities are not included among the Assumed Liabilities (as defined below);

(q)    any Real Property Lease or other Contract which is not assumable and assignable as a matter of applicable law (including, without limitation, any with respect to which any consent requirement in favor of the counter-party thereto may not be overridden pursuant to Section 365 of the Bankruptcy Code);

(r)    all securities, whether capital stock or debt, of any of the Seller or any other entity which is not listed on **Schedule 1.1(n)** attached hereto;

(s)    tax records, minute books, stock transfer books and corporate seals of any Debtor;

(t)    Accounts Receivable to the extent attributable to operation of the Business during any period up to and including the Closing Date; and

(u)    those other assets of Seller, if any, listed on **Schedule 1.2** attached hereto and incorporated herein by this reference.

1.3    Assumed Liabilities.

Upon the terms and subject to the conditions hereof, as of the Closing, the Purchaser shall assume from the Seller only those Liabilities (the "Assumed Liabilities") arising with respect to: (i) the performance after the Closing Date of the Assumed Contracts (subject to the provisions of Section 1.8 hereof), the Assumed Leases (subject to the provisions of Section 1.8 hereof), (ii) any unpaid sick pay, vacation and other paid time off and severance obligations of the Debtors' owing, as of the Closing, to Business Employees hired by Purchaser, (iii) all Cure Costs payable in connection with any of the Assumed Leases and/or Assumed Contracts, (iv) all product warranties, guaranties, indemnities and the like related to the Business (whether arising out of activities occurring prior to or following the Closing), and (v) accounts payable of Debtors as of the Closing Date owing to third parties and obligations to customers of Debtors for refunds, rebates, returns, discounts and the like as of the Closing Date, in each case, (A) to the extent incurred by Debtors in the ordinary course of Seller' Business (but specifically excluding any such accounts payable owing by any Debtor to any other Debtor) and (B) arising out of an Assumed Contract. Purchaser shall not assume or undertake to perform, pay, satisfy or discharge any other Liabilities or obligations of the Seller.

1.4    Purchase Price; Other Consideration and Allocation of Purchase Price.

(a)    Subject to the terms and conditions hereof, and as consideration for the sale and purchase of the Assets (collectively the "Purchase Price"), at the Closing, Purchaser agrees to:

(i)    Assume the Assumed Liabilities; and

(ii)    Pay to the Seller an amount equal to (A) ELEVEN MILLION TWO HUNDRED THOUSAND AND 00/100 DOLLARS (U.S. $11,200,000.00) *minus* (B) an amount equal to the bid deposit previously furnished by Purchaser to the Seller (collectively, the "Cash Consideration").

(b)    The Purchaser shall prepare a rational proposed allocation of the Purchase Price (and all other capitalized costs) among the Assets for U.S. federal, state, local and foreign income and franchise Tax purposes, which allocation shall, to the extent reasonably practicable, minimize adverse tax consequences to the Estates and shall be subject to Seller's reasonable approval. As soon as reasonably practicable following the Closing Date, but in any event not later than 60 days following the Closing Date, the Purchaser shall deliver such proposed allocation to Seller. Following their mutual written agreement thereto, Purchaser and the Seller and their respective Affiliates shall report, act and file Tax Returns in all respects and for all purposes consistent with such allocation prepared by the Purchaser. Neither the Purchaser nor the Seller shall take any tax position (whether in audits, Tax Returns or otherwise) with respect to the mutually approved allocation which is inconsistent with such allocation, unless (and then only to the extent) required by a "determination" within the meaning of Section 1313(a) of the Code.

6

1.5    Closing.

Subject to the terms and conditions of this Agreement and the Sale Approval Order, the sale and purchase of the Assets and the assumption of the Assumed Liabilities contemplated by this Agreement shall take place at a closing (the "Closing") to be held at the offices of Pachulski Stang Ziehl & Jones LLP located in Los Angeles, California, at 10:00 a.m., Pacific Time, no later than June 15, 2018, or at such other place, at such other time, on such other date or in such other manner as the Seller and the Purchaser may mutually agree upon in writing (the day on which the Closing takes place being referred to herein as the "Closing Date").

1.6    Closing Deliveries by Seller.

At the Closing, unless otherwise waived in writing by the Purchaser, the Seller shall deliver or cause to be delivered to the Purchaser:

(a)    duly executed Bills of Sale to transfer the Assets to the Purchaser;

(b)    duly executed Assignments of Intangible Property to transfer the Assets which are intangible property to the Purchaser; and

(c)    duly executed counterparts of the Assignment and Assumption Agreement;

(d)    duly executed counterparts of the Intellectual Property Assignment; and

(e)    such other documents, notices, items and certificates (in each case to the extent not inconsistent with the other terms, provisions and limitations set forth herein and which do not otherwise impose any monetary cost on Seller or materially increase the burdens of this transaction upon Seller) as the Purchaser may reasonably require in order to consummate the transactions contemplated hereunder.

1.7    Closing Deliveries by the Purchaser.

At the Closing, unless otherwise waived in writing by the Seller, the Purchaser shall deliver or cause to be delivered to the applicable Seller:

(a)    an amount equal to the Cash Consideration, by wire transfer of immediately available funds to an account (or accounts) designated in writing by Seller at least two (2) Business Days prior to the Closing Date;

(b)    duly executed counterparts of the Assignment and Assumption of Agreement;

(c)    duly executed counterparts of the Intellectual Property Assignment;

7

(d)    an Assumption of Assumed Liabilities, in form and content reasonably satisfactory to Purchaser and Seller, evidencing Purchaser's assumption of the Assumed Liabilities; and

(e)    such other documents, notices, items and certificates as the Seller may reasonably require (in each case to the extent not inconsistent with the other terms, provisions and limitations set forth herein and which do not otherwise impose any monetary cost on Purchaser or materially increase the burdens of this transaction upon Purchaser) in order to consummate the transactions contemplated hereunder.

1.8    Additional Assumed Contracts and Leases.

(a)    Other than with respect to any Assumed Lease described on **Schedule 1.1(a)** hereto and the other Assumed Contracts described on **Schedule 1.1(b)** hereto (all of which Assumed Leases and Assumed Contracts Seller shall seek to assume and assign at Closing as contemplated by the other provisions of this Agreement), during the period (the "**Contract Retention Period**") from the execution date hereof until the Closing, Seller shall not assume (or pay any cure amounts in connection therewith), reject or seek to assume or reject any Contract or Real Property Lease without first obtaining Purchaser's written consent, which consent may not be unreasonably withheld or delayed; provided that it shall not be deemed unreasonable for Purchaser to withhold such consent so long as Purchaser in good faith has not reached a decision as to whether such Contract or Real Property Lease shall be an Excluded Contract.  Seller shall provide timely and proper notice of the motion seeking entry of the Sale Approval Order to all parties to Assumed Contracts, and Purchaser providing evidence of adequate assurance of future performance thereunder to the satisfaction of the Bankruptcy Court, Seller shall take all other actions reasonably necessary to cause such Assumed Contracts to be assumed by Seller and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code. Notwithstanding the foregoing, in the event the assumption of a Contract or Real Property Lease is the subject of an objection as of the Closing, Seller shall not assume (or pay any cure amounts in connection therewith), reject or seek to assume or reject any such contested Contract or Real Property Lease until entry of a final order of the Bankruptcy Court determining such objection.

(b)    (i) Other than any Assumed Lease described on **Schedule 1.1(a)** hereto and the other Assumed Contracts listed on **Schedule 1.1(b)** hereto, all other Contracts and Real Property Leases of Seller shall during the Contract Retention Period be deemed to be "Held Contracts." Held Contracts shall not automatically be deemed to be Excluded Contracts, but Purchaser may designate any Held Contract as an Excluded Contract upon ten (10) days' prior written notice to Seller, following which designation such Held Contract will cease to be a Held Contract and shall thereafter for all purposes be treated as an Excluded Contract hereunder.  So long as Purchaser complies with its obligations to pay the Run Rate Costs (as defined below) in accordance with Section 1.8(b)(ii) below, Seller shall not reject or seek to reject any Held Contract prior to the expiration of the Contract Retention Period, unless otherwise agreed in writing by Purchaser.  Purchaser may request during the Contract Retention Period, by written notice to Seller (a "Held Contract Assumption Notice"), that any Held Contract be

8

assumed by the applicable Seller and assigned to Purchaser. As soon as practicable after receiving any Held Contract Assumption Notice, the applicable Seller shall, subject to Purchaser providing evidence of adequate assurance of future performance thereunder to the satisfaction of the Bankruptcy Court, take all actions reasonably necessary to seek to assume and assign to Purchaser pursuant to Section 365 of the Bankruptcy Code all Held Contracts set forth in any such Assumption Notice. The Cure Amount with respect to any Held Contract assigned to Purchaser shall be paid by Purchaser concurrently with the assignment of such Held Contract to Purchaser. Seller and Purchaser acknowledge and agree that the agreements and covenants in this Section 1.8 shall survive the Closing. Notwithstanding anything in this Agreement to the contrary, on the date any Held Contract is assumed and assigned to Purchaser pursuant to this Section 1.8(b), such Held Contract shall thereafter be deemed an Assumed Contract for all purposes under this Agreement. Any Held Contract for which Purchaser has not provided a Held Contract Assumption Notice prior to the end of the Contract Retention Period shall be automatically deemed to be an Excluded Contract which Seller, in their sole discretion, may act to assume, reject, or take any other action it may elect.

(ii)     During the Contract Retention Period, with respect to each Held Contract, Purchaser shall pay to the applicable Seller, in advance, on the first day of each calendar month an amount equal to such Seller's reasonably-documented estimated (such estimate to be provided to Purchaser no later than five (5) days prior to the month to which it applies) ordinary course, reasonable monthly out-of-pocket costs and expenses incurred by such Seller during the Contract Retention Period under the Held Contracts and with respect to any (A) equipment, assets and facilities held or occupied thereunder, (B) employees employed at any facilities occupied thereunder, (C) Inventory held at any facilities occupied thereunder, and (D) overhead or other costs associated with the operation of any facilities occupied thereunder (collectively, the "Run Rate Costs"). Not later than the fifth (5th) day of each month of the Contract Retention Period (starting with the second month thereof), Purchaser and Seller shall reconcile between them, based upon reasonable documentation provided by Seller, the actual Run Rate Costs for the immediately preceding month for each Held Contract that is the subject of the Contract Retention Period.

2.     Representations and Warranties of the Seller.

Except as set forth in the schedules to this Agreement (the "**Schedules**") delivered by the Seller on the date hereof, Seller hereby represents and warrants to the Purchaser on the date hereof, that, to the Seller's actual current knowledge:

2.1     Authority.

Subject to the entry of the Sale Approval Order, Seller has all requisite power and authority to enter into this Agreement, carry out his obligations hereunder and consummate the transactions contemplated hereby. This Agreement has been duly executed and delivered by Seller.

9

2.2   No Conflicts.

Subject only to the entry of the Sale Approval Order, the execution and delivery by the Seller of this Agreement, the consummation of the transactions contemplated hereby, and the performance by Seller of this Agreement in accordance with its terms will not (with or without notice or lapse of time or both):

(a)   require Seller to obtain any consent, approval, authorization or actions of, or make any filings with or give any notices to, any Governmental Bodies, except for consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court; or

(b)   violate any Requirement of Law to which Seller, or any Debtor, is subject.

2.3   Litigation.

To Seller's actual current knowledge, there are no Claims pending or, to the knowledge of the Seller, threatened against Seller or any Debtor, before any Governmental Body that would prevent or materially delay the consummation by the Seller of the transactions contemplated by this Agreement.

3.   Representations and Warranties of the Purchaser.

The Purchaser represents and warrants to the Seller as follows:

3.1   Due Incorporation and Authority.

The Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the Czech Republic.  The Purchaser has all requisite entity power and authority to enter into this Agreement, carry out its obligations hereunder and consummate the transactions contemplated hereby.  The execution and delivery by the Purchaser of this Agreement, the performance by the Purchaser of its obligations hereunder and the consummation by the Purchaser of the transactions contemplated hereby have been duly authorized by all requisite entity action on the part of the Purchaser and no other entity proceedings on the part of the Purchaser are necessary to authorize the execution and delivery of this Agreement or to consummate the other transactions contemplated hereby.  This Agreement has been duly executed and delivered by the Purchaser.

3.2   No Conflicts.

The execution and delivery by the Purchaser of this Agreement, the consummation of the transactions contemplated hereby, and the performance by the Purchaser of this Agreement in accordance with its terms will not:

(a)   violate the formation document filed with the applicable Governmental Body in the country of formation of Purchaser);

10

(b)    require the Purchaser to obtain any material consents, approvals, authorizations or actions of, or make any filings with or give any notices to, any Governmental Bodies or any other Person, except for consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court;

(c)    violate or result in the breach of any of the terms and conditions of, cause the termination of or give any other contracting party the right to terminate, or constitute (or with notice or lapse of time, or both, constitute) a material default under, any material Contract to which the Purchaser is a party or by or to which each of the Purchaser or any of its properties is or may be bound or subject; or

(d)    violate any Requirement of Law to which the Purchaser is subject.

3.3    Litigation.

There are no Claims pending or, to the knowledge of the Purchaser, threatened against the Purchaser, before any Governmental Body that would prevent or materially delay the consummation by the Purchaser of the transactions contemplated by this Agreement.

4.    Covenants and Agreements.

4.1    Conduct of Business.

Except (i) as expressly provided in this Agreement or on **Schedule 4.1(b)**, or (ii) to the extent that the following is inconsistent with Seller's duties and obligations as Chapter 11 Trustee in the Case or with orders issued by the Bankruptcy Court, or (iii) to the extent Seller does not have adequate funding to comply, or (iv) as otherwise agreed to in writing by the Purchaser, Seller agree that, from the date hereof until the earlier of the Closing and the date, if any, on which this Agreement is terminated pursuant to Section 7.1 hereof:

(a)    the Seller shall use commercially reasonable efforts to operate the Business in the ordinary course of business consistent with past practice and to preserve intact the Business, keep available the services employees and preserve its relationships with vendors, it being understood and agreed that nothing herein shall be deemed to require Seller to engage, retain or employ any new professional advisors, consultants or employees or any replacements should any existing professional advisors, consultants or employees cease to be engaged, retained or employed by Seller or any Debtor pending the Closing.

(b)    except as expressly permitted or required by this Agreement or as otherwise agreed to in writing by the Purchaser, or to the extent that the following is inconsistent with Seller's duties and obligations as Chapter 11 Trustee in the Case or with orders issued by the Bankruptcy Court, or to the extent Seller does not have adequate funding to comply, Seller shall not, directly or indirectly:

(i)    other than pursuant to the Club Owner's Purchase Agreement and the Club Owner's Related Penthouse IP License Agreement, sell or convey any of the Assets or any interests therein, except in the ordinary course of business consistent with past practice during the six (6) month period immediately preceding mutual execution and delivery of this Agreement;

(ii)    cancel, terminate or amend any Contract identified on **Schedule 4.1(b)(ii)**;

(iii)    acquire or agree to acquire by merging or consolidating with, or by purchasing any equity interest in or a portion of the assets of, or by any other manner, any business or any Person or division thereof;

(iv)    enter into any joint ventures, strategic partnerships or alliances;

(v)    other than licenses heretofore granted (including the Club Owner's Related Penthouse IP License Agreement) and other licenses granted in the ordinary course of the Business enter into any Contract, without first obtaining Purchaser's written consent (which consent Purchaser shall not unreasonably withhold or delay), the effect of which would be to grant to a third party any license to use any Intellectual Property for a period extending beyond the Closing Date;

(vi)    adopt a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or reorganization, other than a plan of reorganization in the Case;

(vii)    other than pursuant to the Club Owner's Purchase Agreement and the Club Owner's Related Penthouse IP License Agreement (A) enter into any exclusive license, distribution, marketing, sales or other agreement; or (B) sell, lease, transfer, encumber, or otherwise dispose of any Intellectual Property, without in each case first obtaining the prior written consent of Purchaser;

(viii)    other than pursuant to the Club Owner's Purchase Agreement and the Club Owner's Related Penthouse IP License Agreement, enter into any Contract that contains non-competition restrictions, including any restrictions purporting to relate to the Business or the sale of the Debtors' goods or products or any geographic restrictions, or in any case that would prohibit or restrict the Purchaser or any of its Affiliates assuming that the transactions contemplated by this Agreement are consummated; or

(ix)    agree in writing or otherwise to take any of the actions described in (i) through (viii) above without the consent of Purchaser.

Notwithstanding anything in this Agreement to the contrary, all of the actions described in this Section 4.1 relate solely to the Business and the Assets and the

12

Purchaser acknowledges that the Seller can take any actions, in his sole and absolute discretion, relating solely to the Excluded Assets and/or Excluded Liabilities.

4.2    Expenses.

Except as otherwise specifically provided herein, the Purchaser and the Seller shall bear their respective expenses incurred in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of their Representatives.

4.3    Access to Information.

From the date hereof until the earlier of (x) the Closing and (y) termination of this Agreement pursuant to Section 7.1, upon reasonable notice, Seller shall, and shall cause Debtors' employees and agents to, (i) afford the officers, employees and Representatives of the Purchaser reasonable access, during normal business hours, to the offices, plants, warehouses, properties, books and records of the Debtors, and (ii) furnish to the officers, employees and Representatives of the Purchaser such additional financial and operating data and other information regarding the operations of the Debtors as are then in existence and as the Purchaser may from time to time reasonably request; provided, however, that such investigation shall not unreasonably interfere with the operations of the Debtors or any of their Affiliates; and provided further, however, that (i) the auditors of the Debtors shall not be obliged to make any work papers available to any Person except as otherwise provided herein, (ii) in no event shall Purchaser be entitled to conduct or cause to be conducted any "invasive" testing of any kind at any of Debtors' facilities, and (iii) nothing in this Section 4.3 shall be deemed to give rise to any condition or contingency to Purchaser's obligation to consummate the transactions contemplated herein.  All information provided pursuant to this Section 4.3 shall be afforded confidential treatment by Purchaser.

4.4    Regulatory and Other Authorizations; Consents.

(a)    Each of the parties hereto shall cooperate and use its commercially reasonable efforts to (i) take, or cause to be taken, all appropriate action, and do, or cause to be done, all things necessary, proper or advisable under any Requirement of Law or otherwise to consummate and make effective the transactions contemplated by this Agreement, (ii) obtain any consents, licenses, permits, waivers, approvals, authorizations or orders required to be obtained or made in connection with the authorization, execution and delivery of this Agreement and, to the extent that the need for the same is not obviated by the entry of the Sale Approval Order, the consummation of the transactions contemplated hereby, and (iii) within ten (10) calendar days of the date hereof, make all filings and give any notice, and thereafter make any other submissions either required or reasonably deemed appropriate by each of the parties, with respect to this Agreement and the transactions contemplated hereby required under any Requirement of Law, including any applicable securities Requirements of Law, and the rules and regulations of any stock exchange on which the securities of any of the parties are listed or traded.  Commercially reasonable efforts shall not obligate the Seller or the Purchaser to make or offer to make

13

any payments to obtain any consents, licenses, permits, waivers, approvals, authorizations or orders.

(b)    The parties hereto shall cooperate and consult with each other in connection with the making of all such filings and notices, including by providing copies of all such documents to the non-filing party and its advisors a reasonable period of time prior to filing or the giving of notice to the extent practicable. No party to this Agreement shall consent to any voluntary extension of any statutory deadline or waiting period or to any voluntary delay of the consummation and the transactions contemplated in this Agreement at the behest of any Governmental Body without the consent and agreement of the other parties to this Agreement, which consent shall not be unreasonably withheld or delayed. Each party shall promptly inform the others of any material communication from any Governmental Body regarding any of the transactions contemplated by this Agreement. To the extent practicable, no party to this Agreement shall agree to participate in any meeting with any Governmental Body in respect of any filing with such body, investigation or other inquiry unless it consults with the other party in advance and, to the extent permitted by such Governmental Body, gives the other party the opportunity to attend and participate at such meeting.

4.5    Further Action.

Each of the parties hereto shall prepare and execute such documents and take such further actions as may be reasonably required or desirable to carry out the provisions hereof and give effect to the transactions contemplated hereby; provided, however, nothing herein shall require either party to this Agreement to (i) execute any document that would impose any additional monetary or otherwise materially increase the burdens of this Agreement imposed upon such party by the other provisions hereof, or (ii) to initiate or participate in any action or other proceeding other than those specifically contemplated by this Agreement, except to the extent such actions are necessary to effectuate the transfer to Purchaser of all rights and assets contemplated by the Acquisition.

4.6    Employee Matters.

(a)    From and after the date hereof, the Purchaser, in its sole and absolute discretion, may: (i) in consultation and cooperation with the Seller, communicate with any of the Business Employees about possible employment with the Purchaser after the Closing Date; and/or (ii) offer employment to any of the Business Employees as of the Closing Date. Those of the Business Employees that accept the Purchaser's offer of employment shall be terminated by the Seller, and shall become employed by the Purchaser or one of its Affiliates (referred to in this Agreement as "Transferred Employees") as of the Closing Date. All employment offers are subject to the satisfactory completion by the Purchaser of its customary employment interview, background checks and drug testing procedures.

(b)    To the extent that length of employment service is relevant for purposes of eligibility or vesting under any employee benefit plan, program or

14

arrangement established or maintained by the Purchaser and provided to the Transferred Employees (excluding any equity-related plan, program or arrangement), the Purchaser shall credit the Transferred Employees under such plan, program or arrangement for service on or prior to the Closing with the Seller as service with the Purchaser to the extent the Seller recognized such service under any comparable plan, program or arrangement of the Seller.

(c)    The Seller shall be responsible for any liabilities or obligations (i) arising under the WARN Act, if any, and (ii) resulting from or precipitated by layoffs, if any, in respect of employees of the Seller whose employment was terminated on or prior to the Closing.

4.7    <u>Bankruptcy Court Approval</u>.

At a hearing held May 9, 2018, the Bankruptcy Court authorized the Acquisition which established requirements to creditors and parties in interest with respect to the Acquisition, and approving the bidding procedures applicable to the Acquisition (the "<u>Bidding Procedures Order</u>").  Pursuant to the Bidding Procedures Order, the Bankruptcy Court has scheduled a hearing on the sale of the Assets to the Purchaser, subject to overbid, at an auction (the "<u>Auction</u>") to be held (if held) at the sale hearing on June 4, 2018 (the "<u>Sale Hearing</u>").  The Seller will request that the Bankruptcy Court enter an order approving the sale and, if any Auction is held, identifying the successful bidder and any back-up bidder at the Auction, as soon as possible after the completing of the Sale Hearing (the "<u>Sale Approval Order</u>").

4.8    <u>Books and Records; Access to Personnel</u>.

The Purchaser agrees that it shall preserve and keep all books and records in respect of the operations of the Business following the Closing and in the Purchaser's possession for a period of at least seven (7) years from the Closing Date.  After such seven-year period, if at any time the Purchaser shall desire to dispose of any of such books and records, then the Purchaser shall provide written notice to the Seller at least thirty (30) calendar days prior to such intended disposition and shall provide the Seller with an opportunity, at their cost and expense, to remove and retain all or any part of such books and records as the Seller may select.  At any time prior to such disposition, Representatives of the Seller shall, upon three (3) days' notice, have reasonable access thereto during normal business hours to examine, inspect and copy such books and records.  During the pendency of the Case, Purchaser shall also make available to Seller and its Representatives (to the extent in Purchaser's or an Affiliate's employ and to the extent that the same does not unreasonably interfere with Purchaser's operation of the Business) access at reasonable times to those individuals listed on **Schedule 4.8** to this Agreement for reasonable consultation in connection with matters relating to administration and wind down of the Case.

DOCS_LA:313445.9 32277/001

4.9    Tax Matters.

(a)    Sales, Use and Other Transfer Taxes.  The Purchaser shall be responsible for any and all excise, sales, value added, use, registration, stamp, franchise, transfer and similar Taxes, levies, charges and fees incurred in connection with the transactions contemplated by this Agreement. The parties hereto agree to cooperate in the filing of all necessary documentation and all Tax Returns with respect to all such Taxes, including any available pre-sale filing procedure.

(b)    Cooperation.  The parties hereto shall cooperate with each other and with each other's respective Representatives, including accounting firms and legal counsel, in connection with the preparation or audit of any Tax Return(s) and any Tax claim or litigation in respect of the Assets and Assumed Liabilities that include whole or partial taxable periods, activities, operations or events on or prior to the Closing Date, which cooperation shall include, but not be limited to, making available employees, if any, for the purpose of providing testimony and advice, or original documents, or any of the foregoing.

4.10    Cure Costs.

The Purchaser shall be exclusively responsible for the payment of, and shall pay prior to or at the Closing, all Cure Costs in cash or other immediately available good funds.

4.11    Use of Intellectual Property.

The Seller shall, promptly following the Closing Date, take such actions as may be necessary so that Debtors cease to use all of the corporate names, trade names and trademarks included in the Intellectual Property; provided, however, Debtors shall not be required to change their names for purposes of or in connection with the Case.

4.12    "AS IS" Transaction.

Purchaser hereby acknowledges and agrees that Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Assets that will survive or continue beyond the Closing (including, without limitation, income to be derived or expenses to be incurred in connection with the Assets, the physical condition of any personal property comprising a part of the Assets or which is the subject of any Assumed Contract to be assumed by Purchaser at the Closing, the environmental condition or other matter relating to the physical condition of any real property or improvements which are the subject of any Real Property Lease to be assumed by Purchaser at the Closing or any other Real Property or improvements comprising a part of the Assets, the zoning of any such Real Property or improvements, the value of the Assets (or any portion thereof), the transferability of Assets, the terms, amount, validity, collectability or enforceability of any assumed liabilities or Assumed Lease or other Assumed Contract, the title of the Assets (or any portion thereof), the merchantability or fitness of the Fixed Assets or Equipment or other tangible personal property included among the Assets or any other portion of the Assets for any particular

16

purpose, or any other matter or thing relating to the Assets or any portion thereof). Without in any way limiting the foregoing, Seller hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Assets. Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation of the physical condition of all portions of the Assets and all such other matters relating to or affecting the Assets as Purchaser deemed necessary or appropriate and that in proceeding with its acquisition of the Assets, Purchaser is doing so based solely upon such independent inspections and investigations. Accordingly, Purchaser will accept the Assets at the Closing **"AS IS," "WHERE IS," and "WITH ALL FAULTS."**

    4.13   Wrong Pocket.

    If Seller receives any payments attributable to Accounts Receivable acquired by Purchaser after the Closing, Seller shall promptly remit (or cause to be promptly remitted) to Purchaser such funds to the extent related to such Accounts Receivable and the Purchaser shall reimburse to Seller any reasonable expenses incurred by Seller in connection therewith. If Purchaser receives any payments attributable to Accounts Receivable that constitute an Excluded Asset after the Closing, Purchaser shall promptly remit (or cause to be promptly remitted) to Seller such funds to the extent constituting an Excluded Asset and the Seller shall reimburse to Purchaser any reasonable expenses incurred by Purchaser in connection therewith. For purposes of this Section 4.13, payments received at a time when both Seller and Purchaser hold an outstanding Account Receivable from such party, such payments shall conclusively be deemed to have been delivered first to pay and satisfy the Account Receivable held by Seller until all Accounts Receivable owing to Seller from such party have been paid and satisfied in full. Seller and Purchaser shall provide such Accounts Receivable information as the other may from time to time reasonably request to confirm the application and disposition of payments received in accordance with the provisions of this Section 4.13 and to otherwise reasonably cooperate with each other to effectuate the agreements provided in this Section 4.13.

    5.   Conditions Precedent to the Obligation of the Purchaser to Close.

    The obligation of the Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment on or prior to the Closing Date of each of the following conditions, any one or more of which (to the extent permitted by law) may be waived by the Purchaser:

    5.1   Representations and Warranties; Covenants.

    The representations and warranties of Seller set forth herein shall be true and correct in all material respects. The covenants and agreements contained in this Agreement to be complied with by the Seller at or before the Closing shall have been complied with in all material respects.

DOCS_LA:313445.9 32277/001

5.2     No Order.

No Governmental Body shall have enacted, issued, promulgated, enforced or
entered any statute, rule, regulation, injunction or other order (whether temporary,
preliminary or permanent) which is in effect and has the effect of making the transactions
contemplated by this Agreement illegal or otherwise restraining or prohibiting
consummation of such transactions and which are not satisfied or resolved or preempted
by the Sale Approval Order.

5.3     Bankruptcy Filing.

The Case shall not have been dismissed.  This Agreement shall bind any
subsequently appointed Chapter 7 trustee in the event the Case is converted to a case
under Chapter 7 of the Bankruptcy Code.  The Bankruptcy Court shall have entered the
Sale Approval Order, and it shall not have been vacated, reversed or stayed.

5.4     Closing Documents.

The Seller shall have delivered to the Purchaser on the Closing Date the
documents required to be delivered pursuant to Section 1.6.

6.      Conditions Precedent to the Obligation of the Seller to Close.

The obligation of the Seller to consummate the transactions contemplated by this
Agreement is subject to the fulfillment on or prior to the Closing Date of each of the
following conditions, any one or more of which (to the extent permitted by law) may be
waived by the Seller:

6.1     Representations and Warranties; Covenants.

The representations and warranties of the Purchaser set forth herein shall be true
and correct in all material respects.  The covenants and agreements contained in this
Agreement to be complied with by the Purchaser at or before the Closing shall have been
complied with in all material respects.

6.2     No Order.

No Governmental Body shall have enacted, issued, promulgated, enforced or
entered any statute, rule, regulation, injunction or other order (whether temporary,
preliminary or permanent) which is in effect and has the effect of making the transactions
contemplated by this Agreement illegal or otherwise restraining or prohibiting
consummation of such transactions and which are not satisfied or resolved or preempted
by the Sale Approval Order.

6.3     Sale Approval Order.

The Bankruptcy Court shall have entered the Sale Approval Order, and the Sale
Approval Order shall not have been vacated, reversed or stayed.

6.4    Closing Documents.

The Purchaser shall have delivered to the Seller on the Closing Date the documents and payments required to be delivered by it pursuant to Section 1.7.

7.    Termination of Agreement.

7.1    Termination Prior to Closing.

Notwithstanding anything herein to the contrary, this Agreement may be terminated, and the transactions contemplated by this Agreement abandoned, at any time before the Closing, upon notice by the terminating party to the other party:

(a)    by the mutual written consent of the Seller and the Purchaser;

(b)    by either the Seller or the Purchaser if the Closing shall not have occurred fifteen (15) days following the entry of the Sale Approval Order; provided, however, that the right to terminate this Agreement under this Section 7.1(b) shall not be available to any party whose failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur prior to such date;

(c)    by the Purchaser, if (x) any of the representations and warranties of any Seller contained in this Agreement shall fail to be true and correct, or (y) there shall be a breach by any Seller of its covenants or agreements in this Agreement that in either case (i) would result in the failure of a condition set forth in Section 5.1 and (ii) which is not curable or, if curable, is not cured within ten (10) calendar days after written notice thereof is delivered by the Purchaser to the Seller; provided, that the Purchaser may not terminate this Agreement pursuant to this Section 7.1(c) if Purchaser is in material breach of this Agreement;

(d)    by the Seller, if (x) any of the representations and warranties of the Purchaser contained in this Agreement shall fail to be true and correct, or (y) there shall be a breach by the Purchaser of its covenants or agreements in this Agreement that in either case (i) would result in the failure of a condition set forth in Section 6.1 and (ii) which is not curable or, if curable, is not cured within ten (10) calendar days after written notice thereof is delivered by the Seller to the Purchaser; provided, that the Seller may not terminate this Agreement pursuant to this Section 7.1(d) if any Seller is in material breach of this Agreement;

(e)    by either the Seller or the Purchaser, if:

(i)    the Bankruptcy Court approves the sale of the Assets to a Successful Bidder (as defined in the Bidding Procedures Order) other than the Purchaser herein; or

(ii)    if the Sale Approval Order has not been entered by the Bankruptcy Court by seven (7) business days after the Sale Hearing; provided,

19

however, that neither party shall be entitled to exercise its rights under this clause (e)(ii) if the Sale Approval Order has been entered by the Bankruptcy Court prior to such party exercising such rights.

7.2     Consequences of Termination.

Termination of this Agreement pursuant to Section 7.1 above shall not affect, prejudice or impair any right or remedy to which Seller or Purchase may be entitled in the event such termination resulted from the other's breach or default hereunder.

8.      Miscellaneous.

8.1     Certain Definitions.

(a)     As used in this Agreement, the following terms have the following meanings:

"Accounts Receivable" means accounts receivable and all trade receivables of the Seller (in each case, whether in the nature of licensing fees, royalties or otherwise) arising in connection with the Business, together with any unpaid interest accrued thereon from the respective obligors and any security or collateral therefor, including recoverable deposits.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such specified Person.

"Assignment and Assumption Agreement" means the Assignment and Assumption Agreement substantially in the form of Exhibit C hereto to be executed by the Purchaser and the Seller on the Closing Date.

"Assignments of Intangible Property" means the Assignments of Intangible Property substantially in the form of Exhibit B hereto to be executed by the Seller on the Closing Date.

"Bill of Sale" means Bills of Sale substantially in the form of Exhibit A hereto to be executed by the Seller on the Closing Date.

"Books and Records" means all files, documents, instruments, papers, books and records, including Tax books and records (whether stored or maintained in hard copy, digital or electronic format or otherwise) used by the Seller in connection with the Business or the other Assets, including Contracts, customer lists, customer information and account records, computer files, data processing records, payroll, employment and personnel records, advertising and marketing data and records, credit records, records relating to suppliers and other data, but "Books and Records" shall not include any of the foregoing to the extent (i) the same are the subject of any attorney-client, work product or similar privilege with respect to work perform in anticipation of or in connection with

20

the preparation or administration of the Case, or (ii) the transfer of the same would violate any Person's privacy rights.

"Business Day" means any day that is not a Saturday, Sunday or other day on which banks located in New York, New York are authorized or obligated to close.

"Business Employees" means Debtors' current employees employed in connection with, or rendering services to, the Business.

"Claim" means a suit, claim, dispute, action, proceeding, inquiry, investigation, litigation, demand, charge, complaint, grievance, arbitration, indictment, or grand jury subpoena.

"Club Owner's License Agreement" means that certain Master License Agreement by and between, Kirkendoll Management, LLC, a Colorado limited liability company and Penthouse Clubs Worldwide, a Delaware limited liability Company, and Penthouse Global Licensing, Inc. a Delaware corporation, dated March 29, 2017.

"Club Owner's Purchase Agreement" means that certain Purchase and Sale Agreement entered into by and between Penthouse Clubs Global Licensing, LLC and the Seller (in his capacity as Chapter 11 Trustee for the estates of the Debtors), dated May 21, 2018 and attached as Exhibit A to that certain *Notice of Motion and Motion for Order (A) Approving the Estates' Sale of Certain Trademarks to Penthouse Clubs Global Licensing, LLC, Free and Clear of all Liens, Claims, Encumbrances and Interests; (B) Approving the Estates' License of Certain Related Intellectual Property to Penthouse Clubs Global Licensing, LLC; and (C) Granting Related Relief; Memorandum of Points and Authorities; Declaration of David K. Gottlieb* filed with the Court on May 21, 2018 as Dkt. No. 503.

"Club Owner's Related Penthouse IP License Agreement" means that certain Master Intellectual Property License Agreement and the Consent to Use and Registration Agreement (and any ancillary documents thereto or executed in connection therewith) entered into by and between Penthouse Clubs Global Licensing, LLC and the Seller (in his capacity as Chapter 11 Trustee for the estates of the Debtors), dated May 21, 2018 and attached as Exhibits B and C to that certain *Notice of Motion and Motion for Order (A) Approving the Estates' Sale of Certain Trademarks to Penthouse Clubs Global Licensing, LLC, Free and Clear of all Liens, Claims, Encumbrances and Interests; (B) Approving the Estates' License of Certain Related Intellectual Property to Penthouse Clubs Global Licensing, LLC; and (C) Granting Related Relief; Memorandum of Points and Authorities; Declaration of David K. Gottlieb* filed with the Court on May 21, 2018 as Dkt. No. 503.

"Code" means the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

"Contract" means any written or oral agreement, arrangement, understanding, lease, license, sublicense, or instrument or other contractual or similar arrangement or commitment.

21

"Cure Costs" means the cure, compensation and restatement, costs and expenses of or relating to the assumption and assignment of the Assumed Contracts (including, without limitation, Assumed Leases) included in the Assets assumed and assigned to the Purchaser hereunder pursuant to Section 365 of the Bankruptcy Code.

"Encumbrances" means all Liens, claims, charges, conditional sales agreements, rights of first refusal, rights of first offer or rights of first negotiation or options, or any other encumbrance preventing the tranfer of good and marketable title.

"Equipment" means all machinery, rolling stock, equipment, computer equipment, software, software systems, databases and database systems used at those premises which are the subject of Assumed Leases assumed and assigned at the Closing.

"Fixed Assets" means all furniture, furnishings, fixtures, trade fixtures, racks, pallets, displays and office equipment used in connection with the Business located in the premises that are operated pursuant to the Assumed Leases assumed and assigned at the Closing.

"Governmental Body" means a domestic or foreign national, federal, state, provincial, or local governmental, regulatory or administrative authority, department, agency, commission, court, tribunal, arbitral body or self-regulated entity.

"Intellectual Property" means, to the extent relating to or used in connection with the Business, whether owned or licensed, whether related to use in the United States or another country, (i) any and all patents (including design patents, industrial designs and utility models) and patent applications (including docketed patent disclosures awaiting filing, reissues, divisions, continuations, continuations-in-part and extensions), patent disclosures awaiting filing determination, inventions and improvements thereto, (ii) trademarks, service marks, certification marks, trade names, brand names, trade dress, logos, business and product names, slogans (including, without limitation, all common-law rights relating to the foregoing), and registrations and applications for registration thereof, (iii) copyrights (including software) and registrations thereof, (iv) inventions, processes, designs, formulae, trade secrets, know-how, industrial models, confidential and technical information, manufacturing, engineering and technical drawings, product specifications, domain names, discoveries and confidential business information, (v) intellectual property rights similar to any of the foregoing, (vi) computer software, web site and domain names and website content, (vii) copies and tangible embodiments thereof (in whatever form or medium, including electronic media) and (viii) all contracts or licenses for the use of any of the foregoing, in the case of each of the foregoing together with all goodwill and Claims directly or indirectly associated therewith.

"Intellectual Property Assignment" means the instrument (in form and content reasonably satisfactory to Purchaser and Seller) pursuant to which the Seller will assign to the Purchaser all of the Debtors' right, title and interest, domestic and foreign, state, federal and common law, in and to the Intellectual Property.

"Inventory" means all merchandise inventory of the Business.

"Liabilities" means any direct or indirect, primary or secondary, liability, indebtedness, obligation, penalty, cost or expense (including costs of investigation, collection and defense) of or by any Person of any type, whether accrued, absolute or contingent, liquidated or unliquidated, choate or inchoate, matured or unmatured, or otherwise. Without limiting the foregoing in any manner, the term "Liabilities" includes and refers to all liabilities and obligations for or with respect to Taxes, including liabilities for Taxes of any Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract, or otherwise.

"Lien" means liens, encumbrances, charges, claims, mortgages, options , pledges, restrictions on transfer, security interests, hypothecations, easements, rights-of-way or encroachments of any nature whatsoever, whether voluntarily incurred or arising by operation of law.

"Permitted Encumbrance" means (a) Liens for Taxes and assessments not yet payable, (b) inchoate mechanics' Liens for work in progress, (c) materialmen's, mechanics', carriers', workmen's and repairmen's Liens arising in the ordinary course and not past due and payable or the payment of which is being contested in good faith by appropriate proceedings, (d) Liens that will be released at or prior to Closing, including any such landlord's liens, (e) Liens arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business, (f) with respect to any real property lease among the Assumed Contracts, easements, covenants, rights-of-way and other similar restrictions of record, and (g) with respect to Assets and rights involved in litigation or other disputes, subject to such litigation claims and defenses.

"Person" means any individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, joint-stock company, trust, Governmental Body or other entity.

"Prepaid Expenses" means all credits, prepaid expenses (including unamortized advertising expenses), deferred charges, advance payments, security deposits, and prepaid items (including in respect of Taxes) of the Seller arising in connection with the Business or other Assets, in each case which are paid or prepaid by any Seller on or prior to the Closing Date and that correspond to, or are to be amortized during, a period after the Closing Date.

"Representative" means, with respect to a particular Person, any director, officer, manager, partner, member, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants, and financial advisors.

"Requirement of Law" means any federal, state, local, municipal, foreign, international, multinational or other law, statute, constitution, treaty, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, requirement or interpretive guidance issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

23

"Security Deposits" means all security deposits (including cash) held by landlords under Assumed Leases or counterparties to any other Assumed Contract.

"Tax" or "Taxes" means all taxes, charges, fees, imposts, levies or other assessments, including all net income, franchise, profits, gross receipts, capital, sales, use, ad valorem, value added, transfer, transfer gains, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, real or personal property, and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, together with any interest and any penalties, fines, additions to tax or additional amounts thereon, imposed by any taxing authority (federal, state, local or foreign) and shall include any successor or transferee liability in respect of Taxes.

"Tax Returns" means all returns, declarations, reports, forms, estimates, information returns and statements required to be filed in respect of any Taxes or to be supplied to a taxing authority in connection with any Taxes.

"Vice Coin Receivable" means all income, royalties, damages and payments due or payable at the Closing or thereafter relating to that certain Amendment to Trade-Mark and Trade-Name License Agreement dated December 28, 2017 ("Effective Date") Between Penthouse Global Media Inc., as Licensor, and Tokken MSB O/A Vice-Org, as Licensee.

    8.2    Consent to Jurisdiction; Service of Process; Waiver of Jury Trial.

        (a)    The Purchaser and the Seller irrevocably and unconditionally consent to submit to the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agree not to commence any litigation relating hereto except in the Bankruptcy Court).

        (b)    Any and all service of process and any other notice in any such Claim shall be effective against any party if given personally or by registered or certified mail, return receipt requested, or by any other means of mail that requires a signed receipt, postage prepaid, mailed to such party as herein provided. Nothing herein contained shall be deemed to affect the right of any party to serve process in any manner permitted by law or to commence legal proceedings or otherwise proceed against any other party in any other jurisdiction.

    8.3    Notices.

    Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed to have been duly given (a) on the day of delivery if delivered in person or by electronic mail, or if delivered by facsimile upon confirmation of receipt, (b) on the first (1st) Business Day following the date of dispatch if delivered by a nationally recognized express courier service, or (c) on the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid. All notices hereunder shall be delivered as set forth below, or

24

pursuant to such other instructions as may be designated by notice given in accordance with this Section 8.3 by the party to receive such notice:

    (a)    if to the Purchaser, to:

Penthouse World Media, LLC
Robert Seifert
2600 South Biscayne Boulevard, Suite 2680
Miami, FL 33131,

with a copy to:

Jason Fischer, Esq.
Fischer Law, P.L.
2600 South Biscayne Boulevard, Suite 2600
Miami, FL 33131
Facsimile: 305-397-2772
jason@fischerlawpl.com

    (b)    if to the Seller, to:

D. Gottlieb & Associates, LLC
17000 Ventura Blvd., Suite 300
Encino, California, 91403
Attention: David Gottlieb
Facsimile: (818) 436-0729
Email Address: dgottlieb@dkgallc.com

with a copy to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067
Attention: Linda Cantor, Esq.
Facsimile: (310) 201-0760
Email Address: lcantor@pszjlaw.com

8.4    <u>Entire Agreement; Recitals.</u>

This Agreement (including any **exhibits** or **schedules** hereto) and any other collateral agreements executed in connection with the consummation of the transactions contemplated hereby, contain the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements, written or oral, with respect thereto. Any exception or disclosure made by Seller in the **Schedules** to this Agreement with regard to a representation of the Seller shall be deemed made with respect to any

25

other representation by such party to which such exception or disclosure is reasonably apparent. The recitals set forth at the beginning of this Agreement are true and correct and hereby incorporated by reference and made part of this Agreement.

8.5    Waivers and Amendments.

This Agreement may be amended, superseded, canceled, renewed or extended, and the terms hereof may be waived, only by a written instrument signed by the Purchaser and the Seller or, in the case of a waiver, by the party waiving compliance. No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party of any such right, power or privilege, nor any single or partial exercise of any such right, power or privilege, preclude any further exercise thereof or the exercise of any other such right, power or privilege.

8.6    Governing Law.

This Agreement and all Claims with respect thereto shall be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and, where state law is implicated, the laws of the State of California without regard to any conflict of laws rules thereof that might indicate the application of the laws of any other jurisdiction.

8.7    Binding Effect; Assignment.

This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. This Agreement is not assignable by any party without the prior written consent of the other parties; provided that the Purchaser may assign this Agreement, or all or any of its rights hereunder, to one or more wholly-owned subsidiaries or Affiliates, of the Purchaser, provided, further that the Purchaser shall not be relieved of any of its obligations under this Agreement as a result of such assignment.

8.8    Usage.

All pronouns and any variations thereof refer to the masculine, feminine or neuter, singular or plural, as the context may require. All terms defined in this Agreement in their singular or plural forms have correlative meanings when used herein in their plural or singular forms, respectively. Unless otherwise expressly provided, the words "include," "includes" and "including" do not limit the preceding words or terms and shall be deemed to be followed by the words "without limitation."

8.9    Articles and Sections.

All references herein to Articles and Sections shall be deemed references to such parts of this Agreement, unless the context shall otherwise require. The Article and Section headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

8.10    Interpretation.

The parties acknowledge and agree that (a) each party and its counsel reviewed and negotiated the terms and provisions of this Agreement and have contributed to its revision, (b) the rule of construction to the effect that any ambiguities are resolved against the drafting party shall not be employed in the interpretation of this Agreement, and (c) the terms and provisions of this Agreement shall be construed fairly as to all parties, regardless of which party was generally responsible for the preparation of this Agreement.

8.11    Severability of Provisions.

If any provision or any portion of any provision of this Agreement shall be held invalid or unenforceable, the remaining portion of such provision and the remaining provisions of this Agreement shall not be affected thereby.  If the application of any provision or any portion of any provision of this Agreement to any Person or circumstance shall be held invalid or unenforceable, the application of such provision or portion of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby.

8.12    Counterparts.

This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts together shall constitute one and the same instrument.  Each counterpart may consist of a number of copies hereof each signed by less than all, but together signed by all, of the parties hereto.

8.13    No Third Party Beneficiaries.

No provision of this Agreement is intended to, or shall, confer any third party beneficiary or other rights or remedies upon any Person other than the parties hereto. Without limiting the generality of the foregoing, no provision of this Agreement shall create any third party beneficiary rights in any employee or former employee of any Debtor in respect of continued employment by such Debtor or the Purchaser.

8.14    Brokerage Obligations.

Except only for Broadway Advisors, LLC (the "Broker"), which Broker Seller has engaged in connection with the transaction contemplated by this Agreement, Seller and the Purchaser each represent and warrant to the other that such party has incurred no liability to any real estate broker or other broker or agent with respect to the payment of any commission regarding the consummation of the transaction contemplated hereby.  It is agreed that other than the fee or commission payable to the Broker (which shall be paid by Seller to the Broker pursuant to a separate agreement between Broker and Seller) if any claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees, or commissions are ever asserted against Purchaser or the Seller in connection with this transaction, all such claims shall be handled and paid by the

27

party whose actions form the basis of such claim and such party shall indemnify, defend (with counsel reasonably satisfactory to the party entitled to indemnification), protect and save and hold the other harmless from and against any and all such claims or demands asserted by any person, firm or corporation in connection with the transaction contemplated hereby.

      8.17   <u>Survival</u>.  The respective representations and warranties of Seller and Purchaser herein, or in any certificates or other documents delivered prior to or at the Closing, shall automatically lapse and cease to be of any further force or effect whatsoever upon the Closing, except as otherwise expressly provided in this Agreement.

      8.18   <u>No Recourse to Seller</u>.  The Purchaser expressly acknowledges and agrees that the Seller is executing this Agreement and entering into the transaction contemplated herein solely in his capacity as Chapter 11 Trustee for Debtors' bankruptcy estates and that in the event of any default in the performance of any of the Seller's or any Estates' obligations under this Agreement or in the event that any other claim is asserted against the Seller or Estates in connection with this Agreement or the Acquisition, Seller shall in no event have any personal liability whatsoever (whether in his individual capacity or otherwise), it being expressly understood and agreed that Purchaser's sole recourse, if any, in such event shall be to the assets of the Estates.

      8.19   <u>Chapter 7</u>.    This Agreement shall survive the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code and Purchaser agrees to perform pursuant to the terms of this Agreement notwithstanding any such conversion unless otherwise ordered by the Bankruptcy Court.

*[Remainder of Page Intentionally Left Blank]*

28

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

PURCHASER:

Penthouse World Media, LLC
a limited liability company organized under
the laws of Delaware

By: _____
    Name: Robert Seifert
    Title:  Authorized Representative

Penthouse World Broadcasting, LLC
a limited liability company organized under
the laws of Delaware

By: _____
    Name: Robert Seifert
    Title:  Authorized Representative

Penthouse World Licensing, LLC
a limited liability company organized under
the laws of Delaware

By: _____
    Name: Robert Seifert
    Title:  Authorized Representative

Penthouse World Digital, LLC
a limited liability company organized under
the laws of Delaware

By: _____
    Name: Robert Seifert
    Title:  Authorized Representative

{N3606822.3;335272.4}

N3606822.2
DOCS_LA-313448.8.322770.01

Penthouse World Publishing, LLC
a limited liability company organized under
the laws of Delaware

By: _____

    Name: Robert Seifert

    Title:  Authorized Representative

SELLER:


_____

David K. Gottlieb, Solely in His
Capacity as Chapter 11 Trustee for
The Debtors

Penthouse World Publishing, LLC
a limited liability company organized under
the laws of Delaware

By: _____

    Name: Robert Seifert
    Title: _____


SELLER:

_____

David K. Gottlieb, Solely in His
Capacity as Chapter 11 Trustee for
The Debtors

# SCHEDULES

Schedule 1.1(a)      Assumed Leases

Schedule 1.1(b)      Assumed Contracts

Schedule 1.1(n)      PGMI's Interests in Entities

Schedule 1.1(r)      List of the post-petition agreements

Schedule 1.2         Excluded Assets

Schedule 4.1(b)(ii)  Contracts not to be Cancelled, Terminated or Amended-

Schedule 4.8         Administration and Wind Down Consultation Individuals

**Schedule 1.1(a)**
**Assumed Leases**

[To be provided]

**Schedule 1.1(b)**

**Assumed Contracts**


[To be provided]

**Schedule 1.1(n)**

**PGMI's Interests in Entities**

[To be provided]

**Schedule 1.1(r)**
**List of the post-petition agreements**

[To be provided]

**Schedule 1.2**

**Excluded Assets**

[To be provided]

**Schedule 4.1(b)(ii)**

**Contracts not to be Cancelled, Terminated or Amended-**

[To be provided]

## Schedule 4.8

### Administration and Wind Down Consultation Individuals

[To be provided]

# **EXHIBITS**

Exhibit A - Bill of Sale

Exhibit B - Assignments of Intangible Property

Exhibit C – Assignment and Assumption Agreement

**Exhibit A**

**Bill of Sale**

**Exhibit B**

**Assignment of Intangible Property**

**Exhibit C**

**Assignment and Assumption Agreement**