James A. Dumas (SBN 76284)
Christian T. Kim (SBN 231017)
DUMAS & KIM, APC.
3435 Wilshire Blvd., Ste. 990
Los Angeles, CA 90010
Email: jdumas@dumas-law.com
Telephone: 213/368-5000
Facsimile: 213/368-5009

Attorneys for Creditor, NOA Productions, SPRL

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>PENTHOUSE GLOBAL MEDIA, INC.,<br><br>        Debtor. | Case No.: 1:18-bk-10098-MB [ Jointly Administered]<br><br>[Chapter 11]<br><br>[Honorable Martin R. Barash]<br><br>**REQUEST FOR ALLOWANCE OF ADMINISTRATIVE CLAIM**<br><br>Date: TBD<br>Time: TBD<br>Place: United States Bankruptcy Court<br>21041 Burbank Blvd, Courtroom 303<br>Woodland Hills, CA 91367 |

      Please take notice that NOA Productions SPRL, whose address and telephone number are Avenue Montjoie, 84, 1180 Brussels- Belgium +32.2.375.99.10, holds an administrative claim pursuant to 11 U.S.C. § 503 as follows:

      Name of Debtor(s) liable on claims: Penthouse Global Broadcasting, Inc.

      Amount of Administrative Claim: $675,120.00

      Basis of Administrative Claim: Sales Commission- Please see attachment plus exhibits

1   Payment and/or notices/objections should be sent/directed to:

2   DUMAS & KIM, APC.

3   3435 Wilshire Blvd., Ste. 990

4   Los Angeles, CA 90010

5   Dated: October 18, 2018

6                                   Respectfully submitted,

7

8                                   James A. Dumas

9

ATTACHMENT TO REQUEST FOR PAYMENT OF ADMINISTRATIVE EXPENSE OF NOA PRODUCTIONS SPRL ("NOA")

This request for payment of administrative expense is based on the PDMP/NOA Productions Restated and Amended Sales Agent Agreement ("the Sales Agent Agreement") dated September 30, 2010 and attached hereto as **Exhibit A.** Pursuant to the Sales Agent Agreement NOA Productions was to receive a commission equal to 25% of gross receipts received by PDMP from telecom broadcasters/operators ("Platforms") procured for PDMP by NOA. The Sales Agent Agreement expired on January 31, 2014 but commissions on sales revenue received after termination remained due until the expiration of the relevant broadcast contract with a platform. If any broadcast contract would be extended or renewed during a five-year period after termination, NOA would be entitled to commissions until the expiration of such extended or renewed contract. PDMP had an obligation to provide periodic reports to NOA regarding the revenue it was receiving from the Platforms that was subject to the obligation to pay commissions.

As it concerns pre-petition commissions that have been due to NOA, the claim for commissions which were unpaid is set forth in NOA's proof of claim which was filed on July 2, 2018. This proof of claim also contains an estimation of the administrative claim as of that date. The proof of claim explains how Penthouse Global Broadcasting assumed the obligations of Penthouse Digital Media Productions under the Sales Agent Agreement. As it concerns income received post-petition that is subject to NOA's claim for commissions, this income was received by Penthouse Global Broadcasting.

Based on the information provided in the PGB Monthly Operating Reports, NOA believes that through August 31, 2018, the sum of between $342,636 and $675,120 is immediately due and payable by the Penthouse consolidated bankruptcy estate to NOA. A schedule of post-petition payments received by PGB for which commissions are due is set forth on **Exhibit B** hereto. The uncertainty in the amount due to the fact that deposits into Account EWB-3852 are not always identified. The obligation to pay the commissions was an ongoing liability that was assumed by the assignee of the broadcast contracts in connection with that certain sale of substantially all of the assets of the consolidated debtors that was approved by the order entered June 14, 2018.

Attached hereto as **Exhibit C** is a list of the Platforms procured for Penthouse by NOA.

Based on (1) the cessation of the operations of Penthouse Digital Media Productions, (2) the assignment of revenue due PDMP to Penthouse Global Broadcasting, (3) the assumption, without notice to or the permission of NOA, of the PDMP's obligation to pay commissions by PGB, (4) the longstanding pattern and practice by Penthouse management of treating PDMP, PGB, and Penthouse Global Media as if they were effectively one entity, and (5) the consolidation of the bankruptcies of these entities in these proceedings, PDMP, PGB, and PGM are collectively responsible for payment of the within claim.

# EXHIBIT "A"

# EXHIBIT "A"

### PDMP/NOA PRODUCTIONS
### RESTATED AND AMENDED
### SALES AGENT AGREEMENT



**THIS 1ˢᵗ AMENDED AND RESTATED CONTRACT** (the "Agreement"), is made and entered into as of **September 30, 2010** ("Agreement Date") and is effective as of **30ᵗʰ day** of **January 2010** ("Effective Date"), by and between **NOA Productions SPRL** ("Agent") with an address of Avenue Montjoie, 84, 1180 Brussels, Belgium and **Penthouse Digital Media Productions, Inc.** ("PDMP") with an address of 6800 Broken Sound Parkway NW, Suite 200, Boca Raton, FL 33487, USA and shall, as of the Effective Date, restate, amend and replace in its entirety that certain Sales Agent Agreement by and between the parties dated February 1, 2007 ("Sales Agent Agreement").

## RECITALS

**WHEREAS,** the parties are desirous of extending the services of Agent and other Agent related activities;

**WHEREAS,** the parties wish to amend and restate the Sales Agent Agreement as set forth herein below; and

**WHEREAS,** the terms and conditions noted herein shall apply as from (and not prior to) the Effective Date;

**WHEREAS,** existing sales completed by Agent prior to the Effective Date will be subject to the terms of the Sales Agent Agreement;

**NOW, THEREFORE,** in consideration of the mutual undertakings herein contained, the parties hereto agree as follows:

## AGREEMENT

1.  Term: The term of this Agreement ("Term") shall commence upon the Effective Date and shall continue until January 31, 2014, unless sooner terminated as provided herein. This Agreement shall be extended for successive periods of three (3) years, subject to the written agreement of the parties at any time prior to the then current Term. Agent shall have (60) days following the expiration of the Term to complete any Prospective Sale commenced prior to the expiration of the Term provided that PDMP authorized such Prospective Sale. Any extension of time of this Agreement shall also be considered an extension of and part of the Term.

2.  Rights:

    (a) Agent may negotiate sales (also known as "Prospective Sales") on behalf of PDMP for exploitation of the Channels and PDMP's titles (collectively, the "Pictures") as follows: Broadcast, including linear, hospitality oriented broadcast service (i.e. hotels), VOD/SVOD, IPTV or any other linear forms of Broadcast now known or developed in the future (hereafter also, the "Products"). Such sales, when fully executed by PDMP and consummated in a written agreement, are referred to herein as "Sales". Other than with respect to the Excepted Parties and the terms and conditions noted herein, Agent's rights to conduct its sales representation activities under this Agreement are exclusive in the Territory for Broadcast. Agent shall have non-exclusive rights for any Sales outside the Territory and for any sales or negotiations related to, multimedia gaming (off deck), Internet or mobile rights (which must first be pre-approved in writing by PDMP). PDMP shall have no obligation to Agent for Sales or activities outside the Territory or otherwise that are obtained through efforts of PDMP on its own (and not through the Agent) outside the Territory. If third party entities approach or contact PDMP directly where Agent has exclusive rights, PDMP shall refer them to Agent for Prospective Sales. Further, PDMP will coordinate any and all Prospective Sales and sales strategies that would affect Agent and Agent's ability to sell Broadcast rights outside the Territory. If Agent rejects or does not pursue a third party lead or sale within the Territory as presented by PDMP within a reasonable period of time, PDMP shall be free to pursue such third party without any financial obligation to Agent (e.g. Agent waives any commission or payments due related thereto).



(b) "Broadcast": means the exhibition, distribution and exploitation of the Picture(s) by conventional, free over-the-air or paid television transmission, by VHF and/or UHF, television broadcast stations and station groups the video and audio portions which are intended to be intelligibly received without charge by means of a standard roof-top or television set contained antenna or other similar means or any form of linear broadcast now known or developed in the future.  For the purposes of this Agreement, Broadcast Rights include the right to sell VOD/SVOD, IPTV and hotel related broadcast products.

(c) "IPTV": means closed systems, like for example cable, satellite and internet protocol ADSL distribution limited to subscribers of the related cable or broadcaster systems.

(d) "Channels": means a linear (*i.e.*, selection, chronological order and play-out of content is predetermined and governed by the provider, without end-viewer interactivity) high definition television programming service branded as Penthouse HD, Penthouse HD1 and/or Penthouse HD2 (the "Service") including any related standard definition playout rights associated therewith, including exhibition of the Service in 3D technology (which may or may not be branded as "Penthouse 3D").

(e) "Territory": means continental Europe and its suburb territories including the countries of the European Union ("EEC") and  Eastern Europe, the CIS countries (CIS territories in respect to potential and available rights only) Norway, Switzerland, Iceland, Greenland, Israel/Palestine, Turkey and the Maghreb countries.  With regard to Spain and Portugal, Agent acknowledges that PDMP has existing business relationships which may effect sales in those territories and accordingly, such rights are hereby reserved to PDMP except any Sales in Spain related to the Channels and to VOD exhibition rights (such as Telefonica).  Further, regarding any multimedia negotiations or deals originating from Agent: Prospective Sales in all European countries must be reviewed in advance on a case by case basis by PDMP to avoid any potential conflicts or issues that relate to PDMP's existing agreements with third parties.

(f) Other than PDMP, Agent shall not represent any adult brands, adult magazine(s), adult products or adult entertainment/content companies in any manner during the Term in the Territory other than those companies listed on the attached Exhibit "A" ("Excepted Parties").

(g) No further amounts will be due Agent in any manner related to that certain license agreement by and between PDMP and General Satellite Corporation dated June 29, 2009. This clause shall not effect Commissions due Agent related to Sales that were under separate agreements (meaning agreements that did not have General Satellite Corporation as a party).

3.  COMMISSIONS:

(a) Subject to the provisions noted in this Agreement, as sole and complete compensation for the Sales other than Gaming Sales, Agent shall receive Twenty Five percent (25%) of Gross Receipts (the "Commission").

(b) For the period of May 19, 2010 to December 31, 2010 ("Bonus Sales Period") Agent shall also be entitled to an additional 5% commission (in addition to the commission noted in 3(a)) for aggregate Sales made during the Bonus Sales Period that: (i) are only related to the Channels and Broadcast rights; and (ii) provide for an excess of US$1,000,000 in  recordable income to PDMP (per US generally accepted accounting principles[GAAP]) each year of the Term.

(c) Renewals or extensions of Sales consummated prior to the expiration of the Term shall entitle Agent to Commission for the duration of the term of the third party contract related to the Sale.  Agent shall also receive Commission for renewals or extensions of Sales agreements that occur within five (5) years following the expiration of the Term (including any extension or renewal thereof) except as expressly provided this Agreement. Within 30 days following the end of the Term, Agent shall provide its correspondence and files on hand and available related to the Sales and Prospective Sales to PDMP (e.g. this shall include contact names, documentation, emails, correspondence, etc.). Agent shall not be entitled to any compensation or consideration from PDMP, its affiliates, clients or other



third persons or entities for or otherwise concerning Sales or its activities conducted in connection with this Agreement other than the Commissions (including the Commissions on Gaming Sales).

(d) Agent shall bear its own costs and expenses in connection with its activities conducted in connection with this Agreement.

(e) PDMP shall be responsible for all bank transfer fees incurred in transferring any payments to Agent's account.

(f) For any multimedia gaming sales negotiated and obtained by Agent (each a "Gaming Sale" or collectively "Gaming Sales"), Agent shall receive a Commission of 30% of Gross Gaming Receipts.

(g) All payments, fees or commissions to subagents used, contracted by or engaged by Agent are the sole and exclusive responsibility and obligation of Agent.

(h) For clarification purposes, Agent's entitlement for payment shall remain for the entire period for Sales made through the Agent during the Term (or other payments as so specifically provided for in subparagraph 3(c)), as so specified in this Agreement.

(i) "Gross Receipts" means all payments derived from Sales actually received by PDMP, less any bona fide refunds or credits. For purposes of Gross Receipts, amounts received by PDMP's affiliate entities shall be considered part of Gross Receipts for purposes of calculating Agent's commission(s).

(j) "Gross Gaming Receipts" means all payments derived from Gaming Sales actually received by PDMP, less any bona fide refunds or credits. For purposes of Gross Gaming Receipts, amounts received by PDMP's affiliate entities shall be considered part of Gross Gaming Receipts for purposes of calculating Agent's commission(s).

4. LIMITED SCOPE OF AGENCY: Agent only has authority to propose verbally and/or in writing Prospective Sales to third parties and, accordingly, Agent has no authority to bind PDMP, its affiliates, parent company or subsidiaries in any manner to any type of agreement or otherwise. PDMP has the right in its sole discretion to accept or reject any Prospective Sale, Sale, Gaming Sale, transaction or client proposed or introduced by Agent. PDMP also is not obligated to extend to Agent or its staff health insurance, disability, other employee benefits or its staff health insurance, life insurance, disability, other employee benefits or other perquisites customarily provided to its own employees. PDMP shall provide to Agent at PDMP's expense sufficient sales materials such as publicity materials, DVDs or tapes, marketing books, flyers and the like for use by Agent solely in connection with this Agreement. For income tax purposes, Agent shall, as PDMP deems necessary, receive an appropriate tax-related documents for its services as an Agent, and Agent shall be responsible for its own taxes associated with its performance of the services and receipts of payments pursuant to this Agreement. It is understood that Agent (and Agent's sub-agents) is under no obligation to perform, or to guarantee the performance of, any obligations of PDMP to its prospective customers or clients under any third party sales agreement. It is understood that PDMP shall bear all costs of delivery required materials to customers and end users, including, without limitation, any applicable taxes unless otherwise agreed between PDMP and the customer/end user. PDMP will reimburse Agent for its actual out-of-pocket expenses which have only been approved in writing in advance by PDMP. Agent is an independent contractor and is solely responsible for his own office and equipment costs and taxes.

5. COORDINATION OF EFFORTS:

(a) Agent shall report to PDMP upon identifying Prospective Sales or Gaming Sales on the status of prospecting, negotiations for Prospective Sales. Additionally, Agent acknowledges that PDMP has prior agreements or relationships with third parties that may effect Agent's ability to negotiate or approach certain third parties in the Territory and in such circumstances, and to avoid eventual conflicts/interpretations, PDMP shall use its commercially reasonable efforts to notify Agent about these prior agreements accordingly in a reasonable and timely manner.



(b) PDMP shall provide to Agent copies of all its agreements with customers related to Sales that involved Agent as well as of invoices to customers as and when available. Agent also shall be sent copies of: (i) PDMP's correspondence with customers that relate to Agent's services under this Agreement; and (ii) monthly reports received by PDMP related to the Sales.

(c) Following the end of the Term, PDMP shall promptly provide to Agent copies of all its agreements with customers related to Sales (including renewals and extensions) that effect Agent's Commission, as well as monthly subscriber reports and copies of invoices to customers only as such information relates to the Sales and Agent's Commission.

6. <u>PAYMENTS:</u>

(a) Any payments for Sales shall only be made payable to PDMP or its designee. PDMP shall pay Agent its Commission within fifteen (15) days of the end of the month in which the Gross Receipts or Gross Gaming Receipts giving rise to the Commission are actually received by PDMP or its designee. If any payments for Sales are received directly by Agent or its designee, the payments are deemed to be received and held in constructive trust on behalf of PDMP, and shall be immediately remitted to PDMP without any deductions whatsoever.

(b) Agent may elect to have payments due Agent under this Agreement made to another entity by signing PDMP's form 'letter of direction'.

(c) Agent is solely and exclusively responsible for any and all tax consequences resulting from the receipt of any Commission hereunder.

7. <u>DELIVERY OF PICTURES:</u> PDMP hereby warrants that it has access to and control of the exploitation for and the delivery of elements of the pictures that PDMP agrees to deliver via a written third party Sales agreement for each Picture. Delivery elements will be agreed by the parties for each Picture.

8. <u>PDMP'S WARRANTIES:</u>

a. PDMP hereby represents and warrants that it has full right to enter this Agreement, and that PDMP has all necessary rights to Pictures licensed pursuant to Sales approved in advance and in writing by PDMP. PDMP will provide Agent with copies of documents evidencing such rights upon Agent's request (PDMP's redaction of financial information permitted).

b. PDMP hereby agrees and acknowledges that Agent shall have no liability whatsoever to any of the artists or other artists or other third party performing services in connection with the Pictures or soundtrack, and Agent shall not be responsible for any of PDMP's obligations with regard to third parties; all residuals, royalties, deferments and any other payments to third parties shall remain the sole responsibility of PDMP.

c. PDMP represents and warrants that it has obtained all necessary music clearances so that the Pictures may be licensed pursuant to Sales approved in advance and in writing by PDMP.

d. PDMP has written evidence on file, as required under the Child Protection Act, for all persons appearing topless, nude or semi-nude or engaging in any sexual activity. PDMP warrants that the aforementioned performers are eighteen (18) years of age or older at the time of the production, and in accordance with the Child Act, copies of original photo identifications with proof of age are on file. Copies of these records shall be provided to third persons and entities consummating Sale requesting and requiring them to enable their compliance with record keeping requirements 18 U.S.C. 2257 and of C.F.R part 75. Agent acknowledges that PDMP shall be responsible for such clients' maintenance of their records.

9. <u>INDEMNIFICATION:</u>
PDMP shall indemnify, defend and hold Agent (including Agent's employees and subagents) harmless from all outside legal fees and costs, expenses and actual damages, including costs and damages resulting from judicial proceedings (whether from third parties or otherwise),  arising (i) from any breach of



PDMP of its warranties and representations under this Agreement; and/or (ii) from PDMP's breach of this Agreement or any other breach of any agreement between PDMP and any third party agreement related to a Sale or Gaming Sale which is the fault of PDMP (and not due to the fault of Agent) or any other wrongful conduct of PDMP, and/or (iii) from any third party claim against Agent relating to any Sales or Prospective Sales in the absence of any fault or wrongful misconduct from Agent towards the applicable third party.

Agent shall indemnify, defend and hold harmless PDMP (including PDMP's employees and representatives) from all outside legal fees and costs arising out of Agent's breach of this Agreement or other costs, expenses, damages attributable to the breach or any other wrongful conduct of Agent, its employees or its subagents.

10. CONFIDENTIAL INFORMATION:

(a) As a result of this Agreement and the parties relationship, each party will have access to "confidential information" of and about the other party (and the other party's affiliates, which shall be deemed included in references to the disclosing party for purposes of this section) and its business. Each party agrees that it will not at any time use for its own benefit, directly or indirectly divulge or communicate to any person, firm, corporation or entity, any confidential information concerning the other party and its business, which was disclosed to or acquired by the receiving party at any time during or prior to the commencement of the Term. Each party specifically agrees that all confidential information matters affecting or relating to the other party's business obtained during their relationship is deemed to be included within the terms of this paragraph and to constitute important, material and confidential trade secrets that affect the successful conduct of each party's business and its goodwill. Without limiting the forgoing, " confidential information" as used herein, means information which includes, but is not limited to, the names, buying habits or practices of any the parties' customers and clients; marketing methods and related data; the names of any vendors or supplies; costs of materials; the prices PDMP obtains or has obtained or at which it sells or has sold its products or services; manufacturing and sales costs; lists or other written records used in PDMP's business; operational, marketing and fundraising strategies; compensation paid to employees and other terms of employment, merchandising or sales techniques; contracts and licenses; business systems; computer programs; or any other confidential information of, about, or concerning the business of each party, its manner of operation, or other confidential data of any kind.

(b) Each party covenants and agrees that it will not (i) use such confidential information, memberships lists, records, or systems except in furtherance of the other party's interests and its rendering  of their requisite performance hereunder; or (ii) disclose to third persons or entities such confidential information who are not bound by confidentiality as so denoted hereunder.

(c) A party's  disclosure of confidential information as required by law shall not constitute a breach of this Agreement, provided that the disclosing party (i) promptly notifies the non-disclosing party in writing of such requirement (unless such notification violates the order of a governmental body or is otherwise prohibited by law); (ii) cooperates with non-disclosing party in efforts to obtain a protective order or other appropriate remedy to protect confidential information against unauthorized use or disclosure, at the non-disclosing party's request and expense; and required.

(d) If party's  so request to each other, each of the party's  promptly shall return to the requiring party, or destroy, or irretrievably delete, as specified by each of the party's , any and all of the requiring party's confidential information, and documents which contain such information, together with all copies, extracts, notes or summaries thereof.

(e) Any and all confidentiality obligations of  the parties shall continue for 5 years following the termination of this Agreement.

11. JACKY WAUTERS IS AGENT "KEY MAN":

(a) Agent understands and agrees that PDMP has entered into this Agreement because it will furnish the personal services of Jacky Wauters ("Wauters"), who is personally and uniquely qualified to render the



services noted hereunder on behalf of Agent. Accordingly, Agent agrees that only Wauters will provide such services to PDMP on Agent's behalf pursuant to this Agreement. Without limiting the provisions of the prior sentence Wauters may be assisted by employees of Agent and subagents engaged by Agent so long as: (i) the subagents and employees are performing only incidental services; and (ii) Wauters is solely supervising all activities of the subagents and employees and that Wauters retains approval on all decision making activities related to the employees and subagents. Agent may not assign, delegate or transfer its obligations under this Agreement without the prior written approval of PDMP. PDMP may assign or otherwise transfer this Agreement to its affiliates, subsidiaries or other successors of PDMP. Any purported assignment, transfer or delegation in violation of this provision shall be void. Should Jacky Wauters be unable to perform the services due to his death, permanent disability or other permanent incapacitation (that is medically documented), PDMP may terminate this Agreement immediately upon written notice to Agent without further liability, but for clarification purposes, the Agent's entitlement for payments shall remain as provided by Paragraph 3 hereinabove. Agent agrees to ensure that Jacky Wauters will enable Agent to comply with all intellectual property, confidentiality and other provisions of this Agreement.

(b) Notwithstanding the foregoing, Agent may utilize the services of sub-agents, subject to the following provisions and conditions: (i) Jacky Wauters remains the primary contact for third party licensees with regard to maintenance of the account; (ii) Agent is solely and exclusively responsible for any expenses or compensation related to the use of such sub-agents; (iii) Agent ensures that any and all sub-agents agree to the applicable obligations and parameters noted in the Sales Agent Agreement, including without limitation, the confidentiality and indemnification provisions; and (iv) Agent shall defend, indemnify and hold harmless PDMP from any and all claims related to any action or inaction of the sub-agents.

(c) With regard to this Agreement, the following provisions are applicable:

> (i) in the event of the disability or incapacitation of Jacky Wauters (that is medically documented), Agent's entitlement to the compensation noted herein shall remain intact pursuant to the terms and conditions of the Agreement;
> (ii) Notwithstanding (c)(i) above, in the event of the death, permanent disability or permanent incapacity of Jacky Wauters (as medically documented), PDMP's rights to terminate this Agreement shall remain in full force and effect.

12. TERMINATION:

(a) Notwithstanding the provisions of Paragraph 1, PDMP may terminate this Agreement immediately upon written notice to Agent if (i) Agent has consummated any Sale on behalf of PDMP or its affiliates without PDMP's prior consent as required by this Agreement; (ii) Agent is in uncured material breach of this Agreement; (iii) Agent has consummated any negotiations with any prospect regarding rights or territory reserved to PDMP according to Paragraph 2 (e) of this Agreement without PDMP's prior consent; or (iv) Agent has been compensated for or in connection with Sales other than as expressively provided by this Agreement (except in the case noted in paragraph 6(a)). Unless otherwise stated hereunder, the following provisions of this Agreement shall survive its expiration or termination: Paragraphs 3, 5(c), 6, 9, 10 and 13 through 16. Agent shall have the right to terminate this Agreement only in the event of: (i) an uncured material breach on the part of PDMP; and (ii) if the Channels cease to broadcast for a period of Thirty (30) consecutive days that is not due to a force majeure event. For clarification purposes, in case of termination of this Agreement either by PDMP or by Agent, Agent's entitlement for payments shall remain for the entire period of each agreement(s) made through the Agent during the Term or other payments as so specifically provided for in subparagraph 3(c) of this Agreement. Notwithstanding the foregoing, no Commissions or payments due Agent shall be payable in any manner under this Agreement following the event of the suicide of Wauters (that is medically or legally documented).

(b) With regard to the cure period for a material breach, either party may terminate this Agreement by written notice and effective on the date set forth therein only if the other party is in material breach of any obligation (i.e., "material breach") contained in this Agreement and such breach has not been cured within thirty (30) days after receipt of written notice to cure the same.



(c) A "force majeure event" shall include, without limitation, conditions or circumstances beyond PDMP's control including, but not limited to acts of God, government restriction, wars, insurrections, fire, flood, earthquake, storm, hurricane or other natural disasters, war, invasion, act of foreign enemies, acts of terrorism, hostilities regardless of whether war is declared, civil war, rebellion, revolution, insurrection, military or usurped power or confiscation, terrorist activities, nationalization, government sanction, blockage, embargo, labor dispute, strike, lockout or interruption or failure of electricity or telephone services.

13. <u>NOTICES:</u> Any notice which a party hereto is required to give or may desire to give in connection with this Agreement shall be in writing and delivered by hand and deemed given upon receipt; by an overnight delivery service recognized in the U.S. and deemed given two (2) days after due deposit therewith; or by telecopy and deemed given upon recipient's confirmation of receipt, addressed as follows (or to other coordinates a recipients party has specified in writing by giving notice thereof):

**If to Agent:**

NOA Productions
Avenue Montjoie, 84
1180 Brussels –Belgium
*Attention: Jacky Wauters*
Tel: +32.2.375.99.01
Fax: +32.2.375.12.88.

**If to PDMP:**

Penthouse Digital Media Productions Inc.
6800 Broken Sound Parkway NW, Suite 200
Boca Raton, FL 33487
*Attn: General Counsel*
Tel: (561) 912-7000
Fax (561) 912- 7038

**With a courtesy copy (which shall not constitute notice to):**

Penthouse Digital Media Productions Inc.
19749 Dearborn Street
Chatsworth, CA 91311
USA
*Attention: Legal*
Tel: (310)280-1950
Fax:(310) 280-1938

14. <u>SEVERABILITY/SAVINGS:</u> If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall have nevertheless continue in full force without being impaired or invalidated in any way. However, before severing any such illegal provision, such court may modify it to the extent necessary to render it enforceable at law or in equity.

15. <u>CHOICE OF LAW; CHOICE OF FORUM; SERVICEOF PROCESS:</u> This Agreement shall be governed by the laws of the State of New York applicable to agreements made and wholly performed therein. All claims arising under or otherwise relating to this agreement shall be brought only in the courts residing in the State of New York, New York City (and courts taking appeals wherefrom). Each party waives all objections to such venue and consent to personal jurisdiction of such courts for purposes of this Agreement. Any service of legal process in any such action or proceeding may, among other methods, be served upon Agent by delivering it or mailing it, by registered or certified mail, or by recognized international courier, addressed to it at the notice address then designated by it in Paragraph 13, and such service shall be deemed to have the same force and effect as personal service within the State of New York.

16. <u>GENERAL PROVISIONS:</u> Except as provided expressively herein, this Agreement represents the entire agreement between both parties, and no changes, alterations or deviation shall be recognized as valid unless such changes, alterations or deviations have been modified embodied in a new and superseding written agreement signed by both parties. Each party to this Agreement acknowledges that no representations, inducement, promises or agreements, oral or otherwise, with regard to the relationship between the parties have been made by any party, or anyone acting on behalf or any party, which are not embodied herein and that no other agreement, statement or promise regarding performance of services not contained in this Agreement shall be valid or binding regarding the subject matter of this Agreement. This Agreement cannot be amended other than by a written instrument executed by both parties. This



Agreement may be executed via facsimile and in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Failure by either party to insist on performance by the other of any term or obligation of this Agreement shall not be construed as a waiver of that party's right to demand such performance at a later time. Captions and headings in this Agreement are for convenience and do not alter the terms of this Agreement in any way.

IN WITNESS WHEREOF, each party has executed this Agreement via a duly authorized representative intending to be bound legally thereby.

NOA Productions, SPRL                          PENTHOUSE DIGITAL MEDIA PRODUCTIONS INC.

By: Jacky Wauters                              By: Anthony Previte
Its: Managing Director                         Its:

**EXHIBIT "A"**
**EXCEPTED PARTIES**

Any Gay, Lesbian, Transsexual, Transgender and/or mixed genres (ie Gay with Hetero) of any such related adult or lifestyle content (linear and non-linear and other exploitation forms).

# EXHIBIT "B"

# EXHIBIT "B"

| | EUR | USD | NOA 25% EUR | NOA 25% USD |
|---|---|---|---|---|
| **January 2018** | | | | |
| Cash Receptions from identified carriages on account # EWB-0448 | 18,246.74 € | | 4,561.69 € | |
| Cash Receptions from un-identified carriages on account # EWB-3852 | 257,873.22 € | | 64,468.31 € | |
| Cash Receptions from identified carriages on account # EWB-3852 | 119,513.51 € | | 29,878.38 € | |
| | | | | |
| **February 2018** | | | | |
| Cash Receptions from identified carriages on account # EWB-0448 | 104,803.22 € | | 26,200.81 € | |
| Cash Receptions from un-identified carriages on account # EWB-3852 | | $ 20,896.38 | | $ 5,224.10 |
| Cash Receptions from identified carriages on account # EWB-3852 | | $ 142,110.37 | | $ 35,527.59 |
| | | | | |
| **March 2018** | | | | |
| Cash Receptions from identified carriages on account # EWB-0448 | 129,417.60 € | $ 14,278.40 | 32,354.40 € | $ 3,569.60 |
| Cash Receptions from un-identified carriages on account # EWB-3852 | | $ 215,543.59 | | $ 53,885.90 |
| | | | | |
| | | | | |
| | | | | |
| **April 2018** | | | | |
| Cash Receptions from identified carriages on account # EWB-0448 | 116,892.71 € | | 29,223.18 € | |
| Cash Receptions from un-identified carriages on account # EWB-3852 | 161,530.39 € | | 40,382.60 € | |
| Cash Receptions from identified carriages on account # EWB-3852 | 55,541.08 € | | 13,885.27 € | |
| | | | | |
| | | | | |
| **May 2018** | | | | |
| Cash Receptions from identified carriages on account # EWB-0448 | 208,138.33 € | | 52,034.58 € | |
| Cash Receptions from un-identified carriages on account # EWB-3852 | | $ 291,447.78 | | $ 72,861.95 |
| Cash Receptions from identified carriages on account # EWB-3852 | | $ 26,729.02 | | $ 6,682.26 |
| | | | | |
| | | | | |
| **June 2018 : No info recived** | | | | |
| Cash Receptions from identified carriages on account # EWB-0448 | 79,970.08 € | | 19,992.52 € | |

| | | | | |
|---|---|---|---|---|
| Cash Receptions from un-identified carriages on account # EWB-3852 | | $ 127,238.85 | | $ 31,809.71 |
| Cash Receptions from identified carriages on account # EWB-3852 | | $ 41,117.57 | | $ 10,279.39 |
| | | | | |
| | | | | |
| **July 2018** | | | | |
| Cash Receptions from identified carriages on account # EWB-0448 | 93,356.34 € | | 23,339.09 € | |
| Cash Receptions from un-identified carriages on account # EWB-3852 | | $ 117,551.81 | | $ 29,387.95 |
| Cash Receptions from identified carriages on account # EWB-3852 | | $ 11,066.58 | | $ 2,766.65 |
| | | | | |
| | | | | |
| **August 2018** | | | | |
| Cash Receptions from identified carriages on account # EWB-0448 | 51,857.82 € | | 12,964.46 € | |
| Cash Receptions from un-identified carriages on account # EWB-3852 | | $ 74,949.47 | | $ 18,737.49 |
| Cash Receptions from identified carriages on account # EWB-3852 | | $ 10,846.86 | | $ 2,711.72 |
| | | | | |
| | | | | |
| | | | | |
| Total of Un-identified Carriages Revenues FX-FCDDA | 419,403.61 € | $ 847,627.88 | 104,850.90 € | $ 211,906.97 |
| Totals of Cash Receptions of Identified Carriages on Accounts EWB-0448 and EWB-3852 | 977,737.43 € | $ 246,148.80 | 244,434.36 € | $ 61,537.20 |
| **Grand Totals identified + non-identified carriages** | **1,397,141.04 €** | **$ 1,093,776.68** | **349,285.26 €** | **$ 273,444.17** |

# EXHIBIT "C"

# EXHIBIT "C"

**Contracts PENTHOUSE / NOA PRODUCTIONS**

| Question 2 | | Contracts closed by NOA PRODUCTIONS | | | |
|---|---|---|---|---|---|
| Name | Country | Business terms | Terms | Automatic renewal | New Terms and Business terms |
| BELGACOM/SKYNET | Belgium | 0,90€/sub/month + 30% for TVOD | 2 year | 1 year periods | same business terms |
| NUMERICABLE/CODITEL | Belgium/Luxembourg | 0,050€/sub/month | 3 year | 1 year periods | 0,053€/sub/month |
| TELENET | Belgium | 200K€ Y1, 225K€ Y2, 225K€ Y3 | 3 year | No | 1 year, 225K€/year |
| BULSATCOM | Bulgaria | 72 K€ Y1, 78K€ Y2, 84K€ Y3, 90K€ Y4 | 4 Year | 3 year periods | 90K€/year |
| BLIZOO | Bulgaria | 12K€/year | 3 Year | No, deal terminated in January 2017 | / |
| ELECTRA | Croatia | 40K€ Y1, 50K€ Y2, 60K€ Y3 | 3 Year | No | 3 year, 30K€/year |
| PRIMETEL | Cyprus | Rev-Share: 65%(PENTHOUSE) - 35% (PRIMETEL) | 3 Year | No (we never got paid by this platform), deal terminated in August 2013 | / |
| ELION | Estonia | 75K€ Y1, 80K€ Y2, 100K€ Y3 | 3 year | No | 3 year, 50K€/year |
| BOUYGUES TELECOM | France | 270K€ Y1, 290K€ Y2, 345K€ Y3 | 3 Year | No | 3 year, 180K€ Y1, 200K€ Y2, 220K€ Y3 |
| ORANGE | France | 50% Rev-Share / VOD: 3K€/title | 3 Year | No | 3 year, 144K€/year |
| CANAL + | France | 250K€/year | 3 Year | No | 3 year, 250K€/year |
| CANAL OVERSEAS | France | 250K€/year | 3 Year | No | 3 year, 300K€ Y1, 315K€ Y2, 330K€ Y3 |
| SFR | France | 350K€ Y1, 400K€ Y2 (VOD: 2.500€/title) | 2 year | No, deal terminated in 2014 | / |
| FREE | France | 500K€/year | 3 Year | No | 3 year, 250K€/year |
| NUMERICABLE | France | 2,50€/sub/month + 50/50 RevShare for VOD | 3 Year | 1 year periods | same business terms |
| LOCATEL | France | Hard SD movie: 1.5K€/title, Soft SD title: 1K€/title | 5 year | No, deal terminated in June 2014 | / |
| DTAG | Germany | 0,12€/sub/month for SD - 0,25€/sub/month for HD | 3 year | 1 year periods | same business terms |
| KABEL DEUTSCHLAND | Germany | VOD: 40% for HD, 30% for SD and 50% 3D | 3 year | 1 year periods | same business terms |
| UNTYMEDIA | Germany | 320K€/year | 3 year | 1 year periods | 0.065€/sub/month (SD+HD) |
| OTE | Greece | 0,70€/sub/month | 3 Year | 1 year periods | 0,20€/sub/month |
| PR TELECOM | Hungary | 3 different cps/packs: 0,05€-0,07€-0,30€/sub/month | 3 year | Yes, but deal terminated in December 2014 | / |
| HOT | Israel | 30% Rev Share for SD and 40% Rev Share for HD | 2 Year | No | 2 year, same business terms |
| SKY ITALIA | Italy | 10% rev share pour la chaîne, 10% pour la VOD | 3 year | No | 1 year, same business terms |
| TANGO | Luxembourg | 0,90€/sub/month | 3 year | 1 year periods | same business terms |
| BLIZOO | Macedonia | 2,5K€ Y1, 3.6K€ Y2, 6K€ Y3 | 3 year | No | 3 year, 4.8K€ Y1, 6K€ Y2, 7.2K€ Y3 |
| MONACO TELECOM | Monaco | Rev-Share: 60% (PENTHOUSE) - 40% (MONACO TELECO | 3 year | 3 year periods | Rev-Share: 55% (PENTHOUSE) - 45% (MONACO TELECOM) |
| CAIW | Netherlands | 0,175€/sub/month | 2 Year | No | 2 year, 0,055€/sub/month |
| VODAFONE NETHERLANDS | Netherlands | HD: 50% Rev-Share - SD: 35% Rev-Share | 3 year | No | 2 year, same business terms |
| KPN | Netherlands | 0,475€/sub/month for SD, 0,725€/sub/month for HD | 2 year | No, deal terminated in July 2015 | / |

| ZIGGO | Netherlands | 300K€/year | 3 year | No | 2 year, 100K€/year |
|---|---|---|---|---|---|
| VIASAT | Nordics | 510K€/year (channels) VOD: 2K€/soft movie, 2,5K€/hard mo | 4 Year | No, deal terminated in March 2016 | / |
| NORWEGIAN | Norway | 21.600$/year (24 titles) | 1 year | No, deal terminated in 2015 | / |
| ROMTELECOM/TELEKOM ROMANIA | Romania | 0,08€/sub/month | 2 year | No (deal terminated in 2015 / Restart in 2017) | 2 year, 0,03€sub/month / VOD: 50/50 |
| SKYLINK/M7 | CZ/Slovakia | 125K€ Y1, 150K€ Y3, 175K€ Y3 | 3 year | No | 2 year, 100K€/year |
| DIGITURK | Turkey | 225,350K€ Y1, 171,925K€ Y2, 175K€ Y3 - VOD: 25K€ Y1, | 3 year | No, deal terminated in January 2017 (political reasons) | / |
| DSMART | Turkey | 350K€ Y1, 400K€ Y2, 400K€ Y3 | 3 year | No | 3 year, 500K€/year |

| In re: PENTHOUSE GLOBAL MEDIA, INC. | CHAPTER: 7 |
|---|---|
| Debtor(s). | CASE NUMBER: 1:18-bk-10098-MB |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 3435 Wilshire Blvd., Ste. 990, Los Angeles, CA 90010.

A true and correct copy of the foregoing document entitled (specify): ***Request for Allowance of Administrative Claim*** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (date) ***October 19, 2018***, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Keith Patrick Banner    kbanner@greenbergglusker.com, sharper@greenbergglusker.com
Ron Bender    rb@lnbyb.com
Stephen F Biegenzahn    efile@sfblaw.com
Paul M Brent    snb300@aol.com
Linda F Cantor    lcantor@pszjlaw.com, lcantor@pszjlaw.com
Carol Chow    carol.chow@ffslaw.com
Russell Clementson    russell.clementson@usdoj.gov
Joseph Corrigan    Bankruptcy2@ironmountain.com
Brian L Davidoff    bdavidoff@greenbergglusker.com, calendar@greenbergglusker.com; jking@greenbergglusker.com

☑ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (date) ***October 19, 2018***, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Penthouse Global Media, Inc.
8944 Mason Ave.
Chatsworth, CA 91311

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (date) ***October 19, 2018***, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

United States Bankruptcy Court
Central District of California Honorable Martin R. Barash
21041 Burbank Boulevard, Suite 342 / Courtroom 303
Woodland Hills, CA 91367

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| _October 19, 2018_ | Danielle M. Landeros | _/s/ Danielle M. Landeros_ |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                    **F 9013-3.1.PROOF.SERVICE**

| In re: PENTHOUSE GLOBAL MEDIA, INC. | CHAPTER: 7 |
|---|---|
| Debtor(s). | CASE NUMBER: 1:18-bk-10098-MB |

James A Dumas    jdumas@dumas-law.com, jdumas@ecf.inforuptcy.com
Jeffrey K Garfinkle    jgarfinkle@buchalter.com, docket@buchalter.com; dcyrankowski@buchalter.com
Allan B Gelbard    xxxesq@aol.com, Allan@GelbardLaw.com
David Keith Gottlieb (TR)    dkgtrustee@dkgallc.com,
dgottlieb@iq7technology.com,rjohnson@dkgallc.com,akuras@dkgallc.com
Mirco J Haag    mhaag@buchalter.com, dcyrankowski@buchalter.com; docket@buchalter.com
Mark S Horoupian    mhoroupian@sulmeyerlaw.com, ppenn@sulmeyerlaw.com; mhoroupian@ecf.inforuptcy.com;
ppenn@ecf.inforuptcy.com
Jeffrey L Kandel    jkandel@pszjlaw.com
John P Kreis    jkreis@kreislaw.com, j.kreis@ca.rr.com
Andrew B Levin    alevin@wcghlaw.com, Meir@virtualparalegalservices.com; pj@wcghlaw.com;
jmartinez@wcghlaw.com
Peter W Lianides    plianides@wcghlaw.com, pj@wcghlaw.com; jmartinez@wcghlaw.com;
Meir@virtualparalegalservices.com
David W. Meadows    david@davidwmeadowslaw.com
Krikor J Meshefejian    kjm@lnbrb.com
Alan I Nahmias    anahmias@mbnlawyers.com, jdale@mbnlawyers.com
Iain A W Nasatir    inasatir@pszjlaw.com, jwashington@pszjlaw.com
Hamid R Rafatjoo    hrafatjoo@raineslaw.com, bclark@raineslaw.com; cwilliams@raineslaw.com
S Margaux Ross    margaux.ross@usdoj.gov
Michael St James    ecf@stjames-law.com
Howard Steinberg    steinbergh@gtlaw.com, pearsallt@gtlaw.com; laik@gtlaw.com
Cathy Ta    cathy.ta@bbklaw.com, paul.nordlund@bbklaw.com; sansanee.wells@bbklaw.com
United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov
Michael H Weiss    mw@weissandspees.com, lm@weissandspees.com
Michael H Weiss    lm@weissandspees.com, lm@weissandspees.com
Marc J Winthrop    mwinthrop@wcghlaw.com, pj@wcghlaw.com; jmartinez@wcghlaw.com
Christopher K.S. Wong    christopher.wong@arentfox.com
Beth Ann R Young    bry@lnbyb.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                              F 9013-3.1.PROOF.SERVICE